IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) ) | C.A. No. 20-755 (RGA) |
| v. | ) ) | |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) ) | |
| Defendant. | ) | |

## <u>JOINT CLAIM CONSTRUCTION BRIEF</u>

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com

*Attorneys for Plaintiff United Therapeutics Corporation*

OF COUNSEL:

Art Dykhuis
WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real
San Diego, CA  92130
(858) 305-2300

Adam W. Burrowbridge
WILSON SONSINI GOODRICH & ROSATI
1700 K Street NW, Fifth Floor
Washington, DC  20006
(202) 973-8800

William C. Jackson
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW

SHAW KELLER LLP
Karen E. Keller (#4489)
Jeff Castellano (#4837)
Nathan R. Hoeschen (#6232)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302)298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Defendant Liquidia Technologies, Inc.*

OF COUNSEL:

Sanya Sukduang
Jonathan Davies
Douglas W. Cheek
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202)842-7800

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212)479-6000

Washington, DC  20005
(202) 237-2727

Bill Ward
BOIES SCHILLER FLEXNER LLP
725 S Figueroa Street, 31st Floor
Los Angeles, CA 90017
(213) 995-5745

Douglas Carsten
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA  92615
(949) 851-0633


April 30, 2021

Deepa Kannappan
Lauren Krickl
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650)843-5000

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703)546-8000

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    NATURE AND STAGE OF PROCEEDINGS ............................................................... 1

    A.    Plaintiff's Opening Position.................................................................................... 1

II.    INTRODUCTION ...................................................................................................... 1

    A.    Plaintiff's Opening Position.................................................................................... 1

    B.    Defendant's Answering Position ............................................................................ 2

III.    BACKGROUND OF TECHNOLOGY ...................................................................... 3

    A.    Plaintiff's Opening Position.................................................................................... 3

    B.    Defendant's Answering Position ............................................................................ 4

IV.    PERSON OF ORDINARY SKILL IN THE ART .................................................... 6

    A.    Plaintiff's Opening Position.................................................................................... 6

    B.    Defendant's Answering Position ............................................................................ 6

V.    DISPUTED CLAIM TERMS .................................................................................... 7

    A.    Term 1: "a process" ............................................................................................... 7

        Representative claim – '066 patent, claim 1 .......................................................... 7

        i.    Plaintiff's Opening Position.................................................................... 8

            1.    "a process" should be given its plain ordinary meaning................. 8

            2.    Liquidia's construction improperly imports limitations ................. 8

        ii.    Defendant's Answering Position ............................................................ 11

        iii.    Plaintiff's Reply Position ....................................................................... 16

        iv.    Defendant's Sur-Reply Position ............................................................ 21

    B.    Term 2: "ambient temperature" .......................................................................... 24

        Representative claim – '066 patent, claim 8 ........................................................ 24

        i.    Plaintiff's Opening Position.................................................................. 24

1. "ambient temperature" should be given its plain and ordinary meaning ............................................... 24

ii. Defendant's Answering Position ...................................... 25

iii. Plaintiff's Reply Position ............................................... 30

iv. Defendant's Sur-Reply Position ...................................... 32

C. Term 3: "stored" / "storing" / "storage" ................................... 33

Representative claim – '066 patent, claim 8 ............................. 34

i. Plaintiff's Opening Position ........................................... 34

1. UTC's construction of "stored" / "storing" / "storage" is supported by the intrinsic evidence ............................... 34

ii. Defendant's Answering Position ...................................... 36

iii. Plaintiff's Reply Position ............................................... 40

iv. Defendant's Sur-Reply Position ...................................... 42

D. Term 4: "pharmaceutical batch" ............................................. 44

Representative claim – '901 patent, claim 1 ............................. 44

i. Plaintiff's Opening Position ........................................... 44

1. UTC's construction for "pharmaceutical batch" should be adopted by the Court ............................... 44

ii. Defendant's Answering Position ...................................... 47

iii. Plaintiff's Reply Position ............................................... 51

iv. Defendant's Sur-Reply Position ...................................... 54

E. Term 5: "contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil" ................................... 56

Representative claim – '901 patent, claim 1 ............................. 56

i. Plaintiff's Opening Position ........................................... 56

1. Plain and ordinary meaning is appropriate ................... 56

ii. Defendant's Answering Position ...................................... 57

iv

iii.    Plaintiff's Reply Position ........................................................................ 61

iv.    Defendant's Sur-Reply Position .............................................................. 64

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
  No. 16-453-RGA, 2017 WL 6508715 (D. Del. Dec. 20, 2017)................................................58

*ActiveVideo Networks, Inc. v. Verizon Commc'ns*,
  694 F.3d 1312 (Fed. Cir. 2012)..........................................................................................11

*Aylus Networks, Inc. v. Apple Inc.*
  856 F.3d 1353 (Fed. Cir. 2017)................................................................................... *passim*

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
  618 F.3d 1354 (Fed. Cir. 2010)..........................................................................................21

*Biagro W. Sales, Inc. v. Grow More, Inc.*,
  423 F.3d 1296 (Fed. Cir. 2005)............................................................................................8

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
  713 F.3d 1090 (Fed. Cir. 2013)..........................................................................................63

*Biovail Corp. Int'l v. Andrx Pharms., Inc.*,
  239 F.3d 1297 (Fed. Cir. 2001)....................................................................................28, 37

*Cont'l Circuits LLC v. Intel Corp.*,
  915 F.3d 788 (Fed. Cir. 2019)......................................................................................21, 63

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
  849 F.2d 1430 (Fed. Cir. 1988)..........................................................................................10

*E.I. du Pont de Nemours & Co. v. Unifrax I LLC*,
  No. 14-1250-RGA, 2016 WL 158031 (D. Del. Jan. 13, 2016), *aff'd*, 921 F.3d
  1060 (Fed. Cir. 2019)........................................................................................................28

*Ekchian v. Home Depot, Inc.*,
  104 F.3d 1299 (Fed. Cir. 1997)..........................................................................................60

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010)..........................................................................................11

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
  750 F.3d 1304 (Fed. Cir. 2014)..........................................................................................19

*Infinity Comput. Prods., Inc. v. Oki Data Ams., Inc.*,
  987 F.3d 1053, 2021 WL 476067 (Fed. Cir. Feb. 10, 2021) ............................................28, 37

*Infinity Comput. Prods., Inc. v. Oki Data Ams., Inc.*,
　No. 18-463-LPS, 2019 WL 2422597 (D. Del. June 10, 2019), *aff'd*, 2021 WL
　476067 (Fed. Cir. Feb. 10, 2021)...........................................................................38

*Input/Output, Inc. v. Sercel, Inc.*,
　No. 5:06-CV-236, 2008 WL 5427982 (E.D. Tex. Apr. 28, 2008)..........................................25

*Intel Corp. v. VIA Techs., Inc.*,
　319 F.3d 1357 (Fed. Cir. 2003)..........................................................................35

*Jazz Pharms., Inc. v. Roxane Labs., Inc.*,
　No. 10-6108 (ES), 2012 WL 4103880 (D.N.J. Sept. 14, 2012)............................................10

*Moleculon Research Corp. v. CBS, Inc.*,
　793 F.2d 1261 (Fed. Cir. 1986)..........................................................................52

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
　572 U.S. 898 (2014)................................................................................35, 37

*Norian Corp. v. Stryker Corp.*,
　363 F.3d 1321 (Fed. Cir. 2004)......................................................................52, 56

*Omega Eng'g, Inc. v. Raytek Corp.*,
　334 F.3d 1314 (Fed. Cir. 2003)......................................................................15, 23

*Orthopaedic Hosp. v. DJO Global, Inc.*,
　No. 19-CV-970 JLS (WVG), 2020 WL 3498167 (S.D. Cal. June 29, 2020) ...................57, 64

*OSRAM GmbH v. Int'l Trade Comm'n*,
　505 F.3d 1351 (Fed. Cir. 2007)..........................................................................51

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
　952 F.3d 1336 (Fed. Cir. 2020)..........................................................................22

*Phillips v. AWH Corp.*,
　415 F.3d 1303 (Fed. Cir. 2005)................................................................... *passim*

*Rosco, Inc. v. Velvac Inc.*,
　No. 11-117-LPS, 2012 WL 6028239 (D. Del. Dec. 4, 2012) ..............................................25

*Sanofi-Aventis U.S. LLC. v. Sandoz, Inc.*,
　No. 07–2762 (JAP), 2010 WL 1049877 (D.N.J. Mar. 18, 2010) ...............................11, 16, 46

*Schering Corp. v. Mylan Pharms., Inc.*,
　No. 09–6383 (JLL), 2011 WL 2446563 (D.N.J. June 15, 2011)...........................................10

*SciMed Life Sys. v. Advanced Cardiovascular Sys.*,
　242 F.3d 1337 (Fed. Cir. 2001)...........................................................................2

*Shire Dev., LLC v. Watson Pharm., Inc.*,
  787 F.3d 1359 (Fed. Cir. 2015)........................................................................22

*Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l., LLC*,
  No. 3:18-cv-01188-WHO, 2020 WL 3187950 (N.D. Cal. June 15, 2020)...............9

*SIPCO, LLC V. Abb, Inc.*,
  No. 6:11–CV–0048 LED–JDL, 2012 WL 3112302 (E.D. Tex. July 30, 2012) ...............10, 46

*Smith & Nephew, Inc. v. Ethicon, Inc.*,
  276 F.3d 1304 (Fed. Cir. 2001).......................................................................52

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995).........................................................................22

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
  775 F.2d 1107 (Fed. Cir. 1985) (en banc).........................................................39

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
  731 F.3d 1271 (Fed. Cir. 2013).................................................................22, 38

*Therasense, Inc. v. Dickinson & Co.*,
  593 F.3d 1325 (Fed. Cir. 2010).......................................................................66

*Thorner v. Sony Comput. Entm't Am., LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)..................................................................16, 30

*United Therapeutics Corp. v. SteadyMed Ltd.*,
  702 F. App'x 990 (Fed. Cir. 2017) ................................................................5, 50

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007).......................................................................23

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)..........................................................................9

*Vivid Techs., Inc. v. Am. Sci. & Eng'g., Inc.*,
  200 F.3d 795 (Fed. Cir. 1999).......................................................................9, 52

**Rules and Statutes**

21 C.F.R. 210.3(b)(2)....................................................................................45

21 C.F.R. § 210.3 ...................................................................................49, 55

§ 505(b)(2) of the Federal Food, Drug and Cosmetic Act ...........................................1

## TABLES OF EXHIBITS

All Exhibits are attached to the Joint Appendix, filed concurrently.

### Joint Exhibits

| Ex. | Description |
|---|---|
| 1 | U.S. Patent No. 9,593,066 (UTC_LIQ00000001-12) |
| 2 | U.S. Patent No. 9,604,901 (UTC_LIQ00003447-58) |

### Plaintiff's Exhibits

| Ex. | Description |
|---|---|
| P1 | *Liquidia Technologies, Inc. v United Therapeutics Corp.*, IPR2020-00769, Paper No. 1 (UTC_LIQ00049402-49480) |
| P2 | *Liquidia Technologies, Inc. v United Therapeutics Corp.*, IPR2020-00770, Paper No. 1 (UTC_LIQ00059721-59802) |
| P3 | *Liquidia Technologies, Inc. v United Therapeutics Corp.*, IPR2020-00769, Paper No. 7 (UTC_LIQ00049380-49396) |
| P4 | Declaration of Robert R. Ruffolo, Ph.D. ("Ruffolo Decl.") |
| P5 | Supplemental Declaration of Robert R. Ruffolo, Ph.D. ("Supp. Ruffolo") |
| P6 | Declaration of Jeffrey D. Winkler, Ph.D. In Support of Petition for *Inter Partes* Review of U.S. Patent No. 9,604,901 (UTC_LIQ00049708 – UTC_LIQ00049791) |

### Defendant's Exhibits

| Ex. | Description |
|---|---|
| D1 | U.S. Patent No. 9,156,786 (UTC_LIQ00083983-93) |
| D2 | U.S. Patent No. 4,306,075 (UTC_LIQ00083611-64) |
| D3 | U.S. Patent No. 6,809,223 (LIQ00084714-23) |
| D4 | *Liquidia Technologies, Inc. v United Therapeutics Corp.*, IPR2020-00769, Paper No. 6 (LIQ00083807-83). |
| D5 | *Liquidia Technologies, Inc. v United Therapeutics Corp.*, IPR2020-00770, Paper No. 6 (LIQ00083725-806). |
| D6 | *Liquidia Technologies, Inc. v United Therapeutics Corp.*, IPR2020-00770, Paper No. 9 (LIQ00083884-99) |
| D7 | *Liquidia Technologies, Inc. v United Therapeutics Corp.*, IPR2020-00770, Paper No. 12 (LIQ00084488-571). |

| | |
|---|---|
| D8 | Declaration of Rodolfo Pinal, Ph.D. In Support of Patent Owner's Response (Paper No. 12) in *Inter Partes* Review of U.S. Patent No. 9,604,901 (LIQ00084572-713) |
| D9 | Deposition Testimony of Rodolfo Pinal, Ph.D. in *Inter Partes* Review of U.S. Patent No. 9,604,901 (LIQ00084724-90). |
| D10 | *SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Paper No. 32 (UTC_LIQ00001170-226) |
| D11 | *SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Paper No. 82 (UTC_LIQ00040890-980) |
| D12 | August 24, 2016 Amendment and Request for Reconsideration for U.S. Patent Application No. 14/849,981 (UTC_LIQ00003127-33) |
| D13 | November 30, 2016 Final Office Action for U.S. Patent Application No. 14/849,981 (UTC_LIQ00003141-47) |
| D14 | January 26, 2015 Reply Under 37 C.F.R. § 1.111 for U.S. Patent Application No. 13/933,623 (LIQ00084196-203) |
| D15 | March 19, 2015 Final Office Action for U.S. Patent Application No. 13/933,623 (LIQ00084170-77) |
| D16 | August 11, 2015 Reply Under 37 C.F.R. § 1.116 for U.S. Patent Application No. 13/933,623 (LIQ00084187-95) |
| D17 | August 4, 2015 Declaration Under 37 C.F.R. § 1.132 of Dr. Liang Guo for U.S. Patent Application No. 13/933,623 (LIQ00083900-34). |
| D18 | August 11, 2016 Amendment & Request for Reconsideration for U.S. Patent Application No. 14/754,932 (LIQ00006759-65) |
| D19 | October 19, 2016 Final Office Action for U.S. Patent Application No. 14/754,932 (UTC_LIQ0006774-79) |
| D20 | Robert Moriarty et al., *The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)*, 69 J. ORG. CHEM. 1890 (2004) (UTC_LIQ00041294-306) |
| D21 | PCT International Publication No. WO 2005/007081, which was filed May 24, 2004 (LIQ00083489-610) |
| D22 | *Storage*, HAWLEY'S CONDENSED CHEMICAL DICTIONARY (15th ed. 2007) (LIQ00084791-93) |
| D23 | *Organic Chemistry*, AMERICAN CHEMICAL SOCIETY (last visited Feb. 25, 2021), *available at* https://www.acs.org/content/acs/en/careers/college-to-career/areas-of-chemistry/organic-chemistry.html (LIQ00084794-800) |
| D24 | *Liquidia Submits New Drug Application for LIQ861 (treprostinil) inhalation powder to U.S. Food and Drug Administratoin for the Treatment of Pulmonary Arterial Hypertension (PAH)*, LIQUIDIA CORPORATION (Jan. 27, |

| | |
|---|---|
| | 202) (last visited Mar. 2, 2021), *available at* https://investors.liquidia.com/news-releases/news-release-details/liquidia-submits-new-drug-application-liq861-treprostinil (LIQ00084801-03) |
| D25 | *Preservation, Packaging, Storage, and Labeling*, U.S. PHARMACOPEIA (2006) (LIQ00084804-18) |
| D26 | *Liquidia Technologies, Inc. v United Therapeutics Corp.*, IPR2020-00770, Paper No. 14 (LIQ00084819-28) |
| D27 | U.S. Patent No. 8,497,393 (LIQ00084829-44) |
| D28 | Hernander, *Regulatory Definitions for "Ambient", "Room Temperature" and "Cold Chain"*, PHARMA PATHWAY (Apr. 7, 2017) (Mar. 5, 2021), *available at* https://pharmapathway.com/regulatory-definitions-ambient-room-temperature-cold-chain/ (LIQ00084845-47) |
| D29 | *United Therapeutics Corp. v. Liquidia Technologies, Inc.*, C.A. No. 20-755-RGA, Plaintiff's Objections and Responses to Defendant's First Set of Interrogatories (Nos. 1-7) (D. Del. Dec. 17, 2020) |
| D30 | *United Therapeutics Corp. v. Liquidia Technologies, Inc.*, C.A. No. 20-755-RGA, Transcript from the April 15, 2021 Deposition of Robert R. Ruffolo, Ph.D. |
| D31 | Declaration of Rodolfo Pinal, Ph.D. in support of Patent Owner's Preliminary Response (Paper No. 6) in *Inter Partes* Review of U.S. Patent No. 9,593,066 (LIQ00084204-345) |
| D32 | Ruffolo R.R., Kurz K., and Paget C.J., "Evaluation of a Novel Antihypertensive Agent, LY127210, in Anesthetized and Conscious Spontaneously Hypertensive Rats," 232 J. Pharmacology and Experimental Therapeutics, 134, 135 (1985) |
| D33 | *Liquidia Technologies, Inc. v United Therapeutics Corp.*, IPR2020-00770, Paper No. 25 (IPR2020-00770) |

## I.     NATURE AND STAGE OF PROCEEDINGS

### A.     Plaintiff's Opening Position

This action arises out of Liquidia Therapeutics Corporation's ("Defendant" or "Liquidia") submission of New Drug Application No. 213005 under § 505(b)(2) of the Federal Food, Drug and Cosmetic Act to the United States Food and Drug Administration ("FDA") seeking approval, prior to the expiration of U.S. Patent No. 9,593,066 ("the '066 patent") and U.S. Patent No. 9,604,901 ("the '901 patent"), to manufacture, market, and sell a version of UTC's TYVASO® (treprostinil) Inhalation Solution that is approved by FDA for treatment of pulmonary arterial hypertension.

## II.    INTRODUCTION

### A.     Plaintiff's Opening Position

United Therapeutics Corporation's ("Plaintiff" or "UTC") proposed claim constructions align with the claims, patent specifications, and prosecution histories as would be understood by a person of ordinary skill in the art ("POSA") as of the filing date.  Specifically, UTC's proposed construction of the "stored" / "storing" / "storage" terms reflect a POSA's understanding that these terms require stability of the material being stored.  The Patent Trial Appeal Board has adopted this construction in a pending *inter partes* review initiated by Liquidia.  UTC's proposed construction of the "pharmaceutical batch" term accounts for how a POSA would have recognized that the commercial manufacturing process described and claimed in the '901 patent significantly differed from the drug development process described in the prior art as described in the '901 patent.  The other terms at issue, which are proposed for construction by Liquidia, would have been understood by a POSA to have their plain and ordinary meaning.

Liquidia's proposed claim constructions are naked attempts to manufacture non-infringement defenses where the plain language of the claims offers no such defense.  Liquidia

1

repeatedly asks this Court to commit the "cardinal sin[]" of claim construction by importing additional limitations into the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005) (quoting *SciMed Life Sys. v. Advanced Cardiovascular Sys.,* 242 F.3d 1337, 1340 (Fed. Cir. 2001)).  For example, Liquidia asks this Court to construe "a process" to expressly exclude certain specific steps despite Liquidia offering in the parallel IPR a construction—one that Liquidia argued was the "the same construction[] that would be appropriate in district court litigation"—that *includes* these same steps.  Likewise, Liquidia proposes an unnecessary, limiting construction for the term "ambient temperature," which is contrary to the plain and ordinary meaning of this term.  The Court should decline Liquidia's invitation to read limitations into the claims and should adopt UTC's constructions.

## B.      Defendant's Answering Position

Liquidia filed an NDA seeking FDA approval to market LIQ861, its novel powder formulation of treprostinil for the treatment of pulmonary arterial hypertension.  Ex. D24.  Although UTC asserted three patents, only two, the '066 and '901 patents, form the basis of the 30-month stay.  Liquidia provided UTC with documentary evidence establishing non-infringement of the asserted claims of the '066 and '901 patents.  To justify maintaining its infringement allegations, UTC now seeks to broaden constructions of the disputed phrases despite expressly limiting the scope of these same phrases during prosecution and before the PTAB.[1]  To do this, UTC is forced to rely on extrinsic evidence, including its declaration from Dr. Ruffolo, because it lacks intrinsic evidence support.  In contrast, Liquidia's proposed

---

[1] Liquidia pursued IPR proceedings for both the '066 and '901 patents—the "'066 IPR" and "'901 IPR," respectively.

constructions are fully supported by the intrinsic evidence and in-line with UTC's

contemporaneous statements regarding the scope of the asserted claims.

III.     **BACKGROUND OF TECHNOLOGY**

A.     **Plaintiff's Opening Position**

The '066 and '901 patents are related to the large-scale, commercial manufacturing of

pharmaceutical compositions and pharmaceutical products of a compound known as

treprostinil, with specific limitations regarding stability, storage, and purity.  The '066 and '901

patents share the same specification and priority date – December 17, 2007.  Treprostinil is a

prostacyclin derivative, which is part of a class of "useful pharmaceutical compounds

possessing activities such as platelet aggregation inhibition, gastric secretion reduction, lesion

inhibition, and bronchodilation."  Ex. 1 ('066 patent) at col. 1:23-26 (D.I. 52-2 at 5).  "Because

Treprostinil, and other prostacyclin derivatives are of great importance from a medicinal point

of view, a need exists for an efficient process to synthesize these compounds on a large scale

suitable for commercial production."  *Id.* at 1:66-2:3.

The '066 and '901 patents improve upon the existing processes for synthesizing

treprostinil, describing for the first time a large-scale, commercial manufacturing process that

produces batches of treprostinil or salts thereof with improved synthetic and manufacturing

efficiencies, and at higher multikilogram levels of production to satisfy increasing commercial

and medical demands for the drug, with a higher level of purity.  *See*, *e.g.*, *id.* at 5:57-6:3, 17:27-

29, Example 6 (D.I. 52-2 at 7, 12-13).  In addition to being "more economical, safer, faster,

greener, easier to operate, and provid[ing] higher purity," the inventions allow the "crude

treprostinil salts [to] be stored as raw material at ambient temperature," which thereafter may be

converted to a final treprostinil API through acidification with dilute hydrochloric acid.  *Id.* at

6:1-3, 17:29-40 (D.I. 52-2 at 7, 13).

The next-generation manufacturing process described in the '066 and '901 patents is able

to increase production efficiencies while delivering larger multikilogram quantities of an ultra-

pure treprostinil active pharmaceutical ingredient ("API").  The prior processes for producing treprostinil API were not suitable for large scale-manufacturing of medical-grade quantities of the drug and had a significantly higher level of impurities when compared to the processes described in the '066 and '901 patents.  *E.g.*, *id.* at col. 15, Example 6 (D.I. 52-2 at 12).  Thus, the resulting treprostinil API is not only a manufacturing process improvement, but also provides treprostinil in much larger quantities and with a higher level of purity than the prior art processes, and which results in large, multikilogram batch production of treprostinil for use as an active ingredient in a pharmaceutical composition or pharmaceutical product.  *Id.* at 5:57-6:3, 17:27-40 (D.I. 52-2 at 7, 13).

**B.**    **Defendant's Answering Position**

The claims of the '066 and '901 patents, which share a specification, "relate[] to a process for producing prostacyclin derivatives and novel intermediate compounds useful in the process."  *See, e.g.*, Ex. 2 at 1:20-22.  UTC and its expert, Dr. Ruffolo, attempt to artificially restrict the claims of the patents-in-suit to "large-scale, commercial manufacturing process[es]."  *See, e.g.*, *supra* § III.A, at 3-4; Ex. P4, ¶¶33, 41.  For example, Dr. Ruffolo devotes pages of his declaration to characterizing the alleged inventions as a "streamlined, next generation manufacturing process" that "provides treprostinil in much larger quantities and with higher levels of purity than previously reported in the art at the level of laboratory benchtop synthesis, as reported in Moriarty …."[2]  Ex. P4, ¶35.  However, the '066 and '901 patents do not ***claim*** the "commercial," "multikilogram" batch limitations that UTC seeks to import.  UTC's '901 IPR expert, Dr. Rudolfo Pinal, testified that none of the claims of the '901 patent included the terms "commercial," "high-scale," "industrial scale," or "large-scale manufacturing."  Ex. D9 at

---

[2] Moriarty et al., *The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)*, J. Org. Chem. 69:1890-1902 (2004) (Ex. D20), is a prior art reference relied upon by Liquidia in this Action and before the PTAB.

105:21-106:21.  Dr. Pinal also acknowledged that the term "pharmaceutical product," as recited

in claim 6 of the '901 patent, does not limit "pharmaceutical" products to only those

commercialized, but instead includes, for example, "pharmaceutical products" administered in a

clinical trial.  *Id*. at 112:12-115:20.  Finally, while Dr. Ruffolo opines that "benchtop" solvents

and reagents are different from those used in "manufacturing plants" (Ex. P4, ¶¶39, 45), Dr.

Pinal admitted that the claims of the '901 patent, except claim 7, do not require any particular

solvent or reagent.  Ex. D9 at 52:22-54:7.  Although Dr. Pinal's statements were made in relation

to the '901 patent, the claims of the '066 patent also lack such limitations.  *See* Ex. 1 at claims.

Dr. Ruffolo also attempts to distinguish the claimed inventions from the alleged

"benchtop" scale of the prior art process of Moriarty.  Ex. P4, ¶35.  The '066 patent claims do

not require any particular quantity of treprostinil and claim 1 of the '901 patent only requires at

least 2.9 grams, which clearly is not a "multikilogram" quantity.  Ex. 1 at claims; Ex. 2 at claim

1.  Moriarty reports producing as much as 441 grams of treprostinil and the "Former Process" of

Example 6, which UTC has admitted is the Moriarty process[3], yields ~535 grams of

treprostinil—180 fold larger than the claimed 2.9 grams.  Ex. D20 at 1902; Ex. 2 at 16:60.  Dr.

Pinal testified that "at least 2.9 grams" does not necessarily denote commercial scale production,

as it would depend on the intended uses–uses Dr. Pinal confirmed are not recited in claims 1 and

---

[3] The PTAB, in its Final Written Decision invalidating U.S. Patent 8,497,393 ("the '393 patent")
(Ex. D27)—a parent patent of the '066 and '901 patents with the same specification—found that
the "Former Process" of Example 6 of the '393 patent is the "process[] for preparing treprostinil
according to Moriarty," and that UTC used the Moriarty process to make commercial batches of
treprostinil.  Ex. D11 at 17, 34-35, 38.  This decision was affirmed by the Federal Circuit.
*United Therapeutics Corp. v. SteadyMed Ltd.*, 702 F. App'x 990 (Fed. Cir. 2017).  UTC
admitted that the "Former Process" of Example 6 is "essentially the same" as the process
disclosed in Moriarty.  Ex. D4 at 66.

8 of the '901 patent.  Ex. D9 at 101:8-105:17, 109:16-112:8, 115:22-119:1.  Clearly, the '066 and '901 patent claims are not limited to "commercial" products and processes.

## IV.     PERSON OF ORDINARY SKILL IN THE ART

### A.     Plaintiff's Opening Position

Because the '066 and '901 patents are directed to commercial manufacturing of pharmaceutical compositions and pharmaceutical products, a POSA as of the priority date, December 2007, would have been an experienced chemical engineer or process research chemist. Ruffolo Decl.,[4] ¶ 48.  This individual would have had 3-5 years of experience in the production and manufacture of pharmaceutical API and final drug product for pharmaceutical compositions and pharmaceutical products.  *Id.*  The POSA is not merely an experienced benchtop chemist, even one with substantial experience in medicinal chemistry, but rather, an individual with commercial-scale production knowledge and experience.

### B.     Defendant's Answering Position

The claims of the '066 and '901 patents are directed to "pharmaceutical composition[s]," "pharmaceutical batch[es]," and "pharmaceutical product[s]" containing treprostinil or its salt, and basic alkylation, hydrolysis, and salt formation steps to achieve such products. Exs. 1, 2 at claims.  A person of ordinary skill in the art (POSA) at the time of the alleged invention would have a master's degree or a Ph.D. in medicinal or organic chemistry, or a closely related field. Alternatively, a POSA would include an individual with a bachelor's degree and at least five years of practical experience in medicinal or organic chemistry.

---

[4] "Ruffolo Decl." refers to the Declaration of Robert R. Ruffolo, Ph.D., served concurrently with UTC's opening brief, attached as Exhibit P4.

UTC and Dr. Ruffolo argue a POSA must be one with "commercial-scale production knowledge and experience," and exclude organic and medicinal chemists.[5]  *Supra* § IV.A, at 6; Ex. P4, ¶¶39, 48.  Such experience is not needed as the asserted claims do not include limitations restricting their application to "commercial manufacturing" endeavors.  Moreover, the patents are entirely directed to descriptions of organic chemical synthesis.  The American Chemical Society describes organic chemistry as "the study of the structure, properties, composition, reactions, and preparation of carbon-containing compounds."  Ex. D23 at 1.  Clearly, the '066 and '901 patents are directed to the preparation of the carbon-containing compound, treprostinil.  Dr. Ruffolo's position that an organic chemist would not have the expertise to be a POSA are, therefore, undermined by the '066 and '901 patent claims.

## V.   DISPUTED CLAIM TERMS

### A.    Term 1: "a process"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction | Patent(s) & Claims |
|---|---|---|
| plain and ordinary meaning | "a process in which no purification steps appear between alkylation and salt formation" | '066 patent, claims 1 and 8 |

**<u>Representative claim – '066 patent, claim 1:</u>**

A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by <u>*a process*</u> comprising providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps, forming a salt of treprostinil by combining the starting batch and a base, isolating the treprostinil salt, and preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and wherein said alkylation is alkylation of benzindene triol.

---

[5] This position is also at odds with the fact that UTC's own EVP of Chemical R&D and Production, Dr. Liang Guo, is an organic chemist.

i.      <u>Plaintiff's Opening Position</u>

1.      **"a process" should be given its plain ordinary meaning**

"[C]laim construction begins with, and remains focused on, the language of the claims." *Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005) (citation omitted). Claim terms are generally given their plain and ordinary meaning. *Phillips*, 415 F.3d at 1312-13. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313.

Here, "a process" is a clear, straightforward, and understandable term. It is not given a special definition by the '066 patent and does not need to be construed by the Court. *See id.* at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."). The term "a process" is a commonly understood term that is readily understood by a POSA (Ex. P4, Ruffolo Decl., ¶ 50), and there is no need for the Court to construe this term.

2.      **Liquidia's construction improperly imports limitations**

Liquidia seeks to read into "a process" a limitation that "no purification steps appear between alkylation and salt formation." The plain and ordinary meaning of the straightforward term "a process" does not include the additional limitation proposed by Liquidia. *Id.* at ¶ 51. Importantly, "a process" is followed by "comprising" in both relevant claims. The specification of the '066 patent specifically defines "comprising" to mean "including but not limited to." Ex. 1 at col. 4:42-43 (D.I. 52-2 at 6). This specific definition is consistent with the plain and ordinary meaning of the term "comprising." The transition phrase "comprising" "is generally understood to signify that the claims do not exclude the presence in the accused apparatus or

method of factors in addition to those explicitly recited." *Vivid Techs., Inc. v. Am. Sci. & Eng'g., Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999); *see also Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l., LLC*, No. 3:18-cv-01188-WHO, 2020 WL 3187950, at *3-4 (N.D. Cal. June 15, 2020).  In view of the open-ended "comprising" transition phrase, a POSA would not understand "a process" to include the additional limitation proposed by Liquidia.  Ruffolo Decl., ¶ 51.  Indeed, because the specification specifically defines "comprising" to mean "including but not limited to," Liquidia's proposed limitation is contrary to the specific intent of the inventors when they used this term. *See, e.g.*, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1585 (Fed. Cir. 1996) (rejecting a claim construction that was contrary to the specific definition in the specification).

Liquidia's proposed construction stands in stark contrast to the construction it offered to the PTAB, which Liquidia claimed is "the same construction[] that would be appropriate in district court litigation."  *See* Ex. P1 (UTC_LIQ00049402-49480, IPR2020-00769, Paper No. 1) at UTC_LIQ00049423.  In its petition for IPR, Liquidia argued that "[a] process therefore includes, but is not limited to, the recited process steps, and may include, without limitation, any other non-recited steps."  *Id.* at UTC_LIQ00049424.  This IPR construction is entirely inconsistent with Liquidia's currently-proposed construction, which seeks to expressly exclude certain steps. Liquidia was right the first time.

Not only is Liquidia's construction contrary to the plain meaning of the term, the limitation that Liquidia seeks to import—that "no purification steps appear between alkylation and salt formation"—is inconsistent with the preferred embodiments described in the specification.  The specification discloses multiple instances where there are purification steps between alkylation and salt formation.  For instance, Example 6 of the '066 patent (column 15 (D.I. 52-2 at 12)) shows significant purification following alkylation and before salt formation, including: filtering with Celite and washing with acetone (steps 9 and 10); "[r]emoval of impurities" with ethyl acetate (step 21); ethyl acetate extraction, water washing, sodium bicarbonate washing, brine washing (steps 23-26); and charcoal filtration (step 29).  *See also* Ruffolo Decl., ¶ 53.  Example 2 also describes purification steps following alkylation and before

9

hydrolysis, including: removing "impurities" with ethyl acetate (Ex. 1 at col. 11:25-26 (D.I. 52-2 at 10)); washing and filtering (*id.* at 11:30-36); and filtering with "Celite® 545" (*id.* at 11:37-45). *See also* Ruffolo Decl., ¶ 54.  Not only is Liquidia seeking to import claim limitations, but it is asking the Court to commit the "cardinal sin[]" of claim construction by importing claim limitations that contradict the patent specification.  *See Phillips*, 415 F.3d at 1320; *see also SIPCO, LLC V. Abb, Inc.*, No. 6:11–CV–0048 LED–JDL, 2012 WL 3112302, at *9 (E.D. Tex. July 30, 2012) (finding that proposed limiting construction "is contradicted by both the plain language of the claims and the structure of the claims"); *Schering Corp. v. Mylan Pharms., Inc.*, No. 09–6383 (JLL), 2011 WL 2446563, at *11 (D.N.J. June 15, 2011) (rejecting proposed construction that contradicted the understanding of a POSA and was not supported by the specification). Moreover, the specification uses the term "process" generically to describe both the prior art process and the claimed process.  *E.g.*, Ex. 1 at col. 15, Example 6 (D.I. 52-2 at 12) (comparing the "Former ***Process***" to "Working example of the ***Process*** according to the present invention") (emphasis added).  Thus, Liquidia's efforts to attach to specific limitations to "a process" is contrary to how the term is used throughout the patent.

The Federal Circuit has often admonished against importing extraneous limitations, which means "read[ing some limitation] into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim."  *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988); *see also Jazz Pharms., Inc. v. Roxane Labs., Inc.*, No. 10-6108 (ES), 2012 WL 4103880, at *13 (D.N.J. Sept. 14, 2012) (declining to construe term and giving it its ordinary and customary meaning where defendant's construction "imports limitations and redundancies unnecessary to the fact-finder's understanding of what dosage means in the context of this claim").  Here too, it would be an error for the Court to import Liquidia's extraneous limitation into the straightforward term "a process."

Liquidia apparently bases its proposed claim construction on the improvement that the '066 patent makes over the prior art "Former Process" described in Example 6 of the '066 patent.

But this misapprehends the improvement described by the '066 patent.  Ruffolo Decl., ¶ 55.  The process described and claimed in the '066 patent, particularly the salt formation step, rendered the extra column chromatography steps in the prior art unnecessary.  Ex. 1 at col. 15, Example 6 (D.I. 52-2 at 12); Ruffolo Decl., ¶ 55.  Although extra column chromatography steps are not necessary, a POSA would have understood that these steps were not prohibited by the claims (Ruffolo Decl., ¶ 52), similar to including an "irrelevant additive" into a drug formulation.  *See Sanofi-Aventis U.S. LLC. v. Sandoz, Inc.*, No. 07–2762 (JAP), 2010 WL 1049877, at *4 (D.N.J. Mar. 18, 2010).  The salt formation step described in the '066 patent is the key improvement over the prior art, and a POSA would have recognized it as such.  Ruffolo Decl., ¶ 55.  As long as the salt formation step was being performed (in addition to the other steps identified in the claims), a POSA would have understood that the claims were being practiced.  *Id.*

A court may permit claim terms to carry their plain and ordinary meanings where the opposing proposed construction erroneously reads a limitation into the claims.  *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010); *ActiveVideo Networks, Inc. v. Verizon Commc'ns*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) ("The district court did not err in concluding that these terms have plain meanings that do not require additional construction.  ActiveVideo's proposed construction erroneously reads limitations into the claims and the district court properly rejected that construction and resolved the dispute between the parties.").  Here, the plain and ordinary meaning of the term "a process" is the correct construction, and this Court should reject Liquidia's improper attempt to import an additional limitation into this term.

## ii.     Defendant's Answering Position

The "process" of claims 1 and 8 of the '066 patent, when read in light of the claim language, specification, and UTC's statements in the '066 IPR, does not include a purification step between alkylation and salt formation steps.  The Court's construction of this phrase is relevant to Liquidia's non-infringement.  Liquidia provided UTC with documentary evidence establishing that the treprostinil in Liquidia's LIQ861 ***undergoes column chromatography***

11

*purification* after alkylation and before salt formation and thus cannot infringe.  To justify its

contrived infringement allegations, UTC now takes the opposite position from what it told the

PTAB in the '066 IPR.

| UTC told the PTAB: | UTC told this Court: |
|---|---|
| "[t]his perspective is critical in the context of *the claimed pharmaceutical composition*, in which, *e.g.*, *no purification steps appear between alkylation and salt formation*." Ex. D4 at 55 (emphasis added). | A "POSA would not understand 'a process' to include the additional limitation proposed by Liquidia."  *Supra* § V.A.i.2, at 9. |

In the '066 IPR, UTC contended the prior art did not permit large-scale synthesis, stating

"[t]his perspective is critical in the context of *the claimed pharmaceutical composition*, in

which, *e.g.*, *no purification steps appear between alkylation and salt formation*."  Ex. D4 at 55

(emphasis added).  UTC also argued the '066 patent "improves upon existing treprostinil

synthesis" particularly "noting that 'the purification by column chromatography is eliminated

….'"  *Id.* at 33.  In presenting secondary considerations to support the non-obviousness of the

'066 patent claims, UTC again pointed to the elimination of purification steps.  *Id.* at 66.  A

POSA reading UTC's statements would understand that the claimed "process" does not permit a

purification step, particularly column chromatography, between alkylation and salt formation.

*Aylus*, 856 F.3d at 1362 ("Regardless of when the statements are made during the [IPR]

proceeding, the public is 'entitled to rely on those representations when determining a course of

lawful conduct, such as launching a new product or de-signing-around a patented invention.'")

(citation omitted).

This lack of purification is consistent with the specification.  In the "Detailed

Description," the '066 patent confirms the absence of a purification step identifying the "present

invention," as one where "*the purification by column chromatography is eliminated*, thus the

required amount of flammable solvents and waste generated are greatly reduced."  Ex. 1 at 5:57-64 (emphasis added); *id*. at 6:4-7:31, 7:64-9:21.

The patent "Examples" also confirm the claimed invention excludes a purification step prior to salt formation.  Example 1, "Alkylation of Benzindene Triol," states:  "[t]he crude benzindene nitrile was used as such in the next step ***without further purification***."  *Id*. at 10:36-37 (emphasis added).  Example 2, "Hydrolysis of Benzindene Nitrile," states:  "[t]he filtrate (pale-yellow) was reduced to volume of 35-40 L by evaporation in vacuo at 50-55° C. ***for direct use in next step***," which is salt formation, as described in Example 3.  *Id*. at 11:46-48 (emphasis added).  No purification, including column chromatography, was performed before salt formation.  Indeed, the specification's only reference to any "purification" step is column chromatography.  Ex. 1 at 5:62, Example 6 (Step 12), 17:28-29.  Finally, Example 6 provides a "Comparison of the Former Process and a Working Example of ***the Process According to the Present Invention***."  *Id.* at 15:1-17:25 (emphasis added).  As show below, Example 6 identifies a single "Purification" step—Step No. 12.  In the "Former Process," "Purification" is performed by column chromatography, whereas the "Working example of the Process according to the present invention" includes "No column."  *Id.* at Example 6 (Step No. 12).

Example 6

Comparison of the Former Process and a Working
Example of the Process According to the Present
Invention

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| | | Nitrile | |
| 1 | Triol weight | 500 g | 5,000 g |
| 2 | Acetone | 20 L (1:40 wt/wt) | 75 L (1:15 wt/wt) |
| 3 | Potassium carbonate | 1,300 g (6.4 eq) | 5,200 g (2.5 eq) |
| 4 | Chloroacetonitrile | 470 g (4.2 eq) | 2,270 g (2 eq) |
| 5 | Tetrabutyl-ammonium bromide | 42 g (0.08 eq) | 145 g (0.03 eq) |
| 6 | Reactor size | 72-Liter | 50-gallon |
| 7 | Reflux time | 8 hours | No heating, Room temperature (r.t.) 45 h |
| 8 | Hexanes addition before filtration | Yes (10 L) | No |
| 9 | Filter | Celite | Celite |
| 10 | Washing | Ethyl acetate (10 L) | Acetone (50 L) |
| 11 | Evaporation | Yes | Yes |
| 12 | Purification | Silica gel column Dichloromethane: 0.5 L Ethyl acetate: 45 L Hexane: 60 L | No column |
| 13 | Evaporation after column | Yes | No |
| 14 | Yield of nitrile | 109-112% | Not checked |

Emphasizing the advantages of the "present invention," the specification concludes that "[t]he quality of treprostinil produced according to this invention is excellent. ***The purification of benzindene nitrile by column chromatography is eliminated***." *Id*. at 17:27-29 (emphasis added). A POSA reading the '066 patent would understand that the claimed "process" does not permit a purification step between the alkylation and salt formation steps.

During prosecution of the '066 patent, UTC distinguished the claimed "process" over the prior art by emphasizing that the starting batch of treprostinil, as claimed, is not purified before salt formation. To overcome the Examiner's obviousness rejection, UTC submitted documents

14

in the '066 prosecution from the then-pending '393 patent IPR ("'393 IPR"), a parent of the '066 patent.  Ex. D12 at 4 (citing Patent Owner Response and Patent Owner's expert declarations from IPR2016-00006).  In the '393 IPR Patent Owner Response, UTC stated that "Moriarty expressly discloses that the compound of formula (VI) from step (a) is purified" and that "the '393 patent specifically distinguishes this limitation over the prior art."  Ex. D10 at 32 (citing Example 6 of the '393 patent).  In withdrawing the obviousness rejection during prosecution of the '066 patent, the Examiner noted that "Moriarty fails to teach formation of the salt ***prior to purification*** of treprostinil in the process described on page 1902 [of Moriarty]."  Ex. D13 at 2 (emphasis added).  Considering UTC's clear statements regarding claim scope, and the Examiner's express reliance on them, a POSA reading the prosecution history of the '066 patent would understand that the claimed "process" of the '066 patent cannot include a purification step between alkylation and salt formation.

UTC's criticisms of Liquidia's proposed construction are meritless.  First, UTC is incorrect that the inclusion of the open-ended transition phrase "comprising" overcomes its clear and unambiguous disavowal of claim scope to overcome the prior art.  *See supra* § V.A.i.2, at 8-9; *see Aylus*, 856 F.3d at 1357, 1363-64 (finding patentee disclaimed claim scope of "comprising" claim); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003) (same).  Second, UTC's contention that Liquidia's proposed construction is "inconsistent" with statements made by Liquidia during the '066 IPR Petition (*see supra* § V.A.i.2, at 9) ignores that UTC had not yet filed its Patent Owner Preliminary Response in which UTC unmistakably confirmed that the claimed process precludes a purification step.  Third, UTC is incorrect that the specification uses the term "process" generically to describe both the prior art process and claimed process because the specification clearly denotes the prior art process as the "***Former***

15

Process" as compared to the "Process according to the present invention."  Ex. 1 at Example 6 (emphasis added); *see supra* § V.A.i.2, at 10.

Fourth, UTC's reference to several steps of Example 6 in support of its allegation that "[t]he specification discloses multiple instances where there are purification steps between alkylation and salt formation" (*see supra* § V.A.i.2, at 9-10; *see also* Ex. P4, ¶¶52-54) directly conflict with (1) the statements UTC made, defining the claims scope to overcome prior art during prosecution and in the '066 IPR and (2) the fact that the only "purification" step identified in the specification, is column chromatography.  At the very least, a POSA would surely understand the claimed "process" does not permit column chromatography purification between alkylation and salt formation considering statements in the specification and made by UTC during prosecution and the '066 IPR.  *See* Ex. P4, ¶55 ("The salt formation step … renders column chromatography steps unnecessary."); *supra* § V.A.i.2, at 10-11 (same).

Lastly, UTC's reliance on *Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, No. 07-2762, 2010 WL 1049877, at *4 (D.N.J. Mar. 18, 2020) is misplaced.  *See supra* § V.A.i.2, at 11.  If addition of a purification step between alkylation and salt formation were permitted, akin to an "irrelevant additive," then UTC would not have expressly touted the elimination of purification before salt formation in the '066 patent specification, prosecution history, and subsequent IPR as a basis of patentability to overcome the prior art.  Ex. P4, ¶55.

Claims 1 and 8 of the '066 patent, when read in light of the specification, prosecution history, and subsequent IPR, cannot include a purification step between alkylation and salt formation.

### iii.    **Plaintiff's Reply Position**

A "patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning[.]" *Thorner v. Sony Comput. Entm't Am., LLC*, 669 F.3d 1362, 1367 (Fed.

Cir. 2012). The patent's title explains the "process" is a "process to prepare Treprostinil, the active ingredient in Remodulin®"—UTC's drug product. Ex. 1 at UTC_LIQ00000001. The patent states that "[o]ne embodiment provides for an improved process to convert benzidine triol to Treprostinil via salts of treprostinil and to purify treprostinil." *Id.* The specification explicitly teaches that claims 1 and 8 are directed to "a process comprising" certain steps, meaning it "includ[es] but [is] *not limited* to" those steps. *Id.* at 4:41-42 (emphasis added). Although the specification does not expressly define the claim term "a process," a POSA would understand its broad meaning to be consistent with the words of the patent. Ruffolo Decl., ¶50. The Court need not construe it.[6]

Liquidia does not contend that a POSA would have trouble understanding the meaning of "a process." In fact, Liquidia previously recognized a POSA would understand that "a process":

> includes, [1] *but is not limited to*, the recited process steps, and
> [2] *may include*, *without limitation*, [3] any *other non-recited steps.*

Ex. P1 at UTC_LIQ00049424 (emphasis added). Liquidia took that position in the '066 IPR proceedings after reviewing all the evidence relevant to claim construction, *i.e.*, the asserted claims, the specification, the prosecution history, and its own expert's opinion. In fact, Liquidia represented this "same construction[] []would be appropriate in district court litigation." *Id.* at UTC_LIQ00049423. Now, without any explanation for its reversal, Liquidia argues a POSA would understand "a process" to mean the *opposite* such that "no purification steps appear between alkylation and salt formation." Resp. at 12.[7] This reversal makes little sense because the inquiry remains the same: distilling "the meaning that [a process] would have to a person of

---

[6] UTC's construction here is consistent with the position it took in the IPR proceedings. *See* Ex. 6 at LIQ00083817-822.

[7] "Resp. at _____" refers to Defendant's Answering Position for the relevant term.

ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

Liquidia's proposed construction requires that "no purification steps *appear* between alkylation and salt formation." Resp. at 12 (emphasis added). This construction is contrary to the claims, which recite "a process comprising"—i.e., a process including but not limited to the identified steps. Liquidia is wrong to add contradictory words that would expressly *exclude* any purification steps.

Having previously conceded that a POSA would understand that "a process" "includes, but is not limited to, the recited process steps, and may include, without limitation, any other non-recited steps" (Ex. P1 at UTC_LIQ00049424), Liquidia now argues that the claim scope is narrowed by some of the "Examples" in the specification. Resp. at 13. But other examples in the specification repeatedly include purification steps between alkylation and salt formation. Ruffolo Decl., ¶¶51-54 (explaining that examples 1, 2, and 6 disclose such purification steps). The examples undercut Liquidia's argument, and thus, "a POSA would have understood that purification steps could be utilized between the alkylation and salt formation steps if needed or desired." Ruffolo Decl., ¶51.

Having found no justification for its "no purification steps" argument, Liquidia again shifts positions and argues that "the claimed 'process' does not permit *a* purification step, *particularly column chromatography*, between alkylation and salt formation." Resp. at 12 (emphasis added). But this new argument fails for the same reason. Just as "a process comprising" claim includes but is not limited to certain steps; a POSA would understand that those claims do not exclude other purification steps such as "column chromatography" just because they are not expressly identified in the claim. As Dr. Ruffolo testified, "[a] POSA

would have recognized that one of the key improvements in the new manufacturing process described in the '066 patent is the salt formation step which indicates that any extra column chromatography steps are not needed, but **could** still be performed if necessary or desired, along with all of the other purification steps that appear in the '066 patent specification that occur between the alkylation and salt formation steps[.]"  Ruffolo Decl., ¶55 (emphasis in original); *see also* ¶56 (explaining that "[i]t is common in *process chemistry*" "to re-purify specific batches of an API") (emphasis added).

Dr. Ruffolo's testimony concerning a POSA's understanding of "'re-processing' or 'reworking'" treprostinil API is consistent with the language of the claims, the specification, the prosecution history, and is uncontested.  *Id.*, ¶56.  Ignoring these facts, Liquidia seeks to transform the patentee's claims from covering processes in which salt formation lowers impurities to covering processes that cannot include additional unidentified purification steps, irrespective of whether those additional purification steps remove any impurities.  That is not what the patentee claimed and is not how a POSA would understand the claimed invention.

Liquidia seeks to justify its new stance by arguing that the patentee disavowed additional purification steps.  But any alleged disavowal must be "clear and unmistakable," and the standard for finding disavowal is "exacting."  *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).  Simply put, the patentee did not explicitly redefine "a process comprising" from its plain and ordinary meaning, nor did the patentee disavow its full scope.

First, to support its distorted disavowal argument, Liquidia points to language concerning the relevant level of skill in the art.  UTC explained that a POSA would have "experience in pharmaceutical production" and understand the claims require "highly pure products at batch scales."  Ex. D4 at LIQ00083868.  Within context, UTC explained the POSA's "perspective is

19

critical in the context of the claimed pharmaceutical composition, in which, *e.g.*, no purification steps appear between alkylation and salt formation." *Id.*  A POSA would understand that while no purification steps expressly *appear*—i.e. are expressly identified—in the claims between the alkylation and salt formation steps, this absence in no way suggests that such steps must be excluded.  UTC's accurate observation of what "appears" in the claims does not come close to an unambiguous disavowal of claim scope.

Second, UTC's statement was made in the context of explaining that "Liquidia is wrong" for "erasing the differences between the claims of the '393 and '066 patents."  *Id.* at LIQ00083867.  Liquidia repeats its mistake here.  Liquidia attempts to apply statements concerning the '393 patent, not at issue here, against the asserted '066 patent.  But dependent claim 8 of the '393 patent, unlike the claims here, expressly excludes an additional purification step.  Ex. D27 at Claim 8 ("The product of claim 1, wherein the process *does not include purifying* the compound of formula (III) produced in step (a).") (emphasis added).  The '066 patent lacks this express exclusion, and a POSA would not understand the claim language of the '066 patent to require this exclusion.  Ruffolo Decl., ¶55.  In fact, the IPR filing Liquidia relies on specifically showed the difference in claim scope and that no such exclusionary limitation is present in the '066 claims:

| U.S. 8,497,393 – CLAIM 1 | U.S. 8,497,393 – CLAIM 9 | U.S. 9,593,066 – CLAIM 1 | U.S. 9,593,066 – CLAIM 8 |
|---|---|---|---|
| 8. The product of claim 1, wherein the process does not include purifying the compound of formula (III) produced in step (a). | 16. The product of claim 9, wherein the process does not include purifying the compound of formula (VI) produced in step (a). | | |

Ex. D4 at LIQ00083859 (showing no corresponding exclusion).

Third, Liquidia misunderstands the law and misapprehends the specification's context when it argues that the "present invention" requires that "the purification by column chromatography is eliminated."  Resp. at 12-13 (emphasis and citation omitted).  The Federal Circuit has repeatedly held that, where "present invention" language refers to advantages and "preference[s]," it is not limiting.  *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1361-62 (Fed. Cir. 2010); *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797-98 (Fed. Cir. 2019).  Here, the specification identifies the elimination of column chromatography as one of many "examples" of unclaimed "advantages" of the invention.  Moreover, it speaks of those advantages in the context of "large-scale synthesis," which Liquidia urges is not a requirement of the claims.  Ex. 1 at 5:57-64 ("The process according to the present invention provides advantages on large-scale synthesis over the existing method.").

Finally, Liquidia misapprehends the prosecution history, again conflating the claims of the '066 and '393 patents.  Liquidia falsely suggests that UTC cited Ex. D10 at 32 to the Examiner during prosecution of the '066 patent.  Resp. at 15.  It did not.  Liquidia's misquote is particularly egregious because, as Liquidia does elsewhere (*id*. at 48), Liquidia cites discussion of claims 8 and 16 of the '393 patent that expressly prohibit the additional purification step— unlike the claims of the '066 patent.  This statement, from a wholly different context, was not relied on by UTC during prosecution and cannot constitute disavowal.  *See* Ex. D12 at 4 (citing Ex. D10 at 12 ("Section III.C") *not* Ex. D10 at 32).  Accordingly, the Court should apply the plain and ordinary meaning for the well-understood claim term "a process."

### iv. **Defendant's Sur-Reply Position**

UTC's arguments that the claimed "process" does not include purification, particularly column chromatography, between alkylation and salt formation should be decisive as to the

meaning of "a process." *Supra* § V.A.ii, at 11-16; *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340, 1346 (Fed. Cir. 2020); *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276-77 (Fed. Cir. 2013); *Shire Dev., LLC v. Watson Pharm., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir. 2015).  UTC's walk-back of its unambiguous arguments should be viewed for what it is—a blatant attempt to maintain its litigation infringement positions despite having made the exact opposite arguments in order to avoid invalidity—and rejected by this Court. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers.").  UTC's argument that "appear" within the phrase "[t]his perspective is critical in the context of the claimed pharmaceutical composition, in which, e.g., ***no purification steps appear*** between alkylation and salt formation," means not "expressly identified" in the claim is nonsensical, as this "critical" perspective would be unnecessary if the claim allowed for purification between these steps.  Moreover, UTC did not make these statements to correct Liquidia's error regarding the '393 Patent (*supra* § V.A.iii, at 19-20), but instead to advocate for this claim scope before the PTAB (Ex. D4 at 55 (emphasis added))—a position UTC repeated in its '901 IPR Patent Owner Response.  Ex. D7 at 25, 58.

Liquidia has not modified its position "without explanation."  UTC characterized its claims as excluding purification, particularly column chromatography, reinforced that position in its presentation of secondary considerations, and confirmed that position through Dr. Ruffolo's declaration—all *after* Liquidia filed its Petition.  *Supra* § V.A.ii, at 11-16; Ex. P4, ¶¶33, 55-56; Ex. D29 at 24-27.  UTC is also incorrect that the transitional phrase "comprising" opens its claims to the purification and column chromatography steps it expressly excluded during prosecution, and argues now are "irrelevant."  *Supra* § V.A.ii, at 15-16; *see Aylus*, 856 F.3d,

1357, 1363-64; *Omega*, 334 F.3d, 1326.  Consequently, Dr. Ruffolo even opines that "comprising" allows the claimed process to include additional steps that would make the claimed process less efficient, less green, and result in the use of more solvents, all undercutting the alleged distinctions UTC asserts its claimed process has over the prior art, distinctions UTC relies on in support of validity.  Ex. D29 at 24-27; Ex. D30 at 71:3-76:4, 82:7-22.  In fact, "[o]ther than something combusting or exploding such that you couldn't use it at the end of the process," Dr. Ruffolo was unable to identify any step that could not be encompassed by the claimed process.  Ex. D30 at 76:18-77:18.

Contrary to UTC's characterizations, Liquidia's construction does not exclude purification steps conducted *after* salt formation—the type of re-processing of "treprostinil API," addressed by Dr. Ruffolo is different from the "purification of intermediates" excluded from specification and claims.  *Supra* § V.A.iii, at 19-20; Ex. P4, ¶56; Ex. 1, Example 6 (steps 15-30 "Treprostinil (intermediate)"); 17:38-40 (referring to "purification of intermediates.").

Liquidia did not "falsely suggest" that UTC cited certain pages of its '393 Patent Owner Response to the Examiner of the '066 patent.  *Supra* § V.A.iii, at 21.  UTC submitted the entire '393 IPR Patent Owner Response to the Examiner.  Ex. D12 at UTC_LIQ00003130; Ex. D10; Ex. D31, ¶¶71-72.  The Examiner withdrew a prior art rejection relying on UTC's elimination of purification before salt formation stating "Moriarty fails to teach formation of the salt ***prior to purification*** of treprostinil"—a statement UTC does not dispute.  Ex. D13 at 2 (emphasis added).

Lastly, UTC's argument that the "present invention" language is non-limiting (*supra* § V.A.iii, at 21) ignores the specification's reference to the present invention ***as a whole*** rather than as a "preference."  Ex. 1 at 5:62-64, 17:28-29; *see Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent…describes the features of the

'present invention' as a whole, this description limits the scope of the invention.") (citation omitted).

### B.    Term 2: "ambient temperature"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction | Patent(s) & Claims |
|---|---|---|
| plain and ordinary meaning | "room temperature or, on average, 25° C" | '066 patent, claims 6 and 8; '901 patent, claim 6 |

**Representative claim – '066 patent, claim 8:**

A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising alkylating a triol intermediate of the formula:



hydrolyzing the resulting compound to form treprostinil, forming a salt of treprostinil stable at *ambient temperature*, storing the treprostinil salt at *ambient temperature*, and preparing a pharmaceutical product from the treprostinil salt after storage, wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.

### i.    Plaintiff's Opening Position

### 1.    "ambient temperature" should be given its plain and ordinary meaning

Ambient temperature is not given any special meaning in the specification of the '066 or '901 patents and is readily understandable to a POSA.  Ruffolo Decl., at ¶ 58.  Accordingly,

"ambient temperature" does not need to be construed by the Court.  *See Phillips*, 415 F.3d at 1324.

Liquidia attempts to limit the construction of ambient temperature to 25 degrees Celsius "on average."  Liquidia's proposed construction is unnecessarily limiting and accomplishes nothing helpful.  *Rosco, Inc. v. Velvac Inc.*, No. 11-117-LPS, 2012 WL 6028239, at *8 (D. Del. Dec. 4, 2012) (stating that "claim construction should not become an obligatory exercise in redundancy" (quotation omitted)); *Input/Output, Inc. v. Sercel, Inc.*, No. 5:06-CV-236, 2008 WL 5427982, at *10 (E.D. Tex. Apr. 28, 2008) (declining to provide constructions "where it would cause further confusion by introducing synonymous words that would themselves require construction or where providing a construction would improperly limit the scope of the claim").

Liquidia's construction is an attempt to limit the construction of "ambient temperature" to 25 degrees Celsius, on average.  If the inventors wanted to limit the claims to 25 degrees Celsius, they could have done so.  There is no support in the intrinsic evidence for such a construction. Rather, the inventors chose the broad term "ambient temperature," which would not been understood by a POSA to be limited to 25 degrees.  Instead, a POSA would have understood "ambient temperature" to be a much wider range of temperature.  Ruffolo Decl., ¶¶ 61-62. Indeed, a POSA would have understood the range of "ambient temperature" to be as broad as starting from 1 degree Celsius, up to 30 degrees Celsius.  *Id.*  Liquidia's proposed construction is unnecessarily narrow and contrary to the plain and ordinary meaning of this term.

### ii.    **Defendant's Answering Position**

The intrinsic evidence requires that "ambient temperature" should be construed as "room temperature, or on average, 25 °C."  The Court's construction of "ambient temperature" is relevant to non-infringement because Liquidia does not store the treprostinil used in LIQ861 at room temperature, or on average 25 °C.  The treprostinil used to prepare LIQ861 is maintained, according to manufacturer and Liquidia specifications, under non-ambient refrigerated conditions, at 2 °C to 8 °C, protected from moisture and light.  Trying to preserve infringement,

UTC now argues that "the practical definition of the term ambient temperature may extend from temperatures as low as 1 degree Celsius to as high as 30 degrees Celsius …." *See* Ex. P4, ¶63; *supra* § V.B.i.1, at 24-25.  UTC's proposal finds no support in the intrinsic record, the plain and ordinary meaning, and is at odds with positions UTC took during prosecution.

Neither the claims nor specification of the '066 and '901 patents provide a numerical value for ambient temperature.  The shared specification discloses only that "[a]dditional advantages of this process are: (a) crude treprostinil salts can be stored as raw material at ambient temperature …." *See, e.g.,* Ex. 2 at 17:4-8.  The '066 and '901 patents, however, incorporate prior art patents that support Liquidia's proposed construction and refute UTC's extension of ambient temperature to refrigerated conditions.  U.S. Patent No. 4,306,075 states "[a]lkali metal carbonate or hydroxide are employed effectively *at ambient temperature* for this purpose.  For example, potassium carbonate or hydroxide in aqueous methanol *at about 25° C.* is advantageously employed."  Ex. D2 at 18:60-64 (emphasis added); Ex. 2 at 1:28.  U.S. Patent No. 6,809,223 states "[a]fter completion, the reaction was quenched by dropwise addition of methanol (5-8 ml) at -40° C.  The resulting solution was allowed to attain *ambient temperature* (leaving overnight with stirring).  *The reaction was cooled to 0-10° C.* …."  Ex. D3 at 12:8-12 (emphasis added); Ex. 2 at 1:32-33.  This intrinsic evidence "incorporated by reference to show how to practice *the embodiments of the present* invention," clearly contrast ambient temperature to the cooled temperatures of 0-10° C.  Ex. 2 at 1:34-35 (emphasis added).

The '066, '901 and their parent patent, U.S. Patent No. 9,156,786 (the "'786 patent") (Ex. 3), all share a common specification, and during prosecution of the '786 patent, UTC defined "ambient temperature" as 25°C.  Specifically, UTC sought to distinguish its '786 patent claims, requiring "storing the collected base addition salt," from prior art by arguing that "[p]rior to the

present invention, treprostinil had to be refrigerated during storage … as it was not known that the salt form was more stable." Ex. D14 at 7.  The Examiner rejected UTC's arguments because the '786 patent claims were "not limited to storing at room temperature."  Ex. D15 at 5.  In response, UTC amended claim 1 of the '786 patent to specifically include an "ambient temperature" limitation—the same claim limitation present in the '066 and '901 patents.  Ex. D16 at 2.  UTC, argued in its reply that:

> Storing treprostinil in salt form provides unexpected advantages over storing treprostinil in the free acid form because treprostinil in the salt form is more stable at **ambient temperature** than free acid.  Treprostinil in the free acid form is not stable at **ambient temperature, such as 25°C**.

*Id.* at 6 (emphasis added).  UTC also submitted the declaration of Dr. Liang Guo, EVP of Chemical R&D and Production at UTC, dated August 4, 2015.  Ex. D17.  Dr. Guo stated "[t]reprostinil diethanolamine salt is more stable than free acid treprostinil when stored at **ambient temperature (25°C)** based on a comparison of stability date for these two compounds."  *Id.*, ¶7 (emphasis added).  The Guo Declaration further explained "free acid treprostinil is not stable at ambient temperature over certain periods of time because of significant formation of dimer defects," and "free acid treprostinil is usually stored and transported at lower temperatures, such as 2°C-8°C," again contrasting refrigerated conditions (2°C-8°C) with the claimed ambient temperature.  *See id.*, ¶8.  A POSA reading the prosecution history of the '786 patent would understand "ambient temperature" to mean room temperature, or on average 25 °C.  Given the shared specification and identical claim term, the prosecution history of the'786 patent constitutes intrinsic evidence to the "ambient temperature" term in the '066 and '901 patents.  The Federal Circuit has made clear that "[w]hen multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the

same claim limitation." *Biovail Corp. Int'l v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001) (citations omitted); *see also E.I. du Pont de Nemours & Co. v. Unifrax I LLC*, No. 14-1250-RGA, 2016 WL 158031, at *8 (D. Del. Jan. 13, 2016) (concluding that parent patent constituted intrinsic evidence for claim construction), *aff'd*, 921 F.3d 1060, 1070-71 (Fed. Cir. 2019) (relying on parent patent as intrinsic evidence for claim construction); *Infinity Comput. Prods., Inc. v. Oki Data Ams., Inc.*, 987 F.3d 1053, 2021 WL 476067, at *5 (Fed. Cir. Feb. 10, 2021) ("A statement made during prosecution of related patents may be properly considered in construing a term common to those patents.") (citation omitted).

Statements made by UTC during the '901 IPR further confirm "ambient temperature" means room temperature, or on average 25 °C. *See Aylus,* 856 F.3d at 1361. UTC submitted the declaration of Rodolfo Pinal in support of its '901 Patent Owner Response. Ex. D8. Dr. Pinal's declaration equates ambient temperature with room temperature or on average 25 °C, and specifically distinguishes ambient temperature from refrigerated temperatures included in UTC's "plain and ordinary meaning" construction stating:

> That the pharmaceutical batch of the '901 patent is stable to storage [sic] at ***ambient temperatures*** is, alone, a highly valuable pharmaceutical improvement over previously known routes for accessing treprostinil, considering that ***not having to constantly maintain refrigeration or freezer temperatures*** lowers the cost of storage and drastically decreases the complexity of material transportation. *See* EX2028 (the '623 application prosecution history), 0193 ("Treprostinil in the free acid form is not stable at ***ambient temperature, such as 25°C***."), 0194 (noting, specifically that the anhydrous form of treprostinil is not stable at ***room temperature***, and instead forms dimers upon standing, ***thus requiring treprostinil to be "refrigerated for storage and transport***," and "shipped with ice packs to maintain ***low (2°C-8°C) temperatures***") 0197-0203 (providing the declaration of Dr. Liang Guo, comprising stability studies to support this assertion).

*Id.*, ¶91 (emphasis added); *see also id.*, ¶¶81, 275. In making these statements, Dr. Pinal specifically relied on the Guo Declaration. *Id.* UTC's own IPR expert, and his reliance on the

Guo Declaration, further establishes that "ambient temperature" is room temperature, or on average 25 °C, and not refrigerated temperatures.

Even Dr. Ruffolo confirms Liquidia's proposed construction that "ambient temperature" means "room temperature or, on average, 25 °C." *See* Ex. P4, ¶60.  Dr. Ruffolo explains that a POSA reading the USP[8] understands that it "defines ambient temperature as room temperature, which spans the temperature range from 20-25 degrees Celsius ...."  Ex. P4, ¶60.  He further states that the World Health Organization ("WHO") "also defines ambient temperature as room temperature, which according to the WHO spans the temperature range from 15-25 degrees Celsius, or up to 30 degrees Celsius depending on climacteric conditions ...."  *Id.*[9]

In an attempt to expand the numerical range of "ambient temperature" to encompass temperatures as low as 1°C, UTC and Dr. Ruffolo rely on extrinsic evidence including "the PMDA (*i.e,.* [sic] the Japanese 'FDA') ...."  *See supra* § V.B.i.1, at 24-25; Ex. P4, ¶61.   The document Dr. Ruffolo cites is not from the Japanese "FDA," but instead a website article credited to "Hemander" and dated April 7, 2017.  Ex. P4, ¶61; Ex. D28.  Even here, the portion allegedly from the Japanese Pharmacopeia does not use the term "ambient temperature," and unlike the USP, to which, Dr. Ruffolo explains, "the FDA requires that pharmaceutical manufacturers adhere," this document does not state that in Japan, "room temperature" is also referred to as "ambient temperature."  Ex. P4, ¶¶60-61.  The 2017 "Hemander" article cannot

---

[8] Dr. Ruffolo cites to the May 1, 2017 version of USP Monograph 659 "Packaging and Storage Requirements," which is not prior art to the '066 and '901 Patents.  Nonetheless, the 2006 version of USP Monograph states: "Room temperature — The temperature prevailing in a working area."  Ex. D25 at 10.  And the 2006 USP defines "the usual and customary working environment" as "20° to 25°."  *Id.*

[9] Dr. Ruffolo's declaration, and the USP and WHO citations constitute extrinsic evidence.

displace the intrinsic evidence defining "ambient temperature" as "room temperature, or on average 25 °C."

### iii.  Plaintiff's Reply Position

The term "ambient temperature" is easily understood and does not require construction. A POSA would understand the variance permitted by "ambient temperature" in the context of global commercial pharmaceutical manufacturing. And the parties agree "[n]either the claims nor specification of the '066 and '901 patents provide a numerical value for ambient temperature." Resp. at 26. Importing numerical limitations into the claims that the patentee intentionally chose not to include, as Liquidia proposes, risks avoidable claim narrowing from extrinsic sources. Ruffolo Decl., ¶¶ 61-62.[10]

No intrinsic evidence supports Liquidia's artificial narrowing of the "ambient temperature" to only an "average of 25 ˚C." Nor is there evidence of a clear disavowal of other temperatures. *Thorner*, 669 F.3d at 1365-67. Liquidia proposes that the Court rewrite the claims to mean "room temperature or, on average, 25 ˚C," but provides no explanation for what—if any—temperature range would actually be permitted or what time period would be used to determine the proposed "average" temperature. Simply, Liquidia's proposed definition, "does not represent the plain and ordinary meaning of the term, nor does it fit any of the regulatory definitions for ambient temperature." Ruffolo Decl., ¶60.

A POSA would also understand that "ambient temperature" does not equate to "room temperature" because "ambient temperature" is a term with particular regulatory meaning. *Id.*, ¶¶59-62. What is ambient in one lab will be different than ambient in another and it is likely that

---

[10] UTC's construction here is consistent with the position it took in the IPR proceedings. *See* Ex. D4 at LIQ00083817-822; *see* Ex. D7 at LIQ00084506-510.

*neither* lab actually "average[s], 25 ˚C." *Id.* (citing regulatory definitions spanning, 1-30, 15-25, and 25-30 degrees Celsius).  The patentee is entitled to the full claim scope, which properly accounts for variance in manufacturing conditions and regulatory requirements throughout the world.

Liquidia attempts to limit the '066 and '901 patents by statements made during amendments to the '786 patent, but these statements both are consistent with UTC's position and highlight the problem with Liquidia's numerical limitation.  Resp. at 26-27.  For example, UTC highlighted the "unexpected advantage[]" of "[s]toring treprostinil in the salt" because "treprostinil in the salt form is more stable at ambient temperature than free acid."  Ex. D16 at LIQ00084192.  UTC's statement is accurate and would not be understood by a POSA as limiting the stability of treprostinil salt to only at "room temperature or, on average, 25˚ C."

The parties, agree that an ambient temperature range includes 25 ˚C.  And a POSA would understand that "when drugs are stable under the ambient temperature ranges designated by the USP and/or the WHO (*i.e.*, 15-25 degrees Celsius, and potentially up to 30 degrees Celsius depending upon climacteric conditions) … these drugs will also be stable when stored at ambient temperatures that are lower than the USP and WHO ambient temperature ranges, for example the ambient temperature range specified by the PMDA (*i.e.*, 1-30 degrees Celsius)."  Ruffolo Decl., ¶62.  For example, Dr. Pinal's notes the advantage of "*not having to constantly maintain* refrigeration or freezer temperatures," which confirms a POSA's understanding that a range of ambient temperatures is permissible for forming and storing treprostinil salt.  Ex. D8 at LIQ00084619 (¶91) (emphasis added).  A POSA would appreciate that "a drug that is stable at ambient temperature will remain stable at all times throughout production and storage in the supply chain."  Ruffolo Decl., ¶62.

Because a POSA would understand the plain and ordinary meaning of "ambient temperature," "[n]either the claims nor specification . . . provide a numerical value for ambient temperature" (Resp. at 26). Liquidia's proposed construction "go[es] against all accepted definitions of the term" (Ruffolo Decl., ¶63), and the Court should construe "ambient temperature" to have its plain and ordinary meaning.

### iv.     Defendant's Sur-Reply Position

As opposed to UTC's construction, Liquidia's construction of "ambient temperature" is supported by intrinsic evidence, including prior art incorporated in the specification, which is not addressed by either UTC or Dr. Ruffolo. *Supra* §§ V.B.iii, at 30; V.B.ii, at 25-27. Statements from the prosecution of the '786 patent and the '901 IPR confirm Liquidia's construction. *Supra* § V.B.ii, at 25-29.

UTC is incorrect that the '786 patent's prosecution history is "consistent with [its] position." *Supra* § V.B.iii, at 31 (citing Ex. D16 at LIQ00084192). UTC argued and submitted the Guo declaration to overcome prior art, arguing "ambient temperature" referred to a temperature of about 25°C——not the broad range UTC now seeks. *Supra* § V.B.ii, at 26-28. UTC avoids addressing its arguments and the Guo Declaration, which addresses how a POSA understands "ambient temperature."

UTC continues to contend the Japanese PMDA defines "ambient temperature" to include from "1-30 degrees," but Dr. Ruffolo admitted that it does not address "ambient temperature." *Supra* § V.B.iii, at 30-31; Ex. D30 at 109:14-110:9. Moreover, Dr. Ruffolo acknowledged that the WHO's definition of "ambient temperature" excludes temperatures below 15°C[11] and UTC

---

[11] Dr. Ruffolo did not address any of Liquidia's evidence in his Supplemental Declaration. Ex. P5.

admits that the USP/WHO define "ambient temperature" as between "15° to 25°C..up to 30°C." Ex. D30 at 109:14-110:9, 112:23-113:11; *supra* § V.B.iii, at 31-32.  With respect to Hemander, which formed the basis for UTC's construction, Dr. Ruffolo acknowledged that Hemander is neither peer-reviewed nor prior art, that he did not review source material cited in Hemander before submitting his opening declaration, and did not know whether the source material cited in Hemander was in effect in December 2007.  Ex. D30 at 95:16-106:20.  Given these oversights, Dr. Ruffolo's declaration should be given no weight.

Finally, Dr. Pinal's statement concerning "the advantage of 'not having to constantly maintain refrigeration or freezer temperatures'" supports Liquidia's construction as it distinguishes "ambient temperature" from refrigerated or freezing temperatures.[12]  *Supra* §§ V.B.iii, at 31-32; V.B.ii, at 28-29.  Dr. Ruffolo has also referred to "ambient temperature" as 25°C.  Ex. D32 at 135. ("At normal **ambient temperatures** (**25° C**), caudal blood flow is minimal.") (emphasis added).

C.      Term 3: "stored" / "storing" / "storage"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction | Patent(s) & Claims |
|---|---|---|
| "require that the stored material possesses stability sufficient to allow manufacture and which maintains integrity for a sufficient period of time to be useful for the preparation of a pharmaceutical composition or a pharmaceutical product" | the claim terms are indefinite | '066 patent, claims 6 and 8; '901 patent, claim 6 |

---

[12] UTC's argument at page 31 of its Reply that drugs can be stored at temperatures below "ambient" is immaterial as the claims expressly require storage of treprostinil at "ambient temperature." Ex. 1, claims 6, 8; Ex. 2, claim 6.

**Representative claim – '066 patent, claim 8:**

A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising alkylating a triol intermediate of the formula:



hydrolyzing the resulting compound to form treprostinil, forming a salt of treprostinil stable at ambient temperature, *storing* the treprostinil salt at ambient temperature, and preparing a pharmaceutical product from the treprostinil salt after *storage*, wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.

    **i.**        **Plaintiff's Opening Position**

        **1.**        **UTC's construction of "stored" / "storing" / "storage" is supported by the intrinsic evidence**

A POSA would have understood these terms to require stability of the material being stored in a batch quantity in the context of commercial pharmaceutical manufacturing.  As the patent specifications explain, "stable" compounds are those "which possess stability sufficient to allow manufacture and which maintain the integrity of the compound for a sufficient period of time to be useful for the purposes detailed herein."  Ex. 1 at col. 4:57-63 (D.I. 52-2 at 6); Ex. 2 ('901 patent) at col. 5:4-10 (D.I. 52-2 at 19).  Thus, these terms require the treprostinil salt to be "stable at ambient temperature," further requiring that the material being stored be stable after storage such that the stored material maintains integrity for a sufficient period of time to be useful for the purposes of commercially preparing pharmaceutical product on a large scale, including preparing "treprostinil by simple acidification."  Ex. 1 at col. 17:32-36 (D.I. 52-2 at 13); Ex. 2 at col. 17:4-8 (D.I. 52-2 at 25).

Based on the claims and the description in the specifications, a POSA would have understood that the terms "stored" / "storing" / "storage" are related to the stability of the treprostinil made according to the claims.  Even beyond the claims, a POSA would have understood the ability of an API or drug product to be stored at ambient temperature to be related to its stability.  Ruffolo Decl., ¶ 66.  The more stable the compound, the longer it can be stored, which is important for pharmaceutical manufacturing.  *Id.*  And stability is directly related to temperature – less stable drugs must be stored at controlled temperatures, such as frozen or freeze dried.  *Id.*  Such requirements make pharmaceutical manufacturing much more difficult, and require additional equipment, cost, and time.  *Id.*  An API or drug product that can be stored at ambient temperature necessarily is stable at the full range of ambient temperatures and does not need to be stored frozen or freeze dried.  *Id.*, ¶¶ 66-67.  As stated in the patent specifications, stable compounds are compounds that can be stored at ambient temperature because they "possess stability sufficient to allow manufacture and which maintains the integrity of the compound for a sufficient period of time to be useful for" the preparation of a pharmaceutical composition or a pharmaceutical product.  Ex. 1 at col. 4:57-63 (D.I. 52-2 at 6).

Notwithstanding the disclosure and context provided in the patents regarding the "stored," "storing," and "storage" terms, Liquidia contends that these terms are indefinite.  A claim is indefinite if, when "read in light of the specification delineating the patent, and the prosecution history," it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  "Any fact critical to a holding on indefiniteness, moreover, must be proven by the challenger by clear and convincing evidence."  *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003).  However, the Federal Circuit has instructed that invalidity arguments should only be considered if the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous.  *See Phillips*, 415 F.3d at 1327.

It is unclear why Liquidia alleges that these claim terms are indefinite.  Indeed, when Liquidia sought *Inter Partes* Review of the '066 and '901 patents, Liquidia proposed

constructions for certain terms, "which are *the same constructions* that would be appropriate in district court litigation."  Ex. P1 at UTC_LIQ00049423 (emphasis added); *see* Ex. P2 (UTC_LIQ00059721-59802, IPR2020-00770, Paper No. 1) at UTC_LIQ00059743 (emphasis added).  These terms did not include "stored" / "storing" / "storage."  *Id.*  Despite now claiming that these terms have no discernable meaning, Liquidia had no problems arguing that the prior art disclosed these limitations in its IPR petitions.  Ex. P1 at UTC_LIQ00049450, 49454-55, 49471, 49475-77; Ex. P2 at UTC_LIQ00059768-70, 59792-95.  Thus, the argument that these terms now lack any discernable meaning rings hollow.

UTC did propose construction for these terms, and the Patent Trial & Appeal Board ("PTAB") adopted precisely the construction that UTC proposes.

> [A]ccording to Patent Owner, we should construe the terms "stored"/"storing"/"storage" to "require that the stored material possesses stability sufficient to allow manufacture and which maintains integrity for a sufficient period of time to be useful for the preparation of a pharmaceutical composition or a pharmaceutical product."  Based on the current record, we find Patent Owner's argument persuasive, and for purposes of this Decision, adopt its proposed construction of "stored"/"storing"/"storage."

Ex. P3 (UTC_LIQ00049380-49396, IPR2020-00769, Paper No. 7) at UTC_LIQ00049387 (citations omitted).  The PTAB readily understood the meaning of these claim terms, and a POSA would have understood these terms to "require that the stored material possesses stability sufficient to allow manufacture and which maintains integrity for a sufficient period of time to be useful for the preparation of a pharmaceutical composition or a pharmaceutical product."

### ii.   Defendant's Answering Position

The terms "stored," "storing," and "storage" from claims 6 and 8 of the '066 patent and claim 6 of the '901 patent, are indefinite at least because (1) UTC and its own experts have offered different definitions of the terms and (2); UTC's proposed construction improperly conflates two independent concepts—storage and stability.

A patent is invalid for indefiniteness if its claims, read in light of the specification, and

36

the prosecution history, fail to inform with "reasonable certainty" those skilled in the art about the scope of the invention. *Nautilus*, 572 U.S. at 901; *Infinity Comput. Prods.*, 2021 WL 476067, at *5 ("Indefiniteness may result from inconsistent prosecution history statements where the claim language and specification on their own leave uncertainty that, if unresolved, would produce indefiniteness."). As explained herein, UTC and its experts have offered inconsistent constructions of the these terms, rendering the terms indefinite.

The '066 and '901 patents' shared specification provides no certainty or guidance with respect to the meaning of the terms. Outside the claims, the term "stored" appears a single time in the specification—"crude treprostinil salts can be stored as raw material at ambient temperature …." *See, e.g.*, Ex. 2 at 17:5-6. UTC proposed inconsistent definitions for the terms during prosecution of the parent '786 patent and during the '066 and '901 IPRs and this litigation, as indicated in the table below.

| UTC's Construction '786 Patent File History | UTC's Construction in '066 and '901 IPR and this Litigation |
|---|---|
| "a period of at least three months" Ex. D16 at 6 (citing Ex. D17, ¶6). | "require that the stored material possesses stability sufficient to allow manufacture and which maintains integrity for a sufficient period of time to be useful for the preparation of a pharmaceutical composition or a pharmaceutical product" Dkt. 52-1 at 6-7; Ex. D4 at 9; *see also* Ex. D5 at 11. |

During prosecution of the parent '786 patent,[13] UTC and its expert, Dr. Guo defined "stored" and "storing" to distinguish its claims from the prior art. Ex. D17, ¶6. UTC stated that "'storing' in the context of 'preparing a pharmaceutical product' would be understood by one of

---

[13] Like the '066 and '901 patents, the '786 patent includes the claim terms "storing" and "storage" (Ex. D1 at claims 1, 9), and, thus, the prosecution history applies with equal force. *Biovail*, 239 F.3d at 1301.

ordinary skill in the art to mean a **period of at least three months**," and criticized the Examiner

for applying a broader interpretation of "storing."  Ex. D16 at 6 (emphasis added).  UTC also

submitted the Guo Declaration, which stated that "a person working in the field of

pharmaceutical chemistry would know that the term 'stored' in the context of storing a drug

substance to be used for preparing a pharmaceutical product means storing for **at least three**

**months**."  Ex. D17, ¶6 (emphasis added).  Dr. Guo also stated that a POSA reading the sentence

"crude treprostinil salts can be stored as raw material at ambient temperature," would "recognize

that the term 'stored' in this statement means stored for a period of at least three months."  *Id*.

 After prosecution of the '786 patent was completed, and after Liquidia filed its '066 and

'901 IPR petitions, UTC proposed a different construction in the context of the '066 and '901

IPRs and here, which lacks the three-months limitation and imposes a new stability limitation.[14]

UTC's abandonment of the three-month storage requirement for purposes of the IPRs is

surprising given that it continues to rely on the Guo Declaration to distinguish the '901 patent

claims from the prior art.  *See* Ex. D8, ¶¶81, 91, 275.

 UTC's inconsistent definitions of "stored," "storing," and "storage" render the claim

terms indefinite.  *Teva Pharms.*, 789 F.3d at 1344-45 (holding claim term indefinite where

patentee used two inconsistent definitions during prosecution of related patents sharing same

specification); *Infinity Comput. Prods., Inc. v. Oki Data Ams., Inc.*, No. 18-463-LPS, 2019 WL

2422597, at *4-6 (D. Del. June 10, 2019) ("[A] person of ordinary skill in the art would not be

reasonably certain as to which of the patentee's two inconsistent definitions of 'passive link' is

---

[14] UTC's argument that the terms stored/storing/storage cannot be indefinite in light of
Liquidia's '066 and '901 IPR petitions (*see supra* § V.C.i.1, at 35-36), ignores the fact that
UTC's inconsistent constructions of these terms, resulting in indefiniteness, ***occurred after***
Liquidia filed its petitions.

used in the claims, rendering the claims indefinite."), *aff'd*, 2021 WL 476067, at *8.  UTC's experts, Dr. Guo and Dr. Ruffolo considered the same terms in the context of the same shared specification and arrived at two different definitions, resulting in the public having no notice as to whether "storage" does or does not require stability, or whether it does or does not require a three month time period.  Here, given the lack of guidance in the specification and the two inconsistent constructions, a POSA would not be reasonably certain as to which of UTC's definition is correct.

UTC's attempt to conflate "storage" and "stability," two separate concepts, and its unwillingness to do the same in the Guo Declaration, further renders the claim terms indefinite and violates the well-settled rule that "when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement."  *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) (en banc).  Claim 8 of the '066 patent expressly includes the term "stable."  UTC's and Dr. Ruffolo's attempt to import the shared specification's definition of "stable" into its proposed construction of "storage" impermissibly renders the claim term redundant.  *See supra* § V.C.i.1, at 34-35; Ex. P4, ¶¶67-70.  Moreover, looking at the same evidence, UTC's prior expert, Dr. Guo, did not include a "stability" limitation in the definition of storage and instead only required a time limitation of three months, whereas Dr. Ruffolo did the exact opposite.  Ex. D17, ¶6; Ex. P4, ¶71.  And both proposed definitions run counter to the plain and ordinary meaning of "storage" as "[a]ny method of keeping raw materials, chemicals…while awaiting use, transportation, or consumption."  Ex. D22 at 1180.  The fact that two of UTC's own experts, reviewing the same exact material, provide two very different constructions for the same terms renders these terms indefinite.

### iii.    **Plaintiff's Reply Position**

The terms "stored," "storing," and "storage" would be understood by a POSA to "require that the stored material possesses stability sufficient to allow manufacture and [] maintains integrity … for a sufficient period of time to be useful for the preparation of a pharmaceutical composition or pharmaceutical product." Ruffolo Decl., ¶71.  The claim language itself demonstrates that the claims require storage and stability sufficient for manufacturing a pharmaceutical composition/product. *See Phillips*, 415 F.3d at 1314 (noting "the context in which a term is used in the asserted claim can be highly instructive" and that "the use of a term within the claim provides a firm basis for construing the term").  For example, claim 8 of the '066 patent requires forming a salt of treprostinil that is "stable."  Ex. 1 at Claim 8.  The claims require that stability is maintained through "storing the treprostinil salt" and "preparing a pharmaceutical product from the Treprostinil salt *after* storage." *Id*. (emphasis added).  After reviewing the relevant claims, specifications, and prosecution history, this is precisely the construction the PTAB found during the IPR for this patent.  Ex. P3, UTC_LIQ00049387 (adopting construction).[15]

A POSA would understand that "[s]tability upon storage is critical to pharmaceutical manufacturing" and that one could not manufacture a pharmaceutical product if the treprostinil salt compound became instable prior to preparation. Ruffolo Decl., ¶66.  Therefore, the claims require stability *from* treprostinil salt formation, *during* storage, and *through* "preparing [the] pharmaceutical product." Ex. 1 at Claim 8.  The claims necessarily link stability to storage and a POSA would understand that "'stored'/'storing'/'storage' are all related to and dependent upon

---

[15] UTC's construction here is consistent with the position it took in the IPR proceedings.  *See* Ex. D4 at LIQ00083821-822; *see* Ex. D7 at LIQ00084509-510.

drug stability."  Ruffolo Decl., ¶66.  The specification defines "stability" as "sufficient *to allow manufacture* and which maintains the integrity of the compound for *a sufficient period of time to be useful* for [manufacturing]."  Ex. 1 at 4:57-63; Ex. 2 at 5:4-10 (emphasis added).  A POSA would understand that in the context of pharmaceutical manufacturing storage requires "stability sufficient to allow manufacture and which maintains integrity … for a sufficient period of time to be useful for the preparation of a pharmaceutical composition or pharmaceutical product."  Ruffolo Decl., ¶¶68-71.

Nonetheless, Liquidia asserts the claim terms "stored," "storing," and "storage" are indefinite. Liquidia does not come close to presenting clear and convincing evidence that a POSA would have no reasonable certainty as to the meaning of these common terms in the commercial pharmaceutical manufacturing context.  In fact, Liquidia offers no evidence at all, beyond unsupported attorney argument, to rebut Dr. Ruffolo's expert opinion.  This alone is fatal to Liquidia's indefiniteness argument.

Liquidia contends that UTC offered "inconsistent constructions," but the statements at-issue are wholly consistent.  Resp. at 37.  As noted, a POSA would understand "that the terms 'stored'/'storing,'/'storage' are *known to be related to the stability* of a drug or drug product."  Ruffolo Decl., ¶66 (emphasis added).  Accordingly, Dr. Guo's statement that "storing" would mean for a period of at least "three months," in context of the claims, is not "the exact opposite" of having stability sufficient to allow manufacture. Resp. at 39.  Moreover, Dr. Pinal expressly considered Dr. Guo's opinions in evaluating the claims.  *See* Ex. D8 at LIQ00084613, 619-620, 702 (¶¶81, 91, 275); *see also* Ex. D9 at LIQ00084755 (122:12-22).  As Dr. Ruffolo explained, storage and stability of API for pharmaceutical manufacture are "related."  Ruffolo Decl., ¶66.  They are not, as Liquidia claims, "two separate concepts." Resp. at 39.  Accordingly, a POSA

would understand storage for "at least a three months" as consistent with stability for a sufficient period for the preparation of a pharmaceutical composition/product.

Finally, Liquidia's complaint that reading storage and stability together as related concepts is somehow "redundant" is odd. *Id.* The fact that claim 8 of the '066 patent requires that the treprostinil salt be "stable" *at formation* is in no way "redundant" with a requirement that it *remain* stable through storage and preparation of the pharmaceutical product. By Liquidia's view, the claim terms without any construction are indefinite and provide "no notice" of their meaning. But Liquidia also asserts that understanding storage and stability to be related (as a POSA would) makes them redundant. *Id.* This makes little sense—the terms cannot each be indefinite alone but redundant together. Again, the PTAB did not find the "storage" terms to be incapable of construction and adopted the construction UTC proposes here. Ex. P3, UTC_LIQ00049387.

### iv.   Defendant's Sur-Reply Position

UTC's contention that Liquidia lacks "evidence" to rebut Dr. Ruffolo's declaration ignores the fact that Dr. Ruffolo's declarations do not address Dr. Guo's definition of "storage," and thus do not reconcile the conflicting definitions.

UTC's rationale to explain away this discrepancy, by arguing that Dr. Guo's definition implicitly requires stability, is wrong. *Supra* § V.C.iii, at 41-42. Dr. Ruffolo and Dr. Guo reviewed the same specification, the same term, "stored," and offered different constructions. Dr. Ruffolo requires "stability sufficient to allow manufacture" for a "sufficient period of time." Dr. Guo requires a specific time period (minimum of "at least three months") with no stability requirement. *Supra* § V.C.ii, at 37-38; Ex. D17, ¶6. Dr. Ruffolo's testimony confirms the two constructions are inconsistent: when asked whether his definition included a three month time period, Dr. Ruffolo stated that his construction included no specific time requirement and that "it

could be longer, maybe, and it certainly could be shorter than [the] three months."[16]  Ex. D30 at 169:19-170:9.  Dr. Ruffolo further testified that the specifications do not provide storage conditions beyond ambient temperature.  *Id.* at 163:6-18.  He also did not know what a "sufficient period" would be for treprostinil or how stable treprostinil needs to be to satisfy the claim under his construction.  *Id.* at 156:17-158:16.  Dr. Ruffolo's testimony confirms the conflict between UTC constructions and further establishes both the term and UTC's litigation construction are indefinite.

Finally, UTC's reliance on '066 Patent claim 8 to argue the claims require both stability and storage is inapplicable as claim 8 ***separately*** requires stability and storage.  *Supra* § V.C.ii, at 39-40.  Claims 6 of the '066 and '901 Patents, however, do not recite "stability," thereby establishing the difference between "stability" and "storage."  Ex. 1, claim 6; Ex. 2, claim 6; *supra* § V.C.ii, at 39-40.  Moreover, when asked about claim 8 of the '066 Patent, which plainly requires "***storing*** the treprostinil salt" and "preparing a pharmaceutical product from the treprostinil salt ***after storage***," Dr. Ruffolo testified that actual storage was not required.  Ex. D30 at 129:2-136:21.  Dr. Ruffolo's positions conflict with UTC's '901 IPR sur-reply, which relies on storage of treprostinil salt, which is "***used for later***," to distinguish the claims from the prior art.  Ex. D33, 18 (emphasis added).  Dr. Ruffolo's testimony regarding UTC's construction of these terms strains credulity, highlights the discrepancies between UTC's competing constructions, and further supports that the terms are indefinite.

---

[16] Dr. Ruffolo's testimony is inconsistent with UTC's arguments that "storing" cannot include "some time elapses between preparation of a compound and its use" but instead understood by a POSA "to mean a period of at least three months."  Ex. D16 at 6.

D.      Term 4: "pharmaceutical batch"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction | Patent(s) & Claims |
|---|---|---|
| "a specific quantity of treprostinil (or its salt) that is intended to have uniform character and quality, within specified limits, and is produced according to a single manufacturing order during the same cycle of manufacture, wherein the uniform character and quality is such that it still contains impurities resulting from the method by which it is produced" | "pharmaceutical batch made according to the process recited in steps (a) – (d) and optionally (e), wherein no purification steps appear between alkylation and salt formation" | '901 patent, claims 1-4, 6, and 8 |

**Representative claim – '901 patent, claim 1:**

A _pharmaceutical batch_ consisting of treprostinil or a salt thereof and impurities resulting from (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and wherein the _pharmaceutical batch_ contains at least 2.9 g of treprostinil or its salt.

i.      **Plaintiff's Opening Position**

1.      **UTC's construction for "pharmaceutical batch" should be adopted by the Court**

UTC's construction of the term "pharmaceutical batch" is how a POSA would have understood this term in view of the claims, '901 patent specification, and prosecution history. UTC's construction is consistent with the qualities of a pharmaceutical batch of material – namely its uniform character and quality, produced with sufficient volume in a single manufacturing cycle, with the impurities resulting from the method of synthesis. In essence, those are the relevant aspects that differentiate a "pharmaceutical batch" from "a batch."

A POSA would have known that 21 C.F.R. 210.3(b)(2) defines "batch" as "a specific quantity of a drug or other material that is intended to have uniform character and quality, within specified limits, and is produced according to a single manufacturing order during the same cycle of manufacture."  Ruffolo Decl., ¶ 75.  A POSA would have further recognized that the manufacturing process described and claimed in the '901 patent produced a treprostinil product with markedly lower impurities than the Former Process.  *Id.* at ¶ 89.  And a POSA would have recognized that the markedly lower impurities in the product produced by the method of the '901 patent are the result of the salt formation step that was such a dramatic improvement over the Former Process.  *Id.*

Consistent with this understanding, a POSA would have understood that a pharmaceutical batch would involve sufficient quantities to use in pharmaceutical settings, and that the synthesis of that material would carry with it the impurities associated with the synthesis process.  And the specification is consistent with this understanding.  Example 6 of the '901 patent compares an "Example of the Process According to the Present Invention," which is a commercial manufacturing process, to the "Former Process," which is a drug development process.  Ex. 2 at col. 15:27-29 (D.I. 52-2 at 24); *see also* Ruffolo Decl., at ¶¶ 84-86.  A POSA would have recognized that drug development and commercial manufacturing processes are completely different processes and would not have been seen to be equivalent or synonymous with each other.  Ruffolo Decl., at ¶¶ 83, 86.  In the comparison in Example 6, the "Former Process," which was based on Moriarty 2004,[17] was disclosed as producing sub-kilogram quantities of treprostinil with a batch size of 500g.  Ex. 2 at col. 15:38 (D.I. 52-2 at 24).  In contrast, the process disclosed and claimed in the '901 patent was disclosed as producing multi-kilogram quantities of treprostinil – with a batch size of 5 kg.  *Id.*  A POSA would have understood that multi-kilogram quantities of treprostinil would have been needed to meet the increased needs for commercial manufacturing.  Ruffolo Decl., ¶¶ 77-81.  Accordingly, the claimed process would

---

[17] D.I. 52-2 at 123-124 (UTC_LIQ00006759-6765, Appl. No. 14/754,932, August 11, 2016 Amendment and Response at UTC_LIQ00006762-63).

have been understood by a POSA to constitute a pharmaceutical batch, while the Former Process would not.  *Id.* at ¶ 86.

Further, the comparison in Example 6 shows that process disclosed and claimed in the '901 patent results in a product with higher purity than the Former Process.  Ex. 2 at col. 16:63 (D.I. 52-2 at 24) (Purity of 99.9% for the claimed process, compared to purity of ~99.0% for the Former Process).  A POSA would have recognized that the higher purity of the process claimed in the '901 patent compared to the Former Process, combined with greatly increased batch size, distinguishes the pharmaceutical batch claimed in the '901 patent from the product produced by the Former Process.  As explained in the prosecution history of the '901 patent, "a pharmaceutical batch produced according to steps (a)-(e) of claim 1 is different from the product produced by the process described in Moriarty 2004."  D.I. 52-2 at 124 (Appl. No. 14/754,932, August 11, 2016 Amendment and Response at UTC_LIQ00006763).

Liquidia again tries to read into the term "no purification steps appear between alkylation and salt formation."  A POSA would not have understood "pharmaceutical batch" to include the extra limitations proposed by Liquidia.  Ruffolo Decl., ¶ 92.  As discussed *supra* (§V.A.i), the '901 patent discloses "purification steps . . . between alkylation and salt formation" in Examples 2 and 6.  Thus, Liquidia's proposed construction is contradicted by the specification and should not be adopted by the Court.  *E.g.*, *SIPCO*, 2012 WL 3112302, at *9.

Furthermore, the novel salt formation step rendered the column chromatography step in the Former Process unnecessary and irrelevant – there was no longer any need for column chromatography because the salt formation step provided a product with purity of 99.9%.  Ex. 2 at col. 16:63 (D.I. 52-2 at 24); *see also* Ruffolo Decl., ¶ 92.  Any extra column chromatography steps before salt formation would have been like adding an inactive ingredient to a pharmaceutical composition.  *Sanofi-Aventis*, 2010 WL 1049877, at *4.

In view of the understanding of a POSA, the claims, specification, and prosecution history of the '901 patent, a POSA would have understood "pharmaceutical batch" to mean "a specific quantity of treprostinil (or its salt) that is intended to have uniform character and quality,

46

within specified limits, and is produced according to a single manufacturing order during the same cycle of manufacture, wherein the uniform character and quality is such that it still contains impurities resulting from the method by which it is produced."

### ii.   **Defendant's Answering Position**

The "pharmaceutical batch" of claims 1-4, 6, and 8 of the '901 patent, when read in light of the claim language, specification, and UTC's statements in the '901 IPR, is made according to a process that does not include a purification step between the alkylation and salt formation steps.  To justify its continued infringement allegations here, UTC again takes a position on the claimed process opposite of what it told the PTAB in the '901 IPR.

| UTC told the PTAB: | UTC told this Court: |
| --- | --- |
| "This perspective is critical in the context of the claimed pharmaceutical composition, in which, *e.g.*, **no purification steps appear between alkylation and salt formation**." Ex. D5 at 56 (emphasis added). | A "POSA would not have understood 'pharmaceutical batch' to include the extra limitations proposed by Liquidia." *Supra* § V.D.i.1, at 46; Ex. P4, ¶¶92-93. |

Just like the '066 IPR, in the '901 IPR, UTC told the PTAB that the prior art did not permit large-scale synthesis, and that "[t]his perspective is critical in the context of the claimed pharmaceutical composition, in which, *e.g.*, ***no purification steps appear between alkylation and salt formation***."  Ex. D5 at 56 (emphasis added).  UTC, in its Patent Owner Preliminary Response, further emphasized absence of purification, including column chromatography, as a benefit of the claimed invention.  *Id*. at 35.  In its brief here, UTC argued column chromatography used in the "Former Process" of Example 6 is "unnecessary and irrelevant" given the salt formation step currently claimed.  *Supra* § V.D.i.1, at 47; *see also* Ex. P4, ¶92.  These statements confirm that the claimed process of making the pharmaceutical batch does not permit a purification step between alkylation and salt formation.  *See Aylus*, 856 F.3d at 1362.

Moreover, a plain reading of claims 1-4, 6, and 8 does not permit a purification step between alkylation and salt formation. *See Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."). Claim 1 of the '901 patent is directed to a pharmaceutical batch of treprostinil and impurities resulting from a series of process steps (a)-(e). The process steps described in Claim 1 do not include a purification step. Claim 2-4, and 6 are directed to a pharmaceutical product or preparing a pharmaceutical product from the pharmaceutical batch in Claim 1, while Claim 8 recites the same process steps (a) to (d) and optionally (e) as Claim 1. Claims 2-4, 6, and 8 thus similarly lack a purification step. Thus, a plain reading of the claims does not permit a purification step between alkylation and salt formation.

As discussed, supra at Section V.A.ii in the context of "process," the lack of a purification step, as proposed by Liquidia's construction is also consistent with the shared patent specification. These disclosures from the shared specification apply equally here.

As they did during the '066 patent prosecution, UTC again, during the '901 patent prosecution, distinguished the claimed process for making the pharmaceutical batch over the prior art by emphasizing that the starting batch of treprostinil is not purified before salt formation. Indeed, UTC made the same arguments in the '901 patent prosecution as the '066 patent prosecution, relying on the same documents from the '393 IPR to argue that the prior art (Moriarty) taught purification before salt formation, whereas the '393 claims do not. *See* Ex. D18 at 4-5; Ex. D10 at 32 (citing Example 6 of the '393 patent); Ex. D27 at claims; *see also* SectionV.A.ii, *supra*. The Examiner withdrew the rejection of the '901 patent claims in view of UTC's arguments. Ex. D19 at 2. Thus, considering UTC's clear and unambiguous statements regarding claim scope and reliance on its '393 IPR arguments, a POSA reading the prosecution

history of the '901 patent would understand that the claimed pharmaceutical batch cannot result from a process with a purification step between alkylation and salt formation.

UTC's construction is also improper because it imports a definition from an FDA regulation, 21 C.F.R. § 210.3, —never referenced by the patents–and only introduces additional undefined terms that never appear in the specification— "uniform character and quality," "single manufacturing order," or "same cycle of manufacture." *Supra* § V.D.i.1 at 44-45. UTC and Dr. Ruffolo attempt to distinguish a "batch" from a "pharmaceutical batch" by arguing that "pharmaceutical" denotes commercial character. *Supra* § V.D.i.1 at 45-46; Ex. P4, ¶75. Without support, they refer to the "Former Process" of Example 6 as a "drug development process," and the Process of the invention as a "commercial manufacturing process." *Supra* § V.D.i.1 at 45-46; Ex. P4, ¶¶84-86. To begin with, "Former Process" was UTC's prior commercial process for making treprostinil, a process disclosed in Moriarty, and confirmed by the PTAB. *See* Ex. D11 at 17, 18, 35 (discussing the purity of "commercial batches of Moriarty"), 38. UTC's argument also ignores the specification's definition of "[p]harmaceutically acceptable"—"useful in preparing a pharmaceutical composition that is generally safe, non-toxic and neither biologically nor otherwise undesirable and includes being useful for veterinary use as well as human pharmaceutical use"—which includes no mention of "commercial." Ex. 2 at 5:27-31. For this reason, "pharmaceutical" cannot afford commercial character when modifying "batch." Even UTC's own IPR expert, Dr. Pinal, agreed that "pharmaceutical" does not denote commercial character. Ex. D9 at 112:12-115:20.

Dr. Pinal also contradicted UTC's attempts to distinguish development batches from commercial batches when he testified that Example 6's use of the term "batch" would denote

"pharmaceutical batch" to a POSA.  *Id*. at 94:12-95:4.  Indeed, Example 6 identifies the

treprostinil of ***both*** the Former Process and the Process according to the invention as a "batch."

| Example 6 | | |
| --- | --- | --- |
| Comparison of the Former Process and a Working Example of the Process According to the Present Invention | | |
| | | Working example of the Process according to the present invention |
| Step No.   Steps | Former Process (Batch size: 500 g) | (Batch size: 5 kg) |

Finally, UTC alleges that the purity of the treprostinil made according to the invention is

higher than the purity made by the Moriarty "Former Process," thereby distinguishing a "batch"

and a "pharmaceutical batch."   *Supra* § V.D.i.1 at 46.  UTC made this exact argument during the

'393 IPR, which the PTAB rejected, and the Federal Circuit affirmed, because batches of

treprostinil made according to the Moriarty "Former Process" were as pure, if not more pure,

than treprostinil made according to the claimed invention.  Ex. D11 at 38; *SteadyMed*, 702 F.

App'x at 990; *see also* Ex. D26 at 8 ("'higher average purity' is not a limitation in the challenged

claims of the '901 patent.") (citation omitted).  There is simply no basis for UTC's construction,

which improperly imports commercial scale and FDA regulatory guidance.

A POSA would understand that Claims 1-4, 6, and 8 of the '901 patent, when read in

light of the specification, prosecution history, and subsequent IPR, cannot include a purification

step between alkylation and salt formation, and UTC is now estopped from arguing that Claim 1-

4, 6, and 8 could include a purification step.

### iii.    __Plaintiff's Reply Position__

A POSA would understand the term "pharmaceutical batch" read in light of the claims, specification, and prosecution history to have the meaning proposed by UTC and adopted by the PTAB.  This definition is consistent with claims 1-9 of the '901 patent, which includes a pharmaceutical batch and "impurities" resulting from the manufacture of the pharmaceutical batch.  *See Phillips*, 415 F.3d at 1314 ("the use of a term within the claim provides a firm basis for construing the term").  This definition is also consistent with the specification and file history of the '901 patent.  *See* Resp. at 44-47; Ruffolo Decl., ¶¶72-93.[18]

Liquidia's stance that "pharmaceutical batch" excludes any "purification step between the alkylation and salt formation" (Resp. at 47) does not align with the patents' descriptions.  *See id.* at 46; Ruffalo Decl., ¶92 ("this has no justification based on the claims, patent specification or prosecution history of the '901 patent, and ignores the fact that at least eight purification steps already exist between the alkylation and salt formation steps denoted in the '901 specification").  By ignoring the fact that the specification includes various examples with purification steps between alkylation and salt formation, Liquidia's construction is contrary to the patentee's intent, and cannot be the correct construction.  *See OSRAM GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) ("a claim interpretation that would exclude the inventor's device is rarely the correct interpretation.") (citation and quotation marks omitted).  Liquidia argues that because the extra column chromatography step is "unnecessary and irrelevant" to the claims, the claimed process "does not permit" such a step.  Resp. at 47.  The fact that a step may be unnecessary does not mean it is prohibited.  Liquidia's position does not comport with logic or

---

[18] UTC's construction here is consistent with the position it took in the IPR proceedings.  *See* Ex. 9 at LIQ00084507-508.

the law.  *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331-32 (Fed. Cir. 2004) ("while 'consisting of' limits the claimed invention, it does not limit aspects unrelated to the invention").

Similarly, Liquidia argues that claims 1-4, 6, and 8 lack extra purification steps and therefore "do[] not permit a purification step between alkylation and salt formation."  Resp. at 48.  The overreach of Liquidia's argument is clear when considering claim 8 of the '901 patent, which recites "[a] method of preparing a pharmaceutical batch as claimed in claim 1, *comprising*" various steps.  Ex. 2 at Claim 8 (emphasis added).  The plain reading of claims 1 and 8 together is that claim 1 is directed towards the *pharmaceutical batch*, while dependent claim 8 is directed towards the *method of preparing the pharmaceutical batch* claimed in claim 1.  When claim 8 describes the method of preparing the pharmaceutical batch, it uses the open term "comprising" when reciting the claimed steps, and thus includes but is not limited to those steps.

If Liquidia's construction of "pharmaceutical batch" were accepted, it would improperly strike the word "comprising" and limit claim 8's open method to a narrower scope than that recited in the patent.  Such a construction would fail to give proper weight to words and context of the claims.  *See Smith & Nephew, Inc. v. Ethicon, Inc.*, 276 F.3d 1304, 1311 (Fed. Cir. 2001) ("A claim is not defective when it states fewer than all of the steps that may be performed in practice of an invention."); *see, e.g., Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1271 (Fed. Cir. 1986) (method as practiced can include steps in addition to those stated in the claim).  Liquidia's contention does not account for the context of method claims where infringement arises when all of the steps of a claimed method are performed, regardless of whether the infringer also performs additional steps. *See, e.g., Vivid Techs., Inc. v. Am. Sci. &*

*Eng'g, Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999) (inclusion of steps in addition to those stated in the claim does not avoid infringement).

As discussed, Liquidia's reliance on IPR statements made to support the requisite level of skill in the art and distinguish the claims at issue from the claims of the '393 patent is misplaced. Ex. D5 at LIQ00083788 ("*e.g.*, no purification steps appear between alkylation and salt formation"). Liquidia again misconstrues this language to manufacture a disavowal argument in hopes of excluding purification steps from the claims. This argument fails for the same reasons discussed above. While it is beneficial that column chromatography need not be performed in some of the embodiments, recognition of a benefit does not equate to a prohibition on performing column chromatography.

Notably, UTC's proposed construction to the PTAB for the term "pharmaceutical composition" has remained consistent, whereas it is Liquidia that again changes positions. UTC maintains—as both before this court and before the PTAB—that a POSA would not have understood "pharmaceutical batch" to include the extra limitations proposed by Liquidia. At the PTAB, Liquidia asserted that "[f]or the purposes of resolving this IPR, Petitioner does not believe construction of claim terms is required. All terms should be given their plain and ordinary meaning in the art as of December 2007." Ex. P2 at UTC_LIQ00059743-744; *see also* Ex. P6 at UTC_LIQ00049725 (¶35) (Liquidia's expert asserting "I have reviewed the claims of the '901 patent. I believe a person of ordinary skill in the art would understand each of the claim terms to take on its plain and ordinary meaning.").

Liquidia's other criticisms are of no moment. Liquidia resists UTC's extrinsic evidence, including relevant sections of the C.F.R. and expert testimony providing context as to a POSAs understanding. This evidence is consistent with the intrinsic evidence. Liquidia misconstrues

Dr. Pinal's testimony (Ex. D9 at LIQ00084748 (94:12-95:4)) in order to further its position (Resp. at 49). Dr. Pinal testified that "batch" in the context of the '901 patent, means pharmaceutical batch—he did not testify that generally "batch" and "pharmaceutical batch" were interchangeable, nor did he say anything about a POSA's understanding of a prior art disclosure of a "batch." Ex. D9 at LIQ00084748 (94:12-95:4). Finally, Liquidia again misapprehends the prosecution history, this time conflating the claims of the '901 and '393 patents. As with the '066 patent, Liquidia falsely suggests that UTC cited Ex. D10 at 32 to the Examiner during prosecution of the '901 patent. Resp. at 48-49. Liquidia's citation and argument is misleading because it takes out of context statements concerning claims 8 and 16 of the '393 patent that expressly prohibit the additional purification step—unlike the claims of the '901 patent. Indeed, UTC did not rely on these statements (Ex. D10 at 32) and in fact directed the Examiner only to Ex. D10 at 12 during prosecution of the '901 patent. *See* Ex. D18 at 4-5 (citing Ex. D10 at 12 ("Section III.C") *not* Ex. D10 at 32). There was no disavowal.

### iv.    Defendant's Sur-Reply Position

UTC cannot avoid its unambiguous prosecution and '901 IPR statements that the "claimed pharmaceutical batch compositions" are made by a process in which "***purification is excluded between alkylation and salt formation***" (Ex. D7 at 25 (emphasis added)), nor can it ignore the specification's repeated emphasis that column chromatography is eliminated (Ex. 2 at 6:9-12, 16:66-17:1). *See supra* V.D.ii, at 47-48. Indeed, while UTC asserts this statement was made to support its definition of a POSA (*supra* § V.D.iii, at 53), UTC actually repeated this argument to overcome prior art in the '901 IPR and to support its alleged secondary considerations in the IPR and here—negating its argument that the term "comprising" in claim 8 permits purification between alkylation and salt formation. *Supra* § V.D.iii, at 52-53; Ex. D7 at 58 ("Rather, the POSA must have been motivated to combine the prior art ***in the way claimed in***

***the '901 patent*** (e.g., not purified before salt formation)…."), 67; Ex. D29 at 24, 26.  These statements–never addressed by Dr. Ruffolo–are dispositive of the issue.

UTC's construction is not supported by its own extrinsic evidence.  *Supra* § V.D.iii, at 53-54.  Dr. Ruffolo admitted that 21 C.F.R. §210.3 had no requirement that the batch contain impurities, he was unaware of any circumstance where the FDA required impurities, and couldn't imagine the agency doing so.  Ex. D30 at 200:22-201:10.  UTC's alleged distinction between a development batch and a "commercial" pharmaceutical batch is belied by its own reply and Dr. Ruffolo's deposition.  UTC noted, and Liquidia agrees, Dr. Pinal testified that "batch" in the context of the '901 Patent means "pharmaceutical batch," (*supra* § V.D.iii, at 53-54; Ex. D9 at 94:19-95:4), and thus the use of "batch" to describe both the "Former Process" and the "Process" according to the invention would be consistent.  *Supra* § V.D.ii, at 49.  And despite admitting that the "Former Process" of Example 6, yielding 535g of treprostinil, was used commercially by UTC, and the "Former Process" and "new" claimed process used the same treprostinil release specification, Dr. Ruffolo rejected that 535g was commercial scale.  (Ex. D30 at 211:2-19.)  Yet, when asked whether 2.9g of treprostinil would be large-scale, he claimed to not know.  (*Id.* at 206:24-208:7)  Dr. Ruffolo's desire to read in a commercial, large-scale limitation into "pharmaceutical batch" (Ex. P4, ¶¶75-76, 78-86, 91), while ignoring the express 2.9g limitation that runs contrary to his position is inconsistent, lacks credibility, and should be given no weight.

UTC also mistakenly asserts that "Liquidia argue[d] that because the extra column chromatography step is 'unnecessary and irrelevant' to the claims, the claimed process 'does not permit' such a step."  *Supra* § V.D.iii, at 51-52.  Liquidia explained, rather, that ***UTC's statements*** that column chromatography is "unnecessary and irrelevant" further confirm that the

claimed process of making the pharmaceutical batch does not permit a purification step between alkylation and salt formation.  *Supra* § V.D.ii, at 47-48.  As such, UTC's reliance on *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321 (Fed. Cir. 2004) is misplaced.  *Supra* § V.D.iii, at 51-52. If a purification step was "unrelated to the invention," then UTC would not have expressly touted the ***elimination*** of purification steps between alkylation and salt formation as an advantage distinguishing the claims from the prior art.  *See* Ex. D7 at 5, 25, 58, 67; Ex. D5 at 35; Ex. 2 at 6:9-12, 16:66-17:1.

 **E.** **Term 5: "contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction | Patent(s) & Claims |
|---|---|---|
| plain and ordinary meaning | "contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, wherein the salt is formed without isolation of treprostinil after alkylation and hydrolysis" | '901 patent, claims 1 and 8 |

  <u>**Representative claim – '901 patent, claim 1:**</u>

  A pharmaceutical batch consisting of treprostinil or a salt thereof and impurities resulting from (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) *contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil*, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and wherein the pharmaceutical batch contains at least 2.9 g of treprostinil or its salt.

 **i.** <u>**Plaintiff's Opening Position**</u>

  **1.** **Plain and ordinary meaning is appropriate**

  "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips*, 415 F.3d at 1312 (internal quotations and citation omitted).  The phrase, "contacting the solution comprising treprostinil

from step (b) with a base to form a salt of treprostinil," is used in its plain and ordinary meaning in the '901 patent and does not need construction.  The '901 patent did not provide any special meaning to this term, and a POSA would have applied its plain and ordinary meaning.  Ruffolo Decl., ¶ 95.

Liquidia's proposed construction simply takes the existing claim language and appends an additional limitation—wherein the salt is formed without isolation of treprostinil after alkylation and hydrolysis.  A POSA would not have read into the claims the unnecessary and irrelevant limitation proposed by Liquidia.  The '901 patent specification states that "treprostinil salts *can* be synthesized from the solution of treprostinil without isolation" (Ex. 2 at 17:8-10 (D.I. 52-2 at 25) (emphasis added)), showing that this step is permissive, and not disclaimed. Indeed, when the patentees wanted to include an isolation limitation in the claims, they did so. *Id.* at claims 1(d) and 8(d) ("isolating the salt of treprostinil").  The inventors specifically chose not to here.  There is no indication in the specification that the process *must* be done without isolation.  Ruffolo Decl., ¶ 95.  A POSA would not read in this unnecessary and irrelevant limitation based on permissive language in the specification, but rather, would use the plain and ordinary meaning of this term.  *E.g.*, *Orthopaedic Hosp. v. DJO Global, Inc.*, No. 19-CV-970 JLS (WVG), 2020 WL 3498167, at *5-7 (S.D. Cal. June 29, 2020) (applying plain and ordinary meaning, and refusing to find disclaimer, when the specification used permissive language to describe the type of "sterilization" that can be used).

### ii.    Defendant's Answering Position

Claims 1 and 8 of the '901 patent do not permit isolation of treprostinil before salt formation.  The Court's construction of this phrase is relevant to Liquidia's non-infringement. Liquidia provided UTC with documentary evidence that the treprostinil in Liquidia's LIQ861 *is isolated* prior to salt formation and cannot infringe.  UTC attempts to salvage its infringement position by pursuing a claim construction that is the opposite of what it told the PTAB, in the context of validity, during the '901 IPR.

| UTC told the PTAB: | UTC told this Court: |
|---|---|
| "Each claim of the '901 patent further *requires* forming the salt *without isolating the intermediate acid*."  *E.g.*, Ex. D7 at 15, 53 (emphasis added). | Forming the treprostinil salt without prior isolation "is permissive and not disclaimed." *E.g.*, *supra* § V.E.i.1 at 56-57. |

UTC should be held to its clear statements of claim scope in the IPR, and the Court should construe the "contacting the solution" phrase consistent with Liquidia's construction, which *does not permit* isolation of treprostinil before salt formation.  *See Aylus*, 856 F.3d at 1361.

In the "Claim Construction" section of its Patent Owner Response, UTC told the PTAB that the "contacting the solution" phrase should be construed to "mean[] treprostinil is *not isolated* from the solution formed in step (b) before forming a salt in step (c)."  Ex. D7 at 11 (emphasis added).  UTC further argued that the phrase "*requires* the solution in which treprostinil is formed be used directly in the next salt-forming step *without isolating treprostinil in between*."  *Id.*  (emphasis added).  UTC's statements amount to a clear and unmistakable acknowledgment that the claims of the '901 patent do not permit isolation of treprostinil prior to salt formation.  *See Acceleration Bay LLC v. Activision Blizzard, Inc.*, No. 16-453-RGA, 2017 WL 6508715, at *5-6 (D. Del. Dec. 20, 2017) (applying prosecution disclaimer to limit claim scope based on statements made by the Patent Owner during a parallel IPR (citing *Aylus*, 856 F.3d at 1360-61)).  UTC and its expert, Dr. Ruffolo, failed to even acknowledge UTC's statements to the PTAB in their opening papers.

UTC repeatedly told the PTAB in multiple '901 IPR submissions that the claims of the '901 patent do not permit isolation of treprostinil prior to salt formation.  *See* Ex. D7 at 15 ("Each claim of the '901 patent further *requires* forming the salt *without isolating the*

*intermediate acid*.") (emphasis added); *id.* at 53 ("[E]ach claim of the '901 patent requires that

treprostinil *not* be isolated before forming a salt[.]") (emphasis in original); Ex. D5 at 71

("[A]dditional advantages include … synthesis without isolation …."); Ex. D6 at 3 ("[C]laim 1

states that the recited impurities must be those specific impurities that result from a process in

which the *salt is formed without isolation of treprostinil intermediate after alkylation and

hydrolysis* ….") (emphasis added).

Moreover, in the '901 IPR, UTC expressly distinguished the claimed process over a

Phares reference[19], arguing that a POSA reading Phares would not have a reasonable expectation

of success in removing the isolation step between hydrolysis and salt formation.  *See* Ex. D7 at

29-34.  UTC further argued that in Phares, "treprostinil *is isolated before* forming a salt, in

contrast to the present claims which require *not isolating treprostinil before* forming a salt."  *Id.*

at 29 (emphasis added); *see also id.* ("Claim 1's recited steps differ from Phares at least because

these steps do not involve isolation of treprostinil intermediate.").  UTC concluded that Liquidia

"failed to establish that a POSA would have been motivated to *remove the step of isolating the

treprostinil before contacting it with a base* … [and] the unpredictability of eliminating an

intermediate isolation … would have dissuaded a POSA from making such a modification."  *Id.*

at 34 (emphasis added).  The PTAB, in its Decision Denying Patent Owner's Request on

Rehearing, particularly noted UTC had taken this position.  Ex. D26 at 3 (noting UTC argued

"claim 1 differs from Phares and Moriarty because each reference separately describes isolating

the treprostinil intermediate.").  UTC indicated, by distinguishing its claims from the prior art,

that the claims of the '901 patent do not cover isolating treprostinil before salt formation.  *See*

---

[19] PCT Application No. WO 2005/007081 to Phares ("Phares") (Ex. D21), is a prior art reference
relied upon by Liquidia in this Action and before the PTAB.

*Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection.").

Finally, Liquidia's proposed construction is required by the plain and ordinary reading of the claim. Claims 1 and 8 are directed to a pharmaceutical batch of treprostinil containing impurities resulting from a series of steps (a)-(e). Ex. 2, claims 1 and 8. Step (b) of both claims 1 and 8 requires "hydrolyzing the product of step (a) to form ***a solution comprising treprostinil***[.]" *Id.* (emphasis added). The following step, step (c), requires "contacting ***the solution comprising treprostinil from step (b)*** with a base to form a salt of treprostinil[.]" *Id.* (emphasis added). A plain reading of claims 1 and 8 requires that "the solution comprising treprostinil from step (b)" is the same solution that is utilized in step (c), with no intervening treprostinil isolation. It is, therefore, UTC and not Liquidia, that now seeks to read in an additional limitation before step (c)—an optional isolation of treprostinil before salt formation—where no such intervening optional step exists.

The '901 patent specification is similarly consistent. Example 2, "Hydrolysis of Benzindene Nitrile," states that "[t]he filtrate (pale-yellow) was reduced to ***volume*** of 35-40 L by evaporation in vacuo at 50-55° C for ***direct use in the next step***." Ex. 2 at 12:15-17 (emphasis added). The next step, conversion of treprostinil to treprostinil diethanolamine salt is described in Example 3, which begins by describing how a "50-L, cylindrical reactor … was charged with a ***solution of treprostinil*** in ethyl acetate (***35-40 L from the previous step***) …." *Id.* at 13:13-17 (emphasis added). This is the same intrinsic evidence UTC relied on in support of its construction of this phrase in the '901 IPR. Ex. D7 at 11 ("Just as in the [']901 patent's Example 3 (reactor charged with treprostinil solution '35-40 L from the previous step'), claim 1 requires

60

the solution in which the treprostinil is formed be used directly in the next salt-forming step without isolating treprostinil in between.").  Example 6, comparing UTC's "Former Process" with the "***Process according to the present invention***," discloses that the treprostinil formed according to the present invention is not isolated prior to salt formation (Step 30), whereas the treprostinil of the "Former Process" is first isolated as a "solid" (Step 30 – solution of treprostinil is evaporated to get solid intermediate treprostinil).  Ex. 2 at Example 6.  Finally, the '901 patent acknowledges that "[a]dditional advantages of this process are … (b) the treprostinil salts can be synthesized from the solution of treprostinil ***without isolation***" and "***[t]his process*** provides better quality of final product as well as saves significant amount[s] of solvents and manpower in purification of intermediates."  *Id*. at 17:4-12 (emphasis added).  Although UTC and Dr. Ruffolo take the position that the specification's use of the term "can" demonstrates that isolation of treprostinil before salt formation is permitted, the same term did not prevent UTC from arguing before the PTAB that the claims "require" salt formation "without" prior isolation.  *Supra* § V.E.i.1 at 56-57; Ex. P4, ¶95; Ex. D7 at 11.

For the reasons stated herein, the Court should construe the "contacting the solution" phrase consistent with Liquidia's proposed construction—the same construction advocated by UTC in the co-pending '901 IPR.

### iii.  Plaintiff's Reply Position

A POSA would understand the plain and ordinary meaning of claims 1 and 9 of the '901 patent.  Nonetheless, under Liquidia's construction claims 1 and 9 of the '901 patent would depart from the text of the claims to include an entirely new litigation-driven[20] "wherein" limitation:

---

[20] Liquidia's motivation is clear: "Liquidia's LIQ861 ***is isolated*** prior to salt formation and cannot infringe."  Resp. at 57 (emphasis in original).  Liquidia's non-infringement theory is irrelevant to how the claims should be construed.

> contacting the solution comprising treprostinil from step (b) with a
> base to form a salt of treprostinil, <u>wherein the salt is formed without
> isolation of treprostinil after alkylation and hydrolysis</u>

But that is not what the claims recite and Liquidia provides no expert declaration to support its

position.  *See, e.g.,* Ruffolo Decl., ¶95 ("[s]uch an extra limitation has no basis in the claims, patent

specification, or prosecution history").  Unlike claim 5 of the '066 patent, which provides that

treprostinil "*has not been previously isolated*," the '901 patent does not include such a limitation.

*See* Ex. 1 at Claim 5 (emphasis added).  Undeterred, Liquidia attempts to rewrite the '901 patent

to mirror claim 5 of the '066 patent.  Resp. at 57-61.

This position is new even to Liquidia.  In the IPR, Liquidia argued "[a]ll terms should be

given their plain and ordinary meaning." Ex. P2 at UTC_LIQ00059743-744.  Liquidia's own

expert, Dr. Winkler, likewise opined that POSAs would understand the plain and ordinary meaning

of the terms:

> I have reviewed the claims of the '901 patent. I believe a person of
> ordinary skill in the art would understand each of the claim terms to
> take on its plain and ordinary meaning.

*See* Ex. P6 at UTC_LIQ00049725 (¶35).  As Dr. Ruffolo explains the specification makes clear

that "the treprostinil salts *can* be synthesized from the solution of Treprostinil without isolation."

Ruffolo Decl., ¶95 (citing Ex. 1 at 17:8-10) (emphasis in original)).  Dr. Pinal's expert testimony

correctly came to the same conclusion, and correctly analyzed the claims from the point of view

of a POSA as of December 17, 2007.

Liquidia is wrong to suggest that unsupported, ambiguous, and inaccurate attorney

statements in the IPR control here.   Nothing requires this Court to construe terms based on

statements made during an IPR that would not be clearly understood by a POSA, conflict other

statements made in the same IPR, and conflict with the patent itself.  At most *Aylus Networks, Inc.*

*v. Apple Inc.* merely instructs that those IPR statements "can be considered."  *See* 856 F.3d 1353,

1361 (Fed. Cir. 2017).  Ultimately, it is the perspective of the POSA that controls when construing claims and a POSA would not understand the patentee to have "unequivocally and unambiguously" disavowed claim scope.  *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013); *id.* at 1100 ("when a prosecution argument is subject to more than one reasonable interpretation, it cannot rise to the level of a clear and unmistakable disclaimer.").

A POSA reviewing statements made in the '901 IPR would consider the declarations of Dr. Pinal, UTC's expert.  Ex. P5, Supp. Ruffolo, ¶14.  Dr. Pinal clearly and unambiguously stated that "this isolation limitation . . . is actually a limitation from the '066 patent—not isolating the treprostinil before contacting it with a base is *not* an explicit limitation of claim 1 of the '901 patent."  Ex. D8 at LIQ00084652 (¶157) (emphasis added).  A POSA would conclude that Liquidia's interpretations of attorney statements are inconsistent with both Dr. Pinal's testimony and the '901 specification and claims.  Ex. P5, Supp. Ruffolo, ¶14.  A POSA would appreciate that "nowhere in the '901 patent specification or claims does it state that isolation of treprostinil before the salt formation step must not, or cannot, be performed."  *Id.*, ¶15.  Rather, the patent states that "the treprostinil salts *can be* synthesized from the solution of treprostinil *without isolation*" (Ex. 2, '901 patent, at 17:8-10) (emphasis added).  While the '901 specification acknowledges that a benefit of the invention includes being able to perform step (c) without prior isolation of treprostinil from step (b), it does not prohibit that isolation.  A POSA would understand that simply disclosing a benefit of the given process does not limit the claims of those patents. Ex. P5, Supp. Ruffolo, ¶18 ("Although it can be desirable in a commercial-scale manufacturing process to eliminate steps for efficiency, the '901 patent specification and claims do not require that any of the purification or isolation steps be eliminated."); *see*, *e.g.*, *Cont'l Circuits*, 915 F.3d at 797-98; Ruffalo Decl., ¶95; Ex. 2 at 17:8-10.

The attorney statement that Liquidia relies on does not cite any expert declaration, finds no support in the '901 patent, and a POSA would conclude that the statement is incorrect based on the examples in the patent.  Ex. P5, Supp. Ruffolo, ¶¶15-17 (describing a POSA's understanding of Examples 2-3 and the disclosed experimental procedures).  For example, "a POSA would understand that the passage in the Patent Owner's Response upon which Liquidia relies is incorrect to the degree it suggests that Examples 2 and 3 describe synthesizing treprostinil without isolating it prior to salt formation."  *Id.*, ¶15.  Moreover, the claims do not require "isolation" to form a "solid."  "Rather, a POSA would understand that a compound can be purified to isolation, even while it is maintained in a solvent, which is often done for practical considerations (*e.g.*, material transfer) in manufacturing plants."  *Id.*, ¶21.

When the patentee intended to include an isolation limitation, it did so explicitly.  Ex. 2 at Claim 1(d), 8(d) ("isolating the salt of treprostinil").  Expert testimony confirms that a POSA would not read limitations into the claims where none exist, especially in light of explicit permissive disclosure in the specification in the context of commercial pharmaceutical manufacturing.  Rather, as all the experts agree, a POSA would apply the claim term's plain and ordinary meaning. *See, e.g.*, *Orthopaedic Hosp. v. DJO Glob., Inc.*, No. 19-CV-970, 2020 WL 3498167, at *5-7 (S.D. Cal. June 29, 2020) (applying plain and ordinary meaning, and refusing to find disclaimer, when the specification used permissive language to describe the type of "sterilization" that can be used).  This Court should do the same.

### iv.      Defendant's Sur-Reply Position

UTC criticizes Liquidia's reliance on "interpretations" of UTC's statements in the '901 IPR.  No interpretation or expert testimony, however, is required to understand UTC's repeated statements excluding isolating the treprostinil intermediate prior to salt formation—statements made in claim construction, to distinguish the '901 patent claims from the prior art, and to

support secondary considerations.  *Supra* § V.E.ii, at 57-61; Ex. D8, ¶¶158-59; Ex. D7 at 66-67; Ex. D29 at 25-26.

UTC now seeks to abandon its '901 IPR statements, asserting they are "attorney statements" that "do[] not cite to any expert declaration," "find[ing] no support in the '901 patent[,]" and "unsupported, ambiguous, and inaccurate."  *Supra* § V.E.iii, at 61-64.  This extraordinary position ignores the statements that were: (1) made in UTC's Patent Owner's Response and additional Patent Owner filings approved by UTC; (2) made to distinguish the '901 patent claims from the prior art; (3) repeated by UTC here to support secondary considerations; and (4) submitted by, among others, Douglas Carsten, counsel in the '901 IPR and here.  Ex. D5 at 35-36, 70-71; Ex. D6 at 2-5; Ex. D7 at 5-6, 11, 29-34, 53, 56-57, 62, 67); Ex. D29 at 25-26.  It is inconceivable that UTC, with its numerous experts[21] and at least three law firms for this litigation and '901 IPR made such an "error."  UTC should not be permitted to recant the moment it becomes inconvenient for its infringement allegations.

UTC's suggestion that its "attorney" arguments should be afforded no weight because they do not cite to an expert declaration overlooks the fact that these statements are attributable to UTC, as the patent owner.  Nonetheless, both UTC and Dr. Pinal, expressly rely on the elimination of isolation prior to salt formation to distinguish the claims from the prior art, Phares, arguing there would be no reasonable expectation of success or motivation to eliminate isolation. Ex. D8, ¶¶158-59; Ex. D5 at 71; Ex. D6 at 3; Ex. D7 at 15, 53.  Moreover, despite withdrawing "statements" about eliminating isolation, UTC, in the same IPR paper, continues to rely on this

---

[21] Despite opining on the '901 IPR, UTC improperly blocked, as privileged, Dr. Ruffolo from answering basic questions concerning whether and when he was involved in the '901 IPR.  Ex. P5; Ex. D30 at 284:1-290:4.  These questions are relevant to Dr. Ruffolo's credibility. Additionally, whether UTC's litigation counsel reviewed the '901 IPR submissions before filing is also relevant.

argument.  Ex. D33 at 22 (relying on Ex. D8, ¶¶157-63), 23.  Further, to argue the "invention" of

the '901 patent is "more economical, safer, faster," UTC and Dr. Pinal still contend treprostinil

salt can be synthesized from solution, "without isolation."  Ex. D8, ¶90; Ex. D7 at 66-67 (relying

on "synthesis without isolation" as an additional advantage of the claimed '901 invention).

Objective indicia must be "commensurate in scope with the claims which the evidence is offered

to support," and thus UTC could not rely on these arguments unless the claims barred isolation

of the treprostinil intermediate before salt formation.  *Therasense, Inc. v. Dickinson & Co.*, 593

F.3d 1325, 1336 (Fed. Cir. 2010) (rejecting objective indicia because the claims were broader

than the evidence offered).

> While claim 1 does not recite an ***explicit*** limitation eliminating isolation, UTC  ignores

the plain meaning of claim 1, which requires that "***the solution comprising treprostinil from step***

***(b)***" is contacted with a base to form treprostinil.  *Supra* § V.E.ii, at 60-61.  Moreover, claims 1

and 8 expressly require "isolating the salt of treprostinil," but not isolating the treprostinil from

the solution from step (b).  Ex. 2, claims 1, 8.  As UTC aptly noted, when UTC intended the

claim to "***include*** an isolation limitation, it did so explicitly."  *Supra* § V.E.iii, 64 (emphasis

added).

> Finally, Dr. Ruffolo's second declaration should be accorded no weight.  Dr. Ruffolo

acknowledged that other than the prior art "Former Process," the '901 patent never discloses

isolation of the treprostinil intermediate from step (b) as a solid.  Ex. D30 at 227:6-18.  The

treprostinil salt, however, is isolated as a solid, consistent with claims 1 and 8.  Ex. 2 at 13:24-27,

35-45 (providing solid weight in "g" or treprostinil salt).  Dr. Ruffolo's opinion relies on

conflating "isolation" with "purification," arguing that purification is isolating the treprostinil

intermediate before salt formation.[22]  Ex. D30 at 86:13-87:23.  The '901 patent attributes

different meanings to these terms.  Within the same paragraph, the '901 patent states that the

"***purification*** by column chromatography is eliminated" while the "treprostinil salts can be

synthesized from the solution of treprostinil without ***isolation***."  Ex. 2 at 6:9 (emphasis added),

17:8-10; 12:15-17, 13:10-12.  Dr. Ruffolo's opinion that claims 1 and 8 also include isolation of

the treprostinil intermediate lacks credibility in view of the claims' requirement that ***the solution***

***from step (b)*** is contacted to form the salt, and Dr. Ruffolo's own statements distinguishing

purification and isolation.  Ex. P5, ¶18 ("[T]he '901 patent specification and claims do not

require that any of the purification ***or*** isolation steps be eliminated.") (emphasis added); *see also*

*supra* § V.E.iii, at 63-64.


MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*
_____

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com

*Attorneys for Plaintiff United Therapeutics*
*Corporation*


SHAW KELLER LLP

*/s/ Nathan R. Hoeschen*
_____

Karen E. Keller (#4489)
Jeff Castellano (#4837)
Nathan R. Hoeschen (#6232)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302)298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

---

[22] If taken at its word, UTC's claims do nothing more than practice the prior art Moriarty and
Phares processes.

OF COUNSEL:

Art Dykhuis
WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real
San Diego, CA  92130
(858) 305-2300

Adam W. Burrowbridge
WILSON SONSINI GOODRICH & ROSATI
1700 K Street NW, Fifth Floor
Washington, DC  20006
(202) 973-8800

William C. Jackson
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC  20005
(202) 237-2727

Bill Ward
BOIES SCHILLER FLEXNER LLP
725 S Figueroa Street, 31st Floor
Los Angeles, CA 90017
(213) 995-5745

Douglas Carsten
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA  92615
(949) 851-0633


April 30, 2021

OF COUNSEL:

Sanya Sukduang
Jonathan Davies
Douglas W. Cheek
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202)842-7800

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212)479-6000


Deepa Kannappan
Lauren Krickl
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650)843-5000

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703)546-8000