IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| | ) | **Redacted - Public Version** |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 20-755-RGA-JLH |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | ███████████ |
| Defendant. | ) ) | |

## LETTER TO THE HONORABLE JENNIFER L. HALL
## FROM NATHAN R. HOESCHEN

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Douglas W. Cheek
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14ᵗʰ Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
David M. Fry (No. 5486)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
dfry@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia
Technologies, Inc.*

Deepa Kannappan
Lauren Krickl
Brittany Cazakoff
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: October 13, 2021

Dear Judge Hall:

Liquidia respectfully requests the Court deny UTC's request to disqualify Dr. Hill as a Qualified Person under the Protective Order ("PO"), because Dr. Hill is an independent consultant with no involvement, past, present or future, in Liquidia's competitive decisions, his disqualification would severely prejudice Liquidia, and UTC has waived its ability to object.

Disqualification is "a drastic measure which courts should hesitate to impose except when absolutely necessary." Ex. 3 at *1. UTC has failed to carry its burden with respect to the five factors this Court considers in "analyzing whether to approve an expert as 'independent' under the terms of a protective order." *Id*. **First**, Dr. Hill is "not an officer, shareholder, or employee" of Liquidia. *See id*. The consulting agreements cited by UTC confirm that Dr. Hill consults with Liquidia regarding clinical studies, and that he is expressly identified as an "Independent Contractor." *See* Ex. 4. The out-of-district cases cited by UTC are inapposite[1]—Dr. Hill is not and has never been an officer, shareholder, or employee of Liquidia, which decidedly weighs against disqualification. Ex. 3 at *1. Under UTC's interpretation, ***any*** third party consultant would be considered an "employee." This cannot be. **Second**, Dr. Hill's consulting relationship with Liquidia is "not so extensive as to require disqualification." Ex. 3 at *1. UTC's citation to *Beam Sys.* is unavailing as in that case the expert's lack of independence based at least 22 different projects resulting in at least $725,000 in fees. 1997 WL 364081, at *4-5. Here, Dr. Hill has worked on a single project, LIQ861 and earned only ▮▮▮▮▮ Ex. A at 10-11. **Third**, despite UTC's unsupported assertions, Dr. Hill has never been involved in Liquidia's "competitive decisions," as confirmed during the deposition of Dr. Benjamin Maynor. Ex. B at 149:3-150:22. UTC's assertion that Dr. Hill was "instrumental in developing [Liquidia's] infringing product" (D.I. 207 at 2) is plainly wrong—he had no role in developing the LIQ861 formulation, as Dr. Hill is a medical doctor, not a drug formulator. Further, Dr. Hill's participation in a Liquidia steering committee does not establish his involvement in "competitive decisions" as the steering committee is simply ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Ex. B at 149:17-150:4. Pharmaceutical companies involved in clinical activities commonly engage such "steering committees," a role Dr. Hill serves for other companies.[2] Ex. A at 3, 6, 11. **Fourth**, Dr. Hill's future involvement with Liquidia will not involve "competitive decisions," because Dr. Hill holds no role, title or position at Liquidia where he would be involved in such decisions. **Fifth**, this factor is not relevant since UTC has failed established, as described above, that Dr. Hill is "not deemed independent." Ex. 3 at *1.

---

[1] In *Biovail Lab'ys Int'l SRL v. Abrika, LLLP,* 2007 WL 788849 *2-3 (S.D. Fla. Mar. 14, 2007), the court had no evidence to conclude that the proposed expert was ***not*** involved in competitive decision-making activities and Biovail had other experts at its disposal, which Liquidia does not. In *Masakazu Ushijima v. Samsung Electronics Co.*, 2014 WL 12160777 *1-2 (W.D. Tex. Oct. 30, 2014), the proposed expert was disqualified because he was directly responsible for licensing the Plaintiff's "entire patent portfolio" and was directly involved in competitive decision making including licensing and infringement strategies for the portfolio *Id.* at *1-2.

[2] Citing *Ares-Serono, Inc. v. Organon Int'l B.V.*, 153 F.R.D. 4 (D. Mass. 1993), UTC contends that Dr. Hill's consultation with Liquidia, extending to discussions with the FDA, warrants disqualification. However, in *Ares-Serono*, the court ***allowed*** the expert to see confidential information ***despite*** her "involve[ment] in decisions connected with securing regulatory approval," and despite the fact that she was a previous employee of the objecting party. *Id.* at *6.

UTC vaguely suggests it would suffer "serious harm," but has not articulated what that harm would be. The documents Dr. Hill would review are at least 10 years old and concern Tyvaso®, which UTC has marketed since 2009. The '793 patent Dr. Hill will address, claims priority to 2006 and the associated work developing that invention was prior to that date. Moreover, the Court already precluded discovery regarding UTC's new, powder-inhaled formulation of treprostinil it co-developed with MannKind—the product that would directly compete with Liquidia's proposed product at issue in this case. UTC therefore would suffer no competitive disadvantage or harm from Dr. Hill seeing these decades-old documents. *See* Ex. C at *2. Despite knowing Dr. Hill provided an expert declaration in January 2021 in a parallel IPR proceeding challenging the validity of the '793 patent, which has been instituted, UTC nonetheless worked with Dr. Hill as a consultant in 2021, demonstrating there is no harm. Ex. A at 11.

UTC suggests that Liquidia can retain another expert. This is not true. Pulmonary arterial hypertension (PAH), the disease at issue in this case, affects a small patient population, less than 200,000 people, and is considered an "orphan disease." Dr. Hill is one of few medical doctors who are experts in this field.[3] Further, UTC has monopolized clinical experts in the PAH field, such that, even when asked by Liquidia, these clinicians were unwilling to oppose UTC.[4] *See* Ex. D at *3; Ex. E at 17-20. Further, none of the Liquidia experts identified in Ex. 15 could replace Dr. Hill, as none are medical doctors who treat PAH. Thus, Liquidia would be unduly burdened by having to retain a new expert to replace Dr. Hill—particularly given that expert reports are due in two days. Conversely, the potential prejudice and undefined harm to UTC in allowing Dr. Hill to review its confidential materials is minimal.

Finally, UTC's delay in raising this issue with the Court both waives its objections and amplifies the prejudice to Liquidia. UTC first complained about Dr. Hill's CV *one day after* the PTAB instituted review of Liquidia's Petition for *Inter Partes* Review of the '793 Patent, for which Dr. Hill submitted an expert declaration. Ex. 13 at 8/12/21 email; *cf.* Ex. F. UTC formally objected to Dr. Hill as a Qualified Person on August 16 (Ex. 13 at 8/16/21 email), triggering the seven-day deadline to raise the issue with the Court (D.I. 33 at ¶ 21). On August 25, Liquidia agreed to extend the time to raise the dispute with the Court until receipt of Dr. Hill's updated CV. (Ex. 13 at 8/25/21 email.) After receiving Dr. Hill's updated CV on August 30 and conducting a meet and confer on August 31 (Ex. 13 at 8/30/21 and 8/31/21 emails), UTC delayed bringing this issue to the Court's attention for *over six weeks*, until yesterday (D.I. 203). UTC's local counsel reached out to Liquidia's local counsel, Karen Keller, on August 31, without copying anyone else, and *Ms. Keller responded the next day* suggesting additional dates. Ex. G.   UTC did not respond until *two weeks* later on September 14 when Ms. Keller was still at trial. Ex. 2 at 8/31/21 and 9/14/21 emails. UTC did not inform Liquidia's lead counsel of their continued desire to pursue this issue before the Court—despite the fact that the parties have addressed multiple other issues before the Court in recent weeks. UTC's delay beyond the seven days required under the Protective Order waives UTC's ability to raise this dispute now and prejudices Liquidia.

For these reasons, the Court should deny UTC's request to disqualify Dr. Hill.

---

[3] For this same reason, UTC's complaint about "*Liquidia's* past conduct" in hiring former UTC associates is misguided. *See* D.I. 207 at 2.

Respectfully submitted,

*/s/ Nathan R. Hoeschen*

Nathan R. Hoeschen (No. 6232)

cc:     Clerk of the Court (by CM/ECF and hand delivery)
        All counsel of record (by CM/ECF and e-mail)

# EXHIBIT A

CURRICULUM VITAE
**NICHOLAS S. HILL, M.D.**

**Nicholas S. Hill, M.D.**
Professor of Medicine
Tufts University School of Medicine
Chief, Pulmonary & Critical Care and Sleep Division
Pulmonary, Critical Care and Sleep Division
Tufts Medical Center
800 Washington St #257
Boston, MA 02111

**August 2021**



## EDUCATION

| | | | |
|---|---|---|---|
| Undergraduate | 1971, | A.B | Harvard College |
| Medical School | 1975, | M.D | Dartmouth Medical School |

## POSTGRADUATE TRAINING
### Internship and Residencies:

| | | |
|---|---|---|
| 1975-1977 | Medicine | New England Medical Center<br>Tufts University School of Medicine |
| 1977-1978 | Internal Medicine Boston Veterans Admin. Medical Center | |

### Fellowships

| | |
|---|---|
| 1978-1979 | Cardiovasc. Med. University of Massachusetts Medical Center |
| 1979-1982 | Pulmonary Med. Boston University School of Medicine |

## LICENSURE AND CERTIFICATION

| | | |
|---|---|---|
| 1977 | #41058 | Massachusetts |
| 1987 | #7167 | Rhode Island |
| 1975 | Diplomate | National Board of Medical Examiners |
| 1978 | Diplomate | American Board of Internal Medicine |
| 1983 | Diplomate | American Board of Internal Medicine, Pulmonary Disease |
| 1987, renewed 2009 | | American Board of Internal Medicine, Special Qualification in Critical Care Medicine |

## ACADEMIC APPOINTMENTS

| | | | |
|---|---|---|---|
| 1982-1987 | Assistant Professor of Medicine | Medicine | Tufts University School of Medicine |
| 1987-1994 | Associate Professor of Medicine | Medicine | Brown University |
| 1994-2002 | Professor of Medicine | Medicine | Brown University |
| 2002-2012 | Adjunct Professor of Medicine | Medicine | Brown Medical School Alpert School of Medicine |
| 2002-present | Professor of Medicine | Medicine | Tufts University School of Medicine |

## HOSPITAL APPOINTMENTS

| | | | |
|---|---|---|---|
| 1982-1987 | Assistant Physician | Medicine | New England Medical Center |
| 1987-2012 | Associate Physician | Medicine | University Medicine Foundation, Rhode Island Hospital |
| 1987-1996 | Director, Resp. Care Unit | Medicine | Rhode Island Hospital |
| 1996-2000 | Medical Director, Pulmonary Rehab Program | Medicine | Meeting Street Center |
| 1997-1998 | Director, Medical ICU | Medicine | Rhode Island Hospital |
| 1998-2002 | Director, Critical Care Service | Medicine | Rhode Island Hospital |
| 2000-2002 | Chief, Pulmonary Division | Medicine | Miriam Hospital |
| 2003-2012 | Medical Director, Outpatient Pulmonary Rehabilitation Program | Medicine | New England Sinai Rehabilitation Center |
| 2002-present | Chief, Pulmonary, Critical Care & Sleep Division | Medicine | Tufts Medical Center |
| 2013- | Medical Staff | Medicine | Lowell General Hospital |
| 2017- | Courtesy Medical Staff | Medicine | UMass Memorial Medical Center |

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

## OTHER CLINICAL POSITIONS

Medical Director
Pulmonary Rehabilitation Program, Meeting Street Center, East Providence, RI, 1996-2000
Medical Director
Pulmonary Rehabilitation Program, Miriam Hospital, 2000–2002
Medical Director
VNA of Rhode Island, 1996–2002
Medical Director
Respiratory Care Tufts-New England Medical Center, 2002-present
Medical Director
Pulmonary Rehabilitation Program, New England Sinai Hospital, Stoughton, MA, 2003-2012
Physician
Pulmonary Hypertension Clinic, Rhode Island Hospital, 2002-2012
Consultant, Louise Wilcox Multidisciplinary ALS Clinic, Rhode Island Hospital, 2003-present
Physician
Pulmonary Hypertension Clinic, UMass Memorial Medical Center, 2017 -present

## HONORS AND AWARDS

| | |
|---|---|
| 1973 | Mosby Book Award, Dartmouth Medical School |
| 1971 | Phi Beta Kappa |
| 1975 | Alpha Omega Alpha |
| 1984 | Career Investigator Award, NIH |
| 1984 | Fellowship Award, Parker B. Francis Foundation |
| 2002 | Citizenship Award, City of Providence, RI |
| 2002 | Murray Kornfeld Honor Lecture, ACCP Annual Meeting |
| 2003 | Phil Kittredge Memorial Lecture, AARC Annual Meeting |
| 2004 | Eli Lilly Distinguished Scholar in Critical Care, Chest Foundation |
| 2003-Present | Best Doctors in America |
| 2005 | Henry Chadwick Medal, Massachusetts Medical Society |
| 2003-Present | Best Doctors in Boston, Boston Magazine |
| 2007 | Parker B. Francis Speaker, ATS International Conference |
| 2009 | Pulmonary Hypertension Association, Award for Excellence in PAH Care |
| 2009 | Margaret Pfrommer Memorial Lecture, ACCP Annual Meeting |
| 2016 | Distinguished Faculty Award, Tufts University School of Medicine |
| 2018 | Walter O'Donahue Memorial Lecture-NAMDRC Annual Meeting |
| 2021 | Leadership Award, Pulmonary Circulation Assembly, American Thoracic Society |

## HOSPITAL COMMITTEES

- Internship Selection Committee
  New England Medical Center Hospital, 1983-1987
- Internship Selection Committee
  Rhode Island Hospital, 1987-2002
- Animal Welfare Committee
  Rhode Island Hospital, 1990-2002
- Ethics Committee
  Rhode Island Hospital, 1996-2002
- General Clinical Research Center
  Tufts-New England Medical Center, 2002-2006
- Scientific Advisory Committee
  Tufts Medical Center, 2002-2006
- Executive Committee, Department of Medicine
  Tufts Medical Center, 2002-present
  - CME Advisory Committee, 2015-present

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

## OTHER MAJOR COMMITTEE ASSIGNMENTS

- Grant Review Committees/Study Sections : American Thoracic Society, Research Grant Review Committee, 1987-1990
- National Heart Lung & Blood Institute Lung Biology and Pathology Review Group, Aspen, CO.  June 1991
- Program Project Grant Reviewer:   October 1992
- Promotions Committee: Department of Medicine, 1995-2002
- Chair, Lung Biology and Pathology: Ad Hoc Review Group.  1996
- Chair, Research Committee, Dept. of Medicine : Brown Medical School, 1999-2002
- Strategic Planning Committee: Brown Medical School, 1999-2000
- Chair Elect: Medical Faculty Executive Committee.  Brown Medical School, 1999-2000
- Research Advisory Committee: Academic Medical Center, 1999-2002
- Eastern Regional Cardiopulmonary Grant Review Committee:
  American Heart Association.  March, Co-Chair, 1998, Chair 1999, 2000
- Chair:  Medical Faculty Executive Committee, 2000-2001
- Chair Emeritus:  Medical Faculty Executive Committee, 2001-2002
- Ad Hoc Reviewer: Orphan Products Division, FDA/NIH, June, 2000, Dec 2002
- Site Visitor for Review of General Clinical Research Center: Boston University, Boston, MA.  July, 2000.
- Member ARDSnet Review Committee:  NIH.  March 2005
- Member, Ad Hoc Review Group, Specialized Clinical Centers of Research, Pulmonary
  Vascular Disease, NIH.  March 2006
- Member, Ad Hoc Review Group, Centers for Multicenter Trial; Pulmonary Hypertension in
  Sickle Cell Disease, NIH.  April 2006
- Clinical Research Development Committee, Tufts Medical Center, 2007-Present
- Gilead PAH Scholar Research Program: Research Review Committee,  2008 – Present, Chair, 2014 - Present
- Chair, NHLBI Steering Committee :  PVDomics Network 2014 - Present
- Ad Hoc Reviewer: NHLBI Review Panel on "Translational Programs in Lung Disease (PO1), Washington, DC. Nov 2015.
- Ad Hoc Reviewer: NHLBI Vascular Interventional/Innovations and Therapeutic Advances (VITA)
  Program Review Committee.  Bolger Center, Potomac, MD.  Jan 2016
- Ad Hoc Reviewer: NHLBI Program Project Review Committee, January 2017
- Ad Hoc Reviewer: NHLBI Clinical Trials Review Committee, February  2017
- Ad Hoc Reviewer : NHLBI Program Project  Review Committee, May 2017
- Ad Hoc Reviewer : NHLBI PPG Review Committee, May 2018

## CONSENSUS CONFERENCES / GUIDELINE COMMITTEES

- American College of Chest Physicians Consensus Conference.
  Mechanical Ventilation Beyond The Critical Care Unit.  October, 1993
- Joint Consensus Group on Noninvasive Ventilation
  American College of Chest Physicians and National Association of Medical Directors of Respiratory
  Care Scientific Advisor
- International Consensus, Conference Noninvasive Positive Pressure Ventilation in Acute Respiratory Failure.
  Paris, France.  April. 2000.
- Roundtable on Mechanical Ventilation :
  European Intensive Care and Emergency Medicine Society.  Brussels, Belgium.  March 2003.
- Jury Member, International Consensus Conference: On End-of-Life in the ICU.  Brussels, Belgium.  April 2003.
- Presenter, International Consensus Conference: On Weaning from Mechanical Ventilation, Budapest, Hungary.  March 2005.
- Summarizer Conference on Respiratory Complications of Neuromuscular Disease :
  American Respiratory Care Foundation.  March, 2006
- Co-Chair, Task Force on Noninvasive Ventilation Guidelines:
  American Thoracic Society (ATS) & European Respiratory Society (ERS),  2012 - 2017

NICHOLAS S. HILL, M.D.
CURRICULUM VITAE 2020

**TRAINING OF STUDENTS/POST-DOCTORAL FELLOWS**

| Name | Title | Dates | Current Position |
|------|-------|-------|------------------|
| **Postdoctoral Trainees** | | | |
| Alec Martin-Achard MD | Role of Oxidants in Lung Injury | 1983-84 | Practice, Geneva, SW |
| Peter Jederlinic, MD | ACE Activity In Hypoxic Lungs | 1984-85 | Asst Prof of Med, Cooperstown, NY |
| Chester Mohr MD | NIV in Neuromuscular Disease | 1985-86 | Practice, Cape Cod Hospital |
| James Klinger MD | ANP in Hypoxic Pulmonary Hypertension | 1988-92 | Assoc Prof. Med, Brown University |
| Anibal Arjona PhD. | Growth Suppressive Effect of ANP | 1991-94 | Research Assoc, Boston Heart Fnd |
| Raymond Petit MD | Polycythemia and Pulmonary Hypertension | 1991-92 | Private Practice, Massachusetts |
| James Nakashima PhD | ANP Receptor Modulation in Endothelial Cells | 1992-99 | Asst. Prof. Med, Brown University |
| Thomas Meyer MD | NIV in Respiratory Failure | 1993-94 | Asst. Prof. Medicine, Jefferson Univ. |
| Naomi Kramer MD | NIV in Respiratory Failure | 1994-95 | Asst. Prof. Medicine, Brown Univ. |
| Richard Swift MD | CNP Responses during Hypoxia | 1995-96 | Private Practice, New Jersey |
| Sangeeta Mehta MD | Mechanisms of Noninvasive Ventilation | 1995-97 | Prof Medicine, Univ of Toronto |
| James McCormick MD | Masks for Noninvasive Ventilation | 1997-98 | Private Practice, Westerly. RI |
| Mallik Karemsetty PhD | Mechanisms of Pulmonary Vasoreactivity | 1998-00 | Asst. Prof of Med Brown University |
| John Ladetto MD | Angiogenesis in Pulmonary Hypertension | 1999-00 | Private practice, Pawtucket, RI |
| Ioana Preston MD | Phosphodiesterase Inhibitors In PHT | 2000-01 | Assoc. Prof of Med, TUSM |
| Tim Liesching MD | Noninvasive Ventilation for CHF | 2001-02 | University |
| Vinay Maheshwari MD | Utilization of NPPV in Acute Care | 2003-05 | Asst Prof of Med, Tufts University |
| Kate Steiner MD | Pulmonary Hypertension | 2005-06 | Asst Prof Med, Harvard Medical School |
| Aylin Ozsancek MD | Utilization of Noninvasive Ventilation | 2005-08 | Asst Prof of Med, Cenkan, Turkey |
| Ali Khodabendeh MD | Noninvasive Ventilation | 2006-08 | Private Practice |
| John Brennan MD | Pulmonary Hypertension Critical Care | 2006-08 | Private Practice |
| Samy Sidhom MD | Utilization of NoninvasiveVentilation | 2008-09 | Private Practice |
| Imrana Qawi MD | Sedation for Noninvasive Ventilation | 2009-12 | Asst Prof of Med, Tufts Medical Center |
| Archan Shah MD | Pulmonary Hypertension | 2009-11 | Staff, Kaiser Permanente, CA |
| Matthew Cohn MD | Effect of Breathe Ventilation System on Work of Breathing in COPD patients | 2012-13 | Asst Prof of Med, National Jewish Health, Denver, CO. |
| Viola Tracy MD | Effect of Breathe Ventilation System on Work of Breathing in COPD patients | 2012-13 | Private Practice Minneapolis,, MN |
| Nadine Al Naamani,MD | Phenotypes in Pulmonary Hypertension | 2013-16 | Asst. Prof of Med, University of Pennsylvania |
| Giulia Spoletini, MD | High Flow Nasal $O_2$ During Breaks from NIV | 2013-14 | PhD Student, Leeds, UK. |
| Mona Alotaibi, MD | High Flow Nasal $O_2$ During Breaks from NIV | 2013-14 | Pulm Critical Care Fellow, UCSD, CA. |
| Felix Yu, MD | Reliability of PAWP Measurements in PH | 2014-16 | Asst Prof of Med, Tufts Medical Center |
| Christopher Manley,MD | Vasoreactivity in Group 2 PH | 2013-14 | Research Fellow, Tufts Medical Center |
| Ana Carolina Garza,MD | Vasoreactivity in Group 2 PH | 2013-14 | Research Fellow, Tufts Medical Center |
| Haval Chweich, MD | Aerogen Nebulizer for Acute Asthma | 2014-16 | Asst. Prof of Med, Tufts Medical Center |
| Alia Khoja, MD | Physiologic Response to HFNO | 2014 | Resident, George Washington |
| Chiara Mega, MD | Physiologic Response to HFNO | 2014 | Pulmonologist, Bologna, Italy |
| Maureen Spring, MD | Physiologic Response to HFNO | 2015-17 | Asst. Prof of Med, Tufts Medical Center |
| Abdallah Kharnaf, MD | Use of Wedge Pullback Oximetry | 2015-17 | Private Practice |
| Alham Alonaizan, MD | Dyspnea in DNI Patients | 2015- | Research Scholar, Tufts Medical Center |
| Lara Pisani, MD | Dyspnea in DNI Patients | 2015 | Researcher, Univ of Bologna, Italy |
| Najia Indrees, MD | Aerogen Nebulizer for Acute Asthma | 2016 | Medical Resident, Tufts Medical Center |
| Faisal Al Tamimi, MD | Balloon Pulmonary Angiography | 2016-17 | Research Scholar, Tufts Medical Center |
| Abd Abdelrahman MD | Wedge Catheter Pull Back | 2017-18 | Research Fellow, Tufts Medical Center |
| Mayanka Tickoo MD | Changing Use of Nasal High Flow | 2017-18 | Attending Physician, Pulmonary, Critical Care, Yale-New Haven Medical Center |
| Asma Tarq, MD | Effect of HFNC on Clearability of Sputum | 2018-19 | Attending Physician, Pulmonary Critical Care, Tufts Medical Center |

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

| Anas Ahmed,MD | Wedge Catheter Pull Back | 2018-19 | Attending Physician, Pulmonary Critical Care, Tufts Medical Center |
|---|---|---|---|
| Elizabeth Han MD | Effect of HFNC on Clearability of Sputum | 2020-21 | Medical Resident, Tufts Medical Center |
| Divya Menon MD | Characterization of Group 2 Pulmonary Hypertension | 2020-21 | Research Fellow, Tufts Medical Center |

| **Student Trainees** | | | |
|---|---|---|---|
| Gabriel Salameh | Pulmonary Vasoconstriction in Rats | 1994-95 | Medical Student, UMDMJ |
| James Watt | Endothelin in Hypoxic Vasoconstriction | 1995-96 | Unknown |
| David Sciacca | Pulmonary Hypoxic Vasoconstriction | 1996-97 | Medical Student, Tufts |
| Christopher Alia | Vasoconstrictor Responses | 1996-98 | Medical Student, NY Medical College |
| Grace Wang | Endothelin Receptors During Hypoxia | 1997-98 | Research Assistant, Brown University |
| Brian Kwong | Angiogenesis In Pulmonary Hypertension | 2000-01 | Medical Student Early ID Trainee |
| Kenyatta Lee | Northern Analysis of Brain Natriuretic Peptide | 1995-96 | Medical Student, Cornell University |
| Stacy Harrington | Histologic Analysis of Pulmonary Arteries | 1997-98 | Undergraduate Univ. of Delaware |
| Shanta Whitaker | MAP Kinases in Hypoxic Pulmonary HTN | 2001 | Graduate/Student, Microbiology |

## TEACHING RESPONSIBILITIES

### University Teaching Roles

| | | | |
|---|---|---|---|
| Section Leader | Biomed 117 | Mammalian Physiology | 1991-1994 |
| Co-director | Biomed 209 | Topics in Respiratory Physiology | 1987-1989 |
| Co-director | Biomed 219 | Topics in Environmental Physiology | 1989-1994 |
| Section Leader | Biomed 281 | Second year Pulmonary Pathophysiology | 1987-2002 |

Small Group Leader and Lecturer-Tufts University
    Lecturer in second year Pathophysiology      2002-
    Small group Leader      2002-

### Hospital Teaching Roles

Attending Physician, Medical Intensive Care Unit, Brown      1987-2002
Attending Physician, Pulmonary Consult Service, Brown      1987-2002
Attending Physician, Respiratory Care Unit, Brown      1987-2002
Attending Physician, Pulmonary Ward, Tufts Medical Center, Boston, MA.      2002-
Attending Physician, Medical Intensive Care Unit, Tufts Medical Center, Boston, MA,      2002-
Attending Physician, Pulmonary Consult Service, Tufts Medical Center, , Boston, MA      2002-
Attending Physician, ICU at Lowell General & Saints Memorial Hospitals, Lowell, MA.      2013-

## PROFESSIONAL SOCIETIES

American College of Chest Physicians, Fellow 1982-
American Thoracic Society, Member 1982-
Massachusetts Thoracic Society, Councilor, 1982-1987
American Federation for Clinical Research, Member, 1982-2004
New England Chapter of American College of Chest Physicians 1984-
American Association for the Advancement of Science, 1985-1995
American Physiological Society, Member, 1985-2002
Rhode Island Thoracic Society, Member 1987
Pulmonary Hypertension Association, 2004-
American College of Chest Physicians 2005
Society of Critical Care Medicine, 2017 -
European Respiratory Society 2016

## OFFICE AND COMMITTEE ASSIGNMENTS IN PROFESSIONAL SOCIETIES

- **American Thoracic Society**
  Program Planning Committee, Assembly on Pulmonary Circulation, 1991-1993
  Chair-elect, 1995 Chair, 1996. Member, 2006 - 2007
  Member, Research Coordinating Committee, 1992 - 1995
  Member, Planning Committee, 2000 - 2006

NICHOLAS S. HILL, M.D.

CURRICULUM VITAE 2020

Chair, Nominating Committee, Pulmonary Circulation Assembly,  2002 - 2003
Member, Program Review Subcommittee,  2003 - 2004
Chair, Program Planning Committee, Critical Care Assembly,  2003 - 2006
Member, Nominating Committee, Critical Care Assembly,  2006 - 2007
Member, Steering Committee, Critical Care Assembly,  2006 - 2007
Secretary-Treasurer 2008-9, Vice President 2009-10, President Elect,  2010 - 2011
President 2011-12, Immediate Past President, 2012 - 2013.
Member ,Nominating Committee,  2013 - 2015
Member , International Lung Health Committee,  2013 - 2014
Member, Drug/Device Discovery and Development Committee,  2013 - 2017
Secretary-Treasurer, Board of Trustees, ATS Foundation, 2015-present
Member, Awards Committee, 2015-17
Chair, Executive Director Search Committee 2017-2018
Board of Trustees, ATS Foundation 2010-2020
Member, Funds for The Future Committee, ATS 2020-present

- **American College of Chest Physicians**
  Vice Chair, Home Care Network,  2001 - 2002
  Chair, Home Care Network,  2002 - 2004
  Steering Committee, Home Care Network,  2001–10
  Member, Health Policy and Advocacy Committee, 2020- present
- **Rhode Island Thoracic Society**
  ATS National Chapter Representative,  1991 - 2000
- **New England Chapter of American College of Chest Physicians**
  - Vice President, 1994 - 1995          - President,  1995 - 1996
- **Pulmonary Hypertension Association 2004**
  Member, Scientific Leadership Committee,  2004 - 2012

## MAJOR RESEARCH INTERESTS

- **Pulmonary Vascular Biology**

My main focus has been on the regulation of pulmonary vascular tone using hypoxia as a model.  I have devoted considerable attention to the role of natriuretic peptides in ameliorating hypoxic pulmonary vasoconstriction and remodeling, and more recent interests have been in the role of angiogenic factors in hypoxic pulmonary hypertension, the role of serotonins in modulating pulmonary vasoreactivity, retinoic acid and the pathogenesis of PH, and signal transduction pathways including lipoxygenases and endothelin. More recently we are looking at cell permeable peptides as possible physiologic and therapeutic tools.

- **Clinical Pulmonary Hypertension**

I established a Pulmonary Hypertension Center at Rhode Island Hospital and Tufts Medical Center and get referrals from all over Southern New England.  My group has participated in many multicenter trials to evaluate the role of both intravenous and subcutaneous prostacyclins and more recently oral endothelin antagonists and combination therapy.  We have also published many studies on therapeutic approaches in various forms of pulmonary hypertension, and continue to be interested in contributing to advances in therapy and suggesting new possible therapeutic approaches.

- **Noninvasive Ventilation**

A major interest in clinical research has been to evaluate ways of delivering and testing the efficacy of noninvasive ventilation; the provision of mechanical ventilatory assistance without requiring an invasive airway.  My group has performed a number of controlled trials dealing with these issues, and continues to examine new applications, improved techniques, and ethical aspects of noninvasive ventilation.  Our most recent thrust has been to explore ways of enhancing the utilization of noninvasive ventilation in critical care and to understand the effect of noninvasive ventilation on sleep in the ICU.  We have also initiated studies on nasal high flow therapy, another noninvasive approach to providing respiratory assistance, examining physiologic effects in COPD patients as well as use during breaks from bi-level noninvasive ventilation.

- **High Flow Nasal Therapy**

The delivery of heated, humidified, oxygenated gas via soft cannulas intranasally is a newer technique for oxygen delivery and ventilatory assistance.   We are involved in studies to understand physiologic effects, appropriate indications, outcomes and epidemiology of use

**NICHOLAS S. HILL, M.D.**
CURRICULUM VITAE 2020

## RESEARCH SUPPORT

| GRANT AWARD/ FUNDING AGENCY/Private Foundations/Industry Awards | $ AMOUNT | YEAR(S) |
|---|---|---|
| CLINICAL INVESTIGATOR AWARD, NHLBI<br>Principal Investigator | ███ | 1983-1988 |
| GRANT-IN-AID AMERICAN THORACIC SOCIETY<br>Principal Investigator | ███ | 1983-1985 |
| PARKER B. FRANCIS FOUNDATION FELLOWSHIP<br>Principal Investigator | ███ | 1983-1987 |
| SHERMAN-WELCH FOUNDATION AWARD<br>Massachusetts Thoracic Society<br>Principal Investigator | ██ | 1983-1985 |
| TRAVENOL, INC<br>Grant for Study of Negative Pressure Ventilation in COPD<br>Co-Investigator | ███ | 1984-1986 |
| GRANT-IN-AID, RHODE ISLAND HEART ASSOCIATION<br>Principal Investigator | ███ | 1988-1989 |
| RESPIRONICS, INC.<br>Grant for Study of Nasal Ventilation in COPD<br>Principal Investigator | ███ | 1988-1989 |
| GRANT-IN-AID, RHODE ISLAND HEART ASSOCIATION<br>Principal Investigator | ███ | 1990-1991 |
| RESPIRONICS, INC.<br>Grant for Study of Nasal Ventilation in Neuromuscular Disease<br>Principal Investigator | ██ | 1990 |
| BURROUGHS-WELLCOME, INC.<br>Multicenter Trial Of Prostacyclin Infusion in Primary Pulmonary Hypertension<br>Principal Investigator | ███ | 1991-1994 |
| RESPIRONICS, INC<br>Grant for Study of Nasal Ventilation<br>Principal Investigator | ██ | 1992 |
| LIFECARE, INC.<br>Grant for Study of Negative Pressure Ventilator<br>Principal Investigator | ███ | 1993 |
| RHODE ISLAND HEART ASSOCIATION - GRANT-IN-AID,<br>Principal Investigator | ███ | 1993-1995 |
| RESPIRONICS, INC.<br>Comparison of Bipap vs CPAP In Management of Acute Pulmonary Edema<br>Principal Investigator | ████ | 1994-1995 |
| PURITAN-BENNETT, INC<br>Grant for Evaluation Of 335 Bi-level Positive Airway Pressure Ventilation<br>Principal Investigator | ███ | 1995 |
| RESPIRONICS, INC<br>Evaluation of Exhalation Valves for Bilevel Positive Airway Pressure Ventilation<br>Principal Investigator | ███ | 1995-1996 |
| MILES LABORATORY<br>Phase III Trial of Norasept (Anti-TNF Antibody) for the Therapy of Sepsis.<br>Principal Investigator | ███ | 1996-1997 |
| RESPIRONICS, INC<br>Evaluation of Oronasal vs Nasal Masks for Administration of Noninvasive Ventilation<br>Principal Investigator | ██ | 1996-1997 |
| GLAXO-WELLCOME, INC.<br>Randomized Trial of Intravenous Flolan for Patients with PH due to Scleroderma | ████ | 1997-1998 |

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

| | | |
|---|---|---|
| RESPIRONICS, INC.<br>Evaluation of the Vision Proportional Assist Ventilator<br>Principal Investigator | ▪ ███ | 1997-1998 |
| RHODE ISLAND HEART ASSOCIATION - GRANT-IN-AID,<br>Modulation of Pulmonary Hypertension by Natriuretic Peptides<br>Principal Investigator | ▪ ███ | 1997-1999 |
| RESMED, INC.<br>Randomized Trial of Noninvasive Ventilation to Facilitate Extubation of Patients with<br>Respiratory Failure | ▪ ███ | 1998-1999 |
| UNITED THERAPEUTICS INC.<br>Randomized Trial of Subcutaneous UT-15 to Treat Patients with Severe Pulmonary<br>Hypertension | ▪ ████ | 1998-1999 |
| RESMED, INC.<br>Randomized Trial of NPPV after Hypercapnic Respiratory Failure in COPD.<br>Principal Investigator | ▪ ███ | 2000- |
| SUNTORY, INC.<br>Phase II Multicenter Trial of Alpha-hANP Infusion in ARDS.<br>Principal Investigator | ▪ ███ | 2000- |
| ICOS PHARMACEUTICALS/TEXAS BIOCHEMICAL<br>Randomized Controlled Trial of Sitaxsentan in the Therapy of Severe PH | ▪ ████ | 2001-2002 |
| RESPIRONICS, INC.<br>Trial of the Total Face Mask for Noninvasive Ventilation | ▪ ███ | 2002-2003 |
| PFIZER, INC.<br>Randomized Trial of the Phosphodiesterase Inhibitor, Sildendafil in PAH | ▪ ████ | 2003 |
| ACTELION, INC.<br>Transition from Prostacyclin Infusion to Oral Bosentan (Investigator Initiated) | ▪ ███. | 2003-2005 |
| MYOGEN, INC.<br>Randomized Trial of Ambrisentan to Treat Patients with Pulmonary Arterial Hypertension | ▪ ███ | 2003-2005 |
| PFIZER, INC.<br>Randomized Trial of the Phosphodiesterase Inhibitor, Sildenafil, Added to Intravenous<br>Epoprostenol in Patients with Pulmonary Arterial Hypertension. | ▪ ████ | 2003–2005 |
| UNITED THERAPEUTICS, INC.<br>Transition from IV Epoprostenol to Sc Treprostinil (Investigator Initiated) | ▪ ███ | 2003-2005 |
| ELI LILLY.<br>Distinguished Scholar in Critical Care Medicine Chest Foundation, Enhancing the Utilization of<br>Noninvasive Positive Pressure Ventilation. | ▪ ████ | 2003-2006 |
| ENCYSIVE, INC.<br>Open-Label Trial of Sitaxsentan In The Therapy Of Severe Pulmonary Hypertension. | ▪ ████ | 2004-2006 |
| RESMED, INC.<br>Investigation of Inspiratory Time Limits for Enhancing Patient-Ventilator Synchrony During<br>Noninvasive Ventilation | ▪ ███ | 2004-2005 |
| UNITED THERAPEUTICS, INC.<br>Trial Of Ropivacaine, A Local Anesthetic, In Controlling Site Pain during Sc Treprostinil<br>Infusion. | ▪ ███ | 2005 |
| SUNOL, INC.SAFETY<br>Pharmacokinetics and Physiological Effects Of Ch36 In Patients with Acute Lung Injury | ▪ ███ | 2005 |
| ASTRA-ZENCA, INC.<br>Efficacy and Safety of Quetiapine in Medical Intensive Care Unit Patients with Delirium: a<br>Randomized Study | ▪ ████ | 2005-2006 |
| ICOS PHARAMACEUTICALS, INC.<br>Randomized, Controlled Trial of Tadalafil to Treat Pulmonary Arterial Hypertension. | ▪ ███ | 2005-2006 |
| RESPIRONICS, INC.<br>Enhancement of the Utilization of Noninvasive Positive Pressure Ventilation Multicenter Trial. | ▪ ████ | 2005-2008 |
| COTHERIX, INC.<br>Addition of Inhaled Iloprost to Sildenafil In Pulmonary Arterial Hypertension Multicenter Trial | ▪ ███ | 2006-2007 |

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

| | | |
|---|---|---|
| ACTELION, INC.<br>Addition of Bosentan to Sildenafil In Pulmonary Arterial Hypertension, Multicenter Trial | ███ | 2006-2007 |
| UNITED THERAPEUTICS, INC.<br>Evaluation of Oral Treprostinil In Pulmonary Arterial Hypertension Multicenter Trial | ███ | 2006-2007 |
| LUNG RX, INC.<br>Addition of inhaled Treprostinil to Sildenafil or Bosentan In Pulmonary Arterial Hypertension Multicenter Trial. | ███ | 2006-2007 |
| EPIX PHARMACEUTICALS<br>Effect of Serotonin B2 Receptor Blockade On Pulmonary Hypertension in COPD. | ███ | 2006-2007 |
| GILEAD SCIENCES, INC<br>Ambrisentan to Treat Patients with WHO Groups 1,3 and 4 PAH ARIES 3. | ███. | 2006-2007 |
| UNITED THERAPEUTICS<br>Long-term effects of inhaled treprostinil | ███ | 2007-2008 |
| RESPIRONICS GRANT<br>Utilization of Noninvasive Ventilation in Acute Care. The major goal of this multicenter project is to evaluate the utilization of noninvasive ventilation in acute respiratory care in different hospitals. | | 2007-2013 |
| ACTELION, INC.<br>Study to assess the safety and tolerability of ACT-064992 in patients with symptomatic PAH. | ███ | 2008-2009 |
| UNITED THERAPEUTICS<br>Evaluation of oral treprostinil effect on exercise capacity | ███ | 2008-2010 |
| UNITED THERAPEUTICS<br>A post-marketing observational study to assess respiratory tract adverse events in pulmonary arterial hypertension patients treated with Tyvaso (treprostinil) inhalation solution | ███ | 2008-2010 |
| ACTELION, INC. (REVEAL)<br>Registry of pulmonary hypertension patients | ███ | 2008- |
| UNITED THERAPEUTICS<br>An open-label extension trial of UT-15C SR in subjects with Pulmonary Arterial Hypertension | ███ | 2009-2010 |
| BAYER<br>Randomized controlled trial to evaluate efficacy and safety of oral BAY 63-2521 in patients with PAH (2 studies – blinded and extension) | ███ | 2009-2012 |
| HOSPIRA<br>Use of dexmetatomidine as sedative agent during non-invasive ventilation | ███ | 2009- |
| GILEAD SCIENCES, INC<br>Randomized controlled study of Cicletanine in subjects with Pulmonary Arterial Hypertension | ███ | 2009-2012 |
| GILEAD SCIENCES, INC. (AMBITION)<br>Assesses the effect of an upfront combination of Tadalafil and Ambrisentan compared to each drug alone in patients with pulmonary arterial. | ███ | 2010-2014 |
| GeNO LLC<br>Evaluates new way to deliver inhaled nitric oxide and assesses response in patients with pulmonary hypertension | ███ | 2010 |
| RESPIRONICS<br>High intensity non-invasive positive pressure ventilation (NPPV) for stable hypercapnic COPD patients | ███ | 2010-2011 |
| UNITED THERAPEUTICS, INC.<br>A post-marketing observational study to assess respiratory tract adverse events in pulmonary arterial hypertension patients treated with Tyvaso (treprostinil) inhalation solution. | ███ | 2010-2014 |
| PHAROS<br>Examines natural history of scleroderma in registry centered at Georgetown Medical Center | ███ | 2010-2015 |
| ACTELION, INC.<br>Long-term effect of combination therapy with bosentan and sildenafil (Compass II) | ███ | 2010-2016 |
| CHEST FOUNDATION-RESPIRONICS<br>Enhancing utilization of non-invasive ventilation in critical care | ███ | 2010-2016 |
| ACTELION, INC.<br>Study to assess the safety and tolerabllity of ACT-064992 in patients with symptomatic PAH. | ███ | 2010-2016 |

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

| | | |
|---|---|---|
| GENZYME PHARMACEUTICALS<br>Evaluation of neutral endopeptidase inhibitor + nitric oxide in rates with pulmonary hypertension induced by monocrotalins | ■ | 2011-2015 |
| BREATHE TECHNOLOGIES, INC.<br>Effect of Noninvasive Open Ventilation (NICU) on Work of Breathing in COPD patients. | ■ | 2012-2013 |
| FISHER PAYKEL HEALTH INC.<br>Role of high flow nasal $O_2$ during breaks from NIV | ■ | 2013-2014 |
| FISHER PAYKEL HEALTH INC.<br>Physiologic Effects of High Flow Nasal H20 in COPD | ■ | 2014-2016 |
| GILEAD SCIENCES, INC.<br>A Phase 2 randomized, double-blind, placebo-controlled multi-center study to assess the efficacy and safety of GS-6624 (Simtuzumab) in subjects with idiopathic pulmonary fibrosis | ■ | 2014-2016 |
| UNITED THERAPEUTICS, INC.<br>A phase III, international, multi-center, randomized, double-blind, placebo-controlled, clinical worsening study of UT-15C in subjects with pulmonary arterial hypertension receiving background oral monotherapy | ■ | 2014-2018 |
| ACTELION, INC. (SERAPHIN)<br>Study to assess the safety and tolerabllity of ACT-064992 in patients with symptomatic pulmonary arterial hypertension (blinded and open label) | ■ | 2014-2017 |
| REATA PHARMACEUTICALS<br>A dose-ranging study of the efficacy and safety of bardoxolone methyl in patients with PAH. | ■ | 2014-2020 |
| AERODYNE, INC<br>Aerogen Nebulizer For Treatment Of Acute Asthma | ■ | 2015 |
| ACTELION, INC.<br>Phase 3b study of macitentan in patients with pulmonary arterial hypertension to psychometrically validate the PAH-SYMPACT instrument. | ■ | 2015-2019 |
| UNITED THERAPEUTICS INC.<br>A multicenter, randomized, double-blinded, placebo-controlled trial to evaluate the safety and efficacy of inhaled Treprostinil in subjects with pulmonary hypertension due to parenchymal lung disease. | ■. | 2016- |
| REATA PHARMACEUTICALS, INC.<br>An Extended Access Program to Assess Long-Term Safety of Bardoxolone Methyl in Patients With Pulmonary Hypertension | ■ | 2016-2020 |
| ALUNG TECHNOLOGIES, INC.<br>A Prospective, Multi-Center, Randomized, Controlled, Pivotal Trial to Validate the Safety and Efficacy of the Hemolung® Respiratory Assist System for COPD Patients Experiencing an Acute Exacerbation Requiring Ventilatory Support. | ■ | 2017- |
| AEROGEN PHARMA LIMITED<br>A Two-Part Pharmacodynamic Study to Compare VentaProst™ (Epoprostenol Solution for Inhalation via Custom Drug Delivery System) Dosing to Conventionally Administered Aerosolized Eoprostenol Dosing in Cardiac Surgery Patients. | ■ | 2017-2019 |
| ACTELION PHARMACEUTICALS LTD.<br>A multi-center, double-blind, placebo-controlled, Phase 4 study in patients with pulmonary arterial hypertension to assess the effect of selexipag on daily life physical activity and patient's self-reported symptoms and their impacts | ■ | 2017-2019 |
| UNITED THERAPEUTICS CORP.<br>A Multicenter, Randomized, Double-Blinded, Placebo-Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects with Pulmonary Hypertension due to Parenchymal Lung Disease. INCREASE trial | ■ | 2018-2020 |
| PROVIDENCE ST. JOSEPH'S & ST. MICHAEL'S HEALTHCARE<br>The Frequency of Screening and SBT Technique Trial: The FAST Trial - A North American Weaning Collaboration. FAST-002 | ■ | 07/12/2018 |
| LIQUIDIA LTI-301<br>A phase 3 open-label, multicenter study to evaluate the Long-term Safety and Tolerability of Inhaled LIQ861 (treprostinil) in Pulmonary Arterial Hypertension (WHO Group 1) Patients (INTREPID)<br>Co-Investigator (PI: Ioana Preston, MD ) | ■ | 08/05/2018 |

| | | |
|---|---|---|
| • LIQUIDIA LTI-302<br>A Global, Open-Label, Extension Study for Participants in LIQ861 Trials to Evaluate the Long-term Safety of Inhaled LIQ861(Treprostinil) in Pulmonary Arterial Hypertension (WHO Group 1) Patients.<br>Co-Investigator (PI: Ioana Preston, MD ) | • ███████ | • 9/19/2019 |
| • GOSSAMER BIO.<br>A Phase 1b, Randomized, Subject-and Investigator-Blinded, Placebo-Controlled, Multi-Center Clinical Trial to Evaluate the Safety, Pharmacokinetics, Pharmacodynamics, and Biomarkers of Inhaled GB002 in Subjects with WHO Group 1 Pulmonary Arterial Hypertension (PAH)<br>Principal Investigator | • ███████ | • 2019-2020 |
| • INSPIRE MEDICAL SYSTEMS<br>Adherence and Outcome of Upper Airway Stimulation (UAS) for OSA International Registry: ADHERE UAS Registry<br>Co-Investigator (PI: Khalid Ismail, MD) | • ██████ | • 11/01/2019 |
| • FISHER & PAYKEL<br>Effect of high flow nasal cannula on sputum clearance in acute exacerbation of chronic obstructive pulmonary disease, ap prospective study<br>Principal Investigator | • ███████ | • 06/10/2020 |
| • DUKE/DCR I , ACTIV-1<br>Randomized Blinded Controlled Trial of the Safety and Efficacy of Multiple Therapeutics for the Treatment of COVID-19 in Hospitalized Adults (ACTIV-1)<br>Principal Investigator | • ██████ | • 08/17/2020 |
| • ALTAVANT , RVT-1201-2002<br>A Phase 2b, Dose-Ranging, Radmonized, Double-Blind, Placebo-Controlled, Multicenter Study of Rodatristat Ethyl in Patients With Pulmonary Arterial Hypertension<br>Principal Investigator | • ██████ | • 02/21/2021 |
| • UNITED THERAPEUTICS, RIN-PF-301 STUDY (TETON)<br>A Randomized, Double-blind, Placebo-controlled, Phase 3 Study of the Efficacy and Safety of Inhaled Treprostinil in Subjects with Idiopathic Pulmonary Fibrosis<br>Principal Investigator | • ██████ | • 2021 |
| • NYU LANGONE / AWARE II<br>Exploring Human Mind, Brain and Conciousness During Death: A Combined Prospective and Retrospective Study -- Aware II<br>Co-Investigator (PI: Michael McBrine MD) | • ███ | • 05/25/2021 |

| **NIH Awards** | | |
|---|---|---|
| • NHLBI - RO1 AWARD                              **Principal Investigator**<br>"Atrial Natriuretic Peptide and the Lung" | • ████████ | • 1991-2001 |
| • NIH/NHLBI – RO1 AWARD          Co-Investigator, (PI: Peter Polgar PhD)<br>Endothelin and Angiotensin Receptor Signaling in Pulmonary Hypertension | • ████████ | • 2008-2013 |
| • NIH/NHLBI                    Co-Investigator, (PI: Peter Lindenauer PhD)<br>Implementation and Outcomes of Noninvasive Ventilation in COPD | • ████████ | • 2011-2016 |
| • NIH/NHLBI                       Collaborator, PI: Deniz Toksoz, PhD<br>Targeted Rho kinase-1 KO Mouse Model for Vascular Smooth Muscle Remodeling | • | • 2012-2014 |
| • NIH/NHLBI                    Collaborator,( PI: Barry Fanburg, MD)<br>Smooth Muscle Cell Protein Serotonylation and Pulmonary Hypertension | • | • 2012-2016 |
| • NIH/NHLBI                      Co-Investigator, (PI: Bill Nichols, PhD)<br>National Biological Sample and Data Repository for Pulmonary Arterial Hypertension | • ███████ | • 2013-2017 |
| • NIH/NHLBI<br>Chair, Steering Committee PVDomics Network | • ████ | • 2014- |
| • NIH/NHLBI - PETAL NETWORK          Site PI, (Local Site PI: Jay Steingrub MD)<br>Re-examination of neuromuscular blockade to treat early ARDS.  Low tidal volume universal support: feasibility of recruitment for interventional trial acronym: LOTUS FRUIT | • ██████ | • 2016-2018 |

NICHOLAS S. HILL, M.D.
CURRICULUM VITAE 2020

## EDITORIAL BOARDS AND ACTIVITY

- **Editorial Boards**:
  - American Journal of Respiratory and Critical Care Medicine 1994-2000, 2002-2008
  - Ibero American Journal of Noninvasive Mechanical Ventilation 2003-
  - Chronic Respiratory Disease, Arnold Publishers, London.  2003-
  - Breathe, education Journal of European Respiratory Society, 2006-2016
  - Expert Reviews in Respiratory Medicine 2007-
  - Respiratory Care  2008
  - European Medical Journal-Respiratory 2012-
- **Associate Editor, Chest**  2005-2019
- **Reviewer for the following journals**:
  - American Journal of Epidemiology
  - American Journal of Physiology: Lung cellular and molecular physiology
  - American Journal of Respiratory and Critical Care Medicine
  - Annals of internal Medicine
  - Chest
  - Circulation Research
  - Critical Care Medicine
  - European Respiratory Journal
  - General Internal Medicine
  - Intensive Care Medicine
  - International Journal of COPD
  - International Journal of Sports Medicine
  - Journal of Applied Physiology
  - Journal of Clinical Investigation
  - Lung
  - Medicine and Science in Sports and Medicine
  - Muscle & Nerve
  - New England Journal of Medicine
  - Respiratory Care
  - Respiratory Medicine
  - Thorax

## BIBLIOGRAPHY: Original/Peer Reviewed Articles

1. Bouverot P, **Hill NS**, Jammes Y. Ventilatory responses to CO2 in intact and chronically chemodenervated Peking Ducks. Respir Physiol 22:137-156, 1974.
2. **Hill NS**, Tenney SM. Ventilatory responses to CO2 and hypoxia in the two-toed sloth (Choloepus hoffmanni).  Respir Physiol 22:322-332, 1974.
   **Hill NS**, Antmann E, Green L, Alpert JS.  Intravenous nitroglycerin:  A review of pharmacology, indications, therapeutic effects, and complications. Chest 1981 79:69-76.
3. **Hill NS**, Rounds S. Amrinone dilates pulmonary vessels and blunts hypoxic vasoconstriction in isolated rat lungs.  Proc Soc Exp Biol Med 173:205-212, 1983.
4. **Hill NS**, Rounds S.  Vascular reactivity is increased in rat lungs injured with a-naphthyl-thiourea.  J Appl Physiol:  Respir Environ Exercise Physiol 54:1693-1701, 1983.
5. **Hill NS**, O'Brien RF, Rounds S.  Repeated lung injury due to a-naphthylthiourea causes right ventricular hypertrophy in rats. J Appl Physiol: Respir Environ Exercise Physiol 56:388-396, 1984.
6. Brody JS, Vaccaro CA, **Hill NS**, Rounds S.  Binding of charged ferritin to alveolar wall components and charge selectivity of macromolecular transport in permeability pulmonary edema in rats.  Circ Res 55:155-167, 1984.
7. Ou LC, **Hill NS**, Tenney SM.  Ventilatory responses and blood gases in usceptible and resistant rats to high altitude.  Respir Physiol 58:161-170, 1984.
8. **Hill NS**, Ou LC.  The role of pulmonary vascular responses to chronic hypoxia in the development of chronic mountain sickness in rats.  Respir Physiol 581:171-85, 1984.

NICHOLAS S. HILL, M.D.

CURRICULUM VITAE 2020

9.  Rounds S, Farber HW, **Hill NS**, O'Brien RF.  Effects of endothelial cell injury on pulmonary vascular reactivity.  Chest 88:213S-216S, 1985.

10.  Ou LC, Sardella GL, **Hill NS**, Tenney SM.  Acute and chronic pulmonary pressor responses to hypoxia:  the role of blunting in acclimatization.  Respir Physiol 64:81-91,1986.

11.  Farber HW, Arbetter J, Schaefer EJ, Hill SP, Grimaldi R, Dallal G, **Hill NS**.  Acute metabolic effects of an endurance triathlon.  Ann Sports Med 3:131-138, 1987.

12.  Konstam MA, **Hill NS**, Bonin JD, Isner JM.  Prostaglandin medication of hemodynamic responses to pulmonary microembolism in rabbits: effect of ibuprofen and meclofenamate.  Exp Lung Res 12:331-345, 1987.

13.  **Hill NS**, Smith RP, Ou LC.  Time course of the development of cardiopulmonary responses to chronic hypoxia in two strains of rat with differing susceptibilities to high altitude.  Respir Physiol 70:229-240, 1987.

14.  **Hill NS**, Sardella GL, Ou LC. Reticulocytosis, increased mean red cell volume, and greater blood viscosity in altitude susceptible compared to altitude resistant ats. Respir Physiol 70:241-249, 1987.

15.  Langleben D, Jones RC, Aronovitz MJ, **Hill NS**, Ou LC, Reid LM.  Pulmonary artery changes in two colonies of rats with differing sensitivity to chronic hypoxia.  Am J Pathol 128:61-66, 1987.

16.  **Hill NS**, Ou LC.  The possible role of atrial natriuretic factor in modulating the pulmonary hypertensive response to hypoxia.  Chest 93:955-965, 1988.

17.  Jederlinic P, **Hill NS**, Ou LC, Fanburg BL.  Angiotensin converting enzyme in chronically hypoxic rats.  Thorax 43(9):703-707, 1988.

18.  Zibrak JD, **Hill NS**, Federman E, Kwa SL, O'Donnell C.  Evaluation of intermittent long-term negative pressure ventilation in patients with severe chronic obstructive pulmonary disease.  Am Rev Respir Dis 138:1515-1518, 1988.

19.  **Hill NS**, Jederlinic P, Gagnon J.  Supplemental oxygen reduces right ventricular hypertrophy in monocrotaline-injected rats.  J Appl Physiol 66:1642-1648, 1989.

20.  Ou LC, Sardella GL, **Hill NS**, Thron CD.  Does atrial natriuretic factor protect against right ventricular overload.  I.  Hemodynamic study.  J Appl Physiol 67:1606-1611, 1989.

21.  Ou LC, Yen S, Sardella GL, **Hill NS**.  Does atrial natriuretic factor protect against right ventricular overload.  II. Tissue binding study.  J Appl Physiol 67:1612-1616, 1989.

22.  Lamon-Fava S, McNamara JR, Farber HW, **Hill NS**, Schaefer EJ.  Acute changes in lipid, lipoprotein, apolipoprotein and low-density lipoprotein particle size after an endurance triathlon.  Metabolism 38:921-925, 1989.

23.  Konstam MA, Brockway B, Aronovitz MJ, Ramberg K, Palabrica TM, Otradovec CL, Cooper A, **Hill NS**.  Kinetics of pulmonary platelet deposition and clearance during thrombin-induced microembolism in rabbits.  Exp Lung Res 15:867-879, 1989.

24.  Mohr CH, **Hill NS**.  Long-term follow-up of nocturnal ventilatory assistance in patients with respiratory failure due to Duchenne-type muscular dystrophy.  Chest 97:91-96, 1990.

25.  **Hill NS**, Lee SL, Fanburg BL.  Effect of calcium channel blockers on serotonin uptake (43043).  Proc Soc Exp Boil Med 193:326-330, 1990.

26.  Strumpf DA, Carlisle CC, Millman RP, Smith KW, **Hill NS**.  An evaluation of the Respironics BiPAP Bi-level CPAP device for delivery of assisted ventilation.  Resp Care 35:415-422, 1990.

27.  **Hill NS**, Lee SL, Jederlinic P, Fanburg BL.  Effect of chronic in vivo exposure to hypoxia on serotonin uptake by isolated rat lungs.  Gen Pharmacol 21:943-947, 1990.

28.  Strumpf DA, Millman RP, Carlisle CC, Grattan LM, Ryan SM, Erickson AD, **Hill NS**. Nocturnal positive pressure ventilation via nasal mask in patients with severe chronic obstructive pulmonary disease.  Am Rev Respir Dis 144:1234-1239, 1991.

29.  **Hill NS**, Jacoby C, Farber HW.  Effect of an endurance triathlon on pulmonary function.  Med Sci Sports Exer 23:1260-1264, 1991.

30.  Farber HW, Schaefer EJ, Franey R, Grimaldi R, **Hill NS**.  The endurance triathlon:  metabolic changes after each event and during recovery.  Med Sci Sports Exer 23:959-965, 1991.

31.  **Hill NS**, Eveloff SE, Carlisle CC, Goff SG.  Efficacy of nocturnal nasal ventilation in patients with restrictive thoracic disease.  Am Rev Respir Dis 145:365-371, 1992.

32.  **Hill NS**, Redline S, Carskadon MA, Curran FJ, Millman RP.  Sleep-disordered breathing in patients with Duchenne muscular dystrophy using negative pressure ventilators.  Chest 102:1656-1662, 1992.

33.  Klinger JR, Moalli R, Warburton RR, Wrenn DS, **Hill NS**.  C-receptor ligand blocks pulmonary clearance of atrial natriuretic peptide in isolated rat lungs.  Proc Soc Exp Biol Med 201:154-158, 1992.

34.  Petit RD, Warburton RR, Ou LC, Brinck-Johnson T, **Hill NS**.  Exogenous erythropoietin fails to augment hypoxic pulmonary hypertension in rats.  Respir Physiol 91:261-270, 1993.

NICHOLAS S. HILL, M.D.
CURRICULUM VITAE 2020

35. **Hill NS**, Petit RD, Gagnon J, Warburton RR, Ou LC.  Hematologic responses and the early development of hypoxic pulmonary hypertension in rats.  Respir Physiol 91:271-282, 1993.

36. Ou LC, Juan JC, **Hill NS**.  Possible role of pulmonary blood volume in chronic hypoxic pulmonary hypertension.  J Appl Physiol 74:3020-3026, 1993.

37. Klinger JR, Petit RD, Curtin LA, Warburton RR, Wrenn DS, Steinhelper ME, Field LJ, **Hill NS**. Cardiopulmonary responses to chronic hypoxia in transgenic mice that overexpress atrial natriuretic peptide.  J Appl Physiol 75:198-205, 1993

38. Klinger JR, Petit RD, Warburton RR, Wrenn DS, Arnal F, **Hill NS**.  Neutral endopeptidase inhibition attenuates the development of hypoxic pulmonary hypertension in rats.  J Appl Physiol 75:1615-1623, 1993.

39. Meyer TJ, Eveloff, SE, Bauer MS, Schwartz WA, **Hill NS**, Millman RP.  Adverse environmental conditions in the respiratory and medical intensive care unit settings.  Chest 105:1211-1216, 1994.

40. **Hill NS**, Klinger JR, Warburton RR, Pietras L, Wrenn DS.  Brain natriuretic peptide: possible role in the modulation of hypoxic pulmonary hypertension.  Am J Physiol 266 (Lung Cell Mol Physiol 10): L308-L315, 1994.

41. Klinger JR, Arnal F, Warburton RR, Ou LC, and **Hill NS**.  Down-regulation of pulmonary atrial natriuretic peptide receptors in rats exposed to chronic hypoxia.  J Appl Physiol 77:1309-1316, 1994.

42. Petit RD, Warburton RR, Ou LC, **Hill NS**.  Pulmonary vascular adaptation to augmented polycythemia during chronic hypoxia.  J Appl Physiol 79:229-235, 1995.

43. Kramer N, Meyer TJ, Meharg J, Cece RD, **Hill NS**.  Randomized, prospective trial of noninvasive positive pressure ventilation in acute respiratory failure.  Am J Respir Crit Care Med 151:1799-1806, 1995.

44. Aaron JN, Carlisle CC, Carskadon MA, Meyer TJ, **Hill NS**, Millman RP.  Environmental noise is a cause of sleep disruption in a respiratory intensive care unit.  Sleep 19:701-710, 1996.

45. Arjona AA, Hsu CA, Wrenn DS, **Hill NS**.  Effects of natriuretic peptides on vascular smooth muscle cells derived from different vascular beds.  Gen Pharm 28: 382-392, 1997.

46. **Hill NS**, Mehta S, Carlisle CC, McCool FD.  Evaluation of the Puritan-Bennett 335 portable pressure support ventilator:  Comparison with the Respironics BiPAP /T.  Respir Care 41:885-894, 1996.

47. Mehta S, Jay GD, Woolard RH, Hipona R, Connolly EM, Cimini DM, Drinkwine JH, **Hill NS**.  Randomized prospective trial of bilevel vs continuous positive airway pressure in acute pulmonary edema.  Crit Care Med 25:620-628, 1997.

48. Brem AS, Bina RB, **Hill N**, Alia C, Morris DJ.  Effects of licorice derivatives on vascular smooth muscle function.  Life Sciences  60:207-214, 1997.

49. Colice GL, **Hill NS**, Lee Y-J, Du H, Klinger J, Leiter JC, Ou L-C.  Exaggerated pulmonary hypertensive response to monocrotaline in rats susceptible to chronic mountain sickness J Appl Physiol 83:25-31, 1997.

50. Maramatsu M, Tyler RC, Gutkowska J, Klinger JR, **Hill NS**, Rodman DM, McMurtry IF. Atrial natriuretic peptide activity accounts for increased cGMP in hypoxia-induced hypertensive rats.  J Appl Physiol 272:L1126-L1132, 1997.

51. Meyer TJ, Pressman MR, Benditt J, McCool FD, Millman RP, Natarajan R, **Hill NS**.  Air leaking through the mouth during nocturnal nasal ventilation:  Effect on sleep quality.  Sleep 1997; 20: 561-569.

52. **Hill NS**, Warburton RR, Pietras L, Klinger JR.  Nonspecific endothelin receptor antagonist, bosentan, blunts monocrotaline-induced pulmonary hypertension in rats.  J Appl Physiol 83:1209-1215, 1997.

53. Klinger JR, Wrenn DS, Warburton RR, Pietras L, Ou L-C, **Hill NS**.  Atrial natriuretic peptide expression in rats with different pulmonary hypertensive responses to hypoxia.  Am J Physiol 273; H411-H417, 1997.

54. Klinger JR, Warburton RR, Pietras L, **Hill NS**.  Brain natriuretic peptide inhibits hypoxic pulmonary hypertension in rats.  J Appl Physiol 84: 1646-1652, 1998.

55. Klinger JR, Siddig FM, Swift RA, Jackson C, Pietras L, Warburton RR, **Hill NS**.  Plasma C-type natriuretic peptide levels are increased in rats exposed to chronic hypoxia.  Am J Physiol (Lung) 275: L645-L652, 1998.

56. Bina RB, **Hill N**, Brem AS.  Effect of serum on vascular smooth muscle function.  Life Sciences 62: 1195-1201, 1998.

57. Klinger JR, Warburton R, Pietras L, Swift R, John S, Smithies O, and **Hill NS**.  Genetic disruption of atrial natriuretic peptide causes pulmonary hypertension in normoxic and hypoxic mice.  Am J Physiol 276: L868-L874 1999.

58. Salameh G, Karamsetty MR, Warburton RR, Klinger JR, Ou L-C, **Hill NS**.  Differences in acute hypoxic pulmonary vasoresponsiveness between rat strains: Role of endothelium.  J Appl Physiol 87: 356-362, 1999.

59. Klings ES, **Hill NS**, Ieong MH, Simms RW, Korn JH, Farber HW.  Systemic sclerosis associated pulmonary hypertension: acute and long-term effects of epoprostenol (prostacyclin).  Arthr Rheum 42: 2638-2645, 1999.

60. Hinderliter AL, Willis PW, Long W, Clarke WR, Ralph D, Caldwell EJ, Williams W, Ettinger NA, **Hill NS**, Summer WR, de Boisblanc B, Koch G, Li S, Clayton LM, Jobsis MM, and Crow JW.  Frequency of prognostic significance of pericardial effusion in primary pulmonary hypertension.  Am J Cardiol 84: 481-484, 1999.

NICHOLAS S. HILL, M.D.

CURRICULUM VITAE 2020

61. Badesch DB, Tapson VE, McGoon, MD, **Hill NS** (19th in list of 30 authors).  A comparison of continuous intravenous epoprostenol with conventional therapy for pulmonary hypertension secondary to the scleroderma spectrum of disease.  Ann Intern Med. 132: 425-434, 2000.

62. Karamsetty MR, Nakashima JM, Ou L-C, Klinger JR, **Hill NS**.  EDHF contributes to strain- related differences in pulmonary arterial relaxation in rats.  Am J Physiol. 280: L458-L464, 2001.

63. Mehta S, McCool FD, **Hill NS**.  Leak compensation in positive pressure ventilators - a lung model study.  Eur Respir J 17 (2): 259-267, 2001.

64. Karamsetty MR, Klinger JR, **Hill NS**.  Phytoestrogens restore nitric oxide mediated relaxation in isolated pulmonary arteries from chronically hypoxic rats.  J Pharmacol Exp Ther 297: 968-974, 2001.

65. Preston I, Klinger JR, Landzberg M, Houtchens J, Nelson D, **Hill NS**.  Vasoresponsiveness of pulmonary hypertension associated with sarcoidosis.  Chest 120:866-872, 2001.

66. Gay PL, Hess DR, **Hill NS**.  Noninvasive proportional assist ventilation for acute respiratory insufficiency:  Comparison with pressure support ventilation.  Am J Respir Crit Care Med 164:1606-1611, 2001.

67. Karamsetty MR, Pietras L, Klinger JR, Lanzillo JJ, Leiter JC, Ou L-C, **Hill NS**.  The role of endothelin-1 in strain-related susceptibility to develop hypoxic pulmonary hypertension in rats.  Respir Physiol 128: 219-227, 2001.

68. Klinger JR, Pietras L, Warburton R, **Hill NS**.  Reduced oxygen increases atrial natriuretic peptide release from atrial cardiocytes.  Exp Biol Med 226:847-853, 2001.

69. Klinger JR, Warburton RR, Pietras L, Oliver P, Fox J, Smithies O, **Hill NS**.  Targeted disruption of the gene for natriuretic receptor-A worsens hypoxia-induced cardiac hypertrophy.  Am J Physiol Heart Circ Physiol 282: 2002; 282:H58-65.

70. Ward NS, LinDY, Nelson DL, Houtchens J, Schwartz WA, Klinger JR, **Hill NS**, Levy MM.  Successful determination of lower inflection point and maximal compliance in a population of patients with ARDS.  Crit Care Med 2002; 30:963-968.

71. Vachiery JL, **Hill N**, Zwicke D, Barst R, Blackburn S, Naeije R. Transitioning from I.V. Epoprostenol to Subcutaneous Treprostinil in Pulmonary Arterial Hypertension.  Chest. 2002 May;121(5):1561-5.

72. Raymond RJ, Hunderliter AL, Willis PW, Ralph D, Caldwell EJ, Williams W, Ettinger NA, **Hill NS**, Summer WR, de Boisblanc B, Schwartz T, Koch G, Clayton LM, Jobsis MM, Crow JW, Long W. Echocrdiographic predictors of adverse outcomes in primary pulmonary hypertension.  J Am Coll Cardiol 2002; 39:1214-1219.

73. **Hill NS**, Carlisle C, Kramer NR.  Effect of a nonrebreathing valve on long-term nasal ventilation using a bilevel device.  Chest 2002; 122:84-91.

74. Karamsetty MR, Klinger JR, **Hill NS**.  Evidence for the role of p38 MAP kinase in hypoxia-induced pulmonary vasoconstriction.  Am J Physiol lung Cell Mol Physiol 2002; 283:L859-866.

75. Kwok H, McCormack J, Cece R, Houtchens J, **Hill NS**.  Controlled trial of oronasal versus nasal mask ventilation in the treatment of acute respiratory failure.  Crit Care Med 2003; 31:468-473.

76. Hinderliter AL, Willis PW 4th, Long WA, Clarke WR, Ralph D, Caldwell EJ, Williams W, Ettinger NA, **Hill NS**, Summer WR, de Boisblanc B, Koch G, Li S, Clayton LM, Jobsis MM, Crow JW:  PPH Study Group.  Frequency and severity of tricuspid regurgitation determined by Doppler echocardiography in primary pulmonary hypertension.  Am J Cardio. 2003; 91:1033-7.

77. Keenan SP, Sinuff T, Cook DJ, **Hill NS**:  Which patient with acute exacerbation of chronic obstructive pulmonary disease benefit from noninvasive positive-pressure ventilation?  A systematic review of the literature.  Ann Intern Med.  2003 June 3; 138(11):127.

78. Budhiraja R, Kayyali US, Karemsetty M, Fogel M, **Hill NS**, Chalkley R, Finlay GA, Hassoun PM.  Estrogen modulates xanthine dehydrogenase/xanthine oxidase activity by a receptor-independent mechanism.  Antioxid Redox Signal 2003; 5:705-711.

79. Keenan SP, Sinuff T, Cook DJ, **Hill NS**:  Does noninvasive positive pressure ventilation improve outcome in acute hypoxemic respiratory failure?  A systematic review.  Crit Care Med. 2004, Dec. 32(12):2516-2523.

80. Esteban A, Frutos-Vivar F, Ferguson ND, Arabgi Y, Apezteguia C, Gonzalez M, Epstein, SK, **Hill NS**, Nava S, Soares MA, D'Empaire G, Alia I, Anzuety A.  Noninvasive positive pressure ventilation for respiratory failure after extubation.  N Engl J Med 2004, June 350(24): 2452-2460.

81. Preston IR, **Hill NS**, Gambardella LS, Warburton RR, Klinger RJ.  Synergistic effects of ANP and sildenafil on cGMP levels and amelioration of acute hypoxic pulmonary hypertension.  Exp Biol Med (Maywood) 2004, Oct: 229(9):  920-925.

82. Barst RJ, Langleben D, Frost A, Horn EM, Oudiz R, Shapiro S, McLaughlin V, **Hill N**, Tapson VF, Robbins IM, Zwicke D, Duncan B, Dixon RA, Frumkin LR; STRIDE-1 Study Group. Sitaxsentan therapy for pulmonary arterial hypertension. Am J Respir Crit Care Med. 2004 Feb 15;169(4):441-7.

83. Levy M, Tanios MA, Nelson D, Short K, Senechia A, Vespia J, **Hill NS**.  Outcomes of patients with do-not-intubate orders treated with noninvasive ventilation.  Crit Care Med.  2004, Oct: 32(10): 2002-2007.

84. Preston IR, Tang G, Tilan JU, **Hill NS**, Suzuki YJ.  Retinoids and pulmonary hypertension.  Circulation  2005, Feb; 111(6): 782-790.

85. Frost AE, Langleben D, Oudiz R, **Hill N**, Horn E, McLaughlin V, Robbins IM, Shapiro S, Tapson VF, Zwicke D, DeMarco T, Schilz R, Rubenfire M, Barst RJ.  The 6-min walk test (6MW) as an efficacy endpoint in pulmonary arterial hypertension clinical trials: demonstration of a ceiling effect.Vascul Pharmacol. 2005 Jun;43(1):36-9.

86. Diaz GG, Alcaraz AC, Talavera JC, Perez PJ, Rodriguez AE, Cordoba FG, **Hill NS**.  Noninvasive positive pressure ventilation to great hypercapneic coma secondary to respiratory failure.  Chest 2005; 127(3): 952-960.

87. Preston IR, Klinger JR, Houtchens J, Nelson D, Farber HW, **Hill NS**.  Acute and chronic effects of sildenafil in patients with pulmonary arterial hypertension.  Respir Med 2005 May2005 Dec;99(12):1501-10.

88. Preston IR, **Hill NS**, Warburton RR, Fanburg BL.  The role of 12-lipoxygenase in hypoxia-induced rat pulmonary artery smooth muscle cell proliferation.  Am J Physiol Lung Cell Mol Physiol  2006 Feb;290(2):L367-74.

89. Klinger JR, Thaker S, Houtchens J, Preston IR, **Hill NS**, Farber HW.  Pulmonary hemodynamic responses to brain natriuretic peptide and sildenafil in patients with pulmonary arterial hypertension.  Chest. 2006 Feb; 129(2):417-25.

90. Maheshwari V, Paioli D, Rothaar R, **Hill NS**.  Utilization of noninvasive ventilation in acute care hospitals: a regional survey.  Chest. 2006 May; 129(5):1226-33.

91. Steiner MK, Preston IR, Klinger JR, Criner GJ, Waxman AB, Farber HW, **Hill NS**.  Conversion to bosentan from prostacyclin infusion therapy in pulmonary arterial hypertension: a pilot study.  Chest. 2006 Nov; 130(5):1471-80.

92. Frutos-Vivar F, Ferguson ND. Esteban A, Epstein SK, Arabi Y, Apezteguia C, Gonzalez M, **Hill NS**.  Risk factors for extubation failure in patients following a successful spontaneous breathing trial.  Chest Dec 2006 130(6):1554-1671.

93. Liu Y, Li M, Warburton RR, **Hill NS**, Fanburg BF.  The 5-HT transporter transactivates the PDGFbeta receptor in pulmonary arteri smooth muscle cells.  FASEB J Sept 2007; 21(11);2725-2734.

94. Liu T, Warburton RR, Guevara OE, **Hill NS**, Fanburg BF; Gaestel M, Kayyali US.  Lack of MK2 Inhibits myofibroblast formation and exacerbates pulmonary fibrosis.  Am J Respir Cell Mol Biol. 2007; 37(5):507-517.

95. Girgis RE, Frost AE, **Hill NS**, Horn EM, Langleben D, McLaughlin VV, Oudiz RJ, Robbins IM, Seibold JR, Shapiro S, Tapson VF, Barst JR.  Selective endothelin a receptor antagonism with sitaxsentan for pulmonary arterial hypertension associated with connective tissue disease.  Ann Rheum Dis.  Nov 2007 66(11)1467-1472.

96. Devlin JW, Nava S, Fong JJ, Bahhady I, **Hill NS**.  Survey of sedation practices during noninvasive positive pressure ventilation to treat acute respiratory failure.  Crit Care Med Oct. 2007; 35(10):2298-2303.

97. Curtis JR, Cook DJ, Sinuff T, White DB, **Hill N**, Keenan SP, Benditt JO, Kacmarek R, Kirchhoff KT, Levy MM.  Noninvasive positive pressure ventilation in critical and palliative care settings: understanding the goals of therapy.  Society of Critical Care Medicine Palliative Noninvasive Positive VentilationTask Force.Crit Care Med. 2007 Mar; 35(3):932-9.

98. Scala R, Nava S, Conti G, Antonelli M, Naldi M, Archinucci I, Coniglio G, **Hill NS**.  Noninvasive versus conventional ventilation to treat hypercapnic encephalopathy in chronic obstructive pulmonary disease.  Intensive Care Med. 2007 Dec; 33(12):2101-8.

99. Badesch DB, **Hill NS**, Burgess G, Rubin LJ, Barst RJ, Galiè N, Simonneau G; SUPER Study Group.  Sildenafil for pulmonary arterial hypertension associated with connective tissue disease.  J Rheumatol. 2007 Dec; 34(12):2417-22.

100. Sinuff T, Cook DJ, Keenan SP, Burns KE, Adhikari NK, Rocker GM, Mehta S, Kacmarek R, Eva K, **Hill NS**.  Noninvasive ventilation for acute respiratory failure near the end of life.  Crit Care Med. 2008 Mar; 36(3):789-94.PMID: 18209669.

101. Nava S, Santoro C, Grassi M, **Hill N**.  The influence of the media on COPD patients' knowledge regarding cardiopulmonary resuscitation.  Int J Chron Obstruct Pulmon Dis. 2008; 3(2):295-300.

102. O'Connor HH, Kirby KJ, Terrin N, **Hill NS**, White AC.  Decannulation following tracheostomy for prolonged mechanical ventilation.  J Intensive Care Med. 2009 May-Jun; 24(3):187-94.

103. Liu T, Guevara OE, Warburton RR, **Hill NS**, Gaestel M, Kayyali US.  Modulation of HSP27 alters hypoxia-induced endothelial permeability and related signaling Pathways.  J Cell Physiol. 2009 Sep; 220(3):600-10.

104. Ferreira JC, Chipman DW, **Hill NS**, Kacmarek RM.  Bilevel vs ICU ventilators providing noninvasive ventilation: effect of system leaks: a COPD lung model comparison.  Chest 2009 Aug; 136(2): 448-56.

105. White AC, Joseph B, Gireesh A, Shantilal P, Garpestad E, **Hill NS**, O'Connor HH.  Terminal withdrawal of mechanical ventilation at a long-term acute care hospital: comparison with a medical ICU.  Chest. 2009 Aug;136(2):465-70.

106. Devlin JW, Roberts RJ, Fong JJ, Skrobik Y, Riker RR, **Hill NS**, Robbins T, Garpestad E. Efficacy and safety of quetiapine in critically ill patients with delirium: A prospective, multicenter, randomized, double-blind, placebo-controlled pilot study.  Crit Care Med. 2010 Feb; 38(2):419-27.

107. Chan MC, Hilyard AC, Wu C, Davis BN, **Hill NS**, Lal A, Lieberman J, Lagna G,Hata A.  Molecular basis for antagonism between PDGF and the TGFbeta family of signaling pathways by control of miR-24 expression. EMBO J. 2010 Feb 3; 29(3):559-73.

108. Minai OA, Nathan SD, **Hill NS**, Badesch DB, Stoller JK. Pulmonary hypertension in lung diseases: survey of beliefs and practice patterns. Respir Med. 2010 May; 104(5):741-8.

109. Vitacca M, Grassi M, Barbano L, Galavotti G, Sturani C, Vianello A, Zanotti E, Ballerin L, Potena A, Scala R, Peratoner A, Ceriana P, Di Buono L, Clini E, Ambrosino N, **Hill N**, Nava S. Last 3 months of life in home-ventilated patients: the family perception. Eur Respir J. 2010 May;35(5):1064-71. doi: 10.1183/09031936.00061009. PMID: 19717483.

110. Liu T, Guevara OE, Warburton RR, **Hill NS**, Gaestel M, Kayyali US. Regulation of vimentin intermediate filaments in endothelial cells by hypoxia. Am J Physiol Cell Physiol. 2010 Apr 28.

111. Casserly B, Pietras L, Schuyler J, Wang R, **Hill NS**, Klinger JR. Cardiac atria are the primary source of ANP release in hypoxia-adapted rats. Life Sci. 2010 Sep 11; 87(11-12):382-9.

112. Chan MC, Weisman AS, Kang H, Nguyen PH, Hickman T, Mecker SV, **Hill NS**, Lagna G, Hata A. The amiloride derivative phenamil attenuates pulmonary vascular remodeling by activating NFAT and the bone morphogenetic protein signaling pathway. Mol Cell Biol. 2011 Feb; 31(3):517-30.

113. Ozsancak A, Sidhom S, Liesching TN, Howard W, **Hill NS**. Evaluation of The Total Face MaskTM For Noninvasive Ventilation To Treat Acute Respiratory Failure. Chest. 2011 Feb 1.

114. Kawut SM, Bagiella E, Lederer DJ, Shimbo D, Horn EM, Roberts KE, **Hill NS**, Barr RG, Rosenzweig EB, Post W, Tracy RP, Palevsky HI, Hassoun PM, Girgis RE; ASA-STAT Study Group. Randomized clinical trial of aspirin and simvastatin for pulmonary arterial hypertension: ASA-STAT: Circulation. 2011 Jun 28; 123(25):2985-93.

115. Devlin JW, Skrobik Y, Riker RR, Hinderleider E, Roberts RJ, Fong JJ, Ruthazer R, **Hill NS**, Garpestad E. Impact of quetiapine on resolution of individual delirium symptoms in critically ill patients with delirium: a post-hoc analysis of a double-blind, randomized, placebo-controlled study. Crit Care. 2011; 15(5):R215. Epub 2011 Sep 17.

116. Liu T, Milia E, Warburton RR, **Hill NS**, Gaestel M, Kayyali US. Anthrax lethal toxin disrupts the endothelial permeability barrier through blocking p38 signaling: J Cell Physiol. 2012 Apr; 227(4):1438-45.

117. Wei L, Warburton RR, Preston IR, Roberts KE, Comhair SA, Erzurum SC, **Hill NS**, Fanburg BL. Serotonylated fibronectin is elevated in pulmonary hypertension. Am J Physiol Lung Cell Mol Physiol. 2012 Jun 15; 302(12):L1273-9. Epub 2012 Apr 20.

118. Lukácsovits J, Carlucci A, **Hill N**, Ceriana P, Pisani L, Schreiber A, Pierucci P, Losonczy G, Nava S. Physiological changes during low- and high-intensity noninvasive ventilation. Eur Respir J. 2012 Apr;39(4):869-75. doi: 10.1183/09031936.00056111. PMID: 21885393.

119. Yu J, Taylor L, Rich C, Toselli P, Stone P, Green D, Warburton R, **Hill N**, Goldstein R, Polgar P. Transgenic expression of an altered angiotensin type I AT1 receptor resulting in marked modulation of vascular type I collagen. J Cell Physiol. 2012 May;227(5):2013-21. doi: 10.1002/jcp.22929. PMID: 21751211.

120. Wang D, Prakash J, Nguyen P, Davis-Dusenbery BN, **Hill NS**, Layne MD, Hata A, Lagna G. Bone morphogenetic protein signaling in vascular disease: anti-inflammatory action through myocardin-related transcription factor. A.J Biol Chem. 2012 Aug,10;287(33):28067-77. Epub 2012 Jun 20. PMID: 22718766

121. Wong CM, Preston IR, **Hill NS**, Suzuki YJ. Iron chelation inhibits the development of pulmonary vascular remodeling. Free Radic Biol Med. 2012 Nov 1; 53(9):1738-47. Epub 2012 Aug 25.

122. Sagliani KD, Dolnikowski GG, **Hill NS**, Fanburg BL, Levy BD, Preston IR. Differences between basal lung levels of select eicosanoids in rat and mouse. Pulm Circ. 2013 Jan; 3(1):82-8.

123. Preston IR, Sagliani KD, Roberts KE, Shah AM, Desouza SA, Howard W, Brennan J, **Hill NS**. Comparison of acute hemodynamic effects of inhaled nitric oxide and inhaled eoprostenol in patients with pulmonary hypertension. Pulm Circ. 2013 Jan; 3(1):68-73.

124. Preston IR, Sagliani KD, Warburton RR, **Hill NS**, Fanburg BL, Jaffe IZ. Mineralocorticoid receptor antagonism attenuates experimental pulmonary hypertension. Am J Physiol Lung Cell Mol Physiol. 2013 May 15; 304(10):L678-88.

125. Kapur NK, Paruchuri V, Aronovitz MJ, Qiao X, Mackey EE, Daly GH, Ughreja K, Levine J, Blanton R, **Hill NS**, Karas RH. Biventricular remodeling in murine models of right ventricular pressure overload. PLoS One. 2013 Jul 30;8(7):e70802.

126. Sadoughi A, Roberts KE, Preston IR, Lai GP, McCollister DH, Farber HW, **Hill NS**. Use of selective serotonin reuptake inhibitors and outcomes in pulmonary arterial hypertension. Chest. 2013 Aug; 144(2):531-41.

127. Green DS, Rupasinghe C, Warburton R, Wilson JL, Sallum CO, Taylor L, Yatawara A, Mierke D, Polgar P, **Hill N**. A cell permeable peptide targeting the intracellular loop 2 of endothelin B receptor reduces pulmonary hypertension in a hypoxic rat model. PLoS One. 2013 Nov 27;8(11):e81309. doi: 10.1371/journal.pone.0081309. PMID: 24312288.

128. Khanna D, Tan M, Furst DE, **Hill NS**, McLaughlin VV, Silver RM, Steen VD, Langer A, Seibold JR. Recognition of pulmonary hypertension in the rheumatology community: lessons from a Quality Enhancement Research Initiative. Clin Exp Rheumatol. 2013 Dec 2.

NICHOLAS S. HILL, M.D.

CURRICULUM VITAE 2020

129. Diraimondo TR, Klöck C, Warburton R, Herrera Z, Penumatsa K, Toksoz D, **Hill N**, Khosla C, Fanburg B. Elevated transglutaminase 2 activity is associated with hypoxia-induced experimental pulmonary hypertension in mice. ACS Chem Biol. 2014 Jan 17; 9(1):266-75.

130. Liesching T, Nelson DL, Cormier KL, Sucov A, Short K, Warburton R, **Hill NS**. Randomized trial of bilevel versus continuous positive airway pressure for acute pulmonary edema. J Emerg Med. 2014 Jan;46(1):130-40. . Epub 2013 Sep 24. ID: 24071031.

131. Ugurlu AO, Sidhom SS, Khodabandeh A, Ieong M, Mohr C, Lin DY, Buchwald I, Bahhady I, Wengryn J, Maheshwari V, **Hill NS**. Use and Outcomes of Noninvasive Positive Pressure Ventilation in Acute Care Hospitals in Massachusetts. Chest. 2014 Jan 30.

132. Ozsancak Ugurlu A, Sidhom SS, Khodabandeh A, Ieong M, Mohr C, Lin DY, Buchwald I, Bahhady I, Wengryn J, Maheshwari V, **Hill NS**. Use and outcomes of noninvasive positive pressure ventilation in acute care hospitals in Massachusetts. Chest. 2014 May; 145(5):964-71.

133. Devlin JW, Al-Qadheeb NS, Chi A, Roberts RJ, Qawi I, Garpestad E, **Hill NS**. Efficacy and safety of early dexmedetomidine during noninvasive ventilation for patients with acute respiratory failure: a randomized, double-blind, placebo-controlled pilot study. Chest. 2014 May;145(6):1204-12.

134. Kapur NK, Qiao X, Paruchuri V, Mackey EE, Daly GH, Ughreja K, Morine KJ, Levine J, Aronovitz MJ, **Hill NS**, Jaffe IZ, Letarte M, Karas RH. Reducing endoglin activity limits calcineurin and TRPC-6 expression and improves survival in a mouse model of right ventricular pressure overload. J Am Heart Assoc. 2014 Jul 11;3(4). pii: e000965.

135. Preston IR, Feldman J, White J, Franco V, Ishizawar D, Burger C, Waxman AB, **Hill NS**. Safety and efficacy of transition from inhaled treprostinil to parenteral treprostinil in selected patients with pulmonary arterial hypertension. Pulm Circ. 2014 Sep;4(3):456-61. doi: 10.1086/677360. PMID: 25621159.

136. Liu T, Ghamloush MM, Aldawood A, Warburton R, Toksoz D, **Hill NS**, Tang DD, Kayyali US. Modulating endothelial barrier function by targeting vimentin phosphorylation. J Cell Physiol. 2014 Oct; 229(10):1484-93.

137. Sprung CL, Truog RD, Curtis JR, Joynt GM, Baras M, Michalsen A, Briegel J, Kesecioglu J, Efferen L, De Robertis E, Bulpa P, Metnitz P, Patil N, Hawryluck L, Manthous C, Moreno R, Leonard S, **Hill NS**, Wennberg E, McDermid RC, Mikstacki A, Mularski RA, Hartog CS, Avidan A. Seeking worldwide professional consensus on the principles of end-of-life care for the critically ill. The Consensus for Worldwide End-of-Life Practice for Patients in Intensive Care Units (WELPICUS) study. Am J Respir Crit Care Med. 2014 Oct 15; 190(8):855-66.

138. Penumatsa K, Abualkhair S, Wei L, Warburton R, Preston I, **Hill NS**, Watts SW, Fanburg BL, Toksoz D. Tissue transglutaminase promotes serotonin-induced AKT signaling and mitogenesis in pulmonary vascular smooth muscle cells. Cell Signal. 2014 Dec; 26(12):2818-25. Epub 2014 Sep 15.

139. Lindenauer PK, Stefan MS, Shieh MS, Pekow PS, Rothberg MB, **Hill NS**. Outcomes associated with invasive and noninvasive ventilation among patients hospitalized with exacerbations of chronic obstructive pulmonary disease. JAMA Intern Med. 2014 Dec 1; 174(12):1982-93.

140. Wilson JL, Rupasinghe C, Usheva A, Warburton R, Kaplan C, Taylor L, **Hill N**, Mierke DF, Polgar P. Modulating the dysregulated migration of pulmonary arterial hypertensive smooth muscle cells with motif mimicking cell permeable peptides. Curr Top Pept Protein Res. 2015;16:1-17. PMID: 27274622.

141. **Hill NS**, Badesch D, Benza RL, D'Eletto TA, Farber HW, Gomberg-Maitland M, Hassoun PM, Preston I. Perspectives On Oral Pulmonary Hypertension Therapies Recently Approved by the Food and Drug Administration. Ann Am Thorac Soc. 2015 Jan 15.

142. Lindenauer PK, Stefan MS, Shieh MS, Pekow PS, Rothberg MB, **Hill NS**. Hospital patterns of mechanical ventilation for patients with exacerbations of COPD. Ann Am Thorac Soc. 2015 Mar;12(3):402-9. doi: 10.1513/AnnalsATS.201407-293OC. PMID: 25654431.

143. Stefan MS, Shieh MS, Pekow PS, **Hill N**, Rothberg MB, Lindenauer PK. Trends in mechanical ventilation among patients hospitalized with acute exacerbations of COPD in the United States, 2001 to 2011. Chest. 2015 Apr;147(4):959-68. doi: 10.1378/chest.14-1216. PMID: 25375230.

144. Al-Naamani N, Preston IR, Paulus JK, **Hill NS**, Roberts KE. Pulmonary Arterial Capacitance Is an Important Predictor of Mortality in Heart Failure With a Preserved Ejection Fraction. JACC Heart Fail. 2015 Jun;3(6):467-74. doi: 10.1016/j.jchf.2015.01.013. PMID: 26046840.

145. Liu T, Warburton RR, **Hill NS**, Kayyali US. Anthrax lethal toxin-induced lung injury and treatment by activating MK2. J Appl Physiol (1985). 2015 Aug 15;119(4):412-9. doi: 10.1152/japplphysiol.00335.2015. PMID: 26066827.

146. Ozsancak Ugurlu A, Sidhom SS, Khodabandeh A, Ieong M, Mohr C, Lin DY, Buchwald I, Bahhady I, Wengryn J, Maheshwari V, **Hill NS**. Where is Noninvasive Ventilation Actually Delivered for Acute Respiratory Failure? Lung. 2015 Oct;193(5):779-88. doi: 10.1007/s00408-015-9766-y. PMID: 26210474.

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

147. Preston IR, Roberts KE, Miller DP, Sen GP, Selej M, Benton WW, **Hill NS**, Farber HW.  Effect of Warfarin Treatment on Survival of Patients With Pulmonary Arterial Hypertension (PAH) in the Registry to Evaluate Early and Long-Term PAH Disease Management (REVEAL).  Circulation. 2015 Dec 22;132(25):2403-11. doi: 10.1161/ CIRCULATIONAHA .115. 018435. PMID: 26510696.

148. Ozsancak Ugurlu A, Sidhom SS, Khodabandeh A, Ieong M, Mohr C, Lin DY, Buchwald I, Bahhady I, Wengryn J, Maheshwari V, **Hill NS**.  Use and Outcomes of Noninvasive Ventilation for Acute Respiratory Failure in Different Age Groups.  Respir Care. 2016 Jan;61(1):36-43. doi: 10.4187/respcare.03966.  PMID: 26374908.

149. Stefan MS, Nathanson BH, Priya A, Pekow PS, Lagu T, Steingrub JS, **Hill NS**, Goldberg RJ, Kent DM, Lindenauer PK. Hospitals' Patterns of Use of Noninvasive Ventilation in Patients With Asthma Exacerbation.  Chest. 2016 Mar;149(3):729-36. doi: 10.1016/j.chest.2015.12.013.  PMID: 26836902.

150. Bear MD, Liu T, Abualkhair S, Ghamloush MA, **Hill NS**, Preston I, Fanburg BL, Kayyali US, Toksoz D.  Alpha-Catulin Co-Localizes With Vimentin Intermediate Filaments and Functions in Pulmonary Vascular Endothelial Cell Migration via ROCK.  J Cell Physiol. 2016 Apr;231(4):934-43. doi: 10.1002/jcp.25185.  PMID: 26377600.

151. Al-Naamani N, Espitia H G, Velazquez-Moreno H, Macuil-Chazaro B, Serrano-Lopez A, Vega-Barrientos RS, **Hill NS**, Preston IR.  Chronic Thromboembolic Pulmonary Hypertension: Experience from a Single Center in Mexico. Lung. 2016 Apr;194(2):315-23. doi: 10.1007/s00408-016-9842-y.  PMID: 26748498.

152. Richter SE, Roberts KE, Preston IR, **Hill NS.**  A Simple Derived Prediction Score for the Identification of an Elevated Pulmonary Artery Wedge Pressure Using Precatheterization Clinical Data in Patients Referred to a Pulmonary Hypertension Center.  Chest. 2016 May;149(5):1261-8. doi: 10.1378/chest.15-0819.  PMID: 26501213.

153. Ventetuolo CE, Baird GL, Barr RG, Bluemke DA, Fritz JS, **Hill NS**, Klinger JR, Lima JA, Ouyang P, Palevsky HI, Palmisciano AJ, Krishnan I, Pinder D, Preston IR, Roberts KE, Kawut SM.  Higher Estradiol and Lower Dehydroepiandrosterone-Sulfate Levels Are Associated with Pulmonary Arterial Hypertension in Men.  Am J Respir Crit Care Med. 2016 May 15;193(10):1168-75. doi: 10.1164/rccm.201509-1785OC.  PMID: 26651504.

154. Al-Naamani N, Sagliani KD, Dolnikowski GG, Warburton RR, Toksoz D, Kayyali U, **Hill NS**, Fanburg BL, Roberts KE, Preston IR.  Plasma 12- and 15-hydroxyeicosanoids are predictors of survival in pulmonary arterial hypertension.  Pulm Circ. 2016 Jun;6(2):224-33. doi: 10.1086/686311.  PMID: 27252849.

155. Stefan MS, Nathanson BH, Lagu T, Priya A, Pekow PS, Steingrub JS, **Hill NS**, Goldberg RJ, Kent DM, Lindenauer PK. Outcomes of Noninvasive and Invasive Ventilation in Patients Hospitalized with Asthma Exacerbation.  Ann Am Thorac Soc. 2016 Jul;13(7):1096-104. doi: 10.1513/AnnalsATS.201510-701OC.  PMID: 27070493.

156. Stefan MS, **Hill NS**, Raghunathan K, Liu X, Pekow PS, Memtsoudis SG, Ramachandran SK, Lindenauer PK.  Outcomes Associated with Early Postoperative Noninvasive Ventilation in Bariatric Surgical Patients with Sleep Apnea.  J Clin Sleep Med. 2016 Nov 15;12(11):1507-1516. PMID: 27568901.

157. Al-Naamani N, Preston IR, **Hill NS**, Roberts KE.  The prognostic significance of pulmonary arterial capacitance in pulmonary arterial hypertension: single-center experience.  Pulm Circ. 2016 Dec;6(4):608-610. doi: 10.1086/688900. PMID: 28090304.

158. Stefan MS, Pekow PS, Shieh MS, **Hill NS**, Rothberg MB, Fisher KA, Lindenauer PK.  Hospital Volume and Outcomes of Noninvasive Ventilation in Patients Hospitalized With an Acute Exacerbation of Chronic Obstructive Pulmonary Disease. Crit Care Med. 2017 Jan;45(1):20-27.  PMID: 27509388.

159. Covella M, Rowin EJ, **Hill NS**, Preston IR, Milan A, Opotowsky AR, Maron BJ, Maron MS, Maron BA.  Mechanism of Progressive Heart Failure and Significance of Pulmonary Hypertension in Obstructive Hypertrophic Cardiomyopathy.  Circ Heart Fail. 2017 Apr;10(4):e003689. doi: 10.1161/CIRCHEARTFAILURE.116.003689.  PMID: 28396501.

160. **Hill NS**, Rahaghi FF, Sood N, Frey R, Ghofrani HA.  Individual dose adjustment of riociguat in patients with pulmonary arterial hypertension and chronic thromboembolic pulmonary hypertension.  Respir Med. 2017 Aug;129:124-129. doi: 10.1016/j rmed.2017.05.005. Epub 2017 May 15. Review.  PMID: 28732819.

161. Hemnes AR, Beck GJ, Newman JH, Abidov A, Aldred MA, Barnard J, Berman Rosenzweig E, Borlaug BA, Chung WK, Comhair SAA, Erzurum SC, Frantz RP, Gray MP, Grunig G, Hassoun PM, **Hill NS**, Horn EM, Hu B, Lempel JK, Maron BA, Mathai SC, Olman MA, Rischard FP, Systrom DM, Tang WHW, Waxman AB, Xiao L, Yuan JX, Leopold JA; PVDOMICS Study Group.  PVDOMICS: A Multi-Center Study to Improve Understanding of Pulmonary Vascular Disease Through Phenomics.  Circ Res. 2017 Oct 27;121(10):1136-1139. doi: 10.1161/CIRCRESAHA.117.311737. PMID: 29074534

162. Hashemian SM, Mortaz E, Jamaati H, Bagheri L, Mohajerani SA, Garssen J, Movassaghi M, Barnes PJ, **Hill NS,** Adcock IM.  Budesonide facilitates weaning from mechanical ventilation in difficult-to-wean very severe COPD patients: Association with inflammatory mediators and cells.  J Crit Care. 2017 Oct 31;44:161-167. doi: 10.1016/j.jcrc.2017.10.045. PMID: 29127842.

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

163. Fisher KA, Mazor KM, Goff S, Stefan MS, Pekow PS, Williams LA, Rastegar V, Rothberg MB, **Hill NS**, Lindenauer PK. Successful Use of Noninvasive Ventilation in Chronic Obstructive Pulmonary Disease. How Do High-Performing Hospitals Do It?  Ann Am Thorac Soc. 2017 Nov;14(11):1674-1681. doi: 10.1513/AnnalsATS.201612-1005OC. PMID: 28719228.

164. Penumatsa KC, Toksoz D, Warburton RR, Kharnaf M, Preston IR, Kapur NK, Khosla C, **Hill NS**, Fanburg BL. Transglutaminase 2 in pulmonary and cardiac tissue remodeling in experimental pulmonary hypertension.  Am J Physiol Lung Cell Mol Physiol. 2017 Nov 1;313(5):L752-L762. doi: 10.1152/ajplung.00170.2017. Epub 2017 Aug 3.  PMID: 28775095.

165. Nwankwo JO, Gremmel T, Gerrits AJ, Mithila FJ, Warburton RR, **Hill NS,** Lu Y, Richey LJ, Jakubowski JA, Frelinger AL 3rd, Chishti AH.  Calpain-1 regulates platelet function in a humanized mouse model of sickle cell disease.  Thromb Res. 2017 Dec;160:58-65. doi: 10.1016/j.thromres.2017.10.018. Epub 2017 Oct 26.  PMID: 29101791.

166. Stefan MS, Priya A, Pekow PS, Lagu T, Steingrub JS, **Hill NS**, Nathanson BH, Lindenauer PK.  The comparative effectiveness of noninvasive and invasive ventilation in patients with pneumonia.  J Crit Care. 2018 Feb;43:190-196. doi: 10.1016/j.jcrc.2017.05.023. Epub 2017 May 23.  PMID: 28915393

167. Wilson JL, Warburton R, Taylor L, Toksoz D, **Hill N**, Polgar P.  Unraveling endothelin-1 induced hypercontractility of human pulmonary artery smooth muscle cells from patients with pulmonary arterial hypertension.  PLoS One. 2018 Apr 12;13(4):e0195780. doi: 10.1371/journal.pone.0195780. eCollection 2018.  PMID: 29649319

168. Skrobik Y, Duprey MS, **Hill NS**, Devlin JW.  Low-Dose Nocturnal Dexmedetomidine Prevents ICU Delirium. A Randomized, Placebo-controlled Trial.  Am J Respir Crit Care Med. 2018 May 1;197(9):1147-1156. doi: 10.1164/rccm.201710-1995OC.  PMID: 29498534

169. Baird GL, Archer-Chicko C, Barr RG, Bluemke DA, Foderaro AE, Fritz JS, **Hill NS**, Kawut SM, Klinger JR, Lima JAC, Mullin CJ, Ouyang P, Palevsky HI, Palmisicano AJ, Pinder D, Preston IR, Roberts KE, Smith KA, Walsh T, Whittenhall M, Ventetuolo CE.  Lower DHEA-S levels predict disease and worse outcomes in post-menopausal women with idiopathic, connective tissue disease- and congenital heart disease-associated pulmonary arterial hypertension.  Eur Respir J. 2018 Jun 28;51(6). pii: 1800467. doi: 10.1183/13993003.00467-2018. Print 2018 Jun.  PMID: 29954925

170. Rice LM, Mantero JC, Stratton EA, Warburton R, Roberts K, **Hill N**, Simms RW, Domsic R, Farber HW, Layfatis P. Serum biomarker for diagnostic evaluation of pulmonary arterial hypertension in systemic sclerosis.  Arthritis Res Ther. 2018 Aug 16;20(1):185. doi: 10.1186/s13075-018-1679-8. PMID: 30115106

171. Spoletini G, Mega C, Pisani L, Alotaibi M, Khoja A, Price LL, Blasi F, Nava S, **Hill NS**. High-flow nasal therapy vs standard oxygen during breaks off noninvasive ventilation for acute respiratory failure: A pilot randomized controlled trial.  J Crit Care. 2018 Dec;48:418-425. doi: 10.1016/j.jcrc.2018.10.004. Epub 2018 Oct 5.  PMID: 30321833

172. Rhodes CJ, Batai K, Bleda M, Haimel M, Southgate L, Germain M, Pauciulo MW, Hadinnapola C, Aman J, Girerd B, Arora A, Knight J, Hanscombe KB, Karnes JH, Kaakinen M, Gall H, Ulrich A, Harbaum L, Cebola I, Ferrer J, Lutz K, Swietlik EM, Ahmad F, Amouyel P, Archer SL, Argula R, Austin ED, Badesch D, Bakshi S, Barnett C, Benza R, Bhatt N, Bogaard HJ, Burger CD, Chakinala M, Church C, Coghlan JG, Condliffe R, Corris PA, Danesino C, Debette S, Elliott CG, Elwing J, Eyries M, Fortin T, Franke A, Frantz RP, Frost A, Garcia JGN, Ghio S, Ghofrani HA, Gibbs JSR, Harley J, He H, **Hill NS,** Hirsch R, Houweling AC, Howard LS, Ivy D, Kiely DG, Klinger J, Kovacs G, Lahm T, Laudes M, Machado RD, MacKenzie Ross RV, Marsolo K, Martin LJ, Moledina S, Montani D, Nathan SD, Newnham M, Olschewski A, Olschewski H, Oudiz RJ, Ouwehand WH, Peacock AJ, Pepke-Zaba J, Rehman Z, Robbins I, Roden DM, Rosenzweig EB, Saydain G, Scelsi L, Schilz R, Seeger W, Shaffer CM, Simms RW, Simon M, Sitbon O, Suntharalingam J, Tang H, Tchourbanov AY, Thenappan T, Torres F, Toshner MR, Treacy CM, Vonk Noordegraaf A, Waisfisz Q, Walsworth AK, Walter RE, Wharton J, White RJ, Wilt J, Wort SJ, Yung D, Lawrie A, Humbert M, Soubrier F, Trégouët DA, Prokopenko I, Kittles R, Gräf S, Nichols WC, Trembath RC, Desai AA, Morrell NW, Wilkins MR; UK NIHR BioResource Rare Diseases Consortium; UK PAH Cohort Study Consortium; US PAH Biobank Consortium.  Genetic determinants of risk in pulmonary arterial hypertension: international genome-wide association studies and meta-analysis.  Lancet Respir Med. 2019 Mar;7(3):227-238. doi: 10.1016/S2213-2600(18)30409-0. Epub 2018 Dec 5.  PMID: 30527956

173. National Heart, Lung, and Blood Institute PETAL Clinical Trials Network, Moss M, Huang DT, Brower RG, Ferguson ND, Ginde AA, Gong MN, Grissom CK, Gundel S, Hayden D, Hite RD, Hou PC, Hough CL, Iwashyna TJ, Khan A, Liu KD, Talmor D, Thompson BT, Ulysse CA, Yealy DM, Angus DC.  Early Neuromuscular Blockade in the Acute Respiratory Distress Syndrome.  N Engl J Med. 2019 May 23;380(21):1997-2008. doi: 10.1056/NEJMoa1901686. Epub 2019 May 19. PMID: 31112383.

174. Wilson JL, Wang L, Zhang Z, **Hill NS**, Polgar P.  Participation of PLK1 and FOXM1 in the hyperplastic proliferation of pulmonary artery smooth muscle cells in pulmonary arterial hypertension.  PLoS One. 2019 Aug 22;14(8):e0221728. doi: 10.1371/journal.pone.0221728. eCollection 2019.  PMID: 31437238.

175. Burns KEA, Rizvi L, Cook DJ, Seely AJE, Rochwerg B, Lamontagne F, Devlin JW, Dodek P, Mayette M, Tanios M, Gouskos A, Kay P, Mitchell S, Kiedrowski KC, **Hill NS**.  Canadian Critical Care Trials Group.  Frequency of Screening and SBT Technique Trial - North American Weaning Collaboration (FAST-NAWC): a protocol for a multicenter, factorial randomized trial.  Trials. 2019 Oct 11;20(1):587. doi: 10.1186/s13063-019-3641-8.  PMID: 31604480

**NICHOLAS S. HILL, M.D.**

176. National Heart, Lung, and Blood Institute PETAL **Clinical Trials Network**, Ginde AA, Brower RG, Caterino JM, Finck L, Banner-Goodspeed VM, Grissom CK, Hayden D, Hough CL, Hyzy RC, Khan A, Levitt JE, Park PK, Ringwood N, Rivers EP, Self WH, Shapiro NI, Thompson BT, Yealy DM, Talmor D.  Early High-Dose Vitamin D$_3$ for Critically Ill, Vitamin D-Deficient Patients.  N Engl J Med. 2019 Dec 26;381(26):2529-2540. doi: 10.1056/NEJMoa1911124. Epub 2019 Dec 11. PMID: 31826336**.**

177. Preston IR, Burger CD, Bartolome S, Safdar Z, Krowka M, Sood N, Ford HJ, Battarjee WF, Chakinala MM, Gomberg-Maitland M, **Hill NS**.  Ambrisentan in portopulmonary hypertension: A multicenter, open-label trial.  J Heart Lung Transplant. 2020 Jan 21. pii: S1053-2498(20)30011-5. doi: 10.1016/j.healun.2019.12.008.  PMID: 32008947

178. Stefan MS, Pekow PS, Shea CM, Hughes AM, **Hill NS**, Steingrub JS, Lindenauer PK.  Protocol for two-arm pragmatic cluster randomized hybrid implementation-effectiveness trial comparing two education strategies for improving the uptake of noninvasive ventilation in patients with severe COPD exacerbation.  Implement Sci Commun. 2020;1(1):46. doi: 10.1186/s43058-020-00028-2. Epub 2020 May 6.  PMID: 32435762

179. Bhedi CD, Nasirova S, Toksoz D, Warburton RR, Morine KJ, Kapur NK, Galper JB, Preston IR, **Hill NS**, Fanburg BL, Penumatsa KC.  Glycolysis regulated transglutaminase 2 activation in cardiopulmonary fibrogenic remodeling.   FASEB J. 2020 Jan;34(1):930-944. doi: 10.1096/fj.201902155R. Epub 2019 Nov 28.  PMID: 31914588

180. Mathioudakis AG, Sivapalan P, Papi A, Vestbo J; DECODE-NET (DisEntangling Chronic Obstructive pulmonary Disease Exacerbations clinical trials NETwork) Investigators.  The DisEntangling Chronic Obstructive pulmonary Disease Exacerbations clinical trials NETwork (DECODE-NET): rationale and vision. Eur Respir J. 2020 Jul 2;56(1):2000627. doi: 10.1183/13993003.00627-2020. Print 2020 Jul.  PMID: 32616552

181. Pharmacokinetics and tolerability of LIQ861, a novel dry-powder formulation of treprostinil. Original Roscigno R, Vaughn T, Anderson S, Wargin W, Hunt T, **Hill NS**.  Pulm Circ. 2020 Nov 19;10(4):2045894020971509. doi: 10.1177/2045894020971509. eCollection 2020 Oct-Dec.  PMID: 33282202

182. Badlam JB, Badesch DB, Austin ED, Benza RL, Chung WK, Farber HW, Feldkircher K, Frost AE, Poms AD, Lutz KA, Pauciulo MW, Yu C, Nichols WC, Elliott CG; USPHSR Investigators.  United States Pulmonary Hypertension Scientific Registry: Baseline Characteristics.  Chest. 2021 Jan;159(1):311-327. doi: 10.1016/j.chest.2020.07.088. Epub 2020 Aug 26. PMID: 32858008

183. Stefan MS, Priya A, Pekow PS, Steingrub JS, **Hill NS,** Lagu T, Raghunathan K, Bhat AG, Lindenauer PK.  A scoring system derived from electronic health records to identify patients at high risk for noninvasive ventilation failure.  BMC Pulm Med. 2021 Feb 5;21(1):52. doi: 10.1186/s12890-021-01421-w.  PMID: 33546651

## BOOK CHAPTERS/REVIEWS

1) Rounds S, **Hill NS**, O'Brien RF.  Pulmonary vascular reactivity after acute lung injury.  Third International Banff Hypoxia Symposium.  In: J. Sutton, ed., Alan R. Liss, Houston, 1983.

2) Rounds S, **Hill NS**.  Pulmonary hypertensive diseases. Chest 1984 85:397-405,.

3) **Hill NS**, Rounds S.  Pulmonary hypertension:  Diagnosis and approach to therapy.  In: Brody JS, Snider GL, eds.  Current Topics in the Management of Respiratory Diseases. 2nd ed, Vol. II.  Churchill-Livingstone, New York, 1985, pp. 31-53.

4) **Hill NS**.  Fluid and electrolyte considerations in diuretic therapy of hypertensive patients with chronic obstructive pulmonary disease.  In: Arch Intern Med 146:129-133, 1986.

5) **Hill NS**.  Clinical applications of body ventilators.Chest 1986 90:897-905.

6) Fanburg BL, Deneke SM, Lee SL, **Hill NS**.  Mediators of lung injury in oxygen toxicity.  Bronchopulmonary dysplasia and related chronic respiratory disorders.  In: 90th Ross Conference on Pediatric Research, March, 1985.  Ross Laboratories, Columbus, pp. 16-23, 1986.

7) **Hill NS**, Rounds S.  Pulmonary embolism.  In: Nobel J,ed. Primary Care for the Internist. Little Brown and Co.1987.

8) **Hill NS**, Fanburg BL.  Clinical correlates of endothelial cell dysfunction.  In: Rayn U, ed. Pulmonary Endothelium, Lung Biology in Health and Disease.  Marcel Dekker, New York 1987.

9) **Hill NS**.  The cardiac exam in lung disease.  In: Med Clin N.A.  8:273-285, 1987.

10) **Hill NS**.  The right ventricle in chronic obstructive pulmonary disease.  In: M. Konstam M, Isner J,eds.  The Right Ventricle.  Martinus-Nijhoff, Norwell, MA, 1988.

11) Rondinelli RD, **Hill NS**.  Rehabilitation of the patient with pulmonary disease.  In: DeLisa JA, ed.  Rehabilitation Medicine, Principles and Practice, J.B. Lippincott, Philadelphia, PA, 1988.

12) **Hill NS**.  Home care of ventilator assisted and dependent patients.J Cardiopulm Rehab 8:462-472, 1988.

13) **Hill NS**.  The use of theophylline in "irreversible" chronic obstructive pulmonary disease:  An update.  Arch Int Med 148:2579-2584, 1988.

14) Jayes RL, **Hill NS**, Pauker SG.  Open lung biopsy in primary pulmonary hypertension:  A decision analysis.  In: Sem Respir Med 10:232-241, 1989.

15) Strumpf DA, Millman RP, **Hill NS**.  The management of chronic hypoventilation.  Chest 948:474-480, 1990.

16) Klinger JR, **Hill NS**.  Evaluation and management of right ventricular dysfunction in chronic obstructive pulmonary disease.  Chest 99:715-723, 1991.

17) Ou LC, **Hill NS**, Pickett BP, Faulkner CS, Sardella GL, Thron CD, Tenney SM.  Hypoxia-induced right ventricular aneurysm.  Symposium on Pulmonary Circulation.  In: Jezeck V, Morpurgo M, Tramarin R, eds.  Current Topics in Rehabilitation:  Springer-Verlag, Berlin, 1992.

18) **Hill NS**, Weiss EB.  Status asthmaticus.  In: Weiss EB, ed.  Bronchial Asthma:  mechanisms and therapeutics. 3rd Edition.  Little Brown and Co., Boston 1993.

19) **Hill NS**.  Noninvasive ventilation.  "Does it work, for whom, and how?"  In: Am Rev Respir Dis 147:1050-1055, 1993.

20) **Hill NS**, Meyer TJ.  Noninvasive positive pressure ventilation.  Pulmonary and Critical Care Update:  In: American College of Chest Physicians 1994.

21) **Hill NS**.  Noninvasive positive pressure ventilation in neuromuscular disease.  Enough is enough!: In: (editorial) Chest 105:337-338, 1994.

22) **Hill NS**.  Use of negative pressure ventilation, rocking beds and pneumobelts: Respir Care 39:532-549, 1994.

23) Unterborn J, **Hill NS**.  Options for mechanical ventilation in neuromuscular diseases:  In: Clin Chest Med 15:765-781, 1994.

24) Meyer TJ, **Hill NS**.  Noninvasive positive pressure ventilation, advance in the treatment of respiratory failure. Ann Intern Med 120:760-770, 1994.

25) **Hill NS**.  Noninvasive nasal positive pressure ventilation:  Management and Monitoring.  In: Robert D, Make BJ, Leger P, Goldberg AI, Paulus J, Willig TN, eds.  In: Home Mechanical Ventilation: Arnette-Blackwell, Paris 1995.

26) **Hill NS**.  Perithoracic ventilation.  In: Muir JR, Robert D, eds.  In: Ventilation Noninvasive Masson, Paris, 1996.

27) **Hill NS**.  Failure to wean: the chronic ventilator-dependent patient.  In: Fishman AP, ed Pulmonary Rehabilitation:  The Series Lung Biology in Health and Disease, Lenfant C, ed.  Marcel-Dekker, Inc., New York, 1996.

28) **Hill NS**.  Noninvasive positive pressure ventilation.  In: Current Topics in Intensive Care, Dellinger RP, ed.: WB Saunders Ltd., London, 1996.

29) Mehta S, **Hill NS**.  Noninvasive ventilation in acute respiratory failure.  In: Respir Care Clin NA 2:267-292, 1996.

30) **Hill NS**.  "Use of noninvasive nocturnal ventilatory support on neuromuscular and chest wall disorders:  Practical aspects" and Kramer NR, Millman RP, and Hill NS, "Assessment of sleep-disordered breathing in patients with neuromuscular and chest wall disorders".  In: Up To Date in Pulmonary and Critical Care Medicine, edited by Postgraduate Education Committee:  In: American Thoracic Society, New York, 1997.

31) **Hill NS**.  Noninvasive mechanical ventilation.  In: Pulmonary and Critical Care Medicine, Update #4.  Bone RC, Dantzker DR, George RB, Matthay RA, Reynolds HY, eds.  Mosby-Year Book, Inc.  Chicago, 1996.

32) **Hill NS**, Meyer TJ, Kramer NR, Meharg J.  Randomized prospective trial of noninvasive positive pressure ventilation in acute respiratory failure: (letter) Am J Respir Crit Care Med 1196, 153:1188-1189.

33) Mehta S, **Hill NS**.  Noninvasive ventilation.  In: Pulmonary and Respiratory Therapy Secrets. Parsons, PE, Heffner JE, eds.  Hanley and Belfus, Inc.  In: Medical Publishers, 1996.

34) Kramer NR, **Hill NS**, Millman RP.  Assessment and treatment of sleep pathology in patients with neuromuscular and chest wall disease.  In: Clin Pulm Med 1996.

35) Bach JR, Broguher P, Hess DR, **Hill NS**, et al.  Consensus Conference:  Noninvasive positive pressure ventilation.  In: Resipr Care 1997, 42:364-369.

36) Wunderink RG, **Hill NS**.  Continuous periodic application of noninvasive ventilation in respiratory failure.  In: Respir Care 1997, 42: 394-408.

37) **Hill NS**.  Complications of noninvasive mask ventilation.  In: Respir Care 1997; 42:432-42.

38) **Hill NS**.  Noninvasive ventilation for COPD.  RT.  In: The Journal for Respir Care Practitioners.  Sept. 1997.

39) **Hill NS**.  Noninvasive ventilation.  In: Pulmonary Perspectives 1997; 14:1-4.

40) **Hill NS**.  Chronic respiratory failure and noninvasive ventilation.  In: Baum G, Crapo J, Celli B, Karlinsky J, eds.  Textbook of Pulmonary Diseases, 6th Edition. Little, Brown, Boston, pp 969-986, 1998.

41) Donado JR, **Hill NS**.  COPD: Out-patient management in chronic obstructive pulmonary disease.  In: Respir Care Clin of N Am 3: 391-423, 1998.

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

42) Make BJ, **Hill NS**, Goldberg AI, et al.  Mechanical ventilation beyond the Intensive Care Unit.  Report of a consensus conference of the American College of Chest Physicians.  In: Chest 1998; 113:289S-344S.

43) Klinger JR, Warburton R, Pietras L, Smithies O, Swift R and **Hill NS**.  Exaggerated pulmonary hypertensive responses during chronic hypoxia in mice with gene-targeted reductions in atrial natriuretic peptide.  In: Chest 1998; 114: 79S-80S.

44) **Hill NS**, Braman S.  Noninvasive Ventilation for Neuromuscular Disease.  In: Cherniack NS, Homma I, Altose M, eds.  Rehabilitation of the Patient with Respiratory Disease: McGraw-Hill, 1998.

45) **Hill NS**.  Noninvasive mechanical ventilation.  In: Albert RK, Spiro H, Jett J, eds.  Comprehensive Respiratory Medicine: Mosby, London 1999.

46) **Hill NS**.  Home noninvasive ventilation for patients with lung disease.  In: Bach JR, ed.  Noninvasive Mechanical Ventilation: Hanley and Belfus, Philadelphia (in press).  Clinical indications for noninvasive positive pressure ventilation in chronic respiratory failure due to restrictive lung disease, COPD, and nocturnal hypoventilation – A Consensus Conference.  ACCP NAMDRC Consensus Group (Hill N, member).  In: Chest, 1999; 116:521-34.

47) **Hill NS**.  Current concepts in mechanical ventilation for chronic obstructive pulmonary disease.  In: Semin Respir Crit Care Med 1999; 20:375-93.

48) **Hill, NS**.  Noninvasive positive pressure ventilation for acute respiratory failure.  In: Braunwald E, ed.  Harrison's On-line: McGraw-Hill, New York, NY, 1999.

49) **Hill NS**.  Noninvasive ventilation in chronic obstructive pulmonary disease.  In: Clin Chest Med 2000; 21:783-97.

50) **Hill NS**.  A 69 yo woman with COPD and increasing cough and dyspnea.  In: Heffner JE, Sahn SA, eds.  Internal Med Pearls: Hanley and Belfus, Inc.  Philadelphia, PA, 2001:208-18.

51) **Hill NS**.  Using NPPV to optimal benefit in acute respiratory failure.  In: J Crit Illness 2001; 16:361-66.

52) **Hill NS**.  NPPV for acute respiratory failure: Tips on technique.  In: J Crit Illness 2011; 16:409-12.

53) Kacmarek R., **Hill NS**.  Ventilators for noninvasive positive pressure ventilation:  Technical aspects - Noninvasive Mechanical Ventilation.  In: Muir JR, Simonds A, Ambrosino N, eds.  European Respiratory Monograph Series, A Rossi, ed.in chief, Sheffield, UK, 2001.

54) **Hill NS**, Noninvasive ventilation in the post-acute setting.  In: Clin Chest Med 2001; 22:35-54.

55) Magno-Russo P, **Hill NS**.  New approaches to pulmonary hypertension.  In: Hospital Practice 2001; 36:29-40.

56) Donat WE, **Hill NS**.  Sites of care for long-term mechanical ventilation.  In: Hill NS, ed.  Long Term Mechanical Ventilation.  Marcel Dekker, New York 2011:19-38.

57) Leger P, **Hill NS**.  Long-term mechanical ventilation for restrictive thoracic disease.  In: Hill NS, ed.  Long Term Mechanical Ventilation.  Marcel Dekker, New York 2001; 105-50.

58) **Hill NS**.  Management of long-term noninvasive ventilation.  In: Hill NS, ed. Long Term Mechanical Ventilation.  Marcel Dekker, New York 2011:253-304.

59) Mehta S, **Hill NS**.  Noninvasive ventilation.  State of the art.  In: Am J Respir Crit Care Med 2011; 163:540-77.

60) **Hill NS**.  Ventilator management for neuromuscular disease.  In: Sem Resp Crit Care Med 2002; 23:293-305.

61) Ward NS, **Hill NS**.  Pulmonary function testing in neuromuscular disease.  In: Clin Chest Med 2001; 22:769-81.

62) Chu J, Wang R, **Hill NS**.  Update in Clinical Toxicology. Am J Respir Crit Care Med 2002; 166:9-15.

63) Liesching T, Kwok H, **Hill NS**.  Acute applications of noninvasive positive pressure ventilation. Chest 2003; 124:699-713.

64) **Hill NS**, Liesching T, Kwok H.  Indications for Noninvasive Ventilation.  In: Slutsky AS, Brochard L, eds.  Mechanical Ventilation:  Springer, Berlin, 2003.

65) Perrin C, D'Ambrosio C, Unterborn J, **Hill NS**.  Pulmonary complications and management of chronic neuromuscular disease.  Muscle & Nerve 2005 Jan; 29(1):5-27.

66) Preston I, **Hill NS**.  Evaluation and management of pulmonary hypertension in scleroderma.  In: Curr Opin Rheum 2003:15.

67) Karemsetty MR, Leiter JC, Ou LC, Preston IR, **Hill NS**.  Stain differences of hypoxia-induced pulmonary hypertension.  In: Yuan JX-J, ed. Hypoxia Pulmonary Asoconstriction Cellular and Molecular Mechanisms:  Springer-Verlag. New York. 2003.

68) **Hill NS**.  Noninvasive Ventilation for COPD.  Respir Care 2004;49:72-85.

69) Maheshwari V, **Hill NS**.  Noninvasive ventilation for chronic obstructive pulmonary disease.  Respir Care 2004; Jan: 49(1): 72-87.

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

70) Thompson BT, Cox PN, Antonelli M, Carlet JM, Cassell J, **Hill NS**, Hinds CJ, Pimentel JM, Reinhart K, Thijs LG, American Thoracic Society, European Respiratory Socitey, European Socitey of Intensive Care Medicine, Society of Critical Care Medicine, Societede Reanimation de Langue Francaise. Challenges in end-of-life care in the ICU: Statement of the 5th International Consensus Conference in Critical Care: Brussels, Belgium, April, 2003, executive summary.

71) **Hill NS**. "Noninvasive Mechanical Ventilation". In: Albert RK, Spiro SG, Jett RJ eds. Clinical Respiratory Medicine. 2nd Edition: Mosby Philadelphia, PA 2004.

72) **Hill NS**. "Chronic Respiratory failure and Noninvasive Ventilation". In: Crapo JD, Glassroth J, Karlinsky J, King TE, eds. Baum's Textbook of Pulmonary Diseases, 7th edition: Lippincott Williams & Wilkens, Philadelphia, PA. 2004.

73) Majid A, **Hill NS**. Noninvasive ventilation for acute respiratory failure. In: Curr Opin Crit Care, 2005 Feb:11(1):77-81.

74) Carlet J, Thijs LG, Antonelli M, Cassell J, Cox P, **Hill N**, Hinds C, Pimentel JM, Reinhart K, Thompson BT. Challenges in end-of-life care in the ICU. Statement of the 5th International Consensus Conference in Critical Care: Brussels, Belgium, April 2003. Intensive Care Med 2004 May; 30(5):770-84.

75) Steiner MK, Preston IR, Klinger JR, **Hill NS**. Pulmonary hypertension: Inhaled nitric oxide, sildenafil and natriuretic peptides. In: Curr Opin Pharmacol 2005, June; 5(3):245-250.

76) Perrin C, D'Ambrosio C, White A, **Hill NS**. Sleep in restrictive and neuromuscular respiratory disorders. In: Semin Respir Crit Care Med 2005 Feb; 26(1): 117-130.

77) Pierson DJ, **Hill NS**. "Acute Ventilatory Failure". In: Mason RJ, Broaddus VC, Murray JF, Nadel JA, eds. Murray and Nadel's Textbook of Respiratory Medicine. 4th ed: Elsevier Saunders Philadelphia, PA 2005.

78) Rajan T, **Hill NS**. "Noninvasive Positive Pressure Ventilation". In: Fink MP, Abraham E, Vincent J-L, Kochanek PM,eds. Textbook of Critical Care Medicine 5Th ed: Elsevier Saunders Philadelphia, PA 2005.

79) **Hill NS**. "Noninvasive Mechanical Ventilation" and "Rocking Beds and Other Respiratory Aids". In: Tobin. MR, ed. Principles of Mechanical Ventilation. 2nd Edition: Elsevier Saunders, Inc., Philadelphia, PA 2006.

80) Klinger JR, Houtchens J, Thaker S, **Hill NS**, Farber H. Acute cardiopulmonary hemodynamic effects of brain natriuretic peptide in patients with pulmonary arterial hypertension. Chest. 2005 Dec; 128(6 Suppl):618S-619S.

81) **Hill NS**. Pulmonary Rehabilitation. In: Proc Am Thorac Soc. 2006; 3(1):66-74.

82) **Hill NS**. Neuromuscular disease in respiratory and critical care medicine. In: Respir Care. 2006 Sep;51(9):1065-71.

83) Maheshwari V, **Hill NS**. Emergency applications of noninvasive ventilation. In: Fein A, Kamholz S, Ost D, ed. Respiratory Emergencies: Hodder Arnold, London, 2006.

84) Perrin C, D'Ambrosio C, White A, Garpestad E, **Hill NS**. Restrictive and neuromuscular Disorders. Sleep. In: Lee-Chiong TL, ed. A Comprehensive Handbook:Wiley-Liss, Hoboken, NJ 2006.

85) **Hill NS**. Q&A: Noninvasive ventilation for COPD. In: J Respir Dis 2006; 27:504.

86) **Hill NS**. Noninvasive Methods of Ventilator Support. In: Principles Practice of Mechanical Ventilation/ ed, M J Tobin- 2nd ed., McGraw-Hill Inc., 2006. pp421- 432.

87) **Hill NS**, Perrin C, D'Ambrosio C, White A, Garpestad E. Restrictive Thoracic and Neuromuscular Disorder. In: Sleep: A Comp Handbook. John Wiley & Son 2006.

88) Garpestad E, Brennan, J, **Hill NS**. Noninvasive ventilation in acute respiratory failure. Chest Aug 2007; 132(2):711-20.

89) **Hill NS**, Brennan J, Garpestad E, Nava S. Noninvasive ventilation for critical care. Crit Care Med 2007;35(10):2402-

90) **Hill NS**, Brennan J, Garpestad E, Nava S. Noninvasive ventilation in acute respiratory failure. Crit Care Med. 2007 Oct; 35(10):2402-7.

91) Garpestad E, Brennan J, **Hill NS**. Noninvasive ventilation for critical care. Chest 2007 Aug; 132(2):711-20.

92) Ozsancak A, D'Ambrosio C, **Hill NS**. Nocturnal noninvasive ventilation. Chest 2008 May; 133(5):1275-86.

93) Ozsancak A, D'Ambrosio C, Garpestad E, Schumaker G, **Hill NS**. Sleep and mechanical ventilation. In: Crit Care Clin 2008 Jul; 24(3):517-31, vi-vii.

94) **Hill NS**, Farber HW, eds. Pulmonary Hypertension. In: Contemporary Cardiology, Cannon C, series editor. Humana Press. New York 2008.

95) **Hill NS**, Preston IR, Roberts KE. "Patients with pulmonary arterial hypertension in clinical trials: who are they?" In: Proc Am Thorac Soc. 2008 Jul 15; 5(5):603-9.

96) **Hill NS**. Noninvasive Mechanical Ventilaton Mac. In: NR, Branson RD eds. Mechanical Ventilation. 2nd Ed.: Saunders St Louis, MO., 2009 pp 366-391.

97) **Hill NS**. Where Should Noninvasive Ventilation Be Delivered? In: Respir Care. 2009 Jan; 54(1):62-70.

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

98) **Hill NS**, Roberts KR, Preston IR. Postoperative pulmonary hypertension: etiology and treatment of a dangerous complication. In: Respir Care. 2009 Jul; 54(7):958-68.

99) Nava S, **Hill N**. Non-invasive ventilation in acute respiratory failure. Lancet. 2009 Jul 18;374(9685):250-9. doi: 10.1016/S0140-6736(09)60496-7. Review.  PMID: 19616722 .

100) **Hill NS**. Acute Ventilatory Failure. In: I&II.RJ Mason, ed., Murray &Nadel's Textbook of Resp Med 5th ed.Vol: Saunders North Am 2010.

101) Brennan J, Garpestad E, **Hill NS**. What Is The Role Of Noninvasive Ventilation In The Intensive Care Unit? In: Evidence-Based Practice of Critical Care, edited by Drs. Deutschman CS, and Neligan PJ. Elsevier Health Sciences, Philadelphia. 2010

102) Rajan T, **Hill NS**. "Noninvasive Positive-Pressure Ventilation". In: Vincent JL, Abraham E, Kochanek P, Moore F, Fink M. Textbook of Critical Care 6th Ed.: Elsevier Saunders Philadelphia, PA. 2011 Jun.  pp347-353.

103) Kahn JM, **Hill NS**, Lilly CM, Angus DC, Jacobi J, Rubenfeld GD, Rothschild JM, Sales AE, Scales DC, Mathers JA. The research agenda in ICU telemedicine: a statement from the Critical Care Societes Collaborative. In: Chest. 2011 Jul; 140(1):230-8.

104) **Hill NS**, Stroller J. Respiratory Monitoring in Critical Care. In: Goldman L, Schafer A, eds, Goldman's Cecil Medicine 24th ed. Philadelphia: Elsevier Saunders 2012; 103:626-29.

105) **Hill NS**, Sidhom S. Mechanical Ventilation Part II: Non-invasive Mechanical ventilation for the Adult Hospitalized Patient. In: Irwin RS, Rippe JM, eds, Intensive Care Medicine 7th ed. Philadelphia: LWW 2011. 59:641-58.

106) **Hill NS**. Noninvasive Respiratory Aids: Rocking Bed, Pneumobelt, and Glossopharyngeal Breathing. In: Principles and Practice of Mechanical Ventilation, 3rd edition. ed., Martin J. Tobin. McGraw-Hill, Philadelphia, PA 2013. pp 435-445.

107) **Hill NS**. Noninvasive Positive–Pressure Ventilation. In: Principles and Practice of Mechanical Ventilation, 3rd edition. ed., Martin J. Tobin. McGraw-Hill, Philadelphia, PA 2013..pp 447-491.

108) Stoller J, **Hill NS**. Respiratory Monitoring in Critical Care. In Cecil-Goldman Medicine. 25th edition. New York. 2015.

109) Minai OA, Yared JP, Kaw R, Subramaniam K, **Hill NS**. Perioperative risk and management in patients with pulmonary hypertension. Chest. 2013 Jul; 144(1):329-40.

110) Mirrakhimov AE, **Hill NS**. Primary antiphospholipid syndrome and pulmonary hypertension. Curr Pharm Des. 2014; 20(4):545-51.

111) **Hill NS**. Acute Ventilatory Failure. In Murray & Nadel's Textbook of Respiratory Medicine, 2-Volume Set, 6th Edition. Saunders, North Am.  2015

112) Yu F, Garpestad E, **Hill NS**. What Is The Role Of Noninvasive Ventilation In The Intensive Care Unit? In: Evidence-Based Practice of Critical Care, 2nd Edition. Edited by Drs. Deutschman CS, and Neligan PJ. Elsevier Health Sciences, Philadelphia. 2015.

113) **Hill NS**, Badesch D, Benza RL, D'Eletto TA, Farber HW, Gomberg-Maitland M, Hassoun PM, Preston I. Perspectives on oral pulmonary hypertension therapies recently approved by the U.S. Food and Drug Administration. Ann Am Thorac Soc. 2015 Feb;12(2):269-73. doi: 10.1513/AnnalsATS.201501-020AS. PMID: 25590376 .

114) Ismail K, Roberts K, Manning P, Manley C, **Hill NS**. OSA and pulmonary hypertension: time for a new look. Chest. 2015 Mar;147(3):847-61. doi: 10.1378/chest.14-0614. Review.  PMID: 25732450.

115) **Hill NS**, Preston IR, Roberts KE. Inhaled Therapies for Pulmonary Hypertension. Respir Care. 2015 Jun;60(6):794-802; discussion 802-5. doi: 10.4187/respcare.03927. Review.  PMID: 26070575.

116) **Hill NS**, Badesch D, Benza RL, D'Eletto TA, Farber HW, Gomberg-Maitland M, Hassoun PM, Preston I. Reply: Perspectives on Oral Pulmonary Hypertension Therapies Recently Approved by the U.S. Food and Drug Administration. Ann Am Thorac Soc. 2015 Jun; 12(6):960.  PMID: 26075562

117) Spoletini G, Alotaibi M, Blasi F, **Hill NS**. Heated Humidified High-Flow Nasal Oxygen in Adults: Mechanisms of Action and Clinical Implications. Chest. 2015 Jul;148(1):253-61. doi: 10.1378/chest.14-2871. Review.  PMID: 25742321.

118) **Hill NS**, Roberts K, Preston I. Pulmonary hypertension trials: how can we do better? Expert Rev Respir Med. 2015 Oct;9(5):551-8. doi: 10.1586/17476348.2015.1074040. PMID: 26290120 .

119) **Hill NS**, Acute Ventilatory Failure. In: Murray & Nadel's Textbook of Respiratory Medicine, 2-Volume Set, 6th Edition. Edited by Drs VC Broaddus, RJ Mason, J Ernst, TE King, Jr, SC. Lazarus, JF Murray, DSc(Hon), FRCP, JA Nadel,, DSc(Hon), DLaw(Hon), A Slutsky, and M Gotway.  Elsevier Inc 2016. Chapter 99, 1723-1739.

120) **Hill NS**, Cawley MJ, Heggen-Peay CL. New Therapeutic Paradigms and Guidelines in the Management of Pulmonary Arterial Hypertension. J Manag Care Spec Pharm. 2016 Mar;22(3 Suppl A):S3-21. doi: 10.18553/jmcp.2016.22.3-a.s3. Review.  PMID: 27003666.

121) Spoletini G, **Hill NS**. High-flow nasal oxygen versus noninvasive ventilation for hypoxemic respiratory failure: Do we know enough? Ann Thorac Med. 2016 Jul-Sep;11(3):163-6. doi: 10.4103/1817-1737.185760. No abstract available. PMID: 27512504.

122) Yu F, **Hill NS**. "Noninvasive Positive-Pressure Ventilation". In: Vincent JL, Abraham E,Kochanek P, Moore F, Fink M. Textbook of Critical Care 7th Ed.: Elsevier Saunders Philadelphia, PA. 2017 Jun. Ch 62. ISBN: 9780323376389.

123) Sidhom S, **Hill NS**. "Mechanical Ventilation Part II: Non-invasive Mechanical Ventilation for the Adult Hospitalized Patient". In: Drs Irwin RS, Rippe  JM. Textbook Irwin and Rippe's Intensive Care Medicine 8th Ed. Lippincott Williams & Wilkins. Philadelphia, 2017.

124) **Hill** NS, Spoletini G, Schumaker G, Garpestad E. Noninvasive Ventilatory Support for Acute Hypercapnic Respiratory Failure. Respir Care. 2019 Jun;64(6):647-657. doi: 10.4187/respcare.06931. PMID: 31110034

125) Tang WHW, Wilcox JD, Jacob MS, Rosenzweig EB, Borlaug BA, Frantz RP, Hassoun PM, Hemnes AR, **Hill NS**, Horn EM, Singh HS, Systrom DM, Tedford RJ, Vanderpool RR, Waxman AB, Xiao L, Leopold JA, Rischard FP. Comprehensive Diagnostic Evaluation of Cardiovascular Physiology in Patients With Pulmonary Vascular Disease: Insights From the PVDOMICS Program. Circ Heart Fail. 2020 Mar;13(3):e006363. doi: 10.1161/CIRCHEARTFAILURE.119.006363. Epub 2020 Feb 24. PMID: 32088984.

## EDITORIALS

1. **Hill NS**. Use of the rocking bed, pneumobelt, and other noninvasive aids to ventilation. In Principles and Practice of Mechanical Ventilation, Tobin MJ, ed., McGraw-Hill 1994.

2. **Hill NS**. Negative pressure ventilation for the facilitation of weaning from mechanical ventilation: back to the future? (Editorial) Respiratory Care 39:19-20, 1994.

3. **Hill NS**. Noninvasive ventilation for the long-term. (Editorial) Thorax 50:595-596, 1995.

4. **Hill NS**. The invasion of noninvasive ventilation: Demographic trends in the use of mechanical ventilation. (Editorial) Respir Care (in press).

5. **Hill NS**, Noninvasive ventilation has been shown to be ineffective in stable COPD (Pro-Con Editorial) Am J Respir Crit Care Med 161: 689-691, 2000.

6. **Hill NS**. Complications of noninvasive ventilation (editorial). Respir Care 45: 480-481, 2000.

7. **Hill NS**. Noninvasive ventilation for immunocompromised patients. (Editorial) N Engl J Med 344: 522-524, 2001.

8. **Hill NS**. Noninvasive ventilation routine therapy for community acquired pneumonia? Not so fast! (Editorial) Intensive Care Med 27: 797-799, 2001.

9. **Hill NS**. Following protocol. Weaning difficult-to-wean patients with chronic obstructive pulmonary disease. (Editorial) Am J Respir Crit Care Med 2001 (in press).

10. **Hill NS**. Saving Face: Better Interfaces for Noninvasive Ventilation. In Intensive Care Medicine 2002; 28:227-229.

11. Reiss TF, Moss J, Osborne M, Curtis JR, **Hill NS**. Collaborative science and the American Thoracic Society: cooperation in harmony with conflict of interest. Am J Respir Crit Care Med. 2012 Feb 15; 185(4):347-9.

12. **Hill NS**. Practice guidelines for noninvasive positive-pressure ventilation: help or hindrance? Chest. 2003; 123:1784-6.

13. **Hill N**. What mask for noninvasive ventilation: is deadspace an issue? Crit Care Med. 2003 Aug; 31(8):2247-8.

14. **Hill NS**. Noninvasive ventilation for respiratory failure caused by exacerbations of COPD. A standard of care? Crit Care 2003; 7:400-401.

15. **Hill NS**. Is there a negative side to noninvasive ventilation? Eur Respir J 2004; 23:361-362.

16. **Hill NS**. Editorial: Assistance ventilatoire mecanique a domicile, l 'experience americanize. Rev Med Respir 2004;21:1-4.

17. D'Ambrosio C, **Hill NS**. A Less expensive way to diagnose OSA. Does it pay? Chronic Respir Dis. In press.

18. **Hill NS**: Noninvasive interfaces: should we go to helmets? Crit Care Med. 2004, Oct.:32(10):2163-2163.

19. **Hill NS**. Brain natriuretic peptide: Is it helpful in detecting pulmonary hypertension in fibrotic lung disease? Am J Respir Crit Care Med 2004 Aug; 170(4): 352-353.

20. Schumaker GL, **Hill NS**, Garpestad E, Teres D. A looming crisis in demand for intensive care unit resources? Crit Care Med 2005 Mar; 33(3):  683-684.

21. Garpestad E, **Hill N**. Noninvasive ventilation for acute respiratory failure: but how severe? Chest. 2005 Dec;128(6):3790-1

22. Schumaker G, **Hill NS**. Utilization of critical care resources is increasing--are we ready? J Intensive Care Med. 2006 May-Jun; 21(3):191-3.

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

23. Garpestad E, **Hill NS**. Noninvasive ventilation for acute lung injury: how often should we try, how often should we fail?: Crit Care. 2006; 10(4):147.

24. Roberts K, Preston I, **Hill NS**. Pulmonary hypertension trials: current end points are flawed, but what are the alternatives?: Chest. 2006 Oct; 130(4):934-6.

25. Garpestad E, Schumaker G, **Hill NS**. Noninvasive ventilation for acute respiratory distress syndrome: breaking down the final frontier? Crit Care Med. 2007 Jan; 35(1):288-90.

26. **Hill NS**, Klinger JR. Pulmonary hypertension in the intensive care unit: Critical role of the right ventricle: Crit Care Med. 2007 Sep; 35(9):2210-1.

27. Shapiro S, **Hill NS**. Transition from IV to subcutaneous prostacyclin: premature withdrawal? Chest. 2007 Sep; 132(3):741-3.

28. **Hill NS**, Preston IR, Roberts KE. Inoperable chronic thromboembolic pulmonary hypertension: treatable with medical therapy: Chest. 2008 Aug; 134(2):221-3.

29. **Hill NS**. Noninvasive ventilation for COPD: volume assurance not very reassuring. COPD. 2010 Dec; 7(6):389-90.

30. **Hill NS**, Roberts K, Preston I. Pulmonary vasculopathy in acute respiratory distress syndrome: something new, something old. Am J Respir Crit Care Med. 2010 Nov 1; 182(9):1093-4.

31. **Hill NS**. Noninvasive ventilation for COPD: volume assurance not very reassuring. COPD. 2010 Dec; 7(6):389-90.

32. **Hill NS**, Preston I, Roberts K. Defining the phenotypes for pulmonary hypertension associated with diastolic heart failure. Circ Heart Fail. 2011 May; 4(3):238-40.

33. Manley C, Garpestad E, **Hill NS**. A new purpose for PAV? Crit Care Med. 2013 Jan (In Press).

34. **Hill NS**, Schraufnagel D, Curtis JR. Why PATS to ANNALSATS? Ann Am Thorac Soc. 2013 Feb; 10(1):53.

35. Manley C, Garpestad E, **Hill NS**. A new purpose for proportional assist ventilation? Crit Care Med.2013 Sep;41(9):2230 1

36. Ghamloush M, **Hill NS**. Synchronized intermittent mandatory ventilation: time to send this workhorse out to pasture. Respir Care. 2013 Nov; 58(11):1992-4. doi: 10.4187/respcare.02880.

37. Angus DC, Deutschman CS, Hall JB, Wilson KC, Munro CL, **Hill NS**. Choosing wisely (®) in critical care: maximizing value in the intensive care unit. Am J Crit Care. 2014 Nov; 23(6):444-6. PMID: 25362666.

38. Rochwerg B, Freitag A, **Hill NS**. New data on noninvasive ventilation in stable chronic obstructive pulmonary disease: revolutionary or evolutionary? Pol Arch Med Wewn. 2015; 125(1-2):5-7. PMID: 25728868.

39. Conti G, **Hill NS**, Nava S. Is sedation safe and beneficial in patients receiving NIV? No. Intensive Care Med. 2015 Sep;41(9):1692-5. doi: 10.1007/s00134-015-3915-x. PMID: 26149298.

40. Spoletini G, Garpestad E, **Hill NS**. High-Flow Nasal Oxygen or Noninvasive Ventilation for Postextubation Hypoxemia: Flow vs Pressure? JAMA. 2016 Apr 5;315(13):1340-2. doi: 10.1001/jama.2016.2709. PMID: 26976699.

41. Demoule A, **Hill N**, Navalesi P. Can we prevent intubation in patients with ARDS? Intensive Care Med. 2016 May;42(5):768-771. doi: 10.1007/s00134-016-4323-6. Epub 2016 Mar 23. Review. No abstract available. PMID: 27007110

42. **Hill NS**, Garpestad E. The Bumpy Road for Noninvasive Ventilation in Acute Respiratory Distress Syndrome. Coming to an End? Am J Respir Crit Care Med. 2017 Jan 1;195(1):9-10. doi: 10.1164/rccm.201610-2138ED. PMID: 28035848.

43. **Hill NS**, Ugurlu AO. Home Noninvasive Ventilation to Reduce Readmissions for Chronic Obstructive Pulmonary Disease.JAMA. 2017 Jun 6;317(21):2167-2169. doi: 10.1001/jama.2017.5226. No abstract available. PMID: 28528346

44. Burns KEA, Devlin JW, **Hill NS**. Patient and Family Engagement in Designing and Implementing a Weaning Trial: A Novel Research Paradigm in Critical Care. Chest. 2017 Oct;152(4):707-711. doi: 10.1016/j.chest.2017.06.028. Epub 2017 Jul 4. Review. PMID: 28687380

45. **Hill NS**. Does Noninvasive Ventilation Have a Role in Severe COPD? Tanaffos. 2017;16(Suppl 1):S11. No abstract available. PMID: 29158750.

46. **Hill NS**, Garpestad E, Schumaker G, Spoletini G. Noninvasive Ventilation for Acute Hypoxemic Respiratory Failure/ARDS - is There a Role? Turk J Anaesthesiol Reanim. 2017 Dec;45(6):332-334. doi: 10.5152/TJAR.2017.24.11.03. Epub 2017 .Dec 1. No abstract available. PMID: 29359071.

47. **Hill NS**, Gillespie MN, McMurtry IF. Fifty Years of Monocrotaline-Induced Pulmonary Hypertension: What Has It Meant to the Field? Chest. 2017 Dec;152(6):1106-1108. doi: 10.1016/j.chest.2017.10.007. No abstract available. PMID: 29223258.

48. **Hill NS**, Garpestad E, Schumaker G, Spoletini G. Judicious Use of Noninvasive Ventilatory Modalities for Severe Pneumonia/ARDS. Turk J Anaesthesiol Reanim. 2018 Feb;46(1):3-4. doi: 10.5152/TJAR.2018.130202. Epub 2018 Feb 1. No abstract available. PMID: 30140494

49. **Hill NS**, Ruthazer R. Predicting Outcomes of High Flow Nasal Cannula for ARDS: An Index that ROX. Am J Respir Crit Care Med. 2019 Jan 29. doi: 10.1164/rccm.201901-0079ED. PMID: 30694696

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

50. Penumatsa KC, Warburton RR, **Hill NS**, Fanburg BL.  CrossTalk proposal: The mouse SuHx model is a good model of pulmonary arterial hypertension.  J Physiol. 2019 Feb;597(4):975-977. doi: 10.1113/JP275864. Epub 2018 Nov 29. No abstract available.  PMID: 30499212

51. **Hill NS,** Farber HW, Preston IR.  An Event-driven Trial for Oral Treprostinil. Progress but Not the Holy Grail. (Editorial) Am J Respir Crit Care Med. 2020 Mar 15;201(6):647-649. doi: 10.1164/rccm.201912-2431ED.  PMID: 31904994

52. **Hill NS.**  No place like home: initiation of non-invasive ventilation for stable severe COPD.  Thorax. 2020 Mar;75(3):196-197. doi: 10.1136/thoraxjnl-2019-213787. Epub 2020 Jan 29.PMID: 31996402

53. Elliott CG, **Hill NS.**  One for the Ages. Chest. 2020 Sep;158(3):856-857.doi: 10.1016/j.chest.2020.04.002.PMID: 32892881

54. **Hill NS,** Devaraj A.  Noninvasive Ventilation Strategies in the Age of COVID-19: An Evolving Story.  Editorial Respir Care. 2021 May;66(5):878-880. doi: 10.4187/respcare.09161.  PMID: 33931518

## BOOKS/VOLUMES EDITED OR AUTHORED

1) **Hill NS**, Bach JR, eds.  Noninvasive Mechanical Ventilation.  In: Respir Care Clin NA, Volume 2, 1996.

2) **Hill NS**. ed.  Long-term Mechanical Ventilation.  In: Lung Biology in Health and Disease, Claude L"Enfant, ed.  Marcel Dekker, Inc.  New York, 2001.

3) **Hill NS**. ed. Noninvasive Positive Pressure Ventilation.  In: Principles and Applications.  Futura Publishing Company, Inc.  Armonk, New York, 2001.

4) **Hill NS**, Levy M., eds., Ventilator Management Strategies of Critical Care.  In: Lung Biology in Health and Disease, Claude L'Enfant, ed., Marcel Dekker, Inc. New York, 2001

5) **Hill NS**. ed.  Respiratory Complications of Neuromuscular Disease.  In: Sem Resp Crit Care Med, Lynch JP, series ed.2002, vol 23.

6) **Hill NS**, Noninvasive Positive-Pressure Ventilation.  In: Textbook of Critical Care 5th ed., MP Fink ed.  Saunders, Philadelphia, PA 2005.  pp. 519-526.

7) **Hill NS**.  Pulmonary Hypertension Therapy.  In: Summit Pub, New York, 2006.

8) **Hill NS,** Farber HW, eds. Pulmonary Hypertension. Humana Press, Totowa, NJ, 2008.

## OTHERS (Case Reports  Letters  etc )

1.Weiland D, **Hill, NS**.  Acquired immunodeficiency syndrome.  Ann Intern Med 99:735 (Letter), 1983.

2.**Hill NS**, Mark EJ.  Case records of the Massachusetts General Hospital:  A 61-year-old man with worsening dyspnea and evidence of pulmonary hypertension.  N Engl J Med 313:1003-1012, 1985.

3.**Hill NS**, Mark EJ.  Case records of the Massachusetts General Hospital:  A 33-year-old man with cough, fever, and a left pleural effusion.  N Engl J Med 318:1257-1267, 1988.

4.**Hill NS**.  Preface in Non-invasive ventilatory support: a practical handbook.  In: AK Simonds, ed.  Arnold, London 2nd ed. 2001.

5.Preston IR, Klinger JR, Houtchens J, Nelson D, Mehta S, **Hill NS**.  Pulmonary edema caused by inhaled nitric oxide in two patients with pulmonary hypertension associated with the CREST syndrome.  Chest 2002; 121:656-659 (Case Report).

6.Stone AS, Nolan S, Al Bebeisi M, McCool JD, **Hill NS**.  A novel form of manually–assisted ventilation (Case report).  Chest 123:949-942, 2003.

7.Devlin JW, Garpestad E, **Hill NS**.  Neuromuscular blockers and ARDS.  N Engl J Med. 2010 Dec 23; 363(26):2562; author reply 2563-4. No abstract available.

8.**Hill NS**. Commentary on "Review: Lower rather than higher tidal volume benefits patients without ARDS". ACP Journal Club 2013; 158(6):JC4.

9.**Hill NS**.  ACP Journal Club. Review: lower rather than higher tidal volume benefits ventilated patients without ARDS.  Ann Intern Med. 2013 Mar 19; 158(6):JC4.

10.Gaga M, Powell CA, Schraufnagel DE, Schönfeld N, Rabe K, **Hill NS**, Sculier JP; ATS/ERS Task Force on the Role of the Pulmonologist in the Management of Lung Cancer.  An official American Thoracic Society/European Respiratory Society statement: the role of the pulmonologist in the diagnosis and management of lung cancer.  Am J Respir Crit Care Med. 2013 Aug 15; 188(4):503-7.

11.Magill SS, Klompas M, Balk R, Burns SM, Deutschman CS, Diekema D, Fridkin S, Greene L, Guh A, Gutterman D, Hammer B, Henderson D, Hess DR, **Hill NS**, Horan T, Kollef M, Levy M, Septimus E, VanAntwerpen C, Wright D, Lipsett P.  Developing a new, national approach to surveillance for ventilator-associated events: executive summary.  Chest. 2013 Nov;144(5):1448-52.  PMID: 24189858.  Also published in Clin Infect Dis. 2013 Dec;57(12):1742-6,  Infect Control Hosp Epidemiol. 2013 Dec; 34(12):1239-43, Am J Crit Care. 2013 Nov; 22(6):469-73, Am J Infect Control. 2013 Nov; 41(11):1096-9, and Crit Care Med. 2013 Nov; 41(11):2467-75.

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

12. Magill SS, Klompas M, Balk R, Burns SM, Deutschman CS, Diekema D, Fridkin S, Greene L, Guh A, Gutterman D, Hammer B, Henderson D, Hess DR, **Hill NS**, Horan T, Kollef M, Levy M, Septimus E, Vanantwerpen C, Wright D, Lipsett P. Executive summary: Developing a new, national approach to surveillance for ventilator-associated events. Ann Am Thorac Soc. 2013 Dec; 10(6):S220-3.

13. Dweik RA, Rounds S, Erzurum SC, Archer S, Fagan K, Hassoun PM, **Hill NS**, Humbert M, Kawut SM, Krowka M, Michelakis E, Morrell NW, Stenmark K, Tuder RM, Newman J; ATS Committee on Pulmonary Hypertension Phenotypes. An official american thoracic society statement: pulmonary hypertension phenotypes. Am J Respir Crit Care Med. 2014 Feb 1; 189(3):345-55.

14. Al-Naamani N, Roberts KE, **Hill NS**, Preston IR. Imatinib as rescue therapy in a patient with pulmonary hypertension associated with Gaucher disease. Chest. 2014 Sep; 146(3):e81-3.

15. Angus DC, Deutschman CS, Hall JB, Wilson KC, Munro CL, **Hill NS**. Choosing wisely® in critical care: maximizing value in the intensive care unit. Crit Care Med. 2014 Nov; 42(11):2437-8.

16. Spoletini G, **Hill NS.** Response. Chest. 2015 Oct;148(4):e127-8. doi: 10.1378/chest.15-1463. PMID: 26437823.

17. Al-Naamani N, Preston IR, Paulus JK, **Hill NS**, Roberts KE. Reply: The Diastolic Pressure Gradient Does Not-and Should Not-Predict Outcomes. JACC Heart Fail. 2015 Oct;3(10):846. doi: 10.1016/j.jchf.2015.07.007. PMID: 26450005.

18. Preston IR, Roberts KE, Miller DP, Sen GP, Selej M, Benton WW, **Hill NS**, Farber HW. Response to Letter Regarding Article, "Effect of Warfarin Treatment on Survival of Patients With Pulmonary Arterial Hypertension (PAH) in the Registry to Evaluate Early and Long-Term PAH Disease Management (REVEAL)". Circulation. 2016 May 17;133(20):e662. doi: 10.1161/CIRCULATIONAHA.116.022321. PMID: 27185031 .

19. Newman JH, Rich S, Abman SH, Alexander JH, Barnard J, Beck GJ, Benza RL, Bull TM, Chan SY, Chun HJ, Doogan D, Dupuis J, Erzurum SC, Frantz RP, Geraci M, Gillies H, Gladwin M, Gray MP, Hemnes AR, Herbst RS, Hernandez AF, **Hill NS**, Horn EM, Hunter K, Jing ZC, Johns R, Kaul S, Kawut SM, Lahm T, Leopold JA, Lewis GD, Mathai SC, McLaughlin VV, Michelakis ED, Nathan SD, Nichols W, Page G, Rabinovitch M, Rich J, Rischard F, Rounds S, Shah SJ, Tapson VF, Lowy N, Stockbridge N, Weinmann G, Xiao L. Enhancing Insights into Pulmonary Vascular Disease through a Precision Medicine Approach. A Joint NHLBI-Cardiovascular Medical Research and Education Fund Workshop Report. Am J Respir Crit Care Med. 2017 Jun 15;195(12):1661-1670. doi: 10.1164/rccm.201701-0150WS. PMID: 28430547

20. Rochwerg B, Brochard L, Elliott MW, Hess D, Hill NS, Nava S, Navalesi P Members Of The Steering Committee, Antonelli M, Brozek J, Conti G, Ferrer M, Guntupalli K, Jaber S, Keenan S, Mancebo J, Mehta S, Raoof S Members Of The Task Force. Official ERS/ATS clinical practice guidelines: noninvasive ventilation for acute respiratory failure. Eur Respir J. 2017 Aug 31;50(2). pii: 1602426. doi: 10.1183/13993003.02426-2016. Print 2017 Aug. PMID: 28860265

21. Jaber S, Bellani G, Blanch L, Demoule A, Esteban A, Gattinoni L, Guérin C, **Hill N**, Laffey JG, Maggiore SM, Mancebo J, Mayo PH, Mosier JM, Navalesi P, Quintel M, Vincent JL, Marini JJ. The intensive care medicine research agenda for airways, invasive and noninvasive mechanical ventilation. Intensive Care Med. 2017 Sep;43(9):1352-1365. doi: 10.1007/s00134-017-4896-8. Epub 2017 Aug 7. Review. PMID: 28785882.

22. **Hill NS**. High Flow Nasal Cannula, Is There a Role in COPD? Tanaffos. 2017;16(Suppl 1):S12. MID: 29158751.

23. **Hill NS**. Does Noninvasive Ventilation Have a Role in Severe COPD? Tanaffos. 2017;16(Suppl 1):S13. PMID: 29158752.

24. Pisani L, **Hill NS**, Pacilli AMG, Polastri M, Nava S. Response. Chest. 2018 Oct;154(4):992. doi: 10.1016/j.chest.2018.07.009. No abstract available. PMID: 30290941

25. Penumatsa KC, Warburton RR, **Hill NS,** Fanburg BL. Rebuttal from Krishna C. Penumatsa, Rod R. Warburton, Nicholas S. Hill and Barry L. Fanburg. J Physiol. 2019 Feb;597(4):983. doi: 10.1113/JP276981. Epub 2018 Nov 29. No abstract available. PMID: 30499182

26. **Hill NS**, Spoletini G. Response to letter: Comparing high flow nasal therapy and standard oxygen during breaks off non-invasive ventilation. J Crit Care. 2019 Jun;51:220. doi: 10.1016/j.jcrc.2019.01.015. Epub 2019 Jan 31. No abstract available. PMID: 30797612.

27. Case Report: Gayen SK, Abdelrahman AA, Preston IR, Petit RD, **Hill NS**. Vitamin C Deficiency-Induced Pulmonary Arterial Hypertension. Chest. 2020 Feb;157(2):e21-e23. doi: 10.1016/j.chest.2019.06.043. PMID: 32033656

28. Stuewe E, **Hill NS**, Kher S. Eliciting History of Prior Severe Acute Respiratory Syndrome Coronavirus 2 Infection in Diagnosing Interstitial Lung Disease during the Coronavirus Disease 2019 Pandemic. Chest. 2021 Mar;159(3):1306. doi: 10.1016/j.chest.2020.10.028. PMID: 33678262

29. Raoof S, Nava S, Carpati C, **Hill NS**. Response. Chest. 2021 Jun;159(6):2505-2506. doi: 10.1016/j.chest.2021.02.031. PMID: 34099133.

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

## INVITED LECTURES (Since 2018)

### 2018

- The 3rd Joint International Meeting: 15th International Conference on Home Mechanical Ventilation (JIVD) & 6th European Respiratory Care Association Congress:  Scientific Sessions: High O2 flow Part 1: From physiology to evidence.  HOF: Only a Question of Oxygen?"  Lyon, France.  March  2018
- National Association for Medical Direction of Respiratory Care (NAMDRC) 2018: Update in Pulmonary, Critical Care and Sleep Medicine. The 41st Annual Meeting and Educational Conference Jointly provided by CHEST® American College of Chest Physicians: Walter O'Donohue Lecture: "Humidified High Flow Nasal Cannulae Oxygen Therapy." Carlsbad, California.  March 2018
- New Jersey Thoracic Society (NJTS) Annual Scientific Program: Plenary Session: Past, Present and Future of Non-Invasive Ventilation. New Brunswick, NJ.  April 2018.
- MGH Conference On Obesity:  Invited Speaker: "Obesity in Pulmonary Hypertension."  Boston, MA.  March, 2018.
- The Annual International Conference:  American Thoracic Society (ATS).   Chair: Session: Division of Lung Diseases NHLBI/NIH:  Initial Findings from The NHLBI PVDOMICS Program: Deep Phenotyping of Patients with Pulmonary Hypertension. Chair:  Session: RAPID: RAPID Abstract Poster Discussion: Critical Care: Invasive, Non-Invasive, Conventional, and Non-Conventional Ventilation In Acute Respiratory Failure.  San Diego, California. May 2018
- The MGH Pulmonary Research Series: Invited Speaker: "Update on Non-Invasive Ventilation Research."  Boston, MA.  June 2019.
- American Association for Respiratory Care, AARC.   57th RESPIRATORY CARE Journal Conference on Noninvasive Respiratory Support in Adults.  Invited Speaker: "Non-Invasive Ventilation for Hypercapnic Respiratory Failure."  Petersburg, Florida.  June 2018
- XIX Foro Internacional de Medicina Crítica / International Forum of Critical Medicine (Mechanical Ventilation - Sepsis and Selected Topics): Presenter: "High Flow Nasal Ventilation in ARDS-Right or Mistaken?", "Update on the Management of Right Cardiac Failure."  Mexico City, México.  July 2018
- IMPACT PH Mentor and Meeting - Total CME: Invited Speaker: "ICU Management of Pulmonary Hypertension."  Pismo Beach, California.  September 2019
- The 22nd Annual Thomas J. Godar Pulmonary/Critical Care Symposium, Saint Frances Hospital and Medical Center:  Invited Speaker:  "Chronic Pulmonary Arterial Hypertension 2018– "Did we climb the top of the mountain ye or long way to go?"  Hartford, CT.  September  2018
- Chest 2016, the Annual Meeting of the American College of Chest Physicians.  Leadership Training Course Speaker:  "Nasal High Flow."  San Antonio, CA.  October 2018
- Annual Fall Respiratory Therapy Symposium.  New York Downstate Association for Respiratory Therapists Inc. (NYDART).  Speaker: "Nasal High Flow Therapy; How does it help and where do I use it?"  Long Island, NY.  October 2018
- The 11th Annual New England Heart Failure and Transplant Network Conference, Tufts University School of Medicine: Speaker: "Update on the Evaluation and Management of Pulmonary HTN in Left Heart Failure," Waltham, MA, November 2018.
- St. Luke's Hospital: ILD Talk: "Diagnosis and Management of Idiopathic Pulmonary Fibrosis" New Bedford, MA.  November 2018
- Rheumatology Grand Rounds, Tufts Medical Center.  Invited Speaker: "Pulmonary Hypertension in Connective Tissue Disease."  Boston, MA.  November 2018.
- 2nd Annual Excellence Experience In Pulmonary Hypertension at Tufts Medical Center.  Spanish Physicians Workshop - Right Heart Catheterization in PH.  Boston, MA.  December 2018
- Course Director.  The 16th Annual Tufts Pulmonary Hypertension Symposium:  Moderator:  Morning Plenary Session, The Great Debate: How Early to Treat PAH and Challenging Cases: Exercise-Induced PAH."  Boston, MA.  December  2018
- Morton Hospital: IPF Talk: "Diagnosis and Management of Idiopathic Pulmonary Fibrosis."  Taunton, MA. December  2018
- Sutter Health Care: Noon Talk:  Respiratory Management of Late Onset Pompe Disease (LOPD),.San Francisco, CA.  December

### 2019

-  Grand Rounds, Lowell General Hospital:  "Impacting Hospital Readmission for Advanced COPD".  Lowell, MA.  January 2019
- Invited Speaker/PH Clinic,: "CTD-PAH", UMASS Memorial Medical Center, Worcester.MA.. January 2019.
- Invites Speaker, California Pacific Medical Center:  "Respiratory Management of Late Onset Pompe Disease (LOPD)". San Francisco, CA.  January 2019
- Pulmonary Grand Rounds, University/Bellevue Bellevue Hospital:  "Noninvasive Ventilatory Techniques", New York. NY.  March 2019
- Visiting Professor-Pulmonary Grand Rounds, University of Vermont Medical Center,: "Challenges in Pulmonary Hypertension".  Burlington, VT.  March 2019.

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

- ➤ NAMDRC Annual Meeting 2019: Advances in Pulmonary, Critical Care and Sleep Medicine and Educational Conference. "Nasal High Flow for Acute Respiratory Failure".  Sonoma, CA.  March 2019
- ➤ New York State Thoracic Society (NYSTS) 2019 Meeting.  "Noninvasive Ventilation in Neuromuscular Disease". Weill Cornell Medical College, NYC, NY.  March 2019
- ➤ Simply Speaking PAH® CME/CE:  "Research Updates and Potential New Directions in PAH Management".  Boston, MA.  April 2019
- ➤ Boehringer Ingelheim 2019 Discovery Award in IPF/ILD - Chair, Scientific Review Committee Meeting.  Boston, MA.  April 2019
- ➤ The Annual International Conference 2019:  American Thoracic Society (ATS). .Presenter Scientific Symposium -: Crossing The Border: Mildly Increased Pulmonary Artery Pressure And The New Definition Of Pulmonary Hypertension: "Normal Limits of Pulmonary Artery Pressure and the Evolving Definition of Pulmonary Hypertension".  Chair, Clinical Session: Clinical Findings From The NHLBI PVDOMICS Program In Patients With Pulmonary Hypertension. Dallas, TX.  May 2019.
- ➤ Clinical talk: "The Evolving Science of Asthma". Falmouth, ME, June 12, 2019
- ➤ Maine General Allergy & Asthma "The Evolving Science of Asthma", Augusta, ME, June12, 20`19
- ➤ Clinical Talk: "Respirator Management of Late Onset Pompe Disease"", Indianapolis. June 25th 2019
- ➤ New York State Society for Respiratory. Plenary Speaker: "Noninvasive Ventilatory Techniques; Changing Paradigm" Verona, NY, September 2019
- ➤ University of Michigan Pulmonary Conference. Invited Speaker. Keynote Address: "Home Noninvasive Techniques to Assist Ventilation in Critical Care; An Evolving Paradigm". "Noninvasive Ventilation for COPD".  Ann Arbor, Michigan.  September, 2019
- ➤ 2019 CHEST Annual Meeting: "Clinical Applications of Nasal High Flow". New Orleans, LA.  October 2019
- ➤ Kjelkgaard Memorial Maine Medical Center Pulmonary Symposium – "NIPPV for Acute Respiratory Failure".  November 2019
- ➤ Tufts Medical Center: "Hypercapnic Respiratory Failure for Residents".  Boston, MA, November 2019
- ➤ Tufts 17th Annual Update in Pulmonary Hypertension. Course Director.  Great Debate: "NICE Hemodynamics: Should 21 Be the New 25? "  December 2019
- ➤ Clinical Talk. Eastern Maine Pulmonary Associates:  "Evolving Science of Asthma"., Bangor, ME December 2019

**2020**

- ➤ Northern California Thoracic Society: Keynote Speaker "High Flow Oxygen for ARDS' and "Update in Diagnosis and Classification of PAH" Monterey, CA.  January 2020
- ➤ Medical Grand Rounds, Baystate Medical Center "The Evolving Paradigm of Noninvasive Management of Acute Respiratory Failure" Springfield, MA January, 2020
- ➤ Panelist. The Climate Crisis and Clinical Practice Symposium.  Joseph B. Martin Conference Center, Boston, MA.,  February 12, 2020
- ➤ Pulmonary Grand Rounds:  Challenges in the Management of Pulmonary Hypertension. Visiting Professor. National Jewish Hospital, Denver, CO.  March 2020
- ➤ Respiratory Complications of Pompe Disease /UCSF Neurology (Virtual).  March 2020
- ➤ Noninvasive Respiratory Support for COVID Pneumonia Association of American Indian Physicians (Virtual).  March 2020
- ➤ Medical Grand Rounds: Noninvasive Respiratory Support for COVID (Virtual).  Tufts Medical Center, Boston, MA.  April 2020
- ➤ NIV for COVID. Virtual.  Indian American Medical Society.  June 2020
- ➤  Webinar: "Respiratory Impact of COVID".  Phillips Medical.  July 2020
- ➤ Webinar International Society of Heart and Lung Transplantation (ISHLT) Annual Meeting.  Presentation of "Results of INPIRE study of dry powder inhaled tresprostinil in PAH" Oral Session  July 2020
- ➤ Pulmonary Lecture Series: "Diagnostic Challenges of Pulmonary HTN".  (Virtual). Tufts Medical Center, Boston, MA  August 2020
- ➤ Pulmonary Grand Rounds; Regents Hospital. "Respiratory Management of COVID-induced Respiratory Failure."  (Virtual) University of Minnesota. . October 2020
- ➤  CHEST 2020: Symposium on Noninvasive Ventilation for COPD. "Presentation on Noninvasive Ventilation for Ambulatory COPD". (Virtual).  October 2020
- ➤ Webinar:  "Noninvasive Respiratory Support for COVID 19" Aerogen, Inc.  November 2020
- ➤ 2020 COVID-19 Research Symposium. (Virtual) Tufts Medical Center, Boston, MA.  November 2020
- ➤ Invite Speaker: Houston Methodist Medical Center: "Noninvasive Ventilation in COVID Time" (Virtual).  December 2020

**NICHOLAS S. HILL, M.D.**

CURRICULUM VITAE 2020

**2021**

➢ Physical Medicine and Rehabilitation Lecture:  "Noninvasive Ventilatory Management of Neuromuscular Disease".  (Virtual) Tufts Medical Center, Boston, MA.  January 2021

➢ Pulmonary Vascular Disease Roundtable: "Findings from the Pulmonary Vascular Disease Omics Network. (Virtual) Sponsor United Therapeutics. March 2021

➢ Webinar: Clinical Pharmacology Course for 4th year Medical Students, Tufts University School of Medicine.  "Pulmonary Pharmacology".  March 2021

➢ Invited Speaker:  New York Downstate Association of Respiratory Therapists: "High Flow Nasal Cannula for COVID" (Virtual). April 2021

➢ Webinar: Tufts University School of Medicine: 1st year Pathophysiology Course Small Groups:  Group Leader for Pulmonary Pathophysiology".  April 2021

➢ Webinar Presentation:  "Pulmonary Hypertension with Interstitial Lung Disease". Practice Point CME.  June 2021

➢ Webinar Presentation: Panelist: "Conversations on Pulmonary Arterial Hypertension". Practice Point CME.  June 2021

# EXHIBIT B

Videotaped Deposition of

**Benjamin Maynor, Ph.D.**

September 09, 2021

UTC

vs.

Liquidia Technologies, Inc.

**Highly Confidential - Under Protective Order**



www.aptusCR.com | 866.999.8310

Highly Confidential - Under Protective Order

Benjamin Maynor, Ph.D.                                    UTC vs. Liquidia Technologies, Inc.

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF DELAWARE
3        C.A. No. 20-755 (RGA) (JLH
4    UNITED THERAPEUTICS
     CORPORATION,
5
6        Plaintiff,
7    v.
8    LIQUIDIA TECHNOLOGIES, INC.,
9        Defendant.
10   ------------------------------------------x
11       HIGHLY CONFIDENTIAL-UNDER PROTECTIVE ORDER
12   REMOTE VIDEOTAPED 30(b)(6) AND PERSONAL DEPOSITION
13   OF BENJAMIN MAYNOR, Ph.D.,  LIQUIDIA TECHNOLOGIES,
14              INC. WITNESS
15
16
17
18
19
20
21
22
23       Reported By:  Randi J. Garcia, RPR
24       Job No.:  10088083
25
```

**Page 2**

```
1
2            Transcript of the deposition of
3    BENJAMIN MAYNOR, Ph.D., called for Oral
4    Examination in the above-captioned matter,
5    said Deposition being taken pursuant to
6    Federal Rules of Civil Procedure by and
7    before RANDI J. GARCIA, Registered
8    Professional Reporter, and Notary Public, via
9    Zoom, on Thursday, September 9, 2021,
10   commencing at approximately 9:32 a.m.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1    A P P E A R A N C E S:
2    For Plaintiff United Therapeutics
     Corporation.
3    By: Art Dykhuis, Esq.
     Amy Mahan, Esq., Ph.D.
4    and Tim M. Dunker, Esq.
     MCDERMOTT WILL & EMERY LLP
5    18565 Jamboree Road, Suite 250
     Irvine, CA 92615
6
7    For Defendant Liquidia Technologies, Inc.
     By: Sanya Sukduang, Esq.
8    Brittany Cazakoff, Esq., Ph.D.
     COOLEY LLP
9    1299 Pennsylvania Avenue, NW
     Suite 700
10   Washington, DC 20004-2400
11
12   Also Present:
13   Spencer Benveniste, Videographer
14              I N D E X
15
16       WITNESS: BENJAMIN MAYNOR, Ph.D.
17
18   EXAMINATION                        PAGE
19
20   By Mr. Dykhuis: ...........................6
21   By Mr. Sukduang: ........................145
22   By Mr. Dykhuis: .........................159
23
24
25              * * *
```

**Page 4**

```
1    EXHIBIT      DESCRIPTION              PAGE
2
3    Exhibit 1    notice of deposition      11
4    Exhibit 2    Document 11               14
5    Exhibit 3    Document 12               21
6    Exhibit 4    U.S. patent number 9,902,818   30
7    Exhibit 5    Document 23               30
8    Exhibit 6    DI37                      79
9    Exhibit 7    LIQ00572146               96
10   Exhibit 8    LIQ02790911              122
11   Exhibit 9    LIQ00943263              129
12   Exhibit 10   LIQ00623136              139
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 1..4**

Page 5

1    THE VIDEOGRAPHER:  We are now on the
2  record.  Today's date is September 9,
3  2021, and the time is 9:32 a.m.
4    This is the remote video-recorded
5  deposition of Dr. Benjamin Maynor via Zoom
6  video conference, being taken in the
7  matter of United Therapeutics Corporation
8  versus Liquidia Technologies.
9    My name is Spencer Benveniste
10  appearing for Aptus Court Reporting,
11  located at 600 West Broadway, Suite 300,
12  in San Diego, California 92101.
13    I'm the official videographer for
14  this deposition.  And this recording is
15  the only authorized video recording of
16  this deposition.
17    The audio and video recording will
18  take place at all times unless all counsel
19  agree to go off the record.
20    Will counsel please identify
21  yourselves and state who you represent.
22    MR. DYKHUIS:  Good morning.  Art
23  Dykhuis on behalf of United Therapeutics
24  Corporation, plaintiffs.  And along with
25  me I have Amy Mahan, and Tim Dunker.

Page 6

1    MR. SUKDUANG:  Hello.  This is Sanya
2  Sukduang from Cooley on behalf of the
3  witness and Liquidia.  And with me is
4  Brittany Cazakoff.
5    THE VIDEOGRAPHER:  Okay.  And the
6  court reporter today is Randi Garcia, and
7  she may now swear in or affirm the
8  deponent.
9    MR. DYKHUIS:  And just before -- just
10  before that, Sanya just reminded me,
11  all -- all three, Amy, Tim and I, are all
12  with McDermott Will & Emery.
13  DR. BENJAMIN WALTZ MAYNOR, after having been
14  first duly sworn, was examined and testified
15  as follows:
16    THE WITNESS:  I do.
17    EXAMINATION
18  BY MR. DYKHUIS:
19    Q.  Well, good morning, Dr. Maynor.
20  Thank you for --
21    A.  Hi.  Yes.
22    Q.  Hi.  Thank you for giving us some
23  time today.  You just heard me announce myself.
24  My name is Art Dykhuis.  I'm one of the lawyers
25  for United Therapeutics.

Page 7

1    And to get started, can you state
2  your full name, please?
3    A.  Yes.  Benjamin Waltz Maynor.
4    Q.  And what is your address?
5    A.  3700 Northampton Road, Durham, North
6  Carolina 27707.
7    Q.  And where do you work now, sir?
8    A.  I work at -- at Orna Therapeutics in
9  Cambridge, Massachusetts.
10    Q.  And then where are you located for
11  this deposition?
12    A.  I'm at the offices of -- of Cooley in
13  Boston.
14    Q.  And then who's in the room there with
15  you?
16    A.  Sanya Sukduang and Brittany Cazakoff.
17    Q.  Thank you.  So first I wanted to go
18  over some basic ground rules and information
19  for the deposition.
20    And the first item is just, even
21  though this is a virtual deposition over Zoom,
22  you do understand that you're under the same
23  oath here as you would be if you were in court
24  before the judge?
25    A.  I do.

Page 8

1    Q.  And then, secondly, more so than
2  in-person depositions with virtual, since we're
3  on Zoom, please -- I see you've got the headset
4  on, but let's make sure to speak clearly and
5  not too quickly for the court reporter.  Is
6  that okay?
7    A.  Yes.  That's okay.
8    Q.  Third, if -- if you don't understand
9  one of my questions, please just let me know,
10  and I'll try to rephrase or reask it another
11  way.  If you don't ask for clarity, I'll just
12  assume that you understood the question.
13    A.  Sure.  Yes.
14    Q.  Normally I would take a break about
15  every hour.  I know today you have a meeting
16  coming up at, I think, 11:00 eastern.  Is it --
17  can we run right up until 11:00?  Do you want
18  to stop five or 10 minutes early, and do you
19  think we can just go straight through?
20    A.  Yes, let's just go straight through.
21    Q.  And then with respect to breaks,
22  we -- we can take them as needed.  I just ask
23  that you answer any pending questions before we
24  take a break --
25    A.  Okay.

1   PAH?
2       A.   No.
3       Q.   Can you turn to the next page, I
4   believe.  It's ending in 943276.
5           Are you there?
6       A.   Yes.
7       Q.   Were you asked questions regarding
8   this page?
9       A.   I was.
10

1   regarding particle size.  I believe you
2   were asked some questions regarding a
3   particle size for LIQ861.  Do you recall
4   questions to that effect?
5       THE WITNESS:  I do.
6   BY MR. SUKDUANG:
7       Q.   And you used a different number of
8   terminology for particle size.

1
2       Q.   Okay.  Could you bring up Exhibit 7?
3   And I think actually Exhibit 7 is one that you
4   were handed as a physical copy.  It should end
5   in -- it should be LIQ00572146 is the front
6   page.
7       A.   Yes, I have it.
8       Q.   Can you turn to the page ending in
9   2173 for me.
10      A.   Okay.
11      Q.   Do you recall being asked questions
12  regarding this page?
13      A.   I do.
14      Q.   Okay.  And -- can you hear me?
15      A.   I can.
16      THE VIDEOGRAPHER:  I just lost you
17  for a second.
18      Are you there, Sanya -- excuse me --
19  counsel?
20      MR. SUKDUANG:  Ben, just tell him I'm
21  plugging in my thing.
22      THE WITNESS:  He's plugging in his
23  headphones, I believe.
24      MR. SUKDUANG:  Can you hear me?
25      THE WITNESS:  Yes.

23      MR. SUKDUANG:  Spencer, you can take
24  this document down.
25      I want to talk to you, Dr. Maynor,

15



Benjamin Maynor, Ph.D.

UTC vs.
Liquidia Technologies, Inc.

---

Page 165

1  the record.
2       MR. SUKDUANG:  I'd like to note that
3  it's not just the witness knows the
4  information or doesn't.  The corporation
5  knows the information or doesn't.
6       MR. DYKHUIS:  Thank you, everyone.
7       THE VIDEOGRAPHER:  Okay.  The time is
8  4:27 p.m.  This is the end of the
9  videotaped deposition of Dr. Benjamin
10  Maynor, Volume 1 dated September 9, 2021.
11  We are off the record.
12       (Time Noted:  4:27 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 167

1  DECLARATION UNDER PENALTY OF PERJURY
2  Case Name: UTC vs. Liquidia Technologies, Inc.
3  Date of Deposition: 09/09/2021
4  Job No.: 10088083
5
6       I, BENJAMIN MAYNOR, PH.D., hereby certify
7  under penalty of perjury under the laws of the State of
8  _____ that the foregoing is true and correct.
9       Executed this _____ day of
10  _____, 2021, at _____.
11
12
13       _____
14            BENJAMIN MAYNOR, PH.D.
15
16  NOTARIZATION (If Required)
17  State of _____
18  County of _____
19  Subscribed and sworn to (or affirmed) before me on
20  this _____ day of _____, 20__,
21  by_____,   proved to me on the
22  basis of satisfactory evidence to be the person
23  who appeared before me.
24  Signature: _____ (Seal)
25

---

Page 166

1                 CERTIFICATE
2              NORTH CAROLINA
3
4            I, the undersigned authority, hereby
5  certify that the foregoing transcript, page 1
6  through 165 is a true and correct transcription
7  of the deposition of Dr. Benjamin Maynor, taken
8  before me at the time and place set forth on
9  the title page hereof.
10            I further certify that said witness
11  was duly sworn by me according to law.
12            I further certify that I am not of
13  counsel to any of the parties to said cause or
14  otherwise interested in the event thereof.
15            IN WITNESS WHEREOF I hereunto set my
16  hand and affix official seal this 11th day of
17  September, 2021.
18       _____
19       RANDI GARCIA, COURT REPORTER, RPR
20                    NOTARY PUBLIC
21
22
23
24
25

---

Page 168

1  DEPOSITION ERRATA SHEET
2  Case Name: UTC vs. Liquidia Technologies, Inc.
   Name of Witness: Benjamin Maynor, Ph.D.
3  Date of Deposition: 09/09/2021
   Job No.: 10088083
4  Reason Codes:  1. To clarify the record.
                  2. To conform to the facts.
5                 3. To correct transcription errors.
6  Page _____ Line _____ Reason _____
7  From _____ to _____
8  Page _____ Line _____ Reason _____
9  From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24  Page _____ Line _____ Reason _____
25  From _____ to _____

---

# EXHIBIT C

2020 WL 1285834
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

H. LUNDBECK A/S, et al., Plaintiff,
v.
APOTEX INC., et al., Defendants.

Civil Action No. 18-88-LPS
|
Signed 03/18/2020

**Attorneys and Law Firms**

Jack B. Blumenfeld, Megan Elizabeth Dellinger, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, George F. Pappas, Pro Hac Vice, for Plaintiff.

Kenneth Laurence Dorsney, Morris James LLP, Adam Wyatt Poff, Pilar Gabrielle Kraman, Young, Conaway, Stargatt & Taylor LLP, James Michael Lennon, Devlin Law Firm LLC, Wilmington, DE, Charles T. Wysocki, Pro Hac Vice, Daniel J. Ritterbeck, Pro Hac Vice, Dennies Varughese, Pro Hac Vice, Russell W. Faegenburg, Pro Hac Vice, Stephanie M. Nguyen, Pro Hac Vice, for Defendants.

**MEMORANDUM ORDER**

Jennifer L. Hall, UNITED STATES MAGISTRATE JUDGE

**\*1** Having reviewed the parties' motion and letters regarding Defendants' use of Dr. Rothschild as an expert (D.I. 698, 704, 711), and having heard argument on March 13, 2020, IT IS HEREBY ORDERED that Plaintiffs' requests to disqualify Dr. Rothschild as an expert and to prevent him from receiving access to materials designated as Confidential Information under the Protective Order are DENIED.

"Federal Courts have the inherent power to disqualify expert witnesses in certain circumstances to protect the integrity of the adversary process and to promote public confidence in the legal system." *Space Sys./Loral v. Martin Marietta Corp.*, No. 95-20122, 1995 WL 686369, at \*2 (N.D. Cal. Nov. 15, 1995). There is no bright-line rule. Instead, courts consider (1) whether the expert had a confidential relationship with the adversary and (2) whether the adversary disclosed confidential information to the expert. *See, e.g., Merck Sharp & Dohme Corp. v. Teva Pharm. USA, Inc.*, No. 14-874, 2015 WL 5163035, \*2 (D. Del. Sept. 3, 2015). Courts also weigh the public interest in allowing or not allowing the expert to testify. *Id.*

Plaintiffs first argue that Dr. Rothschild should be disqualified because he served as a "principal investigator" in certain of Plaintiffs' clinical studies involving vortioxetine. The record reflects that Dr. Rothschild was one of many "principal investigators" that enrolled subjects in four "double-blind" clinical studies (the last of which ended in 2013). In two of the studies, Dr. Rothschild enrolled only a single subject. After one of those studies, Plaintiffs provided Dr. Rothschild with clinical data, some of which Dr. Rothschild (and others) incorporated into a 2012 published article that concluded that vortioxetine did not improve symptoms of generalized anxiety disorder (compared with placebo) over the study period.

For purposes of this decision, I assume that Plaintiffs had a confidential relationship with Dr. Rothschild. But Plaintiffs have not persuaded me that Dr. Rothschild received the type of information that would require disqualification. Plaintiffs' argument—that Dr. Rothschild should be disqualified from this case because he participated in clinical studies involving the same drug—certainly has facial appeal. But having reviewed the materials submitted by the parties, including Dr. Rothschild's declaration describing the nature of the materials he received in connection with those studies [1] (which does not appear to be challenged by Plaintiffs), it does not appear that Dr. Rothschild received any privileged information. Moreover, the types of technical information he did receive are discoverable by Defendants, thus minimizing the potential for an unfair advantage to Defendants. *See High Point Sarl v. Sprint Nextel Corp.*, No. 09-2269, 2013 WL 501783, at \*7 (D. Kan. Feb. 8, 2013); *Palomar Med. Techs., Inc. v. Tria Beauty, Inc.*, No. 09-11081, 2012 WL 517532, at \*4 (D. Mass. Feb. 15, 2012) (denying motion to disqualify expert physician who had conducted two clinical studies for the adversary; expert had not received litigation strategy, work-product, or privileged information from the adversary, which "weigh[ed] strongly against disqualification"); *Space Sys./Loral*, 1995 WL 686369, \*3; *see also Auto-Kaps, LLC v. Clorox Co.*, No. 15-1737, 2016 WL 1122037, at \*3 (E.D.N.Y. Mar. 22, 2016) (granting motion to disqualify where plaintiff's expert "consulted on the very project that culminated in the [accused product]" under circumstances where it was "not difficult to infer that [the expert] was given or exposed to confidential information relating to [the defendant's] strategy regarding

its intellectual property"). It also appears that much of the information from one study is public, as the results were published.

**\*2**  Plaintiffs rely on a line of cases in which courts disqualified experts who received only technical, but not privileged, information from the adversary. *See Eastman Kodak Co. v. Agfa–Gevaert N.V.*, No. 02-6564, 2003 WL 23101783, at \*1 (W.D.N.Y. Dec. 4, 2003); *Thompson, I.G., L.L.C. v. Edgetech I.G., Inc.*, No. 11-12839, 2012 WL 3870563, at \*1 (E.D. Mich. Sept. 6, 2012). But in those cases, the proposed experts had been longstanding employees of the adversaries, during which they acquired deep technical knowledge relevant to the litigation. *See Thompson*, 2012 WL 3870563, at \*1 (plaintiff's proposed expert was a "senior-level employee at [defendant] from 1994 until his resignation in 2008"); *Eastman Kodak*, 2003 WL 23101783, at \*1 (defendant's expert having "previously worked at [plaintiff] for eighteen (18) years"). Disqualification under those circumstances protects the integrity of the adversary process and promotes public confidence in the legal system regardless of whether the information disclosed qualifies as privileged or work product. *See Thompson*, 2012 WL 3870563, at \*7 (disqualifying former fourteen-year, senior-level employee from testifying as a technical expert for the adversary because it was "analogous to an expert switching sides mid-litigation").

Here, in contrast, Dr. Rothschild did not have a longstanding employment relationship with Plaintiffs. He enrolled subjects in four clinical studies during which he received limited information from Plaintiffs. And, for one of those studies, he received aggregated study data that he used to co-author a paper that concluded that vortioxetine was not effective to treat a particular (unapproved) indication. [2] Under the particular facts here, I am not persuaded that the "drastic measure" of disqualification is warranted. *Thompson*, 2012 WL 3870563, at \*2.

Plaintiffs next argue that Dr. Rothschild should be disqualified because he formerly served as a consultant and expert to Plaintiff Lundbeck in cases involving Lexapro® (escitalopram) and Celexa® (citalopram). Those cases involved different patents. The last of those cases was terminated in May 2010, nearly a decade ago. For purposes of this decision, I accept as true Plaintiffs' assertions that Dr. Rothschild received confidential and privileged information during those engagements. But I am not persuaded that the information he received in decade-old litigations involving different drugs would require his disqualification from this case.

Plaintiffs make the conclusory assertion that Dr. Rothschild was given access to Lundbeck's "IP strategy" in the Lexapro® and Celexa® cases. However, nothing in the record suggests that Dr. Lundbeck was privy to any privileged information other than the trial strategy used by Lundbeck for those particular cases. Plaintiffs also contend that a head-to-head study involving escitalopram and vortioxetine is "at the center of the parties' infringement dispute regarding the '096 patent." (D.I. 704 at 2.) But the record indicates that the study was not undertaken until years after Dr. Rothschild's Lundbeck engagements were complete. Having carefully reviewed the record, and the remainder of the parties' arguments, I am not persuaded that the nature of the confidential information Dr. Rothschild received requires his disqualification from this case. *See Novartis AG v. Apotex Inc.*, No. 09-5614, 2011 WL 691594, at \*3-4 (D.N.J. Jan. 24, 2011) (denying request to disqualify expert who had previously served as an expert for the adversary in other cases, where the adversary failed to identify specific confidential information relevant to the current litigation that had been shared with the expert; general allegations that the expert was privy to adversary's "legal strategies and the opinions of its legal counsel" and "regulatory strategies" were insufficient), *report and recommendation adopted*, 2011 WL 611706 (D.N.J. Feb. 8, 2011).

**\*3**  For the foregoing reasons, Plaintiffs' requests are DENIED.

**All Citations**

Slip Copy, 2020 WL 1285834

**Footnotes**

1    My decision does not rely on Dr. Rothschild's averments that he does not remember the actual information received.

2    Defendants state, and Plaintiffs have not disputed, that the use of vortioxetine to treat generalized anxiety disorder is not being litigated in this case.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT D

2012 WL 4815593
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

BUTAMAX™ ADVANCED
BIOFUELS LLC, Plaintiff,

v.

GEVO, INC., Defendant.

Civ. No. 11–54–SLR.
|
Oct. 10, 2012.

**Attorneys and Law Firms**

Richard L. Horwitz, Potter Anderson & Corroon, LLP, Abigail Langsam, Christopher T. Jagoe, Daniel Forchheimer, David Ellis Moore, Hank Heckel, Leora Ben-Ami, Richard A. De Sevo, Pro Hac Vice, Wilmington, DE, for Plaintiff.

Jack B. Blumenfeld, Thomas C. Grimm, Jeremy A. Tigan, Stephen J. Kraftschik, Morris, Nichols, Arsht & Tunnell LLP, Adam Pivovar, Carolyn V. Juarez, Daniel J. Knauss, Gerald J. Flattmann, Jr., James P. Brogan, Jesse Dyer, Michelle Rhyu, Wilmington, DE, for Defendant.

**MEMORANDUM ORDER**

SUE L. ROBINSON, District Judge.

**\*1** At Wilmington this 10th day of October, 2012, in consideration of Butamax's September 14, 2012 Email Request for Emergency Relief regarding the disqualification of Dr. Ron Caspi as an expert witness, the hearing held October 2, 2012 and the papers filed in connection therewith;

IT IS ORDERED that said request (D.I.531) is denied, for the reasons that follow:

1. **Procedural background.** On September 14, 2012, Butamax contacted chambers via email request in an attempt to "exclude Dr. Caspi [as an expert witness] and preclude Gevo from contacting him further." (*Id.*) While it initially appeared that Dr. Caspi was going to work with Butamax, he subsequently signed an agreement to work for Gevo. In support of its request for disqualification, Butamax explained that Dr. Caspi had signed a confidentiality agreement with Butamax "for the purposes of having frank discussions about

litigation issues that relate to his field of technology." (*Id.*) During one such discussion, Dr. Caspi allegedly "raised potential arguments by Gevo" and counsel for Butamax, specifically a junior associate ("JA") on the case, "discussed how [such arguments] would be addressed." (*Id.*) According to Butamax, through the "confidential relationship," Dr. Caspi "at least learned counsel's m.o. and decisionmaking process." (*Id.*)

2. On October 2, 2012, the court held a hearing on the matter. Dr. Caspi testified about his interactions with Butamax and subsequent decision to consult for Gevo. JA, the associate with whom Dr. Caspi allegedly had confidential discussions, also testified in camera about those interactions. Following the hearing, the parties submitted letter briefs in support of their positions. (D.I. 527 & 528)

3. **Standard.** Federal courts have the inherent power to disqualify experts. *See Syngenta Seeds, Inc. v. Monsanto Co.,* Civ. No. 02–1331, 2004 WL 2223252, at \*1 (D.Del. Sept.24, 2004). While there is no bright line rule for expert disqualification, courts have generally adopted a two-part disqualification inquiry: (1) was it objectively reasonable for the party seeking disqualification to have concluded that a confidential relationship existed with the expert; [1] and (2) was confidential or privileged information actually disclosed to the expert. *Id.* at \*2; *Novartis AG v. Apotex Inc.,* Civ. No. 09–5614, 2011 WL 691594, at \*1 (D.N.J. Jan.24, 2011); *Life Technologies Corp. v. Biosearch Technologies, Inc.,* Civ. No. 12–852, 2012 WL 1604710, at \*5 (N.D.Cal. May 7, 2012). Affirmative answers to both inquiries ordinarily compel disqualification; however, "disqualification is likely inappropriate if either inquiry yields a negative response." *Wang Laboratories, Inc. v. Toshiba Corp.,* 762 F.Supp. 1246, 1248 (E.D.Va.1991) ( "[E]ven if counsel reasonably assumed the existence of a confidential relationship, disqualification does not seem warranted where no privileged or confidential information passed.... Similarly, disqualification should not occur in the absence of a confidential relationship even though some confidential information may be disclosed."); *see also Syngenta,* 2004 WL 2223252, at \*2. The party seeking the disqualification bears the burden of proof with respect to both factors. *Syngenta,* 2004 WL 2223252, at \*2.

**\*2** 4. In addition to the above analysis, "courts also balance competing policy objectives and concerns for fundamental fairness." *Id.* "The policy objectives in favor of disqualification include the court's interest in preventing

conflicts of interest and in maintaining judicial integrity. The policy objectives weighing against disqualification include maintaining accessibility to experts with specialized knowledge and encouraging experts to pursue their professions." *Apotex,* 2011 WL 691594, at *1 (citations and quotations omitted).

5. **Facts.** Dr. Caspi signed a confidentiality agreement with Kirkland & Ellis on July 24, 2012. (PX 1) Dr. Caspi signed the agreement following an email exchange between JA and Dr. Caspi on that same day, whereby JA explained that Dr. Caspi would be an "ideal candidate to serve as a consultant" because of his "experience and work with the [EC] Commission;" JA requested a "chance to further discuss this opportunity" with him. (PX 2) Dr. Caspi responded affirmatively, and asked for some information. (*Id.* at 5) JA suggested a telephone conference and, "in preparation for our conversation, would you mind if I send you a non-disclosure form? Signing the form would allow us to discuss the substance of the case in some detail, which may be helpful to you in deciding whether this opportunity is of interest to you." (*Id.*) Still on July 24, 2012, Dr. Caspi received and executed the "NDA," [2] and faxed it back to JA the next day. (*Id.* at 3–4)

6. On August 16, 2012, Dr. Caspi received clearance from his employer to perform the consultation, and asked JA for "the relevant patents, and the stated dispute." (*Id.* at 2) By email dated August 20, 2012, JA responded by forwarding the two patents under discussion, and identifying the dispute as "the interpretation of 'acetohydroxy acid isomeroreductase having the EC number 1.1.1.86' in claim 1 of the '188 patent and 'acetohydroxy acid isomeroreductase enzyme' in claim 1 of the '899 patent." (*Id.*) Following a brief phone conversation on August 27th, Dr. Caspi sent an email to JA on August 29, 2012 wherein he asked her for more "details," "specifically, what is Butamax's exact complaint against Gevo, and what does Gevo claim in return? This was discussed briefly in our phone conversation, but not enough for me to fully understand the nature of the conflict." (*Id.* at 1–2) In a responsive email sent that same day, JA proposed another telephone conversation in order to "better give you the details that you need and answer any questions you may have." (*Id.* at 1)

7. The ensuing telephone conversation took place on September 5, 2012, and lasted no more than 30 minutes. [3] Although Dr. Caspi does not have a specific recollection of this conversation, he does not dispute that, after JA went through the patents as they related to the numbering system, and explained Butamax's position about how the claims

should be interpreted in view of cofactors, KARI enzymes, and EC numbers, Dr. Caspi proposed an argument Gevo might make in response. (D.I. 532 at 17–24, 78) Dr. Caspi recalls that JA did not want to discuss the subject any further and did not respond with anything of substance. (*Id.* at 24–25) JA recalls that she responded in a substantive fashion as to how Butamax would address this hypothetical. (*Id.* at 78–79 (under seal))

*3 8. Although Dr. Caspi ended the conversation with JA by expressing the expectation that he would accept the assignment (*id* . at 26), Dr. Caspi in fact declined the opportunity by an email dated September 11, 2012 and agreed to serve as an expert for Gevo's counsel on September 13, 2012. (PX 2 at 1) In this regard, Dr. Caspi had been contacted by Gevo's counsel on September 4th, met with counsel for Gevo on September 11th, and agreed to serve as an expert for Gevo on September 12, 2012. Prior to making his decision, Dr. Caspi reviewed copies of several declarations (as well as some of the other materials filed in this litigation) provided by Gevo's counsel. (D.I. 532 at 33–36)

9. **Discussion.** For purposes of this analysis, I will assume that a confidential relationship existed between Kirkland & Ellis and Dr. Caspi, based upon the executed confidentiality agreement. (PX 1) I note in this regard, however, that it is apparent from the record that not much, if any, explanation was given to Dr. Caspi before he signed the agreement and that he did not fully understand the scope of the agreement even at the time of the hearing. [4]

10. With respect to the second prong of the test and the fairness/policy considerations, and even accepting Butamax's version of the facts, I conclude that the hypothetical posed by Dr. Caspi and JA's unsolicited response thereto do not constitute confidential information sufficient to disqualify Dr. Caspi from consulting for Gevo. It is evident from the record that Dr. Caspi was not retained by Butamax, had received no fees from Butamax, had received no confidential documents from Butamax, [5] and had participated in only two telephone conversations with counsel which, at most, lasted less than an hour collectively. When compared to those cases where disqualification has been granted, [6] the nature of the relationship and of the information allegedly disclosed instantly is much too abbreviated to warrant such a drastic sanction. I conclude as well that the integrity of the judicial process will not be called into question, and that it would be contrary to the interests of justice to preclude Dr. Caspi, one of a limited number of individuals with expertise related to

Butamax Advanced Biofuels LLC v. Gevo, Inc., Not Reported in F.Supp.2d (2012)

the EC numbering system, from sharing his expertise under these narrow facts.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4815593

## Footnotes

1    In determining the reasonableness of a party's conclusion that a confidential relationship existed, "courts consider several factors, including: (1) the length of the relationship and the frequency of contact; (2) whether the moving party funded or directed the formation of the opinion to be offered at trial; (3) whether the parties entered into a formal confidentiality agreement; (4) whether the expert was retained to assist in the litigation; (5) whether the expert was paid a fee; and (6) whether the expert was asked to agree not to discuss the case with opposing parties or counsel." *Syngenta,* 2004 WL 2223252, at *2.

2    Presumably, the confidentiality, or nondisclosure, agreement.

3    Dr. Caspi estimated that it lasted 10 to 15 minutes. (D.I. 532 at 50) In the interests of fairness but the absence of a better estimate from Butamax, I have doubled that estimate.

4    More specifically, Dr. Caspi testified that no confidential information was ever shared with him. (*See, e.g., id.* at 18, 36–37) Dr. Caspi is correct in his view that no confidential technical information was shared. It is Butamax's contention, however, that JA's analyses constitute attorney work product that should be deemed confidential.

5    Indeed, counsel from Kirkland & Ellis declined to provide Dr. Caspi with even publicly available documents from the litigation, e.g., the declarations of two other EC Commission members that had been submitted on behalf of Butamax. (*Id.* at 35)

6    *See, e.g., Koch Refining Co. v. Jennifer L. Boudreaux MV,* 85 F.3d 1178, 1182 (5th Cir.1996) (counsel spent considerable time with expert explaining his entire theory of the case as well as trial tactics and documents generated for trial); *Wang Laboratories,* 762 F.Supp. at 1249 (counsel shared a memorandum detailing and assessing the patent file wrapper history, as well as a letter outlining potential defenses to the suit).

**End of Document**                                            © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

[Doc. No. 249]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| ASTRAZENECA LP and ASTRAZENECA AB,<br><br>        Plaintiffs,<br><br>   v.<br><br>BREATH LIMITED,<br><br>        Defendant. | Civil No. 08-1512 (RMB/AMD) |

ASTRAZENECA LP and ASTRAZENECA AB,

        Plaintiffs,

    v.

APOTEX, INC. and APOTEX CORP.,

        Defendants.

ASTRAZENECA LP and ASTRAZENECA AB,

        Plaintiffs,

    v.

SANDOZ INC.,

        Defendant.

## **ORDER**

This matter comes before the Court by way of motion [Doc. No. 249] of Plaintiffs AstraZeneca LP and AstraZeneca AB (hereinafter collectively "AstraZeneca") seeking to preclude Defendants Apotex,

Inc. and Apotex Corp. (hereinafter collectively "Apotex") from relying on Dr. Peter J. Barnes as an expert witness or otherwise consulting with Dr. Barnes in this litigation.  On April 11, 2011, the Court held oral argument on the motion at which time Pablo Hendler, Esquire, John Flaherty, Esquire, Judy Yun, Esquire, and Michael Burling, Esquire, appeared on behalf of AstraZeneca; David Aldrich, Esquire, and Christina Saveriano, Esquire, appeared on behalf of Apotex; Katherine Escanlar, Esquire, appeared on behalf of Defendant Breath Limited; and Sheila Wiggins, Esquire, appeared on behalf of Defendant Sandoz Inc.  The Court has considered the parties' submissions and the arguments of counsel.  For the reasons that follow, AstraZeneca's motion is denied.

The District Court's Opinion dated May 14, 2009, filed in Civil Action Number 09-1518 sets forth the factual background of this case and only those facts relevant to the present motion are recounted herein.[1]  In this action, AstraZeneca generally alleges that Apotex's generic copy of AstraZeneca's budesonide inhalation suspension product, Pulmicort Respules®, infringes upon several of AstraZeneca's U.S. patents.  (Mem. in Supp. of Pls.' Mot. to Preclude Apotex from Retaining Peter J. Barnes as an Expert [Doc.

---

[1].  On July 16, 2009, the Court consolidated Civil Action Nos. 08-1512 and 09-1518 with the consent of the parties. (See Order [Doc. No. 74], July 16, 2009.) The District Court's May 14, 2009 Opinion is filed under seal as Doc. No. 112 in Civil Action No. 09-1518.  A redacted version of the Opinion, which sets forth the background of this case, is filed on the docket as Doc. No. 120.

No. 306] (hereinafter, "Pls.' Mem."), 1.)[2]  In the present motion,
AstraZeneca seeks to preclude Apotex from retaining Dr. Barnes as
an expert witness in this case based on AstraZeneca's on-going
relationship with Dr. Barnes and AstraZeneca's alleged disclosure
of confidential information to Dr. Barnes.  This relationship dates
back to the early 1990s and includes a number of research
agreements with the most recent dated December 17, 2009.  (Pls.'
Mem., 5.)   AstraZeneca contends that Dr. Barnes received
confidential information related to the technology at issue in this
case through Dr. Barnes' research involving budesonide, thus
warranting his disqualification as an expert for Apotex.
Specifically, AstraZeneca asserts that "Dr. Barnes has consulted,
and continues to consult, with AstraZeneca regarding inhalation
drugs that contain budesonide as an active ingredient.  Dr. Barnes
has conducted pre-clinical and clinical research for AstraZeneca
concerning the effects of budesonide, by itself (mono-therapy) or
in combination with other active ingredients (combination therapy),

---

2.  The parties' submissions related to this motion have all been
filed under seal on the docket as follows: AstraZeneca's Mem. in
Supp. of its Mot. to Preclude Apotex from Retaining Peter J.
Barnes [Doc. No. 250]; Apotex's Opp'n to Pls.' Mot. to Preclude
Apotex from Retaining Peter J. Barnes as an Expert [Doc. No.
252]; AstraZeneca's Reply Mem. in Support of Pls.' Mot. to
Preclude Apotex from Retaining Peter J. Barnes as an Expert [Doc.
No. 260]; and Apotex's Surreply to Pls.' Mot. to Preclude Apotex
from Retaining Peter J. Barnes as an Expert [Doc. No. 264].  A
motion to seal the unredacted briefs filed in this matter is
presently pending before the Court.  Although the Court
considered both the redacted and unredacted briefs for the
purposes of this motion, the Court has cited the unredacted
briefs herein.

on the treatment of respiratory diseases." (Id. at 1.)

In opposing the motion, Apotex asserts that Dr. Barnes has not received any confidential information concerning Pulmicort Respules® or the patents-in-suit and that AstraZeneca fails to meet its burden to disqualify Dr. Barnes. (Defs.' Apotex's Opp'n to Pls.' Mot. to Preclude Apotex from Retaining Peter J. Barnes as an Expert [Doc. No. 308] (hereinafter "Defs.' Opp'n"), 1.)

Courts in this district have recognized that "[a] federal court has the inherent power to disqualify experts[,]" which is derived from the court's "'duty to preserve confidence in the fairness and integrity of judicial proceedings, and to protect privileges which may be breached if an expert is permitted to switch sides in pending litigation.'" Novartis AG v. Apotex Inc., No. 09-5614, 2011 WL 691594, at *1 (D.N.J. Jan. 24, 2011) (citing United States ex rel Cherry Hill Convalescent Ctr., Inc., 994 F. Supp. at 248-49); see also Medeva Pharma Suisse AG v. Roxane Labs., Inc., No. 07-5165, 2008 WL 5500965, at *1 (D.N.J. Oct. 10, 2008) ("A federal court is bestowed with the inherent power to disqualify experts, derived from its duty to 'preserve confidence in the fairness and integrity of judicial proceedings.'" (citing Cherry Hill Convalescent Ctr., Inc., 994 F. Supp. at 248).) However, disqualification of an expert is "a drastic measure that courts should impose only hesitantly, reluctantly, and rarely." Hewlett-Packard Co. v. EMC Corp., 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004). To determine whether disqualification of an expert who had

4

a prior relationship with a party is warranted, courts utilize a two-prong test which examines "(1) whether it was 'objectively reasonable for the first party who retained the expert to believe that a confidential relationship existed' and (2) whether 'that party disclose[d] any confidential information to the expert.'" Novartis AG, 2011 WL 691594, at *1 (citing Cherry Hill Convalescent Ctr., Inc., 994 F. Supp. at 249). Under this two-prong test, "[a]n expert should be disqualified if both inquiries are answered in the affirmative[,]" but "[d]isqualification ... is inappropriate if either question is answered in the negative." Cherry Hill Convalescent Ctr., Inc., 994 F. Supp. at 249. Accordingly, "even if the party who first retained the expert reasonably assumed the existence of a confidential relationship, disqualification is not warranted where no privileged or confidential information was passed." Id.

The party seeking to disqualify an expert bears the burden of proof on these issues. Novartis AG, 2011 WL 691594, at *1 (citing Cordy v. Sherwin-Williams Co., 156 F.R.D. 575, 580 (D.N.J. 1994)); see also Koch Ref. Co. v. Jennifer L. Boudreau M/V, 85 F.3d 1178, 1181 (5th Cir. 1996) ("The party seeking disqualification bears the burden of proving these elements."). Additionally, in determining whether expert disqualification is warranted, the Court should balance the competing policy objectives that weigh in favor of or against disqualification. Novartis AG, 2011 WL 691594, at *1. Specifically, the Court should balance the "court's interest in

preventing conflicts of interest and maintaining judicial integrity" which favor disqualification "against fostering accessibility to experts with specialized knowledge and encouraging experts to pursue their vocations" which weigh against disqualification. <u>Medeva Pharma Suisse</u>, 2008 WL 5500965, at *1 (citing <u>Cherry Hill Convalescent Ctr., Inc.</u>, 994 F. Supp. at 251).

Both parties acknowledge that Dr. Barnes has a confidential relationship with AstraZeneca, and therefore, AstraZeneca meets prong one of the disqualification test. (<u>See</u> Tr. of April 11, 2011 Hr'g [Doc. No. 337], at 13:1-5.) However, the parties dispute the definition of confidential information as it pertains to prong two of the disqualification test.

AstraZeneca states in its reply brief that "confidential information encompasses thoughts and ideas directly relating to or impacting the litigation." (Reply Mem. in Support of Pls.' Motion to Preclude Apotex from Retaining Peter J. Barnes as an Expert [Doc. No. 309] (hereinafter, "Pls.' Reply Mem."), 6.) AstraZeneca cites a number of cases which it claims support this proposed definition as the standard for disqualification, including <u>Alien Tech. Corp. v. Intermec, Inc.</u>, No. 3:06-cv-51, 2007 WL 4261972 (D.N.D. Nov. 30, 2007); <u>Aventis Pharms. S.A. v. Amphastar Pharm. Inc.</u>, No. ED CV 03-887 RT, 2005 WL 5957795 (C.D. Cal. March 25, 2005); <u>Westerngeco LLC v. Ion GeoPhysical Corp.</u>, No. 09-cv-1827, 2010 WL 2266610 (S.D. Tex. June 2, 2010); <u>Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.</u>, No. 95-cv-8833, 2000 WL 42202

(S.D.N.Y. Jan. 19, 2000). (Id. at 4-6.) AstraZeneca's proposed confidential information definition includes "thoughts and ideas directly relating to or impacting" the litigation. (Pls.' Reply Mem. at 6.)

In contrast to AstraZeneca's broad definition of confidential information, Apotex asserts in its surreply that confidential information, as it pertains to the second prong of the disqualification test, is information provided to the expert that the opposing party would be unable to obtain through discovery. (Defs.' Apotex's Surreply to Pls.' Mot. to Preclude Apotex from Retaining Peter J. Barnes as an Expert [Doc. No. 310] (hereinafter, "Defs.' Surreply"), 3.)(citing Twin City Fire Ins. Co. v. Mitsubishi Motors Credit of Am. Inc., No. SACV 04-0043, 2006 WL 5164249 (C.D.Cal. Nov. 6, 2006).) Apotex further states in its surreply that the "'key distinction in the context of expert qualification is between confidential information that is disclosed to the expert, but that is nevertheless discoverable by the opposing party, and confidential information that is privileged attorney work product, or otherwise inaccessible to the opposing party.'" (Defs.' Surreply, 3 (quoting Twin City Fire Ins., 2006 WL 5164249, at *4).) Apotex asserts that "disqualification 'should not occur where a confidential relationship exists but no privileged information was communicated, or alternatively, where no confidential relationship existed but privileged information was nonetheless disclosed.'" (Defs.' Surreply, 2 (emphasis in

Surreply).)  Additionally,  Apotex  argues  that  Plaintiffs  must demonstrate  that  the  information  provided  to  the  consultant  is directed  to  the  patent  or  technology  at  issue  in  the  litigation. (Defs.' Opp'n, 10.)

The  Fifth  Circuit  Court  of  Appeals  in  Koch  Ref.  Co.  v. Bourdreau  delineated  the  nature  of  confidential  information  as  it pertains to prong two as including:

> discussion  of  the  [moving  party's]  strategies  in  the litigation,  the  kinds  of  experts  the  party  expected  to retain,  the  party's  views  of  the  strengths  and  weaknesses of  each  side,  the  role  of  each  of  the  party's  witnesses to  be  hired,  and  anticipated  defenses.  However,  purely technical information is not confidential.

85  F.3d  at  1182  (citation  omitted).  See  also  Cherry  Hill Convalescent  Ctr.,  Inc,  994  F.  Supp.  at  250.  In  Koch,  because  the moving  party  had  disclosed  the  theory  of  the  case  and  various  trial tactics  with  the  proposed  expert,  the  Fifth  Circuit  upheld  the district  court's  finding  of  a  sufficient  showing  of  confidential information.  Koch  Ref.  Co.,  85  F.3d  at  1182.  Similarly  in  Cordy, the  court  disqualified  the  defendant's  expert  who  had  obtained information  from  plaintiff's  attorney,  including  a  binder  full  of documents,  the  selection  of  which  revealed  the  attorney's  mental impressions.  Cordy  v.  Sherwin  Williams  Co.,  156  F.R.D.  575,  582 (D.N.J.  1994).  In  Cherry  Hill,  the  court  addressed  whether  an accounting  firm,  which  had  originally  worked  in  a  non-litigation context  for  the  moving  party,  could  act  as  an  expert  in  litigation against  the  moving  party.  Relying  in  part  on  Koch,  the  court  in Cherry  Hill  distinguished  "[c]onfidential  business  and  financial

information" from "confidential communications or documents pertaining to litigation." Cherry Hill Convalescent Ctr., Inc., 994 F. Supp. at 251-2. The court in Cherry Hill found that the accounting firm received only confidential business and financial records and no documents falling under the scope of the work product doctrine or protected by the attorney client privilege. Id. at 251. Therefore, the Cherry Hill court concluded that the moving party failed to show that the proposed experts received confidential information which would satisfy the second prong of the disqualification test. Id.

In the context of patent cases, courts in this district have consistently cited the Cherry Hill and Koch definition of confidential information, but frequently focus on the subject matter of the confidential information and its relation to the product at issue. See e.g. Novartis AG, 2011 WL 691594, at *3-4 (citing Cherry Hill, magistrate judge recommended disqualification of proposed expert because expert did not receive confidential information specific to product at issue); Orion Corp., 2009 WL 5872982, at *4 (citing Cherry Hill, court found that moving party failed to establish that proposed expert received confidential information relating specifically to the products at issue in the action); AstraZeneca Pharms., LP v. Teva Pharms. USA, Inc., No. 05-5333, 2007 WL 4292384, at *3-4 (D.N.J. Dec. 4, 2007) (citing the Cherry Hill definition of confidential information, but not addressing discoverability when disqualifying one of two proposed

experts for receiving confidential information related to the drug product in issue). This expansion of the definition of confidential information to include products at issue in addition to work product and privilege information set forth in Koch and Cherry Hill has also been set forth in cases in other districts. See e.g. Bone Care Intern., LLC v. Pentech Pharms., Inc., No. 08-cv-1083, 2009 WL 249386, at *2-4 (N.D. Ill. Feb. 2, 2009) (addressing strategic litigation information and technical information separately and finding that neither had a substantial relationship to the "specific patent or technology at issue in the present litigation"); Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., No. 95-cv-8833, 2000 WL 42202, at *4-5 (S.D.N.Y. Jan. 19, 2000) (disqualifying an expert who reviewed and conducted clinical trials involving the drug at issue without discussing the discoverability of the confidential information disclosed).

This Court finds that expert disqualification is appropriate where the confidential information consists of attorney-client privilege information, material protected by the work product doctrine, or is otherwise confidential material specifically related to the product at issue in the litigation. Koch, 85 F.3d at 1182; Cherry Hill Convalescent Ctr., Inc., 994 F. Supp. at 250; see e.g. AstraZeneca Pharms., LP, 2007 WL 4292384, at *4. To disqualify experts by employing the broad definition of confidentiality as posited by AstraZeneca, "relating to or impacting the litigation" without regard to attorney-client

10

privilege, the work product doctrine, or the product at issue would be inconsistent with the fundamental concept that disqualification is a "drastic measure" to be "imposed reluctantly." <u>Weaver v. Mobile Diagnostech, Inc.,</u> No. 02-1719, 2009 WL 1230297 (W.D.Pa. April 30, 2009).

AstraZeneca has acknowledged that Dr. Barnes received no information relating to "the roles of witnesses," "anticipated defenses and/or claims," or other "litigation-confidential information." (Tr. of April 11, 2011 Hr'g [Doc. No. 337], at 14:1-14.)[3]  Apotex asserts that Dr. Barnes has not done research or confidential consulting with AstraZeneca concerning Pulmicort Respules®, and AstraZeneca does not dispute these assertions. (<u>Id.</u> at 15:13-15.)   AstraZeneca further concedes that Dr. Barnes received no confidential information regarding the "product at issue in the case or the patent in the suit." (<u>Id.</u> at 53:8-12.) However, AstraZeneca argues that Dr. Barnes' confidential research for AstraZeneca as set forth in AstraZeneca's reply brief precludes him from testifying for Apotex as an expert on the budesonide molecule. (<u>Id.</u> at 16:11-25;  17:4-18; Pls.' Reply Mem. at 8.) AstraZeneca further argues that although the confidential research that serves as the alleged basis for the disqualification of Dr. Barnes has not been produced by AstraZeneca in discovery, the

---

3.  Although the transcript is currently sealed on the docket, both parties indicated at oral argument they could make their arguments without disclosing confidential information. (Tr. of April 11, 2011 Hr'g, [Doc. No. 337] 10:5 - 11:6.)

information is relevant for disqualification purposes. (Id. at 27:15-25; 28:1-23).

The Court finds these arguments unpersuasive in light of the the Court's determination that confidential information, as it pertains to prong two, is constrained to circumstances where the confidential information is covered by the attorney-client privilege, the work product doctrine, or is other confidential information that is specifically related to the product at issue in the case. The Fifth Circuit in Koch specifically stated that "purely technical information is not confidential." Koch, 85 F.3d at 1182. AstraZeneca has not sufficiently demonstrated that Dr. Barnes received any confidential information specifically relating to Pulmicort Respules®.

AstraZeneca relies on the Declaration of Dr. Anna Miller-Larson to support its claim that Dr. Barnes received confidential information sufficient to disqualify Dr. Barnes as an expert. (Declaration of Anna Miller-Larson [Doc. No. 307] (hereinafter "Miller-Larson Decl.").) In paragraphs 11 through 18 of the Miller-Larson Decl., Dr. Miller-Larson lists agreements covering studies. (Id. ¶¶ 11-18.) Each study was covered by a confidentiality agreement, and according to the Miller-Larson Decl., some of those studies involved budesonide alone or compared to products other than Pulmicort Respules®. (Id.) In paragraphs 19 through 26, Dr. Miller-Larson lists ongoing studies with Dr. Barnes. (Id. ¶¶ 19-26.) These ongoing research projects all involve budesonide and

12

are covered by confidentiality agreements. (Id.) Additionally, Dr. Miller-Larson states Dr. Barnes is involved in the planning of an additional project, and during the planning process, viewed confidential slides comparing a new drug to budesonide. (Id. ¶ 24.) Finally, Dr. Miller-Larson asserts that Dr. Barnes participated in confidential meetings where the above studies were discussed and presented. (Id. ¶¶ 27-31.) While there is no dispute that Dr. Barnes has done research for AstraZeneca regarding budesonide, none of that research specifically relates to or involves Pulmicort Respules®.

When applying the test for confidential information, courts assess whether the confidential information received by the proposed expert is relevant to the specific technology at issue in the case. See Novartis AG, 2011 WL 691594, at *3; Orion Corp., 2009 WL 5872982, at 4; Greene, Tweed of Del, Inc., 202 F.R.D. at 430. AstraZeneca argues, however, that the correct inquiry is whether the confidential information is "relating to or impacting" the litigation. (Pls.' Reply, 6.) AstraZeneca's proposed standard is overly broad and nebulous. Such a broad definition would greatly restrict litigants' access to experts and, therefore, limits access to expert witnesses with specialized knowledge. Cherry Hill Convalescent Ctr., Inc., 994 F. Supp. at 251.

Additionally, AstraZeneca never served in discovery the information which it claims forms the basis of its disqualification motion. The Court notes that if an expert's possession of

13

confidential information is not relevant to the current litigation, then it is also undiscoverable under Federal Rule of Civil Procedure 26, and does not serve as a basis for disqualifying an expert.  See BP Amoco Chem. Co. v. Flint Hills Res. LLC, 500 F. Supp. 957, 962 (N.D. Ill. 2007).  In BP Amoco Chemical Co., the court stated that the confidential information transmitted from the moving party to the proposed expert fell into three categories, (1) already known by the non-moving party, (2) not relevant to the litigation, and (3) relevant to the litigation and therefore discoverable under Rule 26.  Id.  The court then found that none of those three categories warranted disqualification.  Id. AstraZeneca attempts to explain that the information was not produced for a number of reasons, including all parties objecting to producing documents unrelated to the specific product at issue. [Tr. of April 11, 2011 Hr'g [Doc. No. 337], 24:23-25:2].  The Court's finding that AstraZeneca failed to meet the burden for disqualification is not based on AstraZeneca's failure to provide in discovery the information AstraZeneca claims is confidential and warrants Dr. Barnes' disqualification.  Rather, AstraZeneca's failure to produce the material illuminates the nebulous standard AstraZeneca asks this Court to employ for disqualification.

In Greene, Tweed, the court held that experts previously employed by the defendant were not disqualified from serving as an expert because the moving party did not demonstrate that the experts "were privy to confidential information concerning ... the

14

*specific* technology at issue in the lawsuit." Greene, Tweed of Del., Inc. 202 F.R.D. at 430 (citation omitted) (emphasis added). The court in Greene, Tweed further stated that "asserting that the proposed experts were involved in the development of technology which was 'operationally similar to the infringing products or which evolved into the [technology] used in the [infringing products]' is not enough." Id. (quoting Space Systems/Loral v. Martin Marietta Corp., No. 95-20122, 1995 WL 686369, at *2-3 (N.D.Cal. Nov. 15, 1995.) In Space Systems, the district court held that a researcher, who fifteen years earlier worked on prior systems of the product at issue, possessed no confidential information concerning the specific technology at issue. The Space Systems court came to this conclusion despite the fact that knowledge of the earlier versions related to prior art issues. Space Systems/Loral, 1995 WL 686369 at *3. More recently in AstraZeneca Pharmas. LP v. Teva Pharmaceuticals USA, Inc., AstraZeneca sought to disqualify two experts. Finding that the first expert received no confidential information relating to the product at issue, the court declined to disqualify the first expert. AstraZeneca Pharmas. LP, 2007 WL 4292384, at *3. However, the court found that the second expert did receive confidential information relating to the product at issue. Id. at *4. To make this finding, the court focused on the expert's receipt of "highly sensitive marketing, business, and clinical information," as well as the expert's attendance at a meeting where a "highly

15

particularized analysis of the drug in issue was conducted over a three-day period."  Id. at *4.

While the exhibits attached to the Miller-Larson Decl. and the Miller-Larson Decl. itself establish that Dr. Barnes received information regarding budesonide generally, AstraZeneca does not point to confidential information Dr. Barnes received specifically related to Pulmicort Respules®.  Dr. Barnes' past and on-going research, as well as the confidential information he received from AstraZeneca during that research, may relate to the prior art issues and may relate to drugs containing budesonide, an overlapping active ingredient between Pulmicort Respules® and the other drugs.  However, such confidential information relating to prior art and other drugs is not sufficient to preclude him from testifying as an expert witness against AstraZeneca.  See Chamberlain Grp., Inc. v. Interlogix, Inc. No. 01-cv-6157, 2002 WL 653893, at *5 (N.D. Ill. April 19, 2002) (finding that an expert who worked for defendant's predecessor in a prior patent action concerning prior art to the patent at issue was not disqualified from acting as an expert for plaintiff).

AstraZeneca asserts that limiting confidential information to information specifically relating to Pulmicort Respules® is not appropriate in this case because of "Apotex's stated reason for needing Dr. Barnes' expert testimony - to explicate the molecular mechanism of action of budesonide in airway cells after it is delivered to the lungs."  (Pls.' Reply, 1.)  AstraZeneca also

16

asserts that Apotex's invalidity contentions rely on the manner in which budesonide is administered, and that Dr. Barnes could "inadvertently divulge or rely upon" AstraZeneca's confidential information. (Id.)  However, the Court finds that Dr. Barnes' research in this regard does not specifically relate to Pulmicort Respules®, and the Court rejects AstraZeneca's attempt to broaden the standard beyond the specific product at issue. See Chamberlain Grp., Inc. 2002 WL 653893; Greene, Tweed of Del., Inc. 202 F.R.D. 426; Space Systems/Loral, 1995 WL 686369.  The Court finds that AstraZeneca has failed to meet its burden of establishing that Dr. Barnes received confidential information specifically relating to the product at issue sufficient to warrant disqualification.

Finally, in balancing the competing policy objectives that weigh in favor of or against disqualification, the Court considers the Court's interest in preventing conflicts of interest and preserving judicial integrity against the interests of parties in maintaining accessibility to expert witnesses with specialized knowledge and the interests of experts in pursuing their professions. Cherry Hill Convalescent Ctr., Inc., 994 F. Supp. at 251.  In evaluating these considerations, the Court must determine "whether another expert is available and whether the opposing party will be unduly burdened by having to retain a new expert." Id. Here, AstraZeneca argues that it will be prejudiced if Dr. Barnes is permitted to consult with Apotex, because the scope and nature of Dr. Barnes' work with AstraZeneca and the issues in this case,

17

make it likely that any testimony by Dr. Barnes would rely upon confidential information Dr. Barnes gained through his research for AstraZeneca. (Pls.' Mem. at 12-13.) AstraZeneca further argues that it will suffer prejudice because the premature disclosure of its unpublished, confidential research regarding budesonide may result in the denial of patent protection for future inventions. (Id. at 13.) AstraZeneca also asserts that it will be placed at a competitive disadvantage if the confidential information Dr. Barnes is privy to is disclosed to Apotex because Apotex could then develop, on an expedited basis, generic copies of AstraZeneca's products. (Id.) In opposition, Apotex asserts that although it has retained another expert witness in this matter, Dr. Barnes' testimony is necessary for various aspects of Apotex's case including its invalidity and non-infringement defenses. (Defs.' Opp'n, 20.) Apotex further contends that in contrast to its other expert witness who is a pharmaceutical formulator, Dr. Barnes' extensive expertise and experience in asthma research would significantly assist the Court in understanding the state of the prior art as of the filing dates of the patents at issue in this litigation, making him an irreplaceable expert witness. (Id.) Apotex also contends that disqualification of Dr. Barnes will be prejudicial given the considerable time and money Apotex has invested into working with Dr. Barnes. (Id. at 21.) Finally, Apotex argues that finding a replacement expert would be incredibly difficult because AstraZeneca has numerous consulting relationships

with experts in the field of asthma research which prevents potential experts from considering assisting Apotex for fear that they might lose future consultation work with AstraZeneca. (Id.)

The Court finds that AstraZeneca's assertions of prejudice are not sufficient to warrant Dr. Barnes' disqualification. The Court has not found a conflict of interest precluding Dr. Barnes from serving as an expert. The Court finds that the interests in maintaining accessibility to experts and allowing experts to pursue their profession,[4] weigh against disqualification of Dr. Barnes. See Novartis AG, 2011 WL 691594, at *4. Further, allowing Dr. Barnes to serve as an expert in this case is consistent with the general reluctancy of courts to disqualify experts who possess useful, specialized knowledge which will aid the court's understanding of the matters before it. See Cherry Hill Convalescent Ctr., Inc., 994 F. Supp. at 252. See also Novartis AG, 2011 WL 691594, at *4 (finding that to disqualify expert based on knowledge unrelated to patents at issue would effectively prevent expert from ever testifying adversely to moving party). Thus, the Court does not need to determine whether Apotex's

---

4. The Court notes that in support of its motion, AstraZeneca has supplied under seal a number of research agreements between AstraZeneca and the Imperial College of Science, Technology, and Medicine, in London. Confidentiality agreements address a myriad of contractual terms, including restrictions upon the consultant performing other work, as well as ownership of data and test results, and legal and equitable remedies in the event the consultant breaches any restrictive covenant or other obligation. AstraZeneca has not asserted that Dr. Barnes is in breach of any of the research agreements submitted by agreeing to serve as an expert for Apotex. (See Pls.' Mem.; Pls.' Reply.)

19

assertion of prejudice has been sufficiently demonstrated since the other policy objectives support denial of AstraZeneca's motion. Therefore, AstraZeneca's motion to preclude Apotex from retaining Peter J. Barnes is denied.

CONSEQUENTLY, for the reasons set forth above and for good cause shown:

IT IS on this 30th day of September 2011,

**ORDERED** that AstraZeneca's motion [Doc. No. 249] to preclude Apotex from retaining Peter J. Barnes as an expert witness shall be, and is hereby, **DENIED**.


s/ Ann Marie Donio
ANN MARIE DONIO
UNITED STATES MAGISTRATE JUDGE

cc: Hon. Renée Marie Bumb

20

# EXHIBIT F

Trials@uspto.gov                                            Paper 18
Tel: 571-272-7822                              Entered: August 11, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

_____

IPR2021-00406
Patent 10,716,793 B2

_____

Before ERICA A. FRANKLIN, CHRISTOPHER M. KAISER,
and DAVID COTTA, *Administrative Patent Judges.*

KAISER, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2021-00406
Patent 10,716,793 B2

# INTRODUCTION

## A. Background

Liquidia Technologies, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1–8 of U.S. Patent No. 10,716,793 B2 (Ex. 1001, "the '793 patent"). United Therapeutics Corporation ("Patent Owner") filed a Preliminary Response. Paper 13 ("Prelim. Resp.").

We have authority to determine whether to institute an *inter partes* review. 35 U.S.C. § 314(b) (2018); 37 C.F.R. § 42.4(a) (2020). The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a), which provides that an *inter partes* review may not be instituted unless "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."

After considering the Petition, the Preliminary Response, and the evidence of record, we determine that Petitioner has demonstrated a reasonable likelihood that it would prevail with respect to at least one challenged claim. Accordingly, we institute an *inter partes* review of all challenged claims on all asserted grounds.

## B. Related Matters

The parties identify *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, 1:20-cv-00755-RGA (D. Del.) ("the District Court proceeding"), as a related matter. Pet. 1; Paper 3, 1.

IPR2021-00406
Patent 10,716,793 B2

### C. The Asserted Grounds of Unpatentability

Petitioner contends that claims 1–8 of the '793 patent are unpatentable based on the following grounds (Pet. 30–68):[1]

| Claim(s) Challenged | 35 U.S.C. §[2] | Reference(s)/Basis |
|---|---|---|
| 1–8 | 103 | '212 patent,[3] Voswinckel JESC,[4] Voswinckel JAHA[5] |
| 1–8 | 103 | '212 patent, Voswinckel JESC |
| 1 | 102 | Ghofrani[6] |
| 1, 3, 8 | 103 | Voswinckel JAHA, Ghofrani |
| 1, 3 | 102 | Voswinckel 2006[7] |

---

[1] Petitioner also relies on declarations from Nicholas Hill, M.D., and Igor Gonda, Ph.D. Ex. 1002; Ex. 1004.

[2] The '793 patent claims a priority date of May 15, 2006, and Petitioner "assumes the relevant priority date . . . is May 15, 2006." Pet. 12; Ex. 1001, code (60). Accordingly, patentability is governed by the versions of 35 U.S.C. §§ 102 and 103 preceding the amendments in the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112–29, 125 Stat. 284 (2011).

[3] US 6,521,212 B1, issued Feb. 18, 2003 (Ex. 1006) (alleged to be prior art under 35 U.S.C. §§ 102(a), (b), (e)).

[4] Voswinckel, R., et al., *Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension*, 25 EUROPEAN HEART J. 22 (2004) (Ex. 1007) (alleged to be prior art under 35 U.S.C. § 102(b)).

[5] Robert Voswinckel, et al., *Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension*, in Abstracts from the 2004 Scientific Sessions of the American Heart Association, 110 CIRCULATION III-295 (Oct. 26, 2004) (Ex. 1008) (alleged to be prior art under 35 U.S.C. § 102(b)).

[6] Hossein Ardeschir Ghofrani, et al., *Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie*, 30 HERZ 296–302 (June 2005) (Ex. 1010) (alleged to be prior art under 35 U.S.C. § 102(a)). We rely on the English translation that follows the German original article as part of Ex. 1010.

[7] Robert Voswinckel, et al., *Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension*, 144 ANNALS OF INTERNAL MEDICINE

IPR2021-00406
Patent 10,716,793 B2

| Claim(s) Challenged | 35 U.S.C. §² | Reference(s)/Basis |
|---|---|---|
| 2, 4–8 | 103 | Voswinckel 2006, '212 patent |

### D. The '793 Patent

The '793 patent, titled "Treprostinil Administration by Inhalation," issued on July 21, 2020.  Ex. 1001, codes (45), (54).  The patent "relates to methods and kits for therapeutic treatment and, more particularly, to therapeutic methods involving administering treprostinil using a metered dose inhaler and related kits."  *Id.* at 1:20–23.

Treprostinil "is a prostacyclin analogue" that may be used to treat pulmonary hypertension.  *Id.* at 5:37–41.  According to the '793 patent, it was previously known to administer treprostinil by intravenous, subcutaneous, or inhalation routes to treat any of several conditions, including pulmonary hypertension.  *Id.* at 5:42–58.

The '793 patent relates to the administration of treprostinil in high concentrations over a short inhalation time.  *Id.* at 16:61–63, 17:44–46.  This method of administration is described as reducing pulmonary vascular resistance and pulmonary artery pressure, as well as increasing cardiac output.  *Id.* at 16:32–42, Fig. 10.

### E.  Illustrative Claim

Claims 1–8 of the '793 patent are challenged.  Claim 1 is independent and illustrative; it recites:

> 1.  A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a

---

149–50 (January 2006) (Ex. 1009) (alleged to be prior art under 35 U.S.C. § 102(a)).

IPR2021-00406
Patent 10,716,793 B2

> formulation comprising treprostinil or a
> pharmaceutically acceptable salt thereof with an
> inhalation device, wherein the therapeutically
> effective single event dose comprises from 15
> micrograms to 90 micrograms of treprostinil or a
> pharmaceutically acceptable salt thereof delivered
> in 1 to 3 breaths.

Ex. 1001, 18:23–31.

## ANALYSIS

### A. Claim Construction

In an *inter partes* review, we construe a claim in an unexpired patent "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2020). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Neither party presents any terms for construction. Pet. 12–13; Prelim. Resp. 1–56. Accordingly, we determine that no express construction of any claim term is necessary in order to decide whether to institute trial. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.")).

5

IPR2021-00406
Patent 10,716,793 B2

### B.  Discretionary Denial

Patent Owner argues that we should exercise discretion to deny

institution, either under 35 U.S.C. § 314(a) or under 35 U.S.C. § 325(d).

Prelim. Resp. 9–26.  Petitioner disagrees.  Pet. 4–11.

#### 1.  35 U.S.C. § 314(a) Discretion

Institution of *inter partes* review is discretionary:

> The Director may not authorize an inter partes review to be
> instituted unless the Director determines that the information
> presented in the petition filed under section 311 and any
> response filed under section 313 shows that there is a
> reasonable likelihood that the petitioner would prevail with
> respect to at least 1 of the claims challenged in the petition.

35 U.S.C. § 314(a).  This language provides the Director with discretion to

deny institution of a petition.  *See Cuozzo Speed Techs., LLC v. Lee*, 136 S.

Ct. 2131, 2140 (2016) ("[T]he agency's decision to deny a petition is a

matter committed to the Patent Office's discretion."); Patent Trial and

Appeal Board Consolidated Trial Practice Guide ("CTPG") at 55 (November

2019), *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated.

The Director has delegated his authority under § 314(a) to the Board.  37

C.F.R. § 42.4(a) ("The Board institutes the trial on behalf of the Director.").

The Leahy-Smith America Invents Act was "designed to establish a

more efficient and streamlined patent system that will improve patent quality

and limit unnecessary and counterproductive litigation costs."  H.R. Rep.

No. 112−98, pt. 1, at 40 (2011), 2011 U.S.C.C.A.N. 67, 69 (reviews were

meant to be "quick and cost effective alternatives to litigation"); *see also*

S. Rep. No. 110−259, at 20 (2008); CTPG 56.  The Board recognized these

goals, but also "recognize[d] the potential for abuse of the review process by

IPR2021-00406
Patent 10,716,793 B2

repeated attacks on patents." *General Plastic Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19, 16−17 (PTAB Sept. 6, 2017) (precedential).

In *NHK Spring Co., Ltd. v. Intri-Plex Technologies, Inc.*, IPR2018-00752, Paper 8 (PTAB Sept. 12, 2018) (precedential), the Board determined that the advanced state of a parallel proceeding is an additional factor weighing in favor of denying institution under 35 U.S.C. § 314(a). *Id.* at 19–20. In *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019 ("*Fintiv*"), Paper 11, the Board articulated a list of factors that we consider in determining whether to exercise discretion to deny institution based on an advanced stage of a parallel proceeding:

> 1. whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted;
>
> 2. proximity of the court's trial date to the Board's projected statutory deadline for a final written decision;
>
> 3. investment in the parallel proceeding by the court and the parties;
>
> 4. overlap between issues raised in the petition and in the parallel proceeding;
>
> 5. whether the petitioner and the defendant in the parallel proceeding are the same party; and
>
> 6. other circumstances that impact the Board's exercise of discretion, including the merits.

*Fintiv*, Paper 11, at 5–6. "These factors relate to whether efficiency, fairness, and the merits support the exercise of authority to deny institution in view of an earlier trial date in the parallel proceeding." *Id.* In evaluating these factors, we take "a holistic view of whether efficiency and integrity of the system are best served by denying or instituting review." *Id.* (citing CTPG 58).

7

IPR2021-00406
Patent 10,716,793 B2

Patent Owner has asserted the '793 patent against Petitioner in the District Court proceeding.  Pet. 1; Paper 3, 1.  Given the status of the District Court proceeding, Patent Owner argues that we should exercise discretion under *Fintiv* to deny institution.  Prelim. Resp. 9–26.  We discuss the *Fintiv* factors below.

a. First *Fintiv* Factor: Existence or Likelihood of Stay

Patent Owner contends that this factor weighs in favor of denial. Prelim. Resp. 13–14.  Patent Owner contends that Petitioner has not requested a stay of the District Court proceeding, and there is no reason to believe that a stay would be granted if it were requested.  *Id.*  In support of this assertion, Patent Owner argues that there are patents at issue in the District Court proceeding on which the Board has denied institution of *inter partes* review, leaving the District Court as the only forum in which the invalidity of those patents may be adjudicated.  *Id.*  Petitioner does not address this *Fintiv* factor.  Pet. 4–6.

With regard to the first *Fintiv* factor, Petitioner has not requested a stay of the District Court proceeding, and if such a request is subsequently made, we decline to speculate on the likelihood of a stay being granted.  For these reasons, we determine that this factor is neutral.

b. Second *Fintiv* Factor: Proximity of Anticipated Trial Date and Statutory Deadline for Final Written Decision

Patent Owner contends this factor also weighs in favor of denial, because the presently scheduled trial in the District Court proceeding—a three-day trial beginning March 28, 2022—will occur roughly four and a

IPR2021-00406
Patent 10,716,793 B2

half months[8] before the projected due date for the Board's Final Written Decision on August 17, 2022.  Prelim. Resp. 14–16.  Petitioner does not address this factor.  Pet. 4–6.

Based on the current trial schedule, there is a relatively high likelihood that the District Court will reach its invalidity determination before we issue our Final Written Decision resolving Petitioner's unpatentability allegations.  Thus, we determine that the second *Fintiv* factor weighs in favor of exercising our discretion to deny institution under § 314(a).

c.  Third *Fintiv* Factor: Investment in Parallel Proceeding

Under this factor, we first consider Petitioner's timing in filing the Petition.  If a petitioner, "faced with the prospect of a looming trial date, waits until the district court trial has progressed significantly before filing a petition," that decision "may impose unfair costs to a patent owner." *Fintiv*, Paper 11, at 11.  On the other hand, "[i]f the evidence shows that the petitioner filed the petition expeditiously, such as promptly after becoming aware of the claims being asserted, this fact has weighed against exercising the authority to deny institution." *Id.*

Petitioner asserts that it filed this Petition "within three months of receiving [Patent Owner's] infringement contentions."  Pet. 4.  Patent Owner argues that this three-month delay "can hardly be referred to as

---

[8] Patent Owner describes the March 2022 trial as scheduled for "***six months before*** the Board's expected statutory deadline."  Prelim. Resp. 15 (emphasis in original).  The actual time between the conclusion of the scheduled District Court trial, i.e., March 30, 2022, and the latest date on which the Board's Final Written Decision could be due is four months and 18 days.  Accordingly, we analyze this issue based on that anticipated time frame.

IPR2021-00406
Patent 10,716,793 B2

'expeditious[]' or 'diligent[].'" Prelim. Resp. 18 (quoting *Fintiv*, Paper 11, 11–12 (alterations in original)). Beyond these bare allegations, neither party explains why the facts here suggest either expeditiousness or lack thereof. Pet. 4; Prelim. Resp. 18. We find no unreasonable delay in Petitioner's filing.

Second, we consider "the amount and type of work already completed in the parallel litigation by the court and the parties at the time of the institution decision." *Fintiv*, Paper 11, at 9. "Specifically, if, at the time of the institution decision, the district court has issued substantive orders related to the patent at issue in the petition, this fact favors denial." *Id.* at 9–10.

Petitioner contends this factor weighs in favor of institution, because "the parties have just begun claim construction proceedings in the district court litigation, have not yet taken any depositions, and have conducted only the initial minimum required discovery." Pet. 5. Patent Owner argues that this factor weighs against institution because "a claim construction hearing is currently scheduled for June 4, 2021," and because "the court [likely] will also enter a Claim Construction Order in the case prior to the Board's decision on institution." Prelim. Resp. 17. In addition, Patent Owner notes that the District Court already has entered an order on a substantive issue, namely an order denying Patent Owner's motion to dismiss Petitioner's invalidity counterclaims due to assignor estoppel. *Id.* (citing Ex. 1014).

Although we appreciate that a *Markman* hearing has been held, we find no evidence in the record that any substantive determinations on validity issues have been made in the District Court proceeding. In some respects, the present circumstances are similar to those in *Sand Revolution*

IPR2021-00406
Patent 10,716,793 B2

*II, LLC v. Continental Intermodal Group-Trucking LLC*, IPR2019-01393, Paper 24 (PTAB June 16, 2020) (informative) (*Sand Revolution*"), in which, as here, the parties exchanged preliminary infringement and invalidity contentions, and the district court conducted a *Markman* hearing.  *Id.* at 10. The *Sand Revolution* panel found that, "aside from the district court's *Markman* Order, much of the district court's investment relates to ancillary matters untethered to the validity issue itself" and "much work remains in the district court case as it relates to invalidity: fact discovery is still ongoing, expert reports are not yet due, and substantive motion practice is yet to come."  *Id.* at 10–11.  One difference between the present case and *Sand Revolution* is that neither party here has directed us to the entry of a *Markman* order by the District Court.  In fact, as Patent Owner admits, "the parties to the Delaware Litigation are not disputing any claim terms at issue in the '793 patent," so even the entry of such an order would not materially advance the resolution of any invalidity issue related to the '793 patent. Prelim. Resp. 17.  Moreover, here, as in *Sand Revolution*, much work remains to be done in the district court.  Fact discovery will continue until September 17, 2021, and dispositive motions will not be filed until November 2, 2021.  *Id.* at 11.

On balance, given the timeliness of the Petition and the level of investment of time and resources in the District Court proceeding, coupled with the absence of any substantive determinations on validity issues by the court, we find that this factor weighs against exercising our discretion to deny institution under § 314(a).

IPR2021-00406
Patent 10,716,793 B2

> ### d. Fourth *Fintiv* Factor: Overlap Between Issues Raised in Petition and in Parallel Proceeding

Patent Owner contends this factor favors denial of institution, because "[e]ach of the asserted claims in the Delaware Litigation is the subject of this Petition," and especially because both proceedings address claim 1 of the '793 patent, the only independent claim. Prelim. Resp. 21. Patent Owner also argues that this factor favors denial of institution because "[t]hree of the five references in the Petition are also asserted in Liquidia's Preliminary Invalidity Contentions in the Delaware Litigation." *Id.* at 21–22. Petitioner argues that this factor favors institution because three of the eight claims challenged here are not challenged in the District Court proceeding. Pet. 5.

We note first that neither party cites any evidence in support of its allegations regarding overlapping issues. Petitioner states that claims are challenged here that are not challenged in the District Court proceeding but cites no support at all for this position. *Id.* Patent Owner, meanwhile, cites exhibits that provide the dates of service of the parties' preliminary infringement and invalidity contentions but does not direct us to the invalidity contentions themselves. Prelim. Resp. 12 (citing Exs. 2022–2023). In arguing that "[t]here is substantial overlap in the issues relating to the present matter and the Delaware Litigation," Patent Owner cites no sources at all. *Id.* at 21–22. Given the lack of evidence supporting either party's position, we cannot determine whether there is substantial overlap—or, indeed, any overlap at all—between the unpatentability issues raised here and the invalidity issues raised in the District Court proceeding.

If we ignore the lack of evidence and take the parties' allegations at face value, there seems to be at least some overlap between the issues raised here and the issues raised in the District Court proceeding. But, by Patent

IPR2021-00406
Patent 10,716,793 B2

Owner's own admission, there are claims challenged here that are not challenged in the parallel litigation, and there are prior-art references asserted here that are not asserted in the District Court proceeding. *Id.* The overlap is, at most, not total, and it may or may not be substantial.

In addition to the arguments regarding the overlap of issues, Petitioner argues that Patent Owner has raised assignor estoppel in the District Court proceeding as a way to block Petitioner's assertion of invalidity, which may preclude Petitioner from litigating these issues in any forum other than before the Board. Pet. 5. In response, Patent Owner stipulates that, if we exercise discretion under § 314(a) to deny institution, Patent Owner will not raise its assignor estoppel arguments in the District Court proceeding. Paper 16, 1–2.

Given the lack of evidence supporting either party's position on the overlap of issues, and given that, even according to the parties' unsupported arguments, there may not be substantial overlap of issues, this stipulation does not affect our analysis of the fourth *Fintiv* factor. There are three possibilities to consider. First, Patent Owner may decline to raise its assignor estoppel arguments. In that case, Petitioner would continue to press whatever invalidity arguments it has raised in the District Court proceeding, but we cannot determine on the present record how substantial the overlap is between those arguments and the unpatentability arguments raised here. Even if the District Court makes its decision before we issue a Final Written Decision, the District Court's decision will not reach every issue that Petitioner raises here. Second, Patent Owner may continue to press its assignor estoppel argument and not prevail, leaving Petitioner free to raise the same invalidity arguments. Again, we cannot determine whether and to

IPR2021-00406
Patent 10,716,793 B2

what extent those arguments overlap with Petitioner's unpatentability arguments.  Finally, Patent Owner may prevail on its assignor estoppel argument.  In that case, Petitioner would be barred from raising any invalidity arguments in the District Court proceeding, and the District Court would then have no opportunity to rule on invalidity, eliminating any overlap with the present proceeding.  Patent Owner's stipulation eliminates the possibility that Petitioner will not be able to challenge validity before the District Court, but cannot change the fact that the District Court's decision will not reach every issue that Petitioner raises here.

Thus, we find that there may be some overlap of issues between this proceeding and the District Court proceeding, but this overlap (1) is not total either in terms of claims challenged or in terms of references asserted, and (2) may or may not be substantial.  Moreover, if we institute, and thus Patent Owner's stipulation does not take effect, the overlap may disappear altogether, depending on the outcome of Patent Owner's assignor estoppel argument.  Accordingly, we find that this factor weighs against exercising discretion to deny institution.

   e.  Fifth *Fintiv* Factor: Whether Petitioner and Parallel
     Proceeding Defendant Are Same

The parties do not dispute that the same parties involved in the present proceeding are also involved in the District Court proceeding.  Pet. 4–6; Prelim. Resp. 23–24.  Thus, this factor weighs in favor of exercising our discretion to deny institution under § 314(a).

IPR2021-00406
Patent 10,716,793 B2

> f.  Sixth *Fintiv* Factor: Other Circumstances (Including Merits)

Patent Owner argues that this factor favors denying institution, because Petitioner "has not set forth 'sufficiently strong' proposed grounds that would support a grant of institution.  Prelim. Resp. 24–25.  Petitioner argues to the contrary that "the merits of this Petition are strong," both because the Board previously instituted review based on earlier petitions challenging related patents, and because the present Petition asserts a multiplicity of grounds challenging each claim.  Pet. 5–6.

We are not persuaded by either party's argument.  As discussed below, we determine that Petitioner's case is strong enough to warrant institution of *inter partes* review, contradicting the basis of Patent Owner's argument on this factor.  Petitioner's argument that the present petition is unusually strong because the Board previously instituted review on other petitions suffers from multiple defects.  First, a petition that presents arguments strong enough to institute review is not necessarily a petition that is so strong as to trigger the sixth *Fintiv* factor.  Second, the two petitions on which Petitioner's argument rests both challenged patents other than the '793 patent challenged here.  Third, the two petitions in question were filed by parties other than Petitioner.  It is at best unclear why the Board's determination to institute review on petitions brought by one party challenging certain claims in certain patents should mandate a determination that the merits of the present Petition, brought by a different party and challenging different claims of different patents, are so strong as to warrant weighing this factor in Petitioner's favor.  As for Petitioner's argument that its assertion of multiple grounds to challenge each claim means the Petition is strong, we are not persuaded that the number of asserted grounds of

15

IPR2021-00406
Patent 10,716,793 B2

unpatentability, as opposed to the evidentiary support for and persuasive reasoning behind those grounds, is the proper basis on which to judge the strength of a petition.

Because neither party presents a persuasive argument on the sixth *Fintiv* factor, we find that this factor is neutral with respect to exercising discretion to deny institution.

### g.  Conclusion

Because the analysis is fact-driven, no single factor is determinative of whether we exercise our discretion to deny institution under 35 U.S.C. § 314(a).

On this record, after weighing all of the factors and taking a holistic view, we determine that the facts in this case that weigh against exercising discretion outweigh the facts that favor exercising discretion.  Accordingly, we determine that the circumstances presented weigh against exercising our discretion to deny institution under § 314(a).

### 2.    *35 U.S.C. § 325(d) Discretion*

Patent Owner argues that we should exercise our discretion to deny institution under 35 U.S.C. § 325(d).  Prelim. Resp. 25–26.  Petitioner argues that we should not exercise such discretion.  Pet. 6–11.

Section 325(d) provides that the Director may elect not to institute a proceeding if the challenge to the patent is based on matters previously presented to the Office.  35 U.S.C. § 325(d) states, in pertinent part,

> In determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office.

IPR2021-00406
Patent 10,716,793 B2

In deciding whether to exercise discretion to deny institution under § 325(d), we use a two-part framework, determining first "whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same arguments previously were presented to the Office," and second, "if either condition of first part of the framework is satisfied, whether the petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims." *Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6, at 8 (PTAB Feb. 13, 2020) (precedential) ("*Advanced Bionics*").  To use this framework, we consider the factors set forth in *Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8, at 17–18 (Dec. 15, 2017) (precedential as to § III.C.5, first paragraph) ("*Becton, Dickinson*").  Specifically, we apply *Becton, Dickinson* factors (a), (b), and (d) to determine whether the same or substantially the same art or arguments previously were presented to the Office, and we apply *Becton, Dickinson* factors (c), (e), and (f) to determine whether Petitioner has demonstrated a material error by the Office.  *Advanced Bionics*, at 10. We consider the relevant *Becton, Dickinson* factors below as part of the *Advanced Bionics* framework.

> a. *Advanced Bionics* Step One: Same or Substantially the Same Prior Art or Arguments Previously Presented to the Office

In the first step of the *Advanced Bionics* framework, we determine whether the same or substantially the same prior art or arguments presented here previously were presented to the Office.  We do so by examining three of the *Becton, Dickinson* factors: "(a) the similarities and material

17

IPR2021-00406
Patent 10,716,793 B2

differences between the asserted art and the prior art involved during examination; (b) the cumulative nature of the asserted art and the prior art evaluated during examination;" and "(d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art." *Becton, Dickinson*, at 17–18; *see Advanced Bionics*, at 10.

Here, Petitioner admits that "[t]he art presented in this petition was listed in [Patent Owner's] Information Disclosure Statement." Pet. 7. "Previously presented art includes art . . . provided to the Office by an applicant, such as on an Information Disclosure Statement (IDS), in the prosecution history of the challenged patent." *Advanced Bionics*, at 7–8. Accordingly, all of the art asserted against the '793 patent here previously was presented to the Office.

Given this, we evaluate *Becton, Dickinson* factors (a) and (b) as favoring a finding that the same or substantially the same prior art presented here previously was presented to the Office. The art presented here is not only similar to some art that was before the Office during examination, it is identical, and this identity means that there are no material differences between the art presented here and the art previously before the Office.

> b. *Advanced Bionics* Step Two: Material Error by the Office Shown

Because we find that the same or substantially the same prior art presented here previously was presented to the Office, we proceed to the second step of the *Advanced Bionics* framework and determine whether Petitioner has demonstrated a material error by the Office. We do so by examining the three remaining *Becton, Dickinson* factors: "(c) the extent to

IPR2021-00406
Patent 10,716,793 B2

which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;" "(e) whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and (f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the prior art or arguments." *Becton, Dickinson*, at 17–18; *see Advanced Bionics*, at 10.

With respect to factor (c), Petitioner argues that "no prior art was substantively relied on during examination," because the Office "only issued one substantive rejection during prosecution — for obviousness-type double patenting." Pet. 8 (citing Ex. 1015, 24–28). Patent Owner does not address this factor directly, arguing only that "an analysis of each *Becton* factor is not necessary here." Prelim. Resp. 25–26. On the present record, Petitioner appears to be correct: there was only a single substantive rejection, which did not rely on any of the prior-art references asserted here. Ex. 1015, 1–208. Because the art asserted here was not the basis for a rejection and was not evaluated substantively at all during examination, *Becton, Dickinson* factor (c) weighs in favor of a finding that Petitioner has shown material error by the Office.

With respect to factors (e) and (f), the present Petition argues for the unpatentability of claims 1–8 on six grounds, using multiple combinations of references. As discussed in detail below, we determine that Petitioner has shown at least a reasonable likelihood that it will prevail on its allegation that the challenged claims are unpatentable on at least one of these grounds. In making that determination, we note that several references that were before the Examiner appear on the present record to disclose elements of the challenged claims. For example, Voswinckel JAHA teaches treating

19

IPR2021-00406
Patent 10,716,793 B2

"patients with severe pulmonary hypertension" with "Inhaled Treprostinil Sodium (TRE)" with "3 single breaths" of "TRE solution 600 μg/ml," resulting in "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing," and Voswinckel JESC describes "the acute hemodynamic response to inhaled treprostinil" following the administration to patients of nebulized treprostinil solution in concentrations of 16, 32, 48, and 64 μg/ml for 6 minutes, resulting in "significant long-lasting pulmonary vasodilatation" without "adverse effects." Ex. 1008, 3; Ex. 1007, 7.

In addition to showing a reasonable likelihood of prevailing on theories of unpatentability not previously addressed by the Office, Petitioner relies on evidence not previously available, including the declarations from Dr. Hill and Dr. Gonda.  Accordingly, *Becton, Dickinson* factors (e) and (f) also weigh in favor of a finding that Petitioner has shown material error by the Office.

### c.  Conclusion

For the reasons discussed above, we determine that "the same or substantially the same art [asserted here] previously was presented to the Office," but we determine that Petitioner "has demonstrated that the Office erred in a manner material to the patentability of challenged claims." *Advanced Bionics*, at 8.  Accordingly, we do not exercise discretion under § 325(d) to deny institution.

### C.  Asserted Obviousness over '212 Patent, Voswinckel JESC, and Voswinckel JAHA

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.

20

IPR2021-00406
Patent 10,716,793 B2

Pet. 30–46.  Patent Owner argues that this combination of references fails to teach or suggest all the limitations of any of the challenged claims.  Prelim. Resp. 42–55.  Patent Owner also argues that Petitioner relies on a reference, Exhibit 1037, that has not been proven to be prior art.  *Id.* at 28–32.

1.   *'212 Patent*

The '212 patent teaches "[a] method of delivering benzindene prostaglandins to a patient by inhalation."  Ex. 1006, code (57).  In particular, the '212 patent teaches the use of "[a] benzindene prostaglandin known as UT-15," which "has unexpectedly superior results when administered by inhalation compared to parenterally administered UT-15 in sheep with induced pulmonary hypertension."  *Id.*  There is evidence in the present record that "UT-15" was also known as "Remodulin" or "treprostinil sodium."  Ex. 1035, 582.  According to the '212 patent, the UT-15 may be delivered either as droplets formed "from a solution or liquid containing the active ingredient(s)" via a nebulizer, or as a solid-phase powder via an inhaler.  Ex. 1006, 5:30–41.

According to the '212 patent, this method may be used to "treat[] pulmonary hypertension in a mammal."  *Id.* at 14:9–12.  Moreover, the '212 patent teaches "medical use" of its method in a "human."  *Id.* at 7:4–5.  The necessary dose to achieve "a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of the effect desired by the patient's doctor.  Titration to effect may be used to determine proper dosage."  *Id.* at 6:66–7:3.  "[A]erosolized UT-15 has a greater potency as compared to intravascularly administered UT-15," so the '212 patent teaches delivering "only a fraction (10–50%) of the dosage delivered intravascularly" when using its inhalation delivery

21

IPR2021-00406
Patent 10,716,793 B2

method.  *Id.* at 8:8–12.  Even at "high doses," however, the '212 patent teaches a lack of "significant non-lung effects, i.e., heart rate, cardiac output."  *Id.* at 10:51–54.

### 2.  *Voswinckel JESC*

Voswinckel JESC discusses a study to investigate "the acute hemodynamic response to inhaled treprostinil."  Ex. 1007, 7.  Of the 29 patients in the study, eight were administered a placebo, groups of six patients each were administered 16, 32, and 48 μg/mL solutions of treprostinil, and three patients were administered a solution containing 64 μg/mL of treprostinil.  *Id.*  Each administration used an "OptiNeb ultrasound nebulizer, [made by] Nebu-Tec, Germany" for six minutes.  *Id.*  For each patient, various measurements were taken before administration of the treprostinil and at 0, 15, 30, 60, 90, 120, 150, and 180 minutes after administration.  *Id.*  According to Voswinckel JESC, "[t]reprostinil inhalation results in a significant long-lasting pulmonary vasodilatation," and, "at a concentration of 16 μg/mL, near maximal pulmonary vasodilatation is achieved without adverse effects."  *Id.*

### 3.  *Voswinckel JAHA*

Voswinckel JAHA discusses a study of 17 patients with "severe pulmonary hypertension" who received treprostinil inhalations.  Ex. 1008, 3.  These inhalations each involved "3 single breaths" using a "pulsed OptiNeb® ultrasound nebulizer" and a "600 μg/mL" treprostinil solution.  *Id.*  In addition, "[t]wo patients with idiopathic PAH received compassionate treatment with 4 inhalations of TRE per day after the acute test" and were "treated for more than 3 months."  *Id.*  According to Voswinckel JAHA, "inhalation resulted in a sustained, highly pulmonary selective vasodilatation

IPR2021-00406
Patent 10,716,793 B2

over 120 minutes," showing "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing," and "[t]olerability is excellent even at high drug concentrations and short inhalation times (3 breaths)." *Id.*

### 4. Reliance on Exhibit 1037

In arguing that claims 1–8 would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA, Petitioner and its declarants cite Exhibit 1037, an English translation of the "Operating Instructions" for the "OPTINEB®-ir Microprocessor Controlled Ultrasonic Nebulizer." Pet. 23; Ex. 1002 ¶ 67; Ex. 1037, 1. Patent Owner argues that Exhibit 1037 is undated and therefore not proven to be prior art, so Petitioner's reliance on it should lead to a determination that Petitioner has not shown a reasonable likelihood of prevailing on this asserted ground. Prelim. Resp. 28–32.

We note first that Patent Owner is correct that Exhibit 1037 bears no date. Ex. 1037, 1–33. Accordingly, Petitioner cannot rely on this exhibit as prior art. But the way Petitioner and its declarants use Exhibit 1037 does not amount to a reliance on it as prior art.

As discussed more fully below, Petitioner and its declarants provide two separate calculations to attempt to establish that the prior art taught or suggested the range of treprostinil doses recited in the challenged claims. Pet. 23, 38–39; Ex. 1002 ¶¶ 65–67, 99–100; Ex. 1004 ¶¶ 56–57. One of these calculations begins with the intravascular dose on the FDA label for Remodulin and adjusts that for the '212 patent's teaching that inhalation requires 10–50% the dose that intravascular administration requires. Pet. 38–39. This calculation does not rely on Exhibit 1037 at all. *Id.*

IPR2021-00406
Patent 10,716,793 B2

The other calculation begins with Voswinckel JESC's teaching that patients were administered a nebulized solution over six minutes with a treprostinil concentration of 16, 32, 48, or 64 µg/mL, then multiplies that concentration by the volume of solution that would have been nebulized over a six-minute period.  Pet. 23.  The evidence supporting that volume of solution comes from Petitioner's declarants.  *Id.* (citing Ex. 1002 ¶¶ 65, 67; Ex. 1004 ¶ 56).  Dr. Hill testifies that "a [person of ordinary skill in the art] would understand [a six-minute nebulization event] to [deliver] at least 1 mL [of solution]" and that he personally "prescribed volumes of [at] least 1 mL for inhalation therapy using nebulizers."  Ex. 1002 ¶ 65.  In addition, Dr. Hill also testifies that Exhibit 1037 confirms his understanding of typical nebulization volumes because it teaches "a nebulizing rate of 0.6 mL/min." *Id.* ¶ 67 (citing Ex. 1037, 28).  Finally, Dr. Gonda testifies that a person of ordinary skill in the art "would have known in May 2006 that nebulizers conventionally deliver between 1 and 5 mL."  Ex. 1004 ¶ 56 (citing Ex. 1029, 11; Ex. 1050, 2; Ex. 1066, 1).  Thus, Dr. Hill's testimony regarding his own experience and his opinion of what a person of ordinary skill in the art would have believed about nebulization volumes does not rely on Exhibit 1037.  Similarly, Dr. Gonda's testimony regarding his opinion of what a person of ordinary skill in the art would have believed about nebulization volumes does not rely on Exhibit 1037.  Only Dr. Hill's separate testimony about confirmation of the knowledge of a person of ordinary skill in the art relies on this exhibit, and in doing so, it relies on Exhibit 1037 not as prior art but merely as evidence of the general knowledge in the art at around the time of the invention.  *See Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337–38 (Fed. Cir. 2020)

IPR2021-00406
Patent 10,716,793 B2

(PTAB properly relied on general knowledge of skilled artisan supported by expert testimony).

Thus, Petitioner's arguments for the obviousness of the challenged claims rest on calculations that in one case do not rely on Exhibit 1037 and in another case rely on testimony that includes multiple separate sources, of which Exhibit 1037 is only one of at least four. Accordingly, at least on the current record, we are not persuaded that Petitioner improperly relies on Exhibit 1037.

### 5.  *Analysis*

Petitioner argues that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests the subject matter of claims 1–8 and that a person of ordinary skill in the art would have had a reason to combine the teachings of these references with a reasonable expectation of success. Pet. 30–46. Patent Owner argues that this combination of references fails to teach or suggest delivering a dose of treprostinil within the dose range of the challenged claims in a single dosing event of one to three breaths. Prelim. Resp. 42–55.

### a.  Claim 1

*(1) "A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof"*

Claim 1 recites "[a] method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt

IPR2021-00406
Patent 10,716,793 B2

thereof." Ex. 1001, 18:23–27. Petitioner argues that the '212 patent, Voswinckel JESC, and Voswinckel JAHA each teach or suggest this limitation. Pet. 35–37. Patent Owner does not dispute this argument. Prelim. Resp. 42–55.

The '212 patent teaches treating pulmonary hypertension via inhalation of a benzindene prostaglandin called UT-15, which was also known as "treprostinil sodium." Ex. 1006, code (57) (identifying "benzindene prostaglandin" as "UT-15"), 2:66–3:5 ("This invention relates to . . . a method of treating pulmonary hypertension by administering an effective amount of a benzindene prostaglandin to a mammal in need thereof by inhalation."); Ex. 1035, 582 ("UT-15" also known as "treprostinil sodium"). Voswinckel JAHA teaches treating "patients with severe pulmonary hypertension" with "Inhaled Treprostinil Sodium (TRE)" with "3 single breaths" of "TRE solution 600 µg/ml," resulting in "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." Ex. 1008, 3. Voswinckel JESC describes "the acute hemodynamic response to inhaled treprostinil" following the administration to patients of nebulized treprostinil solution in concentrations of 16, 32, 48, and 64 µg/ml for six minutes, resulting in "significant long-lasting pulmonary vasodilatation" without "adverse effects." Ex. 1007, 7.

On the present record, we are not persuaded that the evidence identified by Petitioner shows sufficiently that the '212 patent teaches or suggests the "single event dose" portion of this limitation, but we are persuaded that Voswinckel JAHA and Voswinckel JESC both teach or suggest the first limitation of claim 1. Accordingly, on the present record, Petitioner has shown sufficiently that the combination of the '212 patent,

IPR2021-00406
Patent 10,716,793 B2

Voswinckel JESC, and Voswinckel JAHA teaches or suggests this portion of claim 1.

*(2) "With an inhalation device"*

Next, claim 1 recites "with an inhalation device."  Ex. 1001, 18:27–28.  Petitioner argues that the '212 patent, Voswinckel JESC, and Voswinckel JAHA each teach or suggest this limitation.  Pet. 37.  Patent Owner does not dispute this argument.  Prelim. Resp. 42–55.  The '212 patent teaches the use in its inhalation method of "a nebulizer, inhaler, atomizer or aerosolizer" to "form[] droplets from a solution or liquid containing the active ingredient(s)."  Ex. 1006, 5:30–32.  Both Voswinckel JESC and Voswinckel JAHA teach the use of a "nebulizer" in their inhalation methods.  Ex. 1007, 7 ("OptiNeb ultrasound nebulizer"); Ex. 1008, 3 ("the pulsed OptiNeb® ultrasound nebulizer").  Dr. Hill testifies that a person of ordinary skill in the art would have understood "that nebulizers and inhalers are inhalation devices."  Ex. 1002 ¶ 94.  Accordingly, on the present record, Petitioner has shown sufficiently that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests this limitation of claim 1.

*(3) "Wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof"*

Claim 1 recites "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof."  Ex. 1001, 18:28–30.  Petitioner argues that the combination of the '212 patent and Voswinckel JESC teaches or suggests this limitation.  Pet. 37–40.  Patent Owner argues that, given the

IPR2021-00406
Patent 10,716,793 B2

teachings of Voswinckel JAHA, a person of ordinary skill in the art would have split the daily dose calculated from the combination of the '212 patent and Voswinckel JESC into four separate single event doses, with none of those individual dosing events delivering a dose within the range recited in claim 1. Prelim. Resp. 49–50.

Petitioner calculates the dose that the prior art teaches delivering by inhalation in two separate ways. First, Petitioner argues that Voswinckel JESC teaches delivering to patients at least one milliliter of a solution containing between 16 and 64 µg of treprostinil per milliliter, resulting in the delivery of between 16 and 64 µg of treprostinil. Pet. 22–24, 38. This calculation relies on the teaching in Voswinckel JESC that "patients inhaled solvent solution (placebo) (n=8) or treprostinil for 6 min (OptiNeb ultrasound nebulizer, Nebu-tec, Germany) in concentrations of 16, 32, 48, and 64 µg/ml (n=6, 6, 6, and 3 patients)." Ex. 1007, 7. It also relies on the testimony of Drs. Hill and Gonda that, over a six-minute nebulization, a person of ordinary skill in the art would have expected the delivery of at least one milliliter of solution. Ex. 1002 ¶¶ 65, 67; Ex. 1004 ¶ 56. Dr. Hill cites as support for his opinion the testimony of Dr. Gonda, as well as his own experience in prescribing inhalation therapy. Ex. 1002 ¶ 65 (citing Ex. 1004 ¶ 56). Dr. Gonda's testimony is supported by his citation to three drug labels showing inhalation doses of between 2.5 and 5 milliliters. Ex. 1004 ¶ 56 n.4. The calculated dose of 16, 32, 48, or 64 µg of treprostinil is within the range of 15–90 µg recited in claim 1.

Patent Owner argues that Petitioner's calculations are for a total daily dose rather than a single event dose. Prelim. Resp. 49–50. With respect to this first calculation, we are not persuaded by Patent Owner's argument on

28

IPR2021-00406
Patent 10,716,793 B2

the present record.  It is true, as Patent Owner notes, that Voswinckel JAHA teaches dividing the total daily dose into four separate dosing events. Ex. 1008, 3 ("Two patients with idiopathic PAH received compassionate treatment with 4 inhalations of TRE per day after the acute test," where a single inhalation comprised "3 single breaths, TRE solution 600 µg/ml"). But Petitioner's first calculation is for a single event dose, not a total daily dose.  Voswinckel JESC teaches delivering its entire dose—the dose calculated by Petitioner and its declarants as between 16 and 64 µg of treprostinil—over a period of six minutes.  Ex. 1007, 7.

On the present record, we determine that Patent Owner is correct that Petitioner's second calculation fails to show a single event dose of between 15 and 90 µg of treprostinil.  Petitioner's second calculation relies on the teaching of the '212 patent that the dose of treprostinil delivered by inhalation should be "10–50%" of the dose required for intravascular delivery.  Ex. 1006, 8:8–12; *see* Pet. 38–39.  Petitioner and Dr. Hill provide calculations of the inhaled dose based on this teaching and the dosing calculations approved by the Food and Drug Administration for intravascular treatment with treprostinil.  Pet. 38–39; Ex. 1002 ¶ 100; Ex. 1018, 10.  According to those calculations, a person of ordinary skill in the art would have understood that a patient should be treated by inhaling between 10.8 and 58.5 µg of treprostinil, which overlaps the range of 15–90 µg recited in claim 1.  Pet. 38–39; Ex. 1002 ¶ 100; Ex. 1018, 10. Importantly, though, these calculations are based on delivering treprostinil intravascularly for 1,440 minutes, or one day, for a total daily dose.  Pet. 38–39 (converting a dose of 1.25 ng/kg/min to a total dose by, *inter alia*, multiplying by "(24x60)min"); Ex. 1002 ¶ 100 (same).  Although this total

IPR2021-00406
Patent 10,716,793 B2

daily dose could in theory be administered once per day, with the entire dose given in a single dosing event, Voswinckel JAHA suggests that it should not be and should instead be broken up into four separate dosing events. Ex. 1008, 3. Even at the high end of the range that emerges from Petitioner's second calculation, one fourth of the total daily dose is less than the fifteen-microgram lower end of the claimed range.

Thus, Voswinckel JAHA teaches splitting the daily dose into four dosing events, and Petitioner does not explain why, despite this teaching, a person of ordinary skill in the art would have split the calculated dose into less than four dosing events. Accordingly, on the present record, we are not persuaded that Petitioner's second calculation shows sufficiently that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests this limitation of claim 1. As discussed above, however, we are persuaded on the present record that Petitioner's first calculation shows sufficiently that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests this limitation of claim 1.

*(4) "Delivered in 1 to 3 breaths"*

Finally, claim 1 recites "delivered in 1 to 3 breaths." Ex. 1001, 18:31. Petitioner argues that Voswinckel JAHA teaches or suggests this limitation. Pet. 40–41. Patent Owner disagrees, arguing that Voswinckel JAHA "does not provide sufficient detail for a person of ordinary skill in the art to determine the precise dosage each patient received." Prelim. Resp. 53–54.

Voswinckel JAHA teaches delivering to patients "a TRE inhalation by use of the pulsed OptiNeb® ultrasound nebulizer (3 single breaths, TRE solution 600 μg/ml)." Ex. 1008, 3. It also reports that "[t]olerability is

30

IPR2021-00406
Patent 10,716,793 B2

excellent even at high drug concentrations and short inhalation times (3 breaths)." *Id.*

Against this evidence, Patent Owner argues that a person of ordinary skill in the art "would not [have been] able to determine the 'single event dose' delivered [in Voswinckel JAHA] without knowing critical details of the pulsed Optineb device." Prelim. Resp. 53 (citing Exs. 2029–2031). Dr. Aaron Waxman, testifying on behalf of Patent Owner, states his opinion that Voswinckel JAHA "does not provide sufficient detail for a person of ordinary skill in the art to determine the precise dosage each patient received," so it "does not teach a therapeutically effective single event dose of 15 micrograms to 90 micrograms." Ex. 2001 ¶ 40.

On the present record, it is unclear why the inability of a person of ordinary skill in the art to determine how much treprostinil was administered in Voswinckel JAHA is important. Petitioner does not rely on Voswinckel JAHA to teach or suggest the delivery of a therapeutically effective dose or the recited dose of fifteen to ninety micrograms; as discussed above, those limitations are taught or suggested by other references. Instead, Petitioner relies on Voswinckel JAHA to teach or suggest only the limitation of claim 1 requiring that the delivery be accomplished in 1 to 3 breaths, which, at least on the present record, Voswinckel JAHA does teach. Accordingly, on the present record, Petitioner has shown sufficiently that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests this limitation of claim 1.

### b. Dependent Claims

Claims 2–8 of the '793 patent depend directly or indirectly from claim 1. Ex. 1001, 18:32–45. Petitioner argues that the combination of the

IPR2021-00406
Patent 10,716,793 B2

'212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests the additional limitations of these claims.  Pet. 41–46.  Patent Owner does not dispute these arguments.  Prelim. Resp. 42–55.

We have reviewed the evidence cited by Petitioner with respect to the dependent claims.  On the present record, we are persuaded that Petitioner has shown sufficiently that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests the subject matter of claims 2–8.

### c. Reason to Combine

As discussed above, Petitioner has shown sufficiently on the present record that the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests every limitation of claims 1–8.  This alone is not sufficient to show that the challenged claims would have been obvious; instead, Petitioner also must show that a person of ordinary skill would have had a reason to combine the teachings of the references and would have had a reasonable expectation of success in doing so.

Petitioner argues that a person of ordinary skill in the art would have had a reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.  Pet. 30–34.  Patent Owner does not dispute this argument.  Prelim. Resp. 1–56.

The '212 patent teaches the use of inhaled treprostinil sodium for the treatment of pulmonary hypertension at doses between 10 and 50 percent of the doses needed for intravascular delivery.  Ex. 1006, code (57), 6:1–2, 8:8–12.  According to the '212 patent, the inhaled treprostinil sodium is used in sheep, which are a model for pulmonary hypertension in humans.  *Id.* at 9:14–27.  Dr. Hill testifies that, based on these teachings, a person of

IPR2021-00406
Patent 10,716,793 B2

ordinary skill in the art would have looked for further information regarding "experimentation [with] inhaled treprostinil in humans." Ex. 1002 ¶ 78.  On the present record, such information can be found in Voswinckel JESC, which reports on a study in which humans with pulmonary hypertension inhaled treprostinil and experienced "significant long-lasting pulmonary vasodilatation . . . without adverse effects." Ex. 1007, 7.  Thus, the present record shows sufficiently that a person of ordinary skill in the art would have had reason to combine the teachings of the '212 patent with those of Voswinckel JESC.

Dr. Hill testifies that, based on the teachings of these references that treprostinil could safely and effectively treat pulmonary hypertension in humans, a person of ordinary skill in the art "would have motivated to further decrease the 6 minute administration time in Voswinckel JESC." Ex. 1002 ¶ 80.  Specifically, Dr. Hill testifies that patients often did not adhere to "inhalation therapy for respiratory diseases," that "[p]oor adherence to medication was known to correlate with worse outcomes," and that "reducing administration time or the number of breaths required for therapy [was known to] improve adherence rates." *Id.* (citing Ex. 1002 ¶¶ 36–37; Ex. 1030, 63; Ex. 1032, 179–80; Ex. 1077, 4).  Voswinckel JAHA teaches administering treprostinil in three breaths using a high concentration of treprostinil in the aerosolized solution. Ex. 1008, 3.  Accordingly, Dr. Hill testifies that a person of ordinary skill in the art would have looked to Voswinckel JAHA to improve patient adherence to the treatment suggested by the combination of the '212 patent and Voswinckel JESC, providing a reason to combine its teachings with those of the other two references. Ex. 1002 ¶¶ 80–82.

33

IPR2021-00406
Patent 10,716,793 B2

Petitioner argues that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the teachings of these three references because Voswinckel JAHA teaches that "[t]olerability is excellent" for its short-duration, high-concentration treprostinil inhalation therapy.  Pet. 33 (citing Ex. 1008, 3).  The present record supports this argument.  Ex. 1008, 3.  In addition, Petitioner notes that other studies "taught safe and effective administration of high dosages of inhaled therapeutics in short durations."  Pet. 33–34 (citing Ex. 1010, 298; Ex. 1034, 177).  Patent Owner argues that these other studies should not be considered, Prelim. Resp. 54, but even without these studies, the present record shows sufficiently that a person of ordinary skill in the art reasonably would have expected to succeed in combining the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.

### d.  Conclusion

On the present record, Petitioner has shown sufficiently that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests all limitations of claims 1–8 and that a person of ordinary skill in the art would have had a reason to combine the teachings of these references with a reasonable expectation of success.  Accordingly, we determine that Petitioner has demonstrated a reasonable likelihood of prevailing on its assertion that claims 1–8 are unpatentable as obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.

### D. Asserted Obviousness over '212 Patent and Voswinckel JESC

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent and Voswinckel JESC.  Pet. 46–50.  Patent

IPR2021-00406
Patent 10,716,793 B2

Owner argues that this combination of references fails to teach or suggest all the limitations of any of the challenged claims. Prelim. Resp. 42–55. Patent Owner also argues that Petitioner relies on a reference, Exhibit 1037, that has not been proven to be prior art. *Id.* at 28–32. This ground and the arguments by both parties differ from the previously discussed ground only in that Petitioner does not rely here on Voswinckel JAHA to teach or suggest any limitation of the challenged claims. *Compare* Pet. 30–46, *with* Pet. 46–50. In particular, Petitioner relies here on routine optimization to reach the limitation of the challenged claims requiring that the single event dose of treprostinil be delivered in one to three breaths. Pet. 47–49.

For the same reasons discussed above, we determine that, on the present record, Petitioner has shown sufficiently that the combination of the '212 patent and Voswinckel JESC teaches or suggests all limitations of claims 1–8, except for the limitation requiring delivery in one to three breaths. Also for the same reasons discussed above, we determine that, on the present record, Petitioner has shown sufficiently that a person of ordinary skill in the art would have had a reason to combine the teachings of these references with a reasonable expectation of success.

Petitioner argues that the combination of the '212 patent and Voswinckel JESC teaches or suggests the final limitation of the challenged claims, delivering inhaled treprostinil treatment in one to three breaths. Pet. 47–49. Specifically, Petitioner argues that the method taught directly by the combination of these references, delivering a single event dose of treprostinil over a six-minute period, would have caused problems with "patient compliance and convenience." *Id.* at 48 (citing Ex. 1002 ¶¶ 128, 130). Petitioner argues further that a person of ordinary skill in the art would have

IPR2021-00406
Patent 10,716,793 B2

been motivated to improve patient compliance by reducing the inhalation time, arriving at one to three breaths through routine optimization. *Id.* at 48–49 (citing Ex. 1002 ¶¶ 126–131).  The present record supports Petitioner's argument on this limitation.

Dr. Hill testifies that, "[d]ue to known problems with patient adherence . . . a [person of ordinary skill in the art] in 2006 reading the '212 patent and Voswinckel JESC would [have been] motivated to minimize the number of breaths requires for administration of treprostinil by inhalation." Ex. 1002 ¶ 128 (citing Ex. 1002 ¶¶ 36–38).  On the present record, the '212 patent itself suggests delivering treprostinil with a discrete number of breaths rather than only via continuous nebulization.  Ex. 1002 ¶ 131 (citing Ex. 1002 ¶¶ 116–117) (testifying that delivery of inhaled dry powder requires use of dry-powder inhaler); Ex. 1006, 14:19–21 (claiming delivery of treprostinil as an inhaled dry powder); Ex. 1039, 81 (teaching that dry powder inhalers "are breath-actuated").  Thus, on the present record, Petitioner has shown sufficiently that a person of ordinary skill in the art would have been motivated to modify the combination of the '212 patent and Voswinckel JESC to reduce the delivery time to a discrete number of breaths, with as low a number of breaths as possible.

On the present record, Petitioner has also shown sufficiently that adjustment and optimization of dosing was known.  The '212 patent teaches varying "[t]he precise amount" of treprostinil administered "depend[ing] upon the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor."  Ex. 1006, 6:56–7:3. Moreover, both Dr. Hill and Dr. Gonda testify that adjustment of dosing for

IPR2021-00406
Patent 10,716,793 B2

inhaled therapies was known and common.  Ex. 1002 ¶ 130 (citing Ex. 1004 ¶ 35; Ex. 1048, 962); Ex. 1004 ¶ 35 (citing Ex. 1047, 1867; Ex. 1048, 962).

Thus, on the present record, Petitioner has shown sufficiently that the combination of the '212 patent and Voswinckel JESC teaches or suggests delivering inhaled treprostinil treatment in one to three breaths.  As discussed above, Petitioner has also shown on the present record that this combination of references teaches or suggests the other limitations of the challenged claims and that a person of ordinary skill in the art would have had reason to combine the teachings of these references with a reasonable expectation of success.  Accordingly, we determine that Petitioner has demonstrated a reasonable likelihood of prevailing on its assertion that claims 1–8 are unpatentable as obvious over the combination of the '212 patent and Voswinckel JESC.

### E.  Grounds Relying on Ghofrani or Voswinckel 2006

Petitioner argues that claim 1 was anticipated by Ghofrani; that claims 1, 3, and 8 would have been obvious over the combination of Voswinckel JAHA and Ghofrani; that claims 1 and 3 were anticipated by Voswinckel 2006; and that claims 2 and 4–8 would have been obvious over the combination of Voswinckel 2006 and the '212 patent.  Pet. 50–64.  Patent Owner argues that each of these grounds fails because Petitioner fails to show sufficiently that Ghofrani and Voswinckel 2006 qualify as prior art.  Prelim. Resp. 32–42.  Petitioner disagrees, arguing that these references qualify as prior art under 35 U.S.C. § 102(a).  Pet. 25–30.

### 1.  Prior-Art Status of Ghofrani

Ghofrani is an article published in the German journal Herz in June 2005, less than one year before the priority date of the '793 patent.

IPR2021-00406
Patent 10,716,793 B2

Pet. 25; Ex. 1010, 9; Ex. 1036 ¶¶ 47–55.  Petitioner argues that Ghofrani is prior art to the '793 patent under 35 U.S.C. § 102(a).  Pet. 25–27.  Patent Owner disagrees, arguing that Petitioner has not shown sufficiently that Ghofrani is "by others" under § 102(a).  Prelim. Resp. 32–39.

As both parties acknowledge, establishing prior-art status under § 102(a) requires showing that the reference is "by others," meaning that it was authored by an entity different from the entity that invented the challenged patent.  Pet. 26–27; Prelim. Resp. 32–34; *see Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1346 (Fed. Cir. 2003) ("it is well-settled law that an inventor's own disclosure will not anticipate his later invention" unless published more than one year prior to the priority date (internal quotation marks omitted)).

The authors of Ghofrani are "Hossein Ardeschir Ghofrani, Robert Voswinckel, Frank Reichenberger, Friedrich Grimminger, [and] Werner Seeger."  Ex. 1010, 9.  The inventors of the '793 patent are Horst Olschewski, Robert Roscigno, Lewis J. Rubin, Thomas Schmehl, Werner Seeger, Carl Sterritt, and Robert Voswinckel.  Ex. 1001, code (72).  Thus, there are, as Petitioner argues, "inventors listed on the '793 Patent that are not listed as authors on Ghofrani, and vice versa."  Pet. 26.  Specifically, Ghofrani, Reichenberger, and Grimminger authored the Ghofrani reference but were not inventors of the '793 patent; and Olschewski, Roscigno, Rubin, Schmehl, and Sterritt were inventors of the '793 patent but not authors of the Ghofrani reference.

Petitioner argues that these differences alone are sufficient to show that Ghofrani is "by others."  *Id.* at 26–27.  We agree that it is possible, depending on the state of the rest of the evidence of record, for any

IPR2021-00406
Patent 10,716,793 B2

difference between the authors of an alleged prior-art reference and the inventors of a challenged patent to render the reference "by others" for purposes of § 102(a). *See, e.g.*, *In re Katz*, 687 F.2d 450, 455 (CCPA 1982) ("ambiguity [was] created by the printed publication" where authors included people not named as inventors); *cf. In re Land*, 368 F.2d 866, 877 (CCPA 1966) (for purposes of § 102(e), reference authored by one co-inventor was "by another").

That said, it is not necessarily always sufficient for Petitioner merely to show a difference between a list of authors and a list of inventors. Where the record contains evidence that the reference was derived entirely from the work of the inventors or at least one joint inventor, this evidence may be sufficient to show that the reference is not "by others" for purposes of § 102(a). *Katz*, 687 F.2d at 455–56 (finding inventor's declaration of sole inventorship sufficient to render reference authored by inventor and others not "by others"). Although the testimony of an inventor that the reference in question was derived from the inventors' work may be sufficient on its own, at least where it is not "a mere pro forma restatement of the oath in [the inventor's] application," affidavits from the other authors disclaiming the invention are particularly strong evidence that the reference is not "by others." *Id.* ("Submission of such affidavits or declarations would have ended the inquiry . . . ."). Here, the present record appears to contain persuasive evidence that, despite the differences between its list of authors and the list of the inventors of the '793 patent, Ghofrani is not "by others" for purposes of § 102(a).

Petitioner's first argument that Ghofrani is "by others" is that there are people who are authors of Ghofrani who are not inventors of the '793 patent.

IPR2021-00406
Patent 10,716,793 B2

Pet. 26.  But Dr. Seeger, one of the inventors of the '793 patent, as well as an author of Ghofrani, describes the roles of the other authors of Ghofrani, explaining that Dr. Ghofrani drafted the portion of the article "relating to phosphodiesterase inhibitors," that Drs. Reichenberger and Grimminger drafted the portion of the article relating to "the use of selective endothelin A receptor agonists for treating pulmonary hypertension," and that he and Dr. Voswinckel—another co-inventor—drafted the portion of the article relating to "the use of inhaled iloprost and inhaled treprostinil for treatment of pulmonary hypertension," the only portion on which Petitioner's unpatentability case rests.  Ex. 2003 ¶¶ 4–8.  Dr. Seeger's testimony is corroborated by the testimony of Drs. Ghofrani, Reichenberger, and Grimminger, each of whom testifies that they "did not make material contributions to" the portion of the Ghofrani reference relating to inhaled treprostinil.  Ex. 2004 ¶¶ 4–5; Ex. 2005 ¶¶ 4–5; Ex. 2006 ¶¶ 4–5.  This is precisely the type of testimony that the *Katz* court held should "end[] the inquiry" into whether Ghofrani was "by others."  687 F.2d at 455–56.  Accordingly, without more and based on the current record, we consider it sufficient to overcome Petitioner's argument that the difference between the Ghofrani authors and the inventors of the '793 patent is sufficient to show that Ghofrani is "by others."

Petitioner also argues that the failure to include some of the inventors of the '793 patent—Olschewski, Roscigno, Rubin, Schmehl, and Sterritt—as authors of Ghofrani renders Ghofrani "by others."  Pet. 26–27.  But "the fact that a reference does not list any co-inventors as authors . . . is certainly not dispositive in itself."  *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 969 (Fed. Cir. 2014); *see* MPEP § 2132.01(I) ("An inventor's or at least one joint

IPR2021-00406
Patent 10,716,793 B2

inventor's disclosure of his or her own work within the year before the application filing date cannot be used against the application as prior art under pre-AIA 35 U.S.C. 102(a)."). Moreover, Dr. Seeger explains the roles of the other named inventors in designing trials and clinical studies leading to the patent application. Ex. 2003 ¶¶ 22–27. In particular, Dr. Seeger testifies that the Ghofrani reference did not report on the details of the studies and trials that were in part designed by these other authors, explaining why they did not contribute to writing Ghofrani, even though they were involved in the related work that gave rise to the '793 patent. *Id.* ¶¶ 11–12. Again, then, the evidence presently of record seems to support a determination that Ghofrani is not "by others" for purposes of § 102(a).

On the other hand, we are mindful that the evidence supporting such a determination consists entirely of the testimony of Drs. Seeger, Ghofrani, Reichenberger, and Grimminger, none of whom Petitioner has had an opportunity to depose. *See* Pet. 27. In addition, where a genuine issue of material fact exists due to Patent Owner's submission of testimonial evidence with its Preliminary Response, we will view that issue "in the light most favorable to the petitioner solely for purposes of deciding whether to institute an inter partes review." 37 C.F.R. § 42.108(c) (2020).[9] In light of these two points, we are reluctant to resolve the issue of whether Ghofrani is "by others" in a way that might preclude institution of review. Moreover, as discussed above, we determine that Petitioner has shown a reasonable

---

[9] This version of Rule 42.108(c) was in effect when the present Petition was filed. Rule 42.108(c) was amended on December 9, 2020, to eliminate the requirement to view such issues in the light most favorable to Petitioner, but only for petitions "filed on or after January 8, 2021." 85 Fed. Reg. 79,120 (Dec. 9, 2020). The present Petition was filed on January 7, 2021. Pet. 69.

IPR2021-00406
Patent 10,716,793 B2

likelihood of prevailing with respect to at least one claim on at least one of its grounds, and instituting review on that ground requires institution as to all grounds. *SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348, 1355–56 (2018); *PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018); *AC Techs. S.A. v. Amazon.com, Inc.*, 912 F.3d 1358, 1364 (Fed. Cir. 2019). Accordingly, although we are not persuaded that Petitioner has shown a reasonable likelihood of prevailing as to the grounds that rely on Ghofrani, we institute review on those grounds. To the extent either party disagrees with our interpretation of the law governing whether a reference is "by others," we invite such argument during trial.

### 2.  Prior-Art Status of Voswinckel 2006

The issues and arguments regarding Voswinckel 2006 are quite similar to those discussed above regarding Ghofrani. Petitioner argues that Voswinckel 2006 qualifies as prior art under § 102(a) and that it is "by others" both because some of its authors—specifically, Ghofrani and Grimminger—are not inventors of the '793 patent and because some inventors of the '793 patent—specifically, Olschewski, Roscigno, Rubin, Schmehl, and Sterritt—are not authors of Voswinckel 2006. Pet. 27–30. Patent Owner disagrees, pointing to the testimony of Drs. Seeger, Ghofrani, and Grimminger explaining the role that the other inventors of the '793 patent played, as well as making clear that neither Ghofrani nor Grimminger authored the portion of Voswinckel 2006 that is relevant as prior art. Prelim. Resp. 32–34, 39–42.

For the same reasons discussed above with respect to Ghofrani, we are not persuaded that the current record, without more, establishes that Petitioner has shown sufficiently that Voswinckel 2006 is "by others," but

IPR2021-00406
Patent 10,716,793 B2

we institute on the grounds relying on Voswinckel 2006, as we are required to do under *SAS Institute*.  To the extent either party disagrees with our interpretation of the law governing whether a reference is "by others," we invite such argument during trial.

## CONCLUSION

Upon consideration of the Petition, the Preliminary Response, and the evidence presented, we determine that Petitioner has shown a reasonable likelihood that it will prevail in showing that at least one of the challenged claims is unpatentable.  Accordingly, we institute an *inter partes* review of all challenged claims based on all grounds asserted in the Petition.

## ORDER

It is hereby

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review is hereby instituted on all claims of the '793 patent and on all relevant grounds set forth in the Petition; and

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(a) and 37 C.F.R. § 42.4, notice is hereby given of the institution of trial, which shall commence on the entry date of this decision.

IPR2021-00406
Patent 10,716,793 B2

For PETITIONER:

Ivor R. Elrifi
Erik B. Milch
Deepa Kannappan
Sanya Sukduang
COOLEY LLP
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com
zLiquidiaIPR@cooley.com
zpatdocketing@cooley.com


For PATENT OWNER:

Stephen B. Maebius
George Quillin
Jason N. Mock
FOLEY & LARDNER LLP
smaebius@foley.com
gquillin@foley.com
jmock@foley.com

Shaun R. Snader
UNITED THERAPEUTICS CORP.
ssnader@unither.com

Douglas Carsten
April E. Weisbruch
Judy Mohr, Ph.D.
MCDERMOTT WILL & EMERY LLP
dcarsten@mwe.com
aweisbruch@mwe.com
jmohr@mwe.com

# EXHIBIT G

| | |
|---|---|
| **From:** | Karen Keller |
| **To:** | Flynn, Michael J. |
| **Subject:** | RE: UTC/Liquidia - Request for Discovery Conference |
| **Date:** | Wednesday, September 1, 2021 10:39:00 AM |

Cam we also add 9/15 and 16 in case she has time? Also, can we drop a footnote noting that opening expert reports are due on October 15?

**From:** Flynn, Michael J. <mflynn@morrisnichols.com>
**Sent:** Tuesday, August 31, 2021 5:47 PM
**To:** Karen Keller <kkeller@shawkeller.com>
**Subject:** UTC/Liquidia - Request for Discovery Conference

Karen,

Following up on our call this afternoon, attached is a draft motion for a teleconference following Judge Hall's form request. We have tentatively proposed Sept. 20 and 21 for the conference, but I'm checking with our team. I know everyone is going to be busy as we head toward the 9/17 fact discovery deadline, and the most recent discovery conference Judge Hall scheduled was for 9/15, so I think that's the right range. Let me know if those dates work for your side, and any others that may also work and I'm sure we'll land on a couple good options.

Thanks,
Michael

_____

**MICHAEL J. FLYNN**
Partner | Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 351-9661 Direct
**mflynn@morrisnichols.com | vcard | bio | www.morrisnichols.com**

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.