IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | ▮▮▮▮▮▮▮▮ |
| v. | ) ) ) | C.A. No. 20-755-RGA-JLH |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | **Redacted – Public Version** |
| Defendant. | ) ) | |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF THE '066 AND '901 PATENTS DUE TO COLLATERAL ESTOPPEL**

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Douglas Cheek
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia Technologies, Inc.*

Lauren Krickl
Deepa Kannappan
Brittany Cazakoff
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000


Dated: January 7, 2022

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS ..................................................... 1

II.    SUMMARY OF ARGUMENT .................................................................... 2

III.    STATEMENT OF UNDISPUTED FACTS ................................................ 3

     A.    The SteadyMed Decisions ............................................................... 3

     B.    Overview of the '066 and '901 Patents......................................... 5

     C.    UTC Admitted that the '393, '066, and '901 Patents Claim the Same Product ..................................................................................... 7

IV.    LEGAL STANDARDS .............................................................................. 10

     A.    Summary Judgment ....................................................................... 10

     B.    Collateral Estoppel......................................................................... 10

V.    ARGUMENT ............................................................................................ 11

     A.    The Product-by-Process Claims of the '066 and '901 Patents are Invalid Due to Collateral Estoppel ........................................... 11

         1.    SteadyMed Decided the Identical Invalidity Issue Here.......................... 12

             a.    The '393, '066, and '901 Patents Claim the Same Product ......... 12

             b.    The Minor Variation in Claim Language Does Not Render the Products of the '066, '901 and '393 Patents Different .......... 15

         2.    The Invalidity Issue was Actually Litigated in SteadyMed.................... 17

         3.    SteadyMed was Determined by a Final and Valid Judgment ................. 18

         4.    SteadyMed's Invalidity Holding was Essential to the Judgment............ 18

     B.    The Remaining Asserted Claims of the '066 and '901 Patent are Likewise Invalid due to Collateral Estoppel.................................................... 19

VI.    CONCLUSION.......................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allergan, Inc. v. Sandoz, Inc.*,
  681 F. App'x 955 (Fed. Cir. 2017) ..................................................................11, 16, 19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .........................................................................................10

*Apeldyn Corp. v. Sony Corp.*,
  87 F. Supp. 3d 681 (D. Del. 2015) ......................................................................3

*Cuozzo Speed Techs., LLC v. Lee*,
  579 U.S. 261 (2016) .........................................................................................17

*Enzo Life Scis., Inc. v. Abbott Lab'ys*,
  C.A. No. 12-274-LPS, 2017 WL 3585618 (D. Del. Aug. 15, 2017), *affirmed by Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340 (Fed. Cir. 2019), *cert. denied* 140 S. Ct. 2634 (2020)..................................................3

*Greenliant Sys., Inc. v. Xicor LLC*,
  692 F.3d 1261 (Fed. Cir. 2012)........................................................................4, 16

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
  937 F.3d 1359 (Fed. Cir. 2019)........................................................................18

*Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc.*,
  458 F.3d 244 (3d Cir. 2006)..............................................................................20

*Karns v. Shanahan*,
  879 F.3d 504 (3d Cir. 2018)....................................................................... *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).........................................................................................10

*Ohio Willow Wood Co. v. Alps South, LLC*,
  735 F.3d 1333 (Fed. Cir. 2013)................................................................. *passim*

*Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*,
  778 F.3d 1311 (Fed. Cir. 2015)..........................................................10, 11, 16, 19

*Sprint Commc'ns Co. v. Cequel Commc'ns, LLC*,
  C.A. Nos. 18-1919-RGA, 18-2033-RGA, 2020 WL 3048175 (D. Del. Jun. 8, 2020) (Andrews, J.)........................................................................................11, 16

*Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*,
  C.A. No. 17-1734-RGA, 2021 WL 982726 (D. Del. Mar. 16, 2021) (Andrews, J.)...................................................................................................................11

## TABLE OF AUTHORITIES
### Continued

**Page(s)**

*SteadyMed Ltd. v. United Therapeutics Corp.*,
  No. IPR2016-00006 ................................................................................................ *passim*

*In re Thorpe*,
  777 F.2d 695 (Fed. Cir. 1985).............................................................................12, 14

*United Therapeutics Corp. v. SteadyMed Ltd.*,
  702 F. App'x 990 (Fed. Cir. 2017) ................................................................ *passim*

*XY, LLC v. Trans Ova Genetics, L.C.*,
  890 F.3d 1282 (Fed. Cir. 2018).............................................................................18

**Statutes**

21 U.S.C. § 355(c)(3)(C) ............................................................................................1

35 U.S.C. § 311(b) ...................................................................................................17

**Other Authorities**

21 C.F.R. § 314.53(c)(2)(ii)........................................................................................7

Fed. R. Civ. P. 56(a) ...........................................................................................2, 10

The Court should enter summary judgment of invalidity of claims 1-3, 6, and 8-9 of U.S. Patent No. 9,593,066 ("the '066 patent") (Ex. 1) and claims 1-4, 6, and 8 of U.S. Patent No. 9,604,901 ("the '901 patent") (Ex. 2) because there is no genuine dispute of material fact that the product and process claimed by these two patents is the same as the product and process claimed by U.S. Patent No. 8,497,393 ("the '393 patent") (Ex. 3), which the Patent Trial and Appeal Board ("PTAB") and Federal Circuit found invalid in 2017.  Ex. 4 (Final Written Decision (Paper No. 82), entered March 31, 2017 in *SteadyMed Ltd. v. United Therapeutics Corp.*, No. IPR2016-00006 ("'393 FWD")); *United Therapeutics Corp. v. SteadyMed Ltd.*, 702 F. App'x 990 (Fed. Cir. 2017). United Therapeutics Corporation ("UTC") is therefore collaterally estopped from re-litigating the issue of validity for the asserted claims of the '066 and '901 patents.

## I.      NATURE AND STAGE OF PROCEEDINGS

This action arises from Liquidia's submission of New Drug Application ("NDA") No. 213005 to the Food and Drug Administration ("FDA"), filed on January 24, 2020, seeking approval for its proposed LIQ861 product.  D.I. 16, ¶ 2; D.I. 26 at 1.  On June 4, 2020, UTC filed suit against Liquidia for infringement of the '066 and '901 patents, triggering a thirty-month stay of the FDA's final approval of LIQ861.  *See* D.I. 1 at 1; 21 U.S.C. § 355(c)(3)(C).  Another patent, U.S. Patent No. 10,716,793 ("the '793 patent"), issued on July 21, 2020 (*see* Ex. 5 (face))[1]; the next day, UTC filed its First Amended Complaint, adding infringement allegations for the '793 patent.  *See* D.I. 16 at 1.  On August 5, 2020, Liquidia filed its Answer and Counterclaims seeking, *inter alia*, declaratory judgments of invalidity of the '901 and '066 patents.  *See* D.I. 23 at 13-16. Before UTC's complaints, Liquidia filed a Petition for *inter partes* review ("IPR") of the '901 patent, and the PTAB issued its Final Written Decision on October 8, 2021, invalidating claims 1-

---

[1] UTC filed the application for the '793 patent just seven days after Liquidia filed its NDA for LIQ861.  Ex. 5 (face); *cf.* D.I. 26 at 1.

5, 8, and 9 of the '901 patent.  D.I. 205.  The FDA tentatively approved LIQ861 on November 4, 2021.  Ex. 6 (LIQ861 Tentative Approval Letter).

The parties have had extensive opportunities to develop the facts in this case.  Fact discovery closed on September 17, 2021 (D.I. 20, ¶ 3.a); opening expert reports were exchanged on October 15, 2021 (D.I. 212, 213); rebuttal expert reports were exchanged on November 12, 2021 (D.I. 234); and reply expert reports were exchanged on December 10, 2021 (D.I. 262).  Expert discovery is set to close on January 14, 2022.  D.I. 20 at 12.  On December 9, 2021, UTC served its Election of Asserted Claims, identifying claims 1-3, 6, and 8-9 of the '066 patent and claims 1-4, 6, and 8 of the '901 patent (collectively, "Asserted Claims").  Ex. 7 at 2.

On December 14, 2021, the Court granted Liquidia leave to move for summary judgment of invalidity of the '066 patent and '901 patent due to collateral estoppel.  D.I. 267.  On January 3, 2022, the Court entered the parties' stipulation of judgment of non-infringement of the '901 patent based on the Court's November 23, 2021, claim construction order (D.I. 245).  D.I. 278.  Trial is set to begin on March 28, 2022.  D.I. 20 at 10.

## II.    SUMMARY OF ARGUMENT

Summary judgment of invalidity based on collateral estoppel is appropriate because there is no genuine dispute as to any material fact that claims 1-3, 6, and 9 of the '066 patent and claims 1-4 of the '901 patent (collectively, "the product-by-process claims") are directed to the same product as the invalidated claims of the '393 patent.  FED. R. CIV. P. 56(a); Ex. 4 ('393 FWD); *SteadyMed*, 702 F. App'x 990.  Additionally, claim 8 of the '066 patent and claims 6 and 8 of the '901 patent (collectively, "the process claims") are invalid because there is no genuine factual dispute that the '393 FWD expressly found, and the Federal Circuit affirmed, that the "recited process steps [of the '393 patent claims] would have been obvious to a relevant skilled artisan." *See* Ex. 4 ('393 FWD) at 80.  Nor is there any genuine factual dispute that UTC had an opportunity

2

to fully and fairly litigate the issue of whether the claimed product and process are invalid, that the Federal Circuit's affirmance of the '393 FWD is a final and valid judgment, and that the issue of validity was essential to both the '393 FWD and its affirmation by the Federal Circuit.

Accordingly, UTC is precluded from re-litigating the issue of invalidity of the claimed product and process, and Liquidia is entitled to summary judgment that the Asserted Claims are invalid. *E.g.*, *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342-43 (Fed. Cir. 2013) (affirming summary judgment of invalidity on the basis of collateral estoppel because the plaintiff, in a separate patent infringement suit, fully and fairly litigated the invalidity of a related patent); *Apeldyn Corp. v. Sony Corp.*, 87 F. Supp. 3d 681, 691-94 (D. Del. 2015) (granting summary judgment due to collateral estoppel because the issue was actually litigated and the plaintiff had an opportunity to fully and fairly litigate the issue); *Enzo Life Scis., Inc. v. Abbott Lab'ys*, C.A. No. 12-274-LPS, 2017 WL 3585618, at *6-10 (D. Del. Aug. 15, 2017) (granting summary judgment of non-enablement in part because a related patent was invalidated in a separate case), *affirmed by Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340 (Fed. Cir. 2019), *cert. denied* 140 S. Ct. 2634 (2020).

## III.    STATEMENT OF UNDISPUTED FACTS

### A.    The *SteadyMed*[2] Decisions

On March 31, 2017, the PTAB found all 22 claims of the '393 patent unpatentable as anticipated and obvious over the prior art, including Phares[3] and Moriarty.[4]  *See* Ex. 4 ('393 FWD) at 21-22, 43-44, 67-68, 84, 90.  The PTAB reasoned that all claims of the '393 patent are product-

---

[2] For ease of reference, "*SteadyMed*" as used herein refers to both the '393 FWD and the Federal Circuit affirmance.

[3] WO 2005/007081 A2 (Jan. 27, 2005) to Ken Phares ("Phares").

[4] Robert M. Moriarty *et al*., "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)," 69 J. ORG. CHEM. 1890-1902 (2004) ("Moriarty").

by-process claims (*id.* at 4), and that the claimed treprostinil product is not "structurally or functionally different" from the treprostinil product disclosed in the prior art. *See id.* at 25-31 (applying *Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1267-68 (Fed. Cir. 2012)), 34 (same), 39-40 (same); *see also id.* at 43, 52-53, 79-83. In particular, the PTAB found that "treprostinil produced according to [the prior art] has the same, or better, overall purity and purity profile than treprostinil produced according to the process recited in the '393 patent." *Id.* at 29 (further finding that the recited process steps are not entitled to patentable weight).

The PTAB specifically rejected UTC's claim construction and substantive arguments that the product of the '393 patent was made for commercial purposes, and had a distinct impurity profile and higher purity level than the product disclosed in the prior art. *Id.* at 11-19 (finding, *inter alia*, that "the evidence of record establishes that the variability in the impurity profile and overall purity level between individual batches of treprostinil produced according to the process steps recited in the challenged claims renders the claimed treprostinil ***structurally and functionally the same*** as treprostinil produced according to Moriarty"); *see also id.* at 25-43 (finding, *inter alia*, that "UTC does not identify, and we do not discern, evidence of record to suggest that treprostinil produced according to the process steps recited in claims 1 and 9 has a higher overall purity or different impurity profile than treprostinil diethanolamine salt produced according to Phares," and that "[t]he average overall purity as measured by HPLC for the commercial batches of '393 patent treprostinil and for the commercial batches of Moriarty treprostinil is the same: 99.7%"); *cf.* Ex. 8 ('393 POR) at 9-12, 16-17, 21.[5,6] Critically, the PTAB rejected UTC's assertion that "'[t]he

---

[5] All emphasis is added unless otherwise noted.

[6] UTC's arguments regarding objective indicia of non-obviousness were likewise rejected. Ex. 4 ('393 FWD) at 56-67, 83; *id.* at 63 (finding no long-felt need because "the challenged claims are not directed to an efficient, cost-effective, or commercial scale synthesis, and thus, cannot be said

question for patentability is whether or not a given batch of *starting* Moriarty treprostinil (steps a and b [alkylation and hydrolysis, respectively] of the '393 independent claims) will be physically changed when step (c) [salt formation] is performed *on that batch*."   Ex. 4 ('393 FWD) at 39 (citing Ex. 8 ('393 POR) at 11) (emphasis in original).  The PTAB held that this "is not the test" for determining patentability, and found the claims unpatentable because "the process steps [] recited in the challenged claims do not impart structural or functional differences on the product claimed."  *Id.* at 40.

Further, the PTAB expressly held that the "recited process steps [of the '393 patent claims] would have been obvious to a relevant skilled artisan."  *Id.* at 80; *see also id.* at 53 ("Because the combination of Moriarty and Phares discloses both the product claimed ***and the process recited*** in the challenged product-by-process claims, it renders those claims obvious."); *see also id.* at 70 ("We are persuaded by SteadyMed's showing that the combination of Moriarty, Phares, Kawakami, and Eğe discloses both the treprostinil products claimed, ***as well as the production of treprostinil diethanolamine salt through the performance of steps (a)-(d)*** recited in the challenged claims of the '393 patent.").

The Federal Circuit affirmed the PTAB's decision on November 14, 2017.  *SteadyMed*, 702 F. App'x 990.

B.     **Overview of the '066 and '901 Patents**

The '066 and '901 patents describe and claim the same treprostinil product made by the same process as the '393 patent.  All three patents originated from the same application[7] and share

---

to satisfy such a need"); *id.* at 64-66 (rejecting argument that "'[t]he use of a salt form to further purify the treprostinil acid . . . was an unexpected result'") (citing Ex. 8 ('393 POR) at 49).

[7] The '393 patent resulted from U.S. Appl. No. 13/548,446 ("the '446 Application"), and the '066 and '901 patents resulted from a divisional and continuation application, respectively, of U.S. Appl. No. 13/933,623, which is a continuation application of the '446 Application.  *See* Ex. 3 (face); Ex. 1 (face); Ex. 2 (face).

an identical specification disclosing the same process steps of alkylation, hydrolysis, and salt formation. *E.g.,* Ex. 3 ('393 patent), 1:65-3:19; Ex. 1 ('066 patent), 2:6-3:33; Ex. 2 ('901 patent), 2:6-3:45. The product-by-process claims of the '393 patent (claims 1-22), '066 patent (claims 1-3, 6, 9), and '901 patent (claims 1-4) recite the same treprostinil product made by the same steps of alkylation, hydrolysis, and salt formation. *Compare* Ex. 3 ('393 patent), claim 1 *to* Ex. 1 ('066 patent), claim 1 *to* Ex. 2 ('901 patent), claim 1. The '393 patent claims a "product" (claims 1-22), the '066 patent claims a "pharmaceutical composition" (claims 1-3, 6) and a "pharmaceutical product" (claim 9), and the '901 patent claims a "pharmaceutical batch" (claims 1-2) and a "pharmaceutical product" (claims 3-4). Ex. 3 ('393 patent), claims 1-22; Ex. 1 ('066 patent), claims 1-3, 6, 9; Ex. 2 ('901 patent), claims 1-4. Despite the slightly different terminology, all three patents' claims recite that the "[pharmaceutical] product," "pharmaceutical composition," and "pharmaceutical batch" comprise treprostinil or a salt of treprostinil. *See id.* Similar to the PTAB's construction of "product" in the '393 FWD, this Court's recent claim construction confirms that the term "pharmaceutical" does not "denote[] a commercial character" or "import an FDA definition." D.I. 241 at 4 n.1; Ex. 9 (Jun. 4, 2021 Markman Hr'g Tr.), 28:3-15; *see also* Ex. 32 (Nuckolls Dep. Tr.) at 34:2-47:24 ████████████████████████████████ ██████████████ Therefore, the product-by-process claims of the '066 and '901 patent comprise the same "product" as the '393 patent claims, *i.e.*, treprostinil or a pharmaceutically acceptable salt of treprostinil.

Similarly, the process claims of the '066 patent (claim 8) and '901 patent (claims 6, 8) recite the same process steps as the invalidated product-by-process claims of the '393 patent. Claims 6 and 8 of the '901 patent depend upon claim 1, and thus necessarily require the treprostinil product recited in product-by-process claim 1 of the '901 patent. Ex. 2 ('901 patent), claims 1, 6,

8.  Further, claim 8 of the '901 patent and claim 8 of the '066 patent claim the same process steps of alkylation, hydrolysis, and salt formation recited in the '393 patent claims.  Ex. 1 ('066 patent), claim 8; Ex. 2 ('901 patent), claim 8; *cf.*, *e.g.*, Ex. 3 ('393 patent), claim 1.

### C.      UTC Admitted that the '393, '066, and '901 Patents Claim the Same Product

UTC has repeatedly represented—in this litigation, to the FDA, and to the U.S. Patent and Trademark Office ("PTO")—that the '393, '066, and '901 patents are directed to the same product. First, Drs. Hitesh Batra and Sudersan Tuladhar, named inventors of all three patents and, with respect to Dr. Batra, ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████. Ex. 10 (Batra Dep. Tr.), 80:2-81:8, 88:2-5; Ex. 11 (Tuladhar Dep. Tr.), 97:25-100:5, 107:1-109:23; *id.* at 107:12-22 ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ They also testified that ██████████████████ ████████████████████████████████████████ Ex. 10 (Batra Dep. Tr.), 75:12-76:5, 79:12-81:8, 347:3-8; Ex. 11 (Tuladhar Dep. Tr.), 97:25-100:5, 107:1-109:23.

Second, UTC submitted Form 3542 documents to the FDA identifying each of the three patents as a "product-by-process" patent for Tyvaso®, UTC's inhaled treprostinil product. *See* Ex. 12 (Tyvaso® Form FDA 3542 for the '066 patent) at Question 2.7; Ex. 13 (Tyvaso® Form FDA 3542 for the '901 patent) at Question 2.7; Ex. 14 (Tyvaso® Form FDA 3542 for the '393 patent) at Question 2.7; *see also* Ex. 10 (Batra Dep. Tr.), 355:1-364:18 (confirming the authenticity of Exs. 12, 13); 21 C.F.R. § 314.53(c)(2)(ii) ("Within 30 days after the date of approval of its NDA or supplement, the applicant must submit Form FDA 3542 for each patent that claims the drug substance (active ingredient), drug product (formulation and composition), or approved method of

use.").[8]  Consequently, all three patents have been listed in the FDA's Orange Book as covering the same drug substance in Tyvaso®.  Ex. 15 (Tyvaso® Orange Book) (currently listing the '066 and '901 patents); Ex. 16 (UTC 2017 Press Release) (stating that the '393, '066, and '901 patents are listed in the Orange Book for Tyvaso®); Ex. 17 (*UTC v. Watson* 2016 FAC), ¶ 21 (stating that the '393 patent is listed in the Orange Book for Tyvaso®).

Third, when implementing the process now claimed by the '393, '066, and '901 patents, UTC informed the FDA that



Ex. 18 _____ at UTC_OREN_00572127; *see also* Ex. 10 (Batra Dep. Tr.), 80:2-81:8, 88:2-5

*id.* at 89:20-90:13

Ex. 19 (Ruffolo Dep. Tr.), 205:11-18 (same); Ex. 20 ('393 IPR Ruffolo Decl.), ¶ 68 (same); Ex. 21 (Pinal Dep. Tr.), 89:4-7 (same).

Fourth, the prosecution histories of the '066 and '901 patents reveal that UTC and the PTO relied on expert declarations from the '393 patent's IPR proceeding to obtain and grant, respectively, the '066 and '901 patents.  During the '393 IPR proceeding, UTC submitted two expert declarations attempting to distinguish the '393 patent's claimed product from that of the prior art reference Moriarty.  Ex. 22 ('393 IPR Williams Decl.); Ex. 20 ('393 IPR Ruffolo Decl.).

---

[8] UTC also represented that all three patents cover the drug substance (*i.e.*, active ingredient) for Tyvaso®, as opposed to the drug product.  Ex. 12 (Tyvaso® Form FDA 3542 for the '066 patent) at Question 2.1; Ex. 13 (Tyvaso® Form FDA 3542 for the '901 patent) at Question 2.1; Ex. 14 (Tyvaso® Form FDA 3542 for the '393 patent) at Question 2.1.

Then, during prosecution of the '066 and '901 patents, UTC submitted *those same declarations* regarding the '393 patent to argue that the '066 and '901 claimed products differed from those of Moriarty.  Ex. 23 (Aug. 24, 2016 '066 FH Response) at UTC_LIQ00003130-132 (arguing that "the processes [of the '393, '066, and '901 patents] result in products having different impurity profiles [than the Moriarty product], and in fact, the pharmaceutical composition of claim 1 [of the '393, '066, and '901 patents] has higher average purity"); Ex. 24 (Aug. 11, 2016 '901 FH Response) at UTC_LIQ00006762-764 (similar).  Subsequently, the Examiner withdrew the obviousness and anticipation rejections against the '066 and '901 patents, expressly relying on the expert declarations from the '393 IPR proceeding as evidence that the product claimed by the '066 and '901 patents allegedly differed from the product in Moriarty.  Ex. 25 (Nov. 30, 2016 '066 FH Office Action) at UTC_LIQ00003143 ("[T]he declarations by Dr. Williams and Dr. Ruffolo [from the '393 IPR proceeding] describe the product of Moriarty to have a different impurity profile from the product [of] the instant claims where [the] salt formation step is present."); Ex. 26 (Oct. 19, 2016 '901 FH Office Action) at UTC_LIQ00006776 (withdrawing rejections "in view of applicants' arguments, amendments and the accompanying declarations").  The '066 and '901 patents issued on March 14, 2017, and March 28, 2017, respectively.  Ex. 1 (face); Ex. 2 (face).  However, on March 31, 2017, within days of issuance of the '066 and '901 patents, the PTAB issued the '393 FWD rejecting the arguments offered by Drs. Williams and Ruffolo in the declarations submitted in the '393 IPR proceeding as well as during prosecution of the '066 and '901 patents.  *E.g.*, Ex. 4 ('393 FWD) at 36-38, 41-42, 60-61.  That is, the very arguments and declarations UTC previously presented, and subsequently relied upon by the PTO Examiner to allow the '066 and '901 patents, were rejected by the PTAB.  UTC did not inform the Examiner of the '066 and '901 patents of the '393 FWD.

## IV.    LEGAL STANDARDS

### A.    Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Once the moving party has shown the absence of a genuine dispute, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Instead, a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see also id.* at 249-50 ("If the evidence [favoring the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted); *Matsushita*, 475 U.S. at 586 (the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts").

### B.    Collateral Estoppel

"Collateral estoppel, also known as issue preclusion, prohibits relitigation of an issue that has been fully and fairly litigated previously."  *Karns v. Shanahan*, 879 F.3d 504, 514 n.3 (3d Cir. 2018).  "The issue of whether to apply collateral estoppel is a question of law" in which the law of the regional circuit controls.  *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015) (internal brackets, citations omitted).  In applying collateral estoppel, the Third Circuit requires that "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a

final and valid judgment; and (4) the determination was essential to the prior judgment." *Karns*,

879 F.3d at 514 n.3 (internal brackets, citations omitted).  The Federal Circuit has held:

> Our precedent does not limit collateral estoppel to patent claims that are identical. Rather, it is the identity of the issues that were litigated that determines whether collateral estoppel should apply. . . . If the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of validity, collateral estoppel applies.

*Ohio Willow Wood*, 735 F.3d at 1342; *see also id.* at 1343 (affirming grant of summary judgment

of invalidity based on collateral estoppel when the nonmoving party had not "explained how any

other alleged differences in claim scope alter the invalidity determination"); *Sprint Commc'ns Co.*

*v. Cequel Commc'ns, LLC*, C.A. Nos. 18-1919-RGA, 18-2033-RGA, 2020 WL 3048175, at *3-6

(D. Del. Jun. 8, 2020) (Andrews, J.) (applying collateral estoppel despite differences in claim

language).[9]

## V.    ARGUMENT

### A.    The Product-by-Process Claims of the '066 and '901 Patents are Invalid Due to Collateral Estoppel

Summary judgment of invalidity of the product-by-process claims is warranted because

there is no genuine dispute of material fact that (1) the issue of invalidity of the product claimed

by the '066 and '901 patents is the same as the previously-decided issue of invalidity of the product

claimed by the '393 patent, since all three patents claim the same product, and this issue was (2)

actually litigated and (3) determined by a final and valid judgment that was (4) essential to the

---

[9] *See also Soverain*, 778 F.3d at 1319-1320 (reversing judgment of no invalidity when invalidity was established by collateral estoppel, and the additional claim limitation "does not materially alter the question of [] validity"; *Allergan, Inc. v. Sandoz, Inc.*, 681 F. App'x 955, 959-961 (Fed. Cir. 2017) (finding collateral estoppel when "the Asserted Claims are substantially similar to the invalidated claims" and "any differences between the claims do not materially alter the question of invalidity"); *Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*, C.A. No. 17-1734-RGA, 2021 WL 982726, at *8-9 (D. Del. Mar. 16, 2021) (Andrews, J.) (granting motion for partial summary judgment of invalidity based on collateral estoppel).

prior judgment.  *E.g.*, *Karns*, 879 F.3d at 514 n.3.  The product-by-process claims of the '066 and

'901 patents are thus invalid due to collateral estoppel.  *Id.*; *see also In re Thorpe*, 777 F.2d 695,

697 (Fed. Cir. 1985) ("If the product in a product-by-process claim is the same as or obvious from

a product of the prior art, the claim is unpatentable even though the prior product was made by a

different process.").

        1.       *SteadyMed* **Decided the Identical Invalidity Issue Here**

        a.       **The '393, '066, and '901 Patents Claim the Same Product**

The '393 FWD, affirmed by the Federal Circuit, held that the treprostinil product claimed

by the '393 patent is invalid.  Ex. 4 ('393 FWD) at 21-22, 43-44, 67-68, 84, 90; *SteadyMed*, 702

F. App'x 990.  There is no genuine factual dispute that the '393, '066, and '901 patents claim the

same treprostinil product made by a process comprising the steps of alkylation, hydrolysis, and

salt formation.  *E.g.,* Ex. 3 ('393 patent), 1:65-3:19 (describing the process steps of alkylation,

hydrolysis, and salt formation); Ex. 1 ('066 patent), 2:6-3:33 (same); Ex. 2 ('901 patent), 2:6-3:45

(same).  All three patents share the same specification, with identical disclosures and examples.

*See generally* Exs. 1-3; Ex. 10 (Batra Dep. Tr.), 75:12-76:5, 79:12-81:8, 347:3-8.  The claimed

"product" ('393 patent, claims 1-22), "pharmaceutical product" ('066 patent, claim 9; '901 patent,

claims 3-4), "pharmaceutical composition" ('066 patent, claims 1-3, 6), and "pharmaceutical

batch" ('901 patent, claims 1-2) all refer to a product comprising treprostinil or a salt of treprostinil.

*See* Ex. 3 ('393 patent), claims 1-22; Ex. 1 ('066 patent), claims 1-3, 6, 9; Ex. 2 ('901 patent),

claims 1-4.  This Court's recent claim construction decision removes any doubt whether these

terms refer to the same product—the Court held that the term "pharmaceutical" does not impart

any "commercial" meaning.  *See* D.I. 241 at 4 n.1 (finding that "pharmaceutical" does not

"denote[] a commercial character" and declining to "import an FDA definition" into

"pharmaceutical batch").  Thus, the product-by-process claims of the '066 and '901 patent

indisputably claim the same "product" as the '393 patent claims.

The record is replete with evidence that UTC considers, and represented to government agencies, that the product claimed by the '066 and '901 patents are the same as the product claimed by the '393 patent.  Dr. Batra, ███████████████████████ named inventor of all three patents, and Dr. Tuladhar, another named inventor on all three patents, ███████████ ████████████████████████████████████████████████████████████ Ex. 10 (Batra Dep. Tr.), 80:2-81:8, 88:2-5; Ex. 11 (Tuladhar Dep. Tr.), 97:25-100:5, 107:1-109:23. Drs. Batra and Tuladhar ███████████████████████████████████ ████████████████████ Ex. 10 (Batra Dep. Tr.), 75:12-76:5, 79:12-81:8, 347:3-8; Ex. 11 (Tuladhar Dep. Tr.), 97:25-100:5, 107:1-109:23.

UTC has also represented to the FDA that the '393, '066, and '901 patents are directed to the same treprostinil product—Tyvaso®.  UTC submitted Form FDA 3542 documents identifying each of the three patents as a "product-by-process" patent covering the drug substance in Tyvaso®. *See* Ex. 12 (Tyvaso® Form FDA 3542 for the '066 patent) at Questions 2.1, 2.7; Ex. 13 (Tyvaso® Form FDA 3542 for the '901 patent) at Questions 2.1, 2.7; Ex. 14 (Tyvaso® Form FDA 3542 for the '393 patent) at Questions 2.1, 2.7; *see also* Ex. 10 (Batra Dep. Tr.), 355:1-364:18 (confirming the authenticity of Exs. 12, 13).  As a result, all three patents have been listed in the FDA's Orange Book as covering the drug substance in Tyvaso®.  Ex. 15 (Tyvaso® Orange Book); Ex. 16 (UTC 2017 Press Release); Ex. 17 (*UTC v. Watson* 2016 FAC), ¶ 21.  UTC cannot now contend that the "drug substance" (*i.e.*, the treprostinil product claimed in each of the product-by-process claims of the '393, '066, and '901 patents) is different among the three patents.

Further, UTC informed the FDA that the drug substance batch prepared by the process of the '393, '066, and '901 patents is ██████████████████████████████████

13

████████████████████████████████████████████—which the PTAB

relied on to invalidate the '393 patent.  Ex. 18 ████████ at UTC_OREN_00572127; *see also*

Ex. 10 (Batra Dep. Tr.), 80:2-81:8, 88:2-5, 89:20-90:13; Ex. 19 (Ruffolo Dep. Tr.), 205:11-18; Ex.

20 ('393 IPR Ruffolo Decl.), ¶ 68; Ex. 21 (Pinal Dep. Tr.), 89:4-7; Ex. 4 ('393 FWD) at 44-55,

67-84.  Here again, UTC expressly informed the FDA that the drug substance it makes—the same

drug substance claimed in the product-by-process claims of the '393, '066, and '901 patents—is

████████████████████████████████████████████████

████████████  As the PTAB noted in the '393 FWD, "UTC did not seek, and the FDA did not

impose, any changes to the types or amounts of impurities that may be present in the treprostinil

manufactured according to the ['393, '066 and '901 patents] versus that made by the Moriarty

process."  Ex. 4 ('393 FWD) at 42.[10]  Accordingly, the product-by-process claims of the '066 and

'901 patents, like those of the '393 patent, are invalid over the Moriarty grounds presented in the

'393 FWD.  *In re Thorpe*, 777 F.2d at 697 ("If the product in a product-by-process claim is the

same as or obvious from a product of the prior art, the claim is unpatentable even though the prior

product was made by a different process.").

Lastly, the prosecution histories of the '066 and '901 patents make clear that the PTO and

UTC treated the claimed product and process as interchangeable with those of the '393 patent.

During prosecution of the '066 and '901 patents, UTC relied on the same expert declarations filed

---

[10] In fact, UTC's certificates of analysis ("COAs") for treprostinil batches made after ████ using
the process disclosed in the '066, '901 and '393 patents confirm that the permitted levels of
impurities and related substances are ████████ to the batches of treprostinil made according to the
previously-used Moriarty process.  *Compare*, *e.g.*, Ex. 27 ████████████████████████ *and*
Ex. 28 ████████████████████████ *with* Ex. 29 ████████ at UTC_OREN_00844304
████████████████████████████████████████████
████████████████████████████████████

in the '393 IPR proceeding in attempt to distinguish the '393 patent's claimed product from the product of Moriarty.  *See supra* § III.C; Ex. 22 ('393 IPR Williams Decl.); Ex. 20 ('393 IPR Ruffolo Decl.).  Not only did UTC submit the declarations previously submitted during the '393 IPR, UTC also relied on these declarations to argue that "the processes [of the '393, '066, and '901 patents] result in products having different impurity profiles [than the Moriarty product], and in fact, the pharmaceutical composition of claim 1 [of the '393, '066, and '901 patents] has higher average purity."  Ex. 23 (Aug. 24, 2016 '066 FH Response) at UTC_LIQ00003130-132; *see also* Ex. 24 (Aug. 11, 2016 '901 FH Response) at UTC_LIQ00006762-764.  The Examiner of the '066 and '901 patents expressly relied on these declarations to withdraw the obviousness and anticipation rejections based on Moriarty.  Ex. 25 (Nov. 30, 2016 '066 FH Office Action) at UTC_LIQ00003143; Ex. 26 (Oct. 19, 2016 '901 FH Office Action) at UTC_LIQ00006776.  UTC never informed the Examiner of the '066 and '901 patents of the '393 FWD, much less the fact that the PTAB found the expert declarations and UTC's prosecution arguments relying thereon unpersuasive.  *E.g.*, Ex. 4 ('393 FWD) at 36-38, 41-42, 60-61.

> **b.    The Minor Variation in Claim Language Does Not Render the Products of the '066, '901 and '393 Patents Different**

UTC may argue that the minor variation in claim language among the three patents precludes application of collateral estoppel.  But this argument is foreclosed by controlling Federal Circuit precedent.  In *Ohio Willow Wood*, the Federal Circuit held that collateral estoppel is not limited to "patent claims that are identical"—"[r]ather, it is the identity of the ***issues*** that were litigated that determines whether collateral estoppel should apply."  735 F.3d at 1342.  Here, the minor differences in claim language do not "materially alter the question of invalidity" (*see id.*) because (a) there is no genuine factual dispute that all three patents claim the same treprostinil product made by the generalized steps of alkylation, hydrolysis, and salt formation, and (b) the

*issue* of invalidity of this treprostinil product has already been decided.  *See supra* § V.A.1.a; *compare* Ex. 3 ('393 patent), claim 1 *with* Ex. 1 ('066 patent), claim 1 *with* Ex. 2 ('901 patent), claim 1; Ex. 4 ('393 FWD) at 21-22, 43-44, 67-68, 84, 90; *SteadyMed*, 702 F. App'x 990.  As in *Ohio Willow Wood*, UTC cannot "explain[] how any [] alleged differences in claim scope alter the invalidity determination."  735 F.3d at 1343; *see also Soverain*, 778 F.3d at 1319-1320; *Allergan*, 681 F. App'x at 959-961; *Sprint v. Cequel*, 2020 WL 3048175, at *3-6.

Even the "impurity" limitations of the '066 and '901 patents do not impart any structural or functional differences to the claimed product of the '393 patent.  Ex. 1 ('066 patent), claim 1 (reciting "a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps . . . whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition"); Ex. 2 ('901 patent), claim 1 (reciting "[a] pharmaceutical batch consisting of treprostinil or a salt thereof and impurities resulting from [alkylation, hydrolysis, and salt formation]"); *see also Greenliant*, 692 F.3d at 1267-68.  Like claim 1 of the '393 patent, neither the '066 patent nor the '901 patent requires any specific impurity level or impurity profile that must exist in the claimed treprostinil product.[11]  Ex. 1 ('066 patent), claim 1; Ex. 2 ('901 patent), claim 1; Ex. 19 (Ruffolo Dep. Tr.), 123:6-24 ███████████ ████████████████████████████████████████████████ Ex. 32 ████████████ 34:2-47:24 ██████ Ex. 30 (Toste Dep. Tr.), 58:6-8 ███████████████████████ ████████████████████████████████████████ Thus, there is no material difference between the product of claim 1 of the '393 patent and the product of the '066 and '901 patents; collateral estoppel applies.  *E.g.*, *Ohio Willow Wood*, 735 F.3d at 1342-43.  In any event,

---

[11] The Reply Expert Report of Dr. F. Dean Toste ████████████████████████████████████ ████████████████████████████████████████████████████ *See* Ex. 31 (Toste Reply Report (Dec. 10, 2021)), ¶¶ 14-22.

the PTAB evaluated the two dependent claims of the '393 patent requiring a specific purity level, and found those claims invalid.  *See* Ex. 3 ('393 patent), claim 2 (reciting "wherein the purity of compound of formula I in said product is at least 99.5%"); *id.*, claim 10 (reciting "wherein the purity of product of step (d) is at least 99.5%"); Ex. 4 ('393 FWD) at 43 (finding that the prior art "necessarily discloses treprostinil having a purity of 99.5% or higher"), 54-55 (similar), 82 (similar).  And finally, the PTAB and Federal Circuit already held that UTC's arguments related to the impurity profile of the '393 patent's product, similar to arguments UTC will likely present here in opposition to Liquidia's motion, were unpersuasive and did not impart any structural or functional difference between the claimed product and the prior art.  *See* Ex. 4 ('393 FWD).  Therefore, the PTAB has already decided the issue of whether the specific purity level and specific impurity profile of the claimed product of the '393 patent (and the '066 and '901 patents) is invalid over the prior art.

UTC may further assert that the PTAB did not institute Liquidia's IPR petition of the '066 patent.  However, this creates no genuine factual dispute.  IPR proceedings are limited to arguments based on "prior art consisting of patents or printed publications" (35 U.S.C. § 311(b)), and thus Liquidia was not able to raise collateral estoppel before the PTAB.  Further, the PTAB has broad discretion to institute or deny IPR petitions, and a decision not to institute is preliminary—not final.  *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 273 (2016).

In sum, there is no genuine dispute of material fact that the '393, '066, and '901 patents claim the same treprostinil product, and that the PTAB and Federal Circuit have already found this product invalid over the prior art.

### 2.    The Invalidity Issue was Actually Litigated in *SteadyMed*

Under the second element of determining whether collateral estoppel applies, there is no genuine factual dispute that UTC actually litigated the validity of the product claimed by the '393

patent before the PTAB, resulting in a final written decision invalidating all claims.  *See* Ex. 4 ('393 FWD) at 2-3, 21-84; *e.g.*, *Karns*, 879 F.3d at 514 n.3.  In appealing the '393 FWD to the Federal Circuit, UTC cannot dispute that it had an opportunity to fully and fairly litigate this issue and cannot, in opposition here, contend the PTAB and Federal Circuit were incorrect.  *SteadyMed*, 702 F. App'x 990; *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 937 F.3d 1359, 1379 (Fed. Cir. 2019) ("Rules of preclusion assume the correctness of the prior judgment.") (applying collateral estoppel).

### 3.  *SteadyMed* was Determined by a Final and Valid Judgment

Under the third element, there is no genuine factual dispute that the Federal Circuit's affirmation of the '393 FWD, invalidating all 22 claims of the '393 patent, rendered the decision final and valid.  *E.g.*, *XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282, 1294 (Fed. Cir. 2018) (finding that Federal Circuit affirmation of a PTAB final judgment on a patent's invalidity "has an immediate issue-preclusive effect" on any pending action involving that patent).

### 4.  *SteadyMed*'s Invalidity Holding was Essential to the Judgment

Under the fourth and final element, there is no genuine factual dispute that the issue of the '393 patent's validity was essential to both the '393 FWD and its affirmation by the Federal Circuit.  Indeed, this was the only issue considered by the PTAB and the Federal Circuit.  *See generally* Ex. 4 ('393 FWD); *SteadyMed*, 702 F. App'x 990.

Accordingly, all four elements of the legal standard for collateral estoppel are satisfied, and the Court should enter summary judgment of invalidity of the product-by-process claims of the '066 and '901 patents.

**B.** **The Remaining Asserted Claims of the '066 and '901 Patent are Likewise Invalid due to Collateral Estoppel**

The three remaining Asserted Claims—process claim 8 of the '066 patent and process claims 6 and 8 of the '901 patent—are also invalid because the PTAB expressly found, and the Federal Circuit affirmed, that the "recited process steps [of the '393 patent claims] would have been obvious to a relevant skilled artisan." *See* Ex. 4 ('393 FWD) at 80. The PTAB reasoned that "the combination of Moriarty and Phares discloses . . . the process recited in the challenged product-by-process claims." *Id.* at 53; *see also id.* at 70 (further finding that "the combination of Moriarty, Phares, Kawakami, and Eğe discloses . . . the production of treprostinil diethanolamine salt through the performance of steps (a)-(d) recited in the challenged claims of the '393 patent"). There is no genuine dispute of material fact that the process claims of the '066 and '901 patents require the same process steps—alkylation, hydrolysis, and salt formation—as the invalidated claims of the '393 patent. *See* Ex. 1 ('066 patent), claim 8; Ex. 2 ('901 patent), claim 8; *cf.*, *e.g.*, Ex. 3 ('393 patent), claim 1; *see also* Ex. 2 ('901 patent), claim 6 (depending upon claim 1). Drs. Batra and Tuladhar ███████████████████████████████

█████████████████ Ex. 10 (Batra Dep. Tr.), 75:12-76:5, 79:12-81:8, 347:3-8; Ex. 11 (Tuladhar Dep. Tr.), 97:25-100:5, 107:1-109:23. The additional limitations regarding "storing . . . at ambient temperature" and "preparing . . . after storage" (*see* Ex. 1 ('066 patent), claim 8; Ex. 2 ('901 patent), claim 6) do not materially alter the question of invalidity because these claims are still "substantially similar to the invalidated claims"—all require the process steps of alkylation, hydrolysis, and salt formation. *E.g.*, *Allergan*, 681 F. App'x at 959-961; *see also Ohio Willow Wood*, 735 F.3d at 1342-43; *Soverain*, 778 F.3d at 1319-1320. Moreover, the "storage" limitation is an inherent property of the claimed product of the '066, '901, and '393 patents, as all three specifications expressly disclose, without any data or further explanation, that the "crude

treprostinil salts can be stored as raw material at ambient temperature. . . ." Ex. 1 ('066 patent), 17:33-34; Ex. 2 ('901 patent), 17:5-6; Ex. 3 ('393 patent), 17:33-34.  In fact, other than this single sentence regarding "storage," the '066, '901, and '393 patents provide no basis for storage capability other than the fact that a salt was made—the same salt claimed in all three patents.

Moreover, there is no dispute that the issue of validity of the process steps of the '393 patent was actually litigated before the PTAB and Federal Circuit, and that the Federal Circuit's affirmance of the '393 FWD is a final and valid judgment.  *See* Ex. 4 ('393 FWD) at 80 (explicitly holding that "recited process steps [of the '393 patent claims] would have been obvious to a relevant skilled artisan"); *cf.* Ex. 8 ('393 POR) at 45-47 (UTC arguing that the prior art combination does not disclose certain process steps and purity requirements recited in the challenged claims); *see also supra* § V.A.2-3.  Issues that are "actually litigated and decided" are considered "necessary" to the judgment for the purposes of collateral estoppel.  *E.g.*, *Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 255 (3d Cir. 2006) (following the "traditional view that independently sufficient alternative findings should be given preclusive effect").  As noted, there can be no question that the invalidity of the process steps was "actually litigated and decided" in *SteadyMed*; thus, this issue was essential to both decisions.  *E.g.*, *Karns*, 879 F.3d at 514 n.3.  The process claims of the '066 and '901 patents are therefore invalid due to collateral estoppel.  In turn, summary judgment of invalidity of all Asserted Claims is appropriate.

## VI.    CONCLUSION

For these reasons, Liquidia respectfully requests that the Court grant summary judgment of invalidity of claims 1-3, 6, and 8-9 of the '066 patent and claims 1-4, 6, and 8 of the '901 patent due to collateral estoppel.

OF COUNSEL:

Sanya Sukduang
Jonathan Davies
Douglas Cheek
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Lauren Krickl
Deepa Kannappan
Brittany Cazakoff
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: January 7, 2022

*/s/ Karen E. Keller*
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia Technologies, Inc.*

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on January 7, 2022, this document was served on

the persons listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Michael J. Flynn
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

Amy Mahan
MCDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
(617) 535-4000
amahan@mwe.com

William C. Jackson
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4216
wjackson@goodwinlaw.com

Bill Ward
BOIES SCHILLER FLEXNER LLP
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
(213) 995-5745
bward@bsfllp.com

Huiya Wu
Joel Broussard
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 459-7270
hwu@goodwinlaw.com
jbroussard@goodwinlaw.com

Adam W. Burrowbridge
Joshua Revilla
Timothy M. Dunker
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street
Washington, DC 20001-1531
(202) 756-8000
aburrowbridge@mwe.com
jrevilla@mwe.com
tdunker@mwe.com

Douglas H. Carsten
Art Dykhuis
Jiaxiao Zhang
Katherine Pappas
Mandy H. Kim
MCDEMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633
dcarsten@mwe.com
adykhuis@mwe.com
jiazhang@mwe.com
kpappas@mwe.com
mhkim@mwe.com

Harrison Gunn
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1064
hgunn@goodwinlaw.com

/s/ Karen E. Keller
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*
*Liquidia Technologies, Inc.*

# EXHIBIT 1

US009593066B2

(12) **United States Patent**
Batra et al.

(10) Patent No.: **US 9,593,066 B2**
(45) Date of Patent: *Mar. 14, 2017

(54) **PROCESS TO PREPARE TREPROSTINIL, THE ACTIVE INGREDIENT IN REMODULIN®**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Hitesh Batra**, Herndon, VA (US); **Sudersan M. Tuladhar**, Silver Spring, MD (US); **Raju Penmasta**, Herndon, VA (US); **David A. Walsh**, Palmyra, VA (US)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/849,981**

(22) Filed: **Sep. 10, 2015**

(65) **Prior Publication Data**

US 2015/0376106 A1        Dec. 31, 2015

**Related U.S. Application Data**

(60) Division of application No. 13/933,623, filed on Jul. 2, 2013, now Pat. No. 9,156,786, which is a continuation of application No. 13/548,446, filed on Jul. 13, 2012, now Pat. No. 8,497,393, which is a continuation of application No. 12/334,731, filed on Dec. 15, 2008, now Pat. No. 8,242,305.

(60) Provisional application No. 61/014,232, filed on Dec. 17, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| *C07C 59/72* | (2006.01) |
| *C07C 51/08* | (2006.01) |
| *C07C 51/41* | (2006.01) |
| *C07C 213/08* | (2006.01) |
| *C07C 405/00* | (2006.01) |
| *A01N 37/10* | (2006.01) |
| *C07C 39/12* | (2006.01) |
| *C07C 39/17* | (2006.01) |
| *C07C 59/60* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *C07C 59/72* (2013.01); *C07C 51/08* (2013.01); *C07C 51/41* (2013.01); *C07C 51/412* (2013.01); *C07C 213/08* (2013.01); *C07C 405/0075* (2013.01); *A01N 37/10* (2013.01); *C07C 39/12* (2013.01); *C07C 39/17* (2013.01); *C07C 59/60* (2013.01)

(58) **Field of Classification Search**
CPC ......... C07C 59/72; C07C 51/08; C07C 51/41; C07C 51/412; C07C 213/08; C07C 405/0075

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,703,544 | A | 11/1972 | Morozowich |
| 3,888,916 | A | 6/1975 | Sinkula |
| 4,306,075 | A | 12/1981 | Aristoff |
| 4,306,076 | A | 12/1981 | Nelson |
| 4,424,376 | A | 1/1984 | Moniot et al. |
| 4,434,164 | A | 2/1984 | Lombardino |
| 4,463,183 | A | 7/1984 | Haslanger |
| 4,486,598 | A | 12/1984 | Aristoff |
| 4,544,764 | A | 10/1985 | Aristoff |
| 4,668,814 | A | 5/1987 | Aristoff |
| 4,683,330 | A | 7/1987 | Aristoff |
| 5,153,222 | A | 10/1992 | Tadepalli et al. |
| 5,466,713 | A | 11/1995 | Blitstein-Willinger et al. |
| 5,506,265 | A | 4/1996 | Blitstein-Willinger |
| 6,054,486 | A | 4/2000 | Crow et al. |
| 6,441,245 | B1 | 8/2002 | Moriarty et al. |
| 6,521,212 | B1 | 2/2003 | Cloutier et al. |
| 6,528,688 | B2 | 3/2003 | Moriarty et al. |
| 6,700,025 | B2 | 3/2004 | Moriarty et al. |
| 6,706,283 | B1 | 3/2004 | Appel et al. |
| 6,756,033 | B2 | 6/2004 | Cloutier et al. |
| 6,765,117 | B2 | 7/2004 | Moriarty et al. |
| 6,803,386 | B2 | 10/2004 | Shorr et al. |
| 6,809,223 | B2 | 10/2004 | Moriarty et al. |
| 7,199,157 | B2 | 4/2007 | Wade et al. |
| 7,384,978 | B2 | 6/2008 | Phares et al. |
| 7,417,070 | B2 | 8/2008 | Phares et al. |
| 8,242,305 | B2 * | 8/2012 | Batra ...................... C07C 51/08 562/466 |
| 2001/0038855 | A1 | 11/2001 | Desjardin et al. |
| 2001/0056095 | A1 | 12/2001 | Mylari |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 101891596 | A | 11/2010 |
| CN | 101891715 | A | 11/2010 |

(Continued)

OTHER PUBLICATIONS

Alexander et al., "The Synthesis of Benzindene Prostacyclin Analogs as Potential Antiulcer Agents," Prostaglandins, 1986, 32(5):647-653.
Aristoff et al., "Synthesis and Structure-Activity Relationship of Novel Stable Prostacyclin Analogs," Advances in Prostaglandin, Thromboxane, and Leukotriene Research, Samuelsson et al., .Eds., 1983, 11:267-274.
Aristoff et al., "Synthesis of Benzopyran Prostaglandins, Potent Stable Prostacyclin Analogs, Via an Intramolecular Mistunobu Reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.

(Continued)

*Primary Examiner* — Yevgeny Valenrod
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

This present invention relates to an improved process to prepare prostacyclin derivatives. One embodiment provides for an improved process to convert benzindene triol to treprostinil via salts of treprostinil and to purify treprostinil.

**10 Claims, No Drawings**

## US 9,593,066 B2

Page 2

(56)                **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2002/0173672 | A1 | 11/2002 | Moriarty et al. |
| 2004/0176645 | A1 | 9/2004 | Moriarty et al. |
| 2005/0085540 | A1 | 4/2005 | Phares et al. |
| 2005/0101608 | A1 | 5/2005 | Santel |
| 2005/0165111 | A1 | 7/2005 | Wade et al. |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2005/0282903 | A1 | 12/2005 | Wade et al. |
| 2007/0078095 | A1 | 4/2007 | Phares et al. |
| 2007/0078182 | A1 | 4/2007 | Phares et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0249167 | A1 | 10/2008 | Phares et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2009/0163738 | A1 | 6/2009 | Batra et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 2 710 726 A1 | 1/2012 |
| EP | 0 004 335 A2 | 10/1979 |
| EP | 0 087 237 B1 | 5/1986 |
| EP | 0 175 450 B1 | 3/1989 |
| EP | 0 159 784 B1 | 6/1989 |
| EP | 0 496 548 A1 | 7/1992 |
| JP | 56-122328 A | 9/1981 |
| JP | 59-044340 A | 3/1984 |
| WO | WO 98/18452 A1 | 5/1998 |
| WO | WO 98/39337 A1 | 9/1998 |
| WO | WO 99/21830 A1 | 5/1999 |
| WO | WO 03/070163 A2 | 8/2003 |
| WO | WO 2005/007081 A2 | 1/2005 |
| WO | WO 2007/134292 A2 | 11/2007 |
| WO | WO 2008/100977 A2 | 8/2008 |
| WO | WO 2009/117095 A1 | 9/2009 |
| WO | WO 2012/009816 A1 | 1/2012 |

### OTHER PUBLICATIONS

Aristoff et al., "Total Synthesis of a Novel Antiulcer Agent via a Modification of the Intramolecular Wadsworth-Emons-Wittig Reaction," J. Am. Chem. Soc., 1985, 107:7967-7974.

Batra et al., "Crystallization Process Development for a Stable Polymorph of Treprostinil Diethanolamine (UT-15C) by Seeding," Organic Process Research & Development, 2009, 13:242-249.

Belch et al., "Randomized, Double-Bling, Placebo-Controlled Study Evaluating the Efficacy and Safety of AS-013, a Prostaglandin E1 Prodrug, in Patients with Intermittent Claudication," Circulation, May 6, 1997, 95(9):2298-2302.

Chemburkar et al., "Dealing with the Impact of Ritonavir Polymorphs on the Late Stages of Bulk Drug Process Development," Organic Process Research & Development, 2000, 4:413-417.

Chung et al., "Promoters for the (Alkyne)hexacarbonyldicobalt-Based Cyclopentenone Synthesis," Organometallics, 1993, 12:220-223.

Clark et al., "High-Performance Liquid Chromatographic Method for Determining the Enantiomeric Purity of a Benzindene Prostaglandin by a Diastereomeric Separation," Journal of Chromatography, 1987, 408:275-283.

Hardinger et al., "Triply-Convergent Syntheses of Two Homochiral Arene-Fused Prostacyclin Analogs Related to U68,215," Bioorganic & Medicinal Chemistry Letters, 1991, 1(1):79-82.

Hicks et al., "A Practical Titanium-Catalyzed Synthesis of Bicyclic Cyclopentenones and Allylic Amines," J. Org. Chem., 1996, 61:2713-2718.

Jeong et al., "Catalytic Version of the Intramolecular Pauson-Khand Reaction," J. Am. Chem. Soc., 1994, 116:3159-3160.

Khand et al., "Organocobalt Complexes. Part II. Reaction of Acetylenehexacarbonyl-dicobalt Complexes, $(R^1 C_2 R^2)Co_2 (CO)_6$, with Norbornene and its Derivatives," J. Chem. Soc., J.C.S. Perkin I., 1973, 977-981.

Mathre et al., "A Practical Enantioselective Synthesis of $\alpha,\alpha$-Diaryl-2-pyrrolidinemethanol. Preparation and Chemistry of the Corresponding Oxazaborolidines," J. Org. Chem., 1991, 56:751-762.

Moriarty et al., "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)," J. Org. Chem. 2004, 69, 1890-1902.

Mulzer et al., "Asymmetric Synthesis of Carbacyclin Precursors by Pauson-Khand Cyclization," Liebigs Ann. Chem., 1988, 891-897.

Nelson, Norman A., "Prostaglandin Nomenclature," J. Med. Chem., Sep. 1974, 17(9):911-918.

Pagenkopf et al., "Photochemical Promotion of the Intramolecular Pauson-Khand Reaction. A New Experimental Protocol for Cobalt-Catalyzed [2 + 2 + 1] Cycloadditions," J. Am. Chem. Soc., 1996, 118:2285-2286.

Pagenkopf, Brian L., "Substrate and Reagent Control of Diastereoselectivity in Transition Metal-Mediated Process: Development of a Catalytic Photo Promoted Pauson-Khand Reaction," Diss. Abstr. Int., 57(12)7535, 1977, Abstract.

Patterson et al., "Acute Hemodynamic Effects of the Prostacyclin Analog 15AU81 in Severe Congestive Heart Failure," Am. J. Cardio., 1995, 75:26A-33A.

Paulson, Peter L., "The Khand Reaction," Tetrahedron, 1985, 41(24):5855-5860.

Schore, Neil E., "Transition-Metal-Mediated Cycloaddition Reactions of Alkynes in Organic Synthesis," Chem. Rev., 1988, 88:1081-1119.

Shambayati et al., "N-Oxide Promjoted Pauson-Khand Cyclizations at Room Temperature," Tetrahedron Letters, 1990, 31(37):5289-5292.

Snell et al., "Investigating the Effect of Impurities on Macromolecule Crystal Growth in Microgravity," Crystal Growth & Design, 2001, 1(2):151-158.

Sorbera et al. "UT-15. Treatment of Pulmonary Hypertension Treatment of Peripheral Vascular Disease," Drug of the Future, 2001, 26(4), 364-374.

Takano et al., "Enantiodivergent Synthesis of Both Enantiomers of Sulcatol and Matsutake Alcohol from (R)-Epichlorohydrin," Chemistry Letters, 1987, 2017-2020.

Viedma, Cristobal, "Selective Chiral Symmetry Breaking during Crystallization: Parity Violation of Cryptochiral Environment in Control?" Crystal Growth & Design, 2007, 7(3):553-556.

Whittle et al., "Antithrombotic Assessment and Clinical Potential of Prostacyclin Analogues," Progress in Medicinal Chemistry, Ellis et al. Eds., 1984, Chapter 6, vol. 21, 238-279.

Zhang et al., "A Nickel(0)-Catalyzed Process for the Transformation of Enynes to Bicyclic Cyclopentenones," J. Org. Chem., 1996, 61:4498-4499.

Steadymed Ltd., v. United Therapeutics Corporation, Petition for Inter Partes Review of U.S. Pat. No. 8,497,393, under 37 CFR 42.100, dated Oct. 1, 2015, with Exhibits 1009, 1010, 1017 and 1018.

Ege, S., Organic Chemistry Second Edition, 1989, 541-547.

Schoffstall et al., Microscale and Miniscale Organic Chemistry Laboratory Experiments, 2nd. Ed., 2004, 200-202.

Wiberg, Kenneth, Laboratory Technique in Organic Chemistry, 1960, 112.

Bighley et al., "Salt Forms of Drugs and Absorption," Encyclopedia of Pharmaceutical Technology, Swarbrick et al., Eds., 1995, 13:453-499.

Simonneau et al., "Continuous Subcutaneous Infusion of Treprostinil, a Prostacyclin Analogue in Patients with Pulmonary Arterial Hypertension," Am. J. Respir. Crit. Care Med., 2002, 165:800-804.

Redacted Petitioner's Reply to Patent Owner's Response to Petition filed on Sep. 27, 2016 in Steadymed Ltd. (Petitioner), v. United Therapeutics Corporation (Patent Owner), Case IPR2016-00006, U.S. Pat. No. 8,497,393, with Exhibits 1022-1028.

Petitioner's Demonstratives filed Nov. 28, 2016, in Steadymed Ltd. (Petitioner), v. United Therapeutics Corporation (Patent Owner), Case IPR2016-00006, U.S. Pat. No. 8,497,393.

UTC_LIQ00254176

## US 9,593,066 B2

Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

Patent Owner Response to Petition filed Nov. 23, 2016, in *Steadymed Ltd.* (*Petitioner*), v. *United Therapeutics Corporation* (*Patent Owner*), Case IPR2016-00006, U.S. Pat. No. 8,497,393, with Redacted Exhibits 2006, 2020, 2022, 2058 and 2059 filed Nov. 23, 2016, 1151 pages.
Patent Owner Demonstratives filed Nov. 23, 2016, in *Steadymed Ltd.* (*Petitioner*), v. *United Therapeutics Corporation* (*Patent Owner*), Case IPR2016-00006, U.S. Pat. No. 8,497,393, 62 pages.
Decision Redacted Institute of *Inter Partes* Review dated Nov. 23, 2016, in *Steadymed Ltd.* (*Petitioner*), v. *United Therapeutics Corporation* (*Patent Owner*), Case IPR2016-00006, U.S. Pat. No. 8,497,393, 53 pages.
Service Third Party Submission dated Oct. 16, 2016, filed but not entered in U.S. Appl. No. 14/849,981 on Oct. 16, 2016, with 6 indicated attachments, 822 pages.
Redacted Defendant Sandoz Inc.'s Invalidity Contentions dated Feb. 5, 2015, *United Therapeutics Corporation* (Plaintiff) v. *Sandoz Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:14-cv-5499(PGH)(LHG), 90 pages.
Defendant Sandoz Inc.'s Invalidity Contention Chartss dated Feb. 5, 2015, *United Therapeutics Corporation* (Plaintiff) v. *Sandoz Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:14-cv-5499(PGH)(LHG), 189 pages.
Defendant Actavis Laboratories FL, Inc. Preliminary Invalidity Contentions, dated Aug. 30, 2016, *United Therapeutics Corporation, and Supemus Pharmaceuticals, Inc.*, (Plaintiff) v. *Actavis Laboratories FL, Inc.*, (Defendant), In The United States District Court for the Distric of New Jersey, Civil Action No. 3:16-cv-01816-PGS-LHG, Civil Action No. 3:16-cv-03642-PGS-LHG, 330 pages, (see particularly pp. 18-20, 42-62 and 269-280).
Exhibit G, Invalidity Claim Chart for the '393 patent, Jan. 12, 2015, 66 pages.
Defendant Teva Pharmaceuticals USA, Inc.'s Amended Non-Infringement and Invalidity Contentions, dated Apr. 24, 2015, *United Therapeutics Corporation* (Plaintiff) v. *Teva Pharmaceuticals USA, Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:14-cv-05498(PGS)(LHG), 94 pages, (see particularly pp. 22-54).
Arumugan et al., "A New Purification Process for Pharmaceutical and Chemical Industries," Organic Process Research & Development, 2005, 9:319-320.

Burk et al., "An Enantioselective Synthesis of (S)-(+)-3-Aminomethyl-5-methylhexanoic Acid via Asymmetric Hydrogenation," J. Org. Chem., 2003, 68:5731-5734.
Eliel et al., Stereochemistry of Organic Compounds, 1994, 322-325.
Harwood et al., Experimental organic chemistry: Principles and Practice, 1989, 127-134.
Jones, Maitland Jr., Organic Chemistry, 2nd Ed., 2000, 153-155.
Lin et al., "Benzindene Prostaglandins. Synthesis of Optically Pure 15-Deoxy-U-68,215 and Its Enantiomer via a Modified Intramolecular Wadsworth-Emmons-Wittig Reaction," J. Org. Chem., 1987, 52:5594-5601.
McManus et al., "Tetrazole Analogs of Plant Auxins," J. Org. Chem., 1959, 24:1464-1467.
Monson, Richard S., Advanced Organic Synthesis, Methods and Techniques, 1971, 178-188.
Ohno et al., "Development of Dual-Acting Benzofurans for Thromboxane A2 Receptor Antagonist and Prostacyclin Receptor Agonist: Synthesis, Structure-Activity Relationship, and Evaluation of Benzofuran Derivatives," J. Med. Chem., 2005, 48:5279-5294.
Olmsted III et al., Chemistry, The Molecular Science, Mosby-Year Book, Inc., Chapter 10 "Effects of Intermolecular Forces," 1994, 428-486.
Pavia et al., Introduction to Organic Laboratory Techniques, First Edition, 1998, 648.
Physicians' Desk Reference, 59 Edition, 2005, for Bicillin® L-A (penicillin G benzathine suspension), 5 pages.
Priscinzano et al., "Piperidine Analogues of 1-[2-[Bis(4-fluorophenyl)methoxy]ethyl]-4-(3-phenylpropyl)piperazine (GBR 12909): High Affinity Ligands for the Dopamine Transporter," J. Med. Chem., 2002, 45:4371-4374.
Remodulin® label, 2014, 17 pages.
Schoffstall, et al., Microscale and Miniscale Organic Chemistry Laboratory Experiments, 2004, 2nd Ed., 200-202.
Sorrell, Thomas N., Organic Chemistry, 1999, 755-758.
Wiberg, Laboratory Technique in Organic Chemistry, 1960, 112.
Yu et al., "Novel Synthetic Route of a Pivotal Intermediate for the Synthesis of 1β-Methyl Carbapenem Antibiotics," Organic Process Research & Development, 2006,10:829-832.
Redacted Defendant Watson Laboratories, Inc.'s Invalidity Contentions dated Dec. 11, 2015, *United Therapeutics Corporation* (Plaintiff) v. *Watson Laboratories, Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:15-cv-05723-PGS-LHG, 35 pages.

* cited by examiner

UTC_LIQ00254177

US 9,593,066 B2

**1**

# PROCESS TO PREPARE TREPROSTINIL, THE ACTIVE INGREDIENT IN REMODULIN®

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a Divisional of U.S. application Ser. No. 13/933,623, filed Jul. 2, 2013, which is a Continuation of U.S. application Ser. No. 13/548,446, filed Jul. 13, 2012, which is a Continuation of U.S. application Ser. No. 12/334, 731, filed Dec. 15, 2008, which claims priority from U.S. Provisional Patent Application 61/014,232, filed Dec. 17, 2007, the entire contents of which are incorporated herein by reference.

## BACKGROUND

The present invention relates to a process for producing prostacyclin derivatives and novel intermediate compounds useful in the process.

Prostacyclin derivatives are useful pharmaceutical compounds possessing activities such as platelet aggregation inhibition, gastric secretion reduction, lesion inhibition, and bronchodilation.

Treprostinil, the active ingredient in Remodulin®, was first described in U.S. Pat. No. 4,306,075. Treprostinil, and other prostacyclin derivatives have been prepared as described in Moriarty, et al in *J. Org. Chem.* 2004, 69, 1890-1902, *Drug of the Future,* 2001, 26(4), 364-374, U.S. Pat. Nos. 6,441,245, 6,528,688, 6,765,117 and 6,809,223. Their teachings are incorporated by reference to show how to practice the embodiments of the present invention.

U.S. Pat. No. 5,153,222 describes use of treprostinil for treatment of pulmonary hypertension. Treprostinil is approved for the intravenous as well as subcutaneous route, the latter avoiding septic events associated with continuous intravenous catheters. U.S. Pat. Nos. 6,521,212 and 6,756, 033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions. U.S. Pat. No. 6,803,386 discloses administration of treprostinil for treating cancer such as lung, liver, brain, pancreatic, kidney, prostate, breast, colon and head-neck cancer. U.S. patent application publication No. 2005/0165111 discloses treprostinil treatment of ischemic lesions. U.S. Pat. No. 7,199,157 discloses that treprostinil treatment improves kidney functions. U.S. patent application publication No. 2005/0282903 discloses treprostinil treatment of neuropathic foot ulcers. U.S. application Ser. No. 12/028,471 filed Feb. 8, 2008, discloses treprostinil treatment of pulmonary fibrosis. U.S. Pat. No. 6,054,486 discloses treatment of peripheral vascular disease with treprostinil. U.S. patent application Ser. No. 11/873,645 filed Oct. 17, 2007 discloses combination therapies comprising treprostinil. U.S. publication No. 2008/ 0200449 discloses delivery of treprostinil using a metered dose inhaler. U.S. publication No. 2008/0280986 discloses treatment of interstitial lung disease with treprostinil. U.S. application Ser. No. 12/028,471 filed Feb. 8, 2008 discloses treatment of asthma with treprostinil. U.S. Pat. Nos. 7,417, 070, 7,384,978 and U.S. publication Nos. 2007/0078095, 2005/0282901, and 2008/0249167 describe oral formulations of treprostinil and other prostacyclin analogs.

Because Treprostinil, and other prostacyclin derivatives are of great importance from a medicinal point of view, a

**2**

need exists for an efficient process to synthesize these compounds on a large scale suitable for commercial production.

## SUMMARY

The present invention provides in one embodiment a process for the preparation of a compound of formula I, hydrate, solvate, prodrug, or pharmaceutically acceptable salt thereof.



(I)

The process comprises the following steps:

(a) alkylating a compound of structure II with an alkylating agent to produce a compound of formula III,



(II)



(III)

wherein

w=1, 2, or 3;

$Y_1$ is trans—CH═CH—, cis-CH═CH—, —$CH_2(CH_2)_m$—, or —C≡C—; m is 1, 2, or 3;

$R_7$ 1 S

(1) —$C_pH_{2p}$—$CH_3$, wherein p is an integer from 1 to 5, inclusive,

(2) phenoxy optionally substituted by one, two or three chloro, fluoro, trifluoromethyl, ($C_1$-$C_3$)alkyl, or ($C_1$-$C_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl, with the proviso that $R_7$ is phenoxy or substituted phenoxy, only when $R_3$ and $R_4$ are hydrogen or methyl, being the same or different,

(3) phenyl, benzyl, phenylethyl, or phenylpropyl optionally substituted on the aromatic ring by one, two or three chloro, fluoro, trifluoromethyl, ($C_1$-$C_3$)alkyl, or ($C_1$-$C_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl,

(4) cis-CH═CH—$CH_2$—$CH_3$,

(5) —$(CH_2)_2$—CH(OH)—$CH_3$, or

(6) —$(CH_2)_3$—CH═C($CH_3$)$_2$;

UTC_LIQ00254178

US 9,593,066 B2

**3**

wherein —C($L_1$)-$R_2$ taken together is

(1) ($C_4$-$C_7$)cycloalkyl optionally substituted by 1 to 3 ($C_1$-$C_5$)alkyl;

(2) 2-(2-furyl)ethyl,

(3) 2-(3-thienyl)ethoxy, or

(4) 3-thienyloxymethyl;

$M_1$ is α-OH:β-$R_5$ or α-$R_5$:β-OH or α-$OR_2$:β-$R_5$ or α-$R_5$: β-$OR_2$, wherein $R_5$ is hydrogen or methyl, $R_2$ is an alcohol protecting group, and

$L_1$ is α-$R_3$:β-$R_4$, α-$R_4$:β-$R_3$, or a mixture of α-$R_3$:β-$R_4$ and α-$R_4$:β-$R_3$, wherein $R_3$ and $R_4$ are hydrogen, methyl, or fluoro, being the same or different, with the proviso that one of $R_3$ and $R_4$ are fluoro only when the other is hydrogen or fluoro.

(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula $I_s$,



$(I_s)$

(d) reacting the salt from step (c) with an acid to form the compound of formula I.

The present invention provides in another embodiment a process for the preparation of a compound of formula IV.



$(IV)$

The process comprises the following steps:

(a) alkylating a compound of structure V with an alkylating agent to produce a compound of formula VI,



$(V)$

**4**

-continued



$(VI)$

(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula $IV_s$, and



$(IV_s)$

(d) reacting the salt from step (b) with an acid to form the compound of formula IV.

DETAILED DESCRIPTION

The various terms used, separately and in combinations, in the processes herein described are defined below.

The expression "comprising" means "including but not limited to." Thus, other non-mentioned substances, additives, carriers, or steps may be present. Unless otherwise specified, "a" or "an" means one or more.

$C_{1-3}$-alkyl is a straight or branched alkyl group containing 1-3 carbon atoms. Exemplary alkyl groups include methyl, ethyl, n-propyl, and isopropyl.

$C_{1-3}$-alkoxy is a straight or branched alkoxy group containing 1-3 carbon atoms. Exemplary alkoxy groups include methoxy, ethoxy, propoxy, and isopropoxy.

$C_{4-7}$-cycloalkyl is an optionally substituted monocyclic, bicyclic or tricyclic alkyl group containing between 4-7 carbon atoms. Exemplary cycloalkyl groups include but not limited to cyclobutyl, cyclopentyl, cyclohexyl, and cycloheptyl.

Combinations of substituents and variables envisioned by this invention are only those that result in the formation of stable compounds. The term "stable", as used herein, refers to compounds which possess stability sufficient to allow manufacture and which maintains the integrity of the compound for a sufficient period of time to be useful for the purposes detailed herein.

As used herein, the term "prodrug" means a derivative of a compound that can hydrolyze, oxidize, or otherwise react under biological conditions (in vitro or in vivo) to provide an active compound. Examples of prodrugs include, but are not

UTC_LIQ00254179

US 9,593,066 B2

5

limited to, derivatives of a compound that include biohydrolyzable groups such as biohydrolyzable amides, biohydrolyzable esters, biohydrolyzable carbamates, biohydrolyzable carbonates, biohydrolyzable ureides, and biohydrolyzable phosphate analogues (e.g., monophosphate, diphosphate or triphosphate).

As used herein, "hydrate" is a form of a compound wherein water molecules are combined in a certain ratio as an integral part of the structure complex of the compound.

As used herein, "solvate" is a form of a compound where solvent molecules are combined in a certain ratio as an integral part of the structure complex of the compound.

"Pharmaceutically acceptable" means in the present description being useful in preparing a pharmaceutical composition that is generally safe, non-toxic and neither biologically nor otherwise undesirable and includes being useful for veterinary use as well as human pharmaceutical use.

"Pharmaceutically acceptable salts" mean salts which are pharmaceutically acceptable, as defined above, and which possess the desired pharmacological activity. Such salts include acid addition salts formed with organic and inorganic acids, such as hydrogen chloride, hydrogen bromide, hydrogen iodide, sulfuric acid, phosphoric acid, acetic acid, glycolic acid, maleic acid, malonic acid, oxalic acid, methanesulfonic acid, trifluoroacetic acid, fumaric acid, succinic acid, tartaric acid, citric acid, benzoic acid, ascorbic acid and the like. Base addition salts may be formed with organic and inorganic bases, such as sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, choline and the like. Included in the invention are pharmaceutically acceptable salts or compounds of any of the formulae herein.

Depending on its structure, the phrase "pharmaceutically acceptable salt," as used herein, refers to a pharmaceutically acceptable organic or inorganic acid or base salt of a compound. Representative pharmaceutically acceptable salts include, e.g., alkali metal salts, alkali earth salts, ammonium salts, water-soluble and water-insoluble salts, such as the acetate, amsonate (4,4-diaminostilbene-2,2-disulfonate), benzenesulfonate, benzonate, bicarbonate, bisulfate, bitartrate, borate, bromide, butyrate, calcium, calcium edetate, camsylate, carbonate, chloride, citrate, clavulariate, dihydrochloride, edetate, edisylate, estolate, esylate, fumarate, gluceptate, gluconate, glutamate, glycollylarsanilate, hexafluorophosphate, hexylresorcinate, hydrabamine, hydrobromide, hydrochloride, hydroxynaphthoate, iodide, isothionate, lactate, lactobionate, laurate, malate, maleate, mandelate, mesylate, methylbromide, methylnitrate, methylsulfate, mucate, napsylate, nitrate, N-methylglucamine ammonium salt, 3-hydroxy-2-naphthoate, oleate, oxalate, palmitate, pamoate (1,1-methene-bis-2-hydroxy-3-naphthoate, einbonate), pantothenate, phosphate/diphosphate, picrate, polygalacturonate, propionate, p-toluenesulfonate, salicylate, stearate, subacetate, succinate, sulfate, sulfosalicylate, suramate, tannate, tartrate, teoclate, tosylate, triethiodide, and valerate salts.

The present invention provides for a process for producing treprostinil and other prostacyclin derivatives and novel intermediate compounds useful in the process. The process according to the present invention provides advantages on large-scale synthesis over the existing method. For example, the purification by column chromatography is eliminated, thus the required amount of flammable solvents and waste generated are greatly reduced. Furthermore, the salt formation is a much easier operation than column chromatography. Moreover, it was found that the product of the process according to the present invention has higher purity. There-

6

fore the present invention provides for a process that is more economical, safer, faster, greener, easier to operate, and provides higher purity.

One embodiment of the present invention is a process for the preparation of a compound of formula I, or a hydrate, solvate, prodrug, or pharmaceutically acceptable salt thereof.



(I)

The process comprises the following steps:

(a) alkylating a compound of formula II with an alkylating agent to produce a compound of formula III,



(II)



(III)

wherein
w=1, 2, or 3;
$Y_1$ is trans-CH=CH—, cis-CH=CH—, —CH$_2$(CH$_2$)$_m$—, or —C≡C—; m is 1, 2, or 3;
$R_7$ is
(1) —C$_p$H$_{2p}$—CH$_3$, wherein p is an integer from 1 to 5, inclusive,
(2) phenoxy optionally substituted by one, two or three chloro, fluoro, trifluoromethyl, (C$_1$-C$_3$)alkyl, or (C$_1$-C$_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl, with the proviso that $R_7$ is phenoxy or substituted phenoxy, only when $R_3$ and $R_4$ are hydrogen or methyl, being the same or different,
(3) phenyl, benzyl, phenylethyl, or phenylpropyl optionally substituted on the aromatic ring by one, two or three chloro, fluoro, trifluoromethyl, (C$_1$-C$_3$)alkyl, or (C$_1$-C$_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl,
(4) cis-CH=CH—CH$_2$—CH$_3$,
(5) —(CH$_2$)$_2$—CH(OH)—CH$_3$, or
(6) —(CH$_2$)$_3$—CH=C(CH$_3$)$_2$;
wherein —C(L$_1$)-R$_2$ taken together is
(1) (C$_4$-C$_7$)cycloalkyl optionally substituted by 1 to 3 (C$_1$-C$_5$)alkyl;

UTC_LIQ00254180

US 9,593,066 B2

**7**

(2) 2-(2-furyl)ethyl,

(3) 2-(3-thienyl)ethoxy, or

(4) 3-thienyloxymethyl;

$M_1$ is α-OH:β-$R_5$ or α-$R_5$:β-OH or α-$OR_2$:β-$R_5$ or α-$R_5$: β-$OR_2$, wherein $R_5$ is hydrogen or methyl, $R_2$ is an alcohol protecting group, and

$L_1$ is α-$R_3$:β-$R_4$, α-$R_4$:β-$R_3$, or a mixture of α-$R_3$:β-$R_4$ and α-$R_4$:β-$R_3$, wherein $R_3$ and $R_4$ are hydrogen, methyl, or fluoro, being the same or different, with the proviso that one of $R_3$ and $R_4$ is fluoro only when the other is hydrogen or fluoro.

(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula $I_s$



(I_s)

(d) reacting the salt from step (c) with an acid to form the compound of formula I.

In one embodiment, the compound of formula I is at least 90.0%, 95.0%, 99.0%.

The compound of formula II can be prepared from a compound of formula XI, which is a cyclization product of a compound of formula X as described in U.S. Pat. No. 6,441,245.



(X)



(XI)

Wherein n is 0, 1, 2, or 3.

The compound of formula II can be prepared alternatively from a compound of formula XIII, which is a cyclization product of a compound of formula XII as described in U.S. Pat. No. 6,700,025.

**8**



(XII)



(XIII)

One embodiment of the present invention is a process for the preparation of a compound having formula IV, or a hydrate, solvate, or pharmaceutically acceptable salt thereof.



(IV)

The process comprises

(a) alkylating a compound of structure V with an alkylating agent such as ClCH$_2$CN to produce a compound of formula VI,



(V)



(VI)

UTC_LIQ00254181

US 9,593,066 B2

**9**

(b) hydrolyzing the product of step (a) with a base such as KOH,

(c) contacting the product of step (b) with a base B such as diethanolamine to for a salt of the following structure, and



(d) reacting the salt from step (b) with an acid such as HCl to form the compound of formula IV.

In one embodiment, the purity of compound of formula IV is at least 90.0%, 95.0%, 99.0%, 99.5%.

In one embodiment, the process further comprises a step of isolating the salt of formula $IV_s$.

In one embodiment, the base B in step (c) may be ammonia, N-methylglucamine, procaine, tromethanine, magnesium, L-lysine, L-arginine, or triethanolamine.

The following abbreviations are used in the description and/or appended claims, and they have the following meanings:

"MW" means molecular weight.

"Eq." means equivalent.

"TLC" means thin layer chromatography.

"HPLC" means high performance liquid chromatography.

"PMA" means phosphomolybdic acid.

"AUC" means area under curve.

In view of the foregoing considerations, and specific examples below, those who are skilled in the art will appreciate that how to select necessary reagents and solvents in practicing the present invention.

The invention will now be described in reference to the following Examples. These examples are not to be regarded as limiting the scope of the present invention, but shall only serve in an illustrative manner.

EXAMPLES

Example 1

Alkylation of Benzindene Triol



**10**

-continued



| Name | MW | Amount | Mol. | Eq. |
|---|---|---|---|---|
| Benzindene Triol | 332.48 | 1250 g | 3.76 | 1.00 |
| $K_2CO_3$ (powder) | 138.20 | 1296 g | 9.38 | 2.50 |
| ClCH$_2$CN | 75.50 | 567 g | 7.51 | 2.0 |
| Bu$_4$NBr | 322.37 | 36 g | 0.11 | 0.03 |
| Acetone | — | 29 L | — | — |
| Celite ®545 | — | 115 g | — | — |

A 50-L, three-neck, round-bottom flask equipped with a mechanical stirrer and a thermocouple was charged with benzindene triol (1250 g), acetone (19 L) and $K_2CO_3$ (powdered) (1296 g), chloroacetonitrile (567 g), tetrabutylammonium bromide (36 g). The reaction mixture was stirred vigorously at room temperature (23±2° C.) for 16-72 h. The progress of the reaction was monitored by TLC. (methanol/CH$_2$Cl$_2$; 1:9 and developed by 10% ethanolic solution of PMA). After completion of reaction, the reaction mixture was filtered with/without Celite pad. The filter cake was washed with acetone (10 L). The filtrate was concentrated in vacuo at 50-55° C. to give a light-brown, viscous liquid benzindene nitrile. The crude benzindene nitrile was used as such in the next step without further purification.

Example 2

Hydrolysis of Benzindene Nitrile



$\xrightarrow[\text{H}_2\text{O, Reflux}]{\text{KOH, MeOH}}$

UTC_LIQ00254182

US 9,593,066 B2

| 11 | | | | |
|---|---|---|---|---|
| Name | MW | Amount | Mol. | Eq. |
| Benzindene Nitrile | 371.52 | 1397 g* | 3.76 | 1.0 |
| KOH | 56.11 | 844 g | 15.04 | 4.0 |
| Methanol | — | 12 L | — | — |
| Water | — | 4.25 L | — | — |

*Note: This weight is based on 100% yield from the previous step. This is not isolated yield.

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with a solution of benzindene nitrile in methanol (12 L) and a solution of KOH (844 g of KOH dissolved in 4.25 L of water). The reaction mixture was stirred and heated to reflux (temperature 72.2° C.). The progress of the reaction was monitored by TLC (for TLC purpose, 1-2 mL of reaction mixture was acidified with 3M HCl to pH 1-2 and extracted with ethyl acetate. The ethyl acetate extract was used for TLC; Eluent: methanol/CH₂Cl₂; 1:9, and developed by 10% ethanolic solution of PMA). After completion of the reaction (~5 h), the reaction mixture was cooled to −5 to 10° C. and quenched with a solution of hydrochloric acid (3M, 3.1 L) while stirring. The reaction mixture was concentrated in vacuo at 50-55° C. to obtain approximately 12-14 L of condensate. The condensate was discarded.

The aqueous layer was diluted with water (7-8 L) and extracted with ethyl acetate (2×6 L) to remove impurities soluble in ethyl acetate. To aqueous layer, ethyl acetate (22 L) was added and the pH of reaction mixture was adjusted to 1-2 by adding 3M HCl (1.7 L) with stirring. The organic layer was separated and the aqueous layer was extracted with ethyl acetate (2×11 L). The combined organic layers were washed with water (3×10 L) and followed by washing with a solution of NaHCO₃ (30 g of NaHCO₃ dissolved in 12 L of water). The organic layer was further washed with saturated solution of NaCl (3372 g of NaCl dissolved in water (12 L)) and dried over anhydrous Na₂SO₄ (950-1000 g), once filtered.

The filtrate was transferred into a 72-L reactor equipped with mechanical stirrer, a condenser, and a thermocouple. To the solution of treprostinil in reactor was added activated carbon (110-130 g). The suspension was heated to reflux (temperature 68-70° C.) for at least one hour. For filtration, a pad of Celite® 545 (300-600 g) was prepared in sintered glass funnel using ethyl acetate. The hot suspension was filtered through the pad of Celite® 545. The Celite® 545 was washed with ethyl acetate until no compound was seen on TLC of the washings.

The filtrate (pale-yellow) was reduced to volume of 35-40 L by evaporation in vacuo at 50-55° C. for direct use in next step.

Example 3

Conversion of Treprostinil to Treprostinil Diethanolamine Salt (1:1)



-continued

(I) EtOH, EtOAc
(II) Heptane Slurry

| | | | | |
|---|---|---|---|---|
| Name | MW | Amount | Mol | Eq |
| Treprostinil | 390.52 | 1464 g* | 3.75 | 1.0 |
| Diethanolamine | 105.14 | 435 g | 4.14 | 1.1 |
| Ethanol | — | 5.1 L | — | — |
| Ethyl acetate | — | 35 L** | — | — |
| Treprostinil Diethanolamine Salt (seed) | — | 12 g | — | — |

*Note: This weight is based on 100% yield from benzindene triol. It is not isolated yield. The treprostinil was carried from previous step in ethyl acetate solution and used as such for this step.
**Note: The total volume of ethyl acetate should be in range of 35-36 L (it should be 7 times the volume of ethanol used). Approximately 35 L of ethyl acetate was carried over from previous step and additional 1.0 L of ethyl acetate was used for rinsing the flask.

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with a solution of treprostinil in ethyl acetate (35-40 L from the previous step), anhydrous ethanol (5.1 L) and diethanolamine (435 g). While stirring, the reaction mixture was heated to 60-75° C., for 0.5-1.0 h to obtain a clear solution. The clear solution was cooled to 55±5° C. At this temperature, the seed of polymorph B of treprostinil diethanolamine salt (~12 g) was added to the clear solution. The suspension of polymorph B was stirred at this temperature for 1 h. The suspension was cooled to 20±2° C. overnight (over a period of 16-24 h). The treprostinil diethanolamine salt was collected by filtration using Aurora filter equipped with filter cloth, and the solid was washed with ethyl acetate (2×8 L). The treprostinil diethanolamine salt was transferred to a HDPE/glass container for air-drying in hood, followed by drying in a vacuum oven at 50±5° C. under high vacuum.

At this stage, if melting point of the treprostinil diethanolamine salt is more than 104° C., it was considered polymorph B. There is no need of recrystallization. If it is less than 104° C., it is recrystallized in EtOH-EtOAc to increase the melting point.

Data on Treprostinil Diethanolamine Salt (1:1)

| Batch No. | Wt. of Benzindene Triol (g) | Wt. of Treprostinil Diethanolamine Salt (1:1) (g) | Yield (%) | Melting point (° C.) |
|---|---|---|---|---|
| 1 | 1250 | 1640 | 88.00 | 104.3-106.3 |
| 2 | 1250 | 1528 | 82.00* | 105.5-107.2 |

US 9,593,066 B2

| 13 | | | | 14 |

-continued

Example 5

| Batch No. | Wt. of Benzindene Triol (g) | Wt. of Treprostinil Diethanolamine Salt (1:1) (g) | Yield (%) | Melting point (° C.) |
|---|---|---|---|---|
| 3 | 1250 | 1499 | 80.42** | 104.7-106.6 |
| 4 | 1236 | 1572 | 85.34 | 105-108 |

*Note: In this batch, approximately 1200 mL of ethyl acetate solution of treprostinil before carbon treatment was removed for R&D carbon treatment experiments.

**Note: This batch was recrystallized, for this reason yield was lower.

### Example 4

### Heptane Slurry of Treprostinil Diethanolamine Salt (1:1)

| Name | Batch No. | Amount | Ratio |
|---|---|---|---|
| Treprostinil Diethanolamine Salt | 1 | 3168 g | 1 |
| Heptane | — | 37.5 L | 12 |
| Treprostinil Diethanolamine Salt | 2 | 3071 g | 1 |
| Heptane | — | 36.0 L | 12 |

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with slurry of treprostinil diethanolamine salt in heptane (35-40 L). The suspension was heated to 70-80° C. for 16-24 h. The suspension was cooled to 22±2° C. over a period of 1-2 h. The salt was collected by filtration using Aurora filter. The cake was washed with heptane (15-30 L) and the material was dried in Aurora filter for 1 h. The salt was transferred to trays for air-drying overnight in hood until a constant weight of treprostinil diethanolamine salt was obtained. The material was dried in oven under high vacuum for 2-4 h at 50-55° C.

Analytical data on and Treprostinil Diethanolamine Salt (1:1)

| Test | Batch 1 | Batch 2 |
|---|---|---|
| IR | Conforms | Conforms |
| Residue on Ignition (ROI) | <0.1% w/w | <0.1% w/w |
| Water content | 0.1% w/w | 0.0% w/w |
| Melting point | 105.0-106.5° C. | 104.5-105.5° C. |
| Specific rotation [α]$^{25}_{589}$ | +34.6° | +35° |
| Organic volatile impurities | | |
| Ethanol | Not detected | Not detected |
| Ethyl acetate | Not detected | <0.05% w/w |
| Heptane | <0.05% w/w | <0.05% w/w |
| HPLC (Assay) | 100.4% | 99.8% |
| Diethanolamine | Positive | Positive |

### Example 5

### Conversion of Treprostinil Diethanolamine Salt (1:1) to Treprostinil



A 250-mL, round-bottom flask equipped with magnetic stirrer was charged with treprostinil diethanolamine salt (4 g) and water (40 mL). The mixture was stirred to obtain a clear solution. To the clear solution, ethyl acetate (100 mL) was added. While stirring, 3M HCl (3.2 mL) was added slowly until pH~1 was attained. The mixture was stirred for 10 minutes and organic layer was separated. The aqueous layer was extracted with ethyl acetate (2×100 mL). The combined organic layers was washed with water (2×100 mL), brine (1×50 mL) and dried over anhydrous Na$_2$SO$_4$. The ethyl acetate solution of treprostinil was filtered and the filtrate was concentrated under vacuum at 50° C. to give off-white solid. The crude treprostinil was recrystallized from 50% ethanol in water (70 mL). The pure treprostinil was collected in a Buchner funnel by filtration and cake was washed with cold 20% ethanolic solution in water. The cake of treprostinil was air-dried overnight and further dried in a vacuum oven at 50° C. under high vacuum to afford 2.9 g of treprostinil (Yield 91.4%, purity (HPLC, AUC, 99.8%).

Analytical Data on Treprostinil from Treprostinil Diethanolamine Salt (1:1) to Treprostinil

| Batch No. | Yield | Purity (HPLC) |
|---|---|---|
| 1 | 91.0% | 99.8% (AUC) |
| 2 | 92.0% | 99.9% (AUC) |
| 3 | 93.1% | 99.7% (AUC) |
| 4 | 93.3% | 99.7% (AUC) |
| 5 | 99.0% | 99.8% (AUC) |
| 6 | 94.6% | 99.8% (AUC) |

US 9,593,066 B2

15      16

Example 6

Comparison of the Former Process and a Working Example of the Process According to the Present Invention

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| | | Nitrile | |
| 1 | Triol weight | 500 g | 5,000 g |
| 2 | Acetone | 20 L (1:40 wt/wt) | 75 L (1:15 wt/wt) |
| 3 | Potassium carbonate | 1,300 g (6.4 eq) | 5,200 g (2.5 eq) |
| 4 | Chloroacetonitrile | 470 g (4.2 eq) | 2,270 g (2 eq) |
| 5 | Tetrabutylammonium bromide | 42 g (0.08 eq) | 145 g (0.03 eq) |
| 6 | Reactor size | 72-Liter | 50-gallon |
| 7 | Reflux time | 8 hours | No heating, Room temperature (r.t.) 45 h |
| 8 | Hexanes addition before filtration | Yes (10 L) | No |
| 9 | Filter | Celite | Celite |
| 10 | Washing | Ethyl acetate (10 L) | Acetone (50 L) |
| 11 | Evaporation | Yes | Yes |
| 12 | Purification | Silica gel column Dichloromethane: 0.5 L Ethyl acetate: 45 L Hexane: 60 L | No column |
| 13 | Evaporation after column | Yes | No |
| 14 | Yield of nitrile | 109-112% | Not checked |
| | | Treprostinil (intermediate) | |
| 15 | Methanol | 7.6 L (50-L reactor) | 50 L (50-gal reactor) |
| 16 | Potassium hydroxide | 650 g (8 eq) | 3,375g (4 eq) |
| 17 | Water | 2.2 L | 17 L |
| 18 | % of KOH | 30% | 20% |
| 19 | Reflux time | 3-3.5 h | 4-5 h |
| 20 | Acid used | 2.6 L (3M) | 12 L (3M) |
| 21 | Removal of impurities | 3 × 3 L Ethyl acetate | 2 × 20 L Ethyl acetate |
| 22 | Acidification | 0.7 L | 6.5 L |
| 23 | Ethyl acetate extraction | 5 × 17 L = 35 L | 90 + 45 + 45 = 180 L |
| 24 | Water washing | 2 × 8 L | 3 × 40 L |
| 25 | Sodium bicarbonate washing | Not done | 120 g in 30 L water + 15 L brine |
| 26 | Brine washing | Not done | 1 × 40 L |
| 27 | Sodium sulfate | 1 kg | Not done |
| 28 | Sodium sulfate filtration | Before charcoal, 6 L ethyl acetate | N/A |
| 29 | Charcoal | 170 g, reflux for 1.5 h, filter over Celite, 11 L ethyl acetate | Pass hot solution (75° C.) through charcoal cartridge and clean filter, 70 L ethyl acetate |
| 30 | Evaporation | Yes, to get solid intermediate treprostinil | Yes, adjust to 150 L solution |
| | | Treprostinil Diethanolamine Salt | |
| 31 | Salt formation | Not done | 1,744 g diethanolamine, 20 L ethanol at 60-75° C. |
| 32 | Cooling | N/A | To 20° C. over weekend; add 40 L ethyl acetate; cooled to 10° C. |
| 33 | Filtration | N/A | Wash with 70 L ethyl acetate |
| 34 | Drying | N/A | Air-dried to constant wt., 2 days |
| | | Treprostinil (from 1.5 kg Treprostinil diethanolamine salt) | |
| 35 | Hydrolysis | N/A | 15 L water + 25 L ethyl acetate + HCl |
| 36 | Extraction | N/A | 2 × 10 L ethyl acetate |
| 37 | Water wash | N/A | 3 × 10 L |

US 9,593,066 B2

17

18

-continued

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| 38 | Brine wash | N/A | 1 × 10 L |
| 39 | Sodium sulfate | N/A | 1 kg, stir |
| 40 | Filter | N/A | Wash with 6 L ethyl acetate |
| 41 | Evaporation | N/A | To get solid, intermediate Treprostinil |
| 42 | Crude drying on tray | 1 or 3 days | Same |
| 43 | Ethanol & water for cryst. | 5.1 L + 5.1 L | 10.2 L + 10.2 L (same %) |
| 44 | Crystallization in | 20-L rotavap flask | 50-L jacketed reactor |
| 45 | Temperature of crystallization | 2 h r.t., fridge –0° C. 24 h | 50° C. to 0° C. ramp, 0° C. overnight |
| 46 | Filtration | Buchner funnel | Aurora filter |
| 47 | Washing | 20% (10 L) cooled ethanol-water | 20% (20 L) cooled ethanol-water |
| 48 | Drying before oven | Buchner funnel (20 h) Tray (no) | Aurora filter (2.5 h) Tray (4 days) |
| 49 | Oven drying | 15 hours, 55° C. | 6-15 hours, 55° C. |
| 50 | Vacuum | <~0.095 mPA | <5 Torr |
| 51 | UT-15 yield weight | ~535 g | ~1,100 g |
| 52 | % yield (from triol) | ~91% | ~89% |
| 53 | Purity | ~99.0% | 99.9% |

The quality of treprostinil produced according to this invention is excellent. The purification of benzindene nitrile by column chromatography is eliminated. The impurities carried over from intermediate steps (i.e. alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step. Additional advantages of this process are: (a) crude treprostinil salts can be stored as raw material at ambient temperature and can be converted to treprostinil by simple acidification with diluted hydrochloric acid, and (b) the treprostinil salts can be synthesized from the solution of treprostinil without isolation. This process provides better quality of final product as well as saves significant amount of solvents and manpower in purification of intermediates.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

**1.** A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps, forming a salt of treprostinil by combining the starting batch and a base, isolating the treprostinil salt, and preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and wherein said alkylation is alkylation of benzindene triol.

**2.** The pharmaceutical composition of claim **1**, wherein the salt is isolated in crystalline form.

**3.** The pharmaceutical composition of claim **1**, wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline.

**4.** The pharmaceutical composition of claim **3**, wherein the base is diethanolamine.

**5.** The pharmaceutical composition of claim **1**, wherein the base is combined with treprostinil that has not been previously isolated.

**6.** The pharmaceutical composition of claim **1**, wherein the isolated salt is stored at ambient temperature.

**7.** The pharmaceutical composition of claim **1**, which is a pharmaceutical solution.

**8.** A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising alkylating a triol intermediate of the formula:



hydrolyzing the resulting compound to form treprostinil, forming a salt of treprostinil stable at ambient temperature, storing the treprostinil salt at ambient temperature, and preparing a pharmaceutical product from the treprostinil salt after storage, wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.

**9.** A pharmaceutical product prepared by the process of claim **8**.

**10.** The process as claimed in claim **8**, wherein forming the salt of treprostinil stable at ambient temperature is performed by adding diethanolamine to treprostinil.

* * * * *

UTC_LIQ00254186

# EXHIBIT 2

US009604901B2

(12) **United States Patent**
   Batra et al.

(10) Patent No.: **US 9,604,901 B2**
(45) Date of Patent:   *Mar. 28, 2017

(54) **PROCESS TO PREPARE TREPROSTINIL, THE ACTIVE INGREDIENT IN REMODULIN®**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Hitesh Batra**, Herndon, VA (US); **Sudersan M. Tuladhar**, Silver Spring, MD (US); **Raju Penmasta**, Herndon, VA (US); **David A. Walsh**, Palmyra, VA (US)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/754,932**

(22) Filed: **Jun. 30, 2015**

(65) **Prior Publication Data**

US 2015/0299091 A1   Oct. 22, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/933,623, filed on Jul. 2, 2013, which is a continuation of application No. 13/548,446, filed on Jul. 13, 2012, now Pat. No. 8,497,393, which is a continuation of application No. 12/334,731, filed on Dec. 15, 2008, now Pat. No. 8,242,305.

(60) Provisional application No. 61/014,232, filed on Dec. 17, 2007.

(51) **Int. Cl.**
| | |
|---|---|
| *C07C 59/72* | (2006.01) |
| *C07C 51/08* | (2006.01) |
| *C07C 51/41* | (2006.01) |
| *C07C 213/08* | (2006.01) |
| *C07C 405/00* | (2006.01) |
| *A01N 37/10* | (2006.01) |
| *C07C 39/12* | (2006.01) |
| *C07C 39/17* | (2006.01) |
| *C07C 59/60* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *C07C 59/72* (2013.01); *C07C 51/08* (2013.01); *C07C 51/41* (2013.01); *C07C 51/412* (2013.01); *C07C 213/08* (2013.01); *C07C 405/0075* (2013.01); *A01N 37/10* (2013.01); *C07C 39/12* (2013.01); *C07C 39/17* (2013.01); *C07C 59/60* (2013.01)

(58) **Field of Classification Search**
CPC ......... C07C 59/72; C07C 51/08; C07C 51/41; C07C 51/412; C07C 213/08; C07C 405/0075
USPC ........................................................ 562/466
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,703,544 | A | 11/1972 | Morozowich |
| 3,888,916 | A | 6/1975 | Sinkula |
| 4,306,075 | A | 12/1981 | Aristoff |
| 4,306,076 | A | 12/1981 | Nelson |
| 4,424,376 | A | 1/1984 | Moniot et al. |
| 4,434,164 | A | 2/1984 | Lombardino |
| 4,463,183 | A | 7/1984 | Haslanger |
| 4,486,598 | A | 12/1984 | Aristoff |
| 4,544,764 | A | 10/1985 | Aristoff |
| 4,668,814 | A | 5/1987 | Aristoff |
| 4,683,330 | A | 7/1987 | Aristoff |
| 5,153,222 | A | 10/1992 | Tadepalli et al. |
| 5,466,713 | A | 11/1995 | Blitstein-Willinger et al. |
| 5,506,265 | A | 4/1996 | Blitstein-Willinger |
| 6,054,486 | A | 4/2000 | Crow et al. |
| 6,441,245 | B1 | 8/2002 | Moriarty et al. |
| 6,521,212 | B1 | 2/2003 | Cloutier et al. |
| 6,528,688 | B2 | 3/2003 | Moriarty et al. |
| 6,700,025 | B2 | 3/2004 | Moriarty et al. |
| 6,706,283 | B1 | 3/2004 | Appel et al. |
| 6,756,033 | B2 | 6/2004 | Cloutier et al. |
| 6,765,117 | B2 | 7/2004 | Moriarty et al. |
| 6,803,386 | B2 | 10/2004 | Shorr et al. |
| 6,809,223 | B2 | 10/2004 | Moriarty et al. |
| 7,199,157 | B2 | 4/2007 | Wade et al. |
| 7,384,978 | B2 | 6/2008 | Phares et al. |
| 7,417,070 | B2 | 8/2008 | Phares et al. |
| 8,242,305 | B2 * | 8/2012 | Batra ...................... C07C 51/08 562/466 |
| 8,497,393 | B2 * | 7/2013 | Batra et al. .................. 562/466 |
| 2001/0038855 | A1 | 11/2001 | Desjardin et al. |
| 2001/0056095 | A1 | 12/2001 | Mylari |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2 710 726 A1 | 1/2012 |
| CN | 101891596 A | 11/2010 |

(Continued)

OTHER PUBLICATIONS

Alexander et al., "The Synthesis of Benzindene Prostacyclin Analogs as Potential Antiulcer Agents," Prostaglandins, 1986, 32(5):647-653.

(Continued)

*Primary Examiner* — Yevegeny Valenrod

(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

This present invention relates to an improved process to prepare prostacyclin derivatives. One embodiment provides for an improved process to convert benzindene triol to treprostinil via salts of treprostinil and to purify treprostinil.

**9 Claims, No Drawings**

LIQ02821340

**US 9,604,901 B2**

Page 2

## (56)          References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2002/0173672 | A1 | 11/2002 | Moriarty et al. |
| 2004/0176645 | A1 | 9/2004 | Moriarty et al. |
| 2005/0085540 | A1 | 4/2005 | Phares et al. |
| 2005/0101608 | A1 | 5/2005 | Santel |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2005/0282903 | A1 | 12/2005 | Wade et al. |
| 2007/0078095 | A1 | 4/2007 | Phares et al. |
| 2007/0078182 | A1 | 4/2007 | Phares et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0249167 | A1 | 10/2008 | Phares et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2009/0163738 | A1 | 6/2009 | Batra et al. |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 101891715 | A | 11/2010 |
| EP | 0 004 335 | A2 | 10/1979 |
| EP | 0 087 237 | B1 | 5/1986 |
| EP | 0 175 450 | B1 | 3/1989 |
| EP | 0 159 784 | B1 | 6/1989 |
| EP | 0 496 548 | A1 | 7/1992 |
| JP | 56-122328 | | 9/1981 |
| JP | 59-044340 | A | 3/1984 |
| WO | WO 98/18452 | A1 | 5/1998 |
| WO | WO 98/39337 | A1 | 9/1998 |
| WO | WO 99/21830 | A1 | 5/1999 |
| WO | WO 03/070163 | A2 | 8/2003 |
| WO | WO 2005/007081 | A2 * | 1/2005 ............. C07C 59/70 |
| WO | WO 2005007081 | A2 * | 1/2005 |
| WO | WO 2007/134292 | A2 | 11/2007 |
| WO | WO 2008/100977 | A2 | 8/2008 |
| WO | WO 2009/117095 | A1 | 9/2009 |
| WO | WO 2012/009816 | A1 | 1/2012 |

### OTHER PUBLICATIONS

Aristoff et al., "Synthesis and Structure-Activity Relationship of Novel Stable Prostacyclin Analogs," Advances in Prostaglandin, Thromboxane, and Leukotriene Research, Samuelsson et al., .Eds., 1983, 11:267-274.

Aristoff et al., "Synthesis of Benzopyran Prostaglandins, Potent Stable Prostacyclin Analogs, Via an Intramolecular Mistunobu Reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.

Aristoff et al., "Total Synthesis of a Novel Antiulcer Agent via a Modification of the Intramolecular Wadsworth-Emons-Witting Reaction," J. Am. Chem. Soc., 1985, 107:7967-7974.

Batra et al., "Crystallization Process Development for a Stable Polymorph of Treprostinil Diethanolamine (UT-15C) by Seeding," Organic Process Research & Development, 2009, 13:242-249.

Belch et al., "Randomized, Double-Blind, Placebo-Controlled Study Evaluating the Efficacy and Safety of AS-013, a Prostaglandin E1 Prodrug, in Patients with Intermittent Claudication," Circulation, May 6, 1997, 95(9):2298-2302.

Chemburkar et al., "Dealing with the Impact of Ritonavir Polymorphs on the Late Stages of Bulk Drug Process Development," Organic Process Research & Development, 2000, 4:413-417.

Chung et al., "Promoters for the (Alkyne)hexacarbonyldicobalt-Based Cyclopentenone Synthesis," Organometallics, 1993, 12:220-223.

Clark et al., "High-Performance Liquid Chromatographic Method for Determining the Enantiomeric Purity of a Benzindene Prostaglandin by a Diastereomeric Separation," Journal of Chromatography, 1987, 408:275-282.

Hardinger et al., "Triply-Convergent Syntheses of Two Homochiral Arene-Fused Cyclopentanoic Analogs Related to U68,215," Bioorganic & Medicinal Chemistry Letters, 1991, 1(1):79-82.

Hicks et al., "A Practical Titanium-Catalyzed Synthesis of Bicyclic Cyclopentenones and Allylic Amines," J. Org. Chem., 1996, 61:2713-2718.

Jeong et al., "Catalytic Version of the Intramolecular Pauson-Khand Reaction," J. Am. Chem. Soc., 1994, 116:3159-3160.

Khand et al., "Organocobalt Complexes. Part II. Reaction of Acetylenehexacarbonyl-dicobalt Complexes, $(R^1C_2R^2)Co_2(CO)_6$, with Norbornene and its Derivatives," J. Chem. Soc., J.C.S. Perkin I., 1973, 977-981.

Mathre et al., "A Practical Enantioselective Synthesis of α,α-Diaryl-2-pyrrolidinemethanol. Preparation and Chemistry of the Corresponding Oxazaborolidines," J. Org. Chem., 1991, 56:751-762.

Moriarty et al., "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)," J. Org. Chem. 2004, 69, 1890-1902.

Mulzer et al., "Asymmetric Synthesis of Carbacyclin Precursors by Pauson-Khand Cyclization," Liebigs Ann. Chem., 1988, 891-897.

Nelson, Norman A., "Prostaglandin Nomenclature," J. Med. Chem., Sep. 1974, 17(9):911-918.

Pagenkopf et al., "Photochemical Promotion of the Intramolecular Pauson-Khand Reaction. A New Experimental Protocol for Cobalt-Catalyzed [2 + 2 + 1] Cycloadditions," J. Am. Chem. Soc., 1996, 118:2285-2286.

Pagenkopf, Brian L., "Substrate and Reagent Control of Diastereoselectivity in Transition Metal-Mediated Process: Development of a Catalytic Photo Promoted Pauson-Khand Reaction," Diss. Abstr. Int., 57(12):7535, 1977, Abstract.

Patterson et al., "Acute Hemodynamic Effects of the Prostacyclin Analog 15AU81 in Severe Congestive Heart Failure," Am. J. Cardio., 1995, 75:26A-33A.

Paulson, Peter L., "The Khand Reaction," Tetrahedron, 1985, 41(24):5855-5860.

Schore, Neil E., "Transition-Metal-Mediated Cycloaddition Reactions of Alkynes in Organic Synthesis," Chem. Rev., 1988, 88:1081-1119.

Shamayati et al., "N-Oxide Promjoted Pauson-Khand Cyclization at Room Temperature," Tetrahedron Letters, 1990, 31(37):5289-5292.

Snell et al., "Investigating the Effect of Impurities on Marcomolecule Crystal Growth in Microgavity," Crystal Growth & Design, 2001, 1(2):151-158.

Sorbera et al. "UT-15. Treatment of Pulmonary Hypertension Treatment of Peripheral Vascular Disease," Drug of the Future, 2001, 26(4), 364-374.

Takano et al., "Enantiodivergent Synthesis of Both Enantiomers of Sulcatol and Matsutake Alcohol from (R)-Epichlorohydrin," Chemistry Letters, 1987, 2017-2020.

Viedma, Cristobal, "Selective Chiral Symmetry Breaking during Crystallization: Parity Violation of Cryptochiral Environment in Control?" Crystal Growth & Design, 2007, 7(3):553-556.

Whittle et al., "Antithrombotic Assessment and Clinical Potential of Prostacyclin Analogues," Progess in Medicinal Chemistry, Ellis et al. Eds., 1984, Chapter 6, vol. 21, 238-279.

Zhang et al., "A Nickel(0)-Catalyzed Process for the Transformation of Enynes to Bicyclic Cyclopentenones," J. Org. Chem., 1996, 61:4498-4499.

Steadymed Ltd., v. United Therapeutics Corporation, Petition for Inter Partes Review of U.S. Pat. No. 8,497,393, under 37 CFR 42.100, dated Oct. 1, 2015, with Exhibits 1009, 1010, 1017 and 1018.

Ege, S., Organic Chemistry Second Edition, 1989, 541-547.

Schoffstall et al., Microscale and Miniscale Organic Chemistry Laboratory Experiments, 2nd. Ed., 2004, 200-202.

Wiberg, Kenneth, Laboratory Technique in Organic Chemistry, 1960, 112.

Redacted Petitioner's Reply to Patent Owner's Response to Petition filed on Sep. 27, 2016 in Steadymed Ltd. (Petitioner), v. United Therapeutics Corporation (Patent Owner), Case IPR2016-00006, U.S. Pat. No. 8,497,393, with Exhibits 1022-1028.

Bighley et al., "Salt Forms of Drugs and Absorption," Encyclopedia of Pharmaceutical Technology, Swarbrick et al., Eds., 1995, 13:453-499.

## US 9,604,901 B2

Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

Simonneau et al., "Continuous Subcutaneous Infusion of Treprostinil, a Prostacyclin Analogue, in Patients with Pulmonary Arterial Hypertension," Am. J. Respir. Crit. Care Med., 2002, 165:800-804.

Petitioner's Demonstratives filed Nov. 28, 2016, in *Steadymed Ltd.* (Petitioner), v. *United Therapeutics Corporation* (Patent Owner), Case IPR2016-00006, U.S. Pat. No. 8,497,393.

Patent Owner Response to Petition filed Nov. 23, 2016, in *Steadymed Ltd.* (Petitioner), v. *United Therapeutics Corporation* (Patent Owner), Case IPR2016-00006, U.S. Pat. No. 8,497,393, with Redacted Exhibits 2006, 2020, 2022, 2058 and 2059 filed Nov. 23, 2016, 1151 pages.

Patent Owner Demonstratives filed Nov. 23, 2016, in *Steadymed Ltd.* (Petitioner), v. *United Therapeutics Corporation* (Patent Owner), Case IPR2016-00006, U.S. Pat. No. 8,497,393, 62 pages.

Decision Redacted Institute of Inter Partes Review dated Nov. 23, 2016, in *Steadymed Ltd.* (Petitioner), v. *United Therapeutics Corporation* (Patent Owner), Case IPR2016-00006, U.S. Pat. No. 8,497,393, 53 pages.

Service copy of Third Party Submission dated Oct. 16, 2016 filed but not entered in U.S. Appl. No. 14/754,932 on Oct. 16, 2016, with 6 indicated attachments, 822 pages.

Redacted Defendant Sandoz Inc.'s Invalidity Contentions dated Feb. 5, 2015, *United Therapeutics Corporation* (Plantiff) v. *Sandoz Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:14-cv-5499(PGH)(LHG), 90 pages.

Defendant Sandoz Inc.'s Invalidity Contention Charts dated Feb. 5, 2015, *United Therapeutics Corporation* (Plantiff) v. *Sandoz Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:14-cv-5499(PGH)(LHG), 189 pages.

Defendant Actavis Laboratories FL, Inc. Preliminary Invalidity Contentions, dated Aug. 30, 2016, *United Therapeutics Corporationg, and Supernus Pharmaceuticals, Inc.,* (Plantiff) v. *Actavis Laboratories FL, Inc.,* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:16-cv-01816-PGS-LHG, Civil Action No. 3:16-cv-03642-PGS-LHG, 330 pages, (see particularly pp. 18-20, 42-62 and 269-280). Exhibit G, Invalidity Claim Chart for the '393 patent, Jan. 12, 2015, 66 pages.

Defendant Teva Pharmaceuticals USA, Inc.'s Amended Non-Infringement and Invalidity Contentions, dated Apr. 24, 2015, *United Therapeutics Corporation* (Plantiff) v. *Teva Pharmaceuticals USA, Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:14-cv-05498(PGS)(LHG), 94 pages, (see particularly pp. 22-54).

Arumugan et al., "A New Purification Process for Pharmaceutical and Chemical Industries," Organic Process Research & Development, 2005, 9:319-320.

Burk et al., "An Enantioselective Synthesis of (S)-(+)-3-Aminomethyl-5-methylhexanoic Acide via Asymmetric Hydrogenation," J. Org. Chem., 2003, 68:5731-5734.

Eliel et al., Stereochemistry of Organic Compounds, 1994, 322-325.

Harwood et al., Experimental organic chemistry: Principles and Practice, 1989, 127-134.

Jones, Maitland Jr., Organic Chemistry, 2nd Ed., 2000, 153-155.

Lin et al., "Benzindene Prostaglandins. Synthesis of Optically Pure 15-Deoxy-U-68,215 and Its Enantiomer via a Modified Intramolecular Wadsworth-Emmons-Wittig Reaction," J. Org. Chem., 1987, 52:5594-5601.

McManus et al., "Tetrazole Analogs of Plant Auxims," J. Org, Chem., 1959, 24:1464-1467.

Monson, Richard S., Advanced Organic Synthesis, Methods and Techniques, 1971, 178-188.

Ohno et al., "Development of Dual-Acting Benzofurans for Thromboxane A2 Antagonist and Prostacyclin Receptor Agonist: Synthesis, Structure-Activity Relationship, and Evaluation of Benzofuran Derivatives," J. Med. Chem., 2005, 48:5279-5294.

Olmsted III et al., Chemistry, The Molecular Science, Mosby-Year Book, Inc., Chapter 10 "Effects of Intermolecular Forces," 1994, 428-486.

Pavia et al., Introduction to Organic Laboratory Techniques, First Edition, 1998, 648.

Physicians' Desk Reference, 59 Edition, 2005, for Bicillin® L-A (penicillin G benzathine suspension), 5 pages.

Priscinzano et al., "Piperidine Analogues of 1-[2-[Bis(4-fluorophenyl)methoxy]ethyl]-4-(3-phenylpropyl)piperazine (GBR 12909): High Affinity Ligands for the Dopamine Transporter," J. Med. Chem., 2002, 45:4371-4374.

Remodulin® label, 2014, 17 pages.

Schoffstall, et al., Microscale and Miniscale Oragnic Chemistry Laboratory Experiments, 2004, 2nd Ed., 200-202.

Sorrell, Thomas N., Organic Chemistry, 1999, 755-758.

Wiberg, Laboratory Technique in Organic Chemistry, 1960, 112.

Yu et al., "Novel Synthetic Route of a Pivotal Intermediate for the Synthesis of Iβ-Methyl Carbapenem Antibiotics," Organic Process Research & Development, 2006, 10:829-832.

Redacted Defendant Watson Laboratories Inc.'s Invalidity Contentions dated Dec. 11, 2015. *United Therapeutics Corporation* (Plantiff) v. *Watson Laboratories, Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:15-cv-05723-PGS-LHG, 35 pages.

* cited by examiner

US 9,604,901 B2

1

## PROCESS TO PREPARE TREPROSTINIL, THE ACTIVE INGREDIENT IN REMODULIN®

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a Continuation of U.S. application Ser. No. 13/933,623, filed Jul. 2, 2013, which is a Continuation of U.S. application Ser. No. 13/548,446, filed Jul. 13, 2012, which is a Continuation of U.S. application Ser. No. 12/334, 731, filed Dec. 15, 2008, which claims priority from U.S. Provisional Patent Application 61/014,232, filed Dec. 17, 2007, the entire contents of which are incorporated herein by reference.

### BACKGROUND

The present invention relates to a process for producing prostacyclin derivatives and novel intermediate compounds useful in the process.

Prostacyclin derivatives are useful pharmaceutical compounds possessing activities such as platelet aggregation inhibition, gastric secretion reduction, lesion inhibition, and bronchodilation.

Treprostinil, the active ingredient in Remodulin®, was first described in U.S. Pat. No. 4,306,075. Treprostinil, and other prostacyclin derivatives have been prepared as described in Moriarty, et al in *J. Org. Chem.* 2004, 69, 1890-1902, *Drug of the Future,* 2001, 26(4), 364-374, U.S. Pat. Nos. 6,441,245, 6,528,688, 6,765,117 and 6,809,223. Their teachings are incorporated by reference to show how to practice the embodiments of the present invention.

U.S. Pat. No. 5,153,222 describes use of treprostinil for treatment of pulmonary hypertension. Treprostinil is approved for the intravenous as well as subcutaneous route, the latter avoiding septic events associated with continuous intravenous catheters. U.S. Pat. Nos. 6,521,212 and 6,756, 033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions. U.S. Pat. No. 6,803,386 discloses administration of treprostinil for treating cancer such as lung, liver, brain, pancreatic, kidney, prostate, breast, colon and head-neck cancer. U.S. patent application publication No. 2005/0165111 discloses treprostinil treatment of ischemic lesions. U.S. Pat. No. 7,199,157 discloses that treprostinil treatment improves kidney functions. U.S. patent application publication No. 2005/0282903 discloses treprostinil treatment of neuropathic foot ulcers. U.S. application Ser. No. 12/028,471 filed Feb. 8, 2008, discloses treprostinil treatment of pulmonary fibrosis. U.S. Pat. No. 6,054,486 discloses treatment of peripheral vascular disease with treprostinil. U.S. patent application Ser. No. 11/873,645 filed Oct. 17, 2007 discloses combination therapies comprising treprostinil. U.S. publication No. 2008/0200449 discloses delivery of treprostinil using a metered dose inhaler. U.S. publication No. 2008/0280986 discloses treatment of interstitial lung disease with treprostinil. U.S. application Ser. No. 12/028,471 filed Feb. 8, 2008 discloses treatment of asthma with treprostinil. U.S. Pat. Nos. 7,417, 070, 7,384,978 and U.S. publication Nos. 2007/0078095, 2005/0282901, and 2008/0249167 describe oral formulations of treprostinil and other prostacyclin analogs.

Because Treprostinil, and other prostacyclin derivatives are of great importance from a medicinal point of view, a

2

need exists for an efficient process to synthesize these compounds on a large scale suitable for commercial production.

### SUMMARY

The present invention provides in one embodiment a process for the preparation of a compound of formula I, hydrate, solvate, prodrug, or pharmaceutically acceptable salt thereof.



(I)

The process comprises the following steps:

(a) alkylating a compound of structure II with an alkylating agent to produce a compound of formula III,



(III)



(II)

wherein

w=1, 2, or 3;

$Y_1$ is trans-CH=CH—, cis-CH=CH—, —CH$_2$ (CH$_2$)$_m$—, or —C=C—; m is 1, 2, or 3;

$R_7$ is

(1) —C$_p$H$_{2p}$—CH$_3$, wherein p is an integer from 1 to 5, inclusive,

(2) phenoxy optionally substituted by one, two or three chloro, fluoro, trifluoromethyl, (C$_1$-C$_3$) alkyl, or (C$_1$-C$_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl, with the proviso that $R_7$ is phenoxy or substituted phenoxy, only when $R_3$ and $R_4$ are hydrogen or methyl, being the same or different,

(3) phenyl, benzyl, phenylethyl, or phenylpropyl optionally substituted on the aromatic ring by one, two or three chloro, fluoro, trifluoromethyl, (C$_1$-C$_3$)alkyl, or (C$_1$-C$_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl,

LIQ02821343

US 9,604,901 B2

**3**

(4) cis-CH=CH—CH$_2$—CH$_3$,

(5) —(CH$_2$)$_2$—CH(OH)—CH$_3$, or

(6) —(CH$_2$)$_2$—C(CH$_3$)$_2$;

wherein —C(L$_1$)-R$_7$ taken together is

(1) (C$_4$-C$_7$)cycloalkyl optionally substituted by 1 to 3 (C$_1$-C$_5$)alkyl;

(2) 2-(2-furyl)ethyl,

(3) 2-(3-thienyl)ethoxy, or

(4) 3-thienyloxymethyl;

M$_1$ is α-OH:β-R$_5$ or α-R$_5$:β-OH or α-OR$_2$:β-R$_5$ or α-R$_5$: β-OR$_2$, wherein R$_5$ is hydrogen or methyl, R$_2$ is an alcohol protecting group, and

L$_1$ is α-R$_3$:β-R$_4$, α-R$_4$:β-R$_3$, or a mixture of α-R$_3$:β-R$_4$ and α-R$_4$:β-R$_3$, wherein R$_3$ and R$_4$ are hydrogen, methyl, or fluoro, being the same or different, with the proviso that one of R$_3$ and R$_4$ is fluoro only when the other is hydrogen or fluoro.

(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula I$_s$



(I$_s$)

(d) reacting the salt from step (c) with an acid to form the compound of formula I.

The present invention provides in another embodiment a process for the preparation of a compound of formula IV.



(IV)

The process comprises the following steps:

(a) alkylating a compound of structure V with an alkylating agent to produce a compound of formula VI,

**4**



(VI)



(V)

(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula IV$_s$, and



(IV$_s$)

(d) reacting the salt from step (b) with an acid to form the compound of formula IV.

## DETAILED DESCRIPTION

The various terms used, separately and in combinations, in the processes herein described are defined below.

The expression "comprising" means "including but not limited to." Thus, other non-mentioned substances, additives, carriers, or steps may be present. Unless otherwise specified, "a" or "an" means one or more.

C$_{1-3}$-alkyl is a straight or branched alkyl group containing 1-3 carbon atoms. Exemplary alkyl groups include methyl, ethyl, n-propyl, and isopropyl.

C$_{1-3}$-alkoxy is a straight or branched alkoxy group containing 1-3 carbon atoms. Exemplary alkoxy groups include methoxy, ethoxy, propoxy, and isopropoxy.

C$_{4-7}$-cycloalkyl is an optionally substituted monocyclic, bicyclic or tricyclic alkyl group containing between 4-7

LIQ02821344

US 9,604,901 B2

5

carbon atoms. Exemplary cycloalkyl groups include but not limited to cyclobutyl, cyclopentyl, cyclohexyl, and cycloheptyl.

Combinations of substituents and variables envisioned by this invention are only those that result in the formation of stable compounds. The term "stable", as used herein, refers to compounds which possess stability sufficient to allow manufacture and which maintains the integrity of the compound for a sufficient period of time to be useful for the purposes detailed herein.

As used herein, the term "prodrug" means a derivative of a compound that can hydrolyze, oxidize, or otherwise react under biological conditions (in vitro or in vivo) to provide an active compound. Examples of prodrugs include, but are not limited to, derivatives of a compound that include biohydrolyzable groups such as biohydrolyzable amides, biohydrolyzable esters, biohydrolyzable carbamates, biohydrolyzable carbonates, biohydrolyzable ureides, and biohydrolyzable phosphate analogues (e.g., monophosphate, diphosphate or triphosphate).

As used herein, "hydrate" is a form of a compound wherein water molecules are combined in a certain ratio as an integral part of the structure complex of the compound.

As used herein, "solvate" is a form of a compound where solvent molecules are combined in a certain ratio as an integral part of the structure complex of the compound.

"Pharmaceutically acceptable" means in the present description being useful in preparing a pharmaceutical composition that is generally safe, non-toxic and neither biologically nor otherwise undesirable and includes being useful for veterinary use as well as human pharmaceutical use.

"Pharmaceutically acceptable salts" mean salts which are pharmaceutically acceptable, as defined above, and which possess the desired pharmacological activity. Such salts include acid addition salts formed with organic and inorganic acids, such as hydrogen chloride, hydrogen bromide, hydrogen iodide, sulfuric acid, phosphoric acid, acetic acid, glycolic acid, maleic acid, malonic acid, oxalic acid, methanesulfonic acid, trifluoroacetic acid, fumaric acid, succinic acid, tartaric acid, citric acid, benzoic acid, ascorbic acid and the like. Base addition salts may be formed with organic and inorganic bases, such as sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, choline and the like. Included in the invention are pharmaceutically acceptable salts or compounds of any of the formulae herein.

Depending on its structure, the phrase "pharmaceutically acceptable salt," as used herein, refers to a pharmaceutically acceptable organic or inorganic acid or base salt of a compound. Representative pharmaceutically acceptable salts include, e.g., alkali metal salts, alkali earth salts, ammonium salts, water-soluble and water-insoluble salts, such as the acetate, amsonate (4,4-diaminostilbene-2,2-disulfonate), benzenesulfonate, benzoate, bicarbonate, bisulfate, bitartrate, borate, bromide, butyrate, calcium, calcium edetate, camsylate, carbonate, chloride, citrate, clavulariate, dihydrochloride, edetate, edisylate, estolate, esylate, fumarate, gluceptate, gluconate, glutamate, glycollylarsanilate, hexafluorophosphate, hexylresorcinate, hydrabamine, hydrobromide, hydrochloride, hydroxynaphthoate, iodide, isothionate, lactate, lactobionate, laurate, malate, maleate, mandelate, mesylate, methylbromide, methylnitrate, methylsulfate, mucate, napsylate, nitrate, N-methylglucamine ammonium salt, 3-hydroxy-2-naphthoate, oleate, oxalate, palmitate, pamoate (1,1-methene-bis-2-hydroxy-3-naphthoate, einbonate), pantothenate, phosphate/diphosphate, picrate, polygalacturonate, propionate, p-toluenesul-

6

fonate, salicylate, stearate, subacetate, succinate, sulfate, sulfosalicylate, suramate, tannate, tartrate, teoclate, tosylate, triethiodide, and valerate salts.

The present invention provides for a process for producing treprostinil and other prostacyclin derivatives and novel intermediate compounds useful in the process. The process according to the present invention provides advantages on large-scale synthesis over the existing method. For example, the purification by column chromatography is eliminated, thus the required amount of flammable solvents and waste generated are greatly reduced. Furthermore, the salt formation is a much easier operation than column chromatography. Moreover, it was found that the product of the process according to the present invention has higher purity. Therefore the present invention provides for a process that is more economical, safer, faster, greener, easier to operate, and provides higher purity.

One embodiment of the present invention is a process for the preparation of a compound of formula I, or a hydrate, solvate, prodrug, or pharmaceutically acceptable salt thereof

(I)



The process comprises the following steps:
(a) alkylating a compound of formula II with an alkylating agent to produce a compound of formula III,

(II)



(III)



wherein

w=1, 2, or 3;

$Y_1$ is trans-CH=CH—, cis-CH=CH—, —CH$_2$(CH$_2$)$_m$—, or —C≡C—; m is 1, 2, or 3;

$R_7$ is

(1) —C$_p$H$_{2p}$—CH$_3$, wherein p is an integer from 1 to 5, inclusive,

(2) phenoxy optionally substituted by one, two or three chloro, fluoro, trifluoromethyl, (C$_1$-C$_3$) alkyl, or (C$_1$-C$_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl, with the proviso that

LIQ02821345

US 9,604,901 B2

7

$R_7$ is phenoxy or substituted phenoxy, only when $R_3$ and $R_4$ are hydrogen or methyl, being the same or different,

(3) phenyl, benzyl, phenylethyl, or phenylpropyl optionally substituted on the aromatic ring by one, two or three chloro, fluoro, trifluoromethyl, $(C_1-C_3)$alkyl, or $(C_1-C_3)$alkoxy, with the proviso that not more than two substituents are other than alkyl,

(4) cis-CH=CH—$CH_2$—$CH_3$,

(5) —$(CH_2)_2$—CH(OH)—$CH_3$, or

(6) —$(CH_2)_3$—CH=C$(CH_3)_2$;

wherein —C($L_1$)-$R_7$ taken together is

(1) $(C_4-C_7)$cycloalkyl optionally substituted by 1 to 3 $(C_1-C_5)$alkyl;

(2) 2-(2-furyl)ethyl,

(3) 2-(3-thienyl)ethoxy, or

(4) 3-thienyloxymethyl;

$M_1$ is α-OH:β-$R_5$ or α-$R_5$:β-OH or α-O$R_2$:β-$R_5$ or α-$R_5$: β-O$R_2$, wherein $R_5$ is hydrogen or methyl, $R_2$ is an alcohol protecting group, and

$L_1$ is α-$R_3$:β-$R_4$, α-$R_4$:β-$R_3$, or a mixture of α-$R_3$:β-$R_4$ and α-$R_4$:β-$R_3$, wherein $R_3$ and $R_4$ are hydrogen, methyl, or fluoro, being the same or different, with the proviso that one of $R_3$ and $R_4$ are fluoro only when the other is hydrogen or fluoro.

(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula $I_s$



(I_s)

(d) reacting the salt from step (c) with an acid to form the compound of formula I.

In one embodiment, the compound of formula I is at least 90.0%, 95.0%, 99.0%.

The compound of formula II can be prepared from a compound of formula XI, which is a cyclization product of a compound of formula X as described in U.S. Pat. No. 6,441,245.



(XI)

8



(X)

Wherein n is 0, 1, 2, or 3.

The compound of formula II can be prepared alternatively from a compound of formula XIII, which is a cyclization product of a compound of formula XII as described in U.S. Pat. No. 6,700,025.



(XII)



(XIII)

One embodiment of the present invention is a process for the preparation of a compound having formula IV, or a hydrate, solvate, or pharmaceutically acceptable salt thereof.



(IV)

The process comprises

(a) alkylating a compound of structure V with an alkylating agent such as ClCH$_2$CN to produce a compound of formula VI,

LIQ02821346

US 9,604,901 B2

9

(VI)



(V)



(b) hydrolyzing the product of step (a) with a base such as KOH,

(c) contacting the product of step (b) with a base B such as diethanolamine to for a salt of the following structure, and



⊕ NH₂(CH₂CH₂OH)₂

(d) reacting the salt from step (b) with an acid such as HCl to form the compound of formula IV.

In one embodiment, the purity of compound of formula IV is at least 90.0%, 95.0%, 99.0%, 99.5%.

In one embodiment, the process further comprises a step of isolating the salt of formula $IV_s$.

In one embodiment, the base B in step (c) may be ammonia, N-methylglucamine, procaine, tromethanine, magnesium, L-lysine, L-arginine, or triethanolamine.

The following abbreviations are used in the description and/or appended claims, and they have the following meanings:

"MW" means molecular weight.

"Eq." means equivalent.

"TLC" means thin layer chromatography.

"HPLC" means high performance liquid chromatography.

"PMA" means phosphomolybdic acid.

"AUC" means area under curve.

In view of the foregoing considerations, and specific examples below, those who are skilled in the art will

10

appreciate that how to select necessary reagents and solvents in practicing the present invention.

The invention will now be described in reference to the following Examples. These examples are not to be regarded as limiting the scope of the present invention, but shall only serve in an illustrative manner.

Examples

Example 1

Alkylation of Benzindene Triol



$$\xrightarrow[\text{Acetone, RT}]{\text{K}_2\text{CO}_3, \text{Bu}_4\text{NBr}}$$



| Name | MW | Amount | | Mol. | Eq. |
|------|-----|--------|---|------|-----|
| Benzindene Triol | 332.48 | 1250 | g | 3.76 | 1.00 |
| K₂CO₃ (powder) | 138.20 | 1296 | g | 9.38 | 2.50 |
| ClCH₂CN | 75.50 | 567 | g | 7.51 | 2.0 |
| Bu₄NBr | 322.37 | 36 | g | 0.11 | 0.03 |
| Acetone | — | 29 | L | — | — |
| Celite ® 545 | — | 115 | g | — | — |

A 50-L, three-neck, round-bottom flask equipped with a mechanical stirrer and a thermocouple was charged with benzindene triol (1250 g), acetone (19 L) and K₂CO₃ (powdered) (1296 g), chloroacetonitrile (567 g), tetrabutylammonium bromide (36 g). The reaction mixture was stirred vigorously at room temperature (23±2° C.) for 16-72 h. The progress of the reaction was monitored by TLC. (methanol/CH₂Cl₂; 1:9 and developed by 10% ethanolic solution of PMA). After completion of reaction, the reaction mixture was filtered with/without Celite pad. The filter cake was washed with acetone (10 L). The filtrate was concentrated in vacuo at 50-55° C. to give a light-brown, viscous liquid benzindene nitrile. The crude benzindene nitrile was used as such in the next step without further purification.

US 9,604,901 B2

**11**

Example 2

Hydrolysis of Benzindene Nitrile



| Name | MW | Amount | Mol. | Eq. |
|---|---|---|---|---|
| Benzindene Nitrile | 371.52 | 1397 g* | 3.76 | 1.0 |
| KOH | 56.11 | 844 g | 15.04 | 4.0 |
| Methanol | — | 12 L | — | — |
| Water | — | 4.25 L | — | — |

*Note:
This weight is based on 100% yield from the previous step. This is not isolated yield.

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with a solution of benzindene nitrile in methanol (12 L) and a solution of KOH (844 g of KOH dissolved in 4.25 L of water). The reaction mixture was stirred and heated to reflux (temperature 72.2° C.). The progress of the reaction was monitored by TLC (for TLC purpose, 1-2 mL of reaction mixture was acidified with 3M HCl to pH 1-2 and extracted with ethyl acetate. The ethyl acetate extract was used for TLC; Eluent: methanol/$CH_2Cl_2$; 1:9, and developed by 10% ethanolic solution of PMA). After completion of the reaction (~5 h), the reaction mixture was cooled to −5 to 10° C. and quenched with a solution of hydrochloric acid (3M, 3.1 L) while stirring. The reaction mixture was concentrated in vacuo at 50-55° C. to obtain approximately 12-14 L of condensate. The condensate was discarded.

The aqueous layer was diluted with water (7-8 L) and extracted with ethyl acetate (2×6 L) to remove impurities soluble in ethyl acetate. To aqueous layer, ethyl acetate (22 L) was added and the pH of reaction mixture was adjusted to 1-2 by adding 3M HCl (1.7 L) with stirring. The organic layer was separated and the aqueous layer was extracted with ethyl acetate (2×11 L). The combined organic layers were washed with water (3×10 L) and followed by washing with a solution of $NaHCO_3$ (30 g of $NaHCO_3$ dissolved in 12 L of water). The organic layer was further washed with

**12**

saturated solution of NaCl (3372 g of NaCl dissolved in water (12 L)) and dried over anhydrous $Na_2SO_4$ (950-1000 g), once filtered.

The filtrate was transferred into a 72-L reactor equipped with mechanical stirrer, a condenser, and a thermocouple. To the solution of treprostinil in reactor was added activated carbon (110-130 g). The suspension was heated to reflux (temperature 68-70° C.) for at least one hour. For filtration, a pad of Celite®545 (300-600 g) was prepared in sintered glass funnel using ethyl acetate. The hot suspension was filtered through the pad of Celite®545. The Celite®545 was washed with ethyl acetate until no compound was seen on TLC of the washings.

The filtrate (pale-yellow) was reduced to volume of 35-40 L by evaporation in vacuo at 50-55° C. for direct use in next step.

Example 3

Conversion of Treprostinil to Treprostinil Diethanolamine Salt (1:1)



| Name | MW | Amount | Mol | Eq |
|---|---|---|---|---|
| Treprostinil | 390.52 | 1464 g* | 3.75 | 1.0 |
| Diethanolamine | 105.14 | 435 g | 4.14 | 1.1 |
| Ethanol | — | 5.1 L | — | — |
| Ethyl acetate | — | 35 L** | — | — |

US 9,604,901 B2

| 13 | | | |
|---|---|---|---|
| -continued | | | |

| Name | MW | Amount | Mol | Eq |
|---|---|---|---|---|
| Treprostinil Diethanolamine Salt (seed) | — | 12 g | — | — |

*Note:
This weight is based on 100% yield from benzidene triol. It is not isolated yield. The treprostinil was carried from previous step in ethyl acetate solution and used as such for this step.
**Note:
The total volume of ethyl acetate should be in range of 35-36 L (it should be 7 times the volume of ethanol used). Approximately 35 L of ethyl acetate was carried over from previous step and additional 1.0 L of ethyl acetate was used for rinsing the flask.

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with a solution of treprostinil in ethyl acetate (35-40 L from the previous step), anhydrous ethanol (5.1 L) and diethanolamine (435 g). While stirring, the reaction mixture was heated to 60-75° C., for 0.5-1.0 h to obtain a clear solution. The clear solution was cooled to 55±5° C. At this temperature, the seed of polymorph B of treprostinil diethanolamine salt (~12 g) was added to the clear solution. The suspension of polymorph B was stirred at this temperature for 1 h. The suspension was cooled to 20±2° C. overnight (over a period of 16-24 h). The treprostinil diethanolamine salt was collected by filtration using Aurora filter equipped with filter cloth, and the solid was washed with ethyl acetate (2×8 L). The treprostinil diethanolamine salt was transferred to a HDPE/glass container for air-drying in hood, followed by drying in a vacuum oven at 50±5° C. under high vacuum.

At this stage, if melting point of the treprostinil diethanolamine salt is more than 104° C., it was considered polymorph B. There is no need for recrystallization. If it is less than 104° C., it is recrystallized in EtOH-EtOAc to increase the melting point.

Data on Treprostinil Diethanolamine Salt (1:1)

| Batch No. | Wt. of Benzidene Triol (g) | Wt. of Treprostinil Diethanolamine Salt (1:1) (g) | Yield (%) | Melting point (° C.) |
|---|---|---|---|---|
| 1 | 1250 | 1640 | 88.00 | 104.3-106.3 |
| 2 | 1250 | 1528 | 82.00* | 105.5-107.2 |
| 3 | 1250 | 1499 | 80.42** | 104.7-106.6 |
| 4 | 1236 | 1572 | 85.34 | 105-108 |

*Note:
In this batch, approximately 1200 mL of ethyl acetate solution of treprostinil before carbon treatment was removed for R&D carbon treatment experiments.
**Note:
This batch was recrystallized, for this reason yield was lower.

## Example 4

Heptane Slurry of Treprostinil Diethanolamine Salt (1:1)

| Name | Batch No. | Amount | Ratio |
|---|---|---|---|
| Treprostinil Diethanolamine Salt | 1 | 3168 g | 1 |
| Heptane | — | 37.5 L | 12 |
| Treprostinil Diethanolamine Salt | 2 | 3071 g | 1 |
| Heptane | — | 36.0 L | 12 |

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a

14

thermocouple was charged with slurry of treprostinil diethanolamine salt in heptane (35-40 L). The suspension was heated to 70-80° C. for 16-24 h. The suspension was cooled to 22±2° C. over a period of 1-2 h. The salt was collected by filtration using Aurora filter. The cake was washed with heptane (15-30 L) and the material was dried in Aurora filter for 1 h. The material was transferred to trays for air-drying overnight in hood until a constant weight of treprostinil diethanolamine salt was obtained. The material was dried in oven under high vacuum for 2-4 h at 50-55° C.

Analytical Data on and Treprostinil Diethanolamine Salt (1:1)

| Test | Batch 1 | Batch 2 |
|---|---|---|
| IR | Conforms | Conforms |
| Residue on Ignition (ROI) | <0.1% w/w | <0.1% w/w |
| Water content | 0.1% w/w | 0.0% w/w |
| Melting point | 105.0-106.5° C. | 104.5-105.5° C. |
| Specific rotation $[\alpha]^{25}_{589}$ | +34.6° | +35° |
| Organic volatile impurities | | |
| Ethanol | Not detected | Not detected |
| Ethyl acetate | Not detected | <0.05% w/w |
| Heptane | <0.05% w/w | <0.05% w/w |
| HPLC (Assay) | 100.4% | 99.8% |
| Diethanolamine | Positive | Positive |

## Example 5

Conversion of Treprostinil Diethanolamine Salt (1:1) to Treprostinil



A 250-mL, round-bottom flask equipped with magnetic stirrer was charged with treprostinil diethanolamine salt (4 g) and water (40 mL). The mixture was stirred to obtain a clear solution. To the clear solution, ethyl acetate (100 mL) was added. While stirring, 3M HCl (3.2 mL) was added slowly until pH ~1 was attained. The mixture was stirred for 10 minutes and organic layer was separated. The aqueous layer was extracted with ethyl acetate (2×100 mL). The

US 9,604,901 B2

15

combined organic layers was washed with water (2×100 mL), brine (1×50 mL) and dried over anhydrous Na$_2$SO$_4$. The ethyl acetate solution of treprostinil was filtered and the filtrate was concentrated under vacuum at 50° C. to give off-white solid. The crude treprostinil was recrystallized from 50% ethanol in water (70 mL). The pure treprostinil was collected in a Buchner funnel by filtration and cake was washed with cold 20% ethanolic solution in water. The cake of treprostinil was air-dried overnight and further dried in a vacuum oven at 50° C. under high vacuum to afford 2.9 g of treprostinil (Yield 91.4%, purity (HPLC, AUC, 99.8%).

Analytical Data on Treprostinil from Treprostinil Diethanolamine Salt (1:1) to Treprostinil

| Batch No. | Yield | Purity (HPLC) |
|---|---|---|
| 1 | 91.0% | 99.8% (AUC) |
| 2 | 92.0% | 99.9% (AUC) |
| 3 | 93.1% | 99.7% (AUC) |
| 4 | 93.3% | 99.7% (AUC) |
| 5 | 99.0 % | 99.8% (AUC) |
| 6 | 94.6% | 99.8% (AUC) |

Example 6

Comparison of the Former Process and a Working Example of the Process According to the Present Invention

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| | | Nitrile | |
| 1 | Triol weight | 500 g | 5,000 g |
| 2 | Acetone | 20 L (1:40 wt/wt) | 75 L (1:15 wt/wt) |
| 3 | Potassium carbonate | 1,300 g (6.4 eq) | 5,200 g (2.5 eq) |
| 4 | Chloroacetonitrile | 470 g (4.2 eq) | 2,270 g (2 eq) |
| 5 | Tetrabutyl-ammonium bromide | 42 g (0.08 eq) | 145 g (0.03 eq) |
| 6 | Reactor size | 72-Liter | 50-gallon |
| 7 | Reflux time | 8 hours | No heating, Room temperature (r.t.) 45 h |
| 8 | Hexanes addition before filtration | Yes (10 L) | No |
| 9 | Filter | Celite | Celite |
| 10 | Washing | Ethyl acetate (10 L) | Acetone (50 L) |
| 11 | Evaporation | Yes | Yes |
| 12 | Purification | Silica gel column Dichloromethane: 0.5 L Ethyl acetate: 45 L Hexane: 60 L | No column |
| 13 | Evaporation after column | Yes | No |
| 14 | Yield of nitrite | 109-112% | Not checked |
| | | Treprostinil (intermediate) | |
| 15 | Methanol | 7.6 L (50-L reactor) | 50 L (50-gal reactor) |
| 16 | Potassium hydroxide | 650 g (8 eq) | 3,375g (4 eq) |
| 17 | Water | 2.2 L | 17 L |
| 18 | % of KOH | 30% | 20% |
| 19 | Reflux time | 3-3.5 h | 4-5 h |
| 20 | Acid used | 2.6 L (3M) | 12 L (3M) |

16

-continued

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| 21 | Removal of impurities | 3 × 3 L Ethyl acetate | 2 × 20 L Ethyl acetate |
| 22 | Acidification | 0.7 L | 6.5 L |
| 23 | Ethyl acetate extraction | 5 × 17 L = 35 L | 90 + 45 + 45 = 180 L |
| 24 | Water washing | 2 × 8 L | 3 × 40 L |
| 25 | Sodium bicarbonate washing | Not done | 120 g in 30 L water + 15 L brine |
| 26 | Brine washing | Not done | 1 × 40 L |
| 27 | Sodium sulfate | 1 kg | Not done |
| 28 | Sodium sulfate filtration | Before charcoal, 6 L ethyl acetate | N/A |
| 29 | Charcoal | 170 g, reflux for 1.5 h, filter over Celite, 11 L ethyl acetate | Pass hot solution (75° C.) through charcoal cartridge and clean filter, 70 L ethyl acetate |
| 30 | Evaporation | Yes, to get solid intermediate treprostinil | Yes, adjust to 150 L solution |
| | | Treprostinil Diethanolamine Salt | |
| 31 | Salt formation | Not done | 1,744 g diethanolamine, 20 L ethanol at 60-75° C. |
| 32 | Cooling | N/A | To 20° C. over weekend; add 40 L ethyl acetate; cooled to 10° C. |
| 33 | Filtration | N/A | Wash with 70 L ethyl acetate |
| 34 | Drying | N/A | Air-dried to constant wt., 2 days |
| | | Treprostinil (from 1.5 kg Treprostinil diethanolamine salt) | |
| 35 | Hydrolysis | N/A | 15 L water + 25 L ethyl acetate + HCl |
| 36 | Extraction | N/A | 2 × 10 L ethyl acetate |
| 37 | Water wash | N/A | 3 × 10 L |
| 38 | Brine wash | N/A | 1 × 10 L |
| 39 | Sodium sulfate | N/A | 1 kg, stir |
| 40 | Filter | N/A | Wash with 6 L ethyl acetate |
| 41 | Evaporation | N/A | To get solid, intermediate Treprostinil |
| 42 | Crude drying on tray | 1 or 3 days | Same |
| 43 | Ethanol & water for cryst. | 5.1 L + 5.1 L | 10.2 L + 10.2 L (same %) |
| 44 | Crystallization in | 20-L rotavap flask | 50-L jacketed reactor |
| 45 | Temperature of crystallization | 2 h r.t., fridge –0° C. 24 h | 50° C. to 0° C. ramp, 0° C. overnight |
| 46 | Filtration | Buchner funnel | Aurora filter |
| 47 | Washing | 20% (10 L) cooled ethanol-water | 20% (20 L) cooled ethanol-water |
| 48 | Drying before oven | Buchner funnel (20 h) | Aurora filter (2.5 h) |
| 49 | Oven drying | 15 hours, 55° C. | 6-15 hours, 55° C. |
| 50 | Vacuum | <–0.095 mPA | <5 Torr |
| 51 | UT-15 yield weight | ~535 g | ~1,100 g |
| 52 | % yield from triol) | ~91% | ~89% |
| 53 | Purity | ~99.0% | 99.9% |

The quality of treprostinil produced according to this invention is excellent. The purification of benzindene nitrile

LIQ02821350

US 9,604,901 B2

17

by column chromatography is eliminated. The impurities carried over from intermediate steps (i.e. alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step. Additional advantages of this process are: (a) crude treprostinil salts can be stored as raw material at ambient temperature and can be converted to treprostinil by simple acidification with diluted hydrochloric acid, and (b) the treprostinil salts can be synthesized from the solution of treprostinil without isolation. This process provides better quality of final product as well as saves significant amount of solvents and manpower in purification of intermediates.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

1. A pharmaceutical batch consisting of treprostinil or a salt thereof and impurities resulting from (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) containing the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and

18

wherein the pharmaceutical batch contains at least 2.9 g of treprostinil or its salt.

2. The pharmaceutical batch of claim 1, which has been dried under vacuum.

3. A pharmaceutical product comprising a therapeutically effective amount of treprostinil from a pharmaceutical batch as claimed in claim 1.

4. A pharmaceutical product comprising a therapeutically effective amount of a salt treprostinil from a pharmaceutical batch as claimed in claim 1.

5. The product of claim 4, wherein the salt is the diethanolamine salt of treprostinil.

6. A method of preparing a pharmaceutical product from a pharmaceutical batch as claimed in claim 1, comprising storing a pharmaceutical batch of a salt of treprostinil as claimed in claim 1 at ambient temperature, and preparing a pharmaceutical product from the pharmaceutical batch after storage.

7. A method as claimed in claim 6, wherein the salt of treprostinil is a diethanolamine salt.

8. A method of preparing a pharmaceutical batch as claimed in claim 1, comprising (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil.

9. A method as claimed in claim 8, wherein the salt of treprostinil is a diethanolamine salt.

*   *   *   *   *

LIQ02821351

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 9,604,901 B2                                          Page 1 of 1
APPLICATION NO.     : 14/754932
DATED               : March 28, 2017
INVENTOR(S)         : Hitesh Batra et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

Column 17, Claim 1, Line 27, "(c) containing the" should be --(c) contacting the--.

Signed and Sealed this
Sixteenth Day of May, 2017

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

LIQ02821352

# EXHIBIT 3

US008497393B2

(12) **United States Patent**
Batra et al.

(10) **Patent No.: US 8,497,393 B2**
(45) **Date of Patent: Jul. 30, 2013**

(54) **PROCESS TO PREPARE TREPROSTINIL, THE ACTIVE INGREDIENT IN REMODULIN®**

(75) Inventors: **Hitesh Batra**, Herndon, VA (US); **Sudersan M. Tuladhar**, Silver Spring, MD (US); **Raju Penmasta**, Herndon, VA (US); **David A. Walsh**, Palmyra, VA (US)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/548,446**

(22) Filed: **Jul. 13, 2012**

(65) **Prior Publication Data**

US 2012/0283470 A1      Nov. 8, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 12/334,731, filed on Dec. 15, 2008, now Pat. No. 8,242,305.

(60) Provisional application No. 61/014,232, filed on Dec. 17, 2007.

(51) **Int. Cl.**
*C07C 62/00* (2006.01)
*C07C 65/00* (2006.01)

(52) **U.S. Cl.**
USPC .......................................................... **562/466**

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,306,075 | A | 12/1981 | Aristoff |
| 4,424,376 | A | 1/1984 | Moniot et al. |
| 4,463,183 | A | 7/1984 | Haslanger |
| 4,486,598 | A | 12/1984 | Aristoff |
| 4,544,764 | A | 10/1985 | Aristoff |
| 4,668,814 | A | 5/1987 | Aristoff |
| 4,683,330 | A | 7/1987 | Aristoff |
| 5,039,814 | A | 8/1991 | Shuman et al. |
| 5,153,222 | A | 10/1992 | Tadepalli et al. |
| 6,054,486 | A | 4/2000 | Crow et al. |
| 6,441,245 | B1 | 8/2002 | Moriarty et al. |
| 6,521,212 | B1 | 2/2003 | Cloutier et al. |
| 6,528,688 | B2 | 3/2003 | Moriarty et al. |
| 6,700,025 | B2 | 3/2004 | Moriarty et al. |
| 6,756,033 | B2 | 6/2004 | Cloutier et al. |
| 6,765,117 | B2 | 7/2004 | Moriarty et al. |
| 6,803,386 | B2 | 10/2004 | Shorr et al. |
| 6,809,223 | B2 | 10/2004 | Moriarty et al. |
| 6,933,385 | B2 | 8/2005 | Westerman et al. |
| 7,199,157 | B2 | 4/2007 | Wade et al. |
| 7,384,978 | B2 | 6/2008 | Phares et al. |
| 7,417,070 | B2 | 8/2008 | Phares et al. |
| 7,999,007 | B2 | 8/2011 | Jeffs et al. |
| 2002/0173672 | A1 | 11/2002 | Moriarty et al. |

| | | | |
|---|---|---|---|
| 2004/0176645 | A1 | 9/2004 | Moriarty et al. |
| 2005/0085540 | A1 | 4/2005 | Phares et al. |
| 2005/0101608 | A1 | 5/2005 | Santel |
| 2005/0165111 | A1 | 7/2005 | Wade et al. |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2005/0282903 | A1 | 12/2005 | Wade et al. |
| 2007/0078095 | A1 | 4/2007 | Phares et al. |
| 2007/0078182 | A1 | 4/2007 | Phares et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0249167 | A1 | 10/2008 | Phares et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2009/0124697 | A1 | 5/2009 | Cloutier et al. |
| 2009/0163738 | A1 | 6/2009 | Batra et al. |
| 2009/0281189 | A1 | 11/2009 | Walsh |
| 2010/0076083 | A1 | 3/2010 | Olschewski |
| 2010/0282622 | A1 | 11/2010 | Phares |
| 2011/0092599 | A1 | 4/2011 | Wade et al. |
| 2011/0118213 | A1 | 5/2011 | Phares et al. |
| 2011/0144204 | A1 | 6/2011 | Jeffs et al. |
| 2011/0224236 | A1 | 9/2011 | Rothblatt et al. |
| 2011/0319641 | A1 | 12/2011 | Batra et al. |
| 2012/0004307 | A1 | 1/2012 | Wade et al. |
| 2012/0010159 | A1 | 1/2012 | Rothblatt et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2 710 726 A1 | 1/2012 |
| CN | 101891596 A | 11/2010 |
| CN | 101891715 A | 11/2010 |
| EP | 0 004 335 A2 | 10/1979 |
| EP | 0 087 237 B1 | 5/1986 |
| EP | 0 175 450 B1 | 3/1989 |
| EP | 0 159 784 B1 | 6/1989 |
| EP | 0 496 548 A1 | 7/1992 |
| WO | WO 98/39337 A1 | 9/1998 |
| WO | WO 99/21830 A1 | 5/1999 |
| WO | WO 03/070163 A2 | 8/2003 |
| WO | WO 2005/007081 A2 | 1/2005 |
| WO | WO 2007/134292 A2 | 11/2007 |
| WO | WO 2008/100977 A2 | 8/2008 |
| WO | WO 2009/117095 A1 | 9/2009 |
| WO | WO 2012/009816 A1 | 1/2012 |

OTHER PUBLICATIONS

Alexander et al., "The Synthesis of Benzindene Prostacyclin Analogs as Potential Antiulcer Agents," Prostaglandins, 1986, 32(5):647-653.
Aristoff et al., "Synthesis and Structure-Activity Relationship of Novel Stable Prostacyclin Analogs," Advances in Prostaglandin, Thromboxane, and Leukotriene Research, Samuelsson et al., .Eds., 1983, 11:267-274.
Aristoff et al., "Synthesis of Benzopyran Prostaglandins, Potent Stable Prostacyclin Analogs, Via an Intramolecular Mistunobu Reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.
Aristoff et al., "Total Synthesis of a Novel Antiulcer Agent via a Modification of the Intramolecular Wadsworth-Emons-Wittig Reaction," J. Am. Chem. Soc., 1985, 107:7967-7974.
Batra et al., "Crystallization Process Development for a Stable Polymorph of Treprostinil Diethanolamine (UT-15C) by Seeding," Organic Process Research & Development, 2009, 13:242-249.

(Continued)

*Primary Examiner* — Yevegeny Valenrod

(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

This present invention relates to an improved process to prepare prostacyclin derivatives. One embodiment provides for an improved process to convert benzindene triol to treprostinil via salts of treprostinil and to purify treprostinil.

**22 Claims, No Drawings**

LIQ00084829

## US 8,497,393 B2

Page 2

### OTHER PUBLICATIONS

Belch et al., "Randomized, Double-Blind, Placebo-Controlled Study Evaluating the Efficacy and Safety of AS-013, a Prostaglandin E1 Prodrug, in Patients with Intermittent Claudication," Circulation, May 6, 1997, 95(9):2298-2302.

Chemburkar et al., "Dealing with the Impact of Ritonavir Polymorphs on the Late Stages of Bulk Drug Process Development," Organic Process Research & Development, 2000, 4:413-417.

Chung et al., "Promoters for the (Alkyne)hexacarbonyldicobalt-Based Cyclopentenone Synthesis," Organometallics, 1993, 12:220-223.

Clark et al., "High-Performance Liquid Chromatographic Method for Determining the Enantiomeric Purity of a Benzindene Prostaglandin by a Diastereomeric Separation," Journal of Chromatography, 1987, 408:275-283.

Hardinger et al., "Triply-Convergent Syntheses of Two Homochiral Arene-Fused Prostacyclin Analogs Related to U68,215," Bioorganic & Medicinal Chemistry Letters, 1991, 1(1):79-82.

Hicks et al., "A Practical Titanium-Catalyzed Synthesis of Bicyclic Cyclopentenones and Allylic Amines," J. Org. Chem., 1996, 61:2713-2718.

Jeong et al., "Catalytic Version of the Intramolecular Pauson-Khand Reaction," J. Am. Chem. Soc., 1994, 116:3159-3160.

Khand et al., "Organocobalt Complexes. Part II. Reaction of Acetylenehexacarbonyl-dicobalt Complexes, $(R^1C_2R^2)Co_2(CO)_6$, with Norbornene and its Derivatives," J. Chem. Soc., J.C.S. Perkin I., 1973, 977-981.

Mathre et al., "A Practical Enantioselective Synthesis of $\alpha,\alpha$-Diaryl-2-pyrrolidinemethanol. Preparation and Chemistry of the Corresponding Oxazaborolidines," J. Org. Chem., 1991, 56:751-762.

Moriarty et al., "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)," J. Org. Chem. 2004, 69, 1890-1902.

Mulzer et al., "Asymmetric Synthesis of Carbacyclin Precursors by Pauson-Khand Cyclization," Liebigs Ann. Chem., 1988, 891-897.

Nelson, Norman A., "Prostaglandin Nomenclature," J. Am. Chem., Sep. 1974, 17(9):911-918.

Pagenkopf et al., "Photochemical Promotion of the Intramolecular Pauson-Khand Reaction. A New Experimental Protocol for Cobalt-Catalyzed [2 +2+2+1] Cycloadditions," J. Am. Chem. Soc., 1996, 118:2285-2286.

Pagenkopf, Brian L., "Substrate and Reagent Control of Diastereoselectivity in Transition Metal-Mediated Process: Development of a Catalytic Photo Promoted Pauson-Khand Reaction," Diss. Abstr. Int., 57(12):7535, 1977, Abstract.

Paulson, Peter L., "The Khand Reaction," Tetrahedron, 1985, 41(24):5855-5860.

Schore, Neil E., "Transition-Metal-Mediated Cycloaddition Reactions of Alkynes in Organic Synthesis," Chem. Rev., 1988, 88:1081-1119.

Shambayati et al., "N-Oxide Promjoted Pauson-Khand Cyclizations at Room Temperature," Tetrahedron Letters, 1990, 31(37):5289-5292.

Snell et al., "Investigating the Effect of Impurities on Macromolecule Crystal Growth in Microgravity," Crystal Growth & Design, 2001, 1(2):151-158.

Sorbera et al. "UT-15. Treatment of Pulmonary Hypertension Treatment of Peripheral Vascular Disease," Drug of the Future, 2001, 26(4), 364-374.

Takano et al., "Enantiodivergent Synthesis of Both Enantiomers of Sulcatol and Matsutake Alcohol from (R)-Epichlorohydrin," Chemistry Letters, 1987, 2017-2020.

Viedma, Cristobal, "Selective Chiral Symmetry Breaking during Crystallization: Parity Violation of Cryptochiral Environment in Control?" Crystal Growth & Design, 2007, 7(3):553-556.

Zhang et al., "A Nickel(0)-Catalyzed Process for the Transformation of Enynes to Bicyclic Cyclopentenones," J. Org. Chem., 1996, 61:4498-4499.

U.S. Appl. No. 13/409,685, filed Mar. 1, 2012, Sharma, Vijay.

Comins et al., "Ortho Metalation Directed by $\alpha$-Amino Alkoxides," J. Org. Chem., 1984, 49:1078-1083.

Comins et al., "Ortho Substitution of M-Anisaldehyde via $\alpha$-Amino Alkoxide Directed Lithiation," J. Org. Chem., 1989, 54:3730-3732.

Corey et al. "Novel Electronic Effects of Remote Substituents on the Oxazaborolidine-Catalyzed Enantioselective Reduction of Ketones," Tetrahedron Letters, 1995, 36(50):9153-9156.

Greene et al., "Protecting Groups," Protective Groups in Organic Synthesis, 2d. Ed., 1991, p. 1-11.

Pansegrau et al., "The Oxazoline-Benzyne Route to 1,2,3-Trisubstituted Benzenes. Tandem Addition of Organolithiums, Organocuprates, and $\alpha$-Lithionitriles to Benzynes," J. Am. Chem. Soc., 1988, 110:7178-7184.

Rowley et al., "Application of the Pauson-Khand reaction to the synthesis of pentalenic acid," Journal of Organometallic Chemistry, 1991, 413:C5-C9.

LIQ00084830

US 8,497,393 B2

**1**

## PROCESS TO PREPARE TREPROSTINIL, THE ACTIVE INGREDIENT IN REMODULIN®

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a Continuation of U.S. application Ser. No. 12/334,731, filed Dec. 15, 2008, which claims priority from U.S. Provisional Patent Application 61/014,232, filed Dec. 17, 2007, the entire contents of which are incorporated herein by reference.

### BACKGROUND

The present invention relates to a process for producing prostacyclin derivatives and novel intermediate compounds useful in the process.

Prostacyclin derivatives are useful pharmaceutical compounds possessing activities such as platelet aggregation inhibition, gastric secretion reduction, lesion inhibition, and bronchodilation.

Treprostinil, the active ingredient in Remodulin®, was first described in U.S. Pat. No. 4,306,075. Treprostinil, and other prostacyclin derivatives have been prepared as described in Moriarty, et al in *J. Org. Chem.* 2004, 69, 1890-1902, *Drug of the Future*, 2001, 26(4), 364-374, U.S. Pat. Nos. 6,441,245, 6,528,688, 6,765,117 and 6,809,223. Their teachings are incorporated by reference to show how to practice the embodiments of the present invention.

U.S. Pat. No. 5,153,222 describes use of treprostinil for treatment of pulmonary hypertension. Treprostinil is approved for the intravenous as well as subcutaneous route, the latter avoiding septic events associated with continuous intravenous catheters. U.S. Pat. Nos. 6,521,212 and 6,756,033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions. U.S. Pat. No. 6,803,386 discloses administration of treprostinil for treating cancer such as lung, liver, brain, pancreatic, kidney, prostate, breast, colon and head-neck cancer. U.S. patent application publication No. 2005/0165111 discloses treprostinil treatment of ischemic lesions. U.S. Pat. No. 7,199,157 discloses that treprostinil treatment improves kidney functions. U.S. patent application publication No. 2005/0282903 discloses treprostinil treatment of neuropathic foot ulcers. U.S. application Ser. No. 12/028,471 filed Feb. 8, 2008, discloses treprostinil treatment of pulmonary fibrosis. U.S. Pat. No. 6,054,486 discloses treatment of peripheral vascular disease with treprostinil. U.S. patent application Ser. No. 11/873,645 filed Oct. 17, 2007 discloses combination therapies comprising treprostinil. U.S. publication No. 2008/0200449 discloses delivery of treprostinil using a metered dose inhaler. U.S. publication No. 2008/0280986 discloses treatment of interstitial lung disease with treprostinil. U.S. application Ser. No. 12/028,471 filed Feb. 8, 2008 discloses treatment of asthma with treprostinil. U.S. Pat. No. 7,417,070, 7,384,978 and U.S. publication Nos. 2007/0078095, 2005/0282901, and 2008/0249167 describe oral formulations of treprostinil and other prostacyclin analogs.

Because Treprostinil, and other prostacyclin derivatives are of great importance from a medicinal point of view, a need exists for an efficient process to synthesize these compounds on a large scale suitable for commercial production.

### SUMMARY

The present invention provides in one embodiment a process for the preparation of a compound of formula I, hydrate, solvate, prodrug, or pharmaceutically acceptable salt thereof.

**2**



(I)

The process comprises the following steps:

(a) alkylating a compound of structure II with an alkylating agent to produce a compound of formula III,



(II)



(III)

wherein

w=1, 2, or 3;

$Y_1$ is trans-CH=CH—, cis-CH=CH—, —CH$_2$(CH$_2$)$_m$—, or —C≡C—; m is 1, 2, or 3;

$R_7$ is

(1) —C$_p$H$_{2p}$—CH$_3$, wherein p is an integer from 1 to 5, inclusive,

(2) phenoxy optionally substituted by one, two or three chloro, fluoro, trifluoromethyl, (C$_1$-C$_3$) alkyl, or (C$_1$-C$_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl, with the proviso that $R_7$ is phenoxy or substituted phenoxy, only when $R_3$ and $R_4$ are hydrogen or methyl, being the same or different,

(3) phenyl, benzyl, phenylethyl, or phenylpropyl optionally substituted on the aromatic ring by one, two or three chloro, fluoro, trifluoromethyl, (C$_1$-C$_3$)alkyl, or (C$_1$-C$_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl,

(4) cis-CH=CH—CH$_2$—CH$_3$,

(5) —(CH$_2$)$_2$—CH(OH)—CH$_3$, or

(6) —(CH$_2$)$_3$—CH=C(CH$_3$)$_2$;

wherein —C(L$_1$)—R$_7$ taken together is

(1) (C$_4$-C$_7$)cycloalkyl optionally substituted by 1 to 3 (C$_1$-C$_8$)alkyl;

(2) 2-(2-furyl)ethyl,

(3) 2-(3-thienyl)ethoxy, or

(4) 3-thienyloxymethyl;

$M_1$ is α-OH:β-R$_5$ or α-R$_5$:β-OH or α-OR$_8$:β-R$_8$ or α-R$_5$:β-OR$_8$, wherein R$_5$ is hydrogen or methyl, R$_8$ is an alcohol protecting group, and

$L_1$ is α-R$_3$:β-R$_4$, α-R$_4$:β-R$_3$, or a mixture of α-R$_3$:-R$_4$ and α-R$_4$:β-R$_3$, wherein R$_3$ and R$_4$ are hydrogen, methyl, or fluoro, being the same or different, with the

US 8,497,393 B2

**3**

proviso that one of $R_3$ and $R_4$ is fluoro only when the other is fluoro.

(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula $I_s$,



(d) reacting the salt from step (c) with an acid to form the compound of formula I.

The present invention provides in another embodiment a process for the preparation of a compound of formula IV.



The process comprises the following steps:

(a) alkylating a compound of structure V with an alkylating agent to produce a compound of formula VI,





(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula $IV_s$, and

**4**



(d) reacting the salt from step (b) with an acid to form the compound of formula IV.

DETAILED DESCRIPTION

The various terms used, separately and in combinations, in the processes herein described are defined below.

The expression "comprising" means "including but not limited to." Thus, other non-mentioned substances, additives, carriers, or steps may be present. Unless otherwise specified, "a" or "an" means one or more.

$C_{1-3}$-alkyl is a straight or branched alkyl group containing 1-3 carbon atoms. Exemplary alkyl groups include methyl, ethyl, n-propyl, and isopropyl.

$C_{1-3}$-alkoxy is a straight or branched alkoxy group containing 1-3 carbon atoms. Exemplary alkoxy groups include methoxy, ethoxy, propoxy, and isopropoxy.

$C_{4-7}$-cycloalkyl is an optionally substituted monocyclic, bicyclic or tricyclic alkyl group containing between 4-7 carbon atoms. Exemplary cycloalkyl groups include but not limited to cyclobutyl, cyclopentyl, cyclohexyl, and cycloheptyl.

Combinations of substituents and variables envisioned by this invention are only those that result in the formation of stable compounds. The term "stable", as used herein, refers to compounds which possess stability sufficient to allow manufacture and which maintains the integrity of the compound for a sufficient period of time to be useful for the purposes detailed herein.

As used herein, the term "prodrug" means a derivative of a compound that can hydrolyze, oxidize, or otherwise react under biological conditions (in vitro or in vivo) to provide an active compound. Examples of prodrugs include, but are not limited to, derivatives of a compound that include biohydrolyzable groups such as biohydrolyzable amides, biohydrolyzable esters, biohydrolyzable carbamates, biohydrolyzable carbonates, biohydrolyzable ureides, and biohydrolyzable phosphate analogues (e.g., monophosphate, diphosphate or triphosphate).

As used herein, "hydrate" is a form of a compound wherein water molecules are combined in a certain ratio as an integral part of the structure complex of the compound.

As used herein, "solvate" is a form of a compound where solvent molecules are combined in a certain ratio as an integral part of the structure complex of the compound.

"Pharmaceutically acceptable" means in the present description being useful in preparing a pharmaceutical composition that is generally safe, non-toxic and neither biologically nor otherwise undesirable and includes being useful for veterinary use as well as human pharmaceutical use.

"Pharmaceutically acceptable salts" mean salts which are pharmaceutically acceptable, as defined above, and which possess the desired pharmacological activity. Such salts

LIQ00084832

US 8,497,393 B2

5

include acid addition salts formed with organic and inorganic acids, such as hydrogen chloride, hydrogen bromide, hydrogen iodide, sulfuric acid, phosphoric acid, acetic acid, glycolic acid, maleic acid, malonic acid, oxalic acid, methanesulfonic acid, trifluoroacetic acid, fumaric acid, succinic acid, tartaric acid, citric acid, benzoic acid, ascorbic acid and the like. Base addition salts may be formed with organic and inorganic bases, such as sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, choline and the like. Included in the invention are pharmaceutically acceptable salts or compounds of any of the formulae herein.

Depending on its structure, the phrase "pharmaceutically acceptable salt," as used herein, refers to a pharmaceutically acceptable organic or inorganic acid or base salt of a compound. Representative pharmaceutically acceptable salts include, e.g., alkali metal salts, alkali earth salts, ammonium salts, water-soluble and water-insoluble salts, such as the acetate, amsonate (4,4-diaminostilbene-2,2-disulfonate), benzenesulfonate, benzonate, bicarbonate, bisulfate, bitartrate, borate, bromide, butyrate, calcium, calcium edetate, camsylate, carbonate, chloride, citrate, clavulariate, dihydrochloride, edetate, edisylate, estolate, esylate, fumarate, gluceptate, gluconate, glutamate, glycollylarsanilate, hexafluorophosphate, hexylresorcinate, hydrabamine, hydrobromide, hydrochloride, hydroxynaphthoate, iodide, isothionate, lactate, lactobionate, laurate, malate, maleate, mandelate, mesylate, methylbromide, methylnitrate, methylsulfate, mucate, napsylate, nitrate, N-methylglucamine ammonium salt, 3-hydroxy-2-naphthoate, oleate, oxalate, palmitate, pamoate (1,1-methene-bis-2-hydroxy-3-naphthoate, einbonate), pantothenate, phosphate/diphosphate, picrate, polygalacturonate, propionate, p-toluenesulfonate, salicylate, stearate, subacetate, succinate, sulfate, sulfosalicylate, suramate, tannate, tartrate, teoclate, tosylate, triethiodide, and valerate salts.

The present invention provides for a process for producing treprostinil and other prostacyclin derivatives and novel intermediate compounds useful in the process. The process according to the present invention provides advantages on large-scale synthesis over the existing method. For example, the purification by column chromatography is eliminated, thus the required amount of flammable solvents and waste generated are greatly reduced. Furthermore, the salt formation is a much easier operation than column chromatography. Moreover, it was found that the product of the process according to the present invention has higher purity. Therefore the present invention provides for a process that is more economical, safer, faster, greener, easier to operate, and provides higher purity.

One embodiment of the present invention is a process for the preparation of a compound of formula I, or a hydrate, solvate, prodrug, or pharmaceutically acceptable salt thereof.



(I)

The process comprises the following steps:

(a) alkylating a compound of formula II with an alkylating agent to produce a compound of formula III,

6



(II)



(III)

wherein

w=1, 2, or 3;

$Y_1$ is trans-CH=CH—, cis-CH=CH—, —$CH_2(CH_2)_m$—, or —C≡C—; m is 1, 2, or 3;

$R_7$ is

(1) —$C_pH_{2p}$—$CH_3$, wherein p is an integer from 1 to 5, inclusive,

(2) phenoxy optionally substituted by one, two or three chloro, fluoro, trifluoromethyl, ($C_1$-$C_3$) alkyl, or ($C_1$-$C_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl, with the proviso that $R_7$ is phenoxy or substituted phenoxy, only when $R_3$ and $R_4$ are hydrogen or methyl, being the same or different,

(3) phenyl, benzyl, phenylethyl, or phenylpropyl optionally substituted on the aromatic ring by one, two or three chloro, fluoro, trifluoromethyl, ($C_1$-$C_3$)alkyl, or ($C_1$-$C_3$) alkoxy, with the proviso that not more than two substituents are other than alkyl,

(4) cis-CH=CH—$CH_2$—$CH_3$,

(5) —($CH_2$)$_2$—CH(OH)—$CH_3$, or

(6) —($CH_2$)$_3$—CH or CH($CH_3$)$_2$;

wherein —C($L_1$)-$R_7$ taken together is

(1) ($C_4$-$C_7$)cycloalkyl optionally substituted by 1 to 3 ($C_1$-$C_5$)alkyl;

(2) 2-(2-furyl)ethyl,

(3) 2-(3-thienyl)ethoxy, or

(4) 3-thienyloxymethyl;

$M_1$ is α-OH:β-$R_5$ or α-$R_5$:β-OH or α-OR$_1$:β-$R_5$ or α-$R_5$:β-OR$_2$, wherein $R_5$ is hydrogen or methyl, $R_2$ is an alcohol protecting group, and

$L_1$ is α-$R_3$:β-$R_4$, α-$R_4$:β-$R_3$, or a mixture of α-$R_3$:β-$R_4$ and α-$R_4$:β-$R_3$, wherein $R_3$ and $R_4$ are hydrogen, methyl, or fluoro, being the same or different, with the proviso that one of $R_3$ and $R_4$ are fluoro only when the other is hydrogen or fluoro.

b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula I$_s$

US 8,497,393 B2

7          8



(I$_a$)

(d) reacting the salt from step (c) with an acid to form the compound of formula I.

In one embodiment, the compound of formula I is at least 90.0%, 95.0%, 99.0%.

The compound of formula II can be prepared from a compound of formula XI, which is a cyclization product of a compound of formula X as described in U.S. Pat. No. 6,441,245.



(X)



(XI)

Wherein n is 0, 1, 2, or 3.

The compound of formula II can be prepared alternatively from a compound of formula XIII, which is a cyclization product of a compound of formula XII as described in U.S. Pat. No. 6,700,025.



(XII)



(XIII)

One embodiment of the present invention is a process for the preparation of a compound having formula IV, or a hydrate, solvate, or pharmaceutically acceptable salt thereof.



(IV)

The process comprises

(a) alkylating a compound of structure V with an alkylating agent such as $ClCH_2CN$ to produce a compound of formula VI,



(V)



(VI)

(b) hydrolyzing the product of step (a) with a base such as KOH,

(c) contacting the product of step (b) with a base B such as diethanolamine to for a salt of the following structure, and



(d) reacting the salt from step (b) with an acid such as HCl to form the compound of formula IV.

In one embodiment, the purity of compound of formula IV is at least 90.0%, 95.0%, 99.0%, 99.5%.

US 8,497,393 B2

**9**

In one embodiment, the process further comprises a step of isolating the salt of formula IV$_s$.

In one embodiment, the base B in step (c) may be ammonia, N-methylglucamine, procaine, tromethanine, magnesium, L-lysine, L-arginine, or triethanolamine.

The following abbreviations are used in the description and/or appended claims, and they have the following meanings:

"MW" means molecular weight.

"Eq." means equivalent.

"TLC" means thin layer chromatography.

"HPLC" means high performance liquid chromatography.

"PMA" means phosphomolybdic acid.

"AUC" means area under curve.

In view of the foregoing considerations, and specific examples below, those who are skilled in the art will appreciate that how to select necessary reagents and solvents in practicing the present invention.

The invention will now be described in reference to the following Examples. These examples are not to be regarded as limiting the scope of the present invention, but shall only serve in an illustrative manner.

EXAMPLES

Example 1

Alkylation of Benzindene Triol



| Name | MW | Amount | Mol. | Eq. |
|---|---|---|---|---|
| Benzindene Triol | 332.48 | 1250 g | 3.76 | 1.00 |
| K$_2$CO$_3$ (powder) | 138.20 | 1296 g | 9.38 | 2.50 |
| ClCH$_2$CN | 75.50 | 567 g | 7.51 | 2.0 |
| Bu$_4$NBr | 322.37 | 36 g | 0.11 | 0.03 |
| Acetone | — | 29 L | — | — |
| Celite ® 545 | — | 115 g | — | — |

**10**

A 50-L, three-neck, round-bottom flask equipped with a mechanical stirrer and a thermocouple was charged with benzindene triol (1250 g), acetone (19 L) and K$_2$CO$_3$ (powdered) (1296 g), chloroacetonitrile (567 g), tetrabutylammonium bromide (36 g). The reaction mixture was stirred vigorously at room temperature (23±2° C.) for 16-72 h. The progress of the reaction was monitored by TLC. (methanol/CH$_2$Cl$_2$; 1:9 and developed by 10% ethanolic solution of PMA). After completion of reaction, the reaction mixture was filtered with/without Celite pad. The filter cake was washed with acetone (10 L). The filtrate was concentrated in vacuo at 50-55° C. to give a light-brown, viscous liquid benzindene nitrile. The crude benzindene nitrile was used as such in the next step without further purification.

Example 2

Hydrolysis of Benzindene Nitrile

| Name | MW | Amount | Mol. | Eq. |
|---|---|---|---|---|
| Benzindene Nitrile | 371.52 | 1397 g* | 3.76 | 1.0 |
| KOH | 56.11 | 844 g | 15.04 | 4.0 |
| Methanol | — | 12 L | — | — |
| Water | — | 4.25 L | — | — |

*Note:
This weight is based on 100% yield from the previous step. This is not isolated yield.

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with a solution of benzindene nitrile in methanol (12 L) and a solution of KOH (844 g of KOH dissolved in 4.25 L of water). The reaction mixture was stirred and heated to reflux (temperature 72.2° C.). The progress of

US 8,497,393 B2

11

the reaction was monitored by TLC (for TLC purpose, 1-2 mL of reaction mixture was acidified with 3M HCl to pH 1-2 and extracted with ethyl acetate. The ethyl acetate extract was used for TLC; Eluent: methanol/CH₂Cl₂; 1:9, and developed by 10% ethanolic solution of PMA). After completion of the reaction (~5 h), the reaction mixture was cooled to −5 to 10° C. and quenched with a solution of hydrochloric acid (3M, 3.1 L) while stirring. The reaction mixture was concentrated in vacuo at 50-55° C. to obtain approximately 12-14 L of condensate. The condensate was discarded.

The aqueous layer was diluted with water (7-8 L) and extracted with ethyl acetate (2×6 L) to remove impurities soluble in ethyl acetate. To aqueous layer, ethyl acetate (22 L) was added and the pH of reaction mixture was adjusted to 1-2 by adding 3M HCl (1.7 L) with stirring. The organic layer was separated and the aqueous layer was extracted with ethyl acetate (2×11 L). The combined organic layers were washed with water (3×10 L) and followed by washing with a solution of NaHCO₃ (30 g of NaHCO₃ dissolved in 12 L of water). The organic layer was further washed with saturated solution of NaCl (3372 g of NaCl dissolved in water (12 L)) and dried over anhydrous Na₂SO₄ (950-1000 g), once filtered.

The filtrate was transferred into a 72-L reactor equipped with mechanical stirrer, a condenser, and a thermocouple. To the solution of treprostinil in reactor was added activated carbon (110-130 g). The suspension was heated to reflux (temperature 68-70° C.) for at least one hour. For filtration, a pad of Celite® 545 (300-600 g) was prepared in sintered glass funnel using ethyl acetate. The hot suspension was filtered through the pad of Celite® 545. The Celite® 545 was washed with ethyl acetate until no compound was seen on TLC of the washings.

The filtrate (pale-yellow) was reduced to volume of 35-40 L by evaporation in vacuo at 50-55° C. for direct use in next step.

Example 3

Conversion of Treprostinil to Treprostinil Diethanolamine Salt (1:1)



(I) EtOH, EtOAc
(II) Heptane Slurry

12

-continued



| Name | MW | Amount | Mol | Eq |
|---|---|---|---|---|
| Treprostinil | 390.52 | 1464 g* | 3.75 | 1.0 |
| Diethanolamine | 105.14 | 435 g | 4.14 | 1.1 |
| Ethanol | — | 5.1 L | — | — |
| Ethyl acetate | — | 35 L** | — | — |
| Treprostinil Diethanolamine Salt (seed) | — | 12 g | — | — |

*Note:
This weight is based on 100% yield from benzindene triol. It is not isolated yield. The treprostinil was carried from previous step in ethyl acetate solution and used as such for this step.
**Note:
The total volume of ethyl acetate should be in range of 35-36 L (it should be 7 times the volume of ethanol used). Approximately 35 L of ethyl acetate was carried over from previous step and additional 1.0 L of ethyl acetate was used for rinsing the flask.

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with a solution of treprostinil in ethyl acetate (35-40 L from the previous step), anhydrous ethanol (5.1 L) and diethanolamine (435 g). While stirring, the reaction mixture was heated to 60-75° C., for 0.5-1.0 h to obtain a clear solution. The clear solution was cooled to 55±5° C. At this temperature, the seed of polymorph B of treprostinil diethanolamine salt (~12 g) was added to the clear solution. The suspension of polymorph B was stirred at this temperature for 1 h. The suspension was cooled to 20±2° C. overnight (over a period of 16-24 h). The treprostinil diethanolamine salt was collected by filtration using Aurora filter equipped with filter cloth, and the solid was washed with ethyl acetate (2×8 L). The treprostinil diethanolamine salt was transferred to a HDPE/glass container for air-drying in hood, followed by drying in a vacuum oven at 50±5° C. under high vacuum.

At this stage, if melting point of the treprostinil diethanolamine salt is more than 104° C., it was considered polymorph B. There is no need of recrystallization. If it is less than 104° C., it is recrystallized in EtOH-EtOAc to increase the melting point.

| | Data on Treprostinil Diethanolamine Salt (1:1) | | | |
|---|---|---|---|---|
| Batch No. | Wt. of Benzindene Triol (g) | Wt. of Treprostinil Diethanolamine Salt (1:1) (g) | Yield (%) | Melting point (° C.) |
| 1 | 1250 | 1640 | 88.00 | 104.3-106.3 |
| 2 | 1250 | 1528 | 82.00* | 105.5-107.2 |

LIQ00084836

US 8,497,393 B2

**13**

-continued

| | | Data on Treprostinil Diethanolamine Salt (1:1) | | |
|---|---|---|---|---|
| Batch No. | Wt. of Benzindene Triol (g) | Wt. of Treprostinil Diethanolamine Salt (1:1) (g) | Yield (%) | Melting point (° C.) |
| 3 | 1250 | 1499 | 80.42** | 104.7-106.6 |
| 4 | 1236 | 1572 | 85.34 | 105-108 |

*Note:

In this batch, approximately 1200 mL of ethyl acetate solution of treprostinil before carbon treatment was removed for R&D carbon treatment experiments.

**Note:

This batch was recrystallized, for this reason yield was lower.

Example 4

| | Heptane Slurry of Treprostinil Diethanolamine Salt (1:1) | | |
|---|---|---|---|
| Name | Batch No. | Amount | Ratio |
| Treprostinil Diethanolamine Salt | 1 | 3168 g | 1 |
| Heptane | — | 37.5 L | 12 |
| Treprostinil Diethanolamine Salt | 2 | 3071 g | 1 |
| Heptane | — | 36.0 L | 12 |

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with slurry of treprostinil diethanolamine salt in heptane (35-40 L). The suspension was heated to 70-80° C. for 16-24 h. The suspension was cooled to 22±2° C. over a period of 1-2 h. The salt was collected by filtration using Aurora filter. The cake was washed with heptane (15-30 L) and the material was dried in Aurora filter for 1 h. The salt was transferred to trays for air-drying overnight in hood until a constant weight of treprostinil diethanolamine salt was obtained. The material was dried in oven under high vacuum for 2-4 h at 50-55° C.

| | Analytical data on and Treprostinil Diethanolamine Salt (1:1) | |
|---|---|---|
| Test | Batch 1 | Batch 2 |
| IR | Conforms | Conforms |
| Residue on Ignition (ROI) | <0.1% w/w | <0.1% w/w |
| Water content | 0.1% w/w | 0.0% w/w |
| Melting point | 105.0-106.5° C. | 104.5-105.5° C. |
| Specific rotation $[\alpha]^{25}_{589}$ | +34.6° | +35° |
| Organic volatile impurities | | |
| Ethanol | Not detected | Not detected |
| Ethyl acetate | Not detected | <0.05% w/w |
| Heptane | <0.05% w/w | <0.05% w/w |
| HPLC (Assay) | 100.4% | 99.8% |
| Diethanolamine | Positive | Positive |

**14**

Example 5

Conversion of Treprostinil Diethanolamine Salt (1:1) to Treprostinil



A 250-mL, round-bottom flask equipped with magnetic stirrer was charged with treprostinil diethanolamine salt (4 g) and water (40 mL). The mixture was stirred to obtain a clear solution. To the clear solution, ethyl acetate (100 mL) was added. While stirring, 3M HCl (3.2 mL) was added slowly until pH ~1 was attained. The mixture was stirred for 10 minutes and organic layer was separated. The aqueous layer was extracted with ethyl acetate (2×100 mL). The combined organic layers was washed with water (2×100 mL), brine (1×50 mL) and dried over anhydrous $Na_2SO_4$. The ethyl acetate solution of treprostinil was filtered and the filtrate was concentrated under vacuum at 50° C. to give off-white solid. The crude treprostinil was recrystallized from 50% ethanol in water (70 mL). The pure treprostinil was collected in a Buchner funnel by filtration and cake was washed with cold 20% ethanolic solution in water. The cake of treprostinil was air-dried overnight and further dried in a vacuum oven at 50° C. under high vacuum to afford 2.9 g of treprostinil (Yield 91.4%, purity (HPLC, AUC, 99.8%).

Analytical Data on Treprostinil from Treprostinil Diethanolamine Salt (1:1) to Treprostinil

| Batch No. | Yield | Purity (HPLC) |
|---|---|---|
| 1 | 91.0% | 99.8% (AUC) |
| 2 | 92.0% | 99.9% (AUC) |
| 3 | 93.1% | 99.7% (AUC) |
| 4 | 93.3% | 99.7% (AUC) |
| 5 | 99.0% | 99.8% (AUC) |
| 6 | 94.6% | 99.8% (AUC) |

LIQ00084837

US 8,497,393 B2

**15**

Example 6

Comparison of the Former Process and a Working Example of the Process According to the Present Invention

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| | | Nitrile | |
| 1 | Triol weight | 500 g | 5,000 g |
| 2 | Acetone | 20 L (1:40 wt/wt) | 75 L (1:15 wt/wt) |
| 3 | Potassium carbonate | 1,300 g (6.4 eq) | 5,200 g (2.5 eq) |
| 4 | Chloroacetonitrile | 470 g (4.2 eq) | 2,270 g (2 eq) |
| 5 | Tetrabutylammonium bromide | 42 g (0.08 eq) | 145 g (0.03 eq) |
| 6 | Reactor size | 72-Liter | 50-gallon |
| 7 | Reflux time | 8 hours | No heating, Room temperature (r.t.) 45 h |
| 8 | Hexanes addition before filtration | Yes (10 L) | No |
| 9 | Filter | Celite | Celite |
| 10 | Washing | Ethyl acetate (10 L) | Acetone (50 L) |
| 11 | Evaporation | Yes | Yes |
| 12 | Purification | Silica gel column Dichloromethane: 0.5 L Ethyl acetate: 45 L Hexane: 60 L | No column |
| 13 | Evaporation after column | Yes | No |
| 14 | Yield of nitrile | 109-112% | Not checked |
| | | Treprostinil (intermediate) | |
| 15 | Methanol | 7.6 L (50-L reactor) | 50 L (50-gal reactor) |
| 16 | Potassium hydroxide | 650 g (8 eq) | 3,375 g (4 eq) |
| 17 | Water | 2.2 L | 17 L |
| 18 | % of KOH | 30% | 20% |
| 19 | Reflux time | 3-3.5 h | 4-5 h |
| 20 | Acid used | 2.6 L (3M) | 12 L (3M) |
| 21 | Removal of impurities | 3 × 3 L Ethyl acetate | 2 × 20 L Ethyl acetate |
| 22 | Acidification | 0.7 L | 6.5 L |
| 23 | Ethyl acetate extraction | 5 × 17 L = 35 L | 90 + 45 + 45 = 180 L |
| 24 | Water washing | 2 × 8 L | 3 × 40 L |
| 25 | Sodium bicarbonate washing | Not done | 120 g in 30 L water + 15 L brine |
| 26 | Brine washing | Not done | 1 × 40 L |
| 27 | Sodium sulfate | 1 kg | Not done |
| 28 | Sodium sulfate filtration | Before charcoal, 6 L ethyl acetate | N/A |
| 29 | Charcoal | 170 g, reflux for 1.5 h, filter over Celite, 11 L ethyl acetate | Pass hot solution (75° C.) through charcoal cartridge and clean filter, 70 L ethyl acetate |
| 30 | Evaporation | Yes, to get solid intermediate treprostinil | Yes, adjust to 150 L solution |
| | | Treprostinil Diethanolamine Salt | |
| 31 | Salt formation | Not done | 1,744 g diethanolamine, 20 L ethanol at 60-75° C. |
| 32 | Cooling | N/A | To 20° C. over weekend; add 40 L ethyl acetate; cooled to 10° C. |
| 33 | Filtration | N/A | Wash with 70 L ethyl acetate |
| 34 | Drying | N/A | Air-dried to constant wt., 2 days |
| | | Treprostinil (from 1.5 kg Treprostinil diethanolamine salt) | |
| 35 | Hydrolysis | N/A | 15 L water + 25 L ethyl acetate + HCl |
| 36 | Extraction | N/A | 2 × 10 L ethyl acetate |
| 37 | Water wash | N/A | 3 × 10 L |

**16**

US 8,497,393 B2

17

18

-continued

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| 38 | Brine wash | N/A | 1 × 10 L |
| 39 | Sodium sulfate | N/A | 1 kg, stir |
| 40 | Filter | N/A | Wash with 6 L ethyl acetate |
| 41 | Evaporation | N/A | To get solid, intermediate Treprostinil |
| 42 | Crude drying on tray | 1 or 3 days | Same |
| 43 | Ethanol & water for cryst. | 5.1 L + 5.1 L | 10.2 L + 10.2 L (same %) |
| 44 | Crystallization in | 20-L rotavap flask | 50-L jacketed reactor |
| 45 | Temperature of crystallization | 2 h r.t., fridge −0° C. 24 h | 50° C. to 0° C. ramp, 0° C. overnight |
| 46 | Filtration | Buchner funnel | Aurora filter |
| 47 | Washing | 20% (10 L) cooled ethanol-water | 20% (20 L) cooled ethanol-water |
| 48 | Drying before oven | Buchner funnel (20 h) Tray (no) | Aurora filter (2.5 h) Tray (4 days) |
| 49 | Oven drying | 15 hours, 55° C. | 6-15 hours, 55° C. |
| 50 | Vacuum | <−0.095 mPA | <5 Torr |
| 51 | UT-15 yield weight | ~535 g | ~1,100 g |
| 52 | % yield from triol) | ~91% | ~89% |
| 53 | Purity | ~99.0% | 99.9% |

The quality of treprostinil produced according to this invention is excellent. The purification of benzindene nitrile by column chromatography is eliminated. The impurities carried over from intermediate steps (i.e. alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step. Additional advantages of this process are: (a) crude treprostinil salts can be stored as raw material at ambient temperature and can be converted to treprostinil by simple acidification with diluted hydrochloric acid, and (b) the treprostinil salts can be synthesized from the solution of treprostinil without isolation. This process provides better quality of final product as well as saves significant amount of solvents and manpower in purification of intermediates.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

**1.** A product comprising a compound of formula I



(I)

or a pharmaceutically acceptable salt thereof, wherein said product is prepared by a process comprising

(a) alkylating a compound of structure II with an alkylating agent to produce a compound of formula III,



(II)



(III)

wherein

w=1, 2, or 3;

$Y_1$ is trans—CH═CH—, cis-CH═CH—, —CH$_2$(CH$_2$)$_m$—, or —C≡C—; m is 1, 2, or 3;

$R_7$ is

(1) —C$_p$H$_{2p}$—CH$_3$, wherein p is an integer from 1 to 5, inclusive,

(2) phenoxy optionally substituted by one, two or three chloro, fluoro, trifluoromethyl, (C$_1$-C$_3$) alkyl, or (C$_1$-C$_3$) alkoxy, with the proviso that not more than two substituents are other than alkyl, with the proviso that $R_7$ is phenoxy or substituted phenoxy, only when $R_3$ and $R_4$ are hydrogen or methyl, being the same or different,

(3) phenyl, benzyl, phenylethyl, or phenylpropyl optionally substituted on the aromatic ring by one, two or three chloro, fluoro, trifluoromethyl, (C$_1$-C$_3$)alkyl, or (C$_1$-C$_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl,

(4) cis-CH═CH—CH$_2$—CH$_3$,

(5) —(CH$_2$)$_2$—CH(OH)—CH$_3$, or

(6) —(CH$_2$)$_3$—CH═C(CH$_3$)$_2$;

—C(L$_1$)—R$_7$ taken together is

(1) (C$_4$-C$_7$)cycloalkyl optionally substituted by 1 to 3 (C$_1$-C$_5$) alkyl;

LIQ00084839

US 8,497,393 B2

19

(2) 2-(2-furyl)ethyl,
(3) 2-(3-thienyl)ethoxy, or
(4) 3-thienyloxymethyl;

$M_1$ is $\alpha$-OH:$\beta$-$R_5$ or $\alpha$-$R_5\beta$-OH or $\alpha$-$OR_1$:$\beta$-$R_5$ or $\alpha$-$R_5$:$\beta$-$OR_2$, wherein $R_5$ is hydrogen or methyl, $R_2$ is an alcohol protecting group, and

$L_1$ is $\alpha$-$R_3$:$\beta$-$R_4$, $\alpha$-$R_4$:$\beta$-$R_3$, or a mixture of $\alpha$-$R_3$:$\beta$-$R_4$ and $\alpha$-$R_4$:$\beta$-$R_3$, wherein $R_3$ and $R_4$ are hydrogen, methyl, or fluoro, being the same or different, with the proviso that one of $R_3$ and $R_4$ are fluoro only when the other is hydrogen or fluoro,

(b) hydrolyzing the product of formula III of step (a) with a base,

(c) contacting the product of step (h) with a base B to form a salt of formula $I_s$.



(I_s)

and

(d) optionally reacting the salt formed in step (c) with an acid to form the compound of formula I.

**2**. The product of claim **1**, wherein the purity of compound of formula I in said product is at least 99.5%.

**3**. The product of claim **1**, wherein the alkylating agent is $Cl(CH_2)_wCN$, $Br(CH_2)_wCN$, or $I(CH_2)_wCN$.

**4**. The product of claim **1**, wherein the base in step (b) is KOH or NaOH.

**5**. The product of claim **1**, wherein the base B in step (c) is selected from the group consisting of ammonia, N-methylglucamine, procaine, tromethanine, magnesium, L-lysine, L-arginine, triethanolamine, and diethanolamine.

**6**. The product of claim **1**, wherein the acid in step (d) is HCl or $H_2SO_4$.

**7**. The product of claim **1**, wherein $Y_1$ is —$CH_2CH_2$—; $M_1$ is $\alpha$-OH:$\beta$-H or $\alpha$-H:$\beta$-OH; —$C(L_1)$-$R_7$ taken together is —$(CH_2)_4CH_3$; and w is 1.

**8**. The product of claim **1**, wherein the process does not include purifying the compound of formula (III) produced in step (a).

**9**. A product comprising a compound having formula IV



(IV)

or a pharmaceutically acceptable salt thereof, wherein the product is prepared by the process comprising
(a) alkylating a compound of formula V with an alkylating agent to produce a compound of formula VI,

20



(V)



(VI)

(b) hydrolyzing the product of formula VI of step (a) with a base,

(c) contacting the product of step (h) with a base B to form a salt of formula $IV_s$, and



(IV_s)

(d) optionally reacting the salt formed in step (c) with an acid to form the compound of formula IV.

**10**. The product of claim **9**, wherein the purity of product of step (d) is at least 99.5%.

**11**. The product of claim **9**, wherein the alkylating agent is $ClCH_2CN$.

**12**. The product of claim **9**, wherein the base in step (b) is KOH.

**13**. The product of claim **9**, wherein the base B in step (c) is selected from a group consisting of ammonia, N-methylglucamine, procaine, tromethanine, magnesium, L-lysine, L-arginine, triethanolamine, and diethanolamine.

**14**. The product of claim **9**, wherein the base B is diethanolamine.

**15**. The product of claim **9**, wherein the acid in step (d) is HCl.

**16**. The product of claim **9**, wherein the process does not include purifying the compound of formula (VI) produced in step (a).

**17**. The product of claim **16**, wherein the base B in step (c) is selected from a group consisting of ammonia, N-methylglucamine, procaine, tromethanine, magnesium, L-lysinc, L-arginine, tricthanolamine, and diethanolamine.

LIQ00084840

US 8,497,393 B2

21

22

**18**. The product of claim **17**, wherein the base B is diethanolamine.

**19**. The product of claim **1**, wherein the base in step (b) is KOH or NaOH and wherein the base 13 in step (c) is selected from the group consisting of ammonia. N-methyl glucamine, procaine, tromethanine, magnesium, L-lysine, L-arginine, triethanolamine, and diethanolamine.

**20**. The product of claim **9**, wherein the base in step (b) is KOH or NaOH and wherein the base B in step (c) is selected from the group consisting of ammonia, N-methylglucamine, procaine, tromethanine, magnesium, L-lysine, L-arginine, triethanolamine, and diethanolamine.

**21**. The product of claim **1**, wherein step (d) is performed.

**22**. The product of claim **21**, wherein the product comprises a pharmaceutically acceptable salt formed from the product of step (d).

\*   \*   \*   \*   \*

LIQ00084841

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,497,393 B2                                       Page 1 of 1
APPLICATION NO.   : 13/548446
DATED                  : July 30, 2013
INVENTOR(S)         : Hitesh Batra et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

    In the Claims:

    Replace the term "tromethanine" with --tromethamine-- as follows:

    Col. 19, claim 5, line 38;
    Col. 20, claim 13, line 5;
    Col. 20, claim 17, line 66;
    Col. 21, claim 19, line 6; and
    Col. 21, claim 20, line 11.

Signed and Sealed this
Eighteenth Day of March, 2014

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

LIQ00084842

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.       : 8,497,393 B2

APPLICATION NO.   : 13/548446

DATED              : July 30, 2013

INVENTOR(S)       : Hitesh Batra et al.

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims:

Replace the term "tromethanine" with --tromethamine-- as follows:

Col. 19, claim 5, line 38;
Col. 20, claim 13, line 55;
Col. 20, claim 17, line 66;
Col. 21, claim 19, line 6; and
Col. 21, claim 20, line 11.

This certificate supersedes the Certificate of Correction issued March 18, 2014.

Signed and Sealed this
Twenty-seventh Day of May, 2014

*Michelle K. Lee*

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

LIQ00084843

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,497,393 B2                                   Page 1 of 1
APPLICATION NO.     : 13/548446
DATED               : July 30, 2013
INVENTOR(S)         : Hitesh Batra et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Replace "$\alpha OR_1{:}\beta{-}R_5$" with -- $\alpha OR_2{:}\beta{-}R_5$ -- as follows:

In the Specification:
Col. 2, line 62;
Col. 6, line 55; and

In the Claims:
Claim 1, col. 19, line 4.

Signed and Sealed this
Thirty-first Day of March, 2015

Michelle K. Lee
Director of the United States Patent and Trademark Office

LIQ00084844

# EXHIBIT 4

Trials@uspto.gov                                    Paper No. 82
571-272-7822                            Entered:  March 31, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

STEADYMED LTD.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.
_____

Case IPR2016-00006
Patent 8,497,393 B2
_____

Before LORA M. GREEN, JONI Y. CHANG, and
JACQUELINE T. HARLOW, *Administrative Patent Judges.*

HARLOW, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Liquidia - Exhibit 1005 - Page 1
UTC_LIQ00040890

IPR2016-00006
Patent 8,497,393 B2

# I.    INTRODUCTION

Petitioner, SteadyMed LTD ("SteadyMed"), filed a Petition on October 2, 2015, requesting an *inter partes* review of claims 1–22 of U.S. Patent No. 8,497,393 B2 (Ex. 1001, "the '393 patent").  Paper 1 ("Pet.").  Patent Owner, United Therapeutics Corporation ("UTC"), filed a Preliminary Response on January 14, 2016.  Paper 10 ("Prelim. Resp.").[1] We determined that the information presented in the Petition demonstrated that there was a reasonable likelihood that SteadyMed would prevail with respect to at least one challenged claim.  Pursuant to 35 U.S.C. § 314, we instituted trial on April 8, 2016, as to claims 1–22 of the '393 patent. Paper 12 ("Dec.").[2]

After institution, UTC filed a Patent Owner Response.  Paper 31 ("PO Resp.").[3]  SteadyMed filed a Reply to the Patent Owner Response. Paper 51 ("Pet. Reply").[4]

In addition, SteadyMed filed a Motion to Exclude Evidence (Paper 63, "Pet. Mot. Exclude").[5]  UTC filed an Opposition (Paper 66, "PO Opp. Exclude"), and SteadyMed filed a Reply (Paper 72, "Pet. Reply Exclude"). UTC likewise filed a Motion to Exclude Evidence (Paper 65, "PO Mot.

---

[1] Paper 8 is a redacted version of the Patent Owner Preliminary Response.
[2] Paper 78 is a redacted version of the Decision on Institution.
[3] Paper 76 is a redacted version of the Patent Owner Response to Petition.
[4] Paper 52 is a redacted version of the Reply to Patent Owner's Response.
[5] Paper 62 is a redacted version of Petitioner's Motion to Exclude Evidence.

2

Liquidia - Exhibit 1005 - Page 2
UTC_LIQ00040891

IPR2016-00006
Patent 8,497,393 B2

Exclude").  SteadyMed filed an Opposition (Paper 68, "Pet. Opp. Exclude"),[6] and UTC filed a Reply (Paper 71, "PO Reply Exclude").

Oral hearing was held November 29, 2016.

This final written decision is entered pursuant to 35 U.S.C. § 318(a). We have jurisdiction under 35 U.S.C. § 6.

We hold that SteadyMed has demonstrated by a preponderance of the evidence that claims 1–22 are unpatentable under 35 U.S.C. § 102(b) and 35 U.S.C. § 103(a).  SteadyMed's Motion to Exclude is *dismissed.*  UTC's Motion to Exclude is *denied.*

## A.   Related Matters

The '393 patent is asserted in several cases in the District of New Jersey.  Pet. 1; Paper 4; Paper 15; Paper 21.

## B.   The '393 Patent

The '393 patent, titled "Process to Prepare Treprostinil, the Active Ingredient in Remodulin®," issued July 30, 2013, from U.S. Patent Application No. 13/548,446 ("the '446 application") (Ex. 1002), filed July 13, 2012.  Ex. 1001, [54], [45], [21], [22].  The '446 application is a continuation of U.S. Patent Application No. 12/334,731 ("the '731 application") (Ex. 1002), filed on December 15, 2008, now issued as U.S. Patent No. 8,242,305 ("the '305 patent").  Ex. 1001, [63].  The

---

[6] Paper 67 is a redacted version of Petitioner's Opposition to Patent Owner's Motion to Exclude Evidence.

3

Liquidia - Exhibit 1005 - Page 3
UTC_LIQ00040892

IPR2016-00006
Patent 8,497,393 B2

'393 patent claims priority to U.S. Provisional Patent Application No. 61/014,232 (Ex. 2008), filed December 17, 2007.  Ex. 1001, [60].

The '393 patent recites 22 product-by-process claims for prostacyclin derivatives, including treprostinil.[7]  *Id*. at 17:51–21:16; Pet. 5; Prelim. Resp. 3.  The process disclosed by the '393 patent takes advantage of carbon treatment and salt formation steps to remove impurities, eliminating the need for purification by column chromatography.  *Id*. at 17:29–32; *see also id*. at 5:41–45 ("[P]urification by column chromatography is eliminated . . . . [T]he salt formation is a much easier operation than column chromatography.").

The process for forming prostacyclin derivatives described in the '393 patent includes four steps:  (a) alkylating a prostacyclin derivative to form an alkylated prostacyclin derivative; (b) hydrolyzing the alkylated prostacyclin derivative with a base to form a prostacyclin acid; (c) contacting the prostacyclin acid with a base to form a prostacyclin carboxylate salt; and (d) optionally reacting the prostacyclin carboxylate salt formed in (c) with an acid to form the desired compound, or pharmaceutically acceptable salt thereof.  *Id*. at 1:65–3:19.

---

[7] The '305 patent, which issued from the parent to the application for the '393 patent, recites claims to a process for the preparation of prostacyclin derivatives comprising steps similar to those set forth in the product-by-process claims of the '393 patent.  *Compare* Ex. 1001, 17:51–21:16, *with* Ex. 2007, 17:39–24:3.

4

Liquidia - Exhibit 1005 - Page 4
UTC_LIQ00040893

IPR2016-00006
Patent 8,497,393 B2

*C.  Illustrative Claim*

Each of the challenged claims is a product-by-process claim.  Of the challenged claims, claims 1 and 9 are independent.  Claim 1, reproduced below, is illustrative of the claimed subject matter.

1.      A product comprising a compound of formula I



or a pharmaceutically acceptable salt thereof, wherein said product is prepared by a process comprising

a) alkylating a compound of structure II with an alkylating agent to produce a compound of formula III,





wherein [recitation of Markush groups for the specified structures],

b) hydrolyzing the product of formula III of step (a) with a base,

5

Liquidia - Exhibit 1005 - Page 5
UTC_LIQ00040894

IPR2016-00006
Patent 8,497,393 B2

c) contacting the product of step (h)[8] with a base B to form a salt of formula $I_s$.

 and

d) optionally reacting the salt formed in step (c) with an acid to form the compound of formula I.

Ex. 1001, 17:51–19:29.  Claim 9 is drawn to a product comprising a specific treprostinil compound within the genus set forth in claim 1, and made by the process recited in claim 1.  *Id*. at 19:48–20:46.

### D.   *Prior Art Relied Upon*

In its Petition, SteadyMed relies upon the following prior art references (Pet. 4–6):

| | | | |
|---|---|---|---|
| Phares | WO 2005/007081 A2 | Jan. 27, 2005 | (Ex. 1005) |
| Kawakami | JP 56-122328A | Sept. 25, 1981 | (Ex. 1006)[9] |

Moriarty et al., *The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins:*

---

[8] We note that the reference to "step (h)," rather than "step (b)," in claim 1 is an apparent typographical error.  *See* Ex. 1001, 3:66–67 ("(c) contacting the product of step (b) with a base B to for a salt of formula $IV_s$"); *see also* Pet. 25; Ex. 1009 ¶ 51.

[9] SteadyMed submitted a certified English translation of Kawakami as Ex. 1007.  Exhibits 1011, 1019, and 1020 are translator declarations attesting to the accuracy of that translation.

6

IPR2016-00006
Patent 8,497,393 B2

*Synthesis of UT-15 (Treprostinil)*, 69 J. Org. Chem. 1890–1902 (2004) ("Moriarty") (Ex. 1004); and

Seyhan N. Eğe, ORGANIC CHEMISTRY 543–547 (2d ed. 1989) ("Eğe") (Ex. 1008).

## E.  Instituted Grounds of Unpatentability

We instituted the instant trial based on the following grounds of unpatentability:

| Claims | Basis | Reference(s) |
|---|---|---|
| 1–5, 7–9, 11–14, and 16–20 | § 102(b) | Phares |
| 1–5, 7–9, 11–14, and 16–20 | § 103(a) | Moriarty and Phares |
| 6, 10, 15, 21, and 22 | § 103(a) | Moriarty, Phares, Kawakami, and Eğe |

## II.  ANALYSIS

### A.  Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable interpretation in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b).  Under the broadest reasonable interpretation standard, claim terms are generally given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  Under this standard, we may take into account definitions or other explanations provided in the written description of the specification.  *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997).  Any special definition for a claim term must be set forth in the

7

Liquidia - Exhibit 1005 - Page 7
UTC_LIQ00040896

IPR2016-00006
Patent 8,497,393 B2

specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Only those terms that are in controversy need be construed, and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

1. *"A product comprising a compound [of/having] formula [I/IV] . . . or a pharmaceutically acceptable salt thereof" / "product"*

Independent claims 1 and 9 recite the phrase "[a] product comprising a compound [of/having] formula [I/IV] . . . or a pharmaceutically acceptable salt thereof . . . ." In addition, each challenged dependent claim recites the term "product." In the Decision on Institution, we construed "[a] product comprising a compound [of/having] formula [I/IV] . . . or a pharmaceutically acceptable salt thereof" to mean "a product including, but not limited to, a compound [of/having] formula [I/IV] or a pharmaceutically acceptable salt thereof." We additionally determined that the claim term "product," as it is used in the '393 patent, does not require interpretation because the claimed "product" is defined by the limitations recited in the challenged claims.

In its Patent Owner Response, UTC contends that our constructions of the above terms, as set forth in the Decision on Institution, are unreasonably broad. PO Resp. 13. In particular, UTC argues that we erred in interpreting the subsidiary term "comprising," as recited in the larger phrase "[a] product comprising a compound [of/having] formula [I/IV] . . . or a pharmaceutically acceptable salt thereof" to mean "including, but not limited to." *Id*. at 13–16. UTC also asserts that we erred in declining to construe "product" as "a

8

Liquidia - Exhibit 1005 - Page 8
UTC_LIQ00040897

IPR2016-00006
Patent 8,497,393 B2

substance resulting from a chemical reaction," and having the impurity profile conferred by the recited process steps. *Id.* at 16–18.

### a. *"Comprising"*

UTC contends that the intrinsic evidence overrides the presumption that the transition phrase "comprising," as recited in the challenged claims, is an "open" phrase. *Id.* at 13. Although UTC does not identify which portions of the prosecution history or specification of the '393 patent support deviating from the well-established meaning of "comprising" in patent law, UTC nevertheless urges that review of the intrinsic record demonstrates disclaimer or disavowal of an open-ended interpretation of "comprising." *Id.* at 13–16.

SteadyMed agrees with the construction of "comprising" set forth in the Decision on Institution, and contends that "comprising" is a term of art in patent law, and not susceptible to the narrow construction proffered by UTC. Pet. Reply 21. SteadyMed also observes (*id.*) that UTC argued in its Preliminary Response for broadly construing that term to mean "including but not limited to" (Prelim. Resp. 23). SteadyMed further asserts that UTC fails to identify any statements in the prosecution history regarding the meaning of "comprising," and improperly conflates the examiner's allowance of the challenged claims with a disavowal of claim scope. Pet. Reply 21.

SteadyMed additionally argues that the interpretation of "comprising" proffered by UTC cannot effect UTC's desired result of limiting the challenged claims to require a particular impurity profile. SteadyMed

9

IPR2016-00006
Patent 8,497,393 B2

asserts that the record is devoid of support for the conclusion that the claimed products and recited processes have unique impurity profiles. *Id*. at 22. In this regard, SteadyMed contends that the observed impurity profiles are not unique to the challenged claims, but rather, depend on unclaimed elements like what solvents were used, whether intermediate products were purified, and what bases, acids, or other reactants were used (*id*. at 23).

"In the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'" *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007); *see also Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). Moreover, the specification of the '393 patent itself adopts this art-established definition of "comprising," stating "[t]he expression 'comprising' means 'including but not limited to.' Thus, other non-mentioned substances, additives, carriers, or steps may be present." Ex. 1001, 4:23–25.

Indeed, in its Preliminary Response, UTC noted both that "comprising" is a term of art in patent law, and that the specification of the '393 patent defines "comprising" consistently with its well-understood meaning in arguing that the claim term "[a/the] process comprising" should be construed to mean "a/the process including but not limited to." Prelim. Resp. 23–24. In contrast, UTC does not identify, and we do not discern support in either the specification or the prosecution history for the

10

Liquidia - Exhibit 1005 - Page 10
UTC_LIQ00040899

IPR2016-00006
Patent 8,497,393 B2

proposition that the Applicant disclaimed or disavowed the full scope of "comprising."

Accordingly, upon review of the parties' arguments and the evidence before us, including the claims, specification, and prosecution history of the '393 patent, we conclude that the broadest reasonable interpretation of the term "comprising," as it is used in the '393 patent, is "including, but not limited to."

### b.   "Product"

UTC asserts that both the specification and prosecution history of the '393 patent demonstrate that the product of the challenged claims must have the particular impurity profile that is conferred by the recited process steps (PO Resp. 17), and, thus, the challenged claims exclude products made using different processes, such as the process taught by Moriarty (*id*. at 16).  UTC further argues that "product" should be construed as "a substance resulting from a chemical reaction."  *Id*. at 17.

SteadyMed agrees with our determination in the Decision on Institution that the term "product," as it is used in the '393 patent, does not require interpretation because the claimed "product" is defined by the limitations recited in the challenged claims.  Pet. Reply 21.  In this regard, SteadyMed points out that UTC's expert, Dr. Williams, contemplates four different meanings for that term, only one of which conforms to the narrow interpretation advanced by UTC.  *Id*. at 21–22.

SteadyMed additionally asserts that UTC's proffered interpretation of "product" cannot effect the desired result of limiting the challenged claims

11

Liquidia - Exhibit 1005 - Page 11
UTC_LIQ00040900

IPR2016-00006
Patent 8,497,393 B2

to require a particular impurity profile. SteadyMed argues that the record is devoid of support for the conclusion that that claimed processes and their products have unique impurity profiles. *Id.* at 22. In this regard, SteadyMed contends that the observed impurity profiles are not unique to the challenged claims, but rather, depend on unclaimed elements like what solvents were used, whether intermediate products were purified, and what bases, acids, or other reactants were used. *Id.* at 23.

In patent parlance, "product" claims relate to structural entities, i.e., compositions of matter, machines, and manufactures. 1 DONALD S. CHISUM, CHISUM ON PATENTS, § 1.02 (Matthew Bender, 2017) ("Three of the four classes of statutory subject matter of utility patents (machines, manufactures, and compositions of matter) relate to structural entities and can be grouped as 'product' claims in order to contrast them with process claims."); *see also* MPEP § 2103 (9th ed., Rev. 07.2015, November 2015) ("Product claims are claims that are directed to either machines, manufactures or compositions of matter."). Accordingly, "[f]or products, the claim limitations will define discrete physical structures or materials." MPEP § 2103.

That a product is claimed in product-by-process format does not support deviation from this rule. Indeed, to subsume evaluation of whether the process steps recited in the challenged claims distinguish the claimed product from the prior art into the claim construction analysis, as UTC suggests, would be to improperly conflate the claim construction determination and patentability analysis, and would require importing unrecited limitations into the claims. As our reviewing court has explained:

12

Liquidia - Exhibit 1005 - Page 12
UTC_LIQ00040901

IPR2016-00006
Patent 8,497,393 B2

> "In determining validity of a product-by-process claim, the focus is on the product and not the process of making it." *Amgen Inc. v. F. Hoffman–La Roche Ltd.*, 580 F.3d 1340, 1369 (Fed.Cir.2009). . . . However, there is an exception to this general rule that the process by which the product is made is irrelevant. As we recognized in *Amgen*, if the process by which a product is made imparts "structural and functional differences" distinguishing the claimed product from the prior art, then those differences "are relevant as evidence of no anticipation" although they "are not explicitly part of the claim."

*Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1268 (Fed. Cir. 2012).

Even setting aside the art-established meaning of "product," UTC's proposed construction of that term as "a substance resulting from a chemical reaction," having the impurity profile conferred by performance of the recited process steps is unsupported by either the intrinsic or extrinsic evidence of record. Neither the specification nor the prosecution history of the '393 patent defines the term "product." In addition, the portions of the specification to which UTC points comport with an understanding of "product" as being defined only by the recited claim elements. For example, the bulk of the specification excerpts identified by UTC in its Patent Owner Response (PO Resp. 17) as supporting an interpretation of "product" as "a substance resulting from a chemical reaction" simply mirror the language of the process steps recited in the challenged claims, and do not further characterize the claim term "product." Ex. 1001, 3:3–4, 3:65–66, 6:65–66. Reference in the '393 patent specification to preparing the compound of formula II "from a compound of formula XI, which is a cyclization product of a compound of formula X" (*id.* at 7:17) likewise does not support UTC's

13

IPR2016-00006
Patent 8,497,393 B2

proposed construction (PO Resp. 17).  Indeed, if any conclusion can be drawn from the specification excerpts highlighted by UTC, it is that the claim term "product" is defined solely by the recited claim limitations.  *See* Ex. 1001, 5:45–46 (referring to the purportedly improved impurity of the "product of the process according to the present invention.").

Moreover, as UTC's expert, Dr. Williams explains, "chemists use the word 'product' in two different contexts, routinely."  Ex. 2059, 248:4–5.  "[T]here's the molecular structural context, and then there's the real-world substance context of the word 'product.'"  *Id*. at 248:19–21.  Indeed, Dr. Williams' own writings indicate that the term "product" does not necessarily refer to the result of a chemical reaction.  Ex. 2020 ¶ 63 ("The scarcity of the natural product from marine sources renders Et-743 an important target for synthesis.").  Accordingly, we do not agree with UTC that the broadest reasonable interpretation of "product" as used in the '393 patent includes a requirement that the claimed "product" be "a substance resulting from a chemical reaction."

Nor do we agree with UTC (PO Resp. 17) that the specification or prosecution history of the '393 patent disclaims or disavows from the scope of the term "product" substances having a different overall purity, or different impurity profile than is purportedly conferred by the recited process steps.  "While a court may look to the specification and prosecution history to interpret what a patentee meant by a word or phrase in a claim, extraneous limitations cannot be read into the claims from the specification

14

UTC_LIQ00040903

IPR2016-00006
Patent 8,497,393 B2

or prosecution history." *Bayer AG. v. Biovail Corp.*, 279 F.3d 1340, 1348 (Fed. Cir. 2002).

During prosecution of the '393 patent, relying on the Declaration of Dr. David Walsh ("Walsh Declaration"), the applicants argued that "the product of present claims is physically differen[t] than treprostinil produced according to the process of Moriarty," and, therefore, "Moriarty cannot anticipate the present claims." Ex. 1002, 344. In his declaration, Dr. Walsh presented a comparison of three certificates of analysis, one for each of treprostinil free acid prepared according to Moriarty, treprostinil diethanolamine prepared according to challenged claims 1 or 9, and treprostinil free acid prepared according to challenged claims 1 or 9.[10] *Id*. at 347–349. Dr. Walsh went on to testify that the treprostinil of Moriarty was physically different from treprostinil prepared according to challenged claims 1 or 9 because the former included detectable amounts of certain impurities not observed in the latter. *Id*. at 349. The examiner subsequently issued a Notice of Allowance. *Id*. at 354–360.

The applicants' arguments during prosecution concerning the alleged physical differences between treprostinil prepared according to Moriarty and treprostinil prepared according to the process steps recited in the challenged claims are not tantamount to a clear disclaimer or disavowal of the full scope of the claim term "product." As an initial matter, the applicants did not

_____

[10] Issued claim 9 of the '393 patent is identified as claim 10 in the Walsh Declaration, and other documents in the prosecution history in the '393 patent.

15

Liquidia - Exhibit 1005 - Page 15
UTC_LIQ00040904

IPR2016-00006
Patent 8,497,393 B2

identify a specific impurity profile associated with treprostinil produced
according to the recited process steps that could serve as a definite limitation
on claim scope; rather, the applicants simply asserted that the Moriarty
treprostinil was physically different from that made according to the
'393 patent (Ex. 1002, 344).  Moreover, the certificates of analysis for
treprostinil diethanolamine and treprostinil free acid presented in the Walsh
Declaration indicate that treprostinil compounds produced according to the
challenged claims can have different impurity profiles and purity levels,
suggesting that an attempt to define such parameters would prove elusive.
Ex. 1002, 348.  Indeed, as discussed in greater detail in Parts II.C.2.b,
II.D.2.e, and II.E.3.d., below, the evidence of record establishes that the
variability in the impurity profile and overall purity level between individual
batches of treprostinil produced according to the process steps recited in the
challenged claims renders the claimed treprostinil structurally and
functionally the same as treprostinil produced according to Moriarty.  In
addition, even assuming Dr. Walsh's analysis of the impurity profiles for
treprostinil produced according to Moriarty and the '393 patent is correct,
the prosecution history is devoid of evidence to support the conclusion that
those differences are due to the recited process steps themselves, and not the
use of unclaimed reagents and reaction conditions, or that any differences in
impurity profile extend to the thousands of additional compounds covered
by the challenged claims.

     The specification of the '393 patent likewise does not disclaim or
disavow the full scope of the term "product."  Akin to its arguments

Liquidia - Exhibit 1005 - Page 16
UTC_LIQ00040905

IPR2016-00006
Patent 8,497,393 B2

concerning the prosecution history of the '393 patent, UTC does not specifically identify the contours of the subject matter purportedly disavowed or disclaimed by the specification. In addition, although UTC points to Example 6 of the '393 patent specification, and the related discussion, as supporting the conclusion that "the claimed 'product' must have an impurity profile conferred by its process steps" (PO Resp. 17), UTC does not identify, and we do not discern discussion in the specification of the impurity profile for treprostinil prepared either by the recited process, or as described by Moriarty.

Example 6 of the specification presents a comparison of processes for preparing treprostinil according to Moriarty and a working example of the process disclosed in the '393 patent. Ex. 1001, 15:1–17:26. Example 6 reports an overall purity of ~99.0% for Moriarty treprostinil, and one of 99.9% for treprostinil prepared in accordance with the claimed invention. Example 6 does not disclose the impurity profile for treprostinil made by either process.

In describing Example 6, the specification states:

> The quality of treprostinil produced according to this invention is excellent. The purification of benzindene nitrile by column chromatography is eliminated. The impurities carried over from intermediate steps (i.e. alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step. Additional advantages of this process are: (a) crude treprostinil salts can be stored as raw material at ambient temperature and can be converted to treprostinil by simple acidification with diluted hydrochloric acid, and (b) the treprostinil salts can be synthesized from the

17

Liquidia - Exhibit 1005 - Page 17
UTC_LIQ00040906

IPR2016-00006
Patent 8,497,393 B2

> solution of treprostinil without isolation.  This process provides
> better quality of final product as well as saves significant amount
> of solvents and manpower in purification of intermediates.

*Id*. at 17:27–40.

Neither the purported difference in overall purity of treprostinil produced according to Moriarty versus that produced according to the process of the '393 patent, nor stated advantages of the '393 patent process as compared to the Moriarty process constitutes a disavowal or disclaimer of the full scope of the term "product."  Example 6 includes numerous process steps in addition to those recited in the challenged claims, and it is not apparent from the specification that the reported purity improvement over Moriarty treprostinil is due to the recited process steps, rather than the unclaimed steps.  Furthermore, as Dr. Williams testifies, "there is the possibility for significant batch-to-batch variations in the impurity profile of each batch of treprostinil."  Ex. 2020 ¶ 93 (internal quotation omitted).  In addition, as discussed in greater detail in Parts II.C.2.b., II.D.2.e., and II.E.3.d., below, the overall purity for Moriarty treprostinil set forth in the '393 patent specification is inconsistent with that reported by Moriarty (99.7%) (Ex. 1004, 13), as well as the average purity of 46 commercial Moriarty batches (99.7%) (Ex. 1021; Ex. 2059, 218:3–219:20).  Lastly, we observe that the challenged claims contain no limitations relating to the impurity profile of the recited product, "and it is the claims ultimately that define the invention."  *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).

Liquidia - Exhibit 1005 - Page 18
UTC_LIQ00040907

IPR2016-00006
Patent 8,497,393 B2

Accordingly, upon review of the parties' arguments and the evidence before us, including the claims, specification, and prosecution history of the '393 patent, we conclude that the term "product," as it is used in that patent, does not require construction because the claimed "product" is defined by the limitations recited in the challenged claims.  We additionally conclude that the broadest reasonable construction of the larger phrase "[a] product comprising a compound [of/having] formula [I/IV] . . . or a pharmaceutically acceptable salt thereof" is "a product including, but not limited to, a compound [of/having] formula [I/IV] or a pharmaceutically acceptable salt thereof."

### 2.  *"[A/the] process comprising"*

Claims 1 and 9 recite "[a/the] process comprising."  In the Decision on Institution, we construed this term to mean "a/the process including, but not limited to."  Dec. 13.  Neither SteadyMed nor UTC challenges the interpretation set forth in the Decision on Institution.  *See* PO Resp. 13–18; Pet. Reply 21–23.  Accordingly, for the reasons set forth in the Decision on Institution (Dec. 13), we broadly, but reasonably, construe "[a/the] process comprising" to mean "a/the process including, but not limited to."

### B.  *Principles of Law*

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008).  "A reference anticipates a claim if it discloses the claimed invention 'such

19

IPR2016-00006
Patent 8,497,393 B2

that a skilled artisan could take its teachings in combination with his own knowledge of the particular art and be in possession of the invention.'" *In re Graves*, 69 F.3d 1147, 1152 (Fed. Cir. 1995) (emphasis omitted) (quoting *In re LeGrice*, 301 F.2d 929, 936 (CCPA 1962)).

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

> When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill. *Sakraida* [*v. Ag Pro, Inc.*, 425 U.S. 273 (1976)] and *Anderson's–Black Rock* [*v. Pavement Salvage Co.*, 396 U.S. 57 (1969)] are illustrative—a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions.

*KSR*, 550 U.S. at 417.

20

Liquidia - Exhibit 1005 - Page 20
UTC_LIQ00040909

IPR2016-00006
Patent 8,497,393 B2

The level of ordinary skill in the art may be reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978).

"The objective indicia of non-obviousness play an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016). Indeed, "evidence of secondary considerations may often be the most probative and cogent evidence [of nonobviousness] in the record." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

## C. Anticipation Grounds of Unpatentability Based on Phares

SteadyMed asserts that claims 1–5, 7–9, 11–14, and 16–20 are unpatentable under § 102(b) as anticipated by Phares. Pet. 22–37. Claims 2–5, 7, 8, and 19 depend directly from claim 1, and claims 11–14, 16–18, and 20 depend, directly or indirectly, from claim 9. In support of its assertion, SteadyMed provides detailed explanations as to how Phares discloses each claim limitation (*id.*), and relies upon the Winkler Declaration (Ex. 1009) and the Rogers Declaration (Ex. 1022) to support its positions.

Upon review of SteadyMed's contentions and supporting evidence, as well as UTC's Patent Owner Response and supporting evidence, we determine that SteadyMed has demonstrated, by a preponderance of the

21

IPR2016-00006
Patent 8,497,393 B2

evidence, that claims 1–5, 7–9, 11–14, and 16–20 of the '393 patent are
unpatentable over Phares.

### 1. Phares

Phares describes "compounds and methods for inducing prostacyclin-
like effects in a subject or patient," including treprostinil and derivatives
thereof. Ex. 1005, 10. The chemical structure of treprostinil disclosed by
Phares, on page 10 of Exhibit 1005, is reproduced below:



*Id.* Phares explains that "[t]reprostinil is a chemically stable analog of
prostacyclin, and as such is a potent vasodilator and inhibitor of platelet
aggregation." *Id.*

Phares further discloses that "[a] preferred embodiment of the present
invention is the diethanolamine salt of treprostinil . . . . A particularly
preferred embodiment of the present invention is form B of treprostinil
diethanolamine." *Id.* at 11. The structure of the diethanolamine salt of
treprostinil described by Phares, on page 99 of Exhibit 1005, is reproduced
below:

22

Liquidia - Exhibit 1005 - Page 22
UTC_LIQ00040911

IPR2016-00006
Patent 8,497,393 B2



*Id*. at 99 (claim 49).  Phares reports that form B of the diethanolamine salt of treprostinil "appears to be a crystalline material which melts at 107°C."  *Id*. at 91.

Phares describes the synthesis of (-)-treprostinil, the enantiomer of treprostinil.  Ex. 1005, 41–42.  Phares explains that "[e]nantiomers of these compounds . . . can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents."  *Id*. at 41.  In particular, Phares teaches that "the enantiomer of the commercial drug (+)-Treprostinil was synthesized using the stereoselective intramolecular Pauson Khand reaction as a key step and Mitsunobu inversion of the side-chain hydroxyl group."  *Id*. at 42.  Phares discloses the following reaction procedure: "i. ClCH$_2$CN, K$_2$CO$_3$. ii, KOH, CH$_3$OH, reflux. 83 % (2 steps)."  *Id*.

23

Liquidia - Exhibit 1005 - Page 23
UTC_LIQ00040912

IPR2016-00006
Patent 8,497,393 B2

## 2. *Discussion*

Each of the challenged claims, including independent claims 1 and 9, is a product-by-process claim. Claim 1 of the '393 patent recites "[a] product comprising a compound of formula I



or a pharmaceutically acceptable salt thereof," and sets forth a series of process steps for obtaining the claimed product. Claim 9 recites "[a] product comprising a compound having formula IV



or a pharmaceutically acceptable salt thereof," and includes the same process steps for obtaining the claimed product as recited in claim 1.

Claim 9 is identical to claim 1, except that it is drawn to a product comprising the specific treprostinil compound, a species of the genus of claim 1. Accordingly, we address claims 1 and 9 together. Dependent claim 2 further limits claim 1, additionally requiring that "the purity of compound of formula I in said product is at least 99.5%."

24

IPR2016-00006
Patent 8,497,393 B2

SteadyMed contends that "Phares discloses in its Claim 49 the identical, pharmaceutically acceptable treprostinil diethanolamine salt" claimed in the '393 patent. Pet. 26. SteadyMed further asserts that the process steps recited in the challenged claims of the '393 patent do not result in a treprostinil product that is physically different or unique from treprostinil produced by prior art methods. *Id*. at 19–22. In support of its position, SteadyMed argues that because the melting point for treprostinil diethanolamine salt reported by Phares is higher and exhibits a narrow range than that reported in the '393 patent, the treprostinil diethanolamine salt of Phares is at least as pure as that generated according to the process of the '393 patent. *Id*. at 27–28. SteadyMed also asserts that Phares inherently anticipates the process steps recited in the challenged claims. *Id*. at 24–28.

We have reviewed the Petition and the supporting evidence to which we are directed as to how Phares teaches each limitation of the challenged claims. We are persuaded by SteadyMed's showing that Phares discloses the identical, pharmaceutically acceptable treprostinil diethanolamine salt claimed in the '393 patent. Ex. 1005, 99 (claim 49); *see also* Ex. 1009 ¶¶ 52–53.

Notwithstanding UTC's arguments to the contrary, which we address below, we are also persuaded by SteadyMed's showing that the process steps recited in the challenged claims of the '393 patent are not entitled to patentable weight because they do not result in a treprostinil product that is structurally or functionally different from treprostinil produced by prior art methods. In this regard, we note, as SteadyMed points out, that the 99.7%

25

UTC_LIQ00040914

IPR2016-00006
Patent 8,497,393 B2

treprostinil purity reported by Moriarty (Ex. 1004, 13) exceeds each of the purity levels exemplified in the specification of the '393 patent (Ex. 1001, 8:66–67), as well as the 99.5% purity recited in dependent claims 2 and 10 of the '393 patent, the only challenged claims that recite a purity level (*id.* at 19:30–31, 20:47–48). Pet. 20–21. Moreover, as discussed in greater detail below, we are persuaded by SteadyMed's showing that any purported differences in the overall purity or impurity profile observed for treprostinil produced according to the '393 patent as compared to prior art methods are attributable to inter-batch variability in purity levels and impurity profiles, as well as variations in reagents, solvents, and reaction conditions, rather than structural and functional differences arising from performance of the process steps recited in the challenged claims. *Id.* at 21.

UTC does not dispute that Phares discloses the identical chemical structure for the treprostinil diethanolamine product claimed in the '393 patent. UTC asserts, however, that SteadyMed improperly combines disparate disclosures of Phares in arguing that Phares teaches the same process for manufacturing treprostinil as recited in claims 1 and 9. PO Resp. 19–20, 24–26.

Corollary to its contentions concerning how Phares treprostinil is made, UTC additionally argues that treprostinil produced according to Phares exhibits differences in overall purity and impurity profile compared to treprostinil produced according to the challenged claims, and, thus, cannot anticipate the claimed product. *Id.* at 20–26. In this regard, UTC argues that "SteadyMed must show that the Phares' diethanolamine salt necessarily

26

IPR2016-00006
Patent 8,497,393 B2

possesses an impurity profile that is distinct from that of the Moriarty product and with higher purity." *Id*. at 21.  UTC further asserts that the melting point data on which SteadyMed relies as establishing that Phares treprostinil is of at least equal purity to treprostinil produced according to the recited process is "not necessarily a reliable metric of purity" (*id*. at 22), and that SteadyMed's analysis of Phares' purity level is unsound (*id*. at 23–24).  With regard to dependent claim 2, UTC argues that "nothing in Phares discloses a purity of at least 99.5%."  *Id*. at 24.

Lastly, UTC asserts that "[b]ecause Phares does not disclose the process of preparing the starting treprostinil acid for the diethanolamine salt, the impurity profile of the diethanolamine salt cannot be established" and, thus, SteadyMed "cannot show that it is necessarily identical to the claimed product or has equal purity to the claimed product."  *Id*. at 26.  We address UTC's arguments below.

>    a.  *"A product comprising a compound [of/having] formula [I/IV] . . .*
>        *or a pharmaceutically acceptable salt thereof"*

It is undisputed that Phares and the '393 patent disclose identical chemical structures for treprostinil diethanolamine salt.  This structural identity is illustrated in the side-by-side comparison of the compounds disclosed in claim 49 of Phares, and column 8, lines 50–63 of the '393

27

Liquidia - Exhibit 1005 - Page 27
UTC_LIQ00040916

IPR2016-00006
Patent 8,497,393 B2

patent set forth in paragraph 52 of the Winkler Declaration, and reproduced below:



Ex 1009 ¶ 52.  As shown in the figure from paragraph 52 of the Winkler Declaration, the treprostinil diethanolamine salt disclosed by Phares is structurally identical to that disclosed in the '393 patent.

### b. Recited Process Steps

In order to determine whether Phares anticipates the challenged claims, we must determine whether the process steps recited in the challenged product-by-process claims are entitled to patentable weight.  The general rule when determining patentability of a product-by-process claim is to "focus . . . on the product and not on the process of making it."  *Amgen, Inc. v. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1369 (Fed. Cir. 2009).  This rule embodies the long-standing principle that "an old product is not patentable even if it is made by a new process."  *Id*. at 1370.  Thus, although a party may be entitled to a patent on a method for purifying a known substance, it is "not entitled to a patent on the article which after being

28

IPR2016-00006
Patent 8,497,393 B2

produced has a greater degree of purity than the product produced by former methods." *In re Merz*, 97 F.2d 599, 601 (CCPA 1938).

An exception to the general rule applies, however, when process steps recited in the claim impart "structural and functional differences" to the claimed product. *Greenliant Sys.*, 692 F.3d at 1267–1268. If the exception applies, the structural and functional differences conveyed by the recited process steps "'are relevant as evidence of no anticipation' although they 'are not explicitly part of the claim.'" *Id.* at 1268 (citing *Amgen*, 580 F.3d at 1370); *Merz*, 97 F.2d at 601 ("[I]f the process produces an article of such purity that it differs not only in degree but in kind it may be patentable.").

Based on the entire record before us, we find that the process steps recited in the challenged claims do not impart structural or functional differences to the claimed product, and, therefore, conclude that those process steps are not entitled to patentable weight. Instead, we find that the evidence of record supports a finding that treprostinil produced according to Phares has the same, or better, overall purity and purity profile than treprostinil produced according to the process recited in the '393 patent. We further find that, to the extent they exist at all, any purity differences between treprostinil produced by prior art methods and that produced according to the process recited in the '393 patent are attributable to inter-batch variability in impurity profiles, as well as variations in reagents, solvents, and reaction conditions, and are not indicative of structural or functional differences imparted by performing the steps recited in the challenged claims of the '393 patent. Moreover, even assuming the

29

IPR2016-00006
Patent 8,497,393 B2

existence of impurity differences between prior art treprostinil and '393 patent treprostinil, we find that the evidence of record does not support a determination that those impurity differences render prior art treprostinil functionally different from '393 patent treprostinil.[11]

As an initial matter, we observe that UTC does not identify, and we do not discern, evidence of record to suggest that treprostinil produced according to the process steps recited in claims 1 and 9 has a higher overall purity or different impurity profile than treprostinil diethanolamine salt produced according to Phares. Although UTC attempts to discredit evidence proffered by SteadyMed to demonstrate that Phares treprostinil is of equivalent purity to that produced according to the '393 patent (which arguments we address below), it is nevertheless the case that the record is devoid of evidence affirmatively suggesting the existence of any structural or functional difference between treprostinil made according to Phares and that made according to the '393 patent.

Moreover, we find that the 107°C melting point for treprostinil diethanolamine salt Form B reported by Phares (Ex. 1005, 91) indicates that the treprostinil product produced by to Phares is at least as pure as that made according to the steps recited in the '393 patent. Phares and the '393 patent each report melting point data for treprostinil diethanolamine salt Form B. Ex. 1005, 91; Ex. 1001, 12:52–13:20, 13:50–65. In particular, Phares

---

[11] Because we determine that the recited process steps are not entitled to patentable weight, we do not address the parties' contentions concerning Phares' anticipation of the recited process steps.

30

Liquidia - Exhibit 1005 - Page 30
UTC_LIQ00040919

IPR2016-00006
Patent 8,497,393 B2

reports a melting point of 107°C (Ex. 1005, 91), and the '393 patent reports melting point ranges of 104.3°C–106.3°C, 105.5°C–107.2°C, 104.7°C–106.6°C, 105°C–108°C, 105.0°C–106.5°C, and 104.5°C–105.5°C (Ex. 1001, 12:52–13:20, 13:50–65).  Because the melting point for treprostinil diethanolamine salt Form B produced according to Phares exceeds the melting point ranges reported for four batches produced according to the challenged claims, and falls within the ranges of the remaining two batches, we find that the treprostinil diethanolamine salt produced according to Phares is of at least equal purity to that produced by the recited process steps, and thus, is not structurally or functionally different from '393 patent treprostinil.  We also find that the 2°C width of the melting peak for treprostinil diethanolamine salt Form B reported by Phares further indicates a high purity for Phares treprostinil, although we note that this additional finding is not essential to our determination that Phares treprostinil is not structurally or functionally different from treprostinil produced according to the '393 patent. Ex. 1005, Fig. 21.

In making these findings, we credit the testimony of SteadyMed's polymorph expert, Dr. Rogers that "[n]o matter how Form B is made, Form B has a single, defined melting point.  If impurities are present, the apparent melting point may decrease due to a phenomenon called 'melting point depression,' but the melting point of a pure substance never changes." Ex. 1022 ¶ 64.  In this regard, we note that reliance by Dr. Williams, UTC's

31

Liquidia - Exhibit 1005 - Page 31
UTC_LIQ00040920

IPR2016-00006
Patent 8,497,393 B2

expert, on Adhiyaman[12] as suggesting that two crystals having the same crystal form could have different pure melting point ("$T_0$") values if made using different solvents (*see* Ex. 2022 ¶ 75) is misplaced.  As explained by Dr. Rogers (Ex. 1022 ¶¶ 78–80), in Adhiyaman, different crystal forms of the same drug were made using different solvents, and thus, the different crystal forms exhibited different pure melting points.  Ex. 2030, 4–5; *see also* Ex. 2059, 180:9–25.  In contrast, Phares and the '393 patent discuss the same crystal form—treprostinil diethanolamine salt Form B—and, accordingly, "the crystals being compared in the '393 Patent and Phares Reference are the same crystal form, and thus have the same $T_0$ pure melting point value.  Any difference in their measured melting point, $T_s$, is due to differing levels of impurities."  Ex. 1022 ¶ 82.  Because it is consistent with the disclosures of Phares, we also credit Dr. Roger's testimony that the onset temperature for Phares' treprostinil diethanolamine salt Form B is 105.00°C, and, therefore, the width of the melting peak reported by Phares is 2°C, suggesting a high overall purity level.  Ex. 1022 ¶ 87; *see also* Ex. 1005, Fig. 21.

We also find unpersuasive UTC's contention that the melting point data provided in Phares is insufficient to support a determination that treprostinil produced according to Phares is of equivalent purity to that produced according to the '393 patent.  PO Resp. 22, 25–26.  In this regard,

---

[12] R. Adhiyaman and Sanat Kumar Basu, *Crystal Modification of Dipyridamole Using Different Solvents and Crystallization Conditions*, Int'l J. Pharmaceutics 321:27-34 (2006) ("Adhiyaman") (Ex. 2030).

Liquidia - Exhibit 1005 - Page 32
UTC_LIQ00040921

IPR2016-00006
Patent 8,497,393 B2

we note that neither UTC nor Dr. Williams identifies support for

Dr. Williams' opinion that an ordinarily skilled artisan "would not have

concluded based on a single melting point example of polymorph B prepared

under unknown conditions (e.g., recrystallization solvent and

recrystallization conditions are not identified) would be of a higher purity

than the known purity of the '393 patent" (Ex. 2020 ¶ 76; *see also id.* ¶¶ 77–

78). We are similarly unpersuaded by Dr. Williams' conclusory testimony

that the purity values reported in Phares and the '393 patent cannot be

compared because "[i]t is known in the art that sample size, rate of heating,

the recrystallization solvent(s) used, and the conditions under which the

crystalline sample was obtained can significantly affect the DSC data" (*id.*

¶ 76; *see also id.* ¶¶ 77–78), as well as his generic assertion, unsupported by

reference to scientific literature, that in his experience, crystals having the

same crystal form but made with different solvents can exhibit different pure

melt points (*see* Ex. 2059, 184:22–185:2). We give such testimony little or

no weight. 37 C.F.R. § 42.65(a).

   Furthermore, as Dr. Williams' acknowledges, he is "not a polymorph

expert." Ex. 2059, 158:17–18; *see also id.* at 156:25–157:2. In addition, the

record nowhere indicates that Dr. Williams' experience with identical crystal

forms made using different solvents exhibiting different pure melting points

extends to treprostinil or related compounds. We are also unpersuaded by

Dr. Williams' opinion that Phares' treprostinil diethanolamine salt exhibits a

"broad melting peak with a range of close to 10 degrees which is indicative

of a lower purity substance" (Ex. 2020 ¶ 76). In particular, we note that

33

IPR2016-00006
Patent 8,497,393 B2

Dr. Williams does not explain how he determined the width of that peak, or how the peak width he identified relates to the onset of the melting event. *See id*.

Neither do we agree with UTC's contention that "SteadyMed must show that the Phares' diethanolamine salt necessarily possesses an impurity profile that is distinct from that of the Moriarty product and with higher purity." PO Resp. 21. In order for process steps recited in a product-by-process claim to be entitled to patentable weight, they must impart structural and functional differences onto the product claimed. *See Greenliant*, 692 F.3d at 1267–1268. Accordingly, the relevant comparison is between Phares treprostinil and '393 patent treprostinil, irrespective of what starting materials were used by Phares. As explained above, the evidence of record shows that Phares treprostinil is of at least equal purity to '393 patent treprostinil, and, therefore, treprostinil produced according to the process steps recited in the challenged claims cannot be said to differ structurally or functionally from treprostinil produced according to Phares.

Although UTC does not endeavor to compare the purity of Phares' treprostinil to that produced according to the '393 patent, it does present purity data for developmental and commercial batches of '393 patent treprostinil, as well as for treprostinil purportedly made according to the process described by Moriarty (Ex. 2020, Appx. A–B (compiling purity data); Ex. 2059, 79:11–16, 81:14–22 (identifying first ten batches of Appendix A as development batches); *id*. at 272:15–273:16 (identifying first five batches of Appendix B as development batches)), which SteadyMed

34

Liquidia - Exhibit 1005 - Page 34
UTC_LIQ00040923

IPR2016-00006
Patent 8,497,393 B2

contends would have been the starting material used by Phares (Pet. 25–26). The average overall purity as measured by HPLC for the commercial batches of '393 patent treprostinil and for the commercial batches of Moriarty treprostinil is the same:  99.7%.  Ex. 2059, 218:25–219:20; *see also id*. at 93:11–25; Ex. 1021.  Notably, this is the same HPLC purity assay value as reported by Moriarty.  Ex. 1004, 13 (reporting an HPLC-determined "purity [of] 99.7%", and noting that the compound tested "was identical in all respects to an authentic sample of UT-15 [treprostinil]").[13]

Because UTC's expert, Dr. Williams, included a disproportionate number of development batches relative to commercial batches in its overall purity calculation for Moriarty treprostinil (10 development batches out of a total of 56 batches) (*see* Ex. 2059, 79:11–16, 81:14–22) as compared to '393 patent treprostinil (5 development batches out of a total of 121) (*see id*. at 272:15–273:16), and did not account for this disparity in the purity calculation, we find that the comparison of like to like, as represented by the average overall purity of the commercial batches only, provides the most reliable evidence of treprostinil purity.  We also find that the development

---

[13] UTC urges us to ignore the purity reported by Moriarty because "it is not clear what method was used to determine the purity in Moriarty."  PO Resp. 29.  We observe, however, that Moriarty, like the '393 patent specification itself, discloses that an HPLC purity assay was used without identifying the particular reference standard employed.  We further note that because reference standards are just that, the absence of information concerning the precise reference standard used does not call into question the validity of the purity reported in Moriarty.

35

Liquidia - Exhibit 1005 - Page 35
UTC_LIQ00040924

IPR2016-00006
Patent 8,497,393 B2

batches are a less reliable indicator of product purity, as they are not necessarily representative of the final, fully optimized production processes. *See e.g.*, Ex. 2059 102:9–12 ("So the development batches for the '393 are also poorer than the later commercial batches. And so by the same token, those numbers bring down the average purity of the '393 process."), 102:20–22 ("But if you did eliminate the development batches, it would certainly improve the overall purity of the '393 batches."), 105:11–16 ("[W]ith the — the Moriarty process, you're starting with an inferior process. So the development batches were not as nice as the development batches that you started with the '393. . . .").

        As further support for these findings, we observe that Dr. Williams neither asserts that exclusion of the development batches from the purity analysis would be improper (*see, e.g.*, Ex. 2059, 91:12–20, 115:7–18), nor articulates any reason the development batches should be included in the purity analysis, beyond stating that he included development batches for both processes and factored all of the data that was presented to him into his calculation (*id.* at 271:25–272:5, 273:13–24). In addition, although it is not necessary to our findings, we note that Dr. Williams' uncertainty regarding whether the purported Moriarty development batches were in fact produced according to the Moriarty process provides an additional reason to exclude the alleged Moriarty development batches from the overall purity calculation. *See, e.g.*, Ex. 2059, 270:23–271:2. Accordingly, we find that there is no difference in the overall purity for treprostinil produced according to Moriarty and that produced according to the '393 patent.

36

IPR2016-00006
Patent 8,497,393 B2

UTC additionally argues that treprostinil produced according to the '393 patent has a different impurity profile than that produced by Moriarty. In particular, UTC contends that comparison of the average impurity profiles for treprostinil produced by each of these methods reveals that certain specific impurities found in Moriarty treprostinil are essentially eliminated from treprostinil made according to the '393 patent.  For example, UTC identifies three impurities as being eliminated from commercial batches of '393 patent treprostinil:  97W86, 1AU90, and 2AU90, and asserts that four more impurities are, on average, greatly reduced:  methyl ester, 751W93, 750W93, and 3AU90.  PO Resp. 10.  UTC additionally states that ethyl ester is slightly increased in '393 patent treprostinil.  *Id*.  UTC then concludes that these impurity differences constitute structural differences between Moriarty and the claimed product.

But we find that UTC's reliance on average impurity profiles for treprostinil produced by different methods is misplaced, as UTC's averages do not account for the significant inter-batch variation in both the types and amounts of impurities present in batches of treprostinil made by either the Moriarty or the '393 patent process.  *See, e.g.*, Ex. 2020, Appx. A–B (compiling impurity data from individual treprostinil batches); PO Resp. 11 ("Moriarty treprostinil may show inter-batch variation in overall purity and impurity profiles"); Ex. 2020 ¶ 93 ("Third, as Dr. Winkler himself points out, there is the possibility for 'significant batch-to-batch variations in the impurity profile of each batch of treprostinil.'").  We also find that the impurity profile averages on which Dr. Williams relies in asserting the

Liquidia - Exhibit 1005 - Page 37
UTC_LIQ00040926

IPR2016-00006
Patent 8,497,393 B2

existence of impurity differences between '393 patent treprostinil and
Moriarty treprostinil are unpersuasive, because those averages obfuscate,
and make no attempt to account for, the extent of inter-batch variation for
treprostinil produced by any method.

The extent of the inter-batch variation for both Moriarty and
'393 patent treprostinil batches is illustrated by the fact that, irrespective of
the averages calculated by Dr. Williams, individual commercial batches of
Moriarty treprostinil exhibit impurity profiles nearly identical, if not
superior, to those seen in individual commercial batches of '393 patent
treprostinil.  For example, the table below compares the types and amounts
of impurities detected in one commercial batch of Moriarty treprostinil (Lot.
No. UT15-031202, Ex. 2036, 5) to those detected in one commercial batch
of '393 patent treprostinil (Lot. No. 01F08017, Ex. 2037, 58–59).

| Compound | Moriarty UT15-031202 (Ex. 2036, 5) | '393 Patent 01F08017 (Ex. 2037, 58–59) |
|---|---|---|
| 1AU90 | Not detected | Not detected |
| 2AU90 | Not detected | Not detected |
| 97W86 | Not detected | Not detected |
| 3AU90 | 0.2% | 0.09% |
| treprostinil methyl ester | <0.05% | <0.05% |
| treprostinil ethyl ester | 0.2% | 0.5% |
| 750W93 | 0.07% | 0.09% |
| 751W93 | <0.05% | <0.05% |
| unidentified impurities | Not detected | 0.08% |
| total related substances | 0.5% | 0.8% |
| assay purity | 99.7% | 99.5% |

38

Liquidia - Exhibit 1005 - Page 38
UTC_LIQ00040927

IPR2016-00006
Patent 8,497,393 B2

As revealed by the above comparison, the Moriarty batch has a higher overall purity, and the same or lower amounts of all but one impurity, 3AU90, than the '393 patent batch. *Compare* Ex. 2036, 5, *with* Ex. 2037, 58–59. In addition, we observe that both the Moriarty batch and the '393 patent batch satisfy the treprostinil drug specification requirements concerning the types and amounts of impurities that may be present in a batch of treprostinil—which requirements notably did not change when UTC switched over from producing treprostinil according to Moriarty to producing it using the process disclosed in the '393 patent. Ex. 2036, 5; Ex. 2037, 58–59; Ex. 2006, 5–6; Ex. 2003. We further note that both batches also satisfy the overall purity requirements under the revised treprostinil drug specification (Ex. 2006, 3–4; Ex. 2003).

As explained above in Part II.A.1.b., the comparisons of purity data for Moriarty and '393 patent treprostinil set forth in the Walsh Declaration and in the specification of the '393 patent itself similarly indicate that batch-to-batch variation, rather than any structural or functional difference between treprostinil products, accounts for the reported differences in overall purity and impurity profile.

UTC additionally contends that whether individual batches of Moriarty treprostinil satisfy the current FDA purity specification is not relevant to patentability. Rather, UTC asserts that "[t]he question for patentability is whether or not a given batch of *starting* Moriarty treprostinil (steps a and b of the '393 independent claims) will be physically changed when step (c) is performed *on that batch*." PO Resp. 11. But whether an

39

IPR2016-00006
Patent 8,497,393 B2

intermediate, or even the final product of the Moriarty process might be further purified when subject to step (c) of the challenged claims is not the test for determining whether the process steps recited in the challenged product-by-process claims are entitled to patentable weight.  Instead, the question before us is whether the process for making treprostinil set forth in the challenged claims imparts structural or functional differences to the product claimed as compared to prior art processes for making the claimed product.  *See Greenliant*, 692 F.3d at 1267–1268.  For the reasons set forth above, and as exemplified by comparison of individual batches of Moriarty and '393 patent treprostinil, we determine that the process steps set recited in the challenged claims do not impart structural or functional differences on the product claimed.  Moreover, we observe that none of the asserted grounds of unpatentability depends on Moriarty alone; rather, each asserted ground of unpatentability is based, in whole or in part, on Phares, which expressly discloses step (c) of the asserted claims, and yields a treprostinil product that is at least as pure as '393 patent treprostinil.  As evident from the discussion above, the use of Moriarty treprostinil as the starting material for the purification disclosed by Phares would result in a treprostinil diethanolamine salt at least as pure as that disclosed by the '393 patent, and thus, a product that is not structurally or functionally different from that disclosed by the '393 patent.

Furthermore, even if it had been shown that treprostinil produced according to the '393 patent differed in overall purity and/or impurity profile from treprostinil produced according to prior art methods, the record

40

Liquidia - Exhibit 1005 - Page 40
UTC_LIQ00040929

IPR2016-00006
Patent 8,497,393 B2

nevertheless fails to support a determination that those differences confer patentable weight to the process steps recited in the challenged claims. *See Merz*, 97 F.2d at 601 ("No new use is claimed for appellant's purified ultramarine.  It is the same old ultramarine with the same old use though it may have brighter color and be more desirable as a pigment than formerly.").  Indeed, as Dr. Williams acknowledged during deposition, with chromatography, as is used in Moriarty, it would be possible to purify treprostinil to "99.99999 percent" by purifying and re-purifying the product. Ex. 2059, 94:1–24.

UTC nevertheless contends that the FDA's approval of UTC's request for a change in the purity assay value for the treprostinil from a range of 97%–101% to a range of 98%–102% was a "major" change evidencing the functional importance of the purported difference in purity between Moriarty treprostinil and treprostinil made according to the '393 patent.  PO Resp. 12. UTC argues also that FDA pharmaceutical batch testing requirements, and prohibition by the FDA of the sale for patient use of batches that fall outside of the relevant purity specification further illustrate the importance of the alleged purity improvements obtained using the process recited in the '393 patent.  *Id*.

Absent from the record, however, is evidence to suggest that the 1% increase in the purity assay value for treprostinil produced according to the '393 patent, or the FDA's general requirements for pharmaceutical purity, demonstrates a functional difference between Moriarty treprostinil and '393 patent treprostinil.  Instead, the record indicates that batches of

41

UTC_LIQ00040930

IPR2016-00006
Patent 8,497,393 B2

Moriarty treprostinil satisfy the 98% minimum purity requirement for treprostinil approved by the FDA, and could be sold to the public (Ex. 2058, 179:23–180:17).  This is true irrespective of whether the overall purity level of 99.7% reported by Moriarty (Ex. 1004, 13), 99.05% reported by Dr. Williams (Ex. 2020 ¶ 98), or 99.7% as obtained when development batches are excluded from Dr. Williams' analysis (Ex. 1021; Ex. 2059, 218:3–20) is accepted, as each of these reported purity levels exceeds the 98% purity required by the FDA.  In addition, we note that UTC's expert, Dr. Ruffolo confirmed during deposition that the 1% purity change sought by UTC and approved by the FDA did not itself constitute a "major" change to the treprostinil drug specification.  Ex. 2058, 310:5–18.  Finally, we observe that the record does not include evidence to suggest the existence of any clinical or safety differences between Moriarty treprostinil and treprostinil produced according to the '393 patent.  *See, e.g.*, Ex. 2058, 257:22–258:9, 315:15–23; Ex. 2059, 47:3–13.

With regard to the purported differences in the impurity profiles for Moriarty treprostinil and '393 patent treprostinil, we additionally note that UTC did not seek, and the FDA did not impose, any changes to the types or amounts of impurities that may be present in treprostinil manufactured according to the '393 patent versus that made by the Moriarty process. Ex. 2006, 5–6; Ex. 2003.  We observe also that the '393 patent itself does not discuss any of the individual impurities, or attribute any clinical relevance to the purported differences between Moriarty treprostinil and that made according to the '393 patent process.

42

IPR2016-00006
Patent 8,497,393 B2

Accordingly, on the record before us, we determine that the process steps recited in the challenged claims of '393 patent do not impart structural or functional differences to the claimed product, and thus, do not patentably limit the claimed product.

### c. Claim 2

Claim 2 depends from claim 1 and further requires that "the purity of compound of formula I in said product is at least 99.5%."

UTC asserts that Phares does not anticipate claim 2, because "nothing in Phares discloses a purity of at least 99.5%." PO Resp. 24.

We do not agree. For the reasons set forth above, we find that Phares treprostinil is at least as pure as treprostinil produced according to the process disclosed in the '393 patent, and therefore, Phares necessarily discloses treprostinil having a purity of 99.5% or higher. Ex. 1009 ¶ 62. Furthermore, a claim to a degree of purity in and of itself does not render the claim patentable over the prior art. *In re Fink*, 62 F.2d 103, 104 (CCPA 1932) (affirming decision where purity of claimed product was merely a matter of degree and there was no reason to believe that prior art product would not be as pure).

### 3. Conclusion

UTC does not separately argue claims 3–5, 7, 8, 11–14, and 16–20. *See* PO Resp. 18–26. We have reviewed Petitioner's evidence and argument as to those claims, and, based on the evidence, find that Petitioner has

43

Liquidia - Exhibit 1005 - Page 43
UTC_LIQ00040932

IPR2016-00006
Patent 8,497,393 B2

established by a preponderance of the evidence that those claims are anticipated by Phares.  Pet. 30–32, 34–37.

For the foregoing reasons, therefore, we determine SteadyMed has demonstrated, by a preponderance of the evidence, that claims 1–5, 7–9, 11–14, and 16–20 are unpatentable under § 102(b) as anticipated by Phares.

### D.  Obviousness Grounds of Unpatentability Based on Moriarty and Phares

SteadyMed asserts that claims 1–5, 7–9, 11–14, and 16–20 are unpatentable under § 103(a) as obvious in view of Moriarty and Phares. Pet. 37–52.  In support of its assertion, SteadyMed provides detailed explanations as to how the combination of Moriarty and Phares discloses each claim limitation (*id.*), and relies upon the Winkler Declaration (Ex. 1009) and the Rogers Declaration (Ex. 1022) to support its positions.

Upon review of SteadyMed's contentions and supporting evidence, as well as UTC's Patent Owner Response and supporting evidence, we determine that SteadyMed has demonstrated, by a preponderance of the evidence, that claims 1–5, 7–9, 11–14, and 16–20 of the '393 patent are unpatentable over the combination of Moriarty and Phares.

44

UTC_LIQ00040933

IPR2016-00006
Patent 8,497,393 B2

### 1. Moriarty

Moriarty describes the synthesis of treprostinil "via the stereoselective intramolecular Pauson-Khand cyclization." Ex. 1004, 1. Formula 7 of Moriarty is reproduced below:



*Id.* at 3. Formula 7 of Moriarty depicts the chemical structure of treprostinil. *Id.*

An excerpt of Scheme 4 of Moriarty is reproduced below:



*Id.* at 6. The excerpted portion of Scheme 4 of Moriarty illustrates the alkylation of Formula 34 to yield Formula 35, and subsequent hydrolysis of Formula 35 with a base (followed by acidification) to yield Formula 7, treprostinil. Ex. 1004, 6, 13.

45

Liquidia - Exhibit 1005 - Page 45
UTC_LIQ00040934

IPR2016-00006
Patent 8,497,393 B2

## 2. *Discussion*

SteadyMed contends that Moriarty and Phares respectively disclose treprostinil acid and treprostinil diethanolamine salt, as recited in that challenged claims of the '393 patent.  Pet. 22–23, 24, 33, 39, 48.  SteadyMed further asserts that Moriarty discloses steps (a) and (b), and Phares discloses step (c) of the process recited in independent claims 1 and 9 of the '393 patent.  Pet. 43, 48–49.

We have reviewed the Petition and the supporting evidence to which we are directed as to how the combination of Moriarty and Phares discloses each limitation of the challenged claimed.  We are persuaded by SteadyMed's showing that the combination of Moriarty and Phares discloses both the treprostinil products claims, as well as the production of those treprostinil products through the performance of steps (a)–(c) recited in claims 1 and 9 of the '393 patent.

Relying on its expert, Dr. Winkler, SteadyMed asserts that an ordinarily skilled artisan, at the time of invention of the '393 patent, would have had reason to combine, and a reasonable expectation of success in combining, Moriarty and Phares.  Pet. 43.  Dr. Winkler testifies that an ordinarily skilled artisan would have sought to combine Moriarty and Phares in order to eliminate the intermediate purification step taught by Moriarty, thereby increasing synthetic efficiency and lowering production costs for treprostinil diethanolamine salt.  Ex. 1009 ¶¶ 77–78.  Dr. Winkler additionally testifies that an ordinarily skilled artisan would have had a reasonable expectation of success in reacting treprostinil with

46

IPR2016-00006
Patent 8,497,393 B2

diethanolamine because Phares successfully performed precisely that reaction. *Id.* ¶ 80.

Notwithstanding UTC's arguments to the contrary, which we address below, we are persuaded by SteadyMed's showing that an ordinarily skilled artisan, at the time of invention of the '393 patent, would have had reason to combine, and a reasonable expectation of success in combining, Moriarty and Phares. "[T]he skilled artisan need not be motivated to combine [the prior art] for the same reason contemplated by [the inventor]." *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006). In this regard, we note that in addition to teaching that intermediate purification is unnecessary to the production of treprostinil diethanolamine salt by the disclosed process (Ex. 1005, 40–42), Phares explicitly describes the Moriarty process in disclosing the production of (-)-treprostinil, the enantiomer of (+)-treprostinil (*id.* at 42). Ex. 1009 ¶¶ 50, 77–78. Accordingly, we are persuaded that an ordinarily skilled artisan would have modified the process of Moriarty to incorporate the step of adding and dissolving diethanolamine to treprostinil as taught by Phares (Ex. 1005, 24) to eliminate the requirement for intermediate purification, thus, improving synthetic efficiency and reducing cost.

UTC does not dispute either that the combination of Moriarty and Phares discloses treprostinil and treprostinil diethanolamine salt, or that the cited combination discloses steps (a)–(c) of claims 1 and 9. UTC contends, however, that an ordinarily skilled artisan would have had neither reason to combine, nor a reasonable expectation of success in combining Moriarty and Phares. PO Resp. 27–32. UTC additionally asserts that the salt formation

47

Liquidia - Exhibit 1005 - Page 47
UTC_LIQ00040936

IPR2016-00006
Patent 8,497,393 B2

recited in step (c) of the challenged claims yields unexpected improvements in both the overall purity and impurity profile of the treprostinil product. *Id.* UTC also argues that treprostinil diethanolamine salt produced according to the cited combination is physically different from treprostinil produced according to the '393 patent process. *Id.* at 28–30. Lastly, UTC asserts that evidence of objective indicia of nonobviousness, including long-felt but unmet need and unexpected results, establish the nonobviousness of the challenged claims. *Id.* at 47–49. We address UTC's arguments below.

### a. Level of Ordinary Skill in the Art

SteadyMed contends that a relevant skilled artisan would have had, at the time of invention of the '393 patent, "a master's degree or a Ph.D. in medicinal or organic chemistry, or a closely related field. (Ex. 1009, Winkler Decl., ¶ 14). Alternatively, a person of ordinary skill would include an individual with a bachelor's degree and at least five years of practical experience in medicinal or organic chemistry." Pet. 4.

UTC does not, in its Patent Owner Response, directly dispute SteadyMed's assertions with regard to the level of ordinary skill in the art, or argue that any differences in the skill levels advanced by the parties are relevant to the nonobviousness analysis. UTC's expert, Dr. Williams, however, advocates for a similar, albeit somewhat higher level of skill than is advanced by SteadyMed. In particular, Dr. Williams testifies that an ordinarily skilled artisan at the time of invention of the '393 patent would have had "a doctorate degree in chemistry, pharmaceutics, pharmaceutical sciences, medicine, or a related discipline. Alternatively, the POSA may

48

Liquidia - Exhibit 1005 - Page 48

UTC_LIQ00040937

IPR2016-00006
Patent 8,497,393 B2

have had a lesser degree in one of those fields, with correspondingly more experience." Ex. 2020 ¶ 33. Dr. Williams additionally testifies that "[t]o the extent necessary, a POSA may have collaborated with others of skill in the art, such that the individual and/or team collectively would have had experience in synthesizing and analyzing complex organic compounds." *Id.* Dr. Ruffolo, UTC's second expert, agrees with Dr. Williams' opinions concerning the ordinarily level of skill in the art. Ex. 2022 ¶ 23.

We find that the level of ordinary skill in the art is reflected by the prior art of record. *See Okajima*, 261 F.3d at 1355. With respect to the slight variance in the educational attainment of a relevant artisan advanced by the parties, we agree with Drs. Williams and Ruffolo that an ordinarily skilled artisan at the time of invention of the '393 patent would have had a doctorate in chemistry, pharmaceutics, pharmaceutical sciences, medicine, or a related discipline, or a lesser degree in one of those fields, with correspondingly more experience. We also agree that the relevant skilled artisan may have collaborated with others of skill in the art, such that the individual and/or team collectively would have had experience in synthesizing and analyzing complex organic compounds. We observe, however, that our findings and legal conclusions apply with equal force whether the level of ordinary skill in the art advanced by SteadyMed or by UTC is adopted.

*b. Rationale to Combine*

UTC asserts that an ordinarily skilled artisan would not have had reason to combine Moriarty and Phares because Moriarty discloses the use

49

of column chromatography for purification, and "Phares does not disclose any benefit or increased purity as a result of using the diethanolamine salt." PO Resp. 31. UTC additionally contends that Moriarty teaches three different ways to make treprostinil, and thus, an ordinarily skilled artisan would not have had reason to select the method that uses steps (a) and (b) recited in the challenged claims over the remaining two options. *Id*. at 27.

We do not agree. "[T]he problem motivating the patentee may be only one of many addressed by the patent's subject matter. . . . [A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420; *see also Kahn*, 441 F.3d at 990 ("[T]he skilled artisan need not be motivated to combine [the prior art] for the same reason contemplated by [the inventor]."). Irrespective of whether Phares suggests any purity benefits over Moriarty, the proposed combination of Moriarty and Phares would eliminate the need for intermediate purification as required by Moriarty alone, and thereby confer efficiency and cost benefits. Ex. 1009 ¶¶ 77–78. We determine that an ordinarily skilled artisan would have sought to combine Moriarty and Phares in order to reap these efficiency and cost benefits.

We additionally find that an ordinarily skilled artisan would have sought to make the proposed combination for the independent reason that Phares is directed to improving treprostinil, and the Moriarty process, including the performance of steps (a) and (b) of the challenged claims, was a well-known way to make treprostinil. *See* Ex. 2059, 240:2–7, 244:10–21.

50

IPR2016-00006
Patent 8,497,393 B2

"[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *KSR*, 550 U.S. at 417. For the same reason, we also find that an ordinarily skilled artisan would have had reason to combine the Moriarty process, including steps (a) and (b) of the challenged claims, with Phares. Indeed, Phares itself describes the Moriarty process, including recited steps (a) and (b), with respect to producing the enantiomer of treprostinil. Ex. 1005, 42.

### c.  *Reasonable Expectation of Success*

Akin to its arguments concerning the rationale for combining Moriarty and Phares, UTC asserts that an ordinarily skilled artisan would not have had "a reasonable expectation of success by using salt formation as a purification step separate from or in addition to the column chromatography of Moriarty." PO Resp. 31. In particular, UTC contends that "Phares does not disclose any alleged benefit to forming the salt and a POSA would have no expectation that only certain acidic and neutral impurities would be reduced or completely eliminated while others remained." *Id.* at 31–32

But whether or not an ordinarily skilled artisan would have had an expectation that salt formation would improve the purity of Moriarty treprostinil is not the relevant inquiry. "The reasonable expectation of success requirement refers to the likelihood of success in combining references to meet the limitations of the claimed invention." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016).

51

Liquidia - Exhibit 1005 - Page 51
UTC_LIQ00040940

IPR2016-00006
Patent 8,497,393 B2

It is undisputed that the proposed combination of Moriarty and Phares yields treprostinil diethanolamine salt, i.e., the product claimed in independent claims 1 and 9.  Furthermore, as detailed in Part II.C.2.b above, both Moriarty treprostinil and Phares treprostinil diethanolamine salt are highly pure.  Indeed, Phares treprostinil diethanolamine salt is at least as pure as that claimed in the '393 patent.  Accordingly, we find that an ordinarily skilled artisan would have a reasonable expectation of success in combining Moriarty and Phares.

### d.  A product comprising a compound [of/having] formula [I/IV] . . . or a pharmaceutically acceptable salt thereof

The present record supports SteadyMed's contention that the treprostinil diethanolamine salt disclosed by the combination of Moriarty and Phares is structurally identical to the pharmaceutically acceptable treprostinil diethanolamine salt recited in the challenged claims.  Pet. 41–42; *see also* Ex. 1004, 6, 13; Ex. 1005, 24, 99 (claim 49); Ex. 1009 ¶ 76.  As explained in Part II.C.2.a., above, it is undisputed that the treprostinil diethanolamine salt disclosed by Phares, which is the product that would result from the proposed combination, has the same chemical structure as the treprostinil diethanolamine salt claimed in the '393 patent.

### e.  Recited Process Steps

UTC does not dispute that the proposed combination of Moriarty and Phares discloses the process steps recited in the challenged product-by-process claims.  Nevertheless, UTC contends that the claimed product is structurally different from prior art treprostinil products, and

52

Liquidia - Exhibit 1005 - Page 52
UTC_LIQ00040941

IPR2016-00006
Patent 8,497,393 B2

therefore, nonobvious.  In addition to reiterating many of the arguments addressed in Part II.C.2.b., above, concerning the purported differences in the overall purity and impurity profile for treprostinil prepared according to the process described in the '393 patent versus that made according to prior art processes, UTC asserts that there is no basis for comparing the purity reported in Moriarty to that reported in the Walsh Declaration submitted during prosecution of the '393 patent.  PO Resp. 29.  UTC also argues that Dr. Winkler's opinions concerning error in purity measurements are themselves erroneous, and should be disregarded.

First, we note that the absence of dispute concerning the disclosure of the recited process steps by the cited combination renders moot the question of whether the process steps recited in the challenged claims impart structural or functional differences to treprostinil so produced as compared to prior art treprostinil products.  Because the combination of Moriarty and Phares discloses both the product claimed and the process recited in the challenged product-by-process claims, it renders those claims obvious.

Furthermore, as explained in Part II.C.2.b., above, we find that the evidence of record does not support the existence of any structural or functional differences between prior art treprostinil and that produced according to the '393 patent.  Notably, our findings in this regard depend neither on comparison of the purity reported by Moriarty to that reported in the Walsh Declaration, nor on Dr. Winkler's opinions concerning error in purity measurements.  Nevertheless, for completeness, we note that the 99.7% purity reported by Moriarty is the same as that derived from analysis

53

Liquidia - Exhibit 1005 - Page 53
UTC_LIQ00040942

IPR2016-00006
Patent 8,497,393 B2

of the purity of the commercial batch data for Moriarty treprostinil produced by UTC.  We also observe, as explained in footnote 13, above, that the 99.7% HPLC purity assay value reported by Moriarty is reliable.

### f.  Claim 2

UTC asserts that the requirement for a product having a purity of at least 99.5% set forth in claim 2 is not rendered obvious by the combination of Phares and Moriarty because "there is no basis to compare the purity disclosed in Moriarty to the measurements obtained in the '393 patent or those obtained by Dr. Walsh in his declaration."  PO Resp. 32.

We do not agree.  The combination of Moriarty and Phares necessarily discloses treprostinil diethanolamine salt having a purity of at least 99.5%.  First, as set forth above in Part II.C.2.c, Phares necessarily discloses treprostinil diethanolamine salt having a purity of 99.5% or higher.  Second, as detailed in Part II.C.2.b., above, Moriarty treprostinil has an overall purity of 99.7%, thus, performing the purification disclosed by Phares on Moriarty would yield a product having at least as high a purity as the starting Moriarty treprostinil.

Furthermore, we find that the 99.7% purity reported in Moriarty is reliable and can be compared to the purity values reported in the '393 patent specification and Walsh Declaration.  Moriarty discloses both that the purity of the disclosed treprostinil product was determined via an HPLC purity assay, and that Moriarty treprostinil "was identical in all respects to an authentic sample of UT-15 [treprostinil]".  Ex. 1004, 13.  The fact that Moriarty does not explicitly identify the reference standard used in the

54

IPR2016-00006
Patent 8,497,393 B2

HPLC purity assay does not call into question the veracity of the purity reported. In this regard, we note that, like Moriarty, the '393 patent does not expressly identify the reference standard used for purity measurements. *See* Paper 81, 18:1–3 ("The specification of the '393 patent does not identify the reference and neither does the Moriarty reference."). We also observe that reference standards are, just that—standards, and as such, the absence of information concerning the precise reference standard used does not call into question the validity of the purity reported in Moriarty.

### g. Claims 8 and 16

Claims 8 and 16 depend from claims 1 and 9, respectively, and further recite "wherein the process does not include purifying the compound of formula [(III)/(IV)] produced in step (a)."

UTC contends that Moriarty teaches purification of the compound produced in step (a), and that Phares does not disclose treprostinil synthesis, or purification details. PO Resp. 32. On this basis, UTC concludes that the cited combination fails to render obvious claims 8 and 16. *Id.*

We do not agree. Rather, as explained in Part II.D.2.b., above, we find that the intermediate purification taught by Moriarty would be eliminated in the proposed combination with Phares. *See* Ex. 1009 ¶¶ 77–78. Accordingly, we agree with SteadyMed that an ordinarily skilled artisan in possession of Phares would have recognized that the alkylation step—step (a) of the challenged claims—"could be followed by the hydrolysis with a base without purifying the product of the alkylation reaction," and, further, would have recognized the elimination of the intermediate purification step

55

IPR2016-00006
Patent 8,497,393 B2

from Moriarty as an advantage of combining Moriarty with Phares.  Pet. 47–48; Ex. 1009 ¶¶ 77–78.

### h. *Objective Indicia of Nonobviousness*

UTC contends that objective indicia of nonobviousness, including evidence of a long-felt but unmet need for treprostinil having greater overall purity and an improved impurity profile compared to treprostinil produced by known methods, as well as evidence that treprostinil produced according to the process steps of the challenged claims unexpectedly yields a product having increased purity as compared to prior art processes establishes that the challenged claims are nonobvious.  PO Resp. 47–49.

Factual inquiries for an obviousness determination include secondary considerations based on evaluation and crediting of objective evidence of nonobviousness. *Graham*, 383 U.S. at 17.  Notwithstanding what the teachings of the prior art would have suggested to a person of ordinary skill in the art at the time of the claimed invention, the totality of evidence submitted, including objective evidence of nonobviousness, may lead to a conclusion that the claimed invention would not have been obvious to one with ordinary skill in the art. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984).  Indeed, when present, evidence of objective indicia of nonobviousness, such as evidence of a long-felt but unmet need or unexpected results "may often be the most probative and cogent evidence [of nonobviousness] in the record." *Stratoflex*, 713 F.2d at 1538.

56

Liquidia - Exhibit 1005 - Page 56
UTC_LIQ00040945

IPR2016-00006
Patent 8,497,393 B2

As explained below, however, upon full consideration of the evidence of record respecting the objective indicia of nonobviousness in this case, we are persuaded that nonobvious is not established by that evidence.

### i.  Long-Felt Need

Relying on the Ruffolo Declaration, UTC asserts that at the time of invention of the '393 patent, there existed a long-felt but unmet need for "a more efficient synthesis to produce treprostinil in a more pure form and in a cost-effective manner."  PO Resp. 47.  In this regard, UTC argues that because treprostinil is a potent drug, "any diastereomeric impurities would also potentially be potent."  *Id*. at 48.  UTC contends that "the FDA as a matter of course seeks to minimize all impurities in drug substances and particularly in highly potent drug substances such as treprostinil," and concludes that "[t]he reduction and removal of several types of impurities met the long-felt need expressed by the FDA to minimize impurities as much as possible."  *Id*.  UTC also asserts that its submission, and the FDA's adoption, of a change in UTC's drug specification for treprostinil increasing the purity from an assay range of 97.0%–101.0% to 98.0% to 102.0% for treprostinil produced according to the process disclosed in the '393 patent demonstrates satisfaction of the long-felt need, expressed by the FDA, for drug substances having fewer, and lower amounts of, impurities.  *Id*. at 48–49.

In response, SteadyMed observes that UTC's expert, Dr. Ruffolo, does not offer any opinion concerning whether a long-felt need existed for higher purity versions of compounds other than treprostinil or treprostinil

57

Liquidia - Exhibit 1005 - Page 57
UTC_LIQ00040946

IPR2016-00006
Patent 8,497,393 B2

diethanolamine salt that fall within the scope of the challenged claims, and notes that claims 10, 14, 15, and 17 of the '393 patent are the only claims limited to treprostinil or its salt.  Pet. Reply 23.

With regard to treprostinil and treprostinil diethanolamine salt, SteadyMed points out that Dr. Ruffolo conceded during deposition that he was unaware if the FDA had sought a change in purity, or if any party had expressed a particular desire for improved purity.  *Id*.  SteadyMed also notes that Dr. Ruffolo acknowledged that drug purity can typically be improved by repeating purification procedures, and that Dr. Williams testified that the purity of treprostinil could be improved using such an approach.  *Id*.  SteadyMed thus contends that there was no need for the claimed invention. *Id*. at 23–24.  SteadyMed additionally asserts that Dr. Ruffolo acknowledged that the change in UTC's purity specification for Treprostinil accepted by the FDA was not a major amendment.  *Id*. at 24.

SteadyMed further points out that treprostinil produced by prior art methods exceeds the 98% purity level required by the FDA, and that the FDA would permit the sale of treprostinil produced according to Moriarty. *Id*.  SteadyMed also asserts that UTC has not identified any clinical difference between Moriarty treprostinil and treprostinil produced according to the method of the '393 patent.  *Id*.  Lastly, SteadyMed argues that Dr. Ruffolo's opinion should be disregarded because it relies on Dr. Williams' assertion that Moriarty treprostinil has an overall purity level of 99.0%.  *Id*.

58

Liquidia - Exhibit 1005 - Page 58
UTC_LIQ00040947

IPR2016-00006
Patent 8,497,393 B2

As an initial matter, we note that UTC's contentions regarding
long-felt need are predicated on UTC's claim that treprostinil made
according to the process described in the '393 patent has a higher purity, and
different impurity profile than treprostinil produced by other methods.
However, as explained in Parts II.C.2.b. and II.D.2.e., above, the present
record does not support that contention. We also observe that the purported
differences between prior art treprostinil and the treprostinil claimed in the
'393 patent derive solely from the process steps recited in the challenged
product-by-process claims, and not the patented product itself. *See Purdue
Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345, 1355 (Fed. Cir. 2016)
(finding evidence of objective indicia of nonobviousness unpersuasive
where such evidence relates to process steps recited in a product-by-process
claim, rather than the "patented product").

Moreover, the evidence of record does not support a determination
that a long-felt need existed for treprostinil having a higher overall purity, or
improved purity profile than that exhibited by prior art treprostinil. "Absent
a showing of long-felt need or the failure of others, the mere passage of time
without the claimed invention is not evidence of nonobviousness." *Iron
Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir.
2004).

UTC does not identify, and we do not discern evidence of record that
any entity aside from UTC sought to produce treprostinil in a more pure
form, via a more efficient synthesis, or in a more cost-effective manner than
was possible using prior art processes. For example, even if we agree with

59

IPR2016-00006
Patent 8,497,393 B2

UTC that because treprostinil is a "very potent drug so any diastereomeric impurities would also *potentially* be potent" (PO Resp. 48 (emphasis added)), the record is nevertheless devoid of evidence that any of those diastereomeric impurities are in fact potent, clinically relevant, or otherwise of concern.  *See e.g.*, Ex. 2022 ¶ 54 (noting that treprostinil "may contain trace amounts of potent structural analogs as impurities," but failing to identify what analogs are potent or to present evidence that such analogs are present in treprostinil produced according to prior art methods); Ex. 2058, 257:22–258:9, 315:15–23; Ex. 2059, 47:3–13.

Neither does the record include evidence to support UTC's assertion that "the FDA as a matter of course seeks to minimize all impurities in drug substances and particularly in highly potent drug substances such as treprostinil" (PO Resp. 48).  UTC relies on Dr. Ruffolo's testimony in this regard, however, Dr. Ruffolo's opinion that "[a]s with all drug substances such as treprostinil, the FDA seeks to list, quantitate, and minimize impurities, and maximize the overall purity, of such drug substances as much as possible for the benefit of patients" (Ex. 2022 ¶ 31) is improperly conclusory.  We give such testimony little or no weight.  37 C.F.R. § 42.65(a).  Likewise, Dr. Ruffolo's opinion that "because some impurities are extremely toxic at very low levels of exposure, Thresholds of Toxicological Concern can, and often are, lowered, beyond the guidelines described above, in the specifications for the synthesis and manufacturing of a drug substance in order to be conservative" (Ex. 2022 ¶ 54), although supported by reference non-binding FDA industry guidance concerning

60

IPR2016-00006
Patent 8,497,393 B2

mutagenic impurities, is insufficient to support the proposition that the FDA
seeks, as a matter of course, to minimize all impurities in all
pharmaceuticals, or in treprostinil in particular.

Moreover, even crediting UTC's contention that the FDA seeks to
minimize all impurities in all pharmaceuticals to the extent possible, such a
general agency preference for improved purity is insufficient to establish a
long-felt but unmet need for improved treprostinil, in particular. *See Tex.
Instruments v. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993)
("[L]ong-felt need is analyzed as of the date of an articulated identified
problem and evidence of efforts to solve that problem.").  Indeed, adherence
to UTC's position would dictate a conclusion of nonobvious for any
pharmaceutical product exhibiting any improvement in purity over prior art
versions of that same product.

The record simply does not support a determination that the FDA
sought a treprostinil product having an improved overall purity or different
impurity profile versus known treprostinil products.  UTC's reliance on its
own request to the FDA for a change in the purity assay value for treprostinil
as evidencing a long-felt need for improved treprostinil (PO Resp. 48) is
misplaced.  Far from indicating the existence of a long-felt need for
improved treprostinil, the revised Drug Substance Specification (Ex. 2006)
submitted by UTC to the FDA demonstrates only that the FDA had
reservations concerning UTC's proposed change from manufacturing
treprostinil by the Moriarty process to using the process described in the
'393 patent.  For example, the FDA notes its concerns that "[b]enzindene

61

Liquidia - Exhibit 1005 - Page 61
UTC_LIQ00040950

IPR2016-00006
Patent 8,497,393 B2

triol is not separated from the final intermediate (UT-I 5C intermediate) by several reaction steps *as is currently the case for the approved starting materials*" (Ex. 2006, 1 (emphasis added)) and that "[b]enzindene triol from several proposed suppliers *appears to result in carry over of impurities*" (*id.* at 2 (emphasis added)).  The FDA also requests "a release specification for the residual diethanolamine present in treprostinil (UT-15) manufactured . . . following the new manufacturing process."  *Id.* at 7.

Furthermore, the FDA's ultimate approval of UTC's request for a change in the purity assay value for treprostinil from a range of 97%–101% to a range of 98%–102% does not evidence the existence of a long-felt need for improved treprostinil.  First, it must be noted that the record indicates that UTC itself, not the FDA, sought the authorized change.  Ex. 2006; *see also* Ex. 2058, 45:15–22.  Second, as Dr. Ruffolo explains, "increasing the stringency of a—of a specification is not a major amendment" to that specification in and of itself.  Ex. 2058, 310:5–13.  Rather, "[w]hat is a major amendment was the change in the process, the change in the starting material."  *Id.* at 310:13–18.  Third, batches of Moriarty treprostinil satisfy the 98% minimum purity requirement for treprostinil approved by the FDA—regardless of whether those batches have an overall purity level of 99.7% as reported by Moriarty (Ex. 1004, 13), 99.05% as originally reported by Dr. Williams (Ex. 2020 ¶ 98), or 99.7% as obtained when development batches are excluded from Dr. Williams' analysis (Ex. 1021; Ex. 2059, 218:3–20)—and could be sold to the public (Ex. 2058, 179:23–180:17).  Fourth, UTC does not identify, and we do not discern evidence to support

62

IPR2016-00006
Patent 8,497,393 B2

the existence of any clinical or safety differences between Moriarty treprostinil, and treprostinil produced according to the '393 patent. *See, e.g.*, Ex. 2058, 257:22–258:9, 315:15–23; Ex. 2059, 47:3–13.

Lastly, we observe that to the extent UTC argues that a long-felt need existed not merely for treprostinil having an improved purity, but for "a more efficient synthesis to produce treprostinil in a more pure form and in a cost-effective manner" (PO Resp. 47), or for "a commercial scale synthesis of treprostinil that results in a treprostinil product with higher overall purity and lower levels of individual impurities" (Ex. 2022 ¶ 31), the challenged claims are not directed to an efficient, cost-effective, or commercial scale synthesis, and thus, cannot be said to satisfy such a need.

Alternatively, we determine that even if UTC had shown that the challenged claims satisfied a long-felt need for treprostinil having a purportedly improved purity, this secondary consideration does not undermine SteadyMed's proof of obviousness in this case. Although secondary considerations must be taken into account, they do not necessarily control the obviousness conclusion. *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988). Here, the record establishes such a strong case of obviousness that UTC's allegedly unexpectedly superior results would nevertheless be insufficient to establish nonobviousness. *Id.* at 769.

Accordingly, for the reasons set forth above, we find that the present record does not support a determination that the product of the challenged claims satisfied a long-felt but unmet need.

63

Liquidia - Exhibit 1005 - Page 63
UTC_LIQ00040952

IPR2016-00006
Patent 8,497,393 B2

### ii. Unexpected Results

UTC contends that "[t]he use of a salt form of treprostinil to further purify the treprostinil acid in a cheaper and better way than the previously used methods of purification was an unexpected result."  PO Resp. 49. Relying on the Williams Declaration, UTC asserts that the salt purification step recited in the challenged claims unexpectedly reduced both diastereomeric impurities and certain non-acidic impurities.  *Id.*  In particular, UTC argues that Eğe predicted only the removal of basic and neutral impurities when an acid is used in salt purification, and contends that the reduction of some, but not all non-acidic impurities highlights the unpredictability of the observed results.  *Id.*

As an initial matter, we note that UTC's contentions regarding unexpected results are predicated on UTC's claim that treprostinil made according to the process described in the '393 patent has fewer impurities than treprostinil produced by other methods.  However, as explained in Parts II.C.2.b., II.D.2.e., and II.E.3.d., the present record does not support that contention.  *See In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997) ("[I]t is well settled that unexpected results must be established by factual evidence."); *cf.*, *Epic Pharma*, 811 F.3d at 1355  (finding evidence of objective indicia of nonobviousness unpersuasive where such evidence relates to process steps recited in a product-by-process claim, rather than the "patented product" itself).

Furthermore, we observe that UTC does not offer evidence to support the contention that "[t]he use of a salt form of treprostinil to further purify

64

Liquidia - Exhibit 1005 - Page 64

UTC_LIQ00040953

IPR2016-00006
Patent 8,497,393 B2

the treprostinil acid in a cheaper and better way than the previously used methods of purification was an unexpected result." In particular, we note that UTC does not identify evidence of record to support a determination that salt purification and free acid regeneration is a "better" way to produce treprostinil. Neither does UTC identify evidence to demonstrate the cost savings associated with salt formation purification, much less establish that cost savings as unexpected. *See In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995) (explaining that unexpected results are useful to show the "improved properties provided by the claimed compositions are much greater than would have been predicted" (internal quotation omitted)).

With regard to the purportedly unexpected result that salt purification reduced some, but not all acidic impurities, including certain stereoisomers, as well as certain non-acidic impurities, we find that these results are not unexpected. For example, Kawakami, discussed in detail in Part II.E., below, expressly describes the use of salt purification to improve the purity of a methanoprostacyclin derivative (Ex. 1007, 6), which like treprostinil, is a prostacyclin compound. Notably, Kawakami teaches the reduction of stereoisomers, in addition to other impurities, through salt formation and subsequent free acid regeneration, suggesting, contrary to UTC's position, that the purported reduction in acidic stereoisomeric impurities obtained via the process steps recited in the challenged claims was not unexpected.

Finally, even crediting UTC's contention that salt purification unpredictably reduced some, but not other impurities, without more, such evidence would nevertheless be insufficient to establish unexpected results.

65

IPR2016-00006
Patent 8,497,393 B2

*See Soni*, 54 F.3d at 751 ("Mere improvement in properties does not always suffice to show unexpected results.").  In this regard, we observe that the miniscule amounts of impurities present in both prior art and '393 patent treprostinil, combined with the significant inter-batch variation in impurity types and amounts between batches of treprostinil render the impurity differences alleged by UTC not unexpected.  *See In re Eli Lilly & Co.*, 902 F.2d 943, 948 (Fed. Cir. 1990) (requiring a showing that "a significant aspect of [the] claimed invention is unexpected in light of the prior art" to establish nonobviousness).

Alternatively, we determine that even if UTC had shown that the challenged claims produce unexpectedly superior treprostinil, this secondary consideration does not overcome the strong showing of obviousness in this case.  Although secondary considerations must be taken into account, they do not necessarily control the obviousness conclusion.  *Newell Cos.*, 864 F.2d at 768.  Here, the record establishes such a strong case of obviousness that UTC's allegedly unexpectedly superior results would nevertheless be insufficient to establish nonobviousness.  *Id*. at 769.

Accordingly, for the reasons set forth above, we find that the present record does not support a determination that the product of the challenged claims was unexpectedly superior to the prior art.

### iii.  *Process Advantages*

With respect to claims 8 and 16, UTC states, without further explanation that "[p]rocess advantages should be considered as secondary considerations to rebut obviousness, even if the process steps or advantages

66

IPR2016-00006
Patent 8,497,393 B2

are not considered" in comparing the challenged claims to the prior art.  PO Resp. 32.

Although we agree that all evidence of objective indicia must be considered in evaluating obviousness, we observe that UTC does not identify what evidence of "process advantages" should be taken into account, or how it should be evaluated.  Accordingly, we determine that the present record does not support a determination that the challenged claims presented process advantages sufficient to overcome the strong showing of obviousness.

For the foregoing reasons, therefore, based on the entire record before us, we find that the evidence of objective indicia of nonobviousness does not undermine SteadyMed's proof of obviousness in this case.  Alternatively, we determine that even if UTC had shown that the challenged claims satisfied a long-felt need for treprostinil of allegedly greater purity, produced unexpectedly superior treprostinil, and afforded process advantages as claimed, this evidence would not undermine SteadyMed's proof of obviousness.

### 3.  Conclusion

UTC does not separately argue claims 3–5, 7, 8, 11–14, and 16–20. *See* PO Resp. 27–33.  We have reviewed Petitioner's evidence and argument as to those claims, and conclude that Petitioner has established by a preponderance of the evidence that Moriarty and Phares would have rendered obvious to one with ordinary skill in the art the subject matter recited in those claims.  Pet. 45–48, 50–52.

67

IPR2016-00006
Patent 8,497,393 B2

For the foregoing reasons, therefore, we determine SteadyMed has demonstrated, by a preponderance of the evidence, that the combination of Moriarty and Phares would have rendered obvious to one with ordinary skill in the art the subject matter recited in claims 1–5, 7–9, 11–14, and 16–20.

### E.   Obviousness Grounds of Unpatentability Based on Moriarty, Phares, Kawakami, and Eğe

SteadyMed asserts that claims 6, 10, 15, 21, and 22 are unpatentable under § 103(a) as obvious in view of Moriarty, Phares or Kawakami, and Eğe.  Pet. 37–52.  As explained in the Decision on Institution (Dec. 37), although SteadyMed nominally identifies this ground of unpatentability as being over "Moriarty (Ex. 1004) with Phares (Ex. 1005) or Kawakami (Exs. 1006 & 1007) and in further combination with Ege (Ex. 1008)" (Pet. 53 (emphasis omitted)), SteadyMed explicitly relies on Kawakami in arguing unpatentability in view of Moriarty, Phares, and Eğe.  Accordingly, as set forth in the Decision on Institution, we understand SteadyMed's stated ground of unpatentability as relying on the combination of Moriarty, Phares, Kawakami, and Eğe.  Dec. 37.

Claims 6, 21, and 22 depend, directly or indirectly, from claim 1, and claims 10 and 15 depend directly from claim 9.  In support of its assertion, SteadyMed provides detailed explanations as to how the combination of Moriarty, Eğe, Phares, and Kawakami discloses each claim limitation (*id*.), and relies upon the Winkler Declaration (Ex. 1009) and the Rogers Declaration (Ex. 1022) to support its positions.

68

Liquidia - Exhibit 1005 - Page 68
UTC_LIQ00040957

IPR2016-00006
Patent 8,497,393 B2

### 1. Kawakami

Kawakami describes "a crystalline dicyclohexylamine salt of a methanoprostacyclin derivative, a manufacturing method thereof, and a purifying method thereof." Ex. 1007, 3. Kawakami discloses obtaining a dicyclohexylamine salt by "mixing a methanoprostacyclin derivative [I] . . . with dicyclohexylamine in an appropriate solvent." Ex. 1007, 5–6. Kawakami explains that "[t]he dicyclohexylamine salt of the methanoprostacyclin derivative [I] thus obtained generally has fairly high purity, and the purity can be further improved by recrystallization as needed with the use of an appropriate solvent." *Id.* at 6.

Kawakami further teaches that "[t]he dicyclohexylamine salt obtained by the present invention can be easily reverted to a free methanoprostacyclin derivative [I] by conventional methods, and the resulting methanoprostacyclin derivative exhibits excellent crystallinity compared with substances not purified according to the present invention." *Id.*

### 2. Eğe

Eğe is an organic chemistry textbook. Ex. 1008, 1. Eğe discloses:

> Carboxylic acids that have low solubility in water, such as benzoic acid, are converted to water-soluble salts by reaction with aqueous base. Protonation of the carboxylate anion by a strong acid regenerates the water-insoluble acid. These properties of carboxylic acids are useful in separating them from reaction mixtures containing neutral and basic compounds.

*Id.* at 8 (reference omitted).

69

Liquidia - Exhibit 1005 - Page 69
UTC_LIQ00040958

IPR2016-00006
Patent 8,497,393 B2

### 3. Discussion

Claims 6, 10, 15, 21, and 22 each recite the product of either claim 1 or claim 9, subject to additional process steps. Notably, each of claims 6, 10, 15, 21, and 22 requires the performance of step (d) recited in claims 1 and 9, but identified as optional in the independent claims.

SteadyMed contends that the combination of Moriarty, Phares, Kawakami, and Eğe discloses the treprostinil products recited in claims 6, 10, 15, 21, and 22 of the '393 patent. Pet. 53–57. SteadyMed also asserts that the combination of Moriarty, Phares, Kawakami, and Eğe discloses steps (a)–(d) required by the challenged claims. *Id.*

We have reviewed the Petition and the supporting evidence to which we are directed as to how the combination of Moriarty, Phares, Kawakami, and Eğe discloses each limitation of the challenged claims. We are persuaded by SteadyMed's showing that the combination of Moriarty, Phares, Kawakami, and Eğe discloses both the treprostinil products claimed, as well as the production of treprostinil diethanolamine salt through the performance of steps (a)–(d) recited in the challenged claims of the '393 patent.

Relying on its expert, Dr. Winkler, SteadyMed asserts that a relevant skilled artisan would add further purification steps as taught by Kawakami and Eğe to the combination of Moriarty and Phares described in Part II.D.2., above, to further improve the treprostinil product. Pet. 53–54. In this regard, SteadyMed contends that Kawakami discloses prostacyclin compounds, of which treprostinil is one example, can be purified by using

70

Liquidia - Exhibit 1005 - Page 70
UTC_LIQ00040959

IPR2016-00006
Patent 8,497,393 B2

weak bases and forming salts, which can then be converted back into free

acid form.  Pet. 43.  In particular, SteadyMed argues that Kawakami

"discloses that the dicyclohexylamine salt of a methanoprostacyclin

derivative 'can be easily reverted to the free methanoprostacyclin derivative

by *conventional methods*,'" and that the "fairly high purity" of the salt

obtained "can be further improved by recrystallization as needed with the

use of an appropriate solvent."  Pet. 53.

In addition, Dr. Winkler testifies that, as evidenced by Eğe, a relevant

skilled artisan "would understand that one such conventional method for

converting the dicyclohexylamine salt of a methanoprostacyclin derivative

to the free methanoprostacyclin derivative, or converting the treprostinil

diethanolamine salt to treprostinil (*i.e.*, the free acid) is by treating the salt

with a strong acid such as HCl or $H_2SO_4$."  Ex. 1009 ¶ 84; *see also* Pet. 53–

54.  Dr. Winkler elaborates on this rationale for combining the cited

references, testifying that a relevant skilled artisan

> would want to form the treprostinil diethanolamine salt, purify it,
> and then convert it back to its free form (*i.e.*, treprostinil) in order
> to obtain excellent crystallinity and increased purity.  And Ege
> (Ex. 1008, p. 8) teaches that one such method for obtaining the
> free form of treprostinil or any carboxylic acid would be by
> treatment of the carboxylate salt with a strong acid.

Ex. 1009 ¶ 88; *see also* Ex. 1008, 8; Pet. 54.

Notwithstanding UTC's arguments to the contrary, which we address

below, we are persuaded by SteadyMed's showing that an ordinarily skilled

artisan, at the time of invention of the '393 patent, would have had reason to

combine, and a reasonable expectation of success in combining, Moriarty,

71

IPR2016-00006
Patent 8,497,393 B2

Phares, Kawakami, and Eğe.  "[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."  *KSR*, 550 U.S. at 417.  We are persuaded that an ordinarily skilled artisan would have modified the above-described combination of Moriarty and Phares to further include carboxylate salt formation and neutral carboxylic acid regeneration steps, as taught by Kawakami, because Kawakami discloses that this purification and free acid regeneration procedure results in excellent crystallinity and improved purity for prostacyclin compounds.  Ex. 1007, 6. We are additionally persuaded that a relevant skilled artisan would have sought to use a strong acid to regenerate treprostinil free acid, because Kawakami discloses the use of "conventional methods" to regenerate prostacyclin free acids (*id*.), and Eğe teaches that treatment of a carboxylate salt, such as treprostinil, with a strong acid will yield a free form of the carboxylic acid.  Ex. 1008, 8.

UTC does not dispute either that the combination of Moriarty, Phares, Kawakami, and Eğe discloses treprostinil and treprostinil diethanolamine salt, or that the cited combination discloses steps (a)–(d) of independent claims 1 and 9, as required by the challenged claims.  Akin to its arguments above concerning anticipation by Phares and obviousness in view of Moriarty and Phares, UTC asserts that the treprostinil products of the challenged claims are structurally and functionally different than those described in the prior art.  PO Resp. 33–34.  UTC also contends that any

72

IPR2016-00006
Patent 8,497,393 B2

"close" structural similarity between Moriarty treprostinil and the claimed invention is insufficient to support a conclusion of obviousness. *Id.* at 45. In addition, UTC argues that an ordinarily skilled artisan would not have had reason to, or a reasonable expectation of success in combining Kawakami and Eğe with Moriarty and Phares. *Id.* at 34–44. UTC further asserts that the cited combination fails to disclose certain process steps and purity requirements recited in the challenged claims. *Id.* at 45–47. Lastly, UTC contends that evidence of objective indicia of nonobviousness, including long-felt but unmet need and unexpected results, establish the nonobviousness of the challenged claims. *Id.* at 47–49. We address UTC's arguments below.

### a. *Level of Ordinary Skill in the Art*

For the reasons set forth above, we apply in our analysis of the obviousness of the challenged claims in view of Moriarty, Phares, Kawakami, and Eğe the same level of ordinarily skill in the art at the time of invention of the '393 patent as described in Part II.D.2.a.

### b. *Rationale to Combine*

UTC asserts that because the level of skill in the chemical arts in general, and in relation to the claimed invention in particular, is high, an ordinarily skilled artisan would not have looked to an undergraduate textbook such as Eğe to identify improved purification techniques for a complex drug such as treprostinil. PO Resp. 35–36. UTC argues also that neither Phares nor Eğe provides reason for a relevant skilled artisan to

73

Liquidia - Exhibit 1005 - Page 73
UTC_LIQ00040962

IPR2016-00006
Patent 8,497,393 B2

include a carboxylate salt formation and neutral acid regeneration step in treprostinil synthesis.  *Id*. at 37.  In this regard, UTC states that there is no suggestion in Phares to convert treprostinil diethanolamine salt back to the free acid (*id*.), and asserts that Eğe teaches away from the use of salt formation and free acid regeneration to remove acidic compounds, such as certain acidic stereoisomers found in treprostinil (*id*. at 38).  On this basis, UTC concludes that a relevant skilled artisan "would have understood Moriarty, Phares, and Eğe to suggest simply making the treprostinil free acid product of Moriarty, and not undergoing the additional time and expense of a 'carboxylate salt formation and regeneration of the neutral carboxylic acid' step."  *Id*.

UTC additionally argues that Kawakami's teachings would not have provided reason to add a carboxylate salt formation and neutral acid regeneration step to the method for treprostinil synthesis disclosed by Moriarty and Phares because the prostacyclins described in Kawakami are "structurally very different" from treprostinil, and thus, the purification of treprostinil is quite different from the prostacyclin purification described by Kawakami.  *Id*. at 39–41.  UTC further asserts that Kawakami teaches away from the salts recited in claims 14 and 18 of the '393 patent.  UTC thus concludes that an ordinarily skilled artisan would not have looked to Kawakami or Eğe to improve treprostinil purification, because neither reference discloses how to remove stereoisomeric impurities.  *Id*. at 41.

We do not find UTC's arguments persuasive.  As explained above, we find that a relevant skilled artisan would have had reason to add a

74

Liquidia - Exhibit 1005 - Page 74
UTC_LIQ00040963

IPR2016-00006
Patent 8,497,393 B2

carboxylate salt formation and neutral acid regeneration step to the method of Moriarty and Phares described above based on Kawakami's teachings that prostacyclin compounds can be purified by using weak bases and forming salts that can subsequently be converted back into free acids of improved purity and crystallinity by conventional methods, and Eğe's teachings that strong acids are useful in such a conversion. Accordingly, it is of no moment whether Phares itself suggests the conversion of treprostinil diethanolamine salt back into free acid form. It is likewise irrelevant that Eğe is an introductory text. Kawakami encourages the use of "conventional methods" to regenerate the free acid. Ex. 1007, 6. As a basic chemistry text, there can be no dispute that Eğe teaches precisely that—namely, a conventional method for regenerating a free acid using a strong acid. Furthermore, the fact that Eğe is an introductory text does not demean its value as prior art.

Neither do we find persuasive UTC's assertion that Eğe teaches away from the claimed invention because it discloses that salt formation and free acid regeneration is only useful to remove neutral and basic impurities, not acidic impurities, such as certain acidic stereoisomers present in treprostinil. As an initial matter, we observe that the '393 patent, as well as the prior art of record, is silent as to the specific impurities present in treprostinil, as well as whether those impurities are acidic. Accordingly, we agree with SteadyMed (Pet. Reply 19) that undisclosed information about the impurities present in treprostinil cannot defeat the rationale for using crystallization discussed above. This is particularly true where, as here, the record

75

Liquidia - Exhibit 1005 - Page 75
UTC_LIQ00040964

IPR2016-00006
Patent 8,497,393 B2

indicates that Kawakami teaches the use of crystallization to separate stereoisomers.  Ex. 2051, 203:4–204:20.

Moreover, even crediting UTC's position, we observe that Eğe's teachings concerning the removal of neutral and basic impurities nevertheless support the proposed combination because the procedure disclosed would be effective for removing neutral and basic impurities, regardless of the impact on acidic impurities (Pet. 53–55; Ex. 1009 ¶¶ 86, 88).  *See In re Kahn*, 441 F.3d at 988 ("[T]he skilled artisan need not be motivated to combine [the prior art] for the same reason contemplated by [the inventor].").  Indeed, as explained above, the evidence of record indicates that treprostinil diethanolamine salt formation followed by regeneration of treprostinil using a strong acid is an effective purification step.  Pet. 53–55; *see also* Ex. 1007, 6; Ex. 1008, 8; Ex. 1009 ¶¶ 82–90.  Accordingly, contrary to UTC's intimations, this is not a case where "there would have been no reason to incur additional time and expense to form a salt of the valuable, relatively pure Moriarty treprostinil free acid only to then convert it back to the free acid, even though the addition would have been technologically possible."  PO Resp. 44.  Rather, an ordinarily skilled artisan would have expected that salt formation and free acid regeneration would yield a highly pure, crystalline product.

With regard to the level of similarity between treprostinil and the methanoprostacyclin derivative described by Kawakami, we disagree with UTC's contention that these compounds are dissimilar, and that an ordinarily skilled artisan thus would not have turned to Kawakami for guidance

76

Liquidia - Exhibit 1005 - Page 76
UTC_LIQ00040965

IPR2016-00006
Patent 8,497,393 B2

regarding the purification of treprostinil.  In this regard, we note that both Kawakami's methanoprostacyclin derivative and treprostinil are prostacyclins.  We also observe that their chemical structures are similar.  Ex. 1028.  In addition, we do not agree with UTC's assessment that Kawakami's methanoprostacyclin derivative and treprostinil are not improved in the same way by salt formation and free acid regeneration.  To the contrary, both compounds exhibit higher overall purity, as well as a reduction in stereoisomer impurities subsequent to treatment.

Turning to UTC's contentions regarding differences between the salt used in Kawakami and the salts recited in claims 14 and 18, we observe that those claims are not challenged under this ground of unpatentability.  We further note that Kawakami's teachings do not affect our determination, set forth above, that claims 14 and 18 are anticipated by Phares and obvious in view of Moriarty and Phares.

Accordingly, on the record before us, we find that SteadyMed has sufficiently demonstrated that one of ordinary skill in the art would have included the carboxylate salt formation and regeneration of the neutral carboxylic acid of Eğe with the syntheses of Moriarty and Phares based on Kawakami's disclosure that the conversion of salts of prostacyclin derivatives to their free forms by conventional methods increases purity and crystallinity of the final product.  *See KSR*, 550 U.S. at 417.

### c.  Reasonable Expectation of Success

UTC recasts several of the same arguments addressed above with respect to the rationale to combine the cited references as supporting a

77

Liquidia - Exhibit 1005 - Page 77
UTC_LIQ00040966

IPR2016-00006
Patent 8,497,393 B2

determination that an ordinarily skilled artisan would not have had a reasonable expectation of success in the proposed combination of Moriarty, Phares, Kawakami, and Eğe.  PO Resp. 37, 42–44.  In particular, UTC asserts that a relevant skilled artisan would not have had a reasonable expectation of success in further purifying the treprostinil product of Moriarty using carboxylate salt formation and neutral carboxylic acid regeneration.  *Id*. at 37.  UTC also argues that treprostinil purification is "quite different" from the purification of the methanoprostacyclin derivative described by Kawakami, and, thus, an ordinarily skilled artisan would have had no reasonable expectation of success in applying the methods of Kawakami to purify treprostinil.  *Id*. at 42.

We do not agree.  As explained in Part II.D.2.c., above, whether or not an ordinarily skilled artisan would have had an expectation that salt formation and free acid regeneration would improve the purity of Moriarty treprostinil is not the relevant inquiry.  *See Intelligent Bio-Sys.*, 821 F.3d at 1367 ("The reasonable expectation of success requirement refers to the likelihood of success in combining references to meet the limitations of the claimed invention.").  It is undisputed that the proposed combination yields treprostinil.  Furthermore, as detailed in Parts II.C.2.b. and II.D.2.e., above, both Moriarty treprostinil and Phares treprostinil diethanolamine salt are highly pure, and Kawakami shows that salt formation and free acid regeneration is an effective technique for purifying a prostacyclin compound (Ex. 1007, 6).

78

IPR2016-00006
Patent 8,497,393 B2

In addition, for the same reasons set forth with respect to the rationale to combine Moriarty, Phares, Kawakami, and Eğe, we find that Kawakami's methanoprostacyclin derivative and treprostinil are sufficiently similar that an ordinarily skilled artisan would have had a reasonable expectation of success in using the salt formation and free acid regeneration prostacyclin purification procedure taught by Kawakami to purify treprostinil.  In this regard, we recognize, but do not find persuasive, UTC's contention that differences in the particular stereoisomers and other impurities removed from treprostinil and Kawakami's methanoprostacyclin derivative using salt formation and free acid regeneration would have foreclosed any reasonable expectation of success.  *See In re Longi*, 759 F.2d 887, 897 (Fed. Cir. 1985) ("Only a reasonable expectation of success, not absolute predictability, is necessary for a conclusion of obviousness.").

Accordingly, we find that an ordinarily skilled artisan would have a reasonable expectation of success in combining Moriarty, Phares, Kawakami, and Eğe to produce treprostinil.

### d.  Recited Process Steps

UTC reasserts its contention, addressed in Parts II.C.2.b. and II.D.2.e., above, that the treprostinil products of the challenged claims exhibit structural and functional differences compared to prior art treprostinil.  PO Resp. 33–34.  In particular, UTC argues that the performance of step (d) as required by claims 6, 10, 15, 21, and 22 imparts a higher overall purity, as well as an improved purity profile relative to the treprostinil produced by Moriarty.  *Id.* at 33.  UTC also asserts that "Phares' diethanolamine salt of

79

UTC_LIQ00040968

IPR2016-00006
Patent 8,497,393 B2

treprostinil is structurally and functionally distinct from the free acid substance formed by step (d) of claims 6, 15 and 21." *Id.*  UTC relies on the same evidence and reasoning addressed previously in making these arguments.  In addition, UTC contends that even if a "close relationship" exists between Moriarty treprostinil and the treprostinil of the challenged claims, "conducting a salt-formation purification step on the known treprostinil free acid of Moriarty would not have been obvious, so the mere existence of a 'close relationship' in the products cannot be used to deny patentability." *Id.* at 45.

As explained in Parts II.C.2.b. and II.D.2.e., above, we find that the evidence of record does not support the existence of any structural or functional differences between prior art treprostinil and that produced according to the '393 patent.  Furthermore, we observe that UTC's argument concerning the effect of a "close relationship" between Moriarty treprostinil and that of the challenged claims is a non-sequitur.  As explained previously, we find that no structural or functional differences exist between Moriarty treprostinil and '393 patent treprostinil, and, therefore, conclude that the process steps recited in the '393 patent are not entitled to patentable weight.  Moreover, even were the recited process steps entitled to patentable weight, as explained-in-part above, and addressed further below, we nevertheless determine that the recited process steps would have been obvious to a relevant skilled artisan.

80

Liquidia - Exhibit 1005 - Page 80

UTC_LIQ00040969

IPR2016-00006
Patent 8,497,393 B2

### e. Claims 6, 15, and 21

Claims 6, 15, and 21 each recite the product of either claim 1 or claim 9, subject to additional process steps. Claim 6 recites "[t]he product of claim 1, wherein the acid in step (d) is HCl or $H_2SO_4$." Claim 15 similarly recites "[t]he product of claim 9, wherein the acid in step (d) is HCl." Claim 21 simply recites "[t]he product of claim 1, wherein step (d) is performed."

UTC does not offer evidence or argument to suggest that the additional process steps recited in claims 6, 15, and 21 impart structural or functional differences to the claimed product beyond that discussed above in Parts II.C.2.b, II.D.2.e, and II.E.3.d. Rather, UTC reiterates the argument, addressed above, that a relevant skilled artisan "would not have looked to Eğe to further purify a complex carboxylic acid such as treprostinil from its stereoisomers and other impurities and would have no reasonable expectation of success by using HCl based on this disclosure." PO Resp. 46 (quoting Ex. 2020 ¶ 115).

It is undisputed that Eğe discloses the conversion of the carboxylate salt sodium benzoate back to the carboxylic acid benzoic acid by treatment with the acid HCl. Ex. 1008, 8; *see* PO Resp. 46 ("Eğe cites HCl as an example in the conversion of benzoic acid"). Moreover, as detailed in Parts II.E.3.b.–c. above, we find that an ordinarily skilled artisan at the time of invention of the '393 patent would have had reason to, and a reasonable expectation of success in, combining Moriarty, Phares, Kawakami, and Eğe. Accordingly, we do not find UTC's position persuasive.

81

Liquidia - Exhibit 1005 - Page 81

UTC_LIQ00040970

IPR2016-00006
Patent 8,497,393 B2

### f. Claim 10

Claim 10 recites "[t]he product of claim 9, wherein the purity of product of step (d) is at least 99.5%." Ex. 1001, 20:47–48.

UTC advances the same argument addressed above, in Part II.D.2.f., concerning claim 2, concerning the comparability of the 99.7% purity reported by Moriarty and that recited in claim 10. PO Resp. 46. In addition, UTC reasserts its contentions, addressed above, in Parts II.E.3.b.–c., that Moriarty does not perform steps (c) or (d) of the challenged claims, and that a relevant skilled artisan would not have had reason to, or a reasonable expectation of success in, looking to Phares, Kawakami, or Eğe to improve the purity of treprostinil. *Id.*

For the same reasons set forth with regard to claim 2, we find that the 99.7% purity reported by Moriarty is reliable, and thus, performing the additional purification steps disclosed by Phares, Kawakami, and Eğe on Moriarty would yield a product having at least as high a purity as the starting Moriarty treprostinil. Furthermore, as explained above, we find that an ordinarily skilled artisan would have had reason to, and a reasonable expectation of success in, combining Moriarty, Phares, Kawakami, and Eğe, in order to produce a treprostinil product of greater purity.

### g. Claim 22

Claim 22 recites "[t]he product of claim 21, wherein the product comprises a pharmaceutically acceptable salt formed from the product of step (d)."

82

IPR2016-00006
Patent 8,497,393 B2

UTC asserts that the cited combination fails to disclose the additional salt formation step recited in claim 22, but does not offer evidence or argument to suggest that this process step imparts structural or functional differences to the claimed product beyond that discussed above in Parts II.C.2.b., II.D.2.e., and II.E.3.d.

It is undisputed that the cited combination discloses treprostinil diethanolamine salt.  Moreover, as explained previously, we find that the evidence of record does not support the existence of any structural or functional differences between prior art treprostinil diethanolamine salt and that produced according to the '393 patent.

### h. Objective Indicia of Nonobviousness

UTC reasserts its position, addressed in Part II.D.2.h., above, that objective indicia of nonobviousness, including evidence of a long-felt but unmet need for treprostinil having greater overall purity and an improved impurity profile compared to treprostinil produced by known methods, as well as evidence that treprostinil produced according to the process steps of the challenged claims unexpectedly yields a product having increased purity as compared to prior art processes establish the nonobviousness of the challenged claims.  PO Resp. 47–49.

As explained in detail above, however, upon full consideration of the evidence of record respecting the objective indicia of nonobviousness in this case, we are persuaded that nonobvious is not established by that evidence.

Liquidia - Exhibit 1005 - Page 83
UTC_LIQ00040972

IPR2016-00006
Patent 8,497,393 B2

### 4. Conclusion

For the foregoing reasons, therefore, we determine SteadyMed has demonstrated, by a preponderance of the evidence, that the combination of Moriarty, Phares, Kawakami, and Eğe would have rendered obvious to one with ordinary skill in the art the subject matter recited in claims 6, 10, 15, 21, and 22.

### F. SteadyMed's Motion to Exclude Evidence

SteadyMed moves to exclude the Ruffolo Declaration (Ex. 2022), concerning the existence of a long-felt but unmet need for the claimed invention because, according to SteadyMed, Dr. Ruffolo applied an incorrect legal standard in rendering his opinions. Paper 63, 1. SteadyMed contends that Dr. Ruffolo's opinions are "unreliable, confusing, and not helpful to the trier of fact." *Id.*

Even without excluding the Ruffolo Declaration, however, we have determined that SteadyMed has demonstrated, by a preponderance of the evidence, that claims 1–22 of the '393 patent are unpatentable.

Accordingly, SteadyMed's Motion to Exclude is *dismissed* as moot.

### G. UTC's Motion to Exclude Evidence

UTC seeks to exclude the following: (1) certain portions of the Winkler Declaration (Ex. 1009); (2) a website printout entitled "Getting Started in HPLC,' Section 4D: Precision and Accuracy" (Ex. 1017); (3) certain portions of the Rogers Declaration (Ex. 1022); and (4) certain portions of the Deposition Transcript of Dr. Robert M. Williams, Ph.D.

84

Liquidia - Exhibit 1005 - Page 84
UTC_LIQ00040973

IPR2016-00006
Patent 8,497,393 B2

(Ex. 2059).  Paper 65, 2.  UTC additionally seeks to exclude the portions of the Petition and Petitioner's Reply to Patent Owner's Response that rely on these exhibits.  *Id.* at 3.

### 1. *Winkler Declaration (Ex. 1009)*

UTC contends that paragraphs 3, 31, 46, 48, 54, 57, 63, 71, and 72 of the Winkler Declaration (Ex. 1009) should be excluded because the testimony in these paragraphs represent "purely legal conclusions or otherwise unsupported conclusory statements."  PO Mot. Exclude 6.

SteadyMed responds that the testimony objected to merely summarizes Dr. Winkler's ultimate conclusions on issues of anticipation and obviousness, and is therefore admissible.  Pet. Opp. Exclude 2.

We are not persuaded by UTC's arguments.  It is blackletter law that "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a).  Furthermore, it is within our discretion to assign the appropriate weight to be accorded to evidence.  In its motion, UTC has not explained adequately why we should exclude conclusory expert testimony, instead of giving it little or no weight.  *See, e.g.*, *Donnelly Garment Co. v. NLRB*, 123 F.2d 215, 224 (8th Cir. 1941) ("One who is capable of ruling accurately upon the admissibility of evidence is equally capable of sifting it accurately after it has been received . . . .").

For the foregoing reasons, we decline to exclude any portion of the Winkler Declaration (Ex. 1009).

85

IPR2016-00006
Patent 8,497,393 B2

### 2. Website Printout:  "Getting Started in HPLC,' Section 4D: Precision and Accuracy" (Ex. 1017)

UTC contends that Exhibit 1017, a website printout entitled "Getting Started in HPLC,' Section 4D:  Precision and Accuracy," should be excluded as inadmissible hearsay.  PO Mot. Exclude 7.  UTC additionally asserts that Exhibit 1017 has not been authenticated, and should be excluded on that basis as well.  UTC contends that Ex. 1017 itself, as well as paragraph 70 of the Winkler Declaration, and the portions of the Petition and Petitioner's Reply to Patent Owner's Response that rely on Exhibit 1017 or paragraph 70 of the Winkler Declaration should be excluded.

SteadyMed responds that Dr. Winkler's reliance on Exhibit 1017 to support his assessment of error in HPLC instrumentation was proper, irrespective of the Exhibit's status as hearsay.  Pet. Opp. Exclude 5.  SteadyMed argues also that Exhibit 1017 is not hearsay and is properly authenticated.  *Id*. at 6.

As an initial matter, we determine that Dr. Winkler is entitled to rely on Exhibit 1017 as support for his opinions.  Fed. R. Evid. 703.  While we recognize UTC's contention that an expert in pharmaceutical purity would not rely on a general HPLC printout to determine instrumentation error rates (PO Reply Exclude 2), we do not find UTC's position persuasive.  In this regard, we observe that Dr. Winkler relies on Exhibit 1017 solely as providing a baseline understanding of the relative standard deviation for HPLC instrumentation.  Ex. 1009 ¶ 70.  We also observe that it is within our discretion to assign the appropriate weight to be accorded to evidence, and UTC has not explained adequately why we should exclude Dr. Winkler's

86

IPR2016-00006
Patent 8,497,393 B2

testimony, instead of giving it little or no weight. *See, e.g.*, *Donnelly Garment Co.*, 123 F.2d at 224.

As to the portions of the Petition and Petitioner's Reply to Patent Owner's Response that UTC seeks to exclude as improperly relying on paragraph 70 of the Winkler Declaration or Exhibit 1017, we note that SteadyMed's pleadings rely exclusively on Dr. Winkler's opinions as set forth in paragraph 70 of his declaration, and not on Exhibit 1017 itself. Accordingly, because we determine that Dr. Winkler's opinions are admissible, we decline to exclude the portions of the Petition and Petitioner's Reply to Patent Owner's Response identified by UTC.

With respect to Exhibit 1017 itself, we do not rely on that Exhibit in our decision, and, therefore, determine that as it pertains to Exhibit 1017, UTC's motion to exclude is moot.

For the foregoing reasons, we decline to exclude paragraph 70 of the Winkler Declaration (Ex. 1009), as well as the portions of the Petition and Petitioner's Reply to Patent Owner's Response identified by UTC. We further determine that the Motion to Exclude is moot as to Exhibit 1017.

### 3. *Rogers Declaration (Ex. 1022)*

UTC seeks to exclude paragraphs 44–48 and 84–87 of the Rogers Declaration (Ex. 1022). PO Mot. Exclude 8–9. UTC asserts that paragraphs 44–48 constitute new opinions concerning the melting point of treprostinil diethanolamine salt Form A, and paragraphs 84–87 improperly rely on facts not in the record. *Id.*

87

IPR2016-00006
Patent 8,497,393 B2

SteadyMed responds that the paragraphs in question directly respond to UTC's challenges concerning the melting point of Phares treprostinil, and that Dr. Rogers' opinions regarding the equipment used to generate Phares' data was proper.  Pet. Opp. Exclude 8–9.

We are not persuaded by UTC's arguments.  Dr. Rogers' testimony pertains directly to UTC's challenges on melting point.  *See* Ex. 1022 ¶¶ 44–48, 84–87.  Moreover, Dr. Rogers' reliance on personal knowledge concerning the instrumentation and software used by Phares is appropriate, because such knowledge is of the sort that a polymorph expert would rely on in providing opinions on compound purity.  *See* Fed. R. Evid. 702, 703.

In addition, it is within our discretion to assign the appropriate weight to be accorded to evidence.  In its motion, UTC has not explained adequately why we should exclude Dr. Rogers' testimony, instead of giving it little or no weight.  *See, e.g.*, *Donnelly Garment Co.*, 123 F.2d at 224.

For the foregoing reasons, we decline to exclude any portion of the Rogers Declaration (Ex. 1022).

### 4. *Williams Deposition Transcript (Ex. 2059)*

UTC contends that "Petitioner's Reply to Patent Owner's Response includes a number of statements and references that misrepresent certain testimony from the deposition transcript of Dr. Williams (Ex. 2059)."  PO Mot. Exclude 9.  On this basis, UTC seeks to exclude several excerpts from Dr. Williams' deposition and corresponding portions of Petitioner's Reply to Patent Owner's Response.  *Id.* at 9–10.

Liquidia - Exhibit 1005 - Page 88
UTC_LIQ00040977

IPR2016-00006
Patent 8,497,393 B2

SteadyMed responds that "a motion to exclude is not a proper vehicle for a party to argue that the other party's arguments are incorrect." Pet. Opp. Exclude 9 (quoting *Hopkins Manufacturing Co., v. Cequent Performance Products, Inc.*, IPR2015-00609, Paper 32, at *23 (PTAB July 28, 2016)). SteadyMed additionally asserts that UTC's arguments go to weight, not admissibility of the evidence. Lastly, SteadyMed points out that, with one exception, UTC failed to object to the disputed portions of Dr. Williams' testimony during his deposition. *Id.* at 10.

We are not persuaded by UTC's arguments. Rather, we agree with SteadyMed that a motion to exclude is not an appropriate means for expressing disagreement with an opposing party's arguments. We also agree with SteadyMed that any concerns regarding the mischaracterization or misrepresentation of Dr. Williams' testimony go to the weight attributable to, and not the admissibility of, that testimony and SteadyMed's arguments. We further observe that to the extent UTC did not object to the disputed questions during Dr. Williams' deposition, any objections to those questions have been waived.

In addition, it is within our discretion to assign the appropriate weight to be accorded to evidence.

For the foregoing reasons, we decline to exclude any portion of Petitioner's Reply to Patent Owner's Response (Paper 51), or the Deposition Transcript of Dr. Robert M. Williams, Ph.D. (Ex. 2059).

89

Liquidia - Exhibit 1005 - Page 89
UTC_LIQ00040978

IPR2016-00006
Patent 8,497,393 B2

## III.  CONCLUSION

For the foregoing reasons, we determine that SteadyMed has shown
by a preponderance of the evidence that claims 1–22 are unpatentable.

## IV.  ORDER

It is

ORDERED that claims 1–22 of the '393 patent are unpatentable;

FURTHER ORDERED that SteadyMed's Motion to Exclude
Evidence is dismissed.

FURTHER ORDERED that UTC's Motion to Exclude Evidence is
denied.

FURTHER ORDERED that, because this is a Final Written Decision,
parties to the proceeding seeking judicial review of the decision must
comply with the notice and service requirements of 37 C.F.R. § 90.2.

90

Liquidia - Exhibit 1005 - Page 90
UTC_LIQ00040979

IPR2016-00006
Patent 8,497,393 B2


PETITIONER:

Stuart E. Pollack
Lisa A. Haile
DLA Piper LLP
stuart.pollack@dlapiper.com
lisa.haile@dlapiper.com
steadymed-ipr@dlapiper.com


PATENT OWNER:

Stephen B. Maebius
George Quillin
FOLEY & LARDNER LLP
smaebius@foley.com
gquillin@foley.com
UT393-IPR@foley.com


Shaun R. Snader
UNITED THERAPEUTICS CORP.
ssnader@unither.com


Douglas Carsten
Richard Torczon
Robert Delafield
WILSON, SONSINI, GOODRICH & ROSATI
dcarsten@wsgr.com
rtorczon@wsgr.com
bdelafield@wsgr.com


91

Liquidia - Exhibit 1005 - Page 91
UTC_LIQ00040980

# EXHIBIT 5

US010716793B2

(12) **United States Patent**
Olschewski et al.

(10) Patent No.: **US 10,716,793 B2**
(45) Date of Patent: **\*Jul. 21, 2020**

(54) **TREPROSTINIL ADMINISTRATION BY INHALATION**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Horst Olschewski**, Graz (AT); **Robert Roscigno**, Chapel Hill, NC (US); **Lewis J. Rubin**, LaJolla, CA (US); **Thomas Schmehl**, Giessen (DE); **Werner Seeger**, Giessen (DE); **Carl Sterritt**, Weybridge (GB); **Robert Voswinckel**, Giessen (DE)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/778,662**

(22) Filed: **Jan. 31, 2020**

(65) **Prior Publication Data**

US 2020/0171044 A1      Jun. 4, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/536,954, filed on Aug. 9, 2019, which is a continuation of application No. 15/011,999, filed on Feb. 1, 2016, now Pat. No. 10,376,525, which is a division of application No. 13/469,854, filed on May 11, 2012, now Pat. No. 9,339,507, which is a division of application No. 12/591,200, filed on Nov. 12, 2009, now Pat. No. 9,358,240, which is a continuation of application No. 11/748,205, filed on May 14, 2007, now abandoned.

(60) Provisional application No. 60/800,016, filed on May 15, 2006.

(51) **Int. Cl.**
*A61K 31/557* (2006.01)
*A61K 9/00* (2006.01)
*A61K 31/192* (2006.01)

(52) **U.S. Cl.**
CPC ............ *A61K 31/557* (2013.01); *A61K 9/008* (2013.01); *A61K 9/0078* (2013.01); *A61K 31/192* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,664,337 A | 5/1972 | Lindsey et al. | |
| 4,001,650 A | 1/1977 | Romain | |
| 4,007,238 A | 2/1977 | Glenn | |
| 4,281,113 A | 7/1981 | Axen et al. | |
| 4,306,075 A | 12/1981 | Aristoff | |
| 4,306,076 A | 12/1981 | Nelson | |
| 4,349,689 A | 9/1982 | Aristoff | |
| 4,473,296 A | 9/1984 | Shofner et al. | |
| 4,486,598 A | 12/1984 | Aristoff | |
| 4,495,944 A | 1/1985 | Brisson et al. | |
| 4,635,647 A | 1/1987 | Choksi | |
| 4,668,814 A | 5/1987 | Aristoff | |
| 4,677,975 A | 7/1987 | Edgar et al. | |
| 4,683,330 A | 7/1987 | Aristoff | |
| 4,692,464 A | 9/1987 | Skuballa et al. | |
| 4,708,963 A | 11/1987 | Skuballa et al. | |
| 4,976,259 A | 12/1990 | Higson et al. | |
| 4,984,158 A | 1/1991 | Hillsman | |
| 5,063,922 A | 11/1991 | Hakkinen | |
| 5,080,093 A | 1/1992 | Raabe et al. | |
| 5,153,222 A | 10/1992 | Tadepalli et al. | |
| 5,234,953 A | 8/1993 | Crow et al. | |
| 5,322,057 A | 6/1994 | Raabe et al. | |
| 5,361,989 A | 11/1994 | Merchat et al. | |
| 5,363,842 A | 11/1994 | Mishelevich et al. | |
| 5,497,763 A | 3/1996 | Lloyd et al. | |
| 5,551,416 A | 9/1996 | Stimpson et al. | |
| 5,727,542 A | 3/1998 | King | |
| 5,865,171 A | 2/1999 | Cinquin | |
| 5,881,715 A | 3/1999 | Shibasaki | |
| 5,908,158 A | 6/1999 | Cheiman | |
| 6,054,486 A | 4/2000 | Crow et al. | |
| 6,123,068 A | 9/2000 | Lloyd et al. | |
| 6,357,671 B1 | 3/2002 | Cewers | |
| 6,521,212 B1 | 2/2003 | Gilles et al. | |
| 6,626,843 B2 | 9/2003 | Hillsman | |
| 6,756,033 B2 | 6/2004 | Cloutier et al. | |
| 6,765,117 B2 | 7/2004 | Moriarty et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| AU | 1999959533 B2 | 2/2000 |
|---|---|---|
| DE | 19838711 C1 | 6/2000 |

(Continued)

OTHER PUBLICATIONS

Abe et al., "Effects of inhaled prostacyclin analogue on chronic hypoxic pulmonary hypertension," J. Cardiovascular Pharmacology, 2001, 37, 239 251.

Agnew JE, Bateman RM, Pavia D, Clarke SW. (1984) Radionuclide demonstration of ventilatory abnormalities in mild asthma. Clinical Science; 66: 525-531.

(Continued)

*Primary Examiner* — Jeffrey S Lundgren
*Assistant Examiner* — Michael J Schmitt
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

Treprostinil can be administered using a metered dose inhaler. Such administration provides a greater degree of autonomy to patients. Also disclosed are kits that include a metered dose inhaler containing a pharmaceutical formulation containing treprostinil.

**8 Claims, 12 Drawing Sheets**

Liquidia's Exhibit 1001
Page 1

LIQ02799887

## US 10,716,793 B2

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,803,386 | B2 | 10/2004 | Shorr et al. |
| 6,809,223 | B2 | 10/2004 | Moriarty et al. |
| 7,172,557 | B1 | 2/2007 | Parker |
| 7,199,157 | B2 | 4/2007 | Wade et al. |
| 7,261,102 | B2 | 8/2007 | Barney et al. |
| 7,384,978 | B2 | 6/2008 | Phares et al. |
| 7,417,070 | B2 | 8/2008 | Phares et al. |
| 7,544,713 | B2 | 6/2009 | Phares et al. |
| 7,726,303 | B2 | 7/2010 | Tyvoll et al. |
| 9,339,507 | B2 * | 5/2016 | Olschewski ............... A61P 9/12 |
| 9,358,240 | B2 * | 6/2016 | Olschewski .......... A61P 43/00 |
| 10,376,525 | B2 * | 8/2019 | Olschewski ........... A61P 11/00 |
| 2003/0192532 | A1 | 10/2003 | Hopkins |
| 2004/0063912 | A1 | 4/2004 | Blumberg et al. |
| 2004/0105819 | A1 | 6/2004 | Hale et al. |
| 2004/0149282 | A1 | 8/2004 | Hickle |
| 2004/0265238 | A1 | 12/2004 | Chaudry |
| 2005/0165111 | A1 | 7/2005 | Wade et al. |
| 2005/0166913 | A1 | 8/2005 | Sexton et al. |
| 2005/0183719 | A1 | 8/2005 | Wuttke et al. |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2006/0147520 | A1 | 7/2006 | Ruegg |
| 2006/0201500 | A1 | 9/2006 | Von Hollen et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2010/0076083 | A1 | 3/2010 | Olschewski et al. |
| 2010/0236545 | A1 | 9/2010 | Kern |
| 2010/0282622 | A1 | 11/2010 | Phares |
| 2012/0177693 | A1 | 7/2012 | Cipolla et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19934582 A1 | 1/2001 |
| FR | 2783431 A1 | 3/2000 |
| JP | 2003-522003 A | 7/2003 |
| JP | 2004-512101 A | 4/2004 |
| JP | 2005-034341 A | 2/2005 |
| WO | WO 93/00951 A1 | 1/1993 |
| WO | WO 01/58514 A1 | 8/2001 |
| WO | WO 01/85241 A1 | 11/2001 |
| WO | WO 02/34318 A2 | 5/2002 |

OTHER PUBLICATIONS

Annals of the International Commission on Radiological Protection (ICRP) vol. 28, No. 3, 1998, Publication 80, Radiation Dose to Patients from Radiopharmaceuticals.

Aradigm Corporation news release Oct. 24, 2005, "Aradigm and United Therapeutics Sign Development and Commercialization Agreement Targeting Pulmonary Hypertension," Red Orbit News, http://www.redorbit.com/modules/news/tools.php?tool=print&id=281787, 2 pages.

Aristoff et al., "Synthesis of benzopyran prostaglandins, potent stable prostacyclin analogs, via an intermolecular mitsunobu reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.

Badesch et al., "Prostanoid Therapy for Pulmonary Arterial Hypertension," Journal of the American College of Cardiology, 2004, 43(12:Suppl.S):56S-61S.

Bein et al., "Cardiovascular and pulmonary effects of aerosolized prostacyclin administration in severe respiratory failure using a ventilator nebulization system," J. Cardiovascular Pharmacology, 1996, 27, 583-586.

Benedict et al., "Evidence-based pharmacologic management of pulmonary arterial hypertension," Clinical Therapeutics, 2007, 29, 2134-2153.

Bindl et al., "Aerosolised prostacyclin for pulmonary hypertension in neonates," Archives of disease in childhood, Fetal and neonatal edition, 1994, 71(3), F214-6.

Blanchard, J.D., Cipolla, D., Liu, K., Morishige, R., Mudumba, S., Thipphawong, J., Taylor, G., Warren, S., Radhakrishnan, R., Van Vlasselaer, R., Visor , G. and Starko, K. (2003) Lung Deposition of Interferon Gamma-1b following Inhalation via AERx® System vs. Respirgard II™ Nebulizer Proc. ATS Annual Meeting (Abstract A373), Seattle.

Booke et al., "Prostaglandins in Patients with Pulmonary Hypertension: The Route of Administration," Anesth. Analg., 1998, 86:917, Letter to the Editor.

Boyd, B., Noymer, P., Liu, K., Okikawa, J., Hasegawa, D., Warren, S., Taylor, G., Ferguson, E., Schuster, J., Farr, S., and Gonda, I. (2004) Effect of Gender and Device Mouthpiece Shape on Bolus Insulin Aerosol Delivery Using the AERx Pulmonary Delivery System. Pharmaceutical Research. 21 (10) 1776-1782.

Byron, Peter R., "Drug Delivery Devices, Issues in Drug Development," Proc. Am. Thorac. Soc., 2004, 1:321-328.

Channick et al., "Safety and efficacy of inhaled treprostinil as add-on therapy to bosentan in pulmonary arterial hypertension," J. American College of Cardiology, 2006, 48, 1433-1437.

Colthorpe P, Taylor G, Farr SJ. (1997) A comparison of two non-invasive methods for quantifying aerosol deposition in the lungs of rabbits. J. Aerosol Med.; 10:255.

Defendant Watson Laboratories, Inc.'s Invalidity Contentions for U.S. Pat. No. 9,339,507 and 9,358,240, in The United States District Court for the District of New Jersey, Civil Action No. 3.15:cv-05723-PGS-LHG, Aug. 5, 2016, 56 pages.

Doyle et al., "Inhaled prostacyclin as a selective pulmonary vasodilator," Anaesthesia and Intensive Care, Aug. 1996, 24(4):514-515.

Dumas et al,. "Hypoxic pulmonary vasoconstriction," General Pharmacology, 1999, 33, 289-297.

Dworetz et al., "Survival of infants with persistent pulmonary hypertension without extracorporeal membrane oxygenation," Pediatrics, 1989, 84, 1-6.

EPA Integrated Risk Information System (IRIS): data sheet for 3-methylphenol (m-cresol). Accessed at http://www.epa.gov/iris/subst/0301/htm on Mar. 9, 2014.

EU Community Register, Annexes to Commission Decision C(2005)3436, Sep. 5, 2005, http://ec.europa.eu/health/documents/communityregister/2005/2005090510259/anx_10259_en.pdf(Annex III—Ventavis® Labelling and Package Leaflet), 30 pages.

Ewert et al., "Aerosolized iloprost for primary pulmonary hypertension," New England Journal of Medicine, 2000, 343, 1421-1422.

Ewert et al., "Iloprost als inhalative bzw. Intravenose langzeitbehandlung von patienten mit primarer pulmonaler hypertonie," Z. Kardiol., 2000, 89, 987-999.

Farr et al., "Comparison of in vitro and in vivo efficiencies of a novel unit-dose liquid aerosol generator and a pressurized metered dose inhaler," International Journal of Pharmaceutics, 2000, 198:63-70.

Final Office Action dated Oct. 16, 2014 in U.S. Appl. No. 12/591,200.
Final Office Action dated Oct. 17, 2012 in U.S. Appl. No. 12/591,200.
Final Office Action dated Nov. 4, 2013 in U.S. Appl. No. 12/303,877.
Final Office Action dated Dec. 22, 2011 in U.S. Appl. No. 12/591,200.
Final Office Action dated Jul. 2, 2013 in U.S. Appl. No. 13/120,015.
Final Office Action dated Jul. 20, 2015 in U.S. Appl. No. 13/120,015.
Final Office Action dated Aug. 1, 2012 in U.S. Appl. No. 12/303,877.

Findlay et al., "Radioimmunoassay for the Chemical Stable Prostacyclin Analog, 15AU81: a Preliminary Pharmacokinetics Study in the Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):167-174.

Fink et al., "Use of Prostacyclin and its Analogues in the Treatment of Cardiovascular Disease," Heart Disease, 1999, 1:29-40.

Gessler et al., "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension," Eur. Respir. J., 2001, 17, 14-19.

Ghofrani et al., "Hypoxia- and non-hypoxia-related pulmonary hypertension—Established and new therapies," Cardiovascular Research, 2006, 72:30-40.

Ghofrani et al., "New therapies in the treatment of pulmonary hypertension," Herz (Heart), 2005, 4:296-302, with English translation.

Hallioglu et al., "Comparison of Acute Hemodynamic Effects of Aerosolized and Intravenous Iloprost in Secondary Pulmonary Hypertension in Children With Congenital Heart Disease," Am. J. Cardiol., 2003, 92:1007-1009.

Liquidia's Exhibit 1001
Page 2

LIQ02799888

**US 10,716,793 B2**

Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

Haraldsson et al., "Comparison of inhaled nitric oxide and inhaled aerosolized prostacyclin in the evaluation of heart transplant candidates with elevated pulmonary vascular resistance," Chest, 1998, 114, 780-786.

Hoeper et al., "A comparison of the acute hemodynamic effects of inhaled nitric oxide and aerosolized iloprost in primary hypertension," J. American College of Cardiology, 2000, 35, 176-182.

Hoeper et al., "Effects of inhaled nitric oxide and aerosolized iloprost in pulmonary veno-occlusive disease," Respiratory Medicine, 1999, 93, 62-70.

Hoeper et al., "Long term treatment of primary pulmonary hypertension with aerosolized iloprost, a prostacyclin analogue," New England Journal of Medicine, 2000, 342, 1866-1870.

Horn et al., "Treprostinil therapy for pulmonary artery hypertension," Expert Opinion on Investigational Drugs, 2002, 11(11):1615-1622.

Howarth, P.H., "Why particle size should affect clinical response to inhaled therapy," Journal of Aerosol Medicine, 2001, 14 Supp. 1, S-27-S-34.

Ichida et al., "Additive effects of beraprost on pulmonary vasodilation by inhaled nitric oxide in children with pulmonary hypertension," American Journal of Cardiology, 1997, 80, 662-664.

Konorza et al., "Klinisch-pharmakologische Austestung bei pulmonaler Hypertonie zur Therapiefuehrung," Herz, 2005, 30:286-295, English abstract on first page.

Krause et al., "Pharmacokinetics and pharmacodynamics of the prostacyclin analogue iloprost in man," Eur. J. Clin. Pharmacol., 1986, 30, 61-68.

Labiris et al., "Pulmonary drug delivery. Part II: The role of inhalant delivery devices and drug formulations in therapeutic effectiveness of aerosolized medications," Br. J. Clin. Pharmacol., 2003, 56(6):600-612.

Lee et al., "Current strategies for pulmonary arterial hypertension," J. Internal Medicine, 2005, 258, 199-215.

Martin, John C., "Inhaled Form of Remodulin in the Pipeline," http://www.phneighborhood.com/content/in_the_news/archive_2320.aspx, ph Neighborhood, Oct. 28, 2005, 2 pages.

Max et al., "Inhaled prostacyclin in the treatment of pulmonary hypertension," Eur. J. Pediatr., 1999, 158 Suppl 1, S23-S26.

McNulty et al., "The Pharmacokinetics and Pharmacodynamics of the Prostacyclin Analog 15AU81 in the Anesthetized Beagle Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):159-166.

Miller et al., "Standardisation of spirometry. Series ATS/ERS Task Force: Standardisation of Lung Function Testing" Eur Respir J 2005; 26: 319-338.

Mueller et al., "Inhaled iloprost in the management of pulmonary hypertension in infants undergoing congenital heart surgery," European Journal of Anaesthesiology, Jun. 2004, 21(Suppl.33):3, Abstract No. 084.

National Radiological Protection Board. Doses to Patients from Medical Radiological Examinations in Great Britain. (1986) Radiological Protection Bulletin No. 77.

Nebu-Tec med. Produkte Eike Kern GmbH, VENTA-NEB®-ir A-I-C-I® Operating Instructions, Sep. 2005.

Non-Final Office Action dated Jan. 29, 2015 in U.S. Appl. No. 13/120,015.

Non-Final Office Action dated Oct. 11, 2011 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Oct. 31, 2012 in U.S. Appl. No. 13/120,015.

Non-Final Office Action dated Dec. 30, 2014 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Mar. 15, 2013 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Mar. 9, 2014 in U.S. Appl. No. 12/591,200.

Notes for Guidance on the Clinical Administration of Radiopharmaceuticals and Use of Sealed Radioactive Sources.

Administration of Radioactive Substances Advisory Committee (ARSAC) (Mar. 2006). ARSAC Secretariat, Chilton, Didcot, Oxon. OX11 0RQ.

Notice of Allowance dated Jun. 11, 2015 in U.S. Appl. No. 12/303,877.

Olschewski et al. For the German PPH Study Group, "Inhaled iloprost to treat severe pulmonary hypertension—An uncontrolled trial," Annals of Internal Medicine, 2000, 132, 435-443.

Olschewski et al., Aerosolized prostacyclin and iloprost in severe pulmonary hypertension,: Annals of Internal Medicine, 1996, 124, 820 824.

Olschewski et al., "Inhaled Iloprost for Severe Pulmonary Hypertension," N. Eng. J. Med., Aug. 1, 2002, 347(5):322-329.

Olschewski et al., "Inhaled prostacyclin and iloprost in severe pulmonary hypertension secondary to lung fibrosis," Am. Respir. Crit. Care Med., 1999, 160, 600-607.

Olschewski et al., "Pharmacodynamics and pharmacokinetics of inhaled iloprost, aerosolized by three different devices, in severe pulmonary hypertension," Chest, 2003, 124, 1294-1304.

Olschewski et al., "Prostacyclin and its analogues in the treatment of pulmonary hypertension," Pharmacology and Therapeutics, 2004, 102, 139-153.

Olschewski et al., "Recovery from circulatory shock in severe primary pulmonary hypertension (PPH) with aerosolization of iloprost," Intensive Care Med., 1998, 24, 631-634.

Olschewski, Horst, "Therapie der pulmonalen Hypertonie," Pneumologe, 2004, 1:95-101.

OPTINEB®-ir Operating Instructions, Unit Type ON-100/2-2.4 MHz, 2005, 33 pages, verified English translation.

Pappert et al., "Aerosolized Prostacyclin Versus Inhaled Nitric Oxide in Children with Severe Acute Respiratory Distress Syndrome," Anesthesiology, Jun. 1995, 82(6):1507-1511.

Publications of the International Commission on Radiological Protection (ICRP) (1977) Recommendations of the International Commission on Radiological Protection 26.

Pulmonary Delivery, ONdrugDelivery, 2006, 5 pages.

Rigby, Jonathan, Aradigm Corporation, "Technological advances for success: Product pipeline in targeted pulmonary delivery," Pulmonary Delivery Innovative Technologies Breathing New Life into Inhalable Therapeutics, ONdrugDelivery, http://www.ondrugdelivery.com/publications/Pulmonary.pdf, 2006, 17-19.

Rubin et al., "Pulmonary Arterial Hypertension: A Look to the Future," Journal of the American College of Cardiology, Jun. 18, 2004, 43(12,Suppl.S):89S-90S.

Saini et al., "Effect of Electrostatic Charge and Size Distributions on Respirable Aerosol Deposition in Lung Model," Industry Applications Conference, 2004, 39th IAS Annual Meeting, Conference Record of the 2004 IEEE Seattle, WA, Oct. 3-7, 2004, 2:948-952.

Sandifer et al., "Effects of Aerosol vs IV UT-15 on Prostaglandin $H_2$ Analog-Induced Pulmonary Hypertension in Sheep," Chest, 2005, 128:616S.

Sandifer et al., "Potent effects of aerosol compared with intravenous treprostinil on the pulmonary circulation," J. Appl. Physiol., 2005, 99:2363-2368.

Santak et al., "Prostacyclin aerosol in an infant with pulmonary hypertension," Eur. J. Pediatr., 1995, 154, 233-235.

Scientific discussion for the approval of Ventavis, European Medicines Agency (EMEA), Oct. 20, 2004, 30 pages.

Soditt et al., "Improvement of oxygenation induced by aerosolized prostacyclin in a preterm infant with persistent pulmonary hypertension of the newborn," Intensive Care Med., 1997, 23, 1275-1278.

Steffen et al., "The Effects of 15AU81, a Chemically Stable Prostacyclin Analog, on the Cardiovascular and Renin-Angiotensis Systems of Anesthetized Dogs," Prostaglandins, Leukotrienes and Essential Fatty Acids, 1991, 43:277-286.

Stricker et al., "Sustained improvement of performance and haemodynamics with long-term aerosolized prostacyclin therapy in severe pulmonary hypertension," Schweiz Med. Wochenschr., 1999, 129, 923-927.

Van Heerden et al., "Inhaled aerosolized prostacyclin as a selective pulmonary vasodilator for the treatment of severe hypertension," Anaesthesia and Intensive Care, 1996, 24, 87-90.

Liquidia's Exhibit 1001
Page 3

LIQ02799889

US 10,716,793 B2

Page 4

(56)         **References Cited**

OTHER PUBLICATIONS

Van Heerden et al., "Re: Delivery of inhaled aerosolized prostacyclin (IAP)," Anaesthesia and Intensive Care, 1996, 24, 624-625.
Voswinckel et al., "Acute effects of the combination of sildenafil and inhaled treprostinil on haemodynamics and gas exchange in pulmonary hypertension," Pulmonary Pharmacology & Therapeutics, 2008, 21, 824-832.
Voswinckel et al., "Favorable Effects of Inhaled Treprostinil in Severe Pulmonary Hypertension," Journal of the American College of Cardiology, 2006, 48(8):1672-1681.
Voswinckel et al., "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," Annals of Internal Medicine, Jan. 17, 2006, 144(2):149-150.
Voswinckel et al., "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal, Journal of the European Society of Cardiology, ESC Congress, Aug. 28-Sep. 1, 2004, Munich, Germany, p. 22, abstract 218.
Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 2004, Abstract 1414, 110, 17 Supplement.
Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 26, 2004, Supplement, 110(17):295, abstract 1414.
Walmrath et al., "Effects of inhaled versus intravenous vasodilators in experimental pulmonary hypertension," Eur. Respir. J., 1997, 10, 1084-1092.
Wasserman et al., "Bronchodilator effects of prostacyclin (PGI2) in dogs and guinea pigs," European Journal of Pharmacology, 1980, 66, 53-63.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01621, U.S. Pat. No. 9,358,240, Jan. 11, 2018.
Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01622, U.S. Pat. No. 9,339,507, Jan. 11, 2018.
Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Petition for Inter Partes Review, IRP2017-01622, U.S. Pat. No. 9,339,507, with all Exhibits on exhibit list.
Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Petition for Inter Partes Review, IRP2017-01621, U.S. Pat. No. 9,358,240, with only Exhibits 1002, 1059, 1161 and 1164 and not including exhibits already provide with C2.
Webb et al., "The use of inhaled aerosolized prostacyclin (IAP) in the treatment of pulmonary hypertension secondary to pulmonary embolism," Intensive Care Med., 1996, 22, 353-355.
Wensel et al., "Effects of iloprost inhalation on exercise capacity and ventilator efficiency in patients with primary pulmonary hypertension," Circulation, 2000, 101, 2388-2392.
Wetzel, R.C., "Aerosolized prostacyclin: in search of the ideal pulmonary vasodilator," Anesthesiology, 1995, 82, 1315-1317.
Wittwer et al., "Inhalative Pre-Treatment of Donor Lungs Using the Aerosolized Prostacyclin Analog Iliprost Ameliorates Reperfusion Injury," J. Heart Lung Transplant, 2005, 24:1673-1679.
Zanen et al., "Optimal particle size for beta 2 agonist and anticholinergic aerosols in patients with severe airflow obstruction," Thorax, 1996, 51, 977-980.
Zanen et al., "The optimal particle size for β-adrenergic aerosols in mild asthmatics," International Journal of Pharmaceutics, 1994, 107, 211-217.

* cited by examiner

Liquidia's Exhibit 1001
Page 4

LIQ02799890



FIGURE 1

Liquidia's Exhibit 1001
Page 5

LIQ02799891

U.S. Patent
Jul. 21, 2020
Sheet 2 of 12
US 10,716,793 B2

# FIGURE 2









Liquidia's Exhibit 1001
Page 6
LIQ02799892





FIGURE 4

Liquidia's Exhibit 1001
Page 8

LIQ02799894

FIGURE 5





Liquidia's Exhibit 1001
Page 9

LIQ02799895

FIGURE 6



Liquidia's Exhibit 1001
Page 10

LIQ02799896



FIGURE 7

Liquidia's Exhibit 1001
Page 11

LIQ02799897

U.S. Patent          Jul. 21, 2020          Sheet 8 of 12          US 10,716,793 B2

FIGURE 8



Liquidia's Exhibit 1001
Page 12

LIQ02799898

FIGURE 9



Liquidia's Exhibit 1001
Page 13

LIQ02799899

FIGURE 10



Liquidia's Exhibit 1001
Page 14

LIQ02799900

# FIGURE 11



Liquidia's Exhibit 1001
Page 15

LIQ02799901



FIGURE 12

LIQ02799902

US 10,716,793 B2

1

# TREPROSTINIL ADMINISTRATION BY INHALATION

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation of U.S. application Ser. No. 16/536,954, filed Aug. 9, 2019, which is a Continuation of U.S. application Ser. No. 15/011,999, filed Feb. 1, 2016, which is a Divisional of U.S. application Ser. No. 13/469,854, filed May 11, 2012, Divisional of U.S. application Ser. No. 12/591,200, filed Nov. 12, 2009, which is a Continuation of U.S. application Ser. No. 11/748,205, filed May 14, 2007, which claims priority to U.S. provisional application 60/800,016 filed May 15, 2006, which are incorporated herein by reference in their entirety.

## FIELD OF THE INVENTION

The present application relates to methods and kits for therapeutic treatment and, more particularly, to therapeutic methods involving administering treprostinil using a metered dose inhaler and related kits.

## BACKGROUND OF THE INVENTION

All blood is driven through the lungs via the pulmonary circulation in order, among other things, to replenish the oxygen which it dispenses in its passage around the rest of the body via the systemic circulation. The flow through both circulations is in normal circumstances equal, but the resistance offered to it in the pulmonary circulation is generally much less than that of the systemic circulation. When the resistance to pulmonary blood flow increases, the pressure in the circulation is greater for any particular flow. The above described condition is referred to as pulmonary hypertension (PH). Generally, pulmonary hypertension is defined through observations of pressures above the normal range pertaining in the majority of people residing at the same altitude and engaged in similar activities.

Pulmonary hypertension may occur due to various reasons and the different entities of pulmonary hypertension were classified based on clinical and pathological grounds in 5 categories according to the latest WHO convention, see e.g. Simonneau G., et al. J. Am. Coll. Cardiol. 2004; 43(12 Suppl S):5S-12S. Pulmonary hypertension can be a manifestation of an obvious or explicable increase in resistance, such as obstruction to blood flow by pulmonary emboli, malfunction of the heart's valves or muscle in handling blood after its passage through the lungs, diminution in pulmonary vessel caliber as a reflex response to alveolar hypoxia due to lung diseases or high altitude, or a mismatch of vascular capacity and essential blood flow, such as shunting of blood in congenital abnormalities or surgical removal of lung tissue. In addition, certain infectious diseases, such as HIV and liver diseases with portal hypertension may cause pulmonary hypertension. Autoimmune disorders, such as collagen vascular diseases, also often lead to pulmonary vascular narrowing and contribute to a significant number of pulmonary hypertension patients. The cases of pulmonary hypertension remain where the cause of the increased resistance is as yet inexplicable are defined as idiopathic (primary) pulmonary hypertension (iPAH) and are diagnosed by and after exclusion of the causes of secondary pulmonary hypertension and are in the majority of cases related to a genetic mutation in the bone morphogenetic protein receptor-2 gene. The cases of idiopathic

2

pulmonary arterial hypertension tend to comprise a recognizable entity of about 40% of patients cared for in large specialized pulmonary hypertension centers. Approximately 65% of the most commonly afflicted are female and young adults, though it has occurred in children and patients over 50. Life expectancy from the time of diagnosis is short without specific treatment, about 3 to 5 years, though occasional reports of spontaneous remission and longer survival are to be expected given the nature of the diagnostic process. Generally, however, disease progress is inexorable via syncope and right heart failure and death is quite often sudden.

Pulmonary hypertension refers to a condition associated with an elevation of pulmonary arterial pressure (PAP) over normal levels. In humans, a typical mean PAP is approximately 12-15 mm Hg. Pulmonary hypertension, on the other hand, can be defined as mean PAP above 25 mmHg, assessed by right heart catheter measurement. Pulmonary arterial pressure may reach systemic pressure levels or even exceed these in severe forms of pulmonary hypertension. When the PAP markedly increases due to pulmonary venous congestion, i.e. in left heart failure or valve dysfunction, plasma can escape from the capillaries into the lung interstitium and alveoli. Fluid buildup in the lung (pulmonary edema) can result, with an associated decrease in lung function that can in some cases be fatal. Pulmonary edema, however, is not a feature of even severe pulmonary hypertension due to pulmonary vascular changes in all other entities of this disease.

Pulmonary hypertension may either be acute or chronic. Acute pulmonary hypertension is often a potentially reversible phenomenon generally attributable to constriction of the smooth muscle of the pulmonary blood vessels, which may be triggered by such conditions as hypoxia (as in high-altitude sickness), acidosis, inflammation, or pulmonary embolism. Chronic pulmonary hypertension is characterized by major structural changes in the pulmonary vasculature, which result in a decreased cross-sectional area of the pulmonary blood vessels. This may be caused by, for example, chronic hypoxia, thromboembolism, collagen vascular diseases, pulmonary hypercirculation due to left-to-right shunt, HIV infection, portal hypertension or a combination of genetic mutation and unknown causes as in idiopathic pulmonary arterial hypertension.

Pulmonary hypertension has been implicated in several life-threatening clinical conditions, such as adult respiratory distress syndrome ("ARDS") and persistent pulmonary hypertension of the newborn ("PPHN"). Zapol et al., Acute Respiratory Failure, p. 241-273, Marcel Dekker, New York (1985); Peckham, J. Ped. 93:1005 (1978). PPHN, a disorder that primarily affects full-term infants, is characterized by elevated pulmonary vascular resistance, pulmonary arterial hypertension, and right-to-left shunting of blood through the patent ductus arteriosus and foramen ovale of the newborn's heart. Mortality rates range from 12-50%. Fox, Pediatrics 59:205 (1977); Dworetz, Pediatrics 84:1 (1989). Pulmonary hypertension may also ultimately result in a potentially fatal heart condition known as "cor pulmonale," or pulmonary heart disease. Fishman, "Pulmonary Diseases and Disorders" 2nd Ed., McGraw-Hill, New York (1988).

Currently, there is no treatment for pulmonary hypertension that can be administered using a compact inhalation device, such as a metered dose inhaler.

## SUMMARY OF THE INVENTION

One embodiment is a method of delivering to a subject in need thereof a therapeutically effective amount of trepros-

Liquidia's Exhibit 1001
Page 17

LIQ02799903

US 10,716,793 B2

3

tinil, or treprostinil derivative or a pharmaceutically acceptable salt thereof comprising administering to the subject a therapeutically effective amount of the treprostinil or treprostinil derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Another embodiment is a method for treating pulmonary hypertension comprising administering to a subject in need thereof treprostinil or its derivative, or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Yet another embodiment is a kit comprising a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or treprostinil derivative, or a pharmaceutically acceptable salt thereof.

And yet another embodiment is a kit for treating pulmonary hypertension in a subject, comprising (i) an effective amount of treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; (ii) a metered dose inhaler; (iii) instructions for use in treating pulmonary hypertension.

Administration of treprostinil using a metered dose inhaler can provide patients, such as pulmonary hypertension patients, with a high degree of autonomy.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 pulmonary and systemic changes in hemodynamics following the inhalation of placebo (open circles), 30 µg treprostinil (triangles), 45 µg treprostinil (squares) or 60 µg TREprostinil (black circles) applied by a Metered Dose Inhaler (MDI-TRE). A single short inhalation of treprostinil induced sustained reduction of PAP and PVR that outlasted the observation period of 120 minutes at doses of 45 and 60 µg MDI-TRE. Systemic arterial pressure and resistance were not significantly affected. PAP=mean pulmonary artery pressure; PVR=pulmonary vascular resistance; SAP=mean systemic arterial pressure; SVR=systemic vascular resistance. Data are given as mean value±standard error of the mean (SEM).

FIG. 2 presents hemodynamic changes induced by the inhalation of placebo (open circles), 30 µg treprostinil (triangles), 45 µg treprostinil (squares) or 60 µg treprostinil (black circles) applied by a metered dose inhaler. Treprostinil induced sustained elevation of cardiac output. Heart rate was rather unchanged as a sign for low spillover of MDI-TRE to the systemic circulation. Gas exchange was not negatively affected. CO=cardiac output; HR=heart rate; SaO2=arterial oxygen saturation; SvO2=central venous oxygen saturation. Data are given as mean value±SEM.

FIG. 3 shows areas under the curve for changes in pulmonary vascular resistance (PVR) calculated for an observation period of 120 minutes after inhalation treprostinil using a metered dose inhaler. PVR was markedly lowered by treprostinil inhalation. The increased pulmonary vasodilation over time with the two highest doses mainly relies on the more sustained effect over time. Data are shown as mean value±95% confidence intervals.

FIG. 4 demonstrates Ventilation-perfusion matching measured with the multiple inert gas elimination technique. Five patients (30 µg TRE, n=2; 45 µg TRE, n=1; 60 µg TRE, n=2) with pre-existing gas exchange problems were investigated for changes in ventilation-perfusion ratios. All patients had significant shunt flow at baseline. Shunt-flow and low V/Q areas were not significantly changed by nitric oxide (NO) inhalation or treprostinil inhalation using a metered dose inhaler (MDI-TRE). MDI-TRE applied at high treprostinil concentrations did not negatively affect ventilation-perfusion matching and gas-exchange. Data are given as mean value±95% confidence intervals.

4

FIG. 5 presents response of pulmonary vascular resistance (PVR) to inhaled treprostinil vs. iloprost—period effects. a) First inhalation with treprostinil (n=22) vs. first inhalation with iloprost (n=22); b) second inhalation with treprostinil (n=22) vs. second inhalation with iloprost (n=22). The PVR decrease with treprostinil was delayed and prolonged, compared to iloprost. Due to carryover effects from the first period, in the second period, the effects of both drugs appeared shortened. Data are shown as percent of baseline values (mean value±95% confidence interval).

FIG. 6 presents response of PVR and systemic arterial pressure (SAP) to inhalation of treprostinil vs. iloprost—dose effects. a) Inhalation of 7.5 µg iloprost (in 6 min) vs. 7.5 µg treprostinil (6 min) (n=14, in a randomized order). b) Inhalation of 7.5 µg iloprost (6 min) vs. 15 µg treprostinil (6 min) (n=14, in randomized order). c) Inhalation of 7.5 µg iloprost (6 min) vs. 15 µg treprostinil (3 min) (n=16, in randomized order). Data are shown as percent of baseline values (mean±95% confidence interval). Iloprost, filled circles; Treprostinil, open triangles.

FIG. 7 presents hemodynamic response to inhalation of treprostinil vs. iloprost. Data from n=44 patients, who inhaled both drugs in randomized order, shown as percent of baseline values (mean value±95% confidence interval). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. 8 presents pharmacodynamics after treprostinil inhalation vs. placebo. Placebo or treprostinil in doses of 30 µg, 60 µg or 90 µg were inhaled (means±95% confidence intervals). Maximal decrease of PVR was comparable for all doses. The duration of pulmonary vasodilation (PVR-decrease) appeared to be dose dependent. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output; SaO2, arterial oxygen saturation; SvO2, mixed venous oxygen saturation.

FIG. 9 presents Areas Between the placebo and the treprostinil Curves (ABC). ABCs were calculated for a 3-hour period after inhalation of TRE or placebo from the relative changes of hemodynamic parameters (means±95% confidence intervals). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; SVR, systemic vascular resistance.

FIG. 10 presents hemodynamic responses to the inhalation of 15 µg treprostinil. The inhalation time by increasing treprostinil concentration. A pulse of aerosol was generated every 6 seconds. TRE aerosol was inhaled in concentrations of 100 µg/ml (18 pulses; n=6), 200 µg/ml (9 pulses; n=6), 600 µg/ml (3 pulses; n=21), 1000 µg/ml (2 pulses; n=7) and 2000 µg/ml (1 pulse; n=8). Placebo data correspond to FIG. 8. Data are shown as means±95% confidence intervals. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. 11 presents areas between the placebo curve and the responses to 15 µg treprostinil inhaled at increasing concentrations to minimize inhalation time. Mean±SEM of relative changes of hemodynamic parameters (observation time 120 min). PAP, pulmonary arterial pressure, SAP, systemic arterial pressure, PVR, pulmonary vascular resistance, CO, cardiac output, SaO2, systemic arterial oxygen saturation, SvO2, pulmonary arterial oxygen saturation.

FIG. 12 presents pharmacokinetics of treprostinil after a single inhalation. Treprostinil plasma levels after inhalation of 30 µg, 60 µg, 90 µg or 120 µg treprostinil (6 min

Liquidia's Exhibit 1001
Page 18

LIQ02799904

US 10,716,793 B2

5

inhalation period; experiments correspond to those shown in FIGS. **8** and **9**). Data with error bars represent mean values±SEM.

### DETAILED DESCRIPTION OF THE INVENTION

Unless otherwise specified, the term "a" or "an" used herein shall mean "one or more."

The present application incorporates herein by reference in its entirety Voswinckel R, et al. J. Am. Coll. Cardiol. 2006; 48:1672-1681.

The inventors discovered that a therapeutically effective dose of treprostinil can be administered in a few single inhalations using a compact inhalation device, such as a metered dose inhaler. Furthermore, the inventors discovered that such administering does not cause significant side effects, especially no significant side effects related to systemic blood pressure and circulation as well as no gas exchange deteriorations or disruptions.

Accordingly, one embodiment of the invention is a method of delivering to a subject in need thereof, such as a human being, a therapeutically effective amount of treprostinil comprising administering to the subject a formulation comprising a therapeutically effective amount of treprostinil, its derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler. Treprostinil can be administered via a metered dose inhaler to a subject affected with a condition or disease, which can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

Another embodiment of the invention is a method for treating pulmonary hypertension, comprising administering to a subject in need thereof, such as a human being, treprostinil or its derivative, or a pharmaceutically acceptable salt using a metered dose inhaler.

Treprostinil, or 9-deoxy-2′,9-alpha-methano-3-oxa-4,5,6-trinor-3,7-(1′3′-interphenylene)-13,14-dihydro-prostaglandin F1, is a prostacyclin analogue, first described in U.S. Pat. No. 4,306,075. U.S. Pat. No. 5,153,222 describes use of treprostinil for treatment of pulmonary hypertension. Treprostinil is approved for the intravenous as well as subcutaneous route, the latter avoiding septic events associated with continuous intravenous catheters. U.S. Pat. Nos. 6,521,212 and 6,756,033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions. U.S. Pat. No. 6,803,386 discloses administration of treprostinil for treating cancer such as lung, liver, brain, pancreatic, kidney, prostate, breast, colon and head-neck cancer. US patent application publication No. 2005/0165111 discloses treprostinil treatment of ischemic lesions. U.S. Pat. No. 7,199,157 discloses that treprostinil treatment improves kidney functions. US patent application publication No. 2005/0282903 discloses treprostinil treatment of neuropathic foot ulcers. U.S. provisional application No. 60/900, 320 filed Feb. 9, 2007, discloses treprostinil treatment of pulmonary fibrosis.

The term "acid derivative" is used herein to describe C1-4 alkyl esters and amides, including amides wherein the nitrogen is optionally substituted by one or two C1-4 alkyl groups.

The present invention also encompasses methods of using Treprostinil or its derivatives, or pharmaceutically acceptable salts thereof. In one embodiment, a method uses Treprostinil sodium, currently marketed under the trade name of REMODULIN®. The FDA has approved Trepro-

6

stinil sodium for the treatment of pulmonary arterial hypertension by injection of dose concentrations of 1.0 mg/mL, 2.5 mg/mL, 5.0 mg/mL and 10.0 mg/mL. The chemical structure formula for Treprostinil sodium is:



Treprostinil sodium is sometimes designated by the chemical names: (a) [(1R,2R,3aS,9aS)-2,3,3a,4,9,9a-hexahydro-2-hydroxy-1-[(3S)-3-hydroxyoctyl]-1H-benz[f]inden-5-yl]oxy]acetic acid; or (b) 9-deoxy-2′,9-α-methano-3-oxa-4,5,6-trinor-3,7-(1′,3′-interphenylene)-13,14-dihydro-prostaglandin F₁. Treprostinil sodium is also known as: UT-15; LRX-15; 15AU81; UNIPROST™; BW A15AU; and U-62,840. The molecular weight of Treprostinil sodium is 390.52, and its empirical formula is $C_{23}H_{34}O_5$.

In certain embodiments, treprostinil can be administered in combination with one or more additional active agents. In some embodiments, such one or more additional active agents can be also administered together with treprostinil using a metered dose inhaler. Yet in some embodiments, such one or more additional active agents can be administered separately from treprostinil. Particular additional active agents that can be administered in combination with treprostinil may depend on a particular disease or condition for treatment or prevention of which treprostinil is administered. In some cases, the additional active agent can be a cardiovascular agent such as a calcium channel blocker, a phosphodiesterase inhibitor, an endothelial antagonist, or an antiplatelet agent.

The present invention extends to methods of using physiologically acceptable salts of Treprostinil, as well as nonphysiologically acceptable salts of Treprostinil that may be used in the preparation of the pharmacologically active compounds of the invention.

The term "pharmaceutically acceptable salt" refers to a salt of Treprostinil with an inorganic base, organic base, inorganic acid, organic acid, or basic or acidic amino acid. Salts of inorganic bases can be, for example, salts of alkali metals such as sodium or potassium; alkaline earth metals such as calcium and magnesium or aluminum; and ammonia. Salts of organic bases can be, for example, salts triethylamine, triethylamine, pyridine, picoline, ethanolamine, diethanolamine, and triethanolamine. Salts of inorganic acids can be, for example, salts of hydrochloric acid, hydroboric acid, nitric acid, sulfuric acid, and phosphoric acid. Salts of organic acids can be, for example, salts of formic acid, acetic acid, trifluoroacetic acid, fumaric acid, oxalic acid, lactic acid, tartaric acid, maleic acid, citric acid, succinic acid, malic acid, methanesulfonic acid, benzenesulfonic acid, and p-toluenesulfonic acid. Salts of basic amino acids can be, for example, salts of arginine, lysine and ornithine. Salts of acidic amino acids can include, for example, salts of aspartic acid and glutamic acid. Quaternary ammonium salts can be formed, for example, by reaction with lower alkyl halides, such as methyl, ethyl, propyl, and butyl chlorides, bromides, and iodides, with dialkyl sul-

Liquidia's Exhibit 1001
Page 19

LIQ02799905

US 10,716,793 B2

7

phates, with long chain halides, such as decyl, lauryl, myristyl, and stearyl chlorides, bromides, and iodides, and with aralkyl halides, such as benzyl and phenethyl bromides.

Preferred pharmaceutically acceptable salts are disclosed, for example, in US patent application publication No. 20050085540.

Treprostinil can be administered by inhalation, which in the present context refers to the delivery of the active ingredient or a combination of active ingredients through a respiratory passage, wherein the subject in need of the active ingredient(s) through the subject's airways, such as the subject's nose or mouth.

A metered dose inhaler in the present context means a device capable of delivering a metered or bolus dose of respiratory drug, such as treprostinil, to the lungs. One example of the inhalation device can be a pressurized metered dose inhaler, a device which produces the aerosol clouds for inhalation from solutions and/or suspensions of respiratory drugs in chlorofluorocarbon (CFC) and/or hydro-fluoroalkane (HFA) solutions.

The inhalation device can be also a dry powder inhaler. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.

The metered dose inhaler can be a soft mist inhaler (SMI), in which the aerosol cloud containing a respiratory drug can be generated by passing a solution containing the respiratory drug through a nozzle or series of nozzles. The aerosol generation can be achieved in SMI, for example, by mechanical, electromechanical or thermomechanical process. Examples of soft mist inhalers include the Respimat® Inhaler (Boeringer Ingelheim GmbH), the AERx® Inhaler (Aradigm Corp.), the Mystic™ Inhaler (Ventaira Pharmaceuticals, Inc) and the Aira™ Inhaler (Chrysalis Technologies Incorporated). For a review of soft mist inhaler technology, see e.g. M. Hindle, The Drug Delivery Companies Report, Autumn/Winter 2004, pp. 31-34. The aerosol for SMI can be generated from a solution of the respiratory drug further containing pharmaceutically acceptable excipients. In the present case, the respiratory drug is treprostinil, its derivative or a pharmaceutically acceptable salt thereof, which can be formulated in SMI as a solution. The solution can be, for example, a solution of treprostinil in water, ethanol or a mixture thereof. Preferably, the diameter of the treprostinil-containing aerosol particles is less than about 10 microns, or less than about 5 microns, or less than about 4 microns.

Treprostinil concentration in an aerosolable formulation, such as a solution, used in a metered dose inhaler can range from about 500 µg/ml to about 2500 µg/ml, or from about 800 µg/ml to about 2200 µg/ml, or from about 1000 µg/ml to about 2000 µg/ml.

The dose of treprostinil that can be administered using a metered dose inhaler in a single event can be from about 15 µg to about 100 µg or from about 15 µg to about 90 µg or from about 30 µg to about 90 µg or from about 30 µg to about 60 µg.

Administering of treprostinil in a single event can be carried out in a limited number of breaths by a patient. For example, treprostinil can be administered in 20 breaths or less, or in 10 breaths or less, or than 5 breaths or less. Preferably, treprostinil is administered in 3, 2 or 1 breaths.

The total time of a single administering event can be less than 5 minutes, or less than 1 minute, or less than 30 seconds.

8

Treprostinil can be administered a single time per day or several times per day.

In some embodiments, the method of treatment of pulmonary hypertension can further comprise administering at least one supplementary agent selected from the group consisting of sildenafil, tadalafil, calcium channel blockers (diltiazem, amlodipine, nifedipine), bosentan, sitaxsentan, ambrisentan, and pharmaceutically acceptable salts thereof. In some embodiments, the supplementary agents can be included in the treprostinil formulation and, thus, can be administered simultaneously with treprostinil using a metered dose inhaler. In some embodiments, the supplementary agents can be administered separately from treprostinil. In some embodiments, the application of intravenous prostacyclin (flolan), intravenous iloprost or intravenous or subcutaneous treprostinil can be administered in addition to treprostinil administered via inhalation using a metered dose inhaler.

The present invention also provides a kit that includes a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof. Such a kit can further include instructions on how to use the metered dose inhaler for inhaling treprostinil. Such instructions can include, for example, information on how to coordinate patient's breathing, and actuation of the inhaler. The kit can be used by a subject, such as human being, affected with a disease or condition that can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

In some cases, the kit is a kit for treating pulmonary hypertension, that includes (i) a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; and (ii) instructions for use of the metered dose inhaler containing treprostinil in treating pulmonary hypertension.

As used herein, the phrase "instructions for use" shall mean any FDA-mandated labeling, instructions, or package inserts that relate to the administration of Treprostinil or its derivatives, or pharmaceutically acceptable salts thereof, for treatment of pulmonary hypertension by inhalation. For example, instructions for use may include, but are not limited to, indications for pulmonary hypertension, identification of specific symptoms associated with pulmonary hypertension, that can be ameliorated by Treprostinil, recommended dosage amounts for subjects suffering from pulmonary hypertension and instructions on coordination of individual's breathing and actuation of the metered dose inhaler.

The present invention can be illustrated in more detail by the following example, however, it should be understood that the present invention is not limited thereto.

Example 1

Open Label Study Upon Acute Safety, Tolerability and Hemodynamic Effects of Inhaled Treprostinil Delivered in Seconds

A study was conducted of acute vasodilator challenge during right heart catheter investigation to determine the safety, tolerability and pulmonary vasodilatory potency of inhaled treprostinil applied in seconds by a soft mist inhaler (SMI-TRE). The study produced evidence for a long lasting

Liquidia's Exhibit 1001
Page 20

LIQ02799906

US 10,716,793 B2

9

favourable effect of SMI-TRE on pulmonary hemodynamics in absence of systemic side effects and gas exchange disruptions.

Summary:

Inhaled nitric oxide (20 ppm; n=45) and inhaled treprostinil sodium (TRE; n=41) or placebo (n=4) were applied once during right heart catheter investigation. TRE was delivered in 2 breaths (1000 µg/ml aerosol concentration; 30 µg dose; n=12), 3 breaths (1000 µg/ml; 45 µg; n=9) or 2 breaths (2000 µg/ml; 60 µg; n=20) from a Respimat® SMI. Pulmonary hemodynamics and blood gases were measured at defined time points, observation time following TRE application was 120 minutes. TRE doses of 30 µg, 45 µg and 60 µg reduced pulmonary vascular resistance (PVR) to 84.4±8.7%, 71.4±17.5% and 77.5±7.2% of baseline values, respectively (mean±95% confidence interval). The 120 minute area under the curve for PVR for placebo, 30 µg, 45 µg and 60 µg TRE was 1230±1310, −870±940, −2450±2070 and −2000±900 min %, respectively. Reduction of PVR by a single inhalation of the two higher doses outlasted the observation period of 120 minutes. Reduction of systemic vascular resistance and pressure was negligible, showing a high pulmonary selectivity for SMI-TRE. Intrapulmonary selectivity was also provided by SMI-TRE as ventilation/perfusion matching, assessed by the multiple inert gas elimination technique in 5 patients with gas exchange problems, was not significantly different after SMI-TRE compared to inhaled nitric oxide or no treatment. No significant side effects were observed.

Conclusions: The acute application of inhaled treprostinil with a metered dose inhaler in 2-3 breaths was safe, well tolerated and induced a strong and sustained pulmonary selective vasodilation.

Methods and Patients

A total number of 45 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics were: female to male ratio (f/m)=29/16, age 59±2.3 years, pulmonary artery pressure (PAP) 45±1.8 mmHg, pulmonary vascular resistance (PVR) 743±52 dynes·s·cm$^{-5}$, pulmonary artery wedge pressure (PAWP) 8.6±0.5 mmHg, central venous pressure (CVP) 6.4±0.7 mmHg, cardiac output (CO) 4.5±0.2 l/min, central venous oxygen saturation (SvO2) 62.3±1.2 mmHg (mean±Standard Error of the Mean). Disease etiologies were idiopathic PAH (iPAH) (n=13), PAH other (n=11), chronic thromboembolic pulmonary hypertension (CTEPH) (n=17) and pulmonary fibrosis (n=4). Table 1 presents the patient characteristics of the different groups.

TABLE 1

Patient characteristics of the different treatment groups.
Data are given as mean ± Standard Error of the Mean (SEM).

|  | Placebo (n = 4) | 30 µg TRE (n = 12) | 45 µg TRE (n = 9) | 60 µg TRE (n = 20) |
|---|---|---|---|---|
| Age [years] | 61 ± 8 | 53.9 ± 3.9 | 54.2 ± 5.7 | 65.5 ± 3.1 |
| PAP [mmHg] | 49.5 ± 10.1 | 45 ± 3.1 | 54.3 ± 2.8 | 39.7 ± 2.0 |
| PVR [Dynes] | 896 ± 163 | 597 ± 53.9 | 1049 ± 107 | 663 ± 81 |
| CO [l/min] | 4.46 ± 0.9 | 5.2 ± 0.4 | 3.9 ± 0.4 | 4.4 ± 0.3 |
| SAP [mmHg] | 98 ± 8.1 | 90.1 ± 3.2 | 82.8 ± 3.9 | 86.1 ± 2.0 |
| SaO2 [%] | 85.3 ± 4.5 | 90.0 ± 1.1 | 89.6 ± 1.1 | 90.6 ± 0.5 |
| SvO2 [%] | 57.5 ± 3.9 | 66.0 ± 1.6 | 59.1 ± 3.4 | 62.5 ± 1.6 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

Baseline values were determined 20-30 minutes after placement of the catheter. Heart rate, pulmonary and sys-

10

temic blood pressure and cardiac output were measured and blood gases were taken during each pharmacological intervention at defined time points. Pharmacological interventions included the inhalation of 20 ppm nitric oxide (NO) after evaluation of baseline parameters (n=45) and the consecutive inhalation of placebo (n=4), 30 µg SMI-TRE (n=12), 45 µg SMI-TRE (n=9) or 60 µg (n=20) SMI-TRE. Placebo and treprostinil was applied with the Respimat® SMI. For filling of this device with treprostinil solution, the placebo solution was withdrawn from the device with a syringe and treprostinil solution was injected into the device under sterile conditions. Aerosol quality was controlled before and after refilling of the SMI devices by laser diffractometry, see e.g. Gessler T., Schmehl T., Hoeper M. M., Rose F., Ghofrani H. A., Olschewski H. et al. Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension. Eur. Respir. J. 2001; 17:14-19 incorporated herein in its entirety. The aerosol sizes before (placebo) and after filling (treprostinil) were unchanged. The aerosol particles mass median aerodynamic diameter of treprostinil-aerosol was 4-5 µm, which can be at the upper limit for alveolar deposition. The aerosol volume delivered by one cycle from the SMI was 15 µl. The solution used for aerosol generation was prepared from treprostinil sodium salt using a standard protocol. The SMI was either filled with a concentration of 1000 µg/ml treprostinil sodium (one aerosol puff=15 µg TRE) or with 2000 µg/ml (one puff=30 µg TRE). The different doses were applied as 2 puffs 1000 µg/ml (30 µg), 3 puffs 1000 µg/ml (45 µg) and 2 puffs 2000 µg/ml (60 µg). The placebo was inhaled as 2 puffs from a placebo-SMI. Hemodynamics and gas-exchange parameters were recorded for 120 minutes after TRE inhalation. This study used the Respimat® device, because the implemented "soft mist" technology was well suited for the deposition of such highly active drugs like prostanoids.

The impact of SMI-TRE on ventilation-perfusion matching was assessed in five patients (30 µg TRE, n=2; 45 µg TRE, n=1; 60 µg TRE, n=2) with pre-existing gas exchange problems by use of the multiple inert gas elimination technique (MIGET), see e.g. Wagner P D, Saltzman H A, West J B. Measurement of continuous distributions of ventilation-perfusion ratios: theory. J Appl Physiol. 1974; 36:588-99; Ghofrani H A, Wiedemann R, Rose F, Schermuly R T, Olschewski H, Weissmann N et al. Sildenafil for treatment of lung fibrosis and pulmonary hypertension: a randomised controlled trial. Lancet. 2002; 360:895-900, both incorporated herein in their entirety.

Statistics:

Mean values, standard deviation, standard error of the mean and 95% confidence intervals were calculated. Statistical analysis was done by use of a paired t-test.

Results:

The inhalation of treprostinil sodium from the metered dose inhaler (SMI-TRE) was well tolerated, only mild and transient cough for a maximum of one minute was reported. No systemic side effects like headache, flush, nausea or dizziness were observed.

Two to three breaths of SMI-TRE induced a strong pulmonary vasodilation that outlasted the observation time of 120 minutes (45 and 60 µg). The lower dose of 30 µg TRE induced a somewhat shorter effect on pulmonary vascular resistance; however, the maximal pulmonary vasodilation was comparable. In contrast, placebo inhalation did not induce pulmonary vasodilation. In fact a slight increase in PVR over the time of the right heart catheter investigation could be recorded following placebo inhalation (FIG. 1). The effect of SMI-TRE on systemic vascular resistance and

Liquidia's Exhibit 1001
Page 21

LIQ02799907

US 10,716,793 B2

| 11 | 12 |

pressure was very small and not clinically significant. Cardiac output was significantly increased over the whole observation period, whereas heart rate was rather unchanged. Gas exchange was not influenced by SMI-TRE (FIG. **2**). The maximal changes in hemodynamic and gas-exchange parameters compared to baseline values are depicted in Table 2.

TABLE 2

Extremes of the relative changes of hemodynamic and gas exchange parameters compared to baseline after inhalation of Placebo (n = 4), 30 µg treprostinil (n = 12), 45 µg treprostinil (n = 9) and 60 µg treprostinil (n = 20). Highest (max) and lowest (min) values during the observation period are shown. Data are given as percent of baseline values (mean ± SEM).

|  | Placebo | 30 µg TRE | 45 µg TRE | 60 µg TRE |
|---|---|---|---|---|
| PAP (min) | 99.4 ± 3.0 | 83.4 ± 3.2 | 77.6 ± 6.8 | 79.5 ± 2.4 |
| PVR (min) | 101.4 ± 1.9 | 84.4 ± 4.4 | 71.4 ± 8.9 | 77.5 ± 3.7 |
| CO (max) | 99.7 ± 1.1 | 108.8 ± 3.8 | 108.6 ± 5.6 | 103.8 ± 2.0 |
| SVR (min) | 104.3 ± 4.3 | 97.7 ± 4.2 | 92 ± 3.9 | 91.3 ± 2.1 |
| SAP (min) | 102.7 ± 1.7 | 97.3 ± 1.9 | 96.1 ± 1.5 | 93.6 ± 2.9 |
| HR (max) | 105 ± 2.1 | 106.1 ± 2.9 | 99.1 ± 2.4 | 101.1 ± 0.9 |
| SaO2 (min) | 98.2 ± 0.4 | 101 ± 0.3 | 94.4 ± 1.8 | 95.8 ± 0.9 |
| SvO2 (max) | 104.5 ± 1.4 | 102.4 ± 1.3 | 104.5 ± 4.4 | 102 ± 1.0 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; SVR = systemic vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; HR = heart rate; SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

The areas under the curve for PVR were calculated for placebo and the different SMI-TRE doses over the 120 minute observation period (FIG. **3**). A dose effect of SMI-TRE with a trend to a more sustained effect with the two highest doses could be observed.

The inhalation of a highly concentrated aerosol can be in theory prone to disturbances of gas exchange because the deposition of even small amounts of aerosol may deliver high doses locally and thereby antagonize the hypoxic pulmonary vasoconstriction in poorly ventilated areas. This would then lead to increased shunt flow or increase of low ventilation/perfusion (V/Q) areas. This question was addressed in five patients with the multiple inert gas elimination technique (MIGET), the gold-standard for intrapulmonary V/Q ratio determination. The MIGET patients were selected for pre-existing gas exchange limitations. Characteristics of these patients were: PAP 54.6±3.2 mmHg, PVR 892±88 dynes, SaO2 91.7±0.5%, SvO2 65.2±1.8%. Etiologies were iPAH (n=1), CTEPH (n=3), pulmonary fibrosis (n=1). The maximal relative reduction of SaO2 after inhalation of SMI-TRE in these patients was –3.8±1.5% compared to baseline values. Shunt flow at baseline, NO-inhalation and 60 minutes after SMI-TRE was 6.4±4.3%, 5.4±3.0% and 8.3±3.4%, respectively (mean±95% confidence interval; FIG. **4**).

No significant increase in low V/Q areas or shunt fraction after inhalation of SMI-TRE was observed, in fact the distribution of perfusion was not different to that at baseline and during nitric oxide inhalation. This proves an excellent intrapulmonary selectivity of SMI-TRE, which is also reflected by unchanged arterial oxygen saturation.
Conclusion:

Treprostinil is tolerated at high doses with no systemic side effects. The application of an effective amount of treprostinil in only few or even one single breath was achieved with a highly concentrated treprostinil sodium solution. Treprostinil can be applied by a metered dose inhaler, such as Respimat® soft mist inhaler.

Example 2

Investigation of the Effects of Inhaled Treprostinil on Pulmonary Hemodynamics and Gas Exchange in Severe Pulmonary Hypertension

This study investigated the effects of inhaled treprostinil on pulmonary vascular resistance in severe pulmonary hypertension and addressed systemic effects and gas exchange as well as tolerability and efficacy of high doses of treprostinil given in short time. A total of 123 patients with a mean pulmonary artery pressure of about 50 mmHg were investigated in three separate randomized studies. Inhaled treprostinil exerted potent sustained pulmonary vasodilation with excellent tolerability and could be safely applied in a few breaths or even in one breath.

Summary:

Three different studies were conducted on a total of 123 patients by means of right heart catheterization: i) a randomized crossover-design study (44 patients), ii) a dose escalation study (31 patients) and iii) a study of reduction of inhalation time while keeping the dose fixed (48 patients). The primary endpoint was the change in pulmonary vascular resistance (PVR).

The mean pulmonary artery pressure of the enrolled patients was about 50 mmHg. Hemodynamics and patient characteristics were similar in all studies. In study i) TRE and Iloprost (ILO), at an inhaled dose of 7.5 µg, displayed comparable PVR decrease, with a significantly different time course (p<0.001), TRE exhibiting a more sustained effect on PVR (p<0.0001) and less systemic side effects. In study ii) placebo, 30 µg, 60 µg, 90 µg or 120 µg TRE were applied with drug effects being observed for 3 hours after inhalation. A near-maximal acute PVR decrease was observed at 30 µg TRE. In study iii) TRE was inhaled with a pulsed ultrasonic nebulizer, mimicking a metered dose inhaler. 15 µg TRE was inhaled with 18 pulses (TRE concentration 100 µg/ml), 9 pulses (200 µg/ml), 3 pulses (600 µg/ml), 2 pulses (1000 µg/ml) or 1 pulse (2000 µg/ml), each mode achieving comparable, sustained pulmonary vasodilation.

Inhaled treprostinil exerts sustained pulmonary vasodilation with excellent tolerability at doses, which may be inhaled in a few or even one breath. Inhaled treprostinil is advantageous to inhaled iloprost in terms of duration of effect and systemic side effects. Inhaled treprostinil is well tolerated in concentrations up to 2000 mg/ml (bringing down inhalation time to a single breath) and in high doses (up to 90 µg).
Methods:

All inhalations were performed with the OPTINEB® ultrasonic nebulizer (Nebutec, Elsenfeld, Germany).

Study i) was a randomized, open-label, single-blind crossover study. The primary objective was to compare the acute hemodynamic effects and the systemic side effects of inhaled treprostinil with inhaled iloprost at comparable doses. A total number of 44 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics and hemodynamic as well as gas exchange parameters are outlined in Table 3.

Liquidia's Exhibit 1001
Page 22

LIQ02799908

US 10,716,793 B2

| 13 | 14 |

TABLE 3

Patient characteristics, hemodynamic parameters and gas exchange values at baseline, before challenge with inhalative prostanoids.

| | N | Age | Gender i/o/t/f | Etiology i/o/t/f | PAP [mmHg] | PVR [dyn * s * cm$^{-5}$] | SAP [mmHg] | CVP [mmHg] | PAWP [mmHg] | CO [l/min] | SaO2 [%] | SvO2 [%] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1a | 14 | 55.1 ± 4.8 | 11/3 | 4/4/2/4 | 53.8 ± 3.1 | 911 ± 102 | 95.4 ± 3.6 | 7.4 ± 1 | 8.0 ± 0.8 | 4.3 ± 0.4 | 93.8 ± 2 | 63.9 ± 2.4 |
| 1b | 14 | 54.1 ± 3.3 | 10/4 | 1/6/5/2 | 47.4 ± 3.8 | 716 ± 80 | 90.6 ± 3.3 | 5.9 ± 1.4 | 6.4 ± 0.7 | 4.7 ± 0.4 | 92 ± 1 | 64.4 ± 2.3 |
| 1c | 16 | 56 ± 2.9 | 7/9 | 6/3/6/1 | 47.5 ± 4.5 | 777 ± 102 | 92 ± 4.5 | 8.3 ± 1.4 | 8.6 ± 1.4 | 4.4 ± 0.5 | 91.4 ± 0.9 | 59.8 ± 2.6 |
| 2a | 8 | 60.8 ± 4 | 4/4 | 2/2/3/1 | 51.9 ± 4.9 | 849 ± 152 | 95.9 ± 4.8 | 7.6 ± 1.4 | 11.1 ± 1.7 | 4.4 ± 0.6 | 89.6 ± 2.8 | 60.1 ± 2.8 |
| 2b | 8 | 52.8 ± 6.6 | 6/2 | 1/3/3/1 | 49 ± 4 | 902 ± 189 | 92.4 ± 2.4 | 4.8 ± 1.1 | 7.2 ± 1.3 | 4.0 ± 0.4 | 92.4 ± 2.4 | 62.5 ± 1.7 |
| 2c | 6 | 56.8 ± 5.9 | 4/2 | 0/2/2/2 | 44.2 ± 3.5 | 856 ± 123 | 96.3 ± 3.9 | 5 ± 1.1 | 6 ± 1 | 3.8 ± 0.3 | 92.8 ± 1.5 | 63.6 ± 1.8 |
| 2d | 6 | 51.2 ± 3.8 | 4/2 | 2/2/2/0 | 55.5 ± 4.9 | 940 ± 110 | 91.2 ± 8.1 | 11.2 ± 1.2 | 10 ± 0.7 | 3.9 ± 0.4 | 92 ± 1.9 | 62 ± 5.8 |
| 2e | 3 | 57.3 ± 9.1 | 1/2 | 0/1/0/2 | 45.3 ± 5.2 | 769 ± 267 | 99 ± 3.2 | 5 ± 2.1 | 9 ± 0.6 | 4.5 ± 0.6 | 94.2 ± 1.3 | 66.3 ± 1.5 |
| 3a | 6 | 52.7 ± 6.6 | 4/2 | 2/4/0/0 | 53.8 ± 6.7 | 928 ± 145 | 92.7 ± 7.9 | 8.7 ± 2.7 | 8.8 ± 1.3 | 4.2 ± 0.6 | 90.4 ± 2.8 | 64.8 ± 4.3 |
| 3b | 6 | 58.3 ± 3.5 | 4/2 | 3/1/1/1 | 54.2 ± 6.1 | 808 ± 156 | 94.3 ± 2.8 | 7 ± 1.4 | 10 ± 1.3 | 5 ± 0.7 | 91.9 ± 0.7 | 63.5 ± 2.9 |
| 3c | 21 | 57.4 ± 5.6 | 8/3 | 7/7/6/1 | 46.1 ± 2.5 | 900 ± 99 | 88 ± 2.8 | 9 ± 1.4 | 9.2 ± 0.5 | 3.7 ± 0.3 | 91.7 ± 0.5 | 59.7 ± 2 |
| 3d | 7 | 55.6 ± 5.8 | 3/4 | 0/4/3/0 | 53.1 ± 7.1 | 732 ± 123 | 91.4 ± 5.6 | 7.9 ± 3.1 | 8.6 ± 1.3 | 5 ± 0.4 | 90.7 ± 1.4 | 61.3 ± 3.7 |
| 3e | 8 | 59 ± 5.2 | 7/1 | 0/4/4/0 | 45.1 ± 3.9 | 733 ± 114 | 92.8 ± 6.8 | 4.6 ± 0.8 | 8.1 ± 1.1 | 4.3 ± 0.2 | 90.7 ± 0.8 | 66.3 ± 2.8 |

Group 1 corresponds to study i); randomized crossover study comparing inhaled iloprost (ILO) and inhaled treprostinil (TRE).
a = 7.5 g ILO vs. 7.5 µg TRE,
b = 7.5 g ILO vs. 15 µg TRE (6 min inhalation time),
c = 7.5 g ILO vs. 15 µg TRE (3 min inhalation time).
Group 2 corresponds to study ii); evaluation of maximal tolerated dose of TRE.
a = placebo inhalation,
b = 30 µg TRE,
c = 60 µg TRE,
d = 90 µg TRE,
e = 120 µg TRE.
Group 3 corresponds to study iii); reduction of inhalation time by increase of TRE concentration, aiming at a total inhaled dose of 15 µg.
a = 18 pulses of 100 µg/ml TRE,
b = 9 pulses of 200 µg/ml TRE,
c = 3 pulses of 600 µg/ml TRE,
d = 2 pulses of 1000 µg/ml TRE,
e = 1 pulse 2000 µg/ml TRE.
Etiology of pulmonary hypertension was classified as idiopathic PAH (i), PAH of other causes (o), chronic thromboembolic PH (t), and pulmonary fibrosis (f).

Each patient inhaled both iloprost and treprostinil on the same day during right heart catheter investigation; the drugs were administered consecutively with a one hour interval between the drug applications. One half of the study patients initially inhaled treprostinil and then inhaled iloprost (n=22), while the other half initially inhaled iloprost and then inhaled treprostinil (n=22). Patients were randomized to one of the two groups and blinded as to the study drugs. Drug effects were monitored for 60 minutes after each inhalation. Iloprost was inhaled at 4 µg/ml (6 min inhalation time; n=44) and treprostinil was inhaled at a concentration of 4 µg/ml (6 min inhalation; n=14), 8 µg/ml (6 min inhalation; n=14) or 16 µg/ml (3 min inhalation; n=16). Based on previous biophysical characterization of the ultrasonic device with iloprost- and treprostinil-solution, this corresponds to a total inhaled dose of 7.5 µg iloprost and treprostinil (4 µg/ml) and 15 µg treprostinil (8 µg/ml and 16 µg/ml), respectively.

Study ii) was a randomized, open-label, single blind, placebo controlled study. The primary objectives were to describe the pharmacodynamic and pharmacokinetic effects of inhaled treprostinil at a well tolerated dose (30 µg) and to explore the highest tolerated single dose. A total number of 31 patients inhaled either placebo or treprostinil; each patient received one inhalation. The first 16 patients were randomized to 30 µg TRE (16 µg/ml, or placebo (stock solution in a concentration corresponding to TRE 16 µg/ml). Subsequent patients received 60 µg TRE (32 µg/ml; n=6), 90 µg TRE (48 µg/ml; n=6) and 120 µg TRE (64 µg/ml; n=3). Inhalation time was 6 minutes in all groups. Hemodynamics and gas-exchange as well as arterial treprostinil concentrations were recorded for 180 minutes.

Study iii) was a randomized, open-label, single blind study. The primary objective was to explore the shortest possible inhalation time for a 15 µg dose of inhaled treprostinil. A total of 48 patients inhaled one dose of TRE during right heart catheter investigation. The drug was applied in 18, 9, 3, 2, or 1 breaths. The aerosol was generated by a pulsed ultrasonic nebulizer (OPTINEB®, Nebutec, Eisenfeld, Germany) in cycles consisting of 2 seconds aerosol production (pulse) and 4 seconds pause. The device included an opto-acoustical trigger for the patient to synchronize the inspiration to the end of the aerosol pulse, thereby providing exact dosage. The TRE dose of 15 µg was either generated during 18 cycles (OPTINEB® filled with 100 µg/ml TRE, n=6), 9 cycles (200 µg/ml TRE, n=6), 3 cycles (600 µg/ml TRE, n=21), 2 cycles (1000 µg/ml TRE, n=7) or 1 cycle (2000 µg/ml TRE, n=8). Hemodynamics and gas exchange were recorded for 120-180 minutes.

Treprostinil plasma concentrations were assessed in study ii) at 10, 15, 30, 60 and 120 minutes after inhalation. Treprostinil quantification was done by Alta Analytical Laboratory (El Dorado Hills, Calif., USA) with a validated liquid chromatography atmospheric-pressure ionization tandem mass spectrometry as previously described Wade M., et al. J. Clin. Pharmacol. 2004; 44:503-9. Mixed venous blood was drawn at the depicted time points (FIG. 11) after inhalation, centrifuged and the plasma frozen at −80° C. until temperature controlled shipping on dry ice.
Statistics:

For statistical analysis of study i) the repeated PVR measurements after inhaled iloprost and treprostinil were subjected to a three-factorial analysis of variance (ANOVA; factors: time (A), drug (B), treprostinil concentration (C)) to avoid multiple testing. The maximum PVR decrease after inhalation of iloprost versus treprostinil was compared by paired t-test. Area under the curve (AUC) was calculated from start of inhalation until 60 min after inhalation. Means, standard error of the mean (SEM) and 95% confidence

Liquidia's Exhibit 1001
Page 23

LIQ02799909

US 10,716,793 B2

15

intervals were calculated. For study ii) and iii) areas between curves (ABC) were calculated between placebo inhalation (study ii) and the respective treprostinil inhalation until 180 min (study ii) and 120 min (study iii)) after end of inhalation.

Results:

The inhalation of iloprost as well as treprostinil in study i) resulted in a rapid decrease in PVR and PAP (FIG. 5-7). No significant differences were observed for the areas under the curve (AUC) of PVR decrease after inhalation of 7.5 µg TRE in 6 minutes (AUC −12.6±7.0%), 15 µg TRE in 6 minutes (AUC −13.3±3.2%) and 15 µg TRE in 3 minutes (AUC −13.6±4.3%). The AUC for PVR after the inhalation of 7.5 µg iloprost in 6 minutes was −7.7±3.7% (mean±95% confidence interval). An overview of the pooled data of treprostinil inhalation as compared to iloprost inhalation is given in FIG. 7. The maximum effect of iloprost and treprostinil on PVR was comparable but this effect was reached significantly later after treprostinil inhalation (18±2 min) compared to iloprost (8±1 min; mean±SEM, p<0.0001) and lasted considerably longer (after 60 min, PVR values in the treprostinil group had not yet returned to baseline). The increase in cardiac output was less acute but prolonged after treprostinil inhalation. Systemic arterial pressure (SAP) was unaffected by treprostinil inhalation, whereas a transient decrease was observed after iloprost inhalation. Iloprost and treprostinil did not affect gas exchange. Three-factorial ANOVA for PVR demonstrated a significant difference between repeated measurements after inhalation ($p_{(A)}$<0.0001), no significant difference between drugs ($p_{B}$=0.1), no difference between treprostinil concentrations ($p_{(C)}$=0.74) and a significant drug×time interaction ($p_{(A×B)}$<0.0001). This translates into a significant effect of both drugs on PVR with comparable drug potency but a prolonged drug effect of treprostinil compared to iloprost.

In this study the occasionally observed mild side effects of iloprost inhalation at the given dose (transient flush, headache) were not observed with inhaled treprostinil. Bad taste was reported by most of the patients after inhalation of TRE. This was later found to be attributable to the metacresol preservative contained in the treprostinil solution.

In study ii) pharmacodynamics of inhaled placebo or treprostinil were observed for 180 minutes. Placebo inhalation was followed by a gradual increase in PVR over the entire observation time. Due to reduced patient numbers in the 120 µg TRE group (because of side effects, see below), the hemodynamic values for this group were not included in the graphs of this study (FIG. 8-9). All TRE doses lead to comparable maximal decreases of PVR to 76.5±4.7% (30 µg), 73.7±5.8% (60 µg), 73.3±4.3% (90 µg) and 65.4±4.1% (120 µg) of baseline values. An extended duration of pulmonary vasodilation was noted, surpassing the 3 hour observation period for the 60 µg and 90 µg (and 120 µg) TRE doses, whereas in the 30 µg dose group the hemodynamic changes had just returned to baseline within this period. Even at the highest doses, TRE had only minor effects on systemic arterial pressure (FIG. 8). Cardiac output was increased to a maximum of 106.8±3.2% (30 µg), 122.9±4.3% (60 µg), 114.3±4.8% (90 µg) and 111.3±3.9% (120 µg TRE). The areas between the response curves after placebo versus TRE inhalation were calculated for PVR, PAP, SVR and SAP (FIG. 9). Areas between the curves for PVR were not significantly different for 30 µg, 60 µg and 90 µg TRE, a nearly maximal effect on PVR was already observed with 30 µg TRE. Effects on PAP and SAP were small and did not show a dose-response relationship. Gas exchange was not affected at doses up to 90 µg TRE, but

16

arterial oxygen saturation was significantly decreased at a dose of 120 µg TRE in all 3 patients. Further dose increments were omitted due to this side effect and severe headache in one patient.

Again, bad taste of the TRE aerosol was reported by most patients. Other side effects were flushing (n=1; 30 µg TRE), mild transient cough (n=3; 60 µg TRE), mild transient bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 30 µg TRE), moderate bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 120 µg TRE), and severe headache (n=1; 120 µg TRE). The bad taste, the bronchoconstriction and the drop in SaO2 was attributed to metacresol in the original TRE solution. With the use of a metacresol-free solution of TRE (University Hospital Giessen, Germany; produced according to the manufacturer's protocol) in the following study, these side effects did no longer occur.

Study iii) was performed with metacresol-free TRE solution, having no specific taste and smell. A total of 48 patients were enrolled. This study aimed at the reduction of inhalation time and aerosol volume needed for pulmonary drug delivery. A modified OPTINEB® inhalation device was programmed to produce a constant amount of aerosol during repeatable pulses of aerosol generation. With this device, treprostinil could be safely utilized up to a concentration of 2000 µg/ml without considerable side effects. No relationship of number or type of side effects to TRE concentration was observed. Reported side effects were mild transient cough (n=6), mild headache (n=2) and mild jaw pain (n=1).

The reduction of PVR and PAP was comparable between all groups (FIG. 10). TRE inhalation reduced PVR to 76.3±5.6% (18 pulses, 100 µg/ml), 72.9±4.9% (9 pulses, 200 µg/ml), 71.2±6.0% (3 pulses, 600 µg/ml), 77.4±4.5% (2 pulses, 1000 µg/ml) and 80.3±5.2% (1 pulse, 2000 µg/ml). PAP was reduced to 84.2±4.5% (18 pulses, 100 µg/ml), 84.2±4.1% (9 pulses, 200 µg/ml), 81.1±4.1% (3 pulses, 600 µg/ml), 86±4% (2 pulses, 1000 µg/ml) and 88±5.4% (1 pulse, 2000 µg/ml). Cardiac output was moderately increased in all groups, whereas systemic arterial pressure was not significantly affected.

The areas between the curves (ABC) for changes in hemodynamic and gas-exchange parameters after inhalation of 15 µg TRE versus placebo were calculated for an observation time of 120 minutes (FIG. 11). The ABC for both PVR and PAP was comparable between all groups.

Pharmacokinetic results from study ii): Peak plasma concentrations of treprostinil were found 10-15 minutes after inhalation. Maximal treprostinil plasma concentrations ($C_{max}$) for the 30 µg, 60 µg, 90 µg and 120 µg doses were 0.65±0.28 ng/ml (n=4), 1.59±0.17 ng/ml (n=4), 1.74 ng/ml (n=1) and 3.51±1.04 ng/ml (n=2), respectively (mean±SEM; FIG. 12).

Discussion:

These studies investigated whether i) the acute effects of inhaled treprostinil would be comparable to or possibly advantageous over inhaled iloprost in pulmonary hypertensive patients, ii) the inhaled prostanoid dose might be increased without substantial local or systemic side effects, and iii) if the time of inhalation, which is 6-12 minutes for iloprost, could be reduced significantly by increasing the concentration of treprostinil aerosol.

The patient population in these studies included different forms of precapillary pulmonary hypertension. All these patients had a need for therapy of pulmonary hypertension and reflected the typical population of a pulmonary hyper-

Liquidia's Exhibit 1001
Page 24
LIQ02799910

US 10,716,793 B2

17                                                                              18

tension center. No major differences in patient characteristics or hemodynamic baseline values existed between the different groups (table 3).

In study i) it was shown that the inhalation of treprostinil and iloprost in similar doses resulted in a comparable maximum pulmonary vasodilatory effect. However, marked differences in the response profile were noted. The onset of the pulmonary vasodilatory effect of inhaled treprostinil was delayed compared to iloprost, but lasted considerably longer, with the PVR decrease continuing beyond the one-hour observation period. Although the average dose of treprostinil was higher than the iloprost dose, no systemic effects were noted after treprostinil inhalation, whereas flush and transient SAP decrease, accompanied by more prominent cardiac output increase, occurred after iloprost inhalation. Such side effects were more prominent than in previous studies with inhaled iloprost. This may have been caused by the fact that the iloprost dose used in this study was 50% higher than the recommended single inhalation dose (5 μg) and that the preceding treprostinil inhalation may have added to the systemic side effects caused by the iloprost inhalation. Surprisingly, with TRE there was no such systemic side effect, although the average effect on PVR was as potent as with iloprost.

This study used a cross-over design in order to minimize the effects of inter-individual differences in response to prostanoids. The short observation period of 1 hour was used to avoid an uncomfortably long catheter investigation. As a study limitation, the short observation interval may have caused carryover effects of the first to the second period as suggested by FIG. **5**. However, this still allowed for the interpretation of the study, that both drugs are potent pulmonary vasodilators and that treprostinil effects are significantly sustained compared to the iloprost effects.

The longer duration of action and the virtual absence of side effects (except the bitter taste of treprostinil aerosol, later attributed to metacresol) encouraged increasing the applied treprostinil dose in study ii). Observation time was extended to 3 hours to obtain precise pharmacodynamic data. Inhaled treprostinil resulted in a strong pulmonary vasodilation that outlasted the observation time of 3 hours when compared to placebo inhalation. Surprisingly, inhaled treprostinil was tolerated in doses up to 90 μg.

Study iii) successfully demonstrated that the inhalation time could be reduced to literally one single breath of 2000 μg/ml treprostinil solution, thereby applying a dose of 15 μg.

This drug administration with a single breath induced pulmonary vasodilation for longer than 3 hours compared to placebo inhalation. Side effects were minor, of low frequency and not related to drug concentration. It was a surprising finding that such high concentrations of treprostinil were so well tolerated.

Conclusion:

Inhaled treprostinil can be applied in high doses (up to 90 μg) with a minimal inhalation time. Inhaled treprostinil exerts high pulmonary selectivity and leads to a long-lasting pulmonary vasodilation.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

**1**. A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

**2**. The method of claim **1**, wherein the inhalation device is a soft mist inhaler.

**3**. The method of claim **1**, wherein the inhalation device is a pulsed ultrasonic nebulizer.

**4**. The method of claim **1**, wherein the inhalation device is a dry powder inhaler.

**5**. The method of claim **1**, wherein the inhalation device is a pressurized metered dose inhaler.

**6**. The method of claim **1**, wherein the formulation is a powder.

**7**. The method of claim **6**, wherein the powder comprises particles less than 5 micrometers in diameter.

**8**. The method of claim **1**, wherein the formulation contains no metacresol.

*     *     *     *     *

Liquidia's Exhibit 1001
Page 25

LIQ02799911

# EXHIBIT 6

## HIGHLY CONFIDENTIAL



**U.S. FOOD & DRUG** ADMINISTRATION

NDA 213005

**TENTATIVE APPROVAL**

Liquidia Technologies, Inc.
Attention: Jennifer Weidman
VP Regulatory Affairs
419 Davis Dr., Suite 100
PO Box 110085
Research Triangle Park, NC 17709

Dear Ms. Weidman:

Please refer to your new drug application (NDA) dated and received ▮▮▮▮▮▮▮▮▮▮
and your amendments, submitted pursuant to section 505(b)(2) of the Federal Food,
Drug, and Cosmetic Act for Yutrepia (treprostinil inhalation powder) Oral Inhalation.

We acknowledge receipt of your amendment dated ▮▮▮▮▮▮▮▮ which constituted a
complete response to our ▮▮▮▮▮▮▮▮▮▮▮ action letter.

This NDA provides for the use of Yutrepia (treprostinil inhalation powder) Oral
Inhalation for the treatment of pulmonary arterial hypertension (PAH; WHO Group 1) to
improve exercise ability in patients with NYHA Functional Class II-III symptoms.

We have completed our review of this application, as amended. It is tentatively
approved under 21 CFR 314.105 for use as recommended in the enclosed final labeling
(Prescribing Information and Instructions for Use) submitted November 4, 2021, carton
and container labeling submitted November 2, 2021. This determination is based upon
information available to the Agency at this time, [i.e., information in your application and
the status of current good manufacturing practices (cGMPs) of the facilities used in the
manufacture and testing of the drug product]. This determination is subject to change on
the basis of any new information that may come to our attention.

Final approval of your application is subject to expiration of a period of patent protection
and/or exclusivity. Therefore, final approval of your application under section 505(c)(3)
of the Act [21 U.S.C. 355(c)(3)] may not be granted before the period has expired.

A listed drug(s) upon which your application relies is subject to a period of patent
protection and your application contains a certification(s) to one or more patents under
section 505(b)(2)(A)(iv) of the FD&C Act stating that the patent(s) is/are invalid,
unenforceable, or will not be infringed by your manufacture, use, or sale of, this drug
product under this application ("paragraph IV certification").

HIGHLY CONFIDENTIAL

NDA 213005
Page 2

Section 505(c)(3)(C) of the FD&C Act provides that approval of a new drug application submitted pursuant to section 505(b)(2) of the FD&C Act that includes a paragraph IV certification shall be made effective immediately, unless an action is brought for infringement of one or more of the patents that were the subject of a paragraph IV certification. If such a patent infringement action is brought prior to the expiration of 45 days from the later of the date the notice provided under section 505(b)(3) is received by the patent owner or approved application holder, your application is subject to a 30-month stay of approval, unless other conditions are met. You notified us that you complied with the requirements of section 505(b)(3) of the FD&C Act.

In addition, you have notified the Agency that the patent owner and/or approved application holder has initiated a patent infringement suit against you with respect to patents 9593066, 9604901, and 10716793 in the United States District Court for the District of Delaware, case number 1:20-cv-00755- RGA.  Therefore, final approval cannot be granted until:

(1)
- expiration of the 30-month period provided for in section 505(c)(3)(C) beginning on the later of the date of receipt by any owner of the listed patent or application holder of the notice required under section 505(b)(3), unless the court has extended or reduced the period because of the failure of either party to reasonably cooperate in expediting the action, or
- the date the court decides that the patent(s) is/are invalid or not infringed as described in section 505(c)(3)(C)(i), (ii), (iii,) or (iv) of the FD&C Act, or,
- the listed patent(s) has/have expired, and

(2) we are assured there is no new information that would affect whether final approval should be granted.

To obtain final approval of this application, submit an amendment two or six months prior to the: (1) expiration of the patent(s) and/or exclusivity protection or (2) date you believe that your NDA will be eligible for final approval, as appropriate. In your cover letter, clearly identify your amendment as **"REQUEST FOR FINAL APPROVAL"**. This amendment should provide the legal/regulatory basis for your request for final approval and should include a copy of any relevant court order or judgment settlement, or licensing agreement, as appropriate. In addition to a safety update, the amendment should also identify changes, if any, in the conditions under which your product was tentatively approved, i.e., updated labeling; chemistry, manufacturing, and controls data; and risk evaluation and mitigation strategy (REMS). If there are no changes, clearly state so in your cover letter. Any changes require our review before final approval and the goal date for our review will be set accordingly.

Until we issue a final approval letter, this NDA is not approved.

The drug product may not be legally marketed until you have been notified in writing that this application is approved.

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

HIGHLY CONFIDENTIAL                                                    LIQ02818822

NDA 213005
Page 3

## REQUIRED PEDIATRIC ASSESSMENTS

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients (which includes new salts and new fixed combinations), new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We note that if this application is ultimately approved, you will need to meet these requirements.



If you have any questions, please call Maryam Changi, Regulatory Project Manager, at (240) 402-2725.

Sincerely,

*{See appended electronic signature page}*

Norman Stockbridge, MD, PhD
Director
Division of Cardiology and Nephrology
Office of Cardiology, Hematology, Endocrinology, and Nephrology
Office of New Drugs
Center for Drug Evaluation and Research

ENCLOSURE(S):
- Content of Labeling
  - Prescribing Information
  - Instructions for Use
- Carton and Container Labeling

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

HIGHLY CONFIDENTIAL

LIQ02818823

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use YUTREPIA™ safely and effectively. See full prescribing information for YUTREPIA™.**

**YUTREPIA™ (treprostinil) inhalation powder, for oral inhalation**
**Initial U.S. Approval:  2002**

------------------------INDICATIONS AND USAGE------------------------
YUTREPIA is a prostacyclin mimetic indicated for the treatment of pulmonary arterial hypertension (PAH; WHO Group 1) to improve exercise ability in patients with NYHA Functional Class II-III symptoms. (1)

----------------------DOSAGE AND ADMINISTRATION----------------------



- See *Dosage and Administration* for full instructions on dosing of patients who are treprostinil-naïve or transitioning from treprostinil inhalation solution to YUTREPIA (2.1)

----------------------DOSAGE FORMS AND STRENGTHS----------------------

To report SUSPECTED ADVERSE REACTIONS, contact Liquidia Technologies, Inc. at 1-XXX-XXX-XXXX or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.

See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling (Instructions for Use).

**Revised: 11/2021**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

1   INDICATIONS AND USAGE
2   DOSAGE AND ADMINISTRATION
    2.1   Usual Dosage In Adults
3   DOSAGE FORMS AND STRENGTHS
4   CONTRAINDICATIONS
5   WARNINGS AND PRECAUTIONS
    5.1   Risk of Symptomatic Hypotension
    5.2   Risk of Bleeding
    5.3   Effect of Other Drugs on Treprostinil
6   ADVERSE REACTIONS
    6.1   Clinical Trials Experience
    6.2   Adverse Reactions Identified in Post-Marketing Experience
7   DRUG INTERACTIONS
    7.1   Effect of Cytochrome P450 Inhibitors and Inducers
    7.2   Effect of Other Drugs on Treprostinil

8   USE IN SPECIFIC POPULATIONS
    8.1   Pregnancy
    8.2   Lactation
    8.4   Pediatric Use
    8.5   Geriatric Use
    8.6   Patients with Hepatic Insufficiency
    8.7   Patients with Renal Insufficiency
10  OVERDOSAGE
11  DESCRIPTION
12  CLINICAL PHARMACOLOGY
    12.1   Mechanism of Action
    12.2   Pharmacodynamics
    12.3   Pharmacokinetics
13  NONCLINICAL TOXICOLOGY
    13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility
    13.2   Animal Toxicology and/or Pharmacology
14  CLINICAL STUDIES
    14.1   Pulmonary Arterial Hypertension (WHO Group 1)
16  HOW SUPPLIED/STORAGE AND HANDLING
17  PATIENT COUNSELING INFORMATION

\* Sections or subsections omitted from the full prescribing information are not listed.

HIGHLY CONFIDENTIAL

LIQ02818824

**FULL PRESCRIBING INFORMATION**

# 1   INDICATIONS AND USAGE

YUTREPIA™ is indicated for the treatment of pulmonary arterial hypertension (PAH) (WHO Group 1) to improve exercise ability in patients with NYHA Functional Class II-III symptoms.

# 2   DOSAGE AND ADMINISTRATION

## 2.1   Usual Dosage In Adults

YUTREPIA capsules are for oral inhalation only and should be used only with the supplied inhaler.

*YUTREPIA Dosing in treprostinil-naïve patients:*

*Dosing in patients transitioning from treprostinil inhalation solution (Tyvaso):*

**Table 1: YUTREPIA Dosing in Patients Transitioning from Treprostinil Inhalation Solution**

| Current Tyvaso Dose* | YUTREPIA Dose |
|---|---|
| Breaths | mcg |
| | |

*Each breath of Tyvaso delivers approximately 6 mcg of treprostinil

In treprostinil-naïve patients and those transitioning from treprostinil inhalation solution, dose increases of 26.5 mcg per dose each week may be implemented, as tolerated. The target maintenance dosage is 79.5-106 mcg, 4 times daily. Doses above 848 mcg per day have not been studied.

# 3   DOSAGE FORMS AND STRENGTHS

YUTREPIA inhalation powder contained in capsule available in



## 4   CONTRAINDICATIONS



## 5   WARNINGS AND PRECAUTIONS

## 6   ADVERSE REACTIONS

The following potential adverse reactions are described in Warnings and Precautions (5):



## 6.1   Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

HIGHLY CONFIDENTIAL

LIQ02818826



## 6.2   Adverse Reactions Identified in Post-Marketing Experience

The following adverse reaction has been identified during the post-approval use of treprostinil inhalation solution. Because this reaction is reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate the frequency or establish a causal relationship to drug exposure:



## 7   DRUG INTERACTIONS



Reference ID: 4883996

HIGHLY CONFIDENTIAL

LIQ02818827

## 7.2    Effect of Other Drugs on Treprostinil



# 8   USE IN SPECIFIC POPULATIONS

## 8.1    Pregnancy

<u>Risk Summary</u>

## 8.2    Lactation

<u>Risk Summary</u>

HIGHLY CONFIDENTIAL                    LIQ02818828

████████████████████████████████████████████

### 8.4   Pediatric Use

████████████████████████████████████

### 8.5   Geriatric Use

████████████████████████████████████████████

### 8.6   Patients with Hepatic Insufficiency

████████████████████████████████████████████

### 8.7   Patients with Renal Insufficiency

████████████████████████████████████████████

## 10 OVERDOSAGE

████████████████████████████████████████████

## 11 DESCRIPTION

YUTREPIA contains treprostinil sodium, a prostacyclin vasodilator.  The chemical name for treprostinil sodium is 2-{[(1R,2R,3aS,9aS)-2-hydroxy-1-[(3S)-3-hydroxyoctyl]-1H,2H,3H,3aH,4H,9H,9aH-cyclopenta[b]naphthalen-5-yl]oxy}acetic acid, sodium salt with the structural formula:

HIGHLY CONFIDENTIAL



Treprostinil sodium has a molecular formula of $C_{23}H_{33}O_5Na$ and a molecular weight of 412.49 daltons equivalent to 390.5 daltons of Treprostinil

YUTREPIA inhalation powder contained in a capsule is intended for oral inhalation. The capsule contains white to off-white powder of treprostinil sodium and the inactive ingredients trehalose, polysorbate 80, L-leucine, sodium citrate, and sodium chloride. 26.5 mcg of treprostinil is equivalent to 28 mcg of treprostinil sodium.

## 12 CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

The major pharmacologic actions of treprostinil are direct vasodilation of pulmonary and systemic arterial vascular beds and inhibition of platelet aggregation.

### 12.2 Pharmacodynamics

Cardiac Electrophysiology

### 12.3 Pharmacokinetics

Absorption

HIGHLY CONFIDENTIAL



*to healthy subjects [see Use in Specific Populations (8.6)].*

## 13 NONCLINICAL TOXICOLOGY

### 13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility

<u>Carcinogenesis</u>



HIGHLY CONFIDENTIAL



### 13.2 Animal Toxicology and/or Pharmacology

## 14 CLINICAL STUDIES

### 14.1  Pulmonary Arterial Hypertension (WHO Group 1)

TRIUMPH I was a 12-week, randomized, double-blind, placebo-controlled multi-center study of patients with PAH. The study population included 235 clinically stable patients with pulmonary arterial hypertension (WHO Group 1), nearly all with NYHA Class III (98%) symptoms who were receiving either bosentan (an endothelin receptor antagonist) or sildenafil (a phosphodiesterase-5 inhibitor) for at least three months prior to study initiation. Concomitant therapy also could have included anticoagulants, other vasodilators (e.g., calcium channel blockers), diuretics, oxygen, and digitalis, but not a prostacyclin. These patients were administered either placebo or treprostinil inhalation solution in four daily treatment sessions with a target dose of 9 breaths (equivalent to 79.5 mcg YUTREPIA) per session over the course of the 12-week study. Patients were predominantly female (82%), had the origin of PAH as idiopathic/heritable (56%), secondary to connective tissue diseases (33%) or secondary to HIV or previous use of anorexigens (12%); bosentan was the concomitant oral medication in 70% of those enrolled, sildenafil in 30%.

The primary efficacy endpoint of the trial was the change in six-minute walk distance (6MWD) relative to baseline at 12 weeks. 6MWD was measured at peak exposure (between 10 and 60 minutes after dosing), and 3-5 hours after bosentan or 0.5-2 hours after sildenafil. Patients receiving treprostinil inhalation solution had a placebo-corrected median change from baseline in peak 6MWD of 20 meters at Week 12 ($p<0.001$).

The distribution of these 6MWD changes from baseline at Week 12 were plotted across the range of observed values (Figure 1). 6MWD measured at trough exposure (defined as measurement of 6MWD at least 4 hours after dosing) improved by 14 meters. There were no placebo-controlled 6MWD assessments made after 12 weeks.

HIGHLY CONFIDENTIAL



**Figure 1.      Distributions of 6MWD Changes from Baseline at Week 12 during Peak Plasma Concentration of Treprostinil Inhalation Solution**

The placebo-corrected median treatment effect on 6MWD was estimated (using the Hodges-Lehmann estimator) within various subpopulations defined by age quartile, gender, geographic region of the study site, disease etiology, baseline 6MWD quartile, and type of background therapy (Figure 2).

Reference ID: 4883996

LIQ02818833



**Figure 2.** **Placebo-Corrected Median Treatment Effect (Hodges-Lehmann estimate with 95% CI) on 6MWD Change from Baseline at Week 12 During Peak Plasma Concentration of Treprostinil Inhalation Solution for Various Subgroups**

## 16 HOW SUPPLIED/STORAGE AND HANDLING



Reference ID: 4883996

HIGHLY CONFIDENTIAL

**Table 3: YUTREPIA Carton Contents by Capsule Strength**

| Capsule Strength (mcg treprostinil) | Capsule Description | NDC Number |
|---|---|---|
| | | |

# 17 PATIENT COUNSELING INFORMATION

Advise the patient to read the FDA-approved patient labeling (Instructions for Use).

Train patients in the administration process for YUTREPIA, including dosing, inhaler preparation, administration, cleaning, and maintenance, according to the instructions for use *[see Instructions for Use]*.

To avoid potential interruptions in drug delivery because of equipment malfunction, patients should have access to a back-up.

In the event that a scheduled dose is missed, take another dose as soon as possible.

®Copyright 2021 Liquidia Technologies, Inc. All rights reserved.

Distributed by: Liquidia Technologies, Inc. Morrisville, NC 27560

HIGHLY CONFIDENTIAL

# Instructions for Use
# YUTREPIA™ (you-TREP-ee-uh)
# (trepostinil)
# inhalation powder, for oral inhalation

This Instructions for Use contains information on how to inhale YUTREPIA™. Read these Instructions for Use before you start using YUTREPIA and each time you get a refill. There may be new information. This information does not take the place of talking to your healthcare provider about your medical condition or treatment.

**Your healthcare provider should show you or your caregiver how to use YUTREPIA the right way before you use it for the first time.**

> **Important information you need to know before inhaling YUTREPIA inhalation powder:**
>
> - **Do not** swallow YUTREPIA capsules. YUTREPIA is for inhalation only.
> - Use YUTREPIA as prescribed by your healthcare provider.
> - YUTREPIA capsules come in ███████████ ████████████████████████
>   ██████████████████████████████████████████████████████████████████
>   ██████████████████████████████████████████████████████████████████
>   ██████████████████████████████████████████████████████████████████
>   ██████████████████████████████████████████████████████████████████
>   ██████████████████████████████████████████████████████████████████
>   ██████████████████████████████████████████████████████████████████
>   ██████████████████████████████████████████████████████████████████
> - **Do not** wash the inhaler. Keep the inhaler dry.
> - Wash and dry your hands your hands before using YUTREPIA.
> - If the contents of the capsule comes in contact with your skin or eyes, rinse the area immediately with water.
> - YUTREPIA capsules should remain in the blister card(s) and each capsule should be removed only when ready to deliver a dose.

**Storing YUTREPIA**



| Text | Illustration |
|------|--------------|
| **Get to know YUTREPIA** | |

The YUTREPIA carton contains (See Figure A):



Reference ID: 4883996

HIGHLY CONFIDENTIAL

LIQ02818837

## Preparing to use YUTREPIA



HIGHLY CONFIDENTIAL



Reference ID: 4883996

HIGHLY CONFIDENTIAL

LIQ02818839



Reference ID: 4883996

HIGHLY CONFIDENTIAL



Reference ID: 4883996

HIGHLY CONFIDENTIAL



Reference ID: 4883996

HIGHLY CONFIDENTIAL                                                                                                                LIQ02818842



Reference ID: 4883996

HIGHLY CONFIDENTIAL



Reference ID: 4883996

HIGHLY CONFIDENTIAL

LIQ02818844



Reference ID: 4883996

HIGHLY CONFIDENTIAL

LIQ02818845



®Copyright 2021 Liquidia Technologies, Inc. All rights reserved.
Distributed by: Liquidia Technologies, Inc. Morrisville, NC 27560
For more information call 1-800-###-#### or go to www.YUTREPIA.com

This Instructions for Use has been approved by the U.S. Food and Drug Administration

Issued: November 2021

Reference ID: 4883996

HIGHLY CONFIDENTIAL                                                                 LIQ02818846



Reference ID: 4883996

HIGHLY CONFIDENTIAL

LIQ02818847



Reference ID: 4883996

HIGHLY CONFIDENTIAL



Reference ID: 4883996

HIGHLY CONFIDENTIAL

LIQ02818849



Reference ID: 4883996

HIGHLY CONFIDENTIAL



Reference ID: 4883996

HIGHLY CONFIDENTIAL



Reference ID: 4883996

HIGHLY CONFIDENTIAL

LIQ02818852



Reference ID: 4883996

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

LIQ02818854

------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

------------------------------------------------------------------------------------------

/s/

------------------------------------------------------------

NORMAN L STOCKBRIDGE
11/04/2021 03:36:56 PM

Reference ID: 4883996

HIGHLY CONFIDENTIAL                                                                                      LIQ02818855

# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No.:  1:20-cv-00755-RGA |
| v. | ) ) | |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) | |

## PLAINTIFF'S ELECTION OF ASSERTED CLAIMS

OF COUNSEL:

William C. Jackson
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036
(202) 346-4216

Huiya Wu
Joel Broussard
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Douglas H. Carsten
Arthur Dykhuis
Jiaxiao Zhang
Katherine Pappas
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92612
(949) 851-0633

Adam W. Burrowbridge
Joshua Revilla
Timothy M. Dunker
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

Harrison Gunn
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

*Attorneys for Plaintiff*
*United Therapeutics Corporation*

1

Plaintiff United Therapeutics Corporation provides the following Election of Asserted Claims of U.S. Patent No. 9,593,066 ("the '066 Patent"), U.S. Patent No. 9,604,901 ("the '901 Patent"), and U.S. Patent No. 10,716,793 ("the '793 Patent") pursuant to the Court's July 31, 2021 Scheduling Order (DI 20), June 16, 2021 Claim Construction Order (DI 119), November 23, 2021 Claim Construction Order (DI 245), and in light of the presumption available under 35 U.S.C. § 295:

**Election of Asserted Claims of the '066 Patent**

1. Claim 1
2. Claim 2
3. Claim 3
4. Claim 6
5. Claim 8
6. Claim 9

**Election of Asserted Claims of the '901 Patent**

1. Claim 1
2. Claim 2
3. Claim 3
4. Claim 4
5. Claim 6
6. Claim 8

**Election of Asserted Claims of the '793 Patent**

1. Claim 1
2. Claim 4
3. Claim 6
4. Claim 7
5. Claim 8

OF COUNSEL:

William C. Jackson
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036
(202) 346-4216

Huiya Wu
Joel Broussard
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Harrison Gunn
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

Douglas H. Carsten
Arthur Dykhuis
Jiaxiao Zhang
Katherine Pappas
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92612
(949) 851-0633

Adam W. Burrowbridge
Joshua Revilla
Timothy M. Dunker
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000

Dated: December 9, 2021

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

*Attorneys for Plaintiff*
*United Therapeutics Corporation*

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 9, 2021, copies of the foregoing were caused to be

served upon the following in the manner indicated:

Karen E. Keller                                                 *VIA ELECTRONIC MAIL*
Jeff Castellano
David M. Fry
Nathan R. Hoeschen
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801

Sanya Sukduang                                            *VIA ELECTRONIC MAIL*
Jonathan Davies
Douglas W. Cheek
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400

Erik Milch                                                      *VIA ELECTRONIC MAIL*
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640

Ivor Elrifi                                                       *VIA ELECTRONIC MAIL*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157

Lauren Krickl                                                 *VIA ELECTRONIC MAIL*
Deepa Kannappan
Brittany Cazakoff
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130


 *Attorneys for Defendant Liquidia Technologies, Inc*


                                                */s/ Michael J. Flynn*
                                                Michael J. Flynn (#5333)

1

# EXHIBIT 8

## HIGHLY CONFIDENTIAL

CONTAINS PROTECTIVE ORDER MATERIAL        Paper _____

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

STEADYMED LTD.,

Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,

Patent Owner.

———————————

Case IPR2016-00006
Patent 8,497,393

———————————

**Patent Owner Response to Petition**

4814-0612-4340.3

IPR2016-00006                                        Patent Owner Response
Patent 8,497,393

## TABLE OF CONTENTS

I.    **INTRODUCTION** ...................................................................1

II.   **SUMMARY OF THE ARGUMENT** ......................................1

III.  **STRUCTURAL/FUNCTIONAL DIFFERENCES OF THE CLAIMED PRODUCTS OVER THE CITED ART** ...................6

     A.   The Importance of Purity in Pharmaceuticals .......................7

     B.   The '393 Product Has A Different Impurity Profile and a Higher Purity Than Moriarty ...................................................9

     C.   The Differences In Impurity Profile And Average Purity Between The '393 Product And Moriarty Are Functionally Important .............12

IV.  **CLAIM CONSTRUCTION** ..................................................13

     A.   Intrinsic Evidence Can Override The Presumption That "Comprising" Creates An "Open" Claim Construction ......................13

     B.   The Distinct Impurity Profile And Higher Purity Of the '393 Patent Product Were Clearly Considered Part of the Claimed Product During Prosecution ...................................................16

V.   **GROUND 1: PHARES FAILS TO EXPLICITLY OR INHERENTLY DISCLOSE EACH AND EVERY LIMITATION OF CLAIMS 1-5, 7-9, 11-14 OR 16-20** .......................................18

     A.   SteadyMed Cannot Pick and Choose From Unrelated Portions of Phares to Establish Anticipation .......................................19

     B.   The Proper Construction of a "product comprising a compound [of/having] formula [I/IV] or a pharmaceutically acceptable salt thereof" Precludes A Finding That Phares Anticipates the Present Claims .................................................................20

     C.   The Higher Melting Point of Phares' Diethanolamine Salt Does Not Necessarily Mean That it is of Higher Purity Than the Diethanolamine Salts of the '393 Patent .............................22

     D.   Phares Fails To Disclose the Claimed Process for Making Treprostinil or Any Purity or Impurity Profile for Treprostinil Diethanolamine .................................................................24

VI.  **GROUND 2: MORIARTY AND PHARES FAIL TO RENDER OBVIOUS CLAIMS 1-5, 7-9, 11-14, OR 16-20** ......................27

4814-0612-4340.3

**HIGHLY CONFIDENTIAL**                                        UTC_WAT00645850

IPR2016-00006                                           Patent Owner Response
Patent 8,497,393

**VII.** **GROUND 3:** **MORIARTY, PHARES, KAWAKAMI, AND EĞE FAIL TO RENDER OBVIOUS CLAIMS 6, 10, 15, 21, AND 22**............**33**

    **A.** The Product of Claims 6, 15, and 21 Are Different Than the Prior Art Treprostinil Products.................................................................33

        1. The '393 Patent Product is Structurally and Functionally Distinct from Moriarty's Product ...........................................34

    **B.** There Is No Motivation For A POSA To Combine Moriarty and Phares with Eğe and Kawakami.......................................................34

        1. There Is No Motivation to Follow the Carboxylate Salt Formation With Regeneration of the Carboxylic Acid.............35

        2. Kawakami Would Have Motivated One of Ordinary Skill In The Art To Select A Dicyclohexyl Amine Salt, Teaching Away From The Diethanolamine Salt of Claims 14 and 18.....41

        3. Kawakami Does Not Provide A Reasonable Expectation Of Success That Treprostinil Products Could Be Further Purified Because Different Impurities Are Targeted...............42

        4. Any "Close" Structural Similarity of the Moriarty Free Acid Does Not Render the Claims Obvious ............................45

        5. Additional Claim Limitations Are Not Disclosed by the Cited Prior Art.................................................................45

**VIII.** **SECONDARY CONSIDERATIONS REBUT ANY POSSIBLE CASE OF OBVIOUSNESS**........................................................**47**

    A. Long-Felt Unmet Need .............................................47

    B. Unexpected Results...................................................49

**IX.** **CONCLUSION** ...................................................................**49**

4814-0612-4340.3

**HIGHLY CONFIDENTIAL**                          UTC_WAT00645851

IPR2016-00006                                            Patent Owner Response
Patent 8,497,393

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Atofina v. Great Lakes Chem. Corp.,*
    441 F.3d 991 (Fed. Cir. 2006)..................................................................17

*In re Buszard,*
    504 F.3d 1364 (Fed. Cir. 2007)................................................................15

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.,*
    246 F.3d 1336 (Fed. Cir. 2001)................................................................13

*Day Intern., Inc. v. Reeves Brothers, Inc.,*
    260 F.3d 1343 (Fed. Cir. 2001)................................................................14

*In re Fisher,*
    427 F.2d 833 (C.C.P.A., 1970) .................................................................39

*In re Hoeksema,*
    399 F.2d 269 (C.C.P.A. 1968) ..................................................................45

*Knoll Pharm. Co., Inc. v. Teva. Pharm. USA, Inc.,*
    367 F.3d 1381, (Fed.Cir. 2004).................................................................48

*In re Omeprazole Patent Litigation,*
    536 F.3d 1361 (Fed. Cir. 2008)................................................................44

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.,*
    520 F.3d 1358 (Fed. Cir. 2008)................................................................39

*Purdue Pharma L.P. v. Endo Pharms. Ins.,*
    438 F.3d 1123 (Fed. Cir. 2006)................................................................17

*SafeTCare Mfg., Inc. v.Tele-Made, Inc.,*
    497 F.3d 1262 (Fed. Cir. 2007)................................................................14

*Standard Oil Co. v. American Cyanamid Co.,*
    774 F.2d 448 (Fed. Cir. 1985)..................................................................14

*Toro Co. v. White Consol. Indus., Inc.,*
    199 F.3d 1295 (Fed. Cir. 1999)................................................................14

*United States v. Adams,*
    383 U.S. 39 (1966)....................................................................................38

iii

**HIGHLY CONFIDENTIAL**                                    **UTC_WAT00645852**

IPR2016-00006                                              Patent Owner Response
Patent 8,497,393

*United Therapeutics Corp. v. Sandoz, Inc.,*
    2014 WL 4259153 (D.N.J. Aug 29, 2014) .........................................................17

*In re Zletz,*
    893 F.2d 319 (Fed. Cir. 1989)............................................................................15

**Federal Statutes**

35 U.S.C. § 316(a)(8).................................................................................................1

35 U.S.C. § 316(e) ..................................................................................................1, 6

**Regulations**

21 C.F.R. § 600.3 (r) (2015) ......................................................................................7

37 C.F.R. § 42.120 ....................................................................................................1

**Other Authorities**

Marti, E., *Purity determination by differential scanning calorimetry* ........................22

R. Adhiyaman, et.al., *Crystal modification of dipyridamole using different
    solvents and crystallization conditions* ................................................................23

iv

**HIGHLY CONFIDENTIAL**                                              **UTC_WAT00645853**

# I.  INTRODUCTION

United Therapeutics Corporation ("UTC") submits this Response in accordance with 35 U.S.C. § 316(a)(8) and 37 C.F.R. § 42.120, responding to the instituted grounds of the Petition for *Inter Partes* Review filed by SteadyMed Ltd. ("SteadyMed") challenging claims 1-22 of U.S. Patent No. 8,497,393 ("the '393 patent").  The Declaration of Dr. Williams ("Ex. 2020") and of Dr. Ruffolo ("Ex. 2022") are filed herewith in support of the Response (Ex. 2020 and Ex. 2022, respectively).  The Board should conclude that SteadyMed  has failed to prove by a preponderance of the evidence that the instituted claims are unpatentable, as required under 35 U.S.C. § 316(e).

# II.  SUMMARY OF THE ARGUMENT

SteadyMed's anticipation and obviousness arguments are flawed for two fundamental reasons. First, SteadyMed's arguments rely on Moriarty (Moriarty *et al.*, J. Org. Chem. 2004, 1890-1902; Ex. 1004) and Phares (International Publication No. WO 2005/007081; Ex. 1005), but neither reference discloses the same highly pure treprostinil or treprostinil diethanolamine product claimed by the '393 patent when properly construed, let alone the same synthesis recited in the instituted claims.  In fact, the Office considered both references during prosecution of the '393 patent, and the Office construed the claims of the '393 patent in a way that distinguished the product of the '393 patent specifically from the Moriarty

HIGHLY CONFIDENTIAL                                            UTC_WAT00645854

IPR2016-00006                                           Patent Owner Response
Patent 8,497,393

product.  Moreover, a person of ordinary skill in the art ("POSA") would not look

to either Eğe (Seyhan N. Eğe, Organic Chemistry 543-547 (2d ed. 1989) (Ex.

1008) or Kawakami (JP 56-122328A) (Ex. 1007) as neither reference is relevant to

further purification of the complex treprostinil carboxylic acid structure that is at

issue in the '393 patent, and a POSA would have no reasonable expectation of

success in combining these references with either Moriarty or Phares.

Second, SteadyMed's anticipation and obviousness arguments are flawed

because they misunderstand, both the error associated with such measurements and

the difference between "assay purity" against a standard and measurements of

purity that directly measure the level of impurities.  As explained in the Williams

and Ruffolo Declarations, this misunderstanding resulted in Petitioner's incorrect

assertion that there are inconsistencies between the purity values recited in the '393

specification, the Walsh Declaration, and the Moriarty prior art. Ex. 2020 at ¶¶88-

89; Ex. 2022 at ¶¶73-74.  Dr. Williams notes that the '393 patent itself expressly

refers to assay purity values as "HPLC (assay)" values whenever it uses such

measurements, as opposed to other purity values based on measuring amount of

impurities. Ex. 2020 at ¶89.  Dr. Ruffolo further explains that FDA drug approval

system rests on precise measurements of individual impurities that make up a

purity "specification" for a drug, which can be reliably determined within the

detection limits of HPLC measurements. Ex. 2022 at ¶¶32-35 and 44-50.  Dr.

2

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                           UTC_WAT00645855

IPR2016-00006                                              Patent Owner Response
Patent 8,497,393

Ruffolo also specifically notes that it is routine to have assay purity values above

100% because it is a relative value measurement. Ex. 2022 at ¶53.

    SteadyMed's purported expert, Dr. Winkler, confirmed this

misunderstanding.  Dr. Winkler acknowledged at his deposition that FDA's purity

specification of less than ████ for the impurity ████ indicates that precise

measurements of impurities are possible:  "I would think that the error in the

measurement for ████ would be, should be less than █ percent." Ex. 2051 at

64:7-9.  Dr. Winkler further acknowledged that he did not know how  the

treprostinil purity specification adopted by FDA could change from ████████

and stated that he viewed purity levels above 100% as errors:  "I think the thing

that I am able to conclude from the data that is on page 6 of this, of this letter [Ex.

2006] is that the error in the HPLC assay could be as high as █ percent in the first

column and by my analysis could be as high as █ percent in the second column."

Ex. 2051 at 86:15-21; 24-25; 87:2-9.  As Dr. Williams explained, Dr. Winkler's

conclusions on this point appear "to arise from Dr. Winkler's fundamental

misunderstanding of how assay purity values are calculated." Ex. 2020 at ¶¶90-92;

*see also* Ex. 2022 at ¶¶74.  Moreover, Dr. Winkler admitted he did not know what

the actual error was associated with the measurements submitted in the Walsh

declaration. Ex. 2051 at 62:16-25; 63:2-14.  Because Dr. Winkler does not

understand the basic differences in types of purity measurements and their related

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                           UTC_WAT00645856

IPR2016-00006                                                    Patent Owner Response
Patent 8,497,393

errors that are used in the '393 patent, discussed in the Walsh Declaration, and

which form the basis for FDA's regulation of drug product manufacturing, his

declaration should not be credited.

Moreover, the Williams Declaration establishes that there are measurable

structural differences between the average impurity profiles of the Moriarty

product and the claimed product based on data obtained from 175 batches. Ex.

2020 ¶¶94-99, Appendices A-B; see also Ex. 2005, Ex. 2036, Ex. 2037, Ex. 2052,

Ex. 2053.  The average impurity profiles show that Moriarty process and the '393

process produce two physically distinct products that contain different total and

specific impurities. *Id.* Specifically, the claimed product essentially lacks certain

impurities found in the Moriarty product, such as ████████████████████

Ex.2020 at ¶¶96-97.  The claimed product also contains much smaller amounts of

other impurities that are found in the Moriarty product, such as ████████████

████████████████████████ *Id.* at ¶96.

Furthermore, based on the same 175 batches, the average purity of the '393

product is ████ greater than the average purity of the Moriarty product, thereby

corroborating that the Moriarty process and the '393 process produces two

physically distinct products that contain measurable and significant structural

differences. *Id.* at ¶98.

4

HIGHLY CONFIDENTIAL                                    UTC_WAT00645857

IPR2016-00006                                          Patent Owner Response
Patent 8,497,393

Finally, the initial claim construction of the preamble "a product…

comprising" urged by SteadyMed and adopted by the Board would violate the

canon that patent claims may not be construed to encompass material that was

clearly disavowed in order to obtain allowance of claims. Even under the broadest

reasonable interpretation standard, the Board has found in its own cases that the

prosecution history may limit the plain meaning of a limitation in a claim, which

otherwise is presumed to apply. The '393 claims were allowed after submission of

the Walsh Declaration, which established the differences between the '393

products and the Moriarty product. This disavowal of the Moriarty subject matter

is further reinforced by additional intrinsic evidence. The '393 patent includes a

side-by-side comparison in Example 6 to show the difference between the Moriarty

product and the '393 product and repeatedly references higher purity and different

impurity profile compared to Moriarty. In the face of this disavowal, it is improper

to construe "a product …comprising" to allow the impurities "without limitation,"

as such a construction would encompass the impurity profile of Moriarty.

In addition, the Williams Declaration explains why Phares cannot anticipate the

claimed products because of the particular conditions used to prepare the Phares

product for polymorph screening and because of the uncertain provenance of

starting treprostinil used to make the diethanolamine salt.

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                          UTC_WAT00645858

IPR2016-00006                                              Patent Owner Response
Patent 8,497,393

As to instituted grounds 2 and 3, Dr. Williams also explains why the references

in the instituted obviousness grounds would not have been combined in the

asserted manner due to lack of motivation and the failure of the references to

provide an expectation of success for achieving the purity level and impurity

profile of the '393 patent in the specific case of treprostinil.  Kawakami teaches

away from the selection of diethanolamine, the salt specifically claimed in claims

14 and 18.  Lastly, secondary considerations of long-felt need and unexpected

results would rebut any case of obviousness as to grounds 2 and 3.

In view of the foregoing, SteadyMed has not met its burden of proving the

unpatentability of claims 1-22 by a preponderance of the evidence, as required

under 35 U.S.C. § 316(e).

## III.   STRUCTURAL/FUNCTIONAL DIFFERENCES OF THE CLAIMED PRODUCTS OVER THE CITED ART

The combined Declarations of Dr. Williams and Dr. Ruffolo establish that

the '393 product has a different impurity profile than the Moriarty product, and in

fact, that the '393 product has higher average purity.  These differences matter.

FDA uses both overall purity and levels of individual impurities ("purity

specification") as a basis to regulate the manufacturing of pharmaceuticals.

Batches that fall outside of the purity specification cannot be sold or used to treat

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                              UTC_WAT00645859

IPR2016-00006                                    Patent Owner Response
Patent 8,497,393

patients.  Thus, differences in purity and impurity profile are not merely academic,

but critical to the successful manufacture of a clinical product.

## A.    The Importance of Purity in Pharmaceuticals

As noted by the '393 patent itself, "because Treprostinil, and other

prostacyclin derivatives are of great importance from a medicinal point of view, a

need exists for an efficient process to synthesize these compounds on a large scale

suitable for commercial production." Ex. 1001, col. 1:57-61.  The invention

therefore "provides for a process that is more economical, safer, faster, greener,

easier to operate, and provides higher purity." *Id.*, col. 5:47-50.  As the treprostinil

product is a drug product subject to the rules of FDA, the reduction of impurities is

of great importance in the drug.  Drug purity is defined by FDA as "relative

freedom from extraneous matter in the finished product, whether or not harmful to

the recipient or deleterious to the product." See, Ex. 2022 at ¶33; see also 21

C.F.R. §600.3 (r) (2015).  The purity of a drug is of such importance to FDA that

the purity level of a drug substance must appear in the drug product specification,

which is a collection of data about the drug required by FDA. *See*, Ex. 2022 at

¶¶32-34.  "Regulatory agencies have also sought to increase levels of purity, and

consequently decrease levels of impurities, in order to provide to the maximum

extent possible, the highest level of safety to patients." *Id.* at ¶36.  This is due to

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645860

IPR2016-00006                                          Patent Owner Response
Patent 8,497,393

the fact that even trace amounts of impurities can sometime pose serious health concerns.

For example, the drug penicillin is one of the best known and extensively studied examples of trace impurities that can cause serious, life-threatening adverse events. *Id.* at ¶62.  While penicillin is safe and effective for most people, it can cause serious allergic reactions resulting in anaphylaxis and death. *Id.*  Because the amount of trace impurity of penicillin needed to cause an allergic reaction is so low, FDA has mandated the production of penicillin active pharmaceutical ingredient (API ) and finished product to be made in buildings entirely separate from buildings that manufacture other APIs or finished drug product. *Id., see also* FDA Guidance for Industry, Non-Penicillin Beta-Lactam Drugs: A CGMP Framework for Preventing Cross-Contamination, (2013) (Ex. 2047) at 1-6.  The same is true for the drug cephalosporin. Ex. 2022 at ¶63; *see also* Ex. 2047 at 1-6.

Additionally, human insulin is another example. For many years, human insulin was derived from pig pancreases, but then it became possible to produce human insulin in the bacteria *E. coli* using large bioreactors. Ex. 2022 at ¶64.  Even though the human insulin derived from *E. coli* was highly pure, it contained very small trace amounts of *E. coli*, a very dangerous bacteria causing reactions (directly from the trace amounts of bacteria, and not due to infection) in some people even in trace amounts.  *Id.*  As a result, the product needed to be even more

8

HIGHLY CONFIDENTIAL                                    UTC_WAT00645861

IPR2016-00006                                                    Patent Owner Response
Patent 8,497,393

highly purified to further minimize or eliminate the trace bacterial contaminants.

*Id.* These examples highlight the importance of drug purity in pharmaceutical

formulations and the potential risks to patients between two products that differ in

their impurity profile and purity.  By having a different impurity profile and overall

purity, two products are structurally and functionally different.

> **B.      The '393 Product Has A Different Impurity Profile and a Higher
>          Purity Than Moriarty**

As detailed in Dr. Williams' Declaration and supporting exhibits, comparing

the average impurity profiles for the '393 product and the Moriarty product using

data obtained from over 175 batches reveals measurable structural differences, as

the two processes produce physically different products which contain different

total and specific amounts of impurities.  Ex. 2020 ¶¶94-99 and Appendices A-B;

*see also* Ex. 2005, Ex. 2036, Ex. 2037, Ex. 2052, Ex. 2053.  The batch reports

show that the Moriarty product and the claimed product exhibit different impurity

profiles and that the claimed product has a higher average purity than Moriarty's

product. *Id.*

| **Moriarty Process Impurities (Average Percent Detected)** |
|---|
|  |
| **'393 patent Process Impurities (Average Percent Detected)** |
|  |

9

4814-0612-4340.3

**HIGHLY CONFIDENTIAL**                                        **UTC_WAT00645862**

IPR2016-00006                                    Patent Owner Response
Patent 8,497,393



In total, the '393 product has ▉ times fewer impurities than the Moriarty

product.[1]  Ex. 2020 ¶¶94-95.  Additionally, certain specific impurities found in the

prior art Moriarty product are essentially eliminated in the '393 product, as the

'393 product does not contain detectable amounts of the impurity ▉ and

none of the commercial batches of the '393 product contain detectable amounts of

▉.  Ex. 2020 ¶¶94, 96-97.  Other impurities, including ▉

▉ are also greatly ▉ in the '393 product as

compared to the Moriarty product, while the level of the ▉ impurity is

▉ in the '393 product. Ex. 2020 ¶96.  These substantial differences

between the impurity profiles of the '393 product and the Moriarty product

constitute structural differences between the claimed product and the prior art.

Furthermore, the average purity based on data from over 175 batches is

higher for the '393 product than that of Moriarty.  As shown above, the average

purity of a Moriarty batch was ▉ while the average purity of a '393 batch

---

[1] Moriarty Total Related Substances: ▉; '393 patent Process Total Related

Substances: ▉

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645863

IPR2016-00006                                          Patent Owner Response
Patent 8,497,393

was ▮▮▮▮▮ Ex. 2020 ¶¶94-99.  This is a marked improvement in overall purity.

Moreover, the purity analyzed in these batches – the total related substances – is

exactly the same type of analysis Dr. Walsh referred to in his declaration when

referring to purity of the '393 patent process versus that of the Moriarty process.

Thus, this analysis is consistent with how the inventor interpreted the purity of the

'393 patent.  And this analysis also persuaded the Office to allow the claims.

The Institution Decision cited to the Walsh Declaration for revealing "that

each of the impurities detected in [the tested batch of] Moriarty treprostinil was

present in an amount below that identified as acceptable in UTC's own

specification for treprostinil produced according to the process disclosed in the

'393 patent."  Paper 12 at 20-21.  First, the above data shows that the average

amount of each impurity and the average purity is different between Moriarty

treprostinil and the '393 product.  Second, whether an isolated batch of Moriarty

treprostinil does or does not satisfy the new FDA purity specification is not

relevant to patentability.  The question for patentability is whether or not a given

batch of *starting* Moriarty treprostinil (steps a and b of the '393 independent

claims) will be physically changed when step (c) is performed *on that batch*.  The

above averages show that it does change, as do the large scale synthesis examples

4-6 in the '393 patent.  While Moriarty treprostinil may show inter-batch variation

in overall purity and impurity profiles, the data of record establishes that

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                   UTC_WAT00645864

IPR2016-00006                                      Patent Owner Response
Patent 8,497,393

performing step (c) *on a given starting batch* of Moriarty treprostinil will lead to a

higher purity and a different impurity profile in the end product.  Petitioner has not

established that any specific batch of Moriarty treprostinil is not physically

changed by performing step (c), and all the evidence suggests that it is.

### C.    The Differences In Impurity Profile And Average Purity Between The '393 Product And Moriarty Are Functionally Important

The higher purity of the claimed product resulted in FDA approving a new

assay purity for the treprostinil drug as noted in the January 2009 letter submitted

to FDA by UTC. Ex. 2006 at 4-6**;** Ex. 2022 at ¶¶66-68; Ex. 2020 at ¶91.

Furthermore, this change constitutes a "major" change according to the

classification system for manufacturing changes used by FDA.  Ex. 2022 at ¶¶70-

72.  FDA requires continuous testing of pharmaceutical batches to ensure that they

fall within the established purity specification. Ex. 2022 at ¶¶32-40.  If a given

batch falls outside the established purity specification, then it will be rejected by

FDA and cannot be sold for patient use.  *Id.* at ¶32.  FDA is so concerned about

purity of pharmaceuticals that it requires companies to test for very tiny amounts of

individual known impurities carried over into the final product based on the

manufacturing process. *Id.* at ¶¶32-40.  Thus, the change in the '393 product is

commercially important and has real-world value.

12

HIGHLY CONFIDENTIAL                                      UTC_WAT00645865

IPR2016-00006                                          Patent Owner Response
Patent 8,497,393

## IV.   CLAIM CONSTRUCTION

In the Decision on Institution (Paper 28), the preliminary claim construction

construes "[a] product comprising a compound [of/having] formula [I/IV] or a

pharmaceutically acceptable salt thereof" and "product" in an unreasonably broad

manner.  The Board is not bound by that preliminary construction based on an

incomplete record.  *See e.g.*, *The Scotts Co., LLC v. Encap, LLC*, IPR2013-00110,

Paper 79 (PTAB June 24, 2014) (overturning preliminary claim construction in

final written opinion) (Ex. 2024).  On the fuller record now available to it, the

Board should adopt UTC's construction of the disputed terms.

### A.   Intrinsic Evidence Can Override The Presumption That "Comprising" Creates An "Open" Claim Construction

The claims at issue in an IPR must be given their broadest reasonable

interpretation (BRI) in light of the specification, but the Board must still interpret

claim terms according to established principles.  The transition phrase

"comprising" is only *presumed* to be an "open" phrase.  *Crystal Semiconductor*

*Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001)

("In the parlance of patent law, the transition 'comprising' creates a presumption

that the recited elements are only a part of the device, that the claim does not

exclude additional, unrecited elements.").  "While it is true that, as a general rule,

the words of a patent claim are to be given their plain, ordinary and accustomed

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                          UTC_WAT00645866

IPR2016-00006                                          Patent Owner Response
Patent 8,497,393

meaning to one of ordinary skill in the relevant art, *Toro Co. v. White Consol.*

*Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999), a court must nevertheless

examine the remaining intrinsic evidence to determine whether the patentee has set

forth an explicit definition of a term contrary to its ordinary meaning, has

disclaimed subject matter, or has otherwise limited the scope of the claims." *Day*

*Intern., Inc. v. Reeves Brothers, Inc.*, 260 F.3d 1343,  1349  (Fed. Cir. 2001).

    The intrinsic record, both the specification and the prosecution history, must

be reviewed to determine if there are limits to terms in the claims that would

otherwise be given their presumptive plain meanings.  Prosecution history "limits

the interpretation of claims so as to exclude any interpretation that may have been

disclaimed or disavowed during prosecution in order to obtain claim allowance."

*Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Similarly, the specification may contain repeated statements distinguishing the

prior art that limit the claims.  *SafeTCare Mfg., Inc. v.Tele-Made, Inc.*, 497 F.3d

1262, 1269-70 (Fed. Cir. 2007) (finding disclaimer where the specification

repeatedly indicated that the invention operated by "pushing (as opposed to

pulling) forces," and then characterized the "pushing forces" as "an important

feature of the present invention").

    Under the BRI standard, the Board should take into account both the

specification and the prosecution history because the patent examiner and the

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                          UTC_WAT00645867

applicant have already worked together to determine the scope of the claimed

invention. *See In re Buszard*, 504 F.3d 1364, 1366-67 (Fed. Cir. 2007) ("The

patent examiner and the applicant, in the give and take of rejection and response,

work toward defining the metes and bounds of the invention to be patented."); *In

re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989) ("When the applicant states the

meaning that the claim terms are intended to have, the claims are examined with

that meaning, in order to achieve a complete exploration of the applicant's

invention and its relation to the prior art.").

The Board has followed these principles of claim construction in other IPR

proceedings. *See, e.g., The Scotts Co., LLC v. Encap, LLC*, IPR2013-00110, Ex.

2024 at 14-16. In *Scotts*, the Board changed its preliminary claim construction of

"being in a solid state at time of coating" because the Board found that the patent

owner had disavowed claim scope during prosecution in order to overcome a

specific prior art reference. Ex. 2024 at 15. The Board relied on statements made

in Examiner Interview Summaries which confirmed that claim amendments and

arguments presented overcame the prior art. *Id.*; *see also* Prosecution History of

U.S. Patent No. 6,209,259 (Ex. 2025). As another example, the Board recently

construed a phrase to exclude trace amounts of a substance based on statements

made during prosecution distinguishing prior art containing trace amounts of the

substance. *Daicel Corp. v. Celanese Int'l Corp.*, IPR2015-00171, Paper 86 at 41

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                        UTC_WAT00645868

(PTAB June 23, 2016).  Thus, the BRI cannot be divorced from the intrinsic

evidence, including the prosecution history.  Such a construction is not reasonable.

### B.  The Distinct Impurity Profile And Higher Purity Of the '393 Patent Product Were Clearly Considered Part of the Claimed Product During Prosecution

As explained during prosecution, "[e]ach of treprostinil as the free acid and

treprostinil diethanolamine prepared according to the process specified in claim 1

or 10 . . . is physically different from treprostinil prepared according to the process

of 'Moriarty' due to differences in their impurity profiles." Ex. 1002 at 344.  In

fact, the Examiner required UTC to provide evidence in declaration form showing

that the product of claims 1 and 10 was different than Moriarty's product.  *Id.* at

328.  In response, UTC filed the Walsh Declaration, which demonstrated that the

claimed product had a different impurity profile and higher purity than Moriarty's

product. *Id.* at 347-349.  It was upon these statements and evidence that Moriarty

was overcome, and shortly thereafter the Examiner issued a Notice of Allowance.

*Id.* at 354-360.

In addition, the '393 specification repeatedly refers to the differences of the

'393 product compared to Moriarty.  The entirety of Example 6 in the '393

specification is a large scale, side-by-side comparison between Moriarty and the

'393 product, which shows a purity of 99.0% for Moriarty and 99.9% for the '393

product. Ex. 1001, 17:step 53.  At the end of this example, the '393 specification

HIGHLY CONFIDENTIAL                                          UTC_WAT00645869

IPR2016-00006                                      Patent Owner Response
Patent 8,497,393

further states that "impurities carried over from intermediate steps (i.e., alkylation

of triol and hydrolysis of benzindene nitrile) are removed during the carbon

treatment and salt formation step" (Ex. 1001, 17:29-32), which are the same

differences (higher purity and different impurity profile) that UTC relied upon in

the Walsh Declaration during prosecution as noted above.

These statements by UTC demonstrate that the claimed "product" must have

an impurity profile conferred by its process steps. *See Purdue Pharma L.P. v. Endo*

*Pharms. Ins.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006); *see also Atofina v. Great*

*Lakes Chem. Corp.*, 441 F.3d 991, 997 (Fed. Cir. 2006) (statements made during

prosecution history that distinguished the claimed invention from the prior art

constituted a prosecution disclaimer); *see also United Therapeutics Corp. v.*

*Sandoz, Inc.,* 2014 WL 4259153, *54-56 (D.N.J. Aug 29, 2014) (finding

compounds made by different processes resulted in different impurity profiles

meaning they were structurally different).

### D.   The Plain Meaning Of "Product" In The Context Of The '393 Product-By-Process Claims Requires The Characteristics Conferred By The Process Steps Be Present

The term "product" in the context of the '393 patent should be construed as

"a substance resulting from a chemical reaction." This is consistent with the '393

patent itself (Ex. 1001 at col. 3, lines 3, 4, 65, and 66; col. 5, line 45; col. 6, lines

65 and 66; and col. 7, line 17), as well as the understanding of a POSA and the

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645870

IPR2016-00006                                              Patent Owner Response
Patent 8,497,393

generally accepted definition in chemistry. Ex. 2020 at ¶¶60-62.  Additionally, Dr. Williams and Dr. Winkler both use the term product to refer to the result of a chemical reaction in their own work. Id. at ¶¶63-65; *see also* Ex. 2031 at 155:2-11 ("the product of a chemical reaction would be essentially all of the substances that result from the treatment of a particular reactant with a particular set of reagents."). To construe the term "product" as "a chemical composition" is too broad and improperly disregards a significant portion of the intrinsic record.  As described above, a product is the result of a chemical reaction and has its own impurity profile depending upon how it is made.  "A chemical composition" could be anything and is in no way limiting to what the term "product" actually means. Ex. 2020 at ¶¶66-68.

## V.    GROUND 1:  PHARES FAILS TO EXPLICITLY OR INHERENTLY DISCLOSE EACH AND EVERY LIMITATION OF CLAIMS 1-5, 7-9, 11-14 OR 16-20

The Board instituted Ground 1 based on the conclusion that Phares teaches the treprostinil diethanolamine salt product recited in claims 1 and 9, and that the recited process steps of the claims do not impart structural or functional differences over Phares' treprostinil diethanolamine salt.  As discussed below, SteadyMed has failed to establish anticipation based on Phares.

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                              UTC_WAT00645871

IPR2016-00006                                           Patent Owner Response
Patent 8,497,393

A.   **SteadyMed Cannot Pick and Choose From Unrelated Portions of Phares to Establish Anticipation**

In attempting to show anticipation, SteadyMed cites four different portions of Phares, Ex. 1005, as teaching the combined elements of claims 1 and 9. However, SteadyMed selectively ignores other portions in the Phares disclosure that suggest the four disparate portions of Phares should not be cobbled together to a single allegedly anticipatory embodiment. Petition at 22-24 and 33-34.

The portions of Phares cited by SteadyMed each relate to distinct subject matter, and Phares provides no description that would lead to the combination of these separate disclosures. Ex. 2020 at ¶¶79-84.  Phares' only disclosure of steps (a) and (b) is directed to the enantiomer (-)-treprostinil, which are not the same as the synthesis for treprostinil. Ex. 2020 at ¶¶79-81.  In fact, the intermediate products disclosed in the enantiomer synthesis as well as several reagents are different than the synthesis of treprostinil. *Id.* at ¶81.  In contrast, Phares' separate alleged disclosure of step (c) is silent as to how the starting treprostinil acid was prepared. Ex. 1005 at 85.  Thus, there is no reason set forth in Phares to combine the single teaching of steps (a) and (b) directed to one enantiomer with the other teachings of step (c), which are all directed to the other enantiomer. Ex. 2020 at ¶¶79-81.

19

**HIGHLY CONFIDENTIAL**                                    **UTC_WAT00645872**

IPR2016-00006                                                Patent Owner Response
Patent 8,497,393

Despite the alleged disclosure in Phares' that enantiomers of the disclosed compounds can be prepared using the proper chiral reagents, Phares itself teaches that treprostinil can be prepared in other ways that do not include steps (a) and (b), including the processes disclosed in US Patent Nos. 4,306,075 (Ex. 2032) and 5,153,222 (Ex. 2033).  Ex. 1005 at 11; Ex. 2020 at ¶78.  Thus, a POSA would reasonably conclude that the diethanolamine salts of Phares were prepared based on other disclosed methods that do not require steps (a) and (b). Ex. 2020 at ¶78. If the diethanolamine salts of Phares were prepared differently than the recited process steps, nothing in Phares establishes that the diethanolamine salts are necessarily the claimed product.

**B.    The Proper Construction of a "product comprising a compound [of/having] formula [I/IV] or a pharmaceutically acceptable salt thereof" Precludes A Finding That Phares Anticipates the Present Claims**

The Board's institution of Ground 1 was partly based on its preliminary finding that "comprising" does not exclude impurities that may possibly be produced by the process of Phares and that the impurity profile of Phares' diethanolamine salt is identical to that of the claimed product. *See* Paper 12 at 30. However, such a finding does not take into consideration the reasonable construction of "product comprising a compound [of/having] formula [I/IV] or a

20

HIGHLY CONFIDENTIAL                                                UTC_WAT00645873

IPR2016-00006                                    Patent Owner Response
Patent 8,497,393

pharmaceutically acceptable salt thereof," which is set forth in this Response and supported by the record now before the Board.

As discussed above in Section IV, both the specification and the prosecution history of the '393 patent distinguish the claimed product from prior art treprostinil products based on its higher purity and different impurity profile, which is achieved through the recited process steps. Thus, to prevail on Ground 1, SteadyMed must show that the Phares' diethanolamine salt necessarily possesses an impurity profile that is distinct from that of the Moriarty product and with higher purity.

Steadymed simply assumes that the diethanolamine salt discussed by Dr. Winkler is prepared from Moriarty treprostinil and does not acknowledge that the source of treprostinil would impact both the overall purity and impurity profile of the resulting salt. As exemplified in the '393 patent, the claimed process provides an improved treprostinil product due to its superior purity. As evidenced by the Williams Declaration and the batch record data, the claimed product has an average purity of ▮▮▮▮ and a distinct impurity profile from Moriarty's product. Ex. 2020 at ¶¶94-99. Importantly, SteadyMed has failed to show that, at a minimum, the Phares' diethanolamine salt possesses an impurity profile that is distinct from that of the Moriarty product and contains fewer overall impurities than the Moriarty product. Nor has SteadyMed shown that the Phares'

21

HIGHLY CONFIDENTIAL                              UTC_WAT00645874

IPR2016-00006                                    Patent Owner Response
Patent 8,497,393

diethanolamine salt has a higher purity than the Moriarty product.  Indeed,

SteadyMed's only argument regarding the purity of Phares' diethanolamine salt is

based on the theory that the higher melting point of Phares' diethanolamine salt

necessarily means that it must be at least equal in purity to that of the exemplified

batches in the '393 patent. *See* Petition at 27-28.  However, for the reasons noted

below, that is an incorrect conclusion based on the evidence now in the record.

### C.   The Higher Melting Point of Phares' Diethanolamine Salt Does Not Necessarily Mean That it is of Higher Purity Than the Diethanolamine Salts of the '393 Patent

The Board relied on incorrect statements in the Winkler Declaration alleging

that Phares' diethanolamine salt must be more or at least equally pure as the

claimed product solely because the former has a higher melting point. Paper 12 at

28-29.  However, melting point is just one factor in assessing a compound's purity

and is not necessarily a reliable metric of purity.  This is especially applicable to

Phares because only one melting point value was obtained in a sample for a

polymorph screen.  A POSA would not rely upon a single melting point value,

absent any other impurity information, to determine the purity of a substance made

under unspecified conditions. Ex. 2020 ¶76.  Indeed, the "higher" melting point of

Phares' diethanolamine salt could be indicative of the inclusion of impurities or the

result of the use of different solvent systems for the crystal forms. *Id.*  Accordingly,

22

HIGHLY CONFIDENTIAL                                    UTC_WAT00645875

IPR2016-00006                                    Patent Owner Response
Patent 8,497,393

the purity of a compound cannot be assessed based solely on its melting point value.

Moreover, even if the melting point could be relied upon, the data cited by Dr. Winkler does not indicate a product of high purity.  To the contrary, Fig. 21 of Phares "shows a broad melting peak with a range of close to 10 degrees which is indicative of a lower purity substance." Ex. 2020 ¶76; *see also*, Marti, E., *Purity determination by differential scanning calorimetry*, Thermochimica Acta, 5(1972) 173-220 at 214 ("The melting of diphenyl is extremely sharp because of the purity level; on the other hand, the melting region of phenacetin-benzamide is rather broad.") (Ex. 2031).

Additionally, Phares discloses several different conditions for preparing Polymorph A of the diethanolamine salt and that Polymorph A is required to make Polymorph B. Ex. 2020 at ¶73.  The '393 patent does not indicate that making Polymorph A first is required. *Id.*  Phares also indicates many conditions used to make Polymorph A and Polymorph B, but it is not clear what conditions were specifically used for the sample analyzed in Figure 21 that Dr. Winkler relies upon. *Id.* at ¶¶73-74.  It is well known that the use of different solvent systems in forming different crystal forms can have a significant effect on the melting point of a substance, as well as other characteristics, including purity, and a higher melting point does not always mean a higher purity. *Id.* at ¶¶75-76; *see also* R. Adhiyaman,

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645876

IPR2016-00006                                                    Patent Owner Response
Patent 8,497,393

et.al., *Crystal modification of dipyridamole using different solvents and crystallization conditions*, Int'l J. Pharm.321 (2006) 27-34 at 33 ("Adhiyaman") ("In conclusion, it can be said that the crystallization conditions and medium used have major effect on dipyridamole crystals habit modification under ambient conditions. The crystals showed significant changes in the shape, size, melting points, dissolution rate, XRD patterns and DSC curves.") (Ex. 2030).

Dr. Williams, therefore, has concluded that "[i]t is known in the art that sample size, rate of heating, the recrystallization solvent(s) used, and the conditions under which the crystalline sample was obtained can significantly affect the DSC data. Dr. Winkler's conclusion based on this single vague and incompletely described DSC data is not scientifically sound." *Id.* at ¶76.

Thus, nothing in Phares establishes that the disclosed diethanolamine salt is at least of equal purity to the diethanolamine salts of the '393 patent. With respect to claim 2 of the '393 patent specifically, nothing in Phares discloses a purity of at least 99.5%. Ex. 2020 at ¶82. For this additional reason, Phares cannot anticipate claim 2.

> **D.    Phares Fails To Disclose the Claimed Process for Making Treprostinil or Any Purity or Impurity Profile for Treprostinil Diethanolamine**

SteadyMed has failed to establish that Phares' diethanolamine salt (Form B) is the claimed product.

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                           UTC_WAT00645877

IPR2016-00006                                              Patent Owner Response
Patent 8,497,393

First, as Dr. Williams notes, the samples of treprostinil diethanolamine

disclosed in Phares were "made for a polymorph screen, not large scale batches."

Ex. 2020 ¶73. Accordingly, "the samples of polymorph B described in Phares are

prepared in a completely different way under different conditions than those

described in the '393 patent." Ex. 2020 ¶75. Specifically, Phares discloses first

preparing polymorph A by any one of a variety of methods and then preparing

polymorph B from some sample of polymorph A. In contrast, the '393 patent

makes no mention of first forming polymorph A. Ex. 2020 ¶¶73-74. Additionally,

Phares describes reaction conditions for making the polymorph samples that are

not described anywhere in the '393 patent. *Id.* In particular, the reaction conditions

disclosed for the sample of polymorph B characterized by Phares, heated slurries

of form A in 1,4-dioxane and toluene, are not described anywhere in the '393

patent. *Id.* It is well-known that the use of different reaction conditions, including

different solvents, can significantly affect the characteristics of a given crystal

form. Ex. 2020 ¶75. As a result, the diethanolamine salt disclosed in Phares cannot

be directly compared to the diethanolamine salt disclosed in the '393 patent.

Second, the Williams Declaration clearly establishes that the claimed

product has an average purity of ███████ thus giving it a superior purity and distinct

impurity profile over that of the prior art treprostinil products**.** Ex. 2020 ¶¶94-99.

The purity of the claimed product provides a structural difference from the prior art

25

4814-0612-4340.3

**HIGHLY CONFIDENTIAL**                                              UTC_WAT00645878

IPR2016-00006                                          Patent Owner Response
Patent 8,497,393

treprostinil, as evidenced by the differences in the average impurity profiles for the

Moriarty product and the '393 product. *Id*., Ex. 2036, Ex. 2037.  Indeed, the higher

purity of the claimed product resulted in FDA approving a new purity specification

for the treprostinil drug as noted in the January 2009 letter submitted to FDA by

UTC. Ex. 2006 at 4-6**;** Ex. 2022 at ¶¶70-72; Ex. 2020 at ¶91.

The impurity profile of the *starting* treprostinil acid used to prepare the

Phares diethanolamine salt is crucial to assess whether the diethanolamine salt is

the same as the claimed product, *i.e*., whether the impurity profile of the

diethanolamine salt in Phares is identical to that of the claimed product. Ex. 2020

¶¶76-78.  However, nowhere does Phares disclose the process of preparing the

treprostinil acid used to prepare the diethanolamine salt.  As acknowledged in both

Phares and the '393 patent, several different processes can produce treprostinil

acid. *See, e.g*., Ex. 1005 at 11; *see also,* Ex. 2020 ¶78.  Each known process can

produce a treprostinil acid with a unique impurity profile. Ex. 2020 ¶78.  Because

Phares does not disclose the process of preparing the starting treprostinil acid for

the diethanolamine salt, the impurity profile of the diethanolamine salt cannot be

established.  Without knowing the impurity profile and level of purity of Phares'

diethanolamine salt, SteadyMed cannot show that it is necessarily identical to the

claimed product or has equal purity to the claimed product.

Consequently, SteadyMed has not carried its burden on Ground 1.

26

4814-0612-4340.3

**HIGHLY CONFIDENTIAL**                                          **UTC_WAT00645879**

IPR2016-00006                                    Patent Owner Response
Patent 8,497,393

## VI.   <u>GROUND 2:</u>  **MORIARTY AND PHARES FAIL TO RENDER OBVIOUS CLAIMS 1-5, 7-9, 11-14, OR 16-20**

Moriarty does not teach salt formation and regeneration of the free acid. SteadyMed attempts to cure this deficiency in Moriarty by citing Phares for allegedly teaching step (c).  However, Moriarty teaches three distinct methods of preparing the treprostinil free acid.  Nothing in Moriarty directs a POSA to select one specific process over the three disclosed for purposes of further modification by adding a salt formation step.  Furthermore, SteadyMed fails to recognize that the performance of step (c) after steps (a) and (b) unexpectedly results in a product with an improved average purity over that of the prior art.  Indeed, the Williams Declaration demonstrates that, out of 122 samples, the claimed product has an average purity of greater than ███ Ex. 2020 at ¶¶94-95 and Appendices A-B.

As discussed above, the claimed product is structurally different from Moriarty's product because the claimed product has a distinct impurity profile, including a marked reduction in several specific impurities, and a higher average purity relative to Moriarty's product. Ex. 2020 at ¶¶94-99 and Appendices A-B. This evidence shows that, in the recited combination, performing step (c) in conjunction with steps (a) and (b) of the present claims produces a treprostinil product that is significantly improved over that of the prior art. Ex. 2020 at ¶¶48-49, 70.

27

4814-0612-4340.3

**HIGHLY CONFIDENTIAL**                                    **UTC_WAT00645880**

IPR2016-00006                                        Patent Owner Response
Patent 8,497,393

Moreover, Moriarty's product cannot render obvious the claimed product because during prosecution of the '393 patent, UTC overcame a rejection based upon Moriarty by providing evidence of representative sample impurity profiles, showing the physical difference between the product of the '393 patent and the Moriarty product. Ex. 1002 at p. 347.  Phares does not cure this deficiency because, as noted above, nothing in Phares establishes that the diethanolamine salt either 1) has an impurity profile similar to the claimed product or 2) has an overall purity at least equal to the claimed product.

In particular, it would not have been obvious to use the salt formation step of Phares to decrease amounts of at least ███████████ which are stereoisomers of treprostinil, and accordingly, are acidic rather than neutral or basic. Ex. 2020 at ¶102.  Thus, when subject to salt-forming conditions, a POSA would expect that any undesired stereoisomer of treprostinil would be included in the final salt product because the stereoisomer would also be converted to the corresponding salt under such salt-forming conditions.  A POSA has no reasonable expectation of success in removing any undesired treprostinil stereoisomer impurities by salt formation and subsequent regeneration of the free acid. *Id.*  Instead, a POSA would expect the salt formation and subsequent regeneration to produce a final product with the same initial amount of stereoisomer impurities before the salt formation step. *Id.*  Yet these impurities are each detected in only a single optimization batch

28

HIGHLY CONFIDENTIAL                                    UTC_WAT00645881

IPR2016-00006                                          Patent Owner Response
Patent 8,497,393

of the '393 product, and in none of the commercial batches. Even taking these

optimization batches into consideration, this represents a greater than 100-fold

reduction as compared to the Moriarty product. *Id.* at ¶¶94-96.

Additionally, as described above, there is no basis for comparing the

"purity" in Moriarty with the purity described in the Walsh Declaration. *Id.* at ¶88.

Walsh's Declaration makes clear that purity in terms of the '393 patent is assessed

by looking to the total related substances of a batch. *Id.* at ¶¶88-89. The Moriarty

reference, while not specifying a reference standard, does refer to a comparison to

an authentic sample. *Id.* As a result, it is not clear what method was used to

determine the purity in Moriarty and therefore a direct comparison of the value

reported in Moriarty cannot be made to the '393 patent.

Moreover, Dr. Winkler fundamentally misunderstands the error associated

with various purity measurements used in the Walsh Declaration, the '393 patent,

the prior art, and FDA. Dr. Winkler states in his declaration that:

> even a difference of 0.4% as discussed below, between the claimed
>
> processes of the '393 Patent and the prior art, such as Moriarty (Ex.
>
> 1004), would be attributable to experimental error, and thus the
>
> claimed degree of purity under the claimed processes of the '393
>
> Patent presents no distinction from the prior art.
>
> Ex. 1009 at ¶69.

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                          UTC_WAT00645882

IPR2016-00006                                          Patent Owner Response
Patent 8,497,393

He goes on to state that "HPLC's precision indicates that the 'RSD' or 'relative standard deviation' for a typical instrument is about 1%." *Id.* at ¶70.

This is wrong for several reasons.  First, during his deposition, Dr. Winkler admitted he did not know what the actual error in the measurement was for the data submitted in the Walsh Declaration during prosecution of the '393 patent. Ex. 2051 at 62:16-25; 63:2-14.[2]  While he did not know the error associated with the measurements made in the data submitted with the Walsh Declaration, he did admit that "the error in the measurement for the ████ [treprostinil impurity] would be, should be less than .1 percent," and in general, "[t]he error should be less than the maximum number reported, that's correct, for the measurement of the materials described here." Ex. 2051 at 63:25-64:4; 64:7-16.  By his own admission, the error associated with the measurement of impurities in treprostinil batch records such as those submitted in Walsh's Declaration are therefore far less than the alleged error of 1% or 0.4% he stated in his declaration.

---

[2] Indeed, Dr Winkler admitted he was not familiar with FDA guidelines regarding impurity profiles for a drug, did not know what is required in order to change a drug specification, and was not familiar with published guidances from FDA regarding changes to new drug applications or abbreviated new drug applications. Ex. 2051 at 19:3-24.

30

HIGHLY CONFIDENTIAL                                          UTC_WAT00645883

IPR2016-00006                                              Patent Owner Response
Patent 8,497,393

In contrast, FDA requires that impurity determinations must be measured at or below 0.05% for drugs such as treprostinil. *See*, Ex. 2022 at ¶47; Ex. 2020 at ¶92.  As Dr. Ruffolo explains, impurities in drug substances such as treprostinil that are administered in dosages less than 2 grams per day require that impurities be reported if they are present at a level less than or equal to 0.05%. *See, e.g.*, Ex. 2022 at ¶¶44-47; *see also* ICH Impurities in New Drug Substances Q3A(R2) monograph at 5-11 (Ex. 2038).  "As a result of these thresholds, by definition, the limit of detection for impurities (and therefore total related substances) must be at least as low as 0.05%."  Ex. 2022 at ¶50.

Furthermore, the '393 patent is directed to an improved and more pure treprostinil product.  *See, e.g.*, Ex. 1001, 17:27-40.  Given that Moriarty discloses the use of column chromatography for purification, a POSA would not be motivated to create the salt form in Phares, as Phares does not disclose any benefit or increased purity as a result of using the diethanolamine salt. Ex. 2020 at ¶101. "In fact, Phares does not allege that the diethanolamine salt is superior in any way to the treprostinil product of Moriarty and instead identifies other earlier treprostinil disclosures as a means to create the treprostinil used to form the diethanolamine salt." *Id.*  A POSA would not have a reasonable expectation of success by using salt formation as a purification step separate from or in addition to the column chromatography of Moriarty, as Phares does not disclose any alleged

31

HIGHLY CONFIDENTIAL                                       UTC_WAT00645884

IPR2016-00006                                          Patent Owner Response
Patent 8,497,393

benefit to forming the salt and a POSA would have no expectation that only certain

acidic and neutral impurities would be reduced or completely eliminated while

others remained. *Id.* at ¶102.  Thus, the combination of Moriarty and Phares cannot

render obvious claims 1-5, 7-9, 11-14, or 16-20.

Similarly, as described above, there is no basis to compare the purity

disclosed in Moriarty to the measurements obtained in the '393 patent or those

obtained by Dr. Walsh in his declaration, and therefore, claim 2 would also not be

rendered obvious by the combination of Phares and Moriarty for this additional

reason. *Id.* at ¶103.

Claims 8 and 16 also require the additional limitation that the formula (VI)

compound of step (a) is not purified.  In fact, the '393 patent specifically

distinguishes this limitation over the prior art. Ex. 1001, Example 6. Moriarty

expressly discloses that the compound of formula (VI) from step (a) is purified. Ex.

2020 at ¶104.  Phares does not disclose any synthesis for treprostinil and, even in

the abbreviated synthesis of the enantiomer, no details of purification are disclosed.

*Id.*  Thus, claims 8 and 16 are not rendered obvious by the combination of Phares

and Moriarty for this additional reason.  Process advantages should be considered

as secondary considerations to rebut obviousness, even if the process steps or

advantages are not considered in the initial determination of whether there is *prima*

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645885

IPR2016-00006                                              Patent Owner Response
Patent 8,497,393

*facie* obviousness (where the products are compared regardless of how they are

made).

Consequently, SteadyMed has not carried its burden on Ground 2.

## VII.   GROUND 3:  MORIARTY, PHARES, KAWAKAMI, AND EĞE FAIL TO RENDER OBVIOUS CLAIMS 6, 10, 15, 21, AND 22

### A.    The Product of Claims 6, 15, and 21 Are Different Than the Prior Art Treprostinil Products

The Board concluded that the process steps of claims 6, 15, and 21,

including step (d), do not impart structural or functional differences over prior art

treprostinil products. Paper 12 at 46-47.

Based on the evidentiary record now before the Board, and in view of the

reasons set forth in Section III, above, the free acid substance formed by step (d) of

claims 6, 10, 15, 21 and 22 is structurally different from the prior art treprostinil

products in Phares and Moriarty.  The evidentiary record shows that the free acid

substance of claims 6, 10, 15, 21 and 22 contains a distinct impurity profile and a

higher average purity over the treprostinil free acid of Moriarty, and thus is

structurally different.  Further, Phares' diethanolamine salt of treprostinil is

structurally and functionally distinct from the free acid substance formed by step

(d) of claims 6, 15 and 21.

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                       UTC_WAT00645886

IPR2016-00006                                          Patent Owner Response
Patent 8,497,393

### 1.   The '393 Patent Product is Structurally and Functionally Distinct from Moriarty's Product

As explained in the Williams Declaration and discussed above, the free acid substances of claims 6, 10, 15, 21 and 22 are structurally distinct from Moriarty's product because the formation of the salt in step (c) leads to a product that has a distinct and improved impurity profile. *See* Sections III, VI, *supra*. Additionally, the average purity of the product of claim 21 is about ▇▇▇ greater than that of Moriarty. Ex. 2020 ¶¶94-99 and Appendices A-B. Indeed, as evidenced by Dr. Ruffolo's Declaration, a ▇▇▇ difference in average purity for a highly potent drug, such as treprostinil is a very significant difference. *See, e.g.*, Ex. 2022 at ¶70.

### B.   There Is No Motivation For A POSA To Combine Moriarty and Phares with Eğe and Kawakami

In the Institution Decision, the Board determined "on the record before us, and for purposes of institution, that the process steps recited in claims 6, 15, and 21 do not impart structural or functional differences to the claimed treprostinil product, we do not address the parties' contentions concerning the obviousness of the recited process steps." Paper 12 at 47. However, the fuller record now indicates that the claimed treprostinil product is structurally and/or functionally different from Moriarty's treprostinil free acid and Phares' treprostinil diethanolamine salt. Thus, the recited process steps must now be considered.

34

HIGHLY CONFIDENTIAL                                    UTC_WAT00645887

IPR2016-00006                                              Patent Owner Response
Patent 8,497,393

Similarly, the board credited Dr. Winkler's opinion regarding the combination of Kawakami and Eğe with Moriarty and Phares. Paper at 42. Dr. Winkler, however, too easily dismisses the complexity and difficulty associated with further purifying a drug substance as complex as treprostinil. Dr. Winkler attempts to portray the chemistry involved in the '393 patent as "nothing more than basic organic chemistry techniques – in my view 'organic chemistry 101'" in an effort to minimize the significant invention of the '393 patent. Ex.1009 at ¶3. Yet, Dr. Winkler contradicts himself by defining a POSA as having "a master's degree or Ph.D. in medicinal or organic chemistry, or a closely related field. Alternatively a person of ordinary skill would include a bachelor's degree and at least five years of practical experience in medicinal or organic chemistry." *Id.* at ¶14. Indeed, Dr. Winkler goes on to testify that to understand the science and chemistry of the patent, you would need that level of skill in the art. Ex. 2051 at 29:12-16. As a result, a POSA would not look to an undergraduate textbook like Eğe, for example, to figure out improved purification techniques for a complex drug substance such as treprostinil.

### 1. There Is No Motivation to Follow the Carboxylate Salt Formation With Regeneration of the Carboxylic Acid

The Board credited Dr. Winkler's opinion regarding the combination of Kawakami and Eğe with Moriarty and Phares. Paper 12 at 42. Dr. Winkler,

35

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645888

IPR2016-00006                                                    Patent Owner Response
Patent 8,497,393

however, too easily dismisses the complexity and difficulty associated with further purifying a drug substance as complex as treprostinil.  After first referencing "organic chemistry 101" to minimize the significance of the '393 patent (Ex. 1009 at ¶3), Dr. Winkler contradicts himself by defining a POSA as having "a master's degree or Ph.D. in medicinal or organic chemistry, or a closely related field. Alternatively a person of ordinary skill would include a bachelor's degree and at least five years of practical experience in medicinal or organic chemistry." *Id.* at ¶14.  At his deposition, Dr. Winkler conceded that, to understand the science and chemistry of the '393 patent, you would need this higher level of skill in the art. Ex. 2051 at 29:12-16.  As a result, a POSA would not look to an undergraduate textbook like Eğe, for example, to figure out improved purification techniques for a complex drug substance such as treprostinil.

As explained previously, the claimed free-acid compounds, including treprostinil, produced by the processes of claims 6, 10, 15, and 21 provide a new product that induced FDA to adopt a new purity standard for treprostinil free acid due to the excellent purity of the final product.  Furthermore, UTC demonstrated that treprostinil free acid made by the claimed methods provides a compound that lacks or reduces the levels of the impurities found in the free acid treprostinil of the Moriarty process.

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                         UTC_WAT00645889

IPR2016-00006                                    Patent Owner Response
Patent 8,497,393

Neither Phares nor Eğe provide a reason that a POSA would include a "carboxylate salt formation and regeneration of the neutral carboxylic acid" step. *See* Petition, p. 54. Phares merely discloses forming a salt from treprostinil free acid of undisclosed origin. *See* Section V.E., *supra*. There is no suggestion that this salt should then be converted *back* to the free acid (*e.g.*, there is no suggestion of using the salt formation as a purification method). "Given that the purification techniques disclosed in Moriarty include chromatography and recrystallization after many years of research to optimize the process of making treprostinil, a POSA would not have been motivated to use a salt purification technique disclosed in an undergraduate chemistry textbook. More importantly, a POSA would not have had a reasonable expectation of success in further purifying the treprostinil product of Moriarty by using such a technique. To the extent a POSA was motivated to further purify treprostinil, a POSA would have focused on the known impurities and investigated methods of removing those." Ex. 2020 at ¶106. Indeed, stereoisomers were known impurities in treprostinil. *Id.* Eğe, however, simply discloses that "carboxylic acids that have low solubility in water, such as benzoic acid, are converted to water-soluble salts by reaction with aqueous base. Protonation of the carboxylate anion by a strong acid regenerates the water-insoluble acid. These properties of carboxylic acids are useful in separating them from reaction mixtures containing neutral and basic compounds." *Id.* at ¶107.

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645890

IPR2016-00006                                                Patent Owner Response
Patent 8,497,393

Indeed, the only example given in Eğe is of benzoic acid – a very simple aromatic acid that is quite different from the structure of treprostinil, as it has no chiral centers and therefore no stereoisomeric impurities. *Id.* at ¶108. Given that Eğe only predicts the removal of neutral and basic compounds by a salt purification step followed by acidification and only describes a simple non-chiral carboxylic acid, a POSA would have no motivation to look to Eğe for purification and no reasonable expectation of success given that many of the impurities in treprostinil are acidic stereoisomers. *Id.* at ¶¶108-109.

As discussed above, the average impurities found in samples of the Moriarty product include three different stereoisomers of treprostinil free acid. Eğe suggests that a "carboxylate salt formation and regeneration of the neutral carboxylic acid" step would not remove these compounds from the product. Thus, a POSA would have understood Moriarty, Phares, and Eğe to suggest simply making the treprostinil free acid product of Moriarty, and not undergoing the additional time and expense of a "carboxylate salt formation and regeneration of the neutral carboxylic acid" step because Eğe actually teaches away from the usefulness of this step when impurities include acidic stereoisomers are present because a POSA would have to ignore Eğe's teaching that these types of impurities could not be removed by carboxylate salt formation. *See* Ex. 2020 ¶¶107-109; *see also United States v. Adams*, 383 U.S. 39, 42-43 (1966).

38

**HIGHLY CONFIDENTIAL**                                    UTC_WAT00645891

The Institution Decision cites *KSR* for the proposition that "a technique has been used to improve one device, and a POSA would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." Paper 12 at 45.  However, the simple application of this proposition regarding devices (a predictable art) should not be applied to an unpredictable field, such as the chemical arts, without truly examining whether the technique would improve *similar compounds* in the *same way. See, e.g.,  In re Fisher*, 427 F.2d 833, 839 (C.C.P.A., 1970)(contrasting "predictable factors, such as mechanical or electrical elements" from "unpredictable factors, such as most chemical reactions"); *see also, Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008).

For example, Kawakami teaches purification of a methanoprostacyclin derivative by forming the dicyclohexyl amine salt and then regenerating the free acid to achieve a "fairly high" purity.  Analogizing to the language cited from *KSR*, a POSA must have recognized that the "technique" of salt formation followed by regeneration of the free acid would improve *similar compounds* in the *same way.*

However, as can be seen by the below comparison, the structures of treprostinil and the methanoprostacyclin derivative of Kawakami are structurally very different – they are not *similar compounds/devices.*

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                                    UTC_WAT00645892

IPR2016-00006
Patent 8,497,393

Patent Owner Response



**Treprostinil**

**methanoprostacyclin compound in Kawakami**

First, the methanoprostocyclin compound in Kawakami is a-two fused-ring structure, while treprostinil is a three-fused-ring structure. Ex. 2020 at ¶112. Second, Kawakami does not actually disclose a purification method for separating diastereomers, but instead one for separating E and Z isomers. Ex. 2020 ¶¶112-113.

Indeed, Kawakami teaches that the starting material does not vary at each chiral center other than the alkene double bond. *Id.*   In other words, Kawakami discloses a mixture of two compounds: (1) the E-isomer of a stereoisomerically pure compound and (2) the Z-isomer of a stereoisomerically pure compound. *Id.* at ¶113.  Treprostinil contains no mixture of E and Z isomers because it does not contain a carbon-carbon double bond that is capable of forming E and Z isomers. Indeed, the use of a specific salt to isolate a specific E/Z isomer does not reasonably suggest that salt formation of a much more complex compound with

40

4814-0612-4340.3

HIGHLY CONFIDENTIAL

UTC_WAT00645893

multiple chiral centers such as treprostinil could be isolated from entirely different impurities and then converted back to the free acid form. *Id.*

Thus, the purification of treprostinil from its stereoisomers and related impurities is quite different from the purification of the methanoprostacyclin derivative from its structural isomer – the compositions are not improved in the *same way*.

As a result of these differences, "a POSA would not have looked to Kawakami (or Eğe) if they were looking for additional purification techniques for treprostinil because neither reference discloses how to remove stereoisomeric impurities." *Id* at ¶112.

### 2. Kawakami Would Have Motivated One of Ordinary Skill In The Art To Select A Dicyclohexyl Amine Salt, Teaching Away From The Diethanolamine Salt of Claims 14 and 18

Not only are there structural differences between treprostinil and the "methanoprostacyclin compound" in Kawakami, but the counter-ion used to prepare the salt is structurally different. *Id.* at ¶114. Specifically, Kawakami teaches preparing the dicyclohexyl amine salt, whereas particular claims of the '393 patent require use of the diethanolamine salt.

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                          UTC_WAT00645894

IPR2016-00006                                                    Patent Owner Response
Patent 8,497,393

Diethanolamine                              dicyclohexyl amine

Because Kawakami uses a different salt to remove a different sort of impurity from

a different structure, a POSA would have no reason to combine the teachings of

Kawakami with Moriarty and Phares in the particular manner of the asserted

grounds in the Petition, or a reasonable expectation of success of achieving a more

pure treprostinil product by such a combination. Ex. 2020 ¶114.  For this reason,

claims 14 and 18 are separately patentable.

> ### 3. Kawakami Does Not Provide A Reasonable Expectation Of Success That Treprostinil Products Could Be Further Purified Because Different Impurities Are Targeted

The purification of treprostinil from its stereoisomers and related impurities

is quite different from the purification of the methanoprostacyclin derivative from

its structural isomer, and thus, Kawakami provides no reasonable expectation of

success.  Ex. 2020 ¶¶112-114

To illustrate this point further, Kawakami is directed to purifying E- and Z-

isomers of methanoprostacyclin compound from one another.  In order for the E-

and Z-isomers to exist, the "prostacyclin compound" must have an alkene.  For

example, Kawakami discusses separating a mixture of the following compounds:

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645895

Treprostinil, on the other hand, contains no mixture of E/Z isomers. In fact, it cannot because it does not contain an alkene capable of E/Z isomerization. SteadyMed has failed to provide a factual basis as to how or why the separation of E/Z isomers of an alkene would provide a motivation to combine or reasonable expectation of success in a compound not containing an alkene capable of E/Z isomerization, such as treprostinil. As explained in the Williams Declaration, the use of a specific salt to isolate a specific E/Z isomer does not reasonably suggest that salt formation of an entirely different compound, such as treprostinil, could be isolated from entirely different impurities, such as stereoisomers and related impurities. Ex. 2020 ¶¶112-114.

Furthermore, the Kawakami reference would have provided no motivation or rationale to attempt to remove the trace impurities of the Moriarty treprostinil free acid through the process of salt formation followed by conversion back to the

43

HIGHLY CONFIDENTIAL

UTC_WAT00645896

IPR2016-00006                                      Patent Owner Response
Patent 8,497,393

free acid.  Indeed, Kawakami was concerned with isolating a particular isomer

from a 7:2 E/Z isomeric mixture. Ex. 1007 at 4.  In other words, the composition in

Kawakami contained, at most, a purity of 77.8% prior to the salt formation step.

Kawakami provides a crude purification of the desired E-isomer through a

particular salt formation, and suggests that not all impurities were removed by

formation of a salt and conversion back to the free acid. *Id.* at 5 ("purity can be

further improved by recrystallization").  Nothing in the reference suggests that a

substance as pure as the Moriarty treprostinil free acid (a substance with about

99.4% assay purity) – a substance that had already been "further improved" by

recrystallization (*see* Ex. 1004 at 13, right column) – would be improved by

formation of a salt and conversion back to the free acid. Ex. 2020 ¶¶113-114.

Thus, even if formation of a salt and conversion back to the free acid was

known in the art, it would not have rendered the present claims obvious without

some motivation and expectation of success in its use on the Moriarty treprostinil

free acid.  To put it another way, there would have been no reason to incur

additional time and expense to form a salt of the valuable, relatively pure Moriarty

treprostinil free acid only to then convert it back to the free acid, even though the

addition would have been technologically possible. *In re Omeprazole Patent*

*Litigation,* 536 F.3d 1361 (Fed. Cir. 2008).

4814-0612-4340.3

**HIGHLY CONFIDENTIAL**                                      **UTC_WAT00645897**

IPR2016-00006                                      Patent Owner Response
Patent 8,497,393

### 4.    Any "Close" Structural Similarity of the Moriarty Free Acid Does Not Render the Claims Obvious

As explained above, the claimed substance is structurally different from

Moriarty's treprostinil free acid because the claimed substance has an improved

and different impurity profile.  Even if the Board views an improvement in

impurity profile of, e.g., ██████ as a close relationship between the substances of the

present claims and of Moriarty, there is no obviousness because there was not a

known or obvious process for making the claimed free acid substance. *See In re*

*Hoeksema*, 399 F.2d 269, 274 (C.C.P.A. 1968)( "the absence of a known or

obvious process for making the claimed compounds overcomes any presumption

that the compounds are obvious based on close relationships between their

structures and those of prior art compounds").  For the reasons set forth in the

previous sections, conducting a salt-formation purification step on the known

treprostinil free acid of Moriarty would not have been obvious, so the mere

existence of a "close relationship" in the products cannot be used to deny

patentability.

### 5.    Additional Claim Limitations Are Not Disclosed by the Cited Prior Art

In addition to the reasons above, certain dependent claims would also not

have been obvious in light of the combination of Phares, Moriarty, Eğe, and

Kawakami.  Claim 6 requires the acid in step (d) to be either HCl or $H_2SO_4$ and

45

HIGHLY CONFIDENTIAL                                      UTC_WAT00645898

IPR2016-00006                                      Patent Owner Response
Patent 8,497,393

claim 15 requires the acid to be HCl.  Similarly, claim 21 requires step (d) is

performed.  Phares, Moriarty, and Kawakami all do not disclose the use of either

HCl or $H_2SO_4$ and do not disclose converting a carboxylic acid salt back to its salt

form using an acid. Ex. 2020 at ¶115.  "Eğe cites HCl as an example in the

conversion of benzoic acid, but as described above, a POSA would not have

looked to Eğe to further purify a complex carboxylic acid such as treprostinil from

its stereoisomers and other impurities and would have no reasonable expectation of

success by using HCl based on this disclosure." *Id.*  In addition to the reasons

above, claims 6, 15, and 21 would not be obvious in light of any combination of

the cited prior art.

Like claim 2, claim 10 requires that the product be 99.5% pure and that step

(d) be performed.  The only purity limitation disclosed in any cited prior art

reference is in Moriarty and, as explained above, that purity cannot be directly

compared to the purity recited by the claims.  Similarly, Moriarty does not perform

steps (c) or (d). *Id.* at ¶116.  A POSA would have no motivation to look to Phares,

Kawakami or Eğe to improve the purity to at least 99.5% and, given that none of

these references disclose a purity amount, would have no reasonable expectation of

success in achieving that purity. *Id.*  Finally, claim 22 requires an extra step of

forming a pharmaceutically acceptable salt from the product of step (d).

SteadyMed and Dr. Winkler cite no evidence whatsoever for this additional step.

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645899

"In fact, none of the references cited even suggest converting a carboxylic acid to a salt form, then regenerating the carboxylic acid, then forming a pharmaceutically acceptable salt from that." *Id.* at ¶117. For this additional reason, claim 22 is not obvious in light of the combination of Phares, Moriarty, Kawakami, or Eğe.

Consequently, SteadyMed has not carried its burden on Ground 3.

## VIII. SECONDARY CONSIDERATIONS REBUT ANY POSSIBLE CASE OF OBVIOUSNESS

SteadyMed has not established a *prima facie* case of obviousness. Thus, UTC is not obligated to provide evidence of objective indicia of non-obviousness. Nonetheless, objective indicia of non-obviousness confirm that the claims of the '393 patent would not have been obvious and, in fact, represent a surprising solution to the problem of minimizing impurities and providing a safer and purer treprostinil product.

### A. Long-Felt Unmet Need

At the time of the invention, there was a long-felt need to have a more efficient synthesis to produce treprostinil in a more pure form and in a cost-effective manner. *See generally*, Ex. 2022 at ¶¶31, 65. Treprostinil has five chiral centers resulting in 32 possible diastereomers, so the potential for diastereomeric impurities is high; only the treprostinil stereoisomer has the desired pharmaceutical effect. Ex. 2013, at pp. 11, ll. 18-25, pp. 15, ll. 1-pp. 16, ll. 8, pp. 19, ll. 14-25.

47

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645900

IPR2016-00006                                    Patent Owner Response
Patent 8,497,393

Treprostinil is also a very potent drug so any diastereomeric impurities would also

potentially be potent. *Id.*; Ex. 2022 at ¶54.  Specifically, the FDA as a matter of

course seeks to minimize all impurities in drug substances and particularly in

highly potent drug substances such as treprostinil. Ex. 2022 at ¶¶ 31, 54.  The

reduction and removal of several types of impurities met the long-felt need

expressed by the FDA to minimize impurities as much as possible. *Id.* at ¶¶ 31, 75.

Additionally, because the '393 patent product was so successful, it resulted in a

change in the drug specification submitted to FDA. *Id.* at ¶¶66-67.  The change

indicated that the assay purity of the new drug substance made by the '393 patent

process increased in purity from an assay range █████████████████

███████ - a full ████████ in assay purity. *Id.* at ¶ 70.  The range of assay values

of ███ as well as the amount above 100% does not indicate an error associated with

the measurement, but just the acceptable value of this measurement approved by

the FDA. *Id.* at ¶¶ 69-70.  The fact that UTC submitted a ███ increase in assay

purity to FDA is considered a "major" change by FDA. *Id.* at ¶ 72.  *See Knoll*

*Pharm. Co., Inc. v. Teva. Pharm. USA, Inc.*, 367 F.3d 1381, 1385 (Fed.Cir. 2004)

(while FDA approval is not determinative of nonobviousness, it can be relevant in

evaluating the objective indicia of nonobviousness). In fact, even a change as small

as 0.1% of impurities can have an impact on a drug substance.  *See, e.g., id.* at ¶¶

32, 45.  Given that FDA consistently wants drug substances to have fewer

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645901

IPR2016-00006                                    Patent Owner Response
Patent 8,497,393

impurities and in less amounts, the '393 patent invention met that need by further

reducing and removing certain specific impurities and by increasing the overall

assay purity of the drug substance.

### B. Unexpected Results

The results of the claimed inventions in the '393 were unexpected. The use

of a salt form of treprostinil to further purify the treprostinil acid in a cheaper and

better way than the previously used methods of purification was an unexpected

result. Moreover, it was unexpected that the salt purification step reduced not only

diastereomeric impurities, but also certain non-acidic impurities as well. *See,*

*supra*, Section XI.B.1; Ex. 2020 ¶¶94-97, 102, 108-109. Indeed, Eğe itself

predicted that a salt formation followed by regeneration using an acid would

remove only basic and neutral impurities. *Id.* at ¶107. The unpredictability of this

result is supported by the fact that the salt purification step did not reduce all non-

acidic impurities; in fact, the '393 product has slightly increased levels of one such

impurity, ███████████████ Ex. 2020 ¶96. Thus, a person of skill in the art

would not have expected the results of the '393 patent to be so successful at

reducing the levels of so many impurities.

### IX. Conclusion

For the foregoing reasons, the Board should hold that SteadyMed has failed

to carry its burden attacking the patentability of the instituted claims because none

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645902

IPR2016-00006                                              Patent Owner Response
Patent 8,497,393

of the prior art cited by SteadyMed anticipates or renders obvious any claim of the

'393 patent.

Respectfully submitted,

Date:    July 6, 2016                    /Stephen B. Maebius/
                                         Stephen B. Maebius
                                         Reg. No. 35,264

50

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                          UTC_WAT00645903

## <u>CERTIFICATE OF COMPLIANCE</u>

This Paper contains 11,230 words according to the word processing program in which it was created, excluding the portions exempted by 37 C.F.R. ¶42.24(a)(1). Accordingly, this Paper complies with the requirements of 37 C.F.R. § 42.24(b)(1).

Date:   <u>July 6, 2016</u>                Signature:  <u>/Stephen B. Maebius/</u>
                                                            Stephen B. Maebius

**HIGHLY CONFIDENTIAL**                                          **UTC_WAT00645904**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Patent Owner Response and accompanying exhibits was served on counsel of record for Petitioner on July 6, 2016 by filing through the Board's PRPS system and by delivering a copy via email to Stuart Pollack and Lisa Haile (the counsel of record for the Petitioner) at the following address:

Steadymed-IPR@dlapiper.com

Date:    July 6, 2016                    Signature:  /Stephen B. Maebius/
                                                     Stephen B. Maebius

4814-0612-4340.3

HIGHLY CONFIDENTIAL                                    UTC_WAT00645905

# EXHIBIT 9

**In the Matter Of:**

*UNITED THERAPEUTICS V.*

*LIQUIDIA TECHNOLOGIES INC.*

*MARKMAN HEARING*

*June 04, 2021*

Markman Hearing - June 04, 2021

**1**

UNITED STATES DISTRICT COURT

IN AND FOR THE STATE OF DELAWARE

------

UNITED THERAPEUTICS )

CORPORATION,      )

    Plaintiff,  )

              )

V.       ) CIVIL ACTION

              ) NO. 20-755

LIQUIDIA TECHNOLOGIES)

INC.,         )

    Defendant.  )

------

    Markman Hearing taken pursuant

to notice at the J. Caleb Boggs Federal

Building, 844 North King Street,

Courtroom 6A, Wilmington, DE 19801

before the Honorable Richard G.

Andrews, on Friday, June 4, 2021,

beginning at 9:00 a.m., before Patrick

J. O'Hare, RPR, Notary Public.

    LEXITAS REPORTING

Registered Professional Reporters

    1330 N. King Street

    Wilmington, DE  19801

    (302) 655-0477

    www.lexitaslegal.com

**2**

1    APPEARANCES:
2
     BOIES SCHILLER FLEXNER LLP
3      BY:  WILLIAM C. JACKSON, ESQ.
       1401 New york Avenue NW
4      Washington, DC 20005
       202-237-2727
5      wjackson@bsfllp.com
       Counsel for Plaintiff
6
7    McDERMOTT WILL EMERY LLP
       BY:  DOUGLAS H. CARSTEN, ESQ.
8      18565 Jamboree Road
       Suite 250
9      Irvine, CA 92612
       949-620-6111
10     dcarsten@mwe.com
       Counsel for Plaintiff
11
12   McDERMOTT WILL EMERY LLP
       BY: JIAXIAO ZHANG, ESQ.
13     18565 Jamboree Road
       Suite 250
14     Irvine, CA 92612
       949-757-6398
15     jiazhang@mwe.com
       Counsel for Plaintiff
16
17   McDERMOTT WILL EMERY LLP
       BY: ADAM BURROWBRIDGE, ESQ.
18     500 North Capitol Street NW
       Washington, DC 20001
19     202-756-8797
       aburrowbridge@mwe.com
20     Counsel for Plaintiff
21
22
23
24

**3**

1    APPEARANCES:  (Cont'd)
2
     MORRIS, NICHOLS, ARSHT & TUNNELL LLP
3      BY: MICHAEL J. FLYNN, ESQ.
       1201 North Market Street
4      Wilmington DE 19899
       302-351-9661
5      mflynn@mnat.com
       Counsel for Plaintiff
6
7    COOLEY LLP
       BY: JONATHAN R. DAVIES, ESQ.
8      1299 Pennsylvania Avenue, NW
       Suite 700
9      Washington DC 20004-2400
       202-776-2049
10     jdavies@cooley.com
       Counsel for Defendant
11
12   COOLEY LLP
       BY:  SANYA SUKDUANG, ESQUIRE
13     1299 Pennsylvania Avenue, NW
       Suite 700
14     Washington, DC 20004-2400
       202-776-2982
15     ssukduang@cooley.com
       Counsel for Defendant
16
17
     SHAW KELLER LLP
18     BY:  KAREN ELIZABETH KELLER, ESQUIRE
       1105 North Market Street
19     12th Floor
       Wilmington, DE 19801
20     302-298-0700
       kkeller@shawkeller.com
21     Counsel for Defendant
22
23
24

**4**

1    APPEARANCES:  (Cont'd)
2
     COOLEY LLP
3      BY:  DOUGLAS W. CHEEK, ESQUIRE
       1299 Pennsylvania Avenue, NW
4      Suite 700
       Washington, DC  20004-2400
5      202-776-2108
       dcheek@cooley.com
6      Counsel for Defendant
7
8    COOLEY LLP
       BY:  BRITTANY CAZAKOFF, ESQUIRE
9      3175 Hanover Street
       Palo Alto, CA  94304
10     650-843-5522
       bcazakoff@cooley.com
11     Counsel for Defendant
12
13
14   ALSO PRESENT:  Kevin Kessler, Esq.
         Shaun Snader, UTC
15         Rusty Schundler,
         Liquidia
16
17
18
19
20
21
22
23
24

Markman Hearing - June 04, 2021

25

1    of the rejection.  That covers the
2    issue.
3            There's one other issue that
4    Mr. Carsten didn't raise, and I can
5    bring it up if they bring it up, but
6    it's the issue of reprocessing
7    treprostinil API.  In their briefing
8    UTC argued that our construction
9    eliminates common pharmaceutical
10   practices, as testified to by
11   Dr. Ruffolo, and that once you make the
12   API you might need to purify it further
13   so that you can meet your release
14   specifications, okay?  That's true.
15           Our construction does not
16   eliminate that.  The treprostinil API
17   in the claims is the treprostinil salt
18   that's made after the alkylation and
19   hydrolysis in the claim of the '066
20   patent.  So, our construction allows
21   for what Dr. Ruffolo wants to do,
22   reprocess the salt.  What our
23   construction does is just adopt what
24   UTC is already arguing what the

26

1    examiner understood is eliminate it,
2    and that's the purification and
3    purification by column chromatography
4    before you make the salt.
5            And so, this issue of
6    reprocessing is permitted by both
7    constructions, and we understand that a
8    skilled artisan might do that after
9    they already make the salt.
10           THE COURT:  All right.  So,
11   for the '066 patent in this term of
12   process I am going to give it its plain
13   and ordinary meaning.  I think the
14   statements that Liquidia is relying on
15   they don't constitute clear and
16   unmistakable disclaimer.  I think what
17   they were saying is, or an
18   interpretation of what they were
19   saying, is that the invention doesn't
20   require that you do this step that
21   Liquidia wants to add in, and so,
22   therefore, I'm not going to add it in
23   and the process will just be a process.
24           All right.  Let's go on to

27

1    the second one of this series.
2            MR. CARSTEN:  Your Honor, I
3    need to approach the podium to switch.
4            THE COURT:  Sure.  I think
5    the next one is a pharmaceutical batch?
6            MR. CARSTEN:  Yes,
7    Your Honor.
8            So, here it's slide 29 of
9    our presentation, the disputed claim
10   term is pharmaceutical batch.  UTC has
11   offered a proposed construction.  I
12   know you don't want to hear about the
13   IPR, but this is, in fact, the proposed
14   construction that we submitted in
15   connection with the '901 IPR and that
16   the patent office adopted provisionally
17   in the institution decision.
18           THE COURT:  Yeah, I'm not
19   sure -- I mean, you know decisions of
20   PTAB under the same standards that we
21   use, you know, I consider them, but
22   what you propose and what PTAB adopted,
23   you know, to the extent that that's
24   supposed to add something to the plain

28

1    meaning of pharmaceutical batch, I'm
2    not going to do that.
3            You know, I've done a lot of
4    these cases, I've never seen before
5    where somebody tried to put FDA
6    definition of something in as -- you
7    know, for a patent, you know, and if it
8    helps, I mean -- to me it seems like
9    the issue boils down to here as to
10   whether I should give it its plain
11   meaning, which after all is what the
12   defendants proposed that they add in
13   the same step that we're talking about.
14   And this is in the '901 patent rather
15   than the other patent.
16           MR. CARSTEN:  I think that's
17   exactly right, Your Honor, and if it's
18   easier for the Court -- what we tried
19   to do here is to put words around the
20   plain -- what we think is the plain and
21   ordinary meaning.  If Your Honor is
22   more comfortable just going with plain
23   and ordinary meaning, we obviously
24   would be fine with that.

29

1      THE COURT:  Well, you know,
2  because -- and the reason why I say
3  this the defendants they do have the
4  plain and ordinary meaning, because
5  their definition is pharmaceutical
6  batch, blah, blah, blah.  And I really
7  don't think pharmaceutical is going to
8  be too difficult, and I understand
9  batch to be, you know, essentially
10  something that's made at one time.
11      And because of the other
12  limitations, it appears that it's going
13  to have at least 2.9 grams of
14  treprostinil in it, but that's
15  obviously a different limitation.  So,
16  why don't you hold your fire and let me
17  hear what the defendant has to say
18  about this one.
19      MR. SUKDUANG:  Thank you,
20  Your Honor.  Again, so I'm Sanya
21  Sukduang.  So, I'm going to jump ahead.
22      Again, similar to the
23  '066 --
24      THE COURT:  So, actually

30

1  just as -- do you kind of as a starting
2  point agree that really this is just a
3  plain meaning of pharmaceutical batch
4  with the limitation about what you want
5  to add in?
6      MR. SUKDUANG:  Yes.  So, the
7  term pharmaceutical we understand is
8  defined in the spec as just something
9  that's going to be safe and nontoxic.
10  A batch is what quantity of drug, 2.9
11  grams, for instance.  The issue --
12  you're right, Your Honor, the issue is
13  what are the steps used to make this,
14  and I go to here in the '901 IPR.
15      And, again --
16      THE COURT:  So, let me just
17  interrupt you for a second, because
18  when I was reading this, you know, I
19  did note at least something about a
20  similarity between the argument term
21  four and term five which contain the
22  '901 patent, and yet -- and when I was
23  reading it, I thought there was sort of
24  different evidence offered for one than

31

1  there is for the other.
2      And now that I'm sitting
3  here I'm wondering if you could just
4  explain to me why that makes sense.
5  Maybe -- I'm not saying it doesn't, but
6  I'm just curious is it because we're
7  basically -- that we're trying it in
8  one place, add it into the
9  pharmaceutical batch term, and the
10  other place we're trying to add it in
11  as sort of a process limitation?
12      MR. SUKDUANG:  Yes.  So, you
13  mentioned terms four and five.  I think
14  it's terms one and four.  It's a
15  process and pharmaceutical batch.  Is
16  that what --
17      THE COURT:  Well, no, I
18  didn't really mean that, because the
19  term one is in the one patent, term
20  four is in the '901 patent, and term
21  five is in the '901 patent.
22      MR. SUKDUANG:  Okay, I
23  understand, Your Honor.
24      So, the evidence is

32

1  different.  There are different --
2  there are different limitations within
3  the claim.  This one is the
4  pharmaceutical batch limitation, the
5  other limitation is contacting the
6  solution.  So, the evidence is
7  different and the process steps between
8  the two are different, and so, the
9  evidence is --
10      THE COURT:  And from the
11  point of view of whatever Liquidia is
12  trying to accomplish here, does it --
13  if you win one of these two, are you
14  happy?
15      MR. SUKDUANG:  Yes, if we
16  win one of the two, we're happy.  Of
17  course, we believe we're correct on
18  both.
19      THE COURT:  But I guess what
20  I'm wondering is the thing that you get
21  from winning one of these.  If you win
22  it in one place, is it kind of
23  redundant of what you get if you win it
24  in the other place?

# EXHIBIT 10

## HIGHLY CONFIDENTIAL



Deposition of:

# Hitesh Batra, Ph.D.

*September 17, 2021*

In the Matter of:

# United Therapeutics Corporation vs Liquidia Technologies Inc

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

HIGHLY CONFIDENTIAL

```
                                            Page 1

1            IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF DELAWARE

2

3    - - - - - - - - - - - - x

        UNITED THERAPEUTICS    :

4       CORPORATION,           :

                               :

5          Plaintiff,          :

                               :

6         v.                   :   Case No.

                               :   1:20-cv-755

7       LIQUIDIA                :

        TECHNOLOGIES, INC.,    :

8                              :

           Defendant.          :

9    - - - - - - - - - - - - x

10

11                       - - -

12             Friday, September 17, 2021

13                       - - -

14

15              Highly Confidential

16          Under the Protective Order

17

18

19   REMOTE ZOOM deposition of HITESH BATRA, Ph.D.,

20   beginning at 10:04 a.m. EST, before Christina S.

21   Hotsko, RPR, CRR, when were present on behalf of

22   the respective parties:
```

HIGHLY CONFIDENTIAL



Page 74

1 and they're outside the scope.
2      THE WITNESS:  My answers will be to the
3 best of my knowledge, whether it is in my personal
4 capacity or the corporate capacity based on the
5 process -- question that you would ask me.      11:28:04
6      MR. SUKDUANG:  And we disagree that
7 they're outside the scope.  There are topics
8 specifically talking about the examples and the
9 work in the '066 and the '901 patents.  But we'll
10 resolve that at the end.      11:28:17
11      Dr. Batra, I'd like to mark as Batra
12 Exhibit Number 7 U.S. patent number 9,604,901.
13      (Batra Deposition Exhibit 7 marked for
14      identification and attached to the
15      transcript.)      11:28:35
16 BY MR. SUKDUANG:
17  Q.  Let me know when you're there.
18  A.  Sure.
19  Q.  Do you have it in front of you?
20  A.  Yeah, I'm opening that one.      11:28:57
21  Q.  Oh, sorry.
22  A.  Yeah, it's there.

Page 75

1  Q.  Okay.  Dr. Batra, do you have in front of
2 you patent number 9,604,901?
3  A.  That's right.  I have it.
4  Q.  And can we refer to this as the
5 '901 patent?      11:29:08
6  A.  Yeah.
7  Q.  Okay.  And you're a named inventor on the
8 '901 patent?
9  A.  That's right.
10  Q.  I can have you compare, but let me ask      11:29:14
11 you the question first.
12      Do you understand that the specification
13 of the '901 patent is the same as the '066 patent?
14  A.  Yeah.  Most likely -- most probably they
15 are.      11:29:43
16  Q.  Okay.  So again, my questions
would that be
19 reflective of
      11:29:54
21      MR. CARSTEN:  Object to the form of the
22 question.  Outside the scope.

Page 76

1      THE WITNESS:  Yeah, I mean,
      11:30:14
6 BY MR. SUKDUANG:
7
12      MR. CARSTEN:  Object to the form of the
13 question.
14      Go ahead and answer.
15      THE WITNESS:  (No verbal response.)      11:30:35
16 BY MR. SUKDUANG:
17  Q.  And with respect to Dr. Tuladhar,
18 Dr. Penmasta and Dr. Walsh, their contribution to
19 the '901 patent, was that similar to their
20 contribution to the '066 patent?      11:30:41
21      MR. CARSTEN:  Same objection.
22      THE WITNESS:

Page 77

1
2 BY MR. SUKDUANG:
3  Q.  Based on your understanding -- based on
4 your understanding of their contribution to the
5 subject matter of the '901 patent, would their      11:30:58
6 contribution, to your understanding, be the same
7 as their contribution to the '066 patent?
8  A.
9      MR. SUKDUANG:  I'm going to mark as
10 Exhibit 8 -- it should be a certificate of      11:31:29
11 correction for the '901 patent.
12      (Batra Deposition Exhibit 8 marked for
13      identification and attached to the
14      transcript.)
15 BY MR. SUKDUANG:      11:31:37
16  Q.  Let me know --
17  A.  Sure.
18  Q.  -- when you have that in front of you.
19      Do you have it in front of you,
20 Batra?      11:31:48
21  A.  I'm opening.  You said Exhibit 8?
22  Q.  Exhibit 8.  Yes.

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL



Page 78

1    A. Not yet there.  I have only up to
2  Exhibit 7.  I refreshed it, and it shows up to 7
3  only.
4       I have it now.
5    Q. So Dr. Batra, do you have in front of you    11:32:20
6  as Batra Exhibit Number 8 a certificate of
7  correction for U.S. patent number 9,604,901?
8    A. Yeah, I have it.
9    Q. You can put that aside.  I just wanted to
10 put that into the record.                          11:32:40
11      Dr. Batra, I'm going to mark as Batra
12 Exhibit Number 9 U.S. patent number 8,497,393.
13      (Batra Deposition Exhibit 9 marked for
14       identification and attached to the
15       transcript.)                      11:31:37
16 BY MR. SUKDUANG:
17   Q. Let me know when you have that in front
18 of you.
19   A. Sure.  I have it in front of me.
20   Q. Dr. Batra, you have in front of you    11:33:15
21 Exhibit 9, U.S. patent number 8,497,393?
22   A. That's right.

Page 79

1    Q. And you are a named inventor on this
2  patent; is that right?
3    A. That's right.
4    Q. And Dr. Tuladhar, Dr. Penmasta, and
5  Dr. Walsh are also named inventors on the    11:33:29
6  '393 patent?
7    A. That's right.
8    Q. And we discussed earlier you provided
9  deposition testimony in the past concerning the
10 '393 patent; is that right?                  11:33:44
11   A. That's right.
12   Q. To the best of your understanding, is the
13 specification of the '393 patent the same as the
14 '901 and '066 patents?
15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮    11:34:02
16   Q. The processes that are disclosed by UTC
17 in the '393 patent, they are the same processes
18 disclosed in the '066 and '901 patents?
19      MR. CARSTEN:  Object to the form of the
20 question.  Outside the scope.          11:34:13
21      THE WITNESS: ▮▮▮▮▮▮▮▮▮▮▮

Page 80

1  BY MR. SUKDUANG:
2    Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮
7       MR. CARSTEN:  Object to the form of the
8  question.  Outside the scope.
9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮                 11:35:47
21 BY MR. SUKDUANG:
22   Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 81

   ▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮                 11:36:10
6       MR. CARSTEN:  Object to the form of the
7  question.  Outside the scope.
8       THE WITNESS: ▮▮▮▮▮▮▮▮
9  BY MR. SUKDUANG:
10   Q. Okay.  And Dr. Batra, there might be some    11:36:18
11 delay.  Just so that your counsel can get their
12 objection and you're not speaking over, just wait
13 until he finishes speaking before you provide your
14 answer.
15   A. Sure.                      11:36:31
16      MR. CARSTEN:  Thank you, Sanya.
17 BY MR. SUKDUANG:
18   Q. Dr. Batra, I'd like to mark as Batra
19 Exhibit Number 10 a document titled, ▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL



Page 82

1    A. And that's Exhibit 9, you said?

2    Q. It should be Exhibit 9 -- excuse me,

3 Exhibit 10.

4    A. Okay.

5    (Batra Deposition Exhibit 10 marked for        11:37:44

6    identification and attached to the

7    transcript.)

8    THE WITNESS:  10 isn't there yet.  There

9 is a little lag.

10 BY MR. SUKDUANG:                                 11:37:48

11    Q. Sure.  That's fine.  While you're waiting

12 for that to load, it's production number

13 UTC_OREN_00844298 --

14    A. Yeah, I have it there.

15    Q. I'm sorry, Dr. Batra.                       11:38:15

16    -- through 00844309.

17    A. That's right.  I have it in front of me.

18    Q. Dr. Batra, have you seen this document

19 before?

20    A. Yeah, I have seen this one earlier.         11:38:27

21

Page 83

1

2    Do you see that?

3    A. Oh, yeah.  I see that.

4    Q. Have you seen this document, Exhibit 10,

5 before that deposition in                         11:38:52

6    MR. CARSTEN:  Object to the form of the

7 question.  And caution the witness not to reveal

8 attorney-client communications.

9    THE WITNESS:  It's -- just going by

10 memory, I'm not sure on that part.  I would -- I   11:39:05

11 may have, I may not have.

12 BY MR. SUKDUANG:

13    Q. Okay.  Do you know what this document is,

14 Dr. Batra?

15

19    Q. And why would -- why did UTC generate

20 this report?                                       11:39:32

21    MR. CARSTEN:  Object to the form of the

22 question.

Page 84

1    THE WITNESS:

Page 85

1

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL



Page 86

2        MR. CARSTEN:  Object to the form of the
3    question.  Outside the scope.
4        THE WITNESS:

13       Do you see that?
14    A.  That's right.
15

18       MR. CARSTEN:  Object to the form of the
19    question.
20       THE WITNESS:

Page 87

18    Q.  Okay.  So let me ask you a different
19    question.
20

Page 88

11:44:26
6        MR. CARSTEN:  Object to the form of the
7    question.  Outside the scope.
8  BY MR. SUKDUANG:
9

Page 89

17    A.  Repeat one more time.  I want to make
18    sure I understand your question.
19    Q.  Sure.
20

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL



Page 90

Page 91

2    Q.  Okay.  Do you know who wrote Batra

3  Exhibit Number 10, the document we're looking at?

4    A.

7    Q.  If you don't know, that's fine.

8       Can you turn to page 2?  It ends in the

9  production number at the bottom 844299.

10    A.  Page 2 of this exhibit.  And you're    11:48:25

11  saying the last line?

12    Q.  Yeah -- no, I was just giving you the

13  numbers.

14       But are you at page 2?

Page 92

Page 93

17       MR. CARSTEN:  Object to the form of the

18  question.

19

24 (Pages 90 - 93)



Page 346

1

3        MR. CARSTEN:  Object to the form of the
4 question.  Beyond the scope.

5

13        MR. CARSTEN:  Object to the form of the
14 question.  Beyond the scope.

15

Page 348

19        MR. CARSTEN:  Object to the form of the
20 question.                      17:41:41
21        MR. SUKDUANG:  Let me rephrase.
22

2 BY MR. SUKDUANG:
3     Q.  Well, examples 1 through 5 in the
4 '066 patent are identical to examples 1 through 5
5 of the '393 patent, are they not?        17:39:59
6        MR. CARSTEN:  Object to the form of the
7 question.  Beyond the scope.
8        THE WITNESS:

18        MR. CARSTEN:  Object to the form of the
19 question.  Misstates testimony.  Beyond the scope.
20        THE WITNESS:

Page 349

1 BY MR. SUKDUANG:
2

                                       17:42:18
6        MR. CARSTEN:  Object to the form of the
7 question.
8

HIGHLY CONFIDENTIAL



Page 354

1     MR. SUKDUANG:  Thank you.

2     (Batra Deposition Exhibit 19 marked for

3     identification and attached to the

4     transcript.)

5     THE WITNESS:  I still really do not get     17:47:46

6 the point.  What are you trying to --

7 BY MR. SUKDUANG:

8   Q.  There is no question pending, Dr. Batra.

9   A.

                                                              17:48:00

16   A.

18   Q.

Page 356

1 9,593,066.

2     Do you see that?

3   A.  Bottom of the -- all the way to the

4 bottom?  What page number are we talking about?

5   Q.  Page 1 of 5.  There's a section 1,     17:50:34

6 "General."

7   A.  Okay.

8   Q.  Do you see that?

9   A.  Yes.

10   Q.  Underneath that is the '066 patent?     17:50:40

11   A.  That's right.

12   Q.  And that's your patent that you're a

13 named inventor on?

14   A.  That's right.  The '066 patent.

15   Q.

Page 355

1     Do you have Exhibit 18 in front of you,

2 Dr. Batra?  Or Exhibit 19.  I apologize.

3   A.  Okay.  I need to go back.  I have to

4 download the 19.

5   Q.  Let me know when you have it.     17:49:11

6   A.  I am on Exhibit 19.

7   Q.  So Exhibit 19 is a document bearing

8 production numbers UTC_LIQ00201693 through 201697,

9 titled, "Patent information submitted upon and

10 after approval of an NDA or supplement."     17:49:41

11     Have you seen this document before,

12 Dr. Batra?

13   A.  I saw this while my preparation.

14   Q.  Okay.  And do you understand this is a

15 document United Therapeutics submitted to the FDA?     17:49:57

16   A.  I understand that.

17   Q.  And you'd anticipate that United

18 Therapeutics would provide truthful and accurate

19 information to the FDA?

20   A.  I would believe so.     17:50:12

21   Q.  And if you see in the bottom towards --

22 on page 1, it says, United States patent number

90 (Pages 354 - 357)

HIGHLY CONFIDENTIAL



Page 358

Page 360

Page 359

Page 361

17:53:48

1    MR. SUKDUANG:  Sorry, Doug.

2    MR. CARSTEN:  Go ahead.

3  BY MR. SUKDUANG:

13  BY MR. SUKDUANG:

16  BY MR. SUKDUANG:

17   Q.

Page 362



9  BY MR. SUKDUANG:

10  Q.

17:56:37

16      MR. SUKDUANG:  Okay.  Can you bring up

17  Exhibit 20, Brittany?

18      You can put Exhibit 19 away, Dr. Batra.

19      THE WITNESS:  Sure.  I did that.

20      MR. SUKDUANG:  And Exhibit 20 should pop   17:56:58

21  up momentarily.

22      MS. CAZAKOFF:  Just confirming it's doc

Page 363

1  18, Sanya.

2      MR. SUKDUANG:  Yes.

3      MS. CAZAKOFF:  Okay.

4      (Batra Deposition Exhibit 20 marked for

5  identification and attached to the   17:57:08

6  transcript.)

7  BY MR. SUKDUANG:

8  Q.  Has it populated, Dr. Batra?

9  A.  Exhibit 20?  Yes.

10  Q.  Exhibit 20 is a document bearing   17:58:16

11  production number UTC_LIQ00201698 through 201702.

12      Have you seen this document in preparing

13  for your corporate testimony today, Dr. Batra?

14  A.  Yeah.  I think I saw this while my

15  preparation.   17:58:41

16  Q.  And does this concern a document

17  submitted by United Therapeutics to the FDA?

18  A.  That's what it says there.  I have to

19  believe that.

20  Q.  And under section 1, General, it concerns   17:58:53

21  patent number 9,604,901?

22  A.  Yeah.  Patent '901 that was approved by

Page 364

1  the U.S. Patent Office.

2  Q.  And you'd expect UTC to provide truthful

3  and accurate information to the FDA?

4  A.  I would believe so.

5  Q.  Do you have any reason to believe that   17:59:18

6  Exhibit 20 does not contain truthful or accurate

7  information?

8  A.  I don't have any reason.

9  Q.  Going back to Exhibit 19 -- you don't

10  have to bring it up.  I just have a question.   17:59:31

11      Do you have any reason to believe

12  Exhibit 19 contains -- does not contain truthful

13  or accurate information?

14      MR. CARSTEN:  Object to the form of the

15  question.   17:59:41

16      THE WITNESS:  Like I said, I believe -- I

17  trust in my company, and I believe in the legal

18  team that's working for our company.

19  BY MR. SUKDUANG:

20  Q.  Okay.   17:59:49

21      MR. SUKDUANG:  Why don't we take a

22  five-minute break so I can wrap things up.

Page 365

1      THE WITNESS:  Sure.

2      VIDEO TECHNICIAN:  We are going off the

3  record.  The time is 5:59 p.m.

4      (A recess was taken.)

5      VIDEO TECHNICIAN:  We are back on the   18:05:15

6  record.  The time is 6:05 p.m.

7      MR. SUKDUANG:  Dr. Batra, I have no

8  further questions for you.

9      I'm just going to note on the record that

10  Liquidity believes that the witness has not been   18:05:34

11  adequately prepared to testify regarding topics 5,

12  6, 7, 8, 9, 13, 14, 15.  And pending the court's

13  resolution to the parties' disputes regarding

14  30(b)(6) topics, we reserve the right to revisit

15  these issues.   18:06:04

16      Thank you for your time, Dr. Batra.  I

17  know it was a long day.

18      MR. CARSTEN:  We absolutely disagree with

19  that litany of supposed topics for which the

20  witness you claim was inadequately prepared.  I   18:06:15

21  think you've been wasting time with this witness

22  and having him go side by side and try to identify

92 (Pages 362 - 365)

HIGHLY CONFIDENTIAL

Page 366

1 differences in words between two voluminous
2 documents. I think that he adequately answered
3 and was more than adequately prepared to answer
4 every one of your questions.
5     That's our position. We have no further      18:06:33
6 questions. And we believe this deposition is
7 closed.
8     MR. SUKDUANG: For clarity, just for the
9 court, what do you mean by supposed topics? Are
10 the topics not real? Are they just imaginary? I   18:06:41
11 just want to make sure -- want to understand why
12 supposed topics.
13     MR. CARSTEN: The list of topics that you
14 identified and the meet and confer which resolved
15 the disputes about the scope of those topics.      18:06:52
16 Those topics.
17     MR. SUKDUANG: What do you mean by
18 supposed? Are they real or not real?
19     MR. CARSTEN: They are real in the sense
20 that, as we agreed in the meet and confers, that's  18:07:03
21 the proper scope of the topic. It isn't the topic
22 that you had served upon us.

Page 367

1     MR. SUKDUANG: Okay. We disagree, but we
2 can get the court to resolve that.
3     MR. CARSTEN: Sure.
4     MR. SUKDUANG: Thank you, Dr. Batra.
5     VIDEO TECHNICIAN: Stand by.              18:07:15
6     This marks the end of the deposition. We
7 are going off the record. The time is 6:07 p.m.
8     (Whereupon, at 6:07 p.m., the remote
9     Zoom videotaped deposition of HITESH
10    BATRA, Ph.D., was concluded.)
11
12
13
14
15
16
17
18
19
20
21
22

Page 368

1          C E R T I F I C A T E
2     I do hereby certify that the aforesaid
3 testimony was taken before me, pursuant to
4 notice, at the time and place indicated; that
5 said deponent was by me duly sworn to tell the
6 truth, the whole truth, and nothing but the
7 truth; that the testimony of said witness was
8 taken by me in stenotypy and thereafter reduced
9 to typewriting under my direction; that said
10 statement is a true record of the proceedings;
11 that I am neither counsel for, related to, nor
12 employed by any of the parties to the action in
13 which this statement was taken; and, further,
14 that I am not a relative or employee of any
15 counsel or attorney employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of this action.
18
19
20
21
22          CHRISTINA S. HOTSKO, RPR, CRR

93 (Pages 366 - 368)

# EXHIBIT 11

## HIGHLY CONFIDENTIAL



Deposition of:

# Sudersan Tuladhar , Ph.D

*September 14, 2021*

In the Matter of:

# United Therapeutics Corporation vs Liquidia Technologies Inc

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
 2

 3       _____
                                      :
 4       UNITED THERAPEUTICS      :
         CORPORATION,             :
 5                                :
               Plaintiff,         :
 6                                :
            v.                    : Case No.
 7                                :  1:20-cv-00755-UNA
         LIQUIDIA TECHNOLOGIES,   :
 8       INC.,                    :
                                  :
 9             Defendant.         :
         _____:

10

11         HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

12                Tuesday, September 14, 2021

13

14             Video Deposition of SUDERSAN TULADHAR,

15       PH.D., taken virtually via Zoom, with the witness

16       participating from his employment address at

17       United Therapeutics Corporation, 1040 Spring

18       Street, Silver Spring, Maryland, beginning at

19       8:56 a.m., before Ryan K. Black, a Registered

20       Professional Reporter, Certified Livenote

21       Reporter and Notary Public and for the

22       Commonwealth of Pennsylvania.

23

24

25
```



Page 94

1   exhibits to run through.
2       A.  Okay.  Number 9 I guess.
3           Yeah.  Page Number 9.
4           (Tuladhar Exhibit No. 9, a document
5   Bates Numbered UTC_LIQ00081720 through
6   UTC_LIQ00081738, was introduced electronically.)
7       Q.  So do you recognize this report,
8   Dr. Tuladhar?
9       A.  Yes.
10      Q.  And you --
11
12
13
14
15
16
17
18
19
20      Q.  Generally speaking, what -- what is
21
22
23
24

Page 95

1
2
3
4
5
6
7
8           MR. CHEEK:  Okay.  All right.  I think
9   I'd like to talk with Sanya off the record for a
10  bit, but I think we're -- we're wrapping up.  So
11  maybe another 10-minute break.
12          THE WITNESS:  Ten-minute break?  Okay.
13          THE VIDEOGRAPHER:  Please stand by.
14  The time is 11:16 a.m.  We're going off the
15  record.
16          (Recess taken.)
17          THE VIDEOGRAPHER:  Time is 11:29 a.m.
18  We're back on the record.
19          Please proceed, Counsel.
20  BY MR. CHEEK:
21      Q.  Hi, Dr. Tuladhar.
22      A.  Yes.
23      Q.  If you'll return back to Exhibit --
24  Exhibit 3, --
25      A.  Okay.

Page 96

1       Q.  -- the '066.
2       A.  Okay.  I'll do that part now.
3       Q.  I'd like to turn to Example 4 on Column
4   13.
5       A.  The same Exhibit 10, right.
6       Q.  No.  Exhibit 3, but -- sorry.  It's
7   confusing.  Example 4 in the '066 patent?
8       A.  Oh, Exhibit 4.  Okay.
9           MS. WU:  Exhibit 4.
10          THE WITNESS:  Okay.
11  BY MR. CHEEK:
12      Q.  Yeah.  It's Exhibit 4.  Sorry about
13  that.
14      A.  Okay.  I got this one.
15      Q.  So you're -- you're in the '066 patent,
16  right, Dr. Tuladhar?
17      A.  Yeah.  '066, yes.
18      Q.  Great.
19          Could you turn to Column 13?
20      A.  Okay.  I'm here now.
21      Q.  So I wanted to ask more about the
22  heptane slurry.
23      A.  Mm-hmm.
24      Q.  Does --

Page 97

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19      Q.  Okay.  I'd like to turn to Example 6.
20      A.  Example 6.
21          Example 6, yes.
22      Q.  Okay.  So
23
24      A.  Yes.
25      Q.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830



Page 98

```
 1
 8          MS. WU:  Objection to the form.
20
21
```

Page 99

```
 1
11          MS. WU:  Objection to form.
12          THE WITNESS:
20          MS. WU:  Same objection.
21
```

Page 100

```
 1
 8          MS. WU:  Same objections.
 9
11          MR. SUKDUANG:  Counsel, this is -- this
12  is Mr. Sukduang.  Can we just make sure we're not
13  speaking over everybody and that -- and -- and
14  that people pause so that the record is clear?
15          THE WITNESS:  Yeah.
16          MS. WU:  Yes.  I think we're trying our
17  best.
18  BY MR. CHEEK:
19      Q.
```

Page 101

```
 6          MS. WU:  Same objection.
 7  BY MR. CHEEK:
 8      Q.  Okay.  Okay.  I just have a couple
 9  general questions before we wrap up, if that
10  works for you?
11          Are you -- are you still employed at
12  UTC, Dr. Tuladhar?
13      A.  Yes, I am.
14      Q.  And what -- what's your current role?
15      A.
```

26 (Pages 98 - 101)

Page 106

```
1    should be Exhibit 10 compared to Exhibits 4 and
2    5.
3        A.  You want me to compare this one with
4    the other one, you said?
5        Q.  So I just wanted to confirm that they
6    have the same specification?
7        Do -- do you understand that --
8        MS. WU:  Do you want him to read all
9    three specifications?
10       THE WITNESS:  I mean, the
11   specification, in this sense, what does this
12   explain about?
13       MR. CHEEK:  Let me rephrase.
14   BY MR. CHEEK:
15       Q.  The specification is the text
16   describing the invention besides the claims,
17   so all of that background information.
18       A.  I think so.  It says the same, I think.
19       Q.  So do you understand that you're an
20   inventor on this patent, Exhibit 10?
21       A.  Yes.
22       Q.  And do you understand that this patent
23   has the same specification as the '066 and '901
24   patents?
25       A.  Yes.
```

Page 107



```
12       Q.
14       MS. WU:  Objection to form.  Calls for
15   expert testimony.
16       THE WITNESS:
17   BY MR. CHEEK:
18       Q.
21       MS. WU:  Same objection.
22       THE WITNESS:
23   BY MR. CHEEK:
24       Q.
```

Page 108

```
2        MS. WU:  Same objections.
3        THE WITNESS:
4    BY MR. CHEEK:
5        Q.
8        MS. WU:  Same objections.
9        THE WITNESS:
10   BY MR. CHEEK:
11       Q.
15       A.
16       MS. WU:  Objection to form.  Calls for
17   expert testimony.
18   BY MR. CHEEK:
19       Q.
23       MS. WU:  Same objections.
24       THE WITNESS:
25   BY MR. CHEEK:
```

Page 109

```
1        Q.
4        MS. WU:  Same objections.
5        THE WITNESS:
6    BY MR. CHEEK:
7        Q.
10       MS. WU:  Same objection.
11       THE WITNESS:
15       MS. WU:  Objection to form.  Calls for
16   expert testimony.
17   BY MR. CHEEK:
18       Q.
21       MS. WU:  Same objections.
22       THE WITNESS:
24   BY MR. CHEEK:
25       Q.  Okay.  For -- for the deposition today,
```

28 (Pages 106 - 109)

Page 110

1  did you review the patents beforehand?
2       A.  Which one is that?
3       Q.  Did -- did you review the '066 and '901
4  patents before the deposition today?
5       A.  No.
6       Q.  You didn't?
7          Did you speak with anyone to prepare
8  for the deposition today?
9       A.  No.
10      Q.  Okay.  All right.  Sorry.  One second.
11         Did you meet with counsel in
12  preparation for the deposition today?
13         MS. WU:  You can say yes or no.
14         THE WITNESS:  No.
15 BY MR. CHEEK:
16      Q.  By phone or by Zoom?
17      A.  We introduced, yes.
18      Q.  Sorry.  I didn't catch the last part.
19      A.  We introduced over the Zoom.
20      Q.  Did -- did you have a Zoom before this
21  call to prepare?
22         MS. WU:  You may answer yes or no.
23         THE WITNESS:  Yes.
24 BY MR. CHEEK:
25      Q.  When -- when did you speak with counsel

Page 111

1  over Zoom?
2       A.  Yesterday we talked -- we -- we
3  introduced each other.
4       Q.  Was yesterday the only time you spoke?
5       A.  Last week, also.
6       Q.  And for how long were those meetings?
7       A.  This is about an hour and discuss
8  something, our -- our interests with each other.
9       Q.  Okay.  And who -- who did you speak
10  with yesterday and last week?
11      A.  Huiya Wu.
12         MR. CHEEK:  Okay.  Great.  I have no
13  further questions.  Thank you very much, Dr.
14  Tuladhar.
15         THE WITNESS:  Thank you, Dr. --
16  Mr. Cheek.
17         MR. CHEEK:  Okay.
18         MS. WU:  I just have a few questions,
19  Dr. Tuladhar, if you can spare a little bit more
20  time?
21         THE WITNESS:  Sure.
22            EXAMINATION
23 BY MS. WU:
24      Q.  ███████████████████████

Page 112

1
2       A.  ████
3       Q.  ████████████████████
4  ████████████████████████
5
6       A.  ██████████████
7
8       Q.  ████
9
10
11         MR. CHEEK:  Objection to form.
12         THE WITNESS:  ████████████
13
14 BY MS. WU:
15      Q.  ██████████████████
16
17         MR. CHEEK:  Objection to form.
18         THE WITNESS:  ██████
19 BY MS. WU:
20      Q.  ██████████████
21      A.  ██████████
22      Q.  ████████████████
23
24
25         MR. CHEEK:  Objection to form.

Page 113

1         THE WITNESS:
2  ██████████████████
3         MS. WU:  Thank you.  I -- I don't have
4  any further questions at this time.  Before I
5  forget, I'd also like to mark this transcript as
6  highly confidential under our case protective
7  order.
8         MR. CHEEK:  Okay.  Thank you very much,
9  Dr. Tuladhar.
10         THE WITNESS:  Thank you.
11         THE VIDEOGRAPHER:  Please stand by
12  while I go off the record.  Time is 11:54 a.m.
13  This concludes today's testimony given by
14  Sudersan Tuladhar.  We are now off the record.
15         (Deposition concluded -- 11:54 a.m.)
16
17
18
19
20
21
22
23
24
25

29 (Pages 110 - 113)

# EXHIBIT 12

## HIGHLY CONFIDENTIAL

| DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>Food and Drug Administration | Form Approved: OMB No. 0910-0513<br>Expiration Date: 09/30/2019<br>See OMB Statement on last page. |
|---|---|

## PATENT INFORMATION SUBMITTED UPON AND AFTER APPROVAL OF AN NDA OR SUPPLEMENT

### *For Each Patent That Claims a Drug Substance (Active Ingredient), Drug Product (Formulation or Composition) and/or Method of Use*

NDA Number
022387

Name of NDA Holder

United Therapeutics Corporation

---

*Refer to instruction sheet (Form FDA 3542 Supplement) for more information.*

*The following is provided in accordance with Section 505(b) and (c) of the Federal Food, Drug, and Cosmetic Act.*

| Trade Name | Active Ingredient(s) |
|---|---|
| Tyvaso® | treprostinil |

| Dosage Form(s) | Strength(s) |
|---|---|
| Solution | 0.6 mg/ml |

| Route(s) of Administration | Type of Use |
|---|---|
| Inhalation | ☒ Prescription       ☐ Over-the-Counter |

Approval Date of NDA or Supplement to which patent information relates *(Enter date, and select either NDA or Supplement.)*

07/30/2009    ☒ NDA    ☐ Supplement

This patent declaration form is required to be submitted to the Food and Drug Administration (FDA) within thirty (30) days after the date of approval of an NDA or supplement or within thirty (30) days of issuance of a patent as required by 21 CFR 314.53(c)(2)(ii) at the address provided in 21 CFR 314.53(d)(4). Except as provided in 21 CFR 314.53(f)(1), a patent declaration form containing an amendment to the description of the approved method(s) of use claimed by the patent is required to be submitted to FDA within thirty (30) days of patent issuance, within thirty (30) days of approval of a corresponding change to product labeling, or within thirty (30) days of a decision described in 21 CFR 314.50(i)(4)(i)(C) or 314.94(a)(12)(vi)(A)(3).

***FDA will not list patent information if the patent declaration does not contain the information required by 21 CFR § 314.53(c)(2) or the patent declaration indicates the patent is not eligible for listing.***

---

*For each patent submitted for the approved NDA or supplement referenced above, you must submit the information described below. If you are not submitting any patents for this NDA or supplement, complete the section above and sections 5 and 6.*

**1. GENERAL** *(Please note: If 1.a is NOT entered, then section 5 later in form must be marked as "Yes" in its check box.)*

| a.  United States Patent Number<br>**9,593,066** | b.  Issue Date of Patent<br>03/14/2017 | c.  Expiration Date of Patent<br>12/15/2028 |
|---|---|---|

d.  Name of Patent Owner
United Therapeutics Corporation

| Address *(of Patent Owner)*<br>55 T.W. Alexander Drive | City<br>Research Triangle Park |
|---|---|

| State/Province/Region<br>North Carolina | Country<br>USA | ZIP or Postal Code<br>27709 |
|---|---|---|

| FAX Number *(if available)*<br>█████████ | Telephone Number<br>█████████ | E-Mail Address *(if available)*<br>█████████ |
|---|---|---|

| *Click for additional set of 1.d. entries (includes all address and related contact items above). May be repeated.* | Add Section 1.d. |
|---|---|

---

**FORM FDA 3542 (8/16)**          Page 1 of 5          PSC Publishing Services (301) 443-6740    EF

HIGHLY CONFIDENTIAL          UTC_LIQ00201693

| e. <u>Name of agent or representative</u> who resides or maintains a place of business within the United States authorized to receive notice of patent certification under section 505(b)(3) and (j)(2)(B) of the Federal Food, Drug, and Cosmetic Act and 21 CFR 314.52 and 314.95 (if patent owner or NDA holder does not reside or have a place of business within the United States)<br><br>Name: | Address *(of agent or representative named in 1.e.)*<br><br>City/State |
|---|---|
| | ZIP Code | FAX Number *(if available)* |
| | Telephone Number | E-Mail Address *(if available)* |

*Click for additional set of 1.e. entries (includes all address and related contact items above). May be repeated.*  [Add Section 1.e.]

**f. Name of NDA Holder**
United Therapeutics Corporation

| Address *(of NDA Holder)*<br>55 T.W. Alexander Drive | City<br>Research Triangle  Park |
|---|---|

| State/Province/Region<br>North Carolina | Country<br>USA | ZIP or Postal Code<br>27709 |
|---|---|---|

| FAX Number *(if available)*<br>██████████ | Telephone Number<br>██████████ | E-Mail Address *(if available)*<br>██████████ |
|---|---|---|

| g.  Has the patent referenced above been submitted previously for listing for this drug product? | ☐ Yes   ☒ No |
|---|---|

h.  If the answer to question 1.g. is "Yes," identify all change(s) from the previously submitted Form 3542 and specify whether each change is related to the patent or related to an FDA action or procedure.

*For the patent referenced above, provide the following information on whether the patent claims the drug substance, drug product, or method of use that is the subject of the approved NDA or supplement. FDA will not list patent information if the patent declaration does not contain the information required by 21 CFR § 314.53(c)(2) or the patent declaration indicates the patent is not eligible for listing.*
- *If the patent is eligible for listing as claiming the drug substance and section 2 is completed, it is not necessary to complete section 3 even if the patent also is eligible for listing as claiming the drug product.*
- *If the patent is eligible for listing as claiming the drug product and section 3 is completed, it is not necessary to complete section 2 even if the patent also is eligible for listing as claiming the drug substance.*

*FDA will consider incomplete a patent declaration that does not include a response to all required questions contained within each section below applicable to the patent referenced above.*

**FORM FDA 3542 (8/16)**          Page 2 of 5

HIGHLY CONFIDENTIAL                                    UTC_LIQ00201694



FORM FDA 3542 (8/16)                                    Page 3 of 5

HIGHLY CONFIDENTIAL

UTC_LIQ00201695

**5. NO RELEVANT PATENTS**

For this NDA or supplement, there are no relevant patents that claim the approved drug substance (active ingredient) or the approved drug product (formulation or composition) or approved method(s) of use with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product.      ☐ Yes

**6. DECLARATION CERTIFICATION**

6.1   *The undersigned declares that this is an accurate and complete submission of patent information for the NDA or supplement approved under section 505 of the Federal Food, Drug, and Cosmetic Act. This time-sensitive patent information or response to a request under 21 CFR 314.53(f)(1) is submitted pursuant to 21 CFR 314.53. I attest that I am familiar with 21 CFR 314.53 and this submission complies with the requirements of the regulation. I verify under penalty of perjury that the foregoing is true and correct.*

*Warning: A willfully and knowingly false statement is a criminal offense under 18 U.S.C. 1001.*

| 6.2  Authorized Signature of NDA Holder or Patent Owner  *(Attorney, Agent, Representative or other Authorized Official) (Provide Information below)* | Date Signed |
|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓   ▓▓▓▓▓▓▓▓▓▓   [ Sign ] | |

| 6.3  Countersignature of Authorized U.S. Agent | Date Signed |
|---|---|
| [ Countersign ] | |

NOTE: Only an NDA holder may submit this declaration directly to the FDA. A patent owner who is not the NDA holder is authorized to sign the declaration but may not submit it directly to FDA. 21 CFR 314.53(c)(4) and (d)(4).

Check applicable box and provide information below.

| | ☒ NDA Holder | ☐ NDA Holder's Attorney, Agent (Representative) or Other Authorized Official |
|---|---|---|
| | ☐ Patent Owner | ☐ Patent Owner's Attorney, Agent (Representative) or Other Authorized Official |

Name
Rex Mauthe, Vice President Regulatory Affairs, United Therapeutics Corp.

| Address | City |
|---|---|
| 55 T.W. Alexander Drive | Research Triangle Park |

| State/Province/Region | Country | ZIP or Postal Code |
|---|---|---|
| North Carolina | USA | 27709 |

| FAX Number *(if available)* | Telephone Number | E-Mail Address *(if available)* |
|---|---|---|
| ▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓ |

FORM FDA 3542 (8/16)                                Page 4 of 5

HIGHLY CONFIDENTIAL                                                  UTC_LIQ00201696

This section applies only to requirements of the Paperwork Reduction Act of 1995.

**\*DO NOT SEND YOUR COMPLETED FORM TO THE PRA STAFF EMAIL ADDRESS BELOW.\***

The burden time for this collection of information is estimated to average 10 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden, to:

> Department of Health and Human Services
> Food and Drug Administration
> Office of Operations
> Paperwork Reduction Act (PRA) Staff
> *PRAStaff@fda.hhs.gov*

> *"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

HIGHLY CONFIDENTIAL                                                                 UTC_LIQ00201697

# EXHIBIT 13

## HIGHLY CONFIDENTIAL

| DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>Food and Drug Administration | Form Approved: OMB No. 0910-0513<br>Expiration Date: 09/30/2019<br>See OMB Statement on last page. |
|---|---|

## PATENT INFORMATION SUBMITTED UPON AND AFTER APPROVAL OF AN NDA OR SUPPLEMENT
### *For Each Patent That Claims a Drug Substance (Active Ingredient), Drug Product (Formulation or Composition) and/or Method of Use*

**NDA Number**
022387

**Name of NDA Holder**
United Therapeutics Corporation

---

*Refer to instruction sheet (Form FDA 3542 Supplement) for more information.*

***The following is provided in accordance with Section 505(b) and (c) of the Federal Food, Drug, and Cosmetic Act.***

| Trade Name | Active Ingredient(s) |
|---|---|
| Tyvaso® | treprostinil |
| **Dosage Form(s)** | **Strength(s)** |
| Solution | 0.6 mg/mL |
| **Route(s) of Administration** | **Type of Use** |
| Inhalation | ☒ Prescription   ☐ Over-the-Counter |

**Approval Date of NDA or Supplement to which patent information relates** *(Enter date, and select either NDA or Supplement.)*

07/30/2009   ☒ NDA   ☐ Supplement

This patent declaration form is required to be submitted to the Food and Drug Administration (FDA) within thirty (30) days after the date of approval of an NDA or supplement or within thirty (30) days of issuance of a patent as required by 21 CFR 314.53(c)(2)(ii) at the address provided in 21 CFR 314.53(d)(4). Except as provided in 21 CFR 314.53(f)(1), a patent declaration form containing an amendment to the description of the approved method(s) of use claimed by the patent is required to be submitted to FDA within thirty (30) days of patent issuance, within thirty (30) days of approval of a corresponding change to product labeling, or within thirty (30) days of a decision described in 21 CFR 314.50(i)(4)(i)(C) or 314.94(a)(12)(vi)(A)(3).

***FDA will not list patent information if the patent declaration does not contain the information required by 21 CFR § 314.53(c)(2) or the patent declaration indicates the patent is not eligible for listing.***

---

***For each patent submitted for the approved NDA or supplement referenced above, you must submit the information described below. If you are not submitting any patents for this NDA or supplement, complete the section above and sections 5 and 6.***

**1. GENERAL** *(Please note: If 1.a is NOT entered, then section 5 later in form must be marked as "Yes" in its check box.)*

| a. United States Patent Number<br>**9,604,901** | b. Issue Date of Patent<br>03/28/2017 | c. Expiration Date of Patent<br>12/15/2028 |
|---|---|---|

| d. Name of Patent Owner |
|---|
| United Therapeutics Corporation |

| Address *(of Patent Owner)*<br>55 T.W. Alexander Drive | City<br>Research Triangle Park |
|---|---|

| State/Province/Region<br>North Carolina | Country<br>USA | ZIP or Postal Code<br>27709 |
|---|---|---|

| FAX Number *(if available)*<br>███████ | Telephone Number<br>███████ | E-Mail Address *(if available)*<br>███████ |
|---|---|---|

*Click for additional set of 1.d. entries (includes all address and related contact items above). May be repeated.*   [ Add Section 1.d. ]

---

**FORM FDA 3542 (8/16)**   Page 1 of 5   PSC Publishing Services (301) 443-6740   EF

HIGHLY CONFIDENTIAL   UTC_LIQ00201698

| e. <u>Name of agent or representative</u> who resides or maintains a place of business within the United States authorized to receive notice of patent certification under section 505(b)(3) and (j)(2)(B) of the Federal Food, Drug, and Cosmetic Act and 21 CFR 314.52 and 314.95 (if patent owner or NDA holder does not reside or have a place of business within the United States)<br><br>Name: | Address (of agent or representative named in 1.e.) |
|---|---|
| | City/State |
| | ZIP Code / FAX Number (if available) |
| | Telephone Number / E-Mail Address (if available) |

*Click for additional set of 1.e. entries (includes all address and related contact items above). May be repeated.*  [ Add Section 1.e. ]

**f.  Name of NDA Holder**
United Therapeutics Corporation

| Address (of NDA Holder)<br>55 T.W. Alexander Drive | City<br>Research Triangle Park |
|---|---|

| State/Province/Region<br>North Carolina | Country<br>USA | ZIP or Postal Code<br>27709 |
|---|---|---|

| FAX Number (if available)<br>████████ | Telephone Number<br>████████ | E-Mail Address (if available)<br>████████ |
|---|---|---|

**g.  Has the patent referenced above been submitted previously for listing for this drug product?**   ☐ Yes   ☒ No

**h.  If the answer to question 1.g. is "Yes," identify all change(s) from the previously submitted Form 3542 and specify whether each change is related to the patent or related to an FDA action or procedure.**

*For the patent referenced above, provide the following information on whether the patent claims the drug substance, drug product, or method of use that is the subject of the approved NDA or supplement. FDA will not list patent information if the patent declaration does not contain the information required by 21 CFR § 314.53(c)(2) or the patent declaration indicates the patent is not eligible for listing.*
- *If the patent is eligible for listing as claiming the drug substance and section 2 is completed, it is not necessary to complete section 3 even if the patent also is eligible for listing as claiming the drug product.*
- *If the patent is eligible for listing as claiming the drug product and section 3 is completed, it is not necessary to complete section 2 even if the patent also is eligible for listing as claiming the drug substance.*

*FDA will consider incomplete a patent declaration that does not include a response to all required questions contained within each section below applicable to the patent referenced above.*

HIGHLY CONFIDENTIAL                                             UTC_LIQ00201699



FORM FDA 3542 (8/16)                    Page 3 of 5

HIGHLY CONFIDENTIAL

UTC_LIQ00201700

[black rectangle]

## 5. NO RELEVANT PATENTS

For this NDA or supplement, there are no relevant patents that claim the approved drug substance (active ingredient) or the approved drug product (formulation or composition) or approved method(s) of use with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product.

☐ Yes

## 6. DECLARATION CERTIFICATION

6.1 *The undersigned declares that this is an accurate and complete submission of patent information for the NDA or supplement approved under section 505 of the Federal Food, Drug, and Cosmetic Act. This time-sensitive patent information or response to a request under 21 CFR 314.53(f)(1) is submitted pursuant to 21 CFR 314.53. I attest that I am familiar with 21 CFR 314.53 and this submission complies with the requirements of the regulation. I verify under penalty of perjury that the foregoing is true and correct.*

*Warning: A willfully and knowingly false statement is a criminal offense under 18 U.S.C. 1001.*

| 6.2 Authorized Signature of NDA Holder or Patent Owner *(Attorney, Agent, Representative or other Authorized Official) (Provide Information below)* | Date Signed |
|---|---|
| [black redaction]  [black redaction]   [ Sign ] | |

| 6.3 Countersignature of Authorized U.S. Agent | Date Signed |
|---|---|
| [ Countersign ] | |

NOTE: Only an NDA holder may submit this declaration directly to the FDA. A patent owner who is not the NDA holder is authorized to sign the declaration but may not submit it directly to FDA. 21 CFR 314.53(c)(4) and (d)(4).

Check applicable box and provide information below.

| | | |
|---|---|---|
| ☒ NDA Holder | ☐ NDA Holder's Attorney, Agent (Representative) or Other Authorized Official | |
| ☐ Patent Owner | ☐ Patent Owner's Attorney, Agent (Representative) or Other Authorized Official | |

Name
Rex Mauthe, Vice President Regulatory Affairs, United Therapeutics Corp.

| Address 55 T.W. Alexander Drive | City Research Triangle Park | |
|---|---|---|
| State/Province/Region North Carolina | Country USA | ZIP or Postal Code 27709 |
| FAX Number *(if available)* [black redaction] | Telephone Number [black redaction] | E-Mail Address *(if available)* [black redaction] |

HIGHLY CONFIDENTIAL                    UTC_LIQ00201701

This section applies only to requirements of the Paperwork Reduction Act of 1995.

**\*DO NOT SEND YOUR COMPLETED FORM TO THE PRA STAFF EMAIL ADDRESS BELOW.\***

The burden time for this collection of information is estimated to average 10 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden, to:

> Department of Health and Human Services
> Food and Drug Administration
> Office of Operations
> Paperwork Reduction Act (PRA) Staff
> *PRAStaff@fda.hhs.gov*

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

HIGHLY CONFIDENTIAL                                                                 UTC_LIQ00201702

# EXHIBIT 14

**HIGHLY CONFIDENTIAL**

<table>
<tr><td>

Department of Health and Human Services
Food and Drug Administration

# PATENT INFORMATION SUBMITTED UPON AND AFTER APPROVAL OF AN NDA OR SUPPLEMENT

### *For Each Patent That Claims a Drug Substance (Active Ingredient), Drug Product (Formulation or Composition) and/or Method of Use*

</td><td>

Form Approved: OMB No. 0910-0513
Expiration Date: 10/31/2013
*See OMB Statement on Page 3.*

**NDA NUMBER**
22387

**NAME OF APPLICANT/NDA HOLDER**
United Therapeutics Corporation

</td></tr>
</table>

*The following is provided in accordance with Section 505(b) and (c) of the Federal Food, Drug, and Cosmetic Act.*

TRADE NAME
TYVASO

| ACTIVE INGREDIENT(S)  treprostinil | STRENGTH(S)  0.6 mg/ml |
|---|---|
| DOSAGE  FORM  Inhalation solution | APPROVAL DATE OF NDA OR SUPPLEMENT  July 30, 2009 |

This patent declaration form is required to be submitted to the Food and Drug Administration (FDA) within thirty (30) days after approval of an NDA or supplement or within thirty (30) days of issuance of a patent as required by 21 CFR 314.53(c)(2)(ii) at the address provided in 21 CFR 314.53(d)(4). To expedite review of this patent declaration form, you may submit an additional copy of this declaration form to the Center for Drug Evaluation and Research "Orange Book" staff.

**For hand-written or typewriter versions of this report:** If additional space is required for any narrative answer (i.e., one that does not require a "Yes" or "No" response), please attach an additional page referencing the question number.

*FDA will not list patent information if you file an incomplete patent declaration or the patent declaration indicates the patent is not eligible for listing.*

*For each patent submitted for the approved NDA or supplement referenced above, you must submit all the information described below. If you are not submitting any patents for this NDA or supplement, complete above section and sections 5 and 6.*

## 1. GENERAL

| a. United States Patent Number  8,497,393 | b. Issue Date of Patent  07/30/2013 | c. Expiration Date of Patent  12/15/2028 |
|---|---|---|
| d. Name of Patent Owner  United Therapeutics Corporation | Address *(of Patent Owner)*  55 T.W. Alexander Drive | |
| | City/State  Research Triangle Park, North Carolina | |
| | ZIP Code  27709 | FAX Number *(if available)* |
| | Telephone Number  ▮▮▮▮▮▮▮▮ | E-Mail Address *(if available)*  ▮▮▮▮▮▮▮▮ |
| e. Name of agent or representative who resides or main- tains a place of business within the United States author- ized to receive notice of patent certification under section 505(b)(3) and (j)(2)(B) of the Federal Food, Drug, and Cosmetic Act and 21 CFR 314.52 and 314.95 (if patent owner or NDA applicant/holder does not reside or have a place of business within the United States) | Address *(of agent or representative named in 1.e.)* | |
| | City/State | |
| | ZIP Code | FAX Number *(if available)* |
| | Telephone Number | E-Mail Address *(if available)* |

| f.  Is the patent referenced above a patent that has been submitted previously for the approved NDA or supplement referenced above? | ☐ Yes   ☒ No |
|---|---|
| g.  If the patent referenced above has been submitted previously for listing, is the expiration date a new expiration date? | ☐ Yes   ☐ No |

PSC Graphics (301) 443-1090   EF

HIGHLY CONFIDENTIAL     UTC_WAT_00275271



HIGHLY CONFIDENTIAL                                                    UTC_WAT_00275272

**6. Declaration Certification**

6.1 *The undersigned declares that this is an accurate and complete submission of patent information for the NDA or supplement approved under section 505 of the Federal Food, Drug, and Cosmetic Act. This time-sensitive patent information is submitted pursuant to 21 CFR 314.53. I attest that I am familiar with 21 CFR 314.53 and this submission complies with the requirements of the regulation. I verify under penalty of perjury that the foregoing is true and correct.*

*Warning: A willfully and knowingly false statement is a criminal offense under 18 U.S.C. 1001.*

| 6.2 Authorized Signature of NDA Applicant/Holder or Patent Owner *(Attorney, Agent, Representative or other Authorized Official) (Provide Information below)* | Date Signed |
|---|---|
| ███████████████████████      ███████████████ | 19 August 2013 |

**NOTE: Only an NDA applicant/holder may submit this declaration directly to the FDA. A patent owner who is not the NDA applicant/ holder is authorized to sign the declaration but may not submit it directly to FDA. 21 CFR 314.53(c)(4) and (d)(4).**

Check applicable box and provide information below.

| ☒ NDA Applicant/Holder | ☐ NDA Applicant's/Holder's Attorney, Agent (Representative) or other Authorized Official |
|---|---|
| ☐ Patent Owner | ☐ Patent Owner's Attorney, Agent (Representative) or Other Authorized Official |

Name
████████████████████████████, United Therapeutics Corporation

| Address | City/State |
|---|---|
| 55 T.W. Alexander Drive | Research Triangle Park, North Carolina |

| ZIP Code | Telephone Number |
|---|---|
| 27709 | ███████████ |

| FAX Number *(if available)* | E-Mail Address *(if available)* |
|---|---|
| ████████████ | ████████████ |

The public reporting burden for this collection of information has been estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

Department of Health and Human Services
Food and Drug Administration
Office of Chief Information Officer
1350 Piccard Drive, Room 400
Rockville, MD  20850

*An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.*

HIGHLY CONFIDENTIAL                                                                         UTC_WAT_00275273

## INFORMATION AND INSTRUCTIONS FOR FORM 3542

### PATENT INFORMATION SUBMITTED UPON AND AFTER APPROVAL OF AN NDA OR SUPPLEMENT

**General Information**

- To submit patent information to the agency the appropriate patent declaration form must be used. Two forms are available for patent submissions. The approval status of your New Drug Application will determine which form you should use.

- Form 3542a should be used when submitting patent information with original NDA submissions, NDA amendments and NDA supplements prior to approval.

- Form 3542 should be used after NDA or supplement approval. This form is to be submitted within 30 days after approval of an application. This form should also be used to submit patent information relating to an approved supplement under 21 CFR 314.53(d) to change the formulation, add a new indication or other condition of use, change the strength, or to make any other patented change regarding the drug, drug product, or any method of use. Form 3542 is also to be used for patents issued after drug approval. Patents issued after drug approval are required to be submitted within 30 days of patent issuance for the patent to be considered "timely filed."

- Only information from form 3542 will be used for Orange Book publication purposes.

- Forms should be submitted as described in 21 CFR 314.53. Sending an additional copy of form 3542 to the Orange Book Staff will expedite patent publication in the Orange Book. The Orange Book Staff address (as of April 2007) is: Orange Book Staff, Office of Generic Drugs OGD/HFD-610, 7500 Standish Place, Rockville, MD 20855.

- The receipt date is the date that the patent information is date stamped in the central document room. Patents are considered listed on the date received.

- Additional copies of these forms may be downloaded from the Internet at: *http://www.fda.gov/opacom/morechoices/fdaforms/ fdaforms.html.*

**First Section**

Complete all items in this section.

### 1. General Section

Complete all items in this section with reference to the patent itself.

1c) Include patent expiration date, including any Hatch-Waxman patent extension already **granted**. Do not include any applicable pediatric exclusivity. The agency will include pediatric exclusivities where applicable upon publication.

1d) Include full address of patent owner. If patent owner resides outside the U.S. indicate the country in the zip code block.

1e) Answer this question if applicable. If patent owner and NDA applicant/holder reside in the United States, leave space blank.

### 2. Drug Substance (Active Ingredient)

Complete all items in this section if the patent claims the drug substance that is the subject of the approved NDA or supplement.

2.4) Name the polymorphic form of the drug identified by the patent.

2.5) A patent for a metabolite of the approved active ingredient may not be listed. If the patent claims an approved method of using the approved drug product to administer the metabolite, the patent may be listed as a method of use patent depending on the responses to section 4 of this form.

2.7) Answer this question only if the patent is a product-by-process patent.

### 3. Drug Product (Composition/Formulation)

Complete all items in this section if the patent claims the drug product that is the subject of the approved NDA or supplement.

3.3) An answer to this question is required only if the referenced patent is a product-by-process patent.

### 4. Method of Use

Complete all items in this section if the patent claims one or more methods of use of the drug product that is the subject of the approved NDA or supplement.

4.2) For each approved use of the drug claimed by the patent, identify by number the claim(s) in the patent that claim the approved use of the drug. An applicant may list together multiple patent claim numbers and information for each approved method of use, if applicable. However, each approved method of use must be separately listed within this section of the form.

4.2a) Specify the part of the approved drug labeling that is claimed by the patent.

4.2b) The answer to this question will be what FDA uses to create a "use-code" for Orange Book publication. The use code designates a method of use patent that claims the approved indication or use of a drug product. Each approved use claimed by the patent should be separately identified in this section and contain adequate information to assist 505(b)(2) and ANDA applicants in determining whether a listed method of use patent claims a use for which the 505(b)(2) or ANDA applicant is not seeking approval. Use a maximum of 240 characters for each "use code."

### 5. No Relevant Patents

Complete this section only if applicable.

### 6. Declaration Certification

Complete all items in this section.

6.2) Authorized signature. Check one of the four boxes that best describes the authorized signature.

HIGHLY CONFIDENTIAL                                                                        UTC_WAT_00275274

# EXHIBIT 15

# Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations

**f  SHARE (HTTPS://WWW.FACEBOOK.COM/SHARER/SHARER.PHP?**
**U=HTTPS://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/PATENT_INFO.CFM?PRODUCT_NO=001&APPL_NO=022387&APPL_TYPE=N)**

**🐦  TWEET (HTTPS://TWITTER.COM/INTENT/TWEET/?TEXT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC**
**EQUIVALENCE EVALUATIONS&URL=HTTPS://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/PATENT_INFO.CFM?**
**PRODUCT_NO=001&APPL_NO=022387&APPL_TYPE=N)**

**+**

**✉  EMAIL (MAILTO:?SUBJECT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE**
**EVALUATIONS&BODY=HTTPS://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/PATENT_INFO.CFM?**
**PRODUCT_NO=001&APPL_NO=022387&APPL_TYPE=N)**

**Home (index.cfm?resetfields=1)** | **Back to Product Details**

Additional Information about Patents

- Patent information is published on or after the submission date as defined in 21 CFR 314.53(d)(5).

- Patent listings published prior to August 18, 2003, only identify method-of-use claims. The listed patents may include drug substance and/or drug product claims that are not indicated in the listing.

- As of December 5, 2016, an NDA holder submitting information on a patent that claims both the drug substance and the drug product (and is eligible for listing on either basis) is required only to specify that it claims either the drug substance or the drug product. Orange Book users should not rely on an Orange Book patent listing, regardless of when first published, to determine the range of patent claims that may be asserted by an NDA holder or patent owner.

## Patent and Exclusivity for: N022387

Product 001
TREPROSTINIL (TYVASO) SOLUTION 0.6MG/ML

**Patent Data**

| Product No | Patent No | Patent Expiration | Drug Substance | Drug Product | Patent Use Code | Delist Requested | Submission Date |
|---|---|---|---|---|---|---|---|
| 001 | 9339507 | 03/10/2028 | | DP | | | 05/17/2016 |

LIQ02821338

| Product No | Patent No | Patent Expiration | Drug Substance | Drug Product | Patent Use Code | Delist Requested | Submission Date |
|---|---|---|---|---|---|---|---|
| 001 | 9358240 | 05/05/2028 | | | U-1849 | | 06/08/2016 |
| 001 | 9593066 | 12/15/2028 | DS | | | | 03/14/2017 |
| 001 | 9604901 | 12/15/2028 | DS | | | | 03/28/2017 |
| 001 | 10376525 | 05/14/2027 | | | U-1849 | | 04/29/2020 |
| 001 | 10716793 | 05/14/2027 | | | U-1849 | | 07/21/2020 |

**Exclusivity Data**

| Product No | Exclusivity Code | Exclusivity Expiration |
|---|---|---|
| 001 | I-856 | 03/31/2024 |

**View a list of all patent use codes (results_patent.cfm)**
**View a list of all exclusivity codes (results_exclusivity.cfm)**

LIQ02821339

# EXHIBIT 16



March 31, 2017

## United Therapeutics Announces Decision From Patent Trial And Appeal Board And Issuance Of New Patents

SILVER SPRING, Md. and RESEARCH TRIANGLE PARK, N.C., March 31, 2017 /PRNewswire/ -- United Therapeutics Corporation (NASDAQ: UTHR) today announced that the U.S. Patent and Trademark's Office (USPTO) Patent Trial and Appeal Board (PTAB) issued a Final Written Decision in connection with the *inter partes* review (IPR) of United Therapeutics' U.S. Patent No. 8,497,393 (the '393 patent). The PTAB found that all claims of the '393 patent are not patentable. United Therapeutics is evaluating its options, including the possibility of immediately exercising its right of appeal to the U.S. Court of Appeals for the Federal Circuit or first requesting a rehearing before the PTAB. The '393 patent remains valid and enforceable until appeals have been exhausted.

By way of background, the '393 patent claims, among other things, treprostinil produced using an improved method and is listed in FDA's Approved Drug Products with Therapeutic Equivalence Evaluations publication, also known as the Orange Book, for Remodulin® (treprostinil) Injection, Tyvaso® (treprostinil) Inhalation Solution, and Orenitram® (treprostinil) Extended-Release Tablets. United Therapeutics is currently asserting the '393 patent (along with several other patents) against Watson Laboratories, Inc. and Actavis Laboratories FL, Inc. in connection with their efforts to obtain approval to market generic copies of Tyvaso and Orenitram, respectively. The Watson and Actavis cases are scheduled for trial in September 2017 and February 2018, respectively. SteadyMed, Ltd. initiated the IPR in October 2015, and has reported plans to file for FDA approval of its Trevyent® treprostinil product in the second quarter of 2017.

United Therapeutics intends to continue vigorously defending the '393 patent, but even if the ultimate result is unfavorable, United Therapeutics has other patents claiming subject matter similar to the '393 patent and with the same expiration date (December 2028). Specifically, in the last month, the USPTO awarded United Therapeutics two additional patents related to the '393 patent, U.S. Patent Nos. 9,593,066 and 9,604,901. United Therapeutics prosecuted the applications that resulted in these new patents in parallel with the '393 patent IPR and presented claims addressing the invalidity arguments raised by SteadyMed in the IPR and Watson and Actavis in the ongoing litigations. The USPTO allowed the new patent claims with full knowledge of the IPR, the invalidity arguments presented therein, and the invalidity arguments raised by Watson and Actavis in connection with the '393 patent. Thus, United Therapeutics anticipates that these new patents should be less susceptible to challenge than the '393 patent. United Therapeutics has listed both these new patents in the Orange Book for Remodulin, Tyvaso, and Orenitram.

### About United Therapeutics

United Therapeutics Corporation is a biotechnology company focused on the development and commercialization of innovative products to address the unmet medical needs of patients with chronic and life-threatening conditions. [uthr-g]

### Forward-looking Statements

Statements included in this press release that are not historical in nature are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements include, among others, statements regarding the possibility of United Therapeutics appealing the PTAB decision, United Therapeutics' intent to continue vigorously defending the '393 patent, United Therapeutics' belief that the two newly issued patents should be less susceptible to challenge than the '393 patent, and the impact of the two newly-issued patents on the timing of market entry for Trevyent. These forward-looking statements are subject to certain risks and uncertainties, such as those described in our periodic and other reports filed with the Securities and Exchange Commission that could cause actual results to differ materially from anticipated results. These risks and uncertainties include, among others, United Therapeutics' plans and ability to defend its intellectual property against challenges from generic companies and from SteadyMed, and such forward-looking statements are qualified by the cautionary statements, cautionary language and risk factors set forth in our periodic reports and documents filed with the Securities and Exchange Commission, including our most recent Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K. We claim the protection of the safe harbor contained in the Private Securities Litigation Reform Act of 1995 for forward-looking statements. We are providing this information as of March 31, 2017, and assume no obligation to update or revise the information contained in this press release whether as a result of new information, future events or any other reason.

To view the original version on PR Newswire, visit:http://www.prnewswire.com/news-releases/united-therapeutics-

announces-decision-from-patent-trial-and-appeal-board-and-issuance-of-new-patents-300432711.html

SOURCE United Therapeutics Corporation

News Provided by Acquire Media

LIQ02821337

# EXHIBIT 17

Case 3:16-cv-00755-PGS-LHG Document 209 Filed 06/28/18 Page 339 of 584 PageID #:
Case 3:15-cv-05723-PGS-LHG Document 49 Filed 06/23/16 Page 1 of 11 PageID #:
20217

William J. O'Shaughnessy
MCCARTER & ENGLISH LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 639-2094
woshaughnessy@mccarter.com

**OF COUNSEL:**
Douglas Carsten
WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real
Suite 200
San Diego, CA 92130

William C. Jackson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC 20015

*Attorneys for Plaintiff*
*United Therapeutics Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 3:15cv-05723-PGS-LHG |
| ) | |
| ) | |
| WATSON LABORATORIES, INC., ) | |
| ) | |
| Defendant. ) | |

## <u>FIRST AMENDED COMPLAINT AND JURY DEMAND</u>

Plaintiff United Therapeutics Corporation ("UTC"), by its undersigned attorneys, for its

First Amended Complaint against Watson Laboratories, Inc. ("Watson"), alleges as follows:

1

LIQ02821353

## NATURE OF THE ACTION

1.  This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code, Sections 100 *et seq.*, involving United States Patent Nos. 6,521,212 ("the '212 patent") (attached as Exhibit A hereto), 6,756,033 ("the '033 patent") (attached as Exhibit B hereto), 8,497,393 ("the '393 patent") (attached as Exhibit C hereto), 9,339,507 ("the '507 patent") (attached as Exhibit D hereto), and 9,358,240 ("the '240 patent") (attached as Exhibit E hereto).

2.  This action arises out of Watson's submission of Abbreviated New Drug Application ("ANDA") No. 208172 to the United States Food and Drug Administration ("FDA") seeking approval, prior to the expiration of the '212, '393, '033, '507, and '240 patents, to manufacture, market, and sell a generic copy of UTC's TYVASO® (treprostinil) Inhalation Solution, 0.6 mg/ml that is approved by FDA for treatment of pulmonary arterial hypertension.

## THE PARTIES

3.  UTC is a corporation organized and existing under the laws of the State of Delaware, and having a place of business at 1040 Spring Street, Silver Spring, Maryland 20910. UTC is a biotechnology company focused on the development and commercialization of products designed to address the needs of patients with chronic and life-threatening conditions.

4.  Upon information and belief, Watson is a corporation organized and existing under the laws of the State of California and has a principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over the subject matter of this action pursuant to the provisions of 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

2

LIQ02821354

6.      Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(b).

7.      Upon information and belief, this Court has personal jurisdiction over Watson with respect to this Complaint because, *inter alia*, of its continuous and systematic contacts with this judicial district.  The notice letter was sent from Watson at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey, NJ 07054.  Upon information and belief, Watson derives substantial revenue from articles used and consumed in this judicial district, and consistent with its practice with respect to other generic products, following any FDA approval of Watson's ANDA, Watson will sell its generic product throughout the United States, including in New Jersey.  Upon information and belief, Watson is registered to conduct business in the State of New Jersey and employs people throughout New Jersey, including at least the following locations: Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054; 100 Enterprise Drive, Rockaway, New Jersey 07866; and 350 Mt. Kemble Avenue, Morristown, New Jersey 07960.  In addition, Watson has previously availed itself of this Court as a forum in which to bring patent litigation against others.

## BACKGROUND

8.      UTC holds an approved New Drug Application (No. 22-387) for TYVASO® (treprostinil) Inhalation Solution, 0.6 mg/ml, which UTC markets and sells under the registered trademark TYVASO®.

9.      TYVASO® is a pharmaceutical product initially approved by FDA in the United States in July 2009, and is indicated for the treatment of pulmonary arterial hypertension. Pulmonary arterial hypertension is a rare disease affecting the pulmonary vasculature and results in high pressure in the pulmonary arteries, which increases strain on the right ventricle of the heart, thereby leading to heart failure and death.

3

LIQ02821355

10.    TYVASO® is an inhalable product approved for sale in a 0.6 mg/mL concentration.

11.    The '212 patent, entitled "Method for treating peripheral vascular disease by administering benzindene prostaglandins by inhalation" was duly and legally issued by the United States Patent and Trademark Office on February 18, 2003. The named inventors are Gilles Cloutier, James Crow, Michael Wade, Richard E. Parker, and James E. Loyd.

12.    UTC is the lawful owner of the '212 patent by assignment of all right, title, and interest in and to the '212 patent, including the right to bring infringement suits thereon.

13.    The '393 patent, entitled "Process to Prepare Treprostinil, the Active Ingredient in Remodulin®," was duly and legally issued by the United States Patent and Trademark Office on July 30, 2014.  The named inventors are Hitesh Batra, Sudersan M. Tuladhar, Raju Penmasta, and David A. Walsh.

14.    UTC is the lawful owner of the '393 patent by assignment of all right, title, and interest in and to the '393 patent, including the right to bring infringement suits thereon.

15.    The '033 patent, entitled "Method for delivering benzindene prostaglandins by inhalation," was duly and legally issued by the United States Patent and Trademark Office on June 29, 2004.  The named inventors are Gilles Cloutier, James Crow, Michael Wade, Richard E. Parker, and James E. Loyd.

16.    UTC is the lawful owner of the '033 patent by assignment of all right, title, and interest in and to the '033 patent, including the right to bring infringement suits thereon.

17.    The '507 patent, entitled "Treprostinil administration by inhalation," was duly and legally issued by the United States Patent and Trademark Office on May 17, 2016.  The named

4

LIQ02821356

inventors are Horst Olschewski, Robert Roscingo, Lewis Rubin, Thomas Schmehl, Werner Seeger, Carl Sterritt, and Robert Voswinckel.

18.    UTC is the lawful owner of the '507 patent by assignment of all right, title, and interest in and to the '507 patent, including the right to bring infringement suits thereon.

19.    The '240 patent, entitled "Treprostinil administration by inhalation," was duly and legally issued by the United States Patent and Trademark Office on June 7, 2016.  The named inventors are Horst Olschewski, Robert Roscingo, Lewis Rubin, Thomas Schmehl, Werner Seeger, Carl Sterritt, and Robert Voswinckel.

20.    UTC is the lawful owner of the '240 patent by assignment of all right, title, and interest in the '240 patent, including the right to bring infringement suits thereon.

21.    TYVASO® and its FDA approved manufacture and uses are covered by one or more claims of the '212, '033, '393, '507, and '240 patents, which have all been listed in connection with TYVASO® in the FDA's *Approved Drug Products with Therapeutic Equivalents* publication (also known as the "Orange Book").

## ACTS GIVING RISE TO THIS ACTION

22.    Watson notified UTC by letter dated June 12, 2015, which was delivered to UTC on or about, Saturday, June 13, 2015 ("Watson's Notice Letter"), that it had filed ANDA No. 208172 with the FDA seeking approval to commercially manufacture, market, use, and sell generic copies of TYVASO® (treprostinil) Inhalation Solution, 0.6 mg/mL ("Watson's ANDA Products") prior to the expiration of the '212, '033, and '393 patents.

23.    Watson's Notice Letter included a statement pursuant to 21 U.S.C. § 355(j)(2)(vii)(IV) purporting to recite Watson's "factual and legal basis" for its opinion that the '212, '033, and '393 patents are not valid, are unenforceable, and/or would not be infringed by

LIQ02821357

the commercial manufacture, use, or sale of Watson's ANDA Products. Yet that statement did

not include any explanation as to why claims 1-5 and 9-12 of the '212 patent, claims 4 and 6-10

of the '033 patent, and any claim of the '393 patent were invalid. The statement also did not

include anything beyond conclusory statements as to why claims 6-8 of the '212 patent and

claims 1-3 and 5 of the '033 patent were invalid. The statement also did not include anything

beyond conclusory statements regarding alleged non-infringement. Watson provided no

explanation as to the alleged unenforceability.

24.     Upon information and belief, Watson submitted ANDA No. 208172 with FDA

seeking approval to commercially manufacture, market, use, and sell generic copies of

TYVASO® (treprostinil) Inhalation Solution, 0.6 mg/mL ("Watson's ANDA Products") prior to

the expiration of the '212, '033, '393,'507, and '240 patents.

25.     UTC commenced this action before the expiration of forty-five days from the date

UTC received Watson's Notice Letter.

26.     Upon information and belief, Watson's ANDA Products contains the same active

compound as UTC's approved TYVASO® product.

27.     Upon information and belief, Watson's ANDA No. 208172 seeks approval from

the FDA to market Watson's ANDA Products for the same indication as UTC's approved

TYVASO® product.

28.     Upon information and belief, Watson represented to FDA in ANDA No. 208172

that Watson's ANDA Products is bioequivalent to UTC's approved TYVASO® product.

29.     Upon information and belief, Watson intends to commercially manufacture, sell,

offer for sale, and/or import Watson's ANDA Products upon, or in anticipation of, FDA

approval.

LIQ02821358

30.     According to Watson's Notice Letter, Watson's ANDA No. 208172 contained a "Paragraph IV" certification pursuant to 21 U.S.C. § 355(j)(2)(vii)(IV) stating that in Watson's opinion the '212, '033, and '393 patents are invalid, unenforceable, and/or would not be infringed by the manufacture, use or sale of Watson's ANDA Products.

31.     Upon information and belief, as of the date of Watson's Notice Letter, Watson was aware of the statutory provisions and regulations set forth in 21 U.S.C. §§ 355(j)(2)(B)(iv)(II) and 21 C.F.R. § 314.95(c)(6).

32.     Upon information and belief, the acts of infringement by Watson have been intentional and willful.

## COUNT 1 INFRINGEMENT OF THE '212 PATENT UNDER 35 U.S.C. § 271(e)

33.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

34.     Upon information and belief, Watson's ANDA Products or an intermediate in its manufacture is covered by one or more claims of the '212 patent.

35.     Watson had knowledge of the '212 patent when it submitted ANDA No. 208172.

36.     Watson's submission of ANDA No. 208172 for the purpose of obtaining approval to engage in the commercial manufacture, use, sale, and/or offer for sale of Watson's ANDA Products was an act of infringement of the '212 patent under 35 U.S.C. § 271(e)(2).

37.     Upon information and belief, the commercial manufacture, use, offer for sale, sale and/or importation of Watson's ANDA Products would infringe one or more claims of the '212 patent.

7

LIQ02821359

38.     Upon information and belief, Watson was and is aware of the existence of the '212 patent and acted without a reasonable basis for believing that it would not be liable for infringement of the '212 patent, thus rendering this case "exceptional" under 35 U.S.C. § 285.

39.     UTC will be substantially and irreparably damaged and harmed if Watson's infringement of the '212 patent is not enjoined by this Court.  UTC does not have an adequate remedy at law.

40.     Upon information and belief, the acts of infringement by Watson have been intentional and willful.

### COUNT 2: INFRINGEMENT OF THE '393 PATENT UNDER 35 U.S.C. § 271(e)

41.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

42.     Upon information and belief, Watson's ANDA Products or an intermediate in its manufacture is covered by one or more claims of the '393 patent.

43.     Watson had knowledge of the '393 patent when it submitted ANDA No. 208172.

44.     Watson's submission of ANDA No. 208172 for the purpose of obtaining approval to engage in the commercial manufacture, use, sale, and/or offer for sale of Watson's ANDA Products was an act of infringement of the '393 patent under 35 U.S.C. § 271(e)(2).

45.     Upon information and belief, the commercial manufacture, use, offer for sale, sale and/or importation of Watson's ANDA Products would infringe one or more claims of the '393 patent.

46.     Upon information and belief, Watson was and is aware of the existence of the '393 patent and acted without a reasonable basis for believing that it would not be liable for infringement of the '393 patent, thus rendering this case "exceptional" under 35 U.S.C. § 285.

LIQ02821360

47.     UTC will be substantially and irreparably damaged and harmed if Watson's infringement of the '393 patent is not enjoined by this Court.  UTC does not have an adequate remedy at law.

48.     Upon information and belief, the acts of infringement by Watson have been intentional and willful.

**COUNT 3: INFRINGEMENT OF THE '033 PATENT UNDER 35 U.S.C. § 271(e)**

49.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

50.     Upon information and belief, use of Watson's ANDA Products is covered by one or more claims of the '033 patent.

51.     Watson had knowledge of the '033 patent when it submitted ANDA No. 208172.

52.     Watson's submission of ANDA No. 208172 for the purpose of obtaining approval to engage in the commercial manufacture, use, sale, and/or offer for sale of Watson's ANDA Products was an act of infringement of the '033 patent under 35 U.S.C. § 271(e)(2).

53.     Upon information and belief, the commercial manufacture, use, offer for sale, sale and/or importation of Watson's ANDA Products would directly or indirectly infringe one or more claims of the '033 patent.

54.     Upon information and belief, Watson will induce others to infringe one or more claims of the '033 patent by, among other things, actively and knowingly aiding and abetting others to infringe, including, but not limited to patients or health care providers that administer Watson's ANDA Product in diluted form for intravenous administration, which use constitutes direct infringement of one or more claims of the '033 patent.  Upon information and belief, Watson's aiding and abetting includes Watson's active steps to promote its ANDA Product for

9

LIQ02821361

infringing uses, and encourage and instruct such use as stated in, for example and without limitation, proposed product package insert labeling pursuant to Watson's ANDA.

55.     Upon information and belief, Watson was and is aware of the existence of the '033 patent and acted without a reasonable basis for believing that it would not be liable for infringement of the '033 patent, thus rendering this case "exceptional" under 35 U.S.C. § 285.

56.     UTC will be substantially and irreparably damaged and harmed if Watson's infringement of the '033 patent is not enjoined by this Court.  UTC does not have an adequate remedy at law.

57.     Upon information and belief, the acts of infringement by Watson have been intentional and willful.

## COUNT 4: INFRINGEMENT OF THE '507 PATENT UNDER 35 U.S.C. § 271(e)

58.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

59.     Upon information and belief, use of Watson's ANDA Products is covered by one or more claims of the '507 patent.

60.     Watson's submission of ANDA No. 208172 for the purpose of obtaining approval to engage in the commercial manufacture, use, sale, and/or offer for sale of Watson's ANDA Products was an act of infringement of the '507 patent under 35 U.S.C. § 271(e)(2).

61.     Upon information and belief, the commercial manufacture, use, offer for sale, sale and/or importation of Watson's ANDA Products would directly or indirectly infringe one or more claims of the '507 patent.

62.     Upon information and belief, Watson will induce others to infringe one or more claims of the '507 patent by, among other things, actively and knowingly aiding and abetting

10

others to infringe, including, but not limited to patients or health care providers that administer Watson's ANDA Product by inhalation, which use constitutes direct infringement of one or more claims of the '507 patent. Upon information and belief, Watson's aiding and abetting includes Watson's active steps to promote its ANDA Product for infringing uses, and encourage and instruct such use as stated in, for example and without limitation, proposed product package insert labeling pursuant to Watson's ANDA.

63.     Upon information and belief, Watson was and is aware of the existence of the '507 patent and lacks a reasonable basis for believing that it would not be liable for infringement of the '507 patent, thus rendering this case "exceptional" under 35 U.S.C. § 285.

64.     UTC will be substantially and irreparably damaged and harmed if Watson's infringement of the '507 patent is not enjoined by this Court. UTC does not have an adequate remedy at law.

65.     Upon information and belief, the acts of infringement by Watson have been intentional and willful.

### COUNT 5: INFRINGEMENT OF THE '507 PATENT UNDER 35 U.S.C. § 271(e)

66.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

67.     Upon information and belief, use of Watson's ANDA Products is covered by one or more claims of the '240 patent.

68.     Watson's submission of ANDA No. 208172 for the purpose of obtaining approval to engage in the commercial manufacture, use, sale, and/or offer for sale of Watson's ANDA Products was an act of infringement of the '240 patent under 35 U.S.C. § 271(e)(2).

11

LIQ02821363

69.     Upon information and belief, the commercial manufacture, use, offer for sale, sale and/or importation of Watson's ANDA Products would directly or indirectly infringe one or more claims of the '240 patent.

70.     Upon information and belief, Watson will induce others to infringe one or more claims of the '240 patent by, among other things, actively and knowingly aiding and abetting others to infringe, including, but not limited to patients or health care providers that administer Watson's ANDA Product by inhalation, which use constitutes direct infringement of one or more claims of the '240 patent.  Upon information and belief, Watson's aiding and abetting includes Watson's active steps to promote its ANDA Product for infringing uses, and encourage and instruct such use as stated in, for example and without limitation, proposed product package insert labeling pursuant to Watson's ANDA.

71.     Upon information and belief, Watson was and is aware of the existence of the '240 patent and lacks a reasonable basis for believing that it would not be liable for infringement of the '240 patent, thus rendering this case "exceptional" under 35 U.S.C. § 285.

72.     UTC will be substantially and irreparably damaged and harmed if Watson's infringement of the '240 patent is not enjoined by this Court.  UTC does not have an adequate remedy at law.

73.     Upon information and belief, the acts of infringement by Watson have been intentional and willful.

## PRAYER FOR RELIEF

WHEREFORE, UTC requests the following relief:

1.     A judgment that Watson:

LIQ02821364

    A.  has infringed the '212 patent, the '033 patent, the '393 patent, the '507 patent, and the '240 patent;

    B.  will induce infringement of the '212 patent, the '033 patent, the '393 patent, the '507 patent, and the '240 patent, and

    C.  will contribute to the infringement by others of the '212 patent, the '033 patent, the '393 patent, the '507 patent, and the '240 patent;

2.    A judgment ordering that the effective date of any FDA approval for Watson to commercially manufacture, make, use, offer to sell, sell, market, or import into the United States Watson's ANDA Products be not earlier than the latest of the expiration dates of the '212 patent, the '033 patent, the '393 patent, the '507 patent, and the '240 patent, inclusive of any extension(s) and additional period(s) of exclusivity to which UTC is or may become entitled;

3.    A judgment pursuant to 35 U.S.C. § 271(e)(4)(B) preliminarily and permanently enjoining Watson, its officer, agents, servants, employees, parents, subsidiaries, affiliate corporations, other business entities and all other persons acting in concert, participation, or privity with them, their successors, and assigns, from infringing, contributorily infringing, or inducing others to infringe the '212 patent, the '033 patent, the '393 patent, the '507 patent, and/or the '240 patent, including engaging in the commercial manufacture, use, sale, offer to sale and/or importation in the United States of the product that is the subject of ANDA No. 208172 and/or any applicable DMF until the expiration of the '212 patent, the '033 patent, the '393 patent, the '507 patent, and the '240 patent, inclusive of any extension(s) and additional period(s) of exclusivity to which UTC is or may become entitled;

4.    A judgment declaring that making, using, selling, offering for sale, or importing into the United States of Watson's ANDA Products, or any product or compound that infringes

LIQ02821365

one or more of the '212 patent, the '033 patent, the '393 patent, the '507 patent, and/or the '240 patent prior to the expiration dates of the respective patents, will infringe, actively induce infringement of, and will contribute to the infringement by others of the '212 patent, the '033 patent, the '393 patent, the '507 patent, and the '240 patent;

5. Temporary, preliminary, permanent, or other injunctive relief as necessary or appropriate should Watson seek to commercially manufacture, use, sell, offer to sell, or import Watson's ANDA Products prior to disposition of this action and/or the expiration of the '212 patent, the '033 patent, the '393 patent, the '507 patent, and the '240 patent;

6. A judgment awarding UTC damages or other monetary relief, pursuant to 35 U.S.C. §§ 271(e)(4)(c) and 284, if Watson commercially manufactures, uses, sells, offers to sell and/or imports any product that is the subject of ANDA No. 208172 that infringes one or more of the '212 patent, the '033 patent, the '393 patent, the '507 patent, and/or the '240 patent;

7. A judgment declaring that Watson's infringement has been willful;

8. A judgement awarding UTC its actual damages for willful infringement;

9. A judgment declaring that, pursuant to 35 U.S.C. § 285, this is an exceptional case and awarding UTC its attorney's fees;

10. Costs and expenses in this action; and

11. Such further and other relief as this Court may deem just and proper.

## JURY DEMAND

UTC requests trial by jury for any issues so triable.

LIQ02821366

Respectfully submitted,

*s/ William J. O'Shaughnessy*
William J. O'Shaughnessy
MCCARTER & ENGLISH LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 639-2094
woshaughnessy@mccarter.com

*Of Counsel*

Douglas Carsten
WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real
Suite 200
San Diego, CA 92130

Veronica S. Ascarrunz
WILSON SONSINI GOODRICH & ROSATI
1700 K Street, NW
Suite 500
Washington, DC 20006

William C. Jackson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC 20015

Dated: June 21, 2016

*Attorneys for Plaintiff*
*United Therapeutics Corporation*

15

## LOCAL CIVIL RULE 11.2 CERTIFICATION

UTC hereby certifies that, to its knowledge, the matter in controversy in this action is not

the subject of any other pending lawsuit, arbitration, or administrative proceeding other than the

following identified proceedings:

- *Supernus Pharmaceuticals, Inc. v. Hon. Michelle K. Lee*, Civil Action No. 16-cv-342 (GBL)(IDD) (E.D. Va.); and

- *United Therapeutics Corporation v. Actavis Laboratories FL, Inc.*, Civil Action No. 3:16-cv-1816 (PGS)(LHG) (D.N.J.).

Respectfully submitted,

*Of Counsel*

Douglas Carsten
WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real
Suite 200
San Diego, CA 92130

Veronica S. Ascarrunz
WILSON SONSINI GOODRICH & ROSATI
1700 K Street, NW
Suite 500
Washington, DC 20006

William C. Jackson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC 20015

*s/ William J. O'Shaughnessy*
William J. O'Shaughnessy
MCCARTER & ENGLISH LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 639-2094
woshaughnessy@mccarter.com

Dated: June 21, 2016

*Attorneys for Plaintiff*
*United Therapeutics Corporation*

16

## CERTIFICATE OF SERVICE

I certify that on this day I caused to be served by the ECF system copies of the First

Amended Complaint upon the following:

      Walsh Pizzi O'Reilly Falanga LLP
      Liza M. Walsh
      Tricia B. O'Reilly
      Joseph L. Linares
      One Newark Center
      1085 Raymond Boulevard, 6th Floor
      Newark, NJ 07102
      (973) 757-1100

      OF COUNSEL:

      WINSTON STRAWN LLP
      Michael K. Nutter
      Kurt A. Mathas
      35 West Wacker Drive
      Chicago, Illinois 60601
      Tel: (312) 558-5600
      Fax: (312) 558-5700

Dated: June 21, 2016
                        *s/* William J. O'Shaughnessy
                        William J. O'Shaughnessy

LIQ02821369

# EXHIBIT 18

## HIGHLY CONFIDENTIAL



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**

**UTC_OREN_00572119**

█████████████████████████████████████████████████████████
████████████████████

**Table 2:** ███████████████████████████



█████████████████████████████████████████████████████
████████████████████████████

██████████████████
██████████████████████

**HIGHLY CONFIDENTIAL**



HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

**Diagram 1:**



**Diagram 2:**





Page 6 of 15

**HIGHLY CONFIDENTIAL**

UTC_OREN_00572123

**Table 4:**



HIGHLY CONFIDENTIAL

**Table 4 cont:**





**HIGHLY CONFIDENTIAL**



HIGHLY CONFIDENTIAL



Page 10 of 15

HIGHLY CONFIDENTIAL

UTC_OREN_00572127

**Table 5:** 

**C.**



**HIGHLY CONFIDENTIAL**

UTC_OREN_00572128



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**

UTC_OREN_00572130



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**

# EXHIBIT 19

# Highly Confidential



Deposition of:
**Robert R. Ruffolo**

*April 15, 2021*

In the Matter of:

**United Therapeutics Corporation vs Liquidia Technologies Inc**

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

DR. RUFFOLO

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE

 2
                              - - -
 3

 4    UNITED THERAPEUTICS       :  C.A. No.
      CORPORATION,              :  20-755-RGA
 5                              :
              Plaintiff,        :
 6                              :
              vs.               :
 7                              :
      LIQUIDIA TECHNOLOGIES, INC.:
 8                              :
              Defendant.        :
 9
10                              - - -
11
12
                    THURSDAY, APRIL 15, 2021
13
14
15                              - - -
16          Remote Videotape Zoom Deposition of
17    ROBERT R. RUFFOLO, Ph.D., taken pursuant
18    to Notice, commencing at approximately
19    9:03 a.m., on the above date, before Rose A.
20    Tamburri, RPR, CM, CCR, CRR, USCRA Speed and
21    Accuracy Champion and Notary Public.
22                              - - -
23                    VERITEXT LEGAL SOLUTIONS
                        MID-ATLANTIC REGION
24              1801 Market Street, Suite 1800
                Philadelphia, Pennsylvania  19103
```

DR. RUFFOLO



Page 122

1  BY MR. DAVIES:
2     Q.  And sitting here today, though, with
3  respect to the '066 and the '901 Patent, you
4  have no opinion as to [redacted]

[redacted] orrect?
9     MR. WARD:  Objection to form.
10    THE WITNESS:  No, that's not
11 correct.
12 BY MR. DAVIES:
13    Q. [redacted]

24    MR. WARD:  Objection to form.

Page 123

1     THE WITNESS: [redacted]

5  BY MR. DAVIES:
6     Q. [redacted]

11    A.  I --
12    MR. WARD:  Objection to form.
13    THE WITNESS: [redacted]

Page 124

1  BY MR. DAVIES:
2     Q.  Including in the context of the '066
3  and '901 Patents; correct?
4     MR. WARD:  Objection to form.
5     THE WITNESS:  In -- for any drug.
6     (Brief pause.)
7  BY MR. DAVIES:
8     Q.  If I have isolated treprostinil salt
9  and dissolved -- completely dissolved it in a
10 solution, could that, under your definition of
11 isolated, still be isolated?
12    MR. WARD:  Objection to form.
13    THE WITNESS:  Of course.
14 BY MR. DAVIES:
15    Q.  How so?
16    A.  Well, isolated has nothing to do with
17 physical state.  Isolated doesn't mean powder.
18    So [redacted]

Page 125

1  [redacted]

4     So the physical state, powder,
5  and -- and -- or liquid doesn't constitute
6  purity or isolation.
7     Q.  Claim 6 refers -- and I'm sorry,
8  Doctor, I'm going back to the '066 Patent, so
9  I'll give you a minute to -- to turn back
10 there.  Just let me know when you're there.
11    A.  Okay.  I have it.
12    Q.  Okay.
13    Claim 6 of the '066 refers to the
14 isolated salt of treprostinil.
15    Do you see that?
16    A.  Yes, I do.
17    Q.  Okay.
18    If I completely dissolve an
19 isolated salt of treprostinil in a solvent, I
20 no longer have the salt present in that
21 solvent system; correct?
22    MR. WARD:  Objection to form.
23    THE WITNESS:  You have the two
24 components of salt, you have the ion and

32 (Pages 122 - 125)

DR. RUFFOLO



Page 202

1    Q.

5    A.

19    Q.

Page 204

1    '066 and the '901 Patent, none of them
2    actually refer to or use the term
3    "commercial"; correct?
4        A.  Well, a couple of points.  On -- let
5    me turn to the claims.
6            So in the '901, we're referring to
7    pharmaceutical batch.  That's commercial
8    production.  Reading further into the claims,
9    they're converting that pharmaceutical batch
10   into pharmaceutical product.  That's
11   commercial product.
12           And so that, combined with what I
13   just read, is -- is at the top of Column 2,
14   that it's a large scale commercial process,
15   clearly is telling us that this is a
16   commercial manufacturing patent.  And a POSA
17   wouldn't, in my opinion, wouldn't arrive at
18   any other conclusion.  It says it.
19

Page 203

1

24    Q.  When you look at the claims of the

4        Q.  You mentioned large scale that's
5    referred to in the specification of the '066
6    and the '901 Patents; is that correct?
7        A.  Yes.
8        Q.  What does large scale mean in the
9    context of the '066 and '901 Patents with
10   respect to treprostinil?
11       A.  So if you go to Example 6 where they
12   talk about the working example for the current
13   process, we're talking about batch sizes of --
14   of five kilograms.

19           So that's an order of magnitude.
20   That's a -- that's big deal.  Scaling up
21               is not easy.
22       Q.  Do you believe there is any lower
23   limit to large scale, as that term is used, in
24   the '066 and '901 Patents?

52 (Pages 202 - 205)

DR. RUFFOLO



1    A.

19        So there's -- it depends on the
20    drug and the whole elevation and production
21    that you're looking to get that defines --
22    defines large scale versus laboratory bench,
23    and that depends, in part, on the drug.
24    Q.   And just, and Doctor, my -- my

1    question was restricted to treprostinil, so
2    let me -- let me maybe ask you more directly.
3        In your opinion, would a
4    pharmaceutical batch of treprostinil of
5    2.9 grams be large scale?
6        MR. WARD:  Objection to form.
7        THE WITNESS:  I don't know.  I --
8    I don't know what that was based on.  I just
9    know that's what the claim reads.  So I don't
10    know what their justification was.  I assume
11    there was some, but I don't know it.
12    BY MR. DAVIES:
13    Q.   But in your opinion, you don't
14    believe 2.9 grams of treprostinil is large
15    scale; correct?
16    A.   No.  What I said was I don't know --
17        MR. WARD:  Objection to form.
18        THE WITNESS:  Okay.  Sorry.
19    What -- I'm sorry, what I -- I interrupted.
20    What I said was I don't know.
21    BY MR. DAVIES:
22    Q.   So you don't know whether two -- a
23    batch -- strike that.
24        You don't know whether a

1    pharmaceutical batch containing at least
2    2.9 grams of treprostinil or its salt would be
3    large scale; correct?
4        MR. WARD:  Form.
5        THE WITNESS:  Only because I don't
6    know what the rationale was for putting that
7    in the claim.  I -- I just don't know.
8    BY MR. DAVIES:
9    Q.   And without understanding what UTC's
10    rationale was for including that in the claim,
11    a POSA would not be able to know whether
12    2.9 grams is a large scale amount of
13    treprostinil or not; correct?
14        MR. WARD:  Objection to form.
15        THE WITNESS:  Well, you know,
16    in -- in comparison to what was prepared at
17    Phares, where everything was much less than a
18    gram, 2.9 grams is actually a significant --
19    significantly large increase, at least a
20    300 percent increase.
21        So it could be that in relation to
22    Phares, this was considered large scale, when
23    Phares was only making milligrams.
24        So that's what I was saying

1    before.  It relates to how much you're making
2    at bench and how much you're making large
3    scale.  That could still be -- in the case of
4    Phares, it's really a tenfold increase.  Even
5    though it's only 2.9 grams, you can't simply
6    just scale up by adding whatever sold more
7    ingredients to the mixture.
8    BY MR. DAVIES:
9    Q.   If you go back to Example 6, and
10    we're in the '901 Patent, and look at the --
11    the bottom of Column 16 for the former
12    process, which you said is the Moriarty
13    process; correct?
14    A.   Yes.  And I'm just -- just getting to
15    that now.
16    Q.   Yeah, no worries.  Just let me know
17    when you're there.
18    A.   Yeah.  I'm there now.
19    Q.   Okay.
20        So bottom of Column 16, bottom of
21    Example 3 in the 9 -- Example 6, I apologize,
22    in the '901 Patent -- well, strike that.  Let
23    me start over.
24        So looking back at Example 6, do

53 (Pages 206 - 209)

DR. RUFFOLO

Page 290

1  regarding Ruffolo Exhibit 13 prior to its
2  filing?
3          MR. WARD:  Same objection, same
4  instruction.
5          MR. DAVIES:  So, counsel, just so
6  the record is clear, we disagree that the
7  questions that I've posed to Dr. Ruffolo are
8  privileged, the responses to those questions
9  would be privileged, or that those questions
10  seek privileged information, and we intend to
11  raise the matter with the Court at an
12  appropriate time.
13          I have nothing further at this
14  time, but I'll hold the deposition open in the
15  event that an additional deposition is
16  required.
17          MR. WARD:  I object to the --
18  holding the deposition open.  Let's take a
19  break and I'll let you know if I have anything
20  when we get back.
21          MR. DAVIES:  Okay.
22          THE VIDEOGRAPHER:  The time is
23  5:01 p.m.
24          We're off the record.

Page 291

1          (Whereupon, a recess was taken at
2  the above time.)
3          THE VIDEOGRAPHER:  The time is
4  5:13 p.m.
5          We're back on the record.
6          MR. WARD:  Okay.  I have no
7  questions for the witness.
8          MR. DAVIES:  Okay.  And as I said,
9  I have no further questions at this time, but
10  hold the deposition open pending the outcome
11  of Liquidia addressing the privilege issues
12  raised during today's deposition.
13          We understand that UTC is standing
14  on its privilege objections made during the
15  deposition; is that correct, counsel?
16          MR. WARD:  We're standing on our
17  privilege objections and object to your
18  attempt to hold the deposition open.
19          MR. DAVIES:  I have nothing
20  further.
21          MR. WARD:  Ready to go off record
22  here.
23          THE VIDEOGRAPHER:  The time is
24  5:13 p.m.

Page 292

1          We're off the record.
2          (Whereupon, the deposition
3  concluded at the above time.)

Page 293

1
2
3      CERTIFICATE
4
      I do hereby certify that I am a
Notary Public in good standing, that the
aforesaid testimony was taken before me,
pursuant to notice, at the time and place
indicated; that said deponent was by me duly
sworn to tell the truth, the whole truth, and
nothing but the truth; that the testimony of
said deponent was correctly recorded in
machine shorthand by me and thereafter
transcribed under my supervision with
computer-aided transcription; that the
deposition is a true and correct record of the
testimony given by the witness; and that I am
neither of counsel nor kin to any party in
said action, nor interested in the outcome
thereof.

      WITNESS by hand and official seal
this 8th day of Apr

      Notary Public

Job No. 4534239

74 (Pages 290 - 293)

# EXHIBIT 20

## HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

CONTAINS PROTECTIVE ORDER MATERIAL        Paper _____

UNITED STATES PATENT AND TRADEMARK OFFICE

...................................

BEFORE THE PATENT TRIAL AND APPEAL BOARD

...................................

STEADYMED LTD.,

Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,

Patent Owner.



...................................

Case IPR2016-00006
U.S. Patent 8,497,393

...................................

# DECLARATION OF ROBERT R. RUFFOLO, Jr., Ph.D. IN SUPPORT OF PATENT OWNER RESPONSE TO PETITION

UTC_WAT00640775

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

## TABLE OF CONTENTS

I.    QUALIFICATIONS AND BACKGROUND..................................3

    A.    Education and Experience.................................3

II.   LEGAL STANDARDS PROVIDED BY COUNSEL...........................10

III.  THE '393 PATENT ................................................12

IV.   SUMMARY OF OPINIONS............................................12

V.    BACKGROUND ....................................................14

A.    THE IMPORTANCE OF PURITY IN PHARMACEUTICAL PREPARATIONS ...................................................14

B.    EXAMPLES OF TOXIC CONTAMINANTS IN PHARMACEUTICAL PREPARATIONS .........................................27

VI.   THE INVENTION OF THE '393 PATENT MET A LONG-FELT UNMET NEED .......................................................32

4832-5096-2228.1

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640776

IPR2016-00006
patent 8,497,393

I have been retained by the law firm of Wilson Sonsini Goodrich & Rosati ("WSGR") as an expert consultant to United Therapeutics Corporation ("UTC") in connection with the above-identified matter to provide expert testimony concerning U.S. Patent No. 8,497,393 ("the '393 patent", Ex. 1001) by Batra *et al.*, entitled "Process to prepare treprostinil, the active ingredient in Remodulin®," issued on July 30, 2013. At the request of Counsel for UTC, I hereby submit this expert declaration.

I.   **Qualifications and Background**

A.   **Education and Experience**

1.      I am the retired (as of 2008) President of Research and Development for Wyeth Pharmaceuticals (now Pfizer Inc.) and Corporate Senior Vice President of Wyeth (now Pfizer Inc.). I am currently Managing Director of Ruffolo Consulting, LLC, a consulting company serving the pharmaceutical and biotechnology industries.

2.      I have studied, researched, taught (in medical and pharmacy schools), worked and managed all aspects of the pharmaceutical drug discovery and development fields for over 35 years. I received my Bachelor of Science (B.S.) degree in Pharmacy (*summa cum laude,* and *With Distinction*) in 1973 from The Ohio State University, and was licensed to practice Pharmacy in 1973. I received my Doctor of Philosophy (Ph.D.) degree in Pharmacology in the fields of autonomic and cardiovascular pharmacology in 1976 also from The Ohio State University. My doctoral research included the areas of drug-receptor interactions, autonomic pharmacology, cardiovascular pharmacology, adrenergic drugs, stereochemistry and the study of the stereochemical aspects of adrenergic drugs and their receptors. During the period of my undergraduate and graduate education, I authored or co-authored a number of peer-reviewed research articles describing that work.

3

P. 3

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

3.      Upon earning my Ph.D. degree, I remained at The Ohio State University as a Postdoctoral Fellow for six months, and extended my research on drug-receptor interactions and drug-receptor theory. From 1977-1978, I worked as a Staff Fellow and Postdoctoral Fellow [Pharmacology Research Associate Training (PRAT) Fellow] at the National Heart Lung and Blood Institute of the National Institutes of Health (NIH) in the laboratory of Dr. Marshall Nierenberg (Nobel Laureate for breaking the genetic code), where my research focused on neurobiology, and in particular on synapse formation in brain, spinal cord and skeletal muscle.

4.      In 1978, I began my independent career in the pharmaceutical industry at Eli Lilly & Company as Senior Pharmacologist in the Department of Cell Biology. I subsequently became Senior Pharmacologist in the Department of Cardiovascular Pharmacology in 1981, and was promoted to Research Scientist in 1982. I then became Chairman of the Cardiovascular Research Committee in 1983, where I continued my research in cardiovascular pharmacology, adrenergic drugs, drug-receptor theory, stereochemistry and the stereochemical basis of drug action. My work also expanded into the area of structure-activity relationships and drug design. Shortly after joining Eli Lilly & Company, I was also assigned to supervise a medicinal chemistry laboratory that was dedicated to my work in stereochemistry and structure-activity relationships, and which I personally directed. While working at Eli Lilly & Company, I was credited with discovering the complex mechanism of action of the newly marketed drug for the treatment of acute congestive heart failure, dobutamine (Dobutrex®), which involved the complex interplay of the different pharmacological activities of both enantiomers of the drug, each acting on multiple adrenergic receptors and their subtypes..

5.      In 1984, I joined SmithKline Beckman Pharmaceuticals (now GlaxoSmithKline PLC) as Director of Cardiovascular Pharmacology, where I continued my work in cardiovascular

4

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640778

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

pharmacology, adrenergic drugs, drug-receptor theory, stereochemistry, the stereochemical basis

of drug action, structure-activity relationships and drug design.  As Director of the Department of

Cardiovascular Pharmacology, I supervised a staff of approximately 40 researchers and scientists

in the field of cardiovascular drug discovery and development.  Throughout my tenure at

SmithKline Beckman Pharmaceuticals (and its subsequent corporate identities that changed

through mergers and acquisitions), I also maintained my own laboratory and conducted studies

on the pharmacology of cardiovascular drugs, drug-receptor interactions, adrenergic

pharmacology, stereochemistry, the steric aspects of drug action, and structure-activity

relationships related to new drug discovery.

      6.     I remained at SmithKline Beckman Pharmaceuticals (and its subsequent corporate

identities) for approximately 17 years, over which time I rose to the position of Senior Vice

President and Director of Biological Sciences Worldwide, where I was responsible for a staff of

approximately 500 scientists.  During my last year at the company, I became the Senior Vice

President and Director of all Discovery Research for the Corporation Worldwide, which included

all of the areas of Biological Sciences, Chemical Sciences, Medicinal Chemistry, Physical

Chemistry, Process Chemistry, Molecular and Cellular Biology, and Genetics, with

responsibility for a staff of approximately 1,700 scientists and an annual budget of approximately

$1.2 billion.

      7.     It was during my tenure at SmithKline Beckman Pharmaceuticals (and its

subsequent corporate identities) that I was personally responsible for the discovery and

subsequent development of Coreg® (carvedilol) for the treatment of chronic congestive heart

failure, for which I was awarded the *Discoverers Award* in 2008 by the Pharmaceutical Research

and Manufacturers Association (PhRMA), which is the major trade association for the

5

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640779

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

pharmaceutical industry and is comprised by Industry CEOs and Senior Executives, as well as a group of my peers (i.e., Presidents of R&D). Coreg® revolutionized the treatment of chronic congestive heart failure by markedly reducing death, hospitalization and morbidity from this devastating disease. Coreg® is now the "standard of care" for the treatment of congestive heart failure. The FDA approved Coreg® in 1997, after more than 10 years of research and development work that I researched and personally led, and the drug is currently prescribed globally to treat congestive heart failure. The drug has saved tens of millions of lives throughout the world.

8.      Also during my tenure at SmithKline Beckman Pharmaceuticals (and its subsequent corporate identities) beginning in 1984, I personally led and managed the discovery of ropinirole (Requip®) for the treatment of Parkinson's disease. Ropinirole is a highly selective dopamine DA2 receptor agonist. Ropinirole was approved by the FDA in 1997 for the treatment of the signs and symptoms of Parkinson's disease, both as monotherapy and as adjunctive treatment in combination with Levodopa.

9.      Also during my tenure at SmithKline Beecham Pharmaceuticals (and its subsequent corporate identities), I personally initiated and led the Angiotensin II Receptor Antagonist Program, and I was personally involved in the discovery and development of the marketed angiotensin II receptor antagonist, eprosartan mesylate (Teveten®), which was approved by the FDA in 2001 for the treatment of hypertension.

10.      As a result of my research at The Ohio State University, Eli Lilly & Company and SmithKline Beckman Pharmaceuticals (and its subsequent corporate identities), I gained considerable experience in all aspects of drug discovery and development. In addition, throughout this entire period, I maintained my own personal laboratories and conducted my own

4832-5096-2226.1

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640780

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

independent research in cardiovascular pharmacology, drug-receptor theory, autonomic pharmacology, stereochemistry and the stereochemical requirements of drug action and structure-activity relationships. It was during this period that my laboratory was the first to discover that three subtypes existed for both alpha-1 and alpha-2 adrenoceptors, which was subsequently proven to be correct when the human genome was sequenced a decade later, confirming indeed that three subtypes existed for each of these two adrenoceptor subtypes. My personal laboratory also collaborated with many internationally recognized scientists and their laboratories throughout the world. In addition, I have been invited to lecture at international symposia and at leading research institutions and hospitals around the world on most areas of my research.

11.    In 2000, I assumed the positions of Executive Vice President of Research and Development at Wyeth Pharmaceuticals as well as Corporate Vice President, and I was appointed to the Corporate Management Committee and the Board of Directors (as a non-voting member), both of which were chaired by the CEO. Eighteen months later, I was promoted to the positions of President of Research and Development, as well as Corporate Senior Vice President, and I was also appointed as Chair of the Science Subcommittee of the Board of Directors. I was responsible for a staff of approximately 7,000 employees globally, with an annual budget in excess of $3 billion. During this period, I was credited with changing the paradigm for drug discovery and development at Wyeth by markedly improving R&D productivity. This work has been highlighted in *BusinessWeek* magazine, and was the subject of a "Case Study" conducted by the Harvard Business School, which was published in the *Harvard Business Review* in 2007. The Harvard Business School "Case Study" has been covered extensively in business school textbooks, and is a commonly taught case study in many leading business schools throughout the

UTC_WAT00640781

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

world, including the Harvard Business School, Wharton Business School, Columbia Business School, Duke University Business School and the London School of Economics. The re-engineering of Research and Development at Wyeth under my direction was also the subject of many articles appearing in major newspapers and trade journals globally. In my role as a scientist and senior pharmaceutical executive, I oversaw and managed each and every aspect of the pharmaceutical drug discovery and development processes. My areas of responsibility included Pharmacological Sciences, Biological Sciences, Biochemical Sciences, Medicinal Chemistry, Physical Chemistry, Molecular Modeling, Spectral Sciences, Pharmaceutics and Pharmaceutical Sciences, Drug Safety and Toxicology, Drug Metabolism, Clinical R&D (which included all clinical trials from Phase 1 through Phase 3), Regulatory Affairs [for FDA (U.S.), EMA (Europe), PMDA (Japan) and every regulatory agency in the world], Medical Affairs, Global Safety Surveillance and Epidemiology, Process Chemistry at the pilot plant and kilo plant levels, as well as the transfer of chemical processes to manufacturing scale, and Post-Marketing Research and Surveillance for all Wyeth drugs throughout their lifetimes on the market.

12.     Following my retirement from Wyeth in 2008, I served for one year as a consultant to Wyeth Pharmaceuticals and Pfizer, Inc. Since then, I have been a consultant to most of the major large and mid-sized pharmaceutical companies and many biotechnology companies, as well as other industries outside of biomedical research, as Managing Director of Ruffolo Consulting, LLC. My consulting responsibilities include the areas of R&D Leadership, Leadership Development, Management of Scientific Innovators, Managing Innovation and Managing Organizational Change.

13.     During my career as an executive in the pharmaceutical industry, both at SmithKline Beckman Pharmaceuticals (and its subsequent corporate identities) and Wyeth

4832-5098-2228 1

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640782

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

Pharmaceuticals, I managed and oversaw the discovery and development of over two-dozen innovative new drugs that were approved by the FDA and other regulatory agencies around the world.

14.     During my career, I have authored or co-authored nearly 500 full-length scientific publications, over 200 abstracts, and I have edited 17 books. I was founder and editor-in-chief of three international scientific journals, and have served on the editorial boards of 29 international scientific journals devoted to the fields of pharmacology, biochemistry, pharmaceutical sciences, medicinal chemistry, physical chemistry, analytical chemistry, stereochemistry and stereoselectivity of drugs. I have lectured extensively in scientific and industrial forums worldwide. I have also been invited to speak extensively on the topics of Pharmaceutical Research and Development Management, Research and Development Productivity, Organizational Change, Federal Regulation of Drug Approval and the Principles of Executive Leadership at national and international scientific and management meetings and symposia, and since my retirement, also as a consultant to most of the mid-sized and large pharmaceutical companies and many biotechnology companies..

15.     I am a member of several professional organizations including the American Society for Pharmacology and Experimental Therapeutics (ASPET), the British Pharmacological Society, the International Union of Pharmacology (IUPHAR), where I was also Chairman of the Committee on Drug Receptor Nomenclature which was responsible for the naming of all drug receptors and ion channels worldwide, and the professional organization comprised of the international Presidents of Research & Development from large Pharmaceutical Companies (a group called "Hever"). I have served as an elected officer of many of these organizations.

4832-5096-2228.1

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640783

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

16.     I have received a number of prestigious awards for accomplishments throughout my career, including two *Lifetime Achievement Awards* (one from the Scrip Awards and the other from The Ohio State University; one of only three ever to be awarded), two *Honorary Doctorates* (one from the University of Catania, Italy, and the other from West Virginia University), *Chief Scientific Officer of the Year* (for being the best leader of R&D in the pharmaceutical and biotechnology industries), the *John Jacob Able Award*, the *Lorenzini Gold Medal for Biomedical Research*, and the *Prix Galien Special Commendation for Excellence and Innovation in Research* to name but a few. I was also the winner of *"The Great Oxford Debate"* at the world-renowned Oxford Union of Oxford University, UK. Recently, the American Society for Pharmacology and Experimental Therapeutics (ASPET) has established an annual award in my name to honor the contributions that I have made to drug discovery and development; the Award is entitled the *"Robert R. Ruffolo Career Achievement in Pharmacology Medal,"* which is awarded annually to the most prestigious scientists in the world at the height of their careers. The American Society for Information Science & Technology has designated me as a *Highly Cited Scientist* for being among the top 100 most cited Pharmacologists in the world for over two decades.

17.     My *curriculum vitae* is submitted herewith as Ex. 2023.

## II.     Legal Standards Provided By Counsel

18.     I have been informed by Counsel that because each claim defines a separate invention, the validity of each claim in a patent is addressed independently of the validity of the other claims in that patent.

19.     I have also been informed by Counsel that the claims of the '393 patent are "product-by-process" claims. I have also been informed by Counsel that the "product" of

10

UTC_WAT00640784

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

product-by-process claims include structural and functional differences that are present even if they are not explicitly claimed.

20.     I understand from Counsel that, in addition to considering the prior art, certain objective indicia may also provide evidence that a claimed invention is not obvious. I am informed by Counsel that these objective indicia, which are also referred to as secondary considerations, may include factors such as commercial success, unexpected results, the resolution of long-felt, but previously unmet needs, skepticism by others prior to achieving the invention, failure of others to achieve the invention, praise from others for the invention, and copying by others.

21.     I have been informed by Counsel that a patent is to be interpreted from the perspective of a hypothetical person referred to as the person of ordinary skill in the art ("POSA") to which the patent pertains. I have also been informed by Counsel that a determination of the level of ordinary skill is based on, among other things, the type of problems encountered in the art, prior art solutions to those problems, rapidity with which innovations are made, sophistication of the art, and the educational level of active workers in the field. I have been informed that in any particular case, every factor may not be present, and one or more factors may predominate. I understand the POSA is presumed to know all prior art that is reasonably relevant to the subject matter of the claimed invention.

22.     I understand from Counsel that the validity of a patent claim must be assessed from the perspective of a POSA at the time of the invention.

23.     I have reviewed Dr. Williams' Declaration (Ex. 2020) and his definition of a POSA with respect to the patent-in-suit and I agree with his opinion that a POSA would have had, at the time of the claimed invention, a doctorate degree in chemistry, pharmaceutics,

11

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640785

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

pharmaceutical sciences, medicine, or a related discipline. Alternatively, the POSA may have had a lesser degree in one of those fields, with correspondingly more experience. To the extent necessary, a POSA may have collaborated with others of skill in the art, such that the individual and/or team collectively would have had experience in synthesizing and analyzing complex organic compounds.

24.    I understand that SteadyMed's expert, Dr. Winkler, in his declaration has opined that a POSA would have "a master's degree or a Ph.D. in medicinal or organic chemistry, or a closely related field. Alternatively, a person of ordinary skill would include an individual with a bachelor's degree and at least five years of practical experience in medicinal or organic chemistry." Ex. 1009 at ¶14.

25.    My opinions in this declaration are expressed from the view of a POSA at the time of the priority date of the '393 patent. These opinions apply equally whether Dr. Williams' definition of a POSA or Dr. Winkler's is applied.

**III.   The '393 Patent**

26.    This case relates to a process to prepare an improved treprostinil product, the active ingredient in Remodulin®, as described in the '393 patent. As described in the '393 patent, treprostinil is prepared as an improved drug substance and active pharmaceutical ingredient (API) in a more pure form. The new preparation of treprostinil described in the '393 patent also has lower levels of impurities.

**IV.   Summary of Opinions**

27.    This report contains a statement of my present opinions and includes the bases and reasons therefore, and the data and other information that I have considered in forming these opinions. In this report, I offer herein my opinions on the importance of drug purity and

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640786

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

impurities, and on the improvements made in these properties as a result of the new preparation of treprostinil as described in this patent.

28.     In forming my opinions, I have reviewed several documents, such as the documents cited by SteadyMed and UTC in this case, the '393 patent and its file history, as well as references that I have found through my own research. I have also based my opinions on my own extensive general knowledge, comprising nearly 40 years of experience, of the areas of pharmaceutical drug synthesis, production of API, manufacturing, formulation and preparation of final drug product.

29.     If called to testify, I will, as needed, explain the principles and terminology used in this report, as well as in the materials referenced herein. I may use demonstrative aids and exhibits to illustrate these principles and the opinions expressed. I have not yet prepared any such demonstrative aids.

30.     I may also testify or provide an opinion in rebuttal to testimony or opinions offered by other witnesses in response to the opinions stated herein. I reserve the right to supplement or otherwise amend my opinions.

31.     It is my opinion that the invention of the '393 patent satisfied a long-felt unmet need by providing a commercial scale synthesis of treprostinil that results in a treprostinil product with higher overall purity and lower levels of individual impurities. As with all drug substances such as treprostinil, the FDA seeks to list, quantitate, and minimize impurities, and maximize the overall purity, of such drug substances as much as possible for the benefit of patients. The claimed invention of the '393 patent invention meets this need.

13

UTC_WAT00640787

HIGHLY CONFIDENTIAL

UTC_WAT00640788

IPR2016-00006
patent 8,497,393

V.     Background

A.     **The Importance of Purity in Pharmaceutical Preparations**

32.     The purity of a pharmaceutical drug substance, both active pharmaceutical ingredient (API) and final or finished drug product, is of the utmost importance to regulatory agencies, and especially the FDA.  Accordingly, the first sentence of the Code of Federal Regulations (C.F.R.) Title 21, Part 610, Subpart B, Section 610.13 is *"Products shall be free of extraneous material except that which is unavoidable in the manufacturing process described in the approved biologics license application."* 21 C.F.R. § 610.13(b) (2015).  Although the FDA provides no absolute level of purity required for any given drug, based on my experience of approximately 40 years in the pharmaceutical industry interacting with the FDA on regulatory issues, it is commonly assumed that, with rare exception, licensed drugs will have purities in excess of 99%, and often significantly higher.  ICH Impurities in New Drug Substances Q3A(R2) (2006) ("Q3A(R2)", Ex. 2038) at 12; ICH M7 Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk, 2015 ("ICH M7", Ex. 2039) at 24-25.  There is so much concern with the purity of drug substance and drug product that the highest level of purity possible should be achieved, even if that means changing the synthetic method as has been done in the '393 patent. Olsen, Bernard A., *What's New with Impurities in Pharmaceuticals?*, Southern California Pharmaceutical Discussion Group, January 15, 2015 (Ex. 2040) at 14.  Drug purity is of such importance to regulatory agencies that the purity level of a drug substance and API **must** appear in the drug product specification, which is the quality control document of the drug's Certificate of Analysis for each batch of drug substance to be released for subsequent formulation into the final drug product. 21 C.F.R. § 600.3 (kk).  If a batch of drug substance falls short of its lowest purity limit listed in the

14

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

specification, that batch of the drug substance must be rejected, even if the deviation in purity is as low as 0.1%. For example, if the actual purity of an API is 99.4% and the lowest limit of purity in the Drug Specification of the Certificate of Analysis is 99.5%, the entire batch of API must be rejected. As the FDA clearly states, *"Each component* [of API] *shall be tested for conformity with all appropriate written specifications for purity, strength and quality." Id.* at § 211.84(d)(2).

33.     The FDA defines purity as *"relative freedom from extraneous matter in the finished product, whether or not harmful to the recipient or deleterious to product." Id.* at § 600.3 (r). Any batches of drug substance that fail to meet the levels of purity indicated in the product specification must not only be rejected, but rejected batches must also be *"identified and controlled under a quarantine system designed to prevent their use in manufacturing or processing operations for which they are unsuitable." Id.* at § 211.110(a). The position of the FDA on the significance of drug purity is absolutely clear, and would be understood by a POSA.

34.     The function of the FDA is to approve new drugs based on their safety and efficacy, as well as the balance between the benefits and risks of new drugs to patients. Biotech, Janet Woodcock, The Political Economy of FDA Drug Review: Processing, Politics, And Lessons For Policy, FDA) (Ex. 2041) at 1-2. The FDA's focus on purity relates specifically to their many analyses that are related to the overall assessment of drug safety, and relative risk, of the new product to be marketed, and is done in the interest of patient safety. Ex. 2039 at 5-9, and 20.

35.     Guidelines and requirements for the levels of purity of new drug substances and new drug products have been increasing over the past few decades. The FDA's requirements for increases in drug purity are based on their prior experiences (both positive and negative) in

15

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640789

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

approving drugs with varying degrees of purity.  Based on my experience, the FDA understands that the levels of purity that they require are dependent upon improvements in technologies available to purify drug substances, as well as improvements in the levels of detection of various drug components, including impurities, that are available to pharmaceutical companies to produce, and equally important, manufacture, highly pure compounds. Ex. 2038 at 6-9.  The trends for improvements in these technologies have unmistakably improved over the decades, and accordingly, so have the FDA's requirements for drug purity.  Accordingly, in my experience, the drug purity requirements of the FDA represent a constantly moving (and improving) target.

36.    Regulatory agencies have also sought to increase levels of purity, and consequently decrease levels of impurities, in order to provide to the maximum extent possible, the highest level of safety to patients. Ex. 2038 at 13-15.  As indicated above, impurities are extraneous substances that are present in the API and final dosage form which add no value to the new drug product or to the patient. 21 C.F.R. § 600.3(5)(r).  Because impurities add no value or benefit to the new drug product, they are, at best, irrelevant, and at worst, sources of potential adverse toxicities to patients.  Impurities, therefore, can only add to the risk assessments, which are often unknown, made by regulatory agencies in the evaluation of new drug products. Ex. 2040 at 3-4 and 5-8.

37.    Impurities may be introduced into the API or final dosage form during any of the many steps involved in the synthesis, formulation and manufacturing of the drug product. ICH Q3D Elemental Impurities ("ICH Q3D", Ex. 2043) at 5; Ex. 2038 at 6-7.  It has long been the desire of regulatory agencies, and especially the FDA, to require pharmaceutical companies to produce the highest levels of drug purity that are possible and practicable.

16

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640790

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

38.     Regulatory agencies have observed toxicities, or adverse events, resulting from drugs in clinical development as well as approved drugs that were not related to the new drug product itself, but rather to the impurities present in these new drugs (see examples below at ¶58). Because impurities add nothing to the benefit of a new drug, by extension, it is the view of regulatory agencies that impurities represent only potential risk to patients. Ex. 2039 at 12-16. Accordingly, regulatory agencies encourage (and may mandate) pharmaceutical manufacturers to increase levels of purity of their new drug substance.  Even for products already approved by the FDA and on the market, it has been my experience that the FDA often encourages manufactures to continue to develop new synthetic and/or manufacturing processes to improve purity, and decrease levels of impurities, even further.  This desirable goal is one of the objects of the invention of the '393 patent with respect to the new preparation of treprostinil with a higher level of purity.

39.     The opening sentences of ICH M7 begin as follows: *"The synthesis of drug substances involves the use of reactive chemicals, reagents, solvents, catalysts, and other processing aids. As a result of chemical synthesis or subsequent degradation, impurities reside in all drug substances and associated drug products."* Id. at 5.  These sentences alone address the importance that regulatory agencies, including the FDA, attach to drug impurities, and the significant risks that may be associated with them.  These sentences are also among the fundamentals taught in all introductory courses in Pharmacology and Toxicology (as an adjunct faculty member at Baylor University Medical School, West Virginia University Medical School, and The Ohio State University Department of Pharmacology, I teach this very concept to medical and pharmacy students in their second year pharmacology courses).

4832-5096-2228.1

UTC_WAT00640791

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

40.     All drug substances contain impurities, and these impurities can range from

harmless to extremely toxic, and often regulatory agencies do not know the risks of all (and

sometimes any) of the impurities present in new drug substances.  Accordingly, regulatory

agencies focus intensely on the numbers and levels of impurities that exist in a drug substance,

such as API and the finished drug product. Ex. 2043 at 13-16.  With the information on

impurities provided by pharmaceutical companies, and analyzed by the regulatory agencies, risk

assessments are made or estimated by regulators with respect to the relative hazard that

impurities, including trace impurities, may have on patients. Ex. 2039 at 6-10.  This task

becomes more complex and uncertain when one considers that there will also likely exist

impurities that are present but not detectable (based on limitations in levels of detection; see

penicillin example below at ¶62), yet may still present risks to individual patients, and the

population of patients at large, who take any given medication.

41.     In their assessment, the FDA and other regulatory agencies attempt to determine

whether the impurities that are known to be present in the new drug substance have the capacity

to induce injury or adverse effects in patients, as well as the types of injuries or adverse effects

that may occur at the anticipated exposure level to the patient. *Id.*  In so doing, regulatory

agencies rely on the concept of the "threshold" for producing an adverse health effect.  With

respect to threshold, the concept of Threshold of Toxicological Concern (TTC) is considered (as

discussed below), which is most often associated with impurities that are known or suspected to

be mutagenic compounds that have the capacity to damage DNA and therefore the possibility of

causing cancer, or impurities known to be highly toxic to humans or animals. *Id.* at 7-8 and 12-

13. Regulators will also consider the type of adverse health effect that each impurity may

produce, such as direct cell, tissue or organ damage, carcinogenicity, teratogenicity, reproductive

4832-5096-2228.1

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640792

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

injury, chemical injury, and other types of injuries that may occur from exposure to an impurity. These considerations by regulatory agencies will also be viewed within the overall context of the benefit/risk ratio of the drug substance itself, as well as the severity of the disease to be treated, the availability of other potentially safer therapeutic alternatives or options, the types of patients being treated (i.e., male, female, children, elderly) and the duration of treatment (acute vs. chronic). *See, e.g., id.* at 12-16.

42.     Among the many considerations that the FDA will explore with respect to impurities in pharmaceutical preparations is the dose-response relationship, or more appropriately, the dose-toxicity relationship, of the impurity. Accordingly, regulatory agencies also rely heavily on the Permitted Daily Exposure (PDE) of the impurity in the individual patient and the population of patients taking the drug (i.e., the maximum allowable level of the impurity that the patient or patient population can be exposed to), the length or duration of exposure to the impurity (acute vs. chronic administration of the drug), and the overall risk assessment made for each impurity. *Id.* at 13-16; *see also*, Ex. 2038 at 14-15; Ex. 2043 at 5-15. This is to say that regulatory agencies are realistic that patients will undoubtedly be exposed to potentially toxic impurities, and as such, regulatory agencies work diligently to determine how many patients may be injured from the anticipated level of exposure to the impurity in the new drug product. *Id.* These assessments are not viewed in isolation, but rather within the context of the other considerations, such as the benefits and risks of the new drug substance, the severity of the disease to be treated and the duration of therapy, as well as the availability of other potentially safer therapeutic alternatives. *Id.* Regulatory agencies will (reluctantly) accept potential or possible risks from impurities when the new drug product is directed to a serious disease with high unmet medical need, and for which there are few or no other therapeutic options. Ex. 2038

19

UTC_WAT00640793

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

at 14-15.  But even in these situations, regulatory agencies still press for the highest levels of purity that are possible and practicable.  Again, this desire of regulatory agencies for the highest levels of purities in pharmaceuticals is one of the subjects of the inventions in the '393 patent.

43.     Based on my personal experience in the pharmaceutical industry, depending upon the nature and number of impurities, and their levels in the drug substance, the FDA may request that individual impurities be synthesized and tested *directly* in a variety of animal safety test systems.  Alternately, it is possible to evaluate *indirectly* the drug substance itself containing the impurities at very high doses in animal safety test systems, such that the absolute level of the impurities are considered to be sufficiently high to provide a level of exposure to the impurity that would be considered to be appropriately high to detect, with a high level of confidence, potentially injurious events in the safety test systems.  For practical considerations, the latter indirect course is the most commonly taken path.  When one or the other of these approaches is taken to assess potential safety risks in animal safety studies, either directly or indirectly, and the results of those safety studies indicate that little or no risk is likely, the potential safety risks of one or more of the impurities in the new drug substance are considered to be "*qualified*", and generally considered by regulatory agencies to present little or no risk to patients.  Ex. 2038 at 9-14.  One significant limitation of the testing of impurities in the drug substance to qualify the impurities, as well as the safety testing done for the drug substance itself, is that these safety test systems rely primarily or exclusively on animal safety models and test systems, and these test systems do not always translate with fidelity to the human patient (*see* below at ¶55).  Differences in safety assessment of drugs (and impurities) between animals and humans can result because of differences in biological and biochemical processes between animals and humans, differences in metabolism and elimination, or differences in the duration of exposure

20

UTC_WAT00640794

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

(animal testing is relatively limited in duration for a new drug substance or impurity, compared to exposure in humans which may extend for decades). As a result, there is no way for regulatory agencies to be absolutely certain of the safety risks associated with impurities in new drug substances. To accommodate for this, the analyses used by regulatory agencies to assess the risks of impurities are highly conservative, yet they still cannot guarantee that patient safety will not be compromised by an impurity. Ex. 2039 at 13-16. As a result, regulatory agencies require that impurities be limited to the lowest levels that are possible and practicable. Again, lowering the levels of impurities in treprostinil is one of the major benefits of the '393 patent, and results in higher levels of purity for the treprostinil product.

44.     Because impurities in a pharmaceutical preparation are so critically important, regulatory agencies have issued specific guidelines that are consistent with those guidelines outlined in the ICH Impurities in New Drug Substances Q3A(R2) monograph. Ex. 2038 at 11-12. Inasmuch as most drugs are administered in dosages of less than 2 grams per day, only the guidelines for these drugs will be discussed herein. And indeed, treprostinil and the '393 patent fall into this category.

45.     Because of the critical significance attached by regulatory agencies to impurities in pharmaceutical preparations, the levels and types of impurities must be included in routine batch specifications for all new drug substances. Ex. 2038 at 7-10. When levels of individual or total impurities exceed those levels listed in the specifications of the batch records required for the release of the drug substance, the batch must be rejected. 21 C.F.R. §§ 211.1 and 211.22(c). For example, if an individual impurity, or the total of all impurities found in a given batch of drug substance, exceeds the limits set in the specifications, even by amounts as low as 0.1%, the entire batch must be rejected. Accordingly, even very small differences in the levels of purity, or

21

UTC_WAT00640795

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

the levels of impurities, can mean the difference between acceptance or rejection of an entire batch of drug substance.

46.     Regulatory agencies categorize the treatment of impurities based on the levels that exist in the drug substance, and they categorize them into three different ways: a) Reporting Threshold, b) Identification Threshold and c) Qualification Threshold. Ex. 2038 at 10-12.  These threshold levels are extremely low (i.e., conservative) because of the importance assigned by regulators to impurities, and the potential for toxicities caused by them.  The specific requirements, as set forth by the ICH, are described below:

47.     Reporting Threshold: when a given impurity is present at a level that is less than or equal to 0.05%, the impurity must be *reported* in the specification of the drug substance for manufacturing. *Id.*

48.     Identification Threshold: when the amount of a given impurity exists at a level that is equal to or greater than 0.1%, or when the total dose of impurity administered per day is equal to or greater than 1.0 mg per day (whichever is lower), the impurity must be *identified* chemically in the specification of the drug substance for manufacturing. *Id.*

49.     Qualification Threshold: when a given impurity exists at a level that is equal to or greater than 0.15%, or when the total dose administered per day is equal to or greater than 1.0 mg per day (whichever is lower), the impurity must be *qualified*, which means that the biological safety must be established in standard safety and toxicology studies as described above. *Id.; see also* 13-15. This may either be done indirectly by studying in animal safety models very high doses of the drug substance containing sufficiently high levels of the impurity to be *qualified*, or directly by studying the isolated and purified impurity to be *qualified* by itself in the safety studies. *Id.* at 9-10.  In practice, *qualification* of an impurity is most commonly done indirectly

4832-5096-2226.1

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640796

IPR2016-00006
patent 8,497,393

by studying high doses of the drug substance containing the impurity in animal safety test systems.

50.　　As a result of these thresholds, by definition, the limit of detection for impurities (and therefore total related substances) *must be* at least as low as 0.05%.

51.　　Often the FDA also requires a measure of the Total Related Substances, which is a measurement of all of the identified impurities added together. *See, e.g.*, Ex. 2006 at 6. This number is essentially a measurement of the purity of the sample itself.

52.　　For each impurity measurement and for the total related substances measurement, the Drug Specification in the Certificate of Analysis also includes a limit for those impurities, reported as "Not More Than", or "NMT", a certain percentage. *Id*. This number is not a measurement of the error, but is an indication of what level in the API or final product the FDA has permitted for that impurity.

53.　　An assay is a measure of the purity of a sample of the drug substance (or drug product) often performed in comparison to a "reference standard". *See, e.g.*, Ex. 2006 at 6; *see also* ICH Guidance For Industry: Q7A Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients (2001) ("Q7A", Ex. 2044) at 34-35; *see also* Reviewer Guidance: Validation of Chromatographic Methods (1994) ("Reviewer Guidance", Ex. 2035) at 8-11. The "reference standard" is a high quality and relatively highly purified sample against which all future samples of the drug are compared and measured. Ex. 2035 at 8. It is important to note that these reference standards do not represent absolute purity (which is impossible), and they also do not represent the maximum level of purity that can be obtained for any given drug. Reference standards are simply deemed to be high quality standards that all future samples of the drug will be measured against. A reference standard should always be included in assays required for

23

HIGHLY CONFIDENTIAL

UTC_WAT00640797

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

determination of the acceptability or unacceptability of manufacturing batches of API or final product in accord with the Drug Specification of the Certificate of Analysis. Ex. 2035 at 9-10. Accordingly, it is possible, and quite common, for a pharmaceutical company to develop an even more highly purified version of a drug than the reference standard for that drug, and as a result, purity levels for the drug will be in excess of 100% (relative to the reference standard) because it is more pure than the reference standard. This is a highly desirable outcome inasmuch as it indicates that the drug is even more pure than the "accepted" highly purified reference standard. Importantly, purities of a drug in excess of 100% (relative to the reference standard) do *not* represent an error in the assay, but simply indicate that the preparation of the drug is *more pure* than the reference standard. It cannot be overstated that a reported purity of a drug of over 100% (relative to the reference standard) does not indicate an error in the measurement, but simply that the sample being analyzed has a higher purity than the reference standard. As is the case for most assays, reported assay values may span a range of acceptable limits that can include and go beyond 100%, indicating that certain samples may be even more pure than the reference standard they are compared to.

54.     It is also important to note that because some impurities are extremely toxic at very low levels of exposure, Thresholds of Toxicological Concern can, and often are, lowered, beyond the guidelines described above, in the specifications for the synthesis and manufacturing of a drug substance in order to be conservative. Ex. 2039 at 12-15. Conservative specifications, which provide a higher level of certainty that the drug product is safe from the standpoint of impurities, can make it especially difficult for API production plants and manufacturing plants that produce final drug product to meet the specifications established for a new drug substance. This creates the situation where exceedingly small differences in the allowable levels of purity

24

UTC_WAT00640798

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

and impurities make it difficult to meet synthesis and manufacturing specifications. It has been my experience that this is particularly important for drugs of extremely high potency, such as the prostaglandins, prostanoids and prostaglandin-like drugs in general, and treprostinil specifically, which may contain trace amounts of potent structural analogs as impurities. As such, establishing specifications for purity and levels of impurities for extremely potent drugs, such as treprostinil, and being able to meet those specifications for synthesis of API and manufacturing of final drug product, is especially difficult for such highly potent drugs. Accordingly, the potential risk from impurities of even very potent drugs is not minimized because of the lower amount of API used in the final drug product.

55.      In addition to the discussion above of the regulatory approach to dealing with the critical issue of impurities in drug substances, there are a number of other issues involved in coping with impurities that regulatory agencies must consider. Among the most important of these other considerations is the fear is that toxic effects of impurities, and especially *qualified* impurities, in drug substances may not be detectable in animal safety and toxicology studies, but yet may still occur in humans, and especially for those drugs that are used on a more chronic basis where they may be administered to patients for decades (especially in view of the relatively short-term nature of animal safety and toxicology testing). Diethylstilbestrol is one such example. This drug was determined to be safe in animal studies, but was subsequently found to produce higher incidences of vaginal and cervical cancer in second-generation female offspring who were exposed to the drug *in utero* while their mothers were being treated. Schrager et al., Diethylstilbestrol Exposure, 2004 (Ex. 2045) at 2-3. These types of results represent false negatives, or Type I Error, in that the animal safety studies failed to predict human toxicities. Carpenter, The Political Economy of FDA Drug Review: Processing, Politics, and Lessons for

25

4832-5096-2228.1

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640799

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

Policy (2013) (Ex. 2042) at 4. And the converse may be true as well, as in the case of saccharin, which was found to be carcinogenic in animals, but not in humans. NTP Report on Carcinogens Background Document for Saccharin, March 1999 (Ex. 2046) at 102. This situation represents a false positive, or a Type II error (Ex. 2042 at 4) which will often result in the termination of development of an otherwise safe and potentially highly beneficial and medically necessary new drug. This latter situation is most unfortunate when a medically necessary product never reaches the human patient.

56.     For these reasons, and others, the types and levels of impurities in drug substances are of the utmost importance to the FDA, and as a result, the FDA insists on the highest level of purity that is possible in a drug substance, and alternatively, the lowest levels of impurities possible. Although the FDA and ICH make recommendations with respect to the levels of impurities that are present, for example a threshold of 0.1%, or a total dose of 1.0 mg per day, whichever is lower (Ex. 2038 at 12), it is important to note that these are simply guidelines, and previously unknown impurities, or known impurities of high risk, can be held to even lower thresholds at the discretion of the regulatory agencies, or potentially not permissible at all down to the level of detection. Ex. 2039 at 12-16. Based on the present FDA and ICH guidelines, a potentially toxic impurity that is not demonstrated to be a risk in *animals*, could be present in a drug substance at a level resulting in exposures of up to 1.0 mg per day that could, in fact, be toxic to *humans*, and yet may *still* not be *identified* or *qualified* (i.e., they were shown or assumed to be safe based on animal studies). Given the number of compounds known to be highly toxic at doses of 1.0 mg or less per day, even these relatively stringent criteria for reporting impurities in specifications for the synthesis and manufacture of drug substance could still expose humans to significant risk, and regulators are acutely aware of this. Accordingly,

26

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640800

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

any procedure or method that provides for a higher level of drug purity and/or lower levels of impurities is of critical importance to regulatory agencies and to patients in general. Again, one of the major inventions in the '393 patent is a new synthesis of treprostinil that results in a higher level of purity.

57.     The regulatory agencies have set specific limits on levels of impurities in drug substances as described above, and they use detailed and complex analyses to assess risk to patients from impurities in drug substances. Accordingly, regulatory agencies insist that drug substances must have the highest levels of purity as possible, and contain the lowest levels of impurities as possible. As a result, new synthetic processes for an existing drug that increase purity and reduce impurities, both in number and level, are considered to be critically important to regulators, patients and public health (Ex. 2040 at 14). Even small increases in purity and decreases in impurities can have significant impacts on patient safety, as well as for acceptance or rejection of batches of manufactured drug substance. My personal experience has been that when considering the safety and toxicology profile of impurities, it is often more efficient to reduce the levels of impurities in the drug substance by altering or changing the synthetic method (*id.*), as opposed to simply adding additional purification steps, to achieve the desired reduction or elimination of impurities, as UTC has done and demonstrated for treprostinil in the '393 patent.

**B.     Examples of Toxic Contaminants in Pharmaceutical Preparations**

58.     Toxic impurities in drug substances are not a hypothetical or theoretical discussion. Indeed, highly toxic impurities in drug substances, API and final formulated product are, indeed, a reality with sometimes tragic outcomes. Specific examples of marketed drugs with highly toxic impurities are presented in this section as well as several examples of the negative

27

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640801

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

impact that toxic impurities in pharmaceutical preparations have had on patients. These examples highlight the critical importance of producing drug product of the highest possible quality and purity and with the lowest possible level of impurities, with both objectives strongly supported and often required by regulatory agencies globally, as reflected in the current ICH Guidelines. Ex. 2039 at 12-16.

59.     The existence of highly toxic impurities in commonly used pharmaceutical preparations is not new and is not uncommon. And despite the strict limitations placed on toxic impurities by regulatory agencies, following the recommendations of the ICH discussed above, even newly approved pharmaceuticals may contain highly toxic impurities. It is important to note that even with the precautions taken by regulatory agencies to restrict or limit the levels of toxic impurities present in pharmaceutical substances, and limitations in the maximum allowable level of exposure to these impurities, that have been discussed previously, there is no guarantee that these toxic impurities are harmless even at the low levels that are permitted to exist in drug products. And this is especially true when these assessments are made in experimental animal safety/toxicology studies, which as discussed above, do not necessarily translate to safety in humans. In fact, regulatory agencies acknowledge that even these low levels of impurities allowed by their guidelines can still result in adverse toxicities in patients, and they have even calculated the risks of adverse toxicities, including cancer, that may be associated with these low levels. Ex. 2039 at 13-16; *see also* Ex. 2043 at 15-16.

60.     As a result, it is still considered absolutely essential for pharmaceutical manufacturers to produce pharmaceutical products with the highest levels of purity, and the lowest levels of impurities, and I have observed over the course of my career that regulatory agencies have at times recommended changing synthetic and manufacturing procedures to

UTC_WAT00640802

4832-5096-2226.1

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

develop improved procedures to enhance purity and decrease the number and levels of impurities,
as has been done in the '393 patent for treprostinil. *Id.*

61.    Despite these significant limitations, which are well-known to regulatory agencies,
there do exist examples of trace impurities in pharmaceutical substances that have produced
significant, and often tragic, toxic adverse effects in patients. Some representative examples of
these toxic or potentially toxic effects of impurities in drug substances and drug products are
presented below:

62.    Penicillins: Penicillins represent a class of drugs that are among the best-known
and most extensively studied examples of trace impurities that can cause serious and potentially
life-threatening adverse events. Penicillins refer to a group of important antibiotics belonging to
the class of beta-lactam antibiotics. FDA Guidance for Industry, Non-Penicillin Beta-Lactam
Drugs: A CGMP Framework for Preventing Cross-Contamination, (2013) ("Penicillin Guidance",
Ex. 2047) at 4-9. Despite the very high level of safety and efficacy associated with the
penicillins (they may be administered at doses of millions of international units, even to newborn
babies), they are, as a class, known to produce serious and life-threatening allergic reactions,
which, at their most serious levels, can result in anaphylaxis and death. *Id.* Penicillins have been
known to be trace impurities in other non-penicillin products that are manufactured by
companies that also manufacture penicillins. Penicillin impurities at minute levels have been
introduced from the environment (e.g., air in the manufacturing facility) into both the API and
finished products manufactured in the same facilities as the penicillins. *Id.* This resulted in
immeasurable amounts of penicillin impurities to occur in other unrelated products which, when
consumed by patients, have resulted in allergic reactions ranging from minor itching (e.g., rashes)
to death (e.g., from anaphylaxis). *Id.* Because penicillins are so highly sensitizing to the human

4832-5096-2226.1

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640803

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

immune system, and the level of penicillin impurity can be exceedingly low and not quantifiable, the FDA (and now other regulatory agencies) has determined that a zero level of penicillin impurity in a drug substance must be guaranteed. Accordingly, the FDA has mandated that the production of penicillin API and finished product must be performed in entirely different buildings, or buildings that are completely physically isolated from all other buildings, that manufacture other API and finished products for all other drugs. *Id.*

63.     Cephalosporins: Cephalosporins are another class of beta-lactam antibiotics that, although chemically different from the penicillins, are associated with the same problem of sensitization and allergic reaction when they exist as trace (and often immeasurable) impurities in the API and finished products of other pharmaceutical drug materials. *Id.* Accordingly, the entire discussion above applies to the cephalosporins as well, including the need for completely isolated synthetic and manufacturing facilities for cephalosporins that are physically (or practically) isolated from all other facilities involved in the production of API and the production of final drug product for all other drugs. *Id.*

64.     Human Insulin: Human insulin is an important protein that regulates glucose levels in the blood. In patients with diabetes, there is a low level of insulin secreted from the pancreas, and as a result, blood glucose levels rise producing the signs and symptoms of diabetes. Heinemann and Richter, Clinical Pharmacology of Human Insulin, 1993 (Ex. 2048) at 3. For decades, patients with diabetes were treated with insulin isolated from the pancreases of pigs inasmuch as no human source of insulin was available. With the advent of recombinant DNA technology, it became possible to produce human insulin in the bacteria *E. coli* using large bioreactors. Ex. 2048 at 2. The *E. coli* containing human insulin is then recovered, and the human insulin is isolated free from the *E. coli* and purified for human use to treat diabetes (this

30

UTC_WAT00640804

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

represents the first drug to be produced by recombinant DNA technology). This was, and is today, considered to be a major advance in human health. Initially, in the isolation of human insulin from *E. coli*, the bacteria in which it was produced, the drug product contained trace impurities from *E. coli*, despite the fact that the human insulin was considered to be highly pure. As a member of the Department of Cell Biology at Eli Lilly and Company that developed recombinant human insulin, I am personally aware that when human insulin was initially developed to treat diabetes, allergic reactions were experienced in some diabetic patients, and these reactions were ultimately attributed to the trace impurities of antigens (foreign proteins capable of producing an allergic reaction) derived from the *E. coli* that was used to produce the human insulin. Ex. 2048 at 2. Subsequently, the company needed to manufacture an even more highly purified formulation of human insulin to ensure that the bacterial contaminants were minimized or eliminated. This phenomenon is not limited to human insulin, but is a fairly common occurrence among human proteins produced as therapeutic drugs through recombinant DNA technologies where the human protein is produced in non-human, and therefore potentially antigenic, cells (many human therapeutic proteins are produced in *E. coli* or Chinese Hamster Ovary Cells, or CHO cells, and trace quantities of foreign *E. coli* or CHO proteins can exist in the final product and elicit allergic responses).

65.     These representative examples described above, and many others, highlight the importance of drug purity in pharmaceutical preparations, and more importantly, the risks that impurities existing in pharmaceutical API or finished drug product can have on patients. It is for these reasons that regulatory agencies encourage the highest levels of purity possible, and the lowest levels of impurities possible, in pharmaceutical product synthesis and production of drug

31

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640805

IPR2016-00006
patent 8,497,393

product. Ex. 2038 at 5-9. These highly valued goals of regulatory agencies with respect to purity and impurities are embodied in the new preparation of treprostinil described in the '393 patent.

## VI.   The Invention of the '393 Patent Met a Long-Felt Unmet Need

66.   I have reviewed the letter submitted by UTC to the FDA on January 2, 2009 including the revised Drug Substance Specification (Ex. 2006), as well as Dr. Williams' Declaration. It is my opinion that the reduction of individual impurities and the change to the specification of the drug substance of treprostinil indicates that the invention of the '393 patent met a long-felt unmet need by providing a higher purity drug substance. If there is any doubt as to the extreme concern that the FDA places on purity, one need only read the letter submitted by UTC to the FDA on January 2, 2009 where UTC responds to the concerns raised by the FDA with respect to the request to change the Drug Specification for treprostinil in the Certificate of Analysis. The FDA raised only three specific concerns with respect to the Supplemental New Drug Application for treprostinil, and two of these concerns were related to impurities. Ex. 2006 at 1-7. In FDA Comment 1, the FDA has expressed concern about impurities in the supplies of ████████████ hat are sourced through outside vendors, and which could potentially carry through to the final product in the synthesis of treprostinil. Id. at 1-3. And in FDA Comment 3, the FDA raises a concern about the "residual ██████████ present in treprostinil", which is a potential impurity. Id. at 6-7.

67.   I have also reviewed Table 1 from Dr. Williams' Declaration where I observe that the level of Total Related Substances (i.e., total impurities) has been reduced from a level of 0.9545% using the Moriarty Process to ██████ ng the '393 patent process, which I calculate to represent a reduction of approximatel█ ██ n total impurities. In addition, a reduction was observed in 7 out of 8 impurities using the '393 patent process (compared to the Moriarty

32

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00640806

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

Process), and three impurities were essentially eliminated. Ex. 2020 at ¶¶94-96. These results would most definitely be considered to be significant and clinically meaningful to the FDA, and is consistent with the fact that the FDA allowed the Drug Specification in the Certificate of Analysis to be changed accordingly.

68.     Specifically, as UTC explained to the FDA, the '393 patent process was not previously used in their prior process, but the use of the diethanolamine salt intermediate (UT-15C) "affords an additional purification step and an improvement in the process to synthesize treprostinil API" which showed the reduction of all but one of the impurities. Ex. 2006, at 2-3. I understand that the prior synthesis used by UTC was the same as Moriarty cited by SteadyMed. *See*, Ex. 1004, *see also*, Ex. 1001, Ex. 6. I have also reviewed the analysis of Dr. Williams and it is my opinion that the removal ███████████████████████████████████ ██████████████ was a long-felt unmet need given the FDA's desire to minimize impurities. I note specifically that the FDA concern identified in FDA Comment 1 of the UTC letter to the FDA dated January 2, 2009 demonstrates FDA's worries over the levels o███████████ which was one of the impurities that was significantly reduced through the '393 patent process. Ex. 2006 at 1-3. As a result, I do not believe that it can be reasonably argued that the improvement in purity, and the reduction in impurities, resulting from the '393 patent process can represent anything other than a long-felt unmet need.

69.     Additionally, UTC noted that there was a █ variability in the assay, which meant that the specification was allowable for █ above and below the average purity for the prior synthesis. Ex. 2006 at 3. This variability does not indicate an error in the measurement, but rather a limit on the acceptable specification, so that subsequent batches can be reliably and consistently approved for use by the current manufacturer, and subsequently by generic

4632-5096-2226.1

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT00640807

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

manufactures, as a practical and realistic matter, which is also of relevance to the FDA.  I have

repeatedly observed during the course of my career that the FDA balances their strong desire for

the highest levels of purity against the practical need for a company to be able to manufacture the

drug product reliably.  There are numerous examples of failures to supply patients with much

needed medications because Drug Specifications could not be met consistently, resulting in

shortages in drug supply. FDA: Drug Shortages, FDA.gov (Ex. 2049) at 1-5.  This has been the

focus of much attention in recent years, so much so that the FDA has developed an App so that

patients can monitor supplies, and observe shortages in drug supply when they occur *Id.*  A

specification that is too limited or restrictive could result in multiple failing batches, and

ultimately the inability to provide a medically necessary drug to patients on a consistent and

reliable basis.  As a result, there is a █ range in the specification, and this does not represent an

error in the assay, but in contrast represents a level of purity that assures the FDA that batches of

treprostinil can be consistently manufactured and supplied to patients that need the medication

on a reliable basis, while at the same time maintaining levels of purity that are consistent with

patient safety.

70.     As a result of the change in the synthesis to use the '393 patent process and

product, the assay value was changed from a range █████████████████████████

the increased purity of the drug substance prepared by the '393 patent process could now be

centered at an increased mean of ████████████████ level as it was for the Moriarty

process. Ex. 2006 at 3-4 and 6.  This is typical of how assays are reported. *See, e.g.,* Guidance

for Industry: Changes to an Approved NDA or ANDA, (2004) (Ex. 2050) at 20.  The change in

the upper limit for the assay from ████████████ did *not* indicate an increase in error from

█████████ but simply indicated that the average purity of the samples *increased,* from a

34

UTC_WAT006640808

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

midpoint o██████████which as indicated above, is always the objective of the FDA. Simply

put, the original range of purity ███████████████████████████he variability in the

assay) fro███████████████████████████████████████████

which unmistakably can *only* represent an upward shift in overall purity of the product, which is

clearly a primary objective of the FDA and a benefit to patients. Likewise, the increase in the

lower limit of ████████████he old Moriarty process████████the '393 patent process

unquestionably represents an *increase* of the minimum level of purity required for release of any

API or final product batch of the drug. This cannot be argued to represent anything other than an

*absolute increase* in the required level of purity in the Drug Specification for the treprostinil

product. It is also not relevant whether a previous process (*i.e.*, Moriarty) produces batches that

are above this ████████What is relevant is that any process that results in a lower

routine level of purity, as is the case for the Moriarty process, will have a higher probability of

failing to meet the new minimum release specification ████████a process that routinely

produces a higher level of purity, such as the '393 patent process, simply because its lower level

of purity is that much closer to the lower ████████required for release. Additionally, as

shown by the 175 batch records, the average purity of the treprostinil product prepared by the

process of the '393 patent ████████while the average purity of the Moriarty product is ████████

Ex. 2020 at ¶99 and Appendices A-B. Thus, the average purity of the treprostinil product ᴵ

prepared by the process of the '393 patent has ████████gher average purity than the Moriarty

product.

71.     As I discussed above, the assay values are a relative measurement that provide a

comparison to a reference standard. Therefore, this change in the assay value indicates that the

new batches made by the '393 patent process resulted in several batches with purities above that



4832-5096-2228.1

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

UTC_WAT006640809

IPR2016-00006
patent 8,497,393

of the highly purified reference sample. No matter how an assay is performed, an increase in the minimum level of purity ███████ in the Drug Specification can *only* represent an increased level of required purity of the API and final drug product required for release of any given batch. This clearly represents an improvement in quality and purity, and a reduction in the level of impurities, which is a major goal of the FDA.

72.     This change in the assay value of the Drug Specification for treprostinil represents a significant change for the FDA. Specifically, any change in the synthesis or manufacture of the drug substance that may affect its impurity profile and/or the physical, chemical, or biological properties of a drug is considered a major change. Ex. 2050 at 17. Because the FDA allowed the drug specification for purity to be changed to reflect the higher level of purity, from a lower limit ██████████████████████ respectfully, resulting from the '393 patent process, it is clear that the FDA considered this to represent a major/significant change.

73.     I have also reviewed the declaration and deposition transcript of Dr. Jeffery D. Winkler. In his opinion, a difference of ████ in a purity measurement "would be attributable to experimental error, and thus the claimed degree of purity under the claimed processes of the '393 patent presents no distinction from the prior art." Ex. 1009 at ¶¶ 68-69. I understand that he also acknowledged that he did not know how a purity specification for an FDA-approved product could change fro ███████ and stated that he viewed purity levels above 100% as errors: "I think the thing that I am able to conclude from the data that is on page 6 of this, of this letter [Ex. 2006] is that the error in the HPLC assay could be as high as █ ercent in the first column and by my analysis could be as high a █ ercent in the second column." Ex. 2051 at 86:15-87:9.

74.     I disagree with Dr. Winkler. As I explain above, assay measurements are comparisons to reference standards and therefore can easily be greater than 100%. This is

4832-5096-2228.1

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00640810

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

different than the purity measurement reporting Total Related Substances reported by Dr. Walsh and separate from the Total Related Substances in the drug specification. Dr. Winkler admits he does not know the difference. *Id.* at 89:2-6.

75.     It is therefore my opinion that the invention of the '393 patent met a long-felt unmet need that led to an increase in the purity of the treprostinil drug substance by reducing and/or removing several individual impurities and improving the overall purity as analyzed by Dr. Williams. It is because of this major change that the FDA permitted the change in the Drug Specification assay measurement submitted by UTC to be included in the revised specifications.

UTC_WAT00640811

UT Ex. 2022
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

IPR2016-00006
patent 8,497,393

I declare under penalty of perjury that the foregoing is true and correct.

Date: July 6, 2016

Robert R. Ruffolo, Jr., Ph.D.

UTC_WAT00640812

# EXHIBIT 21

Page 1

1           UNITED STATES PATENT AND TRADEMARK OFFICE

2            BEFORE THE PATENT TRIAL AND APPEAL BOARD

3      - - - - - - - - - - - - - - x

4      LIQUIDIA TECHNOLOGIES, INC.    :

5                  Petitioner        :

6         vs.                        : IPR2020-0070

7      UNITED THERAPEUTICS           : U.S. Patent No.

8      CORPORATION                   : 9,604,901

9                  Patent Owner      :

10     - - - - - - - - - - - - - - x

11        VIRTUAL VIDEOTAPED DEPOSITION OF: RODOLFO PINAL, Ph.D.

12     DATE:        Wednesday, February 10, 2021

13     TIME:        11:09 a.m.

14     LOCATION:    Remote Proceedings

15     REPORTED BY: Denise M. Brunet, RPR

16                  Reporter/Notary

17

18

19

20              Veritext Legal Solutions

21         1250 Eye Street, N.W., Suite 350

22              Washington, D.C.  20005

Liquidia's Exhibit 1018
IPR2020-00770
Page 1

Page 88

1    Q    Okay.  So then the invention of the '901
2    patent doesn't include column chromatography,
3    correct?
4    A    If we go back to where we read the thing
5    that we just read before, it says that column
6    chromatography is not being used in the present
7    invention and also some of the advantages of doing
8    so.
9    Q    So the first column in example 6 we
10   talked about before, it's labeled, former process,
11   correct?
12   A    Correct.
13   Q    And in your declaration -- I can point
14   you to the paragraph if you're not sure -- but you
15   did a comparison between the former process and
16   basically concluded that it's the same as the
17   Moriarty process.  Is that accurate?
18   A    Not exactly.  I didn't say it was the
19   same.  And let me read exactly what I said.
20   Q    If it's helpful, paragraph 89 is where
21   you say that.
22            THE REPORTER:  I'm sorry.  Repeat what

Liquidia's Exhibit 1018
IPR2020-00770
Page 88

Page 89

 1    you just said, please.

 2    BY MS. KANNAPPAN:

 3        Q    It's at paragraph 89 of your declaration.

 4        A    Okay.  So what I said is, "As I show

 5    below in the annotated example 6 table, this

 6    'Former Process' is almost identical to the

 7    synthetic route taught by Moriarty (EX1009)."

 8            So I did not say that it was the same.  I

 9    said that it's almost identical.

10        Q    Understood.

11            THE REPORTER:  I'm sorry.  He's breaking

12    up.  After you said, "understood," I have no idea

13    what he said.

14            THE WITNESS:  I said that -- let me try

15    to repeat it as best as I can.  I said that they

16    are almost identical, not identical, which are

17    almost the same.  But almost the same is not the

18    same as the same.

19    BY MS. KANNAPPAN:

20        Q    Okay.  To your knowledge, did UTC use the

21    Moriarty process to create a commercial product?

22            MR. TORCZON:  Objection.  Relevance.

Liquidia's Exhibit 1018
IPR2020-00770
Page 89

Page 90

1          THE WITNESS:  The information that I have

2     from -- this comes from the materials that I

3     considered, one of which is the Moriarty article.

4     So the Moriarty article talks about the

5     development of the synthesis method that they

6     published as being made with the intention of

7     large-scale commercial manufacturing.  That is the

8     extent of the information I have.  I don't know if

9     that process as published was used or not by

10    United Therapeutics.

11          So the end of my knowledge or firsthand

12    knowledge of the Moriarty is in the Moriarty

13    article.

14    BY MS. KANNAPPAN:

15    Q    So on example 6 -- if you could go back

16    to the '901 patent, which is Exhibit 1001 for the

17    record.  Let me know when you're there, Dr. Pinal.

18    A    Yes.  I'm just moving this heavy binder.

19    Okay.  Now I have the other binder with the patent

20    in front of me.

21    Q    Are you at columns 15 and 16 with

22    example 6?

Liquidia's Exhibit 1018
IPR2020-00770
Page 90

# EXHIBIT 22

## HIGHLY CONFIDENTIAL

**CONTAINS PROTECTIVE ORDER MATERIAL**     Paper _____

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

STEADYMED LTD.,

Robert M. Williams, Ph.D.
26 August 2016   Exh. No.: 2
Harry A. Palter, CA CSR No. 7708

Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,

Patent Owner.

———————————

Case IPR2016-00006
Patent 8,497,393

———————————

**DECLARATION OF ROBERT M. WILLIAMS, Ph.D., IN SUPPORT OF PATENT OWNER RESPONSE TO PETITION**

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                        UTC_WAT00651824

IPR2016-00006
patent 8,497,393

## TABLE OF CONTENTS

I.   QUALIFICATIONS AND BACKGROUND..........................................3
    A.    Education and Experience ....................................................3
    B.    Materials Considered..........................................................12
II.  LEGAL STANDARDS PROVIDED BY COUNSEL ....................12
A.   THE PERSON OF ORDINARY SKILL IN THE ART ........................12
B.   ANTICIPATION ....................................................................14
C.   OBVIOUSNESS......................................................................14
III. SUMMARY OF OPINIONS..................................................16
IV.  THE '393 PATENT ..............................................................16
V.   CLAIM CONSTRUCTION..................................................18
VI.  PHARES DOES NOT ANTICIPATE CLAIMS 1-5, 7-9, 11-14, OR 16-20 OF THE '393 PATENT..................................................21
A.   THE PRODUCT DISCLOSED IN PHARES IS PHYSICALLY DIFFERENT THAN THE PRODUCTS DISCLOSED IN THE '393 PATENT CLAIMS ................................................................22
B.   PHARES DOES NOT DISCLOSE SEVERAL OTHER CLAIM LIMITATIONS....................................................................25
VII. NONE OF THE CLAIMS OF THE '393 PATENT ARE RENDERED OBVIOUS BY THE PRIOR ART.......................................27
A.   THE PRODUCT OF THE '393 PATENT IS STRUCTURALLY DIFFERENT THAN THE PRODUCT OF THE PRIOR ART..............28
B.   CLAIMS 1-5, 7-9, 11-14, AND 16-20 ARE NOT RENDERED OBVIOUS BY THE COMBINATION OF MORIARTY AND PHARES ............................................................................34
C.   CLAIMS 6, 10, 15, 21, AND 22 ARE NOT RENDERED OBVIOUS BY THE COMBINATION OF MORIARTY, PHARES, KAWAKAMI, AND EGE.......................................................36

APPENDIX A............................................................................42
APPENDIX B............................................................................47

2

HIGHLY CONFIDENTIAL                                    UTC_WAT00651825

IPR2016-00006
patent 8,497,393

I have been retained by the law firm of Wilson Sonsini Goodrich & Rosati ("WSGR") as an expert consultant to United Therapeutics Corporation ("UTC") in connection with the above-identified matter to provide expert testimony concerning U.S. Patent No. 8,497,393 ("the '393 Patent", Ex. 1001) by Batra *et al.*, entitled "Process to prepare Treprostinil, the active ingredient in Remodulin," issued on July 30, 2013.  At the request of Counsel for UTC, I hereby submit this expert declaration.

## I.      Qualifications and Background

### A.      Education and Experience

1.      I am a tenured University Distinguished Professor of Chemistry at Colorado State University (CSU). I currently serve as the Director for the Colorado Center for Drug Discovery. I also served as co-Director (Experimental Therapeutics) for the Infectious Diseases Supercluster Initiative and also served as co-Director for the Cancer Supercluster Initiative at CSU. My *curriculum vitae* is attached hereto as Exhibit A (Ex. 2021).

2.      I received a B.A. in Chemistry from Syracuse University in 1975, and did laboratory research in the field of synthetic organic chemistry under the guidance of the recent Nobel Laureate Professor Ei-ichi Negishi.  In 1979, I received both a Master's degree and Ph.D. degree in Organic Chemistry from the Massachusetts Institute of Technology (MIT) under the direction of Professor William H. Rastetter.  Upon graduating from MIT, I spent one year (1979-80) as a postdoctoral fellow at Harvard University in the laboratories of the Nobel Laureate, the late Professor Robert B. Woodward, whose laboratory was subsequently managed by Professor Yoshito Kishi.

3.      Subsequent to my fellowship at Harvard, I served as an Assistant Professor at Colorado State University from 1980–84.  I was tenured and promoted early, to the rank of

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                                        UTC_WAT00651826

IPR2016-00006
patent 8,497,393

Associate Professor in 1985, and in 1988, I was promoted to the rank of Full Professor.  In 2002, I was named a University Distinguished Professor, which is my current position.  University Distinguished Professor is the highest academic rank at Colorado State University, and there are a maximum of twelve University Distinguished Professors at any given time out of a faculty of 1,200.  This is a lifetime appointment until retirement, whereupon Emeritus status is granted.  In addition to my positions at Colorado State University, I was a Visiting Professor of Chemistry at Harvard University from 1994–95, at which time I was sponsored by Professor Stuart L. Schreiber and taught a sophomore organic chemistry course for pre-medical students, Chem 17. I was also a Visiting Professor of Chemistry at the University of California at Berkeley in 1990 and worked in the laboratory of Professor Peter G. Schultz.

4.      I have extensive experience in the field of synthetic organic chemistry and medicinal chemistry with an emphasis on biologically active compounds including anti-tumor agents, heterocycles, antibiotics, anti-fungal agents, anti-viral agents, immunomodulators, amino acids, peptides and alkaloids, among many other classes of biologically active organic substances. My organic chemistry research interests include the total synthesis of novel natural and synthetic products, heterocyclic chemistry, asymmetric synthesis, synthetic methodology, process chemistry, and reaction mechanisms.  I have extensive experience in the synthesis, chemistry, conformational analysis, biochemical activity, and biological activity of a range of organic compounds.

5.      My research laboratory at Colorado State University has worked extensively on the chemistry and biology of numerous drugs over my career, including Quinocarcin (Quinocarmycin citrate), Tetrazomine, Bioxalomycin, Ecteinascidin 743 (Yondelis® or trabectidin), Renieramycin, Cribrostatin-4, Jorumycin, the Mitomycins, FR900482, FK973,

4

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                                            UTC_WAT00651827

IPR2016-00006
patent 8,497,393

FK317, FK228 (Romidepsin), Largazole, Stephacidins A and B, Avrainvillamide, Spirotryprostatins, TMC-95A/B, Rottlerin, and Antimycin, amongst many others.

6.      I have been the Principal Investigator on numerous research grants from Federal agencies, such as the National Institutes of Health (NIH) and the National Science Foundation (NSF) as well as from various Foundations, and corporations to synthesize biologically active compounds on both small laboratory scale as well as larger industrial scales.

7.      I held a funded research collaboration with the Infectious Diseases Research Institute (IDRI), in Seattle, Washington, to develop several novel adjuvants for the treatment and prevention of autoimmune diseases, infectious diseases and cancer (2010).

8.      From 1991-1993, I held a research grant from Symphony Pharmaceuticals, located in Philadelphia, Pennsylvania, to prepare anti-HIV drugs based on inhibition of the HIV protease.  I supervised a graduate student who prepared several very potent peptide isosteres that exhibited in vitro activity against HIV.

9.      I have taught undergraduate and graduate courses in organic chemistry, organic synthesis, biosynthesis, biological chemistry, drug design, and the synthesis of natural products. I have also lectured at numerous professional conferences, universities, and in corporate R&D laboratories in those areas.

10.      I am a Scientific Founder, Acting President, and Chair of the Scientific Advisory Board of Cetya Therapeutics, a company that is developing several drugs, including drugs for the treatment of various cancers, multiple myeloma, autoimmune diseases, and hemoglobinopathies. I also direct all of the process scale synthesis optimization and drug formulation studies being conducted on Cetya's HDAC inhibitors.  This includes injectable formulations as well as oral formulations.  Specifically, I directed and supervised post-doctoral researchers in my laboratory

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                                                              UTC_WAT00651828

IPR2016-00006
patent 8,497,393

(on behalf of Cetya Therapeutics) to formulate the poorly water-soluble drug Largazole, including a myriad of synthetic analogs of Largazole prepared in my laboratory, as a polysorbate-80/ethanol co-solvent excipient system.  This formulation has been used in animal studies for obtaining critical dose-escalation and pharmacokinetic data.  I have also specifically directed and supervised the formulation of Largazole and related analogs in various PEG-based (polyethylene glycol) excipient systems.  This work is currently being conducted in collaboration with oncologist Dr. Douglas Thamm of the Colorado State University Animal Cancer Center, pharmacologist Dr. Dan Gustafson of the Colorado State University Animal Cancer Center, Dr. Kimberly Stegmaier of the Dana-Farber Cancer Institute/Harvard Medical School and Dr. James E. Bradner of the Dana-Farber Cancer Institute/Harvard Medical School.  The animal studies commenced in 2010, and the drug formulation studies are being conducted in my laboratory at Colorado State University under my direction.

11.    I was a Scientific Founder, Member of the Scientific Advisory Board, and Member of the Corporate Board of Directors for Xcyte Therapies, a company devoted to developing *ex vivo* T-cell therapies for treating cancer, autoimmune, and infectious diseases, including HIV.  As a Scientific Founder and Member of the Board of Directors of Xcyte Therapies, I was deeply involved in writing the patents and developing formulation strategies for both topical and injectable drugs based on FK228 (Romidepsin).

12.    As a Scientific Founder and Acting Vice-President of Discovery Chemistry of HemaQuest Pharmaceuticals (Seattle, Washington), I have directed the pre-clinical and clinical synthesis, scale-up and formulation studies of several of the companies' drugs.  These include both water-soluble drugs and hydrophobic, poorly water-soluble drugs for therapeutic applications in both cancer and hemoglobinopathies.  I directed both the medicinal chemistry

6

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                                 UTC_WAT00651829

IPR2016-00006
patent 8,497,393

efforts as well as the pre-process optimization work for potential industrial-scale syntheses of our lead drug candidates.

13.     In addition, I am a Scientific Founder and member of the Scientific Advisory Board of Sapientia Therapeutics, located in Philadelphia, Pennsylvania. I am the acting Director of the Medicinal Chemistry, Process Chemistry and Drug Formulation efforts of this company to develop novel small-molecule inhibitors of protein kinase C-delta for autoimmune diseases, cancer and scleroderma. My laboratory has synthesized the first lead compounds, which are protein kinase C-delta (PKC-Δ) inhibitors and are water-insoluble substances. Under my direction we have engaged in early scale-up and route optimization for our leading drug candidates.

14.     As a chemist with expertise in structure-activity studies and synthesis of biologically active agents, I have been retained to consult for a number of pharmaceutical and biopharmaceutical companies for both drug discovery and process research applications over the past thirty years. I consulted for Ajinomoto Co., Japan from 2002-2014 in the general area of process chemistry in the manufacture of amino acids, their derivatives, pharmaceutical intermediates and peptide synthesis. I served as a consultant for Cubist Pharmaceutical Company (2000–03) in the general field of antibacterial agents. I consulted for NewBiotics, Inc. (2001–02) in the general fields of anti-infective agents and anti-cancer agents. I consulted for Hoffman-La Roche, Inc. (1989–92) in the field of cephalosporin-fluoroquinolone dual-action antibacterial agents, as well as on a project concerned with inhibitors of diaminopimelic acid (DAP) biosynthesis as potential antibacterial agents. I consulted for W.R. Grace (1985–90) in the area of specialty chemicals and pharmaceutical intermediates process manufacturing and process development. I was a Scientific Founder, Member of the Scientific Advisory Board,

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                     UTC_WAT00651830

IPR2016-00006
patent 8,497,393

Consultant and sub-contractor for Microcide Pharmaceutical Co. (Microcide) in their drug

discovery and early process research efforts. Microcide was a biopharmaceutical company

devoted to developing antibacterial agents against a range of drug-resistant bacterial and fungal

infectious diseases. In addition, I have consulted for EPIX Medical, G. D. Searle, Nutrasweet,

and Boehringer-Ingelheim, among others. The consulting work I performed for Nutrasweet

(1990-1991), was concerned with large-scale manufacturing process chemistry for Aspartame.

15. I was a co-organizer of a special Symposium on process chemistry at The

International Chemical Congress of Pacific Basin Societies, PacifiChem 2015 (December 15-18,

Honolulu, Hawaii) entitled: *"New Horizon of Process Chemistry by Scalable Reactions and*

*Technology."*

16. I have directed the research activities of more than sixty PhD students and eighty

post-doctoral fellows; most of my former co-workers have gone on to successful careers in the

pharmaceutical industry in both process research and medicinal chemistry.

17. I have delivered numerous named and plenary lectures at Universities,

corporations, and scientific societies on the synthesis, chemistry, biology, and mechanism of

action of numerous classes of therapeutic agents, as detailed in my *curriculum vitae* attached

hereto as Exhibit A.

18. I have published more than 315 scientific research articles, authored numerous

chapters in books, and have written a well-known textbook on the synthesis of optically active

amino acids. I have particular expertise in the large-scale industrial synthesis of amino acids and

their derivatives. I am also a named inventor on seventeen issued U.S. patents and published

patent applications. My publications and patents are listed on my CV, provided in Exhibit 2021.

4851-2371-9220.1

P. 8

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                    UTC_WAT00651831

IPR2016-00006
patent 8,497,393

19.     I currently serve on the Editorial board for *Chemistry & Biology*. I have served as Editor for the *Organic Chemistry Series* published by Pergamon Press and Elsevier (1997-2012), and *Mini Reviews in Organic Chemistry* (Bentham Science). I have also served as an editor for several other journals in the past, including *Tetrahedron: Asymmetry*, *Tetrahedron Publications*, *Amino Acids*, and the *Journal of the American Chemical Society*.

20.     I am a member of the American Chemical Society, the Japan Antibiotics Research Association, the International Society of Heterocyclic Chemistry, and the American Association for the Advancement of Science. I am a Member of the University of Colorado Cancer Center, located in Aurora, Colorado. I have served as organizer or co-organizer of numerous scientific meetings and symposia, and served as the Vice President of the International Society of Heterocyclic Chemistry, Chairing the 2003 International Congress of Heterocyclic Chemistry.

21.     I serve on the Scientific Advisory Board of Arch Therapeutics, located in Boston, Massachusetts, that is developing self-assembling peptides for wound healing and surgical closure.

22.     I have also served on the Scientific Advisory Boards for a number of other companies. I currently serve on the External Advisory Committee for the Puerto Rico Alliance for the Advancement of Biomedical Research Excellence. I was a Scientific Founder, Director of Chemistry, and member of the Scientific Advisory Board for HemaQuest Pharmaceuticals. I was a Founding Scientist and Member of the Scientific Advisory Board of Microcide Pharmaceuticals from 1993 to 1998.

23.     I have expertise in drug formulation for injectable, topical and oral medications. I have directed research programs, both through my academic laboratory at Colorado State University as well as through my various consulting engagements and as a research director

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                              UTC_WAT00651832

IPR2016-00006
patent 8,497,393

and/or consultant for companies developing medicines for numerous therapeutic indications. I have consulted on many aspects of pharmaceutical drug discovery, development, formulation, and manufacturing. This includes basic discovery and optimization, early process research, large-scale manufacturing, and drug formulation.

24. I have served as a consultant for a number of companies for both drug discovery and process research applications, including, for example, W.R. Grace Company (1985-1990, fine chemicals synthesis); Symphony Pharmaceuticals (1991-1993, anti-HIV drugs); G.D. Searle Co. (1988-1990, memory and learning enhancement agents based on NMDA receptor antagonists); Nutrasweet Co. (1990-1991, artificial sweeteners); EPIX Medical (1993-1997, MRI imaging and contrast agents); Hoffman-La Roche, Inc. (1989-1992, cephalosporin-fluoroquinolone dual-action antibacterial agents); Boehringer-Ingelheim Pharmaceuticals (1992-1993, antiviral agents); Cubist Pharmaceutical Company (2000-2003, macrocyclic peptide antibacterial agents); NewBiotics, Inc. (2001-2002, anti-infective agents and anti-cancer agents); Microcide Pharmaceutical Co. (1993-1998, analogs of macrocyclic anti-fungal agents related to echinocandin, cephalosporins, and quinolones); Xcyte Therapies (1996-2006, T-cell activation); Ajinomoto Co, Japan (2002-2014, amino acids, peptides, and other specialty chemicals); HemaQuest Pharmaceuticals (2006-2014, short chain fatty acids for treating hemoglobinopathies); Sapientia Therapeutics (2012-present, small-molecule inhibitors of protein kinase C-delta); Arch Therapeutics (2010-present, self-assembling peptides for wound healing); and most recently, Cetya Therapeutics (2012-present, histone deacetylase inhibitors as therapeutic agents for treating cancers, multiple myeloma, autoimmune diseases, and hemoglobinopathies).

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651833

IPR2016-00006
patent 8,497,393

25.     Under my direction, my laboratory developed the technology for the asymmetric synthesis of amino acids in 1985 that was commercialized by Aldrich Chemical Co. in 1988.  My laboratory devised several large-scale (multi-kilogram) process routes for the manufacture of the so-called "Williams Lactone" that has been sold by Sigma-Aldrich Chemical Company since 1988.  Early manufacturing was conducted in China by several of my former co-workers at the Chengdu Institute of Organic Chemistry.

26.     I have been awarded numerous prizes and awards including the NIH Research Career Development Award (1984-89), the Eli Lilly Young Investigator Award (1986), the Merck, Sharp & Dohme Academic Development Award (1991), an award from the Japanese Society for the Promotion of Science Fellowship (1999), the Arthur C. Cope Scholar Award sponsored by The American Chemical Society (2002), the Multiple Myeloma Research Foundation Senior Award (2010), the ACS Ernest Guenther Award in the Chemistry of Natural Products sponsored by Givoudan and The American Chemical Society (2011), an award from the Japanese Society for the Promotion of Science Long-term Fellowship (2012-2013), and the Organic Synthesis Award from the local Rocky Mountain section of the American Chemical Society (2012).

27.     I have testified numerous times as an expert witness in process chemistry patent litigation in the following matters:  Great Lakes Chemical *versus* Archimica SPA. Civil Action No. 99–728-JJF; Ranbaxy Laboratories *versus* Abbott Laboratories. Case No. 04 C 8078; Lundbeck *versus* Infosint. 06 Civ. 2869 (LAK); United Therapeutics Corp. *versus* Sandoz, Inc. C.A. Nos.: 12-1617 (PGS)(LHG) and 13-316 (PGS) (LHG); Gilead Sciences, Inc. and Emory University *versus* Cipla, Limited. Civil Action No.: 1:12-cv-06350-RJS; United Therapeutics

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                                 UTC_WAT00651834

IPR2016-00006
patent 8,497,393

Corp. *versus* Teva Pharmaceuticals, USA, Inc. C.A. No.: 3:14-cv-05498 (PGS)(LHG); United Therapeutics Corp. *versus* Sandoz, Inc. C.A. No.: 3:14-cv-05499 (PGS)(LHG).

**B.      Materials Considered**

28.      In forming my opinions in this report, I have relied upon my professional experience and personal knowledge. I have also reviewed a number of documents in this case including all documents cited by the SteadyMed and UTC as well as the materials I have cited in this declaration. In this report, I have provided representative citations to exemplary documents that I have relied upon in reaching my opinions. If I am provided additional information or documents in this proceeding, I may offer further opinions regarding the additional information.

**II.      Legal Standards Provided By Counsel**

29.      I have been informed by Counsel that, during an *inter partes* review (IPR), a petitioner must prove invalidity by a preponderance of the evidence. Accordingly, I understand that the burden is on a petitioner to prove invalidity, rather than a patent owner to prove validity. I have been informed by Counsel that because each claim defines a separate invention, the validity of each claim in a patent is addressed independently of the validity of the other claims in that patent.

30.      I have also been informed by Counsel that the claims of the '393 patent are "product-by-process" claims. I have also been informed by Counsel that when evaluating the validity of a patent claim, the "product" of product-by-process claims must include structural and/or functional differences over the prior art, even if they are not explicitly claimed.

**A.      The Person of Ordinary Skill in the Art**

31.      I have been informed by Counsel that a patent is to be interpreted from the perspective of a hypothetical person referred to as the person of ordinary skill in the art ("POSA")

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

**HIGHLY CONFIDENTIAL**                                                                 **UTC_WAT00651835**

IPR2016-00006
patent 8,497,393

to which the patent pertains. I am further informed that a determination of the level of ordinary skill is based on, among other things, the type of problems encountered in the art, prior art solutions to those problems, rapidity with which innovations are made, sophistication of the art, and the educational level of active workers in the field. I have been informed that in any particular case, every factor may not be present, and one or more factors may predominate. I understand the person of ordinary skill in the art is presumed to know all prior art that is reasonably relevant to the subject matter of the claimed invention.

32.     I understand from Counsel that the validity of a patent claim must be assessed from the perspective of a POSA at the time of the invention.

33.     Given the complexity of the chemistry involved in the '393 patent, it is my opinion that a POSA with respect to the patent-in-suit would have had, at the time of the claimed invention, a doctorate degree in chemistry, pharmaceutics, pharmaceutical sciences, medicine, or a related discipline. Alternatively, the POSA may have had a lesser degree in one of those fields, with correspondingly more experience. To the extent necessary, a POSA may have collaborated with others of skill in the art, such that the individual and/or team collectively would have had experience in synthesizing and analyzing complex organic compounds. It is my understanding that a patent is to be interpreted from the perspective of a person of ordinary skill in the art at the time of the patent's priority date.

34.     I understand that SteadyMed's expert Dr. Winkler has opined that a POSA would have "a master's degree or a Ph.D. in medicinal or organic chemistry, or a closely related field. Alternatively, a person of ordinary skill would include an individual with a bachelor's degree and at least five years of practical experience in medicinal or organic chemistry." Ex. 1009 at ¶14.

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651836

IPR2016-00006
patent 8,497,393

35.     All of my opinions regarding validity contained in this report are expressed from the view of a POSA at the time of the priority date of the '393 patent.  These opinions apply equally whether my definition of a POSA or Dr. Winkler's is applied.

**B.     Anticipation**

36.     I understand from Counsel that anticipation requires that each and every element of a claim is set forth in a single prior art reference, and that these elements are arranged or combined in that reference in the same way as recited by the claim.  I further understand from Counsel that if there is any difference between the prior art reference and the claimed invention, there is no anticipation by that reference.  Further, I understand that there is no anticipation if the elements disclosed in a prior art reference must be combined with the knowledge of one skilled in the art to achieve the subject matter of the claim.  I understand that for a prior art reference to be anticipatory, it must enable a POSA to make or practice the invention without undue experimentation.

37.     I also understand from Counsel that if the single prior art reference is missing a claimed feature, the reference may inherently anticipate if that missing feature is necessarily present in the single prior art reference.

38.     I also understand from Counsel that if there are structural or functional differences in the product of the product by process claims of the invention from the product of the prior art that arise from the process in which it was made, those differences may be evidence of no anticipation even if those differences are not explicitly claimed.

**C.     Obviousness**

39.     I understand from Counsel that obviousness requires that a POSA would have been able to arrive at the claimed invention by modifying a single prior art reference or by

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                            UTC_WAT00651837

IPR2016-00006
patent 8,497,393

combining two or more prior art references.  I also understand from Counsel that obviousness analysis must be conducted from the point of view of a POSA at the time of the invention, and that it is improper to employ hindsight or consider the inventors' own path to the invention as proof of obviousness.

40.    Counsel has also informed me that obviousness requires that a POSA would have had a reasonable expectation of success in achieving the claimed invention.

41.    I understand from Counsel that four factual issues are relevant to obviousness analysis: the scope and content of the prior art; the level of ordinary skill in the field of the art at the time of the invention; the differences between the claimed invention and the prior art; and various objective indicia of non-obviousness.

42.    I understand from Counsel that, in addition to considering the prior art, certain objective indicia may also provide evidence that a claimed invention is not obvious.  I am informed by Counsel that these objective indicia, which are also referred to as secondary considerations, may include factors such as commercial success, unexpected results, the resolution of long-felt but previously unmet needs, skepticism by others prior to achieving the invention, failure of others to achieve the invention, praise from others for the invention, and copying by others.

43.    I understand from Counsel that, like anticipation, if there are structural or functional differences in the product of the product by process claims of the invention from the product of the prior art that arise from the process in which it was made, those differences may be evidence of non-obviousness even if those differences are not explicitly claimed.

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651838

IPR2016-00006
patent 8,497,393

### III.   Summary of Opinions

44.     It is my opinion that the term "product" as it is used in the claims of the '393 patent should be construed using UTC's construction: "a substance resulting from a chemical reaction."

45.     It is my opinion that the term "[a] product comprising a compound of formula I/IV or a pharmaceutically acceptable salt thereof" as it is used in the claims of the '393 patent should be construed using UTC's construction: "a substance resulting from a chemical reaction constituted primarily of formula I/IV or a pharmaceutically acceptable salt thereof."

46.     It is also my opinion that none of the claims of the '393 patent are anticipated by or rendered obvious by the prior art.

47.     My opinions and the bases for them are based on information that I know, that I have reviewed, and that I am currently aware exists.  I reserve the right to supplement or amend my opinions in light of any additional evidence, testimony, or other information that may be provided to me after the date of this declaration. Additionally, I may use the cited materials to assist me in preparing demonstratives such as graphics and animations if I am asked to testify.

### IV.   The '393 Patent

48.     The '393 patent is directed to an improved treprostinil product and improved process for making the product.  I understand from Counsel that the priority date for the '393 patent is December 17, 2007.

49.     The synthesis of treprostinil is complex as several improvements resulting in improved products are disclosed in the '393 patent itself.  The structure of treprostinil has five chiral centers (stereogenic centers) resulting in 32 possible stereoisomers of treprostinil.

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651839

IPR2016-00006
patent 8,497,393

50.      The '393 patent has two independent claims: Claims 1 and 9. Claim 1 requires "a product comprising a compound of formula I…or a pharmaceutically acceptable salt thereof," in which formula I can be several structures including treprostinil. Claim 9 requires "[a] product comprising a compound having formula IV…or a pharmaceutically acceptable salt thereof," in which is the structure of treprostinil.  Both Claims 1 and 9 then specify that the product is prepared by a process comprising (a) alkylating a compound of Formula II or V [a benzindene triol structure] with an alkylating agent to produce a compound of Formula III or VI [a benzindene nitrile intermediate], (b) hydrolyzing the product of formula III or VI of step (a) with a base, (c) contacting the product of step (b) with a base B to form a salt of Formula Is or IVs [indicating a salt form of treprostinil with an HB+ counterion], and (d) optionally reacting the salt formed in step (c) with an acid to form the compound of formula I or IV. Dependent Claim 7 further identifies the specific structure of Formula I of the  product of Claim 1 as treprostinil. Because the other possible structures of Claim 1 are not at issue here, I will consider these Claims 1, 7, and 9 together in my analysis.  Likewise, I will consider the following dependent claims together that have similar claim limitations.

51.      Dependent Claims 2 and 10 provide a further purity limitation. Claim 2 further requires "[t]he product of claim 1 wherein the purity of compound of formula I in said product is at least 99.5%."  Similarly, Claim 10 requires "[t]he product of claim 9, wherein the purity of product of step (d) is at least 99.5%."  Thus, step (d) must be performed in claim 10, but both of these claims require a purity of at least 99.5%.

52.      Dependent Claims 3 and 11 provide a further limitation on what alkylating agent may be used.  Claim 3 requires the alkylating agent be $Cl(CH_2)_wCN$, $Br(CH_2)_wCN$, or $I(CH_2)_wCN$.  Claim 11 requires the alkylating agent be $Cl(CH_2)_wCN$.

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                                                   UTC_WAT00651840

IPR2016-00006
patent 8,497,393

53.     Dependent Claims 4 and 12 specify what base may be used in step (b).  Claim 4 requires the base in step (b) to be KOH or NaOH and Claim 12 requires the base to be KOH.

54.     Dependent Claims 5, 13, 14, 17 and 18 specify what the base B in step (c) may be selected from certain specific bases.  Claims 5, 13, and 17  limit base B to the group consisting of ammonia, N-methylglucamine, procaine, tromethamine, magnesium, L-lysine, L-arginine, triethanolamine, and diethanolamine.  Claims 14 and 18 specify that the base B is diethanolamine.

55.     Dependent Claims 6 and 15 specify what acid is used in step (d).  Claim 6 specifies the acid is HCl or $H_2SO_4$.  Claim 15 specifies the acid is HCl.

56.     Dependent Claims 8 and 16 specify that the process does not include purifying the compound of formula III or VI produced in step (a).

57.     Dependent Claims 19 and 20 depend on Claims 1 and 9, respectively.  Each dependent claim further specifies the base in step (b) is KOH or NaOH and the base in step (c) is selected from the same group specified in Claims 5, 13, and 17.

58.     Claim 21 depends on Claim 1 and requires that step (d) is performed.  Claim 22 depends on Claim 21 and further requires that the product comprises a pharmaceutically acceptable salt formed from the product of step (d).

V.     **Claim Construction**

59.     I understand from Counsel that different claim constructions for certain terms used in the claims of the '393 patent have been proposed by SteadyMed and UTC, and that the U.S. Patent and Trademark Office ("PTO") has entered a preliminary claim construction for certain terms.

18

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651841

IPR2016-00006
patent 8,497,393

60.     I agree with UTC's construction of the term "product" as "a substance resulting from a chemical reaction" which is consistent with the plain and ordinary meaning of the term.

61.     In the chemical context, "product" generally refers to the real world outcome or result of a reaction:

Generalized Chemical Reaction

Reactants → Products

I agree with UTC that the '393 patent itself distinguishes "product" to identify it as what comes at the end of a chemical process or chemical reaction. Prelim. Resp. at pp.17-18.

62.     I also agree with the consistent definitions given by the several textbooks cited by UTC all referring to "product" as the result of a chemical reaction. *Id.* at 19.

63.     In fact, I have used the term "product" consistently in my own publications to refer to the real world result of a chemical reaction. *See, e.g.,* Williams, et.al., *Asymmetric, Stereocontrolled Total Synthesis of Paraherquamide A*, J. Am. Chem. Soc. 2003, 125, 12172-178.  ("However, the reaction was very slow and gave the desired cyclization product 64 in only 25% yield, accompanied by products from competing pathways.") (Ex. 2026); Williams, et.al., *Stereocontrolled Total Synthesis of (+)-Paraherquamide B*, J. Am. Chem. Soc. 1996, 118, 557-579 ("Compound 66 was refluxed in benzene with 20 equiv of sodium hydride, resulting in a very clean and high yielding cyclization reaction furnishing the desired product 68 in 93% yield.") (Ex. 2027); Williams, et.al., *Synthetic Studies on Et-743. Assembly of the Pentacyclic Core and a Formal Total Synthesis,* J. Org. Chem. 73.24 (2008): 9594-9600. ("The scarcity of the natural product from marine sources renders Et-743 an important target for synthesis.") (Ex. 2028).

19

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651842

IPR2016-00006
patent 8,497,393

64.     Dr. Winkler also uses the term "product" as the result of a chemical reaction in his own publications and confirmed that understanding during his deposition. *See, e.g.*, Winkler, J., et.al., *A Pauson-Khand Approach to the Synthesis of Ingenol*, Org. Lett., 2005, 8, 1489-1491 at Abstact ("Pauson-Khand cyclization of dioxanone photoadduct 21 leads to the formation of a single product in good yield.") (Ex. 2029); *see also* Ex. 2051 at 155:12-157:3.

65.     Specifically, Dr. Winkler confirmed that "the product of a chemical reaction would be essentially all of the substances that result from the treatment of a particular reactant with a particular set of reagents." Ex. 2051 at 155:2-11.  This is consistent with UTC's definition as well as how Dr. Walsh interpreted the product in his Declaration submitted during prosecution of the '393 Patent. Ex. 1002 at 346-347 (showing the products containing certain other substances as impurities).

66.     I disagree with the PTO's preliminary construction and SteadyMed's construction of "product" as "a chemical composition."  I believe that this proposed definition is too broad and does not accurately describe the term as it is customarily used in the art and in the context of how it is defined in the '393 patent.  In the chemical context, there can be no "product" if there is no corresponding reaction, process, or synthesis that it refers to.  A "chemical composition" could be used to describe the starting materials, solvents, reagents, catalysts, and even the glassware used during a chemical reaction as there is no limitation on SteadyMed's construction of the term "product" on how it relates to the chemical reaction at issue.

67.     In the '393 patent and each of the references I describe above, the word "product" is exclusively used to describe a substance resulting from a chemical reaction, and it is not used to describe any and all "chemical compositions."

4851-2371-9220.1              UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                    UTC_WAT00651843

IPR2016-00006
patent 8,497,393

68.     SteadyMed's construction is therefore inconsistent with the understanding of a POSA and inconsistent with the '393 patent specification regarding the term "product" because "a chemical composition" is not an accurate and specific definition of the term.

69.     For the reasons I previously described regarding the term "product", a POSA would understand the plain and ordinary meaning of the claim term "A product comprising a compound of formula I/IV or a pharmaceutically acceptable salt thereof," as UTC's construction: "a substance resulting from a chemical reaction constituted primarily of formula I/IV or a pharmaceutically acceptable salt thereof." This definition is consistent with how a POSA would understand the term and is consistent with its plain and ordinary meaning.

70.     I disagree with the PTO's preliminary construction and SteadyMed's construction of "[a] product comprising a compound of formula I/IV or a pharmaceutically acceptable salt thereof" as "a chemical composition that includes, but is not limited to, a compound of Formula I, or a pharmaceutically acceptable salt thereof, and that may also include other non-mentioned substances (including impurities), additives, or carriers, without limitation as to the types of or relative amounts thereof." I believe that this proposed definition is too broad and does not accurately describe the term. The entirety of the '393 patent is directed to an improved product with lower amounts of impurities and therefore the product includes its own impurity profile which provides a high level of purity and does not indiscriminately include other substances and impurities "without limitation as to the types of or relative amounts thereof."

**VI.     Phares Does Not Anticipate Claims 1-5, 7-9, 11-14, or 16-20 of the '393 Patent**

71.     I have reviewed Dr. Winkler's opinions alleging that Phares (Ex. 1005) inherently anticipates Claims, 1-5, 7-9, 11-14, and 16-20. I have also reviewed the Institution Decision in which the Board credited Dr. Winkler's opinion regarding this lack of physical differences

21

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651844

IPR2016-00006
patent 8,497,393

between the treprostinil products of the '393 patent and Phares. Paper 12 at 23-31. I disagree.

Additionally, the Board credited Dr. Winkler's opinion that Phares discloses the same process

for synthesizing treprostinil as the '393 patent. Paper 12 at 29-30. This is not true. Because no

synthesis of treprostinil is disclosed in Phares, the diethanolamine salt described would have an

unknown impurity profile and therefore cannot anticipate any claim of the '393 patent.

### A.   The Product Disclosed in Phares is Physically Different Than the Products Disclosed in the '393 Patent Claims

72.     In order for Phares to anticipate any claim of the '393 patent, Phares must

disclose every claim limitation of the product. Phares does not disclose the same product as

claimed in the '393 patent.

73.     Contrary to Dr. Winkler's opinion, the polymorph form and purity of the

treprostinil diethanolamine salt is not the same as that claimed in the '393 patent. Specifically,

Phares discloses samples made for a polymorph screen, not large scale batches. *See, e.g.*, Ex.

1005 at 85-86. In fact Phares notes several different conditions to form polymorph A including

preparation using fast evaporation, slow evaporation, freeze drying, heating, and slow cooling

in a variety of solvent systems including water and ethanol; water, toluene, and tetrahydrofuran.

*Id.* Once polymorph A is prepared, Phares then further states that polymorph form B must be

made from polymorph A, listing several conditions under which polymorph B is prepared. *Id.*

Phares further notes that the polymorph B sample that was used for characterization was made

from heated slurries of form A in 1,4-dioxane and toluene. *Id.* at 87. In fact, it is not clear which

sample of polymorph form A was further used to create the characterized sample of polymorph

B that Dr. Winkler discusses. Ex. 1009 at ¶¶58-61.

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651845

IPR2016-00006
patent 8,497,393

74.     The '393 patent does not discuss that polymorph A must be formed first. *See, e.g.*, Ex. 1001 at col. 12-13 and 15.  The '393 patent also does not describe the use of 1,4 dioxane or toluene and only describes forming the diethanolamine salt followed by cooling and filtering the salt with ethyl acetate and ethanol, and then drying. *Id.*  Thus, the treprostinil diethanolamine salt formed in Phares required an extra step to first form polymorph A, under different reaction conditions with different solvents.

75.     It is well-known that the use of different solvent systems in forming different crystal forms can have a significant effect on the melting point of a substance as well as other characteristics including purity. *See, e.g.*, R. Adhiyaman, et.al., *Crystal modification of dipyridamole using different solvents and crystallization conditions*, Int'l J. Pharm.321,  2006, 27-34 at 33 ("Adhiyaman") ("In conclusion, it can be said that the crystallization conditions and medium used have major effect on dipyridamole crystals habit modification under ambient conditions. The crystals showed significant changes in the shape, size, melting points, dissolution rate, XRD patterns and DSC curves.") (Ex. 2030).  Given that the samples of polymorph B described in Phares are prepared in a completely different way under different conditions than those described in the '393 patent, their melting points and other analytical data cannot be directly compared.

76.     Furthermore, the only data that Dr. Winkler relies upon to conclude that the polymorph B sample of treprostinil diethanolamine salt in Phares has a "higher purity than the '393 product" is that the recorded melting point was higher in one sample than the melting point of the diethanolamine salt sample of the '393 patent. Ex. 1009 at ¶¶ 59-60.  This is incorrect for several reasons.  First, as mentioned above, the different solvents and conditions used to form the salt can greatly affect the melting point – which is the only purported evidence

4851-2371-9220.1

P. 23

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

**HIGHLY CONFIDENTIAL**                                                        **UTC_WAT00651846**

IPR2016-00006
patent 8,497,393

that Dr. Winkler cites for purity.  Second, there is absolutely no actual purity data disclosed in

Phares for the diethanolamine salt or treprostinil free acid and a POSA would not have

concluded based on a single melting point example of polymorph B prepared under unknown

conditions (e.g., recrystallization solvent and recrystallization conditions are not identified)

would be of a higher purity than the known purity of the '393 patent.  Third, even if the

diethanolamine salt samples were prepared under the same work-up and purification conditions,

a higher melting point does not mean that the substance must be of a higher purity.  See, Ex. 2030

at Fig. 5 showing modified crystals in several different solvents had a higher melting point than

the pure dipyridamole).  Fourth, the DSC curve cited by Dr. Winkler in Fig. 21 of Phares (Ex.

1009 at ¶59) shows a broad melting peak with a range of close to 10 degrees which is indicative

of a lower purity substance. See, Marti, E., *Purity determination by differential scanning

calorimetry*, Thermochimica Acta, 5(1972) 173-220 at 214 ("The melting of diphenyl is

extremely sharp because of the purity level; on the other hand, the melting region of phenacetin-

benzamide is rather broad.") (Ex. 2031).  Additionally, the DSC data provided does not describe

the sample size, the rate of temperature increase as a function of time and does not compare this

with an authentic standard of known purity melted under identical conditions.  It is known in the

art that sample size, rate of heating, the recrystallization solvent(s) used, and the conditions

under which the crystalline sample was obtained can significantly affect the DSC data.  Dr.

Winkler's conclusion based on this single vague and incompletely described DSC data is not

scientifically sound.

77.     Dr. Winkler also points to the brief description of the formation of the treprostinil

diethanolamine salt (Ex. 1009 at ¶¶50-54), but that description does not indicate what treprostinil

free acid was used to make it.  While the Board agreed with Dr. Winkler regarding the similarity

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                                    UTC_WAT00651847

IPR2016-00006
patent 8,497,393

of the products of Phares and the '393 patent, the source of the treprostinil used to make treprostinil diethanolamine is very important and would greatly affect the impurity profile and other analytical characteristics, including DSC, of the sample.

78.     In fact, Phares itself describes several references that could be used to make treprostinil, but does not identify which one, if any, was used to make the sample for the treprostinil diethanolamine salt. *See, e.g.*, Ex. 1005 at 9 ("Compounds of the present invention can also be provided by modifying the compounds found in U.S. Patent Nos. 4,306,075 ("the '075 patent", Ex. 2032)  and 5,153,222 ("the '222 patent", Ex. 2033) in like manner."). The '075 patent, for example, discloses a very different and less pure treprostinil product than that of Moriarty (Ex. 1004). *See, e.g.*, Ex. 1004 at 1892-93.  Thus, without knowing the source of the treprostinil used in Phares to make the treprostinil diethanolamine salt, the resulting product could have a very different purity and impurity profile and would necessarily have a distinct impurity profile if it were made by a different process than that disclosed in the '393 patent.

**B.     Phares Does Not Disclose Several Other Claim Limitations**

79.     Dr. Winkler alleges that Phares discloses the same synthesis to make treprostinil diethanolamine as the synthesis described in the '393 patent and the Board credited his opinion on this point. *See*, Ex. 1009 at ¶¶51-57; Paper 12 at 29-30.  I disagree.  First, there is no description whatsoever in Phares of how to make treprostinil free acid.  Instead, Dr. Winkler points to the synthesis of the enantiomer of treprostinil ((-) treprostinil) which is a completely different synthesis for a different stereoisomer. Ex. 1009 at ¶57.  Winkler alleges that because certain steps are used in forming the enantiomer, those steps are inherently disclosed for use with treprostinil. Ex. 1009 at ¶¶56-57.

25

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651848

IPR2016-00006
patent 8,497,393

80.      I understand the Board decision did not address the additional limitations of independent Claims 1 and 9 nor the dependent claim limitations in its anticipation analysis because "the process steps recited in claims 1 and 9 do not impart structural or functional differences to the claimed treprostinil product." Paper 12 at 31.  I disagree with this assertion. Even if Phares used the synthesis of Moriarty to make treprostinil, there are significant differences between the product of Moriarty and the product of the '393 patent. *See*, Section VII(A) below.  Because the products are different, the process differences are relevant to the anticipation analysis.

81.      The synthesis for the enantiomer of treprostinil disclosed in Phares, however, is different than the synthesis of treprostinil disclosed in the '393 patent.  First, contrary to Dr. Winkler's claims, the earlier part of the synthesis used in Phares to make the enantiomer is not the same synthesis disclosed in Moriarty.  Specifically, the Moriarty reference obviously does not describe the synthesis of the enantiomer of treprostinil, but also does not include the Mitsunobu inversion step described by Phares wherein the stereochemistry of the secondary alcohol moiety has to be chemically reversed. Ex. 1005 at 40.  In fact, because (S)-2-methyl-CBS-oxazaborolidine is used on structure 5, the resulting structures 6-11 are diastereoisomers of the intermediates used in the synthesis of the '393 patent.  As a result, intermediate products of formulas (II) and (III) of Claim 1 and intermediate products of formulas (V) and (VI) of Claim 9 of the '393 patent are not disclosed in Phares.  Thus, because steps (a) – (c) of *every claim* of the patent requires these products, Phares cannot anticipate any claim of the '393 patent.

82.      Second, Claim 2 requires a specific purity of 99.5%.  As I discussed above, there are no specific purity measurements disclosed in Phares and a single broad melting point determination with a large melting point range does not provide evidence that the purity of the

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                    UTC_WAT00651849

IPR2016-00006
patent 8,497,393

treprostinil diethanolamine sample is at least 99.5%.  *See*, Section VI(A) above.  For this additional reason, Phares does not anticipate Claim 2.  The purity of that sample was not calculated from the DSC data as no control to an authentic standard of known purity was performed or reported.

83.     SteadyMed claims that because the synthesis of the enantiomer of treprostinil in Phares does not describe a purification step, that the claim limitation of Claims 8 and 16 that the process does not include purifying the compound of Formula III (or VI) produced in step (a) is satisfied.  That is not correct.  In fact, Phares does not disclose any specific details of those steps whatsoever.  Indeed, if the same synthesis from Moriarty was used as Dr. Winkler suggests, purification at step (a) is specifically described in that reference. Ex. 1004 at 1901-1902. Regardless of what synthesis was used, however, the fact remains that compounds of Formula III and VI do not appear in Phares as described above.

84.     Under my interpretation of the highly pure product described in each of the claims of the '393 patent, Phares does not anticipate Claims 1-5, 7-9, 11-14, or 16-20 because it does not disclose the highly-pure product of the '393 patent, the synthesis of treprostinil, nor compounds of structures (II) and (III) from independent Claim 1 or structures (V) and (VI) from independent Claim 9, which are required by all of the claims.

**VII.    None of the Claims of the '393 patent Are Rendered Obvious by the Prior Art**

85.     I understand that the Board cited additional grounds for unpatentability including obviousness based on the combination of Moriarty and Phares and obviousness based on the combination of Moriarty, Phares, Kawakami (Ex. 1007), and Eğe (Ex. 1008).  I disagree that any claim of the '393 patent is rendered obvious by any combination of these references.

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651850

IPR2016-00006
patent 8,497,393

### A.    The Product of the '393 Patent Is Structurally Different Than the Product of the Prior Art

86.    In his declaration, Dr. Winkler expresses his opinion that "the '393 patent processes do not result in a physically different or unique product than that disclosed in the prior art." Ex. 1009 at ¶71.  I am aware that, in the Institution Decision, the Board credited Dr. Winkler's opinion regarding this lack of physical differences between the treprostinil products of the '393 patent and the prior art. Paper 12 at 16-17.  I disagree with Dr. Winkler's opinion for at least the following reasons.

87.    Dr. Winkler appears to base his opinion on a comparison between the '393 patent process batches identified in the declaration submitted by Dr. David Walsh, one of the inventors of the '393 patent, during prosecution (Walsh Declaration), and a single prior art process batch identified in a particular prior art publication by Moriarty . Ex. 1009 at ¶¶63-71.  However, Dr. Winkler's comparison suffers from several critical flaws.

88.    First, and most fundamentally, there is no basis for comparing the "purity" reported in Moriarty with the purity discussed in the Walsh Declaration.  When purity is determined by comparison of a sample to a reference standard such as assay purity (*see, e.g.*, ICH Guidance For Industry: Q7A Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients (2001) ("Q7A") at 28-29 (Ex. 2034); see also Reviewer Guidance: Validation of Chromatographic Methods (1994) ("Reviewer Guidance") at 5-8) (Ex. 2035), one cannot directly compare the purity values of two samples in any meaningful way unless each value was achieved by comparison to the same reference standard.  Neither the Walsh Declaration nor Moriarty identifies a specific reference standard.  While Moriarty notes that the

28

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                                    UTC_WAT00651851

IPR2016-00006
patent 8,497,393

treprostinil product obtained was compared to an authentic sample of UT-15, there is no mention

of any such comparison in the Walsh Declaration.

89.     Instead, with respect to the Walsh Declaration, purity must be understood not with

respect to any reference standard, but with respect to the amount of total impurities reported as

detected in each of the sample batches.  The term "purity" must also be understood with respect

to the amount of total impurities detected in the context of the '393 patent itself; wherever assay

purity is referred to, the '393 patent specifies that the number indicated refers to "HPLC (Assay)."

For each of the representative batches discussed in the Walsh Declaration, impurity data is

presented in the same way, and thus the purity of these samples can properly be compared to

each other; the same cannot necessarily be said of the sample data reported in Moriarty.

90.     Second, Dr. Winkler concludes from Example 4 of the '393 patent that the

instrumentation used to measure purity "can have variations of at least 0.4%," and thus any

detected difference less than that can be attributed to experimental error. Ex. 1009 at ¶¶69-70.

Dr. Winkler bases his estimate of experimental error on the statement "that Example 4's Batch 1

had an HPLC Assay of 100.4%, which is obviously greater than the 100% value theoretically

achievable."  Ex. 1009 at ¶70.  This is unsupported and appears to arise from Dr. Winkler's

fundamental misunderstanding of how assay purity values are calculated.  HPLC assay values

are calculated with respect to a reference standard; thus, any time that the sample you are

measuring has a greater purity than the reference standard, the assay value will exceed 100%.  As

such, it is incorrect to conclude that an assay value of 100.4% must indicate an error of at least

0.4%. Dr. Winkler's conclusion on this point is therefore fundamentally flawed.

91.     This explains why the assay value for drug specification submitted to the FDA

changed from a range of ███████████████ *See*, Ex. 2003 at 6.  This change was not due to

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                          UTC_WAT00651852

IPR2016-00006
patent 8,497,393

an increase in impurities, but because the purity of the product using the '393 patent process improved (as compared to the already-established reference standard) thus moving the acceptability range to a higher purity specification. *Id.* The letter notes that the scope of the range remained unchanged which simply indicates the acceptability criteria was increased, and does not index an error rate or limit of detection. Indeed, the change to the specification is further evidence that the product of the '393 patent is physically different than the product of Moriarty.

92.    Indeed, Dr. Winkler's conclusion is contradicted by the impurity data actually measured for the treprostinil product made by both the '393 patent process and the prior art process according to Moriarty. For both processes, impurities are reported with specific numbers unless the amount detected fell below 0.05%; in cases where some amount of an impurity less than 0.05% was detected, it was reported as simply "less than 0.05%" or "< 0.05%." This means that the level of detection for measuring impurities in these treprostinil samples was somewhere between 0 and 0.05%, not something in excess of 0.4% as Dr. Winkler erroneously concludes.

93.    Third, as Dr. Winkler himself points out, there is the possibility for "significant batch-to-batch variations in the impurity profile of each batch of treprostinil." Dr. Walsh stated that the data presented in his declaration came from representative samples of each synthetic process. Ex. 1002 at 346-347.  However, there is no such indication that the purity data reported in Moriarty comes from a representative sample of the prior art process. Due to the possibility of batch-to-batch variations, if a small number of batches are to be used as the basis for comparison, it is critical that those batches be representative of their respective products and processes. Thus while one could reasonably rely on a comparison between the representative batches presented in

30

P. 30

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                   UTC_WAT00651853

IPR2016-00006
patent 8,497,393

the Walsh Declaration, one could not reasonably add the batch discussed in Moriarty to that comparison. It is exactly this scientifically unsound comparison to Moriarty upon which Dr. Winkler bases his opinion.

94.    Ideally, to avoid the risk of batch-to-batch variations unintentionally biasing the data, a comparison should be made between the average impurities detected in treprostinil products made by the '393 patent process and treprostinil products made by the prior art process. To this end, I have prepared a chart containing impurity data for 56 samples of treprostinil product as produced by the prior art process according to Moriarty through 2004 (the date of the publication), attached as Appendix A to this declaration[1], and another chart containing impurity data for 122 samples of treprostinil product as produced by the '393 patent processes, attached as Appendix B to this declaration. I have prepared these charts using impurity data from release testing of samples of the respective treprostinil products that were produced by or for UTC for the purposes of obtaining regulatory approval and/or commercial sale. *See* Appendix A, Appendix B; Ex. 2005; Ex. 2036; Ex. 2037; Ex. 2052; Ex. 2053. As the purpose of these charts is to calculate the average impurities – both specific and total – found in the treprostinil products of each process, I have necessarily assigned a value of zero where the level of impurities was

---

[1] I am aware that UTC's Process Optimization Report for treprostinil prepared according to the '393 process included Table 2, which provided average impurity data for 96 batches of treprostinil made according to the prior art process. UT Ex. 2005 at 7. However, Table 2 does not provide exact values for four of the eight impurities under consideration, ████████████████ nd does not identify the underlying batch data. *Id.* As such, I have prepared my own chart using data on 56 treprostinil samples made by the prior art method and have based my analysis, including my calculations of average for total and individual impurities, upon this chart. While I believe my chart allows for a more precise comparison between Moriarty treprostinil products and '393 treprostinil products, the averages presented in the Process Optimization Report still show significant differences between '393 treprostinil products and the Moriarty treprostinil products. Specifically, Table 2 of the Process Optimization Report shows that on average ███████ as detectable in these ██████████ and that these ███████ contained higher average levels ███████████████ nd total impurities as compared to the averages for the '393 treprostinil product. Ex. 2005 at 7; Appendix B.

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651854

IPR2016-00006
patent 8,497,393

reported as "ND" (Not Detected), and a value of 0.05 where the level of impurities was reported as being less than 0.05%. From these data, I have found the following average impurity levels:



95.     These averages make clear that the '393 patent process does result in a treprostinil product that is physically different from the prior art treprostinil product.  In terms of total volume of impurities, the Moriarty process resulted in ████ ████ the amount of impurities that is achieved with the '393 patent process.

96.     The products from the two processes also differ significantly with respect to the individual impurities in each product's impurity profile.  Notably, the '393 patent process produces a treprostinil product that does not contain any detectable amounts of ████ ████ Additionally, the '393 patent process produces a treprostinil product that, on average, contains only ████████████████████████████████ compared to the Moriarty process, this represents greater than ████████████ in each of the ████ and ████ impurities and ████ reduction in ████████████ The '393 patent process also produces a treprostinil product that, on average, has significantly reduced amounts of several other identified impurities; as compared to the average of the Moriarty process, the '393 patent process produces a treprostinil product with less than ████ the amount ████████ approximately ████ the amount ████████ approximately ████ the amount of

32

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651855

IPR2016-00006
patent 8,497,393

██████ Conversely, the '393 patent process produces a treprostinil product which actually contains slightly more ████████████ than was detected in the treprostinil product of the Moriarty process.

97.     Looking past the average data, it is also worth noting that, out of all the batches of treprostinil product made by the '393 patent process which I reviewed, ██████ was only detected in a single batch ████████████████ was also only detected in a single batch ██████████ and both impurities were only detected at a level of ██████████ Furthermore, batches ████████████████ were both identified as "optimization batches" (as distinguished from commercial batches) and thus are not properly representative of treprostinil products made by the '393 patent process.

98.     From these data, it is clear that the treprostinil product produced by the '393 patent process has a markedly different impurity profile than the treprostinil product of the Moriarty prior art process, and as such is physically distinct from the prior art product. Moreover, it could not have been obvious that employing the process of the '393 patent would result in a reduction of impurities as compared to the Moriarty process. Indeed, the '393 patent process actually results in an ██████ one detected impurity ██████████ Furthermore, it is also clear that the treprostinil product produced by the '393 patent process has a higher average purity than the Moriarty product. The treprostinil product of the '393 patent has an average purity of ██████ while the Moriarty product has an average purity of 99.05%. Thus, the treprostinil product of the '393 patent has an average purity that ██████ higher than that of Moriarty's.

33

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651856

IPR2016-00006
patent 8,497,393

99.     Therefore, it is my opinion that the treprostinil product produced by the process used in the '393 patent Claims 1 and 9 is physically different than the treprostinil product produced by Moriarty.

**B.     Claims 1-5, 7-9, 11-14, and 16-20 Are Not Rendered Obvious by the Combination of Moriarty and Phares**

100.    As described above, the product of Moriarty is physically different than the product of the '393 patent process.  Even if the Moriarty synthesis was used to make treprostinil, a POSA would not have been motivated to make the diethanolamine salt identified in Phares.

101.    Specifically, the '393 patent notes that the salt formation step results in an improved and more pure treprostinil product.  Given that Moriarty discloses the use of column chromatography for purification, a POSA would not have been motivated to create the salt form in Phares as Phares does not disclose any benefit or increased purity as a result of using the diethanolamine salt.  In fact, Phares does not allege that the diethanolamine salt is superior in any way to the treprostinil product of Moriarty and instead identifies other earlier treprostinil disclosures as a means to create the treprostinil used to form the diethanolamine salt. *See*, Section VI(A) above.

102.    Additionally, a POSA would not have had a reasonable expectation of success in making the higher purity treprostinil product claimed in the '393 patent by the use of a salt formation step.  As identified above, the impurities of treprostinil include ████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████  As described above, the '393 patent process essentially eliminated the ████████████████████████████████ ut did not eliminate another ███████████ which likely has the same ██████ as the other

34

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                    UTC_WAT00651857

IPR2016-00006
patent 8,497,393

stereoisomers. Similarly, the ██████ mpurity increased while the ████████ mpurity decreased. A POSA would have expected that all of the stereoisomers would remain as salt impurities, but that is not the case. Instead, the impurity profile of the '393 patent process yields an unexpected result by removing ████████████ hile ██████████ mpurity and ████████ nother. A POSA could not have predicted this outcome based on the salt formation described in Phares.

103.    Regarding Claim 2, neither Moriarty nor Phares discloses treprostinil or treprostinil diethanolamine at a purity of 99.5%. As described above, Phares does not disclose any purity measurement (see Section VI above) and the purity measurement identified in Moriarty does not identify how the measurement was taken (see Section VII(A) above). Regardless of the purity identified in Moriarty, a further analysis of all batches made by the Moriarty process up to the time of the reference itself reveals an average purity of 99.05% while the average purity of the '393 patent batches is ██████ Given that the error rate must be below 0.05% for these measurements (see Section VII(A) above), the '393 patent process batches are significantly better in terms of overall purity. For this additional reason, Claim 2 is not rendered obvious by the combination of Moriarty and Phares.

104.    Regarding Claims 8 and 16, Phares does not disclose any synthesis for treprostinil and therefore cannot disclose whether purification was needed for step (a). (*See*, Section VI(B) above). As previously described, Moriarty specifically discloses that purification is performed at step (a). See Section VII(B) above. In fact and most significantly, the '393 patent itself identifies that as a distinguishing feature over the prior art. *See, e.g.*, Ex. 1001 at Example 6. For this additional reason, Claims 8 and 16 are not rendered obvious by the combination of Moriarty and Phares.

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651858

IPR2016-00006
patent 8,497,393

### C. Claims 6, 10, 15, 21, and 22 Are Not Rendered Obvious by the Combination of Moriarty, Phares, Kawakami, and Ege

105.    Each of Claims 6, 10, 14, 21, and 22 require the additional step (d) of independent Claims 1 and 9 which is to react the salt formed in step (c) with an acid to form the compound of formula I or IV (treprostinil).  Claim 22 further requires a pharmaceutically acceptable salt formed from the product of step (d).  Step (d) is not disclosed in any way in Moriarty, Phares, Kawakami, or Ege.  Additionally, it is my opinion that it would not have been obvious to combine these references to arrive at the claimed inventions of Claims 6, 10, 15, 21, or 22.

106.    First, there is no teaching or suggestion to perform step (d) in either Moriarty or Phares and similarly no reference to reverting back to treprostinil free acid from any treprostinil salt.  Given that the purification techniques disclosed in Moriarty include chromatography and recrystallization after many years of research to optimize the process of making treprostinil, a POSA would not have been motivated to use a salt purification technique disclosed in an undergraduate chemistry textbook.  More importantly, a POSA would not have had a reasonable expectation of success in further purifying the treprostinil product of Moriarty by using such a technique.  To the extent a POSA was motivated to further purify treprostinil, a POSA would have focused on the known impurities and investigated methods of removing those.  At the time of the invention, it was known that the formation of diastereomers occurred in the formation of treprostinil. *See*, Ex. 1004 at 1897-99.  Thus, a POSA would have focused on how to remove those types of impurities.

107.    Ege simply discloses that "carboxylic acids that have low solubility in water, such as benzoic acid, are converted to water-soluble salts by reaction with aqueous base.  Protonation of the carboxylate anion by a strong acid regenerates the water-insoluble acid.  These properties

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651859

IPR2016-00006
patent 8,497,393

of carboxylic acids are useful in separating them from reaction mixtures containing neutral and basic compounds." Ex. 1008 at 8. This disclosure, however, would not have provided a POSA with a motivation to make the treprostinil free acid disclosed in Moriarty, convert that to the salt form of Phares, then convert the salt form back to the free acid.

108.   First, Eğe does not provide any detail regarding how this reaction could be applied to more complex carboxylic acids or if it even could be applied. Specifically, the only carboxylic acid referenced in Eğe as an example is benzoic acid, a very simple aromatic acid, which is structurally very different from treprostinil acid. Indeed, benzoic acid has no chiral centers and therefore no stereoisomers and there is no suggestion in Eğe that this step could be used in purifying more complex carboxylic acids such as treprostinil which have stereoisomeric impurities. Second, Eğe specifically notes that "these properties of carboxylic acids are useful in separating them from reaction mixtures containing neutral and basic compounds," therefore Eğe would not apply to purifying carboxylic acids with stereoisomeric impurities because each stereoisomer would necessarily be an acidic impurity. As described above, the impurities that are removed from the '393 patent product include some, but not all acidic impurities and some but not all neutral impurities. See, Section VII(B) above. For these reasons a POSA would not have been motivated to combine Eğe with either Moriarty or Phares and would not have had a reasonable expectation of success in further purifying treprostinil using the acid reformation step described in Eğe.

109.   Indeed, given that Eğe predicts that only neutral and basic impurities would be removed, the actual average impurity profile for the '393 patent product is an unexpected result given that some but not all neutral impurities are removed as well as some but not all acidic impurities. See, Section VII(B) above.

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                        UTC_WAT00651860

IPR2016-00006
patent 8,497,393

110.    Kawakami similarly does not provide any motivation for combining with either Phares or Moriarty and a POSA would not have had a reasonable expectation of success in preparing the products of Claims 6, 10, 15, 21, or 22 by combining these references.

111.    Kawakami discloses the purification of a methanoprostacyclin derivative by forming the dicyclohexyl amine salt then regenerating the free acid to achieve a "fairly high" purity. Ex. 1007 at 6.  Treprostinil and methanoprostacyclin, however, are very different structures:



**Treprostinil**                    **methanoprostacyclin compound in Kawakami**

112.    As shown here, the methanoprostacylin compound in Kawakami is a two-fused ring structure which is different than the three-fused ring structure of treprostinil that also includes an aromatic ring absent in the Kawakami methanoprostacyclin.  These differences matter because a POSA would not have looked to Kawakami (or Eğe) if they were looking for additional purification techniques for treprostinil because neither reference discloses how to remove stereoisomeric impurities.

113.    Instead, Kawakami provides a purification method for separating E and Z isomers of a starting material that is otherwise free of impurities, and not diastereomers that result from the various chiral centers that treprostinil was known to have as impurities.  In fact, treprostinil

38

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                    UTC_WAT00651861

IPR2016-00006
patent 8,497,393

contains no mixture of E and Z isomers because it does not contain a carbon-carbon double bond that is capable of forming E and Z isomers.  Indeed, the use of a specific salt to isolate a specific E/Z isomer does not reasonably suggest that salt formation of a much more complex compound with multiple chiral centers such as treprostinil could be isolated from entirely different impurities and then converted back to the free acid form.  In fact, nothing in Kawakami suggests that this method could be used for a substance that was already fairly pure such as the treprostinil disclosed in Moriarty.

114.    Similarly, Kawakami uses a dicyclohexylamine salt and does not use a diethanolamine salt, nor any salt counterion disclosed in the '393 patent.  A POSA would have had no reason to combine the synthesis of Moriarty, use the salt only disclosed by Phares, and convert back to the free acid based on the teaching of Kawakami because Kawakami uses a different salt to separate a different structure from different types of impurities.  Even if a POSA did combine these references in this way, a POSA would not have had a reasonable expectation of success in forming a more pure treprostinil product because Kawakami does not provide any information regarding the high level of purity required by the '393 patent and does not describe the separation of the types of stereoisomeric impurities known to be present in the treprostinil product. Dr. Winkler's obviousness analysis using these combinations is flawed and suffers from hindsight analysis.

115.    Claim 6 requires the acid in step (d) be either HCl or $H_2SO_4$ and Claim 15 requires the acid to be HCl. Claim 21 requires that step (d) is performed.  Phares, Moriarty, and Kawakami all do not disclose the use of either HCl or $H_2SO_4$ in converting a salt back to a carboxylic acid of any kind. Eğe cites HCl as an example in the conversion of benzoic acid, but as described above, a POSA would not have looked to Eğe to further purify a complex

39

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                                           UTC_WAT00651862

IPR2016-00006
patent 8,497,393

carboxylic acid such as treprostinil from its stereoisomers and other impurities and would have

no reasonable expectation of success by using HCl based on this disclosure.  For this additional

reason, Claims 6 and 15 would not have been rendered obvious by any combination of Phares,

Moriarty, Kawakami or Eğe.  Similarly, given the deficiencies described above regarding Eğe

and Kawakami, Claim 21 would not have been rendered obvious by any combination of Phares,

Moriarty, Eğe, or Kawakami.

116.    Claim 10 requires that step (d) is performed and further requires the product to be

at least 99.5% pure.  The only purity limitation disclosed in any of the cited prior art references is

to Moriarty in which neither step (c) or (d) is performed.  There is absolutely no other disclosure

of a purity of at least 99.5% in any other cited prior art reference.  A POSA looking to improve

the purity of treprostinil above that level would have had no reason to look to Phares, Kawakami,

or Eğe and based on their disclosures, would have had no reasonable expectation of success in

making a treprostinil product with that level of purity as it simply is not present in the prior art

allegedly disclosing step (d).

117.    Claim 22 depends on Claim 21 and further requires a pharmaceutically acceptable

salt be formed from the product of step (d).  Dr. Winkler cites no evidence for this additional step

in the prior art. In fact, none of the references cited even suggest converting a carboxylic acid to

a salt form, then regenerating the carboxylic acid, then forming a pharmaceutically acceptable

salt from that.  It is my opinion that there is no evidence in the prior art supporting the additional

claim limitation of Claim 22 and therefore no combination of Moriarty, Phares, Kawakami, or

Eğe would render this claim obvious.

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL

UTC_WAT00651863

IPR2016-00006
patent 8,497,393

I declare under penalty of perjury that the foregoing is true and correct.


Date: July 6, 2016

Robert M. Williams, Ph.D.

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

HIGHLY CONFIDENTIAL                                          UTC_WAT00651864



HIGHLY CONFIDENTIALUTC_WAT00651865

HIGHLY CONFIDENTIAL

UTC_WAT00651866

HIGHLY CONFIDENTIAL

UTC_WAT00651867



HIGHLY CONFIDENTIAL

UTC_WAT00651868



HIGHLY CONFIDENTIAL

UTC_WAT00651869

IPR2016-00006
patent 8,497,393

**APPENDIX B**

4851-2371-9220.1

UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

**HIGHLY CONFIDENTIAL**

**UTC_WAT00651870**



UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

P. 48

HIGHLY CONFIDENTIAL

UTC_WAT00651871



P. 49

SteadyMed v. United Therapeutics
UT Ex. 2020
IPR2016-00006



UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

P. 50

HIGHLY CONFIDENTIAL

UTC_WAT00651873



UT Ex. 2020
SteadyMed v. United Therapeutics
IPR2016-00006

P. 51

4851-2371-9220.1

UTC_WAT00651874

# EXHIBIT 23

Atty. Dkt. No. 080618-1581

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| First Inventor Name: | Hitesh BATRA |
| Title: | AN IMPROVED PROCESS TO PREPARE TREPROSTINIL, THE ACTIVE INGREDIENT IN REMODULIN® |
| Appl. No.: | 14/849,981 |
| Filing Date: | 9/10/2015 |
| Examiner: | Yevgeny Valenrod |
| Art Unit: | 1672 |
| Confirmation Number: | 6653 |

## AMENDMENT AND REQUEST FOR RECONSIDERATION

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

This amendment is submitted in response to the outstanding, non-final Office Action mailed on February 25, 2016.

**Amendments to the Claims** are reflected in the listing of claims that begins on page 2 of this document.

**Remarks** begin on page 4 of this document.

4849-0244-5109.1

UTC_LIQ00003127

Atty. Dkt. No. 080618-1581

**Amendments to the Claims:**

This listing of claims will replace all prior versions and listings of claims in the application:

**Listing of Claims:**

1.       (Previously Presented) A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps, forming a salt of treprostinil by combining the starting batch and a base, isolating the treprostinil salt, and preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and wherein said alkylation is alkylation of benzindene triol.

2.       (Previously Presented) The pharmaceutical composition of claim 1, wherein the salt is isolated in crystalline form.

3.       (Canceled).

4.        (Previously Presented) The pharmaceutical composition of claim 1, wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline.

5.       (Previously Presented) The pharmaceutical composition of claim 4, wherein the base is diethanolamine.

6.       (Previously Presented) The pharmaceutical composition of claim 1, wherein the base is combined with treprostinil that has not been previously isolated.

7.       (Previously Presented) The pharmaceutical composition of claim 1, wherein the isolated salt is stored at ambient temperature.

8.       (Previously Presented) The pharmaceutical composition of claim 1, which is a pharmaceutical solution.

9.       (Previously Presented) A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising alkylating a triol intermediate of the formula:

UTC_LIQ00003128

Atty. Dkt. No. 080618-1581



hydrolyzing the resulting compound to form treprostinil, forming a salt of treprostinil stable at ambient temperature, storing the treprostinil salt at ambient temperature, and preparing a pharmaceutical product from the treprostinil salt after storage, wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.

10.      (Previously Presented) A pharmaceutical product prepared by the process of claim 9.

11.      (New) The process as claimed in claim 9, wherein forming the salt of treprostinil stable at ambient temperature is performed by adding diethanolamine to treprostinil.

4849-0244-5109.1

UTC_LIQ00003129

Atty. Dkt. No. 080618-1581

## REMARKS

Applicants respectfully request reconsideration and allowance of the present application.

### Status of Claims

Applicants have canceled claim 3 and added claim 11 to depend from claim 9.  Support for claim 11 can be found in examples 4-6.  No new matter has been added.

After the amendment, claims 1, 2, and 4-11 are pending.

### 35 U.S.C. § 103

Claims 1-3, 6, 8, and 9 stand rejected under 35 U.S.C. § 103(a) as allegedly obvious over Moriarty (2004) in view of Phares (WO 2005/007081 A2).  Applicants respectfully request reconsideration of the rejection.

Applicants filed a notification of related proceedings to bring to the Examiner's attention documents from IPR2016-00006, which involves parent U.S. Patent No. 8,497,393.  Certain information is redacted in those documents due to confidentiality.  Documents provided in that notification include the Patent Owner's Response and expert declarations from Dr. Williams and Ruffolo.  These documents address the subject matter of the '393 patent claims although certain information is relevant to the present claims as explained herein.

Claim 1 recites steps, including "forming a salt", which read on a commercial process used by the assignee of the present application.  Prior to the current commercial process, the assignee used a process based on Moriarty 2004.  Because the assignee used both processes, the assignee had the opportunity to analyze the resulting pharmaceutical products as reflected in certificates of analysis.  In the IPR, Dr. Williams and Dr. Ruffolo used these certificates of analysis to explain that a pharmaceutical batch produced according to a salt formation process as covered by claim 1 is different from the product produced by the process described in Moriarty 2004.  Williams Dec. at ¶¶94-99; Ruffolo Dec. at ¶¶66-72.  Specifically, the processes result in products having different impurity profiles, and in fact, the pharmaceutical composition of claim 1 has higher average purity.  Patent Owner's Response at Section III.C.

The differences are not merely academic, but critical to the successful manufacture of a clinical product.  FDA uses both overall purity and levels of individual impurities ("purity specification") as a basis to regulate the manufacturing of pharmaceuticals.  Batches that fall outside of the purity specification cannot be sold or used to treat patients.  As noted in the Patent Owner's IPR Response, the differences between claim 1's pharmaceutical composition and a product produced according to the process of Moriarty were significant enough to result in FDA's acceptance of a new purity specification for the commercial product, thus proving that the products are not the same in the eyes of the FDA.  Patent Owner's Response at Section III.C. Furthermore, this change constitutes a "major" change according to the classification system for manufacturing changes used by FDA. Ruffolo Dec. at ¶¶70- 72.

The rejection further cites Phares for showing that it would have been obvious to form a diethanolamine salt using Moriarty's treprostinil.  However, the differences in the resulting products, as explained above, would not have been expected based on the prior art.  In particular, it would not have been obvious to use the salt formation step of Phares to decrease amounts of stereoisomer impurities of treprostinil, which are acidic rather than neutral or basic. Williams Dec. at ¶102.  When subject to salt-forming conditions, one of ordinary skill in the art would expect that any undesired stereoisomer of treprostinil would be included in the final salt product because the stereoisomer would also be converted to the corresponding salt under such salt-forming conditions.  One of ordinary skill in the art would have had no reasonable expectation of success in removing any undesired treprostinil stereoisomer impurities by salt formation.

In addition, FDA's decision to adopt a new purity specification for the resulting product further establishes unobviousness of the presently claimed invention.  Indeed, as noted above, the specification change is classified as a "major" change according to the FDA's classification system for manufacturing changes. *See Knoll Pharm. Co., Inc. v. Teva. Pharm. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004) (explaining that while FDA approval is not determinative of nonobviousness, it can be relevant in evaluating the objective indicia of nonobviousness).  As noted in Dr. Ruffolo's Declaration, even small changes in impurity are important to FDA: "Regulatory agencies have also sought to increase levels of purity, and consequently decrease levels of impurities, in order to provide to the maximum extent possible, the highest level of

UTC_LIQ00003131

Atty. Dkt. No. 080618-1581

safety to patients." Ruffolo Dec. at ¶36. This is due to the fact that even trace amounts of impurities can sometime pose serious health concerns.

Accordingly, withdrawal of the rejection under 35 U.S.C. § 103(a) is requested.


**<u>Double Patenting</u>**

Claims 1-10 have been rejected for alleged non-statutory double patenting as unpatentable over claims 24 and 26 of US Patent No. 8,242,305. Applicants will address the rejection by filing a terminal disclaimer or other action if still necessary after the PTO's consideration of the above arguments and confirmation that the present claims are otherwise in condition for allowance.

4849-0244-5109.1

UTC_LIQ00003132

Atty. Dkt. No. 080618-1581

**<u>Concluding Remarks</u>**

Applicants believe that the application is in condition for allowance.  Favorable reconsideration is respectfully requested.  The Examiner is invited to contact the undersigned by telephone if it is felt that a telephone interview would advance prosecution.

The Commissioner is hereby authorized to charge any additional fees that may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741.  Should no proper payment be enclosed herewith, as by a check being in the wrong amount, unsigned, post-dated, otherwise improper or informal or even entirely missing or a credit card payment form being unsigned, providing incorrect information resulting in a rejected credit card transaction, or even entirely missing, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.  If any extensions of time are needed for timely acceptance of papers submitted herewith, Applicants hereby petition for such extension under 37 C.F.R. § 1.136 and authorize payment of any such extension fees to Deposit Account No. 19-0741.

Respectfully submitted,

Date <u>Aug. 24, 2016</u>                    By <u>/Stephen B. Maebius/</u>

FOLEY & LARDNER LLP                     Stephen B. Maebius
Customer Number: 22428                  Attorney for Applicant
Telephone:     (202) 672-5569           Registration No. 35,264
Facsimile:     (202) 672-5399

UTC_LIQ00003133

# EXHIBIT 24

Atty. Dkt. No. 080618-1550
Appl. No. 14/754,932

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

First Inventor Name:     Hitesh BATRA

Title:                   AN IMPROVED PROCESS
                         TO PREPARE
                         TREPROSTINIL, THE
                         ACTIVE INGREDIENT IN
                         REMODULIN®

Appl. No.:               14/754,932

Filing Date:             6/30/2015

Examiner:                Yevgeny Valenrod

Art Unit:                1672

Confirmation Number:     1865

### AMENDMENT & REQUEST FOR RECONSIDERATION

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

This amendment is submitted in response to the outstanding, non-final Office Action mailed on February 11, 2016.

**Amendments to the Claims** are reflected in the listing of claims that begins on page 2 of this document.

**Remarks** begin on page 4 of this document.

-1-

4838-0212-5110.1

UTC_LIQ00006759

Atty. Dkt. No. 080618-1550
Appl. No. 14/754,932

**Amendments to the Claims:**

This listing of claims will replace all prior versions and listings of claims in the application:

**Listing of Claims:**

1.   (Currently Amended) A <u>pharmaceutical</u> batch ~~comprising~~ <u>consisting of</u> treprostinil or a salt thereof <u>and impurities resulting from</u> ~~prepared by~~ (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and

> ~~,~~ wherein the <u>pharmaceutical</u> batch contains at least 2.9 g of treprostinil or its salt.

2.-5.    (Canceled)

6.     (Currently Amended) The <u>pharmaceutical</u> batch of claim 1, which has been dried under vacuum.

7.     (Canceled)

8.     (Currently Amended) A pharmaceutical product comprising a therapeutically effective amount of treprostinil from a <u>pharmaceutical</u> batch as claimed in claim 1.

9.     (Currently Amended) A pharmaceutical product comprising a therapeutically effective amount of a salt of treprostinil from a <u>pharmaceutical</u> batch as claimed in claim 1.

10.     (Currently Amended) The product of claim 9<u>,</u> wherein the salt is the diethanolamine salt of treprostinil.

-2-

UTC_LIQ00006760

Atty. Dkt. No. 080618-1550
Appl. No. 14/754,932

11.      (Currently Amended) A method of preparing a pharmaceutical product from a ~~high purity pharmaceutical~~ batch as claimed in claim 1, comprising storing a <u>pharmaceutical</u> batch of a salt of treprostinil as claimed in claim 1 at ambient temperature, and preparing a pharmaceutical product from the <u>pharmaceutical</u> batch after storage.

12.      (Previously Presented) A method as claimed in claim 11, wherein the salt of treprostinil is a diethanolamine salt.

13.      (Currently Amended) A method of preparing a ~~high purity~~ <u>pharmaceutical</u> batch as claimed in claim 1, comprising (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil.

14.      (Previously Presented) A method as claimed in claim 13, wherein the salt of treprostinil is a diethanolamine salt.

4838-0212-5110.1

UTC_LIQ00006761

Atty. Dkt. No. 080618-1550
Appl. No. 14/754,932

## REMARKS

Applicants respectfully request reconsideration and allowance of the present application.

### Status of Claims

Applicants have amended claim 1 to recite a "pharmaceutical" batch, "consisting of" as the transitional phrase, and "impurities" resulting from the recited steps. Conforming amendments are made to claim 13 and dependent claims. Support for these amendments can be found in the Examples 4-6 of the specification. No new matter has been added. Claims 2 and 3 are canceled. Applicants reserve the right to file one or more continuing applications directed to any subject matter omitted by the present amendment.

After the amendment, claims 1, 6, and 8-14 are pending.

### Interview

Applicants thank the Examiner for the courtesy of the interview held on July 22, 2016, during which the presently-presented amendments were discussed. Applicants have followed the Examiner's suggestions for amendments and additionally address the points discussed at the Interview in the remarks below.

### 35 U.S.C. § 102

Claims 1-3, 6, 8, and 9 stand rejected under 35 U.S.C. § 102(b) as allegedly anticipated by Moriarty (2004). Applicants respectfully request reconsideration of the rejection.

Applicants filed a notification of related proceedings to bring to the Examiner's attention documents from IPR2016-00006, which involves parent U.S. Patent No. 8,497,393. Certain information is redacted in those documents due to confidentiality. Documents provided in that notification include the Patent Owner's Response and expert declarations from Dr. Williams and Ruffolo. These documents address the subject matter of the '393 patent claims although certain information is relevant to the present claims as explained herein.

Claim 1 recites steps (a)-(e), which read on a commercial process used by the assignee of the present application. Prior to the current commercial process, the assignee used a process

-4-

UTC_LIQ00006762

Atty. Dkt. No. 080618-1550
Appl. No. 14/754,932

based on Moriarty 2004.  Because the assignee used both processes, the assignee had the opportunity to analyze the resulting products as reflected in certificates of analysis.  In the IPR, Dr. Williams and Dr. Ruffolo used these certificates of analysis to explain that a pharmaceutical batch produced according to steps (a)-(e) of claim 1 is different from the product produced by the process described in Moriarty 2004.  Williams Dec. at ¶¶94-99; Ruffolo Dec. at ¶¶66-72.  Specifically, the processes result in products having different impurity profiles, and in fact, the pharmaceutical batch of claim 1 has higher average purity.  Patent Owner's Response at Section III.C.

The differences are not merely academic, but critical to the successful manufacture of a clinical product.  FDA uses both overall purity and levels of individual impurities ("purity specification") as a basis to regulate the manufacturing of pharmaceuticals.  Batches that fall outside of the purity specification cannot be sold or used to treat patients.  As noted in the Patent Owner's IPR Response, the differences between claim 1's pharmaceutical batch and a product produced according to the process of Moriarty were significant enough to result in FDA's acceptance of a new purity specification for the commercial product, thus proving that the products are not the same in the eyes of the FDA.  Patent Owner's Response at Section III.C.  Furthermore, this change constitutes a "major" change according to the classification system for manufacturing changes used by FDA. Ruffolo Dec. at ¶¶70- 72.  Clearly, the pharmaceutical batch of claim 1 differs from the product resulting from Moriarty's synthesis.

Accordingly, withdrawal of the rejection under 35 U.S.C. § 102(b) is requested.


## 35 U.S.C. § 103

Claims 10-12 stand rejected under 35 U.S.C. § 103(a) as obvious over Moriarty (2004) in view of Phares (WO 2005/007081 A2).  Applicants respectfully request reconsideration of the rejection.

The rejection cites Phares for showing that it would have been obvious to form a diethanolamine salt using Moriarty's treprostinil.  However, the differences in the resulting products, as explained above, would not have been expected based on the prior art.  In particular, it would not have been obvious to use the salt formation step of Phares to decrease amounts of

Atty. Dkt. No. 080618-1550
Appl. No. 14/754,932

stereoisomer impurities of treprostinil, which are acidic rather than neutral or basic. Williams Dec. at ¶102.  When subject to salt-forming conditions, one of ordinary skill in the art would expect that any undesired stereoisomer of treprostinil would be included in the final salt product because the stereoisomer would also be converted to the corresponding salt under such salt-forming conditions.  One of ordinary skill in the art would have had no reasonable expectation of success in removing any undesired treprostinil stereoisomer impurities by salt formation and subsequent regeneration of the free acid.

In addition, FDA's decision to adopt a new purity specification for the resulting product further establishes unobviousness of the presently claimed invention.  Indeed, as noted above, the specification change is classified as a "major" change according to the FDA's classification system for manufacturing changes.  *See Knoll Pharm. Co., Inc. v. Teva. Pharm. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004) (explaining that while FDA approval is not determinative of nonobviousness, it can be relevant in evaluating the objective indicia of nonobviousness).  As noted in Dr. Ruffolo's Declaration, even small changes in impurity are important to FDA: "Regulatory agencies have also sought to increase levels of purity, and consequently decrease levels of impurities, in order to provide to the maximum extent possible, the highest level of safety to patients."  Ruffolo Dec. at ¶36. This is due to the fact that even trace amounts of impurities can sometime pose serious health concerns.

Accordingly, withdrawal of the rejection under 35 U.S.C. § 103(a) is requested.


### Double Patenting

Claims 13-14 have been rejected for non-statutory double patenting as unpatentable over claims 24 and 26 of US Patent No. 8,242,305.  Applicants will address the rejection by filing a terminal disclaimer if still necessary after the above amendments upon confirming that the present claims are otherwise in condition for allowance.

-6-

UTC_LIQ00006764

Atty. Dkt. No. 080618-1550
Appl. No. 14/754,932

## **Concluding Remarks**

Applicants believe that the application is in condition for allowance.  Favorable reconsideration is respectfully requested.  The Examiner is invited to contact the undersigned by telephone if it is felt that a telephone interview would advance prosecution.

The Commissioner is hereby authorized to charge any additional fees that may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741.  Should no proper payment be enclosed herewith, as by a check being in the wrong amount, unsigned, post-dated, otherwise improper or informal or even entirely missing or a credit card payment form being unsigned, providing incorrect information resulting in a rejected credit card transaction, or even entirely missing, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.  If any extensions of time are needed for timely acceptance of papers submitted herewith, Applicants hereby petition for such extension under 37 C.F.R. § 1.136 and authorize payment of any such extension fees to Deposit Account No. 19-0741.

Respectfully submitted,

Date Aug. 11, 2016                          By /Stephen B. Maebius/

FOLEY & LARDNER LLP                          Stephen B. Maebius
Customer Number: 22428                       Attorney for Applicant
Telephone:     (202) 672-5569                Registration No. 35,264
Facsimile:     (202) 672-5399

-7-

UTC_LIQ00006765

# EXHIBIT 25

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/849,981 | 09/10/2015 | Hitesh BATRA | 080618-1581 | 6653 |

22428          7590          11/30/2016
Foley & Lardner LLP
3000 K STREET N.W.
SUITE 600
WASHINGTON, DC 20007-5109

| EXAMINER |
|---|
| VALENROD, YEVGENY |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1672 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 11/30/2016 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

ipdocketing@foley.com

PTOL-90A (Rev. 04/07)

UTC_LIQ00003141

| **Office Action Summary** | **Application No.** 14/849,981 | **Applicant(s)** BATRA ET AL. |
|---|---|---|
| | **Examiner** YEVGENY VALENROD | **Art Unit** 1672 | **AIA (First Inventor to File) Status** No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☒ Responsive to communication(s) filed on *8/24/16*.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☒ This action is **FINAL**.          2b) ☐ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5) ☒ Claim(s) *1,2 and 4-11* is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☒ Claim(s) *1,2 and 4-11* is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10) ☐ The specification is objected to by the Examiner.
11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All   b) ☐ Some**  c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)
2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date *2/29/16*.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .
4) ☐ Other: _____.

UTC_LIQ00003142

Application/Control Number: 14/849,981                                    Page 2
Art Unit: 1672

The present application is being examined under the pre-AIA first to invent

provisions.

## DETAILED ACTION

### *Withdrawn rejections / reasons for allowability*

Rejection of claims 1-2, 4-10 under 35USC 103(a) as being unpatentable over

Moriarty in view of Phares is withdrawn in view of applicants' arguments.  Moriarty fails

to teach formation of the salt prior to purification of treprostinil in the process described

on page 1902.  Moriarty also discloses that the sample of treprostinil obtained is in all

respects identical to the authentic sample.  In this respects the final product of Moriarty

does not have the impurities from alkylation and hydrolysis because its a pure sample.

With respect to the sample prior to chromatography, Moriarty obtains crystals

from the free acid of treprostinil.  The crystals are also described as pure treprostinil and

there is no basis to presume that the described impurities are present in the crystalized

sample.

Furthermore, the declarations by Dr Williams and Dr. Ruffolo describe the

product of Moriarty to have a different impurity profile from the product the instant claims

where salt formation step is present.

### *Maintained Double Patenting Rejection*

The nonstatutory double patenting rejection is based on a judicially

created doctrine grounded in public policy (a policy reflected in the statute) so as to

prevent the unjustified or improper timewise extension of the "right to exclude" granted

Application/Control Number: 14/849,981                                        Page 3
Art Unit: 1672

by a patent and to prevent possible harassment by multiple assignees. A nonstatutory

double patenting rejection is appropriate where the claims at issue are not identical, but

at least one examined application claim is not patentably distinct from the reference

claim(s) because the examined application claim is either anticipated by, or would have

been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46

USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed.

Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*,

686 F.2d 937, 214 USPQ 761 (CCPA 1982); In re Vogel, 422 F.2d 438, 164 USPQ 619

(CCPA 1970); and *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d)

may be used to overcome an actual or provisional rejection based on a nonstatutory

double patenting ground provided the reference application or patent either is shown to

be commonly owned with this application, or claims an invention made as a result of

activities undertaken within the scope of a joint research agreement. See MPEP §

717.02 for applications subject to examination under the first inventor to file provisions

of the AIA as explained in MPEP § 2159.  See MPEP §§ 706.02(l)(1) - 706.02(l)(3) for

applications not subject to examination under the first inventor to file provisions of the

AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).

The USPTO Internet website contains terminal disclaimer forms which may be

used. Please visit www.uspto.gov/forms/. The filing date of the application in which the

form is filed  determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or

PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may be filled out

UTC_LIQ00003144

Application/Control Number: 14/849,981                                     Page 4
Art Unit: 1672

completely online using web-screens. An eTerminal Disclaimer that meets all

requirements is auto-processed and approved immediately upon submission. For more

information about eTerminal Disclaimers, refer to

http://www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

     Claims 1-2 and 4-11 are rejected on the ground of nonstatutory double patenting

as being unpatentable over claims 24 and 26 of U.S. Patent No. 8,242,305 ('305).

Although the claims at issue are not identical, they are not patentably distinct from each

other because:

     Claim 24 of '305 is directed to a process for the preparation of compound IV

(treprostinil).  Said method comprises alkylation od benzindene triol to prepare

compound (VI) followed by hydrolyzing compound (VI) and contacting the hydrolysis

product with a base.  In claim 26 the contacting base is diethanolamine.


     Claims 1-2 and 4-11 are provisionally rejected on the ground of nonstatutory

double patenting as being unpatentable over claims 1-3, 8-14,  of copending Application

No. 14/754,932 (reference application). Although the claims at issue are not identical,

they are not patentably distinct from each other because both the instant claims and

claims of '932 are directed to a pharmaceutical product comprising treprostinil

diethanolamine and a method of preparing said product via alkylation of benzindene

triol, hydrolysis, contacting with a base to form a salt and isolation of the salt.

     This is a provisional nonstatutory double patenting rejection because the

patentably indistinct claims have not in fact been patented.

UTC_LIQ00003145

Application/Control Number: 14/849,981                                        Page 5
Art Unit: 1672

### *Conclusion*

Claims 1-2 and 4-11 are pending

Claims 1-2 and 4-11 are rejected

**THIS ACTION IS MADE FINAL.**  Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the mailing date of this final action.


Any inquiry concerning this communication or earlier communications from the

examiner should be directed to YEVGENY VALENROD whose telephone number is

(571)272-9049.  The examiner can normally be reached on mon-fri 8-4:30.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Fereydoun G. Sajjadi can be reached on 571-572-3311.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

UTC_LIQ00003146

Application/Control Number: 14/849,981                                      Page 6
Art Unit: 1672

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/YEVGENY VALENROD/
Primary Examiner, Art Unit 1672

UTC_LIQ00003147

# EXHIBIT 26

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/754,932 | 06/30/2015 | Hitesh Batra | 080618-1550 | 1865 |

22428          7590          10/19/2016
Foley & Lardner LLP
3000 K STREET N.W.
SUITE 600
WASHINGTON, DC 20007-5109

| EXAMINER |
|---|
| VALENROD, YEVGENY |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1672 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 10/19/2016 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

ipdocketing@foley.com

PTOL-90A (Rev. 04/07)

UTC_LIQ00006774

| **Office Action Summary** | **Application No.** 14/754,932 | **Applicant(s)** BATRA ET AL. |
|---|---|---|
| | **Examiner** YEVGENY VALENROD | **Art Unit** 1672 | **AIA (First Inventor to File) Status** No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>8/11/16</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☒ This action is **FINAL**.          2b) ☐ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☒ Claim(s) <u>1,6 and 8-14</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☒ Claim(s) <u>1,6 and 8-12</u> is/are allowed.

7) ☒ Claim(s) <u>13-14</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All   b) ☐ Some**  c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____.
      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)

2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.

4) ☐ Other: _____.

UTC_LIQ00006775

Application/Control Number: 14/754,932                                   Page 2
Art Unit: 1672

The present application is being examined under the pre-AIA first to invent

provisions.

## DETAILED ACTION

Rejection of claims 1-3, 6, 8 and 9 under 35 USC102(b) as anticipated by Moriarty et al

is withdrawn in view applicants' arguments, amendments and the accompanying

declarations.


Rejection of claims 10-12 under 35 USC 103(a) over Moriatry in view of Phares are

withdrawn in view of applicants' arguments, amendments and the accompanying

declarations


### *Maintained Double Patenting*

The nonstatutory double patenting rejection is based on a judicially created

doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the

unjustified or improper timewise extension of the "right to exclude" granted by a patent

and to prevent possible harassment by multiple assignees. A nonstatutory double

patenting rejection is appropriate where the claims at issue are not identical, but at least

one examined application claim is not patentably distinct from the reference claim(s)

because the examined application claim is either anticipated by, or would have been

obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d

1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir.

1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*,

UTC_LIQ00006776

Application/Control Number: 14/754,932                                    Page 3
Art Unit: 1672

686 F.2d 937, 214 USPQ 761 (CCPA 1982); In re Vogel, 422 F.2d 438, 164 USPQ 619

(CCPA 1970); and In re Thorington, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d)

may be used to overcome an actual or provisional rejection based on a nonstatutory

double patenting ground provided the reference application or patent either is shown to

be commonly owned with this application, or claims an invention made as a result of

activities undertaken within the scope of a joint research agreement. See MPEP §

717.02 for applications subject to examination under the first inventor to file provisions

of the AIA as explained in MPEP § 2159.  See MPEP §§ 706.02(l)(1) - 706.02(l)(3) for

applications not subject to examination under the first inventor to file provisions of the

AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).

The USPTO Internet website contains terminal disclaimer forms which may be

used. Please visit www.uspto.gov/forms/. The filing date of the application in which the

form is filed  determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or

PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may be filled out

completely online using web-screens. An eTerminal Disclaimer that meets all

requirements is auto-processed and approved immediately upon submission. For more

information about eTerminal Disclaimers, refer to

http://www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

Claims 13-14 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 24 and 26 of U.S. Patent No. 8,242,305 ('305). Although

UTC_LIQ00006777

Application/Control Number: 14/754,932                              Page 4
Art Unit: 1672

the claims at issue are not identical, they are not patentably distinct from each other

because:

Claim 24 of '305 is directed to a process for the preparation of compound IV

(treprostinil).  Said method comprises alkylation od benzindene triol to prepare

compound (VI) followed by hydrolyzing compound (VI) and contacting the hydrolysis

product with a base.  In claim 26 the contacting base is diethanolamine.


### Conclusion

Claims 1, 6, 8-14 are pending

Claims 1, 6, 8-12 are allowed

Claims 13-14 are rejected

**THIS ACTION IS MADE FINAL.**  Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the mailing date of this final action.

Application/Control Number: 14/754,932                                    Page 5
Art Unit: 1672

    Any inquiry concerning this communication or earlier communications from the examiner should be directed to YEVGENY VALENROD whose telephone number is (571)272-9049.  The examiner can normally be reached on mon-fri 8-4:30.

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Fereydoun G. Sajjadi can be reached on 571-572-3311.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

    Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/YEVGENY VALENROD/
Primary Examiner, Art Unit 1672

UTC_LIQ00006779

# EXHIBIT 27

## HIGHLY CONFIDENTIAL



United Therapeutics Corporation
1040 Spring Street
Silver Spring, Maryland 20910
Phone (301) 608-9292
Facsimile (301) 608-0376
www.unither.com



**HIGHLY CONFIDENTIAL**

P. 26    UT Ex. 2037    **UTC_TV_000017276**
SteadyMed v. United Therapeutics

HIGHLY CONFIDENTIAL    UTC_LIQ00214670



**HIGHLY CONFIDENTIAL**

P. 27
UT Ex. 2037
SteadyMed v. United Therapeutics

**UTC_TV_000017277**

HIGHLY CONFIDENTIAL

UTC_LIQ00214671

# EXHIBIT 28

## HIGHLY CONFIDENTIAL



United Therapeutics Corporation
1040 Spring Street
Silver Spring, Maryland 20910
Phone (301) 608-9292
Facsimile (301) 608-0376
www.unither.com

UTC_LIQ00264317



HIGHLY CONFIDENTIAL

UTC_LIQ00264318

# EXHIBIT 29

## HIGHLY CONFIDENTIAL



1

EXHIBIT 20
Deponent Betta
Date 12/15/16 nm   Rptr

EXHIBIT
Marsh 19
12/15

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

UTC-Sand-Rem01096531

UTC_TV_000009332

HIGHLY CONFIDENTIAL

UTC_OREN_00844298



2

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

UTC-Sand-Rem01096532

UTC_TV_000009333

HIGHLY CONFIDENTIAL

UTC_OREN_00844299



3

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

UTC-Sand-Rem01096533

UTC_TV_000009334

HIGHLY CONFIDENTIAL

UTC_OREN_00844300



4

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

UTC-Sand-Rem01096534

UTC_TV_000009335

UTC_OREN_00844301



HIGHLY CONFIDENTIAL

UTC-Sand-Rem01096535

HIGHLY CONFIDENTIAL

UTC_TV_000009336

HIGHLY CONFIDENTIAL

UTC_OREN_00844302



HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

UTC-Sand-Rem01096536

UTC_TV_000009337

UTC_OREN_00844303



HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

UTC-Sand-Rem01096537

UTC_TV_000009338

HIGHLY CONFIDENTIAL

UTC_OREN_00844304



8

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

UTC-Sand-Rem01096538

UTC_TV_000009339

HIGHLY CONFIDENTIAL

UTC_OREN_00844305



9

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

UTC-Sand-Rem01096540

UTC_TV_000009341

UTC_OREN_00844307



11

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

UTC-Sand-Rem01096541

UTC_TV_000009342

UTC_OREN_00844308

HIGHLY CONFIDENTIAL

UTC_OREN_00844309

# EXHIBIT 30

*ROUGH*ROUGH*ROUGH*

10:31:03AM  1        THE VIDEOGRAPHER:  Good morning we are going

10:31:15AM  2   on the record at 10:31 a.m. on December 30, 2021.  This

10:31:21AM  3   system Media Unit 1 of the remote recorded deposition of

10:31:24AM  4   Dr. F. Dean Toste in the matter of United Therapeutics

10:31:31AM  5   versus LIQ technology inks filed in the United States

10:31:37AM  6   District Court for the District of Delaware case number

10:31:42AM  7   20-755.  My name is Orson Braithwaite from the firm

10:31:48AM  8   Veritext Legal Solutions.  I'm the videographer.  The

10:31:51AM  9   court reporter is Bonnie Russo from the firm Veritext

10:31:53AM 10   Legal Solutions.  Counsel will now state their

10:31:55AM 11   appearances and affiliations for the record.

10:31:58AM 12        MR. SUKDUANG:  Sanya Sukduang and Doug cheek

10:32:03AM 13   from cool on behalf of Liquidia.  Also on the line is

10:32:11AM 14   deep can from Cooley.

10:32:15AM 15        MS. PAPPAS:  Catholic pap from McDermott

10:32:20AM 16   Will & Emery on behalf of plaintiff United Therapeutics

10:32:25AM 17   joined by add burr and bald videographer.

10:32:52AM 18        BY MR. SUKDUANG:

10:32:53AM 19     Q.  Hello Dr. Toste.  My name is Sanya Sukduang.

10:32:57AM 20   Nice to meet you?

10:32:59AM 21     A.  Nice to meet you too.

10:33:01AM 22     Q.  We are conducting your deposition in testimony U

10:33:05AM 23   T C versus Liquidia case by zoom and we are looking at

10:33:10AM 24   each on a video camera; is that correct?

10:33:13AM 25     A.  Yes.

*ROUGH*ROUGH*ROUGH*

12:12:09PM  1   I am just asking you whether I met what the claim

12:12:12PM  2   required.  Forget whether you infringe or not.  I am

12:12:17PM  3   trying to see did I do everything that this claim says?

12:12:19PM  4        A.  I see.  I think then you would go to the specs.

12:12:26PM  5   To understand.

12:12:27PM  6        Q.  Of the patent?

12:12:28PM  7        A.  Yeah.

12:12:28PM  8        Q.  So if a POSA looking at this how would they know

12:12:38PM  9   whether I need to do further purification of the salt to

12:12:46PM 10   meet the lower level or I can just use the salt itself?

12:12:54PM 11             MS. PAPPAS:  Objection.

12:12:55PM 12        Q.  Without further purification?

12:12:58PM 13        A.  I'm sorry.

12:12:59PM 14        Q.  Really what I am trying to get at in your opinion

12:13:03PM 15   reading Claim 1 when I make the salt do I have to do

12:13:08PM 16   subsequent purification steps of the salt that's I made

12:13:13PM 17   in order to meet the whoer level requirement of the

12:13:17PM 18   claim?

12:13:19PM 19             MS. PAPPAS:  Objection.  Form.

12:13:23PM 20             THE WITNESS:  Do I have to -- well, it needs

12:13:26PM 21   to become more pure.

12:13:28PM 22        Q.  Right.  So how -- how do I know -- how do I do

12:13:31PM 23   that looking at the claim?

12:13:33PM 24             MS. PAPPAS:  Objection.  Form.

12:13:35PM 25             THE WITNESS:

57

*ROUGH*ROUGH*ROUGH*

12:13:35PM 1      Q.  I'm sorry.  Can you repeated your answer.

12:13:37PM 2      A.  Yeah.  You -- sorry, Kathy, for cutting you off.

12:13:41PM 3   You look at the -- you would look at the specs /(.

12:13:44PM 4      Q.  Of the patent?

12:13:52PM 5      A.  Yeah initially, yeah.

12:13:56PM 6      Q.  Does Claim 1 require the pharmaceutical

12:14:27PM 7   composition to be of any specific purity?

12:14:31PM 8      A.  Not in Claim 1.

12:14:36PM 9      Q.  So if my starting batch was 50 percent pure and

12:14:44PM 10   my pharmaceutical composition was 51 percent pure I

12:14:49PM 11   would be okay according to the claim?

12:14:50PM 12           MS. PAPPAS:  Objection.  Form.

12:14:55PM 13           THE WITNESS:  I mean in terms of -- I don't

12:14:58PM 14   know what you are asking.

12:15:00PM 15      Q.  The phrase it says the level of one or more

12:15:03PM 16   impurities found in the starting batch of treprostinil

12:15:06PM 17   is lower than pharmaceutical composition.  So you have

12:15:11PM 18   Claim 1 in front of you?

12:15:12PM 19      A.  Right.

12:15:13PM 20      Q.  In that claim phrase if my starting batch was 50

12:15:18PM 21   percent pure and my pharmaceutical composition was 51

12:15:23PM 22   percent pure would I meet that requirement of the claim?

12:15:28PM 23           MS. PAPPAS:  Objection.  Form.

12:15:34PM 24           THE WITNESS:  Would you meet -- certainly

12:15:35PM 25   you would have lowered the impurities.

*ROUGH*ROUGH*ROUGH*

12:15:38PM 1      Q.  So in your opinion -- I'm sorry I didn't mean to

12:15:41PM 2    interrupt you.

12:15:41PM 3      A.  So with respect to that question in the claim

12:15:45PM 4    lower one or more impurities found in the starting batch

12:15:52PM 5    if the 51 percent increased impurity was as a result --

12:15:58PM 6    there is a lot of ifs so I always feel uncomfortable

12:16:01PM 7    when I am using a lots of ifs but if the increase in

12:16:06PM 8    impurity was a result of lower one of the impurities in

12:16:09PM 9    the starting batch then you would have certainly met

12:16:13PM 10   that component of the claim.

12:16:15PM 11     Q.  Okay.  So if I lowered one or more of the

12:16:21PM 12   impurities in the starting batch when I got to the final

12:16:24PM 13   composition let me rephrase.  If my starting batch was

12:16:29PM 14   50 percent pure and my pharmaceutical composition was 51

12:16:34PM 15   percent pure and that difference in impurity is I

12:16:38PM 16   removed one of the impurities in the starting batch it

12:16:42PM 17   would meet that claim limitation?

12:16:44PM 18          MS. PAPPAS:  Objection.  Form.

12:16:47PM 19          THE WITNESS:  I mean it would meet that

12:16:49PM 20   component of the claim limitation right.

12:16:51PM 21     Q.  Right.  What if my starting batch was 50 percent

12:16:58PM 22   pure and my pharmaceutical composition was 51.  '01

12:17:03PM 23   percent pure and that difference is I removed that .01

12:17:09PM 24   percent difference I remove Tim purity from the starting

12:17:14PM 25   batch would I meet that limitation?

59

# EXHIBIT 31

## HIGHLY CONFIDENTIAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>LIQUIDIA TECHNOLOGIES, INC.,<br><br>　　　　　　Defendant. | C.A. No. 20-755 (RGA) (JLH) |

**HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

---

**REPLY EXPERT REPORT OF F. DEAN TOSTE, PH.D. ON INFRINGEMENT OF U.S. PATENT NO. 9,593,066**

---

*Highly Confidential—Subject to Protective Order*

# Table of Contents

I.    INTRODUCTION                                                                           1

   A.    Scope of Analysis                                                            1

   B.    Materials Considered                                                         1

II.    INFRINGEMENT OF U.S. PATENT NO. 9,593,066                                             1

   A.    Relevant "impurities" as understood by a POSA                                2

   B.    "starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis *steps*"                                                  7

   C.    Basing conclusions on data                                                   14

III.    CONCLUSION                                                                           21

*Highly Confidential—Subject to Protective Order*

## I.      INTRODUCTION

### A.  Scope of Analysis

1.      I, Professor F. Dean Toste, Ph.D., submit this reply report in response to the Rebuttal

Expert Report of Dr. Jeffrey Winkler on the Issue of Non-Infringement dated November 12, 2021

("Winkler Reb. Rpt.").

2.      I provided an Initial Opening Report in this matter dated October 15, 2021 ("Initial

Opening Report") and a Supplemental Opening Report dated November 15, 2021 ("Supplemental

Opening Report") (collectively, "Opening Reports").

3.      I incorporate by reference the opinions set forth in my Opening Reports as if set forth

fully herein.

### B.  Materials Considered

4.      In forming my opinions in this report, I have relied on my professional experience

and personal knowledge.  I have also reviewed a number of documents and materials in this case,

which are reflected in **Exhibit 3** to my Initial Opening Report and **Exhibit 5** to my Supplemental

Opening Report.  A list of the materials I newly considered when forming my opinions expressed in

this Reply Report is attached hereto as **Exhibit 7**.

## II.     INFRINGEMENT OF U.S. PATENT NO. 9,593,066

5.      As discussed in my Opening Reports, impurities are chemical substances contained as

a mixture with the major (desired) compound, but that differ in composition; the impurity identified

by Yonsung and Liquidia as the related substance impurity ███████████" is the impurity on

which I focused my analyses.  Dr. Winkler's responsive report opined that the ███████████

impurity is irrelevant to the asserted claims (*see* Winkler Reb. Rpt. ¶¶ 23-26, 37-54).  I disagree.

Below I address why a person of skill in the art would *not* understand the "impurities" as recited in

1

*Highly Confidential—Subject to Protective Order*

claim 1 to be so limited.  First, I address how a POSA would understand the plain and ordinary

meaning of the term "impurities" in the context of the art and particularly in light of the POSA's

experience relevant to realizing highly pure pharmaceutical products.[1]  Then I discuss how a POSA

would apply this knowledge and understanding to interpret the relevant "impurities" language in

claim 1 of the '066 patent, and how Dr. Winkler's analyses appear to diverge from mine as

exemplified by Dr. Winkler's repeated omission of the word "steps" when interpreting claim 1 of the

'066 patent.  Finally, I provide a few responsive points regarding my reliance on data to reach

conclusions.  While I am addressing some of Dr. Winkler's opinions, I am not opining on each and

every one contained in his report.  I understand from counsel that Dr. Nuckolls is also addressing

other responsive opinions offered by Dr. Winkler.  For all the reasons discussed in my Opening

Reports and in this report,  it is more likely than not that Liquidia will infringe at least Claim 1 of the

'066 patent (and claims 2, 3, and 6 as discussed in ¶ 99 of my Initial Opening Report) by importing

and/or using the treprostinil sodium API to manufacture the Proposed Product.

### A.  Relevant "impurities" as understood by a POSA

6.      Small molecule drug substances, of which treprostinil is an example, are produced by

a process called chemical synthesis.  By their very nature, the steps in chemical synthesis produce

**impurities**.  Impurities are chemical entities other than the final drug substances that are produced in

trace amounts during the chemical synthesis process steps.  These impurities can originate from "raw

materials, intermediates, solvents, chemical reagents, catalysts, by-products, impurities present in the

---

[1] As part of my opinions in my Initial Opening Report I provided some background
information regarding relevant organic chemistry concepts and the compounds discussed (¶¶ 33-56);
those opinions are expressly incorporated herein by reference.  The further background information
that I provide in this report is to clarify and delineate where and how my opinions diverge from those
offered by Dr. Winkler in his rebuttal report on these concepts.

*Highly Confidential—Subject to Protective Order*

starting material and chemical entities formed from those starting material impurities (particularly those involved in the last steps of the synthesis)". [F. Qui & D. L. Norwood (2007) "Identification of Pharmaceutical Impurities" *Journal of Liquid Chromatography & Related Techniques* **2007**, *30*, 877-935 (page 881)]

7.       A common type of impurity is a "**process impurity**".  Process impurities can arise from **starting materials or intermediates** in the chemical synthesis process.

8.       **"By-products"** are amongst the most common types of process impurities.  By-products are formed from undesired reactions, commonly referred to as side-reactions, of the starting material.  "The selectivity of a chemical reaction is rarely 100%, and side-reactions are common during the synthesis of drug substances."  (*ibid,* page 883).

9.        Another common type of process impurity is derived from impurities present in the starting material(s) or intermediate(s) in the chemical synthesis of the drug substance.  "Impurities present in the starting material could follow the same reaction pathways as the starting material itself, and the reaction products could carry over to the final product as process impurities" (*ibid,* page 881).

10.      As described above, impurities in starting materials or intermediates can be carried through synthetic steps to present as process impurities in the final drug substances.  This is particularly important to consider "in the last few *steps* of the synthesis, [because these impurities] can potentially survive the synthetic and purification process and appear in the final product as impurities." (*ibid,* page 881) (emphasis added).

11.      A summary of the types of relevant impurities described above is shown in the figure below (from K. M. Alsante *et. al* "Recent Trends in Product Development and Regulatory Issues on Impurities in Active Pharmaceutical Ingredient (API) and Drug Products. Part 2: Safety

*Highly Confidential—Subject to Protective Order*

Considerations of Impurities in Pharmaceutical Products and Surveying the Impurity Landscape"

*AAPS PharmaSciTech* **2013**, *15*, 237-251, page 239).  In this figure, the starting material (**A**)

contains a minor impurity (**A'**) which is converted through two steps (via intermediate **C/C'**) to a

process impurity (**DS'**) that is present in the final drug substance (**DS**).  The by-products derived

from starting material (**A**) and intermediate (**C**) is denoted as **BP**.



Fig. 1. The potential sources of drug impurities during development for both drug substances and drug products

12.   Notably, a POSA considers all impurities produced in chemical steps whether they

are derived from by-products (**BP1, BP2**), from intermediates (**C**), from the process steps(s) of an

intermediate (**C'**) or from impurities carried through from a starting material (**A'**) through chemical

operations to produce an impurity in an intermediate (**C'**).  An example taken from Eli Lilly's

Semagacestat (C. L. Burcham *et al.* "Using Quality by Design Principles as a Guide for Designing

Process Control Strategy", in Chapter 7 in Comprehensive Quality by Design for Pharmaceutical

Product Development and Manufacture.)  process development is illustrative.  In this case "five

impurities have been associated with contaminants in hydroxyvaline [a reagent/starting material, i.e.

**A/A'**] and could be expected to be present at some level. These species and the impurities resulting

from "*carrying them through the coupling step* are illustrated" below.

4

*Highly Confidential—Subject to Protective Order*



13.    As stated in my Initial Opening Report (¶ 32), my opinion is that a person of skill in the art ("POSA")

> "would be a person with a Ph.D. in physical, organic, or pharmaceutical chemistry, or a closely related discipline, with several years of experience relevant to realizing highly pure pharmaceutical products, which could be through practical experience in the pharmaceutical industry or otherwise through collaboration with those in the pharmaceutical industry. Alternatively, a person of ordinary skill in the art would also include someone with a lesser degree and with correspondingly (approximately five) more years of practical experience in physical, organic or pharmaceutical chemistry, provided they similarly have several years of experience relevant to realizing highly pure pharmaceutical products."

I understand that Dr. Nuckolls' articulation of the experience level of a POSA is slightly different from mine, which is likely because I had independently considered the appropriate experience level

*Highly Confidential—Subject to Protective Order*

of a POSA and came up with my own articulation of the hypothetical person. I understand that Dr.

Nuckolls provided the following POSA definition

> "UTC has previously presented the opinion that a POSA in the relevant fields in December 2007 would have been an experienced chemical engineer or process research chemist. This individual would have had 3-5 years of experience in the production and manufacture of pharmaceutical API and final drug product for pharmaceutical compositions and pharmaceutical products. I agree that this is an appropriate definition of a POSA. The POSA may also be an individual with a Master's degree in chemistry, chemical engineering, or a related field, and would have had access to and would have worked in collaboration with persons having at least 3-5 years of experience in the production and manufacture of API and drug products, and/or experience in clinical medicine."

I agree with Dr. Nuckolls' alternate articulation of a POSA. It is similar to the one that I proposed in

that it highlights the POSA's understanding of the realities of the production and manufacture of

API; my analysis and opinions would not change under Dr. Nuckolls' proposed definition of a

POSA. I understand that Dr. Winkler's definition of a POSA is someone who has

> "a master's degree or a Ph.D. in medicinal or organic chemistry, or a closely related field. Alternatively, a POSA would include an individual with a bachelor's degree and at least five years of practical experience in medicinal or organic chemistry",

In Dr. Winkler's rebuttal report, he states that his opinions would not change if the Court were to

adopt my or Dr. Nuckolls' definition of a POSA. Winkler Reb. Rpt. ¶ 11. I disagree that Dr.

Winkler's definition of the POSA is sufficient because his hypothetical person lacks exposure to API

synthesis reflected in both my and Dr. Nuckolls' standard. This aspect of the standard is helpful in

understanding common issues regarding process impurities in API synthesis. However, if the Court

were to adopt Dr. Winkler's definition of a POSA, my opinions offered on infringement of the

asserted claim(s) would be the same.

*Highly Confidential—Subject to Protective Order*

**B. "starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis *steps*"**

14.    Claim 1 of the '066 patent recites in relevant part "A pharmaceutical composition . . . prepared by a process comprising providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps . . . whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and wherein said alkylation is alkylation of benzindene triol."  As discussed above in Section II.A, if a particular impurity is present in the batch of treprostinil prepared by the alkylation and hydrolysis steps of an intermediate ███████ then a POSA would understand it to be a process impurity for purposes of preparing a pharmaceutical composition within the scope of the claim.

15.    In Dr. Winkler's view, ████████████████ is not a relevant impurity because ████████ ███████████████████████████████████████████████████████████████████ ████████████████ Winkler Reb. Rep. ¶¶ 23, 32-33, 38-39.  But Dr. Winkler's interpretation is not consistent with the claim's plain reference to "prior alkylation and hydrolysis *steps*", and it presents an erroneously narrow reading that the impurities must have been formed by alkylation of pure ████████ which is inconsistent with how a POSA would understand the synthesis described in the patent.  As a result, Dr. Winkler has narrowed what he considers to be a relevant impurity to only include **by-products** derived from ████████ A POSA would not understand the plain and ordinary meaning of "impurities" to be as narrow as required by Dr. Winkler's analyses (*see* Winkler Reb. Rpt. ¶¶ 23-54).  This is particularly true because the claim recites "providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis *steps*".   A POSA would understand that impurities resulting from alkylation/hydrolysis *steps* would include process impurities with origins in starting materials, solvents, chemical reagents, catalysts, by-

*Highly Confidential—Subject to Protective Order*

products, and from impurities present in intermediates that "follow the same reaction pathways as the starting material itself." (Qui & Norwood, 2007).  This is because a POSA would understand ███ ███████████ to be a process impurity following the same reaction pathway in the ██████ █████████, and would understand the ████████████ found in the starting batch of ████ to result from those prior alkylation and hydrolysis steps.

16.     To be clear, in my view a POSA's understanding of the claim's reference to "providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps" does not turn on an interpretation of the word "impurities" nor "steps", however, considering how Dr. Winkler has selectively used this claim language in his analysis provides a good window into where and why my opinion differs from his, and why a POSA would understand that the analyses I provided in my Opening Reports more likely than not establish infringement.  For example, when Dr. Winkler analyzes and applies the claim language, his selective dropping of the word "steps" appears to affect the outcome of his inquiry as to whether ██████ ████████ "results from prior alkylation and hydrolysis steps . . . wherein the alkylation is alkylation of benzindene triol."  (Claim 1).  A POSA would understand the plain and ordinary meaning of the word "steps" to refer to the general steps in the synthetic process, rather than the specific blackboard alkylation reaction step of alkylating pure BTO molecules as Dr. Winkler opines.  As an example of exactly this, consider Yonsung's DMF in which they define the synthetic process in terms of its steps, with Step ██ being the conversion of █████████████████████ and Step ██ being the conversion from ████████████████████████ each of which includes multiple necessary operations.  LIQ00573512-3791 at LIQ00573514-548) (DMF providing description of the manufacturing process and showing synthetic route, showing flow charts of the process, and describing the synthetic steps in further detail); Toste Op. Rep. ¶¶67, 69-73.  Dr.

*Highly Confidential—Subject to Protective Order*

Winkler even recognizes this in his responsive report.  *See* Winkler Reb. Rprt. At ¶ 32 ("For Step █ (████), impurities could be introduced by…" (citing to DMF)), ¶ 33 ("Similarly, for Step █ ████ impurities could be introduced by…" (citing to DMF)).  But in Dr. Winkler's opinion, the ████████ impurity comes from the ███████████████████ (Winkler Reb. Rep. ¶ 38), which is an impurity present in the ████████████████████████████ ███ by omitting the word "steps" from his analysis is Dr. Winkler attempts to assert that the alkylation of the ████ *molecule* does not result in the impurity of ████████████ and therefore (in Dr. Winkler's view)████████████ is not a relevant impurity as contemplated by the claim. However,  since the claim language specifically states "impurities resulting from prior alkylation and hydrolysis *steps*" (emphasis added), a POSA would understand this includes process impurities that would result from the ████████████ as well as other potential impurities (such as the ████████████ ████████ the actual starting material needed to complete the claimed *steps*.  Again, in my view a POSA's understanding of the claim would not turn on a reading of the word "step", but Dr. Winkler's selective use of the word to inform his analysis highlights why Dr. Winkler's responsive position would not be understood by a POSA to undercut my infringement analyses.

17.     This understanding is further grounded in the patent's specification, which discusses the improved purity of the invention and the inventive process' removal of "impurities carried over from intermediate steps".  *See* '066 patent at 17:27-32 ("The quality of treprostinil produced according to this invention is excellent.  The purification of benzindene nitrile by column chromatography is eliminated.  The **impurities *carried over from intermediate steps*** (i.e. alkylation of triol and hydrolysis of benzindene nitrile) ***are removed*** during the carbon treatment and salt formation step.") (emphasis added).  A POSA would understand from the patent's teachings like this one that the patent is not directed towards a hypothetical synthesis of theoretically pure materials,

*Highly Confidential—Subject to Protective Order*

but instead is contemplating the real-world synthetic processes.  While I disagree with Dr. Winkler that there would really be a question of this to a POSA, the fact that the specification notes impurities are carried over from intermediate steps would clarify that "wherein said alkylation is alkylation of benzindene triol" refers to benzindene triol (purchasable or synthetically prepared in house) as the starting reagent used in the actual chemical synthesis, not a hypothetical "pure" molecule.  '066 Patent 17:62-63.  In sum, reading the claim language in light of the specification, it would be clear to a POSA that the transformation of impurities during the alkylation and hydrolysis steps yields impurities "resulting from prior alkylation and hydrolysis steps" within the plain and ordinary meaning of "impurities" as recited by the claim.  '066 Patent 17:54-55.



18.     This is perhaps best exemplified by overlaying the labeling from the figure from paragraph 11 (*supra*) detailing a POSA's understanding of process impurities with a diagram prepared by Dr. Winkler (*see* above).  In this scheme, ████ is an intermediate (**C**) which contains a process impurity ████████.  The alkylation and hydrolysis converted these into the drug substance ████████████ and an impurity ████████████).  Much in the same way, the

*Highly Confidential—Subject to Protective Order*

impurity ▓▓ present in the starting ▓▓▓▓▓▓▓ is converted into the ▓▓▓▓▓▓▓

in the ▓▓▓▓▓▓ through a number of chemical steps.  In conclusion, a POSA would

understand that ▓▓▓▓▓▓ would be a process impurity resulting from the alkylation and

hydrolysis of **BTO** as claimed.

19.      This is supported by Dr. Winkler himself.  He states that the small amount of ▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ that Yonsung's DMF establishes can be

found in the batch of ▓▓▓▓▓▓ is actually used in the synthesis.  Winkler Reb. Rep. ¶ 51.  This

statement clearly demonstrates that a POSA would understand that impurities found in intermediates

and products can arise from process impurities derived from chemical operations (process steps)

performed on impure starting materials and/or intermediates.  However, he then asserts that ▓▓▓

▓▓▓▓▓ cannot result from the alkylation of this ▓▓ batch, and that therefore ▓▓▓▓▓▓

cannot result from the claimed alkylation and hydrolysis steps.  *Id.*  I disagree, as articulated in

paragraphs 6-11 (*supra*), and supported by Dr. Winkler's description of the source of the impurities

present in the ▓▓ batch and described above in paragraph 12 (*supra*), a POSA would understand

that impurities formed during the alkylation of ▓▓▓ include process impurities from starting

materials, intermediates and other sources.  This is consistent with the background art as well as how

Yonsung's DMF and other analytical testing documents characterize impurities in the intermediates

and treprostinil sodium API.

20.      As discussed, Dr. Winkler incorrectly assumes that the "alkylation step" referenced in

the claim must be referring only to alkylation of the molecule of ▓▓▓, rather than the process step

of alkylating the benzindene triol.  *See e.g.*, Winkler Reb. Rep. ¶32 ("Claim 1, however, requires

explicitly that the alkylation be of benzindene triol and thus a POSA would understand that

impurities resulting from reagents, starting materials, or reactions involving compounds that are not

*Highly Confidential—Subject to Protective Order*

***directly resulting from*** the alkylation of ██████ are excluded from claim 1.") (emphasis added).  At its core, this is apparently based on Dr. Winkler's preferential application of one clause in claim 1 regarding the alkylation step, which recites "wherein said alkylation is alkylation of benzindene triol" ('066 Patent 14:62-63) taken out of context from the rest of the claim language[2].  Because alkylating ████████████████, Dr. Winkler further opines that the hydrolysis step recited in the claim must be "hydrolysis *of the* TN01" (Winkler Reb. Rep. ¶32), thereby extending the overly restrictive analysis of hypothetically pure chemical synthesis past the alkylation step and into the hydrolysis step.  However, Dr. Winkler points to no claim language restricting hydrolysis to hydrolysis of the █████████, because there is none.  Even assuming that Dr. Winkler's interpretation of the claim's language regarding alkylation is correct (and I do not believe a POSA would think that it is), the hydrolysis step would still generate impurities that do not result from the alkylated █████ molecule itself, and a POSA would understand that the claimed impurities could come from a variety of sources including impurities in the starting materials, solvents, and intermediates such as ████████████.  A POSA would understand impurities resulting from the hydrolysis *step* to include impurities from the myriad sources described above, as well as the intended products.

     21.    In Dr. Winkler's view, UTC's statement in front of the PTAB that "claims 1-7 of the '066 patent specifically recite limitations relating to the impurity profile of the recited pharmaceutical product" supports the conclusion that "a POSA would understand that the 'impurity profile' claimed by the '066 Patent does *not* include impurities contained in the starting materials or

---

[2] Dr. Winkler is inconsistent on his interpretation of "alkylation" even within this one clause.  In the first instance, he takes "alkylation" to mean the same as "alkylation step" as recited in the earlier clause of the claim. However in the second instance he distinguishes in order to fit the argument that "said alkylation" must only be alkylation of the BTO molecule and not inclusive of the alkylation step as a whole.

*Highly Confidential—Subject to Protective Order*

reagents, even if they react with the reagents used during the alkylation and hydrolysis steps."

Winkler Reb. Rep. ¶ 24.  I disagree.  A POSA would of course understand that the impurity profile

of a pharmaceutical product would include impurities originally detectable in some form in the

starting materials.  Indeed, a POSA would understand any impurity from any source in a process step

to be relevant for the purposes of preparing a pharmaceutical composition within the scope of the

claim.  This is reflected, for example, in the DMF's effort to characterize potential impurities in the

treprostinil sodium API regardless of whether they ████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████  LIQ00000001-LIQ00000624 at LIQ00000038.

22.     Dr. Winkler continues to apply this erroneous analysis throughout his report, arguing

that ███████████████ is irrelevant to the claim because it results from alkylation and hydrolysis of

an impurity observed in the █████ "not alkylation of ██████ itself" (Winkler Reb. Rpt. ¶ 43), opining

that "a POSA would understand 'impurities' in claim 1 to only include those impurities generated

upon alkylation of ███████ and not impurities resulting from alkylation of compounds other than ██████

or hydrolysis of compounds other than ████████  Winkler Reb. Rpt. ¶ 44.  I disagree, as a POSA

would have a broader understanding of what impurities would result from the alkylation step of ██████

and subsequent hydrolysis.  Such a narrow view is not realistic and is inconsistent with how a

process chemist would approach producing highly pure pharmaceutical products.  For example,

Burcham *et al.* state "It is important to fully understand the origin and fate of **all** impurities

throughout the synthesis as this allows for appropriate limits and controls to be established."

(emphasis added).  In my experience, the understanding of the "*origin* and fate" of impurities in a

synthesis is exactly the type of concern a process chemist would address in the face of these issues,

*Highly Confidential—Subject to Protective Order*

and indeed I have mentored many bright Ph.D. students who grow to appreciate this reality only after joining pharmaceutical companies and grappling with this difficult endeavor.

### C. Basing conclusions on data

23.     In my Initial Opening Report, I included a footnote stating that ████████ of the ████████ has been reported in prostaglandins, and while the lack of the ████████████ ████ in treprostinil makes it less likely to be occurring in the hydrolysis/alkylation reactions, that it could not be definitively ruled out as an additional source of ████████ Initial Opening Report ¶ 42 n. 2.  In return, Dr. Winkler asserts that ████████ during ████████████ ████████████████████████ Winkler Reb. Rep. at ¶ 52.  However, Dr. Winkler's assertion is not supported by data ruling out ████████ during the alkylation and hydrolysis steps performed in Yonsung's synthesis of **TN02**; ████████████████████ ████████████████████████████████, the Merritt reference itself notes that the pathway is "typical."  As discussed above, it is immaterial to infringement of the asserted claim whether the ████████ was formed through ████████ during the claimed alkylation/hydrolysis steps or whether it resulted from ████ through the alkylation/hydrolysis steps, because either way ████████ in the ██ is "resulting from prior alkylation and hydrolysis steps" where "said alkylation is alkylation of benzindene triol," as recited by the claim.  However, when analyzing all available data regarding the source of the ████ in Yonsung's ████ was unable to rule out ████████ occurring during the alkylation/hydrolysis steps; given the lack of determinative literature on the point, in order to conclusively determine that ████████ during the alkylation/hydrolysis steps was not an additional source of ████████ in Yonsung's ██ I would need to collect further data from testing precursor samples from Yonsung's synthetic process (████████ which I

*Highly Confidential—Subject to Protective Order*

understand were not made available by Liquidia during the litigation.  In my view, a POSA would not so cavalierly exclude possible sources of impurities without data supporting the conclusion that the particular source could actually be ruled out, as such assumptions could be disastrous to the pursuit of realizing highly pure pharmaceutical products.  A POSA would understand that impurities can arise from a variety of sources and that proper experimentation is the best and only way to fully exclude sources from consideration.

24.     The peril of such assumptions can be seen in Gilead's synthesis of Rovafovir Etalafenamide (Standley *et al.* "Synthesis of Rovafovir Etalafenamide (Part 1): Active Pharmaceutical Ingredient Process Development, Scale-Up, and Impurity Control Strategy." *Org. Process Res. Dev.* **2021**, *25*, 1215.)  In these studies, it was initially posited that "**8** is a process impurity generated en route to **1**...Initial investigations pointed to **9** (a diastereomer of intermediate **6**) as the ultimate progenitor of this impurity."  But experimentally they found that the "reaction is ultimately responsible for producing both precursors (**12** and **9**) that converge to **8** later in the synthetic sequence."  Here the assumption that a process impurity (**8**) was produced solely from a ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉) proved incorrect.  My conclusion remains the same: while I do not disagree with Dr. Winkler's hypothesis, I am reluctant to make such absolute assertions in the absence of data and experimentation.

*Highly Confidential—Subject to Protective Order*



25.     As part of my Opening Reports, I examined the HPLC chromatograms provided from Yonsung's analytical testing during manufacture of the API.  In some instances, I found indication that there likely ▮▮▮▮▮▮▮▮ present in the ▮▮▮▮ samples that was reported as 'undetected' in Yonsung's DMF due to insufficient resolution to separate the impurity's peak from the shoulder of the primary peak.  Initial Opening Report ¶¶ 74-78.  In response, Dr. Winkler opined that my analysis was "attempting to supercede the data that Yonsung provided in its DMF and was subsequently reviewed by the FDA."  Winkler Reb. Rep. ¶ 54.  I disagree with Dr. Winkler's characterization of my analysis.  My analysis was conducted for the purpose of assessing infringement, not to impact or otherwise opine on the sufficiency of data submitted to the FDA.  The claim calls in relevant part for analysis of whether the starting batch of treprostinil ▮▮▮▮ has one or more impurities that are lowered in the pharmaceutical composition (**TN**); my analysis focused on ▮▮▮▮▮▮▮▮ s an exemplary infringing impurity, so I considered the analytical data made

16

*Highly Confidential—Subject to Protective Order*

available to me to assess whether the batches of ███████████ present, and whether the level of ████████ was lowered in the corresponding batch of **TN**.  In instances where it appeared likely from the data that there was unreported ███████ hidden in the shoulder of the ███ peak, I was unable to conclude that there was no ████████ present in the **TN02**. *See* Initial Opening Report ¶¶ 76-77.  In my opinion this is likely due to insufficient resolution under the conditions of HPLC analysis employed by Yonsung, which failed to produce adequate separation of the ███ peak from ███████ peak in instances where there was only a small amount of that impurity.  *See* Initial Opening Report ¶¶ 51-56, 76-77.  Whether such data is sufficient for the purposes for which it is submitted to the FDA is not relevant to the question of whether the data is sufficient for informing the infringement inquiry.  Indeed, Yonsung's acceptance criteria for ███ includes that there is not more than (NMT) ███████████ in █████ sample (LIQ00573512-LIQ00573791 at LIQ00573782), which is substantially more than was reported in the ███ batches that I reviewed (*see* Opening Reports, Supplemental Appendix to Supplemental Opening Report); in my opinion it is more likely than not that presence of ███████ above that threshold in the ███ would be captured and reported even under Yonsung's HPLC methods, because such a large amount of the impurity ████ would lower the peak ratio between the ██ ██████ and the ████ making it less likely that the ████████████ would manifest as a shoulder to █████ *See* Initial Opening Report ¶¶ 51-56.  Further, due to the effectiveness of the claimed salt formation step at eliminating the █████████ from the pharmaceutical batch there is likely little reason for the FDA to highly scrutinize levels of this impurity in the intermediates.  Notably, Dr. Winkler does not contend that any of my interpretations of the HPLC chromatograms were incorrect or otherwise substantively flawed.

*Highly Confidential—Subject to Protective Order*

26.     While Dr. Winkler criticizes my exemplary focus on the ███████████ impurity, this is one of only two impurities that were characterized, tested-for, and reported in Yonsung's analytic testing documents for both the ████ and **TN**.  Put differently, ███████████ one of only ██ impurities that were specifically identified, quantified, and reported in both the starting batch of treprostinil and the pharmaceutical composition.[3]  As Dr. Winkler agrees (Winkler Reb. Rpt. at ¶¶ 25-26), the relevant inquiry for claim 1 of the '066 patent's "whereby" clause requires comparing levels of impurities in the starting batch of treprostinil (████ with those in the pharmaceutical composition (**TN** API).  Because Liquidia did not produce any samples of ████ independent testing or analyses of the impurities present in the starting batch of treprostinil as recited in the claim was not possible; instead, I was limited to reviewing and analyzing the produced documents regarding impurities as tested by Yonsung and Liquidia.  This matters because of the POSA's ability to use testing and experimental methods for identification, characterization, and quantification of individual impurities; without ████ samples I was unable to undertake this analysis for myself.

27.     For example, as explained above and in my Opening Reports, the HPLC conditions chosen for analyzing a substance and its impurities can affect the resolution between peaks of interest in the HPLC chromatograms, and accordingly can affect the ability to accurately quantify the relative amount of the chemical components of the substance tested.  Even when using the same HPLC conditions, the POSA running the sample themselves has significantly more data available

---

[3] Typically, a POSA has the opportunity to control an experiment's conditions necessary to identify, characterize and quantify each individual impurity present throughout the synthetic process; a POSA analyzing infringement by Yonsung's API would accordingly typically be able to control experimental testing of intermediate samples from various steps of Yonsung's synthetic process, and could potentially identify a wider range of impurities present in samples beyond those that Yonsung particularly tracks through the intermediates and reports on its certificates of analysis (such as the ███████████ ).

*Highly Confidential—Subject to Protective Order*

than through review of a cold paper printout.  For example, the POSA can blow up the HPLC chromatograms to observe and quantify impurities even when the instrument does not pick them up by performing a manual integration of the area under the peak.  This practice can be seen in some of Yonsung's quality control testing records.  *See e.g.*, Initial Opening Report ¶ 90 (reproducing blowup ███████ batch ████████████ from manual integration review in LIQ00576770 - LIQ00576818 at LIQ00576806-807), Supplemental Opening Report ¶ 22 (reproducing blowup from ██████ batch ████████████ from manual integration review in LIQ02817203 - LIQ02817256 at LIQ02817244-45, and for **TN** batch ████████████ from manual integration review in LIQ02816162 - LIQ02816323 at LIQ02816224-25); *see also* LIQ00575090 - LIQ00575249 at LIQ00575175-176 (HPLC chromatogram blowups from **TN** batch ████████████ during manual integration review), LIQ00576033 - LIQ00576203 at LIQ00576123-24 (HPLC chromatogram blowups from **TN** batch ████████████ during manual integration review), LIQ00577744 - LIQ00577952 at LIQ00577800 (HPLC chromatogram blowups from **TN** batch ████████████ during manual integration review), LIQ00578562 - LIQ00578614 at LIQ00578598, LIQ00578600 (HPLC chromatogram blowups from ██████ batch ████████████ during manual integration review), LIQ00578650 - LIQ00578818 at LIQ00578710-11 (HPLC chromatogram blowups from **TN** batch ████████████ during manual integration review), LIQ00579721-LIQ00579776 at LIQ00579763-64 (HPLC chromatogram blowups from ██████ batch ████████████ during manual integration review), LIQ00583125 - LIQ00583178 at LIQ00583166-67 (HPLC chromatogram blowups from ██████ batch TN02120H010 during manual integration review), LIQ02817098 - LIQ02817161 at LIQ02817139-140 (HPLC chromatogram blowups from ██████ batch ████████████ during manual integration review), LIQ02816326 - LIQ02816481 at LIQ02816381-82 (HPLC chromatogram blowups from **TN** batch ████████████ during manual integration review).  Without access to samples of Yonsung's

*Highly Confidential—Subject to Protective Order*

intermediates for use in independent analytical testing, my conclusions are necessarily limited by the analytical testing methods employed by Yonsung, i.e., the limited data produced by Liquidia.  In my view, for all the reasons stated in my Opening Reports and in this report, a POSA would conclude based on this data that it is more likely than not that Liquidia's Proposed Product will infringe at least Claim 1 of the '066 patent.

*Highly Confidential—Subject to Protective Order*

## III.   CONCLUSION

28.   In my opinion, for all the reasons discussed in my Opening Reports and in this report, it is more likely than not that Liquidia will infringe at least Claim 1 of the '066 patent (and claims 2, 3, and 6 as discussed in ¶ 99 of my Initial Opening Report) by importing and/or using the treprostinil sodium API to manufacture the Proposed Product.

29.   For the foregoing reasons, it is my opinion that Liquidia directly and/or indirectly infringes Claim 1 of the '066 Patent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on Dec 10, 2021 at

Berkeley, CA .

By _____

F. Dean Toste

**Exhibit 7**

**Materials Considered by F. Dean Toste**

**Exhibit 3** to my Initial Opening Report and **Exhibit 5** to my Supplemental Opening Report included the materials I considered in whole or in part in forming the opinions set forth in my report; I incorporate by reference the materials listed in Exhibit 3 and 5 here as well.

The following list contains the additional documents that I considered in whole or in part in forming the opinions set forth in my Reply Report.

| Document | Description |
|---|---|
| | Rebuttal Report of Dr. Jeffrey Winkler |
| | Exhibits to Dr. Winkler's Rebuttal Report |
| | Initial Opening Report of Dr. Dean Toste |
| | Supplemental Appendix to Supplemental Opening Report of Dr. Dean Toste |
| UTC_LIQ00254175-4186 | U.S. Patent No. 9,593,066 B2 |
| | C. L. Burcham et al. *Using Quality by Design Principles as a Guide for Designing Process Control Strategy*, in Chapter 7 in Comprehensive Quality by Design for Pharmaceutical Product Development and Manufacture |
| UTC_LIQ00051107-1165 | F. Qui & D. L. Norwoord (2007) *Identification of Pharmaceutical Impurities* J. Liquid Chromatography & Related Techniques 2007, 30, 877-935 |
| | K. M. Alsante et. al. *Recent Trends in Product Development and Regulatory Issues on Impurities in Active Pharmaceutical Ingredient (API) and Drug Products. Part 2: Safety Considerations of Impurities in Pharmaceutical Products and Surveying the Impurity Landscape* AAPS PharmaSciTech 2013, 15, 237-251, page 239 |
| | Stanley et al. *Synthesis of Rovafovir Etalafenamide (Part 1): Active Pharmaceutical Ingredient Process Development, Scale-Up, and Impurity Control Strategy*. Org. Process Res. Dev. 2021, 25, 1215 |

For clarity regarding all the translations received to-date and what I understand to be the controlling versions in instances where more than one translation was received, below is the table cross listing the BATES as originally produced by Liquidia, the BATES of the translated version, and the BATES of the corrected version (if applicable) for all documents. These are among the materials I considered in whole or part in forming the opinions set forth in my reports

| Original BATES | Original Translation BATES | BATES of corrected translation *(controlling if provided)* | Description |
|---|---|---|---|
| LIQ00573792 - LIQ00573807 | UTC_LIQ00231341-UTC_LIQ00231373 | | |
| LIQ00573808 - LIQ00573833 | UTC_LIQ00231489-UTC_LIQ00231541 | UTC_LIQ00262175-UTC_LIQ00262227 | |
| LIQ00573834 - LIQ00573854 | UTC_LIQ00231446-UTC_LIQ00231488 | UTC_LIQ00262228-UTC_LIQ00262271 | |
| LIQ00573855 - LIQ00573872 | UTC_LIQ00231409-UTC_LIQ00231445 | | |
| LIQ00573873 - LIQ00573937 | UTC_LIQ00231762-UTC_LIQ00231892 | | |
| LIQ00573938 - LIQ00573954 | UTC_LIQ00231374-UTC_LIQ00231408 | | |
| LIQ00573955 - LIQ00573976 | UTC_LIQ00231542-UTC_LIQ00231586 | | |
| LIQ00573978 - LIQ00573978 | UTC_LIQ00231333-UTC_LIQ00231335 | | List of Intermediates and Finished API.pdf |
| LIQ00573979 - LIQ00574001 | UTC_LIQ00231587-UTC_LIQ00231633 | | Method of Secondary Packaging.pdf |

| Original BATES | Original Translation BATES | BATES of corrected translation *(controlling if provided)* | Description |
|---|---|---|---|
| LIQ00574002 - LIQ00574003 | UTC_LIQ00231336- UTC_LIQ00231340 | | List of Packaging Method & Container.pdf |
| LIQ00574004 - LIQ00574025 | UTC_LIQ00231634- UTC_LIQ00231678 | | [PM027]-17 Method of Primary Packaging.pdf |
| LIQ00574026 - LIQ00574066 | UTC_LIQ00231679- UTC_LIQ00231761 | | [QA021] Product Packaging and Distribution.pdf |
| LIQ00574067 - LIQ00574093 | UTC_LIQ00234126- UTC_LIQ00234180 | | |
| LIQ00574094 - LIQ00574151 | UTC_LIQ00234298- UTC_LIQ00234414 | | |
| LIQ00574152 - LIQ00574189 | UTC_LIQ00234415- UTC_LIQ00234491 | | |
| LIQ00574190 - LIQ00574231 | UTC_LIQ00234850- UTC_LIQ00234934 | | |
| LIQ00574232 - LIQ00574272 | UTC_LIQ00234935- UTC_LIQ00235017 | | |
| LIQ00574273 - LIQ00574315 | UTC_LIQ00235018- UTC_LIQ00235104 | UTC_LIQ00262272- UTC_LIQ00262358 | |
| LIQ00574316 - LIQ00574455 | UTC_LIQ00234569- UTC_LIQ00234849 | | |

| Original BATES | Original Translation BATES | BATES of corrected translation *(controlling if provided)* | Description |
|---|---|---|---|
| LIQ00574730 - LIQ00574769 | UTC_LIQ00231893- UTC_LIQ00231973 | | |
| LIQ00574770 - LIQ00574841 | UTC_LIQ00232193- UTC_LIQ00232337 | | |
| LIQ00574842 - LIQ00574894 | UTC_LIQ00232086- UTC_LIQ00232192 | | |
| LIQ00574895 - LIQ00574939 | UTC_LIQ00233159- UTC_LIQ00233249 | | |
| LIQ00574940 - LIQ00575004 | UTC_LIQ00233028- UTC_LIQ00233158 | | |
| LIQ00575005 - LIQ00575054 | UTC_LIQ00232927- UTC_LIQ00233027 | | |
| LIQ00575055 - LIQ00575089 | UTC_LIQ00232015- UTC_LIQ00232085 | UTC_LIQ00262359- UTC_LIQ00262429 | |
| LIQ00575090 - LIQ00575249 | UTC_LIQ00232606- UTC_LIQ00232926 | | |
| LIQ00575643 - LIQ00575683 | UTC_LIQ00233988- UTC_LIQ00234070 | | |
| LIQ00575684 - LIQ00575768 | UTC_LIQ00232435- UTC_LIQ00232605 | UTC_LIQ00262430- UTC_LIQ00262600 | |

| Original BATES | Original Translation BATES | BATES of corrected translation *(controlling if provided)* | Description |
|---|---|---|---|
| LIQ00575769 - LIQ00575831 | UTC_LIQ00233861- UTC_LIQ00233987 | | |
| LIQ00575832 - LIQ00575879 | UTC_LIQ00232338- UTC_LIQ00232434 | UTC_LIQ00262601- UTC_LIQ00262697 | |
| LIQ00575880 - LIQ00575932 | UTC_LIQ00233754- UTC_LIQ00233860 | UTC_LIQ00262698- UTC_LIQ00262804 | |
| LIQ00575933 - LIQ00576012 | UTC_LIQ00233593- UTC_LIQ00233753 | | |
| LIQ00576013 - LIQ00576032 | UTC_LIQ00231974- UTC_LIQ00232014 | UTC_LIQ00262805- UTC_LIQ00262845 | |
| LIQ00576033 - LIQ00576203 | UTC_LIQ00233250- UTC_LIQ00233592 | | |
| LIQ00576537 - LIQ00576617 | UTC_LIQ00235896- UTC_LIQ00236058 | | |
| LIQ00576618 - LIQ00576645 | UTC_LIQ00235839- UTC_LIQ00235895 | | |
| LIQ00576646 - LIQ00576685 | UTC_LIQ00235758- UTC_LIQ00235838 | | |
| LIQ00576686 - LIQ00576734 | UTC_LIQ00235659- UTC_LIQ00235757 | | |

| Original BATES | Original Translation BATES | BATES of corrected translation *(controlling if provided)* | Description |
|---|---|---|---|
| LIQ00576735 - LIQ00576769 | UTC_LIQ00235588-UTC_LIQ00235658 | | |
| LIQ00576770 - LIQ00576818 | UTC_LIQ00235489-UTC_LIQ00235587 | | |
| LIQ00576819 - LIQ00576994 | UTC_LIQ00235136-UTC_LIQ00235488 | | |
| LIQ00576995 - LIQ00577009 | UTC_LIQ00235105-UTC_LIQ00235135 | UTC_LIQ00262846-UTC_LIQ00262876 | |
| LIQ00577330 - LIQ00577357 | UTC_LIQ00237765-UTC_LIQ00237821 | | |
| LIQ00577358 - LIQ00577493 | UTC_LIQ00238152-UTC_LIQ00238424 | | |
| LIQ00577494 - LIQ00577529 | UTC_LIQ00238498-UTC_LIQ00238570 | | |
| LIQ00577530 - LIQ00577596 | UTC_LIQ00238571-UTC_LIQ00238705 | | |
| LIQ00577597 - LIQ00577635 | UTC_LIQ00238920-UTC_LIQ00238998 | | |
| LIQ00577636 - LIQ00577728 | UTC_LIQ00239186-UTC_LIQ00239372 | | |

| Original BATES | Original Translation BATES | BATES of corrected translation *(controlling if provided)* | Description |
|---|---|---|---|
| LIQ00577729 - LIQ00577743 | UTC_LIQ00239404-UTC_LIQ00239434 | UTC_LIQ00262877-UTC_LIQ00262907 | |
| LIQ00577744 - LIQ00577952 | UTC_LIQ00236927-UTC_LIQ00237345 | | |
| LIQ00578275 - LIQ00578450 | UTC_LIQ00239850-UTC_LIQ00240202 | | |
| LIQ00578451 - LIQ00578478 | UTC_LIQ00240260-UTC_LIQ00240316 | | |
| LIQ00578479 - LIQ00578525 | UTC_LIQ00240317-UTC_LIQ00240411 | | |
| LIQ00578526 - LIQ00578561 | UTC_LIQ00240507-UTC_LIQ00240579 | | |
| LIQ00578562 - LIQ00578614 | UTC_LIQ00240653-UTC_LIQ00240759 | | |
| LIQ00578615 - LIQ00578649 | UTC_LIQ00240938-UTC_LIQ00241008 | | |
| LIQ00578650 - LIQ00578818 | UTC_LIQ00241009-UTC_LIQ00241347 | | |
| LIQ00578819 - LIQ00578833 | UTC_LIQ00239466-UTC_LIQ00239496 | UTC_LIQ00262908-UTC_LIQ00262938 | |

| Original BATES | Original Translation BATES | BATES of corrected translation *(controlling if provided)* | Description |
|---|---|---|---|
| LIQ00578995 - LIQ00579086 | UTC_LIQ00236094-UTC_LIQ00236278 | | |
| LIQ00579087 - LIQ00579105 | UTC_LIQ00236279-UTC_LIQ00236317 | | |
| LIQ00579491 - LIQ00579581 | UTC_LIQ00244715-UTC_LIQ00244897 | | |
| LIQ00579582 - LIQ00579611 | UTC_LIQ00245081-UTC_LIQ00245141 | | |
| LIQ00579612 - LIQ00579663 | UTC_LIQ00236318-UTC_LIQ00236422 | | |
| LIQ00579664 - LIQ00579720 | UTC_LIQ00236423-UTC_LIQ00236537 | | |
| LIQ00579721 - LIQ00579776 | UTC_LIQ00236538-UTC_LIQ00236650 | | |
| LIQ00579777 - LIQ00579811 | UTC_LIQ00236651-UTC_LIQ00236721 | | |
| LIQ00579812 - LIQ00580015 | UTC_LIQ00236722-UTC_LIQ00236926 | | |
| LIQ00580016 - LIQ00580032 | UTC_LIQ00236059-UTC_LIQ00236093 | UTC_LIQ00262939-UTC_LIQ00262973 | |

| Original BATES | Original Translation BATES | BATES of corrected translation *(controlling if provided)* | Description |
|---|---|---|---|
| LIQ00581307 - LIQ00581345 | UTC_LIQ00245203- UTC_LIQ00245281 | | |
| LIQ00581346 - LIQ00581399 | UTC_LIQ00245361- UTC_LIQ00245469 | | |
| LIQ00581400 - LIQ00581434 | UTC_LIQ00245579- UTC_LIQ00245649 | | |
| LIQ00581435 - LIQ00581535 | UTC_LIQ00245721- UTC_LIQ00245923 | | |
| LIQ00581536 - LIQ00581551 | UTC_LIQ00246127- UTC_LIQ00246159 | UTC_LIQ00262974- UTC_LIQ00263006 | |
| LIQ00581552 - LIQ00581807 | UTC_LIQ00246160- UTC_LIQ00246672 | | |
| LIQ00582512 - LIQ00582539 | UTC_LIQ00242703- UTC_LIQ00242759 | | |
| LIQ00582540 - LIQ00582685 | UTC_LIQ00242817- UTC_LIQ00243109 | | |
| LIQ00582854 - LIQ00582879 | UTC_LIQ00243456- UTC_LIQ00243508 | | |
| LIQ00582880 - LIQ00582989 | UTC_LIQ00243509- UTC_LIQ00243729 | | |

| Original BATES | Original Translation BATES | BATES of corrected translation *(controlling if provided)* | Description |
|---|---|---|---|
| LIQ00582990 - LIQ00583032 | UTC_LIQ00244038- UTC_LIQ00244124 | | |
| LIQ00583033 - LIQ00583087 | UTC_LIQ00244236- UTC_LIQ00244346 | | |
| LIQ00583088 - LIQ00583124 | UTC_LIQ00244422- UTC_LIQ00244496 | | |
| LIQ00583125 - LIQ00583178 | UTC_LIQ00244497- UTC_LIQ00244605 | | |
| LIQ00583179 - LIQ00583194 | UTC_LIQ00242637- UTC_LIQ00242669 | UTC_LIQ00263007- UTC_LIQ00263039 | |
| LIQ00583195 - LIQ00583431 | UTC_LIQ00241687- UTC_LIQ00242161 | | |
| LIQ02815266 - LIQ02815280 | UTC_LIQ00247533- UTC_LIQ00247563 | UTC_LIQ00263040- UTC_LIQ00263070 | |
| LIQ02815281 - LIQ02815295 | UTC_LIQ00247564- UTC_LIQ00247594 | | |
| LIQ02815296 - LIQ02815310 | UTC_LIQ00247595- UTC_LIQ00247625 | UTC_LIQ00263071- UTC_LIQ00263101 | |
| LIQ02815311 - LIQ02815327 | UTC_LIQ00247626- UTC_LIQ00247660 | UTC_LIQ00263102- UTC_LIQ00263136 | |

| Original BATES | Original Translation BATES | BATES of corrected translation *(controlling if provided)* | Description |
|---|---|---|---|
| LIQ02815328 - LIQ02815344 | UTC_LIQ00258176-UTC_LIQ00258210 | | |
| LIQ02815346 - LIQ02815427 | UTC_LIQ00258211-UTC_LIQ00258375 | | |
| LIQ02815428 - LIQ02815444 | UTC_LIQ00258376-UTC_LIQ00258410 | | |
| LIQ02815446 - LIQ02815557 | UTC_LIQ00258411-UTC_LIQ00258635 | | |
| LIQ02815558 - LIQ02815574 | UTC_LIQ00247661-UTC_LIQ00247695 | | |
| LIQ02815576 - LIQ02815686 | UTC_LIQ00247696-UTC_LIQ00247918 | | |
| LIQ02815687 - LIQ02815703 | UTC_LIQ00258636-UTC_LIQ00258670 | | |
| LIQ02815705 - LIQ02815846 | UTC_LIQ00258671-UTC_LIQ00258955 | | |
| LIQ02815847 - LIQ02815863 | UTC_LIQ00247919-UTC_LIQ00247953 | | |
| LIQ02815865 - LIQ02816002 | UTC_LIQ00247954-UTC_LIQ00248230 | | |

| Original BATES | Original Translation BATES | BATES of corrected translation *(controlling if provided)* | Description |
|---|---|---|---|
| LIQ02816005 - LIQ02816159 | UTC_LIQ00248231- UTC_LIQ00248541 | | |
| LIQ02816162 - LIQ02816323 | UTC_LIQ00248542- UTC_LIQ00248866 | | |
| LIQ02816326 - LIQ02816481 | UTC_LIQ00248867- UTC_LIQ00249179 | | |
| LIQ02816484 - LIQ02816634 | UTC_LIQ00249180- UTC_LIQ00249482 | | |
| LIQ02816635 - LIQ02816672 | UTC_LIQ00249483- UTC_LIQ00249559 | | |
| LIQ02816674 - LIQ02816754 | UTC_LIQ00249560- UTC_LIQ00249722 | | |
| LIQ02816755 - LIQ02816794 | UTC_LIQ00249723- UTC_LIQ00249803 | | |
| LIQ02816796 - LIQ02816874 | UTC_LIQ00249804- UTC_LIQ00249962 | | |
| LIQ02816875 - LIQ02816913 | UTC_LIQ00249963- UTC_LIQ00250041 | | |
| LIQ02816915 - LIQ02816962 | UTC_LIQ00250042- UTC_LIQ00250148 | | |

| Original BATES | Original Translation BATES | BATES of corrected translation *(controlling if provided)* | Description |
|---|---|---|---|
| LIQ02816963 - LIQ02817002 | UTC_LIQ00250149- UTC_LIQ00250229 | | |
| LIQ02817004 - LIQ02817059 | UTC_LIQ00250230- UTC_LIQ00250342 | | |
| LIQ02817060 - LIQ02817096 | UTC_LIQ00250343- UTC_LIQ00250417 | | |
| LIQ02817098 - LIQ02817161 | UTC_LIQ00250418- UTC_LIQ00250546 | | |
| LIQ02817162 - LIQ02817201 | UTC_LIQ00250547- UTC_LIQ00250627 | | |
| LIQ02817203 - LIQ02817256 | UTC_LIQ00250628- UTC_LIQ00250736 | | |
| LIQ02817257 - LIQ02817292 | UTC_LIQ00250737- UTC_LIQ00250809 | | |
| LIQ02817294 - LIQ02817346 | UTC_LIQ00250810- UTC_LIQ00250916 | | |
| LIQ02817347 - LIQ02817385 | UTC_LIQ00250917- UTC_LIQ00250995 | | |
| LIQ02817387 - LIQ02817481 | UTC_LIQ00250996- UTC_LIQ00251186 | | |

# EXHIBIT 32

## HIGHLY CONFIDENTIAL

*ROUGH*ROUGH*ROUGH*

| 09:03:48AM | 1 | THE VIDEOGRAPHER:  Good morning.  We are |
| 09:03:57AM | 2 | going on the record at 9:03 a.m. on January 4, 2022. |
| 09:04:04AM | 3 | This is Media Unit 1 of the remote recorded deposition |
| 09:04:07AM | 4 | of Dr. Colin Nuckolls in the matter of United |
| 09:04:14AM | 5 | Therapeutics corporation versus Liquidia, Inc. filed in |
| 09:04:18AM | 6 | the United States District Court for the District of |
| 09:04:22AM | 7 | Delaware, case number 20-755. |
| 09:04:26AM | 8 | My name is Orson Braithwaite from the firm |
| 09:04:29AM | 9 | Veritext Legal Solutions.  I am the videographer.  The |
| 09:04:31AM | 10 | court reporter is Bonnie Russo from the firm Veritext |
| 09:04:33AM | 11 | Legal Solutions.  Counsel will now state their |
| 09:04:36AM | 12 | appearances and affiliations for the record. |
| 09:04:39AM | 13 | MS. KANNAPPAN:  This is deep can from Cooley |
| 09:04:44AM | 14 | LLP on behalf of Liquidia technologies.  With me is |
| 09:04:48AM | 15 | Douglas cheek from Cooley LLP and our expert Dr. Jeffrey |
| 09:04:54AM | 16 | wing. |
| 09:04:56AM | 17 | MS. WU:  Huiya Wu on behalf of United |
| 09:05:01AM | 18 | Therapeutics with me is hairy gun of good and Catholic |
| 09:05:04AM | 19 | pap McDermott Will & Emery videographer thank you.  Will |
| 09:05:09AM | 20 | the court reporter please swear in the witness. |
| 09:05:55AM | 21 | Q.  Good morning doctor? |
| 09:05:57AM | 22 | A.  Good morning. |
| 09:05:58AM | 23 | Q.  Please state your full name for the record? |
| 09:06:01AM | 24 | A.  Colin pet per Nuckolls. |
| 09:06:02AM | 25 | Q.  And where do you currently reside Dr. Nuckolls? |

1

*ROUGH*ROUGH*ROUGH*

09:59:07AM 1     A.  Of, no.

09:59:08AM 2     Q.  Did you check the accuracy of the translations

09:59:14AM 3   yourself?

09:59:15AM 4     A.  I don't have any way to do that so no.  I mean I

09:59:22AM 5   relied on the certified translations from counsel.

09:59:26AM 6     Q.  Okay.

09:59:27AM 7     Q.

09:59:29AM 8           MS. KANNAPPAN:  I am going to enter tab 3

09:59:32AM 9   which is the '066 patent as Exhibit 4.

09:59:35AM 10          (Deposition Exhibit    was marked for

09:59:38AM 11   identification.)

09:59:38AM 12          BY MS. KANNAPPAN:

09:59:39AM 13    Q.  Dr. Nuckolls I believe you have a hard copy of

09:59:42AM 14   that in front of you?

09:59:43AM 15    A.  Yes, I do.  Let me just download it so I have the

09:59:47AM 16   one -- oh shoot.  It just logged me out of this.  Hold

09:59:52AM 17   on.  There is a little check box that says keep my

10:00:04AM 18   logged in.  I guess it timed out.  It is the giving me

10:00:09AM 19   the spinning here so give me two seconds.

10:00:15AM 20    Q.  No problem.

10:00:28AM 21    A.  It is still spinning.  As you mention I do have a

10:00:34AM 22   paper copy.  I should make sure that this document the

10:00:38AM 23   exhibit system is working.  Here we go.  Here we go.

10:00:41AM 24   Okay.

10:00:50AM 25    Q.  Do you have it in front of you?

33

*ROUGH*ROUGH*ROUGH*

10:00:52AM 1     A.  Yes, I do.

10:00:52AM 2     Q.  Okay.  For the record this is a document which on

10:00:57AM 3   the first page says Patent No. U.S. 9,593,066 B2

10:01:06AM 4   starting at Bates number UTC_LIQ00254175 and ending in

10:01:19AM 5   Bates number UTC_LIQ00254186.

10:01:29AM 6        Dr. Nuckolls, do you recognize this document?

10:01:31AM 7     A.  Yes, I do.

10:01:31AM 8     Q.  What do you recognize it as?

10:01:33AM 9     A.  This is one of the patents-in-suit /(.

10:01:36AM 10    Q.  And this is specifically the 066 patent?

10:01:39AM 11    A.  Yes, it is.

10:01:41AM 12    Q.  Okay.  Have you reviewed this patent before?

10:01:44AM 13    A.  Yes, I have.

10:01:48AM 14    Q.  Does this appear to be a true and accurate copy

10:01:51AM 15  of the 066 patent?

10:01:52AM 16    A.  I can't vouch for every word by assume you

10:02:19AM 17  wouldn't pull a fast one on me but it appears to be a

10:02:22AM 18  complete and accurate copy of the 066 patent.

10:02:25AM 19    Q.  Is this as far as I know this is also an accurate

10:02:29AM 20  copy so that is a representation to you?

10:02:31AM 21    A.  We are both in big trouble if it's not.

10:02:35AM 22    Q.  Okay.  Let's look at Claim 1 on the last page.

10:02:41AM 23    A.  Okay.

10:02:42AM 24    Q.  Can you please go ahead and read it to yourself.

10:03:24AM 25    A.  Okay.

34

*ROUGH*ROUGH*ROUGH*

10:03:24AM 1     Q.  Okay.  In this claim there is no required amount

10:03:31AM 2   for the final pharmaceutical composition, correct?

10:04:11AM 3     A.  So within Claim 1 there is no amount listed for

10:04:15AM 4   the pharmaceutical composition.

10:04:18AM 5     Q.  And there is no amount listed for the

10:04:21AM 6   pharmaceutical composition of Claim 1 or the

10:04:25AM 7   pharmaceutical product of Claim 9 in any of the claims

10:04:33AM 8   listed here, correct?

10:04:40AM 9     A.  Give me just a minute.  I want to review one

10:04:43AM 10   thing in the patent.

10:04:44AM 11     Q.  Sure.

10:06:09AM 12     Q.  Just to clarify my question was aabout the

10:06:12AM 13   claims?

10:06:13AM 14     A.  So the examples within the patent refer to

10:06:20AM 15   amounts for various -- for various materials.

10:06:24AM 16     Q.  But none of the claims at the ends of the 066

10:06:27AM 17   patent list any amount for the pharmaceutical

10:06:30AM 18   composition or pharmaceutical product?

10:06:33AM 19     A.  The claims themselves do not directly mention an

10:06:40AM 20   amount but they mention at various places the claim

10:06:46AM 21   mentions pharmaceutical -- let's me get the language

10:06:50AM 22   right a pharmaceutical composition in that claim 1.

10:06:55AM 23     Q.  Okay.  And so just to confirm there is no amount

10:06:59AM 24   specified for the pharmaceutical composition in Claim 1,

10:06:59AM 25   correct?

35

*ROUGH*ROUGH*ROUGH*

10:07:04AM 1      A.  So there are ams that are listed in the examples

10:07:07AM 2   but in the claims themselves they don't mention amounts.

10:07:10AM 3      Q.  Okay.  Ant within the claims themselves there is

10:07:14AM 4   no specific purity level required of the final

10:07:19AM 5   pharmaceutical composition or product, correct?

10:07:24AM 6      A.  Within the -- within the examples that are listed

10:07:30AM 7   they discuss various purity levels that's they as swayed

10:07:35AM 8   for.

10:07:35AM 9      Q.  But Dr. Nuckolls my question is about the claims

10:07:39AM 10   so within the claims themselves there is no specific

10:07:41AM 11   purity level required of final pharmaceutical

10:07:45AM 12   composition of product, correct?

10:07:46AM 13      A.  So your correct in that in the claims themselves

10:07:50AM 14   they don't but consideringing the patent as a whole

10:07:52AM 15   there are impurities that are listed in the examples in

10:07:58AM 16   the examples as well so the patent itself I don't think

10:08:03AM 17   is considered just the claims enough.

10:08:07AM 18      Q.  But my question was to ask you to consider the

10:08:10AM 19   claims ant I think you answered it the claims themselves

10:08:14AM 20   don't specify purity level of the final product or

10:08:18AM 21   composition, right?

10:08:19AM 22      A.  So the examples discuss purity levels the claims

10:08:28AM 23   themselves do not discuss the absolute purity levels.

10:08:32AM 24      Q.  So in your opening report you reviewed both the

10:08:36AM 25   '901 patent and the '066 patent, right?

*ROUGH*ROUGH*ROUGH*

10:08:39AM 1      A.  That's correct.

10:08:41AM 2      Q.  And so you are aware that they share the same

10:08:46AM 3   specification and by specification I mean examples?

10:08:50AM 4      A.  I don't recall if they share the same examples or

10:08:55AM 5   not.  I can verify that if you would like.

10:08:58AM 6      Q.  No that's okay.  What I was getting at there is a

10:09:03AM 7   legal concept which is not relevant to your expertise so

10:09:06AM 8   we will just move on 6789 so my question continue to be

10:09:10AM 9   able the claims and not anything else in the patent.

10:09:14AM 10   The claims don't say anything ant commercial scale,

10:09:14AM 11   correct?

10:09:23AM 12      A.  In so much as we consider the claims in isolation

10:09:26AM 13   they don't mention that's but they do refer to you know

10:09:29AM 14   pharmaceutical compositions and pharmaceutical products

10:09:33AM 15   and in the -- in the-in the descriptions they discuss

10:09:40AM 16   various scales for the various steps.

10:09:49AM 17      Q.  Do you recall -- actually let's just go ahead and

10:09:53AM 18   enter the '901 patent as Exhibit 5.  Doug you need to

10:10:05AM 19   pull that up on your own.  I don't think I have that

10:10:08AM 20   tabbed?

10:10:12AM 21           MR. CHEEK:  Sure.  Give me one second.

10:10:16AM 22           (Deposition Exhibit    was marked for

10:10:17AM 23   identification.)

10:10:17AM 24           BY MS. KANNAPPAN:

10:10:17AM 25      Q.  Dr. Nuckolls you can go ahead answered use the

37

*ROUGH*ROUGH*ROUGH*

10:10:19AM 1   one in front of you.  I just have one question for you.

10:10:27AM 2   On the very last page of the '901 patent, just let me

10:10:30AM 3   know when you are there?

10:10:32AM 4      A.  Is it uploaded.  I have to download.

10:10:34AM 5      Q.  It will probably take a second because Mr. Cheek

10:10:38AM 6   has to find it but if you have the hard copy in front of

10:10:41AM 7   you I just have one question for you?

10:10:44AM 8      A.  So go to the last page.

10:10:46AM 9      Q.  Yes?

10:10:46AM 10     A.  Okay.  The last page that I have is a certificate

10:10:53AM 11  of correction.

10:10:54AM 12     Q.  Okay.  The second to last page.  The page with

10:10:57AM 13  the claims?

10:10:58AM 14     A.  Okay.

10:10:58AM 15     Q.  And do you see that's the first claim specifies

10:11:02AM 16  at least 2.  9 grams quantity?

10:11:06AM 17     A.  The Claim 1, you know, subsection E says:

10:11:31AM 18  Optionally reacting the salt of treprostinil with an

10:11:33AM 19  acid to form treprostinil and where in the

10:11:34AM 20  pharmaceutical batch contains at least 2.9 grams of

10:11:38AM 21  treprostinil or its salt.

10:11:40AM 22     Q.  Okay.  So Claim 1 of the it '901 patent does

10:11:43AM 23  specify an amount for the final product, correct?

10:11:47AM 24     A.  /( it specifies a range.  It says that the batch

10:11:51AM 25  contains the at least 2.9 grams of treprostinil or its

*ROUGH*ROUGH*ROUGH*

10:11:54AM 1   salt.

10:11:54AM 2      Q. So let's go back to the 066 patent, which is

10:11:59AM 3   Exhibit 4 for the record.

10:12:00AM 4      A. Exhibit 5 is still not uploaded.

10:12:04AM 5      Q. Correct.

10:12:07AM 6      A. I don't need it for exhibit-just so you know we

10:12:11AM 7   are behind now.

10:12:12AM 8      Q. Okay?

10:12:12AM 9      A. I am back on the 066.

10:12:15AM 10      Q. Okay. So none of the 066 claims contain any

10:12:19AM 11   similar range or amount for the final products, correct?

10:12:28AM 12      A. So the claims themselves don't but the examples

10:12:32AM 13   within the -- within the patent discuss amounts as well.

10:12:36AM 14      Q. Okay. And my questions continued to be about the

10:12:39AM 15   claim language itself so what is in the claims. So my

10:12:43AM 16   next question is none of the claims use the word

10:12:48AM 17   industrial scale, do they?

10:12:50AM 18      A. So I don't -- I need to look and see if they have

10:13:06AM 19   the words industrial scale in the claims. Give me one

10:13:10AM 20   minute to review that and then I will answer your

10:13:12AM 21   question.

10:13:13AM 22      Q. Sure.

10:13:40AM 23      A. So the claims don't have the specific words

10:13:43AM 24   industrial scale but the example show things on a very

10:13:46AM 25   large scale on the order of you know in some cases some

39

*ROUGH*ROUGH*ROUGH*

10:13:51AM 1   cases -- in some cases they were you know like if you

10:14:19AM 2   look for example at column 13 the diethanolamine salt

10:14:26AM 3   was 1.5 kilograms roughly approximately.

10:14:31AM 4      Q.  I will lodge an objection as nonresponsive on the

10:14:35AM 5   record.  Dr. Nuckolls I do have limited time so if you

10:14:38AM 6   could be specifically answering the question I ask your

10:14:42AM 7   counsel will have a chance to ask you any clarifying

10:14:45AM 8   questions after I am done but I mentioned a few times

10:14:47AM 9   now that's I am specifically asking about what is

10:14:50AM 10   specifically in the language of the claims.  It so if

10:14:53AM 11   you could just direct your answer to that's I would

10:14:56AM 12   appreciate it.  So my next question is for Claim 1 Claim

10:15:02AM 13   1 does not identify any specific alkylation or

10:15:07AM 14   hydrolysis reagents, correct?

10:15:52AM 15      A.  Within Claim 1 if we exclude the discussion of

10:15:56AM 16   the examples there are not alkylating or hydrolysis

10:16:00AM 17   reagents listed.

10:16:01AM 18      Q.  Are there any solvents for the alkylation an

10:16:06AM 19   hydrolysis steps in the language of Claim 1?

10:16:09AM 20      A.  I'm sorry ask your question one more time.

10:16:17AM 21      Q.  Are there any solvents specified for the

10:16:20AM 22   alkylation or hydrolysis steps in the language of Claim

10:16:26AM 23   1?

10:16:26AM 24      A.  If we only look at Claim 1 exclude any of the

10:16:29AM 25   example there are no solvents that are listed there for

40

*ROUGH*ROUGH*ROUGH*

10:16:31AM 1   the alkylation or hydrolysis.

10:16:34AM 2      Q.  If we only look at Claim 1 there are no reaction

10:16:39AM 3   conditions specified for the alkylation and hydrolysis

10:16:43AM 4   steps, correct?

10:16:47AM 5      A.  So again if we exclude the examples and only look

10:16:50AM 6   at Claim 1 there are no examples of specific you asked

10:16:56AM 7   about alkylation and hydrolysis conditions; is that

10:16:59AM 8   correct.

10:16:59AM 9      Q.  Correct?

10:16:59AM 10     A.  Yes.

10:17:02AM 11     Q.  And Claim 1 doesn't tell you how much reagent to

10:17:08AM 12  use in the alkylation and hydrolysis steps, correct?

10:17:14AM 13     A.  So if we exclude -- if we exclude the exams an

10:17:19AM 14  only look at Claim 1 that is not listed in Claim 1.

10:17:22AM 15     Q.  If we only look at Claim 1 there is no direction

10:17:27AM 16  as to how much solvents to use this the alkylation and

10:17:31AM 17  hydrolysis steps correct?

10:17:32AM 18     A.  Again if we only look at Claim 1 and exclude the

10:17:40AM 19  examples there are no example -- there is no solvents

10:17:44AM 20  listed.

10:17:45AM 21     Q.  There is no amount of solvent listed either?

10:17:48AM 22     A.  Only if if I miss understand you said amounts of

10:17:51AM 23  solvents.

10:17:52AM 24     Q.  Correct.  So if we exclude -- if we exclude the

10:17:55AM 25  examples an only look at claim 1 there is no amounts of

41

*ROUGH*ROUGH*ROUGH*

10:17:59AM 1   solvents listed?

10:18:00AM 2       Q.  And Claim 1 doesn't specify any particular

10:18:05AM 3   pharmaceutically acceptable salts of treprostinil,

10:18:05AM 4   correct?

10:18:12AM 5       A.  So if we exclude the -- if we exclude claim -- if

10:18:23AM 6   we exclude claim 3 in the examples an only look at Claim

10:18:28AM 7   1 there are no -- there are no pharmaceutically

10:18:32AM 8   acceptable salts-well let me back up I want to clarify

10:18:35AM 9   that answer.  In the -- if we exclude the description in

10:18:40AM 10  the patent that describes pharmaceutically acceptable

10:18:43AM 11  salts and we exclude the other claim that discusses the

10:18:48AM 12  pharmaceutical acceptable salts and only look at Claim 1

10:18:54AM 13  they are not listed there.

10:18:56AM 14      Q.  Starting at line 53 of column 17 do you see

10:19:10AM 15  that's Claim 1 requires providing a starting batch of

10:19:18AM 16  treprostinil having one or more impurities resulting

10:19:23AM 17  from prior alkylation and hydrolysis steps?

10:19:29AM 18      A.  Yes I see that.

10:19:36AM 19      Q.  And at the end of the claim which is starting at

10:19:40AM 20  line 62 of column 17 Claim 1 recites that the said

10:19:46AM 21  alkylation is alkylation of benzindene triol, correct?

10:19:53AM 22      A.  It does say that, yes.

10:19:55AM 23      Q.  So the alkylation step covered by this claim is

10:19:59AM 24  alkylation of benzindene triol to form an intermediate,

10:19:59AM 25  correct?

42

*ROUGH*ROUGH*ROUGH*

10:20:07AM 1      A.  The alkylation is alkylation of benzindene triol

10:20:11AM 2   to form that intermediate.  The alkylated intermediate.

10:20:17AM 3      Q.  And the hydrolysis step covered by this claim is

10:20:21AM 4   hydrolysis of that alkylated intermediate to form the

10:20:25AM 5   starting batch of treprostinil, correct?

10:20:31AM 6      A.  After hydrolysis of the alkylated product and

10:20:36AM 7   upon the product that is isolated from that step is the

10:20:42AM 8   starting batch of treprostinil.

10:20:43AM 9      Q.  Okay.

10:20:45AM 10      Q.  Is there -- never mind.  So there is -- does the

10:20:58AM 11   claim specific an isolation step between hydrolysis and

10:21:02AM 12   forming a salt of treprostinil?

10:21:05AM 13      A.  So the way I read the claim it's a come pricing

10:21:23AM 14   claim so it could include other things.  I don't see

10:21:26AM 15   that it has specifically mentions the isolation.

10:21:30AM 16      Q.  But it does mention isolating the treprostinil

10:21:34AM 17   salt after salt formation, correct?

10:21:42AM 18      A.  They do isolate the treprostinil salt.

10:21:44AM 19      Q.  So the claim does specify isolation of the

10:21:47AM 20   treprostinil salt but does not specify isolation of the

10:21:51AM 21   starting batch of treprostinil prior tor salt formation,

10:21:51AM 22   correct?

10:21:56AM 23      A.  Again it's a comprising claim.  It doesn't

10:21:59AM 24   include that but because it's a comprising claim it

10:22:02AM 25   could include that.

*ROUGH*ROUGH*ROUGH*

10:22:03AM 1      Q.  My question wasn't whether it include it.  My

10:22:07AM 2    question was whether it specified it so let will me

10:22:10AM 3    repeat it.  The claim recites isolation of treprostinil

10:22:13AM 4    salt but does not recite isolation of the starting batch

10:22:18AM 5    of treprostinil prior to salt formation, correct?

10:22:23AM 6      A.  I think I want to stick with my previous answer

10:22:25AM 7    in that it doesn't have the specific words that say

10:22:29AM 8    isolate the treprostinil but because it is a come

10:22:33AM 9    pricing claim it could be include because it could

10:22:36AM 10   include other things, other steps.

10:22:39AM 11     Q.  And at the end of Claim 1 the claim recites as we

10:22:50AM 12   have covered where said alkylation is alkylation of a

10:22:54AM 13   starting batch of benzindene triol, correct?

10:22:58AM 14     A.  It says that, yes.

10:23:00AM 15     Q.  The claim does not say ██████████████?

10:23:21AM 16     A.  Some again those specific words are not there and

10:23:24AM 17   if I only look at that claim in isolation what you said

10:23:27AM 18   is correct.

10:23:28AM 19     Q.  Does the claim recite any impurities the other

10:23:32AM 20   than those found in the starting batch of treprostinil?

10:23:35AM 21     A.  What the claim says is that it says a

10:23:50AM 22   pharmaceutical composition comprising treprostinil or

10:23:53AM 23   pharmaceutically acceptable salt there of said

10:23:56AM 24   composition prepared by a process comprising providing a

10:24:00AM 25   starting batch of treprostinil having one or more

44

*ROUGH*ROUGH*ROUGH*

10:24:02AM 1   impurities resulting from the prior alkylation

10:24:06AM 2   hydrolysis steps.

10:24:11AM 3      Q.  Right so the claim doesn't recite any impurities

10:24:14AM 4   the other than those that you just read off, correct?

10:24:18AM 5      A.  Again if I only look at the claim in isolation it

10:24:22AM 6   mentions having one or more impurities resulting from

10:24:27AM 7   the prior alkylation hydrolysis steps.

10:24:29AM 8      Q.  It doesn't mention any impurities in any thing

10:24:34AM 9   other than the starting batch of treprostinil, correct?

10:24:48AM 10     A.  So if claim recites it has a starting batch

10:24:51AM 11  of treprostinil having one or more impurities resulting

10:24:54AM 12  from prior alkylation of hydrolysis.

10:24:55AM 13     Q.  Those impurities are in the starting batch of

10:24:59AM 14  treprostinil, correct?

10:25:02AM 15     A.  Looking at the claims in isolation it says the --

10:25:06AM 16  it says that the starting batch of treprostinil would

10:25:08AM 17  have one or more impurities resulting from the prior

10:25:11AM 18  alkylation or hydrolysis steps.

10:25:13AM 19     Q.  So other than impurities in the starting the

10:25:15AM 20  batch of treprostinil does Claim 1 discuss any other

10:25:22AM 21  impurities?

10:25:23AM 22     A.

10:25:28AM 23     Q.  If I only consider Claim 1 in isolation it refers

10:25:32AM 24  to one or more impurities resulting from the prior

10:25:37AM 25  alkylation hydrolysis steps?

45

*ROUGH*ROUGH*ROUGH*

10:25:38AM 1     Q.  Okay.  I'm going to object as nonresponsive.  You

10:25:42AM 2   have given me the same response to very different

10:25:46AM 3   questions that I have been asking you, so let me try

10:25:48AM 4   this again.

10:25:48AM 5          I agree with you that there are impurities

10:25:52AM 6   recited resulting from the prior alkylation and

10:25:56AM 7   hydrolysis steps in the starting batch of treprostinil.

10:26:00AM 8          My question is other than impurities in the

10:26:05AM 9   starting batch of treprostinil, does Claim 1 recite any

10:26:09AM 10  impurities, yes or no?

10:26:13AM 11          MS. WU:  Dr. Nuckolls, feel free to answer

10:26:17AM 12  the question truthfully and completely in whatever way

10:26:20AM 13  you feel comfortable.

10:26:22AM 14          MS. KANNAPPAN:  I'm going to object to that

10:26:23AM 15  as an improper instruction, but please answer, Dr.

10:26:28AM 16  Nuckolls.

10:26:28AM 17     A.  So if I /( the words that are written there-well

10:26:34AM 18  actually sorry with all the repeated your question just

10:26:37AM 19  so I -- because I feel like there is a disconnect

10:26:43AM 20  because I am not trying to be nonresponsive because I

10:26:44AM 21  think I am answering your question and then you ask me

10:26:47AM 22  the same question so will you ask me one more time and I

10:26:50AM 23  will try to answer your question the best I can.

10:26:52AM 24     Q.  So the only mention of impurities in Claim 1 is

10:26:57AM 25  the impurities resulting from prior alkylation of

*ROUGH*ROUGH*ROUGH*

10:27:02AM 1    hydrolysis steps in the starting batch of treprostinil

10:27:06AM 2    right?

10:27:06AM 3        A.  If I only consider Claim 1 in isolation the only

10:27:10AM 4    -- there is a -- the impurities are mentioned down at

10:27:15AM 5    line 60 as well right so if you are saying the only

10:27:19AM 6    mention of impurities is in that sentence up above then

10:27:22AM 7    that's they are also mentioned in line 60.

10:27:26AM 8        Q.  But it's the same impurities in the starting

10:27:29AM 9    batch of treprostinil mentioned both times, correct?

10:27:39AM 10       A.  Yes if I only consider this claim in isolation it

10:27:41AM 11   is mentions those impurities both time the same

10:27:45AM 12   impurities both time.

10:27:46AM 13       Q.  Other than those two mentions of the impurities,

10:27:49AM 14   there is are no other mentions of impurities in Claim 1,

10:27:49AM 15   correct?

10:27:53AM 16       A.  If I only consider Claim 1 in isolation there is

10:27:56AM 17   no mention of impurities other than those two -- other

10:28:02AM 18   than those two that we just discussed.

10:28:05AM 19       Q.  There is no mention of impurities in any of the

10:28:15AM 20   other claims either?

10:28:18AM 21       A.  So if I only consider the -- if I only consider

10:28:48AM 22   these claims there is no mention of impurities in the

10:28:51AM 23   other ones aside from Claim 1 that's I could see just

10:28:55AM 24   going through it right now.

10:28:57AM 25       Q.  Okay.

47

*ROUGH*ROUGH*ROUGH*

10:29:06AM 1     Q.  So we talked a little bit about the examples when

10:29:09AM 2   I was asking about the claims.  Is it your opinion that

10:29:13AM 3   the examples described in the specification are the only

10:29:19AM 4   examples that meet the claim limitations?

10:29:28AM 5     A.  I don't understand your question.  Can you ask it

10:29:31AM 6   again.

10:29:31AM 7     Q.  Yeah.  So earlier we were talking about various

10:29:36AM 8   alkylation hydrolysis reagents do you recall that line

10:29:39AM 9   of questioning?

10:29:40AM 10    A.  Yes.

10:29:40AM 11    Q.  You did say that -- that the claims themselves

10:29:44AM 12  don't mention specific reagents but that the examples

10:29:48AM 13  do, correct?

10:29:51AM 14    A.  The examples within the 066 patent discuss

10:29:55AM 15  alkylation and hydrolysis conditions and reagents.

10:29:59AM 16    Q.  So is it your opinion that only the alkylation

10:30:03AM 17  and hydrolysis reagents described in the examples meet

10:30:08AM 18  the claims?

10:30:11AM 19    A.  ████████████████████████████████

████████████████████████████████████████████

███████████████████████████

10:30:20AM 22    Q.  Okay.

10:30:21AM 23    Q.  Going back to Claim 1 and our impurity discussion

10:30:26AM 24  what are some possible impurities in the starting batch

10:30:30AM 25  of treprostinil that are not impurities resulting from

48