Original Filing Date: January 28, 2022
Redacted Filing Date: February 4, 2022

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> LIQUIDIA TECHNOLOGIES, INC., <br><br> Defendant. | C.A. No.: 1:20-cv-00755-RGA <br><br> **REDACTED - PUBLIC VERSION** |

## DECLARATION OF DAVID A. WALSH

I, David A. Walsh, Ph.D., declare as follows:

1. I am the retired (as of 2015) Executive Vice President of Chemical Research and Development for United Therapeutics Corporation ("UTC"). I held that position from 2010 through my retirement in 2015. From 2007-2009 I served as the Executive Vice President of Operations and Medicinal Chemistry for UTC, and from 2001-2007 I served as UTC's Executive Vice President & Chief Operating Officer, Production.

2. I am an inventor on U.S. Patent Nos. 9,593,066 and 9,604,901 ("asserted patents"), as well as the related U.S. Patent No. 8,497,393 (collectively "the patents"). I understand that UTC is accusing Liquidia of infringing the asserted patents in pending litigation, and I further understand that UTC is not asserting the '393 patent against Liquidia. I have published across seven decades, am the co-author of over 60 technical publications/presentations and have been awarded 51 U.S. patents.

3. I submit this declaration in support of UTC's Opposition to Liquidia's Motion for Summary Judgment. If called as a witness at trial, I would testify to the same.

4. I graduated from Clarkson College with a B.S. in Chemistry in 1967, then from the University of New Hampshire first in 1970 with a M.S. in Organic Chemistry, then in 1973

with a Ph.D. in Organic Chemistry. From 1973-1974 I was an NIH Postdoctoral Fellow in Medicinal Chemistry with the University of Kansas. Thereafter I began my career in discovery research and chemical process development with emerging pharmaceutical companies.

5. First I worked with A.H. Robins company (1974-1990), where my lab was responsible for the synthesis of bromfenac (Duract®, Xibrom®) and nepafenac (Nevanac®), two drugs that are on the U.S. commercial market. I was then employed by NutraSweet Co. from 1990-1992, where I performed chemical work on a process to synthesize aspartic acid, with my work ultimately resulting in ███████████████████████████████████. I then joined BioCryst Pharmaceuticals (1992-1997), where my work included leading a scientific team that developed an economical, practical, large-scale manufacturing process for ByoCryst's lead drug candidate, and then further developing a drug candidate from the time it left drug discovery until commercial manufacture, including data for NDA submissions. I then joined Gem Pharmaceuticals, Inc. (1998-1999), a new drug development company where I was responsible for the analytical development, chemical process development, API and clinical supplies manufacture, stability studies and data for CMC filings for clinical candidates. ███████████████████████████████████████████████████████████████████████████████████████████████████████

6. In 1999 I joined a company then named SynQuest as the Vice President of Operations, where I was responsible for ██████████████████████████████████ ████████████████████████████████████████████████████ treprostinil API.[1]

7. When I joined SynQuest in 1999, it was ███████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████.

---

[1] "Treprostinil" as known from UTC's treprostinil products: Remodulin®, Tyvaso®, Orenitram®. "API" meaning "active pharmaceutical ingredient" – for the sake of simplicity and brevity, in this declaration I use the general phrase "treprostinil API" to refer to the desired active pharmaceutical ingredient containing treprostinil or a salt of treprostinil.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████

8. The co-inventors on the asserted patents (Hitesh Batra, Sudersan Tuladhar, and Raju Penmasta) to my knowledge all similarly had a background in pharmaceutical development or process chemistry.

9. ███████████████████████████████████████████████████████

███████████████████████████████████. ███████████████████████

███████████████████████" █████████████████████████████████

███████████████████████████████████████████████████████████

the JOC article (sometimes called the "Moriarty" paper), "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)." This Moriarty paper is incorporated by reference into the specifications of the patents, for example looking at the asserted patents, that disclosure can be seen in the specification at column 1, lines 27-34; in U.S. Patent No. 8,497,393, that disclosure also appears in column 1, but at lines 22-28. Columns 15-17 of the patents provides a chart labeled "Example 6", which compares the "Former Process" in the left column with a "Working example of the process according to the present invention" on the right; to my knowledge, the "Former Process" column on the left side of this Example 6 chart in the specifications of the patents is the first public disclosure of the specifics of the "Former Process" that UTC had used for manufacture of treprostinil API.

10. The subject matter described and claimed in the asserted patents includes a process for conversion of benzindene triol to treprostinil API that is different than the former process that had been previously used by UTC, and the treprostinil API described and claimed in the asserted patents is different than the treprostinil API that UTC was able to obtain using the former process. The new process we invented and claimed in the asserted patents works surprisingly well. Through the process described and claimed in the asserted patents, we were able to transform

treprostinil, which is relatively unstable, into batches of more chemically and thermally stable treprostinil API, allowing more options for functional and safe use of the treprostinil API than was possible using API manufactured with the former process. In addition to creating a more stable treprostinil API, the process we developed and claimed in the asserted patents created a purer treprostinil API than what we had been able to manufacture under the former process.

11. The improved process has many real-world benefits. For example, because the claimed treprostinil API is more chemically, structurally, and thermally stable it allows the API to be stored and further processed at room temperature and above. This is a tremendous benefit in the real world of pharmaceutical manufacturing. The treprostinil manufactured under UTC's prior process was only stable for a matter of weeks without significant degradation, whereas the treprostinil API manufactured under the patented process is stable for a matter of years without significant degradation. As one practical example of why this matters, the claimed treprostinil API can be shipped throughout the world without the complexity or cost required with end-to-end cold storage and careful handling of the treprostinil to avoid degradation that would make it unfit for use. Similarly, the claimed treprostinil API has better versatility during the drug product manufacturing process than that of the former process due to its stability and purity, for example it can be used in pharmaceutical products where the handling or processing of the treprostinil API (e.g. into its final dosage form) would expose the treprostinil API to elevated temperatures, as there is a lower likelihood of degradation beyond usable limits when using the more stable treprostinil API as taught and claimed in the asserted patents than using the less stable treprostinil from the former process. Another benefit of the treprostinil as claimed is its improved safety profile for those workers that manufacture the treprostinil pharmaceutical products from the API. Specifically, treprostinil in the free acid form is very irritating and can cause severe reactions upon exposure. The invention of the asserted patents reduces exposure and can eliminate such severe reactions.

12. The patented process also results in a treprostinil API that is purer than any other process known at the time of our invention. The increased purity provides a safer product with

increased yield, two important benefits when manufacturing for commercial use. While the prior process UTC used to manufacture treprostinil provided acceptable purity, the patented process provides a product of exceptional purity as compared to both the prior product and pharmaceutical products more generally. At the time of the invention, I did not think that changing the method of synthesis would so profoundly affect the purity or stability of the resulting product. As I previously mentioned, treprostinil itself is relatively unstable, and it was surprising that the patented process could be used to improve stability of the API without affecting its quality or using other chemical means like preservatives to control its stability.

13. 

14. The asserted patents also provide a cleaner, greener, less costly, and more efficient manufacturing process that provides real world benefits. For example, the patented process saves significant amounts of toxic solvents that would otherwise have a detrimental environmental

impact. ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████  The patented process thus enables manufacturing in areas with more strict environmental laws throughout the world.  Due to the option of removing certain purification steps that had been necessary to the prior process, the patented technique also allows for the removal of costly solvents from the synthetic process and the significant disposal costs of those solvents as well as rendering unnecessary costly specialized equipment.  The patented process is a more efficient process that is much easier to perform, takes less time and money to perform, and results in a superior pharmaceutical composition.

15. ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████  Analyzing a sample for purity using HPLC where the sample is more pure than the reference standard used for its comparison will actually yield an HPLC Assay result that is over 100%, which can be seen for example in the patents under Example 4 (in the '066 patent appearing at column 13, line 64) where it reports for Batch 1 that the "HPLC (Assay)" was 100.4%.

7

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: January 27, 2022

David A. Walsh, Ph.D.

# CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 28, 2022, upon the following in the manner indicated:

| | |
|---|---|
| Karen E. Keller, Esquire<br>Jeff Castellano, Esquire<br>Nathan R. Hoeschen, Esquire<br>SHAW KELLER LLP<br>I.M. Pei Building<br>1105 North Market Street, 12th Floor<br>Wilmington, DE  19801<br>*Attorneys for Defendant Liquidia Technologies, Inc.* | *VIA ELECTRONIC MAIL* |
| Sanya Sukduang, Esquire<br>Jonathan Davies, Esquire<br>Douglas W. Cheek, Esquire<br>Adam Pivovar, Esquire<br>COOLEY LLP<br>1299 Pennsylvania Avenue, NW, Suite 700<br>Washington, DC  20004-2400<br>*Attorneys for Defendant Liquidia Technologies, Inc.* | *VIA ELECTRONIC MAIL* |
| Erik Milch, Esquire<br>COOLEY LLP<br>11951 Freedom Drive, 14th Floor<br>Reston, VA  20190-5640<br>*Attorneys for Defendant Liquidia Technologies, Inc.* | *VIA ELECTRONIC MAIL* |
| Ivor Elrifi, Esquire<br>COOLEY LLP<br>55 Hudson Yards<br>New York, NY  10001-2157<br>*Attorneys for Defendant Liquidia Technologies, Inc.* | *VIA ELECTRONIC MAIL* |

2

Lauren Krickl, Esquire  *VIA ELECTRONIC MAIL*
Deepa Kannappan, Esquire
Brittany Cazakoff, Esquire
COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

　　　　　　　　　　　　　　　　　　　　　　　*/s/ Michael J. Flynn*
　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　Michael J. Flynn (#5333)