IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) |
| Defendant. | ) ) |

**Redacted – Public Version**

C.A. No. 20-755-RGA-JLH

▐▐▐▐▐▐▐▐▐▐▐▐

## REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF THE '066 AND '901 PATENTS DUE TO COLLATERAL ESTOPPEL

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Douglas Cheek
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Defendant Liquidia Technologies, Inc.*

Lauren Krickl
Deepa Kannappan
Brittany Cazakoff
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000


February 11, 2022

# TABLE OF CONTENTS

**Page**

I.  UTC MISCHARACTERIZES THE LAW REGARDING COLLATERAL
    ESTOPPEL AS APPLIED TO PRODUCT-BY-PROCESS CLAIMS ............................ 1

II. NO GENUINE DISPUTE OF MATERIAL FACT EXISTS REGARDING THE
    PRODUCT CLAIMED IN THE '066, '901, AND '393 PATENTS ................................ 3

    A.  The Invalidity of the Claimed Product Has Already Been Decided ..................... 4

    B.  The Invalidity of the Claimed Process Has Already Been Decided ..................... 9

    C.  Liquidia's Motion is Not Procedurally Barred .................................................... 10

III. CONCLUSION ............................................................................................................ 10

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                     **Pages(s)**

*A.K. Stamping Co. v. Instrument Specialties Co.*,
  106 F. Supp. 2d 627 (D.N.J. 2000) ......................................................................................10

*Allergan, Inc. v. Sandoz, Inc.*,
  681 F. App'x 955 (Fed. Cir. 2017) .......................................................................................3

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
  580 F.3d 1340 (Fed. Cir. 2009).............................................................................................10

*Courteau v. U.S.*,
  287 F. App'x 159 (3d Cir. 2008) ........................................................................................10

*Custom Accessories, Inc. v. Jeffrey-Allan Indus.*,
  807 F.2d 955 (Fed. Cir. 1986).............................................................................................3

*Daiichi Sankyo Co. v. Apotex, Inc.*,
  501 F.3d 1254 (Fed. Cir. 2007).............................................................................................3

*Evonik Degussa GmbH v. Materia Inc.*,
  53 F. Supp. 3d 778 (D. Del. 2014).......................................................................................7

*Greenliant Sys., Inc. v. Xicor LLC*,
  692 F.3d 1261 (Fed. Cir. 2012)........................................................................................2, 4

*In re Ochiai*,
  71 F.3d 1565 (Fed. Cir. 1995)............................................................................................10

*In re Thorpe*,
  777 F.2d 695 (Fed. Cir. 1985)..........................................................................................2, 4

*Innogenetics, N.V. v. Abbott Lab'ys*,
  512 F.3d 1363 (Fed. Cir. 2008)...........................................................................................3

*Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*,
  No. 12-1138-SLR, 2014 WL 2960363 (D. Del. Jun. 30, 2014)................................................5

*MSM Investments Co. v. Carolwood Corp.*,
  70 F. Supp. 2d 1044 (N.D. Cal. 1999) ...................................................................................5

*Ohio Willow Wood Co. v. Alps S., LLC*,
  735 F.3d 1333 (Fed. Cir. 2013)........................................................................................2, 6

*Purdue Pharma L.P. v. Mylan Pharms., Inc.*,
  C.A. No. 15-1155-RGA-SRF, 2017 WL 784989 (D. Del. Mar. 1, 2017) ...............................10

# TABLE OF AUTHORITIES
## Continued

Page(s)

*PSN Ill., LLC v. Ivoclar Vivadent, Inc.*,
  525 F.3d 1159 (Fed. Cir. 2008)........................................................................7

*Ruiz v. A.B. Chance Co.*,
  234 F.3d 654 (Fed. Cir. 2000)..........................................................................3

*Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*,
  778 F.3d 1311 (Fed. Cir. 2015)........................................................................3

*Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*,
  C.A. No. 17-1734-RGA,
  2021 WL 982726 (D. Del. Mar. 16, 2021) (Andrews, J.)........................................3

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
  407 F.3d 1371 (Fed. Cir. 2005)........................................................................3

*Torpharm, Inc. v. Ranbaxy Pharms., Inc.*,
  336 F.3d 1322 (Fed. Cir 2003)........................................................................9

*Trs. of the Univ. of Pa. v. Eli Lilly & Co.*,
  No. 2:15-cv-06133-PD, D.I. 343 (E.D. Pa. Jan. 14, 2022)....................................10

*Union Carbide Corp. v. Am. Can Co.*,
  724 F.2d 1567 (Fed. Cir. 1984)........................................................................7

*United Therapeutics Corp. v. SteadyMed Ltd.*,
  702 F. App'x. 990 (Fed. Cir. 2017) ...........................................................8, 9, 10

*Westwood Chem., Inc. v. U.S.*,
  525 F.2d 1367 (Ct. Cl. 1975) ...................................................................3, 9, 10

UTC should be collaterally estopped from asserting the '066 and '901 patents because there is no genuine dispute of material fact that the patents claim the same product and process as the invalidated '393 patent.  In opposing Liquidia's collateral estoppel summary judgment motion, UTC ironically relies on the same arguments and "facts" that were already considered and rejected by both the PTAB and Federal Circuit in the '393 patent IPR proceeding.  Indeed, the Walsh and Fawzi Declarations highlight UTC's attempt to relitigate issues that have been squarely decided, such as purported advantages of the claimed process and purity/impurity profile of the claimed product compared to that of the prior art product.  Not only were these issues previously decided, but UTC also ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████.   D.I.  282,  Ex.  18  (████████)  at UTC_OREN_00572127 (emphasis added).  As discussed herein, UTC's ████████████ flatly contradicts its arguments in opposition.

## I.   UTC MISCHARACTERIZES THE LAW REGARDING COLLATERAL ESTOPPEL AS APPLIED TO PRODUCT-BY-PROCESS CLAIMS

UTC criticizes Liquidia for "erroneously focus[ing] on the *similarities* between the claims at-issue" rather than "analyz[ing] *how* 'the differences between the unadjudicated patent claims and adjudicated patent claims' impact the validity analysis."  D.I. 290 at 10; *see also id.* at 1, 3. This argument fails for several reasons.  First, UTC ignores the full context of the relevant case law regarding claim "differences," which provides:

> Our precedent does not limit collateral estoppel to patent claims that are identical. Rather, it is the ***identity of the issues*** that were litigated that determines whether collateral estoppel should apply.  If the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity, collateral estoppel applies.

*Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1342-45 (Fed. Cir. 2013) (citations omitted) (emphasis modified).[1]  Thus, it is the "sameness" of the issues—not the differences in claim language—that controls the collateral estoppel analysis.   And here, as explained in Liquidia's Opening Brief, the invalidity of the claimed product and process is the precise ***issue*** already decided by the PTAB and Federal Circuit.  *See* D.I. 282, § V.A.1.

Second, Federal Circuit precedent dictates that "[i]f the product in a product-by-process claim is ***the same as*** or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process."  *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985) (emphasis added); *see also Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1268 (Fed. Cir. 2012) ("In determining validity of a product-by-process claim, the focus is on the product and not the process of making it.") (citation omitted).  Liquidia is therefore correct to focus on whether the '066 and '901 patents claim the "same product" as the '393 patent.  D.I. 282, § V.A.1.a.  And contrary to UTC's assertion, Liquidia never relies on the '393 patent as "prior art" (D.I. 290 at 10)—instead, Liquidia explains that the product and process claimed by the '393 patent was found invalid over the prior art, and the '066 and '901 patents claim the same product made by the same process as the '393 patent; collateral estoppel thus applies.  *See* D.I. 282 at 13-15.

Third, Liquidia did analyze whether the minor variation in claim language materially alters the question of invalidity.  D.I. 282, § V.A.1.b.  UTC is thus wrong to contend that Liquidia "ignore[ed] the undisputed *differences* between the *claims* of the patents and their impact on the invalidity analysis."  *E.g.*, D.I. 290 at 1.  There are no meaningful differences among the claims.

---

[1] UTC attempts to distinguish *Ohio Willow* because, there, "it was 'without dispute' that the asserted claims were not materially different from the invalidated claims."  D.I. 290 at 11 n.4 (quoting *Ohio Willow*, 735 F.3d at 1342).  This is unavailing because collateral estoppel looks solely to whether the same issue was previously litigated, not whether the litigants in the case agree or disagree with one another.  *E.g.*, *Ohio Willow*, 735 F.3d at 1342-45.

UTC's argument regarding the *Graham* factors is misplaced.  *See* D.I. 290 at 13; *id.* at §

VI.C.3.  UTC relies heavily on *Westwood Chem., Inc. v. U.S.*, 525 F.2d 1367 (Ct. Cl. 1975), but

the court there explained that if the "litigated and nonlitigated claims . . . are of identical scope, it

readily follows that no new issues bearing on the obviousness determination are presented," and a

*Graham* analysis is only necessary if comparison of the claims "reveal[s] some differences of a

substantive nature."  *Id.* at 1375; *see also id.* at 1380 (applying collateral estoppel because "such

minor differences as exist between the litigated claims and those here in issue are so insubstantial

that the issues of validity under Graham v. John Deere, must be considered to be the same").[2]

Here, analysis of the *Graham* factors is not necessary because the Asserted Claims are identical in

scope to the invalidated claims of the '393 patent.  *See* D.I. 282, §§ V.A.1.a, V.B.[3]  Indeed, courts

routinely apply collateral estoppel without analyzing the *Graham* factors.  *E.g.*, *Soverain Software*

*LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1319-20 (Fed. Cir. 2015); *see*

*also id.* at 1314 ("The issue of whether to apply collateral estoppel is a ***question of law***[.]") (citation

omitted) (emphasis added); *Allergan, Inc. v. Sandoz, Inc.*, 681 F. App'x 955, 959-61 (Fed. Cir.

2017); *Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*, C.A. No. 17-1734-RGA, 2021 WL

982726, at \*8-9 (D. Del. Mar. 16, 2021) (Andrews, J.).

## II.   NO GENUINE DISPUTE OF MATERIAL FACT EXISTS REGARDING THE PRODUCT CLAIMED IN THE '066, '901, AND '393 PATENTS

UTC does not dispute that the product made by the process steps of the '393 patent was

found unpatentable in a final judgment essential to the PTAB's and Federal Circuit's decisions, or

---

[2] The remaining cases relied upon by UTC did not involve collateral estoppel and thus are inapposite.  *See generally Ruiz v. A.B. Chance Co.*, 234 F.3d 654 (Fed. Cir. 2000); *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371 (Fed. Cir. 2005); *Innogenetics, N.V. v. Abbott Lab'ys*, 512 F.3d 1363 (Fed. Cir. 2008); *Custom Accessories, Inc. v. Jeffrey-Allan Indus.*, 807 F.2d 955 (Fed. Cir. 1986); *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254 (Fed. Cir. 2007).

[3] In any event, the PTAB already applied the *Graham* factors when invalidating the claimed product and process steps.  D.I. 282, Ex. 4 ('393 FWD) at 20-21, 48-49, 56-67, 83.

that UTC had an opportunity to fully and fairly litigate this issue.  Thus, the only question before

the Court is whether the product claimed by the '066 and '901 patent is the same as that claimed

by the '393 patent.  *E.g., In re Thorpe*, 777 F.2d at 697; *Greenliant*, 692 F.3d at 1268.  The answer

is yes, for the reasons set forth in Liquidia's Opening Brief.  D.I. 282, §§ V.A.1.a, V.B.  UTC

makes no effort to address the unambiguous testimony of ████████████████████████

████████████████.  *See* D.I. 282 at 7, 13, 19.  Nor does UTC contest that it submitted

████████████████████████████████████████████████████████████████

████████ that all three patents are listed in the Orange Book for Tyvaso®, or that UTC relied on

declarations addressing the product claimed in the '393 patent during prosecution of the '066 and

'901 patents.  *See* D.I. 282 at 7-9, 13-15; *cf.* D.I. 290 at 19 n.9, 6 n.3.  And UTC misrepresents that

its ████████████████████████████████████ (D.I. 290 at 19), when in fact

UTC ████████████████████████████████████████████████████

████████████████████████████████████████:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

D.I. 282, Ex. 18 (████████████) at UTC_OREN_00572127 (emphases added).

### A.      The Invalidity of the Claimed Product Has Already Been Decided

UTC is wrong to assert that the process steps of the product-by-process claims in the '066

and '901 patents impart structural or functional differences to the claimed product that "materially

alter" the invalidity question.  *See* D.I. 290, § VI.C.2.  The dispositive fact is that all three patents

claim products resulting from the same process steps—alkylation, hydrolysis, and salt formation.

*See* Ex. 33 (comparing claim 1 of the '393, '066, and '901 patents).  The process steps of the

4

product-by-process claims of the '066 and '901 patents are thus duplicative of—not "narrower" than—those of the '393 patent.  *See* D.I. 290 at 13-14.[4]

In the '066 patent,[5] UTC points to a clause stating: "whereby 'a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition.'" D.I. 290 at 14-15.  This "whereby" clause, however, is ***not*** a process step—it merely recites the result of carrying out the process steps of alkylation, hydrolysis, and salt formation; it does not change the claimed product, and thus cannot impart a structural or functional difference.[6]  *See* D.I. 282, Ex. 1 ('066 patent), claim 1.  This same result is achieved when following the process steps of the '393 patent.  Independent claims 1 and 9 of the '393 patent recite a product made by alkylation, hydrolysis, and salt formation.  D.I. 282, Ex. 3 ('393 patent), claims 1, 9.  These '393 process steps, identical to the '066 process steps, lead to the same product.  Further, claim 16 of the '393 patent, which depends from claim 9, recites a product "wherein the process does not include purifying the compound of formula (VI) produced in step (a) [alkylation]."  *Id.*, claim 16. Those impurities would be present until the salt formation step removes them.  Ex. 34 (Fawzi Dep. Tr.) at 239:20-240:18, 243:6-10.  Thus, following either claims 1, 9, or 16 of the '393 patent results in the same product as claim 1 of the '066 patent, including the result "whereby a level of one or

---

[4] UTC's cited cases are distinguishable because neither involved product-by-process claims, *Joao Bock* involved two different constructions of the same claim term, and *MSM Investments* also involved broader claims that raised new § 112 issues.  *Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*, No. 12-1138-SLR, 2014 WL 2960363, at *10 n.34 (D. Del. Jun. 30, 2014); *MSM Investments Co. v. Carolwood Corp.*, 70 F. Supp. 2d 1044, 1051 (N.D. Cal. 1999).

[5] UTC includes only passing references to alleged differences in the '901 patent claims compared to the '393 patent claims, without further explanation.  *See* D.I. 290 at 5, 15.

[6] Even if this clause was found to be a process step, it would not impart any structural or functional difference because it does not specify any impurity level or impurity profile that must exist in the claimed product.  *See* D.I. 282 at 16-17.  Regardless, the PTAB invalidated two claims of the '393 patent requiring a purity of "at least 99.5%."  *See id.* at 17.

more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition."[7]

It also makes no difference that the '066 patent claims recite a "composition" and a "starting batch," instead of a "product" as recited in the '393 patent.[8]  *See* D.I. 290 at 14-15.  The law is clear that "the mere use of different words in . . . the claims does not create a new issue of invalidity."  *Ohio Willow*, 735 F.3d at 1343; D.I. 282 at 11 n.9 (citing cases).  Nonetheless, the "starting batch" of the '066 patent is "treprostinil free acid."  Ex. 34 (Fawzi Dep. Tr.), 162:7-163:8.  And the product after the hydrolysis step (process step (b) of claim 1 in the '393 patent) is also treprostinil free acid.  *Id.* at 171:2-19, 182:17-25.[9]

UTC's allegation that the '066 patent claims an improved "impurity profile," while the '393 patent does not, is likewise unavailing.  *See* D.I. 290 at 15.  UTC's experts agree that neither the '066 patent nor '901 patent requires any specific impurity or impurity profile that must exist in the claimed treprostinil product.  D.I. 282 at 16-17.  Therefore, as the PTAB found for the '393 patent, the '066 and '901 patents themselves "do[] not discuss any of the individual impurities."  *See* D.I. 290 at 15 (citing D.I. 282, Ex. 4 ('393 FWD) at 42).  UTC is also wrong to suggest that "the [PTAB] only examined the *purity* of the treprostinil molecule claimed in the '393 claims."  *See* D.I. 290 at 15.  The PTAB expressly found that the "impurity profile" of the product claimed by the '393 patent "renders the claimed treprostinil structurally and functionally the same as the treprostinil produced according to Moriarty."  D.I. 282, Ex. 4 ('393 FWD) at 14-16, 29-30, 36-38 (finding "no difference in the overall purity for treprostinil produced according to Moriarty and

---

[7] Dr. Fawzi admitted that the claims of the '393 patent include "impurities."  Ex. 34 (Fawzi Dep. Tr.) at 238:2-12, 240:4-9; *see also* D.I. 282, Ex. 3 ('393 patent), claims 2 and 10.
[8] The same is true for the "batch" claimed by the '901 patent.  *See* D.I. 290 at 15.
[9] UTC's arguments regarding the '066 IPR proceeding fail for the same reasons articulated in Liquidia's Opening Brief.  *See* D.I. 290 at 14 n.5; *cf.* D.I. 282 at 17.

that produced according to the '393 patent").  Thus, UTC has already fully litigated and lost the *issue* of an improved "impurity profile" as an alleged distinction of the product claimed in the '393 patent (and the '066 and '901 patents) over the prior art.  *See* D.I. 282, Ex. 4 ('393 FWD) at 11-19, 25-43; D.I. 282, Ex. 8 ('393 POR) at 6-12.[10]

UTC's reliance on declarations from named inventor Dr. Walsh and UTC expert Dr. Fawzi is a poorly disguised attempt to relitigate issues that have already been adversely decided against UTC.  The Walsh Declaration (D.I. 292) cites no evidence in support of his conclusions, and thus cannot create a genuine issue of material fact.  *E.g.*, *PSN Ill., LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1167-68 (Fed. Cir. 2008) (affirming summary judgment when the inventor's testimony was "wholly conclusory and thus insufficient to raise a disputed issue of material fact"); *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1572 (Fed. Cir. 1984) (affirming summary judgment of invalidity when "the Fischer affidavit expressed no more than an unsupported conclusory opinion which ignored . . . the evidence of record" and thus raised "no genuine issue of material fact").  Further, Dr. Walsh's testimony only addresses purported advantages of the claimed *process*—not the claimed *product* as required to determine validity for product-by-process claims.  D.I. 292 (Walsh Dec.) at ¶¶ 9-15; *id.*, *e.g.*, ¶ 14 ("███████████ ████████████████████████████████████████████████████████████ ████████").[11]  The PTAB already ruled on this issue, finding that the "recited process steps [of

---

[10] *Evonik Degussa GmbH v. Materia Inc.*, 53 F. Supp. 3d 778 (D. Del. 2014) is inapposite because that court's decision hinged on issues unique to § 112.  *Id.* at 791-92 ("If the scope of a subsequent patent claim differs from that of a prior patent claim, a new issue of patent validity exists **with respect to whether the subsequent claim is properly enabled under 35 U.S.C. § 112**.") (emphasis added).

[11] UTC has asserted that the claimed process of the '066 and '901 patents includes chromatography (*e.g.*, D.I. 75 at 11, 18-19, 53), but ████████████████████████████████████████ ████████████████████████████████████████████████████████.  Ex. 35 (Walsh Dep. Tr.), 167:1-168:2; Ex. 36 (Ruffolo Dep. Tr.), 82:7-22.

alkylation, hydrolysis, and salt formation] would have been obvious to a relevant skilled artisan." D.I. 282, Ex. 4 ('393 FWD) at 80; *see also id.* at 53, 70.

Similarly, the Fawzi Declaration attempts to relitigate the issue of whether the claimed product's impurity profile is different from that of the prior art product. *See* D.I. 290 at 16-17 (citing D.I. 291 (Fawzi Dec.) at Ex. 2, pp. 3, 30-31, 34, 41). The PTAB and Federal Circuit already found that it is not. D.I. 282, Ex. 4 ('393 FWD) at 11-19, 25-43; *SteadyMed*, 702 F. App'x 990. In fact, Dr. Fawzi admits that his opinion that the '393 FWD was wrong is based on his re-analysis of the same data already analyzed by Dr. Williams in the '393 IPR proceeding—and found unpersuasive. *See* Ex. 34 (Fawzi Dep. Tr.), 250:4-254:1, 260:25-261:8; D.I. 291 (Fawzi Dec.), Ex. 2 at ¶¶ 74, 100-114; D.I. 282, Ex. 4 ('393 FWD) at 32-36. Additionally, the Fawzi Declaration still confirms that ████████████████████████████████████████████

███████ D.I. 291 (Fawzi Decl.) at ¶ 9.[12]

The remaining limitations identified by UTC do not bar the application of collateral estoppel. *See* D.I. 290 at 17-18. UTC relies on limitations regarding storage and stability of the ***salt*** as an alleged distinction of the claimed ***product*** over the prior art product and the '393 patent's product. *See id.* This ignores the fact that the claimed product of claim 1 of the '066 and '901 patents can be either treprostinil free acid ***or*** a pharmaceutically acceptable salt. D.I. 282, Ex. 1 ('066 patent), claim 1; D.I. 282, Ex. 2 ('901 patent), claim 1. It is undisputed that the free acid is ***not*** stable or stored at ambient temperature—████████████████████████████

████████████████████████████████████████████████████████

---

[12] UTC's statements regarding Liquidia's API manufacturing process, which relates to infringement, is wholly irrelevant to whether collateral estoppel applies. *See* D.I. 290 at 17. And they are nonetheless ████████████████████████████████████████████

████████████████████████████████

██████████████████████  Ex. 38 (Smyth Dep. Tr.), 88:8-12, 90:15-92:14; Ex. 39 (████████

██████  ████████ ), at UTC_LIQ00264319 ████████  ██████  ████  ████  Ex. 40

(UTC_LIQ00262040-087).  Finally, the "storage" limitation UTC points to is not directed to the

claimed product of the '066 and '901 patents, but to an intermediate ***before*** it is used to make the

claimed "pharmaceutical composition" or "pharmaceutical product."  *See* D.I. 282, Ex. 1 ('066

patent), claims 6 and 8; D.I. 282, Ex. 2 ('901 patent), claim 6.

In sum, collateral estoppel applies because there is no genuine dispute of material fact that

the product claimed by the '066 and '901 patents is the same product of the invalidated '393 patent.

### B.  The Invalidity of the Claimed Process Has Already Been Decided

The '393 FWD, affirmed by the Federal Circuit, expressly ruled on the invalidity of the

claimed process steps—alkylation, hydrolysis, and salt formation.  D.I. 282, Ex. 4 ('393 FWD) at

53, 70, 80; *SteadyMed*, 702 F. App'x 990; Ex. 41 (comparing process steps in claim 1 of the '393

patent to those in claim 8 of the '066 and '901 patents).  Contrary to UTC's assertions, Liquidia's

Opening Brief and the arguments set forth above squarely address why the additional limitations

do not "materially alter" the invalidity question.  D.I. 282, § V.B; *see supra* § II.B.  UTC is wrong

to assert that the process claims require a "materially different validity analysis" (D.I. 290 at 11;

*id.* at 8)—the basis for summary judgment here is collateral estoppel, and the PTAB and Federal

Circuit have already found the claimed process steps invalid.  D.I. 282, § V.B.  The cases cited by

UTC are either inapplicable or support application of collateral estoppel here.  In *Torpharm, Inc.*

*v. Ranbaxy Pharms., Inc.*, the previous litigation found product claims invalid based on prior sale

and did not rule on the validity of any process steps.  336 F.3d 1322, 1325 (Fed. Cir. 2003)

("However, there was (and still is) no evidence of what process [third party] used to make its

[product], and by stipulation the product-by-process claims . . . were not at issue in the [previous]

litigation.").  *Westwood Chemical* specifically held that "a process and product may present

identical issues concerning, e.g., their obviousness."   525 F.2d at 1379 (finding that "this distinction . . . is of no merit and does not defeat application of [collateral] estoppel").[13]  The process claims of the '066 and '901 patents are thus invalid.

### C.    Liquidia's Motion is Not Procedurally Barred

UTC's untimeliness argument is meritless—Liquidia first disclosed an invalidity defense based on *SteadyMed* nearly **15 months ago** in its invalidity contentions.  *See* Ex. 42 (Preliminary Invalidity Contentions) at 115-119 (asserting invalidity for claiming the same product as the invalidated '393 patent); Ex. 43 (First Supplemental Invalidity Contentions) at 49-50, 114-115 (same).  Further, Liquidia sought leave from the Court to file the instant Motion, and UTC, in response, never asserted that Liquidia's collateral estoppel defense is procedurally barred.  *See* D.I. 228, 246, 257.  UTC's failure to raise this issue until now confirms it is "not prejudiced in its ability to respond."  *See Courteau v. U.S.*, 287 F. App'x 159, 161-62 (3d Cir. 2008) (internal quotation omitted); Ex. 44 (*Trs. of the Univ. of Pa. v. Eli Lilly & Co.*, No. 2:15-cv-06133-PD, D.I. 343 (E.D. Pa. Jan. 14, 2022)) at 7-11 (applying collateral estoppel when raised for the first time in a motion to strike filed after summary judgment briefing).[14]

### III.    CONCLUSION

Liquidia respectfully requests that the Court grant summary judgment of invalidity of the Asserted Claims of the '066 and '901 patents due to collateral estoppel.

---

[13] Several cases relied upon by UTC did not involve collateral estoppel.  *See generally In re Ochiai*, 71 F.3d 1565 (Fed. Cir. 1995); *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340 (Fed. Cir. 2009); *A.K. Stamping Co. v. Instrument Specialties Co.*, 106 F. Supp. 2d 627 (D.N.J. 2000).  And *Purdue Pharma L.P. v. Mylan Pharms., Inc.* was decided on a motion to dismiss, where the court found that the "fact-based inquiries are premature for resolution at this stage."  C.A. No. 15-1155-RGA-SRF, 2017 WL 784989, at *8 (D. Del. Mar. 1, 2017); *see also* 2017 WL 2569604, at *1-2.
[14] UTC's also argues that Liquidia's motion for summary judgment on *all* asserted claims is "improper" (D.I. 290 at 2)—this too is misguided, because the Court's order "grant[ed] Liquidia leave to move for summary judgment of invalidity of the [']066 patent and [']901 patent due to collateral estoppel," with no reference to specific claims.  *See* D.I. 267.

/s/ Nathan R. Hoeschen

Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Douglas Cheek
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Lauren Krickl
Deepa Kannappan
Brittany Cazakoff
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: February 11, 2022

## CERTIFICATE OF SERVICE

I, Nathan R. Hoeschen, hereby certify that on February 11, 2022, this document was

served on the persons listed below in the manner indicated:

### BY EMAIL

Jack B. Blumenfeld
Michael J. Flynn
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

William C. Jackson
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4216
wjackson@goodwinlaw.com

Bill Ward
BOIES SCHILLER FLEXNER LLP
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
(213) 995-5745
bward@bsfllp.com

Huiya Wu
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 459-7270
hwu@goodwinlaw.com

Adam W. Burrowbridge
Joshua Revilla
Timothy M. Dunker
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street
Washington, DC 20001-1531
(202) 756-8000
aburrowbridge@mwe.com
jrevilla@mwe.com
tdunker@mwe.com

Douglas H. Carsten
Art Dykhuis
Jiaxiao Zhang
Katherine Pappas
Mandy H. Kim
MCDEMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633
dcarsten@mwe.com
adykhuis@mwe.com
jiazhang@mwe.com
kpappas@mwe.com
mhkim@mwe.com

Harrison Gunn
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1064
hgunn@goodwinlaw.com

/s/ Nathan R. Hoeschen
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*
*Liquidia Technologies, Inc.*

# EXHIBIT 33

**EXHIBIT 33[1]**

| '393 Patent Claim 1 | '066 Patent Claim 1 | '901 Patent Claim 1 |
|---|---|---|
| A product comprising a compound of formula I<br><br><br><br>or a pharmaceutically acceptable salt thereof, | A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, | A pharmaceutical batch consisting of treprostinil or a salt thereof |
| wherein said product is prepared by a process comprising | said composition prepared by a process comprising providing a starting batch of treprostinil having one or more impurities resulting from | and impurities resulting from |
| (a) alkylating a compound of [a genus including benzindene triol] with an alkylating agent to produce a compound [from a genus comprising treprostinil], | prior alkylation and | (a) alkylating a benzindene triol, |
| (b) hydrolyzing the product [] of step (a) with a base, | hydrolysis steps, | (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, |
| (c) contacting the product of step (h) with a base B to form a salt of formula I₅.<br><br> | forming a salt of treprostinil by combining the starting batch and a base, | (c) containing the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, |
| | isolating the treprostinil salt, | (d) isolating the salt of treprostinil, and |
| | and preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable | |

---

[1] Highlighting added for emphasis.

| | salt thereof from the isolated treprostinil salt, | |
|---|---|---|
| (d) optionally reacting the salt formed in step (c) with an acid to form the compound of formula I. | | (e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and |
| | whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and wherein said alkylation is alkylation of benzindene triol. | |
| | | wherein the pharmaceutical batch contains at least 2.9 g of treprostinil or its salt. |

# EXHIBIT 34



Deposition of:

**Mahdi Fawzi , Ph.D.**

*January 14, 2022*

In the Matter of:

**United Therapeutics Corporation vs Liquidia Technologies Inc**

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com  |

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
2

3       _____
                                        :
        UNITED THERAPEUTICS            :
4       CORPORATION,                   :
                                        :
5            Plaintiff,                :
                                        :
6            v.                        : Case No.
                                        : 1:20-cv-00755-UNA
7       LIQUIDIA TECHNOLOGIES,         :
        INC.,                          :
8                                       :
             Defendant.                :
9       _____:
10
11         HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER
12                 Friday, January 14, 2022
13
               Video Deposition of MAHDI FAWZI, PH.D.,
14
        taken virtually via Zoom, with the witness
15
        participating from his residence at 1 Dukes Court
16
        Morristown, New Jersey, beginning at 11:15 a.m.,
17
        before Ryan K. Black, a Registered Professional
18
        Reporter, Certified Livenote Reporter and Notary
19
        Public and for the Commonwealth of Pennsylvania.
20
21
22
23
24
25

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Page 2

```
 1   A P P E A R A N C E S:
 2   MCDERMOTT WILL & EMERY LLP
     BY: ADAM W. BURROWBRIDGE, ESQ. - Via Zoom
 3      MICHAEL BALDWIN, ESQ. - Via Zoom
     The McDermott Building
 4   500 North Capitol Street, NW
     Washington, DC  20001
 5   202.756.8000
     aburrowbridge@mwe.com
 6   mbaldwin@mwe.com
 7   MCDERMOTT WILL & EMERY LLP
     BY: KATHERINE PAPPAS, ESQ. - Via Zoom
 8   18565 Jamboree Road
     Suite 250
 9   Irvine, California  92612
     949.851.0633
10   kpappas@mwe.com
11   Representing - United Therapeutics Corp.
12
     COOLEY LLP
13   BY: SANYA SUKDUANG, ESQ. - Via Zoom
     1299 Pennsylvania Avenue NW
14   Suite 700
     Washington, DC 20004
15   202.842.7800
     ssukduang@cooley.com
16
     COOLEY LLP
17   BY: DEEPA KANNAPPAN, ESQ. - Via Zoom
     3175 Hanover Street
18   Palo Alto, California  94304
     650.843.5000
19   dkannappan@cooley.com
20   Representing - Liquidia Technologies, Inc.
21
22   ALSO PRESENT:
23   Solomon Francis - Legal Videographer
24   Grant Franis - Tech Concierge
25   Carissa Narciso - Tech Concierge
```

Page 3

```
 1              I N D E X
 2   TESTIMONY OF:  MAHDI FAWZI, PH.D       PAGE
 3   By Mr. Sukduang..........................6, 342
 4   By Mr. Burrowbridge.........................335
 5        E X H I B I T S
 6   EXHIBIT        DESCRIPTION        PAGE
 7   Fawzi 1   a copy of the Rebuttal Expert
 8        Report of Mahdi Fawzi..............13
 9   Fawzi 2   a copy of Dr. Fawzi's curriculum
10        vitae.............................19
11   Fawzi 3   a copy of U.S. Patent Number
12        9,593,066.........................44
13   Fawzi 4   a copy of U.S. Patent Number
14        9,604,901.........................45
15   Fawzi 5   a copy of Claim 1 of the
16        '901 patent.......................66
17   Fawzi 6   a copy of U.S. Patent Number
18        8,497,393........................217
19   Fawzi 7   a document Bates Numbered LI000018937
20        through LIQ00018949...............269
21   Fawzi 8   a document Bates Numbered
22        UTC_OREN_00844298 through
23        00844309..........................282
24
25
```

Page 4

```
 1              I N D E X (Cont'd)
 2   EXHIBIT        DESCRIPTION        PAGE
 3   Fawzi 9   a document Bates Numbered
 4        UTC_LIQ00041294 through
 5        UTC_LIQ00041306..................300
 6   Fawzi 10   a document Bates Numbered
 7        UTC_LIQ00041172 through
 8        UTC_LIQ00041293..................309
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1        THE VIDEOGRAPHER:  Good morning.
 2        We're going on the record at 11:15 a.m.
 3   on January 14th, 2022.  This is the remote
 4   video-recorded deposition of Dr. Mahdi Fawzi,
 5   taken in the matter of United Therapeutic
 6   Corporation versus Liquidia Technologies, Inc.,
 7   filed in the United States District Court for the
 8   District of Delaware, Case Number 20-755.
 9        My name is Solomon Francis,
10   with Veritext Legal Solutions, and I'm the
11   videographer.  Our court reporter today is Ryan
12   Black, with Veritext Legal Solutions.  At this
13   time will counsel please state their appearances
14   and affiliations for the record?
15        MR. SUKDUANG:  Sanya Sukduang, from
16   Cooley LLP, on behalf of defendant Liquidia
17   Technologies.  And with me is my colleague Deepa
18   Kannappan.
19        MR. BURROWBRIDGE:  Adam Burrowbridge,
20   with McDermott, Will & Emery, on behalf of United
21   Therapeutics Corporation and for the witness Dr.
22   Mahdi Fawzi.  Along with me is Kathy Pappas and
23   Mike Baldwin, also of McDermott, Will & Emery.
24        THE VIDEOGRAPHER:  All right.  If that's
25   all, at this time will the court reporter please
```

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 158

1   point you to, but that -- that talks about Claim
2   1.
3       A.  But I don't make any judgment on it.
4       Q.  Your entire opinion -- your entire
5   report is judgment on the claims, is it not?
6       MR. BURROWBRIDGE:  Objection; form.
7       THE WITNESS:  Not on this specific
8   claim.  My entire report covers the -- the whole
9   process of the two patents, '066 and '901.
10  BY MR. SUKDUANG:
11      Q.  You -- you -- you -- you understand that
12  the process that -- that -- that the invention is
13  the claim, correct?
14      A.  Yes.
15      MR. BURROWBRIDGE:  Objection to form.
16  BY MR. SUKDUANG:
17      Q.  And you -- and you give opinions in this
18  case that you don't believe the claim is obvious,
19  correct?
20      A.  Yes.
21      Q.  And in rendering that opinion, do you
22  have to understand the claim in order to make
23  that opinion?
24      A.  Of course.
25      Q.  Okay.  So I'm asking you, in your

Page 159

1   understanding of the claim, does the Claim 1
2   require alkylation of benzindene triol?
3       MR. BURROWBRIDGE:  Objection; form.
4       THE WITNESS:  The way it is stated,
5   it talks about the impurities that could come
6   probably from alkylation or hydrolysis or the
7   salt formation.
8   BY MR. SUKDUANG:
9       Q.  Why do you say "probably from"?
10      A.  Because it could --
11      MR. BURROWBRIDGE:  Objection; form.
12      THE WITNESS:  Sorry.
13  BY MR. SUKDUANG:
14      Q.  Why do you say "probably from"?
15      A.  I cannot discount the solvents and
16  reagents and conditions like reflux or -- or
17  other steps, evaporation or stirring with
18  heptane.  All of those could have impurities.
19  But the two major steps, the alkylation and the
20  hydrolysis, are the primary sources of the type
21  of impurities that they have encountered.
22      Q.  Okay.  So if the alkylation is -- and
23  the hydrolysis is the primary source of
24  impurities, what am I alkylating?
25      MR. BURROWBRIDGE:  Objection; form.

Page 160

1       [No audible response.]
2   BY MR. SUKDUANG:
3       Q.  Are you considering your answer, Dr.
4   Fawzi?
5       A.  I have not changed my answer.
6       Q.  I'm not asking if you changed it.  You
7   said "alkylation and hydrolysis are the primary
8   sources of impurities."  My question is, then
9   what am I alkylating?
10      MR. BURROWBRIDGE:  Objection; form.
11      THE WITNESS:  The way I read this claim,
12  it is targeted to treprostinil and no other
13  compounds, and that treprostinil could have
14  impurities that are, possibly, coming from prior
15  steps.  It doesn't say whether I can use a
16  product that has a lot of impurities in it.
17  It says I have to reduce the impurity from the
18  starting material.
19  BY MR. SUKDUANG:
20      Q.  Okay.  In order to get the starting
21  material, I have to conduct alkylation and
22  hydrolysis, correct?
23      MR. BURROWBRIDGE:  Objection; form.
24      THE WITNESS:  As part of the -- it makes
25  an assumption that the source of the benzindene

Page 161

1   triol has to be, specifically, what if you skip
2   the benzindene triol alkylations or hydrolysis
3   and have a material that is coming from the salt
4   form.
5   BY MR. SUKDUANG:
6       Q.  My question is, you said -- you pointed
7   me to the impurities between the starting batch
8   and the pharmaceutical composition.  My question
9   now is, in order to get to the starting batch,
10  I'd have to conduct alkylation and hydrolysis to
11  form that starting batch, correct?
12      MR. BURROWBRIDGE:  Objection; form.
13      THE WITNESS:  That's the synthetic step
14  that is being described in the patent.
15  BY MR. SUKDUANG:
16      Q.  Okay.  And then what am I alkylating
17  in order to get to the starting batch?  What
18  compound am I conducting alkylation on?
19      MR. BURROWBRIDGE:  Objection; form.
20      [No audible response.]
21  BY MR. SUKDUANG:
22      Q.  Do you have an answer?
23      A.  No, I don't have a specific answer.
24      Q.  Okay.  What's the start -- read the
25  claim --

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 162

1      MR. BURROWBRIDGE: It's --
2      MR. SUKDUANG: Let me finish with the
3  claim. I know we're almost at an hour. Give me
4  a few more minutes.
5      MR. BURROWBRIDGE: Great. Thank you.
6  BY MR. SUKDUANG:
7      Q. With respect to Claim 1, you see the
8  word "starting batch"?
9      A. Where are we now?
10     Q. In Claim 1?
11     A. Of '06 --
12     Q. Yes, please.
13     A. -- '066?
14     Q. Yes, please.
15     A. Okay.
16     Q. Do you see the term "starting batch"?
17     A. Yes.
18     Q. In your opinion, what compound is the
19  starting batch?
20     MR. BURROWBRIDGE: Object to form.
21     THE WITNESS: Treprostinil.
22  BY MR. SUKDUANG:
23     Q. Is it treprostinil free acid or
24  treprostinil salt?
25     MR. BURROWBRIDGE: Objection; form.

Page 163

1      THE WITNESS: It could be either.
2  BY MR. SUKDUANG:
3      Q. So my starting batch, in your opinion,
4  could be either the treprostinil free acid or the
5  treprostinil salt?
6      MR. BURROWBRIDGE: Objection; form.
7      THE WITNESS: That's the way I
8  understand it -- I read it.
9  BY MR. SUKDUANG:
10     Q. Okay. If I make the treprostinil salt,
11  doesn't the patent teach me that making the
12  treprostinil salt is the pure -- purifies the
13  compound?
14     MR. BURROWBRIDGE: Objection; form.
15     THE WITNESS: Yes.
16  BY MR. SUKDUANG:
17     Q. So if I make the treprostinil salt
18  and that's my starting batch, what's my
19  pharmaceutical composition in the claim?
20     MR. BURROWBRIDGE: Object to the form of
21  the question.
22     THE WITNESS: The composition could be a
23  formulation product.
24  BY MR. SUKDUANG:
25     Q. Could it also just be the treprostinil

Page 164

1  salt?
2      MR. BURROWBRIDGE: Objection to form.
3      THE WITNESS: And that's 15C, yes.
4  BY MR. SUKDUANG:
5      Q. So in your opinion when it says in
6  Claim 1, "A level of one or more impurities found
7  in the starting batch of treprostinil is lower
8  than the pharmaceutical composition," in your
9  opinion, am I comparing treprostinil salt to
10  another treprostinil salt?
11     MR. BURROWBRIDGE: Objection; form.
12     THE WITNESS: Can you repeat the
13  question, please.
14  BY MR. SUKDUANG:
15     Q. In Claim 1 where it says, "Whereby a
16  level of one or more impurities found in the
17  starting batch of treprostinil is lower in the
18  pharmaceutical composition." Do you see that in
19  Claim 1?
20     A. Yes.
21     Q. And you said the starting batch could be
22  the pharmaceutical salt, correct?
23     A. Yes.
24     Q. So in Claim 1, in your opinion, do I
25  analyze the impurities of the pharmaceutical salt

Page 165

1  of treprostinil and compare that to the same
2  pharmaceutical salt of treprostinil?
3      MR. BURROWBRIDGE: Objection; form.
4      THE WITNESS: The treprostinil
5  diethanolamine salt is an intermediate that could
6  be converted to treprostinil itself or an API of
7  treprostinil diethanolamine salt.
8  BY MR. SUKDUANG:
9      Q. So in your example, the treprostinil
10  diethanolamine could be my starting batch, and
11  then my pharmaceutical composition could be the
12  free acid of treprostinil?
13     MR. BURROWBRIDGE: Objection; form.
14     THE WITNESS: Yes.
15  BY MR. SUKDUANG:
16     Q. Okay. Does Claim 1 require the salt to
17  be treprostinil diethanolamine -- diethanolamine?
18     MR. BURROWBRIDGE: Objection; form.
19  Object to the extent it calls for a legal
20  conclusion.
21     THE WITNESS: If you go to Claim 3, it
22  spells out what are the salts that have been
23  claimed: Sodium, ammonia, potassium, calcium,
24  ethanolamine, diethanolamine, n-methylglucamine
25  and choline.

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 170

1  We're back on the record.
2       Please proceed, Counsel.
3       MR. SUKDUANG:  I apologize.
4  BY MR. SUKDUANG:
5       Q.  Dr. Fawzi, did you speak to your counsel
6  during the break?
7       A.  Nope.
8       Q.  Do you have the '901 patent in front of
9  you?
10      A.  Yes.
11      Q.  And it's Exhibit 4 for the record.  Can
12 you turn to the claims again?  It's at the back
13 of the document.
14      A.  Yes.
15      Q.  Let me know when you're there.
16      A.  I am there.
17      Q.  Looking at Claim 1, does Claim 1 require
18 the prostinil or the salt of treprostinil to
19 have a particular level of purity?
20      MR. BURROWBRIDGE:  Objection; form.
21      THE WITNESS: It's not specified.
22 BY MR. SUKDUANG:
23      Q.  For Claim 1, you'd agree with me that,
24 for Step A, the claim requires alkylation of
25 benzindene triol?

Page 171

1       A.  Yes.
2       Q.  Okay.  And that product is then hyd
3  -- hydrolyzed, correct, in Step B?
4       MR. BURROWBRIDGE:  Objection; form.
5       THE WITNESS:  Yes.
6  BY MR. SUKDUANG:
7       Q.  And that hydrolyzed product becomes a
8  solution of treprostinil, correct?
9       MR. BURROWBRIDGE:  Objection; form.
10      THE WITNESS:  Comprising treprostinil
11 -- treprostinil.
12 BY MR. SUKDUANG:
13      Q.  Yes.  The solution comprising
14 treprostinil, correct?
15      A.  Yes.
16      Q.  And is that treprostinil in a free acid
17 form?
18      A.  I assume it is in the free acid form
19 since the next step is to make a salt.
20      Q.  Does the word treprostinil itself tell
21 you whether the treprostinil is in a plus or
22 minus configuration?
23      A.  Treprostinil is an approved
24 pharmacological active plus configuration
25 compound.  That's my understanding from the

Page 172

1  literature.
2       Q.  I'm going to go on mute for one second,
3  okay, to clear my throat.
4       Apologize.
5       So, based on that answer, if I see the
6  word treprostinil, I understand it's in the plus
7  configuration?
8       MR. BURROWBRIDGE:  Objection; form.
9       THE WITNESS:  Yes.  That would be my
10 reading.
11 BY MR. SUKDUANG:
12      Q.  Do you -- have you heard of the phrase
13 UT-15?
14      A.  Yes.
15      Q.  And what is UT-15?
16      A.  It's treprostinil.
17      Q.  And is that treprostinil in the positive
18 configuration -- excuse me, the plus
19 configuration?
20      MR. BURROWBRIDGE:  Objection; form.
21      THE WITNESS:  I believe so.
22 BY MR. SUKDUANG:
23      Q.  Have you heard of the phrase UT-15C, C
24 as in Charlie?
25      A.  Yes.

Page 173

1       Q.  And what is UT -- UT-15C?
2       A.  It's my understanding it's the
3  treprostinil diethanolamine salt.
4       Q.  Okay.  And is UT-15C in the plus
5  configuration?
6       A.  Yes.  I assume so.
7       Q.  Do you know what an impurity profile is,
8  Dr. Fawzi?
9       MR. BURROWBRIDGE:  Objection; form.
10      THE WITNESS:  Sorry.  There is no
11 official definition of a impurity profile, but
12 it is the holistic term to use for all of the
13 impurities and solvates and hydrates that are all
14 included in the impurity profile.
15 BY MR. SUKDUANG:
16      Q.  So is it the totality of all the
17 impurities?
18      MR. BURROWBRIDGE:  Objection to form.
19      THE WITNESS:  That's my understanding.
20 BY MR. SUKDUANG:
21      Q.  Claim 1 -- I'm sorry.
22      Claim 1 of the '901 patent says, "it's a
23 pharmaceutical batch consisting of treprostinil
24 or a salt thereof and impurities resulting from,
25 A, alkylating a benzindene triol; B, hydrolyzing

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Page 178

1      MR. BURROWBRIDGE: Objection; form.
2      THE WITNESS: Not that I see.
3    BY MR. SUKDUANG:
4      Q. Can you go to Example 1 of the '901
5    patent, or the '066? Either one, they're both
6    the same, but I think you have the '901 in front
7    of you.
8      A. Yes. Which page?
9      Q. Example 1 starts at Column 10.
10     A. Column 10. Okay.
11     Q. Let me know when you're there.
12     A. Okay. I'm there.
13     Q. And Example 1 is, "alkylation of
14   benzindene triol," correct?
15     A. Yes.
16     Q. Does Example 1 provide the structure or
17   name of any impurity generated from this example?
18     MR. BURROWBRIDGE: Objection; form.
19     THE WITNESS: As a POSA, you expect your
20   impurities to come from your primary compound, or
21   the reaction of the primary compound with the
22   reagent and the condition you are treating. So
23   although it doesn't specifically list the
24   impurities, with the structures in front of you,
25   both of the reagents and the compound, you can

Page 179

1    propose some impurities in those -- in the
2    product of the alkylation step.
3    BY MR. SUKDUANG:
4      Q. Okay. When you said, "primary
5    compound," does the primary compound I'm reacting
6    benzindene triol in Example 1?
7      A. Yes.
8      Q. Okay. You said if I have the primary
9    compound and the reagents I can -- I could
10   propose impurities that could result from
11   alkylating the primary compound; is that right?
12   Did I understand you correctly?
13     A. Yes.
14     Q. If I can propose particular impurities
15   by alkylation of the primary compound, BTO, do I
16   know if those impurities are actually formed?
17     MR. BURROWBRIDGE: Objection; form.
18     THE WITNESS: To know for sure, you
19   have to identify it chemically, quantify it
20   analytically and qualify it biologically.
21   BY MR. SUKDUANG:
22     Q. Okay. But you believe by alkylating the
23   primary compound, BTO, a POSA would expect that
24   impurities resulting from the alkylation that BTO
25   should form?

Page 180

1      MR. BURROWBRIDGE: Objection; form.
2      THE WITNESS: Yes. You have a
3    epichlorohydrin, a reactive molecule, and a
4    relatively sensitive molecule of benzindene
5    triol, it could interact anywhere; the condition
6    of potassium carbonate and the other reagent
7    could interact. So the target molecule would be
8    benzindene triol to -- to see what impurity has
9    been generated from it.
10     BY MR. SUKDUANG:
11     Q. And then the -- the resulting product of
12   Example 1 is -- is benzindene nitrile, correct?
13     A. Yes.
14     Q. Does Example 1 provide me the purity of
15   the benzindene nitrile?
16     MR. BURROWBRIDGE: Objection; form.
17     THE WITNESS: Not that I see
18   specifically here.
19     BY MR. SUKDUANG:
20     Q. Okay. Do you see it generally?
21     MR. BURROWBRIDGE: Same objection.
22     THE WITNESS: As I described, the
23   structures, the reagent, the condition gives you
24   an idea of which direction the reaction is going
25   to go and which side reaction could happen, but

Page 181

1    they are not definitive. These are -- an
2    analytical chemist could guess what to look for.
3    BY MR. SUKDUANG:
4      Q. Okay. The benzindene nitrile made in
5    Example 1 is used in Example 2, correct?
6      MR. BURROWBRIDGE: Objection; form.
7      THE WITNESS: Yes.
8    BY MR. SUKDUANG:
9      Q. Do you see at the bottom Example 1,
10   Column 10 at Line 66 it says, "the crude
11   benzindene nitrile was used as such in the
12   next step without further purification"?
13     A. Yes. I see that.
14     Q. What does the word "crude" mean to a
15   POSA -- person of ordinary skill in the art?
16     A. Crude means has not been purified.
17     Q. Okay.
18     A. For example, in this instance, it could
19   be colors, it could be oils, could be gummy
20   materials. They're not crystalline forms.
21     Q. Now, moving over to Example 2, Column
22   11. Example 2 is hydrolysis of benzindene
23   nitrile.
24     A. Okay.
25     Q. And Example 2 is also in the '066

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL – UNDER PROTECTIVE ORDER

Page 182

1   patent, correct?
2       A.  I assume.  I haven't looked at it
3   critically yet.
4       Q.  If you need to, let me know.
5       A.  Okay.  Let me take a look at the
6   specifics.  It's easy to make assumptions rather
7   than be specific.
8       Yes, it is included.
9       Q.  Okay.  So Example 2, I take the
10  benzindene nitrile from Example 1 and I conduct
11  hydrolysis on that nitrile?
12      A.  Yes.
13      MR. BURROWBRIDGE:  Objection; form.
14  BY MR. SUKDUANG:
15      Q.  Is that yes, Dr. Fawzi?
16      A.  Yes.
17      Q.  Okay.  And when I conduct hydrolysis of
18  the benzindene nitrile, what product results?
19      MR. BURROWBRIDGE:  Objection; form.
20      THE WITNESS:  Treprostinil is the
21  product.
22  BY MR. SUKDUANG:
23      Q.  Okay.  And is that treprostinil in the
24  free acid form?
25      A.  Yes.

Page 183

1       MR. BURROWBRIDGE:  Objection; form.
2   BY MR. SUKDUANG:
3       Q.  Does Example 2 provide me the name or
4   structure of any impurity that is generated by
5   hydrolyzing the benzindene nitrile to form the
6   treprostinil free acid?
7       MR. BURROWBRIDGE:  Objection; form.
8       THE WITNESS:  Well, if you look at
9   the reagents that are being used and the fact
10  that the previous step of alkylation not being
11  purified, the inclusion of methanol and KOH could
12  give you reason to worry about the esterification
13  of that carboxyl group.
14  BY MR. SUKDUANG:
15      Q.  Okay.  My question is -- so -- so based
16  on your answer, a person of ordinary skill in the
17  art might be able to guess if impurities are
18  generated by hydrolyzing the benzindene nitrile,
19  correct?
20      MR. BURROWBRIDGE:  Objection, form.
21  Mischaracterizes his testimony.
22      THE WITNESS:  No, I didn't say
23  specifically that -- the hydrolysis step.  It
24  depends upon the solvent and the reagent and the
25  condition.  But I'm doing a cursory look at the

Page 184

1   reagent, and I look at the structure of the
2   treprostinil and I think there is a possibility
3   of this aliphatic carboxylic acid to be
4   esterified.
5   BY MR. SUKDUANG:
6       Q.  Does Example 2 actually provide the name
7   or structure of any specific impurity generated
8   by this reaction?
9       MR. BURROWBRIDGE:  Objection; form.
10      THE WITNESS:  Not that I see.
11  BY MR. SUKDUANG:
12      Q.  Does Example 2 provide me the purity of
13  the resulting treprostinil free acid?
14      MR. BURROWBRIDGE:  Form objection.
15      THE WITNESS:  It provides you with the
16  idea that it is crude and unpurified.
17  BY MR. SUKDUANG:
18      Q.  Did you say "crude and unpurified"?
19      A.  Yes.
20      Q.  Okay.  But does it tell me what the
21  actual purity of the treprostinil free acid is?
22      A.  You have to --
23      MR. BURROWBRIDGE:  Objection; form.
24      THE WITNESS:  Sorry.
25      You have to do the analytical test.

Page 185

1   BY MR. SUKDUANG:
2       Q.  And that analytical test is not reported
3   in this patent, Example 2, is it?
4       MR. BURROWBRIDGE:  Objection; form.
5       THE WITNESS:  It talks about TLC; that's
6   an analytical test.
7   BY MR. SUKDUANG:
8       Q.  But does it say, "based on TLC, here are
9   the impurities"?
10      MR. BURROWBRIDGE:  Objection; form.
11      THE WITNESS:  I'm trying to read before
12  and after the --
13  BY MR. SUKDUANG:
14      Q.  Sure.  Sure.  Take your time.
15      A.  Sorry.
16      You see, one step here that I'm
17  concerned about is the reflux.  That temperature
18  is 72 degrees.  And then it says, "the progress
19  of the reaction was monitored by TLC."
20      Q.  Mm-hmm.  Does it tell me -- does the TLC
21  monitoring in any of Example 2 tell me the purity
22  of the resulting treprostinil free acid?
23      A.  Qualitatively, yes.
24      Q.  Does it tell me quantitatively?
25      MR. BURROWBRIDGE:  Objection; form.

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 234

1      A.  Yes.
2          MR. BURROWBRIDGE:  Objection; form.
3   BY MR. SUKDUANG:
4      Q.  Is that a yes?
5      A.  Yes.
6      Q.  And then after benzindene nitrile,
7   there's a step (b), do you see that?
8      A.  Yes.
9      Q.  And step (b) says, "hydrolyzing the
10  product of formula VI of step (a) with a base,
11  correct?
12     A.  Yes.
13     Q.  Is that hydrolyzing the benzindene
14  nitrile with a base?
15         MR. BURROWBRIDGE:  Objection; form.
16         THE WITNESS:  Yes.
17  BY MR. SUKDUANG:
18     Q.  And then after step (b), there's a step
19  (c).  Do you see that?
20     A.  Yes.
21     Q.  Step (c) is "contacting the product of
22  step (h) -- which I think is supposed to be (b)
23  -- with a base B to form a salt of formula IV
24  subscript s."  Do you see that?
25     A.  Yes.

Page 235

1      Q.  Do you see that compound IV subscript s
2   under step (c)?
3      A.  Yes.
4      Q.  Is that a Tre -- is that -- does that
5   represent a pharmaceutically acceptable salt of
6   treprostinil?
7          MR. BURROWBRIDGE:  Objection; form.
8          THE WITNESS:  Theoretically.
9   BY MR. SUKDUANG:
10     Q.  Okay.  And then I forgot to ask, after
11  -- in step (b), when I hydrolyze the benzindene
12  nitrile, is the resulting product a treprostinil
13  free acid?
14         MR. BURROWBRIDGE:  Objection; form.
15         THE WITNESS:  Are you going backwards?
16  BY MR. SUKDUANG:
17     Q.  Yeah.  I forgot to ask you a question.
18  I'm going back to step (b).
19         When I hydrolyze the benzindene nitrile,
20  the compound of formula IV with a base, does that
21  form treprostinil free acid?
22         MR. BURROWBRIDGE:  Same objection.
23         THE WITNESS:  Why don't they refer to it
24  by the number?
25  BY MR. SUKDUANG:

Page 236

1      Q.  I'm just asking you a question from a
2   scientific perspective.  If I hydrolyze the
3   compound of formula IV with a base, does it form
4   treprostinil free acid?
5          MR. BURROWBRIDGE:  Objection; form.
6          THE WITNESS:  Formula IV is --
7   BY MR. SUKDUANG:
8      Q.  I'm sorry.  Formula VI.  I
9   keep saying formula IV.  That might be causing
10  you some confusion.  That's my fault.
11         If I -- in step (b), when I hydrolyze
12  the product of formula VI, do I get treprostinil
13  free acid?
14         MR. BURROWBRIDGE:  Same objection.
15         THE WITNESS:  I assume.
16  BY MR. SUKDUANG:
17     Q.  Okay.  Can you look at Claim 10?
18         Claim 10 says, "the purity of product of Claim 9
19  wherein the purity of product of step (d) is at
20  least 99.5 percent pure."  Do you see that?
21     A.  Yes.
22     Q.  And step (d) in Claim 9 is converting
23  the treprostinil salt back to treprostinil free
24  acid; is that correct?
25         MR. BURROWBRIDGE:  Objection; form.

Page 237

1          THE WITNESS:  Where are you exactly in
2   this?
3   BY MR. SUKDUANG:
4      Q.  In -- in Claim 9, step (d), D as in
5   David.
6      A.  Okay.
7      Q.  Claim 9, step (d), is taking the salt
8   -- treprostinil salt and reacting it to reform
9   the treprostinil free acid; is that correct?
10         MR. BURROWBRIDGE:  Same objection.
11         THE WITNESS:  Yes.
12  BY MR. SUKDUANG:
13     Q.  And so in Claim 10, that product, that
14  treprostinil free acid I make in step (d), is at
15  least 99.5 percent pure, correct?
16         MR. BURROWBRIDGE:  Same objection.
17         THE WITNESS:  That's what it says in
18  this line.
19  BY MR. SUKDUANG:
20     Q.  And so in Claim 10, the product, the
21  treprostinil free acid, will have -- can have
22  impurities, correct?
23         MR. BURROWBRIDGE:  Same objection.
24         THE WITNESS:  Can you repeat that,
25  please.

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 238

1    BY MR. SUKDUANG:
2        Q.   The product of step 10 -- excuse me, the
3    product in Claim 10 can have impurities, correct?
4            MR. BURROWBRIDGE:  Objection; form.
5            THE WITNESS:  Yes, potentially.
6    BY MR. SUKDUANG:
7        Q.   And those impurities in the product of
8    Claim 10 could result from the alkylation and the
9    hydrolysis that's performed to make that product,
10   correct?
11           MR. BURROWBRIDGE:  Objection; form.
12           THE WITNESS:  Yes.
13   BY MR. SUKDUANG:
14       Q.   Can you go to Claim 16 for me and read
15   Claim 16 to yourself?
16       A.   Mm-hmm.
17       Q.   Let me know when you're finished.
18       A.   Okay.
19       Q.   Okay.  So Claim 16 is a dependent Claim,
20   correct?
21       A.   That's what I understand.
22       Q.   And it depends from Claim 9, correct?
23       A.   Yes.
24       Q.   And it refers -- it says, "the product
25   of Claim 9 wherein the process does not include

Page 239

1    purifying the compound of formula VI produced in
2    step (a).  Do you see that?
3        A.   Yeah.  I need to picture exactly where
4    I'm -- where you're talking about here.
5        Q.   So let me -- so it says, "the process
6    does not include purifying the compound of
7    formula VI produced in step (a)."
8        A.   And formula VI is what compound?  Is it
9    acetonitrile?
10       Q.   It's ben -- it's benzindene nitrile.
11   It's benzindene nitrile, correct, if you look up?
12       A.   Mm-hmm.
13           MR. BURROWBRIDGE:  Objection; form.
14   BY MR. SUKDUANG:
15       Q.   And compound VI is benzindene nitrile,
16   correct?
17       A.   Yes.
18           MR. BURROWBRIDGE:  Same objection.
19   BY MR. SUKDUANG:
20       Q.   And -- and Claim 16 says, after I make
21   the benzindene nitrile, I do not purify it,
22   correct?
23           MR. BURROWBRIDGE:  Objection; form.
24           THE WITNESS:  And that's Claim 16.
25           MR. BURROWBRIDGE:  Correct.

Page 240

1            THE WITNESS:  Produced in step (a).
2            Yes.
3    BY MR. SUKDUANG:
4        Q.   Okay.  So the benzindene nitrile from
5    step (a), when I'm looking at Claim 16, will --
6    will include impurities, because I have not
7    purified it, correct?
8            MR. BURROWBRIDGE:  Objection; form.
9            THE WITNESS:  Yes.
10   BY MR. SUKDUANG:
11       Q.   And when I perform the salt step of step
12   (c) in Claim 9 on the compound VI from Claim 16,
13   the salt pure -- the salt will purify that
14   compound, correct, the salt formation step?
15           MR. BURROWBRIDGE:  Objection; form.
16           THE WITNESS:  It's first to be
17   hydrolyzed, hydrolyzing the product of formula
18   VI.
19   BY MR. SUKDUANG:
20       Q.   Yes.  If I have -- if I have the
21   benzindene nitrile that hasn't been purified, and
22   then I hydrolyze it, correct?
23       A.   Yeah.  That would -- item (b) says --
24           MR. BURROWBRIDGE:  Objection; form.
25   BY MR. SUKDUANG:

Page 241

1        Q.   And those impurities will still be
2    present from the alkylation of the hydrolysis,
3    correct, because I haven't purified in -- in
4    Claim 16?
5            MR. BURROWBRIDGE:  Objection; form.
6            THE WITNESS:  This is somewhat
7    confusing.
8    BY MR. SUKDUANG:
9        Q.   Am I correct?
10           MR. BURROWBRIDGE:  Same objection.
11           THE WITNESS:  I need to think about it.
12           You're going between claims and between
13   steps.
14   BY MR. SUKDUANG:
15       Q.   And that's the point of a dependent
16   claim, correct?
17           MR. BURROWBRIDGE:  Objection; form.
18           THE WITNESS:  I don't know exactly.
19   BY MR. SUKDUANG:
20       Q.   But you do understand that benzindene
21   nitrile in Claim 16 produced in step (a) is not
22   purified?  That's what Claim 16 says, correct?
23           MR. BURROWBRIDGE:  Objection; form.
24           THE WITNESS:  "Product of Claim 9,
25   wherein the process does not include purifying

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 242

1    the compound formula produced in step (a)."
2         Can you go to Example 6 and show me
3    where exactly these claims are?
4    BY MR. SUKDUANG:
5         Q.  It's not Example 6.  It's formula VI.
6         A.  Oh.
7         Q.  Right?  It says formula VI, correct?
8         A.  No.  What I wanted to know exactly which
9    step is being --
10        Q.  Oh, okay.  What step in Example 6 is
11   this referring to?
12        A.  Yeah.
13        Q.  Okay.  I apologize.
14        Go to Example 6, which is in Column 15.
15        A.  Okay.
16        Q.  Let me know when you're there.
17        A.  Yeah.  I am there.
18        Q.  Okay.  Steps 1 through 14 -- steps 1
19   through 14 form benzindene nitrile, correct?
20        A.  Yes, that's what it says.
21        MR. BURROWBRIDGE:  Objection; form.
22   BY MR. SUKDUANG:
23        Q.  And step 12 says "purification,"
24   correct?
25        A.  Yes.

Page 243

1         Q.  And it says, for the working example
2    -- working invention, "no column," correct?
3         MR. BURROWBRIDGE:  Objection; form.
4         THE WITNESS:  Yes.
5    BY MR. SUKDUANG:
6         Q.  And so Claim 16 addresses not purifying
7    the benzindene nitrile, correct?
8         MR. BURROWBRIDGE:  Same objection.
9         THE WITNESS:  That's the way it's
10   written.
11   BY MR. SUKDUANG:
12        Q.  And that's what's reflected in step 12
13   of Example 6, working example, correct?
14        A.  Yes.
15        MR. BURROWBRIDGE:  Objection; form.
16   BY MR. SUKDUANG:
17        Q.  Is that a yes?
18        A.  Yes.
19        Q.  Can you look at Column 19 again, please,
20   the claims of the '393, --
21        A.  See, what bothers me about this column
22   is the structure that is given that has multiple
23   potential.  Now, what you're reading is --
24        Q.  Dr. Fawzi, I haven't asked a question.
25   I just asked you to turn to Column 19.  Are you

Page 244

1    at Column 19?
2         A.  Yeah.  But I'm telling you what bothers
3    me on that.
4         Q.  I -- it doesn't -- I'm not concerned at
5    this point as to what bothers you.  You can tell
6    me that when I ask you the question, okay?
7         A.  Okay.
8         MR. BURROWBRIDGE:  Dr. Fawzi, are you
9    answering the previous question?
10        MR. SUKDUANG:  No.  Don't -- don't put
11   words in his mouth, Mr. Burrowbridge, and that
12   was certainly coaching.
13   BY MR. SUKDUANG:
14        Q.  Can you look at Claim 2?  Can you look
15   at Claim 2 for me --
16        A.  Do you really think I'm coachable?  I
17   mean.
18        Q.  You know what, Dr. Fawzi, you're giving
19   me fantastic answers, and I appreciate that.  And
20   I appreciate -- I know it's late in the day.
21        MR. BURROWBRIDGE:  And, Counsel,
22   I just want to make sure he has an opportunity,
23   obviously, to give his full and complete answer.
24   So there was just a little mixup there and I
25   understand, so --

Page 245

1         MR. SUKDUANG:  I'm sure --
2         MR. BURROWBRIDGE:  Let's get back on
3    track.
4         MR. SUKDUANG:  As Dr. Fawzi says, he's
5    more than capable of proceeding through this.
6    BY MR. SUKDUANG:
7         Q.  Dr. Fawzi, can you look at Claim 2 for
8    me in Column 19?
9         A.  Okay.
10        Q.  Let me know when you're there.
11        Are you there?
12        A.  Yes, I am.
13        Q.  Claim 2 says, "The product of Claim 1
14   wherein the purity of compound of formula I in
15   said product is at least 99.5 percent."  Do you
16   see that?
17        A.  Yes.
18        Q.  So do you agree that the product of
19   Claim 1 --
20        A.  The problem with that, that's where I
21   was --
22        MR. BURROWBRIDGE:  Is that the question?
23   BY MR. SUKDUANG:
24        Q.  I haven't finished my question,
25   Dr. Fawzi.  I apologize.

62 (Pages 242 - 245)

HIGHLY CONFIDENTIAL – UNDER PROTECTIVE ORDER

Page 246

1    A.   Okay.
2    Q.   Do you agree that the product of Claim 1
3  can include impurities?
4         MR. BURROWBRIDGE:  Objection; form.
5         THE WITNESS:  Claim 1 is so broad, and I
6  don't know which compound they are making.
7  BY MR. SUKDUANG:
8    Q.   You don't know if Claim 1 makes
9  treprostinil?
10    A.   Of this packet?
11    Q.   Yeah.
12    A.   No, I don't know.  The structure drawn,
13  it could be several compounds.
14    Q.   Okay.  Let me ask you this very specific
15  question:  Looking at Claim 1 of the '393 patent,
16  do you know whether Claim 1 includes making
17  treprostinil?
18         MR. BURROWBRIDGE:  Objection; form.
19         THE WITNESS:  Out of thousands of
20  compounds.
21  BY MR. SUKDUANG:
22    Q.   So let me rephrase it.
23         You agree that Claim 1 of the '393
24  patent makes treprostinil out of thousands of
25  compounds?

Page 247

1         MR. BURROWBRIDGE:  Same objection.
2         THE WITNESS:  Possibly.
3  BY MR. SUKDUANG:
4    Q.   Not possibly.  Certainly, correct?
5  Treprostinil is one of the compounds out of the
6  thousands of compounds in Claim 1, correct?
7         MR. BURROWBRIDGE:  Objection; form.
8         THE WITNESS:  It doesn't spell it out
9  specifically.
10  BY MR. SUKDUANG:
11    Q.   Are you disagreeing with me that
12  treprostinil is one of the compounds out of the
13  universe of compounds in Claim 1?
14    A.   Can you please point me to a specific
15  line --
16         MR. BURROWBRIDGE:  Objection; form.
17         THE WITNESS:  -- that clearly spells out
18  treprostinil being one of these compounds.
19  BY MR. SUKDUANG:
20    Q.   Like I said, Dr. Fawzi, I'm not the
21  chemist, but I'm almost certain that when you
22  look at the substituents you form treprostinil.
23    A.   Yeah.  But why -- why wouldn't they --
24         MR. BURROWBRIDGE:  Dr. Fawzi, let-- Dr.
25  Fawzi, let -- let him ask the question.

Page 248

1         MR. SUKDUANG:  I did.
2         MR. BURROWBRIDGE:  There was no question
3  pending.
4         MR. SUKDUANG:  I did.
5         MR. BURROWBRIDGE:  There was no question
6  pending.
7  BY MR. SUKDUANG:
8    Q.   You're asking me why didn't they spell
9  it out.  My question to you is not why they
10  didn't spell it out, Dr. Fawzi.  My question is
11  very specific:  Are you able to give an opinion
12  as to whether the product of Claim 1 of the '393
13  patent includes treprostinil?
14         MR. BURROWBRIDGE:  Objection; form.
15         THE WITNESS:  I need to look at all of
16  these substituents to see which one exactly is
17  treprostinil.  You have chirality problems.  You
18  have two new substituent, LI and M4, you have a Y
19  you have an R.  Which one is it?
20  BY MR. SUKDUANG:
21    Q.   So do you not know?  Sitting here today
22  you cannot tell me whether Claim 1 of the '393
23  patent includes treprostinil?
24         MR. BURROWBRIDGE:  Objection to form.
25         THE WITNESS:  Unless I -- sorry.

Page 249

1  BY MR. SUKDUANG:
2    Q.   Go ahead, Doctor.  Go ahead, Dr. Fawzi.
3    A.   Tell me where the line says
4  treprostinil is included in this package of
5  thousands of compounds.
6    Q.   Tell me where the line that it is
7  excluded.  I'm asking you a question.  Tell me
8  where Claim 1 of the '393 patent excludes
9  treprostinil.
10         MR. BURROWBRIDGE:  Objection; form.
11         THE WITNESS:  It certainly doesn't
12  mention it by name.
13  BY MR. SUKDUANG:
14    Q.   Does it mention it -- does it provide
15  you the -- the structure that you can make
16  treprostinil?
17         MR. BURROWBRIDGE:  Same objections.
18         THE WITNESS:  I am not such a good
19  chemist to tell you which -- how to make it from
20  these substituents and chiral --
21  BY MR. SUKDUANG:
22    Q.   So today -- sitting here today, you
23  can't tell me whether Claim 1 -- the product of
24  Claim 1 includes treprostinil.
25         MR. BURROWBRIDGE:  Same objection.

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 250

1    THE WITNESS:  I can't point it out to
2    you.  I cannot point it out to you.
3    BY MR. SUKDUANG:
4        Q.  Okay.  We'll move on.
5            Can you go to your expert report?
6        A.  Sure.
7        Q.  Can you go to Page 33?
8        A.  I'm there.
9        Q.  In Paragraphs 103, 104 and 105, you
10   provide some calculations of impurities, correct?
11       A.  These are average impurities that I took
12   out of the Williams document, and it's impurities
13   both for the existing process and the new
14   process.
15       Q.  Okay.  Where did you get the data that
16   you analyzed?
17       A.  I just told you, from the Williams
18   document.
19       Q.  Is that the -- Dr. Williams'
20   declaration he submitted in the '393 IPR?
21       A.  I believe so.
22       Q.  Okay.  And so you took Dr. -- and you
23   understand that the Patent Office considered that
24   data during the '393 IPR?
25       A.  They didn't consider my analysis of it.

Page 251

1        Q.  Let me ask my question and then -- and
2    then I'm going to ask you a follow-up.
3            They -- they analyzed -- the Patent
4    Office analyzed this data you looked at from
5    Dr. Williams, correct?
6        A.  Yes.
7        Q.  And based on the analysis of the data
8    Dr. Williams provided, they still invalidated the
9    '393 patent, correct?
10       MR. BURROWBRIDGE:  Objection; form.
11           THE WITNESS:  I think you need to hear
12   my perspective on the data.
13   BY MR. SUKDUANG:
14       Q.  I'm going to ask you for your
15   perspective the very next question.  So answer my
16   question first.
17       MR. BURROWBRIDGE:  Counsel, let him
18   finish his answer, please.
19       MR. SUKDUANG:  Well, I'll let him finish
20   when he answers mine.
21       MR. BURROWBRIDGE:  Counsel, just
22   don't interrupt him is all.  You can ask your
23   questions.  Just please don't interrupt the
24   witness.
25   BY MR. SUKDUANG:

Page 252

1        Q.  Dr. Fawzi, the Patent Office considered
2    the data presented by Dr. Williams and still
3    invalidated the '393 patent, correct?
4        MR. BURROWBRIDGE:  Objection; form.
5            THE WITNESS:  But that doesn't mean
6    they had the benefit of the whole package of
7    information here which I am presenting with
8    statistical analysis to rule out any overlap
9    between the averages from Chicago and averages
10   from Silver Spring.
11   BY MR. SUKDUANG:
12       Q.  So you're taking the data that
13   Dr. Williams submitted, and was considered by the
14   Patent Office, and conducting a different
15   analysis on it, correct?
16       A.  What I did was to take the data and
17   apply averaging based on using the full list of
18   the impurities and eliminating the term
19   "undetectable" and replacing it with "zero,"
20   because that's the more mathematically accurate
21   way, and taking the data that says "less
22   than .05" and replacing it with ".05," because
23   that's the maximum threshold of that, less
24   than .05.  And then I took the averages of those
25   data and did an unpaired T-test on them to see

Page 253

1    are they overlapping, are they from the same set
2    of data, so to characterize those two processes.
3    And my analysis indicated, at 99.99 percent
4    probability, they are not overlapping.  They are
5    not simple random variation in batches.
6        Q.  Great.  So you re -- you -- you redid
7    the analysis that Dr. Williams did?
8        MR. BURROWBRIDGE:  Objection; form.
9            THE WITNESS:  I did my own analysis.
10   BY MR. SUKDUANG:
11       Q.  On the same data that Dr. Williams
12   presented to the Patent Office?
13       A.  Yes.
14       MR. BURROWBRIDGE:  Objection; form and
15   mischaracterizes the testimony.
16   BY MR. SUKDUANG:
17       Q.  Was that a yes?
18       MR. BURROWBRIDGE:  Same objection.
19           THE WITNESS:  They are not Dr. Williams'
20   data.  They are my data now.
21   BY MR. SUKDUANG:
22       Q.  You and Dr. Williams looked at the same
23   -- same underlying data and -- and did analysis
24   on the same underlying -- different analyses on
25   the same underlying data?

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 254

1      A.  Exactly.  Yes.
2          MR. BURROWBRIDGE:  Objection; form.
3   Mischaracterizes the testimony.
4   BY MR. SUKDUANG:
5      Q.  Did you say that's exactly what you did?
6      A.  That's what I analyzed the data with
7   point of view of looking at overlap and not
8   necessarily are they variation or no variation.
9      Q.  Just so the record is clear, you and
10  Dr. Williams looked at the same underlying data,
11  correct?
12     A.  I --
13         MR. BURROWBRIDGE:  Please let me object.
14  So, Dr. Fawzi, I'm going to object for form and
15  to the extent it mischaracterizes the testimony
16  and the work that he has done.
17         THE WITNESS:  Can you ask another
18  question, please?
19  BY MR. SUKDUANG:
20     Q.  Yeah.  I'll move on.  I think I have the
21  answer I need.
22         Dr. Fawzi, you did a -- did you do a
23  paired or an unpaired T-test?
24     A.  Unpaired T-test.
25     Q.  Why did you do an unpaired T-test.

Page 255

1      A.  That is what the normal statistical
2   value is done in the clinical and other
3   pharmaceutical studies, to look for significance.
4      Q.  Do you believe doing the paired T-test
5   would be incorrect for your analysis?
6          MR. BURROWBRIDGE:  Objection; form.
7          THE WITNESS:  I don't really know.
8   BY MR. SUKDUANG:
9      Q.  Why don't you know?
10     A.  I did not do that test.
11     Q.  So you don't know whether a P -- a
12  paired T-test would also be proper.  You don't
13  -- you don't have an opinion on that?
14         MR. BURROWBRIDGE:  Objection; form.
15         THE WITNESS:  Yes.  I haven't done it.
16  I don't have an opinion on it.
17  BY MR. SUKDUANG:
18     Q.  Okay.  Did you do these calculations
19  yourself?
20     A.  Yes.
21         MR. BURROWBRIDGE:  Objection; form.
22  BY MR. SUKDUANG:
23     Q.  Okay.  How did you average the
24  impurities in the table on Paragraph 104?
25         MR. BURROWBRIDGE:  Objection; form?

Page 256

1          THE WITNESS:  Generated the average
2   impurities from the certificate of analysis and
3   used Dr. Williams' for the majority of them.
4   BY MR. SUKDUANG:
5      Q.  You used Dr. Williams' data for the
6   majority of the certificates of analysis?
7      A.  Yes.
8          MR. BURROWBRIDGE:  Objection; form.
9          Dr. Fawzi, please just give me an
10  opportunity to object.  Thank you.
11         THE WITNESS:  Sorry.  Go ahead.
12  BY MR. SUKDUANG:
13     Q.  Why did you pick the unpaired T-test
14  over other statistical analyses?
15     A.  The unpaired T-test is more reliable to
16  show overlap.
17     Q.  When you -- when you -- you indicated
18  that you took "not detected" and made it "zero,"
19  correct?
20         MR. BURROWBRIDGE:  Objection; form.
21         THE WITNESS:  Yes.
22  BY MR. SUKDUANG:
23     Q.  Why didn't you make it .01?
24         MR. BURROWBRIDGE:  Same objection.
25         THE WITNESS:  It's not detected;

Page 257

1   therefore, it is not something that I can assign
2   a value to other than zero.
3   BY MR. SUKDUANG:
4      Q.  Did you consider the standard of error
5   in these HPLC assays when you conducted this
6   average?
7          MR. BURROWBRIDGE:  Objection; form.
8          THE WITNESS:  The standard of error is
9   the same for all of them since they use the same
10  HPLC method.
11  BY MR. SUKDUANG:
12     Q.  What is the standard of error in this
13  HPLC method?
14     A.  It's the same that --
15         MR. BURROWBRIDGE:  Objection; form.
16         THE WITNESS:  It's the same that has
17  been used every day.
18  BY MR. SUKDUANG:
19     Q.  Well, what is it?  Is it 1 percent, is
20  it .5 percent, is it .05 percent?  Do you know?
21         MR. BURROWBRIDGE:  Objection; form.
22         THE WITNESS:  We use the same data from
23  the same analytical method, and I did not take
24  into any more specifics on the analytical method.
25  I used it as it is being used in the certificate

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 258

1    of analysis --
2        MR. SUKDUANG:  Okay.  Okay.
3        THE WITNESS:  -- and the method that is
4    approved by the FDA.
5    BY MR. SUKDUANG:
6        Q.  Okay.  And -- and you also mentioned you
7    took another value and made it .05?  I'm trying
8    to --
9        A.  Yeah.  Levels of impurities which were
10   assigned to be less than .05, I gave them the
11   number .05 because that's the maximum that you
12   can go to with a less than .05.
13       Q.  So if it was .04, you rounded it up
14   to .05?
15       A.  Yes.
16       Q.  If it was .01, you rounded it up to .05?
17       A.  Anything less than .05 I treated to .05.
18       Q.  And explain to me why you did that
19   again?  Why did you make it .05?
20       A.  Because these are assigned impurities
21   that have a value which is not of significance in
22   the FDA's eyes.
23       Q.  So you applied an FDA criteria to round
24   it up to .05?
25       MR. BURROWBRIDGE:  Objection.

Page 259

1        THE WITNESS:  I used what everyday
2    analytical chemists use in their analysis of
3    certificate of analysis.
4    BY MR. SUKDUANG:
5        Q.  And an everyday chemist in their review
6    of the certificate of analysis applies the FDA's
7    standard?
8        MR. BURROWBRIDGE:  Objection; form.
9        THE WITNESS:  If they are releasing a
10   product to the market, yes.
11   BY MR. SUKDUANG:
12       Q.  Okay.
13       Can you go to Paragraph 112, please, of
14   your expert report?
15       A.  Yes, I'm at it.
16       Q.  And -- and Paragraph 112 talks about
17   impurities that can be sources of toxicity,
18   correct?
19       A.  Yes.
20       Q.  Have you seen any document from UTC,
21   submitted to the FDA, indicating that any of the
22   impurities that you have identified are toxic?
23       MR. BURROWBRIDGE:  Objection to form.
24       THE WITNESS:  Since you know, the
25   compound being pharmacologically very active and,

Page 260

1    potentially, therapeutic at very, very low doses,
2    you need to be extremely careful of not just
3    considering known and unknown impurities, but
4    also detected and undetected impurities,
5    especially on things that are potentially toxic.
6        This molecule and all of its derivative
7    have pharmacological activity, well-established
8    in the last four decades that prostacyclins and
9    prostaglandin derivative are pharmacologically
10   extremely active at very low doses.
11   BY MR. SUKDUANG:
12       Q.  Thank you -- thank you for that
13   explanation.  Let me ask you this question:  Have
14   you ever seen any document from UTC telling the
15   FDA that the impurities you've identified in
16   Paragraph 104 are toxic?  My question is spe
17   -- my question is not general.  My question is
18   specific to UTC, the FDA and these impurities?
19       MR. BURROWBRIDGE:  Objection; form.
20       THE WITNESS:  UTC has been very clear
21   with the FDA on all of the impurities and all of
22   the percentages, and they have received approval
23   for these products.
24   BY MR. SUKDUANG:
25       Q.  Have you seen any document submitted to

Page 261

1    the FDA by UTC that the process -- the Silver
2    Spring process is less -- creates a product that
3    is less toxic than the Chicago process?
4        MR. BURROWBRIDGE:  Objection; form.
5        THE WITNESS:  I did not opine on the
6    impurities -- the specific impurities and the
7    specific pharmacological activity.  I don't have
8    those data.
9        MR. SUKDUANG:  Okay.
10       THE WITNESS:  What I'm aware of and
11   lived through, minor impurities could create
12   havoc in the system.  I don't know if you have
13   heard a lot about Zantac and Valsartan and other
14   compounds that have found in them nitrosamine
15   impurities that have potential carcinogenic
16   activity, product that FDA has recalled from
17   the market from all commercial use trying to
18   eliminate those nanogram-level impurities which
19   were not detected before in Zantac and in
20   Valsartan and metformin, actually, too.
21       All of those give me worriness that I
22   need to be 100 percent certain of any unknown or
23   unidentified impurities that could crop up in the
24   product, because, as I said before, the source of
25   all of the impurities are structurally related to

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Page 262

1  this compound.
2  BY MR. SUKDUANG:
3      Q.  Well, thank goodness we're not working
4  on Zantac or Valsartan in this case.  Thank
5  goodness.
6      A.  There are other things.
7      Q.  Let me ask you about -- and thank
8  goodness we're not living through the terrible
9  things you've had to go through in your career.
10      I want to talk about treprostinil.  I
11  want to talk about treprostinil, and my question
12  is very specific:  Have you seen a document from
13  UTC saying that the product made from the Silver
14  Spring process is less toxic than the product
15  made from the Chicago process?
16      MR. BURROWBRIDGE:  Objection; form.
17  Asked and answered.
18      THE WITNESS:  No specific report
19  I have seen that states the differences in
20  pharmacological or toxicological activities of
21  those two -- of those impurities from the two
22  sides.
23  BY MR. SUKDUANG:
24      Q.  Have you seen any document UTC submitted
25  to the FDA indicating that the product made by

Page 263

1  the Silver Spring process is more efficacious
2  than the product made by the Chicago process?
3      MR. BURROWBRIDGE:  Objection; form.
4      THE WITNESS:  No, I have not seen
5  anything like that.
6      What I have seen is the averages and the
7  statistical difference between the two processes.
8  BY MR. SUKDUANG:
9      Q.  Have you seen any document that UTC
10  submitted to the FDA indicating that the product
11  made by the Silver Spring process is safer than
12  the product made by the Chicago process?
13      MR. BURROWBRIDGE:  Objection; form.
14      THE WITNESS:  Since the product made in
15  Chicago has been stopped and the product right
16  now is the Silver Springs process, I cannot have
17  any direct comparison in efficacy or in toxicity.
18  BY MR. SUKDUANG:
19      Q.  Have you seen any document submitted by
20  UTC telling the FDA that the impurity profile
21  from the Silver Spring process is different than
22  the impurity profile of the product made by the
23  Chicago process?
24      MR. BURROWBRIDGE:  Objection; form.
25      THE WITNESS:  All I know, all the

Page 264

1  impurities were lower, except for the ethyl
2  ester, which was higher in averages.  And to
3  me that's significant.  That's -- ethyl versus
4  methyl esters are the last two solvents in one
5  process versus another.
6  BY MR. SUKDUANG:
7      Q.  Did you see any document submitted by
8  UTC to the FDA telling the FDA that the Silver
9  -- the product made by the Silver Spring process
10  is different from the product made by the Chicago
11  process?
12      A.  No.
13      MR. BURROWBRIDGE:  Objection; form.
14      THE WITNESS:  I'm sorry.
15      And they would not -- they have met all
16  the specification for all the impurities, and
17  they just show that they have less of those
18  impurities in the Silver Spring process than the
19  Chicago process, except for ethyl ester, which
20  has higher average than the methyl ester.
21  BY MR. SUKDUANG:
22      Q.  Can you look at the impurities in your
23  table on Paragraph 104?
24      A.  Okay.
25      Q.  Are any of the impurities -- let me know

Page 265

1  when you're there.
2      A.  Okay.  I'm there.
3      Q.  Are any of the impurities you identified
4  there extremely toxic at a low level of exposure?
5      MR. BURROWBRIDGE:  Objection; form.
6      THE WITNESS:  I have not done
7  pharmacology or toxicology on these compounds
8  and these impurities, but there are tons of
9  information out there for the last 40 years
10  starting with Upjohn and then we Wellcome and
11  then GlaxoSmithKline that indicates all of those
12  structural analogs have pharmacological activity.
13  BY MR. SUKDUANG:
14      Q.  Okay.  My question was, did any of
15  the impurities that you list in your tables on
16  Paragraph 104, do you have any information that
17  those -- any of those impurities are extremely
18  toxic at very low levels of exposure?
19      A.  No, I do not.
20      MR. BURROWBRIDGE:  Objection; form.
21      THE WITNESS:  No, I do not know that.
22  BY MR. SUKDUANG:
23      Q.  What level of any of these impurities
24  would make the impurity toxic?
25      MR. BURROWBRIDGE:  Objection; form.

67 (Pages 262 - 265)

# EXHIBIT 35





Deposition of:

# David Walsh, Ph.D.

*September 14, 2021*

In the Matter of:

# United Therapeutics Corporation vs Liquidia Technologies Inc

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

HIGHLY CONFIDENTIAL

```
                                             Page 1

 1            IN THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF DELAWARE

 2

 3     - - - - - - - - - - - - x

          UNITED THERAPEUTICS      :

 4        CORPORATION,             :

                                    :

 5          Plaintiff,             :

                                    :

 6        v.                       :  Case No.

                                    :  1:20-cv-755

 7        LIQUIDIA                  :

          TECHNOLOGIES, INC.,      :

 8                                  :

            Defendant.             :

 9     - - - - - - - - - - - - x

10

11                        - - -

12            Tuesday, September 14, 2021

13                        - - -

14

15              Highly Confidential

16           Under the Protective Order

17

18

19     REMOTE ZOOM deposition of DAVID ALLAN

20     WALSH, Ph.D., beginning at 10:12 a.m. EST, before

21     Christina S. Hotsko, RPR, CRR, when were present

22     on behalf of the respective parties:
```



Page 2

A P P E A R A N C E S  (Via Zoom)

On behalf of Petitioner:
ART DYKHUIS, ESQUIRE
KATHERINE PAPPAS, ESQUIRE
McDermott Will Emery, LLP
18565 Jamboree Road, Suite 250
Irvine, California 92612-2565
(949) 989-8292
adykhuis@mwe.com
kpappas@mwe.com

On behalf of Defendant:
LAUREN KRICKL, ESQUIRE
Cooley, LLP
3175 Hanover Street
Palo Alto, California 94304-1130
(650) 843-5065
lkrickl@cooley.com

ERIK MILCH, ESQURE
Cooley, LLP
Reston Town Center
11951 Freedom Drive, 14th Floor
Reston, Virginia 20190-5640
(703) 456-8573
emilch@cooley.com

Also Present:
Scott Forman, CLVS, Video Technician

Page 3

C O N T E N T S

EXAMINATION BY:                          PAGE
   Counsel for Defendant                 05

WALSH DEPOSITION EXHIBITS: *             PAGE
   Exhibit 1    Walsh CV                          16
   Exhibit 2    U.S. 9,593,006 Patent, Batra et al.   20
   Exhibit 3    U.S. 9,604,901 Patent, Batra et al.   23
   Exhibit 4    U.S. 8,497,393 Patent, Batra et al.   26
   Exhibit 5    U.S. 9,604,901 Patent Certificate    117
                of Correction

   Exhibit 6    Remodulin Product Information         122

   Exhibit 7    ▮▮▮▮▮▮▮▮                              129

   Exhibit 8    ▮▮▮▮▮▮▮▮▮▮▮
                ▮▮▮▮▮▮▮▮▮
                        161
   Exhibit 9    ▮▮▮▮▮▮▮▮
   Exhibit 10   ▮▮▮▮▮▮▮▮

   Exhibit 11   ▮▮▮▮▮▮▮▮
                ▮▮▮▮▮▮

         * (Exhibits attached to transcript.)

Page 4

P R O C E E D I N G S

VIDEO TECHNICIAN:  Good morning.  We're
going on the record at 10:12 a.m. on
September 14th, 2021.

This is media unit 1 of the          10:12:21
video-recorded deposition of David Walsh, Ph.D.,
in the matter of United Therapeutics Corporation
versus Liquidia Technologies, Inc., filed in the
United States District Court for the District of
Delaware, case number 1:20-cv-755.          10:12:36

This deposition is being held at the
residence of Dr. Walsh.

My name is Scott Forman from the firm
Veritext, and I am the videographer.  The court
reporter is Christina Hotsko from the firm          10:12:51
Veritext.

I am not related to any party in this
action, nor am I financially interested in the
outcome.

Counsel will now state their appearances          10:12:57
and affiliations for the record.

MS. KRICKL:  Lauren Krickl of Cooley,

Page 5

LLP, on behalf of Liquidia Technologies, Inc.  And
with me is Erik Milch, also of Cooley.

MR. DYKHUIS:  And I am Art Dykhuis with
McDermott, Will & Emery on behalf of the witness
and plaintiff United Therapeutics Corporation.          10:13:20
And with me I have Kathy Pappas, also with
McDermott.

VIDEO TECHNICIAN:  Thank you very much.
Will the court reporter please swear in the
witness.

Whereupon,

DAVID ALLAN WALSH, Ph.D.,
being first duly sworn or affirmed to testify to
the truth, the whole truth, and nothing but the
truth, was examined and testified as follows:          10:13:57

VIDEO TECHNICIAN:  Thank you very much.
You may proceed.  Thank you.

EXAMINATION BY COUNSEL FOR DEFENDANT
BY MS. KRICKL:

Q.  Good morning, Dr. Walsh.          10:13:58
A.  Good morning.
Q.  Please state your full name for the

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL



Page 166

1 ███████████████████████

███████████████████████████

███████

5 BY MS. KRICKL:                                   14:46:08

6     Q. Got it.

7         Did the new process increase annual

8 capacity at the Chicago site?

9         MR. DYKHUIS: Objection. Form,

10 foundation, and vague.                          14:46:15

11       THE WITNESS: No.

12 BY MS. KRICKL:

13    Q. Did the new process enable UTC to install

14 and validate the process at Silver Spring?

15    A. Yes.                                       14:46:30

16        MR. DYKHUIS: Objection. Form,

17 foundation, and vague.

18 BY MS. KRICKL:

19    Q. Sorry, can you repeat your answer to

20 that? Was it yes?                               14:46:43

21    A. Yes.

22    Q. Yes? Okay.

Page 167

1     If I took the new process and added

2 column chromatography, would that increase costs?

3         MR. DYKHUIS: Objection. Form, vague,

4 seeking expert testimony, and incomplete

5 hypothetical.                                    14:47:03

6     THE WITNESS: Yes.

7 BY MS. KRICKL:

8     Q. Why would it increase costs?

9         MR. DYKHUIS: Same objections.

10    THE WITNESS: I think I answered that     14:47:14

11 question before. It was -- you needed extra new

12 equipment to run the process, and you needed a lot

13 of solvent. It's cost on both ends, buying the

14 solvent to use and then getting rid of it.

15 BY MS. KRICKL:                                  14:47:39

16    Q. If I took the new process and added

17 column chromatography, would that impact the

18 safety profile of any of the reaction steps?

19        MR. DYKHUIS: Objection to form and

20 vague. Seeking expert testimony. Incomplete      14:47:51

21 hypothetical.

22    THE WITNESS: There are safety concerns

Page 168

1 with every step you do in the lab. So if you add

2 a new one, that would increase safety concerns.

3 BY MS. KRICKL:

4     Q. Would costs be increased if I took the

5 new process and introduced the step of isolating     14:48:14

6 treprostinil free acid?

7     A. Yes.

8     Q. Why?

9     A. Anytime you add a step, it increases

10 costs. It takes longer in production and it takes     14:48:31

11 the cost of the chemicals and the salaries of the

12 employees to do that.

13    Q. Would that also impact the safety of the

14 reaction steps?

15        MR. DYKHUIS: Objection as to form.         14:48:41

16 Vague. Expert testimony. Incomplete

17 hypothetical.

18    THE WITNESS: Yes. I already answered

19 that. Anytime you increase [sic] a step, it would

20 increase safety concerns.                           14:48:51

21 BY MS. KRICKL:

22    Q. Can you please flip to the page -- page 3

Page 169

1 of the PDF, which ends in 8224 [sic].

2     A. Okay.

3     Q. Under the fourth heading, do you see

4 where it says, █████████████████████

█████████████████████                               14:49:19

6 --

7     A. Yes.

8     Q. Sorry, thank you.

9         ██████████████████████

███████████████████████████████

███████████                                   right?

12    A. Yes.

13    Q. Why was that -- strike that.

14        █████████████████████

████████████                                          14:49:46

16    A. Yes.

17        MR. DYKHUIS: Objection to foundation.

18 BY MS. KRICKL:

19    Q. ██████████████████

20        MR. DYKHUIS: Objection. Form.            14:49:54

21    THE WITNESS: ████████████

43 (Pages 166 - 169)

ERRATA SHEET FOR THE TRANSCRIPT OF:

*United Therapeutics Corporation v. Liquidia Technologies, Inc.*
Case No. 1:20-cv-00755-UNA

Deponent: David Walsh, Ph.D.

Deposition Date:  September 14, 2021

I wish to make the following changes for the following reasons:

| Page:Line | Now Reads | Should Read | Reason |
|-----------|-----------|-------------|--------|
| 77:8-9 | When Moriarty group | When the Moriarty group | Clarification/transcription |
| 78:13-14 | at the Chica-- | at the Chicago facility | Clarification/transcription |
| 36: 5 | particularly in ease.. | particularly for ease.. | " / " |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

David A. Walsh                    Oct. 22, 2021

David  Walsh                              Date

*United Therapeutics Corporation v. Liquidia Technologies, Inc.*

\*\*\*

## ACKNOWLEDGEMENT OF DEPONENT

I, David Walsh, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_David A. Walsh_                    _Oct. 22, 2021_

David Walsh                           Date

2

# EXHIBIT 36



Deposition of:
# Robert R. Ruffolo

*April 15, 2021*

In the Matter of:

# United Therapeutics Corporation vs Liquidia Technologies Inc

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Page 1

1             IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE

2

                              - - -

3

4     UNITED THERAPEUTICS        :  C.A. No.
      CORPORATION,               :  20-755-RGA

5                                :

              Plaintiff,         :

6                                :

              vs.                :

7                                :

      LIQUIDIA TECHNOLOGIES, INC.:

8                                :

              Defendant.         :

9

10                             - - -

11

12

                    THURSDAY, APRIL 15, 2021

13

14

15                             - - -

16         Remote Videotape Zoom Deposition of

17     ROBERT R. RUFFOLO, Ph.D., taken pursuant

18     to Notice, commencing at approximately

19     9:03 a.m., on the above date, before Rose A.

20     Tamburri, RPR, CM, CCR, CRR, USCRA Speed and

21     Accuracy Champion and Notary Public.

22                             - - -

23                  VERITEXT LEGAL SOLUTIONS
                      MID-ATLANTIC REGION

24             1801 Market Street, Suite 1800
               Philadelphia, Pennsylvania  19103

DR. RUFFOLO

Page 2

1  APPEARANCES:
2
3  BOIES, SCHILLER, FLEXNER LLP
   BY:  BILL WARD, ESQUIRE
4  401 Wilshire Boulevard, Suite 850
   Santa Monica, California  90401
5  (310) 752-2402
   bward@bsfllp.com
6  (Via Remote Zoom)
   Representing the Plaintiff and
7  The Witness
8  COOLEY LLP
   BY:  JONATHAN DAVIES, ESQUIRE
9  1299 Pennsylvania Avenue NW, Suite 700
   Washington, DC  20004
10 (202) 776-2049
   jdaviesw@cooley.com
11 (Via Remote Zoom)
   Representing the Defendant
12
13
14 ALSO PRESENT:
15
16 ADAM W. BURROWBRIDGE, ESQUIRE
17
18 DOUGLAS H. CARSTEN, ESQUIRE
19
20 DOUGLAS W. CHEEK, ESQUIRE
21
22 ANDREW SMITH, Video Concierge
23
24 ORSON BRAITHWAITE, Videographer

Page 3

1         I N D E X
2
   TESTIMONY OF:  ROBERT R. RUFFOLO, Ph.D.
3
   By Mr. Davies............................8
4
5
6        E X H I B I T S
7
   EXHIBIT NO.    DESCRIPTION      PAGE NO.
8
   Exhibit 0001  Amended Notice of      14
9                Deposition
10 Exhibit 0002  Declaration of Robert  31
                 R. Ruffolo, Ph.D.
11               dated February 5, 2021
12 Exhibit 0003  U.S. Patent No.        65
                 9,593,066 - Bates Nos.
13               UTC_LIQ00000001 - 12
14 Exhibit 0004  U.S. Patent No.        65
                 9,604,901 - Bates Nos.
15               UTC_LIQ00003447 - 58
16 Exhibit 0005  '066 and '901 Patent   65
                 Asserted Claims -
17
   Exhibit 0006  Hemander Article -     95
18               Regular Definitions for
                 Ambient, Room Temperature
19               and Cold Chain -Bates
                 Nos. LIQ00084845 - 47
20
   Exhibit 0007  Packaging and Storage  102
21               Requirements Revision
                 Bulletin dated
22               May 1, 2017
23 Exhibit 0008  Declaration of Dr.     158
                 Liang Guo - Bates Nos.
24               LIQ00083900 - 934

Page 4

1       E X H I B I T S, Continued:
2
   Exhibit 0009  C.F.R. Section 210.3 -    179
3                Bates Nos.
                 UTC_LIQ00041891 - 893
4
   Exhibit 0010  Supplemental Declaration  234
5                of Robert R. Ruffolo,
                 Ph.D., dated April 2,
6                2021
7  Exhibit 0011  Patent Owner's Response   243
                 to Petition - Bates Nos.
8                LIQ00084488 - 571
9  Exhibit 0012  Patent Owner             264
10               Preliminary Response
11               Under 35 U.S.C. Section
12               313 and 37 C.F.R.
13               Section 42.107 - Bates
14               Nos. LIQ00083725 - 806
15
16 Exhibit 0013  Patent Owner's Request    271
17               for Rehearing - Bates
18               Nos. LIQ00083884 - 899
19
20 Exhibit 0014  Decision Denying Patent   277
21               Owner's Request on
22               Rehearing of Decision
23               on Institution - Bates
24               Nos. LIQ00084819 - 828

Page 5

1  DEPOSITION SUPPORT INDEX
2
3  DIRECTION TO WITNESS NOT TO ANSWER
4
5  Page    Line
6
7    28     24
8
9    45     6
10
11   60     24
12
13   284    8, 24
14
15   285    23
16
17   286    6, 12, 19
18
19   287    20
20
21   288    3, 21
22
23   289    3, 17, 24
24

2 (Pages 2 - 5)

DR. RUFFOLO

1       So does the 0 -- does the spec --
2   and so if I refer to the specification of the
3   '066 Patent, do you understand I'm also
4   referring to the specification of the '901
5   Patent?
6       A.  Yes.
7       Q.  Okay.
8       So -- and maybe -- maybe for
9   clarity's sake, if I refer to the
10  patents-in-suit -- strike that.  Strike that.
11      So does the specification of the
12  '066 and the '901 Patents tell me how to
13  determine whether the process is more
14  efficient?
15      MR. WARD:  Objection to form.
16      THE WITNESS:  Well, if I
17  understand the question, I'm not sure I
18  understand it.  Maybe -- maybe you could ask
19  it again before I answer.
20  BY MR. DAVIES:
21      Q.  Does the specification of the '066 or
22  the '901 Patent provide -- strike that.
23      Does the specification of the '066
24  and the '901 Patent tell a person of skill in

1   the art how to determine whether the claim
2   process is more efficient?
3       A.  The patent specification, Column 17,
4   lists the advantages, including related to
5   efficiency, I believe.  We can read it.  And
6   I -- I think that's what you're asking.
7       Q.  And, Dr. Ruffolo, are you in the '066
8   Patent or the '901 Patent?
9       A.  I'm sorry, the '066.
10      Q.  Okay.
11      So where in the '066 Patent does
12  it tell a skilled artisan how to determine
13  whether or not the claimed process is more
14  efficient?
15      A.  It's talking about advantages in the
16  process that allow it to be stored at ambient
17  temperature, that would provide a level of
18  efficiency.  You can --
19      Q.  And, Dr. Ruffolo, let me just stop
20  you there.
21      So in addition to providing
22  improved efficiency, what other advantages
23  would you --
24      MR. WARD:  You've got to let --

1   let the witness complete his answer.
2       MR. DAVIES:  That's fine.
3       You can complete your answer, Dr.
4   Ruffolo.
5       THE WITNESS:  Okay.  Thank you.
6       Storage at ambient temperature
7   would be an efficiency; the synthesis, the way
8   it's synthesized would be an efficiency;
9   having the option not to isolate would be an
10  efficiency.  You could isolate, but not having
11  to do it would be an efficiency.
12      Improvement of quality would be an
13  efficiency, you wouldn't have to clean it up
14  as much.  It saves solvents, manpower,
15  purification, intermediate steps.  It -- so --
16  so my understanding of efficiency would be
17  efficiencies from the specification, which is,
18  I think, what you asked.
19  BY MR. DAVIES:
20      Q.  Do you see, in Column 17, it says,
21  "The purification" -- and, I'm sorry, strike
22  that.
23      Do you see in Column 17 of the
24  '066 Patent, beginning at line 28 or 29 -- no,

1   28, I'm sorry -- strike that.  Let's start
2   over.
3       Beginning -- Column 17, beginning
4   in line 28 of the '066 Patent, it says, "The
5   purification of benzindene nitrile by column
6   chromatography is eliminated."
7       Do you see that?
8       A.  Yes, I do.
9       Q.  Does that make the claimed process
10  more efficient?
11      MR. WARD:  Objection to form.
12      THE WITNESS:  Yes, it would.  That
13  optional step to eliminate would.
14  BY MR. DAVIES:
15      Q.  So if that step is optional, if I
16  were to include column chromatography, that
17  would, by definition, make the claim process
18  less efficient?
19      MR. WARD:  Objection to form.
20      THE WITNESS:  It could.
21  BY MR. DAVIES:
22      Q.  Well, it could or it would, Doctor?
23      A.  Well, it depends.
24      MR. WARD:  Objection to form.

21 (Pages 78 - 81)

DR. RUFFOLO

1         THE WITNESS: It depends if you're
2    making other changes. If that additional step
3    allows you to eliminate other purification
4    steps, then you're right, almost 15 in this
5    patent, then you -- it could.
6    BY MR. DAVIES:
7        Q.   Absent any other change to the
8    process, would the inclusion of column
9    chromatography make the process less
10   efficient?
11        MR. WARD: Objection to form.
12        THE WITNESS: In my opinion, yes.
13   BY MR. DAVIES:
14       Q.   Would it also make the process less
15   green?
16        MR. WARD: Same objection.
17        THE WITNESS: It could.
18   BY MR. DAVIES:
19       Q.   Would it make -- would it involve the
20   use of additional solvents?
21        MR. WARD: Same objection.
22        THE WITNESS: Very likely.
23   BY MR. DAVIES:
24       Q.   You pointed to some other advantages

1    of the claim process that are identified in
2    Column 17, including that the crude
3    treprostinil salts can be stored as raw
4    material at ambient temperature.
5         Do you see that?
6        A.   Yes, I do.
7        Q.   Okay.
8         If I would add a step to the
9    claimed process that lessened the stability of
10   the treprostinil salt at ambient temperature,
11   would that be permitted under your definition
12   of "a process"?
13        MR. WARD: Objection to form.
14        THE WITNESS: Could you repeat the
15   question, please?
16   BY MR. DAVIES:
17       Q.   If I added a step to the claimed
18   process that made the treprostinil salts less
19   stable at ambient temperatures, could that --
20   could that additional step still be included
21   under your definition of "process"?
22        A.   I don't know. Perhaps.
23        Q.   Why do you say "perhaps"?
24        A.   Because I don't know.

1        Q.   Okay.
2         The next thing that's referred to
3    in Column 17 is that the crude treprostinil
4    salt can be converted to treprostinil by
5    simple acidification with diluted hydrochloric
6    acid.
7         Do you see that?
8        A.   Yes, I do.
9        Q.   And what advantage does that provide
10   to the claim process?
11        MR. WARD: Objection to form.
12        THE WITNESS: Well, that's a step
13   you would need to protonate the ionized
14   carboxylic acid in treprostinil to predict --
15   to make it into treprostinil.
16   BY MR. DAVIES:
17       Q.   And so that step, conversion to
18   treprostinil by simple acidification with
19   diluted hydrochloric acid, is required under
20   your definition of "a process"?
21        MR. WARD: Objection to form.
22        THE WITNESS: If you're -- if
23   you're trying to make a treprostinil-free
24   acid, which is treprostinil, you would have to

1    get it to protonate, and that would be done
2    through acidification.
3    BY MR. DAVIES:
4        Q.   Using diluted hydrochloric acid?
5        A.   Using --
6         MR. WARD: Objection to form.
7         THE WITNESS: Yes, you could use
8    hydrochloric acid as -- as done here. You can
9    use other acids.
10   BY MR. DAVIES:
11       Q.   Do you see the next thing in Column
12   17, it refers to the treprostinil salts can be
13   synthesized from the solution of treprostinil
14   without isolation?
15        Do you see that?
16        MR. WARD: Objection to form.
17        THE WITNESS: Yes, I do.
18        MR. DAVIES: Okay.
19   BY MR. DAVIES:
20       Q.   And what advantage does that feature
21   provide to the claim process?
22        MR. WARD: Objection to form.
23        THE WITNESS: It allows you to
24   eliminate an isolation step that's optional,

22 (Pages 82 - 85)

# EXHIBIT 37



| LIQUIDIA. TECHNOLOGIES | Approved |  |
|---|---|---|
|  | Form |  |
| CONFIDENTIAL | Revision: | 2 |
| Document #:   FRM-011 | Effective Date: | Oct 6, 2019 |
| Title:   Receiving Inspection Report |  |  |

**Receiving Inspection Report (page 1 of 2)**



Page 1 of 3               Printed 1/7/2021 11:10:00 AM

HIGHLY CONFIDENTIAL

LIQ02798133

| LIQUIDIA TECHNOLOGIES | Approved |
|---|---|
| | Form |

| CONFIDENTIAL | | Revision: | 2 |
|---|---|---|---|
| Document #: | FRM-011 | Effective Date: | Oct 6, 2019 |
| Title: | Receiving Inspection Report | | |

Receiving Inspection Report (page 2 of 2)

Page 2 of 3                    Printed 1/7/2021 11:10:00 AM

HIGHLY CONFIDENTIAL

LIQ02798134

| LIQUIDIA. TECHNOLOGIES | Approved | |
|---|---|---|
| | Form | |
| CONFIDENTIAL | Revision: | 00 |
| Document #:  FRM-012 | Effective Date: | Aug 6, 2017 |
| Title: | Material Sampling Form | |

## Material Sampling Form

| Sample: | UOM: | Sample | UOM: |
|---|---|---|---|
| Sample: | UOM: | Sample | UOM: |
| Sample: | UOM: | Sample | UOM: |
| Sample: | UOM: | Sample | UOM: |
| Sample: | UOM: | Sample | UOM: |

Room Completed In: _____     Equipment Asset #: _____

Completed By: _____     Date: _____

**Material Sampling**

RMS#_____          Lot#_____

Material Description: _____

RMS# Sample Requirement: _____

Number of Containers in Lot: _____     Containers to be sampled: _____

| Sample: | UOM: | Sample | UOM: |
|---|---|---|---|
| Sample: | UOM: | Sample | UOM: |
| Sample: | UOM: | Sample | UOM: |
| Sample: | UOM: | Sample | UOM: |
| Sample: | UOM: | Sample | UOM: |

Room Completed In: _____     Equipment Asset #: _____

Completed By: _____     Date: _____

HIGHLY CONFIDENTIAL

LIQ02798135

**YONSUNG**
Fine Chemicals

# YONSUNG FINE CHEMICALS CO., LTD.

207, Sujeong-ro, Jangan-myeon, Hwaseong-si, Gyeonggi-do, 18581, Republic of Korea

TEL: +82-31-8047-9800 / E-mail: yonsungfc@yonsungchem.co.kr

**CERTIFIED TRUE COPY**
FROM THE ORIGINAL DOCUMENT

SIGN/DATE : _(signature)_ 2020. 12. 01

YONSUNG FINE CHEMICALS CO., LTD.

# Certificate of Analysis

| | | | |
|---|---|---|---|
| Product Name : | Treprostinil Sodium | Batch No. : | |
| Molecular Formula : | $C_{23}H_{33}NaO_5$ (M.W. 412.49) | CAS No. : | 289480-64-4 |
| Manufacturing Date : | Sep. 01, 2020 | Expiry Date : | Aug. 31, 2023 |

_Nov. 27, 2020_

Date of Issue

Sep. 21, 2020

Date of QC Test Approval

Page 1 of 2

Form QA023-01 (Certificate No. TNIH1-04(V00))

HIGHLY CONFIDENTIAL

LIQ02798136

**YONSUNG FINE CHEMICALS CO., LTD.**

207, Sujeong-ro, Jangan-myeon, Hwaseong-si, Gyeonggi-do, 18581, Republic of Korea

TEL: +82-31-8047-9807 / E-mail: yonsungfc@yonsungchem.co.kr

**CERTIFIED TRUE COPY**
FROM THE ORIGINAL DOCUMENT

# Certificate of Analysis

SIGN/DATE : ____ 2020.12.01

YONSUNG FINE CHEMICALS CO.,LTD.

| | | | |
|---|---|---|---|
| Product Name : | Treprostinil Sodium | Batch No. : | ▮ |
| Molecular Formula : | $C_{23}H_{33}NaO_5$ (M.W. 412.49) | CAS No. : | 289480-64-4 |
| Manufacturing Date : | Sep. 01, 2020 | Expiry Date : | Aug. 31, 2023 |



[Remarks]
N/A

*Nov. 27, 2020*

Date of Issue

Sep. 21, 2020

Date of QC Test Approval

Page 2 of 2

Form QA023-01 (Certificate No. TNIH1-04(V00))

HIGHLY CONFIDENTIAL

LIQ02798137



## YONSUNG
## FINE CHEMICALS CO., LTD.

207, Sujeong-ro, Jangan-myeon,
Hwaseong-si, Gyeonggi-do,
18581, Republic of Korea
TEL: 82-31-351-6622
FAX: 82-31-351-6624

February 7, 2020

To whom it may concern,

**Name of the substance:** *Treprostinil Sodium*

Sincerely,

*Director of Quality Department*
*Yonsung Fine Chemicals Co., LTD.*

1 / 1

HIGHLY CONFIDENTIAL

LIQ02798138



# YONSUNG
# FINE CHEMICALS CO., LTD.

207, Sujeong-ro, Jangan-myeon,
Hwaseong-si, Gyeonggi-do,
18581, Republic of Korea
TEL; 82-31-351-6622
FAX: 82-31-351-6624

February 22, 2016

To whom it may concern,

Name of the substance: Treprostinil Sodium

Sincerely,

*Director of Quality Department*
*Yonsung Fine Chemicals Co., LTD.*

1 / 1

HIGHLY CONFIDENTIAL

LIQ02798139

# LIQUIDIA. TECHNOLOGIES

| | Approved |
|---|---|
| | **Raw Material Specification** |

| CONFIDENTIAL | Revision: | 6 |
|---|---|---|
| Document #: | RMS-031 | Effective Date: | May 3, 2020 |
| **Title:** | **Raw Materials Specification - Treprostinil Sodium** | | |

## 1    RAW MATERIAL SPECIFICATION

| Material: | Grade: | N/A |
|---|---|---|
| Treprostinil Sodium | **Material Risk Level:** | **1** |

| Supplier: | Catalog # | Container Type |
|---|---|---|
| Yonsung Fine Chemicals | Treprostinil Sodium | Glass Bottle |
| | n/a | n/a |
| ███████████████ | ███████████ | |
| ███████ | ███ | |
| ███████████████ | | |
| ██ ███████ | | |
| █████████ | | |
| | | ▐▐ █ |
| ████████████ | | |

| Documentation Required | | |
|---|---|---|
| Vendor CofA | | |
| ████████ | | |
| ████████ | | |

HIGHLY CONFIDENTIAL

LIQ02798140

| **LIQUIDIA** TECHNOLOGIES | Approved |  |
|---|---|---|
| | **Raw Material Specification** |  |
| CONFIDENTIAL | Revision: | 6 |
| Document #:   RMS-031 | Effective Date: | May 3, 2020 |
| **Title:**   **Raw Materials Specification - Treprostinil Sodium** | | |



Printed 1/7/2021 11:06:00 AM

HIGHLY CONFIDENTIAL

| LIQUIDIA TECHNOLOGIES | Approved |
|---|---|
| | **Raw Material Specification** |
| CONFIDENTIAL | Revision: | 6 |
| Document #: RMS-031 | Effective Date: | May 3, 2020 |
| **Title:** | **Raw Materials Specification - Treprostinil Sodium** |

## ATTACHMENT 1



## 2   REVISION HISTORY



| Revision | |
|---|---|
| 06 | |
| 05 | |

HIGHLY CONFIDENTIAL                                                                 LIQ02798142

| LIQUIDIA TECHNOLOGIES | Approved |
|---|---|
| | **Raw Material Specification** |

| CONFIDENTIAL | | Revision: | 6 |
|---|---|---|---|
| Document #: | RMS-031 | Effective Date: | May 3, 2020 |
| **Title:** | **Raw Materials Specification - Treprostinil Sodium** | | |

|  |  |  | Updated reference to water | Clarification to be consistent with current |
|---|---|---|---|---|
| 04 | | | | |
| 03 | | | | |
| 02 | | | | |
| 01 | | | | |
| 00 | | | | |

Review;Apr 30, 2020 10:21 AM EDT
ew;Apr 30, 2020 10:30 AM EDT
iew;Apr 30, 2020 1:33 PM EDT
ove;Apr 30, 2020 12:35 PM CDT
Approve;Apr 30, 2020 1:37 PM EDT
rove;Apr 30, 2020 1:52 PM EDT
prove;May 1, 2020 6:44 PM EDT

HIGHLY CONFIDENTIAL

LIQ02798143



| YONSUNG Fine Chemicals | *Material Safety Data Sheet* *Treprostinil sodium* | Document No. : TNMS-V09 |
| | | Revision Date : Jun. 26, 2019 |

## SECTION I – Product and Company Identification

- **Product Name:** Treprostinil sodium
- **Manufacturer:** Yonsung Fine Chemicals Co., Ltd.
- **Address:** 207, Sujeong-ro, Jangan-myeon, Hwaseong-si, Gyeonggi-do, 18581, Republic of Korea
- **Emergency Phone:** 82 31 351 6622
- **Fax phone:** 82 31 351 6624
- **Synonyms:** (1R,2R,3aS,9aS)-[[2,3,3a,4,9,9a-Hexahydro-2-hydroxy-1-[(3S)-3-hydroxyoctyl]-1H-benz[f]inden-5-yl]oxy]acetic acid, monosodium salt
- **Chemical family:** Prostaglandins
- **Molecular Formula:** $C_{23}H_{33}NaO_5$
- **Molecular Weight:** 412.49

## SECTION II – Hazards Identification

- **Emergency Overview:** No data available.
- **Route(s) of Entry:** Inhalation? Yes Skin? Yes Eyes? Yes Ingestion? Yes Other: Injection
- **Potential Health Effects (Acute and Chronic):** Material may be irritating to the mucous membranes and upper respiratory tract.
  May be harmful by inhalation, ingestion, or skin absorption. May cause eye, skin, or respiratory system irritation.
  The toxicological properties of this compound have not been fully evaluated.
- **Signs and Symptoms Of Exposure:** No data available.



- H302 Harmful if swallowed
- H315 Causes skin irritation
- H322 Harmful if inhaled
- P264 Wash hands thoroughly after handling
- P280 Wear protective groves/protective clothing/eye protection/face protection
- P270 Do not eat, drink or smoke when using this product
- P301+312 If swallowed : call a POISON CENTER or doctor/physician IF you feel unwell
- P304+340 IF INHALED : Remove victim to fresh air and Keep at rest in a position comfortable for breathing

## SECTION III – Composition/Information on Ingredients

- **Hazardous Components (Specific Chemical Identity/Common Name):** Treprostinil sodium
- **CAS #:** 289480-64-4
- **Percentage:** 100.0%

**1 / 4**

LIQ02798144



| YONSUNG Fine Chemicals | **_Material Safety Data Sheet_** _Treprostinil sodium_ | Document No. : TNMS-V09 Revision Date : Jun. 26, 2019 |
|---|---|---|

- **OSHA PEL:** No data
- **ACGIH TLV:** No data
- **Other Limits:** No data

### SECTION IV – Hazards Identification

- **Emergency Overview:** No data available.
- **Route(s) of Entry:** Inhalation? Yes Skin? Yes Eyes? Yes Ingestion? Yes Other: Injection
- **Potential Health Effects (Acute and Chronic):** Material may be irritating to the mucous membranes and upper respiratory tract.

    May be harmful by inhalation, ingestion, or skin absorption. May cause eye, skin, or respiratory system irritation. The toxicological properties of this compound have not been fully evaluated.
- **Signs and Symptoms Of Exposure:** No data available.

### SECTION V – Fire Aid Measures

- **Emergency and First Aid Procedures:** If inhaled remove to fresh air. If not breathing, give artificial respiration or give oxygen by trained personnel. Get immediate medical attention.

    If swallowed, wash out mouth with water provided person is conscious. Never give anything by mouth to an unconscious person. Get medical attention. Do NOT induce vomiting unless directed to do so by medical personnel.

    In case of contact with eyes, hold eyelids apart and flush eyes with plenty of water. After initial

    flushings, remove any contact lenses and continue flushing for at least 20 minutes. Have eyes

    examined and tested by medical personnel.

    In case of skin contact, immediately wash skin with soap and plenty of water. Remove contaminated clothing. Get medical attention if symptoms occur. Wash clothing before reuse.

### SECTION VI – Fire Fighting Measures

- **Flash Pt:** 199.3℃.
- **Explosive Limits: LEL:** No data. **UEL:** No data.
- **Autoignition Pt:** No data.
- **Fire Fighting Instructions:** As in any fire, wear self-contained breathing apparatus pressure-demand (MSHA/NIOSH approved or equivalent), and full protective gear to prevent contact with skin and eyes.
- **Flammable Properties and Hazards:** No data available.
- **Extinguishing Media:** Use alcohol foam, carbon dioxide, or water spray.

### SECTION VII –Accidental Release Measures

- **Steps To Be Taken In Case Material Is Released Or Spilled:**

    Wear a NIOSH/MSHA approved self-contained breathing apparatus and appropriate personal

    protection (rubber boots, safety goggles, and heavy rubber gloves).

    Vacuum or sweep up material and place in disposal container.

    Avoid raising dust. After removal, ventilate contaminated area and flush thoroughly with water.

HIGHLY CONFIDENTIAL

LIQ02798145



**YONSUNG**
Fine Chemicals

## *Material Safety Data Sheet*
### *Treprostinil sodium*

Document No. : TNMS-V09

Revision Date : Jun. 26, 2019

### SECTION VIII – Handling and Storage

- **Hazard Label Information:** Avoid contact with skin and eyes. Do not reuse this container. Use with adequate ventilation. Wash thoroughly after handling.
- **Precautions To Be Taken in Handling:** Avoid breathing (dust, vapor, mist, gas).
  Avoid contact with eyes, skin, and clothing. Avoid prolonged or repeated exposure.
  Do not reuse this container. Use with adequate ventilation.
  Wash thoroughly after handling.
- ███████████████████████████████████████

### SECTION IX – Exposure Controls/Personal Protection

- **Protective Equipment Summary – Hazard Label Information:** Eye wash station in work area Lab coat Latex disposable gloves Safety glasses Safety shower in work area Vent Hood
- **Respiratory Equipment (Specify Type):** No data available.
- **Eye Protection:** Safety glasses
- **Protective Gloves:** Latex disposable gloves
- **Other Protective Clothing:** Lab coat
- **Engineering Controls (Ventilation etc.):** Use process enclosures, local exhaust ventilation, or other engineering controls to control airborne levels below recommended exposure limits.
- **Work/Hygienic/Maintenance Practices:** Do not take internally.
  Facilities storing or utilizing this material should be equipped with an eyewash facility and a safety shower.
  Wash thoroughly after handling.

### SECTION X – Physical and Chemical Properties

- **Physical States:** [ ] Gas [ ] Liquid [ X ] Solid
- **Melting Point:** No data.
- **Boiling Point:** 587.1 °C at 760 mmHg.
- **Autoignition Pt:** No data.
- **Explosive Limits:** LEL: No data. UEL: No data.
- **Specific Gravity (Water = 1):** No data.
- **Vapor Pressure (vs. Air or mm Hg):** No data.
- **Vapor Density (vs. Air = 1):** No data.
- **Evaporation Rate (vs Butyl Acetate=1):** No data.
- **Solubility in Water:** sol. at 25.0 C
- **Other Solubility Notes:** sol. in EtOH, DMSO & DMF
- **Percent Volatile:** N.A.
- **Corrosion Rate:** No data.
- **Formula:** C23H33NaO5
- **Molecular Weight:** 412.49

**3 / 4**

HIGHLY CONFIDENTIAL

|  YONSUNG Fine-Chemicals | ***Material Safety Data Sheet*** *Treprostinil sodium* | Document No. : TNMS-V09 Revision Date : Jun. 26, 2019 |
|---|---|---|

- **pH:** No data.

- **Appearance and Odor:** A crystalline solid

## SECTION XI – Stability and Reactivity

- **Stability:** Unstable [ ] Stable [ X ]

- **Conditions To Avoid - Instability:** No data available.

- **Incompatibility - Materials To Avoid:** No data available.

- **Hazardous Decomposition Or Byproducts:** No data available.

- **Hazardous Polymerization:** Will occur [ ] Will not occur [ X ]

- **Conditions To Avoid - Hazardous**

- **Polymerization:** No data available.

## SECTION XII –Toxicological Information

- **Toxicological Information:** The toxicological effects of this compound have not been thoroughly studied.

- **Toxicity Data (LD50) :** No information available

- **Carcinogenicity/Other Information:** No data available.

- **Carcinogenicity:** NTP? No IARC Monographs? No OSHA Regulated? No

## SECTION XIII –Ecological Information

- **Ecological Information:** Runoff from fire control or dilution water may cause pollution.

## SECTION XIV – Disposal Considerations

- **Waste Disposal Method:** Dispose in accordance with local, state and federal regulations.

## SECTION XV – Transport Information

- **DOT Proper Shipping Name:** None

- **Non-Hazardous for Transport:** This substance is considered to be non-hazardous for transport.

- **IATA**

- Non-Hazardous for Air Transport: Non-hazardous for air transport.

## SECTION XVI – Regulatory Information

- Regulatory information on this product is not available.

## SECTION XVII – Other Information

- **DISCLAIMER:** This information is believed to be accurate and represents the best information currently available to us. However, we make no warranty of merchantability or any other warranty, express or implied, with respect to such information, and we assume no liability resulting from its use. Users should make their own investigations to determine the suitability of the information for their particular purposes.

------------------------------------------------------------------------------------------------

**4 / 4**

HIGHLY CONFIDENTIAL



# YONSUNG
## FINE CHEMICALS CO., LTD.

207, Sujeong-ro, Jangan-myeon,
Hwaseong-si, Gyeonggi-do,
18581, Republic of Korea
TEL: 82-31-351-6622
FAX: 82-31-351-6624

January 4, 2021

# Letter of Declaration

To whom it may concern,

**Name of the substance**: Treprostinil Sodium

Sincerely,



*Director of Quality Department*
*Yonsung Fine Chemicals Co., Ltd.*

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

QA Approved



| Product Name | Batch No. | Mfg. date | Exp. date | Quantity |
|---|---|---|---|---|
| Treprostinil Sodium | ▉ | ▉ | ▉ | ▉ |
| Treprostinil Sodium | ▉ | ▉ | ▉ | ▉ |
| Treprostinil Sodium | ▉ | ▉ | ▉ | ▉ |

NDC NO.

▉

CAS No.
289480-64-4

Country of Origin
Republic of Korea

Storage condition

▉



**YONSUNG** 207, Sujeong-Ro, Jangan-Myeon, Hwasung-Si, Gyeonggi-Do, 18581, Republic of Korea
Tel +82-31-8047-9800
E-mail yonsungfc@yonsungchem.co.kr
Fine Chemicals

QA011-08

⚠ *Caution :* For further manufacturing, processing or repacking use only. *Rx only.*

TN-03-001(2)_V01



Confidential



Uncontrolled Copy

LIQ02798149



HIGHLY CONFIDENTIAL



**Importance:**          High

**EXTERNAL MESSAGE WARNING**

Best Regards,

Sr. Director-Business Development

**LGM Pharma**
PARTNER SMART.

Boca Raton, FL 33487, USA

The information contained in this transmission may contain trade secrets or other confidential information, and it is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To the extent that this email does contain trade secrets or other confidential information, the recipient shall treat such information in accordance with applicable law.

Please consider the environment before printing this email

HIGHLY CONFIDENTIAL                                                                                           LIQ02798151



Thank you for providing this information. Hope you are well.

Thank you.

**LGM Pharma**
PARTNER SMART.

Please see attached and below.

Thanks and kind regards,

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**LGM Pharma**
PARTNER SMART.

2

**Web:** www.lgmpharma.com

Procurement & Logistics Offices
Hamelacha Street 15, Industrial Park Har Tuv Beit Shemesh 9905515, Israel



The information contained in this transmission may contain trade secrets or other confidential information, and it is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To the extent that this email does contain trade secrets or other confidential information, the recipient shall treat such information in accordance with applicable law.

🖨 Please consider the environment before printing this email

HIGHLY CONFIDENTIAL

LIQ02798153



**YONSUNG**
**FINE CHEMICALS CO., LTD.**

207, Sujeong-ro, Jangan-myeon,
Hwaseong-si, Gyeonggi-do,
18581, Republic of Korea
TEL: 82-31-351-6622
FAX: 82-31-351-6624



**3. Conclusion**

Confidential
November 13, 2020

1 / 4

Uncontrolled Copy
Confidential

HIGHLY CONFIDENTIAL

LIQ02798154



# YONSUNG
## FINE CHEMICALS CO., LTD.

207, Sujeong-ro, Jangan-myeon,
Hwaseong-si, Gyeonggi-do,
18581, Republic of Korea
TEL: 82-31-351-6622
FAX: 82-31-351-6624



1 NMT: Not more than; 2 ND: Not detected; 3 TAMC: total aerobic microbial count; 4 TYMC: total combined yeasts/molds count

Confidential
November 13, 2020

2 / 4

Uncontrolled Confidential

HIGHLY CONFIDENTIAL



# YONSUNG
## FINE CHEMICALS CO., LTD.

207, Sujeong-ro, Jangan-myeon,
Hwaseong-si, Gyeonggi-do,
18581, Republic of Korea
TEL: 82-31-351-6622
FAX: 82-31-351-6624



1 NMT: Not more than; 2 ND: Not detected; 3 TAMC: total aerobic microbial count; 4 TYMC: total combined yeasts/molds count

Confidential
November 13, 2020

3 / 4

Uncontrolled Copy   Confidential

HIGHLY CONFIDENTIAL

LIQ02798156



# YONSUNG
## FINE CHEMICALS CO., LTD.

207, Sujeong-ro, Jangan-myeon,
Hwaseong-si, Gyeonggi-do,
18581, Republic of Korea
TEL: 82-31-351-6622
FAX: 82-31-351-6624



1 NMT: Not more than; 2 ND: Not detected; 3 TAMC: total aerobic microbial count; 4 TYMC: total combined yeasts/molds count

**5. Reference**

STP-TN-005

November 13, 2020

4 / 4

Confidential

Uncontrolled Confidential

HIGHLY CONFIDENTIAL

LIQ02798157

## Marathon Electronic Data Logger





Marathon Products, Inc.
www.marathonproducts.com / info@marathonproducts.com

HIGHLY CONFIDENTIAL

LIQ02798158

## TREPROSTINIL SODIUM.MP_Lgr

Print Job: 994625269
Page 2 of 2



HIGHLY CONFIDENTIAL

LIQ02798159

SENSITECH

TempTale® Ultra



HIGHLY CONFIDENTIAL



**YONSUNG**
**FINE CHEMICALS CO., LTD.**

207, Sujeong-ro, Jangan-myeon,
Hwaseong-si, Gyeonggi-do,
18581, Republic of Korea
TEL: 82-31-351-6622
FAX: 82-31-351-6624

15th of November, 2019

## Declaration letter

To whom it may concern,

*Director of Quality Department*
*Yonsung Fine Chemicals Co., Ltd.*

HIGHLY CONFIDENTIAL

**LGM Pharma, LLC**
2758 Circleport Drive
Erlanger, KY 41018
United States
Tel.: 1-(800)-881-8210, Fax: 1-(561)-892-0580



URL: www.lgmpharma.com
E-mail: info@lgmpharma.com

To:
**Liquidia Technologies**
PO Box 110085
Research Triangle Park, NC 27709-5085
Tel.: 1-919-328-4400, LGM warehouse (USA)

Ship to:
**Liquida Technologies, Inc.**
419 Davis Drive, Suite 100
Morrisville, NC 27560
Attn: Dana Paris
Tel.: 1-919-328-4400, Fax: 919 328-4402

Date: 05-Jan-2021



### Part Totals

| CAS Number | Part Description | |
|---|---|---|
| 289480-64-4-GM | Treprostinil Sodium | |

Please ship tomorrow overnight with frozen gel packs and data logger , COA & MSDS .

Hanna Pshemish
LGM Pharma, LLC

# EXHIBIT 38



Deposition of:

# Hugh Smyth , Ph.D.

*January 19, 2022*

In the Matter of:

# United Therapeutics Corporation vs Liquidia Technologies Inc

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

————————————————————————

)Case No.

UNITED THERAPEUTICS                )1:20-cv-00755

CORPORATION                        )

                                   )

    Plaintiff                      )

                                   )

vs.                                )

                                   )

LIQUIDIA TECHNOLOGIES, INC.,   )

                                   )

    Defendant                      )

————————————————————————


Remote Videotaped Deposition of

HUGH SMYTH, Ph.D.

January 19, 2022

10:10 a.m.


Reported by:  Bonnie L. Russo

Job No. 5008746

Page 2

1   Remote Videotaped Deposition of Hugh Smyth,
2   Ph.D. held through:
3
4
5
6
7           Veritext Legal Solutions
8           1250 I Street, N.W.
9           Washington, D.C.
10
11
12
13
14
15
16
    Pursuant to Notice, when were present on behalf
17
    of the respective parties:
18
19
20
21
22

Page 3

1   APPEARANCES:
2   On behalf of the Plaintiff:
3     ART DYKHUIS, ESQUIRE
      McDERMOTT WILL & EMERY
4     2049 Century Park E
      Suite 3200
5     Los Angeles, California
      adykhuis@mwe.com
6
      -and-
7
      TIMOTHY DUNKER, ESQUIRE
8     McDERMOTT WILL & EMERY
      500 N. Capitol Street, N.W.
9     Washington, D.C. 20001
      tdunker@mwe.com
10
    On behalf of the Defendant:
11
      SANYA SUKDUANG, ESQUIRE
12    COOLEY LLP
      1299 Pennsylvania Avenue, N.W.
13    Suite 700
      Washington, D.C. 20004
14    ssukduang@cooley.com
15     -and-
16    LAUREN KRICKL, ESQUIRE
      COOLEY LLP
17    3175 Hanover Street
      Palo Alto, California 94304
18    lkrickl@cooley.com
19
    Also Present:
20    Orson Braithwaite, Videographer
21
22

Page 4

1              I N D E X
2   EXAMINATION OF HUGH SMYTH, Ph.D.       PAGE
3   BY MR. SUKDUANG                8
4
5              EXHIBITS
6
7   Exhibit 1   Expert Report of           19
                Hugh Smyth Ph.D.
8
9   Exhibit 2   United States Patent       36
                No. 10,716,793 B2
10              LIQ02799887-911

11  Exhibit 3                              79
                UTC_LIQ00258957
12
13  Exhibit 4                              81
                UTC_LIQ00258956
14
15  Exhibit 5                              84
                UTC_LIQ00258958
16
17  Exhibit 6    UTC_LIQ00264301          86
18  Exhibit 7   Photograph of Shipping Label  86
                Attachments
19              UTC_LIQ00264302-330
20  Exhibit 8   Article entitled         189
                "Evolution of dry powder
21              inhaler design, formulation,
                and performance"
22              UTC_LIQ00257724-735

Page 5

1   EXHIBITS (CONTINUED):
2
3   Exhibit 9   Excel Spreadsheet          206
                UTC_LIQ00257399
4   Exhibit 10  Excel Spreadsheets         222
                UTC_LIQ00257400
5
6   Exhibit 11  International Publication   226
                Number WO 2005/007081 A9
7               UTC_LIQ00041172-293
8
9   Exhibit 12  International Publication   233
                Number WO 2014/159050 A1
10  Exhibit 13  Smyth Lab Notebook         254
                UTC_LIQ00258049-080
11
12
13
14
15
16
17
18
19
20
21
22  (Exhibits bound separately.)

2 (Pages 2 - 5)



Page 86

1 
 
 
 
6    Q.   Okay.
7    A.   That -- that were in the lab, yes.
8    Q.   I think that's what we are going to
9 get to next.
10        There is going to be a couple new
11 exhibits that get marked in your folder.  It
12 will take a moment.
13        MS. KRICKL:  Sanya, you would like
14 me to mark the next two?
15        MR. SUKDUANG:  Yeah.  You can
16 check -- you can check your chat box.
17        MS. KRICKL:  Oh.  Sorry.
18        (Deposition Exhibit 6 was marked for
19 identification.)
20        (Deposition Exhibit 7 was marked for
21 identification.)
22        BY MR. SUKDUANG:

Page 87

1    Q.   Dr. Smyth, if you refresh there
2 might be a new exhibit that popped up into your
3 folder.
4    A.   Okay.  Yeah.  I see Exhibit 6.
5    Q.   Yes.  Could you open that for me,
6 please.
7    A.   Okay.
8        MR. SUKDUANG:  And for the record,
9 Exhibit 6 is a document bearing production
10 number UTC_LIQ00264301.
11        BY MR. SUKDUANG:
12 
 
15        MR. DYKHUIS:  Object to form.
16 
18        BY MR. SUKDUANG:
19 
 
 

Page 88

1    Q.   Did you or one of your colleagues
2 take a picture of          ?
3    A.
4    Q.                           ?
5    A.
6    Q.   Okay.                       ?
7    A.            .
 
 
 
12    A.   That is correct.
13        MR. DYKHUIS:  Form.
14        MR. SUKDUANG:  I am just waiting to
15 make sure of something.
16        Lauren, I think the document is
17 marked incorrectly in the folder.
18        MS. KRICKL:  Which one?
19        MR. SUKDUANG:  There are two Exhibit
20 6's.  There is a 6-4 and 6-5.
21        MS. KRICKL:  Okay.
22        MR. DYKHUIS:  6-5 should be Exhibit

Page 89

1 7.
2        MS. KRICKL:  I'll reintroduce that
3 one, and we can remove the other one later.
4        BY MR. SUKDUANG:
5    Q.   Dr. Smyth, you'll -- you can
6 refresh, and there should, hopefully, be an
7 Exhibit 7 in your folder.
8    A.   Okay.  Yeah.  I see something --
9 Exhibit 7.
10        MR. SUKDUANG:  And for the record,
11 Exhibit 7 is a document bearing production
12 number UTC_LIQ00264302 through UTC_LIQ00264330.
13        BY MR. SUKDUANG:
14    Q.   And do you have that in front of
15 you, Dr. Smyth -- Smyth?
16    A.   I -- yeah.  The UTC numbers are kind
17 of -- I guess, I see one number.
18    Q.   Yeah.  The first -- the first and
19 last page I just ran.
20    A.   Okay.  Yeah.  I presume that's
21 accurate.
22    Q.   Dr. Smyth, you can flip through

23 (Pages 86 - 89)



**Page 90**

1    this. I have some questions about certain
2    pages.
3         But I just want to ask -- my first
4    question is: ████████████████
█    ████████████████████
█    ████████████████████
█    ████████████████████
█    ████████████████
10        MR. DYKHUIS: Object to form.
11        THE WITNESS: ████████
█    ████████████████
█    ████████████████████
14        BY MR. SUKDUANG:
15    Q.   Yeah. Let me -- there is a
16    document -- document UTC_LIQ00264319. Is that
17    -- can you turn to that page.
18    A.   Yes, I'm there.
19    Q.   And the top, it's written: ████
█    ████████
21    A.   Yes. In a -- in a Sharpie, yes.
22    Q.   Yep. And then in the bottom

**Page 91**

1    right-hand corner there is a ████████
█    ████████
3    A.   Yes.
4    Q.   And would that be a -- ████
█    ████████?
6        MR. DYKHUIS: Object to form.
7        THE WITNESS: No. So that's --
8    that's Kelly down in the receiving office, so
9    yeah, the way that things come into the
10    university, they -- they all go through
11    receiving, and so when she gets things, she
12    stamps them.
13        BY MR. SUKDUANG:
14    Q.   Okay. This page we are looking at
15    appears -- it -- ████████████
█    ████████, correct?
17    A.   I'm just going to rotate the page.
18    Oops.
19         Yeah. The title says ████████.
20    Q.   And within this ████████
█    ████████████████; is that right?

**Page 92**

1    A.   Yes.
2    Q.   And then on the right-hand side
3    toward the top, there is ████████.
4         Do you see that?
5    A.   I see that.
█    ████████████████
7    A.   I see that, yes.
█    ██  ████████████████
9        MR. DYKHUIS: Object to form.
10   Foundation.
█    ████████████████████
█    ████████████████████████
█    ████████████████
15        BY MR. SUKDUANG:
16   Q.   Can you turn to the next page, the
17   page ending in -- the bottom four numbers are
18   4320?
19   A.   Okay.
20   Q.   And is this a ████████████
█    ████████████████?
22        MR. DYKHUIS: Object to form.

**Page 93**

1        THE WITNESS: Yeah. The document is
2    titled ████
█    ████████████.
4        BY MR. SUKDUANG:
5    Q.   And then under that it is ████?
6    A.   Under that ████████████████
█    ████████████.
8    Q.   And this document spans 11 pages,
9    correct?
10   A.   The document says page -- you know,
11   on this page it says 1 of 11, so I presume it's
12   11 pages.
13   Q.   What is a safety data sheet?
14   A.   It's a -- a data sheet that is often
15   used when chemicals are shipped and received
16   and stored. For example, for chemicals in my
17   lab, you know, you would maintain a or have
18   access to safety data sheets. And it just
19   outlines hazard information, first-aid
20   measures, firefighting measures, accidental
21   release measures, things of that nature for
22   that -- for that chemical.

24 (Pages 90 - 93)

# EXHIBIT 39





**UPS NEXT DAY AIR** **1**

TRACKING #:

BILLING:  P/P
HAZARDOUS MATERIALS - AIR ELIGIBLE
HAZ#: 1625

WS  22.0.17 uniFLOW Unive 48.0A 07/2021

Fold here and place in label pouch

Exhibit
7
Hugh Smyth

UTC_LIQ00264302



CONFIDENTIAL



United Therapeutics Corporation
1040 Spring Street
Silver Spring, Maryland 20910
Phone (301) 608-9292
Facsimile (301) 608-0376
www.unither.com

UTC_LIQ00264304



CONFIDENTIAL

UTC_LIQ00264305



CONFIDENTIAL



CONFIDENTIAL



UTC_LIQ00264308



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL                    UTC_LIQ00264312



CONFIDENTIAL

UTC_LIQ00264313



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

UTC_LIQ00264316



United Therapeutics Corporation
1040 Spring Street
Silver Spring, Maryland 20910
Phone (301) 608-9292
Facsimile (301) 608-0376
www.unither.com

UTC_LIQ00264317



CONFIDENTIAL

UTC_LIQ00264318

CONFIDENTIAL

UTC_LIQ00264319



CONFIDENTIAL



CONFIDENTIAL

UTC_LIQ00264321



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

UTC_LIQ00264325



CONFIDENTIAL



CONFIDENTIAL

UTC_LIQ00264327



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

UTC_LIQ00264330

# EXHIBIT 40





HIGHLY CONFIDENTIAL

UTC_LIQ00262040

United Therapeutics Corporation
1040 Spring Street
Silver Spring, Maryland 20910
Phone (301) 608-9292
Facsimile (301) 608-0376
www.unither.com



HIGHLY CONFIDENTIAL

UTC_LIQ00262041



Batch # 1102109

Page 2 of 2

HIGHLY CONFIDENTIAL

UTC_LIQ00262042

HIGHLY CONFIDENTIAL

UTC_LIQ00262043

Master Copy

**EXECUTION COPY**

Confidential and proprietary. Property of United Therapeutics Corporation. May not be reproduced without permission.

HIGHLY CONFIDENTIAL

UTC_LIQ00262044

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262045

Master Copy

EXECUTION COPY



HIGHLY CONFIDENTIAL

Master Copy

EXECUTION COPY



HIGHLY CONFIDENTIAL

UTC_LIQ00262047

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262048

Master Copy

EXECUTION COPY



HIGHLY CONFIDENTIAL

UTC_LIQ00262049

Master Copy

EXECUTION COPY



HIGHLY CONFIDENTIAL

UTC_LIQ00262050

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262051

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262052

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262053

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262054

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262055

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262056

Master Copy

EXECUTION COPY



HIGHLY CONFIDENTIAL

UTC_LIQ00262057

Master Copy



HIGHLY CONFIDENTIAL

UTC_LIQ00262058

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262059

Master Copy

EXECUTION COPY

UTC_LIQ00262060

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262061

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262062

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262063

Master Copy

EXECUTION COPY



HIGHLY CONFIDENTIAL

UTC_LIQ00262064

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262065

Master Copy



HIGHLY CONFIDENTIAL

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262067

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262068

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262069

EXECUTION COPY



HIGHLY CONFIDENTIAL

Master Copy

EXECUTION COPY



HIGHLY CONFIDENTIAL

Master Copy

EXECUTION COPY

HIGHLY CONFIDENTIAL

UTC_LIQ00262072



HIGHLY CONFIDENTIAL

UTC_LIQ00262073



HIGHLY CONFIDENTIAL

UTC_LIQ00262074



HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

UTC_LIQ00262076



HIGHLY CONFIDENTIAL

UTC_LIQ00262077



HIGHLY CONFIDENTIAL

UTC_LIQ00262078



HIGHLY CONFIDENTIAL

UTC_LIQ00262079



HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

UTC_LIQ00262081



HIGHLY CONFIDENTIAL

UTC_LIQ00262082



HIGHLY CONFIDENTIAL

UTC_LIQ00262083



HIGHLY CONFIDENTIAL

UTC_LIQ00262084



HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

UTC_LIQ00262086



HIGHLY CONFIDENTIAL

UTC_LIQ00262087

# EXHIBIT 41

**EXHIBIT 41[1]**

| '393 Patent Claim 1 | '066 Patent Claim 8 | '901 Patent Claim 8 |
|---|---|---|
| A product comprising a compound of Formula I<br><br>or a pharmaceutically acceptable salt thereof, wherein said product is prepared by a process comprising | A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising | A method of preparing a pharmaceutical batch as claimed in Claim 1, comprising |
| (a) alkylating a compound of [a genus including benzindene triol] with an alkylating agent to produce a compound [from a genus comprising treprostinil], | alkylating a triol intermediate of the formula: | (a) alkylating a benzindene triol, |
| (b) hydrolyzing the product [] of step (a) with a base, | hydrolyzing the resulting compound to form treprostinil, | (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, |
| (c) contacting the product of step [(b)] with a base B to form a salt of formula I$_s$. | forming a salt of treprostinil stable at ambient temperature, and | (c) contacting the solution comprising tresprostinil from step (b) with a base to form a salt of tresprostinil, |
|  | preparing a pharmaceutical product from the treprostinil salt after storage, wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof. | (d) isolating the salt of treprostinil, and |
| (d) optionally reacting the salt formed in step (c) with an acid to form the compound of formula I. |  | (e) optionally reacting the salt of tresprostinil with an acid to form treprostinil. |

---

[1] Highlighting added for emphasis.

# EXHIBIT 42

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 20-755-RGA |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) | |

**DEFENDANT LIQUIDIA TECHNOLOGIES, INC.'S
PRELIMINARY INVALIDITY CONTENTIONS**

Defendant Liquidia Technologies, Inc. ("Liquidia") hereby submits these Preliminary Invalidity Contentions pursuant to Paragraph 4(d) of the Delaware Default Standard for Discovery and Section (3)(g)(i) of the Scheduling Order (D.I. 20) with respect to all claims of U.S. Patent Nos. 9,593,066 ("the '066 Patent"), 9,604,901 ("the '901 Patent"), and 10,716,793 ("the '793 Patent") (collectively, "the Asserted Patents") asserted by United Therapeutics Corp. ("UTC" or "Plaintiff"), in UTC's Preliminary Infringement Contentions dated October 16, 2020. Specifically, UTC asserted infringement of claims 1-3, 6, and 8-9 of the '066 Patent; claims 1-4, 6, and 8 of the '901 Patent; and claims 1, 4, and 6-8 of the '793 Patent (collectively, "the Asserted Claims").

## I.   GENERAL INFORMATION

These contentions are based on information reasonably available to Liquidia at this time, and may require subsequent amendment, alteration or supplementation. Consequently, Liquidia reserves the right to amend, alter, or supplement these contentions based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction from the Court, or as a result of UTC's Asserted Claims and contentions. Moreover, these

1

contentions may be in the alternative and do not substitute any concession by Liquidia for the purposes of claim construction or infringement.  *See* Fed. R. Civ. P. 8(d).

In these Preliminary Invalidity Contentions, Liquidia has identified specific combinations of primary and secondary prior art references upon which it intends to rely.  However, there is a large volume of background art relevant to invalidity, on which Liquidia relies but for which Liquidia could not possibly provide written explanations of every possible combination. Accordingly, Liquidia expressly reserves its right to rely on combinations not expressly set forth herein.

Liquidia also attempted to identify the most relevant portions of each prior art reference upon which it intends to rely.  Given the number of relevant passages within each prior art reference, Liquidia could not possibly identify every single passage that may be relevant to its invalidity positions.  Accordingly, Liquidia expressly reserves the right to rely upon additional portions of the cited prior art references, but has made a good faith effort to identify representatively relevant passages.

Furthermore, these contentions are provided without prejudice to Liquidia's right to introduce at trial any subsequently discovered evidence or expert opinions relating to currently-known facts and to produce and introduce at trial all evidence, whenever discovered, relating to the proof of subsequent discovered facts.  Moreover, facts, documents and things now known may be imperfectly understood and, accordingly, such facts, documents and things may not be included in the following contentions.  Liquidia reserves the right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, expert opinion testimony, documents and things notwithstanding the written statements herein.  Liquidia further reserves its right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any

and all facts, documents and things that are not currently recalled but might be recalled at some time in the future.

The information set forth below is provided without waiving: (1) the right to object to the use of any statement for any purpose, in this action or any other action, on the grounds of privilege, relevance, materiality, or any other appropriate grounds; (2) the right to object to any request involving or relating to the subject matter of the statements herein; or (3) the right to revise, correct, supplement, or clarify any of the statements provided below at any time.

Liquidia reserves the right to allege the invalidity of the Asserted Claims on bases other than those disclosed herein.

### A.      Identification of Asserted Claims

On October 16, 2020, UTC provided its Preliminary Infringement Contentions pursuant to the Scheduling Order and the Default Standard for Discovery.  In UTC's Preliminary Infringement Contentions, UTC asserts that the manufacturing of the active pharmaceutical ingredient for Liquidia's Proposed NDA Product that is subject of Liquidia's NDA No. 213005 under § 505(b)(2) of the Federal Food, Drug and Cosmetic Act to the United States Food and Drug Administration, in accordance with the protocol referenced in Liquidia's NDA and described in Drug Master File No. 27680, infringes claims 1-3, 6, and 8-9 of the '066 Patent and claims 1-4, 6, and 8 of the '901 Patent.  UTC further alleges that the drug product that is the subject of Liquidia's NDA, when used in the intended manner and as taught in Liquidia's proposed label and package insert, infringes claims 1, 4, and 6-8 of the '793 patent.  In view of UTC's Preliminary Infringement Contentions, the following invalidity contentions address the Asserted Claims of the Asserted Patents.

## II.      U.S. PATENT NO. 9,593,066

The '066 Patent issued March 14, 2017 from Application No. 14/849,981, filed September 10, 2015.  *See* '066 Patent at 1.  Application No. 14/849,981 is a divisional of Application

No. 13/933,623, filed on July 2, 2013, now Patent No. 9,156,786, which is a continuation of Application No. 13/548,446, filed on July 13, 2012, now Pat. No. 8,497,393, which is a continuation of Application No. 12/334,731, filed on December 15, 2008, now Pat. No. 8,242,305. *Id.* The '066 Patent claims priority to provisional application No. 61/014,232, filed December 17, 2007. *Id.*

The '066 Patent allegedly discloses an "improved process" to prepare prostacyclin derivatives such as treprostinil. *Id.* at Abstract. Claim 1 is a product-by-process claim drawn to a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof. Claim 8 is drawn to a process of preparing the same product from claim 1, comprising the steps of alkylation of an intermediate triol to form a treprostinil salt. *Id.* at cols. 17-18, claims 1 and 8.

Asserted Claim 1 recites the following:

1[a][1] A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising

1[b] providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps,

1[c] forming a salt of treprostinil by combining the starting batch and a base,

1[d] isolating the treprostinil salt, and

1[e] preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt,

1[f] whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and

---

[1] The bracketed letters have been added for ease of review and to distinguish among the various limitations.

1[g] wherein said alkylation is alkylation of benzindene triol.

Asserted dependent claims 2, 3, and 6 are directed towards pharmaceutical compositions of claim 1, wherein the salt is isolated in crystalline form (claim 2); the base is selected from a group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline (claim 3); and the isolated salt is stored at ambient temperature (claim 6).

Asserted Claim 8 recites the following:

8[a] A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising

8[b] alkylating a triol intermediate of the formula:



8[c] hydrolyzing the resulting compound to form treprostinil,

8[d] forming a salt of treprostinil stable at ambient temperature,

8[e] storing the treprostinil salt at ambient temperature, and

8[f] preparing a pharmaceutical product from the treprostinil salt after storage,

8[g] wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.

Asserted dependent claim 9 is directed toward a pharmaceutical product prepared by the process of claim 8.

These Preliminary Invalidity Contentions establish that claims 1-3, 6, and 8-9 of the '066 Patent are unpatentable as obvious under 35 U.S.C. § 103.  Moreover, these Preliminary Invalidity

Contentions show that the Asserted Claims of the '066 Patent are also invalid under 35 U.S.C. § 112.

### A.    Scope and Content of the Prior Art for the '066 and '901 Patents

#### 1.    Phares 2005

Phares 2005 is titled "Compounds and Methods for Delivery of Prostacyclin Analogs." Int'l App. No. PCT/US2004/016401 ("Phares 2005").  The named inventors are Ken Phares and David Mottola.  Phares 2005 was published January 27, 2005 and is prior art to the '066 and '901 Patents under 35 U.S.C. §§ 102(a), (b), and (e).  The '066 and '901 Patents seek the benefit of provisional application No. 61/014,232, filed on December 17, 2007.  For the purposes of this petition, Petitioner will use December 17, 2007 as the effective filing date of the '066 and '901 Patents.

Phares 2005 describes "compounds and methods for inducing prostacyclin-like effects in a subject or a patient," including treprostinil and derivatives thereof.  *Id.* at 8.  The chemical structure of treprostinil is shown below:



*Id.*  Phares 2005 explains that "[t]reprostinil is a chemically stable analog of prostacyclin, and as such is a potent vasodilator and inhibitor of platelet aggregation."  *Id.*

Phares 2005 further discloses that "[a] preferred embodiment of the present invention is the diethanolamine salt of treprostinil."  *Id.* at 9.  A particularly preferred embodiment of the invention disclosed in Phares 2005 is "[F]orm B of treprostinil diethanolamine."  *Id.*  The structure

of treprostinil diethanolamine salt described by Phares 2005 is reproduced below:



*Id.* at 96 (claim 49).  Phares 2005 discloses two crystalline forms of treprostinil diethanolamine salt, Form A and Form B.  *Id.* at 85-89.  The crystalline Form B "appears to be the most thermodynamically stable form" with "full conversion to Form B at ambient, 15° C, and 30° C after 7 days, 11 days, and 1 day, respectively." *Id.* at 89.

Phares 2005 further discloses the synthesis of (-)-treprostinil, the enantiomer of (+)-treprostinil.  *Id.* at 39-40.  Phares 2005 explains that "[e]nantiomers of these compounds . . . can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents."  *Id.* at 39.   In particular, Phares 2005 teaches that "the enantiomer of the commercial drug (+)-Treprostinil was synthesized using the stereoselective intramolecular Pauson Khand reaction as a key step and Mitsunobu inversion of the side-chain hydroxyl group."  *Id.* at 40.  Phares 2005 discloses the following reaction procedure for the synthesis of **2**, the enantiomer of treprostinil, from the benzindene triol **11** (outlined in the red-dotted square below):

*Id.*  The reaction procedure for the conversion of **11b** to **2** is disclosed in Phares 2005 as: "(l) i. ClCH$_2$CN, K$_2$CO$_3$. ii, KOH, CH$_3$OH, reflux. 83% (2steps)."  *Id.*  Steps (i) to (k) shown above result in treprostinil triol (the precursor for treprostinil), and step (l) coverts the precursor into treprostinil.

Phares 2005 further "provides for compositions which may be prepared by mixing one or more compounds of the instant invention, or pharmaceutically acceptable salts thereof, with pharmaceutically acceptable carriers, excipients, binders, diluents or the like, to treat or ameliorate a variety of disorders related vasoconstriction and/or platelet aggregation."  *Id.* at 48.  Thus, the pharmaceutical acceptability of the compounds is clearly disclosed in Phares 2005.

## 2. Moriarty 2004

Moriarty 2004 was published in 2004 in the Journal of Organic Chemistry, Volume 69, No. 6, pp. 1890-1902.  Robert M. Moriarty et al., *The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)*, 69 J. ORG. CHEM. 1890 (2004) ("Moriarty 2004").  Moriarty 2004 is prior art to the '066 and '901 Patents under §§ 102(a) and (b).  Moriarty 2004 was also used in

prosecution of the '066 and '901 Patents and in the '393 IPR without objection from the Patent Owner.

Moriarty 2004 is titled "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)." *Id*. at 1890. Moriarty 2004 describes the synthesis of treprostinil "via the stereoselective intramolecular Pauson-Khand cyclization." *Id*. Structure **7** of Moriarty 2004 depicts the chemical structure of treprostinil, prior to salt formation, and is shown below:



**7**

*Id.* at 1892. This is the identical treprostinil pharmaceutical salt precursor disclosed in the '066 and '901 Patents:



'066 Patent at 11:50-65; '901 Patent at 11:16-28.

Scheme 4 of Moriarty 2004 further discloses alkylation of **34** by $ClCH_2CN$ to yield **35**. Moriarty 2004 at 1895, 1902. The alkylation product **35** is then hydrolyzed with a base (*i.e.* aqueous KOH), followed by acidification to yield **7**, treprostinil. *Id.* The alkylation reaction of **34**

to yield **35** as disclosed in Moriarty 2004 is equivalent to the alkylation reaction disclosed in the '066 and '901 Patents.

**34** and **35** of Moriarty 2004 are as follows:



*Id.* at 1895.

Moriarty 2004 reports that the disclosed process yields a 99.7% pure crystalline solid in the form of "[w]hite needles." *Id.* at 1902.

### 3.    U.S. Patent No. 6,765,117 ("the '117 Patent")

The '117 Patent is titled "Process for Stereoselective Synthesis of Prostacyclin Derivatives." The named inventors are Robert M. Moriarty, Raju Penmasta, Liang Guo, Munagala S. Rao, and James P. Staszewski. The '117 Patent issued on July 20, 2004 and is prior art to the '066 and '901 Patents under §§ 102(a), (b), and (e). The '117 Patent is directed towards a "process for producing prostacyclin derivatives," including treprostinil, and "novel intermediate compounds useful in the process." '117 Patent at 1:14-16. The prostacyclin derivatives and intermediates include the following general structure:



10

*See, e.g.*, '117 Patent at claim 1.

For example, the '117 Patent includes the synthesis of treprostinil (which is the case in which: Z is O, n is 1, X is COOH, $Y_1$ is $CH_2CH_2$-, $M_1$ is an H and an OH group in the S configuration (*i.e.*, the same stereoisomer configuration found in the structure of treprostinil (below)), $L_1$ is α-H; β-H, and $R_7$ is $-(CH_2)_3$-$CH_3$ amongst its many examples. For example, claim 3 of the '117 Patent discloses the structure of treprostinil below:



which is produced by a process for making 9-deoxy-PGF1-type compounds, the process comprising cyclizing the following starting compound:



### 4.    Wiberg 1960

Wiberg 1960 is a textbook published in 1960 by McGraw-Hill Book Company, Inc. and written by Kenneth B. Wiberg.  Kenneth B. Wiberg, LABORATORY TECHNIQUE IN ORGANIC CHEMISTRY 112 (1960) ("Wiberg 1960").  Wiberg 1960 is prior art to the '066 and '901 Patents under §§ 102(a) and (b).  Wiberg 1960 is an organic chemistry textbook titled "Laboratory Technique in Organic Chemistry."  *Id.*  Describing laboratory purification methods, Wiberg 1960 explicitly states:

> A typical example is the purification of a water-insoluble solid carboxylic acid by dissolving it in sodium hydroxide solution, filtering, precipitating the compound by the addition of acid. A similar procedure may be used with amines: dissolve the compound in acid and precipitate it with a base. These procedures usually work quite well in that they utilize a chemical reaction to aid in separation from nonacidic or nonbasic impurities.

Wiberg 1960 at 112.

### 5.     Schoffstall 2004

Schoffstall 2004 is a textbook published in 2004 by The McGraw-Hill Companies, Inc. and written by Allen M. Schoffstall et al.  Allen M. Schoffstall et al., MICROSCALE AND MINISCALE ORGANIC CHEMISTRY LABORATORY EXPERIMENTS (Thomas D. Timp ed., 2d ed. 2004) ("Schoffstall 2004").  Schoffstall 2004 is prior art to the '066 and '901 Patents under §§ 102(a) and (b).  Schoffstall 2004 is the second edition of an organic chemistry textbook titled "Microscale and Miniscale Organic Chemistry Laboratory Experiments."  Schoffstall 2004 describes an experiment in which carboxylic acid is separated from neutral and basic organic compounds by conversion to a salt.  Schoffstall 2004 at 201-02.  Addition of an acid, such as HCl, then regenerates the carboxylic acid from the salt, which can then be filtered or extracted into an organic solvent. *Id*.

Specifically, Schoffstall 2004 indicates that "[a] water-insoluble, acidic organic compound such as a carboxylic acid or phenol can be easily separated from neutral and basic organic compounds by conversion to a water-soluble salt."  *Id*. at 201.  Schoffstall 2004 discloses the following general reaction scheme:

$$\underset{\substack{\text{a water-insoluble}\\\text{carboxylic acid}}}{RCO-H} + NaOH \longrightarrow \underset{\substack{\text{a water-soluble}\\\text{carboxylate salt}}}{RCO^-Na^+} + H_2O$$

*Id*.

12

Schoffstall 2004 indicates that "[n]eutral and basic organic compounds remain in the organic layer.  The two layers can then be separated.  Addition of HCl to the aqueous layer regenerates the water-insoluble carboxylic acid, which can then be filtered or extracted into an organic solvent."  *Id*.  Similarly, Schoffstall 2004 discloses the following general reaction scheme:

$$\underset{\substack{\text{a water-soluble} \\ \text{carboxylate salt}}}{RCO^-Na^+} + HCl \longrightarrow \underset{\substack{\text{a water-insoluble} \\ \text{carboxylic acid}}}{RCO-H} + NaCl$$

*Id*.

### 6.      Kawakami 1981

Japanese Patent Application No. 56-122328 ("Kawakami 1981"), published on September 25, 1981, is titled "Crystalline Amine Salt of Methanoprostacyclin Derivative, Manufacturing Method Thereof, and Purifying Method Thereof."  Kawakami 1981 is prior art to the '066 and '901 Patents under §§ 102(a) and (b).  The named inventors are Hajime Kawakami, Keiichi Ono, Akihiko Sugie, and Sumimoto Katsube.  Kawakami 1981 at 1.  Kawakami 1981 is directed to the preparation and use of dicyclohexylamine (*i.e.*, an amine base with similar reactivity to diethanolamine) to form a crystalline dicyclohexylamine salt of a methanoprostacyclin derivative, in order to purify methanoprostacyclin.  *Id*. at 3.  Kawakami 1981 further discloses that the dicyclohexylamine salt of a methanoprostacyclin derivative can be easily reverted to the free methanoprostacylcin derivative by conventional methods, such as treating the salt with a strong acid such as HCl or $H_2SO_4$.  *Id*. at 6.  Per Kawakami 1981, the salt that is obtained has "fairly high purity, and the purity can be further improved by recrystallization as needed with the use of an appropriate solvent."  *Id*.

### 7.    Ege 1989

Ege 1989 was published in 1989 by D.C. Heath and Company and is the second edition of a textbook titled "Organic Chemistry."  Seyhan N. Ege, ORGANIC CHEMISTRY (Mary Le Quesne et al. eds., 2d ed. 1989) ("Ege 1989").  Ege 1989 is prior art to the '066 and '901 Patents under §§ 102(a) and (b).  Ege 1989 was edited by Seyhan N. Ege.  Ege 1989 discloses that sodium benzoate (i.e., a carboxylate salt) can be converted back to benzoic acid (i.e., a carboxylic acid) by treatment with the acid HCl, which is prototypical of the reaction of treprostinil diethanolamine salt with an acid to regenerate treprostinil carboxylic acid.  Ege 1989 at 546.  The reaction scheme is provided below:



*Id.*

### B.    Claims 1-3, 6, and 8-9 Are Invalid Under 35 U.S.C. § 103

#### 1.    Claims 1-3, 6, and 8-9 Would Have Been Obvious Over Phares 2005

The Asserted Claims of the '066 Patent would have been obvious over Phares 2005.

##### a.    Independent Claim 1 Would Have Been Obvious

###### (1)    Claim Element 1[a]

| 1[a] | *A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising:* |
|------|---|

Phares 2005 discloses the same pharmaceutical composition and synthesis of treprostinil as set forth in independent claims 1 and 8 of the '066 Patent.  Phares 2005 describes "compounds

and methods for inducing prostacyclin-like effects in a subject or a patient," including treprostinil and derivatives thereof.  Phares 2005 at 8.  The chemical structure of treprostinil disclosed in Phares 2005 is shown below:



*Id.* This is the same treprostinil disclosed in the '066 Patent:



Where w = 1; $Y_1$ is—$CH_2(CH_2)_m$- and m is 1; $M_1$ is $\alpha$-OH: $\beta$-$R_5$ or $\alpha$-$R_5$: $\beta$-OH, wherein $R_5$ is hydrogen; $L_1$ is $\alpha$-$R_3$: $\beta$-$R_4$, $\alpha$-$R_4$: $\beta$-$R_3$, or a mixture of $\alpha$-$R_3$: $\beta$-$R_4$ and $\alpha$-$R_4$: $\beta$-$R_3$, wherein $R_3$ and $R_4$ are hydrogen; and $R_7$ is  —$C_pH_{2p}$—$CH_3$, wherein p is an integer from 1 to 5 inclusive (p=3). '066 Patent at 2:7-3:15.

Phares 2005 further discloses the identical, pharmaceutically acceptable treprostinil diethanolamine salt as the '066 Patent.  Phares 2005 at 96 (claim 49).  The structure of treprostinil diethanolamine salt disclosed by Phares 2005 (left) is reproduced below in a side-by-side comparison with the treprostinil diethanolamine salt disclosed in the '066 Patent (right):

15

(Phares 2005)                                                 ('066 Patent)

Phares 2005 at 96 (claim 49); '066 Patent at 12:8-23, 14:9-20 (Examples 3 and 5).  Other than a change in formatting, one can easily see that these two structures from Phares 2005 and the '066 Patent are identical.

This salt is made by the same process steps as claim 1 of the '066 Patent: (a) by forming a salt of treprostinil by combining the starting batch of treprostinil acid and a base and; (b) isolating the treprostinil salt.  '066 Patent at 17:51-63 (claim 1); Phares 2005 at 22.  The isolated salt is then used to prepare a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof.  '066 Patent at 17:51-63 (claim 1); Phares 2005 at 58.  This shows that Phares 2005 necessarily discloses the same process steps to make a pharmaceutically acceptable salt thereof disclosed in claim 1—treprostinil diethanolamine salt—claimed in the '066 Patent, and thus inherently renders obvious claim 1 of the '066 Patent.  Further support for the obviousness of each process element of claim 1 is provided in the following Sections II.B.1.a.(2)-(7).

### (2)     Claim Element 1[b]

| 1[b] | *providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps,* |
|------|---------------------------------------------------------------------------------------------------------------------------------|

As discussed above in Section II.B.1.a.(1), Phares 2005 discloses the identical treprostinil and pharmaceutically acceptable treprostinil diethanolamine salt as the '066 Patent.  The remaining process claim elements do nothing to impart structural or functional differences in the claimed treprostinil or pharmaceutically acceptable salt thereof, and thus, do not patentably limit the claimed pharmaceutical composition.  Even so, Phares 2005 further discloses providing a starting batch of treprostinil having one or more impurities resulting from alkylation and hydrolysis steps.

Phares 2005 discloses the same steps of alkylating and hydrolyzing to make the treprostinil disclosed in the '066 Patent.  Phares 2005 discloses the synthesis of (-)-treprostinil, the enantiomer of (+)-treprostinil.  Phares 2005 at 39-40.  Phares 2005 explains that enantiomers of these compounds (including (-)-treprostinil) "can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents," referring to the reaction scheme where "the enantiomer of the commercial drug (+)-Treprostinil was synthesized using the stereoselective intramolecular Pauson Khand reaction as a key step and Mitsunobu inversion of the side-chain hydroxyl group."  *Id.*  A POSA would therefore understand that Phares 2005 inherently discloses the synthesis of both enantiomeric forms of treprostinil, both (-)-treprostinil and (+)-treprostinil. *Id.*  Phares 2005 illustrates the following synthesis reaction:



*Id.* at 40.  The reaction procedure for alkylation to treprostinil is disclosed in Phares 2005 (*i.e.*, the

conversion of Compound 11b to the intermediate nitrile product (not shown) in the above reaction scheme) as: (l) **i. ClCH₂CN, K₂CO₃.**" *Id.* (emphasis added).

Phares 2005 details the exact same alkylation and hydrolyzing steps: (1) i. ClCH₂CN, K₂CO₃. ii. KOH, CH₃OH, reflux. 83% (2 steps).  *Id.*  Chloroacetonitrile (ClCH₂CN) was known in the art at the time of the invention to play an important role in alkylation reactions, and potassium hydroxide in methanol (KOH, CH₃OH) was known to play an important role in hydrolysis.  Further, in view of the immediate steps prior to conversion to the salt and/or crystallization being those of alkylation and hydrolysis, a POSA would understand that at least one impurity in the substrate for salt formation and/or crystallization would most likely result from these intermediate steps.

Therefore, based on the identical starting materials and chemical steps in Phares 2005 and the '066 Patent, a POSA would expect to observe the same impurity profiles in each.  In both cases, a POSA would understand these impurities to most likely result from either the prior alkylation and/or hydrolysis steps.  Phares 2005 therefore renders obvious providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps.

### (3)      Claim Element 1[c]

| 1[c] | *forming a salt of treprostinil by combining the starting batch and a base,* |
|------|------------------------------------------------------------------------------|

As discussed above in Section II.B.1.a.(1), Phares 2005 discloses the identical treprostinil and pharmaceutically acceptable treprostinil diethanolamine salt as the '066 Patent.

Phares 2005 further discloses combining a starting batch and a base.  Phares 2005 at 22.  In particular, page 22 of Phares 2005 further teaches dissolving treprostinil acid, which was made upon alkylation and hydrolysis, in a 1:1 molar ratio mixture of ethanol: water and **diethanolamine**

(*i.e.*, a base).  *Id.*

### (4)     Claim Element 1[d]

| 1[d] | *isolating the treprostinil salt, and* |
|------|----------------------------------------|

Phares 2005 discloses isolating the identical pharmaceutically acceptable treprostinil diethanolamine salt as the '066 Patent.  Phares 2005 further discloses isolating crystalline forms of treprostinil diethanolamine salt—Form A and Form B.  Phares 2005 at 85-89.  Upon completion of a reaction, the product is isolated.  The isolation steps needed following conversion of Form A to Form B are routine and understood by a sophomore organic chemistry student.  *Id.*

### (5)     Claim Element 1[e]

| 1[e] | *preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt,* |
|------|----------------------------------------------------------------------------------------------------------------------------------------------------|

The invention of Phares 2005 "provides for compositions which may be prepared by mixing one or more compounds of the instant invention, or pharmaceutically acceptable salts thereof, with pharmaceutically acceptable carriers, excipients, binders, diluents or the like, to treat or ameliorate a variety of disorders related vasoconstriction and/or platelet aggregation."  *Id.* at 48.  Thus, the pharmaceutical acceptability of the compounds is clearly disclosed in Phares 2005.

A POSA would also know how to prepare a composition comprising treprostinil (treprostinil carboxylic acid) or a salt thereof salt thereof from Phares 2005's isolated pharmaceutically acceptable treprostinil salt.  The addition of an acid to a carboxylate salt to regenerate the carboxylic acid is standard chemical purification known in the art.  *See, e.g.*, Schoffstall at 201-02; Wiberg at 112.  For example, Ege 1989 discloses that sodium benzoate (*i.e.*, a carboxylate salt) can be converted back to benzoic acid (*i.e.*, a carboxylic acid) by treatment with the acid HCl, which is prototypical of the reaction of the treprostinil diethanolamine salt to regenerate the treprostinil carboxylic acid.  Ege 1989 at 546.

19

Phares 2005 therefore discloses isolating a treprostinil salt, and a skilled artisan would have a reasonable expectation of success and would know how to prepare a pharmaceutical composition comprising treprostinil or a salt thereof from the isolated treprostinil salt based on the disclosures of Phares 2005 and standard knowledge in the art as evidenced by Ege.  There is nothing novel about preparing a composition with an isolated treprostinil salt versus a treprostinial salt that is not previously isolated.  *Id.*

### (6)    Claim Element 1[f]

| 1[f] | *whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and* |
|------|------|

The claim language of the '066 Patent does not disclose the percentage of "impurity" required in the starting batch of treprostinil and simply states "having one or more impurities."  The '066 Patent discloses that in one embodiment the "purity of compound of formula IV is at least 90.0%, 95.0%, 99.0% [or] 99.5%," where the formula IV is treprostinil.  '066 Patent at 9:22-23.  This disclosure shows that the purity of treprostinil may be as low as 90.0%.

Based on the identical starting materials and chemical steps used to make treprostinil in Phares 2005 and the '066 Patent, as discussed further in Sections II.A.1 and II.B.1.a.(2), a POSA would expect to observe the same impurity profiles in the "starting batch" of treprostinil resulting from the prior alkylation and/or hydrolysis steps.  Further, because Phares 2005 discloses the same method of making treprostinil salts as claimed in the '066 Patent, the pharmaceutical batch of Phares 2005 would also have contained a lower amount of one or more impurities than the starting batch of treprostinil.  Accordingly, that the claimed pharmaceutical composition contains a lower amount of one or more impurities than the starting batch of treprostinil was neither new nor nonobvious.  *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985) ("If the product in the product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable

20

even though the prior product was made by a different process."); *see also Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1366 (Fed. Cir. 2009) ("It has long been the case that an old product is not patentable even if it is made by a new process.").

Phares 2005 further discloses two crystalline forms of treprostinil diethanolamine salt, Form A and Form B.  Phares 2005 at 85-89.  Form A has an endotherm at 103° C and Form B has an endotherm at 107° C.  *Id*. at 87-88.  A form exhibiting a higher endotherm temperature is inherently understood to be compatible with a higher purity.  Thus, the higher melting point of Form B would be consistent and compatible with a higher degree of purity in Form B in comparison with Form A based on these endotherm temperatures.  Further, Form A is utilized as the starting material for the formation of Form B.  A POSA would understand that this transformation, similar to that described in the '066 Patent, typically removes impurities.  *Id*.  As such, Form A should be purer than the starting batch, and Form B purer than Form A.  *Id*.

Further, a POSA would have had a reasonable expectation that the treprostinil salt described in Phares 2005 would contain a lower amount of one or more impurities than the starting batch of treprostinil because contacting a carboxylic acid of prostacyclin derivative, such as treprostinil, with a base to form a salt, followed by the addition of a strong acid to regenerate the carboxylic acid, was a well-known chemical purification technique in the prior art.  For example, Kawakami 1981 is directed to the preparation and use of dicyclohexylamine (i.e., an amine base with similar reactivity to diethanolamine) to form a crystalline dicyclohexylamine salt of a methanoprostacyclin derivative, in order to purify the methanoprostacyclin.  *See generally* Kawakami 1981.  Kawakami 1981 also discloses that the dicyclohexylamine salt of a methanoprostacyclin derivative can easily be reverted to the free methanoprostacyclin derivative by conventional methods, such as treating the salt with a strong acid such as HCl or $H_2SO_4$.  *Id*. at

6.  Per Kawakami 1981, the salt that is obtained has "fairly high purity, and the purity can be further improved by recrystallization as needed with the use of an appropriate solvent."  *Id.*; *see also* Ege 1989 at 546 (disclosing that sodium benzoate (i.e., a carboxylate salt) can be converted back to the benzoic acid (i.e., a carboxylic acid) by treatment with HCl).  Thus, a POSA would know that a pharmaceutical composition comprising either treprostinil acid or treprostinil salt made by the process disclosed in Phares 2005 and claimed in the '066 Patent would possess less impurities than the starting batch of treprostinil resulting from the prior alkylation and/or hydrolysis steps.

A POSA would therefore find it obvious that the level of one or more impurities found in the starting batch of treprostinil is lower in the final pharmaceutical composition.

### (7)    Claim Element 1[g]

| 1[g] | *wherein said alkylation is alkylation of benzindene triol.* |
|------|--------------------------------------------------------------|

Example 1 of the '066 Patent describes the alkylation of benzindene triol.  '066 Patent at 9:50-10:13.  This alkylation reaction is shown below:



Alkylation of Benzindene Triol

*Id.*  Benzindene triol is the fused tricyclic core wherein the three hydroxyl groups (-OH) are not all located on the core.  In this example, the hydroxyl group indicated with the red square is being

alkylated using **ClCH₂CN** in the presence of K₂CO₃, Bu₄NBr and acetone.

As stated above in Section II.B.1.a.(2), Phares 2005 discloses an alkylation reaction identical in nature to the '066 Patent alkylation reaction: **(l) i. ClCH₂CN, K₂CO₃**. Phares 2005 at 39-40. In particular, in step (l) the starting treprostinil precursor compound, the benzindene triol, has the same structural formula as the treprostinil precursor being alkylated in the '066 Patent (**11b** indicates that "R" can be "H"). The reaction from Phares 2005 is shown below for comparison:



*Id.* Phares 2005 teaches a POSA to selectively alkylates the phenolic –OH group on the fused three ring core of Compound **11b** as indicated in the red box. *Id.*

In addition, Phares 2005 cites to U.S. Patent No. 4,306,075 for routes in which compounds disclosed in Phares 2005 can be modified. *Id.* at 9 (citing U.S. Patent No. 4,306,075 ("the '075 Patent")). Chart P of the '075 patent provides a synthetic scheme where the -OH of a benzindene triol, as referred to in the '066 Patent, is alkylated. '075 Patent at col. 90. While the '075 Patent does not disclose the same synthesis reaction, this reference supports the proposition that it was not a novel step at the time of the invention to alkylate an –OH group on the benzene of a fused ring system.

The disclosures and references contained in Phares 2005 thus disclose alkylation of a benzindene triol that can be used to prepare treprostinil.

### b.      Dependent Claims 2-3 and 6 Would Have Been Obvious

#### (1)      Claim 2

| 2 | The pharmaceutical composition of claim 1, *wherein the salt is isolated in crystalline form.* |
|---|---|

As stated above in Section II.A.1, Phares 2005 discloses that "[a] preferred embodiment of the present invention is the diethanolamine salt of treprostinil." Phares 2005 at 9. Phares 2005 discloses two **crystalline forms** of treprostinil diethanolamine salt, Form A and Form B. *Id.* at 85-89 ("two **crystalline forms** of UT-15C were idenitified [sic] as well as an amorphous form.") (emphasis added). A particularly preferred embodiment of the invention disclosed in Phares 2005 is "Form B of treprostinil diethanolamine." *Id.* at 9. Phares 2005 therefore discloses the same treprostinil diethanolamine salt, in crystalline form, as the '066 Patent.

#### (2)      Claims 3

| 3 | The pharmaceutical composition of claim 1, *wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline.* |
|---|---|

Phares 2005 discloses the preparation of treprostinil diethanolamine, including the step of adding treprostinil and diethanolamine (*i.e.,* a base) in a 1:1 molar ratio mixture of ethanol: water. Phares 2005 at 22. After addition of a base, the treprostinil diethanolamine can then be further precipitated and purified to form the crystalline "Form A" and "Form B." *Id.* at 85-89. Phares 2005 thus discloses the use of the base diethanolamine.

Phares 2005 further discloses several other inorganic bases such as sodium, ammonia, potassium, calcium, and ethanolamine, as recited in dependent claim 3 of the '066 Patent. Phares 2005 at 55.

In addition, the language of claim 3 is indefinite. It recites only *sodium*, *potassium*, and *calcium*, but sodium, potassium, and calcium on their own are not bases. They are the counterions

that result from treatment of the treprostinil acid with the corresponding bases.

### (3)   Claim 6

| 6 | The pharmaceutical composition of claim 1, *wherein the isolated salt is stored at ambient temperature.* |
|---|---|

Although claim 6 requires the "isolated salt" to be stored at ambient temperature, the '066 Patent fails to provide any evidence that the salt, as made according to the process disclosed in the '066 Patent was stored at ambient temperature.  Additionally, claim 6 does not provide a duration of time for storage at ambient temperature.  Nonetheless, as discussed above in Section II.B.1.a.(1), Phares 2005 discloses the same formula of treprostinil and identical pharmaceutically acceptable treprostinil diethanolamine salt as the '066 Patent (Form A and Form B).  Phares 2005 at 8-9; 85-89.  Phares 2005 discloses that Form B is more thermodynamically stable than Form A.  *Id.* at 87.  Phares 2005 further discloses that Form B is made from Form A, with full conversion to Form B at ambient temperature after 7 days, 15° C after 11 days and 30° C after 1 day, suggesting stability at these temperatures.  *Id.* at 89 (Table 17).  "Ambient temperature" means "room temperature" or, on average, 25° C.  *Id.*  Full conversion after 7 days at ambient temperature, as disclosed by Phares 2005, inherently teaches that Form B is stable at ambient temperature and therefore could be stored at ambient temperature.  *Id.*

Further, treprostinil was known to be stable at ambient temperature by December 2007.  Mardi Gomberg-Maitland et al., *Transition from Intravenous Epoprostenol to Intravenous Treprostinil in Pulmonary Hypertension*, 172 Am. J. Respir. Crit. Care Med. 1586-1589, 1586 (2005) ("Treprostinil has theoretical advantages over epoprostenol because of its stability at room temperature . . . .") ("Gomberg-Maitland 2005"); Dunbar Ivy et al., *Transition of Stable Pediatric Patients with Pulmonary Arterial Hypertension from Intravenous Epoprostenol to Intravenous Treprostinol*, 99(5) Am. J. Cardiol. 696, 696 (2007) ("Ivy 2007") ("Treprostinil possesses

physiochemical properties that make its use more convenient, including stability at room temperature . . . .").  In fact, the prescribing information for UTC's REMODULIN® published in March 2006 states plainly that "[t]reprostinil is chemically stable at room temperature and neutral pH."  *REMODULIN® Product Information*, UNITED THERAPEUTICS CORP. (Mar. 2006) ("REMODULIN® Label 2006").  Because treprostinil was known to be chemically stable at ambient temperature as of December 2007, a POSA would know that the treprostinil salts described in Phares 2005 could be "stored at ambient temperature."

As the treprostinil and treprostinil diethanolamine salt disclosed in Phares 2005 and the '066 Patent are identical, there are no structural differences between these molecules that would indicate that the compounds would require different storage conditions.

### c.     Independent Claim 8 Would Have Been Obvious

#### (1)     Claim Elements 8[a] and 8[b]

| 8[a] | *A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising:* |
|------|-----------------------------------------------------------------------------------------------------------------------------------|
| 8[b] | *alkylating a triol intermediate of the formula:*  |

Phares 2005 discloses the same treprostinil and treprostinil diethanolamine salt as the '066 Patent.  Phares 2005 at 8-10; 87-88; *supra* Section II.B.1.a.(1).  Phares 2005 further discloses alkylating a triol intermediate, the benzindene triol, of the same structural formula disclosed in claim 8 of the '066 Patent.  *See also supra* Section II.B.1.a.(7).  A comparison between the alkylation substrates disclosed in the '066 Patent (left) and Phares 2005 (right) are produced below

for a side-by-side comparison:



(’066 Patent)                                     (Phares 2005)

’066 Patent at 9:50-10:13, claim 8; Phares 2005 at 40.  Intermediate **11b** of Phares 2005 indicates that “R=H,” so the structural formulas disclosed for the triol intermediates are the same in claim 8 of the ’066 Patent and structure **11b** of Phares 2005.

### (2)     Claim Element 8[c]

| 8[c] | *hydrolyzing the resulting compound to form treprostinil,* |
|------|-----------------------------------------------------------|

Phares 2005 discloses hydrolyzing the resulting compound (obtained by the alkylation of the substrate **11b** shown above) to form the same structural formula for treprostinil starting material disclosed in the ’066 Patent.  *See supra* Sections II.B.1.a.(2) and II.B.1.a.(7).  The hydrolyzing procedure is disclosed in Phares 2005 as: adding “KOH, CH₃OH, reflux. 83%.” Phares 2005 at 40.  This hydrolyzing procedure, though explicitly disclosed for the preparation of the enantiomer of treprostinil, is inherently disclosed for the preparation of the treprostinil structure at page 22 of Phares 2005 as well.  A comparison between the treprostinil starting material disclosed in the ’066 Patent (left) and the treprostinil that is taught in Phares 2005 at page 22 (right) are produced below for a side-by-side comparison:

('066 Patent)                    (Phares 2005)

'066 Patent at 10:55-65 (Example 2); Phares 2005 at 8.

Treprostinil can be further converted to treprostinil salt with the disclosed preparation on page 22 of Phares 2005, wherein the treprostinil starting material is added to and dissolved in diethanolamine in a 1:1 molar ratio mixture of ethanol: water and further precipitated and purified to form the crystalline form. *Id.* at 85-89. This disclosure of the diethanolamine salt formation is identical to the pharmaceutical salt of treprostinil as disclosed in claims 1 and 8 of the '066 Patent.

### (3)    Claim Elements 8[d] and 8[e]

| 8[d] | *forming a salt of treprostinil stable at ambient temperature,* |
|------|------|
| 8[e] | *storing the treprostinil salt at ambient temperature, and* |

*See* explanation under independent claim 1 and dependent claim 6. Sections II.B.1.a.(1) and II.B.1.b.(3).

### (4)    Claim Element 8[f]

| 8[f] | *preparing a pharmaceutical product from the treprostinil salt after storage,* |
|------|------|

As treprostinil and treprostinil diethanolamine salt are disclosed in Phares 2005 and the '066 Patent, there are no structural differences between these molecules that would require different storage conditions or indicate that the pharmaceutical product could not be formed from the salt after storage. The same process used to form salts before storage would also be used to

form salts after storage; this step is not novel or an improvement.  Phares 2005 thus inherently discloses preparation of a pharmaceutical product from the treprostinil salt after storage.

### (5)      Claim Element 8[g]

| 8[g] | *wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.* |
|------|------|

*See* explanation under independent claim 1.  Section II.B.1.a.(1).

### d.      Dependent Claim 9 Would Have Been Obvious

| 9 | *A pharmaceutical product prepared by the process of claim 8.* |
|---|---|

*See* explanation under independent claims 1 and 8.  Sections II.B.1.a and II.B.1.c.

### 2.      Claims 1-3, 6, and 8-9 Would Have Been Obvious Over Moriarty 2004 in Combination with Phares 2005

### a.      Motivation to Combine Moriarty 2004 with Phares 2005

A POSA would have been motivated to combine Moriarty 2004 and Phares 2005 at the time of the invention of the '066 Patent.  The combination of Moriarty 2004 and Phares 2005 discloses the same process steps and same treprostinil product of the '066 Patent.  *See* Sections II.A.1 and II.A.2 *supra*.  As discussed above, Moriarty 2004 teaches the preparation of treprostinil acid, and Phares 2005 teaches the preparation of treprostinil diethanolamine by dissolving treprostinil acid and treating it with diethanolamine.  Moriarty at 1895, 1902; Phares 2005 at 22.  Phares 2005 further discloses two polymorphs of treprostinil diethanolamine and their relative stabilities.  Phares 2005 at 85-89.

More specifically, Moriarty 2004 indicates that the crystalline treprostinil resulting from the disclosed process is obtained in the form of "[w]hite needles."  Moriarty 2004 at 1902.  A POSA would have known that "needle-shaped crystals are not desirable because of their poor flow properties."  HANDBOOK OF PHARMACEUTICAL SALTS 137 (P. Heinrich Stahl et al. eds., 1st ed.

2002) ("Stahl 2002") at p. 62; *see also* Declaration of Dr. Rodolfo Pinal, *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00769, Ex. 2002 at ¶ 258 (P.T.A.B. July 14, 2020) (UTC expert testifying that needle-shaped crystals were known to be unsuitable for downstream processing).  To improve the flow properties, among others, of the treprostinil acid produced according to Moriarty 2004, a POSA would have been motivated to modify the resulting treprostinil product disclosed in Moriarty 2004.  One means of improving the downstream processing properties of APIs is to make them into a salt form.  *See* G. Steffen Paulekuhn et al., *Trends in Active Pharmaceutical Ingredient Salt Selection based on Analysis of the Orange Book Database*, 50 J. MED. CHEM. 6665-6672, 6665 (2007) ("Paulekuhn 2007") ("Salt formation is a well-known technique to modify and optimize the physical chemical properties of an ionizable research or development compound.  Properties such as solubility, dissolution rate, hygroscopicity, stability, impurity profiles, and crystal habits can be influenced by using a variety of pharmaceutically acceptable counterions.").  Thus, a POSA would have sought to combine the treprostinil acid of Moriarty 2004 with the diethanolamine salt of Phares 2005 to improve properties, such as flow, of the pharmaceutical product.

Additionally, a POSA would have sought to combine Phares 2005 and Moriarty 2004 because Phares 2005 is directed to improving treprostinil, and the Moriarty 2004 process, including those steps claimed by the '066 Patent, was a well-known way to make treprostinil.  Further, a POSA would have sought to combine Moriarty 2004 and Phares 2005 in order to eliminate the intermediate purification step taught by Moriarty 2004, thereby increasing synthetic efficiency and lowering production costs for treprostinil diethanolamine salt.  A POSA would understand that an intermediate purification step is unnecessary because not purifying the intermediate carboxylic acid before addition of a base does not affect salt formation.

Accordingly, a POSA would have been motivated to combine the treprostinil acid disclosed in Moriarty 2004 with the diethanolamine treprostinil disclosed in Phares 2005.

**b.     Reasonable Expectation of Success**

A POSA would have had a reasonable expectation of success in reacting the treprostinil taught by Moriarty 2004 with diethanolamine to form a treprostinil diethanolamine salt. "The reasonable expectation of success requirement refers to the likelihood of success in combining references to meet the limitations of the claimed invention." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016). The proposed combination of Moriarty 2004 and Phares 2005 yields treprostinil diethanolamine salt (*i.e.*, the product claimed in independent claims 1 and 8 of the '066 Patent) via the process taught by Phares 2005. A POSA would have a reasonable expectation of success in doing so because Phares 2005 successfully performed precisely that step. *Id.* Indeed, the combination of Moriarty 2004 and Phares 2005 results in essentially the same process as disclosed in Example 6 of the '066 patent. Further, a POSA would understand that forming a salt from the treprostinil acid disclosed in Moriarty 2004 would not make the resulting product less pure than the 99.7% disclosed in the reference. Schoffstall 2004 at 201-02; Wiberg 1960 at 112; *see also* Laurence M. Harwood et al., Experimental Organic Chemistry 127 (1st ed. 1989) ("Harwood 1989") ("The simplest and most effective technique for the purification of solid organic compounds is crystallization. Crystalline compounds are easy to handle, their purity is readily assessed . . . and they are often easier to identify than liquids or oils.").

**c.     Independent Claim 1 Would Have Been Obvious**

Moriarty 2004 in combination with Phares 2005 teaches each element of claim 1 of the '066 Patent.

31

### (1)     Claim Element 1[a]

| 1[a] | *A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising:* |
|------|-----------------------------------------------------------------------------------------------------------------------------------------------------------|

Moriarty 2004 discloses the production of a pharmaceutical composition and the synthesis of treprostinil via the stereoselective intramolecular Pauson-Khand cyclization.  Moriarty 2004 at 1890.  Structure **7** of Moriarty 2004 depicts the chemical structure of treprostinil and is shown below:



**7**

*Id*. at 1892.  This is the identical treprostinil pharmaceutical salt precursor disclosed in the '066 Patent:



'066 Patent at 11:50-65.

While the step of reacting treprostinil with a base to form a salt of **7** is not disclosed in Moriarty 2004, this step is clearly disclosed in Phares 2005.  Phares 2005 at 22.  Phares 2005 discloses that treprostinil acid (which is equivalent to **7** in Moriarty 2004) is dissolved in a 1:1

32

molar ratio mixture of ethanol: water and diethanolamine (*i.e.*, the base) is added and dissolved. *Id*. The solution is heated and acetone is added as an antisolvent during cooling. *Id*. The resulting structure (left) corresponds to the treprostinil diethanolamine salt claimed in the '066 Patent (right). A side-by-side comparison is shown below:



|              (Phares 2005)                          ('066 Patent) |

Phares 2005 at 9, 96 (claim 49); '066 Patent at 9:5-18, 12:8-23 (Example 3). Other than a change in formatting, these two structures are identical.

The formation of salts by the reaction of carboxylic acids with bases is a common reaction in organic chemistry and this process is well within the skill of a POSA, as discussed above. *E.g.*, Kawakami 1981 at 6.

This salt is the result of the same steps described in the '066 Patent (a) by forming a salt of treprostinil by combining the starting solution of treprostinil acid and a base and (b) isolating the treprostinil salt. '066 Patent at claims 1 and 8. The isolated salt is then used to prepare a pharmaceutical batch comprising treprostinil or a salt thereof. *Id.*

The combination of Moriarty 2004 and Phares 2005 discloses the same process steps and product of the '066 Patent and as such, the combination of these references would disclose a purity

of at least equal purity to that claimed in the '066 Patent.  In fact, in the IPR proceeding involving the related '393 Patent, the PTAB determined that the product resulting from Moriarty 2004 is the same product as disclosed and claimed in the '393 patent.  *SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Paper 82 at 16 (P.T.A.B. Mar. 31, 2017) (The "batches of treprostinil produced according to the process steps recited in the challenged claims renders the claimed treprostinil structurally and functionally the same as treprostinil produced according to Moriarty [2004].").  Thus, for the same reasons, the product disclosed in Moriarty 2004 is necessarily the same as the product of the '066 Patent, because it claims the exact same process as the '393 patent.  The '066 Patent discloses that in one embodiment the "purity of compound of formula IV is at least 90.0%, 95.0%, 99.0% [or] 99.5%, where the compound of formula IV is treprostinil."  '066 Patent at 9:22-23.  This disclosure shows that the purity of treprostinil may be as low as 90.0%.

Phares 2005 further discloses two crystalline forms of treprostinil diethanolamine salt, Form A and Form B.  Phares 2005 at 85-89.  Form A has an endotherm, 103° C and Form B has an endotherm, 107° C.  Phares 2005 at 87-88.  The higher melting point of Form B is consistent and compatible with a higher degree of purity in Form B in comparison with Form A.  Further, Form A is utilized as the starting material for the formation of Form B.  Phares 2005 at 87-88.  A POSA would understand that this transformation, similar to that described in the '066 Patent, typically removes impurities.  *Id*.  As such, Form A should be purer than the starting batch and Form B purer than Form A.  *Id.*

Therefore, Moriarty 2004 in combination with Phares 2005 disclose a pharmaceutical composition comprising treprostinil or a salt thereof and impurities.

### (2)    Claim Element 1[b]

| 1[b] | *providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps,* |
|------|------|

Both Moriarty 2004 and Phares 2005 teach the alkylation and hydrolysis steps claimed in the '066 Patent. *See* Moriarty 2004; Phares 2005. Moriarty 2004 teaches that the alkylating agent is $ClCH_2CN$, which corresponds to $Cl(CH_2)_wCN$ where w is 1 disclosed in the '066 Patent. Moriarty 2004 at 1892, 1895; '066 Patent at 2:36-47. Moriarty 2004 further discloses that the base in step (b) is KOH. Moriarty at 1892, 1895. Phares 2005 teaches the exact same alkylation and hydrolyzing steps for treprostinil's enantiomer, detailed as "step (1)": (1) i. **$ClCH_2CN$**, $K_2CO_3$. ii. **KOH**, $CH_3OH$, reflux. 83% (2 steps) and disclosed as equally applicable to treprostinil. Phares 2005 at 39, 40. Chloroacetonitrile ($ClCH_2CN$) was known in the art at the time of the invention to play an important role in alkylation reactions, and methanolic potassium hydroxide (KOH, $CH_3OH$) was known to play an important role in hydrolysis. It thus would have been obvious to a POSA that the starting batch of treprostinil, as prepared in Moriarty 2004 or the Phares 2005 treprostinil acid disclosed at page 22, would result from these previously described alkylation and hydrolysis steps. Based on these identical starting materials and reagents, a POSA would expect the starting batch of treprostinil from Moriarty 2004 and Phares 2005 to contain one or more impurities resulting from the prior alkylation and hydrolysis steps.

The combination of Moriarty 2004 and Phares 2005 discloses the same process steps and product of the '066 Patent, and as such, the combination of these references would disclose a purity of at least equal purity to that claimed in the '066 Patent. The '066 Patent discloses that in one embodiment the "purity of compound of formula IV is at least 90.0%, 95.0%, 99.0% [or] 99.5%," where the compound of formula IV is treprostinil. '066 Patent at 9:22-23. This disclosure shows that the purity of treprostinil may be as low as 90.0%.

### (3)   Claim Element 1[c]

| 1[c] | *forming a salt of treprostinil by combining the starting batch and a base,* |
|------|------------------------------------------------------------------------------|

As discussed above, Moriarty 2004 discloses the identical treprostinil precursor and Phares 2005 discloses the identical pharmaceutically acceptable treprostinil diethanolamine salt as the '066 Patent.

Scheme 4 of Moriarty 2004 teaches that **35** is hydrolyzed with a base (*i.e.*, aqueous KOH), followed by acidification to yield **7**, the treprostinil salt precursor disclosed in the '066 Patent. Moriarty 2004 at 1895, 1902.  Phares 2005 also teaches the same reactions of the enantiomeric treprostinil salt precursor: (1) i. $ClCH_2CN$, $K_2CO_3$. ii. KOH, $CH_3OH$, reflux. 83% (2 steps).  Phares 2005 at 40.  Phares 2005 explains that "[e]nantiomers of these compounds . . . can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents," thereby inherently teaching the synthesis of both enantiomeric forms of treprostinil, both (-)-treprostinil and (+)-treprostinil.  *Id.* at 39-40.

Treprostinil can be further converted to treprostinil salt in view of the disclosed preparation on page 22 of Phares 2005, wherein the treprostinil is added to and dissolved in diethanolamine (*i.e.,* a base) in a 1:1 molar ratio mixture of ethanol: water and the resulting salt further precipitated and purified to form the crystalline form (*i.e.*, "Form B").  *Id.* at 85-89.  This disclosure of the diethanolamine salt formation is identical to the pharmaceutical salt of treprostinil as disclosed in claims 1 and 8 of the '066 Patent.

### (4)     Claim Element 1[d]

| 1[d] | *isolating the treprostinil salt, and* |
| --- | --- |

Phares 2005 discloses isolating the identical pharmaceutically acceptable treprostinil diethanolamine salt form as the '066 Patent.  *See* Phares 2005's further disclosure of the same element in Ground 1, *supra* at Section II.B.1.a.(4).

### (5)   Claim Element 1[e]

| 1[e] | *preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt,* |
|------|---|

*See* Phares 2005's disclosure of the same element in Ground 1.  Section II.B.1.a.(5).

### (6)   Claim Element 1[f]

| 1[f] | *whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and* |
|------|---|

As the combination of Moriarty 2004 with Phares 2005 discloses the same process steps and product of the '066 Patent, the combination of these references would disclose a purity of at least equal purity to that claimed in the '066 Patent.

The claim language of the '066 Patent does not disclose the percentage of "impurity" required in the starting batch of treprostinil and simply states "having one or more impurities." The '066 Patent discloses that in one embodiment the "purity of compound of formula IV is at least 90.0%, 95.0%, 99.0% [or] 99.5%," where the compound of formula IV is treprostinil.  '066 Patent at 9:22-23.  This disclosure shows that the purity of treprostinil may be as low as 90.0%. Moriarty 2004 discloses a purity of 99.7%.  Moriarty 2004 at 1902.

Based on the identical starting materials and chemical steps used to make treprostinil in Phares 2005 and the '066 Patent, as discussed further in Sections II.A.1 and II.B.1.a.(2), a POSA would expect to observe the same impurity profiles in the "starting batch" of treprostinil resulting from the prior alkylation and/or hydrolysis steps.  Further, because Phares 2005 discloses the same method of making treprostinil salts as claimed in the '066 Patent, the pharmaceutical batch of Phares 2005 would also have contained a lower amount of one or more impurities than the starting batch of treprostinil.  Accordingly, that the claimed pharmaceutical composition contains a lower amount of one or more impurities than the starting batch of treprostinil was neither new nor

nonobvious.  *Thorpe*, 777 F.2d at 697 ("If the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process."); *see also Amgen*, 580 F.3d at 1366 ("It has long been the case that an old product is not patentable even if it is made by a new process.").

Additionally, a POSA would have a reasonable expectation that the treprostinil salt described in Phares 2005 would contain a lower amount of one or more impurities than the starting batch of treprostinil because crystallization of the starting batch to make the treprostinil salt would purify the sample.  *See* Harwood 1989 at 127 ("The simplest and most effective technique for the purification of solid organic compounds is crystallization.  Crystalline compounds are easy to handle, their purity is readily assessed . . . and they are often easier to identify than liquids or oils.").  Further, because regeneration of the carboxylic acid was a standard chemical purification method known in the art (*see, e.g.*, Ege 1989 at 546), a POSA would know that formation of a pharmaceutical product comprising treprostinil acid by reacting the treprostinil salt with an acid (e.g., HCl) would further purify the pharmaceutical composition.  Thus, a POSA would know that a pharmaceutical composition comprising either treprostinil acid or treprostinil salt made by the process disclosed in Phares 2005 and claimed in the '066 Patent would possess less impurities than the starting batch of treprostinil resulting from the prior alkylation and/or hydrolysis steps.

Accordingly, that the pharmaceutical composition described in Phares 2005 and claimed by the '066 Patent contains a lower amount of one or more impurities than the starting batch of treprostinil would have been obvious to a POSA in December 2007 over Moriarty 2004 in combination with Phares 2005.

### (7)     Claim Element 1[g]

| 1[g] | *wherein said alkylation is alkylation of benzindene triol.* |
|------|--------------------------------------------------------------|

Moriarty 2004 teaches alkylation of benzindene triol. Moriarty 2004 at 1897. The alkylation reaction of **34** to yield **35** as disclosed in Moriarty 2004 is equivalent to the alkylation reaction disclosed in the '066 Patent. **34** and **35** of Moriarty 2004 are as follows:



*Id.* at 1895, 1902. Moriarty 2004 teaches that the triol (**34**) was alkylated at the phenolic hydroxyl group with use of chloroacetonitrile in refluxing acetone with potassium carbonate (**34** → **35**) and nitrile **35** was hydrolyzed with ethanolic potassium hydroxide to yield UT-15 (**7**). *Id.* at 1897. This is the same triol disclosed in the '066 Patent as shown below:



('066 Patent)                                                   (Moriarty 2004)

'066 Patent at 10:17-26; Moriarty 2004 1895, 1902.

As discussed above in Section II.B.1.a.(7), Phares 2005 also discloses alkylation of a benzindene triol (**11b** → **2**). Phares 2005 at 40. A POSA would recognize that step (l) disclosed

in Phares 2005 (i. ClCH$_2$CN, K$_2$CO$_3$) teaches the same alkylation reaction to give the nitrile disclosed in Phares 2005.

### d. Dependent Claims 2-3 and 6 Would Have Been Obvious

#### (1)    Claim 2

| 2 | The pharmaceutical composition of claim 1, *wherein the salt is isolated in crystalline form.* |
|---|---|

As discussed above, while Moriarty 2004 does not teach preparation of a diethanolamine salt of treprostinil or a pharmaceutical product comprising treprostinil salt, Phares 2005 teaches preparation of treprostinil diethanolamine by dissolving treprostinil acid and treating it with diethanolamine. Phares 2005 at 22. The pharmaceutical acceptability of treprostinil diethanolamine is clearly disclosed in Phares 2005. *Id.* at 48 (The invention of Phares 2005 "provides for compositions which may be prepared by mixing one or more compounds of the instant invention, or pharmaceutically acceptable salts thereof, with pharmaceutically acceptable carriers, excipients, binders, diluents or the like, to treat or ameliorate a variety of disorders related vasoconstriction and/or platelet aggregation."). Accordingly, a POSA would have found it obvious to prepare a product from the pharmaceutically acceptable treprostinil diethanolamine salt of Phares 2005 that was in turn prepared from the treprostinil free acid obtained by the process of Moriarty 2004.

Phares 2005 further discloses two **crystalline forms** of treprostinil diethanolamine salt, Form A and Form B. Phares 2005 at 85 ("Two **crystalline forms** of UT-15C were idenitified [sic] as well as an amorphous form") (emphasis added).) A particularly preferred embodiment of the invention disclosed in Phares 2005 is "Form B of treprostinil diethanolamine." *Id.* at 9. Phares 2005 therefore discloses the same treprostinil diethanolamine salt, in crystalline form, as the '066 Patent. Further, a sophomore organic chemistry student would understand that isolation of

crystalline Forms A and B (wherein Form B is assumed to have higher purity than Form A) would be possible.

### (2)    Claim 3

| 3 | The pharmaceutical composition of claim 1, *wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline.* |
|---|---|

As explained *supra* in Section II.B.1.b.(2), Phares 2005 discloses the additional elements of claim 3.

In addition, the language of claim 3 is indefinite, because the recited *sodium*, *potassium*, and *calcium* on their own are not bases; rather, they are counterions that result from treatment of the treprostinil acid with the corresponding bases.

### (3)    Claim 6

| 6 | The pharmaceutical composition of claim 1, *wherein the isolated salt is stored at ambient temperature.* |
|---|---|

As discussed above, Moriarty 2004 disclose the synthesis of the treprostinil in the '066 Patent.   *See* Moriarty 2004.   Phares 2005 teaches the same treprostinil and treprostinil diethanolamine salt (Form A and Form B) as the '066 Patent.  Phares 2005 at 8-9, 22, 85-89. Phares 2005 discloses that Form B is more thermodynamically stable than Form A.  *Id.* at 87-88. Phares 2005 further discloses that Form B is made from Form A, with full conversion to Form B at ambient temperatures after 7 days, 15° C after 11 days and 30° C after 1 day, suggesting stability at these temperatures.  *Id.* at 89, Table 17.  A POSA would understand "ambient temperature" to mean "room temperature" or, on average, 25° C.  A POSA would also understand that full conversion after 7 days at ambient temperature suggests that Form B is stable at ambient temperature and therefore could be stored at ambient temperature.

Further, treprostinil was known to be stable at ambient temperature by December 2007. Gomberg-Maitland 2005 at 1586 ("Treprostinil has theoretical advantages over epoprostenol because of its stability at room temperature . . . ."); Ivy 2007 at 696 ("Treprostinil possesses physiochemical properties that make its use more convenient, including stability at room temperature . . . ."). In fact, the prescribing information for UTC's REMODULIN® published in March 2006 states plainly that "[t]reprostinil is chemically stable at room temperature and neutral pH." REMODULIN® Label 2006. Because treprostinil was known to be chemically stable at ambient temperature as of December 2007, a POSA would know that the treprostinil salts described in Phares 2005 could be "stored at ambient temperature."

As the treprostinil and treprostinil diethanolamine salt disclosed in Phares 2005 and the '066 Patent are identical, there are no structural differences between these molecules that would indicate to a POSA that the compounds would require different storage conditions.

### e.    Independent Claim 8 Would Have Been Obvious

#### (1)    Claim Elements 8[a]-8[c]

| 8[a] | *A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising:* |
|------|----------------------------------------------------------------------------------|
| 8[b] | *alkylating a triol intermediate of the formula:*  |
| 8[c] | *hydrolyzing the resulting compound to form treprostinil,* |

As discussed above, Moriarty 2004 and Phares 2005 disclose the synthesis of the treprostinil in the '066 Patent. Specifically, Moriarty 2004[2] teaches the alkylation of triol intermediate **34** (left) which has the same formula as the triol structure in claim 8 of the '066 Patent (right):



| (Moriarty 2004) | ('066 Patent) |

Moriarty 2004 at 1895; '066 Patent at 9:54-63)  Moriarty 2004 teaches that the "**[t]riol** (**34**) **was alkylated** at the phenolic hydroxyl group with use of chloroacetonitrile in refluxing acetone with potassium carbonate (**34→35**) and nitrile (**35**) was hydrolyzed with ethanolic potassium hydroxide to yield UT-15 (**7**) in 9% overall yield." Moriarty 2004 at 1897 (emphasis added).)  Phares 2005 discloses the same reaction conditions for the triol alkylation step as Moriarty 2004 and as the '066 Patent, where "R" can be "H" (structure **11b**):

---

[2] During the '066 IPR, UTC admitted that the "Former Process" of Example 6 is the process described in Moriarty 2004. *See Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00769, Paper No. 6 at 66 (P.T.A.B. July 14, 2020) ("The 'former process' in example 6 is essentially the same as Liquidia's Moriarty [2004] references."); *see also SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Paper No. 32 at 5 (P.T.A.B. July 6, 2016) ("The '393 Patent includes a side-by-side comparison in Example 6 to show the difference between the Moriarty [2004] product and the '393 product . . . .").

43

Phares 2005 at 40.  Phares 2005 discloses that the reaction could be performed on the enantiomer of the substrate that is taught in Moriarty 2004 and the '066 Patent.  *Id.* at 39-40.  Phares 2005 further explains that "[e]nantiomers of these compounds…can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents," thereby inherently teaching the synthesis of both enantiomeric forms of treprostinil, both (-)-treprostinil and (+)-treprostinil.  *Id.*

Further, Moriarty 2004 teaches hydrolyzing the product **35**, obtained on alkylation of triol **34**, to form treprostinil (**7**):



Moriarty 2004 at 1895.  Moriarty 2004 teaches that ". . . nitrile (**35**) **was hydrolyzed** with ethanolic potassium hydroxide to yield UT-15 (**7**) in 9% overall yield."  *Id.* at 1897 (emphasis added).

Phares 2005 also teaches hydrolyzing the product obtained on alkylation of triol **11b** (with chloroacetonitrile) to form **2**, the enantiomer of treprostinil:

44

Phares 2005 at 39-40 (detailed as "step (1)"): (1) i. **ClCH$_2$CN**, K$_2$CO$_3$. ii. **KOH**, CH$_3$OH, reflux. 83% (2 steps).

Thus, claim elements 8[a]-[c] are obvious over the combination of Moriarty 2004 and Phares 2005.

### (2)    Claim Elements 8[d]-[f]

| | |
|---|---|
| 8[d] | *forming a salt of treprostinil stable at ambient temperature,* |
| 8[e] | *storing the treprostinil salt at ambient temperature, and* |
| 8[f] | *preparing a pharmaceutical product from the treprostinil salt after storage,* |

As discussed above, Moriarty 2004 does not teach the step of reacting treprostinil **7** with a base to form a salt of **7**.  However, this step is clearly disclosed in Phares 2005.  Phares 2005 also discloses that the treprostinil salt Form B is stable at ambient temperatures, with full conversion from Form A to Form B after 7 days at ambient temperature.  Phares 2005 at 89, Table 17.  A POSA would also understand that full conversion of Form A to Form B after 7 days at ambient temperature teaches that Form B is stable at ambient temperature and therefore could be stored at ambient temperature.  *See* explanation under independent claim 1 and dependent claim 6.  Sections II.B.2.c and II.B.2.d.(3).

### (3)    Claim Element 8[g]

| | |
|---|---|
| 8[g] | *wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.* |

*See* explanation under independent claim 1.  Section II.B.2.c.(1).

### f.       Dependent Claim 9 Would Have Been Obvious

| 9 | *A pharmaceutical product prepared by the process of* claim 8. |
|---|---|

*See* explanation under independent claims 1 and 8.  Sections II.B.2.c and II.B.2.e.

### 3.       No Evidence of Objective Indicia of Nonobviousness (Secondary Considerations)

Secondary considerations of nonobviousness, which are also called objective indicia, must be evaluated to determine whether or not UTC would be able to overcome the strong *prima facie* case of obviousness presented herein.  When the invention represents no more than the "predictable use of prior art elements according to their established functions," the secondary considerations are inadequate to establish nonobviousness as a matter of law.  *See, e.g., Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) (citation omitted).  In this case, Liquidia is not aware of any secondary considerations sufficient to overcome the strong showing of *prima facie* obviousness.  The specification and prosecution history of the '066 Patent do not disclose any unexpected results or skepticism in the field.   To the extent UTC identifies any evidence of secondary considerations of nonobviousness, Liquidia reserves the right to respond and present evidence to the contrary.  To the extent UTC submits evidence of secondary considerations previously submitted during the IPR of the '393 Patent, those positions have already been rejected and do not support the non-obviousness of the '066 patent here.

### C.      Claims 1-3, 6, and 8-9 Are Invalid Under 35 U.S.C. § 112

The Asserted Claims of the '066 Patent are invalid under 35 U.S.C. § 112 for lack of written description support, lack of enablement, and indefiniteness.  "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  To satisfy the enablement

requirement under § 112(a), the specification must enable a person having ordinary skill in the art to make and use the invention. *Wyeth & Cordis Corp. v. Abott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013).  This requirement is met when at the time of filing the application, one skilled in the art, having read the specification, could practice the invention without "undue experimentation." *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010) (quoting *Genentech Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997)).  Finally, under § 112, patent claims must "particularly point[] out and distinctly claim[] the subject matter" regarded as the invention. 35 U.S.C. § 112(b).  A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  As discovery is ongoing, Liquidia reserves the right to supplement and/or amend these contentions.

### 1.     Claims 6, 8, and 9 Lack Written Description Support

#### a.     "Stored"/"Storing"/"Storage" Lack Written Description Support

Asserted Claim 6 is directed to a pharmaceutical composition of claim 1, wherein the isolated salt is "stored" at ambient temperature.  Asserted Claim 8 of the '066 Patent, which Asserted Claim 9 depends, is directed to a method of preparing the pharmaceutical product comprising treprostinil or treprostinil salt by "forming a salt of treprostinil stable at ambient temperature, storing the treprostinil salt at ambient temperature, and preparing a pharmaceutical product from the treprostinil salt after storage . . . ."  "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms*, 598 F.3d at 1351.  An adequate written description need not in every instance describe an actual

reduction to practice but "must nonetheless 'describe the claimed subject matter in terms that establish that [the applicant] was in possession of the . . . claimed invention, including all of the elements and limitations.'" *University of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 926 (Fed. Cir. 2004) (quoting *Hyatt v. Boone*, 146 F.3d 1348, 1353 (Fed. Cir. 1998)).  Accordingly, the specification of the '066 Patent must sufficiently describe a method of "storing" a treprostinil salt at ambient temperature and preparing a pharmaceutical product from the salt after "storage" and also a pharmaceutical composition wherein the "isolated salt is stored at ambient temperature," such that a person of skill in the art would recognize that the named inventors actually invented what is claimed.

A POSA reviewing the specification of the '066 Patent would conclude that the inventors were not in possession of a method of preparing a pharmaceutical product from a treprostinil salt that was "stored" at ambient temperature, or an isolated salt stored at ambient temperature.  As UTC noted in its Preliminary Response to Liquidia's IPR Petition with respect to the '066 Patent, "[p]rostaglandin derivatives," like treprostinil, "in particular were known to be unstable upon storage due to inherent instability of the crystalline lattice of these compounds owning to their long, flexible sidearms, as well as the presence of multiple polymorphic crystals." *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00769, Paper 6 at 52 (P.T.A.B. July 14, 2020). Further, UTC noted in its Preliminary Response that "[e]nvironmental factors are a significant factor (*e.g.*, temperature, oxygen, atmosphere, humidity).  This is especially true for compounds stored as salts." *Id.*

Considering these admissions regarding the instability of prostaglandin derivatives, and in particular salts of treprostinil, the specification of the '066 Patent provides no evidence or disclosure that the treprostinil salts of the claimed invention were actually "stored" for any length

of time, let alone at ambient temperatures, that the inventors were in possession of an isolated salt

that was stored at ambient temperature, or that the inventors were in possession of a method of

"storing" a treprostinil salt at ambient temperature and preparing a pharmaceutical product of

treprostinil after such "storage."   The specification of the '066 Patent provides only a generic

statement regarding the "stor[age]" of "crude treprostinil salts" at ambient temperature, which

provides no greater detail than the claims themselves.  *See* '066 Patent at 17:32–38 ("Additional

advantages of this process are: (a) crude treprostinil salts can be stored as raw material at ambient

temperature and can be converted to treprostinil by simply acidification with diluted hydrochloric

acid, and (b) the treprostinil salts can be synthesized from the solution of treprostinil without

isolation.").  The '066 Patent does not disclose any experimental data to support these statements,

and further lacks any details as to how long the "crude treprostinil salt" can be stored or under

what conditions, other than temperature.

Further, a POSA reading the specification of the '066 Patent would also not understand

that the "crude treprostinil salts" described in the specification constitute a "salt of treprostinil

stable at ambient temperature" within the meaning of claim 8 as the treprostinil salt itself can be

the claimed pharmaceutical product (claim 8 does not require any additional processing steps for

the treprostinil salt prior to incorporating it into the "pharmaceutical product.").  Similarly, a POSA

reading the specification of the '066 Patent would not understand that the "crude treprostinil salts"

constitute "isolated salt[s]" within the meaning of claim 6 as the specification provides no

indication that the tresprostinil salt was ever isolated.  And even if the "crude treprostinil salts"

described in the specification of the '066 Patent constitute a "salt of treprostinil stable at ambient

temperature" within the meaning of claim 8 or "isolated salt" within the meaning of claim 6, which

Liquidia does not concede, the specification of the '066 Patent does not provide evidence that the

"crude" salts were ever actually stored, let alone for what length of time and under what conditions other than temperature. Moreover, the specification of the '066 Patent states only that "crude treprostinil salts" can be stored at ambient temperatures, and such "crude" salts must be further processed. There is no indication in the specification of the '066 Patent that the inventors were in possession of an "isolated salt" or a "salt of treprostinil" that could be "stored" within the meaning of claims 6 or 8.

The specification and claim's vague description of "storing" crude treprostinil salts and a "salt of treprostinil stable at ambient temperature" also lacks information as to "significant" environmental conditions, according to UTC, such as oxygen, atmosphere, and humidity, that the isolated salt or treprostinil salt can be stored. *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997) ("The description requirement of the patent statute requires a description of an invention, not an indication of a result that one might achieve if one made that invention."). A disclosure of "ambient temperature" provides no information as to, for example, the % relative humidity at which the treprostinil salt can stored. Considering UTC's contention that the significance of these undefined variables is "especially true for compounds stored as salts," and the lack of these variables in which the isolated treprostinil salt can be stored, a skilled artisan would not conclude that the inventors were in possession of the invention claimed in claims 6 and 8. Thus, claims 6, 8, and 9 of the '066 Patent are invalid for lack of written description.

> **b.    To the Extent UTC Contends that Claims 1 and 8 Permit "Isolation" of Treprostinil Before Combining with a Base to Form a Salt, the Asserted Claims Lack Adequate Written Description Support**

Claim 1 of the '066 Patent requires "forming a salt of treprostinil by combining the starting batch and a base." Additionally, claim 8 requires "forming a salt of treprostinil." "[T]he test for

sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351.  To the extent UTC argues that claims 1 and 8 permit isolation of treprostinil prior to contacting the treprostinil with a base to form a salt, the claims lack adequate written description support as the specification does not disclose that such a process will result in the claim requirement that "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition."

More specifically, all of the examples disclosed in the specification of the '066 Patent disclose forming a salt of treprostinil by contacting treprostinil in solution with a base.  Indeed, Example 2 specifically states that "[t]he filtrate (pale yellow) was reduced to volume of 35-40 L by evaporation in vacuo at 50-55° C for ***direct use in the next step***."  *See* '066 Patent at 11:46-48 (emphasis added).  The treprostinil was not isolated prior to conducting the "next step"—formation of a treprostinil salt.  Additionally, Example 6, which compares UTC's "Former Process" against the "Process According to the Present Invention," discloses that the treprostinil formed according to the present invention is not isolated prior to preparing the salt form, whereas the treprostinil of the "Former Process" is isolated as a "solid."  *Id*. at col. 15, steps 30-31.  According to the '066 Patent's specification, "[t]he quality of treprostinil produced according to this invention [Example 6] is excellent. . . . The impurities carried over from the intermediate steps (i.e. alkylation of triol and hydrolysis of the benzindene nitrile) are removed during the carbon treatment and the salt formation step."  *Id*. at 17:27-32.  The "salt formation" step of the "invention" is performed without first isolating treprostinil prior to contacting with a base.  Further, the '066 Patent acknowledges that "[a]dditional advantages of ***this process*** are . . . (b) the treprostinil salts can be synthesized from the solution of treprostinil ***without isolation***" and that "***[t]his process*** provides better quality

of final product as well as saves significant amount of solvents and manpower in purification of intermediates." *Id*. at 17:32-40 (emphases added).

As such, as described in the specification of the '066 Patent, in order to achieve the limitation in claim 1 that "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition," the specification only discloses that result where the treprostinil *is not* isolated prior to contacting with a base. And with respect to claim 8, the specification does not disclose that the treprostinil can be isolated prior to contacting with a base to form a salt. Considering the specification of the '066 Patent in light of the limitations of claims 1 and 8, a person of ordinary skill in the art would not conclude that the inventors were in possession of a process wherein treprostinil was isolated prior to contacting it with a base to form a salt of treprostinil. As such, to the extent UTC contends that claims 1 and 8 permit isolation of treprostinil before reaction with a base to form a salt, claims 1 and 8, which all other Asserted Claims of the '066 Patent depend, lack adequate written description support.

### 2.    Claims 6, 8, and 9 Are Not Enabled

#### a.    "Stored"/"Storage"/"Storing" Are Not Enabled

Asserted Claim 6 is directed to a pharmaceutical composition of claim 1, wherein the isolated salt is "stored" at ambient temperature. Asserted Claim 8 of the '066 Patent, which Asserted Claim 9 depends, is directed to a method of preparing the pharmaceutical product comprising treprostinil or treprostinil salt by "forming a salt of treprostinil stable at ambient temperature, . . . and preparing a pharmaceutical product from the treprostinil salt after storage . . . ." "To constitute an enabling disclosure, 'the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.'" *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1155 (Fed. Cir. 1997) (quoting *In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993)). Factors to be considered in determining whether

a disclosure would require undue experimentation include:  "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims."  *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).  Accordingly, the specification of the '066 Patent must enable a skilled artisan to prepare a treprostinil pharmaceutical product after "storage" of a treprostinil salt at ambient temperature without undue experimentation.

As UTC noted in its Preliminary Response to Liquidia's IPR Petition with respect to the '066 Patent, "[p]rostaglandin derivatives," like treprostinil, "in particular were known to be unstable upon storage due to the inherent instability of the crystalline lattice of these compounds owning to their long, flexible sidearms, as well as the presence of multiple polymorphic crystals." *Liquidia Techs.*, IPR2020-00769, Paper 6 at 52.  Further, UTC noted in its Preliminary Response that "[e]nvironmental factors are a significant factor (*e.g.*, temperature, oxygen, atmosphere, humidity).  This is especially true for compounds stored as salts."  *Id.*  Thus, to the extent UTC contends that prostaglandin derivatives like treprostinil exhibit "inherent instability" and that environmental factors, such as temperature, oxygen, atmosphere, and humidity, have a "significant" impact on the stability of salts, a person of ordinary skill in the art would be required to undergo undue experimentation to practice the invention claimed in clams 6 and 8 of the '066 Patent.

Applying the eight *Wands* factors in sequential order, and taking into account UTC's prior statements regarding the instability of treprostinil, the specification of the '066 Patent would not enable a person of ordinary skill to "stor[e]" an isolated salt of treprostinil in claim 6 or "stor[e] treprostinil salt and create the pharmaceutical product of claim 8.

| *Wands* Factor | Application to Claims 6 and 8-9 of the '066 Patent |
|---|---|
| Quantity of Experimentation Necessary | To the extent UTC's contention that prostaglandin derivatives exhibit "inherent instability" and that humidity, oxygen, and atmosphere are "especially" significant environmental factors is correct, a person of skill in the art would have to engage in significant amounts of experimentation to discern how to effectively "stor[e]" the claimed treprostinil salts.   More specifically, while the claim defines the temperature at which the salts can be stored (ambient temperature), a person of ordinary skill in the art would require extensive experimentation to determine the other "significant" environmental factors suitable for storage, including humidity, whether the treprostinil can be exposed to light, or needs to be stored in an oxygen rich or depleted environment.  Moreover, each "significant" environmental factor would require experimentation while maintaining constant the other environmental factors. |
| Amount of Guidance or Direction Presented | As discussed above, the specification and claims of the '066 Patent provide guidance only as to what temperature at which the claimed treprostinil salts are stored.   The specification and claims are completely silent as to other "significant" environmental factors, according to UTC, such as oxygen, atmosphere, and humidity.  Accordingly, besides temperature, the amount of guidance or direction presented is non-existent. |
| Presence or Absence of Working Examples | Besides providing only a vague description of "stor[ing]" "crude treprostinil salts" at ambient temperature, which Liquidia does not concede constitutes treprostinil salts within the meaning of claims 6 or 8, the specification is completely lacking in working examples of "storing" treprostinil salts under any conditions.  And even if the "crude treprostinil salts" constitute treprostinil salts within the meaning of claims 6, 8, or 9, the specification's brief mention of their "stor[age]" provides no more detail than the claims and, thus, does not constitute a working example. |
| Nature of the Invention | According to UTC, polymorphs (i.e., salts) "had plagued the pharmaceutical industry for over a decade prior to the '066 Patent, with high-profile failures including withdrawal of an approved drug from the market." *Liquidia Techs.*, IPR2020-00769, Paper 6 at 51.  "These incidents underscore the difficulty of understanding the polymorphic nature of pharmaceutical compounds."   *Id*.  Accordingly, to the extent UTC argues that claims 6 and 8-9 would have been nonobvious, the nature of the invention was one of great uncertainty. |

| State of the Prior Art | According to UTC, the prior art was silent as to storage considerations for treprostinil salts. *See, e.g.*, *id.* at 50-53.  To the extent UTC argues that claims 6 and 8-9 would have been nonobvious, without guidance as to "significant" environmental conditions (in UTC's own words), needed to store treprostinil salts, the state of the prior art was very limited. |
|---|---|
| Relative Skill of Those in the Art | According to UTC, "the POSA[3] would have been an industrial chemist or chemical engineer with experience in pharmaceutical production, familiar with controlling for polymorphs and realizing highly pure products at batch scales as the challenged claims required." *Id.* at 55.  To the extent UTC argues that claims 6 and 8-9 would have been nonobvious, the relative skill of those in the art was high. |
| Predictability or Unpredictability of the Art | As mentioned above, UTC contends that polymorphs "had plagued the pharmaceutical industry for over a decade prior to the '066 Patent, with high-profile failures including withdrawal of an approved drug from the market." *Id.* at 51.  "These incidents underscore the difficulty of understanding the polymorphic nature of pharmaceutical compounds." *Id.*  Accordingly, to the extent UTC argues that claims 6 and 8-9 would have been nonobvious, the art was highly unpredictable. |
| Breadth of the Claims | Claims 6 and 8-9 are extremely broad as they only limit "storage" to ambient temperature, leaving undefined and unclaimed all other "significant" environmental conditions, in UTC's own words, needed to store treprostinil salts. |

Applying all eight *Wands* factors, in view of UTC's statements regarding the instability of treprostinil, the '066 Patent fails to enable a person of ordinary skill in the art to practice Asserted Claims 6, 8, and 9.  Accordingly, claims 6, 8, and 9 of the '066 Patent are invalid as not enabled.

---

[3] Liquidia does not, at this time, concede to UTC's definition of a person of ordinary skill in the art.

> **b.    To the Extent UTC Contends that Claims 1 and 8 Permit "Isolation" of Treprostinil Before Combining with a Base to Form a Salt, the Asserted Claims Are Not Enabled**

Claim 1 of the '066 Patent requires "forming a salt of treprostinil by combining the starting batch and a base."  Additionally, claim 8 requires "forming a salt of treprostinil."  To the extent UTC argues that claims 1 and 8 permit isolation of treprostinil prior to contacting the treprostinil with a base to form a salt, the claims are not enabled as a person of ordinary skill in the art would have to engage in undue experimentation to achieve the result that "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition."

| *Wands* Factor | Application to Claims 1 and 8 of the '066 Patent |
|---|---|
| Quantity of Experimentation Necessary | As mentioned above in Section II.C.1.b *supra*, all of the examples disclosed in the specification of the '066 Patent disclose forming a salt of treprostinil by contacting treprostinil in solution with a base. To the extent UTC contends that claims 1 and 8 permit isolation of treprostinil before contacting with a base to form a salt, without guidance or direction in the '066 Patent, a POSA would have to engage in a significant amount of experimentation to achieve "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition." |
| Amount of Guidance or Direction Presented | As mentioned above in Section II.C.1.b *supra*, the specification and claims of the '066 Patent provide no guidance or direction as to how a POSA would isolate treprostinil before reacting it with a base and also achieve a "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition." |
| Presence or Absence of Working Examples | As mentioned above in Section II.C.1.b *supra*, the specification and claims of the '066 Patent provide no working examples of isolating treprostinil before reacting it with a base and achieving a "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition." |
| Nature of the Invention | According to UTC, a POSA would not have known that the level of one or more impurities found in the starting batch of treprostinil described in Phares 2005 was lower in the pharmaceutical composition. *Liquidia Techs.*, IPR2020-00769, Paper 6 at 37.  To the extent UTC contends that the pharmaceutical composition of |

| | |
|---|---|
| | Phares 2005 did not inherently possess a lower level of one or more impurities than the starting batch of treprostinil, the nature of the invention—that is isolating treprostinil before reacting with a base and achieving a pharmaceutical composition with a lower amount of one or more impurities than the starting batch—was one of great uncertainty. |
| State of the Prior Art | To the extent that UTC contends that the pharmaceutical composition of Phares 2005 did not inherently possess a lower level of one or more impurities than the starting batch of treprostinil, the state of the prior art was silent as to how a POSA would isolate treprostinil before contact with a base to form a salt and achieve a pharmaceutical composition with a lower level of one or more impurities than the starting batch of treprostinil. |
| Relative Skill of Those in the Art | According to UTC, "the POSA[4] would have been an industrial chemist or chemical engineer with experience in pharmaceutical production, familiar with controlling for polymorphs and realizing highly pure products at batch scales as the challenged claims required." *Liquidia Techs.*, IPR2020-00769, Paper 6 at 55.  To the extent UTC argues that claims 6 and 8 would have been nonobvious, the relative skill of those in the art was high. |
| Predictability or Unpredictability of the Art | To the extent UTC contends that the pharmaceutical composition of Phares 2005 did not inherently possess a lower level of one or more impurities than the starting batch of treprostinil, the state of the art—that is, in isolating treprostinil before reacting with a base and achieving a pharmaceutical composition with a lower amount of one or more impurities than the starting batch—was highly unpredictable. |
| Breadth of the Claims | To the extent UTC contends that the claims permit isolation of treprostinil before reacting it with a base, the claims encompass a broad scope of processes that are unsupported by the specification. |

Applying all eight *Wands* factors, to the extent UTC contends that the claims permit isolation of the treprostinil salt before adding a base to form a salt, claims 1 and 8 of the '066 Patent and, therefore, all other Asserted Claims of the '066 Patent are invalid as not enabled.

---

[4] Liquidia does not, at this time, concede to UTC's definition of a person of ordinary skill in the art.

### 3.    Claims 1-3, 6, and 8-9 Are Indefinite

#### a.    Claim Reciting "Impurities" Is Indefinite

Asserted Claim 1 of the '066 Patent, which Asserted Claims 2, 3, and 6 depend, is directed towards a pharmaceutical composition comprising treprostinil that is prepared by a process comprising a starting batch of treprostinil having one or more "impurities" resulting from prior alkylation and hydrolysis steps and wherein the level of one or more "impurities" found in the starting batch of treprostinil is lower in the pharmaceutical composition.  A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus*, 572 U.S. at 901.  "[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them."  *Id*. at 909 (alterations omitted).  Consequently, claim 1 of the '066 Patent, read in light of the specification and prosecution history, must apprise a POSA with "reasonable certainty" what compounds and in what specific amounts constitute "impurities" within the meaning of claim 1.

Neither the specification, claims, nor prosecution history of the '066 Patent apprise a POSA with "reasonable certainty" as to what constitutes an "impurit[y]" within the meaning of claim 1. Claim 1 of the '066 Patent indicates only that the "impurities" must "result[] from [the] prior alkylation . . . and hydrolysis steps," and the specification provides no further guidance.[5]  During prosecution of the '066 Patent, UTC submitted two expert declarations that were submitted by UTC during the '393 Patent IPR.  Those expert declarations identify eight impurities contained in the Moriarty 2004 (Former Process) batches:  1AU90, 2AU90, 3AU90, 750W93, 751W93,

---

[5] Similarly, UTC acknowledged in its Preliminary Response in the '066 Patent IPR that the claimed "impurities" must "result[] from [the] prior alkylation of benzindene triol and hydrolysis steps." *Liquidia Techs.*, IPR2020-00769, Paper 6 at 2.

97W86, ethyl ester, and methyl ester.  *See, e.g.*, Declaration of Dr. Robert M. Williams, *SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Exhibit 2020 at ¶ 94 (P.T.A.B. July 6, 2016) ("Williams Declaration").  Neither declaration, however, identifies the chemical compounds that are labeled "1AU90," "2AU90," "3AU90," "750W93," or "97W86."  Further, neither declaration establishes that the impurities identified actually resulted from "prior alkylation and hydrolysis steps."  As the Patent Trial & Appeal Board ("PTAB") noted in its Final Written Decision invalidating the '393 Patent, the "claims contain no limitations relating to the impurity profile of the recited product, 'and it is the claims ultimately that define the invention.'"  *SteadyMed*, IPR2016-00006, Paper 82 at 18 (quoting *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006)).  Without further guidance as to what constitutes an "impurit[y]" within the meaning of claim 1, a skilled artisan would not be apprised with "reasonable certainty" as to what impurities are needed to meet the claim limitation.

Similarly, neither the specification, claims, nor prosecution history of the '066 Patent apprise a POSA with "reasonable certainty" as to what level of "impurities" is needed to meet the claim limitation.  Moriarty 2004 specifies that the treprostinil made according to Moriarty 2004 was 99.7% pure.  *See* Moriarty 2004 at 1902.  While UTC contends in the specification of the '066 Patent that the "Former Process" (i.e., Moriarty 2004) has a purity of approximately 99.0% as compared to a purity of 99.9% for the process of the claimed invention (*see* '066 Patent col. 17, step 53), the calculations of UTC's own expert submitted during prosecution acknowledge that the "Former Process" yields a purity of 99.7%.  *See SteadyMed*, IPR2016-00006, Paper 82 at 35. UTC's expert Dr. Williams reviewed 46 commercial batches of treprostinil in accordance with Moriarty 2004 and found that the average purity of the batches was 99.7%, which the PTAB acknowledged was an accurate value and the same as reported in Moriarty 2004.  *Id*.  Further, as

59

acknowledged by the PTAB in the '393 IPR, Dr. Williams also reviewed 116 commercial batches of treprostinil made according to the process disclosed in the '393 (and thus the '066) Patent, and several Moriarty 2004 commercial batches were more pure than the batches made according to the disclosed process.  *Id*. at 38-39.  Thus, a POSA would not have any reasonable certainty what level of impurity should be "included" in the product.  As such, a person of ordinary skill in the art would not know, with reasonable certainty, what level of purity will be required to meet the limitations of claim 1.  *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 117 F. Supp. 3d 632, 642 (D. Del. 2015).

Thus, because a POSA would not be apprised with "reasonable certainty" what compounds or amounts of such compounds constitute "impurities" within the meaning of the claim limitation, Asserted Claim 1 of the '066 Patent and, therefore, all other Asserted Claims 2, 3, and 6 of the '066 Patent are invalid as indefinite.

### b.   Claims Reciting "Stored," "Storage," and "Storing" Are Indefinite

Asserted Claim 6 of the '066 Patent is directed toward a pharmaceutical composition of claim 1, wherein the isolated salt is "stored" at ambient temperature.  Similarly, Asserted Claim 8 of the '066 Patent, which Asserted Claim 9 depends, is directed to a method of preparing the pharmaceutical product comprising treprostinil after "storing" a treprostinil salt at ambient temperature.  A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus*, 572 U.S. at 901.  "[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them."  *Id*. at 909 (alterations omitted).  Accordingly, claims 6 and 8 of the '066 Patent, read in light of the specification and prosecution history, must apprise a POSA with

"reasonable certainty" as to what constitutes "storage" of the treprostinil salt within the meaning of the claims.

As mentioned above, UTC noted in its Preliminary Response to Liquidia's IPR Petition with respect to the '066 Patent that "[p]rostaglandin derivatives," like treprostinil, "in particular were known to be unstable upon storage due to inherent instability of the crystalline lattice of these compounds owning to their long, flexible sidearms, as well as the presence of multiple polymorphic crystals." *Liquidia Techs.*, IPR2020-00769, Paper 6 at 52. Further, UTC noted in its Preliminary Response that "[e]nvironmental factors are a significant factor (*e.g.*, temperature, oxygen, atmosphere, humidity). This is especially true for compounds stored as salts." *Id.* However, the claims specify only that the treprostinil salt be stored at "ambient temperature" and fail to provide any guidance or direction into other "significant" storage considerations, in UTC's own words, like oxygen, atmosphere, and humidity. Without guidance as to necessary storage considerations of the treprostinil salt and pharmaceutical composition, a person of ordinary skill in the art "would not be apprised with reasonable certainty about the scope of the invention." *Butamax*, 117 F. Supp. 3d at 642.

Thus, Asserted Claims 6, 8 and 9 of the '066 Patent are invalid as indefinite.

## III.   U.S. PATENT NO. 9,604,901

The '901 Patent issued March 28, 2017 from Application No. 14/754,932, filed June 30, 2015.  '901 Patent at 1.  Application No. 14/754,932 is a continuation of Application No. 13/933,623, filed on July 2, 2013, now Patent No. 9,156,786, which is a continuation of Application No. 13/548,446, filed on July 13, 2012, now Patent No. 8,497,393, which is a continuation of Application No. 12/334,731, filed on December 15, 2008, now Pat. No. 8,242,305. *Id.*  The '901 Patent claims priority to provisional application No. 61/014,232, filed December 17, 2007.  *Id.*

The '901 Patent discloses an "improved process" to prepare prostacyclin derivatives such as treprostinil. *Id*. at Abstract. Claim 1 is drawn to a pharmaceutical batch comprising treprostinil or a salt thereof. *Id*. at 17:24-18:2, claim 1.

Asserted Claim 1, the only independent claim, recites the following:

1[a] A pharmaceutical batch consisting of treprostinil or a salt thereof and impurities resulting from

1[b] (a) alkylating a benzindene triol,

1[c] (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil,

1[d] (c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil,

1[e] (d) isolating the salt of treprostinil, and

1[f] (e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and

1[g] wherein the pharmaceutical batch contains at least 2.9 g of treprostinil or its salt.

Asserted dependent claim 2 is directed towards a pharmaceutical batch of claim 1, which has been dried under vacuum. Asserted dependent claims 3 and 4 are directed towards pharmaceutical products comprising a "therapeutically effective amount" of treprostinil (claim 3) or treprostinil salt (claim 4) from a pharmaceutical batch of claim 1. Asserted dependent claim 6 is directed towards methods of preparing a pharmaceutical product from a pharmaceutical batch of claim 1, comprising storing a pharmaceutical batch of a treprostinil salt of claim 1 at ambient temperature and preparing a pharmaceutical product from the pharmaceutical batch after storage.

Asserted dependent claim 8 is directed towards methods of preparing a pharmaceutical product from a pharmaceutical batch of claim 1, comprising (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil.

These Preliminary Invalidity Contentions establish that claims 1-4, 6, and 8 of the '901 Patent are unpatentable as obvious under 35 U.S.C. § 103 based on two grounds that rely on Phares 2005 and Moriarty 2004 as primary references, respectively. Moreover, these Preliminary Invalidity Contentions show that the Asserted Claims of the '901 Patent are also invalid under 35 U.S.C. § 112.

### A.      Scope and Content of the Prior Art

The scope and content of the prior art with respect to the '066 Patent, described in Section II.A *supra*, applies to the '901 Patent, which has the same effective filing date, the same specification, and substantially identical claim language.

### B.      Claims 1-4, 6, and 8 Are Invalid Under 35 U.S.C. § 103

#### 1.      Claims, 1-4, 6, and 8 Would Have Been Obvious Over Phares 2005

##### a.      Independent Claim 1 Would Have Been Obvious

###### (1)      Claim Element 1[a]

| 1[a] | *A pharmaceutical batch consisting of treprostinil or a salt thereof and impurities resulting from*: |
|---|---|

Phares 2005 discloses the same synthesis of treprostinil as set forth in independent claim 1 of the '901 Patent. Phares 2005 describes "compounds and methods for inducing prostacyclin-like effects in a subject or a patient," including treprostinil and derivatives thereof. Phares 2005

at 8. The chemical structure of treprostinil disclosed in Phares 2005 is shown below:



*Id.* This is the same treprostinil disclosed in the '901 Patent:



where w = 1;  $Y_1$  is—$CH_2(CH_2)_m$- and m is 1; $M_1$  is $\alpha$-OH: $\beta$-$R_5$ or $\alpha$-$R_5$: $\beta$-OH, wherein $R_5$ is hydrogen; $L_1$ is $\alpha$-$R_3$: $\beta$-$R_4$, $\alpha$-$R_4$: $\beta$-$R_3$, or a mixture of $\alpha$-$R_3$: $\beta$-$R_4$ and $\alpha$-$R_4$: $\beta$-$R_3$, wherein $R_3$ and $R_4$ are hydrogen; and $R_7$ is  —$C_pH_{2p}$—$CH_3$, wherein p is an integer from 1 to 5 inclusive (p=3). '901 Patent at 2:7-3:20.

Phares 2005 further discloses the identical, pharmaceutically acceptable treprostinil diethanolamine salt as the '901 Patent. Phares 2005 at 96 (claim 49). The structure of treprostinil diethanolamine salt disclosed by Phares 2005 (left) is reproduced below in a side-by-side comparison with the treprostinil diethanolamine salt disclosed in the '901 Patent (right):

(Phares 2005)                                              ('901 Patent)

Phares 2005 at 96, claim 49; '901 Patent at 12:45-59, 14:35-48 (Examples 3 and 5).  Other than a

change in formatting, one can easily see that these two structures from Phares 2005 and the '901

Patent are identical.

This salt is the result of the same steps described in claim 1 of the '901 Patent: (a) by

forming a salt of treprostinil by combining the starting solution of treprostinil acid and a base and;

(b) isolating the treprostinil salt.  '901 Patent at 17:24-18:2 (claim 1); Phares 2005 at 22.  The

isolated salt is then used to prepare a pharmaceutical batch comprising treprostinil or a salt thereof.

'901 Patent at 17:24-18:2 (claim 1); Phares 2005 at 58.  As such, the treprostinil salt of Phares

2005 would contain impurities from the recited steps.

This shows that Phares 2005 necessarily discloses and/or renders obvious the product

claimed in the '901 Patent and the same process steps to make treprostinil and a salt thereof

disclosed in claim 1 of the '901 Patent (treprostinil diethanolamine salt).  This pharmaceutical

batch contains impurities resulting from the steps of alkylation and hydrolysis as described in

65

further detail below.  Further support for the obviousness of each process element of claim 1 is also provided in the following Sections III.B.1.a.(2)-(6).

### (2)   Claim Elements 1[b] and 1[c]

| 1[b] | *(a) alkylating a benzindene triol,* |
|------|---------------------------------------|
| 1[c] | *(b) hydrolyzing the product of step (a) to form a solution comprising treprostinil,* |

As discussed above in Section III.B.1.a.(1), Phares 2005 discloses the identical treprostinil and pharmaceutically acceptable treprostinil diethanolamine salt as the '901 Patent.  The remaining process claim elements do nothing to impart structural or functional differences in the claimed treprostinil or salt thereof, and thus, do not patentably limit the claimed pharmaceutical composition.  Even so, Phares 2005 further discloses providing a starting solution of treprostinil having one or more impurities resulting from alkylation and hydrolysis steps.

Specifically, Example 1 of the '901 Patent describes the alkylation of benzindene triol. '901 Patent at 10:10-67.  This alkylation reaction is shown below:



Alkylation of Benzindene Triol

*Id.*  Benzindene triol is the fused three ring core wherein the three hydroxyl groups (-OH) are not all located on the core.  In this example, the hydroxyl group indicated with the red square is being alkylated using **ClCH$_2$CN** in the presence of $K_2CO_3$, Bu$_4$NBr and acetone.

Phares 2005 discloses an alkylation reaction identical in nature to the '901 Patent alkylation reaction: **(l) i. ClCH$_2$CN, K$_2$CO$_3$**.  Phares 2005 at 39-40.  In particular, in step (l) the starting treprostinil precursor compound, the benzindene triol, is the enantiomer of the treprostinil precursor being alkylated in the '901 Patent (**11b** indicates that "R" can be "H").  Phares 2005 discloses the synthesis of (-)-treprostinil, the enantiomer of (+)-treprostinil and explains that "[e]nantiomers of these compounds…can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents."  *Id*.  The reaction from Phares 2005 is shown below for comparison:



*Id*. at 40, -OH group (where R=H) being alkylated indicated with red square.)  A POSA would understand that one could selectively alkylate the phenolic –OH group on the fused three-ring core of Compound **11b** as (where R=H) indicated in the red box.

In addition, Phares 2005 cites to the '075 Patent for routes in which compounds disclosed in Phares 2005 can be modified Phares 2005 at 9 (citing the '075 Patent).  Chart P of the '075 patent provides a synthetic scheme where the —-OH of a benzindene triol, as referred to in the '901 Patent, is alkylated.  '075 Patent at col. 90.  While the '075 Patent does not disclose the same synthesis reaction, this reference supports the proposition that it was not a novel step at the time of the invention to alkylate an –OH group on the benzene of a fused ring system and that a POSA could arrive at the treprostinil compound disclosed in the '901 Patent by reading the disclosures and references contained in Phares 2005.  This includes the step of selectively alkylating a benzindene triol.

Phares 2005 further discloses hydrolyzing the product from the alkylation reaction (step (a) above) to form enantiomeric treprostinil starting material.  The hydrolyzing procedure is disclosed in Phares 2005 as: "**ii, KOH, CH$_3$OH**, reflux. 83%."  Phares 2005 at 40 (emphasis added).  Phares 2005 further explains that "[e]nantiomers of these compounds . . . can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents," thereby inherently teaching this hydrolysis step for treprostinil as well.  *Id.* at 39-40.  A comparison between the treprostinil starting material disclosed in the '901 Patent (left) and Phares 2005 (right) are produced below for a side-by-side comparison:



|                  |                  |
|:----------------:|:----------------:|
| ('901 Patent)    | (Phares 2005)    |

'901 Patent at 11:1-12:17 (Example 2); Phares 2005 at 8.

Claim 1 of the '901 Patent simply teaches that one can perform the alkylation and hydrolysis steps, *i.e.*, making the nitrile and then hydrolyzing to make the treprostinil carboxylic acid (salt precursor).  '901 Patent at claim 1.  Phares 2005 teaches that the treprostinil carboxylic acid is in a solution.  Phares 2005 at 22, 40.  Treatment of Compound **11b** with KOH, CH$_3$OH (methanol), as explained above, would lead to the formation of a solution of treprostinil carboxylic acid after neutralization.  *Id*. at 40.  Phares 2005 further discloses that such treprostinil carboxylic acid can be in solution at page 22, where it teaches dissolving the treprostinil acid in ethanol/water.  *Id*. at 22.  Finally, a POSA would expect that the treprostinil formed would include the impurities

from the alkylation and hydrolysis steps, as those steps in Phares 2005 are, as discussed above, the same as claimed in the '901 Patent.

### (3)    Claim Element 1[d]

| 1[d] | *(c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil,* |
|---|---|

As discussed in the above section, Phares 2005 discloses treprostinil carboxylic acid starting material in solution.  Phares 2005 at 40.

Phares 2005 further discloses combining a starting batch of treprostinil and a base.  In particular, page 22 of Phares 2005 teaches dissolving treprostinil acid in a 1:1 molar ratio mixture of ethanol: water and **diethanolamine** (*i.e.*, a base).  *Id.* at 22.  However, a POSA would likely understand the treprostinil acid disclosed at page 22 to have been isolated before addition of the base.

But not isolating the treprostinil before contacting it with a base is obvious based on what is taught by Phares 2005.  For example, with the treprostinil solution inherently taught by Phares 2005 at page 40, instead of isolating the neutral carboxylic acid at this step by removal of the methanol, a POSA would find it obvious to instead add diethanolamine (*i.e.*, a base) to the treprostinil solution so that removal of the methanol would instead leave a salt, specifically, treprostinil diethanolamine salt.  *Id.* at 40.

A POSA would be motivated to do so to save a step of isolation of the treprostinil, instead waiting until the salt is formed to conduct an isolation step.  The result would be a process with just one isolation step, rather than two, which would be faster, more efficient, and more economical.  A POSA would have a reasonable expectation of success in doing so because isolation after salt formation is standard practice in the art, and is a step specifically taught in Phares 2005.  *Id.* at 22, 85-89.

### (4)   Claim Element 1[e]

| 1[e] | *(d) isolating the salt of treprostinil, and* |
|------|----------------------------------------------|

Phares 2005 discloses isolating the identical treprostinil diethanolamine salt as the '901 Patent.  Phares 2005 further discloses isolating crystalline forms of treprostinil diethanolamine salt—Form A and Form B.  Phares 2005 at 85-89.  A POSA would understand that upon completion of a reaction, the product is isolated, and even a sophomore organic chemistry student would understand the isolation steps needed following recrystallization.

### (5)   Claim Element 1[f]

| 1[f] | *(e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and* |
|------|------------------------------------------------------------------------------------------|

The step of reacting the foregoing salt of treprostinil with an acid to form the treprostinil in claim 1 of the '901 Patent is optional.  Therefore, no disclosure in Phares 2005 is required to demonstrate the obviousness of this claim element.  Even so, this step was generally known in the art and would have been obvious to a POSA.  *See* Schoffstall 2004 at 201-02; Wiberg 1960 at 112. The '901 Patent itself admits that step (e) is merely a "simple acidification with diluted hydrochloric acid" step, and is thus not a novel step.  '901 Patent at 17:5-8.

### (6)   Claim Element 1[g]

| 1[g] | *wherein the pharmaceutical batch contains at least 2.9 g of treprostinil or its salt.* |
|------|------------------------------------------------------------------------------------------|

The procedures outlined on pages 18 and 22 of Phares 2005 teach a reaction of ~1 gram-scale quantities of treprostinil (for the preparation of the corresponding methyl ester).  Phares 2005 at 18, 22.  The steps disclosed in Phares 2005 can simply be scaled up to produce a pharmaceutical batch of treprostinil or its salt of at least 2.9 g.  *See also* Moriarty 2004 at 1902 (disclosing production of 441g of treprostinil).  A POSA would expect that a reaction that is taught on a 1 gram scale could easily be achieved on a 2.9 gram scale because a POSA would understand that,

in this field, increasing the scale of a reaction by a factor of 3 can be done with a reasonable expectation of success, especially given that success was already demonstrated in art (e.g., Moriarty 2004). *Id.*

### b. Dependent Claims 2-4, 6 and Would Have Been Obvious

#### (1) Claim 2

| 2 | The pharmaceutical batch of claim 1, *which has been dried under vacuum.* |
|---|---|

The process limitation of drying a product under vacuum as disclosed in dependent claim 2 of the '901 Patent is not accorded any weight for determining the validity of the claims because it does not impart some unique and novel property or structure in the resulting treprostinil or treprostinil salt product. *See e.g., Amgen,* 580 F.3d, 1366. Even so, drying a product under vacuum is a standard organic chemistry practice for the isolation of a solid and would have been obvious to a POSA. *See, e.g.*, Moriarty 2004 at 1902.

#### (2) Claims 3 and 4

| 3 | *A pharmaceutical product comprising a therapeutically effective amount of treprostinil from a pharmaceutical batch* as claimed in claim 1. |
|---|---|
| 4 | *A pharmaceutical product comprising a therapeutically effective amount of a salt of treprostinil from a pharmaceutical batch* as claimed in claim 1. |

Phares 2005 further discloses a therapeutically effective amount of treprostinil and treprostinil salt. Phares 2005 at 48-49, 60, 65. The invention of Phares 2005 "provides for compositions which may be prepared by mixing one or more compounds of the instant invention, or pharmaceutically acceptable salts thereof, with pharmaceutically acceptable carriers, excipients, binders, diluents or the like, to treat or ameliorate a variety of disorders related vasoconstriction and/or platelet aggregation." *Id.* at 48. A "therapeutically effective dose" as defined in Phares 2005 further "refers to that amount of one or more compounds of the instant invention sufficient

to result in amelioration of symptoms of the disorder." *Id.* The compositions can be formulated for various routes of administration, for example, by oral administration, by transmucosal administration, by rectal administration, transdermal or subcutaneous administration as well as intrathecal, intravenous, intramuscular, intraperitoneal, intranasal, intraocular or intraventricular injection. *Id.* at 48-49.

Phares 2005 also discloses that a therapeutically effective dose may vary depending on the route of administration and dosage form. *Id.* at 51. The preferred compound or compounds of the invention disclosed in Phares 2005 is a "formulation that exhibits a high therapeutic index." *Id.* Pharmaceutical formulations include "any of the compounds of any of the embodiments of compound of structure I, II or pharmaceutically acceptable salts thereof described in combination with a pharmaceutically acceptable carrier." *Id.* at 52. The invention disclosed in Phares 2005 also provides a method of using the above compounds therapeutically of/for: pulmonary hypertension, ischemic diseases, heart failure, conditions requiring anticoagulation, thrombotic microangiopathy, extracorporeal circulation, central retinal vein occlusion, atherosclerosis, inflammatory diseases, hypertension, reproduction and parturition, cancer or other conditions of unregulated cell growth, cell/tissue preservation and other emerging therapeutic areas where prostacyclin treatment appears to have a beneficial role. *Id.* at 4; *see also* clinical study results of UT-15C on pages 82-85.)

Phares 2005 therefore discloses the additional elements of dependent claims 3 and 4.

### (3) Claim 6

| 6 | *A method* of preparing a pharmaceutical product from a pharmaceutical batch as claimed in claim 1, *comprising storing a pharmaceutical batch of a salt of treprostinil* as claimed in claim 1 *at ambient temperature, and preparing a pharmaceutical product from the pharmaceutical batch after storage*. |
|---|---|

Phares 2005 discloses the same treprostinil and treprostinil diethanolamine salt as the '901

Patent.  Phares 2005 at 8-9; 85-89, 96, claim 49.  Phares 2005 discloses that crystalline Form B is more thermodynamically stable than Form A.  *Id.* at 89.  Phares 2005 further discloses that Form B is made from Form A, with full conversion to Form B at ambient temperature after 7 days, 15° C after 11 days and 30° C after 1 day, suggesting stability at these temperatures.  *Id.* at 89, Table 17.  A POSA would understand "ambient temperature" to mean "room temperature" or, on average, 25° C.  A POSA would also understand that full conversion after 7 days at ambient temperature inherently teaches that Form B is stable at ambient temperature and therefore could be stored at ambient temperature.  *Id.*

As the treprostinil and treprostinil diethanolamine salt disclosed in Phares 2005 and the '901 Patent are identical, there are no structural differences between these molecules that would indicate to a POSA that the compounds would require different storage conditions.

Further, treprostinil was known to be stable at ambient temperature by December 2007. Gomberg-Maitland 2005 at 1586 (2005) ("Treprostinil has theoretical advantages over epoprostenol because of its stability at room temperature . . . ."); Ivy 2007 at 696 ("Treprostinil possesses physiochemical properties that make its use more convenient, including stability at room temperature . . . .").  In fact, the prescribing information for UTC's REMODULIN® published in March 2006 states plainly that "[t]reprostinil is chemically stable at room temperature and neutral pH."  REMODULIN® Label 2006.  Because treprostinil was known to be chemically stable at ambient temperature as of December 2007, a POSA would know that the treprostinil salts described in *Phares 2005* could be stored at ambient temperature.

Phares 2005 further "provides for compositions which may be prepared by mixing one or more compounds of the instant invention, or pharmaceutically acceptable salts thereof, with pharmaceutically acceptable carriers, excipients, binders, diluents or the like, to treat or ameliorate

a variety of disorders related vasoconstriction and/or platelet aggregation." Phares 2005 at 48. A "therapeutically effective dose" as defined in Phares 2005 further "refers to that amount of one or more compounds of the instant invention sufficient to result in amelioration of symptoms of the disorder." *Id.* Phares 2005 also discloses that compositions can be formulated for various routes of administration, for example, by oral administration, by transmucosal administration, by rectal administration, transdermal or subcutaneous administration as well as intrathecal, intravenous, intramuscular, intraperitoneal, intranasal, intraocular or intraventricular injection. *Id.* at 48-49. Thus, Phares 2005 discloses preparing a pharmaceutical product from the pharmaceutical batch of a salt of treprostinil.

Since Phares 2005 teaches the stability of the treprostinil salt at ambient (room) temperature (Phares 2005 at 89, Table 17), a POSA would reasonably expect the salt to behave the same pre- and post-storage. Thus, a POSA would expect that the Phares 2005 disclosure for preparing a pharmaceutical product from the pharmaceutical batch of a salt of treprostinil also applies to such a salt *after storage*. *Id.*

Accordingly, Phares 2005 renders obvious storing a pharmaceutical batch of a salt of treprostinil at ambient temperature and preparing a pharmaceutical product from the pharmaceutical batch after storage.

### c.      Dependent Claim 8 Would Have Been Obvious

Dependent claim 8 is independent claim 1 without claim limitation 1[f].

### (1)      Claim Element 8[a]

| 8[a] | *A method of preparing a pharmaceutical batch as claimed in claim 1, comprising:* |
|------|-----------------------------------------------------------------------------------|

*See* explanation under independent claim 1, Section II.B.1.c.(1).

74

### (2)    Claim Elements 8[b] and 8[c]

| 8[b] | *(a) alkylating a benzindene triol,* |
|------|--------------------------------------|
| 8[c] | *(b) hydrolyzing the product of step (a) to form a solution comprising treprostinil,* |

Phares 2005 discloses alkylating a triol intermediate, the benzindene triol, of the same structural formula disclosed in claim 8 of the '901 Patent. *See also* Section III.B.1.a.(2).   A comparison between the alkylation substrates disclosed in the '901 Patent (left) and Phares 2005 (right, enantiomer) are produced below for a side-by-side comparison:



Alkylation of Benzindene Triol

('901 Patent)                                              (Phares 2005)

'901 Patent at 10:10-67 (claim 8); Phares 2005 at 40.  Intermediate **11b** of Phares 2005 indicates that "R=H," showing that enantiomeric triol intermediates are disclosed in claim 8 of the '901 Patent and structure **11b** of Phares 2005.

Phares 2005 discloses hydrolyzing the resulting compound to form the same structural formula of treprostinil starting material disclosed in the '901 Patent. *See* Section III.B.1.a.(3).  The hydrolyzing procedure is disclosed in Phares 2005 as: "ii, KOH, $CH_3OH$, reflux. 83%." *Id.* at 40. A comparison between the treprostinil starting material disclosed in the '901 Patent (left) and Phares 2005 (right) are produced below for a side-by-side comparison:

(’901 Patent)                                        (Phares 2005)

’901 Patent at 11:15-29 (Example 2); Phares 2005 at 8.

Claim 1 of the ’901 Patent simply teaches that one can perform the alkylation and hydrolysis steps, *i.e.*, making the nitrile and then hydrolyzing to make the treprostinil carboxylic acid (salt precursor).  ’901 Patent at claim 1.  Phares 2005 teaches that the resulting treprostinil carboxylic acid is in a solution.  Phares 2005 at 22, 40.  A POSA would understand that treatment of **11b** with (ii) KOH, $CH_3OH$ (methanol) would lead to the formation of a solution of treprostinil carboxylic acid after neutralization.  Phares 2005 further discloses that such treprostinil carboxylic acid can be in solution at page 22, where it teaches dissolving the treprostinil acid in ethanol/water.  *Id.* at 22.

### (3)    Claim Element 8[d]

| 8[d] | *(c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil,* |
|---|---|

*See* explanation under independent claim 1.  Section III.B.1.a.(3).

### (4)    Claim Element 8[e]

| 8[e] | *(d) isolating the salt of treprostinil, and* |
|---|---|

*See* explanation under independent claim 1.  Section III.B.1.a.(4).

### (5)   Claim Element 8[f]

| 8[f] | *(e) optionally reacting the salt of treprostinil with an acid to form treprostinil.* |
|------|---------------------------------------------------------------------------------------|

The step of reacting the foregoing salt of treprostinil with an acid to form the treprostinil in claim 1 of the '901 Patent is optional.  Therefore, no disclosure in Phares 2005 is required to demonstrate the obviousness of this claim element.  Even so, this step was generally known in the art and would have been obvious to a POSA.  *See* Schoffstall 2004 at 201-02; Wiberg 1960 at 112.  The '901 Patent itself admits that step (e) is merely a "simple acidification with diluted hydrochloric acid" step, and is thus not a novel step.  '901 Patent at 17:5-8.

### 2.   Claims 1-4, 6, and 8 Would Have Been Obvious Over Moriarty 2004 in Combination with Phares 2005

#### a.   Motivation to Combine Moriarty 2004 with Phares 2005

A POSA would have been motivated to combine Moriarty 2004 and Phares 2005 at the time of the invention of the '901 Patent.  The combination of Moriarty 2004 and Phares 2005 discloses the same process steps and same treprostinil product of the '901 Patent.  *See* Sections II.A.1 and II.A.2 *supra*.  As discussed above, Moriarty 2004 teaches the preparation of treprostinil acid, and Phares 2005 teaches the preparation of treprostinil diethanolamine by dissolving treprostinil acid and treating it with diethanolamine.  Moriarty at 1895, 1902; Phares 2005 at 22.  Phares 2005 further discloses two polymorphs of treprostinil diethanolamine and their relative stabilities.  Phares at 85-89.

More specifically, Moriarty 2004 indicates that the crystalline treprostinil resulting from the disclosed process is obtained in the form of "[w]hite needles."  Moriarty 2004 at 1902.  A POSA would have known that "needle-shaped crystals are not desirable because of their poor flow properties."  Stahl 2002 at 137; *see also* Declaration of Dr. Rodolfo Pinal, *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00769 at ¶ 258 (July 14, 2020) (UTC expert testifying that

needle-shaped crystals were known to be unsuitable for downstream processing).  To improve the flow properties, among others, of the treprostinil acid produced according to Moriarty 2004, a POSA would have been motivated to modify the resulting treprostinil product disclosed in Moriarty 2004.  One means of improving the downstream processing properties of APIs is to make them into a salt form.  *See* Paulekuhn 2007 at 6665 ("Salt formation is a well-known technique to modify and optimize the physical chemical properties of an ionizable research or development compound.  Properties such as solubility, dissolution rate, hygroscopicity, stability, impurity profiles, and crystal habits can be influenced by using a variety of pharmaceutically acceptable compounds.").  Thus, a POSA would have sought to combine the treprostinil acid of Moriarty 2004 with the diethanolamine salt of Phares 2005 to improve properties, such as flow, of the pharmaceutical product.

Additionally, a POSA would have sought to combine Phares 2005 and Moriarty 2004 because Phares 2005 is directed to improving treprostinil, and the Moriarty 2004 process, including those steps claimed by the '901 Patent, was a well-known way to make treprostinil.  Further, a POSA would have sought to combine Moriarty 2004 and Phares 2005 in order to eliminate the intermediate purification step taught by Moriarty 2004, thereby increasing synthetic efficiency and lowering production costs for treprostinil diethanolamine salt.  A POSA would understand that an intermediate purification step is unnecessary because not purifying the intermediate carboxylic acid before addition of a base does not affect salt formation.

Accordingly, a POSA would have been motivated to combine the treprostinil acid disclosed in Moriarty 2004 with the diethanolamine treprostinil disclosed in Phares 2005.

### b.      Reasonable Expectation of Success

A POSA would have had a reasonable expectation of success in reacting the treprostinil taught by Moriarty 2004 with diethanolamine to form a treprostinil diethanolamine salt.  "The

reasonable expectation of success requirement refers to the likelihood of success in combining references to meet the limitations of the claimed invention." *Intelligent Bio-Sys.*, 821 F.3d at 1367. The proposed combination of Moriarty 2004 and Phares 2005 yields treprostinil diethanolamine salt (*i.e.*, the product claimed in independent claims 1 of the '901 Patent) via the process taught by Phares 2005. A POSA would have a reasonable expectation of success in doing so because Phares 2005 successfully performed precisely that step. *Id.* Indeed, the combination of Moriarty 2004 and Phares 2005 results in essentially the same process as disclosed in Example 6 of the '901 patent. Further, a POSA would understand that forming a salt from the treprostinil acid disclosed in Moriarty 2004 would not make the resulting product less pure than the 99.7% disclosed in the reference. Schoffstall 2004 at 201-02; Wiberg 1960 at 112; *see also* Harwood 1989 at 127 ("The simplest and most effective technique for the purification of solid organic compounds is crystallization. Crystalline compounds are easy to handle, their purity is readily assessed . . . and they are often easier to identify than liquids or oils.").

### c.      Independent Claim 1 Would Have Been Obvious

Moriarty 2004 in combination with Phares 2005 teaches each element of claim 1 of the '901 Patent.

### (1)      Claim Element 1[a]

| 1[a] | *A pharmaceutical batch consisting of treprostinil or a salt thereof and impurities resulting from:* |
|------|------|

Moriarty 2004 discloses the production of a pharmaceutical batch of treprostinil and the synthesis of treprostinil via the stereoselective intramolecular Pauson-Khand cyclization. Moriarty 2004 at 1890. Structure **7** of Moriarty 2004 depicts the chemical structure of treprostinil and is shown below:

**7**

*Id.* at 1892.  This is the identical treprostinil pharmaceutical salt precursor disclosed in the '901 Patent:



'901 Patent at 12:25-37.

While the step of reacting treprostinil with a base to form a salt of **7** is not disclosed in Moriarty 2004, this step is clearly disclosed in Phares 2005.  Phares 2005 discloses that treprostinil acid (which is equivalent to **7** in Moriarty 2004) is dissolved in a 1:1 molar ratio mixture of ethanol: water and diethanolamine (*i.e.*, the base) is added and dissolved.  Phares 2005 at 22.  The solution is heated and acetone is added as an antisolvent during cooling.  *Id.*  The resulting structure (left) corresponds to the treprostinil diethanolamine salt claimed in the '901 Patent (right).  A side-by-side comparison is shown below:

(Phares 2005)                              ('901 Patent)

Phares 2005 at 9, 96 (claim 49); '901 Patent at 9:35-45, 12:45-60, Example 3.  Other than a change in formatting, one can easily see that these two structures from Phares 2005 and the '901 Patent are identical.

The formation of salts by the reaction of carboxylic acids with bases is a common reaction in organic chemistry and is well within the skill of a POSA, as discussed above.  *See, e.g.*, Kawakami 1981.

This salt is the result of the same steps described in the '901 Patent; (a) by forming a salt of treprostinil by combining the starting solution of treprostinil acid and a base and; (b) isolating the treprostinil salt.  '901 Patent at claims 1 and 8.  The isolated salt is then used to prepare a pharmaceutical batch comprising treprostinil or a salt thereof.  *Id.*; Phares 2005 at 58.  As such, the treprostinil salt of Phares 2005 would contain impurities from the recited steps.

Therefore, Moriarty 2004 in combination with Phares 2005 disclose a pharmaceutical batch consisting of treprostinil or a salt thereof.  This pharmaceutical batch contains impurities resulting from the steps of alkylation and hydrolysis as described in further detail below.

81

### (2)    Claim Element 1[b]

| 1[b] | *(a) alkylating a benzindene triol,* |

Both Moriarty 2004 and Phares 2005 teach alkylating a benzindene triol. Moriarty 2004 at 1895, 1902; Phares 2005 at 39-40.

Moriarty 2004 teaches alkylation of benzindene triol. Moriarty 2004 at 1897. The alkylation reaction of **34** to yield **35** as disclosed in Moriarty 2004 is equivalent to the alkylation reaction disclosed in the '901 Patent. **34** and **35** of Moriarty 2004 are as follows:



Moriarty 2004 at 1895, 1902. Moriarty 2004 teaches that the triol (**34**) was alkylated at the phenolic hydroxyl group with use of chloroacetonitrile in refluxing acetone with potassium carbonate (**34 → 35**) and nitrile **35** was hydrolyzed with ethanolic potassium hydroxide to yield UT-15 (**7**). *Id.* at 1897. This is the same triol disclosed in the '901 Patent as shown below:



('901 Patent)                    (Moriarty 2004)

'901 Patent at 10:17-26; Moriarty 2004 at 1895, 1902.

As discussed above in Section III.B.1.a.(2), Phares 2005 also discloses alkylation of a benzindene triol (**11b → 2**).  Phares 2005 at 40.  The reaction from Phares 2005 is shown below for comparison:



Phares 2005 at 39-40, -OH group being alkylated indicated with red square.

A POSA would recognize that the alkylation reaction step (l) disclosed in Phares 2005 ("i. ClCH$_2$CN, K$_2$CO$_3$") for the enantiomer of treprostinil is equally applicable to treprostinil, as disclosed in the '901 Patent.  Phares 2005 at 40.  Phares 2005 explains that enantiomers of these compounds (including (-)-treprostinil) "can be synthesized using the reagents and synthons of enantiomeric chirality of the above reagents," thereby inherently teaching the synthesis of both enantiomeric forms of treprostinil and of the benzindene triol and nitrile intermediates thereof.  *Id.* at 39.

### (3)     Claim Element 1[c]

| 1[c] | *(b) hydrolyzing the product of step (a) to form a solution comprising treprostinil,* |
|------|--------------------------------------------------------------------------------------|

As discussed above, Moriarty 2004 discloses the identical treprostinil precursor, and Phares 2005 discloses the identical pharmaceutically acceptable treprostinil diethanolamine salt as the '901 Patent.  Scheme 4 of Moriarty 2004 teaches that **35** is hydrolyzed with a base (*i.e.*, aqueous KOH), followed by acidification to yield **7**, the treprostinil salt precursor disclosed in the '901 Patent.  Phares 2005 at 6, 13.  A POSA would understand that adding aqueous KOH would result in a solution of treprostinil (**7**).

Phares 2005 also discloses hydrolyzing the product from the alkylation reaction (step (a) above) to form the enantiomeric treprostinil starting material disclosed in the '901 Patent.  The hydrolyzing procedure is disclosed in Phares 2005 as: "ii, KOH, CH₃OH, reflux. 83%."  Phares 2005 at 40.  A comparison between the treprostinil starting material disclosed in the '901 Patent (left) and Phares 2005 (right) are produced below for a side-by-side comparison:



('901 Patent)                                        (Phares 2005)

'901 Patent at 11:17-29, Example 2; Phares 2005 at 8.

Claim 1 of the  '901 Patent simply teaches that one can perform the alkylation and hydrolysis steps, *i.e.*, making the nitrile and then hydrolyzing to make the treprostinil carboxylic acid (salt precursor) and subsequently make the salt by adding a base to the treprostinil carboxylic acid.  '901 Patent at claim 1.

Phares 2005 teaches that the treprostinil carboxylic acid is in a solution.  Phares 2005 at 22, 40.  A POSA would understand that treatment of **11b** with (ii) KOH, CH₃OH (methanol) would lead to the formulation of a solution of treprostinil carboxylic acid after neutralization.  Phares 2005 further discloses that such treprostinil carboxylic acid can be in solution at page 22, where it teaches dissolving the treprostinil acid in ethanol/water.  *Id.* at 22.  Finally, a POSA would expect that the treprostinil formed would include the impurities from the alkylation and hydrolysis steps,

as those steps in Phares 2005 are, as discussed above, the same as claimed in the '901 Patent.

### (4)   Claim Element 1[d]

| 1[d] | *contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil,* |
|---|---|

As explained above, Moriarty 2004 and Phares 2005 disclose formation of a solution comprising treprostinil.

Phares 2005 further discloses combining a starting batch of treprostinil and a base.  In particular, page 22 of Phares 2005 teaches dissolving treprostinil acid in a 1:1 molar ratio mixture of ethanol: water to give a solution of tresprostinil acid, which is then treated with a base, **diethanolamine**.  Phares 2005 at 22.  However, a POSA would likely understand the treprostinil acid disclosed at page 22 to have been isolated before addition of the base.

But not isolating the treprostinil before contacting it with a base is obvious based on what is taught by Phares 2005.  For example, with the treprostinil solution inherently taught by Phares 2005 at page 40, instead of isolating the neutral carboxylic acid at this step by removal of the methanol, a POSA would find it obvious to instead add diethanolamine (*i.e.*, a base) to the treprostinil solution so that removal of the methanol would instead leave a salt, specifically, treprostinil diethanolamine salt.  Phares 2005 at 40.

A POSA would be motivated to do so to save a step of isolation of the treprostinil, instead waiting until the salt is formed to conduct an isolation step.  The result would be a process with just one isolation step, rather than two, which would be faster, more efficient, and more economical.  *Id.*  A POSA would have a reasonable expectation of success in doing so because isolation after salt formation is standard practice in the art, and is a step specifically taught in Phares 2005.  Phares 2005 at 22, 85-89.  The resulting diethanolamine salt formation is identical

to the pharmaceutical salt of treprostinil as disclosed in claim 1 of the '901 Patent.

### (5)    Claim Element 1[e]

| 1[e] | *(d) isolating the salt of treprostinil, and* |
|---|---|

Phares 2005 discloses isolating the identical pharmaceutically acceptable treprostinil diethanolamine salt form as the '901 Patent.  Phares 2005 at 85-89.  Phares 2005 further discloses isolating crystalline forms of treprostinil diethanolamine salt—Form A and Form B.  *Id.*. A POSA would understand that upon completion of a reaction, the product is isolated, and even a sophomore organic chemistry student would understand the isolation steps needed following the conversion of Form A to Form B.

### (6)    Claim Element 1[f]

| 1[f] | *(e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and* |
|---|---|

The step of reacting the foregoing salt of treprostinil with an acid to form the treprostinil in claim 1 of the '901 Patent is optional.  Therefore, no disclosure in Moriarty 2004 or Phares 2005 is required to demonstrate the obviousness of this claim element.  Even so, this step was generally known in the art and would have been obvious to a POSA.  *See* Schoffstall 2004; Wiberg 1960.  The '901 Patent itself admits that step (e) is merely a "simple acidification with diluted hydrochloric acid" step, and is thus not a novel step.  '901 Patent at 17:5-8.

### (7)    Claim Element 1[g]

| 1[g] | *wherein the pharmaceutical batch contains at least 2.9 g of treprostinil or its salt.* |
|---|---|

As discussed above, Moriarty 2004 discloses the identical treprostinil precursor, and Phares 2005 discloses the identical pharmaceutically acceptable treprostinil diethanolamine salt as the '901 Patent.

Moriarty 2004 discloses that to meet the demands of producing multikilogram quantities of UT-15 (**7**) needed in the course of drug development, an efficient and economical synthesis had to be devised.  Moriarty 2004 at 1892.  The essential requirements for any large-scale, multistep synthesis of a molecule of the complexity of UT-15 (**7**) are very high overall stereoselectivity, high overall chemical yield, and scalability of individual steps to multigram quantities.  *Id.*  Moriarty 2004 further discloses that after the synthesis steps described above, crude UT-15 (**7**) was crystallized by dissolving the solid in ethanol, 50° C and adding water 1:1.  *Id.* at 1902.  "White needles obtained upon standing were filtered, washed with 20% ethanol-water, and dried in a vacuum oven, 55° C to give **441 g** (83%) of pure UT-15 as a colorless crystalline solid."  *Id.* (emphasis added).  A POSA would therefore conclude that the synthesis of quantities at least as large as 2.9 g of treprostinil (and its derived salt) would be possible.

In addition, a POSA would readily understand that one could follow the steps disclosed in Phares 2005 and simply scale up said steps to produce a pharmaceutical batch of treprostinil or its salt of at least 2.9 g.  This is especially true since Phares 2005 teaches that gram-scale quantities of treprostinil can be produced, and a POSA would expect that a reaction taught on a 1-gram scale could easily be achieved on a 2.9-gram scale.  *Id.*; Phares 2005 at 18, 22.

### d.    Dependent Claims 2-4 and 6 Would Have Been Obvious

#### (1)    Claim 2

| 2 | The pharmaceutical batch of claim 1, *which has been dried under vacuum.* |
|---|---|

Moriarty 2004 discloses the identical treprostinil precursor, and Phares 2005 discloses the identical pharmaceutically acceptable treprostinil diethanolamine salt as the '901 Patent.

Moriarty 2004 further discloses that after the synthesis steps described above, crude UT-15 (**7**) was crystallized by dissolving the solid in ethanol, 50° C and adding water 1:1.  Moriarty

2004 at 1902.  "White needles obtained upon standing were filtered, washed with 20% ethanol-water, **and dried in a vacuum** oven, 55°C to give 441 g (83%) of pure UT-15 as a colorless crystalline solid."  (*Id.* (emphasis added).)

### (2)  Claims 3 and 4

| 3 | *A pharmaceutical product comprising a therapeutically effective amount of treprostinil from a pharmaceutical batch* as claimed in claim 1. |
| 4 | *A pharmaceutical product comprising a therapeutically effective amount of a salt treprostinil from a pharmaceutical batch* as claimed in claim 1. |

Moriarty 2004 teaches that UT-15 (**7**) has proven effective in the treatment of pulmonary hypertension and investigated for use in treating severe congestive heart failure, severe intermittent claudication, and immuno-suppression.  Moriarty 2004 at 1892.  A goal of the experiments disclosed in Moriarty 2004 was to meet the demands of producing multikilogram quantities of UT-15 needed in the course of drug development.  *Id.*  Therefore, Moriarty 2004 discloses a pharmaceutical product comprising a therapeutically effective amount of treprostinil from the pharmaceutical batch.

Phares 2005 further discloses a therapeutically effective amount of treprostinil and treprostinil salt.  Phares 2005 at 48-49, 60, 65.  The invention of Phares 2005 "provides for compositions which may be prepared by mixing one or more compounds of the instant invention, or pharmaceutically acceptable salts thereof, with pharmaceutically acceptable carriers, excipients, binders, diluents or the like, to treat or ameliorate a variety of disorders related vasoconstriction and/or platelet aggregation."  *Id.* at 48.  A "therapeutically effective dose" as defined in Phares 2005 further "refers to that amount of one or more compounds of the instant invention sufficient to result in amelioration of symptoms of the disorder."  *Id.*  The compositions can be formulated for various routes of administration, for example, by oral administration, by transmucosal

administration, by rectal administration, transdermal or subcutaneous administration as well as intrathecal, intravenous, intramuscular, intraperitoneal, intranasal, intraocular or intraventricular injection. *Id.* at 48-49.

Phares 2005 also discloses that a therapeutically effective dose may vary depending on the route of administration and dosage form. *Id.* at 51. The preferred compound or compounds of the invention disclosed in Phares 2005 is a "formulation that exhibits a high therapeutic index." *Id.* Pharmaceutical formulations include "any of the compounds of any of the embodiments of compound of structure I, II or pharmaceutically acceptable salts thereof described in combination with a pharmaceutically acceptable carrier." *Id.* at 52.

The invention disclosed in Phares 2005 also "provides a method of using the above compounds therapeutically of/for: pulmonary hypertension, ischemic diseases, heart failure, conditions requiring anticoagulation, thrombotic microangiopathy, extracorporeal circulation, central retinal vein occlusion, atherosclerosis, inflammatory diseases, hypertension, reproduction and parturition, cancer or other conditions of unregulated cell growth, cell/tissue preservation and other emerging therapeutic areas where prostacyclin treatment appears to have a beneficial role." *Id.* at 4; *see also* clinical study results of UT-15C on pages 82-85.

### (3)    Claim 6

| 6 | *A method of preparing a pharmaceutical product* from a pharmaceutical batch as claimed in claim 1, comprising *storing a pharmaceutical batch of a salt of treprostinil* as claimed in claim 1 at *ambient temperature, and preparing a pharmaceutical product from the pharmaceutical batch after storage.* |
|---|---|

As discussed above, Phares 2005 discloses the same treprostinil and treprostinil diethanolamine salt as the '901 Patent. Phares 2005 at 8-9; 85-89, 96 (claim 49). Phares 2005 further discloses isolation of two crystalline salt forms of UT-15C – Form A and Form B. *Id.* at

85-89.  Phares 2005 discloses that crystalline Form B is more thermodynamically stable than Form A.  *Id.* at 89.  Phares 2005 further discloses that Form B is made from Form A, with full conversion to Form B at ambient temperature after 7 days, 15° C after 11 days and 30° C after 1 day, suggesting stability of the treprostinil diethanolamine salt at these temperatures.  *Id.* at 89, Table 17.  A POSA would understand "ambient temperature" to mean "room temperature" or, on average, 25° C.  A POSA would also understand that full conversion after 7 days at ambient temperature, as disclosed by Phares 2005, inherently teaches that Form B is stable at ambient temperature and therefore could be stored at ambient temperature.  *Id.*

As the treprostinil and treprostinil diethanolamine salt disclosed in Phares 2005 and the '901 Patent are identical, there are no structural differences between these molecules that would indicate to a POSA that the compounds would require different storage conditions.

Further, treprostinil was known to be stable at ambient temperature by December 2007.  Gomberg-Maitland 2005 at 1586 ("Treprostinil has theoretical advantages over epoprostenol because of its stability at room temperature . . . ."); Ivy 2007 at 696 ("Treprostinil possesses physiochemical properties that make its use more convenient, including stability at room temperature . . . .").  In fact, the prescribing information for UTC's REMODULIN® published in March 2006 states plainly that "[t]reprostinil is chemically stable at room temperature and neutral pH."  REMODULIN® Label 2006.  Because treprostinil was known to be chemically stable at ambient temperature as of December 2007, a POSA would know that the treprostinil salts described in Phares 2005 could be stored at ambient temperature.

Phares 2005 and Moriarty 2004 disclose preparing a pharmaceutical product from the pharmaceutical batch of a salt of treprostinil.  Phares 2005 "provides for compositions which may be prepared by mixing one or more compounds of the instant invention, or pharmaceutically

acceptable salts thereof, with pharmaceutically acceptable carriers, excipients, binders, diluents or the like, to treat or ameliorate a variety of disorders related vasoconstriction and/or platelet aggregation." *Id.* at 48. A "therapeutically effective dose" as defined in Phares 2005 further "refers to that amount of one or more compounds of the instant invention sufficient to result in amelioration of symptoms of the disorder." *Id.* Phares 2005 also discloses that compositions can be formulated for various routes of administration, for example, by oral administration, by transmucosal administration, by rectal administration, transdermal or subcutaneous administration as well as intrathecal, intravenous, intramuscular, intraperitoneal, intranasal, intraocular or intraventricular injection. *Id.* at 48-49. Moriarty 2004 teaches that UT-15 (**7**) has proven effective in the treatment of pulmonary hypertension and investigated for use in treating severe congestive heart failure, severe intermittent claudication, and immuno-suppression. A POSA would therefore understand that UT-15 functions here as a pharmaceutical product. Moriarty 2004 at 1892.

Since Phares 2005 teaches the stability of the treprostinil salt at ambient (room) temperature (Phares 2005 at 89, Table 17), a POSA would reasonably expect the salt to behave the same pre- and post- storage. Thus, a POSA would expect that the Phares 2005 and Moriarty 2004 disclosures for preparing a pharmaceutical product from the pharmaceutical batch of a salt of treprostinil also applies to such a salt *after storage*.

Accordingly, Moriarty 2004 in combination with Phares 2005 renders obvious storing a pharmaceutical batch of a salt of treprostinil at ambient temperature and preparing a pharmaceutical product from the pharmaceutical batch after storage.

### e.    Dependent Claim 8 Would Have Been Obvious

Dependent claim 8 is independent claim 1, without claim limitation 1[f].

### (1)    Claim Element 8[a]

| 8[a] | *A method of preparing a pharmaceutical batch* as claimed in claim 1, comprising: |
|------|-----------------------------------------------------------------------------------|

*See* explanation under independent claim 1, Section III.B.2.c.

### (2)    Claim Elements 8[b] and [c]

| 8[b] | *(a) alkylating a benzindene triol,* |
|------|--------------------------------------|
| 8[c] | *(b) hydrolyzing the product of step (a) to form a solution comprising treprostinil,* |

Moriarty 2004 teaches both the alkylating and hydrolyzing steps of claim 8.  Moriarty 2004 teaches the alkylation of triol intermediate **34** (left) which has the same formula as the triol structure disclosed in the '901 Patent (right):



(Moriarty 2004)                    ('901 Patent)

Moriarty 2004 at 1895; '901 Patent at 9:15-25.  Moriarty 2004 teaches that the "**[t]riol 34 was alkylated** at the phenolic hydroxyl group with use of chloroacetonitrile in refluxing acetone with potassium carbonate (**34→ 35**) and nitrile **35** was **hydrolyzed** with ethanolic potassium hydroxide to yield UT-15 (**7**) in 9% overall yield."  Moriarty 2004 at 1898 (emphasis added).)

Phares 2005 also teaches both the alkylating and hydrolyzing steps of claim 8.  Phares 2005 discloses alkylating a triol intermediate, the benzindene triol, of the same structural formula disclosed in claim 8 of the '901 Patent.  *See also* Section III.B.2.c.(2).  Phares 2005 also discloses

92

this same triol alkylation step as Moriarty 2004 and as the '901 Patent, where "R" can be "H" (structure **11b**):



Alkylation of Benzindene Triol

('901 Patent)                                                         (Phares 2005)

'901 Patent at 9:50-10:13, claim 8; Phares 2005 at 40.

Phares 2005 discloses hydrolyzing the resulting compound to form the same structural formula of treprostinil starting material disclosed in the '901 Patent. *See* Section III.B.2.c.(3). The hydrolyzing procedure is disclosed in Phares 2005 as: "ii, KOH, CH$_3$OH, reflux. 83%." Phares 2005 at 40 (emphasis added). Phares 2005 further explains that "[e]nantiomers of these compounds…can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents," thereby inherently teaching this hydrolysis step for treprostinil as well. *Id*. at 39-40. A comparison between the resulting treprostinil starting material disclosed in the '901 Patent (left) and Phares 2005 (right) are produced below for a side-by-side comparison:

93

('901 Patent)                                    (Phares 2005)

'901 Patent at 11:17-29, Example 2; Phares 2005 at 8.

Claim 1 of the '901 Patent simply teaches that one can perform the alkylation and hydrolysis steps, *i.e.*, making the nitrile and then hydrolyzing to make the treprostinil carboxylic acid (salt precursor). '901 Patent at claim 1.

Phares 2005 also teaches that the resulting treprostinil carboxylic acid is in a solution. Phares 2005 at 22, 40. A POSA would understand that treatment of **11b** with KOH, $CH_3OH$ (methanol), as taught in Phares 2005's hydrolyzing step, would lead to the formation of a solution of treprostinil carboxylic acid after neutralization. *Id.* at 40. Phares 2005 further discloses that such treprostinil carboxylic acid can be in solution at page 22, where it teaches dissolving the treprostinil acid in ethanol/water. *Id.*; Phares 2005 at *22*.

### (3)     Claim Elements 8[d]

| 8[d] | *(c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil,* |
|------|------|

*See* explanation under independent claim 1. Section III.B.2.c.(4).

### (4)     Claim Element 8[e]

| 8[e] | *(d) isolating the salt of treprostinil, and* |
|------|------|

*See* explanation under independent claim 1. Section III.B.2.c.(5).

### (5)    Claim Element 8[f]

| 8[f] | *(e) optionally reacting the salt of treprostinil with an acid to form treprostinil.* |
|------|--------------------------------------------------------------------------------------|

The step of reacting the foregoing salt of treprostinil with an acid to form the treprostinil in claim 8 of the '901 Patent is optional.  Therefore, no disclosure in Moriarty 2004 or Phares 2005 is required to demonstrate the obviousness of this claim element.  Even so, this step was generally known in the art and would have been obvious to a POSA.  *See, e.g.*, Schoffstall 2004 at 201-02; Wiberg 1960 at 112.  Moreover, the '901 Patent admits that step (e) is merely a "simple acidification with diluted hydrochloric acid" step, and is thus not a novel step.  '901 Patent at 17:5-8.

### 3.    No Evidence of Objective Indicia of Nonobviousness (Secondary Considerations)

Secondary considerations of nonobviousness, which are also called objective indicia, must be evaluated to determine whether or not UTC would be able to overcome the strong *prima facie* case of obviousness presented herein.  When the invention represents no more than the "predictable use of prior art elements according to their established functions," the secondary considerations are inadequate to establish nonobviousness as a matter of law.  *See, e.g., Wyers*, 616 F.3d at 1246. In this case, Liquidia is not aware of any secondary considerations sufficient to overcome the strong showing of *prima facie* obviousness.  The specification and prosecution history of the '901 Patent do not disclose any unexpected results or skepticism in the field.  To the extent UTC identifies any evidence of secondary considerations of nonobviousness, Liquidia reserves the right to respond and present evidence to the contrary.  To the extent UTC submits evidence of secondary considerations previously submitted during the IPR of the '393 Patent, those positions have already been rejected and do not support the non-obviousness of the '901 Patent here.

### C.      Claims 1-4, 6, and 8 Are Invalid Under 35 U.S.C. § 112

The Asserted Claims of the '901 Patent are invalid under 35 U.S.C. § 112 for lack of written description support, lack of enablement, and indefiniteness.  "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad*, 598 F.3d at 1351.  To satisfy the enablement requirement under § 112(a), the specification must enable a person having ordinary skill in the art to make and use the invention.  *Wyeth*, 720 F.3d at 1384.  This requirement is met when at the time of filing the application, one skilled in the art, having read the specification, could practice the invention without "undue experimentation."  *ALZA*, 603 F.3d at 940 (quoting *Genentech*, 108 F.3d at 1365).  Finally, under § 112, patent claims must "particularly point[] out and distinctly claim[] the subject matter" regarded as the invention.  35 U.S.C. § 112(b).  A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus*, 572 U.S. at 901.  As discovery is ongoing, Liquidia reserves the right to supplement and/or amend these contentions.

#### 1.      Claims 3, 4, and 6 Lack Written Description Support

##### a.      "Therapeutically Effective Amount" Lacks Written Description Support

Asserted Claims 3 and 4 of the '901 Patent are directed to pharmaceutical products comprising a "therapeutically effective amount" of treprostinil or "salt treprostinil."  "[T]he purpose of the written description requirement is to 'ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of the art as described in the patent specification.'"  *Ariad*, 598 F.3d at 1353-54 (2010) (quoting *Rochester*, 358 F.3d at 920).  Accordingly, to satisfy the written description requirement, "the

patentee is obliged to described . . . subject matter commensurate with the scope of the exclusionary right." *Id.* at 1360. Thus, for UTC to satisfy the written description requirement, the specification of the '901 Patent must adequately describe the full scope of claims 3 and 4 of the '901 Patent.

Here, however, neither the claim language nor specification of the '901 Patent define or otherwise describe what constitutes a "therapeutically effective amount" of treprostinil or a treprostinil salt. Indeed, the claims are extremely broad as they do not recite a specific disease[6] to which a "therapeutically effective" amount of treprostinil or salt thereof would be applicable nor to a particular route of administration (e.g., inhalation). In fact, other than claims 3 and 4, the specification does not use the term "therapeutically effective," and further does not include any disclosure concerning any doses that the claimed "pharmaceutical product" should contain. *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("[C]laims must be construed so as to be consistent with the specification, of which they are part."). Because the '901 Patent fails to limit the scope of claims 3 or 4, the specification of the '901 Patent must reasonably convey to those skilled in the art that the inventors had possession of a "therapeutically effective amount" of treprostinil to treat *any condition* and by *any route of administration* as of December 17, 2007.

---

[6] The '901 Patent provides only general descriptions of treprostinil's potential uses in the treatment of various disorders and by different routes of administration. *See* '901 Patent at 1:36–65 (describing generally treprostinil's potential use in treatment of pulmonary hypertension, peripheral vascular disease, lung cancer, liver cancer, brain cancer, pancreatic cancer, kidney cancer, prostate cancer, breast cancer, colon cancer, head-neck cancer, kidney malfunction, neuropathic foot ulcers, pulmonary fibrosis, interstitial lung disease, and asthma). However, these extremely general characterizations of routes of administration and potential disorders treated by treprostinil fail to limit the scope of claims 3 and 4.

Even if the '901 Patent's general reference to various disorders and routes of administration demonstrates possession of a "therapeutically effective amount" of treprostinil or treprostinil salt to treat those conditions (*see* '901 Patent at 1:36-65), which Liquidia does not concede, the '901 Patent provides no evidence that the named inventors possessed a "therapeutically effective amount" of treprostinil or treprostinil salt for all other conditions and routes of administration encompassed by the claims.  By failing to provide any guidance or evidence that the inventors were in possession of a "therapeutically effective amount" of treprostinil or treprostinil salt to treat all conditions and routes of administration encompassed by the claims, the specification of the '901 Patent fails to adequately describe claims 3 and 4 of the '901 Patent.  *See, e.g.*, *Biogen Int'l GmbH v. Mylan Pharms. Inc.*, No. 17CV116, 2020 WL 3317105, at *15 (N.D. W. Va. June 18, 2020) (invalidating patent lacking clinical data for inadequately describing "therapeutically effective amount").

### b.  "Storing"/"Storage" Lack Written Description Support

Asserted Claim 6 of the '901 Patent is directed to a method of preparing the pharmaceutical product comprising treprostinil after "storing" a pharmaceutical batch of a treprostinil salt at ambient temperature.  "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad*, 598 F.3d at 1351.  An adequate written description need not in every instance describe an actual reduction to practice but "must nonetheless 'describe the claimed subject matter in terms that establish that [the applicant] was in possession of the . . . claimed invention, including all of the elements and limitations.'"  *Rochester*, 358 F.3d at 926 (quoting *Hyatt*, 146 F.3d at 1353).  Accordingly, the specification of the '901 Patent must sufficiently describe a method of "storing" a pharmaceutical batch at ambient temperature and preparing a pharmaceutical product from the pharmaceutical batch after "storage" such that a

person of skill in the art would recognize that the named inventors actually invented what is claimed.

A POSA reviewing the specification of the '901 Patent would conclude that the inventors were not in possession of a method of preparing a pharmaceutical product from a pharmaceutical batch of treprostinil salt that was "stor[ed]" at ambient temperature.  As UTC noted in its Preliminary Response to Liquidia's IPR Petition with respect to the '901 Patent, "[p]rostaglandin derivatives," like treprostinil, "in particular were known to be unstable upon storage due to inherent instability of the crystalline lattice of these compounds owning to their long, flexible sidearms, as well as the presence of multiple polymorphic crystals." *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00770, Paper 6 at 53 (P.T.A.B. July 14, 2020).  Further, UTC noted in its Preliminary Response that "[e]nvironmental factors are a significant factor (*e.g.*, temperature, oxygen, atmosphere, humidity).  This is especially true for compounds stored as salts."  *Id*. at 54.

Considering these admissions regarding the instability of prostaglandin derivatives, and in particular salts of treprostinil, the specification of the '901 Patent provides no evidence or disclosure that the treprostinil salts of the claimed invention were actually "stor[ed]" for any length of time, let alone at ambient temperatures, or that the inventors were in possession of a method of "storing" a pharmaceutical batch of treprostinil salt at ambient temperature and preparing a pharmaceutical product of treprostinil after such "storage."  The specification of the '901 Patent provides only a generic statement regarding the "stor[age]" of "crude treprostinil salts" at ambient temperature, which provides no greater detail than the claims themselves.  *See* '901 Patent at 17:4-10 ("Additional advantages of this process are: (a) crude treprostinil salts can be stored as raw material at ambient temperature and can be converted to treprostinil by simply acidification with diluted hydrochloric acid, and (b) the treprostinil salts can be synthesized from the solution of

99

treprostinil without isolation."). The '901 Patent does not disclose any experimental data to support these statements, and further lacks any details as to how long the "crude treprostinil salt" can be stored or under what conditions, other than temperature.

Further, a POSA reading the specification of the '901 Patent would also not understand that the "crude treprostinil salts" described in the specification constitute a "pharmaceutical batch of a salt of treprostinil" within the meaning of claim 6 as the treprostinil salt itself can be the claimed pharmaceutical product (claim 6 does not require any additional processing steps for the treprostinil salt prior to incorporating it into the "pharmaceutical product."). And even if the "crude treprostinil salts" described in the specification of the '901 Patent constitute a "pharmaceutical batch of a salt of treprostinil" within the meaning of claim 6, which Liquidia does not concede, the specification of the '901 Patent does not provide evidence that the "crude" salts were ever actually stored, let alone for what length of time and under what conditions other than temperature. Moreover, the specification of the '901 Patent states only that "crude treprostinil salts" can be stored at ambient temperatures, and such "crude" salts must be further processed. There is no indication in the specification of the '901 Patent that the inventors were in possession of a pharmaceutical batch of treprostinil salt within the scope of claims 6 that can be stored.

The specification and claim's vague description of "storing" crude treprostinil salts and a "pharmaceutical batch of a salt of treprostinil" lacks guidance as to "significant" environmental factors, in UTC's own words, such as oxygen, atmosphere, and humidity. *University of California*, 119 F.3d at 1568 ("The description requirement of the patent statute requires a description of an invention, not an indication of a result that one might achieve if one made that invention."). Considering UTC's contention that the significance of these undefined variables is "especially true for compounds stored as salts," and the lack of disclosure as to these variables in specification of

the '901 Patent, a POSA would not conclude that the inventors were in possession of the invention claimed in claim 6.  Thus, claim 6 of the '901 Patent is invalid for lack of written description.

> **c.      To the Extent UTC Contends that Claim 1 Permits "Isolation" of Treprostinil Before Combining with a Base to Form a Salt, the Asserted Claims Lack Adequate Written Description**

Claim 1 of the '901 Patent, which all other Asserted Claims of the '901 Patent depend, requires "form[ing] a salt of treprostinil" by (a) alkylating a benzindene triol, (b) hydrolyzing the product of step(a), and (c) "contacting the solution comprising treprostinil from step (b) with a base."  "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad*, 598 F.3d at 1351.  An adequate written description need not in every instance describe an actual reduction to practice but "must nonetheless 'describe the claimed subject matter in terms that establish that [the applicant] was in possession of the . . . claimed invention, including all of the elements and limitations.'"  *Rochester*, 358 F.3d at 926 (quoting *Hyatt*, 146 F.3d at 1353).  To the extent UTC argues that claim 1 permits isolation of treprostinil prior to contacting the treprostinil with a base to form a salt, claim 1 of the '901 Patent lacks adequate written description support because a POSA would not recognize that the inventors possessed a "pharmaceutical product" according to claim 1 where the treprostinil was isolated before contact with a base to form a salt.

As an initial matter, Liquidia maintains that claim 1 of the '901 Patent prohibits the isolation of treprostinil before contact with a base to form a salt.  First, the plain and ordinary meaning of claim 1 excludes isolation of treprostinil prior to contacting the treprostinil with a base to form a salt.  Because the "solution" resulting from the alkylation and hydrolysis steps (and, thus, containing the "impurities" resulting from each step) is contacted with a base to form a salt, the claims prohibit isolation of treprostinil before reacting with a base to form a salt.  Second, as

discussed in greater detail in Section II.C.1.b *supra*, the specification of the '901 Patent confirms that claim 1 excludes isolation of treprostinil prior to contacting the treprostinil with a base to form a salt.  Finally, UTC's arguments made during the '901 IPR confirm that the claims exclude isolation of treprostinil before contacting with a base to form a salt.  UTC stated clearly that "claim 1's recited steps differ from Phares [2005] and Moriarty [2004] because they do not involve isolation of treprostinil intermediate." *Liquidia Technologies, Inc. v. United Therapeutics Corp.*, IPR2020-00770, Paper 9 at 2 (P.T.A.B. Oct. 27, 2020); *see also id.* at 3 ("The claimed pharmaceutical batches are an improvement over Moriarty [2004] and Phares [2005] in part because they form a salt without prior isolation of the intermediate treprostinil.").  Considering the claims, specification, and arguments made by UTC in the '901 IPR, claim 1 of the '901 Patent prohibits the isolation of treprostinil before contact with a base to form a salt.

However, to the extent UTC contends that claim 1 of the '901 Patent permits isolation of treprostinil before contacting with a base to form a salt, claim 1 of the '901 Patent lacks adequate written description support.  As discussed in greater detail in Section II.C.1.b *supra*, all examples disclosed in the specification of the '901 Patent disclose forming a salt of treprostinil by contacting treprostinil in solution with a base.  The specification provides no evidence that the named inventors were in possession of a "pharmaceutical batch" within the meaning of claim 1, wherein the treprostinil was isolated before contact with a base to form a salt.  Without evidence or guidance as to how a POSA would produce a "pharmaceutical batch" within the meaning of claim 1, wherein the treprostinil is isolated before contact with a base to form a salt, claim 1 of the '901 Patent and, therefore, all other Asserted Claims of the '901 Patent lack adequate written description support.

## 2.    Claims 3, 4, and 6 Are Not Enabled

### a.    "Therapeutically Effective Amount" Is Not Enabled

Asserted Claims 3 and 4 of the '901 Patent are directed to pharmaceutical products comprising a "therapeutically effective amount" of treprostinil or "salt treprostinil."  To satisfy the statutory requirement underlying § 112, the scope of the claims must be "commensurate" with teachings in the specification.  *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1377 (Fed. Cir. 1999).  "The scope of the claims must be less than or equal to the scope of the enablement." *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1196 (Fed. Cir. 1999).  "To constitute an enabling disclosure, 'the specification of a patent must teach those skilled in the art how to make and use the full scope of the invention without undue experimentation.'" *Harris*, 114 F.3d at 1155 (quoting *Wright*, 999 F.2d at 1561).  Factors to be considered in determining whether a disclosure would require undue experimentation include:  "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability and unpredictability of the art, and (8) the breadth of the claims."  *Wands*, 858 F.2d at 737.

Here, as discussed above in Section III.C.1.c, neither the claim language nor specification of the '901 Patent limit "therapeutically effective amount" of Asserted Claims 3 or 4 to a specific indication (e.g., pulmonary hypertension) nor to a particular route of administration (e.g., inhalation).  Thus, to meet the enablement requirement, the specification of the '901 Patent must enable a skilled artisan to identify a "therapeutically effective amount" for any and all conditions and routes of administration encompassed by the claims without the need for undue experimentation.  For the reasons discussed below, applying the *Wands* factors, the specification

of the '901 Patent fails to adequately enable a person of ordinary skill in the art to practice the full scope of the invention without undue experimentation.

| *Wands* Factor | Application to Claims 3 and 4 of the '901 Patent |
|---|---|
| Quantity of Experimentation Necessary | Identifying a "therapeutically effective amount" of treprostinil with respect to all conditions and by all routes of administration encompassed by claims 3 and 4, if it exists at all, would require an exorbitant amount of effort, entailing significant amounts of time-consuming and expensive preclinical and clinical studies evaluating different doses and different routes of administration. |
| Amount of Guidance or Direction Presented | Besides citing general references to treprostinil's potential uses, the '901 Patent fails to provide any guidance or direction to a skilled artisan in identifying a "therapeutically effective amount" for the treatment of all conditions and by all routes of administration encompassed by the claims. *See, e.g.*, '901 Patent at 1:36–65. Thus, the specification of the '901 Patent provides little guidance to a person of ordinary skill in the art. |
| Presence or Absence of Working Examples | The '901 Patent specification is completely lacking in working examples of "therapeutically effective amount[s]" of treprostinil used to treat any condition utilizing any route of administration. |
| Nature of the Invention | To the extent UTC contends that identifying a therapeutically effective amount of treprostinil or treprostinil salt would have been nonobvious, the nature of the invention is one of great uncertainty. |
| State of the Prior Art | Although treprostinil was known to treat certain conditions by certain routes of administration by December 2007, the state of the prior art was completely silent as to treprostinil's use in treating many conditions and routes of administration encompassed by the claims. |
| Relative Skill of Those in the Art | To the extent UTC contends that identifying a therapeutically effective amount of treprostinil or treprostinil salt would have been nonobvious, for many if not all conditions and routes of administration encompassed by the claims, the relative skill in the art was high, requiring specialized medical training and years of experience treating the condition as well as skilled artisans in formulation development for various routes of administration. |
| Predictability or Unpredictability of the Art | To the extent UTC contends that identifying a therapeutically effective amount of treprostinil or treprostinil salt would have been nonobvious, treatment of many conditions encompassed by the claims (e.g., cancer) is considered unpredictable even today and, |

| | certainly, would have been considered unpredictable in December 2007. |
|---|---|
| Breadth of the Claims | As described in greater detail above, the scope of Asserted Claims 3 and 4 is very broad, encompassing any amount of treprostinil or a salt thereof for the treatment of any condition and by any route of administration. |

Applying all eight *Wands* factors, the specification of the '901 Patent fails to enable a skilled artisan to identify a "therapeutically effective amount" for all conditions and routes of administration encompassed by the claims. Accordingly, claims 3 and 4 of the '901 Patent are invalid as not enabled.

### b.    "Storage"/"Storing" Are Not Enabled

Asserted Claims 6 of the '901 Patent is directed to a method of preparing the pharmaceutical product comprising treprostinil after "storing" a pharmaceutical batch treprostinil salt at ambient temperature. "To constitute an enabling disclosure, 'the specification of a patent must teach those skilled in the art how to make and use the full scope of the invention without undue experimentation.'" *Harris*, 114 F.3d at 1155 (quoting *Wright*, 999 F.2d at 1561). Factors to be considered in determining whether a disclosure would require undue experimentation include: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability and unpredictability of the art, and (8) the breadth of the claims." *Wands*, 858 F.2d at 737. Accordingly, the specification of the '901 Patent must enable a skilled artisan to prepare a treprostinil pharmaceutical product after "storage" of a pharmaceutical batch of treprostinil salt at ambient temperature without undue experimentation.

As UTC noted in its Preliminary Response to Liquidia's IPR Petition with respect to the '901 Patent, "[p]rostaglandin derivatives," like treprostinil, "in particular were known to be unstable upon storage due to inherent instability of the crystalline lattice of these compounds owning to their long, flexible sidearms, as well as the presence of multiple polymorphic crystals." *Liquidia Techs.*, IPR2020-00770, Paper 6 at 53. Further, UTC noted in its Preliminary Response that "[e]nvironmental factors are a significant factor (*e.g.*, temperature, oxygen, atmosphere, humidity). This is especially true for compounds stored as salts." *Id*. at 54. Thus, to the extent UTC contends that prostaglandin derivatives like treprostinil exhibit "inherent instability" and that environmental factors, such as temperature, oxygen, atmosphere, and humidity, have a "significant" impact on the stability of salts, a person of ordinary skill in the art would have required extensive disclosure to practice claim 6 of the '901 Patent.

Applying the eight *Wands* factors in sequential order, and taking into account UTC's nonobvious positions with respect to claim 6 of the '901 Patent, the specification of the '901 Patent would not enable a person of ordinary skill to "stor[e]" a pharmaceutical batch of treprostinil salt and create the claimed pharmaceutical product.

| *Wands* Factor | Application to Claim 6 of the '901 Patent |
|---|---|
| Quantity of Experimentation Necessary | To the extent UTC's contention that prostaglandin derivatives exhibit "inherent inability" and that humidity, oxygen, atmosphere, and humidity are "especially" significant environmental factors is correct, a person of skill in the art would have to engage in significant amounts of experimentation to discern how to effectively "stor[e]" the claimed treprostinil salts. More specifically, while the claim defines the temperature at which the salts can be stored (ambient temperature), a person of ordinary skill in the art would require extensive experimentation to determine the other "significant" environmental factors suitable for storage, including humidity, whether the treprostinil can be exposed to light, or needs to be stored in an oxygen rich or depleted environment. Moreover, each "significant" environmental factor would require |

| | |
|---|---|
| | experimentation while maintaining constant the other environmental factors. |
| Amount of Guidance or Direction Presented | As discussed above, the specification and claims of the '901 Patent provide guidance only as to the temperature at which the claimed treprostinil salts are stored. The specification and claims are completely silent as to other "significant" environmental factors, according to UTC, such as oxygen, atmosphere, and humidity. Accordingly, besides temperature, the amount of guidance or direction presented is non-existent. |
| Presence or Absence of Working Examples | Besides providing only a vague description of "stor[ing]" "crude treprostinil salts" at ambient temperature, which Liquidia does not concede constitutes treprostinil salts within the meaning of claim 6, the specification is completely lacking in working examples of "storing" treprostinil salts under any conditions. And even if the "crude treprostinil salts" constitute treprostinil salts within the meaning of claim 6, the specification's brief mention of their "stor[age]" provides no more detail than the claims and, thus, does not constitute a working example. |
| Nature of the Invention | According to UTC, polymorphs (i.e., salts) "had plagued the pharmaceutical industry for over a decade prior to the '901 Patent, with high-profile failures including withdrawal of an approved drug from the market." *Liquidia Techs.*, IPR2020-00770, Paper 6 at 52. "These incidents underscore the difficulty of understanding the polymorphic nature of pharmaceutical compounds." *Id.* at 53. Accordingly, to the extent UTC argues that claim 8 would have been nonobvious, the nature of the invention was one of great uncertainty. |
| State of the Prior Art | According to UTC, the prior art was silent as to storage considerations for treprostinil salts. *See, e.g.*, *Liquidia Techs.*, IPR2020-00770, Paper 6 at 51-55. To the extent UTC argues that claim 8 would have been nonobvious, without guidance as to "significant" environmental considerations with respect to the storage of treprostinil salts, the state of the prior art was very limited. |
| Relative Skill of Those in the Art | According to UTC, "the POSA[7] would have been an industrial chemist or chemical engineer with experience in pharmaceutical production, familiar with controlling for polymorphs and realizing highly pure products at batch scales as the challenged claims |

---

[7] Liquidia does not, at this time, concede to UTC's definition of a person of ordinary skill in the art.

| | |
|---|---|
| | required." *Liquidia Techs.*, IPR2020-00770, Paper 6 at 56.  To the extent UTC argues that claim 6 would have been nonobvious, the relative skill of those in the art was high. |
| Predictability or Unpredictability of the Art | As mentioned above, UTC contends that polymorphs "had plagued the pharmaceutical industry for over a decade prior to the '901 Patent, with high-profile failures including withdrawal of an approved drug from the market." *Liquidia Techs.*, IPR2020-00770, Paper 6 at 52.  "These incidents underscore the difficulty of understanding the polymorphic nature of pharmaceutical compounds." *Id*. at 53.  Accordingly, to the extent UTC argues that claim 8 would have been nonobvious, the art was highly unpredictable. |
| Breadth of the Claims | The breadth of claim 6 is broad because it simply limits "storage" by temperature.  Claim 6 of the '901 Patent provides no further limitations as to other "significant" environmental factors, according to UTC, such as oxygen, atmosphere, and humidity. |

Applying all eight *Wands* factors, in view of UTC's nonobvious arguments, the '901 Patent fails to enable a person of ordinary skill in the art to practice Asserted Claim 6.  Accordingly, claim 6 of the '901 Patent is invalid as not enabled.

### c. To the Extent UTC Contends that Claim 1 Permits "Isolation" of Treprostinil Before Combining with a Base to Form a Salt, the Asserted Claims Are Not Enabled

Claim 1 of the '901 Patent, which all other Asserted Claims of the '901 Patent depend, requires "form[ing] a salt of treprostinil" by (a) alkylating a benzindene triol, (b) hydrolyzing the product of step(a), and (c) "contacting the solution comprising treprostinil from step (b) with a base."  To the extent UTC argues that claim 1 permits isolation of treprostinil before contacting the treprostinil with a base to form a salt, the claims are not enabled as a person of ordinary skill in the art would have to engage in undue experimentation to achieve the claimed "pharmaceutical batch."

| *Wands* Factor | Application to Claim 1 of the '901 Patent |
|---|---|

| | |
|---|---|
| Quantity of Experimentation Necessary | As mentioned above, all of the examples disclosed in the specification of the '901 Patent disclose forming a salt of treprostinil by contacting treprostinil in solution with a base. To the extent UTC contends that claims 1 and 8 permit isolation of treprostinil before contacting with a base to form a salt, without guidance or direction in the '901 Patent, a POSA would have to engage in a significant amount of experimentation to achieve the claimed "pharmaceutical batch." |
| Amount of Guidance or Direction Presented | As mentioned above, the specification and claims of the '901 Patent provide no guidance or direction as to how a POSA would isolate treprostinil before reacting it with a base and also achieve the claimed "pharmaceutical batch." |
| Presence or Absence of Working Examples | As mentioned above, the specification and claims of the '901 Patent provide no working examples of isolating treprostinil before reacting it with a base and achieving the claimed "pharmaceutical batch." |
| Nature of the Invention | According to UTC, "[t]he claimed pharmaceutical batches are an improvement over Moriarty [2004] and Phares [2005] in part because they form a salt without prior isolation of the intermediate treprostinil." *Liquidia Techs.*, IPR2020-00770, Paper 9 at 3. To the extent UTC contends that the claimed pharmaceutical batch differs from the prior art Moriarty 2004 and Phares 2005 processes, the nature of the invention—that is, isolating the treprostinil before reacting with a base to form a salt and achieving the claimed "pharmaceutical batch"——was one of great uncertainty. |
| State of the Prior Art | To the extent that UTC contends that achieving the claimed "pharmaceutical batch" and isolating treprostinil before reacting with a base to form a salt was novel and nonobvious, the state of the prior art was silent as to how a POSA would achieve the claimed "pharmaceutical batch" and isolate treprostinil before reacting with a base. |
| Relative Skill of Those in the Art | According to UTC, "the POSA[8] would have been an industrial chemist or chemical engineer with experience in pharmaceutical production, familiar with controlling for polymorphs and realizing highly pure products at batch scales as the challenged claims required." *Liquidia Techs.*, IPR2020-00770, Paper 6 at 56. To the |

---

[8] Liquidia does not, at this time, concede to UTC's definition of a person of ordinary skill in the art.

| | extent UTC argues that claims 1 would have been nonobvious, the relative skill of those in the art was high. |
|---|---|
| Predictability or Unpredictability of the Art | As mentioned above, according to UTC, "[t]he claimed pharmaceutical batches are an improvement over Moriarty [2004] and Phares [2005] in part because they form a salt without prior isolation of the intermediate treprostinil." *Liquidia Techs.*, IPR2020-00770, Paper 9 at 3.  To the extent UTC contends that the claimed pharmaceutical batch differs from the prior art Moriarty 2004 and Phares 2005 processes, the nature of the invention—that is, isolating the treprostinil before reacting with a base to form a salt and achieving the claimed "pharmaceutical batch"——was very unpredictable. |
| Breadth of the Claims | To the extent UTC contends that the claims permit isolation of treprostinil before reacting it with a base, the claims encompass a broad scope of processes that are unsupported by the specification. |

Thus, applying the *Wands* factors, the '901 Patent fails to enable a POSA to achieve the claimed "pharmaceutical batch" after isolating treprostinil before reacting it with a base to form a salt.  Thus, claim 1 of the '901 Patent and, therefore, all other Asserted Claims of the '901 Patent are invalid as not enabled.

### 3. Claims 1-4, 6, and 8 Are Indefinite

### a. Claim Reciting "Impurities" Is Indefinite

Asserted Claim 1 of the '901 Patent, which all Asserted Claims of the '901 Patent depend, is directed to a pharmaceutical batch consisting of treprostinil or a treprostinil salt and "impurities" resulting from the claimed process.  A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901.  "[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id*. at 909 (alterations omitted).  Consequently, claim 1 of the '901 Patent, read in light of the specification and prosecution history, must apprise

a POSA with "reasonable certainty" what compounds and in what specific amounts constitute "impurities" within the meaning of claim 1.

As an initial matter, claim 1 of the '901 Patent, read in light of the specification and prosecution history, is indefinite because it fails to apprise a POSA with "reasonable certainty" whether the claimed "pharmaceutical batch" is required to include or exclude the claimed impurities. The plain language of the claim indicates that "pharmaceutical batch" *includes* the claimed impurities. *See* '901 Patent, claim 1 ("A pharmaceutical batch *consisting of* treprostinil or a salt thereof *and impurities* . . . .") (emphases added). However, the specification and prosecution history indicate that the "pharmaceutical batch" *excludes* the claimed impurities. For instance, the specification states that the "impurities carried over from intermediate steps (i.e. alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step." *Id.* at 17:1-4. Additionally, during prosecution of the '901 Patent, UTC argued that the claimed invention was nonobvious because it *excluded* impurities found in batches made by the prior art Moriarty 2004 process. *See, e.g.*, Response to Non-Final Rejection (U.S. Application No. 14/754,932) (Aug. 11, 2016) at 5-6. Without even "reasonable certainty" as to whether the claimed "pharmaceutical product" includes or excludes the claimed impurities, a POSA would not be afforded "clear notice of what is claimed, thereby apprising the public of what is still open to them." *Nautilus*, 572 U.S. at 909 (alterations omitted).

Additionally, neither the specification, claims, nor prosecution history of the '901 Patent apprise a POSA with "reasonable certainty" as to what constitutes an "impurit[y]" within the meaning of claim 1. Claim 1 of the '901 Patent states only that the "impurities" must "result[] from (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) containing the solution comprising treprostinil from step (b) with a

base to form a salt of treprostinil, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil."  The specification provides no further guidance.  During prosecution of the '901 Patent, UTC submitted two expert declarations that were submitted by UTC during the '393 Patent IPR.  Those expert declarations identify eight impurities contained in the Moriarty 2004 (Former Process) batches:  1AU90, 2AU90, 3AU90, 750W93, 97W86, ethyl ester, and methyl ester.  *See, e.g.*, Declaration of Dr. Robert M. Williams, *SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Exhibit 2020 at ¶ 94 (P.T.A.B. July 6, 2016) ("Williams Declaration").  Neither declaration, however, identifies the chemical compounds that are labeled "1AU90," "2AU90," "3AU90," "750W93," or "97W86."  Further, neither declaration establishes that the impurities identified actually resulted from the claimed steps.  As the Patent Trial & Appeal Board noted in its Final Written Decision invalidating the '393 Patent, the "claims contain no limitations relating to the impurity profile of the recited product, 'and it is the claims ultimately that define the invention.'"  *SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Paper No. 82 at 18 (P.T.A.B. Mar. 31, 2017) (quoting *Purdue*, 438 F.3d at 1136).  Without further guidance as to what constitutes an "impurit[y]" within the meaning of claim 1, a skilled artisan would not be apprised with "reasonable certainty" as to what impurities are needed to meet the claim limitation.

Similarly, neither the specification, claims, nor prosecution history of the '901 Patent apprise a POSA with "reasonable certainty" as to what level of "impurities" is needed to meet the claim limitation.  Moriarty 2004 specifies that the treprostinil made according to Moriarty 2004 was 99.7% pure.  *See* Moriarty 2004 at 1902.  While UTC contends in the specification of the '901 Patent that the "Former Process" (i.e., Moriarty 2004) has a purity of approximately 99.0% as compared a purity of 99.9% for the process of the claimed invention (*see* '901 Patent col. 16,

step 53), the calculations of UTC's own expert submitted during prosecution acknowledge that the "Former Process" yields a purity of 99.7%.  *See SteadyMed*, IPR2016-00006, Paper 82 at 35. UTC's expert Dr. Williams reviewed 46 commercial batches of treprostinil in accordance with Moriarty 2004 and found that the average purity of the batches was 99.7%, which the PTAB acknowledged was an accurate value and the same as reported in Moriarty 2004.  *Id*.  Further, as acknowledged by the PTAB in the '393 IPR, Dr. Williams also reviewed 116 commercial batches of treprostinil made according to the process disclosed in the '393 (and thus the '901) Patent, and several Moriarty 2004 commercial batches were more pure than the batches made according to the disclosed process.  *Id*. at 38-39.  Thus, a POSA would not have any reasonable certainty what level of impurity should be "included" in the product.  As such, a person of ordinary skill in the art would not know, with reasonable certainty, what level of purity will be required to meet the limitations of claim 1.  *Butamax*, 117 F. Supp. 3d at 642.

Thus, claim 1 of the '901 Patent and, therefore, all other Asserted Claims of the '901 Patent are invalid as indefinite.

### b.      Claim Reciting "Storage" and "Storing" Is Indefinite

Asserted Claim 6 of the '901 Patent is directed to a method of preparing the pharmaceutical product from a pharmaceutical batch of claim 1 comprising "storing" a pharmaceutical batch at ambient temperature and preparing a pharmaceutical product from the pharmaceutical batch after "storage."  A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus*, 572 U.S. at 901.  "[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them."  *Id*. at 909 (alterations omitted).  Accordingly, claim 6 of the '901 Patent,

read in light of the specification and prosecution history, must apprise a POSA with "reasonable certainty" as to what constitutes "storage" or "storing" a pharmaceutical batch of treprostinil salt.

As mentioned above, UTC noted in its Preliminary Response to Liquidia's IPR Petition with respect to the '901 Patent that "[p]rostaglandin derivatives," like treprostinil, "in particular were known to be unstable upon storage due to inherent instability of the crystalline lattice of these compounds owning to their long, flexible sidearms, as well as the presence of multiple polymorphic crystals." *Liquidia Techs.*, IPR2020-00770, Paper 6 at 53.  Further, UTC noted in its Preliminary Response that "[e]nvironmental factors are a significant factor (*e.g.*, temperature, oxygen, atmosphere, humidity).  This is especially true for compounds stored as salts." *Id*. at 54. Without guidance as to "significant" environmental factors needed to "store" the pharmaceutical batch of treprostinil salt, a person of ordinary skill in the art "would not be apprised with reasonable certainty about the scope of the invention." *Butamax*, 117 F. Supp. 3d at 642.

Thus, Asserted Claim 6 of the '901 Patent is invalid as indefinite.

### c.   Claims Reciting "Therapeutically Effective Amount" Are Indefinite

Asserted Claims 3 and 4 of the '901 Patent are directed to pharmaceutical products comprising a "therapeutically effective amount" of treprostinil or "salt treprostinil."   "[T]he language of the claims must make it clear what subject matter they encompass." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1562 (Fed. Cir. 1996).  "The requirement that the claims 'particularly point[] out and distinctly claim[]' the invention is met when a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification." *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001) (quoting *Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993)).  To meet the definiteness requirement, claims 3 and 4 of the '901 Patent, read in

light of the specification and prosecution history, must inform with "reasonable certainty" those skilled in the art about the scope of the invention. *See Nautilus*, 572 U.S. at 901.

Here, however, neither the specification nor prosecution history define or use the term "therapeutically effective amount," which was contained in the original claims of the application. More specifically, neither the claims, specification, nor prosecution history indicate which condition the "therapeutically effective amount" of treprostinil is intended to treat, which route the amount is to be administered, or the level of treatment (e.g., amelioration of symptoms) the amount is intended to achieve. Without even guidance as to which indication or route of administration the "therapeutically effective amount" is intended, claims 3 and 4 of the '901 Patent, read in light of the specification and prosecution history, would not apprise a POSA with "reasonable certainty" as to the scope of the invention. *Nautilus*, 572 U.S. at 901.

Thus, Asserted Claims 3 and 4 of the '901 Patent are invalid as indefinite.

## IV. THE '066 AND '901 PATENTS ARE INVALID FOR CLAIMING THE SAME PRODUCT AS INVALIDATED U.S. PATENT NO. 8,497,393

The Asserted Claims of the '066 and '901 Patents are invalid as they are not directed to a novel and nonobvious product. The '393 Patent is the grandparent application of both the '066 and '901 Patents.[9] Both the '066 and '901 Patents share the exact same specification as the '393 Patent, and the claims of both are substantially similar if not nearly identical to those of the '393 Patent as shown below.

| USP 8,497,393 Claim 1 | USP 9,593,066 Claim 1 | USP 9,604,901 Claim 1 |
| --- | --- | --- |

---

[9] The '393 Patent resulted from U.S. Application No. 13/548,446 ("the '446 Application"). The '066 Patent resulted from a divisional application of U.S. Application No. 13/933,623, which is a continuation application of the '446 Application. The '901 Patent resulted from a continuation application of U.S. Application No. 13/933,623, which is a continuation application of the '446 Application.

| A product comprising a compound of formula I  or a pharmaceutically acceptable salt thereof, | A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, | A pharmaceutical batch consisting of treprostinil or a salt thereof |
|---|---|---|
| wherein said product is prepared by a process comprising | said composition prepared by a process comprising providing a starting batch of treprostinil having one or more impurities resulting from | and impurities resulting from |
| (a) alkylating a compound of [a genus including benzindene triol] with an alkylating agent to produce a compound [from a genus comprising treprostinil], | prior alkylation and | (a) alkylating a benzindene triol, |
| (b) hydrolyzing the product [] of step (a) with a base | hydrolysis steps, | (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, |
| (c) contacting the product of step (h) with a base B to form a salt of formula I_s.  | forming a salt of treprostinil by combining the starting batch and a base, | (c) containing the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, |
|  | isolating the treprostinil salt, | (d) isolating the salt of treprostinil, and |
|  | and preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, |  |

| | | |
|---|---|---|
| (d) optionally reacting the salt formed in step (c) with an acid to form the compound of formula I. | | (e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and |
| | whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and wherein said alkylation is alkylation of benzindene triol. | |
| | | wherein the pharmaceutical batch contains at least 2.9 g of treprostinil or its salt. |

Although the '393 Patent claims a "product," the '066 Patent claims a "pharmaceutical composition," and the '901 Patent claims a "pharmaceutical batch," all three patents confirm that the "product," "pharmaceutical composition," and "pharmaceutical batch" can comprise only treprostinil or a salt of treprostinil. That is, the claims of the '066 and '901 patents can comprise the same "product" as claimed in the '393 patent. The prosecution histories of all three patents confirm that they claim the same treprostinil product made by UTC's "new" process. During prosecution of the '393 Patent, UTC overcame the Examiner's anticipation rejection by submitting a declaration of its Executive Vice President of Chemical Research and Development purportedly establishing that "[t]he product of Moriarty 2004 is *physically different* from the product of claims 1 and 10, in which a base addition salt is formed *in situ* with treprostinil that has not been previously isolated." Response to Non-Final Office Action (U.S. Application No. 13/548,446) (Feb. 8, 2013) at 9 (first emphasis added); *see also* Declaration of Dr. David Walsh (U.S. Application No. 13/548,446) (June 5, 2013). In its Patent Owner Preliminary Response during the '393 Patent IPR, UTC submitted two expert declarations that also purportedly established that the

117

product of the pending claims differed from the product of Moriarty 2004.  *See* Declaration of Dr. Robert M. Williams, *SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Exhibit 2020 (P.T.A.B. July 6, 2016); Declaration of Dr. Robert R. Ruffolo, *SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Exhibit 2022 (P.T.A.B. July 6, 2016).

Before the PTAB issued its Final Written Decision invalidating the '393 Patent, UTC relied on those same expert declarations during prosecution of the '066 and '901 Patents to similarly argue that the claimed products differed from those of Moriarty 2004.  *See* Response to Non-Final Office Action (U.S. Application No. 14/849,981) (Aug. 24, 2016); Response to Non-Final Office Action (U.S. Application No. 14/754,932) (Aug. 11, 2016).  The Examiner of the '066 and '901 Patents only withdrew the obviousness and anticipation rejections after receiving the expert declarations submitted by UTC during the '393 Patent IPR proceeding.  *See* Final Rejection (U.S. Application No. 14/849,981) (Nov. 30, 2016) (withdrawing obviousness and anticipation rejections but maintaining obviousness-type double patenting rejection); Final Rejection (U.S. Application No. 14/754,932) (Oct. 19, 2016) (same).  In withdrawing the obviousness rejection of the '066 Patent, moreover, the Examiner expressly relied on the expert declarations as evidence that the claimed product differed from Moriarty 2004.  *See* Final Rejection (U.S. Application No. 14/849,981) (Nov. 30, 2016) at 2 ("[T]he declarations [submitted by UTC during the '393 Patent IPR proceeding] describe the product of Moriarty to have a different impurity profile from the product [of] the instant claims where [the] salt formation step is present.").

By relying on evidence submitted during the '393 Patent IPR proceeding to purportedly establish that the claimed inventions of the '066 and '901 Patents differed from the product described in Moriarty 2004, UTC confirmed that the '066 and '901 Patents claim the same treprostinil product claimed in the '393 Patent.  The PTAB invalidated the claims of the '393

patent, and the Federal Circuit affirmed.  *See SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Paper No. 82 at 84 (P.T.A.B. Mar. 31, 2017); *United Therapeutics Corp. v. SteadyMed Ltd.*, 702 Fed. App'x. 990 (Fed. Cir. 2017) (affirming invalidation of '393 Patent). Because the product of the '393 Patent is not valid, the "pharmaceutical composition" and "pharmaceutical batch" of the '066 and '901 Patents, respectively, are not directed to novel and nonobvious products and thus are invalid product by process claims.  "If the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process."  *Thorpe*, 777 F.2d at 697; *see also Amgen.*, 580 F.3d at 1366 ("It has long been the case that an old product is not patentable even if it is made by a new process.").  Because the '066 and '901 Patents claim the same treprostinil product claimed by the '393 Patent, which was invalidated by the PTAB in its Final Written Decision and affirmed by the Federal Circuit, the claims of the '066 and '901 Patents are invalid as being directed to the same product as the '393 Patent.

## V.    U.S. PATENT NO. 10,716,793

### A.    Claims 1, 4, and 6-8 Are Invalid Under 35 U.S.C. § 103

The '793 patent issued July 21, 2020 from application No. 16/778,662, filed January 31, 2020.  *See* '793 Patent at 1.  Application No. 16/778,662 is a continuation of 16/536,954, filed on August 9, 2019, which is a continuation of Application No. 15/011,999, filed on February 1, 2016, now Patent No. 10,376,525, which is a division of Application No. 13/469,854, filed on May 11, 2012, now Patent No. 9,339,507, which is a division of Application No. 12/591,200, filed on November 12, 2009, now Patent No. 9,358,240, which is a continuation of Application No. 11/748,205, filed on May 14, 2007, now abandoned.  *Id.*

The '793 patent is directed to methods of treating pulmonary hypertension where treprostinil is delivered by inhalation.  '793 Patent, Abstract, claims 1-8.  UT's Preliminary

Infringement Contentions served on October 16, 2020 assert claims 1, 4, and 6-8 (collectively, "the Asserted Claims") of the '793 Patent.

Asserted Claim 1, the only independent claim, recites the following:

1[a] A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof

1[b] with an inhalation device,

1[c] wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof

1[d] delivered in 1 to 3 breaths.

*Id.* at claim 1.

The seven dependent claims are directed to various inhalation devices and formulation properties.  *Id.* at claims 2-8.  Asserted dependent claims 4 and 6-8 are directed to methods where the inhalation device is a dry powder inhaler (DPI) (claim 4), the formulation is a powder (claim 6), the powder comprises particles less than 5 micrometers in diameter (claim 7), and the formulation contains no metacresol (claim 8).  *Id.* at claims 4, 6-8.

Notably, the specification of the '793 patent contains only a single mention of a dry powder inhaler and dry powder formulations.  *Id.* at 7:22-26 ("The inhalation device can be also a dry powder inhaler.  In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.").

120

These Preliminary Invalidity Contentions establish that claims 1, 4, and 6-8 of the '793 Patent are unpatentable as either anticipated under 35 U.S.C. § 102 or obvious under 35 U.S.C. § 103 based on:

- the '212 Patent[10] alone;

- the '212 Patent in combination with Voswinckel 2004[11];

- the '212 Patent in combination with Voswinckel 2006[12];

- Voswinckel 2006 alone;

- Voswinckel 2006 in combination with the '212 Patent;

- Voswinckel 2004 alone; and/or

- Voswinckel 2004 in combination with the '212 Patent.

Moreover, these Preliminary Invalidity Contentions show that the Asserted Claims of the '793 Patent are also invalid under 35 U.S.C. § 112.

### 1. Scope and Content of the Prior Art

#### a. '212 Patent

The '212 Patent issued on February 18, 2003, and therefore is prior art to the '793 Patent under at least 35 U.S.C. §§ 102(a), (b), and (e).

---

[10] U.S. Patent No. 6,521,212.

[11] Robert Voswinckel, Beate Enke, Andre Kreckel, Frank Reichenberger, Stefanie Krick, Henning Gall, Tobias Gessier, Thomas Schmehl, Markus G. Kohstall, Friedrich Grimminger, Hossein A. Ghofrani, Werner Seeger, and Horst Olschewski, Abstract 1414: "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension," *Journal of the American Heart Association* (October 26, 2004).

[12] Robert Voswinckel, Hossein A. Ghofrani, Friedrich Grimminger, and Werner Seeger, "Clinical Observations" on "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," "Letters" Section of the *Annals of Internal Medicine* (January 2006).

121

The '212 Patent discloses methods of delivering a therapeutically effective amount of benzindene[13] prostaglandin (including treprostinil, referred to as "UT-15") by inhalation to treat pulmonary hypertension.  '212 Patent, Abstract, 2:16-18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24.  A POSA in May 2006 would have known that "UT-15" is synonymous with treprostinil sodium, and that treprostinil is an analog of benzindene prostaglandin.[14]  The '212 Patent further discloses that an inhaler may be used to deliver the benzindene prostaglandin, and that powder formulations may be used.  *Id.* at 5:30-32, 5:37-41 ("Alternatively, solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention.  In such case, the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter.").

The '212 Patent states that "[i]n the case of treating peripheral vascular disease by inhalation of a benzindene prostaglandin of the present invention, the dosage for inhalation, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg; typically from 0.5 µg to 2.5 mg, preferably from 7 µg to 285 µg, per day per

---

[13] This appears to be a typographical error in the '212 patent, as well as the '901 and '066 patents; "benzindene" should be "benzidine."

[14] *See, e.g.,* https://www.medchemexpress.com/Treprostinil-sodium.html#:~:text=Treprostinil%20sodium%20(Synonyms%3A%20UT%2D15)&text=Treprostinil%20sodium%20is%20a%20potent,6.2%2C%2B11.2%20nM%2C%20respectively.&text=*%20Please%20select%20Quantity%20before%20adding%20items ("Treprostinil sodium (Synonyms: UT-15)"); Chattaraj, S.C., "Treprostinil sodium Pharmacia," Curr. Opin. Investig. Drugs, 3(4):582-6 (Apr. 2002), *available at* https://pubmed.ncbi.nlm.nih.gov/12090728/ ("United Therapeutics Corp (UTC) is developing treprostinil sodium (Remodulin, UT-15), a stable structural analog of prostacyclin [prostaglandin I2 or PGI$_2$], for the potential treatment of primary pulmonary (arterial) hypertension (PAH), peripheral vascular disease (PVD) and other cardiovascular conditions. . ."); *see also* U.S. Patent No. 9,358,240 ("the '240 Patent") ("U.S. Pat Nos. 6,521,212 and 6,756,033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions.").

kilogram bodyweight." '212 Patent, 5:54-62; *see also id.* at Figs. 16, 18.  The '212 Patent further states that aerosolized (i.e., inhaled) UT-15 "has a greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.* at 8:9-18.  The '212 Patent also discloses delivering dosages of 262.5 micrograms of nebulized UT-15 (*id.* at 9:4-9) and dosages of 250, 500, and 1000 micrograms per kg of body weight per minute of aerosolized UT-15 (*id.* at 11:7-13).

Additionally, the '212 Patent explains that "[t]he precise amount that is considered effective for a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor." *Id.* at 6:56-7:3; *see also id.* at 7:25-33.  The '212 Patent further teaches that the disclosed benzindene prostaglandin, UT-15, can be "given in high doses without significant non-lung effects." *Id.* at 10:51-57 ("These data are important in that this would indicate that, unlike intravenously infused UT-15, aerosolized UT-15 can be given in high doses without significant non-lung effects, i.e., heart rate, cardiac output. The aerosol delivery of UT-15 for these experiments is approximately 15-27 times that of the effective minimal tested dose of 250 ng per kg per min shown in FIG. 16.").

### b.   '033 Patent

U.S. Patent No. 6,756,033 ("the '033 Patent") issued on June 29, 2004, and therefore is prior art to the '793 Patent under 35 U.S.C. §§ 102(a), (b), and (e).  The '033 Patent is a continuation of and shares its specification with the '212 Patent.  Accordingly, the '033 Patent contains the same disclosures as the '212 Patent, described above.

### c.   Voswinckel 2004

Abstract 1414 entitled "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension" authored by Robert Voswinckel, Beate Enke, Andre Kreckel, Frank Reichenberger, Stefanie Krick, Henning Gall, Tobias Gessier, Thomas Schmehl, Markus G. Kohstall, Friedrich Grimminger, Hossein A. Ghofrani, Werner Seeger, and Horst Olschewski was published in the Journal of the American Heart Association on October 26, 2004 ("**Voswinckel 2004**"), and is therefore prior art to the '793 patent under at least 35 U.S.C. §§ 102(a) and 102(b). Voswinckel 2004 describes a study in which 17 patients with "severe pulmonary hypertension" received a treprostinil inhalation by use of the "pulsed OptiNeb® ultrasound nebulizer" at a dosage of "3 single breaths" of "600 µg/ml)" of treprostinil solution.  The study found that treprostinil "inhalation resulted in a sustained, highly pulmonary selective vasodilation over 120 minutes," showing "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing."  Voswinckel 2004 at 1414.  Voswinckel 2004 also teaches that "[t]olerability [of treprostinil] is excellent even at high concentrations and short inhalation times (3 breaths)."  *Id.*

### d.      Voswinckel 2006

In the January 2006 edition of the "Letters" section of the Annals of Internal Medicine, Drs. Robert Voswinckel, Hossein A. Ghofrani, Friedrich Grimminger, and Werner Seeger published an article under "Clinical Observations" on "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension" ("**Voswinckel 2006**").  The article is prior art under at least 35 U.S.C. § 102(a).  The article discloses a patient trial run to "characterize the effects of inhaled treprostinil with special regard to safety, tolerability, and efficacy in patients with severe pulmonary arterial hypertension."  Voswinckel 2006 at 149-50.  Three patients with "severe pulmonary hypertension" were given a "single 15-µg dose of treprostinil, inhaled in 3 breaths through a modified OptiNeb ultrasonic inhalation device."  *Id.* at 150.  One patient had a "favorable vasodilator response" and the other two patients were given "long-term inhaled treprostinil therapy

. . . consisting of 4 daily 15-µg doses" over 3 months, resulting in "dramatic[]" functional improvement without side effect. *Id.* The authors concluded that treprostinil was "clinically effective, safe, and well tolerated when 15 µg was inhaled in 3 breaths 4 times daily." *Id.*

### e. Chaudry 2004

U.S. Patent Appl. Pub. No. 2004/0265238 to Imtiaz Chaudry ("Chaudry 2004") issued on December 30, 2004, and therefore is prior art to the '793 Patent under 35 U.S.C. §§ 102(a), (b), and (e). Chaudry 2004 is directed to "inhalable formulation[s] for the treatment of pulmonary hypertension" where the formulation comprises a "hypertension-reducing agent" including a "vasodilator," such as "the prostacyclin analog treprostinil sodium." Chaudry 2004, Abstract, [0010], [0012], [0017], [0026], [0097], Claim 44. Chaudry 2004 further discloses that "[c]ontinuous intravenous prostacyclin is far from ideal as a treatment for pulmonary hypertension, however, because the agent is available only in limited supply, it is very costly, and optimal management requires that the intravenous therapy with prostacyclin be started in specialized centers familiar with the technique, equipment, and dose ranging. . . . Further, because the agent is delivered systemically with only a small percentage of the agent actually absorbed by the pulmonary system, it must be administered in high dosages." *Id.* at [0011]. Chaudry 2004 discloses that "therapeutically effective amount[s] of a hypertension-reducing agent" may include various ranges, such as from "about 0.001 mg/ml to about 20 mg/ml[,]" "about 0.008 mg/ml to about 15.0 mg/ml[,]" "about 0.001 mg/ml to about 0.50 mg/ml[,]" "about 0.001 mg/ml to about 1.0 mg/ml[,]" "about 0.005 mg/ml to about 1.0 mg/ml[,]" and "about 0.01 mg/ml to about 1.0 mg/ml." *Id.* at [0037]-[0038]. Chaudry provides extensive disclosure regarding the use of nebulizing devices for inhalation. *Id.* at [0061-0066]. Chaudry 2004 also discloses that inhalation of the formulation "may take about . . . 3 minutes." *Id.* at [0067].

### f. Ghofrani 2005

"New therapies in the treatment of pulmonary hypertension" by Ghofrani et al., URBAN & VOGEL, No. 4, pp. 296-302 (2005) ("Ghofrani 2005") is prior art to the '793 Patent at least under 35 U.S.C. § 102(a). Ghofrani 2005 describes the use of inhaled treprostinil to treat pulmonary hypertension. Ghofrani 2005 at pp. 297-98. Ghofrani states the following:

> Initial trials in Giessen have shown proof of efficacy of *inhaled* treprostinil for the effective reduction of the pulmonary vascular resistance (PVR) [6]. In this first study, 17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil (*15 mcg/inhalation*). This led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min. In direct comparison with inhaled iloprost, inhaled treprostinil showed a stronger pulmonary selectivity, so that *it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring* [6]. Due to these unique properties (pronounced pulmonary selectivity and long duration of action after an individual inhalation), it is possible to reduce the number inhalations necessary to up to four per day; the inhalation period can be reduced to < 1 min. by selecting a suitable device. Additionally, the initial data shows that *it is technically feasible for there to be only one to two breaths in an application*.

*Id.* at 298 (emphases added).

### g.     Bender 1997

"Nonadherence in asthmatic patient: is there a solution to the problem?" by Bender et al., ANN. ALLERGY ASTHMA IMMUNOL., 79:177-86 (1997) ("Bender 1997") was published in September 1997 and therefore is prior art to the '793 Patent under at least 35 U.S.C. §§ 102(a) and (b). Bender 1997 discusses the challenge of patient compliance or adherence to inhaled medications. Bender 1997, Abstract. Bender 1997 found that "[t]here is no evidence of recent improvement in the rates of nonadherence, and patients continue on average to take about 50% of prescribed medication." *Id.* Bender 1997 also reported that adherence to inhaled medications is linked to treatment outcome. *See id.* at 179-80 ("[P]atients with high adherence rates in both groups had a dramatically lower mortality rate than poor adherers.").

126

### h.     Clark 1995

"Medical Aerosol Inhalers: Past, Present, and Future" by A.R. Clark, AEROSOL SCIENCE AND TECHNOLOGY, 22(4):374-391 (1995) ("Clark 1995") was published in 1995 and therefore is prior art to the '793 Patent under at least 35 U.S.C. §§ 102(a) and (b).  Clark 1995 provides an overview of "three major types of medical aerosol inhalers" – the nebulizer, the pressurized metered dose inhaler, and the dry powder inhaler.  Clark 1995, Abstract.  Clark 1995 further states that the dry powder inhaler was first commercialized in the early 1960s.  *Id.*

### i.     Olschewski 2002

"Inhaled Iloprost for Severe Pulmonary Hypertension" by Olschewski et al., New Engl. J. Med., 347(5):322-29 (Aug. 1, 2002) ("Olschewski 2002") was published on August 1, 2002 and therefore is prior art to the '793 Patent under at least 35 U.S.C. §§ 102(a) and (b).  Olschewski 2002 reports that inhaled iloprost, an analog of prostacyclin, is an effective therapy for patients with severe pulmonary hypertension.  Olschewski 2002, Abstract.  The study used an inhalation device where "inhalation commonly required 10 minutes," but Olschewski 2002 noted that "[d]ifferent techniques of administering aerosolized iloprost result in similar acute hemodynamic effects as long as identical doses are delivered to the respiratory tract in a particle size suitable for alveolar deposition.[]  With other techniques, the duration of inhalation may be shortened considerably."  *Id.* at 328.

### j.     Ventavis® Label 2004

The December 2004 label for Ventavis® (iloprost) inhalation solution ("Ventavis® Label 2004") is prior art to the '793 Patent under at least 35 U.S.C. §§ 102(a) and (b).  "Iloprost is a synthetic analogue of prostacyclin PGI$_2$."  Ventavis® Label 2004 at 4.  "Ventavis is breathed (inhaled) into your lungs" and "[o]ne treatment session will usually last about 4 to 10 minutes."

*Id.* at 16.  Ventavis® is indicated for treatment of pulmonary arterial hypertension (*id.* at 8) and has a maximum daily dose of 45 micrograms (*id.* at 11).

### k.      OptiNeb® User Manual 2005

Opti-Neb-ir® Operating Instructions, Model ON-100/2 (2005) ("OptiNeb® User Manual 2005") is prior art to the '793 Patent under at least 35 U.S.C. § 102(b).  OptiNeb® User Manual 2005 discloses that the OptiNeb® device could nebulize (*i.e.*, produce aerosol) at a rate of 0.6 ml/min.  OptiNeb® User Manual 2005 at 28.

### l.      Additional Background Prior Art

In general, there has been extensive interest in inhaled prostacyclins prior to May 15, 2006. For example, an article by Walmrath et al. titled "Direct Comparison of Inhaled Nitric Oxide and Aerosolized Prostacyclin in Acute Respiratory Distress Syndrome" published in the American Journal of Respiratory Critical Care Medicine, Volume 153, pages 991-996 in 1996 ("**Walmrath**") reported the use of prostacyclin aerosol compared to the standard of therapy with nitric oxide (NO). An article by Olschewski et al. titled "Inhaled Prostacyclin and Iloprost in Severe Pulmonary Hypertension Secondary to Lung Fibrosis" published in the American Journal of Respiratory Critical Care Medicine, Volume 160,  pages 600 to 607 in 1999 ("**Olschewski 1999**") studied in pulmonary arterial hypertension patients inhaled prostacyclin, inhaled iloprost, and inhaled treprostinil.  Olschewski 1999 concluded that "in pulmonary hypertension secondary to lung fibrosis, aerosolization of PGI$_2$ or iloprost causes marked pulmonary vasodilatation with maintenance of gas exchange and systemic arterial pressure.  Olschewski 1999 at Abstract.  Two articles by **Hache** et al. (2003) ("Inhaled epoprostenol (prostacyclin) and pulmonary hypertension before cardiac surgery" in the Journal of Thoracic and Cardiovascular Surgery) and **De Wet** et al. (2004) ("Inhaled prostacyclin is safe, effective, and affordable in patients with pulmonary hypertension, right heart dysfunction, and refractory hypoxemia after cardiothoracic surgery")

published on the benefits of inhaled prostacyclin in surgical patients with pulmonary hypertension and compared this approach over the use of the then standard of therapy NO.

Patents on inhaled prostacyclins, other than those discussed above, also pre-date May 15, 2006.  For example, U.S. Patent No. 5,187,286 to **Skuballa** et al. discloses the synthesis and delivery by inhalation of "prostacyclin agonists" which includes the class of prostacyclin drugs delivered by inhalation such as epoprostenol, iloprost and treprostinil.  U.S. Patent No. 6,242,482 to **Shorr** et al. discloses administration of inhalation of derivatives of prostaglandins that also cover prostacyclin-like molecules.

Additionally, there was extensive literature prior to May 15, 2006 on the pros and cons of various inhalation devices, as well as plentiful motivation to reduce the number of breaths required for adequate dosing with these devices.  A 2006 chapter on "Aerosols" in the Encyclopedia of Respiratory Medicine by S.P. Newmann ("**Newmann**") and a 2005 article by David E. Geller entitled "Comparing Clinical Features of the Nebulizer, MDI, and DPI" published in *Respiratory Care*, Volume 50, Issue 10 ("**Geller 2005**") describe nebulizers and dry powder inhalers. Newmann also discloses that it was generally known in the art that "inhaler devices should deliver particles smaller than approximately 5 µm in diameter in order to enter the lungs."  Newmann, at 58.  A 2003 article by David Geller and several co-authors, titled "Bolus Inhalation of rhDNase with the AERx System in Subjects with Cystic Fibrosis" and published in the Journal of Aerosol Medicine's Volume 16, Issue 2 ("**Geller 2003**") emphasizes the benefits of reducing the duration of therapy from multiple breaths from a nebulizer lasting several minutes to much shorter inhalation time using just 3 breaths from a "soft mist inhaler" AERx.  Geller 2003 at Abstract.

Efforts to reduce the duration of the dose administration specifically in the case of prostacyclin medication have been presented prior to 2006 in several publications.  As noted

above, Olschewski et al. observed a preference for shorter delivery time of iloprost.  Olschewski 2002 at 328.  Gessler et al. in a 2001 publication titled "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension" in the European Respiratory Journal, Volume 17, pages 14 to 19 ("**Gessler**") compared the traditional jet nebulizer versus a fast ultrasonic nebulizer to significantly reduce the number of breaths required for this inhaled therapy by pulmonary arterial hypertension patients and therefore the overall duration of a dose delivery from 12 to 2 min.  Similar improvements were reported for treprostinil in Voswinckel 2004 and 2006, described above.

### 2. Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious over the '212 Patent Alone

The Asserted Claims of the '793 Patent would have been obvious to a POSA by May 15, 2006 over the '212 Patent[15] alone.

For the same reasons explained herein, claims 1, 4, and 6-8 of the '793 Patent are invalid for obviousness-type double patenting over the '212 Patent, which is assigned to UTC.  This deficiency cannot be cured by filing a terminal disclaimer, because the '212 Patent has expired.

### a. Claims 1 Would Have Been Would Have Been Obvious

#### (1) Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|------|----------------------------------------------------------------------------------|

Claim element 1[a] of the '793 Patent is disclosed in the '212 Patent.  The '212 Patent describes methods of delivering a therapeutically effective amount of benzindene prostaglandin

---

[15] The '033 Patent shares a specification with the '212 patent.  Thus, all references to the '212 patent in this section are equally applicable to the '033 Patent.

(also known as "UT-15") by inhalation to treat pulmonary hypertension in a single dose event. '212 Patent, Abstract, 2:16-18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24.  A POSA as of May 2006 would have readily understood that "UT-15" is synonymous with treprostinil sodium, and that treprostinil is an analog of benzindene prostaglandin.[16]

Specifically, the '212 Patent discloses "a method of treating pulmonary hypertension by inhalation of a benzindene prostaglandin" (*id.* at 7:18-20) or a "pharmaceutically acceptable salt" thereof (*id.* at 4:11-12).  The '212 Patent further states that the "benzindene prostaglandin is delivered by inhalation to a patient in need thereof in a 'therapeutically effective amount.'"  *Id.* at 6:56-58.  "A 'therapeutically effective amount' refers to that amount that has therapeutic effects on the condition intended to be treated or prevented."  *Id.* at 6:58-61.  The '212 Patent explains that "[t]he precise amount that is considered effective for a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor."  *Id.* at 6:66-7:2.  Accordingly, the '212 patent teaches "[a] method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof," as recited claim element 1[a] of the '793 Patent.

### (2)  Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|------|------------------------------|

Claim element 1[b] of the '793 Patent is disclosed in the '212 Patent, which expressly discloses that an inhaler may be used to deliver the benzindene prostaglandin.  '212 Patent, 5:30-

---

[16] *See infra* note 14.

32 ("Preferably, a nebulizer, **inhaler**, atomizer or aerosolizer is used[,] which forms droplets from a solution or liquid containing the active ingredient(s).") (emphasis added).  A POSA as of May 2006 would have readily understood that an inhaler is an inhalation device.

### (3)   Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|------|---|

Claim element 1[c] of the '793 Patent is disclosed in the '212 Patent, which teaches delivering "from 15 micrograms to 90 micrograms" of inhaled treprostinil.

The '212 Patent expressly discloses the claimed dosage amount of "from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof."  The '212 Patent states that "[i]n the case of treating peripheral vascular disease by inhalation of a benzindene prostaglandin of the present invention, **the dosage for inhalation**, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, **should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg**; typically from 0.5 µg to 2.5 mg, **preferably from 7 µg to 285 µg**, per day per kilogram bodyweight."  '212 Patent, 5:54-62 (emphasis added); *see also id.* at Figs. 16, 18.  The '212 Patent further explains that inhaled UT-15 "has a greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly."  *Id.* at 8:9-18.  A POSA would have been further informed by additional disclosures in the '212 Patent that likewise teach the claimed dosage amount of "from 15 micrograms to 90 micrograms."  *See, e.g.,* '793 Patent at 9:4-9 (disclosing delivery of 262.5 micrograms of nebulized UT-15); *see also id.* at 11:7-13 (disclosing

delivery of 250, 500, and 1000 micrograms per kg of body weight per minute of aerosolized UT-15).

Moreover, the '212 Patent states that "[t]he precise amount that is considered effective for a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor." '212 Patent, 6:56-7:3; *see also id*. at 7:25-33; *see also generally id.* at 1:10-2:64. The '212 Patent also states that the disclosed benzindene prostaglandin, UT-15, can be "given in high doses without significant non-lung effects." *Id.* at 10:51-57 ("These data are important in that this would indicate that, unlike intravenously infused UT-15, aerosolized UT-15 can be given in high doses without significant non-lung effects, i.e., heart rate, cardiac output. The aerosol delivery of UT-15 for these experiments is approximately 15-27 times that of the effective minimal tested dose of 250 ng per kg per min shown in FIG. 16."). These disclosures would have further motivated a POSA reading the '212 Patent to administer inhaled treprostinil at a dosage amount of 15-90 micrograms, as claimed.

### (4)      Claim Element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|--------------------------------|

Claim element 1[d] of the '793 Patent would have been obvious over the '212 Patent in view of a POSA's general knowledge in the field and/or by applying routine optimization.

A POSA reading the '212 Patent would have been motivated to minimize the number of breaths required for administration of treprostinil by inhalation, to increase patient compliance and convenience. *See* '212 Patent, 11:7-13 (disclosing a per-minute delivery rate); *see also id.* at 13:6-8 (describing aerosolized UT-15 delivered for "4-5 minutes"). By May 2006, the general state of the art had established the safety and efficacy of inhaled therapeutics, including prostaglandin

analogs such as treprostinil, delivered over short periods of time.  *See, e.g.,* Chaudry 2004 at [0037]-[0038], [0067] (disclosing that delivery by inhalation "may take about . . . 3 minutes"); *see also* Ghofrani 2005 at p. 298 ("[I]t is technically feasible for there to be only one to two breaths in an application."); *see also* Clark 1995, Abstract; *see also* Olschewski 2002 at Abstract, 328; *see also* Ventavis® Label 2004 at 4, 16; *see also* OptiNeb® User Manual 2005 at 28; *see also* Geller 2003 at Abstract; *see also generally, supra*, "Additional Background Prior Art" Section.  A POSA would have been further aware of the problem of patient noncompliance to inhaled medications, and thus would have been encouraged to reduce the number of breaths required for drug delivery to increase patient compliance and treatment outcome.  *See, e.g.,* Bender 1997 at Abstract, 179-80; *see also* Olschewski 2002 at 328; Newmann at 63; Geller 2003 at Abstract; Geller 2005 at 1314, 1318.  Accordingly, claim element 1[d] requiring "delivery in 1 to 3 breaths" would have been obvious over the '212 Patent in view of a POSA's general knowledge in the field.

Relying on the '212 Patent to deliver inhaled treprostinil in 1 to 3 breaths would have amounted to mere routine optimization that cannot save the '793 Patent from obviousness.  *See, e.g., Genzyme Therapeutic Prods. L.P. v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1365, 1373 (Fed. Cir. 2016) (affirming decision finding dosing claims obvious when "the claimed dosing schedule would have been arrived at by routine optimization"); *see also Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1329-31 (Fed. Cir. 2014) (affirming decision finding dosing claims obvious because "a relatively infrequent dosing schedule has long been viewed as a potential solution to the problem of patient compliance"); *see also Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.,* 395 F.3d 1364, 1373 (Fed. Cir. 2005) (reversing decision to find claims obvious that covered slightly different dosages from those of the prior art).  In fact, the '212 Patent itself contemplates dose optimization as a matter of routine.  '212 Patent, 6:56-7:3, 7:25-33; *see also generally id.* at

134

1:10-2:64.  A POSA therefore would have understood that the benzindene prostaglandin (*i.e.*, treprostinil) disclosed in the '212 Patent could be "delivered in 1 to 3 breaths," as claimed.

### b.    Dependent Claims 4 and 6-8 Would Have Been Obvious

#### (1)    Claim 4

| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
|---|---|

Claim 4 of the '793 Patent is disclosed in the '212 Patent, which discloses that an "inhaler" may be used to deliver the benzindene prostaglandin.  '212 Patent at 5:30-32.  The '212 Patent further states that "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention."  *Id.* at 5:37-39.  Accordingly, a POSA would have readily understood that the "inhaler" disclosed in the '212 Patent could be used as a "dry powder inhaler," as claimed, to deliver powder formulations.

#### (2)    Claim 6

| 6 | The method of claim 1, wherein the formulation is a powder. |
|---|---|

Claim 6 of the '793 Patent is disclosed in the '212 Patent, which discloses that powder formulations may be used.  '212 Patent at 5:37-39 ("Alternatively, solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention.").[17]

#### (3)    Claim 7

| 7 | The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter. |
|---|---|

---

[17] To the extent UTC contends that the '212 Patent fails to describe a powder formulation of treprostinil administered in 1-3 breaths, the claims of the '793 Patent are invalid under § 112, as described below.

Claim 7 of the '793 Patent is disclosed in the '212 Patent, which expressly discloses that "the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter." '212 Patent at 5:39-41.

### (4)    Claim 8

| 8 | *The method of claim 1, wherein the formulation contains no metacresol.* |
|---|---|

Claim 8 of the '793 Patent is disclosed in the '212 Patent, which has no disclosure requiring the presence of metacresol in the described formulation. *See generally* '212 Patent; *see also, e.g., id.* at 4:47-54 (stating that the active ingredients include "liquid formulations comprising a benzindene prostaglandin, such as UT-15, **alone** or in combination with other active ingredients") (emphasis added). The '212 Patent therefore discloses a formulation of UT-15 (*i.e.*, treprostinil) that contains no metacresol.

### c.    Motivation to Modify the '212 Patent to Arrive at "Delivered in 1 to 3 Breaths"

As explained above in connection with claim element 1[d], a POSA would have been motivated to modify the '212 Patent to arrive at the limitation reciting "delivered in 1 to 3 breaths." *See supra* Section V.A.2.a.4. The relevant scientific literature was replete with teachings regarding the safe and effective administration of inhaled therapeutics, including prostaglandin analogs such as treprostinil. *See, e.g.,* Chaudry 2004 at [0037]-[0038], [0067] (disclosing that "a therapeutically effective amount of a hypertension-reducing agent may include from about 0.001 mg/ml to about 20 mg/ml" and that delivery by inhalation "may take about . . . 3 minutes"); *see also* Ghofrani 2005 at p. 298 (disclosing administration of inhaled treprostinil at a dose of "15 mcg/inhalation" and that "it is possible to increase the dosage to up to 90 mcg") ("[I]t is technically feasible for there to be only one to two breaths in an application."); *see also* Clark 1995, Abstract; *see also*

Olschewski 2002 at Abstract, 328; *see also* Ventavis® Label 2004 at 4, 16; *see also* OptiNeb® User Manual 2005 at 28; *see also generally, supra*, "Additional Background Prior Art" Section.

Additionally, the problem of patient nonadherence to inhaled medications was well-understood, and a POSA in May 2006 would have readily appreciated that reducing the number of breaths for drug delivery would increase patient compliance and, in turn, treatment outcome. *See, e.g.,* Bender 1997 at Abstract, 179-80 (emphasizing the challenge of patient compliance to inhaled medications and its relationship to treatment outcome); *see also* Olschewski 2002 at 328 (noting that "the duration of inhalation may be shortened considerably"); Newmann at 63; Geller 2003, Abstract; Geller 2005 at 1314, 1318.  Therefore, a POSA would have been encouraged to modify the teachings of the '212 Patent to deliver inhaled treprostinil in 1 to 3 breaths.  This modification would have represented mere routine optimization, which is not enough to save a claim from obviousness.  *See, e.g., Genzyme Therapeutic*, 825 F.3d at 1365, 1373; *see also Hoffmann-La Roche*, 748 F.3d at 1329-31; *see also Merck,* 395 F.3d at 1373.

### d. Reasonable Expectation of Success in Modifying the '212 Patent to Arrive at "Delivered in 1 to 3 Breaths"

Similarly, a POSA also would have had a reasonable expectation of success in modifying the '212 Patent to arrive at the limitation reciting "delivered in 1 to 3 breaths."  For the same reasons set forth above, a POSA would have expected to succeed in reducing the number of breaths during administration of inhaled treprostinil, due to the general state of the art regarding the safety and efficacy of inhaled therapeutics and the known problem of patient noncompliance.  *See supra* Section V.A.2.c; *see also supra* Section V.A.2.a.4.  Further, the '212 patent discloses that "aerosolized UT-15 has both greater potency and efficacy relative to attenuating chemically induced pulmonary hypertension," and "greater potency as compared to intravascularly administered UT-15."  '212 Patent, 8:5-12.  As such, a POSA would readily conclude that a

"therapeutically effective" amount of treprostinil could be delivered via inhalation in 1-3 breaths. Additionally, relying on the '212 Patent to deliver treprostinil in 1 to 3 breaths would have required only routine optimization, which would have further bolstered a POSA's expectation of success. *See id.*

### 3. Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious over the '212 Patent in Combination with Voswinckel 2004

The Asserted Claims of the '793 Patent would have been obvious over the '212 Patent[18] in combination with **Voswinckel 2004**.

#### a. Claims 1 Would Have Been Would Have Been Obvious

##### (1) Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|------|------|

Claim element 1[a] the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.2.a.1.

##### (2) Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|------|------|

Claim element 1[b] of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.2.a.2.

##### (3) Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|------|------|

---

[18] The '033 Patent shares a specification with the '212 Patent.  Thus, all references to the '212 Patent in this section are equally applicable to the '033 Patent.

Claim element 1[c] of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.2.a.3.

To the extent that UT contends that the single event dose is not disclosed in the '212 patent, this limitation is disclosed in **Voswinckel 2004**.  As discussed below, claim 1 is therefore obvious over the '212 Patent in combination with Voswinckel 2004.  Voswinckel 2004 conducted a study of inhaled treprostinil in patients with severe pulmonary hypertension and states that "[p]atients received a TRE [inhaled treprostinil sodium] by use of the pulsed OptiNeb® ultrasound nebulizer (3 single breaths, TRE solution 600 µg/ml)." *See* Voswinckel 2004.  A POSA reading Voswinckel 2004 would have known that the OptiNeb® ultrasound nebulizer could deliver 15-90 micrograms of inhaled treprostinil, due to the variability in dosing provided by this device.  *See also, e.g.,* OptiNeb® User Manual 2005.  More specifically, as demonstrated by the Tyvaso prescribing information, the administration described in the Voswinckel 2004 paper delivers 18 micrograms in 3 breaths.  *See* Tyvaso Label (2009) at 1 ("Initial dosage: 3 breaths (18 mcg) per treatment session.  If 3 breaths are not tolerated, reduce to 1 or 2 breaths."); *see also id.* at 1 (disclosing a treprostinil solution of "0.6 mg per mL," *i.e.,* 600 micrograms per mL); *see also id.* at 2 ("Tyvaso is intended for oral inhalation using the Tyvaso Inhalation System, which consists of the Optineb-ir Model ON-100/07 (an ultrasonic, pulsed-delivery device) and its accessories.").  Therefore, the claimed dosage amount would have been obvious over the '212 Patent in combination with Voswinckel 2004.  A POSA would have been motivated to combine the '212 Patent with Voswinckel 2004 for the reasons set forth below in Sections V.A.3.a.4, V.A.3.c, and V.A.3.d.

### (4)    Claim Element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|--------------------------------|

Claim element 1[d] of the '793 Patent would have been obvious over the '212 Patent in combination with **Voswinckel 2004**.

Voswinckel 2004 states that "[p]atients received a TRE [inhaled treprostinil sodium] by use of the pulsed OptiNeb® ultrasound nebulizer (3 single breaths, TRE solution 600 µg/ml)" and further observes that "[t]olerability is excellent even at high drug concentrations and short inhalation times (3 breaths)." *See* Voswinckel 2004.   A POSA also would have known, as explained above, that it would be desirable to reduce the number of breaths required for delivery of treprostinil by inhalation, to increase patient compliance and convenience. *See, e.g.,* Bender 1997 at Abstract, 179-80; *see also* Olschewski 2002 at 328; Newmann at 63; Geller 2003 at Abstract; Geller 2005 at 1314, 1318.   Therefore, a POSA therefore would have been encouraged to apply the 3-breath delivery disclosure of Voswinckel 2004 to the teachings of the '212 Patent. A POSA would have been further motivated to combine the '212 Patent with Voswinckel 2004, and would have had a reasonable expectation of success in doing so, because both references are directed to the use of inhaled treprostinil (also known as benzindene prostaglandin UT-15), for the treatment of pulmonary hypertension. *See, e.g.,* '212 Patent, Abstract (disclosing "[a] method of delivering benzindene prostaglandins to a patient by inhalation" for the treatment of "pulmonary hypertension"); *see also* Voswinckel 2004 (titled "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension").   Moreover, Voswinckel 2004 discloses that delivery of inhaled treprostinil in 3 single breaths was successful, further confirming that a POSA would have had a reasonable expectation of successfully achieving the claimed invention. *Id*.

Accordingly, claim element 1[d] would have been obvious over the combination of the '212 Patent with Voswinckel 2004.

### b. Dependent Claims 4 and 6-8 Would Have Been Obvious

#### (1) Claim 4

| 4 | *The method of claim 1, wherein the inhalation device is a dry powder inhaler.* |

The additional limitation of claim 4 of the '793 Patent is disclosed in the '212 Patent, as described above.

### (2)    Claim 6

| 6 | *The method of claim 1, wherein the formulation is a powder.* |

The additional limitation of claim 6 of the '793 Patent is disclosed in the '212 Patent, as described above.

### (3)    Claim 7

| 7 | *The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter.* |

The additional limitation of claim 7 of the '793 Patent is disclosed in the '212 Patent, as described above.

### (4)    Claim 8

| 8 | *The method of claim 1, wherein the formulation contains no metacresol .* |

The additional limitation of claim 8 of the '793 Patent is disclosed in the '212 Patent, as described above.  Additionally, treprostinil was delivered without metacresol as disclosed in Voswinckel 2004.

### c.    Motivation to Combine the '212 Patent with Voswinckel 2004

A POSA would have been motivated to combine the '212 Patent with Voswinckel 2004 to arrive at the Asserted Claims of the '793 Patent.  Both the '212 Patent and Voswinckel 2004 are directed to the use of inhaled treprostinil (also known as benzindene prostaglandin UT-15), for the treatment of pulmonary hypertension.  *See, e.g.,* '212 Patent, Abstract (disclosing "[a] method of delivering benzindene prostaglandins to a patient by inhalation" for the treatment of "pulmonary

141

hypertension"); *see also* Voswinckel 2004 (titled "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension").  Indeed, Voswinckel 2004 puts into clinical practice the express teachings of the '212 patent, with success.  As such, a POSA would have been motivated to combine the teachings of the '212 Patent to deliver treprostinil in 1 to 3 breaths due to the disclosure in Voswinckel 2004 that "[t]olerability is excellent even at high drug concentrations and short inhalation times (3 breaths)."  *See* Voswinckel 2004 at Conclusion.

Additionally, and as noted, the relevant scientific literature was replete with teachings regarding the safe and effective administration of inhaled therapeutics, including prostaglandin analogs.  *See, e.g.,* Chaudry 2004 at [0037]-[0038], [0067] (disclosing that "a therapeutically effective amount of a hypertension-reducing agent may include from about 0.001 mg/ml to about 20 mg/ml" and that delivery by inhalation "may take about . . . 3 minutes"); *see also* Ghofrani 2005 at p. 298 (disclosing administration of inhaled treprostinil at a dose of "15 mcg/inhalation" and that "it is possible to increase the dosage to up to 90 mcg") ("[I]t is technically feasible for there to be only one to two breaths in an application."); *see also* Clark 1995, Abstract; *see also* Olschewski 2002 at Abstract, 328; *see also* Ventavis® Label 2004 at 4, 16; *see also* OptiNeb® User Manual 2005 at 28; *see generally, supra*, "Additional Background Prior Art" Section.

Further, the problem of patient nonadherence to inhaled medications was well-understood, and a POSA in May 2006 would have readily appreciated that reducing the number of breaths for drug delivery would increase patient compliance and, in turn, treatment outcome.  *See, e.g.,* Bender 1997 at Abstract, 179-80 (emphasizing the challenge of patient compliance to inhaled medications and its relationship to treatment outcome); *see also* Olschewski 2002 at 328 (noting that "the duration of inhalation may be shortened considerably"); Newmann at 63; Geller 2003 at Abstract; Geller 2005 at 1318, 1318.  Therefore, a POSA would have been encouraged to apply the 3-breath

delivery disclosure of Voswinckel 2004 to the teachings of the '212 Patent to arrive at the limitation reciting "delivery in 1 to 3 breaths" claimed by the '793 Patent.

### d. Reasonable Expectation of Success in Combining the '212 Patent with Voswinckel 2004

Similarly, a POSA also would have had a reasonable expectation of success in combining the '212 Patent with Voswinckel 2004 to arrive at the claimed treatment including delivery of 15-90 micrograms "in 1 to 3 breaths." As noted, the '212 Patent and Voswinckel 2004 are directed to solving the same problem, treatment of pulmonary hypertension, via the same means, inhaled treprostinil. For the same reasons set forth above, a POSA would have expected to succeed in reducing the number of breaths when delivering inhaled treprostinil, due to the general state of the art regarding the safety and efficacy of inhaled therapeutics, the known problem of patient noncompliance, and Voswinckel 2004's explicit disclosure that administration of treprostinil was successful. *See supra* Section V.A.3.c. Therefore, a POSA would have had a reasonable expectation of success in applying the 3-breath delivery disclosure of Voswinckel 2004 to the teachings of the '212 Patent.

### 4. Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious over the '212 Patent in Combination with Voswinckel 2006

The Asserted Claims of the '793 Patent would have been obvious over the '212 Patent[19] in combination with **Voswinckel 2006**.

### a. Claims 1 Would Have Been Would Have Been Obvious

#### (1) Claim Element 1[a]

| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically |
|------|------|

---

[19] The '033 Patent shares a specification with the '212 Patent. Thus, all references to the '212 Patent in this section are equally applicable to the '033 Patent.

| | *effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|---|---|

Claim element 1[a] the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.2.a.1.

### (2)   Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|---|---|

Claim element 1[b] of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.2.a.2.

### (3)   Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|---|---|

Claim element 1[c] of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.2.a.3.  To the extent that UT contends that the '212 Patent alone does not disclose the claimed dosage amount, this limitation would have been obvious over the '212 Patent in combination with **Voswinckel 2006**.  Claim 1 is therefore obvious over the '212 Patent in combination with Voswinckel 2006.

Voswinckel 2006 expressly discloses that treprostinil was "clinically effective, safe, and well tolerated when 15 μg was inhaled in 3 breaths 4 times daily."  Voswinckel 2006 at 150.  Therefore, the claimed dosage amount would have been obvious over the '212 Patent in combination with Voswinckel 2006.  A POSA would have been motivated to combine this teaching from Voswinckel 2006 with the '212 Patent for the reasons set forth below in Sections V.A.4.a.4, V.A.4.c, and V.A.4.d.

(4)     **Claim Element 1[d]**

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|--------------------------------|

Claim element 1[d] of the '793 Patent would have been obvious over the '212 Patent in combination with **Voswinckel 2006**.

Voswinckel 2006 expressly discloses delivery of inhaled treprostinil "in 3 breaths." *See* Voswinckel 2006 at 150.  A POSA also would have known, as explained above, that it would be desirable to reduce the number of breaths required for delivery of treprostinil by inhalation, to increase patient compliance and convenience. *See, e.g.,* Bender 1997 at Abstract, 179-80; *see also* Olschewski 2002 at 328; Newmann at 63; Geller 2003 at Abstract; Geller 2005 at 1314, 1318. Therefore, a POSA therefore would have been encouraged to apply the 3-breath delivery disclosure of Voswinckel 2006 to the teachings of the '212 Patent.  A POSA would have been further motivated to combine the '212 Patent with Voswinckel 2006, and would have had a reasonable expectation of success in doing so, because both references are directed to the use of inhaled treprostinil (also known as benzindene prostaglandin UT-15), for the treatment of pulmonary hypertension. *See, e.g.,* '212 Patent, Abstract (disclosing "[a] method of delivering benzindene prostaglandins to a patient by inhalation" for the treatment of "pulmonary hypertension"); *see also* Voswinckel 2006 at 149 (titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension").  Moreover, Voswinckel 2006 discloses that delivery of inhaled treprostinil in 3 single breaths was successful, further confirming that a POSA would have had a reasonable expectation of successfully achieving the claimed invention. *Id.*

Accordingly, claim element 1[d] would have been obvious over the combination of the '212 Patent with Voswinckel 2006.

**b.     Dependent Claims 4 and 6-8 Would Have Been Obvious**

### (1)     Claim 4

| 4 | *The method of claim 1, wherein the inhalation device is a dry powder inhaler.* |
|---|---|

The additional limitation of claim 4 of the '793 Patent is disclosed in the '212 Patent, as described above.

### (2)     Claim 6

| 6 | *The method of claim 1, wherein the formulation is a powder.* |
|---|---|

The additional limitation of claim 6 of the '793 Patent is disclosed in the '212 Patent, as described above.

### (3)     Claim 7

| 7 | *The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter.* |
|---|---|

The additional limitation of claim 7 of the '793 Patent is disclosed in the '212 Patent, as described above.

### (4)     Claim 8

| 8 | *The method of claim 1, wherein the formulation contains no metacresol.* |
|---|---|

The additional limitation of claim 8 of the '793 Patent is disclosed in the '212 Patent, as described above.  Additionally, treprostinil was delivered without metacresol in Voswinckel 2006.

### c.     Motivation to Combine the '212 Patent with Voswinckel 2006

A POSA would have been motivated to combine the '212 Patent with Voswinckel 2006 to arrive at the Asserted Claims of the '793 Patent.  Both the '212 Patent and Voswinckel 2006 are directed to the use of inhaled treprostinil (also known as benzindene prostaglandin UT-15), for the treatment of pulmonary hypertension.  *See, e.g.,* '212 Patent, Abstract (disclosing "[a] method of delivering benzindene prostaglandins to a patient by inhalation" for the treatment of "pulmonary

146

hypertension"); *see also* Voswinckel 2006 at 149 (titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension").  Indeed, Voswinckel 2006 puts into clinical practice the express teachings of the '212 patent, with success.  As such, a POSA would have been motivated to combine the teachings of the '212 Patent to deliver treprostinil in 1 to 3 breaths due to the disclosure in Voswinckel 2006 that treprostinil was "clinically effective, safe, and well tolerated when 15 µg was inhaled in 3 breaths 4 times daily."  *See* Voswinckel 2006 at 150.

Additionally, as noted, the relevant scientific literature was replete with teachings regarding the safe and effective administration of inhaled therapeutics, including prostaglandin analogs.  *See, e.g.,* Chaudry 2004 at [0037]-[0038], [0067] (disclosing that "a therapeutically effective amount of a hypertension-reducing agent may include from about 0.001 mg/ml to about 20 mg/ml" and that delivery by inhalation "may take about . . . 3 minutes"); *see also* Ghofrani 2005 at p. 298 (disclosing administration of inhaled treprostinil at a dose of "15 mcg/inhalation" and that "it is possible to increase the dosage to up to 90 mcg") ("[I]t is technically feasible for there to be only one to two breaths in an application."); *see also* Clark 1995, Abstract; *see also* Olschewski 2002 at Abstract, 328; *see also* Ventavis® Label 2004 at 4, 16; *see also* OptiNeb® User Manual 2005 at 28; *see generally, supra*, "Additional Background Prior Art" Section.

Further, the problem of patient nonadherence to inhaled medications was well-understood, and a POSA in May 2006 would have readily appreciated that reducing the number of breaths for drug delivery would increase patient compliance and, in turn, treatment outcome.  *See, e.g.,* Bender 1997 at Abstract, 179-80 (emphasizing the challenge of patient compliance to inhaled medications and its relationship to treatment outcome); *see also* Olschewski 2002 at 328 (noting that "the duration of inhalation may be shortened considerably"); Newmann at 63; Geller 2003, Abstract; Geller 2005 at 1314, 1318.  Therefore, a POSA would have been encouraged to apply the

disclosures of Voswinckel 2006 to the teachings of the '212 Patent to arrive at the claimed dosage amount and "delivery in 1 to 3 breaths" limitation.

### d.     Reasonable Expectation of Success in Combining the '212 Patent with Voswinckel 2006

Similarly, a POSA also would have had a reasonable expectation of success in combining the '212 Patent with Voswinckel 2006 to arrive at the limitation reciting "delivered in 1 to 3 breaths." As noted, the '212 Patent and Voswinckel 2006 are directed to solving the same problem treatment of pulmonary hypertension, via the same means, inhaled treprostinil. For the same reasons set forth above, a POSA would have expected to succeed in reducing the number of breaths when delivering inhaled treprostinil, due to the general state of the art regarding the safety and efficacy of inhaled therapeutics, the known problem of patient noncompliance, and Voswinckel 2006's explicit disclosure that administration of treprostinil was successful. *See supra* Section V.A.4.c. Therefore, a POSA would have had a reasonable expectation of success in applying the disclosures of Voswinckel 2006 regarding dosage amount and number of breaths to the teachings of the '212 Patent.

### 5.     Claim 1 of the '793 Patent is Anticipated by Voswinckel 2006

Claim 1 of the '793 Patent is anticipated by Voswinckel 2006.

### a.     Claim 1 is Anticipated

### (1)     Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|------|------|

Claim element 1[a] of the '793 Patent is disclosed in Voswinckel 2006, which teaches the recited method of treating pulmonary hypertension. Voswinckel 2006 describes treating "three

patients with severe pulmonary hypertension" with "inhaled treprostinil."  Voswinckel 2006 at 150.  Voswinckel 2006 also describes "**a single** 15-µg **dose** of treprostinil, inhaled 3 breaths" inducing "highly pulmonary selective and sustained vasodilation" proving that "the drug was clinically effective" at the dosage and number of breaths.  Voswinckel 2006 at 150 (emphasis added).

(2)      <strong>Claim Element 1[b]</strong>

| 1[b] | *with an inhalation device,* |
|------|------------------------------|

Claim element 1[b] of the '793 Patent is disclosed in Voswinckel 2006, which expressly discloses "inhaled treprostinil" administered "through a modified OptiNeb ultrasonic **inhalation device**."  *Id.* (emphasis added).

(3)      <strong>Claim Element 1[c]</strong>

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 microgram to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|------|------------------------------|

Claim element 1[c] of the '793 Patent is disclosed in Voswinckel 2006, which specifically teaches that "a single 15-µg dose of treprostinil" was inhaled by patients "through a modified OptiNeb ultrasonic inhalation device."  *Id.*

(4)      <strong>Claim Element 1[d]</strong>

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|------------------------------|

Claim element 1[d] of the '793 Patent is disclosed in Voswinckel 2006 which specifically teaches that "15-µg dose of treprostinil" was inhaled by patients "in **3 breaths** through a modified OptiNeb ultrasonic inhalation device."  *Id.* (emphasis added).

> **6.      Claims 4 and 6-8 of the '793 Patent Would Have Been Obvious over Voswinckel 2006 in Combination with the '212 Patent**

Claims 4 and 6-8 of the '793 Patent would have been obvious over Voswinckel 2006 in combination with the '212 Patent by May 15, 2006.  All of the limitations of Claim 1 are disclosed by Voswinckel 2006, as described above.  The additional limitations of the dependent claims 4 and 6-8 are obvious over Voswinckel 2006 in combination with the '212 Patent.  A POSA would have motivated to modify Voswinckel 2006 with the '212 Patent with a reasonable expectation of success as described below.

### a.  Dependent Claims 4 and 6-8 Would Have Been Obvious

#### (1)  Claim 4

| 4 | *The method of claim 1, wherein the inhalation device is a dry powder inhaler.* |
|---|---|

Claim 4 of the '793 Patent would have been obvious over Voswinckel 2006 in combination with the '212 Patent, which discloses that an "inhaler" may be used to deliver its disclosed benzindene prostaglandin: UT-15 (i.e. treprostinil salt).  '212 Patent, 5:30-32.  The '212 Patent further states that "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention."  *Id.* at 5:37-39.  The "present invention" of the '212 Patent includes the 15 µg disclosed dosage of Vowinckel 2006: "[i]n the case of treating peripheral vascular disease by inhalation of a benzindene prostaglandin of the present invention, **the dosage for inhalation**, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, **should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg**; typically from 0.5 µg to 2.5 mg, **preferably from 7 µg to 285 µg**, per day per kilogram bodyweight."  '212 Patent, 5:54-62 (emphasis added); *see also id.* at Figs. 16, 18.  Voswinckel 2006 teaches that those dosages can be administered in 3 breaths.

Accordingly, a POSA would have readily understood that "inhaled treprostinil" dosage and breath disclosure of Voswinckel 2006 could be expanded to use in a "dry powder inhaler" as disclosed by the '212 Patent.  A POSA would have been motivated to do so because dry powder inhalers were well-known to be very portable and quick to use, breath-actuated, could be designed as single-dose or multi-dose devices, provided the "lowest cost dose," and were easier for patients (especially children) to use than the pulsed ultrasonic nebulizer disclosed in Voswinckel 2006. Newman at 58, 61-62, 63; Geller 2005 at 1316-17; *see also* Frijlink and De Boer, "Dry powder inhalers for pulmonary drug delivery," Expert Opinion on Drug Delivery, 1:1, pp. 67-86 (2004) at 81 ("Advantages such as the potential ability to generate high FPFs and a relatively high lung deposition, fast and easy administration, the ability to prepare stable formulations (compared with solutions), and the fact that DPIs are breath-actuated and easily portable, justify their existence."). A POSA would have had a reasonable expectation of success in using a dry powder inhaler, because the '212 patent discloses the use of such a device to deliver inhaled treprostinil.

To the extent a POSA would not have a reasonable expectation of success in converting Voswinckel 2006's dosing regimen from a pulsed ultrasonic nebulizer to a dry powder inhaler, claim 4 of the '793 Patent is invalid for lack of enablement and written description, because, as discussed in Sections V.B.1.a and V.B.2.a below, the '793 Patent does not disclose or enable converting treprostinil delivery between the two inhalation devices.

### (2)    Claim 6

| 6 | *The method of claim 1, wherein the formulation is a powder.* |
|---|---|

Claim 6 of the '793 Patent would have been obvious over Voswinckel 2006 in combination with the '212 Patent, which discloses that powder formulations may be used.  '212 Patent, 5:37-39 ("Alternatively, solid formulations, usually in the form of a powder, may be inhaled in

accordance with the present invention."). A POSA would have been motivated to convert Voswinckel 2006's treprostinil solution to a powder because powders were known to be more stable formulations than solutions by May 2006. *See* Frijlink and De Boer, "Dry powder inhalers for pulmonary drug delivery," Expert Opinion on Drug Delivery, 1:1, pp. 67-86 (2004) at 81. A POSA would have had a reasonable expectation of success in doing so because converting a solution to dry powder was well known by 2006, and the '212 patent discloses that treprostinil can be formulated as a powder for delivery by inhalation. *See, e.g.*, Chew and Chan, "Pharmaceutical Dry Powder Aerosol Delivery," KONA No. 19, pp. 46-56 (2001), available at https://www.jstage.jst.go.jp/article/kona/19/0/19_2001010/_pdf, at 51-53 ("Preparation of Powders" section).

To the extent a POSA would not have a reasonable expectation of success in converting Voswinckel 2006's treprostinil formulation to a powder, claim 6 of the '793 Patent is invalid for lack of enablement and written description, because, as discussed in Sections V.B.1.a and V.B.2.a below, the '793 Patent does not disclose or enable converting treprostinil delivery between the two inhalation devices.

(3)     **Claim 7**

| 7 | *The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter.* |
|---|---|

Claim 7 of the '793 Patent would have been obvious over Voswinckel 2006 in combination with the '212 Patent, which expressly discloses that "the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter." '212 Patent, 5:39-41. Further, it was generally known in the art that "inhaler devices should deliver particles smaller than approximately 5 µm in diameter in order to enter the lungs." Newman at 58.

(4)     **Claim 8**

| 8 | *The method of claim 1, wherein the formulation contains no metacresol.* |

Claim 8 of the '793 Patent is disclosed in Voswinckel 2006 and in the '212 Patent as discussed above.  Moreover, claim 8 woul dhave been obvious over Voswinckel 2006 in combination with the '212 Patent, as Voswinckel 2006 does not disclose the presence of metacresol in the described formulation of "inhaled treprostinil," and the '212 Patent discloses that the active ingredients include "liquid formulations comprising a benzindene prostaglandin, such as UT-15, **alone** or in combination with other active ingredients."  *See generally* Voswinckel 2006; *see also, e.g.,* '212 Patent at 4:47-54 (emphasis added).  Voswinckel 2006 in combination with the '212 Patent therefore discloses a formulation of treprostinil that contains no metacresol.

### 7.     Claim 1 of the '793 Patent Would Have Been Obvious over Voswinckel 2004 Alone

Claim 1 of the '793 Patent would have been obvious over Voswinckel 2004 by May 15, 2006.

### a.     Claims 1 Would Have Been Would Have Been Obvious

#### (1)     Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |

Claim element 1[a] the '793 Patent would have been obvious over Voswinckel 2004, which teaches the recited method of treating pulmonary hypertension.  Voswinckel 2004 describes treating "17 patients with severe pulmonary hypertension" with "Inhaled Treprostinil Sodium (TRE)."  Voswinckel 2004 at Title, Methods.  Voswinckel 2004 also describes a single event dose of "3 breaths" of "TRE solution 600 µg/ml" having "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing."  *Id.* at Methods, Conclusion.

### (2)    Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|------|------------------------------|

Claim element 1[b] of the '793 Patent would have been obvious over the Voswinckel 2004, which expressly discloses "inhaled TRE" through "the use of the pulsed OptiNeb® ultrasound nebulizer." *Id.* at Methods.  A POSA as of May 2006 would have readily understood that this nebulizer is an inhalation device.

### (3)    Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|------|------------------------------|

Claim element 1[c] of the '793 Patent would have been obvious over Voswinckel 2004, which teaches the claimed dosage amount for inhaled treprostinil.  Voswinckel 2004 discloses treating patients with a single event dose of "TRE solution 600 µg/ml" through the use of the pulsed OptiNeb® ultrasound nebulizer.  A POSA would understand that a patient taking 1 to 3 breaths of such a solution through a pulsed OptiNeb® ultrasound nebulizer would inhale between 15 and 90 micrograms of treprostinil.

### (4)    Claim Element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|------------------------------|

Claim element 1[d] of the '793 Patent would have been obvious over Voswinckel 2004, which discloses treating patients with a single event dose of "3 breaths."  Voswinckel 2004 at Methods.

### 8.    Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious Over Voswinckel 2004 in Combination with the '212 Patent

The Asserted Claims of the '793 Patent would have been obvious over Voswinckel 2004 in combination with the '212 Patent by May 15, 2006. A POSA would have motivated to modify Voswinckel 2004 with the '212 Patent with a reasonable expectation of success as described for the relevant limitations below.

### a.      Claims 1 Would Have Been Would Have Been Obvious

#### (1)      Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|---|---|

As explained above, claim element 1[a] of the '793 Patent is disclosed in both Voswinckel 2004 and the '212 Patent.

#### (2)      Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|---|---|

As explained above, claim element 1[b] of the '793 Patent is disclosed in both Voswinckel 2004 and the '212 Patent.

#### (3)      Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|---|---|

Claim element 1[c] of the '793 Patent would have been obvious over Voswinckel 2004 in combination with the '212 Patent.

Voswinckel 2004 discloses treating patients with a single event dose of "TRE solution 600 µg/ml" in "3 breaths" and teaches that this dose was effective in showing "strong pulmonary selective vasodilatory efficacy . . . following single acute dosing.' Voswinckel 2004 at Methods,

155

Conclusion.  A POSA would understand Voswinckel 2004's disclosure of a single event dose of "3 breaths" of inhaled treprostinil having "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing" to mean that 3 breaths delivered an amount of the drug to be effective in treating pulmonary hypertension.

The '212 Patent expressly discloses that an effective amount of inhaled treprostinil is "from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof." Specifically, the '212 Patent states that "[i]n the case of treating peripheral vascular disease by inhalation of a benzindene prostaglandin of the present invention, **the dosage for inhalation**, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, **should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg**; typically from 0.5 µg to 2.5 mg, **preferably from 7 µg to 285 µg**, per day per kilogram bodyweight." '212 Patent, 5:54-62 (emphasis added); *see also id.* at Figs. 16, 18.  The '212 Patent further explains that inhaled UT-15 "has a greater potency compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.* at 8:9-18.  A POSA would have been further informed by additional disclosures in the '212 Patent that likewise teach the claimed dosage amount of "from 15 micrograms to 90 micrograms." *See, e.g., id.* at 9:4-9 (disclosing delivery of 262.5 micrograms of nebulized UT-15); *see also id.* at 11:7-13 (disclosing delivery of 250, 500, and 1000 micrograms per kg of body weight per minute of aerosolized UT-15).  Accordingly, a POSA reading Voswinckel 2004's disclosure of 3 breaths with the effects described in Voswinckel 2004's conclusion would understand that the treprostinil was delivered within the claimed dosage range.

A POSA would have been motivated to combine the Voswinckel 2004's breath disclosure with the dosage disclosure in the '212 Patent, because both references are directed to the use of inhaled treprostinil sodium (also known as benzindene prostaglandin UT-15), for the successful treatment of pulmonary hypertension. *See, e.g.,* '212 Patent, Abstract (disclosing "[a] method of delivering benzindene prostaglandins to a patient by inhalation" for the treatment of "pulmonary hypertension"); *see also* Voswinckel 2004 (titled "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension").

Further, the general state of the art would have further motivated a POSA to combine the teachings of Voswinckel 2004 with those of the '212 Patent. The relevant scientific literature was replete with teachings regarding the safe and effective administration of inhaled therapeutics, including prostaglandin analogs. *See, e.g.,* Chaudry 2004 at [0037]-[0038], [0067] (disclosing that "a therapeutically effective amount of a hypertension-reducing agent may include from about 0.001 mg/ml to about 20 mg/ml" and that delivery by inhalation "may take about . . . 3 minutes"); *see also* Ghofrani 2005 at p. 298 (disclosing administration of inhaled treprostinil at a dose of "15 mcg/inhalation" and that "it is possible to increase the dosage to up to 90 mcg") ("[I]t is technically feasible for there to be only one to two breaths in an application."); *see also* Clark 1995, Abstract; *see also* Olschewski 2002 at Abstract, 328; *see also* Ventavis® Label 2004 at 4, 16; *see also* OptiNeb® User Manual 2005 at 28; *see generally, supra*, "Additional Background Prior Art" section.

A POSA also would have had a reasonable expectation of success in combining Voswinckel 2004 with the '212 Patent to arrive at the Asserted Claims of the '793 Patent. As noted, the two references pertain to the effective and improved use of inhaled treprostinil to treat pulmonary hypertension. *See, e.g.,* '212 Patent, Abstract; *see also* Voswinckel 2004 at Title. In

157

fact, Voswinckel 2004 expressly states that "[t]olerability is excellent even at high drug concentrations and short inhalation times (3 breaths)." *See* Voswinckel 2004 at Conclusion.  A POSA therefore would have expected success when modifying the Voswinckel 2004 to deliver treprostinil in 3 breaths at the effective dosage amounts disclosed in the '212 Patent.

**(4)      Claim Element 1[d]**

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|-------------------------------|

Claim element 1[d] of the '793 Patent is disclosed in Voswinckel 2004, which discloses treating patients with a single event dose of "3 breaths."  Voswinckel 2004 at Methods.

**b.      Dependent Claims 4 and 6-8 Would Have Been Obvious**

**(1)      Claim 4**

| 4 | *The method of claim 1, wherein the inhalation device is a dry powder inhaler.* |
|---|--------------------------------------------------------------------------------|

Claim 4 of the '793 Patent would have been obvious over Voswinckel 2004 in combination with the '212 Patent, which discloses that an "inhaler" may be used to deliver the benzindene prostaglandin.  '212 Patent, 5:30-32.  The '212 Patent further states that "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention."  *Id.* at 5:37-39.  The '212 Patent specifically teaches the claimed dosages to be effective in treating inhaled treprostinil, and Voswinckel 2004 teaches that those dosages can be administered in 3 breaths.  Accordingly, a POSA would have readily understood that "inhaled treprostinil" dosage and breath disclosure of Voswinckel 2004 could be expanded to use in "dry powder inhaler" as disclosed by the '212 Patent.  A POSA would have been motivated to do so because dry powder inhalers were well-known to be very portable and quick to use, breath-actuated, could be designed as single-dose or multi-dose devices, provided the "lowest cost dose," and were easier for patients (especially children) to use than the pulsed ultrasonic nebulizer disclosed in Voswinckel 2006.

158

Newman at 58, 61-62, 63; Geller 2005 at 1316-17; *see also* Frijlink and De Boer, "Dry powder inhalers for pulmonary drug delivery," Expert Opinion on Drug Delivery, 1:1, pp. 67-86 (2004) at 81 ("Advantages such as the potential ability to generate high FPFs and a relatively high lung deposition, fast and easy administration, the ability to prepare stable formulations (compared with solutions), and the fact that DPIs are breath-actuated and easily portable, justify their existence.").

To the extent a POSA would not have a reasonable expectation of success in converting Voswinckel 2004's dosing regimen from a pulsed ultrasonic nebulizer to a dry powder inhaler, claim 4 of the '793 Patent is invalid for lack of enablement and written description, because, as discussed in Sections V.B.1.a and V.B.2.a below, the '793 Patent does not disclose or enable converting treprostinil delivery between the two inhalation devices.

### (2) Claim 6

| 6 | *The method of claim 1, wherein the formulation is a powder.* |
|---|---|

Claim 6 of the '793 Patent would have been obvious over Voswinckel 2004 in combination with the '212 Patent, which discloses that powder formulations may be used. '212 Patent, 5:37-39 ("Alternatively, solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention."). A POSA would have been motivated to convert Voswinckel 2004's treprostinil solution to a powder because powders were known to be more stable formulations than solutions by May 2006. *See* Frijlink and De Boer, "Dry powder inhalers for pulmonary drug delivery," Expert Opinion on Drug Delivery, 1:1, pp. 67-86 (2004) at 81. A POSA would have had a reasonable expectation of success in doing so converting a solution to dry powder was well known by 2006. *See, e.g.*, Chew and Chan, "Pharmaceutical Dry Powder Aerosol Delivery," KONA No. 19, pp. 46-56 (2001), available at

https://www.jstage.jst.go.jp/article/kona/19/0/19_2001010/_pdf, at 51-53 ("Preparation of Powders" section).

To the extent a POSA would not have a reasonable expectation of success in converting Voswinckel 2004's treprostinil formulation to a powder, claim 6 of the '793 Patent is invalid for lack of enablement and written description, because, as discussed in Sections V.B.1.b and V.B.2.b below, the '793 Patent does not disclose or enable making a treprostinil powder formulation.

### (3) Claim 7

| 7 | *The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter.* |
|---|---|

Claim 7 of the '793 Patent would have been obvious over Voswinckel 2004 in combination the '212 Patent, which expressly discloses that "the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter." '212 Patent, 5:39-41. Further, it was generally known in the art that "inhaler devices should deliver particles smaller than approximately 5 µm in diameter in order to enter the lungs." Newman at 58.

### (4) Claim 8

| 8 | *The method of claim 1, wherein the formulation contains no metacresol.* |
|---|---|

Claim 8 of the '793 Patent is disclosed in Voswinckel 2004 and in the '212 Patent as discussed above. Moreover, claim 8 would have been obvious over Voswinckel 2004 in combination with the '212 Patent, as Voswinckel 2004 does not disclose the presence of metacresol in the described formulation of "inhaled treprostinil," and the '212 Patent discloses that the active ingredients include "liquid formulations comprising a benzindene prostaglandin, such as UT-15, **alone** or in combination with other active ingredients." *See generally* Voswinckel 2004; '212 Patent; *see also, e.g.,* '212 Patent at 4:47-54 (emphasis added). Voswinckel 2004 in

combination with the '212 Patent therefore discloses a formulation of treprostinil that contains no metacresol.

### 9. No Evidence of Objective Indicia of Nonobviousness (Secondary Considerations)

To date, UT has put forth no secondary indicia of nonobviousness that would overcome the strong *prima facie* case of obviousness presented herein.  When, as here, the invention represents no more than the "predictable use of prior art elements according to their established functions," the secondary considerations are inadequate to establish nonobviousness as a matter of law.  *See, e.g., Wyers v. Master Lock Co.*, 616 F.3d 1231, 1245 (Fed. Cir. 2010).  In this case, Liquidia is not aware of any secondary considerations sufficient to overcome the strong showing of *prima facie* obviousness.  To the extent UTC identifies any evidence of secondary considerations of nonobviousness, Liquidia reserves the right to respond and present evidence to the contrary.

### B. To the Extent UTC Contends that the '793 Patent is Nonobvious, Claims 1, 4, and 6-8 Are Invalid Under 35 U.S.C. § 112

To the extent that UTC contends that the Asserted Claims of the '793 Patent are nonobvious, claims 1, 4, and 6-8 are invalid under 35 U.S.C. § 112 for lack of written description support and lack of enablement.  The legal standards for written description and enablement under § 112 are set forth above in Section II.C.

### 1. Claims 1, 4, and 6-8 Lack Written Description Support

#### a. The Limitation Reciting "15 micrograms to 90 micrograms . . . delivered in 1 to 3 breaths" Lacks Written Description Support as to Claims 1, 4, and 6-8

Independent claim 1 of the '793 Patent requires administering "from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths."  '793 Patent, claim 1.  Claims 4 and 6-7 depend from claim 1 and further recite,

respectively, "wherein the inhalation device is a dry powder inhaler," "wherein the formulation is a powder," and "wherein the powder comprises particles less than 5 micrometers in diameter." *Id.* at claims 4, 6-7.  As such, claim 1 and claim 8, which depends from claim 1, must be construed broadly enough to include the use of a dry powder formulation and DPI delivering 15 to 90 micrograms.  However, the specification of the '793 Patent contains only a single statement regarding dry powder formulations and dry powder inhalers.  *Id.* at 7:22-26 ("The inhalation device can also be a dry powder inhaler.  In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.").

During prosecution of a related patent, U.S. Patent No. 9,358,240 ("the '240 Patent"), UTC filed a declaration of Dr. Edmund J. Elder, Jr., to overcome the Examiner's prior art rejections. '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr.  In his declaration, Dr. Elder noted that delivery of the drug through a "single event," as claimed here by the '793 Patent, depends upon a number of factors associated with the nebulizer, including "fill volume" and "dead volume," which are in turn used to calculate the "delivered volume." *Id.* at ¶¶ 8, 11-12.  However, all of the doses and examples disclosed in the '793 Patent are directed to aerosolized solutions—not dry powder formulations.  *See* '793 Patent, 8:56-18:11.  Moreover, the discussion of the doses needed and concentrations of treprostinil are in the context of metered dose inhalers, which utilize solutions rather than dry powder formulations.  *See, e.g.,* '793 Patent, 7:45-53.  The '793 Patent does not disclose the dosage amount of powder formulation needed for administration via a dry powder inhaler—much less any experimental data to support the claim language reciting "dry powder inhaler" and "powder" formulations.  In fact, the specification is lacking any details or guidance as to the dosage amount or number of breaths required to treat

pulmonary hypertension using a powder formulation administered with a dry powder inhaler, as claimed.

Accordingly, a POSA reading the specification of the '793 Patent would conclude that the inventors were not in possession of a method of treatment using a dry powder inhaler to deliver a powder formulation at the claimed dosage amount of 15-90 micrograms delivered in 1 to 3 breaths. The specification's sole generic disclosure regarding dry powder formulations and dry powder inhalers is not sufficient to allow a POSA to recognize that the inventor actually invented what is claimed, particularly in light of Dr. Elder's testimony during prosecution of a related patent. The '793 Patent fails to describe what the dry powder formulation is, much less how to formulate treprostinil into a dry powder. The specification is completely lacking in working examples of delivering 15-90 micrograms of powder treprostinil in 1 to 3 breaths using a dry powder inhaler. In fact, to our knowledge, Liquidia's LIQ861 product "will be the first-to-market inhaled dry powder treprostinil that can be delivered using a convenient, palm-sized, disposable DPI." *See* D.I. 31-1 (Exhibits to UTC's Motion to Dismiss Counterclaims) at 32. Thus, claims 1, 4, and 6-8 are invalid for lack of written description.

### b.   The Limitations Reciting "Powder" in Claims 1, 4, and 6-8 Lack Written Description Support

As noted, claims 4 and 6-7 of the '793 Patent recite, respectively, "wherein the inhalation device is a dry powder inhaler," "wherein the formulation is a powder," and "wherein the powder comprises particles less than 5 micrometers in diameter." '793 Patent, claims 4, 6-7. Claims 4 and 6-8 ultimately depend from claim 1. Accordingly, claims 1 and 8 must be construed to include the use of a powder formulation and DPI. However, the specification of the '793 Patent contains only a single statement regarding dry powder formulations and dry powder inhalers. *Id.* at 7:22-26 ("The inhalation device can also be a dry powder inhaler. In such case, the respiratory drug is

inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter."). This bare disclosure is not sufficient to convey to a POSA that the inventors were in possession of a method of treatment using a dry powder inhaler to deliver a powder formulation, particularly in light of Dr. Elder's testimony described above. Indeed, the '793 Patent fails to describe what the dry powder formulation is, much less how to formulate treprostinil into a dry powder. The specification is completely lacking in working examples of delivering powder treprostinil using a dry powder inhaler. In fact, to our knowledge, Liquidia's LIQ861 product "will be the first-to-market inhaled dry powder treprostinil that can be delivered using a convenient, palm-sized, disposable DPI." *See* D.I. 31-1 (Exhibits to UTC's Motion to Dismiss Counterclaims) at 32. Thus, claims 1, 4, and 6-8 are invalid for lack of written description.

### 2.  Claims 1, 4, and 6-8 Are Not Enabled

#### a.  The Limitation Reciting "15 micrograms to 90 micrograms . . . delivered in 1 to 3 breaths" Is Not Enabled as to Claims 1, 4, and 6-8

Independent claim 1 of the '793 Patent requires administering "from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths." '793 Patent, claim 1. Claims 4 and 6-8 depend from claim 1 and further recite, respectively, "wherein the inhalation device is a dry powder inhaler," "wherein the formulation is a powder," "wherein the powder comprises particles less than 5 micrometers in diameter," and "wherein the formulation contains metacresol." *Id.* at claims 4, 6-8. As such, claim 1 must be construed broadly enough to include the use of a dry powder formulation and DPI delivering 15 to 90 micrograms. However, as noted above, the specification of the '793 Patent contains only a single statement regarding dry powder formulations and dry powder inhalers. *Id.* at 7:22-26 ("The inhalation device can also be a dry powder inhaler. In such case, the respiratory drug is inhaled in

solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.").  Further, the '793 Patent fails to describe what the dry powder formulation is, much less how to formulate treprostinil into a dry powder.  The specification is completely lacking in working examples of delivering 15-90 micrograms of powder treprostinil in 1 to 3 breaths using a dry powder inhaler.  In fact, to our knowledge, Liquidia's LIQ861 product "will be the first-to-market inhaled dry powder treprostinil that can be delivered using a convenient, palm-sized, disposable DPI."  *See* D.I. 31-1 (Exhibits to UTC's Motion to Dismiss Counterclaims) at 32.

During prosecution of a related patent, U.S. Patent No. 9,358,240 ("the '240 Patent"), UTC filed a declaration of Dr. Edmund J. Elder, Jr., to overcome the Examiner's prior art rejections. '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr.  In his declaration, Dr. Elder noted that delivery of the drug through a "single event," as claimed here by the '793 Patent, depends upon a number of factors associated with the nebulizer, including "fill volume" and "dead volume," which are in turn used to calculate the "delivered volume."  *Id.* at ¶¶ 8, 11-12.  However, all of the doses and examples disclosed in the '793 Patent are directed to aerosolized solutions—not dry powder formulations.  *See* '793 Patent, 8:56-18:11.  Moreover, the discussion of the doses needed and concentrations of treprostinil are in the context of metered dose inhalers, which utilize solutions rather than dry powder formulations.  *See, e.g.,* '793 Patent, 7:45-53.  The '793 Patent does not disclose the dosage amount of powder formulation needed for administration via a dry powder inhaler.  The '793 Patent does not disclose the dosage amount of powder formulation needed for administration via a dry powder inhaler—much less any experimental data to support the claim language reciting "dry powder inhaler" and "powder" formulations.  In fact, the specification is lacking any details or guidance as to the dosage amount

or number of breaths required to treat pulmonary hypertension using a powder formulation administered with a dry powder inhaler, as claimed.

Accordingly, claims 1, 4, and 6-8 of the '793 Patent are not enabled because the specification does not provide sufficient guidance as to the concentration and amount of treprostinil powder formulation that would be needed to obtain a dose of 15-90 micrograms in 1-3 breaths, as claimed. Instead, a POSA would be required to undergo undue experimentation to practice the invention recited in claims 1, 4, and 6-8 of the '793 Patent.

Applying the eight *Wands* factors in sequential order, and taking into account UTC's prior representations to the Patent Office through the testimony of Dr. Elder, the specification of the '793 Patent would not enable a POSA to treat patients with pulmonary hypertension by administering 15-90 micrograms of powder formulation of treprostinil in 1 to 3 breaths using a dry powder inhaler.

| *Wands* Factor | Application to Claims 1, 4, and 6-8 of the '793 Patent |
|---|---|
| Quantity of Experimentation Necessary | Guided by just one generic disclosure relating to dry powder inhalers and powder formulations (and no disclosure regarding the corresponding dosage amount and number of breaths), a POSA would have to engage in significant amounts of experimentation to discern the dosage amount and number of breaths required to administer a powder formulation of treprostinil with a dry powder inhaler for the treatment of pulmonary hypertension. For example, a POSA would have to conduct extensive experimentation to determine the "fill volume," "dead volume," and "delivered volume" required to deliver an effective amount of powder treprostinil by inhalation. *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶¶ 8, 11-12. |
| Amount of Guidance or Direction Presented | As discussed above, the specification provides only one vague disclosure relating to dry powder inhalers and powder formulations. The specification is completely silent as to the dosage amount or number of breaths required to treat pulmonary hypertension using these claimed powder formulations administered by dry powder inhalers. The amount of guidance is therefore non-existent. |

| | |
|---|---|
| Presence or Absence of Working Examples | Besides the brief disclosure that "[t]he inhalation device can also be a dry powder inhaler" where treprostinil is "usually in the form of a powder" ('793 Patent, 7:22-26), the specification is completely lacking in working examples of delivering 15-90 micrograms of powder treprostinil in 1 to 3 breaths using a dry powder inhaler. |
| Nature of the Invention | During prosecution of a related patent, UTC noted that drug delivery through a "single event," as claimed here by the '793 Patent, depends upon a number of factors associated with the nebulizer, including "fill volume" and "dead volume," which are in turn used to calculate the "delivered volume."  *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶¶ 8, 11-12.  Accordingly, to the extent UTC argues that claims 4 and 6-8 would have been nonobvious, the nature of the invention was one of great uncertainty. |
| State of the Prior Art | According to UTC, the prior art reference Chaudry 2004 "does little to provide guidance to one of skill in the art if attempting to determine a 'single event dose' for the treprostinil formulation," as claimed by the '793 Patent.  *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶ 10.  "Instead, Chaudry provides a variety of possible permutations and combinations of variables, leaving one of ordinary skill in the art with no starting point from which to determine who to achieve a specific outcome."  *Id.* at ¶ 26.  To the extent UTC argues that claims 1, 4, and 6-8 would have been nonobvious, without guidance as to the multiple "[i]mportant factors influencing the total dose delivered to a patient's airways" (in UTC's own words), the state of the prior art was very limited.  *See id.* at ¶ 11. |
| Relative Skill of Those in the Art | Given the medical subject matter of the Asserted Claims, the level of skill of those in the art would be relatively high. |
| Predictability or Unpredictability of the Art | During prosecution of a related patent, UTC highlighted the unpredictable nature of determining dosage amounts for drugs delivered by inhalation.  *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶¶ 8, 11-12 (identifying multiple factors affecting drug delivery via nebulizer, including "fill volume" and "dead volume," which are in turn used to calculate "delivered volume").  Accordingly, to the extent UTC argues that claims 1, 4, and 6- would have been nonobvious, the art was highly unpredictable. |
| Breadth of the Claims | Claims 1, 4, and 6-8 are extremely broad, as the claimed dosage range of 15 to 90 micrograms is very wide, and the claims provide |

| | no details regarding how much treprostinil in the form of a powder is required to treat pulmonary hypertension. |
|---|---|

Applying all eight *Wands* factors, the '793 Patent fails to enable a person of ordinary skill in the art to practice claims 1, 4, and 6-8.  Thus, claims 1, 4, and 6-8 are invalid for lack of enablement.

### b.    The Limitations Reciting "Powder" in Claims 1, 4, and 6-8 Are Not Enabled

As noted, claims 4 and 6-8 of the '793 Patent recite, respectively, "wherein the inhalation device is a dry powder inhaler," "wherein the formulation is a powder," and "wherein the powder comprises particles less than 5 micrometers in diameter."  '793 Patent, claims 4, 6-8.  Claims 4 and 6-8 ultimately depend from claim 1.  Accordingly, claims 1 and 8 must be construed to include the use of a powder formulation and DPI.  However, the specification of the '793 Patent contains only a single statement regarding dry powder formulations and dry powder inhalers.  *Id.* at 7:22-26 ("The inhalation device can also be a dry powder inhaler.  In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.").  This bare disclosure is not sufficient to enable a POSA to practice claims 1, 4, and 6-8, which require a "powder" formulation of treprostinil, particularly in light of Dr. Elder's testimony described above.  Further, the '793 Patent fails to describe what the dry powder formulation is, much less how to formulate treprostinil into a dry powder.  The specification is completely lacking in working examples of delivering powder treprostinil using a dry powder inhaler.  In fact, to our knowledge, Liquidia's LIQ861 product "will be the first-to-market inhaled dry powder treprostinil that can be delivered using a convenient, palm-sized, disposable DPI."  *See* D.I. 31-1 (Exhibits to UTC's Motion to Dismiss Counterclaims) at 32.

Accordingly, claims 1, 4, and 6-8 of the '793 Patent are not enabled because the specification does not provide sufficient guidance regarding how to treat pulmonary hypertension with the claimed powder formulation and/or using a dry powder inhaler. Instead, a POSA would be required to undergo undue experimentation to practice the invention recited in claims 1, 4, and 6-8 of the '793 Patent.

Applying the eight *Wands* factors in sequential order, and taking into account UTC's prior representations to the Patent Office through the testimony of Dr. Elder, the specification of the '793 Patent would not enable a POSA to treat patients with pulmonary hypertension by administering a powder formulation of treprostinil using a dry powder inhaler.

| *Wands* Factor | Application to Claims 1, 4, and 6-8 of the '793 Patent |
|---|---|
| Quantity of Experimentation Necessary | Guided by just one generic disclosure, a POSA would have to engage in significant amounts of experimentation to formulate the claimed powder formulation for the treatment of pulmonary hypertension using a dry powder inhaler. For example, a POSA would have to conduct extensive experimentation to determine the "fill volume," "dead volume," and "delivered volume" required to deliver an effective amount of powder treprostinil by inhalation. *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶¶ 8, 11-12. |
| Amount of Guidance or Direction Presented | As discussed above, the specification provides only one vague disclosure relating to dry powder inhalers and powder formulations. The amount of guidance is therefore minimal at best. |
| Presence or Absence of Working Examples | Besides the brief disclosure that "[t]he inhalation device can also be a dry powder inhaler" where treprostinil is "usually in the form of a powder" ('793 Patent, 7:22-26), the specification is completely lacking in working examples of delivering powder treprostinil using a dry powder inhaler. |
| Nature of the Invention | During prosecution of a related patent, UTC noted that drug delivery through a "single event," as claimed here by the '793 Patent, depends upon a number of factors associated with the nebulizer, including "fill volume" and "dead volume," which are in turn used to calculate the "delivered volume." *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. |

| | Edmund J. Elder, Jr., at ¶¶ 8, 11-12.  Accordingly, to the extent UTC argues that claims 4 and 6-8 would have been nonobvious, the nature of the invention was one of great uncertainty. |
|---|---|
| State of the Prior Art | According to UTC, the prior art reference Chaudry 2004 "does little to provide guidance to one of skill in the art if attempting to determine a 'single event dose' for the treprostinil formulation," as claimed by the '793 Patent.  *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶ 10.  "Instead, Chaudry provides a variety of possible permutations and combinations of variables, leaving one of ordinary skill in the art with no starting point from which to determine who to achieve a specific outcome."  *Id.* at ¶ 26.  To the extent UTC argues that claims 1, 4, and 6-8 would have been nonobvious, without guidance as to the multiple "[i]mportant factors influencing the total dose delivered to a patient's airways" (in UTC's own words), the state of the prior art was very limited.  *See id.* at ¶ 11. |
| Relative Skill of Those in the Art | Given the medical subject matter of the Asserted Claims, the level of skill of those in the art would be relatively high. |
| Predictability or Unpredictability of the Art | During prosecution of a related patent, UTC highlighted the unpredictable nature of determining dosage amounts for drugs delivered by inhalation.  *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶¶ 8, 11-12 (identifying multiple factors affecting drug delivery via nebulizer, including "fill volume" and "dead volume," which are in turn used to calculate "delivered volume").  Accordingly, to the extent UTC argues that claims 1, 4, and 6-8 would have been nonobvious, the art was highly unpredictable. |
| Breadth of the Claims | Claims 1, 4, and 6-8 are extremely broad, as they provide no details regarding how much treprostinil in the form of a powder is required to treat pulmonary hypertension. |

Applying all eight *Wands* factors, the '793 Patent fails to enable a person of ordinary skill in the art to practice claims 1, 4, and 6-8.  Thus, claims 4 and 6-8 are invalid for lack of enablement.

## VI.   CONCLUSION

Based upon the information presently available to Liquidia, and based upon Liquidia's initial understanding of the scope and construction of the Asserted Claims of the Asserted Patents,

and of UTC's apparent positions concerning the scope and construction of the Asserted Claims of the Asserted Patents, the Asserted Claims of the Asserted Patents are invalid at least for the reasons set forth above and based on the production that will accompany these Preliminary Invalidity Contentions.  Discovery and Liquidia's investigation are ongoing, and Liquidia reserves the right to modify and/or supplement its Preliminary Invalidity Contentions.

OF COUNSEL:

Sanya Sukduang
Jonathan R. Davies
COOLEY LLP
1299 Pennsylvania Avenue, NW Suite 700
Washington, DC 20004-2400
(202) 776-2982
(202) 776-2049

Erik Milch
COOLEY LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190-5656
(703) 456-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6840

Lauren Krickl
Deepa Kannappan
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5065
(650) 843-5673

Dated: November 13, 2020

*/s/ Nathan R. Hoeschen*
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia Technologies, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Nathan R. Hoeschen, hereby certify that on November 13, 2020, this document was

served on the persons listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Michael J. Flynn
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

William C. Jackson
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
(202) 237-2727
wjackson@bsfllp.com

Douglas H. Carsten
Joshua Mack
WILSON SONSINI GOODRICH &ROSATI
12235 EL Camino Real
San Diego, CA 92130
(858) 350-2300
dcarsten@wsgr.com
jmack@wsgr.com

Adam W. Burrowbridge
WILSON SONSINI GOODRICH &ROSATI
1700 K Street NW, 5th Floor
Washington, DC 20006-3814
(202) 973-8800
aburrowbridge@wsgr.com

*/s/ Nathan R. Hoeschen*
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia
Technologies, Inc.*

# EXHIBIT 43



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION, | |
| Plaintiff, | C.A. No. 20-755-RGA-JLH |
| v. | |
| LIQUIDIA TECHNOLOGIES, INC., | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| Defendant. | |

**DEFENDANT LIQUIDIA TECHNOLOGIES, INC.'S**
**FIRST SUPPLEMENTAL INVALIDITY CONTENTIONS**

# TABLE OF CONTENTS

**Page**

I.    GENERAL INFORMATION ................................................................................ 1

      A.    Identification of Asserted Claims ...................................................... 3

II.   U.S. PATENT NO. 9,593,066 ................................................................... 3

      A.    Scope and Content of the Prior Art for the '066 and '901 Patents ...................... 6

            1.    Phares 2005 .......................................................................... 6

                  a.    Disclosures ................................................................ 6

                  b.    Phares 2005 Teaches (+)-Treprostinil Synthesis ......................... 8

            2.    Moriarty 2004 ....................................................................... 15

            3.    U.S. Patent No. 6,765,117 ("the '117 Patent") ...................................... 17

            4.    U.S. Patent No. 4,306,075 ("the '075 Patent") ...................................... 19

            5.    Wiberg 1960 ......................................................................... 21

            6.    Schoffstall 2004 .................................................................... 21

            7.    Kawakami 1981 ....................................................................... 22

            8.    Ege 1989 ............................................................................ 23

      B.    Claims 1, 2, 3, 6, and 9 Are Invalid Under 35 U.S.C. § 102(b) ........................ 24

            1.    The Board and Federal Circuit Confirmed that Prior Art Moriarty
                  Batches Are Structurally and Functionally Identical ............................... 24

            2.    Internal UTC Documents Confirm That Prior Art Remodulin®
                  Batches Are Structurally and Functionally the Same as the Product
                  Claimed in the '066 Patent ....................................................... 28

      C.    Claims 1-3, 6, and 8-9 Are Invalid Under 35 U.S.C. § 103 ............................. 31

            1.    Claims 1-3, 6, and 8-9 Would Have Been Obvious Over Phares
                  2005 .............................................................................. 31

                  a.    Independent Claim 1 Would Have Been Obvious ......................... 31

                        (1)    Claim Element 1[a] ........................................... 31

                        (2)    Claim Element 1[b] ........................................... 34

                        (3)    Claim Element 1[c] ........................................... 35

                        (4)    Claim Element 1[d] ........................................... 36

                        (5)    Claim Element 1[e] ........................................... 36

                        (6)    Claim Element 1[f] ........................................... 37

                        (7)    Claim Element 1[g] ........................................... 39

**TABLE OF CONTENTS**
(continued)

Page

b.      Dependent Claims 2-3 and 6 Would Have Been Obvious........... 41

    (1)      Claim 2...................................................... 41

    (2)      Claims 3 ................................................... 41

    (3)      Claim 6 .................................................... 42

c.      Independent Claim 8 Would Have Been Obvious...................... 46

    (1)      Claim Elements 8[a] and 8[b] ......................... 46

    (2)      Claim Element 8[c] ...................................... 47

    (3)      Claim Elements 8[d] and 8[e] ......................... 48

    (4)      Claim Element 8[f] ...................................... 48

    (5)      Claim Element 8[g]....................................... 49

d.      Dependent Claim 9 Would Have Been Obvious ........................ 49

2.      Claims 1-3, 6, and 8-9 Would Have Been Obvious Over Moriarty 2004 in Combination with Phares 2005................................... 49

a.      Motivation to Combine Moriarty 2004 with Phares 2005 ........... 49

    (1)      UTC is Precluded from Disputing the Motivation to Combine Moriarty and Phares 2005 ................................ 49

    (2)      A POSA Would Nonetheless Be Motivated to Combine Moriarty and Phares 2005 ................................ 51

b.      Reasonable Expectation of Success ............................. 54

c.      Independent Claim 1 Would Have Been Obvious...................... 55

    (1)      Claim Element 1[a] ...................................... 55

    (2)      Claim Element 1[b]....................................... 58

    (3)      Claim Element 1[c] ...................................... 59

    (4)      Claim Element 1[d]....................................... 60

    (5)      Claim Element 1[e] ...................................... 60

    (6)      Claim Element 1[f] ...................................... 60

    (7)      Claim Element 1[g]....................................... 62

d.      Dependent Claims 2-3 and 6 Would Have Been Obvious........... 63

    (1)      Claim 2...................................................... 63

    (2)      Claim 3...................................................... 64

    (3)      Claim 6...................................................... 64

**TABLE OF CONTENTS**
(continued)

| | | | | |
|---|---|---|---|---|
| | e. | | Independent Claim 8 Would Have Been Obvious | 65 |
| | | (1) | Claim Elements 8[a]-8[c] | 65 |
| | | (2) | Claim Elements 8[d]-[e] | 67 |
| | | (3) | Claim Element 8[f] | 68 |
| | | (4) | Claim Element 8[g] | 68 |
| | f. | | Dependent Claim 9 Would Have Been Obvious | 68 |
| D. | | | Claims 1-3, 6, and 8-9 Are Invalid Under 35 U.S.C. § 112 | 68 |
| | 1. | | Claim 1 Lacks Written Description Support and is Not Enabled | 70 |
| | | a. | "Impurities" Limitation Lacks Written Description Support | 70 |
| | | b. | "Salt" Limitation Lacks Written Description Support and Is Not Enabled | 71 |
| | 2. | | Claims 6, 8, and 9 Lack Written Description Support | 72 |
| | | a. | "Stored"/"Storing"/"Storage" at "Ambient Temperature" Lack Written Description Support | 72 |
| | | b. | To the Extent UTC Contends that Claims 1 and 8 Permit "Isolation" of Treprostinil Before Combining with a Base to Form a Salt, the Asserted Claims Lack Adequate Written Description Support | 77 |
| | | a. | To the Extent UTC Contends that Claims 1 and 8 Permit Column Chromatography Between Alkylation and Salt Formation, the Asserted Claims Lack Written Description Support | 79 |
| | 3. | | Claims 6, 8, and 9 Are Not Enabled | 83 |
| | | a. | "Stored"/"Storage"/"Storing" at "Ambient Temperature" Are Not Enabled | 83 |
| | | b. | To the Extent UTC Contends that Claims 1 and 8 Permit "Isolation" of Treprostinil Before Combining with a Base to Form a Salt, the Asserted Claims Are Not Enabled | 87 |
| | | c. | To the Extent UTC Contends the Claims Permit Column Chromatography Between Alkylation and Salt Formation, the Claims Are Not Enabled | 89 |
| | 4. | | Claims 1-3, 6, and 8-9 Are Indefinite | 91 |
| | | a. | Claim Reciting "Impurities" Is Indefinite | 91 |

## TABLE OF CONTENTS
(continued)

Page

        b.    Claims Reciting "Stored," "Storage," and "Storing" Are Indefinite ........................................................................................ 93

III.    U.S. PATENT NO. 9,604,901 ..................................................................... 95

    A.    Scope and Content of the Prior Art ................................................... 97

    B.    Claims 1-4 and 6 Are Invalid Under 35 U.S.C. § 102(b) .................. 97

    C.    Claims 1-4, 6, and 8 Are Invalid Under 35 U.S.C. § 103 .................. 98

        1.    Claims, 1-4, 6, and 8 Would Have Been Obvious Over Phares 2005 ......................................................................................... 98

            a.    Independent Claim 1 Would Have Been Obvious ...................... 98

                (1)    Claim Element 1[a] ........................................................ 98

                (2)    Claim Elements 1[b] and 1[c] ...................................... 100

                (3)    Claim Element 1[d] ...................................................... 103

                (4)    Claim Element 1[e] ...................................................... 106

                (5)    Claim Element 1[f] ....................................................... 106

                (6)    Claim Element 1[g] ...................................................... 106

            b.    Dependent Claims 2-4, 6 and Would Have Been Obvious ........ 109

                (1)    Claim 2 ......................................................................... 109

                (2)    Claims 3 and 4 ............................................................. 110

                (3)    Claim 6 ......................................................................... 111

            c.    Dependent Claim 8 Would Have Been Obvious ...................... 111

                (1)    Claim Element 8[a] ...................................................... 111

                (2)    Claim Elements 8[b] and 8[c] ...................................... 112

                (3)    Claim Element 8[d] ...................................................... 113

                (4)    Claim Element 8[e] ...................................................... 113

                (5)    Claim Element 8[f] ....................................................... 114

        2.    Claims 1-4, 6, and 8 Would Have Been Obvious Over Moriarty 2004 in Combination with Phares 2005 ................................. 114

            a.    Motivation to Combine Moriarty 2004 with Phares 2005 ........ 114

                (1)    UTC is Precluded From Disputing the Motivation to Combine Moriarty and Phares 2005 ............................ 114

                (2)    A POSA Nonetheless Would Have Been Motivated to Combine Moriarty and Phares 2005 ......................... 115

# TABLE OF CONTENTS

(continued)

|   |   |   |   | Page |
|---|---|---|---|---|

|   |   |   |   |
|---|---|---|---|
| | b. | Reasonable Expectation of Success | 116 |
| | c. | Elimination of the Crude Treprostinil Isolation Step of Moriarty Would Have Been Obvious | 117 |
| | d. | Independent Claim 1 Would Have Been Obvious | 118 |
| | | (1) Claim Element 1[a] | 118 |
| | | (2) Claim Element 1[b] | 121 |
| | | (3) Claim Element 1[c] | 122 |
| | | (4) Claim Element 1[d] | 124 |
| | | (5) Claim Element 1[e] | 125 |
| | | (6) Claim Element 1[f] | 125 |
| | | (7) Claim Element 1[g] | 125 |
| | e. | Dependent Claims 2-4 and 6 Would Have Been Obvious | 126 |
| | | (1) Claim 2 | 126 |
| | | (2) Claims 3 and 4 | 127 |
| | | (3) Claim 6 | 128 |
| | f. | Dependent Claim 8 Would Have Been Obvious | 129 |
| | | (1) Claim Element 8[a] | 129 |
| | | (2) Claim Elements 8[b] and [c] | 129 |
| | | (3) Claim Elements 8[d] | 131 |
| | | (4) Claim Element 8[e] | 131 |
| | | (5) Claim Element 8[f] | 132 |
| D. | Claims 1-4, 6, and 8 Are Invalid Under 35 U.S.C. § 112 | | 132 |
| | 1. | Claim 1 Lacks Written Description Support and is Not Enabled | 133 |
| | | a. "Impurities" Limitation Lacks Written Description Support | 133 |
| | | b. "Salt" Limitation Lacks Written Description Support and Is Not Enabled | 134 |
| | 2. | Claims 1, 3, 4, and 6 Lack Written Description Support | 135 |
| | | a. "Therapeutically Effective Amount" Lacks Written Description Support | 135 |
| | | b. "Storing"/"Storage" at "Ambient Temperature" Lack Written Description Support | 137 |

**TABLE OF CONTENTS**
(continued)

c.    To the Extent UTC Contends that Claim 1 Permits "Isolation" of Treprostinil Before Combining with a Base to Form a Salt, the Asserted Claims Lack Adequate Written Description ............................................................. 141

d.    To the Extent UTC Contends that Claim 1 Permits Column Chromatography Between Alkylation and Salt Formation, the Asserted Claims Lack Adequate Written Description ........ 144

3.    Claims 1, 3, 4, and 6 Are Not Enabled ................................. 146

    a.    "Therapeutically Effective Amount" Is Not Enabled ............... 146

    b.    "Storage"/"Storing" at "Ambient Temperature" Are Not Enabled ......................................................................... 149

    c.    To the Extent UTC Contends that Claim 1 Permits Column Chromatography Between Alkylation and Salt Formation, the Asserted Claims Are Not Enabled ....................................... 153

    d.    To the Extent UTC Contends that Claim 1 Permits "Isolation" of Treprostinil Before Combining with a Base to Form a Salt, the Asserted Claims Are Not Enabled ............. 155

4.    Claims 1-4, 6, and 8 Are Indefinite ........................................ 157

    a.    Claim Reciting "Impurities" Is Indefinite ................................. 157

    b.    Claim Reciting "Storage" and "Storing" Is Indefinite .............. 160

    c.    Claims Reciting "Therapeutically Effective Amount" Are Indefinite ........................................................................... 161

IV.    THE '066 AND '901 PATENTS ARE INVALID FOR CLAIMING AN OLD PRODUCT .............................................................................. 161

V.    U.S. PATENT NO. 10,716,793 .............................................. 168

A.    Claims 1, 4, and 6-8 Are Invalid Under 35 U.S.C. §§ 102 and 103 ................. 170

1.    Scope and Content of the Prior Art ........................................ 170

    a.    '212 Patent ........................................................................ 170

    b.    '033 Patent ........................................................................ 172

    c.    Voswinckel JAHA .............................................................. 172

    d.    Voswinckel JESC ............................................................... 173

    e.    Voswinckel 2006 ............................................................... 173

    f.    Chaudry 2004 .................................................................... 174

    g.    Ghofrani 2005 ................................................................... 175

## TABLE OF CONTENTS
(continued)

h.   Bender 1997 ....................................................................... 176

i.   Clark 1995 ......................................................................... 176

j.   Olschewski 2002 ............................................................... 176

k.   Ventavis® Label 2004 ...................................................... 177

l.   OptiNeb® User Manual 2005 ........................................... 177

m.   Additional Background Prior Art .................................... 177

2.   Technical Background .................................................................. 179

a.   History of Inhalation Therapy ......................................... 179

b.   Inhaled Treprostinil and Its Analogues .......................... 181

c.   Well Known Considerations for Inhalation Therapies ............. 184

3.   Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious over the '212 Patent Alone ........................................................ 188

a.   Claims 1 Would Have Been Would Have Been Obvious ........... 188

(1)   Claim Element 1[a] ................................................ 188

(2)   Claim Element 1[b] ............................................... 189

(3)   Claim Element 1[c] ................................................ 190

(4)   Claim Element 1[d] ............................................... 191

b.   Dependent Claims 4 and 6-8 Would Have Been Obvious ......... 193

(1)   Claim 4 ................................................................... 193

(2)   Claim 6 ................................................................... 193

(3)   Claim 7 ................................................................... 194

(4)   Claim 8 ................................................................... 194

c.   Motivation to Modify the '212 Patent to Arrive at "Delivered in 1 to 3 Breaths" ......................................... 195

d.   Reasonable Expectation of Success in Modifying the '212 Patent to Arrive at "Delivered in 1 to 3 Breaths" ..................... 196

4.   Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious over the '212 Patent in Combination with Voswinckel JAHA ............. 197

a.   Claims 1 Would Have Been Would Have Been Obvious ........... 197

(1)   Claim Element 1[a] ................................................ 197

(2)   Claim Element 1[b] ................................................ 197

## TABLE OF CONTENTS
(continued)

Page

(3) Claim Element 1[c] ...................................................... 198

(4) Claim Element 1[d] ...................................................... 199

b. Dependent Claims 4 and 6-8 Would Have Been Obvious ......... 200

(1) Claim 4 ...................................................... 200

(2) Claim 6 ...................................................... 200

(3) Claim 7 ...................................................... 200

(4) Claim 8 ...................................................... 200

c. Motivation to Combine the '212 Patent with Voswinckel JAHA ...................................................... 201

d. Reasonable Expectation of Success in Combining the '212 Patent with Voswinckel JAHA ...................................................... 202

5. Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious over the '212 Patent in Combination with Voswinckel 2006 ............... 203

a. Claims 1 Would Have Been Would Have Been Obvious ......... 203

(1) Claim Element 1[a] ...................................................... 203

(2) Claim Element 1[b] ...................................................... 203

(3) Claim Element 1[c] ...................................................... 204

(4) Claim Element 1[d] ...................................................... 204

b. Dependent Claims 4 and 6-8 Would Have Been Obvious ......... 205

(1) Claim 4 ...................................................... 205

(2) Claim 6 ...................................................... 206

(3) Claim 7 ...................................................... 207

(4) Claim 8 ...................................................... 207

c. Motivation to Combine the '212 Patent with Voswinckel 2006 ...................................................... 207

d. Reasonable Expectation of Success in Combining the '212 Patent with Voswinckel 2006 ...................................................... 209

6. Claim 1 of the '793 Patent is Anticipated by Voswinckel 2006 ........... 209

a. Claim 1 is Anticipated ...................................................... 209

(1) Claim Element 1[a] ...................................................... 209

(2) Claim Element 1[b] ...................................................... 210

(3) Claim Element 1[c] ...................................................... 210

## TABLE OF CONTENTS
(continued)

  (4) Claim Element 1[d] ........................................................ 210

7. Claims 4 and 6-8 of the '793 Patent Would Have Been Obvious over Voswinckel 2006 in Combination with the '212 Patent ............... 211

 a. Dependent Claims 4 and 6-8 Would Have Been Obvious ......... 211

  (1) Claim 4 ........................................................................ 211

  (2) Claim 6 ........................................................................ 212

  (3) Claim 7 ........................................................................ 213

  (4) Claim 8 ........................................................................ 214

8. Claim 1 of the '793 Patent Would Have Been Obvious over Voswinckel JAHA Alone ..................................................................... 214

 a. Claims 1 Would Have Been Would Have Been Obvious .......... 214

  (1) Claim Element 1[a] ..................................................... 214

  (2) Claim Element 1[b] ..................................................... 215

  (3) Claim Element 1[c] ..................................................... 215

  (4) Claim Element 1[d] ..................................................... 216

9. Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious Over Voswinckel JAHA in Combination with the '212 Patent ............. 216

 a. Claims 1 Would Have Been Would Have Been Obvious .......... 216

  (1) Claim Element 1[a] ..................................................... 216

  (2) Claim Element 1[b] ..................................................... 216

  (3) Claim Element 1[c] ..................................................... 217

  (4) Claim Element 1[d] ..................................................... 219

 b. Dependent Claims 4 and 6-8 Would Have Been Obvious ......... 219

  (1) Claim 4 ........................................................................ 219

  (2) Claim 6 ........................................................................ 220

  (3) Claim 7 ........................................................................ 221

  (4) Claim 8 ........................................................................ 222

10. Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious Over the '212 Patent in Combination with Voswinckel JESC and Voswinckel JAHA .................................................................................. 222

 a. Claim 1 Would Have Been Obvious ......................................... 222

  (1) Claim Element 1[a] ..................................................... 222

# TABLE OF CONTENTS
### (continued)

**Page**

(2)     Claim Element 1[b]....................................................... 223

(3)     Claim Element 1[c]....................................................... 223

(4)     Claim Element 1[d]....................................................... 225

b.     Dependent Claims 4 and 6-8 Would Have Been Obvious......... 226

(1)     Claim 4.......................................................................... 226

(2)     Claim 6.......................................................................... 226

(3)     Claim 7.......................................................................... 226

(4)     Claim 8.......................................................................... 226

c.     Motivation to Combine '212 Patent with Voswinckel JESC and Voswinckel JAHA With a Reasonable Expectation of Success ......................................................................................... 227

11.     Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious Over the '212 Patent and Voswinckel JESC........................................... 230

a.     Claim 1 Would Have Been Obvious......................................... 230

(1)     Claim Element 1[a]-[c] ............................................... 230

(2)     Claim Element 1[d] is obvious via routine optimization ................................................................ 231

b.     Dependent Claims 4 and 6-8 Would Have Been Obvious......... 232

c.     Motivation to Combine the '212 Patent with Voswinckel JESC............................................................................................ 233

12.     Claim 1 of the '793 Patent is Anticipated by Ghofrani ........................ 233

a.     Claim 1 is Anticipated by Ghofrani ......................................... 233

(1)     Claim Element 1[a] ...................................................... 233

(2)     Claim Element 1[b] ...................................................... 233

(3)     Claim Element 1[c] ...................................................... 234

(4)     Claim Element 1[d] ...................................................... 234

13.     Claims 1 and 8 of the '793 Patent Would Have Been Obvious Over Voswinckel JAHA and Ghofrani ............................................................ 234

a.     Claim 1 Would Have Been Obvious......................................... 235

(1)     Claim Element 1[a] ...................................................... 235

(2)     Claim Element 1[b] ...................................................... 235

(3)     Claim Element 1[c] ...................................................... 235

## TABLE OF CONTENTS
(continued)

Page

(4)    Claim Element 1[d] ............................................... 236

b.    Dependent Claim 8 Would Have Been Obvious ...................... 236

(1)    Claim 8 ............................................................. 236

c.    Motivation to Combine Voswinckel JAHA and Ghofrani with a Reasonable Expectation of Success ................................ 237

B.    Claims 1, 4, and 6-8 Are Invalid Under 35 U.S.C. § 112 ................................. 238

1.    Claims 1, 4, and 6-8 Lack Written Description Support ...................... 238

a.    The Limitation Reciting "15 micrograms to 90 micrograms . . . delivered in 1 to 3 breaths" in Claims 1, 4, and 6-8 Lacks Written Description Support .......................................... 238

b.    The Limitations Reciting "Powder" in Claims 1, 4, and 6-8 Lack Written Description Support ............................................. 240

c.    The Limitation Reciting "Method of Treating Pulmonary Hypertension" Lacks Written Description Support .................. 241

2.    Claims 1, 4, and 6-8 Are Not Enabled .................................................... 242

a.    The Limitation Reciting "15 micrograms to 90 micrograms . . . delivered in 1 to 3 breaths" Is Not Enabled as to Claims 1, 4, and 6-8 ........................................................................ 242

b.    Claims 1, 4, and 6-8 Are Not Enabled With Respect to Powder Formulations of Treprostinil for Use In Treating Pulmonary Hypertension .......................................................... 245

c.    The Limitation Reciting "Method of Treating Pulmonary Hypertension" in Claims 1, 4, and 6-8 Is Not Enabled ............. 248

VI.    UTC'S ALLEGED EVIDENCE OF SECONDARY CONSIDERATIONS IS UNAVAILING ............................................................................................. 251

A.    The '066 and '901 Patents Do Not Claim Unexpected Results ...................... 251

B.    The '066 and '901 Patents Do Not Satisfy a Long-Felt but Unmet Need ......... 255

C.    Yonsung Does Not Perform and Therefore Has Not "Copied" the Claimed Processes of the '066 and '901 Patents .............................................. 257

D.    Yonsung's Implementation of a Salt Formation Step Does Not Evidence Failure of Others as to the '066 and '901 Patents ............................................. 258

E.    UTC Has Failed to Prove the Claimed Aspects of the '066 and '901 Patents Resulted in Any Alleged Commercial Success of Tyvaso® ................. 259

F.    The Claimed Invention of the '793 Patent Does Not Exhibit Unexpected Results ......................................................................................... 262

**TABLE OF CONTENTS**
(continued)

G.    The '793 Patent Does Not Satisfy a Long-Felt But Unmet Need ...................... 262

H.    UTC Has Failed to Prove the Claimed Aspects of the '793 Patent Resulted in Any Alleged Commercial Success of Tyvaso® ............................................ 263

I.    Liquidia Has Not "Copied" the '793 Patent ...................................................... 265

VII.    CONCLUSION ............................................................................................................ 265

Defendant Liquidia Technologies, Inc. ("Liquidia") hereby submits these Supplemental Invalidity Contentions pursuant to Paragraph 4(d) of the Delaware Default Standard for Discovery and Section (3)(g)(i) of the Scheduling Order (D.I. 20) with respect to all claims of U.S. Patent Nos. 9,593,066 ("the '066 Patent"), 9,604,901 ("the '901 Patent"), and 10,716,793 ("the '793 Patent") (collectively, "the Asserted Patents") asserted by United Therapeutics Corp. ("UTC" or "Plaintiff"), in UTC's Preliminary Infringement Contentions dated October 16, 2020.  Specifically, UTC asserted infringement of claims 1-3, 6, and 8-9 of the '066 Patent; claims 1-4, 6, and 8 of the '901 Patent; and claims 1, 4, and 6-8 of the '793 Patent (collectively, "the Asserted Claims").

## I.   GENERAL INFORMATION

These contentions are based on information reasonably available to Liquidia at this time, and may require subsequent amendment, alteration or supplementation.  Consequently, Liquidia reserves the right to amend, alter, or supplement these contentions based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction from the Court, or as a result of UTC's Asserted Claims and contentions.  Moreover, these contentions may be in the alternative and do not substitute any concession by Liquidia for the purposes of claim construction or infringement.  *See* Fed. R. Civ. P. 8(d).

In these Supplemental Invalidity Contentions, Liquidia has identified specific combinations of primary and secondary prior art references upon which it intends to rely. However, there is a large volume of background art relevant to invalidity, on which Liquidia relies but for which Liquidia could not possibly provide written explanations of every possible combination.   Accordingly, Liquidia expressly reserves its right to rely on combinations not expressly set forth herein.

Liquidia also attempted to identify the most relevant portions of each prior art reference upon which it intends to rely.  Given the number of relevant passages within each prior art

reference, Liquidia could not possibly identify every single passage that may be relevant to its invalidity positions. Accordingly, Liquidia expressly reserves the right to rely upon additional portions of the cited prior art references but has made a good faith effort to identify representatively relevant passages.

Furthermore, these contentions are provided without prejudice to Liquidia's right to introduce at trial any subsequently discovered evidence or expert opinions relating to currently-known facts and to produce and introduce at trial all evidence, whenever discovered, relating to the proof of subsequent discovered facts. Moreover, facts, documents and things now known may be imperfectly understood and, accordingly, such facts, documents and things may not be included in the following contentions. Liquidia reserves the right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, expert opinion testimony, documents and things notwithstanding the written statements herein. Liquidia further reserves its right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, documents and things that are not currently recalled but might be recalled at some time in the future.

The information set forth below is provided without waiving: (1) the right to object to the use of any statement for any purpose, in this action or any other action, on the grounds of privilege, relevance, materiality, or any other appropriate grounds; (2) the right to object to any request involving or relating to the subject matter of the statements herein; or (3) the right to revise, correct, supplement, or clarify any of the statements provided below at any time.

Liquidia reserves the right to allege the invalidity of the Asserted Claims on bases other than those disclosed herein.

2
**HIGHLY CONFIDENTIAL**

## A.     Identification of Asserted Claims

On October 16, 2020, UTC provided its Preliminary Infringement Contentions pursuant to the Scheduling Order and the Default Standard for Discovery.  In UTC's Preliminary Infringement Contentions, UTC asserts that the manufacturing of the active pharmaceutical ingredient for Liquidia's Proposed NDA Product that is subject of Liquidia's NDA No. 213005 under § 505(b)(2) of the Federal Food, Drug and Cosmetic Act to the United States Food and Drug Administration, in accordance with the protocol referenced in Liquidia's NDA and described in Drug Master File No. 27680, infringes claims 1-3, 6, and 8-9 of the '066 Patent and claims 1-4, 6, and 8 of the '901 Patent.  UTC further alleges that the drug product that is the subject of Liquidia's NDA, when used in the intended manner and as taught in Liquidia's proposed label and package insert, infringes claims 1, 4, and 6-8 of the '793 Patent.  In view of UTC's Preliminary Infringement Contentions, the following invalidity contentions address the Asserted Claims of the Asserted Patents.

## II.     U.S. PATENT NO. 9,593,066

The '066 Patent issued March 14, 2017 from Application No. 14/849,981, filed September 10, 2015.  *See* '066 Patent at 1.  Application No. 14/849,981 is a divisional of Application No. 13/933,623, filed on July 2, 2013, now Patent No. 9,156,786, which is a continuation of Application No. 13/548,446, filed on July 13, 2012, now Patent No. 8,497,393, which is a continuation of Application No. 12/334,731, filed on December 15, 2008, now Patent No. 8,242,305.  *Id.*  The '066 Patent claims priority to provisional application No. 61/014,232, filed December 17, 2007.  *Id.*

The '066 Patent allegedly discloses an "improved process" to prepare prostacyclin derivatives such as treprostinil.  *Id*. at Abstract.  Claim 1 is a product-by-process claim drawn to a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof.

Claim 8 is drawn to a process of preparing the same product from claim 1, comprising the steps of alkylation of an intermediate triol to form a treprostinil salt.  *Id.* at cols. 17-18, claims 1 and 8.

Asserted Claim 1 recites the following:

1[a][1] A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising

1[b] providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps,

1[c] forming a salt of treprostinil by combining the starting batch and a base,

1[d] isolating the treprostinil salt, and

1[e] preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt,

1[f] whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and

1[g] wherein said alkylation is alkylation of benzindene triol.

Asserted dependent claims 2, 3, and 6 are directed towards pharmaceutical compositions of claim 1, wherein the salt is isolated in crystalline form (claim 2); the base is selected from a group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline (claim 3); and the isolated salt is stored at ambient temperature (claim 6).

Asserted Claim 8 recites the following:

---

[1] The bracketed letters have been added for ease of review and to distinguish among the various limitations.

**HIGHLY CONFIDENTIAL**

8[a] A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising

8[b] alkylating a triol intermediate of the formula:



8[c] hydrolyzing the resulting compound to form treprostinil,

8[d] forming a salt of treprostinil stable at ambient temperature,

8[e] storing the treprostinil salt at ambient temperature, and

8[f] preparing a pharmaceutical product from the treprostinil salt after storage,

8[g] wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.

Asserted dependent claim 9 is directed toward a pharmaceutical product prepared by the process of claim 8.

These Supplemental Invalidity Contentions establish that claims 1-3, 6, and 9 of the '066 Patent are invalid as anticipated under 35 U.S.C. § 102(b). Claims 1-3, 6, and 8-9 of the '066 Patent are unpatentable as obvious under 35 U.S.C. § 103. Moreover, these Supplemental Invalidity Contentions show that the Asserted Claims of the '066 Patent are also invalid under 35 U.S.C. § 112.

HIGHLY CONFIDENTIAL

A.      **Scope and Content of the Prior Art for the '066 and '901 Patents**

1.      **Phares 2005**

a.      **Disclosures**

Phares 2005 is titled "Compounds and Methods for Delivery of Prostacyclin Analogs." Int'l App. No. PCT/US2004/016401 ("Phares 2005").  The named inventors are Ken Phares and David Mottola.  Phares 2005 was published January 27, 2005 and is prior art to the '066 and '901 Patents under 35 U.S.C. §§ 102(a), (b), and (e).  The '066 and '901 Patents seek the benefit of provisional application No. 61/014,232, filed on December 17, 2007.

Phares 2005 describes "compounds and methods for inducing prostacyclin-like effects in a subject or a patient," including treprostinil and derivatives thereof.  *Id*. at 8.  The chemical structure of treprostinil is shown below:



*Id*.  Phares 2005 explains that "[t]reprostinil is a chemically stable analog of prostacyclin, and as such is a potent vasodilator and inhibitor of platelet aggregation."  *Id.*

Phares 2005 further discloses that "[a] preferred embodiment of the present invention is the diethanolamine salt of treprostinil."  *Id.* at 9.  A particularly preferred embodiment of the invention disclosed in Phares 2005 is "[F]orm B of treprostinil diethanolamine."  *Id.*  The structure of treprostinil diethanolamine salt described by Phares 2005 is reproduced below:

**HIGHLY CONFIDENTIAL**

*Id.* at 96 (claim 49).  Phares 2005 discloses two crystalline forms of treprostinil diethanolamine salt, Form A and Form B.  *Id.* at 85-89.  The crystalline Form B "appears to be the most thermodynamically stable form" with "full conversion to Form B at ambient, 15° C, and 30° C after 7 days, 11 days, and 1 day, respectively." *Id.* at 89.

Phares 2005 teaches that "treprostinil as the free acid has an absolute oral bioavailability of less than 10%." *Id*. at 2.  However, Phares 2005 specifically discloses a clinical study that determined treprostinil diethanolamine has an oral bioavailability of 21-25% when delivered in 0.2-2.0 mg doses—a greater than 100% increase compared to treprostinil free acid.  *Id*. at 83.  Based on that study, Phares 2005 additionally noted that the "safety profile with UT-15C (treprostinil diethanolamine) is consistent with the reported safety profile and product labeling of Remodulin (treprostinil sodium) and other prostacyclin analogs." *Id*.

Phares 2005 further "provides for compositions which may be prepared by mixing one or more compounds of the instant invention, or pharmaceutically acceptable salts thereof, with pharmaceutically acceptable carriers, excipients, binders, diluents or the like, to treat or ameliorate

a variety of disorders related vasoconstriction and/or platelet aggregation." *Id.* at 48. Thus, the pharmaceutical acceptability of the compounds is clearly disclosed in Phares 2005.

### b.      Phares 2005 Teaches (+)-Treprostinil Synthesis

Phares 2005 teaches the synthesis of (+)-treprostinil. First, Phares 2005 discloses that synthesis of (+)-treprostinil, labeled as compound **1**, was already well-known, and that its sodium salt had already been approved by the FDA for treatment of pulmonary hypertension. Phares 2005 at 8-9. Indeed, the '066 and '901 Patent specifications state that "[t]reprostinil, the active ingredient in Remodulin®, was first described in U.S. Patent No. 4,306,075. Treprostinil, and other prostacyclin derivatives have been prepared as described in Moriarty, et al in *J. Org. Chem.* 2004, 69, 1890-1902, *Drug of the Future*, 2001, 26(4), 364-374, U.S. Patent Nos. 6,441,245, 6,528,688, 6,765,117 and 6,809,223." '066 Patent at 1:27-32.

Second, Phares 2005 expressly discloses the synthesis of (-)-treprostinil, the enantiomer of (+)-treprostinil. Phares 2005 at 39-40. In particular, Phares 2005 teaches that "the enantiomer of the commercial drug (+)-Treprostinil was synthesized using the stereoselective intramolecular Pauson Khand reaction as a key step and Mitsunobu inversion of the side-chain hydroxyl group." *Id.* at 40. Phares 2005 discloses the following reaction procedure (outlined in the red-dotted square below) for the synthesis of compound **2**, the enantiomer of treprostinil, from benzindene triol **11b** (outline in the red-dotted square below):

*Id.*

The reaction procedure for the conversion of 11b to 2 is disclosed in Phares 2005 as: "(l) i. ClCH$_2$CN, K$_2$CO$_3$. ii, KOH, CH$_3$OH, reflux. 83% (2 steps)." *Id.*   Steps (i) to (k) shown above result in treprostinil triol (the precursor for treprostinil), and step (l) converts the precursor (benzindene triol) into treprostinil.  Phares 2005 thus discloses how to get from benzindene triol to (-)-treprostinil, the enantiomer of (+)-treprostinil.  A POSA would know that the two enantiomers of treprostinil could be synthesized using the same achiral reagents starting with either enantiomer of the benzindene triol starting material.  *See* Gao, K., "Synthesis of A-Galceramides, (-)-Treprostinil, and Design and Synthesis of Anti-Viral Agents," Thesis submitted as partial fulfillment of the requirements for the degree of Doctor Of Philosophy in Chemistry in the Graduate College of the University of Illinois at Chicago, 2006 at 182.

Phares 2005 further explains how the enantiomer of (-)-treprostinil, or (+)-treprostinil, can by synthesized.  A POSA would understand from this disclosure that in order to synthesize (+)-treprostinil, it would follow the same steps as disclosed in Phares 2005 only using achiral reagents.  One of Dr. Robert Moriarty's graduate students at the University of Illinois at Chicago,

HIGHLY CONFIDENTIAL

Dr. Kuangqiang Gao, published his doctoral thesis in 2006 on the synthesis of, among other compounds, (-)-treprostinil and related derivatives using synthetic routes known to reach (+)-treprostinil.  Gao at iii (acknowledging Dr. Moriarty as doctoral advisor), 168-92 (describing known syntheses of (+)-treprostinil and corresponding synthesis of (-)-treprostinil).  Of note, Dr. Gao, under Dr. Moriarty's supervision, wrote that "(-)-Treprostinil is the enantiomer of (+)-Treprostinil," and  "in principle, ***any synthesis for (+)-Treprostinil can be employed to prepare another enantiomer by altering the stereochemistry of starting material and reagents***."  *Id.* at 182 (emphasis added).  Applying the same "principle," any synthesis for (-)-treprostinil, such as that disclosed in Phares 2005, can be employed to prepare another enantiomer (i.e., (+)-treprostinil) by altering the stereochemistry of starting material and reagents.

The process of using achiral reagents[2] to synthesize enantiomeric products from enantiomeric starting materials was also well known in the art.  For example, ***Yadav*** describes how to synthesize enantiomeric compounds: **1a**, (+)-altholactone and its enantiomer **1b**, (-)-altholactone; and **2a,** (+)-isoaltholactone, and its enantiomer, **2b**, (-)-isoaltholactone, respectively.  Yadav, J.S., et al., "A concise and stereoselective synthesis of both enantiomers of altholactone and isoaltholactone," Tetrahedron Letters, 44:5831-33 (2003) at 5831.  To perform this synthesis, Yadav describes enantiomeric starting materials, epoxy esters **7a** and **7b**, which are transformed using the same achiral reagent, $OsO_4$, NMO.  *Id.* at 5832 ("Epoxy ester **7b** was transformed in a

---

[2] An "achiral reagent" is one that is itself not chiral, and is therefore superimposable on its mirror image in three-dimensional space, where a POSA would understand that a "chiral" molecule is one that is not superimposable on its mirror image. *See* RICHARD J. LEWIS, SR., HAWLEY'S CONDENSED CHEMICAL DICTIONARY (15th ed. 2007) Hawley's Condensed Chemical Dictionary, 15th. ed. (2007) at 270 (defining "chiral" as "[i]n chemistry this term describes asymmetric molecules that are mirror images of each other, i.e., they are related like right and left hands. Such molecules are also called enantiomers and are characterized by optical activity.").

**HIGHLY CONFIDENTIAL**

similar fashion to afford **1a** and **2b** as illustrated in Scheme 3.").  When the achiral reagent is applied to materials that are enantiomers, Yadav teaches that the resulting products are enantiomeric compounds, which are formed in the same ratios.  This is illustrated in Schemes 2 and 3 (Yadav at 5832), reproduced below:

Yadav therefore teaches that Phares 2005 discloses the synthesis of (+)-treprostinil through disclosing the synthesis of its enantiomer, (-)-treprostinil.  Just as Yadav teaches how to synthesize enantiomeric products from enantiomeric starting material using achiral reagents, Phares 2005 teaches how (+)-treprostinil can be synthesized using a starting material of enantiomeric chirality to that used to synthesize (-)-treprostinil.

As another example, ***Takadoi***, describes the synthesis of enantiomeric compounds using achiral reagents.  Masanori Takadoi, et al., "Synthetic studies of himbacine, a potent antagonist of the muscarinic M2 subtype receptor 1. Stereoselective total synthesis and antagonistic activity of enantiomeric pairs of himbacine and (2'S,6'R)-diepihimbacine, 4-epihimbacine, and novel himbacine congeners," Tetrahedron 58 (2002) 9903–23.  Takadoi describes the synthesis of himbacine **1** using (*S*)-**9** as the starting material.  He then teaches the synthesis of unnatural *ent*-himbacine *ent*-**1**, the enantiomer of natural himbacine **1**, by using (*R*)-**9** instead of (*S*)-**9** as a starting material.  Takadoi at 9906.  In other words, by using the enantiomer of (*S*)-**9** and achiral reagents, Takadoi was able to synthesize the enantiomer of himbacine **1** using the same achiral reagents: "According to the synthetic scheme to **1** detailed above, we succeeded in obtaining *ent*-**1** from (*R*)-**9** . . . ." *Id*.

As these references illustrate, a POSA would understand that the synthesis of (+)-treprostinil would follow the same steps as disclosed in Phares 2005 for (-)-treprostinil, but with the enantiomeric (+)-benzindene triol starting material to benzindene triol **11b** that is taught in Phares 2005. Phares 2005 at 40.  A POSA would further know that the requisite enantiomeric (+)- benzindene triol starting material was taught in Moriarty. *See* Moriarty at 1895 (**34** in Scheme 4).  In particular, a POSA would have understood that he or she would synthesize the (+)-treprostinil using the process disclosed in Phares 2005's step (l) by simply starting with (+)-

**HIGHLY CONFIDENTIAL**

benzindene triol, the enantiomer of **11b**, the benzindene triol starting material taught in Phares 2005. Processes are described below comparing the '901 Patent claims with the disclosures in Phares 2005.

The '066 and '901 Patent claims start with (+)-benzindene triol—the enantiomer of Phares 2005's compound **11b**, (-)-benzindene triol (Phares 2005 at 39-40). The tables below depict Phares 2005's structures on the left and the '066 and '901 Patents' on the right.

| (-) Benzindene Triol Starting Material | (+) Benzindene Triol Starting Material |
|:---:|:---:|
|  |  |

Next, both Phares 2005 and the '066 and '901 Patents disclose use of chloroacetonitrile (ClCH$_2$CN) and potassium carbonate (K$_2$CO$_3$) to alkylate the phenolic hydroxyl group located on the benzene ring of the benzindene triol intermediate (circled in red above). *Compare* '066 Patent at Example 1, *with* Phare 2005 at 40 (Step (l)). The figure below shows the benzindene nitrile intermediates resulting from the alkylation reaction, again with Phares 2005 on the left and the '066 and '901 Patents on the right.

| (-) Benzindene Nitrile Intermediate | (+) Benzindene Nitrile Intermediate |
|:---:|:---:|

**HIGHLY CONFIDENTIAL**

Similarly, both Phares 2005 and the '066 and '901 Patents disclose hydrolysis of the nitrile group (circled in red above) using methanol, potassium hydroxide, and refluxing (heating). *Compare* '066 Patent at Example 2, *with* Phares 2005 at 40 (Step (l)).  The resulting treprostinil enantiomers from the hydrolysis step are shown below, again with Phares 2005 on the left and the '066 and '901 Patents on the right.

| (-) Treprostinil | (+) Treprostinil |
|---|---|



Considering the alkylation and hydrolysis steps disclosed in Phares 2005's step (l) do not affect the stereocenters of the benzindene triol starting material, and a POSA's knowledge of enantiomeric reactions, a POSA would have understood that he or she would synthesize the (+)-treprostinil using the process disclosed in Phares 2005's step (l) by simply starting with the

14

HIGHLY CONFIDENTIAL

enantiomer of the Phares 2005 starting material (compound **11b** on page 40), *i.e.*, (+)-benzindene triol. *See* Phares 2005 at 40. As Dr. Moriarty's former graduate student advises, "in principle, any synthesis for (+)-Treprostinil can be employed to prepare another enantiomer by altering the stereochemistry of starting material and reagents." Gao at 182. Under the same "principle," a POSA would know that the synthetic route to (-)-treprostinil disclosed in Phares 2005 can be employed to prepare (+)-treprostinil using the enantiomer of the benzindene triol disclosed in Phares 2005 and identical achiral reagents. Phares 2005 at 40.

### 2. Moriarty 2004

Moriarty 2004 was published in 2004 in the Journal of Organic Chemistry, Volume 69, No. 6, pp. 1890-1902. Robert M. Moriarty, et al., "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)," 69 J. ORG. CHEM. 1890 (2004) ("Moriarty 2004"). Moriarty 2004 is prior art to the '066 and '901 Patents under §§ 102(a) and (b). Moriarty 2004 was also considered by the Examiner in prosecution of the '066 and '901 Patents and in the IPR proceeding with respect to the parent U.S. Patent No. 8,497,393 (*see, e.g.*, *SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, 2017 WL 1215714, Paper 82 at 45 (P.T.A.B. Mar. 31, 2017) (discussing Moriarty 2004), *aff'd*, *United Therapeutics v. SteadyMed*, 702 F. App'x 990 (2017)) without objection from the Patent Owner.

Moriarty 2004 is titled "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)." *Id*. at 1890. Moriarty 2004 describes the synthesis of treprostinil "via the stereoselective intramolecular Pauson-Khand cyclization." *Id*. Structure **7** of Moriarty 2004 depicts the chemical structure of treprostinil, prior to salt formation, and is shown below:

**7**

*Id.* at 1892.  This is the identical treprostinil pharmaceutical salt precursor disclosed in the '066 and '901 Patents:



'066 Patent at 11:50-65; '901 Patent at 11:16-28.

Scheme 4 of Moriarty 2004 further discloses alkylation of **34** by $ClCH_2CN$ to yield **35**. Moriarty 2004 at 1895, 1902.  The alkylation product **35** is then hydrolyzed with a base (*i.e.* aqueous KOH), followed by acidification to yield **7**, treprostinil.  *Id.*  The alkylation reaction of **34** to yield **35** as disclosed in Moriarty 2004 is equivalent to the alkylation reaction disclosed in the '066 and '901 Patents.

**34** and **35** of Moriarty 2004 are as follows:

**HIGHLY CONFIDENTIAL**

*Id*. at 1895.

Moriarty 2004 reports that the disclosed process yields a 99.7% pure crystalline solid in the form of "[w]hite needles."  *Id*. at 1902.

The "Former Process" of Example 6 in the '901 and '066 Patents is the process for preparing treprostinil according to Moriarty, and UTC has confirmed that it used the Moriarty process to make commercial batches of treprostinil.  *See Steadymed*, IPR2016-00006, Paper 82 at 17-18, 34, 38; *see also Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00770, Ex. 2025 (Pinal Declaration) at ¶ 89 (comparing Example 6 and Moriarty and stating that "Moriarty teaches only the Former Process" of Example 6).

### 3.     U.S. Patent No. 6,765,117 ("the '117 Patent")

The '117 Patent is titled "Process for Stereoselective Synthesis of Prostacyclin Derivatives."  The named inventors are Robert M. Moriarty, Raju Penmasta, Liang Guo, Munagala S. Rao, and James P. Staszewski.  The '117 Patent issued on July 20, 2004 and is prior art to the '066 and '901 Patents under §§ 102(a), (b), and (e).  The '117 Patent is directed towards a "process for producing prostacyclin derivatives," including treprostinil, and "novel intermediate compounds useful in the process."  '117 Patent at 1:14-16.  The prostacyclin derivatives and intermediates include the following general structure:

*See, e.g.*, '117 Patent at claim 1.

For example, the '117 Patent includes the synthesis of treprostinil (which is the case in which: Z is O, n is 1, X is COOH, $Y_1$ is $CH_2CH_2$-, $M_1$ is an H and an OH group in the S configuration (*i.e.*, the same stereoisomer configuration found in the structure of treprostinil (below)), $L_1$ is α-H; β-H, and $R_7$ is –$(CH_2)_3$-$CH_3$ amongst its many examples. For example, claim 3 of the '117 Patent discloses the structure of treprostinil below:



which is produced by a process for making 9-deoxy-PGF1-type compounds, the process comprising cyclizing the following starting compound:



The '117 Patent teaches alkylation of benzidine triol (*id.* at 20:30-62) and hydrolysis of the resulting product to form treprostinil free acid (*id.* at 20:62-21:11).

**HIGHLY CONFIDENTIAL**

### 4. U.S. Patent No. 4,306,075 ("the '075 Patent")

The '075 Patent teaches the synthesis of treprostinil, since Example 33 ('075 Patent at 62:4-39) teaches the preparation of 9-Deoxy-2',9α-methano-3-oxa-4,5,6-trinor-3,7-(1',3'-inter-phenylene)-13,14-dihydro-PGF$_1$ (Formula XI), where X$_1$ is COOH, Y$_1$ is -CH$_2$CH$_2$-, R$_{20}$, R$_{21}$, R$_{23}$, and R$_{24}$ are all hydrogen, Z$_4$ is -CH$_2$-, R$_{22}$ is $\beta$-hydrogen, R$_8$, M$_1$, L$_1$ and R$_7$ are as defined in Example 8, which a POSA would understand as R$_8$ is hydroxy, M$_1$ is α-OH:β-H, L$_1$ is α-H:β-H and R$_7$ is n-butyl. *Id*. at 36:39-41.

| Teachings of Example 33 | |
| --- | --- |
| (Formula XI: X$_1$ is COOH, Y$_1$ is —CH$_2$CH$_2$—, R$_{20}$, R$_{21}$, R$_{23}$, and R$_{24}$ are all hydrogen, Z$_4$ is —CH$_2$—, R$_{22}$ is $\beta$-hydrogen, R$_8$, M$_1$, L$_1$, and R$_7$ are as defined in Example 8) and its corresponding methyl ester (X$_1$ is —COOCH$_3$).<br><br><br><br>Formula XI ('075 Patent at 62:4-11, 74:25-39). | Example 33 refers to Example 8 for R$_8$, M$_1$, L$_1$, and R$_7$:<br><br>EXAMPLE 8<br>2-Decarboxy-2-hydroxymethyl-9$\beta$-methyl-CBA$_2$<br>(Formula XXXVI: X$_1$ is —CH$_2$OH, Z$_2$ is —(CH$_2$)$_3$—, R$_8$ is hydroxy, Y$_1$ is trans—CH≡CH—, M$_1$ is α-OH:β-H, L$_1$ is α-H:β-H and R$_7$ is n-butyl).<br><br>Example 8 ('075 Patent at 36:37-41). |

As indicated in the Figure below, the result of each of these substitutions into the generic structure of Figure XI leads to treprostinil (as drawn below on the right and labeled "Formula XI (treprostinil)").

| Substituted Formula XI ('075 Patent) |
| --- |

Formula XI

X_1 = COOH
Y_1 = -CH_2CH_2-
R_20 = R_21 = R_22 = R_23 = H
Z_4 = -CH_2-
R_22 = β-H
R_8 = OH
M_1 = α-OH:β-H
L_1 = α-H:β-H
R_7 = n-butyl

Formula XI (treprostinil)

Formula XI (treprostinil redrawn)

The '075 patent teaches that "[p]harmacologically acceptable salts of the novel prostaglandin analogs of this invention for the purposes described above are those with pharmacologically acceptable metal cations, ammonia, amine cations, or quaternary ammonium cations." *Id.* at 14:56-60. The '075 patent further discloses that:

The compounds of this invention prepared by the processes of this invention, in free acid form, are transformed to pharmacologically acceptable salts by neutralization with appropriate amounts of the corresponding inorganic or organic base, examples of which correspond to the cations and amines listed hereinabove. These transformations are carried out by a variety of procedures known in the art to be generally useful for the preparation of inorganic, i.e., metal or ammonium salts. The choice of procedure depends in part upon the solubility characteristics of the particular salt to be prepared. In the case of the inorganic salts, it is usually suitable to dissolve an acid of this invention in water containing the stoichiometric amount of a hydroxide, carbonate, or bicarbonate corresponding to the inorganic

20

**HIGHLY CONFIDENTIAL**

> salt desired. For example, such use of sodium hydroxide, sodium carbonate, or sodium bicarbonate gives a solution of the sodium salt. Evaporation of the water or addition of a water-miscible solvent of moderate polarity, for example, a lower alkanol or a lower alkanone, gives the solid inorganic salt if that form is desired.

*Id.* at 30:41-62.

### 5.      Wiberg 1960

Wiberg 1960 is a textbook published in 1960 by McGraw-Hill Book Company, Inc. and written by Kenneth B. Wiberg.  Kenneth B. Wiberg, LABORATORY TECHNIQUE IN ORGANIC CHEMISTRY 112 (1960) ("Wiberg 1960").  Wiberg 1960 is prior art to the '066 and '901 Patents under §§ 102(a) and (b).  Wiberg 1960 is an organic chemistry textbook titled "Laboratory Technique in Organic Chemistry." *Id.*  Describing laboratory purification methods, Wiberg 1960 explicitly states:

> A typical example is the purification of a water-insoluble solid carboxylic acid by dissolving it in sodium hydroxide solution, filtering, precipitating the compound by the addition of acid. A similar procedure may be used with amines: dissolve the compound in acid and precipitate it with a base. These procedures usually work quite well in that they utilize a chemical reaction to aid in separation from nonacidic or nonbasic impurities.

Wiberg 1960 at 112.

### 6.      Schoffstall 2004

Schoffstall 2004 is a textbook published in 2004 by The McGraw-Hill Companies, Inc. and written by Allen M. Schoffstall, et al.  Allen M. Schoffstall, et al., MICROSCALE AND MINISCALE ORGANIC CHEMISTRY LABORATORY EXPERIMENTS (Thomas D. Timp ed., 2d ed. 2004) ("Schoffstall 2004").  Schoffstall 2004 is prior art to the '066 and '901 Patents under §§ 102(a) and (b).  Schoffstall 2004 is the second edition of an organic chemistry textbook titled "Microscale and Miniscale Organic Chemistry Laboratory Experiments."   Schoffstall 2004 describes an experiment in which carboxylic acid is separated from neutral and basic organic compounds by conversion to a salt.  Schoffstall 2004 at 201-02.  Addition of an acid, such as HCl, then regenerates

the carboxylic acid from the salt, which can then be filtered or extracted into an organic solvent. *Id*.

Specifically, Schoffstall 2004 indicates that "[a] water-insoluble, acidic organic compound such as a carboxylic acid or phenol can be easily separated from neutral and basic organic compounds by conversion to a water-soluble salt." *Id*. at 201. Schoffstall 2004 discloses the following general reaction scheme:

$$RCO-H + NaOH \longrightarrow RCO^-Na^+ + H_2O$$

a water-insoluble carboxylic acid       a water-soluble carboxylate salt

*Id*.

Schoffstall 2004 indicates that "[n]eutral and basic organic compounds remain in the organic layer. The two layers can then be separated. Addition of HCl to the aqueous layer regenerates the water-insoluble carboxylic acid, which can then be filtered or extracted into an organic solvent." *Id*. Similarly, Schoffstall 2004 discloses the following general reaction scheme:

$$RCO^-Na^+ + HCl \longrightarrow RCO-H + NaCl$$

a water-soluble carboxylate salt       a water-insoluble carboxylic acid

*Id*.

### 7. Kawakami 1981

Japanese Patent Application No. 56-122328 ("Kawakami 1981"), published on September 25, 1981, is titled "Crystalline Amine Salt of Methanoprostacyclin Derivative, Manufacturing Method Thereof, and Purifying Method Thereof." Kawakami 1981 is prior art to the '066 and

'901 Patents under §§ 102(a) and (b).  The named inventors are Hajime Kawakami, Keiichi Ono, Akihiko Sugie, and Sumimoto Katsube.  Kawakami 1981 at 1.  Kawakami 1981 is directed to the preparation and use of dicyclohexylamine (*i.e.*, an amine base with similar reactivity to diethanolamine) to form a crystalline dicyclohexylamine salt of a methanoprostacyclin derivative, in order to purify methanoprostacyclin.  *Id*. at 3.  Kawakami 1981 further discloses that the dicyclohexylamine salt of a methanoprostacyclin derivative can be easily reverted to the free methanoprostacylcin derivative by conventional methods, such as treating the salt with a strong acid such as HCl or $H_2SO_4$.  *Id*. at 6.  Per Kawakami 1981, the salt that is obtained has "fairly high purity, and the purity can be further improved by recrystallization as needed with the use of an appropriate solvent."  *Id*.

### 8.     Ege 1989

Ege 1989 was published in 1989 by D.C. Heath and Company and is the second edition of a textbook titled "Organic Chemistry."  Seyhan N. Ege, ORGANIC CHEMISTRY (Mary Le Quesne, et al. eds., 2d ed. 1989) ("Ege 1989").  Ege 1989 is prior art to the '066 and '901 Patents under §§ 102(a) and (b).  Ege 1989 was edited by Seyhan N. Ege.  Ege 1989 discloses that sodium benzoate (i.e., a carboxylate salt) can be converted back to benzoic acid (i.e., a carboxylic acid) by treatment with the acid HCl, which is prototypical of the reaction of treprostinil diethanolamine salt with an acid to regenerate treprostinil carboxylic acid.  Ege 1989 at 546.  The reaction scheme is provided below:

**HIGHLY CONFIDENTIAL**

*Id.*

### B.     Claims 1, 2, 3, 6, and 9 Are Invalid Under 35 U.S.C. § 102(b)

Claims 1, 2, 3, 6, and 9 of the '066 Patent are invalid as anticipated under 35 U.S.C. § 102(b).  There is a "long-standing rule that an old product is not patentable even if it is made by a new process."  *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1370 (Fed. Cir. 2009). "As a result, a product-by-process claim can be anticipated by a prior art product that does not adhere to the claim's process limitation."  *Id.*   Claims 1, 2, 3, 6, and 9 are product-by-process claims.  UTC acknowledge to the FDA in its Form 3542 with respect to Tyvaso® that the '066 Patent contains product-by-process claims.  *See* Form 3542 for '066 Patent (UTC_LIQ0021693-7) at 3 (UTC_LIQ00201695).  Claim 1 claims a "pharmaceutical composition" that is "prepared by a process . . . ."  *See* '066 Patent at claim 1.   Claims 2, 3, and 6 all claim a "pharmaceutical composition of claim 1 . . . ."  *Id.* at claims 2, 3, 6.  Claim 9 recites a "pharmaceutical product prepared by the process of claim 8."  *Id.* at claim 9.  As such, claims 1, 2, 3, 6, and 9 are anticipated under § 102(b) if an old product sold by UTC over a year before the effective filing date is the same as products made by the claimed process.

#### 1.     The Board and Federal Circuit Confirmed that Prior Art Moriarty Batches Are Structurally and Functionally Identical

U.S. Patent No. 8,397,393 ("the '393 Patent") is the parent of the '066 Patent.  Both patents claim a "product" or "pharmaceutical composition" that is "prepared by a process comprising"

(a) alkylation of a benzindene triol, (b) hydrolysis of a benzindene nitrile, and (c) combining or contacting the batch with a base to form a salt of treprostinil.  *Compare* '066 Patent at claim 1, *with* '393 Patent at claim 1.  The '393 Patent includes the optional step (d) of "reacting the salt formed in step (c) with an acid to form the compound of formula 1."  '393 Patent at claim 1; *cf.* MPEP § 2111.04 ("Claim scope is not limited by claim language that suggests or makes optional but does not require steps to be performed, or by claim language that does not limit a claim to a particular structure.").  The '066 Patent similarly claims the treprostinil free acid prepared from the treprostinil salt.  *See* '066 Patent at claim 1 ("A pharmaceutical composition comprising ***treprostinil or a pharmaceutically acceptable salt thereof***, said composition prepared by a process comprising . . . and ***preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt*** . . . .") (emphases added).  As such, the '393 Patent and '066 Patent claim the same product-by-process.  ███

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████

UTC's reliance on Tyvaso®'s sales as evidence of commercial success for the '393, '066, and '901 Patents provides that the patents claim the same product-by-process.  *See* UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 27;   United Therapeutics

Corp.'s Responses to Watson Laboratories, Inc.'s Invalidity Contentions (Jan. 25, 2016) (UTC_LIQ00206482-UTC_LIQ00206549) at 60-61; Plaintiffs' Responses to Actavis Laboratories, FL, Inc.'s Invalidity Contentions (Oct. 14, 2016) (UTC_LIQ00204305-UTC_LIQ00204559) at 26.  Patentees can only rely on the "commercial success of a product embodying that invention." *Merck & Co. v. Teva Pharms. USA, Inc.*, 393 F.3d 1364, 1376 (Fed. Cir. 2005).  Accordingly, the same batches that embody the '393 Patent also embody the '066 and '901 Patents.

During the '393 IPR, the Board found that "the process steps recited in the challenged claims do not impart structural or functional differences to the claimed product, and, therefore, conclude[d] that those process steps are not entitled to patentable weight," which the Federal Circuit affirmed.  *SteadyMed*, IPR2016-00006, Paper 82 at 29, *aff'd*, *United Therapeutics Corp. v. SteadyMed Ltd.*, 702 F. App'x 990 (Fed. Cir. 2017).  The Board noted that "individual commercial batches of Moriarty treprostinil exhibit impurity profiles nearly identical, if not superior, to those seen in individual commercial batches of '393 patent treprostinil." *Id*. at 38.  Finally, the Board provided a table comparing one commercial batch of Moriarty treprostinil (Lot No. UT15-031202) with one commercial batch of '393 patent treprostinil (Lot No. 01F08017).

**HIGHLY CONFIDENTIAL**

| Compound | Moriarty UT15-031202 (Ex. 2036, 5) | '393 Patent 01F08017 (Ex. 2037, 58–59) |
|---|---|---|
| 1AU90 | Not detected | Not detected |
| 2AU90 | Not detected | Not detected |
| 97W86 | Not detected | Not detected |
| 3AU90 | 0.2% | 0.09% |
| treprostinil methyl ester | <0.05% | <0.05% |
| treprostinil ethyl ester | 0.2% | 0.5% |
| 750W93 | 0.07% | 0.09% |
| 751W93 | <0.05% | <0.05% |
| unidentified impurities | Not detected | 0.08% |
| total related substances | 0.5% | 0.8% |
| assay purity | 99.7% | 99.5% |

The Board noted that the Moriarty batch has a higher overall purity, and the same or lower amounts of all but one impurity, 3AU90, than the '393 patent batch. *Id*. at 39. In addition, the Board noted that both the Moriarty batch and the '393 patent batch satisfy the treprostinil drug specification concerning the types and amounts of impurities that may be present in a batch of treprostinil—which requirements notably did not change when UTC switched over from producing treprostinil according to Moriarty to producing it using the process disclosed in the '393 patent. *Id*. Because the '066 Patent claims the same product as the '393 patent, the Board's findings are applicable to the '066 Patent.

Additionally, UTC



*See* UTC_WAT00637646-UTC_WAT00637746 ( ); UTC_OREN_00020808-UTC_OREN_00020819 at 1-2 (same). Thus, claims 1, 2, 3, 6, and 9 of

the '066 Patent are invalid as anticipated under Section 102(b).  *Amgen*, 580 F.3d at 1370 ("[A] product-by-process claim can be anticipated by a prior art product that does not adhere to the claim's process limitation.").

2. **Internal UTC Documents Confirm That Prior Art Remodulin® Batches Are Structurally and Functionally the Same as the Product Claimed in the '066 Patent**



28
**HIGHLY CONFIDENTIAL**



29



Remodulin® (treprostinil sodium) was also FDA-approved to be stored at ambient

**HIGHLY CONFIDENTIAL**

temperature, construed here as 15-30°C.   D.I. 119 at 1; *see* 2004 Remodulin Label, p.12 (disclosing that FDA-approved unopened vials of treprostinil sodium salt are "stable until the date indicated *when stored at 15 to 25°C*" and instructions say to "[s]tore at 25°C . . . with excursions permitted *to 15-30°C*") (emphases added).

By UTC's own admission, treprostinil made according to the claimed process of the '066 Patent is of the "same high quality and purity" as the commercial treprostinil produced in Chicago according to the prior art Moriarty process.  These lots were sold in the United States over one year before the effective date of the '066 Patent—December 17, 2007—and therefore qualify as disqualifying prior sales.  Thus, claims 1, 2, 3, 6, and 9 of the '066 Patent are invalid as anticipated under Section 102(b).  *Amgen*, 580 F.3d at 1370 ("[A] product-by-process claim can be anticipated by a prior art product that does not adhere to the claim's process limitation.").

## C.   Claims 1-3, 6, and 8-9 Are Invalid Under 35 U.S.C. § 103

### 1.   Claims 1-3, 6, and 8-9 Would Have Been Obvious Over Phares 2005

The Asserted Claims of the '066 Patent would have been obvious over Phares 2005.

#### a.   Independent Claim 1 Would Have Been Obvious

##### (1)   Claim Element 1[a]

| 1[a] | *A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising:* |
|------|--------------------------------------------------------------------------------------------|

Phares 2005 discloses the same pharmaceutical composition and synthesis of treprostinil as set forth in independent claims 1 and 8 of the '066 Patent.  Phares 2005 describes "compounds and methods for inducing prostacyclin-like effects in a subject or a patient," including treprostinil and derivatives thereof.  Phares 2005 at 8.  The chemical structure of treprostinil disclosed in Phares 2005 is shown below:

*Id.* This is the same treprostinil disclosed in the '066 Patent:



Where w = 1; $Y_1$ is —$CH_2(CH_2)_m$- and m is 1; $M_1$ is α-OH: β-$R_5$ or α-$R_5$: β-OH, wherein $R_5$ is hydrogen; $L_1$ is α-$R_3$: β-$R_4$, α-$R_4$: β-$R_3$, or a mixture of α-$R_3$: β-$R_4$ and α-$R_4$: β-$R_3$, wherein $R_3$ and $R_4$ are hydrogen; and $R_7$ is  —$C_pH_{2p}$—$CH_3$, wherein p is an integer from 1 to 5 inclusive (p=3). '066 Patent at 2:7-3:15.

Phares 2005 further discloses the identical, pharmaceutically acceptable treprostinil diethanolamine salt as the '066 Patent.  Phares 2005 at 96 (claim 49).  The structure of treprostinil diethanolamine salt disclosed by Phares 2005 (left) is reproduced below in a side-by-side comparison with the treprostinil diethanolamine salt disclosed in the '066 Patent (right):

**HIGHLY CONFIDENTIAL**

(Phares 2005)                    ('066 Patent)

Phares 2005 at 96 (claim 49); '066 Patent at 12:8-23, 14:9-20 (Examples 3 and 5). Other than a change in formatting, one can easily see that these two structures from Phares 2005 and the '066 Patent are identical.

This salt is made by the same process steps as claim 1 of the '066 Patent: (a) by forming a salt of treprostinil by combining the starting batch of treprostinil acid and a base and; (b) isolating the treprostinil salt. '066 Patent at 17:51-63 (claim 1); Phares 2005 at 22. The isolated salt is then used to prepare a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof. '066 Patent at 17:51-63 (claim 1); Phares 2005 at 58. This shows that Phares 2005 necessarily discloses the same process steps to make a pharmaceutically acceptable salt thereof disclosed in claim 1—treprostinil diethanolamine salt—claimed in the '066 Patent, and thus inherently renders obvious claim 1 of the '066 Patent. Further support for the obviousness of each process element of claim 1 is provided in the following Sections II.C.1.a.(2)-(7).

### (2) Claim Element 1[b]

| 1[b] | *providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps,* |
|---|---|

As discussed above in Section II.C.1.a.(1), Phares 2005 discloses the identical treprostinil and pharmaceutically acceptable treprostinil diethanolamine salt as the '066 Patent. The remaining process claim elements do nothing to impart structural or functional differences in the claimed treprostinil or pharmaceutically acceptable salt thereof, and thus, do not patentably limit the claimed pharmaceutical composition. Even so, Phares 2005 further discloses providing a starting batch of treprostinil having one or more impurities resulting from alkylation and hydrolysis steps.

Phares 2005 discloses the same steps of alkylating and hydrolyzing to make the treprostinil disclosed in the '066 Patent. Phares 2005 discloses the synthesis of (-)-treprostinil, the enantiomer of (+)-treprostinil. Phares 2005 at 39-40. As explained above in Section II.A.1.b, Phares 2005 therefore teaches the synthesis of (+)-treprostinil using the same steps as the '066 Patent. Phares 2005 illustrates the following synthesis reaction:



*Id.* at 40. The reaction procedure for alkylation to treprostinil is disclosed in Phares 2005 (*i.e.*, the conversion of Compound 11b to the intermediate nitrile product (not shown) in the above reaction scheme) as: (l) **i. $ClCH_2CN$, $K_2CO_3$.**" *Id.* (emphasis added).

Phares 2005 details the exact same alkylation and hydrolyzing steps: (1) i. $ClCH_2CN$, $K_2CO_3$. ii. KOH, $CH_3OH$, reflux. 83% (2 steps). *Id.* Chloroacetonitrile ($ClCH_2CN$) was known in the art at the time of the invention to play an important role in alkylation reactions, and

potassium hydroxide in methanol (KOH, CH₃OH) was known to play an important role in hydrolysis.  Further, in view of the immediate steps prior to conversion to the salt and/or crystallization being those of alkylation and hydrolysis, a POSA would understand that at least one impurity in the substrate for salt formation and/or crystallization would most likely result from these intermediate steps.  ████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████

Therefore, based on the identical starting materials and chemical steps in Phares 2005 and the '066 Patent, a POSA would expect that the starting batch of treprostinil necessarily contains impurities from the prior alkylation and hydrolysis steps.  In both cases, a POSA would understand these impurities to result from either the prior alkylation and/or hydrolysis steps.  Phares 2005 therefore renders obvious providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps.

### (3)    Claim Element 1[c]

| 1[c] | *forming a salt of treprostinil by combining the starting batch and a base,* |
|------|------------------------------------------------------------------------------|

As discussed above in Section II.C.1.a.(1), Phares 2005 discloses the identical treprostinil and pharmaceutically acceptable treprostinil diethanolamine salt as the '066 Patent.

Phares 2005 further discloses combining a starting batch and a base.  Phares 2005 at 22. In particular, page 22 of Phares 2005 further teaches dissolving treprostinil acid, which was made

upon alkylation and hydrolysis, in a 1:1 molar ratio mixture of ethanol: water and **<u>diethanolamine</u>** (*i.e.*, a base). *Id.*

### (4)    Claim Element 1[d]

| 1[d] | *isolating the treprostinil salt, and* |
|------|-----------------------------------------|

Phares 2005 discloses isolating the identical pharmaceutically acceptable treprostinil diethanolamine salt as the '066 Patent.  Phares 2005 further discloses isolating crystalline forms of treprostinil diethanolamine salt—Form A and Form B.  Phares 2005 at 85-89.  Upon completion of a reaction, the product is isolated.  The isolation steps needed following conversion of Form A to Form B are routine and understood by a sophomore organic chemistry student.  *Id.*

### (5)    Claim Element 1[e]

| 1[e] | *preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt,* |
|------|-----------------------------------------|

The invention of Phares 2005 "provides for compositions which may be prepared by mixing one or more compounds of the instant invention, or pharmaceutically acceptable salts thereof, with pharmaceutically acceptable carriers, excipients, binders, diluents or the like, to treat or ameliorate a variety of disorders related vasoconstriction and/or platelet aggregation." *Id.* at 48. Thus, the pharmaceutical acceptability of the compounds is clearly disclosed in Phares 2005.

A POSA would also know how to prepare a composition comprising treprostinil (treprostinil carboxylic acid) or a salt thereof salt thereof from Phares 2005's isolated pharmaceutically acceptable treprostinil salt.  The addition of an acid to a carboxylate salt to regenerate the carboxylic acid is standard chemical purification known in the art.  *See, e.g.*, Schoffstall 2004 at 201-02; Wiberg 1960 at 112.  For example, Ege 1989 discloses that sodium benzoate (*i.e.*, a carboxylate salt) can be converted back to benzoic acid (*i.e.*, a carboxylic acid) by

treatment with the acid HCl, which is prototypical of the reaction of the treprostinil diethanolamine salt to regenerate the treprostinil carboxylic acid.  Ege 1989 at 546.

Phares 2005 therefore discloses isolating a treprostinil salt, and a skilled artisan would have a reasonable expectation of success and would know how to prepare a pharmaceutical composition comprising treprostinil or a salt thereof from the isolated treprostinil salt based on the disclosures of Phares 2005 and standard knowledge in the art as evidenced by Ege.  There is nothing novel about preparing a composition with an isolated treprostinil salt versus a treprostinil salt that is not previously isolated.  *Id.*

### (6)    Claim Element 1[f]

| 1[f] | *whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and* |
|------|------|

The claim language of the '066 Patent does not disclose the percentage of "impurity" required in the starting batch of treprostinil and simply states "having one or more impurities." The '066 Patent discloses that in one embodiment the "purity of compound of formula IV is at least 90.0%, 95.0%, 99.0% [or] 99.5%," where the formula IV is treprostinil.  '066 Patent at 9:22-23.  This disclosure shows that the purity of treprostinil may be as low as 90.0%.

Based on the identical starting materials and chemical steps used to make treprostinil in Phares 2005 and the '066 Patent, as discussed further in Sections II.A.1 and II.C.1.a.(2), a POSA would expect to observe the same impurity profiles in the "starting batch" of treprostinil resulting from the prior alkylation and/or hydrolysis steps.  Pinal Dep. Tr. at 55:19-58:17.  Further, because Phares 2005 discloses the same method of making treprostinil salts as claimed in the '066 Patent, the pharmaceutical batch of Phares 2005 would also have contained a lower amount of one or more impurities than the starting batch of treprostinil.  Accordingly, that the claimed pharmaceutical composition contains a lower amount of one or more impurities than the starting batch of

HIGHLY CONFIDENTIAL

treprostinil was neither new nor nonobvious.  *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985) ("If the product in the product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process."); *see also Amgen*, 580 F.3d at 1366 ("It has long been the case that an old product is not patentable even if it is made by a new process.").

Phares 2005 further discloses two crystalline forms of treprostinil diethanolamine salt, Form A and Form B.  Phares 2005 at 85-89.  Form A has an endotherm at 103° C and Form B has an endotherm at 107° C.  *Id*. at 87-88.  A form exhibiting a higher endotherm temperature is inherently understood to be compatible with a higher purity.  Thus, the higher melting point of Form B would be consistent and compatible with a higher degree of purity in Form B in comparison with Form A based on these endotherm temperatures.  Further, Form A is utilized as the starting material for the formation of Form B.  A POSA would understand that this transformation, similar to that described in the '066 Patent, typically removes impurities.  *Id*.  As such, Form A should be purer than the starting batch, and Form B purer than Form A.  *Id.*

Further, a POSA would have had a reasonable expectation that the treprostinil salt described in Phares 2005 would contain a lower amount of one or more impurities than the starting batch of treprostinil because contacting a carboxylic acid of prostacyclin derivative, such as treprostinil, with a base to form a salt, followed by the addition of a strong acid to regenerate the carboxylic acid, was a well-known chemical purification technique in the prior art.  For example, Kawakami 1981 is directed to the preparation and use of dicyclohexylamine (i.e., an amine base with similar reactivity to diethanolamine) to form a crystalline dicyclohexylamine salt of a methanoprostacyclin derivative, in order to purify the methanoprostacyclin.  *See generally* Kawakami 1981.  Kawakami 1981 also discloses that the dicyclohexylamine salt of a

HIGHLY CONFIDENTIAL

methanoprostacyclin derivative can easily be reverted to the free methanoprostacyclin derivative by conventional methods, such as treating the salt with a strong acid such as HCl or $H_2SO_4$. *Id*. at 6.  Per Kawakami 1981, the salt that is obtained has "fairly high purity, and the purity can be further improved by recrystallization as needed with the use of an appropriate solvent."  *Id*.; *see also* Ege 1989 at 546 (disclosing that sodium benzoate (i.e., a carboxylate salt) can be converted back to the benzoic acid (i.e., a carboxylic acid) by treatment with HCl).  Thus, a POSA would know that a pharmaceutical composition comprising either treprostinil acid or treprostinil salt made by the process disclosed in Phares 2005 and claimed in the '066 Patent would possess less impurities than the starting batch of treprostinil resulting from the prior alkylation and/or hydrolysis steps.

A POSA would therefore find it obvious that the level of one or more impurities found in the starting batch of treprostinil is lower in the final pharmaceutical composition.

### (7)    Claim Element 1[g]

| 1[g] | *wherein said alkylation is alkylation of benzindene triol.* |

Example 1 of the '066 Patent describes the alkylation of benzindene triol.  '066 Patent at 9:50-10:13.  This alkylation reaction is shown below:

Alkylation of Benzindene Triol

*Id*.  Benzindene triol is the fused tricyclic core wherein the three hydroxyl groups (-OH) are not all located on the core.  In this example, the hydroxyl group indicated with the red square is being alkylated using **ClCH$_2$CN** in the presence of K$_2$CO$_3$, Bu$_4$NBr and acetone.

As stated above in Section II.C.1.a.(2), Phares 2005 discloses an alkylation reaction identical in nature to the '066 Patent alkylation reaction: **(l) i. ClCH$_2$CN, K$_2$CO$_3$**.  Phares 2005 at 39-40.  In particular, in step (l) the starting treprostinil precursor compound, the benzindene triol, has the same structural formula as the treprostinil precursor being alkylated in the '066 Patent (**11b** indicates that "R" can be "H").  The reaction from Phares 2005 is shown below for comparison:



*Id*.  Phares 2005 teaches a POSA to selectively alkylates the phenolic –OH group on the fused three ring core of Compound **11b** as indicated in the red box.  *Id*.

In addition, Phares 2005 cites to U.S. Patent No. 4,306,075 for routes in which compounds disclosed in Phares 2005 can be modified.  *Id*. at 9 (citing U.S. Patent No. 4,306,075 ("the '075 Patent")).  Chart P of the '075 patent provides a synthetic scheme where the -OH of a benzindene triol, as referred to in the '066 Patent, is alkylated.  '075 Patent at col. 90.  While the '075 Patent does not disclose the same synthesis reaction, this reference supports the proposition that it was not a novel step at the time of the invention to alkylate an –OH group on the benzene of a fused ring system.

The disclosures and references contained in Phares 2005 thus disclose alkylation of a benzindene triol that can be used to prepare treprostinil.

**HIGHLY CONFIDENTIAL**

### b.   Dependent Claims 2-3 and 6 Would Have Been Obvious

#### (1)   Claim 2

| 2 | The pharmaceutical composition of claim 1, *wherein the salt is isolated in crystalline form.* |
|---|---|

As stated above in Section II.A.1, Phares 2005 discloses that "[a] preferred embodiment of the present invention is the diethanolamine salt of treprostinil." Phares 2005 at 9.  Phares 2005 discloses two **crystalline forms** of treprostinil diethanolamine salt, Form A and Form B.  *Id.* at 85-89 ("two **crystalline forms** of UT-15C were idenitified [sic] as well as an amorphous form.") (emphasis added).  A particularly preferred embodiment of the invention disclosed in Phares 2005 is "Form B of treprostinil diethanolamine." *Id.* at 9.  Phares 2005 therefore discloses the same treprostinil diethanolamine salt, in crystalline form, as the '066 Patent.

#### (2)   Claims 3

| 3 | The pharmaceutical composition of claim 1, *wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline.* |
|---|---|

Phares 2005 discloses the preparation of treprostinil diethanolamine, including the step of adding treprostinil and diethanolamine (*i.e.,* a base) in a 1:1 molar ratio mixture of ethanol: water.  Phares 2005 at 22.  After addition of a base, the treprostinil diethanolamine can then be further precipitated and purified to form the crystalline "Form A" and "Form B." *Id*. at 85-89.  Phares 2005 thus discloses the use of the base diethanolamine.

Phares 2005 further discloses several other inorganic bases such as sodium, ammonia, potassium, calcium, and ethanolamine*,* as recited in dependent claim 3 of the '066 Patent.  Phares 2005 at 55.

In addition, the language of claim 3 is indefinite.  It recites *sodium*, *potassium*, and *calcium*, but sodium, potassium, and calcium on their own are not bases.  They are the counterions that

result from treatment of the treprostinil acid with the corresponding bases.

### (3)  Claim 6

| 6 | The pharmaceutical composition of claim 1, *wherein the isolated salt is stored at ambient temperature.* |
|---|---|

A POSA would have found it obvious that the isolated treprostinil diethanolamine salt disclosed in Phares was storable at "ambient temperature," which the Court construed as ranging between 15° and 30° C.  D.I. 119 at 1.  Liquidia notes that the '066 Patent fails to provide any evidence that the salt, as made according to the process disclosed in the '066 Patent was stored at ambient temperature.  Nor does claim 6 does not provide a duration of time for storage at ambient temperature.

*First*, a POSA would expect that the treprostinil diethanolamine salt could be stored at ambient temperature because Phares 2005 teaches that treprostinil diethanolamine polymorphs have high melting points and can be formulated into a tablet and safely administered to human beings.  *See* Phares 2005 at 84-90. ███████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

HIGHLY CONFIDENTIAL

████████████████████████████████████████████████████████

████████████████████████████████████████    Because Phares 2005 discloses the

successful formulation and administration of treprostinil diethanolamine tablets, a POSA would

expect that treprostinil diethanolamine could be stored at ambient temperature—if not higher

temperatures.

*Second*, Dr. Pinal testified that the "stability" of the claimed pharmaceutical batch of the

'901 Patent derives from the presence of the impurities resulting from the claimed steps.

Declaration of Rodolfo Pinal, Ph.D. Supporting United Therapeutic Corporation's Patent Owner

Responses, *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00770, Exhibit 2025 at

¶ 91 (P.T.A.B. Mar. 1, 2021) ("Pinal Reply Declaration")  ("I note that precisely because though

the treprostinil molecule is taught by the prior art, the stability advantage afforded by the '901

Patent resides outside the treprostinil molecule itself, namely, the stability advantage is a function

of the specific impurities and levels thereof, present in the [pharmaceutical] batch.").  If Dr. Pinal

is correct, applying the same reasoning to the '066 Patent, then the treprostinil salt formed by

Phares 2005, or the combination of Moriarty and Phares 2005, would similarly be stable, and

therefore a POSA would expect it to be storable at ambient temperature, as required by claim 6.

A POSA would understand from Phares 2005 that a polymorph (Form A or Form B) of

treprostinil diethanolamine would be present at ambient temperature, or ~25° C.  Phares 2005

teaches that both Form A and Form B have melting temperatures well above ambient temperature:

103° C and 107° C, respectively.  Phares 2005 at 87-88.  Phares 2005 teaches the synthesis of

treprostinil diethanolamine:  "Treprostinil acid [sic] is dissolved in a 1:1 molar ratio mixture of

ethanol:water and diethanolamine is added and dissolved. The solution is heated and acetone is

added as an antisolvent during cooling."  *Id.* at 22.  Because there is no temperature limitation

**HIGHLY CONFIDENTIAL**

here, a POSA would understand that treprostinil diethanolamine was being isolated at ambient temperature, so that it was stable at ambient temperature, which is a requirement according to UTC.  This conclusion is supported by a subsequent disclosure by Batra, which teaches that treprostinil diethanolamine was "dried at room temperature to obtain Form B."  Batra, H., et al., *Crystallization Process Development for a Stable Polymorph of Treprostinil Diethanolamine (UT-15C) by Seeding*, Org. Proc. Res. Dev., 13, 242-49 (2009) ("Batra") at 249.  A POSA would understand from Phares 2005, as confirmed by the subsequent Batra disclosure, that treprostinil diethanolamine was stable at room (ambient) temperature.

Claim 6 of the '066 Patent is not specific as to what form of treprostinil is stored at ambient temperature, so a disclosure of the presence of *any* treprostinil diethanolamine polymorph at ambient temperature is sufficient to meet the claim language.



A POSA would certainly understand Phares 2005 to disclose as much, a point that Dr. Pinal and Dr. Batra agree with. Further, Phares 2005's teaching that Form A and Form B are "hygrosopic," meaning they absorb water in humid conditions (Phares 2005 at 87-88), is immaterial to claim 6 of the '066 Patent. Claim 6 does not say anything about humidity; its only recited storage limitation is to temperature.

***Third***, Phares 2005 mentions no special storage conditions for the treprostinil diethanolamine salt.  If the resulting salt needed to be stored at a temperature other than ambient, a POSA would have expected such disclosure in Phares 2005 based on the specificity of the

**HIGHLY CONFIDENTIAL**

reference.  For example, in an animal dosing study, Phares 2005 was careful to specify that:

> **The plasma samples were frozen at -20 °C and were transported on ice** to Absorption Systems Exton Facility. There **they were stored in a -80 °C freezer** pending analysis.

Phares 2005 at 67 (emphasis added).  Thus, a POSA would understand that, if reaction or storage conditions were required to be anything other than ambient temperature, Phares 2005 would have explicitly disclosed the relevant temperature.

*Fourth*, to the extent "storage" and "storing" require stability, which Liquidia disagrees, as did the Court in its claim construction ruling, the '066 Patent provides no evidence of storage stability.  The *only* reference to "storing" in the '066 Patent specification is a single sentence:

> Additional advantages of this process are: (a) crude treprostinil salts can be stored as raw material at ambient temperature and can be converted to treprostinil by simple acidification with diluted hydrochloric acid . . . .

'066 Patent at 17:32-36.  The '066 Patent certainly assumes that a POSA would understand that all crude treprostinil salts can be stored at ambient temperature, without needing to see storage stability data.  Applying the same assumed knowledge of a POSA to a POSA reading Phares 2005, a POSA would understand the treprostinil diethanolamine salt described there to be storable at room temperature.  Further, the claims are not specific as to which polymorph is stored at ambient temperature or how stable it is.  All that claim 6 requires is that some polymorph is present at ambient temperature. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

*Fifth*, Phares 2005 discloses the formation of the more "thermodynamically stable" polymorph (Form B) at ambient temperature (Phares 2005 at 89 (Table 17)), so a POSA would expect that Form B could further be stored under these same conditions.  *Id*. at 22 (salt formation

step without specifying non-ambient temperature conditions).

***Sixth***, salts of treprostinil were already known and FDA-approved to be stored at these temperatures.  *See* 2004 Remodulin Label, p.12 (disclosing that FDA-approved unopened vials of treprostinil sodium salt are "stable until the date indicated *when stored at 15 to 25°C*" and instructions say to "[s]tore at 25°C . . . with excursions permitted *to 15-30°C*") (emphases added).

For at least these reasons, a POSA would have found it obvious that treprostinil diethanolamine salt was storable at ambient temperature.

### c.    Independent Claim 8 Would Have Been Obvious

#### (1)    Claim Elements 8[a] and 8[b]

| 8[a] | *A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising:* |
|------|------|
| 8[b] | *alkylating a triol intermediate of the formula:*  |

Phares 2005 discloses the same treprostinil and treprostinil diethanolamine salt as the '066 Patent.  Phares 2005 at 8-10; 87-88; *supra* Section II.C.1.a.(1).  Phares 2005 further discloses alkylating a triol intermediate, the benzindene triol, of the same structural formula disclosed in claim 8 of the '066 Patent.  *See also supra* Section II.C.1.a.(7).  A comparison between the alkylation substrates disclosed in the '066 Patent (left) and Phares 2005 (right) are produced below for a side-by-side comparison:

Alkylation of Benzindene Triol

('066 Patent)                                        (Phares 2005)

'066 Patent at 9:50-10:13, claim 8; Phares 2005 at 40. Intermediate **11b** of Phares 2005 indicates that "R=H," so the structural formulas disclosed for the triol intermediates are the same in claim 8 of the '066 Patent and structure **11b** of Phares 2005.

### (2)   Claim Element 8[c]

| 8[c] | *hydrolyzing the resulting compound to form treprostinil,* |
|---|---|

Phares 2005 discloses hydrolyzing the resulting compound (obtained by the alkylation of the substrate **11b** shown above) to form the same structural formula for treprostinil starting material disclosed in the '066 Patent. *See supra* Sections II.C.1.a.(2) and II.C.1.a.(7). The hydrolyzing procedure is disclosed in Phares 2005 as: adding "KOH, CH3OH, reflux. 83%." Phares 2005 at 40. This hydrolyzing procedure, though explicitly disclosed for the preparation of the enantiomer of treprostinil, is inherently disclosed for the preparation of the treprostinil structure at page 22 of Phares 2005 as well. A comparison between the treprostinil starting material disclosed in the '066 Patent (left) and the treprostinil that is taught in Phares 2005 at page 22 (right) are produced below for a side-by-side comparison:

47

**HIGHLY CONFIDENTIAL**

('066 Patent)                                    (Phares 2005)

'066 Patent at 10:55-65 (Example 2); Phares 2005 at 8.

Treprostinil can be further converted to treprostinil salt with the disclosed preparation on page 22 of Phares 2005, wherein the treprostinil starting material is added to and dissolved in diethanolamine in a 1:1 molar ratio mixture of ethanol: water and further precipitated and purified to form the crystalline form. *Id.* at 85-89. This disclosure of the diethanolamine salt formation is identical to the pharmaceutical salt of treprostinil as disclosed in claims 1 and 8 of the '066 Patent.

### (3)    Claim Elements 8[d] and 8[e]

| 8[d] | *forming a salt of treprostinil stable at ambient temperature,* |
|------|--------------------------------------------------------------------|
| 8[e] | *storing the treprostinil salt at ambient temperature, and* |

*See* explanation under independent claim 1 and dependent claim 6. Sections II.C.1.a.(1) and II.C.1.b.(3).

### (4)    Claim Element 8[f]

| 8[f] | *preparing a pharmaceutical product from the treprostinil salt after storage,* |
|------|-----------------------------------------------------------------------------------|

As treprostinil and treprostinil diethanolamine salt are disclosed in Phares 2005 and the '066 Patent, there are no structural differences between these molecules that would require different storage conditions or indicate that the pharmaceutical product could not be formed from the salt after storage. The same process used to form salts before storage would also be used to

48

form salts after storage; this step is not novel or an improvement.  Phares 2005 thus inherently discloses preparation of a pharmaceutical product from the treprostinil salt after storage.

### (5)    Claim Element 8[g]

| 8[g] | *wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.* |
|------|------|

*See* explanation under independent claim 1.  Section II.C.1.a.(1).

### d.    Dependent Claim 9 Would Have Been Obvious

| 9 | *A pharmaceutical product prepared by the process of claim 8.* |
|---|------|

*See* explanation under independent claims 1 and 8.  Sections II.C.1.a and II.C.1.c.

### 2.    Claims 1-3, 6, and 8-9 Would Have Been Obvious Over Moriarty 2004 in Combination with Phares 2005

### a.    Motivation to Combine Moriarty 2004 with Phares 2005

### (1)    UTC is Precluded from Disputing the Motivation to Combine Moriarty and Phares 2005

UTC's argument concerning motivation to combine Moriarty with Phares 2005 is precluded because the issue was fully and fairly tried in a previous action involving substantially similar claims and was adversely resolved against UTC.  For issue preclusion to apply, the unadjudicated and previously adjudicated claims need not be identical.  *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013) (applying issue preclusion to parent patent with substantially similar claim as invalidated child patent).  Rather, "it is the identity of the *issues* that were litigated that determines whether [issue preclusion] should apply."  *Id.* (emphasis in original).  "If the differences between the unadjudicated patent claims and adjudicated patent claims *do not materially alter the question of invalidity*, [issue preclusion] applies."  *Id*.

The *issue* of a motivation to combine Moriarty and Phares 2005 was already litigated and decided in the '393 IPR and affirmed by the Federal Circuit.  *SteadyMed*, IPR2016-00006, Paper

82 at 47, *aff'd*, *United Therapeutics v. SteadyMed*, 702 F. App'x 990 (2017).  The '393 and '066 Patent claims are substantially similar.  Both patents require a process of (i) alkylating a benzindene triol; (ii) hydrolyzing the product of step (i); (iii) contacting the product of step (ii) with a base to form a treprostinil salt; (iv) isolating the salt of treprostinil; and (v) optionally reacting the treprostinil salt from step (iii) to form treprostinil.  The only differences are that the '066 Patent claims include impurity limitations as to the starting batch and pharmaceutical composition.  These differences are immaterial, because they are not excluded from the claims of the '393 Patent and are nonetheless disclosed by the exact same combination of Moriarty and Phares 2005 that invalidated the '393 Patent.

Particularly for product-by-process claims, the product—not the process— controls.  *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985); *Amgen*, 580 F.3d at 1369.  UTC conceded that the '393 and '066 Patents claim the same product.  *See* Amendment and Request for Reconsideration (U.S. App. No. 14/849,981) (Aug. 24, 2016) at 4  (UTC citing certificates of analysis for the product claimed in the '393 Patent, and relied upon by UTC's experts, to argue that "a pharmaceutical batch produced according to a salt formation process as covered by claim 1 [of the '066 Patent] is different from the product produced by the process described in Moriarty 2004.").  Thus, the storage issues claimed in the '066 Patent claims 6 and 8 would be the same for both patents' products.

In sum, UTC has "not provided any explanation regarding *how* the [additional] limitations" of the '066 Patent are "patentably significant" to the motivation to combine Moriarty and Phares 2005 "in view of the obviousness determination regarding the claims of the ['393] patent."  *Ohio Willow Wood*, 735 F.3d at 1343 (emphasis in original).  Thus, issue preclusion should apply.

HIGHLY CONFIDENTIAL

### (2)    A POSA Would Nonetheless Be Motivated to Combine Moriarty and Phares 2005

A POSA would have been motivated to combine Moriarty 2004 and Phares 2005 at the time of the invention of the '066 Patent.  The combination of Moriarty 2004 and Phares 2005 discloses the same process steps and same treprostinil product of the '066 Patent.  *See* Sections II.A.1 and II.A.2 *supra*.  As discussed above, Moriarty 2004 teaches the preparation of treprostinil acid, and Phares 2005 teaches the preparation of treprostinil diethanolamine by dissolving treprostinil acid and treating it with diethanolamine.  Moriarty at 1895, 1902; Phares 2005 at 22.  Phares 2005 further discloses two polymorphs of treprostinil diethanolamine and their relative stabilities.  Phares 2005 at 85-89. █████████████████████████

███████████████████████████████████████████████████████

████████████████████████

First, a POSA would also be motivated to form a salt of treprostinil because, as Phares 2005 expressly discloses, carboxylate salts (COO⁻ M⁺) exhibit enhanced bioavailability relative to the free carboxylic acid (COOH).  In particular, Phares 2005 teaches that "treprostinil as the free acid has an absolute oral bioavailability of less than 10%."  Phares 2005 at 2. ██████████████

███████████████████████████████████████████████████████

███████ For this reason, Phares 2005 identifies a "clinical interest in providing treprostinil orally." Phares 2005 at 2.  Phares 2005 specifically discloses a clinical study that determined treprostinil diethanolamine has an oral bioavailability of 21-25% when delivered in 0.2-2.0 mg doses—a greater than 100% increase compared to treprostinil free acid.  *Id.* at 83.  This finding is unsurprising, given that POSAs were aware that organic salts can "exhibit enhanced bioavailability and desirable formulation characteristics."  Berge, S.M., et al., "Pharmaceutical Salts," J. Pharm. Scis., 66(1):1-19 (1977) at 7.  Thus, a POSA would be motivated to form a salt form of treprostinil

in order to improve bioavailability.

Second, a POSA would be motivated to form a salt of treprostinil because it was known that treprostinil diethanolamine had no safety problems relative to the FDA-approved drug, Remodulin®.  In fact, Phares 2005 expressly discloses that the "safety profile with UT-15C (treprostinil diethanolamine) is consistent with the reported safety profile and product labeling of [FDA-approved] Remodulin (treprostinil sodium) and other prostacyclin analogs."  Phares 2005 at 83; *see also* Pinal Dep. Tr. at 147:10-149:18.

More specifically, Moriarty 2004 indicates that the crystalline treprostinil resulting from the disclosed process is obtained in the form of "[w]hite needles."  Moriarty 2004 at 1902.  A POSA would have known that "needle-shaped crystals are not desirable because of their poor flow properties."  HANDBOOK OF PHARMACEUTICAL SALTS 137 (P. Heinrich Stahl, et al. eds., 1st ed. 2002) ("Stahl 2002") at p. 62; *see also* Declaration of Dr. Rodolfo Pinal, *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00769, Ex. 2002 at ¶ 258 (P.T.A.B. July 14, 2020) (UTC expert testifying that needle-shaped crystals were known to be unsuitable for downstream processing).  To improve the flow properties, among others, of the treprostinil acid produced according to Moriarty 2004, a POSA would have been motivated to modify the resulting treprostinil product disclosed in Moriarty 2004.  One means of improving the downstream processing properties of APIs is to make them into a salt form.  *See* G. Steffen Paulekuhn, et al., *Trends in Active Pharmaceutical Ingredient Salt Selection based on Analysis of the Orange Book Database*, 50 J. MED. CHEM. 6665-6672, 6665 (2007) ("Paulekuhn 2007") ("Salt formation is a well-known technique to modify and optimize the physical chemical properties of an ionizable research or development compound.  Properties such as solubility, dissolution rate, hygroscopicity, stability, impurity profiles, and crystal habits can be influenced by using a variety of

**HIGHLY CONFIDENTIAL**

pharmaceutically acceptable counterions."). Thus, a POSA would have sought to combine the treprostinil acid of Moriarty 2004 with the diethanolamine salt of Phares 2005 to improve properties, such as flow, of the pharmaceutical product.

Third, a POSA would have sought to combine Phares 2005 and Moriarty 2004 because Phares 2005 is directed to improving treprostinil, and the Moriarty 2004 process, including those steps claimed by the '066 Patent, was a well-known way to make treprostinil. Further, a POSA would have sought to combine Moriarty 2004 and Phares 2005 in order to eliminate the intermediate purification step taught by Moriarty 2004, thereby increasing synthetic efficiency and lowering production costs for treprostinil diethanolamine salt. ██████████████████ ███████████████████████████████████████████ A POSA would understand that an intermediate purification step is unnecessary because not purifying the intermediate carboxylic acid before addition of a base does not affect salt formation.

Fourth, a POSA would have sought to combine Phares 2005 and Moriarty 2004 because Phares 2005 teaches that treprostinil diethanolamine salts can be formulated as tablets and safely administered to patients. *See* Phares 2005 at 84-85. ████████████████



████████████████ For these additional reasons, identified by a named inventor of the '066 Patent, a POSA would have been motivated to combine Phares 2005 with Moriarty 2004.

Lastly, to the extent UTC contends that a POSA would not be motivated to combine Moriarty and Phares 2005 because they are "directed to different problems," UTC is incorrect.

Both Moriarty and Phares 2005 are directed to the same subject matter—that is, treprostinil. And even if they were directed to different problems, "[o]ne of ordinary skill in the art need not see the identical problem addressed in a prior art reference to be motivated to apply its teachings." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1323 (Fed. Cir. 2005).

Accordingly, a POSA would have been motivated to combine the treprostinil acid disclosed in Moriarty 2004 with the diethanolamine treprostinil disclosed in Phares 2005.

### b.    Reasonable Expectation of Success

A POSA would have had a reasonable expectation of success in reacting the treprostinil taught by Moriarty 2004 with diethanolamine to form a treprostinil diethanolamine salt. "The reasonable expectation of success requirement refers to the likelihood of success in combining references to meet the limitations of the claimed invention." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016). ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ The proposed combination of Moriarty 2004 and Phares 2005 yields treprostinil diethanolamine salt (*i.e.*, the product claimed in independent claims 1 and 8 of the '066 Patent) via the process taught by Phares 2005. A POSA would have a reasonable expectation of success in doing so because Phares 2005 successfully performed precisely that step. *Id.* Indeed, the combination of Moriarty 2004 and Phares 2005 results in essentially the same process as disclosed in Example 6 of the '066 Patent. Further, a POSA would understand that forming a salt from the treprostinil acid disclosed in Moriarty 2004 would not make the resulting product less pure than the 99.7% disclosed in the reference. Schoffstall 2004 at 201-02; Wiberg 1960 at 112; Kawakami 1981 at 6; *see also* Laurence M. Harwood, et al., Experimental Organic Chemistry 127 (1st ed. 1989) ("Harwood 1989") ("The simplest and most effective technique for the purification of solid organic

**HIGHLY CONFIDENTIAL**

compounds is crystallization.  Crystalline compounds are easy to handle, their purity is readily assessed . . . and they are often easier to identify than liquids or oils.").

### c.    Independent Claim 1 Would Have Been Obvious

Moriarty 2004 in combination with Phares 2005 teaches each element of claim 1 of the '066 Patent.

### (1)    Claim Element 1[a]

| 1[a] | *A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising:* |
|------|---|

Moriarty 2004 discloses the production of a pharmaceutical composition and the synthesis of treprostinil via the stereoselective intramolecular Pauson-Khand cyclization.  Moriarty 2004 at 1890.  Structure **7** of Moriarty 2004 depicts the chemical structure of treprostinil and is shown below:



**7**

*Id*. at 1892.  This is the identical treprostinil pharmaceutical salt precursor disclosed in the '066 Patent:

'066 Patent at 11:50-65.

While the step of reacting treprostinil with a base to form a salt of **7** is not disclosed in Moriarty 2004, this step is clearly disclosed in Phares 2005.  Phares 2005 at 22.  Phares 2005 discloses that treprostinil acid (which is equivalent to **7** in Moriarty 2004) is dissolved in a 1:1 molar ratio mixture of ethanol: water and diethanolamine (*i.e.*, the base) is added and dissolved. *Id*.  The solution is heated and acetone is added as an antisolvent during cooling. *Id*.  The resulting structure (left) corresponds to the treprostinil diethanolamine salt claimed in the '066 Patent (right).  A side-by-side comparison is shown below:



(Phares 2005)                                             ('066 Patent)

Phares 2005 at 9, 96 (claim 49); '066 Patent at 9:5-18, 12:8-23 (Example 3).  Other than a change in formatting, these two structures are identical.

56
**HIGHLY CONFIDENTIAL**

The formation of salts by the reaction of carboxylic acids with bases is a common reaction in organic chemistry and this process is well within the skill of a POSA, as discussed above. *E.g.*, Kawakami 1981 at 6.

This salt is the result of the same steps described in the '066 Patent (a) by forming a salt of treprostinil by combining the starting solution of treprostinil acid and a base and (b) isolating the treprostinil salt. '066 Patent at claims 1 and 8. The isolated salt is then used to prepare a pharmaceutical batch comprising treprostinil or a salt thereof. *Id.*

The combination of Moriarty 2004 and Phares 2005 discloses the same process steps and product of the '066 Patent and as such, the combination of these references would disclose a purity of at least equal purity to that claimed in the '066 Patent. In fact, in the IPR proceeding involving the related '393 Patent, the PTAB determined that the product resulting from Moriarty 2004 is the same product as disclosed and claimed in the '393 patent. *SteadyMed*, IPR2016-00006, Paper 82 at 16 (The "batches of treprostinil produced according to the process steps recited in the challenged claims renders the claimed treprostinil structurally and functionally the same as treprostinil produced according to Moriarty [2004].")). Thus, for the same reasons, the product disclosed in Moriarty 2004 is necessarily the same as the product of the '066 Patent, because it claims the exact same process as the '393 patent. The '066 Patent discloses that in one embodiment the "purity of compound of formula IV is at least 90.0%, 95.0%, 99.0% [or] 99.5%, where the compound of formula IV is treprostinil." '066 Patent at 9:22-23. This disclosure shows that the purity of treprostinil may be as low as 90.0%.

Phares 2005 further discloses two crystalline forms of treprostinil diethanolamine salt, Form A and Form B. Phares 2005 at 85-89. Form A has an endotherm, 103° C and Form B has an endotherm, 107° C. Phares 2005 at 87-88. The higher melting point of Form B is consistent

**HIGHLY CONFIDENTIAL**

and compatible with a higher degree of purity in Form B in comparison with Form A. Further, Form A is utilized as the starting material for the formation of Form B. Phares 2005 at 87-88. A POSA would understand that this transformation, similar to that described in the '066 Patent, typically removes impurities. *Id.* As such, Form A should be purer than the starting batch and Form B purer than Form A. *Id.*

Therefore, Moriarty 2004 in combination with Phares 2005 disclose a pharmaceutical composition comprising treprostinil or a salt thereof and impurities.

### (2)    Claim Element 1[b]

| 1[b] | *providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps,* |
|---|---|

Both Moriarty 2004 and Phares 2005 teach the alkylation and hydrolysis steps claimed in the '066 Patent. *See* Moriarty 2004; Phares 2005. Moriarty 2004 teaches that the alkylating agent is $ClCH_2CN$, which corresponds to $Cl(CH_2)_wCN$ where w is 1 disclosed in the '066 Patent. Moriarty 2004 at 1892, 1895; '066 Patent at 2:36-47. Moriarty 2004 further discloses that the base in step (b) is KOH. Moriarty at 1892, 1895. Phares 2005 teaches the exact same alkylation and hydrolyzing steps for treprostinil's enantiomer, detailed as "step (1)": (1) i. **$ClCH_2CN$**, $K_2CO_3$. ii. **KOH**, $CH_3OH$, reflux. 83% (2 steps) and disclosed as equally applicable to treprostinil. Phares 2005 at 39, 40; *see also* Section I.A.1.b (explaining how Phares 2005 teaches synthesis of (+)-treprostinil). Chloroacetonitrile ($ClCH_2CN$) was known in the art at the time of the invention to play an important role in alkylation reactions, and methanolic potassium hydroxide (KOH, $CH_3OH$) was known to play an important role in hydrolysis. It thus would have been obvious to a POSA that the starting batch of treprostinil, as prepared in Moriarty 2004 or the Phares 2005 treprostinil acid disclosed at page 22, would result from these previously described alkylation and hydrolysis steps. Indeed, Dr. Pinal agrees that all reactions produce impurities. ▮



Based on these identical starting materials and reagents, a POSA would expect the starting batch of treprostinil from Moriarty 2004 and Phares 2005 to contain one or more impurities resulting from the prior alkylation and hydrolysis steps.

### (3)    Claim Element 1[c]

| 1[c] | *forming a salt of treprostinil by combining the starting batch and a base,* |
|------|------|

As discussed above, Moriarty 2004 discloses the identical treprostinil precursor and Phares 2005 discloses the identical pharmaceutically acceptable treprostinil diethanolamine salt as the '066 Patent.

Scheme 4 of Moriarty 2004 teaches that **35** is hydrolyzed with a base (*i.e.*, aqueous KOH), followed by acidification to yield **7**, the treprostinil salt precursor disclosed in the '066 Patent. Moriarty 2004 at 1895, 1902.  Phares 2005 also teaches the same reactions of the enantiomeric treprostinil salt precursor: (1) i. ClCH$_2$CN, K$_2$CO$_3$. ii. KOH, CH$_3$OH, reflux. 83% (2 steps).  Phares 2005 at 40.  Phares 2005 explains that "[e]nantiomers of these compounds . . . can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents," thereby inherently teaching the synthesis of both enantiomeric forms of treprostinil, both (-)-treprostinil and (+)-treprostinil.  *Id.* at 39-40.

Treprostinil can be further converted to treprostinil salt in view of the disclosed preparation on page 22 of Phares 2005, wherein the treprostinil is added to and dissolved in diethanolamine (*i.e.,* a base) in a 1:1 molar ratio mixture of ethanol: water and the resulting salt further precipitated and purified to form the crystalline form (*i.e.*, "Form B").  *Id.* at 85-89.  This disclosure of the

**HIGHLY CONFIDENTIAL**

diethanolamine salt formation is identical to the pharmaceutical salt of treprostinil as disclosed in claims 1 and 8 of the '066 Patent.

### (4)    Claim Element 1[d]

| 1[d] | *isolating the treprostinil salt, and* |
|------|----------------------------------------|

Phares 2005 discloses isolating the identical pharmaceutically acceptable treprostinil diethanolamine salt form as the '066 Patent.  *See* Phares 2005's further disclosure of the same element in Ground 1, *supra* at Section II.C.1.a.(4).

### (5)    Claim Element 1[e]

| 1[e] | *preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt,* |
|------|---------------------------------------------------------------------------------------------------------------------------------------------------|

*See* Phares 2005's disclosure of the same element in Ground 1.  Section II.C.1.a.(5).

### (6)    Claim Element 1[f]

| 1[f] | *whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and* |
|------|----------------------------------------------------------------------------------------------------------------------------------------|

As the combination of Moriarty 2004 with Phares 2005 discloses the same process steps and product of the '066 Patent, the combination of these references would disclose a purity of at least equal purity to that claimed in the '066 Patent.

The claim language of the '066 Patent does not disclose the percentage of "impurity" required in the starting batch of treprostinil and simply states "having one or more impurities." The '066 Patent discloses that in one embodiment the "purity of compound of formula IV is at least 90.0%, 95.0%, 99.0% [or] 99.5%," where the compound of formula IV is treprostinil.  '066 Patent at 9:22-23.  This disclosure shows that the purity of treprostinil may be as low as 90.0%. Moriarty 2004 discloses a purity of 99.7%.  Moriarty 2004 at 1902.

Based on the identical starting materials and chemical steps used to make treprostinil in

**HIGHLY CONFIDENTIAL**

Phares 2005 and the '066 Patent, as discussed further in Sections II.A.1 and II.C.1.a.(2), a POSA would expect the "starting batch" of treprostinil to necessarily contain impurities resulting from the prior alkylation and/or hydrolysis steps. █████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ Further, because Phares 2005 discloses the same method of making treprostinil salts as claimed in the '066 Patent, the pharmaceutical batch of Phares 2005 would also have contained a lower amount of one or more impurities than the starting batch of treprostinil.  Accordingly, that the claimed pharmaceutical composition contains a lower amount of one or more impurities than the starting batch of treprostinil was neither new nor nonobvious.  *Thorpe*, 777 F.2d at 697 ("If the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process."); *see also Amgen*, 580 F.3d at 1366 ("It has long been the case that an old product is not patentable even if it is made by a new process.").

Additionally, a POSA would have a reasonable expectation that the treprostinil salt described in Phares 2005 would contain a lower amount of one or more impurities than the starting batch of treprostinil because crystallization of the starting batch to make the treprostinil salt would purify the sample.  *See* Harwood 1989 at 127 ("The simplest and most effective technique for the purification of solid organic compounds is crystallization.  Crystalline compounds are easy to handle, their purity is readily assessed . . . and they are often easier to identify than liquids or oils.").  Further, because regeneration of the carboxylic acid was a standard chemical purification method known in the art (*see, e.g.*, Ege 1989 at 546; Schoffstall 2004 at 201-02; Wiberg 1960 at

61

**HIGHLY CONFIDENTIAL**

112; Kawakami 1981 at 6), a POSA would know that formation of a pharmaceutical product comprising treprostinil acid by reacting the treprostinil salt with an acid (e.g., HCl) would further purify the pharmaceutical composition.  Thus, a POSA would know that a pharmaceutical composition comprising either treprostinil acid or treprostinil salt made by the process disclosed in Phares 2005 and claimed in the '066 Patent would possess less impurities than the starting batch of treprostinil resulting from the prior alkylation and/or hydrolysis steps.

Accordingly, that the pharmaceutical composition described in Phares 2005 and claimed by the '066 Patent contains a lower amount of one or more impurities than the starting batch of treprostinil would have been obvious to a POSA in December 2007 over Moriarty 2004 in combination with Phares 2005.

### (7)    Claim Element 1[g]

| 1[g] | *wherein said alkylation is alkylation of benzindene triol.* |
|------|-------------------------------------------------------------|

Moriarty 2004 teaches alkylation of benzindene triol.  Moriarty 2004 at 1897.  The alkylation reaction of **34** to yield **35** as disclosed in Moriarty 2004 is equivalent to the alkylation reaction disclosed in the '066 Patent.  **34** and **35** of Moriarty 2004 are as follows:



*Id*. at 1895, 1902.  Moriarty 2004 teaches that the triol (**34**) was alkylated at the phenolic hydroxyl group with use of chloroacetonitrile in refluxing acetone with potassium carbonate (**34 → 35**) and nitrile **35** was hydrolyzed with ethanolic potassium hydroxide to yield UT-15 (**7**).  *Id.* at 1897.  This is the same triol disclosed in the '066 Patent as shown below:

**HIGHLY CONFIDENTIAL**

|                | |
|----------------|---|
| ('066 Patent)  | (Moriarty 2004) |

'066 Patent at 10:17-26; Moriarty 2004 1895, 1902.

As discussed above in Section II.C.1.a.(7), Phares 2005 also discloses alkylation of a benzindene triol (**11b → 2**). Phares 2005 at 40. A POSA would recognize that step (l) disclosed in Phares 2005 (i. ClCH$_2$CN, K$_2$CO$_3$) teaches the same alkylation reaction to give the nitrile disclosed in Phares 2005.

### d.      Dependent Claims 2-3 and 6 Would Have Been Obvious

### (1)      Claim 2

| 2 | The pharmaceutical composition of claim 1, *wherein the salt is isolated in crystalline form.* |
|---|---|

As discussed above, while Moriarty 2004 does not teach preparation of a diethanolamine salt of treprostinil or a pharmaceutical product comprising treprostinil salt, Phares 2005 teaches preparation of treprostinil diethanolamine by dissolving treprostinil acid and treating it with diethanolamine. Phares 2005 at 22. The pharmaceutical acceptability of treprostinil diethanolamine is clearly disclosed in Phares 2005. *Id.* at 48 (The invention of Phares 2005 "provides for compositions which may be prepared by mixing one or more compounds of the instant invention, or pharmaceutically acceptable salts thereof, with pharmaceutically acceptable

carriers, excipients, binders, diluents or the like, to treat or ameliorate a variety of disorders related vasoconstriction and/or platelet aggregation."). Accordingly, a POSA would have found it obvious to prepare a product from the pharmaceutically acceptable treprostinil diethanolamine salt of Phares 2005 that was in turn prepared from the treprostinil free acid obtained by the process of Moriarty 2004.

Phares 2005 further discloses two **crystalline forms** of treprostinil diethanolamine salt, Form A and Form B. Phares 2005 at 85 ("Two **crystalline forms** of UT-15C were idenitified [sic] as well as an amorphous form") (emphasis added).) A particularly preferred embodiment of the invention disclosed in Phares 2005 is "Form B of treprostinil diethanolamine." *Id.* at 9. Phares 2005 therefore discloses the same treprostinil diethanolamine salt, in crystalline form, as the '066 Patent. Further, a sophomore organic chemistry student would understand that isolation of crystalline Forms A and B (wherein Form B is assumed to have higher purity than Form A) would be possible.

### (2)    Claim 3

| 3 | The pharmaceutical composition of claim 1, *wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline.* |
|---|---|

As explained *supra* in Section II.C.1.b.(2), Phares 2005 discloses the additional elements of claim 3.

In addition, the language of claim 3 is indefinite, because the recited *sodium*, *potassium*, and *calcium* on their own are not bases; rather, they are counterions that result from treatment of the treprostinil acid with the corresponding bases.

### (3)    Claim 6

| 6 | The pharmaceutical composition of claim 1, *wherein the isolated salt is stored at ambient temperature.* |
|---|---|

**HIGHLY CONFIDENTIAL**

For the reasons stated above in Section II.C.1.b.(3), a POSA would have found it obvious that treprostinil diethanolamine salt was storable at ambient temperature.

### e.       Independent Claim 8 Would Have Been Obvious

### (1)       Claim Elements 8[a]-8[c]

| 8[a] | *A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising:* |
|------|-----------------------------------------------------------------------------------------------------|
| 8[b] | *alkylating a triol intermediate of the formula:*  |
| 8[c] | *hydrolyzing the resulting compound to form treprostinil,* |

As discussed above, Moriarty 2004 and Phares 2005 disclose the synthesis of the treprostinil in the '066 Patent.  Specifically, Moriarty 2004[3] teaches the alkylation of triol intermediate **34** (left) which has the same formula as the triol structure in claim 8 of the '066 Patent (right):

---

[3] During the '066 IPR, UTC admitted that the "Former Process" of Example 6 is the process described in Moriarty 2004.  *See Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00769, Paper No. 6 at 66 (P.T.A.B. July 14, 2020) ("The 'former process' in example 6 is essentially the same as Liquidia's Moriarty [2004] references."); *see also SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Paper No. 32 at 5 (P.T.A.B. July 6, 2016) ("The '393 Patent includes a side-by-side comparison in Example 6 to show the difference between the Moriarty [2004] product and the '393 product . . . .").

HIGHLY CONFIDENTIAL

(Moriarty 2004)                                    ('066 Patent)

Moriarty 2004 at 1895; '066 Patent at 9:54-63)  Moriarty 2004 teaches that the "**[t]riol** (**34**) **was alkylated** at the phenolic hydroxyl group with use of chloroacetonitrile in refluxing acetone with potassium carbonate (**34→35**) and nitrile (**35**) was hydrolyzed with ethanolic potassium hydroxide to yield UT-15 (**7**) in 9% overall yield."  Moriarty 2004 at 1897 (emphasis added).)  Phares 2005 discloses the same reaction conditions for the triol alkylation step as Moriarty 2004 and as the '066 Patent, where "R" can be "H" (structure **11b**):



Phares 2005 at 40.  Phares 2005 discloses that the reaction could be performed on the enantiomer of the substrate that is taught in Moriarty 2004 and the '066 Patent.  *Id.* at 39-40.  Phares 2005 further explains that "[e]nantiomers of these compounds…can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents," thereby inherently teaching the synthesis of both enantiomeric forms of treprostinil, both (-)-treprostinil and (+)-treprostinil.  *Id.*

66
**HIGHLY CONFIDENTIAL**

Further, Moriarty 2004 teaches hydrolyzing the product **35**, obtained on alkylation of triol **34**, to form treprostinil (**7**):



Moriarty 2004 at 1895.  Moriarty 2004 teaches that ". . . nitrile (**35**) **was hydrolyzed** with ethanolic potassium hydroxide to yield UT-15 (**7**) in 9% overall yield."  *Id.* at 1897 (emphasis added).

Phares 2005 also teaches hydrolyzing the product obtained on alkylation of triol **11b** (with chloroacetonitrile) to form **2**, the enantiomer of treprostinil:



Phares 2005 at 39-40 (detailed as "step (1)"): (1) i. **ClCH$_2$CN**, K$_2$CO$_3$. ii. **KOH**, CH$_3$OH, reflux. 83% (2 steps).

Thus, claim elements 8[a]-[c] are obvious over the combination of Moriarty 2004 and Phares 2005.

### (2)    Claim Elements 8[d]-[e]

| 8[d] | *forming a salt of treprostinil stable at ambient temperature,* |
|------|------------------------------------------------------------------|
| 8[e] | *storing the treprostinil salt at ambient temperature, and*      |

*See* explanation under independent claim 1 and dependent claim 6.  Sections II.C.2.c and

II.C.2.d.(3).

### (3)   Claim Element 8[f]

| 8[f] | *preparing a pharmaceutical product from the treprostinil salt after storage,* |
|------|-------------------------------------------------------------------------------|

As treprostinil and treprostinil diethanolamine salt are disclosed in Phares 2005 and the '066 Patent, there are no structural differences between these molecules that would require different storage conditions or indicate that the pharmaceutical product could not be formed from the salt after storage.  The same process used to form salts before storage would also be used to form salts after storage; this step is not novel or an improvement.  Phares 2005 thus inherently discloses preparation of a pharmaceutical product from the treprostinil salt after storage.

### (4)   Claim Element 8[g]

| 8[g] | *wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.* |
|------|-----------------------------------------------------------------------------------------------------------|

*See* explanation under independent claim 1.  Section II.C.2.c.(1).

### f.   Dependent Claim 9 Would Have Been Obvious

| 9 | *A pharmaceutical product prepared by the process of* claim 8. |
|---|---------------------------------------------------------------|

*See* explanation under independent claims 1 and 8.  Sections II.C.2.c and II.C.2.e.

### D.   Claims 1-3, 6, and 8-9 Are Invalid Under 35 U.S.C. § 112

The Asserted Claims of the '066 Patent are invalid under 35 U.S.C. § 112 for lack of written description support, lack of enablement, and indefiniteness.  To the extent UTC contends that claims 1-3, 6, and 8-9 of the '066 Patent are not obvious, the asserted claims of the '066 patent are invalid under 35 U.S.C. § 112 for the reasons stated below.  "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  The applicant must "'convey

with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention,' and demonstrate that by disclosure in the specification of the patent." *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008) (quoting *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991)). "One cannot disclose a forest in the original application, and then later pick a tree out of the forest and say here is my invention." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326-37 (Fed. Cir. 2000) (finding "nothing in the written description of Examples 1 and 3 that would suggest to one skilled in the art that the [claimed invention] is an important defining quality of the formulation, nor does the disclosure even motivate one to [reach the claimed invention]"). Lastly, patents may need to disclose experimental data to provide an adequate written description if the inventor expressly claims that the invention achieves a certain result or has an efficacy limitation. *Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1384 (Fed. Cir. 2019) ("[W]hen the inventor expressly claims that result, our case law provides that that result must be supported by adequate disclosure in the specification.").

To satisfy the enablement requirement under § 112(a), the specification must enable a person having ordinary skill in the art to make and use the invention. *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013). This requirement is met when at the time of filing the application, one skilled in the art, having read the specification, could practice the invention without "undue experimentation." *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010) (quoting *Genentech Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997)). Finally, under § 112, patent claims must "particularly point[] out and distinctly claim[] the subject matter" regarded as the invention. 35 U.S.C. § 112(b).

**HIGHLY CONFIDENTIAL**

A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). As discovery is ongoing, Liquidia reserves the right to supplement and/or amend these contentions.

### 1.     Claim 1 Lacks Written Description Support and is Not Enabled

#### a.     "Impurities" Limitation Lacks Written Description Support

Asserted Claim 1 of the '066 Patent recites "a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps" and requires that "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition" of treprostinil salt or subsequently reformed treprostinil. '066, 17:53-55, 17:60-62. However, the '066 patent specification never discloses any measurement of impurities resulting from the alkylation or hydrolysis steps in the "starting batch of treprostinil," and in particular provides no analysis of the purity of the treprostinil free acid made after hydrolysis, or the impurities and their amounts that may remain in the treprostinil free acid that result from alkylation and hydrolysis. *See id.* at Examples 1 and 2; Example 6 (between steps 14 and 15 or between steps 30 and 31). Nor does the '066 patent specification disclose any purity measurements after salt formation or the impurities resulting from prior alkylation or hydrolysis and their amounts that may remain in the treprostinil salt. *See id.* at Examples 3, 4; Batra Dep. Tr. at 237:13-241:7. As such, the '066 patent does not demonstrate that the inventors actually determined that "a starting batch of treprostinil" had "one or more impurities resulting from prior alkylation and hydrolysis steps" or whether the "level of one or more impurities [resulting from prior alkylation or hydrolysis] found in the starting batch of treprostinil is lower in the pharmaceutical composition," and for this reason, the specification of the '066 patent does not convey to a skilled artisan that the

70

**HIGHLY CONFIDENTIAL**

inventors had possession of this limitation.   The '066 patent specification thus fails to provide any written description support for claim 1's recited reduction in impurities resulting from prior alkylation or hydrolysis between its starting batch and pharmaceutical composition.

### b.      "Salt" Limitation Lacks Written Description Support and Is Not Enabled

Asserted Claim 1 of the '066 Patent recites "forming a salt of treprostinil by combining the starting batch and a base."   '066, 17:55-56.   The claim recites use of *any* base to form a salt, while the patent specification only has a few lines identifying such bases.   *Id.* at 5:27-30 (identifying only "sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, choline and the like" as bases).

This disclosure is not sufficient to enable a skilled artisan to practice the full scope of claim 1.

71

Nor does the '066 patent adequately describe the full scope of claim 1.



Thus, the '066 patent's disclosure of possible bases does not provide adequate description of the broad spectrum of specific acid-base combinations that work to form a salt of treprostinil.

**2.      Claims 6, 8, and 9 Lack Written Description Support**

**a.      "Stored"/"Storing"/"Storage"   at   "Ambient   Temperature" Lack Written Description Support**

Asserted Claim 6 is directed to a pharmaceutical composition of claim 1, wherein the isolated salt is "stored" at "ambient temperature," which the Court construed as "room temperature (equal to or less than the range of 15°C to 30°C)."  D.I. 119 at 1.  Asserted Claim 8 of the '066 Patent, which Asserted Claim 9 depends, is directed to a method of preparing the pharmaceutical product comprising treprostinil or treprostinil salt by "forming a salt of treprostinil stable at ambient temperature, storing the treprostinil salt at ambient temperature, and preparing a pharmaceutical product from the treprostinil salt after storage . . . ."  "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad Pharms*, 598 F.3d at 1351.  An adequate written description need not in every instance describe an actual reduction to practice but "must nonetheless 'describe the claimed subject matter in terms that establish that [the applicant] was in possession of the . . . claimed invention, including all of the

HIGHLY CONFIDENTIAL

elements and limitations.'" *University of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 926 (Fed. Cir. 2004) (quoting *Hyatt v. Boone*, 146 F.3d 1348, 1353 (Fed. Cir. 1998)).  The specification, moreover, must provide written description support for an entire claimed range.  *Eiselstein v. Frank*, 52 F.3d 1035, 1040 (Fed. Cir. 1995) ("Since the grandparent application only disclosed a nickel range of 45-55%, it can hardly be said to have disclosed 50-60%.").  Accordingly, the specification of the '066 Patent must sufficiently describe a method of "storing" a treprostinil salt at the full range of 15 to 30° C and preparing a pharmaceutical product from the salt after "storage" and also a pharmaceutical composition wherein the "isolated salt is stored at ambient temperature," such that a person of skill in the art would recognize that the named inventors actually invented what is claimed.

A POSA reviewing the specification of the '066 Patent would conclude that the inventors were not in possession of a method of preparing a pharmaceutical product from a treprostinil salt that was "stored" at ambient temperature, or an isolated salt stored at the full range of 15 to 30° C. Initially, the '066 patent does not include any data where a treprostinil salt was stored for any period of time at ambient temperature. ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████ ███ Dep. Tr. 256:7-265:2.  Further, as UTC noted in its Preliminary Response to Liquidia's IPR Petition with respect to the '066 Patent, "[p]rostaglandin derivatives," like treprostinil, "in particular were known to be unstable upon storage due to inherent instability of the crystalline lattice of these compounds owning to their long, flexible sidearms, as well as the presence of multiple polymorphic crystals." *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00769, Paper 6 at 52 (P.T.A.B. July 14, 2020). Further, UTC noted in its Preliminary Response that "[e]nvironmental factors are a significant

factor (*e.g.*, temperature, oxygen, atmosphere, humidity).  This is especially true for compounds stored as salts." *Id*.  In UTC's Patent Owner Response to Liquidia's IPR Petition with respect to the '901 Patent, UTC further argued that a POSA would require storage stability data to believe a treprostinil salt could be stored at ambient temperature.  *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00770, Paper 12 at 29 (P.T.A.B. Dec. 21, 2020) ("No storage stability data is presented [in Phares]."); *see also* Declaration of Rodolfo Pinal, Ph.D. Supporting United Therapeutic Corporation's Patent Owner Response, *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00770, Ex. 2025 at ¶ 204 (P.T.A.B. Dec. 21, 2020) ("Phares also does not provide any storage stability data or suggest that an isolated treprostinil salt can be stored at ambient temperature prior to the preparation of a pharmaceutical composition.").

Additionally, named inventor ██████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL

████████████████████████████████████

███████████████████████

Considering these admissions , the specification of the '066 Patent provides no evidence or disclosure that the treprostinil salts of the claimed invention were actually "stored" for any length of time, let alone at 15 to 30° C, that the inventors were in possession of an isolated salt that was stored at the full range of ambient temperature, or that the inventors were in possession of a method of "storing" a treprostinil salt at ambient temperature and preparing a pharmaceutical product of treprostinil after such "storage."  The specification of the '066 Patent provides only a generic statement regarding the "stor[age]" of "crude treprostinil salts" at ambient temperature, which provides no greater detail than the claims themselves.  *See* '066 Patent at 17:32–38 ("Additional advantages of this process are: (a) crude treprostinil salts can be stored as raw material at ambient temperature and can be converted to treprostinil by simply acidification with diluted hydrochloric acid, and (b) the treprostinil salts can be synthesized from the solution of treprostinil without isolation.").  The '066 Patent does not disclose any experimental data to support these statements, and further lacks any details as to how long the "crude treprostinil salt" can be stored or under what conditions, other than temperature.

Further, a POSA reading the specification of the '066 Patent would also not understand that the "crude treprostinil salts" described in the specification constitute a "salt of treprostinil stable at ambient temperature" within the meaning of claim 8 as the treprostinil salt itself can be the claimed pharmaceutical product (claim 8 does not require any additional processing steps for the treprostinil salt prior to incorporating it into the "pharmaceutical product.").  Similarly, a POSA reading the specification of the '066 Patent would not understand that the "crude treprostinil salts" constitute "isolated salt[s]" within the meaning of claim 6 as the specification provides no

indication that the treprostinil salt was ever isolated.  And even if the "crude treprostinil salts" described in the specification of the '066 Patent constitute a "salt of treprostinil stable at ambient temperature" within the meaning of claim 8 or "isolated salt" within the meaning of claim 6, which Liquidia does not concede, the specification of the '066 Patent does not provide evidence that the "crude" salts were ever actually stored, let alone for what length of time and under what conditions other than temperature.  Moreover, the specification of the '066 Patent states only that "crude treprostinil salts" can be stored at ambient temperatures, and such "crude" salts must be further processed.  There is no indication in the specification of the '066 Patent that the inventors were in possession of an "isolated salt" or a "salt of treprostinil" that could be "stored" within the meaning of claims 6 or 8.

The specification and claim's vague description of "storing" crude treprostinil salts and a "salt of treprostinil stable at ambient temperature" also lacks information as to "significant" environmental conditions, according to UTC, such as oxygen, atmosphere, and humidity, that the isolated salt or treprostinil salt can be stored.  *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997) ("The description requirement of the patent statute requires a description of an invention, not an indication of a result that one might achieve if one made that invention.").  A disclosure of "ambient temperature" provides no information as to, for example, the % relative humidity at which the treprostinil salt can stored.  Considering UTC's contention that the significance of these undefined variables is "especially true for compounds stored as salts," and the lack of these variables in which the isolated treprostinil salt can be stored, a skilled artisan would not conclude that the inventors were in possession of the invention claimed in claims 6 and 8.  Thus, claims 6, 8, and 9 of the '066 Patent are invalid for lack of written description.

HIGHLY CONFIDENTIAL

**b.    To the Extent UTC Contends that Claims 1 and 8 Permit "Isolation" of Treprostinil Before Combining with a Base to Form a Salt, the Asserted Claims Lack Adequate Written Description Support**

Claim 1 of the '066 Patent requires "forming a salt of treprostinil by combining the starting batch and a base."  Additionally, claim 8 requires "forming a salt of treprostinil."  "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad*, 598 F.3d at 1351.  To the extent UTC argues that claims 1 and 8 permit isolation of treprostinil prior to contacting the treprostinil with a base to form a salt, the claims lack adequate written description support as the specification does not disclose that such a process will result in the claim requirement that "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition."

More specifically, all of the examples disclosed in the specification of the '066 Patent disclose forming a salt of treprostinil by contacting treprostinil in solution with a base.  Indeed, Example 2 specifically states that "[t]he filtrate (pale yellow) was reduced to volume of 35-40 L by evaporation in vacuo at 50-55° C for ***direct use in the next step***."  *See* '066 Patent at 11:46-48 (emphasis added).  The treprostinil was not isolated prior to conducting the "next step"—formation of a treprostinil salt.  Additionally, Example 6, which compares UTC's "Former Process" against the "Process According to the Present Invention," discloses that the treprostinil formed according to the present invention is not isolated prior to preparing the salt form, whereas the treprostinil of the "Former Process" is isolated as a "solid."  *Id*. at col. 15, steps 30-31.  According to the '066 Patent's specification, "[t]he quality of treprostinil produced according to this invention [Example 6] is excellent.  . . . The impurities carried over from the intermediate steps (i.e. alkylation of triol and hydrolysis of the benzindene nitrile) are removed during the carbon treatment and the salt

formation step." *Id.* at 17:27-32.  The "salt formation" step of the "invention" is performed without first isolating treprostinil prior to contacting with a base.  Further, the '066 Patent acknowledges that "[a]dditional advantages of ***this process*** are . . . (b) the treprostinil salts can be synthesized from the solution of treprostinil ***without isolation***" and that "***[t]his process*** provides better quality of final product as well as saves significant amount of solvents and manpower in purification of intermediates."  *Id.* at 17:32-40 (emphases added).  ███████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████

████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████

**HIGHLY CONFIDENTIAL**

As such, as described in the specification of the '066 Patent, in order to achieve the limitation in claim 1 that "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition," the specification only discloses that result where the treprostinil *is not* isolated prior to contacting with a base.  And with respect to claim 8, the specification does not disclose that the treprostinil can be isolated prior to contacting with a base to form a salt.  Considering the specification of the '066 Patent in light of the limitations of claims 1 and 8, a person of ordinary skill in the art would not conclude that the inventors were in possession of a process wherein treprostinil was isolated prior to contacting it with a base to form a salt of treprostinil.  As such, to the extent UTC contends that claims 1 and 8 permit isolation of treprostinil before reaction with a base to form a salt, claims 1 and 8, which all other Asserted Claims of the '066 Patent depend, lack adequate written description support.

> **a.  To the Extent UTC Contends that Claims 1 and 8 Permit Column Chromatography Between Alkylation and Salt Formation, the Asserted Claims Lack Written Description Support**

To the extent UTC argues that claims 1 and 8 permit column chromatography between alkylation and salt formation, the claims lack adequate written description support as the specification does not disclose that such a process will result in the claim requirement that "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition."  "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad*, 598 F.3d at 1351.

The examples of the '066 Patent only describe a process of the invention in which no column chromatography appears between alkylation and salt formation.  The '066 Patent states that "*the purification by column chromatography is eliminated*, thus the required amount of

flammable solvents and waste generated are greatly reduced." '066 Patent at 5:57-64 (emphasis added); *id*. at 6:4-7:31, 7:64-9:21.  Example 1, "Alkylation of Benzindene Triol," states:  "[t]he crude benzindene nitrile was used as such in the next step ***without further purification***."  *Id*. at 10:36-37 (emphasis added).  Example 2, "Hydrolysis of Benzindene Nitrile," states:  "[t]he filtrate (pale-yellow) was reduced to volume of 35-40 L by evaporation in vacuo at 50-55° C. ***for direct use in next step***," which is salt formation, as described in Example 3.  *Id.* at 11:46-48 (emphasis added).  No column chromatography was performed before salt formation.  Finally, Example 6 provides a "Comparison of the Former Process and a Working Example of ***the Process According to the Present Invention***."  *Id.* at 15:1-17:25 (emphasis added).  In the "Former Process," "Purification" is performed by column chromatography, whereas the "Working example of the Process according to the present invention" includes "No column."  *Id.* at Example 6 (Step No. 12).

**HIGHLY CONFIDENTIAL**

Example 6

Comparison of the Former Process and a Working
Example of the Process According to the Present
Invention

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| | | Nitrile | |
| 1 | Triol weight | 500 g | 5,000 g |
| 2 | Acetone | 20 L (1:40 wt/wt) | 75 L (1:15 wt/wt) |
| 3 | Potassium carbonate | 1,300 g (6.4 eq) | 5,200 g (2.5 eq) |
| 4 | Chloroacetonitrile | 470 g (4.2 eq) | 2,270 g (2 eq) |
| 5 | Tetrabutyl-ammonium bromide | 42 g (0.08 eq) | 145 g (0.03 eq) |
| 6 | Reactor size | 72-Liter | 50-gallon |
| 7 | Reflux time | 8 hours | No heating, Room temperature (r.t.) 45 h |
| 8 | Hexanes addition before filtration | Yes (10 L) | No |
| 9 | Filter | Celite | Celite |
| 10 | Washing | Ethyl acetate (10 L) | Acetone (50 L) |
| 11 | Evaporation | Yes | Yes |
| 12 | Purification | Silica gel column Dichloromethane: 0.5 L Ethyl acetate: 45 L Hexane: 60 L | No column |
| 13 | Evaporation after column | Yes | No |
| 14 | Yield of nitrile | 109-112% | Not checked |

Emphasizing the advantages of the "present invention," the specification concludes that "[t]he quality of treprostinil produced according to this invention is excellent. *The purification of benzindene nitrile by column chromatography is eliminated*." *Id*. at 17:27-29 (emphasis added).



As such, as described in the specification of the '066 Patent, in order to achieve the limitation in claim 1 that "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition," the specification only discloses that result where column chromatography *is not* conducted between alkylation and salt formation.  And with respect to claim 8, the specification does not disclose that column chromatography can be conducted between alkylation and salt formation.  Considering the specification of the '066 Patent in light of the limitations of claims 1 and 8, a person of ordinary skill in the art would not conclude that the inventors were in possession of a process wherein column chromatography appeared between alkylation and salt formation resulting in the claim requirement that "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition."  As such, to the extent UTC contends that claims 1 and 8 permit column chromatography between alkylation and salt formation, claims 1 and 8, which all other Asserted Claims of the '066 Patent depend, lack adequate written description support.

HIGHLY CONFIDENTIAL

### 3.    Claims 6, 8, and 9 Are Not Enabled

#### a.    "Stored"/"Storage"/"Storing" at "Ambient Temperature" Are Not Enabled

Asserted Claim 6 is directed to a pharmaceutical composition of claim 1, wherein the isolated salt is "stored" at "ambient temperature," which the Court construed as "room temperature (equal to or less than the range of 15°C to 30°C)."  D.I. 119 at 1.  Asserted Claim 8 of the '066 Patent, which Asserted Claim 9 depends, is directed to a method of preparing the pharmaceutical product comprising treprostinil or treprostinil salt by "forming a salt of treprostinil stable at ambient temperature, . . . and preparing a pharmaceutical product from the treprostinil salt after storage . . . ."

"To constitute an enabling disclosure, 'the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.'"  *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1155 (Fed. Cir. 1997) (quoting *In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993)).  Factors to be considered in determining whether a disclosure would require undue experimentation include:  "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims."  *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).  Accordingly, the specification of the '066 Patent must enable a skilled artisan to prepare a treprostinil pharmaceutical product after "storage" of a treprostinil salt at ambient temperature without undue experimentation.

As UTC noted in its Preliminary Response to Liquidia's IPR Petition with respect to the '066 Patent, "[p]rostaglandin derivatives," like treprostinil, "in particular were known to be unstable upon storage due to the inherent instability of the crystalline lattice of these compounds

HIGHLY CONFIDENTIAL

owning to their long, flexible sidearms, as well as the presence of multiple polymorphic crystals." *Liquidia Techs.*, IPR2020-00769, Paper 6 at 52. Further, UTC noted in its Preliminary Response that "[e]nvironmental factors are a significant factor (*e.g.*, temperature, oxygen, atmosphere, humidity). This is especially true for compounds stored as salts." *Id*. Further, Dr. Pinal opined in the '901 IPR that "[i]ncreases in humidity enhance the thermodynamic activity of water in the environment, yielding potential hydrates, degrading crystal quality through hygroscopicity and even deliquescence (particularly for salts), and promoting chemical decomposition, leading to the production of additional contaminants and impurities." Declaration of Rodolfo Pinal, Ph.D. Supporting United Therapeutic Corporation's Patent Owner Response, *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00770, Ex. 2025 at ¶ 220 (P.T.A.B. Dec. 21, 2020).

Thus, to the extent UTC contends that prostaglandin derivatives like treprostinil exhibit "inherent instability" and that environmental factors, such as temperature, oxygen, atmosphere, and humidity, have a "significant" impact on the stability of salts, a person of ordinary skill in the art would be required to undergo undue experimentation to practice the invention claimed in clams 6 and 8 of the '066 Patent.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

Applying the eight *Wands* factors in sequential order, and taking into account UTC's prior statements regarding the instability of treprostinil, the specification of the '066 Patent would not enable a person of ordinary skill to "stor[e]" an isolated salt of treprostinil in claim 6 or "stor[e]

**HIGHLY CONFIDENTIAL**

treprostinil salt and create the pharmaceutical product of claim 8 at the full 15 to 30° C range encompassed by the Court's claim construction order.

| *Wands* Factor | Application to Claims 6 and 8-9 of the '066 Patent |
|---|---|
| Quantity of Experimentation Necessary | To the extent UTC's contention that prostaglandin derivatives exhibit "inherent instability" and that humidity, oxygen, and atmosphere are "especially" significant environmental factors is correct, a person of skill in the art would have to engage in significant amounts of experimentation to discern how to effectively "stor[e]" the claimed treprostinil salts. More specifically, while the claim defines the temperature at which the salts can be stored (ambient temperature), a person of ordinary skill in the art would require extensive experimentation to determine the other "significant" environmental factors suitable for storage, including humidity, whether the treprostinil can be exposed to light, or needs to be stored in an oxygen rich or depleted environment. Moreover, each "significant" environmental factor would require experimentation while maintaining constant the other environmental factors. |
| Amount of Guidance or Direction Presented | As discussed above, the specification and claims of the '066 Patent provide guidance only as to what temperature at which the claimed treprostinil salts are stored. The specification and claims are completely silent as to other "significant" environmental factors, according to UTC, such as oxygen, atmosphere, and humidity. Accordingly, besides temperature, the amount of guidance or direction presented is non-existent. |
| Presence or Absence of Working Examples | Besides providing only a vague description of "stor[ing]" "crude treprostinil salts" at ambient temperature, which Liquidia does not concede constitutes treprostinil salts within the meaning of claims 6 or 8, the specification is completely lacking in working examples of "storing" treprostinil salts under any conditions. And even if the "crude treprostinil salts" constitute treprostinil salts within the meaning of claims 6, 8, or 9, the specification's brief mention of their "stor[age]" provides no more detail than the claims and, thus, does not constitute a working example. |
| Nature of the Invention | According to UTC, polymorphs (i.e., salts) "had plagued the pharmaceutical industry for over a decade prior to the '066 Patent, with high-profile failures including withdrawal of an approved drug from the market." *Liquidia Techs.*, IPR2020-00769, Paper 6 at 51. "These incidents underscore the difficulty of understanding the polymorphic nature of pharmaceutical compounds." *Id.* |

| | Accordingly, to the extent UTC argues that claims 6 and 8-9 would have been nonobvious, the nature of the invention was one of great uncertainty. |
|---|---|
| State of the Prior Art | According to UTC, the prior art was silent as to storage considerations for treprostinil salts. *See, e.g.*, *id.* at 50-53. To the extent UTC argues that claims 6 and 8-9 would have been nonobvious, without guidance as to "significant" environmental conditions (in UTC's own words), needed to store treprostinil salts, the state of the prior art was very limited. |
| Relative Skill of Those in the Art | According to UTC, "the POSA[4] would have been an industrial chemist or chemical engineer with experience in pharmaceutical production, familiar with controlling for polymorphs and realizing highly pure products at batch scales as the challenged claims required." *Id.* at 55. To the extent UTC argues that claims 6 and 8-9 would have been nonobvious, the relative skill of those in the art was high. |
| Predictability or Unpredictability of the Art | As mentioned above, UTC contends that polymorphs "had plagued the pharmaceutical industry for over a decade prior to the '066 Patent, with high-profile failures including withdrawal of an approved drug from the market." *Id.* at 51. "These incidents underscore the difficulty of understanding the polymorphic nature of pharmaceutical compounds." *Id*. Accordingly, to the extent UTC argues that claims 6 and 8-9 would have been nonobvious, the art was highly unpredictable. |
| Breadth of the Claims | Claims 6 and 8-9 are extremely broad as they only limit "storage" to ambient temperature, leaving undefined and unclaimed all other "significant" environmental conditions, in UTC's own words, needed to store treprostinil salts. |

Applying all eight *Wands* factors, in view of UTC's statements regarding the instability of treprostinil, the '066 Patent fails to enable a person of ordinary skill in the art to practice Asserted Claims 6, 8, and 9. Accordingly, claims 6, 8, and 9 of the '066 Patent are invalid as not enabled.

---

[4] Liquidia does not, at this time, concede to UTC's definition of a person of ordinary skill in the art.

**b.** **To the Extent UTC Contends that Claims 1 and 8 Permit "Isolation" of Treprostinil Before Combining with a Base to Form a Salt, the Asserted Claims Are Not Enabled**

Claim 1 of the '066 Patent requires "forming a salt of treprostinil by combining the starting batch and a base." Additionally, claim 8 requires "forming a salt of treprostinil." To the extent UTC argues that claims 1 and 8 permit isolation of treprostinil prior to contacting the treprostinil with a base to form a salt, the claims are not enabled as a person of ordinary skill in the art would have to engage in undue experimentation to achieve the result that "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition."

| *Wands* Factor | Application to Claims 1 and 8 of the '066 Patent |
|---|---|
| Quantity of Experimentation Necessary | As mentioned above in Section II.D.2.b *supra*, all of the examples disclosed in the specification of the '066 Patent disclose forming a salt of treprostinil by contacting treprostinil in solution with a base. To the extent UTC contends that claims 1 and 8 permit isolation of treprostinil before contacting with a base to form a salt, without guidance or direction in the '066 Patent, a POSA would have to engage in a significant amount of experimentation to achieve "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition." |
| Amount of Guidance or Direction Presented | As mentioned above in Section II.D.2.b *supra*, the specification and claims of the '066 Patent provide no guidance or direction as to how a POSA would isolate treprostinil before reacting it with a base and also achieve a "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition." |
| Presence or Absence of Working Examples | As mentioned above in Section II.D.2.b *supra*, the specification and claims of the '066 Patent provide no working examples of isolating treprostinil before reacting it with a base and achieving a "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition." |
| Nature of the Invention | According to UTC, a POSA would not have known that the level of one or more impurities found in the starting batch of treprostinil described in Phares 2005 was lower in the pharmaceutical composition. *Liquidia Techs.*, IPR2020-00769, Paper 6 at 37. To the extent UTC contends that the pharmaceutical composition of |

| | |
|---|---|
| | Phares 2005 did not inherently possess a lower level of one or more impurities than the starting batch of treprostinil, the nature of the invention—that is isolating treprostinil before reacting with a base and achieving a pharmaceutical composition with a lower amount of one or more impurities than the starting batch—was one of great uncertainty. |
| State of the Prior Art | To the extent that UTC contends that the pharmaceutical composition of Phares 2005 did not inherently possess a lower level of one or more impurities than the starting batch of treprostinil, the state of the prior art was silent as to how a POSA would isolate treprostinil before contact with a base to form a salt and achieve a pharmaceutical composition with a lower level of one or more impurities than the starting batch of treprostinil. |
| Relative Skill of Those in the Art | According to UTC, "the POSA[5] would have been an industrial chemist or chemical engineer with experience in pharmaceutical production, familiar with controlling for polymorphs and realizing highly pure products at batch scales as the challenged claims required." *Liquidia Techs.*, IPR2020-00769, Paper 6 at 55.  To the extent UTC argues that claims 6 and 8 would have been nonobvious, the relative skill of those in the art was high. |
| Predictability or Unpredictability of the Art | To the extent UTC contends that the pharmaceutical composition of Phares 2005 did not inherently possess a lower level of one or more impurities than the starting batch of treprostinil, the state of the art—that is, in isolating treprostinil before reacting with a base and achieving a pharmaceutical composition with a lower amount of one or more impurities than the starting batch—was highly unpredictable. |
| Breadth of the Claims | To the extent UTC contends that the claims permit isolation of treprostinil before reacting it with a base, the claims encompass a broad scope of processes that are unsupported by the specification. |

Applying all eight *Wands* factors, to the extent UTC contends that the claims permit isolation of the treprostinil salt before adding a base to form a salt, claims 1 and 8 of the '066 Patent and, therefore, all other Asserted Claims of the '066 Patent are invalid as not enabled.

---

[5] Liquidia does not, at this time, concede to UTC's definition of a person of ordinary skill in the art.

c.      **To the Extent UTC Contends the Claims Permit Column Chromatography Between Alkylation and Salt Formation, the Claims Are Not Enabled**

To the extent UTC argues that claims 1 and 8 permit column chromatography between alkylation and salt formation, the claims are not enabled as a person of ordinary skill in the art would have to engage in undue experimentation to achieve the result that "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition."

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

| *Wands* Factor | Application to Claims 1 and 8 of the '066 Patent |
|---|---|
| Quantity of Experimentation Necessary | As mentioned above in Section II.D.2.c *supra*, all of the examples disclosed in the specification of the '066 Patent lack a column chromatography step between alkylation and salt formation.  To the extent UTC contends that claims 1 and 8 permit column chromatography between alkylation and salt formation, without guidance or direction in the '066 Patent, a POSA would have to engage in a significant amount of experimentation to achieve "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition." |
| Amount of Guidance or Direction Presented | As mentioned above in Section II.D.2.c *supra*, the specification and claims of the '066 Patent provide no guidance or direction as to how a POSA would perform column chromatography between alkylation and salt formation and also achieve a "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition." |
| Presence or Absence of Working Examples | As mentioned above in Section II.D.2.c *supra*, the specification and claims of the '066 Patent provide no working examples of column chromatography between alkylation and salt formation while also achieving a "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition." |

HIGHLY CONFIDENTIAL

| | |
|---|---|
| Nature of the Invention | According to UTC, a POSA would not have known that the level of one or more impurities found in the starting batch of treprostinil described in Phares 2005 was lower in the pharmaceutical composition. *Liquidia Techs.*, IPR2020-00769, Paper 6 at 37.  To the extent UTC contends that the pharmaceutical composition of Phares 2005 did not inherently possess a lower level of one or more impurities than the starting batch of treprostinil, the nature of the invention—that is performing column chromatography between alkylation and salt formation and achieving a pharmaceutical composition with a lower amount of one or more impurities than the starting batch—was one of great uncertainty. |
| State of the Prior Art | To the extent that UTC contends that the pharmaceutical composition of Phares 2005 did not inherently possess a lower level of one or more impurities than the starting batch of treprostinil, the state of the prior art was silent as to how a POSA would perform salt formation between alkylation and salt formation and achieve a pharmaceutical composition with a lower level of one or more impurities than the starting batch of treprostinil. |
| Relative Skill of Those in the Art | According to UTC, "the POSA[6] would have been an industrial chemist or chemical engineer with experience in pharmaceutical production, familiar with controlling for polymorphs and realizing highly pure products at batch scales as the challenged claims require[d]." *Liquidia Techs.*, IPR2020-00769, Paper 6 at 55.  To the extent UTC argues that claims 6 and 8 would have been nonobvious, the relative skill of those in the art was high. |
| Predictability or Unpredictability of the Art | To the extent UTC contends that the pharmaceutical composition of Phares 2005 did not inherently possess a lower level of one or more impurities than the starting batch of treprostinil, the state of the art—that is, in performing column chromatography between alkylation and salt formation and achieving a pharmaceutical composition with a lower amount of one or more impurities than the starting batch—was highly unpredictable. |
| Breadth of the Claims | To the extent UTC contends that the claims permit column chromatography between alkylation and salt formation, the claims encompass a broad scope of processes that are unsupported by the specification. |

---

[6] Liquidia does not, at this time, concede to UTC's definition of a person of ordinary skill in the art.

**HIGHLY CONFIDENTIAL**

Applying all eight *Wands* factors, to the extent UTC contends that the claims permit column chromatography between alkylation and salt formation, claims 1 and 8 of the '066 Patent and, therefore, all other Asserted Claims of the '066 Patent are invalid as not enabled.

### 4. Claims 1-3, 6, and 8-9 Are Indefinite

#### a. Claim Reciting "Impurities" Is Indefinite

Asserted Claim 1 of the '066 Patent, which Asserted Claims 2, 3, and 6 depend, is directed towards a pharmaceutical composition comprising treprostinil that is prepared by a process comprising a starting batch of treprostinil having one or more "impurities" resulting from prior alkylation and hydrolysis steps and wherein the level of one or more "impurities" found in the starting batch of treprostinil is lower in the pharmaceutical composition.  A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901.  "[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id*. at 909 (alterations omitted).  Consequently, claim 1 of the '066 Patent, read in light of the specification and prosecution history, must apprise a POSA with "reasonable certainty" what compounds and in what specific amounts constitute "impurities" within the meaning of claim 1.

Neither the specification, claims, nor prosecution history of the '066 Patent apprise a POSA with "reasonable certainty" as to what constitutes an "impurit[y]" within the meaning of claim 1. Claim 1 of the '066 Patent indicates only that the "impurities" must "result[] from [the] prior alkylation . . . and hydrolysis steps," and the specification provides no further guidance.[7]  During

---

[7] Similarly, UTC acknowledged in its Preliminary Response in the '066 Patent IPR that the claimed "impurities" must "result[] from [the] prior alkylation of benzindene triol and hydrolysis steps." *Liquidia Techs.*, IPR2020-00769, Paper 6 at 2.

prosecution of the '066 Patent, UTC submitted two expert declarations that were submitted by UTC during the '393 Patent IPR. Those expert declarations identify ███ impurities contained in the Moriarty 2004 (Former Process) batches: ███████████████████████████ ███████████████████. *See, e.g.*, Declaration of Dr. Robert M. Williams, *SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Exhibit 2020 at ¶ 94 (P.T.A.B. July 6, 2016) ("Williams Declaration"). Neither declaration, however, identifies the chemical compounds that are labeled ███████████████████████ Further, neither declaration establishes that ████████████████████████████ ███ As the Patent Trial & Appeal Board ("PTAB") noted in its Final Written Decision invalidating the '393 Patent, the "claims contain no limitations relating to the impurity profile of the recited product, 'and it is the claims ultimately that define the invention.'" *SteadyMed*, IPR2016-00006, Paper 82 at 18 (quoting *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006)). Without further guidance as to what constitutes an "impurit[y]" within the meaning of claim 1, a skilled artisan would not be apprised with "reasonable certainty" as to what impurities are needed to meet the claim limitation.

Similarly, neither the specification, claims, nor prosecution history of the '066 Patent apprise a POSA with "reasonable certainty" as to what level of "impurities" is needed to meet the claim limitation. Moriarty 2004 specifies that the treprostinil made according to Moriarty 2004 was 99.7% pure. *See* Moriarty 2004 at 1902. While UTC contends in the specification of the '066 Patent that the "Former Process" (i.e., Moriarty 2004) has a purity of approximately ███ as compared to a purity of ███ for the process of the claimed invention (*see* '066 Patent col. 17, step 53), the calculations of UTC's own expert submitted during prosecution acknowledge that the "Former Process" yields a purity of ███. *See SteadyMed*, IPR2016-00006, Paper 82 at 35.

**HIGHLY CONFIDENTIAL**

UTC's expert Dr. Williams reviewed ▮ commercial batches of treprostinil in accordance with Moriarty 2004 and found that the average purity of the batches was ▮, which the PTAB acknowledged was an accurate value and the same as reported in Moriarty 2004. *Id*. Further, as acknowledged by the PTAB in the '393 IPR, Dr. Williams also reviewed ▮ commercial batches of treprostinil made according to the process disclosed in the '393 (and thus the '066) Patent, and several Moriarty 2004 commercial batches were more pure than the batches made according to the disclosed process. *Id*. at 38-39. Thus, a POSA would not have any reasonable certainty what level of impurity should be "included" in the product. As such, a person of ordinary skill in the art would not know, with reasonable certainty, what level of purity will be required to meet the limitations of claim 1. *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 117 F. Supp. 3d 632, 642 (D. Del. 2015).

Thus, because a POSA would not be apprised with "reasonable certainty" what compounds or amounts of such compounds constitute "impurities" within the meaning of the claim limitation, Asserted Claim 1 of the '066 Patent and, therefore, all other Asserted Claims 2, 3, and 6 of the '066 Patent are invalid as indefinite.

### b. Claims Reciting "Stored," "Storage," and "Storing" Are Indefinite

Asserted Claim 6 of the '066 Patent is directed toward a pharmaceutical composition of claim 1, wherein the isolated salt is "stored" at ambient temperature. Similarly, Asserted Claim 8 of the '066 Patent, which Asserted Claim 9 depends, is directed to a method of preparing the pharmaceutical product comprising treprostinil after "storing" a treprostinil salt at ambient temperature. A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. "[A] patent must

be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id*. at 909 (alterations omitted). Accordingly, claims 6 and 8 of the '066 Patent, read in light of the specification and prosecution history, must apprise a POSA with "reasonable certainty" as to what constitutes "storage" of the treprostinil salt within the meaning of the claims.

As mentioned above, UTC noted in its Preliminary Response to Liquidia's IPR Petition with respect to the '066 Patent that "[p]rostaglandin derivatives," like treprostinil, "in particular were known to be unstable upon storage due to inherent instability of the crystalline lattice of these compounds owning to their long, flexible sidearms, as well as the presence of multiple polymorphic crystals." *Liquidia Techs.*, IPR2020-00769, Paper 6 at 52. Further, UTC noted in its Preliminary Response that "[e]nvironmental factors are a significant factor (*e.g.*, temperature, oxygen, atmosphere, humidity). This is especially true for compounds stored as salts." *Id*. However, the claims specify only that the treprostinil salt be stored at "ambient temperature" and fail to provide any guidance or direction into other "significant" storage considerations, in UTC's own words, like oxygen, atmosphere, and humidity. Without guidance as to necessary storage considerations of the treprostinil salt and pharmaceutical composition, a person of ordinary skill in the art "would not be apprised with reasonable certainty about the scope of the invention." *Butamax*, 117 F. Supp. 3d at 642.

Additionally, as further explained in Liquidia's Answering Claim Construction Brief, UTC's inconsistent definitions of "stored," "storing," and "storage" in the parent U.S. Patent No. 9,156,786 prosecution history and during the '066 and '901 IPRs render the claim terms indefinite. Defendant Liquidia Technologies, Inc.'s Answering Claim Construction Brief, *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-cv-755, at 13-16 (D. Del. Mar. 5, 2021)

**HIGHLY CONFIDENTIAL**

("Liquidia's Answering Claim Construction Brief"); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344-45 (Fed. Cir. 2015) (holding claim term indefinite where patentee used two inconsistent definitions during prosecution of related patents sharing same specification); *Infinity Comput. Prods., Inc. v. Oki Data Ams., Inc.*, No. 18-463-LPS, 2019 WL 2422597, at *4-6 (D. Del. June 10, 2019) ("[A] person of ordinary skill in the art would not be reasonably certain as to which of the patentee's two inconsistent definitions of 'passive link' is used in the claims, rendering the claims indefinite."), *aff'd*, 987 F.3d 1053 (Fed. Cir. 2021).

Thus, Asserted Claims 6, 8 and 9 of the '066 Patent are invalid as indefinite.

## III.    U.S. PATENT NO. 9,604,901

The '901 Patent issued March 28, 2017 from Application No. 14/754,932, filed June 30, 2015.   '901 Patent at 1.   Application No. 14/754,932 is a continuation of Application No. 13/933,623, filed on July 2, 2013, now Patent No. 9,156,786, which is a continuation of Application No. 13/548,446, filed on July 13, 2012, now Patent No. 8,497,393, which is a continuation of Application No. 12/334,731, filed on December 15, 2008, now Patent No. 8,242,305.   *Id.*   The '901 Patent claims priority to provisional application No. 61/014,232, filed December 17, 2007.   *Id.*

The '901 Patent discloses an "improved process" to prepare prostacyclin derivatives such as treprostinil.   *Id.* at Abstract.   Claim 1 is drawn to a pharmaceutical batch comprising treprostinil or a salt thereof.   *Id.* at 17:24-18:2, claim 1.

Asserted Claim 1, the only independent claim, recites the following:

1[a]  A pharmaceutical batch consisting of treprostinil or a salt thereof and impurities resulting from

1[b]  (a) alkylating a benzindene triol,

1[c]  (b) hydrolyzing the product of step (a) to form a solution comprising

treprostinil,

1[d] (c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil,

1[e] (d) isolating the salt of treprostinil, and

1[f] (e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and

1[g] wherein the pharmaceutical batch contains at least 2.9 g of treprostinil or its salt.

Asserted dependent claim 2 is directed towards a pharmaceutical batch of claim 1, which has been dried under vacuum.  Asserted dependent claims 3 and 4 are directed towards pharmaceutical products comprising a "therapeutically effective amount" of treprostinil (claim 3) or treprostinil salt (claim 4) from a pharmaceutical batch of claim 1.  Asserted dependent claim 6 is directed towards methods of preparing a pharmaceutical product from a pharmaceutical batch of claim 1, comprising storing a pharmaceutical batch of a treprostinil salt of claim 1 at ambient temperature and preparing a pharmaceutical product from the pharmaceutical batch after storage. Asserted dependent claim 8 is directed towards methods of preparing a pharmaceutical product from a pharmaceutical batch of claim 1, comprising (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil.

These Supplemental Invalidity Contentions establish that Claims 1-4 and 6 are invalid as anticipated under 35 U.S.C. § 102(b).  Claims 1-4, 6, and 8 of the '901 Patent are unpatentable as

96

**HIGHLY CONFIDENTIAL**

obvious under 35 U.S.C. § 103.  Moreover, these Supplemental Invalidity Contentions show that the Asserted Claims of the '901 Patent are also invalid under 35 U.S.C. § 112.

### A.  Scope and Content of the Prior Art

The scope and content of the prior art with respect to the '066 Patent, described in Section II.A *supra*, applies to the '901 Patent, which has the same effective filing date, the same specification, and substantially identical claim language.

### B.  Claims 1-4 and 6 Are Invalid Under 35 U.S.C. § 102(b)

Claims 1-4 and 6 of the '901 Patent are invalid as anticipated under 35 U.S.C. § 102(b). There is a "long-standing rule that an old product is not patentable even if it is made by a new process." *Amgen*, 580 F.3d at 1370.  "As a result, a product-by-process claim can be anticipated by a prior art product that does not adhere to the claim's process limitation." *Id*.  Claims 1-4 are product-by-process claims.

Claim 1 claims a "pharmaceutical composition . . . resulting from" several synthetic steps.  *See* '066 Patent at claim 1.  Claim 2 recites a "pharmaceutical composition of claim 1 . . . ." *Id*. at claim 2.  Claims 3-4 recite a "pharmaceutical composition . . . as claimed in claim 1." *Id*. at claims 3-4.  Claim 6, which depends from claim 1, recites "wherein the isolated salt is stored at ambient temperature."  Remodulin was also FDA-approved to be stored at ambient temperature, construed here as *15-30°C*.  D.I. 119 at 1; *see* 2004 Remodulin Label, p.12 (disclosing that FDA-approved unopened vials of treprostinil sodium salt are "stable until the date indicated *when stored at 15 to 25°C*" and instructions say to "[s]tore at 25°C . . . with excursions permitted *to 15-30°C*") (emphases added).  For the reasons stated in

Section II.B, claims 1-4 and 6 are anticipated under § 102(b) because UTC sold Remodulin® in the United States before December 17, 2006 containing treprostinil that was structurally and functionally identical to treprostinil made according to the claimed process of the '901 Patent.

**C.     Claims 1-4, 6, and 8 Are Invalid Under 35 U.S.C. § 103**

**1.     Claims, 1-4, 6, and 8 Would Have Been Obvious Over Phares 2005**

**a.     Independent Claim 1 Would Have Been Obvious**

**(1)     Claim Element 1[a]**

| 1[a] | *A pharmaceutical batch consisting of treprostinil or a salt thereof and impurities resulting from*: |
|------|--------------------------------------------------------------------------------------------|

Phares 2005 discloses the same synthesis of treprostinil as set forth in independent claim 1 of the '901 Patent.  Phares 2005 describes "compounds and methods for inducing prostacyclin-like effects in a subject or a patient," including treprostinil and derivatives thereof.  Phares 2005 at 8.  The chemical structure of treprostinil disclosed in Phares 2005 is shown below:



*Id.* This is the same treprostinil disclosed in the '901 Patent:

where w = 1;  $Y_1$ is —$CH_2(CH_2)_m$- and m is 1; $M_1$ is $\alpha$-OH: $\beta$-$R_5$ or $\alpha$-$R_5$: $\beta$-OH, wherein $R_5$ is hydrogen; $L_1$ is $\alpha$-$R_3$: $\beta$-$R_4$, $\alpha$-$R_4$: $\beta$-$R_3$, or a mixture of $\alpha$-$R_3$: $\beta$-$R_4$ and $\alpha$-$R_4$: $\beta$-$R_3$, wherein $R_3$ and $R_4$ are hydrogen; and $R_7$ is  —$C_pH_{2p}$—$CH_3$, wherein p is an integer from 1 to 5 inclusive (p=3). '901 Patent at 2:7-3:20.

Phares 2005 further discloses the identical, pharmaceutically acceptable treprostinil diethanolamine salt as the '901 Patent.  Phares 2005 at 96 (claim 49).  The structure of treprostinil diethanolamine salt disclosed by Phares 2005 (left) is reproduced below in a side-by-side comparison with the treprostinil diethanolamine salt disclosed in the '901 Patent (right):



(Phares 2005)                    ('901 Patent)

HIGHLY CONFIDENTIAL

Phares 2005 at 96, claim 49; '901 Patent at 12:45-59, 14:35-48 (Examples 3 and 5). Other than a change in formatting, one can easily see that these two structures from Phares 2005 and the '901 Patent are identical.

This salt is the result of the same steps described in claim 1 of the '901 Patent: (a) by forming a salt of treprostinil by combining the starting solution of treprostinil acid and a base and; (b) isolating the treprostinil salt. '901 Patent at 17:24-18:2 (claim 1); Phares 2005 at 22. The isolated salt is then used to prepare a pharmaceutical batch comprising treprostinil or a salt thereof. '901 Patent at 17:24-18:2 (claim 1); Phares 2005 at 58. As such, the treprostinil salt of Phares 2005 would contain impurities from the recited steps. █████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

This shows that Phares 2005 necessarily discloses and/or renders obvious the product claimed in the '901 Patent and the same process steps to make treprostinil and a salt thereof disclosed in claim 1 of the '901 Patent (treprostinil diethanolamine salt). This pharmaceutical batch contains impurities resulting from the steps of alkylation and hydrolysis as described in further detail below. Further support for the obviousness of each process element of claim 1 is also provided in the following Sections III.C.1.a.(2)-(6).

### (2)    Claim Elements 1[b] and 1[c]

| 1[b] | *(a) alkylating a benzindene triol,* |
|------|------|
| 1[c] | *(b) hydrolyzing the product of step (a) to form a solution comprising treprostinil,* |

As discussed above in Section III.C.1.a.(1), Phares 2005 discloses the identical treprostinil and pharmaceutically acceptable treprostinil diethanolamine salt as the '901 Patent. The remaining

process claim elements do nothing to impart structural or functional differences in the claimed treprostinil or salt thereof, and thus, do not patentably limit the claimed pharmaceutical composition.  Even so, Phares 2005 further discloses providing a starting solution of treprostinil having one or more impurities resulting from alkylation and hydrolysis steps.

Specifically, Example 1 of the '901 Patent describes the alkylation of benzindene triol. '901 Patent at 10:10-67.  This alkylation reaction is shown below:

Alkylation of Benzindene Triol



*Id.*  Benzindene triol is the fused three ring core wherein the three hydroxyl groups (-OH) are not all located on the core.  In this example, the hydroxyl group indicated with the red square is being alkylated using **ClCH$_2$CN** in the presence of K$_2$CO$_3$, Bu$_4$NBr and acetone.

Phares 2005 discloses an alkylation reaction identical in nature to the '901 Patent alkylation reaction: **(l) i. ClCH$_2$CN, K$_2$CO$_3$**.  Phares 2005 at 39-40.  In particular, in step (l) the starting treprostinil precursor compound, the benzindene triol, is the enantiomer of the treprostinil precursor being alkylated in the '901 Patent (**11b** indicates that "R" can be "H").  Phares 2005 discloses the synthesis of (-)-treprostinil, the enantiomer of (+)-treprostinil and explains that "[e]nantiomers of these compounds…can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents."  *Id*.  The reaction from Phares 2005 is shown below for comparison:

**HIGHLY CONFIDENTIAL**

*Id*. at 40, -OH group (where R=H) being alkylated indicated with red square.)  A POSA would understand that one could selectively alkylate the phenolic –OH group on the fused three-ring core of Compound **11b** as (where R=H) indicated in the red box.

In addition, Phares 2005 cites to the '075 Patent for routes in which compounds disclosed in Phares 2005 can be modified Phares 2005 at 9 (citing the '075 Patent).  Chart P of the '075 patent provides a synthetic scheme where the –-OH of a benzindene triol, as referred to in the '901 Patent, is alkylated.  '075 Patent at col. 90.  While the '075 Patent does not disclose the same synthesis reaction, this reference supports the proposition that it was not a novel step at the time of the invention to alkylate an –OH group on the benzene of a fused ring system and that a POSA could arrive at the treprostinil compound disclosed in the '901 Patent by reading the disclosures and references contained in Phares 2005.  This includes the step of selectively alkylating a benzindene triol.

Phares 2005 further discloses hydrolyzing the product from the alkylation reaction (step (a) above) to form enantiomeric treprostinil starting material.  The hydrolyzing procedure is disclosed in Phares 2005 as: "**ii, KOH, CH₃OH**, reflux. 83%."  Phares 2005 at 40 (emphasis added).  Phares 2005 further explains that "[e]nantiomers of these compounds . . . can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents," thereby inherently teaching this hydrolysis step for treprostinil as well.  *Id*. at 39-40.  A comparison between the treprostinil starting material disclosed in the '901 Patent (left) and Phares 2005 (right) are produced below for a side-by-side comparison:

('901 Patent)                              (Phares 2005)

'901 Patent at 11:1-12:17 (Example 2); Phares 2005 at 8.

Claim 1 of the '901 Patent simply teaches that one can perform the alkylation and hydrolysis steps, *i.e.*, making the nitrile and then hydrolyzing to make the treprostinil carboxylic acid (salt precursor). '901 Patent at claim 1. Phares 2005 teaches that the treprostinil carboxylic acid is in a solution. Phares 2005 at 22, 40. Treatment of Compound **11b** with KOH, CH$_3$OH (methanol), as explained above, would lead to the formation of a solution of treprostinil carboxylic acid after neutralization. *Id*. at 40. Phares 2005 further discloses that such treprostinil carboxylic acid can be in solution at page 22, where it teaches dissolving the treprostinil acid in ethanol/water. *Id*. at 22. Finally, a POSA would expect that the treprostinil formed would include the impurities from the alkylation and hydrolysis steps, as those steps in Phares 2005 are, as discussed above, the same as claimed in the '901 Patent.

### (3)     Claim Element 1[d][8]

| 1[d] | *(c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil,* |
|------|------|

---

[8] Pending the Court's construction of "contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil," Liquidia reserves the right to supplement Section III.C.1.a.(3).

**HIGHLY CONFIDENTIAL**

As discussed in the above section, Phares 2005 discloses treprostinil carboxylic acid starting material in solution.  Phares 2005 at 40.

Phares 2005 further discloses combining a starting batch of treprostinil and a base.  In particular, page 22 of Phares 2005 teaches dissolving treprostinil acid in a 1:1 molar ratio mixture of ethanol: water and **diethanolamine** (*i.e.*, a base).  *Id*. at 22.  However, a POSA would likely understand the treprostinil acid disclosed at page 22 to have been isolated before addition of the base.

But not isolating the treprostinil before contacting it with a base is obvious based on what is taught by Phares 2005.  For example, with the treprostinil solution inherently taught by Phares 2005 at page 40, instead of isolating the neutral carboxylic acid at this step by removal of the methanol, a POSA would find it obvious to instead add diethanolamine (*i.e.*, a base) to the treprostinil solution so that removal of the methanol would instead leave a salt, specifically, treprostinil diethanolamine salt.  *Id*. at 40.

A POSA would be motivated to do so to save a step of isolation of the treprostinil, instead waiting until the salt is formed to conduct an isolation step.  The result would be a process with just one isolation step, rather than two, which would be faster, more efficient, and more economical.  A POSA would have a reasonable expectation of success in doing so because isolation after salt formation is  a step specifically taught in Phares 2005.  *Id*. at 22, 85-89.

A POSA would further have a reasonable expectation of success in doing so because formation of a carboxylate salt by the addition of a base to a neutral carboxylic acid is a standard chemical purification procedure.  For example, ***Wiberg 1960***, an organic chemistry lab textbook provided to organic chemistry students, explicitly states:

> A typical example is the purification of a water insoluble solid carboxylic acid by dissolving it in sodium hydroxide solution, filtering, and precipitating the

**HIGHLY CONFIDENTIAL**

> compound by the addition of acid.  A similar procedure may be used with amines: dissolve the compound in acid and precipitate it with a base.  These procedures usually work quite well in that they utilize a chemical reaction to aid in separation from nonacidic or nonbasic impurities.

Wiberg 1960 at 112.  The teachings of Wiberg 1960 are directly relevant here as the textbook establishes that formation of a carboxylate salt by the addition of a base to a neutral carboxylic acid was a well-known purification method as early as 1960.

Similarly, *Schoffstall 2004* describes an experiment in which carboxylic acid is separated from neutral and basic organic compounds by conversion to a salt.  Addition of an acid, such as HCl, then regenerates the carboxylic acid from the salt, which can then be filtered or extracted into an organic solvent.  Schoffstall 2004 at 201-02.  Additionally, *Ege 1989*, an organic chemistry textbook, discloses that sodium benzoate (*i.e.*, a carboxylate salt) can be converted back to benzoic acid (*i.e.*, a carboxylic acid) by treatment with the acid HCl, which is prototypical of the reaction of the treprostinil diethanolamine salt with an acid to regenerate treprostinil carboxylic acid.  Ege 1989 at 546.

Finally, *Kawakami 1981* demonstrates that contacting a carboxylic acid of a prostacyclin derivative, such as treprostinil, with a base to form a salt, followed by the addition of a strong acid to regenerate the carboxylic acid, was a well-known chemical purification technique in the prior art.  Kawakami 1981 is directed to the preparation and use of dicyclohexylamine (*i.e.*, an amine base with similar reactivity to diethanolamine) to form a crystalline dicyclohexylamine salt of a methanoprostacyclin derivative, in order to purify the methanoprostacyclin.  Kawakami 1981 further discloses that the dicyclohexylamine salt of a methanoprostacyclin derivative can be easily reverted to the free methanoprostacyclin derivative by conventional methods, such as treating the salt with a strong acid such as HCl or $H_2SO_4$.  Kawakami 1981 at 6.  Per Kawakami 1981, the salt

**HIGHLY CONFIDENTIAL**

that is obtained has "fairly high purity, and the purity can be further improved by recrystallization as needed with the use of an appropriate solvent." *Id.*

For the reasons stated above, a POSA would have had a reasonable expectation of success in eliminating the crude treprostinil isolation step of Phares 2005 based on the teachings of Wiberg 1960, Schoffstall 2004, Ege 1989, and Kawakami 1981.

### (4)   Claim Element 1[e]

| 1[e] | *(d) isolating the salt of treprostinil, and* |
|------|-----------------------------------------------|

Phares 2005 discloses isolating the identical treprostinil diethanolamine salt as the '901 Patent.  Phares 2005 further discloses isolating crystalline forms of treprostinil diethanolamine salt—Form A and Form B.  Phares 2005 at 85-89.  A POSA would understand that upon completion of a reaction, the product is isolated, and even a sophomore organic chemistry student would understand the isolation steps needed following recrystallization.

### (5)   Claim Element 1[f]

| 1[f] | *(e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and* |
|------|-------------------------------------------------------------------------------------------|

The step of reacting the foregoing salt of treprostinil with an acid to form the treprostinil in claim 1 of the '901 Patent is optional.  Therefore, no disclosure in Phares 2005 is required to demonstrate the obviousness of this claim element.  Even so, this step was generally known in the art and would have been obvious to a POSA.  *See* Schoffstall 2004 at 201-02; Wiberg 1960 at 112. The '901 Patent itself admits that step (e) is merely a "simple acidification with diluted hydrochloric acid" step, and is thus not a novel step.  '901 Patent at 17:5-8.

### (6)   Claim Element 1[g]

| 1[g] | *wherein the pharmaceutical batch contains at least 2.9 g of treprostinil or its salt.* |
|------|------------------------------------------------------------------------------------------|

The procedures outlined on pages 18 and 22 of Phares 2005 teach a reaction of ~1 gram-

scale quantities of treprostinil (for the preparation of the corresponding methyl ester).  Phares 2005 at 18, 22.  The steps disclosed in Phares 2005 can simply be scaled up to produce a pharmaceutical batch of treprostinil or its salt of at least 2.9 g.  *See also* Moriarty 2004 at 1902 (disclosing production of 441g of treprostinil).  A POSA would expect that a reaction that is taught on a 1 gram scale could easily be achieved on a 2.9 gram scale because a POSA would understand that, in this field, increasing the scale of a reaction by a factor of 3 can be done with a reasonable expectation of success, especially given that success was already demonstrated in art (e.g., Moriarty 2004).  *Id.*

Further, the batch-size claimed by the '901 Patent is entirely within the scale that would be routine for an organic or medicinal chemist.  The Journal of Organic Chemistry and Journal of Medicinal Chemistry, journals that are expressly for organic and medicinal chemists, respectively, regularly described syntheses of products on scales greater than 2.9 grams before December 2007.  For example, ***Parks***[9] and ***Hanessian***[10] are articles published in the Journal of Organic Chemistry in 2006 that describe the successful synthesis of up to 42.4 grams (Parks at 9626) and 8.45 grams of product (Hanessian at 9813), respectively.  Similarly, ***Frost***[11] and ***Regan***[12] are articles published in the Journal of Medicinal Chemistry in 2006 that describe the successful synthesis of up to 60.0 grams (Frost at 7850) and 20.3 grams of product (Regan at 7892), respectively.

---

[9] Parks, B.W., et al., "Convenient Synthesis of 6,6-Bicyclic Malonamides: A New Class of Conformationally Preorganized Ligands for f-Block Ion Binding," J. Org. Chem., 71:9622-27 (2006) ('901 IPR Ex. 1020).

[10] Hanessian, S., et al., "Structure-Based Organic Synthesis of a Tricyclic *N*-Malayamycin Analogue," J. Org. Chem., 71:9807-17 (2006) ('901 IPR Ex. 1021).

[11] Frost, J.M., et al., "Synthesis and Structure – Activity Relationships of 3,8-Diazabicyclo[4.2.0]octane Ligands, Potent Nicotinic Acetylcholine Receptor Agonists," J. Med. Chem., 49:7843-53 (2006) ('901 IPR Ex. 1022).

[12] Regan, J., et al., "Quinol-4-ones as Steroid A-Ring Mimetics in Nonsteroidal Dissociated Glucocorticoid Agonists," J. Med. Chem., 49:7887-96 (2006) ('901 IPR Ex. 1023).

HIGHLY CONFIDENTIAL

It was common practice prior to 2007 for students to run experiments and to prepare salts at multi-gram quantities, and it is still common practice today. Several articles published in the Journal of Chemical Education prior to 2007 describe research conducted in undergraduate laboratories on scales greater than 2.9 grams. For instance, **Mak**[13] is an article titled, "Mannich Reactions in Room Temperature Ionic Liquids (RTILs): An Advanced Undergraduate Project of Green Chemistry and Structural Elucidation" and published in 2006. It describes the chemical synthesis of 1-butyl-3-methylimidazolium tetrafluoroborate in an undergraduate laboratory beginning with 10.0 grams of starting material. Mak Supplemental Materials at 5. The publication advises "instructors" that "[t]he ionic liquid [bmim] [BF4] can be ***conveniently synthesized in a hundred-gram scale*.**" Mak at 945 (emphasis added).

Similarly, **Baar**[14] is an article titled, "Enantiomeric Resolution of (±)-Mandelic Acid by (1*R*,2*S*)-(-)-Ephedrine: An Organic Chemistry Laboratory Experiment Illustrating Stereoisomerism" and published in 2006, that describes the preparation, recrystallization, and enantiomeric resolution of two salts starting with 3.00 grams of each starting material. Barr Supplemental Materials 2-4. **Brigandi**[15] is an article titled, "Synthesis and Analysis of Copper Hydroxy Double Salts" and published in 2005 that describes the synthesis of "several naturally occurring copper double salts using simple aqueous conditions" (*id*. at 1662) beginning with 4

---

[13] Mak, K.K.W., et al., "Mannich Reactions in Room Temperature Ionic Liquids (RTILs): An Advanced Undergraduate Project of Green Chemistry and Structural Elucidation," J. Chem. Ed., 83(6):943-46 (2006) ('901 IPR Ex. 1025); Mak Supplemental Materials ('901 IPR Ex. 1026).

[14] Baar, M.R., et al., "Enantiomeric Resolution of (±)-Mandelic Acid by (1*R*,2*S*)-(-)-Ephedrine: An Organic Chemistry Laboratory Experiment Illustrating Stereoisomerism," J. Chem. Ed., 82(7):1040-42 (2005) ('901 IPR Ex. 1027); Baar Supplemental Materials ('901 IPR Ex. 1028).

[15] Brigandi, L.M., et al., "Synthesis and Analysis of Copper Hydroxy Double Salts," J. Chem. Educ., 82(11):1662 (2005) ('901 IPR Ex. 1029); Brigandi Supplemental Materials ('901 IPR Ex. 1030).

HIGHLY CONFIDENTIAL

grams of starting material (Brigandi Supplemental Materials at 1, 2).

Lastly, **Hamilton**[16] is a Laboratory Manual for Chemistry 202, Organic Chemistry Laboratory I at Mount Holyoke College in 2006 that describes an experiment entitled "Resolution of (R,S) –1–Phenylethylamine via Diastereoisomer formation with (*2R*), (*3R*)–Tartaric Acid," where students prepare tartrate salt complexes. Hamilton at 1. This experiment started with multi-gram quantities of materials: 6.25 grams of (*R,R*)-tartaric acid and 5 grams of (*R,S*)-1-phenylethylamine. Hamilton at 4.

Based on the reactions and experiments described above, and those completed even in undergraduate laboratories, it is clear that a POSA would have a reasonable expectation that Phares 2005's treprostinil synthesis could be scaled up to produce 2.9 grams of treprostinil or its salt.

### b.    Dependent Claims 2-4, 6 and Would Have Been Obvious

### (1)    Claim 2

| 2 | The pharmaceutical batch of claim 1, *which has been dried under vacuum.* |
|---|---|

The process limitation of drying a product under vacuum as disclosed in dependent claim 2 of the '901 Patent is not accorded any weight for determining the validity of the claims because it does not impart some unique and novel property or structure in the resulting treprostinil or treprostinil salt product. *See e.g., Amgen,* 580 F.3d, 1366. Even so, drying a product under vacuum is a standard organic chemistry practice for the isolation of a solid and would have been obvious to a POSA. *See, e.g.*, Moriarty 2004 at 1902; Gao at 64, 75, 208; Loewenthal[17] at 112-13;

---

[16] Hamilton, D.G., "Experiment #5: Resolution of (*R,S*)-1-Phenylethylamine via Diastereoisomer formation with (*2R*),(*3R*)-Tartaric Acid," Laboratory Manual for Chemistry 202, Organic Chemistry Laboratory I at Mount Holyoke College (2006) ('901 IPR Ex. 1031).

[17] Excerpts from Loewenthal, H.J.E., et al., A Guide for the Perplexed Organic Experimentalist, Chapter 4: Running Small-scale Reactions in the Research Laboratory, pp. 87-119, 2d ed. (1990) ('901 IPR Ex. 1035).

Heidelberger[18] at 55.   Accordingly, it would have been obvious to a POSA to dry the pharmaceutical batch of claim 1 under vacuum.

### (2)   Claims 3 and 4

| 3 | *A pharmaceutical product comprising a therapeutically effective amount of treprostinil from a pharmaceutical batch* as claimed in claim 1. |
| 4 | *A pharmaceutical product comprising a therapeutically effective amount of a salt of treprostinil from a pharmaceutical batch* as claimed in claim 1. |

Phares 2005 further discloses a therapeutically effective amount of treprostinil and treprostinil salt.  Phares 2005 at 48-49, 60, 65.  The invention of Phares 2005 "provides for compositions which may be prepared by mixing one or more compounds of the instant invention, or pharmaceutically acceptable salts thereof, with pharmaceutically acceptable carriers, excipients, binders, diluents or the like, to treat or ameliorate a variety of disorders related vasoconstriction and/or platelet aggregation." *Id.* at 48.  A "therapeutically effective dose" as defined in Phares 2005 further "refers to that amount of one or more compounds of the instant invention sufficient to result in amelioration of symptoms of the disorder." *Id.*  The compositions can be formulated for various routes of administration, for example, by oral administration, by transmucosal administration, by rectal administration, transdermal or subcutaneous administration as well as intrathecal, intravenous, intramuscular, intraperitoneal, intranasal, intraocular or intraventricular injection. *Id.* at 48-49.

Phares 2005 also discloses that a therapeutically effective dose may vary depending on the route of administration and dosage form. *Id.* at 51.  The preferred compound or compounds of the invention disclosed in Phares 2005 is a "formulation that exhibits a high therapeutic index." *Id.*

---

[18] Heidelberger, M., An Advanced Laboratory Manual of Organize Chemistry (1928) ('901 IPR Ex. 1036).

**HIGHLY CONFIDENTIAL**

Pharmaceutical formulations include "any of the compounds of any of the embodiments of compound of structure I, II or pharmaceutically acceptable salts thereof described in combination with a pharmaceutically acceptable carrier." *Id.* at 52.  The invention disclosed in Phares 2005 also provides a method of using the above compounds therapeutically of/for: pulmonary hypertension, ischemic diseases, heart failure, conditions requiring anticoagulation, thrombotic microangiopathy, extracorporeal circulation, central retinal vein occlusion, atherosclerosis, inflammatory diseases, hypertension, reproduction and parturition, cancer or other conditions of unregulated cell growth, cell/tissue preservation and other emerging therapeutic areas where prostacyclin treatment appears to have a beneficial role. *Id.* at 4; *see also* 82-85 (demonstrating safety of administering treprostinil diethanolamine to patients in clinical studies).  In addition to these disclosures, a POSA would know what dosages of treprostinil are therapeutically effective based on the dosages expressly disclosed in the FDA-approved label for the drug Remodulin®, which is treprostinil sodium. *See* Remodulin® Label (2006) ('901 IPR Ex. 1037).

Phares 2005 therefore discloses the additional elements of dependent claims 3 and 4.

### (3)    Claim 6

| 6 | *A method* of preparing a pharmaceutical product from a pharmaceutical batch as claimed in claim 1, *comprising storing a pharmaceutical batch of a salt of treprostinil* as claimed in claim 1 *at ambient temperature, and preparing a pharmaceutical product from the pharmaceutical batch after storage.* |
|---|---|

For the reasons stated above in Section II.C.1.b.(3), a POSA would have found it obvious that treprostinil diethanolamine salt was storable at ambient temperature.

### c.    Dependent Claim 8 Would Have Been Obvious

Dependent claim 8 is independent claim 1 without claim limitation 1[f].

### (1)    Claim Element 8[a]

| 8[a] | *A method of preparing a pharmaceutical batch as claimed in claim 1, comprising:* |
|---|---|

*See* explanation under independent claim 1, Section II.C.1.c.(1).

### (2)    Claim Elements 8[b] and 8[c]

| 8[b] | *(a) alkylating a benzindene triol,* |
|------|--------------------------------------|
| 8[c] | *(b) hydrolyzing the product of step (a) to form a solution comprising treprostinil,* |

Phares 2005 discloses alkylating a triol intermediate, the benzindene triol, of the same structural formula disclosed in claim 8 of the '901 Patent.  *See also* Section III.C.1.a.(2).  A comparison between the alkylation substrates disclosed in the '901 Patent (left) and Phares 2005 (right, enantiomer) are produced below for a side-by-side comparison:

Alkylation of Benzindene Triol



('901 Patent)                                             (Phares 2005)

'901 Patent at 10:10-67 (claim 8); Phares 2005 at 40.  Intermediate **11b** of Phares 2005 indicates that "R=H," showing that enantiomeric triol intermediates are disclosed in claim 8 of the '901 Patent and structure **11b** of Phares 2005.

Phares 2005 discloses hydrolyzing the resulting compound to form the same structural formula of treprostinil starting material disclosed in the '901 Patent.  *See* Section III.C.1.a.(2).  The hydrolyzing procedure is disclosed in Phares 2005 as: "ii, KOH, CH₃OH, reflux. 83%."  *Id*. at 40. A comparison between the treprostinil starting material disclosed in the '901 Patent (left) and Phares 2005 (right) are produced below for a side-by-side comparison:

**HIGHLY CONFIDENTIAL**

('901 Patent)                                    (Phares 2005)

'901 Patent at 11:15-29 (Example 2); Phares 2005 at 8.

Claim 1 of the '901 Patent simply teaches that one can perform the alkylation and hydrolysis steps, *i.e.*, making the nitrile and then hydrolyzing to make the treprostinil carboxylic acid (salt precursor).  '901 Patent at claim 1.  Phares 2005 teaches that the resulting treprostinil carboxylic acid is in a solution.  Phares 2005 at 22, 40.  A POSA would understand that treatment of **11b** with (ii) KOH, $CH_3OH$ (methanol) would lead to the formation of a solution of treprostinil carboxylic acid after neutralization.  Phares 2005 further discloses that such treprostinil carboxylic acid can be in solution at page 22, where it teaches dissolving the treprostinil acid in ethanol/water.  *Id.* at 22.

### (3)    Claim Element 8[d]

| 8[d] | *(c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil,* |
|------|------|

*See* explanation under independent claim 1.  Section III.C.1.a.(3).

### (4)    Claim Element 8[e]

| 8[e] | *(d) isolating the salt of treprostinil, and* |
|------|------|

*See* explanation under independent claim 1.  Section III.C.1.a.(4).

### (5)    Claim Element 8[f]

| 8[f] | *(e) optionally reacting the salt of treprostinil with an acid to form treprostinil.* |
|------|---------------------------------------------------------------------------------------|

The step of reacting the foregoing salt of treprostinil with an acid to form the treprostinil in claim 1 of the '901 Patent is optional.  Therefore, no disclosure in Phares 2005 is required to demonstrate the obviousness of this claim element.  Even so, this step was generally known in the art and would have been obvious to a POSA.  *See* Schoffstall 2004 at 201-02; Wiberg 1960 at 112.  The '901 Patent itself admits that step (e) is merely a "simple acidification with diluted hydrochloric acid" step, and is thus not a novel step.  '901 Patent at 17:5-8.

### 2.    Claims 1-4, 6, and 8 Would Have Been Obvious Over Moriarty 2004 in Combination with Phares 2005

#### a.    Motivation to Combine Moriarty 2004 with Phares 2005

##### (1)    UTC is Precluded From Disputing the Motivation to Combine Moriarty and Phares 2005

UTC's argument concerning motivation to combine Moriarty with Phares 2005 is precluded because the issue was fully and fairly tried in a previous action involving substantially similar claims and was adversely resolved against UTC.  For issue preclusion to apply, the unadjudicated and previously adjudicated claims need not be identical.  *Ohio Willow Wood*, 735 F.3d at 1342 (applying issue preclusion to parent patent with substantially similar claim as invalidated child patent).  Rather, "it is the identity of the *issues* that were litigated that determines whether [issue preclusion] should apply."  *Id.* (emphasis in original).  "If the differences between the unadjudicated patent claims and adjudicated patent claims ***do not materially alter the question of invalidity***, [issue preclusion] applies."  *Id*.

The *issue* of a motivation to combine Moriarty and Phares 2005 was already litigated and decided in the '393 IPR and affirmed by the Federal Circuit.  *SteadyMed*, IPR2016-00006, Paper 82 at 47, *aff'd*, *United Therapeutics v. SteadyMed*, 702 F. App'x 990 (2017).  The '393 and '901

Patent claims are substantially similar.  Both patents require a process of (i) alkylating a benzindene triol; (ii) hydrolyzing the product of step (i); (iii) contacting the product of step (ii) with a base to form a treprostinil salt; (iv) isolating the salt of treprostinil; and (v) optionally reacting the treprostinil salt from step (iii) to form treprostinil.  The only differences are that the '901 Patent claims include an impurity limitation and amount of treprostinil.  These differences are immaterial, because they are not excluded from the claims of the '393 Patent and are nonetheless disclosed by the exact same combination of Moriarty and Phares 2005 that invalidated the '393 Patent.

Particularly for product-by-process claims, the product—not the process— controls.  *In re Thorpe*, 777 F.2d at 697; *Amgen*, 580 F.3d at 1369.  UTC conceded that the '393 and '901 Patents claim the same product.  *See* Amendment & Request for Reconsideration (U.S. App. No. 14/754,932) (Aug. 11, 2016) at 4-5 (UTC citing certificates of analysis for the product claimed in the '393 Patent, and relied upon by UTC's experts, to argue that the "pharmaceutical batch" of the '901 Patent "is different from the product produced by the process described in Moriarty 2004.").  Thus, the storage issues claimed in the '901 Patent claim 6 would be the same for both patents' products.

In sum, UTC has "not provided any explanation regarding *how* the [additional] limitations" of the '901 Patent are "patentably significant" to the motivation to combine Moriarty and Phares 2005 "in view of the obviousness determination regarding the claims of the ['393] patent."  *Ohio Willow Wood*, 735 F.3d at 1343 (emphasis in original).  Thus, issue preclusion should apply.

### (2)     A POSA Nonetheless Would Have Been Motivated to Combine Moriarty and Phares 2005

For the reasons stated above in Section II.C.a.(2), a POSA would have been motivated to form the treprostinil diethanolamine salt of Phares 2005 from the treprostinil free acid of Moriarty.

### b.     Reasonable Expectation of Success

A POSA would have had a reasonable expectation of success in reacting the treprostinil taught by Moriarty 2004 with diethanolamine to form a treprostinil diethanolamine salt.  "The reasonable expectation of success requirement refers to the likelihood of success in combining references to meet the limitations of the claimed invention."  *Intelligent Bio-Sys.*, 821 F.3d at 1367.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████     The proposed combination of Moriarty 2004 and Phares 2005 yields treprostinil diethanolamine salt (*i.e.*, the product claimed in independent claims 1 of the '901 Patent) via the process taught by Phares 2005.  A POSA would have a reasonable expectation of success in doing so because Phares 2005 successfully performed precisely that step.  Phares 2005 at 22; *Intelligent Bio-Sys.*, 821 F.3d at 1367.  Indeed, the combination of Moriarty 2004 and Phares 2005 results in essentially the same process as disclosed in Example 6 of the '901 Patent.  Further, a POSA would understand that forming a salt from the treprostinil acid disclosed in Moriarty 2004 would not make the resulting product less pure than the 99.7% disclosed in the reference.  Schoffstall 2004 at 201-02; Wiberg 1960 at 112; *see also* Harwood 1989 at 127 ("The simplest and most effective technique for the purification of solid organic compounds is crystallization.  Crystalline compounds are easy to handle, their purity is readily assessed . . . and they are often easier to identify than liquids or oils.").

c.      Elimination of the Crude Treprostinil Isolation Step of Moriarty Would Have Been Obvious[19]

A POSA would be motivated to eliminate the intermediate isolation and crystallization steps of Moriarty to improve synthetic efficiency and reduce cost.  The Board's finding in the '393 IPR that "an ordinarily skilled artisan would have modified the process of Moriarty to incorporate the step of adding and dissolving diethanolamine to treprostinil as taught by Phares [2005] to eliminate the requirement for intermediate purification, thus, improving synthetic efficiency and reducing cost" is equally relevant here.  *Steadymed*, IPR2016-00006, Paper 82 at 47.  Specifically, a POSA would be motivated to eliminate the highlighted step below:

> The combined organic layers were washed with water, dried (Na$_2$SO$_4$), treated with charcoal, and concentrated in vacuo to yield crude UT-15 (7) as an off-white solid. This was crystallized by dissolving the solid in ethanol at 50 °C and adding water (1:1). White needles obtained upon standing were filtered, washed with 20% ethanol-water, and dried in a vacuum oven at 55 °C to give 441 g (83%) of pure UT-15 as colorless crystalline solid . . . .

Moriarty 2004 at 1902.

A POSA would be motivated to eliminate this isolation step because a POSA would know that it would be more efficient to form a salt from a preexisting solution, without recourse to isolation of a solid, re-dissolving that solid, and then forming a salt.  If a POSA actually carried out an isolation step, then a POSA would have to re-dissolve the crude treprostinil carboxylic acid in order to apply the salt formation step of Phares 2005.  A POSA would therefore be motivated to eliminate the isolation step to most efficiently prepare the treprostinil salt.

Further, Moriarty 2004 discloses that KOH can be neutralized in the presence of methanol using HCl to access the neutral treprostinil free acid.  *See* Moriarty 2004 at 1902 ("Then the

---

[19] Pending the Court's construction of "contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil," Liquidia reserves the right to supplement Section III.C.2.c.

**HIGHLY CONFIDENTIAL**

reaction mixture was refluxed for 3 h and cooled at 0 °C, then 3 M aqueous HCl was added until pH 10-12.").  Moriarty 2004 does not disclose the presence of any treprostinil methyl ester after neutralization of the KOH base.  *Id.* (disclosing resulting 99.7% treprostinil free acid product). Thus, as evidenced by Moriarty 2004, a POSA would know that neutralization of the treprostinil carboxylate salt solution could be achieved without methyl ester formation, and a POSA would therefore be motivated to eliminate the crude treprostinil isolation step of Phares 2005 by neutralizing the KOH in solution and adding diethanolamine to produce the treprostinil diethanolamine salt using the procedure provided in Phares 2005.

Lastly, for the reasons stated above in Section III.C.1.a.(3), a POSA would have had a reasonable expectation of success in eliminating the crude treprostinil isolation step of Moriarty 2004, as evidenced by the teachings of Wiberg 1960, Schoffstall 2004, Kawakami 1981, and Ege 1989, which demonstrate that reacting a carboxylic acid with a base to form a carboxylate salt was a well-known purification step in December 2007.

### d.        Independent Claim 1 Would Have Been Obvious

Moriarty 2004 in combination with Phares 2005 teaches each element of claim 1 of the '901 Patent.

### (1)        Claim Element 1[a]

| 1[a] | *A pharmaceutical batch consisting of treprostinil or a salt thereof and impurities resulting from:* |
|------|------|

Moriarty 2004 discloses the production of a pharmaceutical batch of treprostinil and the synthesis of treprostinil via the stereoselective intramolecular Pauson-Khand cyclization. Moriarty 2004 at 1890.  Structure **7** of Moriarty 2004 depicts the chemical structure of treprostinil and is shown below:

**7**

*Id.* at 1892.  This is the identical treprostinil pharmaceutical salt precursor disclosed in the '901 Patent:



'901 Patent at 12:25-37.

While the step of reacting treprostinil with a base to form a salt of **7** is not disclosed in Moriarty 2004, this step is clearly disclosed in Phares 2005.  Phares 2005 discloses that treprostinil acid (which is equivalent to **7** in Moriarty 2004) is dissolved in a 1:1 molar ratio mixture of ethanol: water and diethanolamine (*i.e.*, the base) is added and dissolved.  Phares 2005 at 22.  The solution is heated and acetone is added as an antisolvent during cooling.  *Id.*  The resulting structure (left) corresponds to the treprostinil diethanolamine salt claimed in the '901 Patent (right).  A side-by-side comparison is shown below:

(Phares 2005)                                    ('901 Patent)

Phares 2005 at 9, 96 (claim 49); '901 Patent at 9:35-45, 12:45-60, Example 3.  Other than a change in formatting, one can easily see that these two structures from Phares 2005 and the '901 Patent are identical.

The formation of salts by the reaction of carboxylic acids with bases is a common reaction in organic chemistry and is well within the skill of a POSA, as discussed above.  *See, e.g.*, Kawakami 1981.

This salt is the result of the same steps described in the '901 Patent; (a) by forming a salt of treprostinil by combining the starting solution of treprostinil acid and a base and; (b) isolating the treprostinil salt.  '901 Patent at claims 1 and 8.  The isolated salt is then used to prepare a pharmaceutical batch comprising treprostinil or a salt thereof.  *Id.*; Phares 2005 at 58.  As such, the treprostinil salt of Phares 2005 would contain impurities from the recited steps.

Therefore, Moriarty 2004 in combination with Phares 2005 disclose a pharmaceutical batch consisting of treprostinil or a salt thereof.  This pharmaceutical batch contains impurities resulting from the steps of alkylation and hydrolysis as described in further detail below.

### (2)       Claim Element 1[b]

| 1[b] | *(a) alkylating a benzindene triol,* |
|------|--------------------------------------|

Both Moriarty 2004 and Phares 2005 teach alkylating a benzindene triol.  Moriarty 2004 at 1895, 1902; Phares 2005 at 39-40.

Moriarty 2004 teaches alkylation of benzindene triol.  Moriarty 2004 at 1897.  The alkylation reaction of **34** to yield **35** as disclosed in Moriarty 2004 is equivalent to the alkylation reaction disclosed in the '901 Patent.  **34** and **35** of Moriarty 2004 are as follows:



Moriarty 2004 at 1895, 1902.  Moriarty 2004 teaches that the triol (**34**) was alkylated at the phenolic hydroxyl group with use of chloroacetonitrile in refluxing acetone with potassium carbonate (**34 → 35**) and nitrile **35** was hydrolyzed with ethanolic potassium hydroxide to yield UT-15 (**7**).  *Id.* at 1897.  This is the same triol disclosed in the '901 Patent as shown below:



('901 Patent)                    (Moriarty 2004)

121
**HIGHLY CONFIDENTIAL**

'901 Patent at 10:17-26; Moriarty 2004 at 1895, 1902.

As discussed above in Section III.C.1.a.(2), Phares 2005 also discloses alkylation of a benzindene triol (**11b → 2**). Phares 2005 at 40. The reaction from Phares 2005 is shown below for comparison:



Phares 2005 at 39-40, -OH group being alkylated indicated with red square.

A POSA would recognize that the alkylation reaction step (l) disclosed in Phares 2005 ("i. ClCH$_2$CN, K$_2$CO$_3$") for the enantiomer of treprostinil is equally applicable to treprostinil, as disclosed in the '901 Patent. Phares 2005 at 40. Phares 2005 explains that enantiomers of these compounds (including (-)-treprostinil) "can be synthesized using the reagents and synthons of enantiomeric chirality of the above reagents," thereby inherently teaching the synthesis of both enantiomeric forms of treprostinil and of the benzindene triol and nitrile intermediates thereof. *Id.* at 39.

### (3)    Claim Element 1[c]

| 1[c] | *(b) hydrolyzing the product of step (a) to form a solution comprising treprostinil,* |
|------|----|

As discussed above, Moriarty 2004 discloses the identical treprostinil precursor, and Phares 2005 discloses the identical pharmaceutically acceptable treprostinil diethanolamine salt as the '901 Patent. Scheme 4 of Moriarty 2004 teaches that **35** is hydrolyzed with a base (*i.e.*, aqueous KOH), followed by acidification to yield **7**, the treprostinil salt precursor disclosed in the '901 Patent. Phares 2005 at 6, 13. A POSA would understand that adding aqueous KOH would result in a solution of treprostinil (**7**).

Phares 2005 also discloses hydrolyzing the product from the alkylation reaction (step (a) above) to form the enantiomeric treprostinil starting material disclosed in the '901 Patent.  The hydrolyzing procedure is disclosed in Phares 2005 as: "ii, KOH, CH₃OH, reflux. 83%."  Phares 2005 at 40.  A comparison between the treprostinil starting material disclosed in the '901 Patent (left) and Phares 2005 (right) are produced below for a side-by-side comparison:



('901 Patent)                                        (Phares 2005)

'901 Patent at 11:17-29, Example 2; Phares 2005 at 8.

Claim 1 of the  '901 Patent simply teaches that one can perform the alkylation and hydrolysis steps, *i.e.*, making the nitrile and then hydrolyzing to make the treprostinil carboxylic acid (salt precursor) and subsequently make the salt by adding a base to the treprostinil carboxylic acid.  '901 Patent at claim 1.

Phares 2005 teaches that the treprostinil carboxylic acid is in a solution.  Phares 2005 at 22, 40.  A POSA would understand that treatment of **11b** with (ii) KOH, CH₃OH (methanol) would lead to the formulation of a solution of treprostinil carboxylic acid after neutralization.  Phares 2005 further discloses that such treprostinil carboxylic acid can be in solution at page 22, where it teaches dissolving the treprostinil acid in ethanol/water.  *Id.* at 22.  Finally, a POSA would expect that the treprostinil formed would include the impurities from the alkylation and hydrolysis steps,

as those steps in Phares 2005 are, as discussed above, the same as claimed in the '901 Patent.

**(4)    Claim Element 1[d]**

| 1[d] | *contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil,* |
|------|---------------------------------------------------------------------------------------------------------------|

As explained above, Moriarty 2004 and Phares 2005 disclose formation of a solution comprising treprostinil.

Phares 2005 further discloses combining a starting batch of treprostinil and a base.  In particular, page 22 of Phares 2005 teaches dissolving treprostinil acid in a 1:1 molar ratio mixture of ethanol: water to give a solution of treprostinil acid, which is then treated with a base, **diethanolamine**.  Phares 2005 at 22.  However, a POSA would likely understand the treprostinil acid disclosed at page 22 to have been isolated before addition of the base.

But not isolating the treprostinil before contacting it with a base is obvious based on what is taught by Phares 2005.  For example, with the treprostinil solution inherently taught by Phares 2005 at page 40, instead of isolating the neutral carboxylic acid at this step by removal of the methanol, a POSA would find it obvious to instead add diethanolamine (*i.e.*, a base) to the treprostinil solution so that removal of the methanol would instead leave a salt, specifically, treprostinil diethanolamine salt.  Phares 2005 at 40.

A POSA would be motivated to do so to save a step of isolation of the treprostinil, instead waiting until the salt is formed to conduct an isolation step.  The result would be a process with just one isolation step, rather than two, which would be faster, more efficient, and more economical.  *Id.*  A POSA would have a reasonable expectation of success in doing so because isolation after salt formation is standard practice in the art, and is a step specifically taught in Phares 2005.  Phares 2005 at 22, 85-89; *see also* Wiberg 1960 at 112; Schoffstall 2004 at 201-02;

Ege 1989 at 546; Kawakami 1981 at 6. The resulting diethanolamine salt formation is identical to the pharmaceutical salt of treprostinil as disclosed in claim 1 of the '901 Patent.

### (5)   Claim Element 1[e]

| 1[e] | *(d) isolating the salt of treprostinil, and* |
|------|-----------------------------------------------|

Phares 2005 discloses isolating the identical pharmaceutically acceptable treprostinil diethanolamine salt form as the '901 Patent. Phares 2005 at 85-89. Phares 2005 further discloses isolating crystalline forms of treprostinil diethanolamine salt—Form A and Form B. *Id*. A POSA would understand that upon completion of a reaction, the product is isolated, and even a sophomore organic chemistry student would understand the isolation steps needed following the conversion of Form A to Form B.

### (6)   Claim Element 1[f]

| 1[f] | *(e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and* |
|------|-------------------------------------------------------------------------------------------|

The step of reacting the foregoing salt of treprostinil with an acid to form the treprostinil in claim 1 of the '901 Patent is optional. Therefore, no disclosure in Moriarty 2004 or Phares 2005 is required to demonstrate the obviousness of this claim element. Even so, this step was generally known in the art and would have been obvious to a POSA. *See* Schoffstall 2004; Wiberg 1960. The '901 Patent itself admits that step (e) is merely a "simple acidification with diluted hydrochloric acid" step, and is thus not a novel step. '901 Patent at 17:5-8.

### (7)   Claim Element 1[g]

| 1[g] | *wherein the pharmaceutical batch contains at least 2.9 g of treprostinil or its salt.* |
|------|------------------------------------------------------------------------------------------|

As discussed above, Moriarty 2004 discloses the identical treprostinil precursor, and Phares 2005 discloses the identical pharmaceutically acceptable treprostinil diethanolamine salt as the

'901 Patent.

Moriarty 2004 discloses that to meet the demands of producing multikilogram quantities of UT-15 (**7**) needed in the course of drug development, an efficient and economical synthesis had to be devised.  Moriarty 2004 at 1892.  The essential requirements for any large-scale, multistep synthesis of a molecule of the complexity of UT-15 (**7**) are very high overall stereoselectivity, high overall chemical yield, and scalability of individual steps to multigram quantities.  *Id*.  Moriarty 2004 further discloses that after the synthesis steps described above, crude UT-15 (**7**) was crystallized by dissolving the solid in ethanol, 50° C and adding water 1:1.  *Id.* at 1902.  "White needles obtained upon standing were filtered, washed with 20% ethanol-water, and dried in a vacuum oven, 55° C to give **441 g** (83%) of pure UT-15 as a colorless crystalline solid."  *Id.* (emphasis added).  A POSA would therefore conclude that the synthesis of quantities at least as large as 2.9 g of treprostinil (and its derived salt) would be possible.

In addition, for the reasons stated above in Section III.C.1.a.(6), a POSA would readily understand that one could follow the steps disclosed in Phares 2005 and simply scale up said steps to produce a pharmaceutical batch of treprostinil or its salt of at least 2.9 g.  This is especially true since Phares 2005 teaches that gram-scale quantities of treprostinil can be produced, and a POSA would expect that a reaction taught on a 1-gram scale could easily be achieved on a 2.9-gram scale. *Id.*; Phares 2005 at 18, 22.

### e.    Dependent Claims 2-4 and 6 Would Have Been Obvious

#### (1)    Claim 2

| 2 | The pharmaceutical batch of claim 1, *which has been dried under vacuum.* |
|---|---|

Moriarty 2004 discloses the identical treprostinil precursor, and Phares 2005 discloses the identical pharmaceutically acceptable treprostinil diethanolamine salt as the '901 Patent.

Moriarty 2004 further discloses that after the synthesis steps described above, crude UT-15 (**7**) was crystallized by dissolving the solid in ethanol, 50° C and adding water 1:1.  Moriarty 2004 at 1902.  "White needles obtained upon standing were filtered, washed with 20% ethanol-water, **and dried in a vacuum** oven, 55°C to give 441 g (83%) of pure UT-15 as a colorless crystalline solid."  (*Id.* (emphasis added).)   Additionally, for the reasons stated above in Section III.C.1.b.(1), it would have been obvious to a POSA to dry the pharmaceutical batch of claim 1 under vacuum.

### (2)    Claims 3 and 4

| 3 | *A pharmaceutical product comprising a therapeutically effective amount of treprostinil from a pharmaceutical batch* as claimed in claim 1. |
|---|---|
| 4 | *A pharmaceutical product comprising a therapeutically effective amount of a salt treprostinil from a pharmaceutical batch* as claimed in claim 1. |

Moriarty 2004 teaches that UT-15 (**7**) has proven effective in the treatment of pulmonary hypertension and investigated for use in treating severe congestive heart failure, severe intermittent claudication, and immuno-suppression.  Moriarty 2004 at 1892.  A goal of the experiments disclosed in Moriarty 2004 was to meet the demands of producing multikilogram quantities of UT-15 needed in the course of drug development.  *Id.*  Therefore, Moriarty 2004 discloses a pharmaceutical product comprising a therapeutically effective amount of treprostinil from the pharmaceutical batch.

Phares 2005 further discloses a therapeutically effective amount of treprostinil and treprostinil salt.  Phares 2005 at 48-49, 60, 65.  The invention of Phares 2005 "provides for compositions which may be prepared by mixing one or more compounds of the instant invention, or pharmaceutically acceptable salts thereof, with pharmaceutically acceptable carriers, excipients, binders, diluents or the like, to treat or ameliorate a variety of disorders related vasoconstriction

and/or platelet aggregation." *Id.* at 48. A "therapeutically effective dose" as defined in Phares 2005 further "refers to that amount of one or more compounds of the instant invention sufficient to result in amelioration of symptoms of the disorder." *Id.* The compositions can be formulated for various routes of administration, for example, by oral administration, by transmucosal administration, by rectal administration, transdermal or subcutaneous administration as well as intrathecal, intravenous, intramuscular, intraperitoneal, intranasal, intraocular or intraventricular injection. *Id.* at 48-49.

Phares 2005 also discloses that a therapeutically effective dose may vary depending on the route of administration and dosage form. *Id.* at 51. The preferred compound or compounds of the invention disclosed in Phares 2005 is a "formulation that exhibits a high therapeutic index." *Id.* Pharmaceutical formulations include "any of the compounds of any of the embodiments of compound of structure I, II or pharmaceutically acceptable salts thereof described in combination with a pharmaceutically acceptable carrier." *Id.* at 52.

The invention disclosed in Phares 2005 also "provides a method of using the above compounds therapeutically of/for: pulmonary hypertension, ischemic diseases, heart failure, conditions requiring anticoagulation, thrombotic microangiopathy, extracorporeal circulation, central retinal vein occlusion, atherosclerosis, inflammatory diseases, hypertension, reproduction and parturition, cancer or other conditions of unregulated cell growth, cell/tissue preservation and other emerging therapeutic areas where prostacyclin treatment appears to have a beneficial role." *Id.* at 4; *see also* clinical study results of UT-15C on pages 82-85.

### (3)    Claim 6

| 6 | *A method of preparing a pharmaceutical product* from a pharmaceutical batch as claimed in claim 1, comprising *storing a pharmaceutical batch of a salt of treprostinil* as claimed in claim 1 at *ambient temperature, and preparing a pharmaceutical product from the pharmaceutical batch after storage.* |
|---|---|

For the reasons stated above in Section II.C.2.d.(3), Moriarty 2004 in combination with Phares 2005 renders obvious storing a pharmaceutical batch of a salt of treprostinil at ambient temperature and preparing a pharmaceutical product from the pharmaceutical batch after storage.

### f.    Dependent Claim 8 Would Have Been Obvious

Dependent claim 8 is independent claim 1, without claim limitation 1[f].

### (1)    Claim Element 8[a]

| 8[a] | *A method of preparing a pharmaceutical batch* as claimed in claim 1, comprising: |
|------|-----------------------------------------------------------------------------------|

*See* explanation under independent claim 1, Section III.C.2.d.

### (2)    Claim Elements 8[b] and [c]

| 8[b] | *(a) alkylating a benzindene triol,* |
|------|--------------------------------------|
| 8[c] | *(b) hydrolyzing the product of step (a) to form a solution comprising treprostinil,* |

Moriarty 2004 teaches both the alkylating and hydrolyzing steps of claim 8.  Moriarty 2004 teaches the alkylation of triol intermediate **34** (left) which has the same formula as the triol structure disclosed in the '901 Patent (right):



(Moriarty 2004)                              ('901 Patent)

Moriarty 2004 at 1895; '901 Patent at 9:15-25.  Moriarty 2004 teaches that the "**[t]riol 34 was**

129

**HIGHLY CONFIDENTIAL**

**alkylated** at the phenolic hydroxyl group with use of chloroacetonitrile in refluxing acetone with potassium carbonate (**34**→**35**) and nitrile **35** was **hydrolyzed** with ethanolic potassium hydroxide to yield UT-15 (**7**) in 9% overall yield."  Moriarty 2004 at 1898 (emphasis added).)

Phares 2005 also teaches both the alkylating and hydrolyzing steps of claim 8.  Phares 2005 discloses alkylating a triol intermediate, the benzindene triol, of the same structural formula disclosed in claim 8 of the '901 Patent.  *See also* Section III.C.2.d.(2).  Phares 2005 also discloses this same triol alkylation step as Moriarty 2004 and as the '901 Patent, where "R" can be "H" (structure **11b**):

Alkylation of Benzindene Triol



(̕901 Patent)                                                  (Phares 2005)

'901 Patent at 9:50-10:13, claim 8; Phares 2005 at 40.

Phares 2005 discloses hydrolyzing the resulting compound to form the same structural formula of treprostinil starting material disclosed in the '901 Patent.  *See* Section III.C.2.d.(3).  The hydrolyzing procedure is disclosed in Phares 2005 as: "ii, KOH, $CH_3OH$, reflux. 83%."  Phares 2005 at 40 (emphasis added).  Phares 2005 further explains that "[e]nantiomers of these compounds…can be synthesized using reagents and synthons of enantiomeric chirality of the above reagents," thereby inherently teaching this hydrolysis step for treprostinil as well.  *Id*. at 39-40.  A comparison between the resulting treprostinil starting material disclosed in the '901 Patent

130
**HIGHLY CONFIDENTIAL**

(left) and Phares 2005 (right) are produced below for a side-by-side comparison:



('901 Patent)                              (Phares 2005)

'901 Patent at 11:17-29, Example 2; Phares 2005 at 8.

Claim 1 of the '901 Patent simply teaches that one can perform the alkylation and hydrolysis steps, *i.e.*, making the nitrile and then hydrolyzing to make the treprostinil carboxylic acid (salt precursor).  '901 Patent at claim 1.

Phares 2005 also teaches that the resulting treprostinil carboxylic acid is in a solution. Phares 2005 at 22, 40.  A POSA would understand that treatment of **11b** with KOH, CH₃OH (methanol), as taught in Phares 2005's hydrolyzing step, would lead to the formation of a solution of treprostinil carboxylic acid after neutralization.  *Id.* at 40.  Phares 2005 further discloses that such treprostinil carboxylic acid can be in solution at page 22, where it teaches dissolving the treprostinil acid in ethanol/water.  *Id.*; Phares 2005 at 22.

### (3)    Claim Elements 8[d]

| 8[d] | *(c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil,* |
|---|---|

*See* explanation under independent claim 1.  Section III.C.2.d.(4).

### (4)    Claim Element 8[e]

| 8[e] | *(d) isolating the salt of treprostinil, and* |
|---|---|

*See* explanation under independent claim 1.  Section III.C.2.d.(5).

### (5)    Claim Element 8[f]

| 8[f] | *(e) optionally reacting the salt of treprostinil with an acid to form treprostinil.* |
|------|--------------------------------------------------------------------------------------|

The step of reacting the foregoing salt of treprostinil with an acid to form the treprostinil in claim 8 of the '901 Patent is optional.  Therefore, no disclosure in Moriarty 2004 or Phares 2005 is required to demonstrate the obviousness of this claim element.  Even so, this step was generally known in the art and would have been obvious to a POSA.  *See, e.g.*, Schoffstall 2004 at 201-02; Wiberg 1960 at 112.  Moreover, the '901 Patent admits that step (e) is merely a "simple acidification with diluted hydrochloric acid" step, and is thus not a novel step.  '901 Patent at 17:5-8.

### D.    Claims 1-4, 6, and 8 Are Invalid Under 35 U.S.C. § 112

The Asserted Claims of the '901 Patent are invalid under 35 U.S.C. § 112 for lack of written description support, lack of enablement, and indefiniteness.  To the extent UTC contends that claims 1-4, 6, and 8 of the '901 Patent are not obvious, the asserted claims of the '901 patent are invalid under 35 U.S.C. § 112 for the reasons stated below.

"[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad*, 598 F.3d at 1351.  The applicant must "'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention,' and demonstrate that by disclosure in the specification of the patent."  *Carnegie Mellon Univ.*, 541 F.3d at 1122 (quoting *Vas-Cath*, 935 F.2d at 1563-64).  "One cannot disclose a forest in the original application, and then later pick a tree out of the forest and say 'here

is my invention.'" *Purdue Pharma*, 230 F.3d at 1326-37 (finding "nothing in the written description of Examples 1 and 3 that would suggest to one skilled in the art that the [claimed invention] is an important defining quality of the formulation, nor does the disclosure even motivate one to [reach the claimed invention]").  Lastly, patents may need to disclose experimental data to provide an adequate written description if the inventor expressly claims that the invention achieves a certain result or has an efficacy limitation.  *Nuvo Pharms.*, 923 F.3d at 1380 ("[W]hen the inventor expressly claims that result, our case law provides that that result must be supported by adequate disclosure in the specification.").

To satisfy the enablement requirement under § 112(a), the specification must enable a person having ordinary skill in the art to make and use the invention.  *Wyeth*, 720 F.3d at 1384.  This requirement is met when at the time of filing the application, one skilled in the art, having read the specification, could practice the invention without "undue experimentation."  *ALZA*, 603 F.3d at 940 (quoting *Genentech*, 108 F.3d at 1365).

Finally, under § 112, patent claims must "particularly point[] out and distinctly claim[] the subject matter" regarded as the invention.  35 U.S.C. § 112(b).  A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus*, 572 U.S. at 901.  As discovery is ongoing, Liquidia reserves the right to supplement and/or amend these contentions.

### 1.      Claim 1 Lacks Written Description Support and is Not Enabled

#### a.      "Impurities" Limitation Lacks Written Description Support

Asserted Claim 1 of the '901 Patent recites "a pharmaceutical batch consisting of . . . impurities resulting from (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil."  '901, 17:24-27.  However, the '901 patent

**HIGHLY CONFIDENTIAL**

specification never discloses any measurement or identification of impurities after the alkylation or hydrolysis steps, and in particular provides no analysis of the impurities and their amounts that may remain in the treprostinil free acid that result from alkylation and hydrolysis.  *See id.* at Examples 1 and 2; Example 6 (between steps 14 and 15 or between steps 30 and 31).  As such, the '901 patent does not demonstrate that the inventors actually determined whether they made "a pharmaceutical batch consisting of . . .  impurities resulting from (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil," and for this reason, the specification of the '901 patent does not convey to a skilled artisan that the inventors had possession of this limitation.  The '901 patent specification thus fails to provide any written description support for claim 1's recited impurities resulting from alkylation and hydrolysis.

### b. "Salt" Limitation Lacks Written Description Support and Is Not Enabled

Asserted Claim 1 of the '901 Patent recites "contacting the solution comprising treprostinil from step (b) with a base."  '901, 17:27-29.  The claim recites use of *any* base to form a salt, while the patent specification only has a few lines identifying such bases.  *Id.* at 5:41-45 (identifying only "sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, choline and the like" as bases).

This disclosure is not sufficient to enable a skilled artisan to practice the full scope of claim 1.



Nor does the '901 patent adequately describe the full scope of claim 1. ████████████

Thus, the '901 patent's four line disclosure of possible bases does not provide adequate description of the broad spectrum of specific acid-base combinations that work to form a salt of treprostinil.

### 2.    Claims 1, 3, 4, and 6 Lack Written Description Support

#### a.    "Therapeutically Effective Amount" Lacks Written Description Support

Asserted Claims 3 and 4 of the '901 Patent are directed to pharmaceutical products comprising a "therapeutically effective amount" of treprostinil or "salt treprostinil."   "[T]he purpose of the written description requirement is to 'ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of the art as described in the patent specification.'"   *Ariad*, 598 F.3d at 1353-54 (2010) (quoting *Rochester*, 358 F.3d at 920).   Accordingly, to satisfy the written description requirement, "the patentee is obliged to described . . . subject matter commensurate with the scope of the

**HIGHLY CONFIDENTIAL**

exclusionary right." *Id*. at 1360.  Thus, for UTC to satisfy the written description requirement, the specification of the '901 Patent must adequately describe the full scope of claims 3 and 4 of the '901 Patent.

Here, however, neither the claim language nor specification of the '901 Patent define or otherwise describe what constitutes a "therapeutically effective amount" of treprostinil or a treprostinil salt.  Indeed, the claims are extremely broad as they do not recite a specific disease[20] to which a "therapeutically effective" amount of treprostinil or salt thereof would be applicable nor to a particular route of administration (e.g., inhalation).  In fact, other than claims 3 and 4, the specification does not use the term "therapeutically effective," and further does not include any disclosure concerning any doses that the claimed "pharmaceutical product" should contain.  *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("[C]laims must be construed so as to be consistent with the specification, of which they are part.").  Because the '901 Patent fails to limit the scope of claims 3 or 4, the specification of the '901 Patent must reasonably convey to those skilled in the art that the inventors had possession of a "therapeutically effective amount" of treprostinil to treat *any condition* and by *any route of administration* as of December 17, 2007.

---

[20] The '901 Patent provides only general descriptions of treprostinil's potential uses in the treatment of various disorders and by different routes of administration.  *See* '901 Patent at 1:36–65 (describing generally treprostinil's potential use in treatment of pulmonary hypertension, peripheral vascular disease, lung cancer, liver cancer, brain cancer, pancreatic cancer, kidney cancer, prostate cancer, breast cancer, colon cancer, head-neck cancer, kidney malfunction, neuropathic foot ulcers, pulmonary fibrosis, interstitial lung disease, and asthma).  However, these extremely general characterizations of routes of administration and potential disorders treated by treprostinil fail to limit the scope of claims 3 and 4.  Further, given the list of diseases and the breadth of the '901 claims covering these diseases, the '901 patent needs to provide written description support for a therapeutically effective amount of each disease.

**HIGHLY CONFIDENTIAL**

Even if the '901 Patent's general reference to various disorders and routes of administration demonstrates possession of a "therapeutically effective amount" of treprostinil or treprostinil salt to treat those conditions (*see* '901 Patent at 1:36-65), which Liquidia does not concede, the '901 Patent provides no evidence that the named inventors possessed a "therapeutically effective amount" of treprostinil or treprostinil salt for all other conditions and routes of administration encompassed by the claims. By failing to provide any guidance or evidence that the inventors were in possession of a "therapeutically effective amount" of treprostinil or treprostinil salt to treat all conditions and routes of administration encompassed by the claims, the specification of the '901 Patent fails to adequately describe claims 3 and 4 of the '901 Patent. *See, e.g.*, *Biogen Int'l GmbH v. Mylan Pharms. Inc.*, No. 17CV116, 2020 WL 3317105, at *15 (N.D. W. Va. June 18, 2020) (invalidating patent lacking clinical data for inadequately describing "therapeutically effective amount").

### b.       "Storing"/"Storage" at "Ambient Temperature" Lack Written Description Support

Asserted Claim 6 of the '901 Patent is directed to a method of preparing the pharmaceutical product comprising treprostinil after "storing" a pharmaceutical batch of a treprostinil salt at "ambient temperature," which the Court construed as "room temperature (equal to or less than the range of 15°C to 30°C)." D.I. 119 at 1. "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351. An adequate written description need not in every instance describe an actual reduction to practice but "must nonetheless 'describe the claimed subject matter in terms that establish that [the applicant] was in possession of the . . . claimed invention, including all of the elements and limitations.'" *Rochester*, 358 F.3d at 926 (quoting *Hyatt*, 146 F.3d at 1353). The specification, moreover, must

provide written description support for an entire claimed range. *Eiselstein*, 52 F.3d at 1040 ("Since the grandparent application only disclosed a nickel range of 45-55%, it can hardly be said to have disclosed 50-60%.").  Accordingly, the specification of the '901 Patent must sufficiently describe a method of "storing" a pharmaceutical batch at the full range of 15 to 30° C and preparing a pharmaceutical product from the pharmaceutical batch after "storage" such that a person of skill in the art would recognize that the named inventors actually invented what is claimed.

A POSA reviewing the specification of the '901 Patent would conclude that the inventors were not in possession of a method of preparing a pharmaceutical product from a pharmaceutical batch of treprostinil salt that was "stor[ed]" at the full range of 15 to 30° C.  As UTC noted in its Preliminary Response to Liquidia's IPR Petition with respect to the '901 Patent, "[p]rostaglandin derivatives," like treprostinil, "in particular were known to be unstable upon storage due to inherent instability of the crystalline lattice of these compounds owning to their long, flexible sidearms, as well as the presence of multiple polymorphic crystals."  *Liquidia Techs.,*, IPR2020-00770, Paper 6 at 53 (P.T.A.B. July 14, 2020).  Further, UTC noted in its Preliminary Response that "[e]nvironmental factors are a significant factor (*e.g.*, temperature, oxygen, atmosphere, humidity).  This is especially true for compounds stored as salts."  *Id*. at 54.  In UTC's Patent Owner Response to Liquidia's IPR Petition with respect to the '901 Patent, UTC further argued that a POSA would require storage stability data to believe a treprostinil salt could be stored at ambient temperature.  *Liquidia Techs.*, IPR2020-00770, Paper 12 at 29 ("No storage stability data is presented [in Phares].");  *see also* Declaration of Rodolfo Pinal, Ph.D. Supporting United Therapeutic Corporation's Patent Owner Response, *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00770, Ex. 2025 at ¶ 204 (P.T.A.B. Dec. 21, 2020) ("Phares also does not provide

any storage stability data or suggest that an isolated treprostinil salt can be stored at ambient temperature prior to the preparation of a pharmaceutical composition.").

Additionally, ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████

Considering these admissions, the specification of the '901 Patent provides no evidence or disclosure that the treprostinil salts of the claimed invention were actually "stor[ed]" for any length of time, let alone at 15 to 30° C, or that the inventors were in possession of a method of "storing" a pharmaceutical batch of treprostinil salt at the full range of ambient temperature and preparing a pharmaceutical product of treprostinil after such "storage."  The specification of the '901 Patent provides only a generic statement regarding the "stor[age]" of "crude treprostinil salts" at "ambient temperature," which provides no greater detail than the claims themselves.  *See* '901 Patent at

17:4-10 ("Additional advantages of this process are: (a) crude treprostinil salts can be stored as raw material at ambient temperature and can be converted to treprostinil by simply acidification with diluted hydrochloric acid, and (b) the treprostinil salts can be synthesized from the solution of treprostinil without isolation.").  The '901 Patent does not disclose any experimental data to support these statements, and further lacks any details as to how long the "crude treprostinil salt" can be stored or under what conditions, other than temperature.

Further, a POSA reading the specification of the '901 Patent would also not understand that the "crude treprostinil salts" described in the specification constitute a "pharmaceutical batch of a salt of treprostinil" within the meaning of claim 6 as the treprostinil salt itself can be the claimed pharmaceutical product (claim 6 does not require any additional processing steps for the treprostinil salt prior to incorporating it into the "pharmaceutical product.").  And even if the "crude treprostinil salts" described in the specification of the '901 Patent constitute a "pharmaceutical batch of a salt of treprostinil" within the meaning of claim 6, which Liquidia does not concede, the specification of the '901 Patent does not provide evidence that the "crude" salts were ever actually stored, let alone for what length of time and under what conditions other than temperature.  Moreover, the specification of the '901 Patent states only that "crude treprostinil salts" can be stored at ambient temperatures, and such "crude" salts must be further processed. There is no indication in the specification of the '901 Patent that the inventors were in possession of a pharmaceutical batch of treprostinil salt within the scope of claims 6 that can be stored.

The specification and claim's vague description of "storing" crude treprostinil salts and a "pharmaceutical batch of a salt of treprostinil" lacks guidance as to "significant" environmental factors, in UTC's own words, such as oxygen, atmosphere, and humidity.  *University of California*, 119 F.3d at 1568 ("The description requirement of the patent statute requires a description of an

invention, not an indication of a result that one might achieve if one made that invention."). Considering UTC's contention that the significance of these undefined variables is "especially true for compounds stored as salts," and the lack of disclosure as to these variables in specification of the '901 Patent, a POSA would not conclude that the inventors were in possession of the invention claimed in claim 6.  Thus, claim 6 of the '901 Patent is invalid for lack of written description.

### c.  To the Extent UTC Contends that Claim 1 Permits "Isolation" of Treprostinil Before Combining with a Base to Form a Salt, the Asserted Claims Lack Adequate Written Description[21]

Claim 1 of the '901 Patent, which all other Asserted Claims of the '901 Patent depend, requires "form[ing] a salt of treprostinil" by (a) alkylating a benzindene triol, (b) hydrolyzing the product of step(a), and (c) "contacting the solution comprising treprostinil from step (b) with a base."  "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad*, 598 F.3d at 1351.  An adequate written description need not in every instance describe an actual reduction to practice but "must nonetheless 'describe the claimed subject matter in terms that establish that [the applicant] was in possession of the . . . claimed invention, including all of the elements and limitations.'"  *Rochester*, 358 F.3d at 926 (quoting *Hyatt*, 146 F.3d at 1353).  To the extent UTC argues that claim 1 permits isolation of treprostinil prior to contacting the treprostinil with a base to form a salt, claim 1 of the '901 Patent lacks adequate written description support because a POSA would not recognize that the inventors possessed a "pharmaceutical product" according to claim 1 where the treprostinil was isolated before contact with a base to form a salt.

---

[21] Pending the Court's construction of "contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil," Liquidia reserves the right to supplement Section III.D.1.c.

**HIGHLY CONFIDENTIAL**

As an initial matter, Liquidia maintains that claim 1 of the '901 Patent prohibits the isolation of treprostinil before contact with a base to form a salt.  First, the plain and ordinary meaning of claim 1 excludes isolation of treprostinil prior to contacting the treprostinil with a base to form a salt.  Because the "solution" resulting from the alkylation and hydrolysis steps (and, thus, containing the "impurities" resulting from each step) is contacted with a base to form a salt, the claims prohibit isolation of treprostinil before reacting with a base to form a salt.  Second, as discussed in greater detail in Section II.D.2.b *supra*, the specification of the '901 Patent confirms that claim 1 excludes isolation of treprostinil prior to contacting the treprostinil with a base to form a salt.  Finally, UTC's arguments made during the '901 IPR confirm that the claims exclude isolation of treprostinil before contacting with a base to form a salt.  UTC stated clearly that "claim 1's recited steps differ from Phares [2005] and Moriarty [2004] because they do not involve isolation of treprostinil intermediate."  *Liquidia Technologies, Inc. v. United Therapeutics Corp.*, IPR2020-00770, Paper 9 at 2 (P.T.A.B. Oct. 27, 2020); *see also id.* at 3 ("The claimed pharmaceutical batches are an improvement over Moriarty [2004] and Phares [2005] in part because they form a salt without prior isolation of the intermediate treprostinil.").  Considering the claims, specification, and arguments made by UTC in the '901 IPR, claim 1 of the '901 Patent prohibits the isolation of treprostinil before contact with a base to form a salt.

However, to the extent UTC contends that claim 1 of the '901 Patent permits isolation of treprostinil before contacting with a base to form a salt, claim 1 of the '901 Patent lacks adequate written description support.  As discussed in greater detail in Section II.D.2.b *supra*, all examples disclosed in the specification of the '901 Patent disclose forming a salt of treprostinil by contacting treprostinil in solution with a base.  The specification provides no evidence that the named inventors were in possession of a "pharmaceutical batch" within the meaning of claim 1, wherein

**HIGHLY CONFIDENTIAL**

the treprostinil was isolated before contact with a base to form a salt. ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

Without evidence or guidance as to how a POSA would produce a "pharmaceutical batch" within the meaning of claim 1, wherein the treprostinil is isolated before contact with a base to form a salt, claim 1 of the '901 Patent and, therefore, all other Asserted Claims of the '901 Patent lack adequate written description support.

143

        **d.**     **To the Extent UTC Contends that Claim 1 Permits Column Chromatography Between Alkylation and Salt Formation, the Asserted Claims Lack Adequate Written Description**

To the extent UTC argues that claims 1 permits column chromatography between alkylation and salt formation, the claims lack adequate written description support as the specification does not disclose that such a process will result in the claimed "pharmaceutical batch." "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351.

The examples of the '901 Patent only describe a process in which no column chromatography appears between alkylation and salt formation. The '901 Patent states that "***the purification by column chromatography is eliminated***, thus the required amount of flammable solvents and waste generated are greatly reduced." '901 Patent at 6:9-11 (emphasis added). Example 1, "Alkylation of Benzindene Triol," states: "[t]he crude benzindene nitrile was used as such in the next step ***without further purification***." *Id.* at 10:66-67 (emphasis added). Example 2, "Hydrolysis of Benzindene Nitrile," states: "[t]he filtrate (pale-yellow) was reduced to volume of 35-40 L by evaporation in vacuo at 50-55° C. ***for direct use in next step***," which is salt formation, as described in Example 3. *Id.* at 12:15-17 (emphasis added). No column chromatography was performed before salt formation. Finally, Example 6 provides a "Comparison of the Former Process and a Working Example of ***the Process According to the Present Invention***." *Id.* at 15:25-16:64 (emphasis added). In the "Former Process," "Purification" is performed by column chromatography, whereas the "Working example of the Process according to the present invention" includes "No column." *Id.* at Example 6 (Step No. 12).

**HIGHLY CONFIDENTIAL**

## Example 6

### Comparison of the Former Process and a Working Example of the Process According to the Present Invention

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| | | Nitrile | |
| 1 | Triol weight | 500 g | 5,000 g |
| 2 | Acetone | 20 L (1:40 wt/wt) | 75 L (1:15 wt/wt) |
| 3 | Potassium carbonate | 1,300 g (6.4 eq) | 5,200 g (2.5 eq) |
| 4 | Chloroacetonitrile | 470 g (4.2 eq) | 2,270 g (2 eq) |
| 5 | Tetrabutyl-ammonium bromide | 42 g (0.08 eq) | 145 g (0.03 eq) |
| 6 | Reactor size | 72-Liter | 50-gallon |
| 7 | Reflux time | 8 hours | No heating, Room temperature (r.t.) 45 h |
| 8 | Hexanes addition before filtration | Yes (10 L) | No |
| 9 | Filter | Celite | Celite |
| 10 | Washing | Ethyl acetate (10 L) | Acetone (50 L) |
| 11 | Evaporation | Yes | Yes |
| 12 | Purification | Silica gel column Dichloromethane: 0.5 L Ethyl acetate: 45 L Hexane: 60 L | No column |
| 13 | Evaporation after column | Yes | No |
| 14 | Yield of nitrite | 109-112% | Not checked |

Emphasizing the advantages of the "present invention," the specification concludes that "[t]he quality of treprostinil produced according to this invention is excellent. ***The purification of benzindene nitrile by column chromatography is eliminated***." *Id.* at 16:66-17:1 (emphasis added). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



As such, as described in the specification of the '901 Patent, in order to achieve the claimed "pharmaceutical batch," the specification only discloses that result where column chromatography *is not* conducted between alkylation and salt formation.  Considering the specification of the '901 Patent, a person of ordinary skill in the art would not conclude that the inventors were in possession of a process wherein column chromatography appeared between alkylation and salt formation resulting in the claimed "pharmaceutical batch."  As such, to the extent UTC contends that claim 1 permits column chromatography between alkylation and salt formation, claim 1, which all other Asserted Claims of the '901 Patent depend, lack adequate written description support.

### 3.  Claims 1, 3, 4, and 6 Are Not Enabled

#### a.  "Therapeutically Effective Amount" Is Not Enabled

Asserted Claims 3 and 4 of the '901 Patent are directed to pharmaceutical products comprising a "therapeutically effective amount" of treprostinil or "salt treprostinil."  To satisfy the statutory requirement underlying § 112, the scope of the claims must be "commensurate" with teachings in the specification.  *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1377 (Fed. Cir. 1999).  "The scope of the claims must be less than or equal to the scope of the enablement."  *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1196 (Fed. Cir.

1999).  "To constitute an enabling disclosure, 'the specification of a patent must teach those skilled in the art how to make and use the full scope of the invention without undue experimentation.'" *Harris*, 114 F.3d at 1155 (quoting *Wright*, 999 F.2d at 1561).  Factors to be considered in determining whether a disclosure would require undue experimentation include:  "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability and unpredictability of the art, and (8) the breadth of the claims." *Wands*, 858 F.2d at 737.

Here, as discussed above in Section III.D.1.c, neither the claim language nor specification of the '901 Patent limit "therapeutically effective amount" of Asserted Claims 3 or 4 to a specific indication (e.g., pulmonary hypertension) nor to a particular route of administration (e.g., inhalation).  Indeed, the claims are extremely broad as they do not recite a specific disease[22] to which a "therapeutically effective" amount of treprostinil or salt thereof would be applicable nor to a particular route of administration (e.g., inhalation).  In fact, other than claims 3 and 4, the specification does not use the term "therapeutically effective," and further does not include any disclosure concerning any doses that the claimed "pharmaceutical product" should contain.  *Merck & Co.*, 347 F.3d at 1371 ("[C]laims must be construed so as to be consistent with the specification,

---

[22] The '901 Patent provides only general descriptions of treprostinil's potential uses in the treatment of various disorders and by different routes of administration.  *See* '901 Patent at 1:36–65 (describing generally treprostinil's potential use in treatment of pulmonary hypertension, peripheral vascular disease, lung cancer, liver cancer, brain cancer, pancreatic cancer, kidney cancer, prostate cancer, breast cancer, colon cancer, head-neck cancer, kidney malfunction, neuropathic foot ulcers, pulmonary fibrosis, interstitial lung disease, and asthma).  However, these extremely general characterizations of routes of administration and potential disorders treated by treprostinil fail to limit the scope of claims 3 and 4.  Further, given the list of diseases and the breadth of the '901 claims covering these diseases, the '901 patent needs to provide written description support for a therapeutically effective amount of each disease.

**HIGHLY CONFIDENTIAL**

of which they are part."). Because the '901 Patent fails to limit the scope of claims 3 or 4, the specification of the '901 Patent must enable a skilled artisan to identify a "therapeutically effective amount" of treprostinil to treat *any condition* and by *any route of administration* without the need for undue experimentation as of December 17, 2007.

For the reasons discussed below, applying the *Wands* factors, the specification of the '901 Patent fails to adequately enable a person of ordinary skill in the art to practice the full scope of the invention without undue experimentation.

| *Wands* Factor | Application to Claims 3 and 4 of the '901 Patent |
|---|---|
| Quantity of Experimentation Necessary | Identifying a "therapeutically effective amount" of treprostinil with respect to all conditions and by all routes of administration encompassed by claims 3 and 4, if it exists at all, would require an exorbitant amount of effort, entailing significant amounts of time-consuming and expensive preclinical and clinical studies evaluating different doses and different routes of administration. |
| Amount of Guidance or Direction Presented | Besides citing general references to treprostinil's potential uses, the '901 Patent fails to provide any guidance or direction to a skilled artisan in identifying a "therapeutically effective amount" for the treatment of all conditions and by all routes of administration encompassed by the claims. *See, e.g.*, '901 Patent at 1:36–65. Thus, the specification of the '901 Patent provides little guidance to a person of ordinary skill in the art. |
| Presence or Absence of Working Examples | The '901 Patent specification is completely lacking in working examples of "therapeutically effective amount[s]" of treprostinil used to treat any condition utilizing any route of administration. |
| Nature of the Invention | To the extent UTC contends that identifying a therapeutically effective amount of treprostinil or treprostinil salt would have been nonobvious, the nature of the invention is one of great uncertainty. |
| State of the Prior Art | Although treprostinil was known to treat certain conditions by certain routes of administration by December 2007, the state of the prior art was completely silent as to treprostinil's use in treating many conditions and routes of administration encompassed by the claims. |

148
**HIGHLY CONFIDENTIAL**

| Relative Skill of Those in the Art | To the extent UTC contends that identifying a therapeutically effective amount of treprostinil or treprostinil salt would have been nonobvious, for many if not all conditions and routes of administration encompassed by the claims, the relative skill in the art was high, requiring specialized medical training and years of experience treating the condition as well as skilled artisans in formulation development for various routes of administration. |
| --- | --- |
| Predictability or Unpredictability of the Art | To the extent UTC contends that identifying a therapeutically effective amount of treprostinil or treprostinil salt would have been nonobvious, treatment of many conditions encompassed by the claims (e.g., cancer) is considered unpredictable even today and, certainly, would have been considered unpredictable in December 2007. |
| Breadth of the Claims | As described in greater detail above, the scope of Asserted Claims 3 and 4 is very broad, encompassing any amount of treprostinil or a salt thereof for the treatment of any condition and by any route of administration. |

Applying all eight *Wands* factors, the specification of the '901 Patent fails to enable a skilled artisan to identify a "therapeutically effective amount" for all conditions and routes of administration encompassed by the claims. Accordingly, claims 3 and 4 of the '901 Patent are invalid as not enabled.

### b. "Storage"/"Storing" at "Ambient Temperature" Are Not Enabled

Asserted Claims 6 of the '901 Patent is directed to a method of preparing the pharmaceutical product comprising treprostinil after "storing" a pharmaceutical batch treprostinil salt at "ambient temperature," which the Court construed as "room temperature (equal to or less than the range of 15°C to 30°C)." D.I. 119 at 1.

"To constitute an enabling disclosure, 'the specification of a patent must teach those skilled in the art how to make and use the full scope of the invention without undue experimentation.'" *Harris*, 114 F.3d at 1155 (quoting *Wright*, 999 F.2d at 1561). Factors to be considered in determining whether a disclosure would require undue experimentation include: "(1) the quantity

of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability and unpredictability of the art, and (8) the breadth of the claims." *Wands*, 858 F.2d at 737.  Accordingly, the specification of the '901 Patent must enable a skilled artisan to prepare a treprostinil pharmaceutical product after "storage" of a pharmaceutical batch of treprostinil salt at the full range of 15 to 30° C without undue experimentation.

As UTC noted in its Preliminary Response to Liquidia's IPR Petition with respect to the '901 Patent, "[p]rostaglandin derivatives," like treprostinil, "in particular were known to be unstable upon storage due to inherent instability of the crystalline lattice of these compounds owning to their long, flexible sidearms, as well as the presence of multiple polymorphic crystals." *Liquidia Techs.*, IPR2020-00770, Paper 6 at 53.  Further, UTC noted in its Preliminary Response that "[e]nvironmental factors are a significant factor (*e.g.*, temperature, oxygen, atmosphere, humidity).  This is especially true for compounds stored as salts." *Id.* at 54.  Further, Dr. Pinal opined in the '901 IPR that "[i]ncreases in humidity enhance the thermodynamic activity of water in the environment, yielding potential hydrates, degrading crystal quality through hygroscopicity and even deliquescence (particularly for salts), and promoting chemical decomposition, leading to the production of additional contaminants and impurities."  Declaration of Rodolfo Pinal, Ph.D. Supporting United Therapeutic Corporation's Patent Owner Response, *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00770, Ex. 2025 at ¶ 220 (P.T.A.B. Dec. 21, 2020).

████████████████████████████████████

████████████████████████████████████

**HIGHLY CONFIDENTIAL**

███████████████████████████████████

███████████████████████

Thus, to the extent UTC contends that prostaglandin derivatives like treprostinil exhibit "inherent instability" and that environmental factors, such as temperature, oxygen, atmosphere, and humidity, have a "significant" impact on the stability of salts, a person of ordinary skill in the art would have required extensive disclosure to practice claim 6 of the '901 Patent.

Applying the eight *Wands* factors in sequential order, and taking into account UTC's nonobvious positions with respect to claim 6 of the '901 Patent, the specification of the '901 Patent would not enable a person of ordinary skill to "stor[e]" a pharmaceutical batch of treprostinil salt at the full range of 15 to 30° C and create the claimed pharmaceutical product.

| *Wands* Factor | Application to Claim 6 of the '901 Patent |
|---|---|
| Quantity of Experimentation Necessary | To the extent UTC's contention that prostaglandin derivatives exhibit "inherent inability" and that humidity, oxygen, atmosphere, and humidity are "especially" significant environmental factors is correct, a person of skill in the art would have to engage in significant amounts of experimentation to discern how to effectively "stor[e]" the claimed treprostinil salts. More specifically, while the claim defines the temperature at which the salts can be stored (ambient temperature), a person of ordinary skill in the art would require extensive experimentation to determine the other "significant" environmental factors suitable for storage, including humidity, whether the treprostinil can be exposed to light, or needs to be stored in an oxygen rich or depleted environment. Moreover, each "significant" environmental factor would require experimentation while maintaining constant the other environmental factors. |
| Amount of Guidance or Direction Presented | As discussed above, the specification and claims of the '901 Patent provide guidance only as to the temperature at which the claimed treprostinil salts are stored. The specification and claims are completely silent as to other "significant" environmental factors, according to UTC, such as oxygen, atmosphere, and humidity. Accordingly, besides temperature, the amount of guidance or direction presented is non-existent. |

**HIGHLY CONFIDENTIAL**

| | |
|---|---|
| Presence or Absence of Working Examples | Besides providing only a vague description of "stor[ing]" "crude treprostinil salts" at ambient temperature, which Liquidia does not concede constitutes treprostinil salts within the meaning of claim 6, the specification is completely lacking in working examples of "storing" treprostinil salts under any conditions. And even if the "crude treprostinil salts" constitute treprostinil salts within the meaning of claim 6, the specification's brief mention of their "stor[age]" provides no more detail than the claims and, thus, does not constitute a working example. |
| Nature of the Invention | According to UTC, polymorphs (i.e., salts) "had plagued the pharmaceutical industry for over a decade prior to the '901 Patent, with high-profile failures including withdrawal of an approved drug from the market." *Liquidia Techs.*, IPR2020-00770, Paper 6 at 52. "These incidents underscore the difficulty of understanding the polymorphic nature of pharmaceutical compounds." *Id.* at 53. Accordingly, to the extent UTC argues that claim 8 would have been nonobvious, the nature of the invention was one of great uncertainty. |
| State of the Prior Art | According to UTC, the prior art was silent as to storage considerations for treprostinil salts. *See, e.g.*, *Liquidia Techs.*, IPR2020-00770, Paper 6 at 51-55. To the extent UTC argues that claim 8 would have been nonobvious, without guidance as to "significant" environmental considerations with respect to the storage of treprostinil salts, the state of the prior art was very limited. |
| Relative Skill of Those in the Art | According to UTC, "the POSA[23] would have been an industrial chemist or chemical engineer with experience in pharmaceutical production, familiar with controlling for polymorphs and realizing highly pure products at batch scales as the challenged claims require[d]." *Liquidia Techs.*, IPR2020-00770, Paper 6 at 56. To the extent UTC argues that claim 6 would have been nonobvious, the relative skill of those in the art was high. |
| Predictability or Unpredictability of the Art | As mentioned above, UTC contends that polymorphs "had plagued the pharmaceutical industry for over a decade prior to the '901 Patent, with high-profile failures including withdrawal of an approved drug from the market." *Liquidia Techs.*, IPR2020-00770, Paper 6 at 52. "These incidents underscore the difficulty of understanding the polymorphic nature of pharmaceutical |

---

[23] Liquidia does not, at this time, concede to UTC's definition of a person of ordinary skill in the art.

**HIGHLY CONFIDENTIAL**

| | compounds." *Id*. at 53.  Accordingly, to the extent UTC argues that claim 8 would have been nonobvious, the art was highly unpredictable. |
|---|---|
| Breadth of the Claims | The breadth of claim 6 is broad because it simply limits "storage" by temperature.  Claim 6 of the '901 Patent provides no further limitations as to other "significant" environmental factors, according to UTC, such as oxygen, atmosphere, and humidity. |

Applying all eight *Wands* factors, in view of UTC's nonobvious arguments, the '901 Patent fails to enable a person of ordinary skill in the art to practice Asserted Claim 6.  Accordingly, claim 6 of the '901 Patent is invalid as not enabled.

### c.   To the Extent UTC Contends that Claim 1 Permits Column Chromatography Between Alkylation and Salt Formation, the Asserted Claims Are Not Enabled

To the extent UTC argues that claim 1 permits column chromatography between alkylation and salt formation, the claims are not enabled as a person of ordinary skill in the art would have to engage in undue experimentation to achieve the claimed "pharmaceutical batch."

| *Wands* Factor | Application to Claim 1 of the '901 Patent |
|---|---|
| Quantity of Experimentation Necessary | As mentioned above in Section III.D.2.d *supra*, all of the examples disclosed in the specification of the '901 Patent lack a column chromatography step between alkylation and salt formation.  To the extent UTC contends that claim 1 permits column chromatography between alkylation and salt formation, without guidance or direction in the '901 Patent, a POSA would have to engage in a significant amount of experimentation to achieve the claimed "pharmaceutical batch." |

| | |
|---|---|
| Amount of Guidance or Direction Presented | As mentioned above in Section III.D.2.d *supra*, the specification and claims of the '901 Patent provide no guidance or direction as to how a POSA would perform column chromatography between alkylation and salt formation and also achieve the claimed "pharmaceutical batch." |
| Presence or Absence of Working Examples | As mentioned above in Section III.D.2.d *supra*, the specification and claims of the '901 Patent provide no working examples of column chromatography between alkylation and salt formation while also achieving the claimed "pharmaceutical batch." |
| Nature of the Invention | To the extent UTC contends that the pharmaceutical composition of Phares 2005 did not constitute a "pharmaceutical batch," the nature of the invention—that is performing column chromatography between alkylation and salt formation and achieving a pharmaceutical composition with a lower amount of one or more impurities than the starting batch—was one of great uncertainty. |
| State of the Prior Art | To the extent that UTC contends that the pharmaceutical composition of Phares 2005 did not inherently constitute a "pharmaceutical batch," the state of the prior art was silent as to how a POSA would perform salt formation between alkylation and salt formation and achieve a "pharmaceutical batch." |
| Relative Skill of Those in the Art | According to UTC, "the POSA[24] would have been an industrial chemist or chemical engineer with experience in pharmaceutical production, familiar with controlling for polymorphs and realizing highly pure products at batch scales as the challenged claims required." *Liquidia Techs.*, IPR2020-00770, Paper 6 at 56. To the extent UTC argues that claim 1 would have been nonobvious, the relative skill of those in the art was high. |
| Predictability or Unpredictability of the Art | To the extent UTC contends that the pharmaceutical composition of Phares 2005 did not inherently constitute a "pharmaceutical batch," the state of the art—that is, in performing column chromatography between alkylation and salt formation and achieving a pharmaceutical composition with a lower amount of one or more impurities than the starting batch—was highly unpredictable. |
| Breadth of the Claims | To the extent UTC contends that the claims permit column chromatography between alkylation and salt formation, the claims |

_____

[24] Liquidia does not, at this time, concede to UTC's definition of a person of ordinary skill in the art.

| | encompass a broad scope of processes that are unsupported by the specification. |
|---|---|

Applying all eight *Wands* factors, to the extent UTC contends that the claims permit column chromatography between alkylation and salt formation, claim 1 of the '901 Patent and, therefore, all other Asserted Claims of the '066 Patent are invalid as not enabled.

### d. To the Extent UTC Contends that Claim 1 Permits "Isolation" of Treprostinil Before Combining with a Base to Form a Salt, the Asserted Claims Are Not Enabled

Claim 1 of the '901 Patent, which all other Asserted Claims of the '901 Patent depend, requires "form[ing] a salt of treprostinil" by (a) alkylating a benzindene triol, (b) hydrolyzing the product of step(a), and (c) "contacting the solution comprising treprostinil from step (b) with a base." To the extent UTC argues that claim 1 permits isolation of treprostinil before contacting the treprostinil with a base to form a salt, the claims are not enabled as a person of ordinary skill in the art would have to engage in undue experimentation to achieve the claimed "pharmaceutical batch."

| *Wands* Factor | Application to Claim 1 of the '901 Patent |
|---|---|
| Quantity of Experimentation Necessary | As mentioned above, all of the examples disclosed in the specification of the '901 Patent disclose forming a salt of treprostinil by contacting treprostinil in solution with a base. To the extent UTC contends that claims 1 and 8 permit isolation of treprostinil before contacting with a base to form a salt, without guidance or direction in the '901 Patent, a POSA would have to engage in a significant amount of experimentation to achieve the claimed "pharmaceutical batch." |
| Amount of Guidance or Direction Presented | As mentioned above, the specification and claims of the '901 Patent provide no guidance or direction as to how a POSA would isolate treprostinil before reacting it with a base and also achieve the claimed "pharmaceutical batch." |
| Presence or Absence of Working Examples | As mentioned above, the specification and claims of the '901 Patent provide no working examples of isolating treprostinil before |

| | reacting it with a base and achieving the claimed "pharmaceutical batch." |
|---|---|
| Nature of the Invention | According to UTC, "[t]he claimed pharmaceutical batches are an improvement over Moriarty [2004] and Phares [2005] in part because they form a salt without prior isolation of the intermediate treprostinil." *Liquidia Techs.*, IPR2020-0770, Paper 9 at 3.  To the extent UTC contends that the claimed pharmaceutical batch differs from the prior art Moriarty 2004 and Phares 2005 processes, the nature of the invention—that is, isolating the treprostinil before reacting with a base to form a salt and achieving the claimed "pharmaceutical batch"——was one of great uncertainty. |
| State of the Prior Art | To the extent that UTC contends that achieving the claimed "pharmaceutical batch" and isolating treprostinil before reacting with a base to form a salt was novel and nonobvious, the state of the prior art was silent as to how a POSA would achieve the claimed "pharmaceutical batch" and isolate treprostinil before reacting with a base. |
| Relative Skill of Those in the Art | According to UTC, "the POSA[25] would have been an industrial chemist or chemical engineer with experience in pharmaceutical production, familiar with controlling for polymorphs and realizing highly pure products at batch scales as the challenged claims require[d]." *Liquidia Techs.*, IPR2020-0770, Paper 6 at 56.  To the extent UTC argues that claims 1 would have been nonobvious, the relative skill of those in the art was high. |
| Predictability or Unpredictability of the Art | As mentioned above, according to UTC, "[t]he claimed pharmaceutical batches are an improvement over Moriarty [2004] and Phares [2005] in part because they form a salt without prior isolation of the intermediate treprostinil."  *Liquidia Techs.*, IPR2020-0770, Paper 9 at 3.  To the extent UTC contends that the claimed pharmaceutical batch differs from the prior art Moriarty 2004 and Phares 2005 processes, the nature of the invention—that is, isolating the treprostinil before reacting with a base to form a salt and achieving the claimed "pharmaceutical batch"——was very unpredictable. |
| Breadth of the Claims | To the extent UTC contends that the claims permit isolation of treprostinil before reacting it with a base, the claims encompass a broad scope of processes that are unsupported by the specification. |

---

[25] Liquidia does not, at this time, concede to UTC's definition of a person of ordinary skill in the art.

Thus, applying the *Wands* factors, the '901 Patent fails to enable a POSA to achieve the claimed "pharmaceutical batch" after isolating treprostinil before reacting it with a base to form a salt.  Thus, claim 1 of the '901 Patent and, therefore, all other Asserted Claims of the '901 Patent are invalid as not enabled.

### 4.  Claims 1-4, 6, and 8 Are Indefinite

#### a.  Claim Reciting "Impurities" Is Indefinite

Asserted Claim 1 of the '901 Patent, which all Asserted Claims of the '901 Patent depend, is directed to a pharmaceutical batch consisting of treprostinil or a treprostinil salt and "impurities" resulting from the claimed process.  A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901.  "[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* at 909 (alterations omitted).  Consequently, claim 1 of the '901 Patent, read in light of the specification and prosecution history, must apprise a POSA with "reasonable certainty" what compounds and in what specific amounts constitute "impurities" within the meaning of claim 1.

As an initial matter, claim 1 of the '901 Patent, read in light of the specification and prosecution history, is indefinite because it fails to apprise a POSA with "reasonable certainty" whether the claimed "pharmaceutical batch" is required to include or exclude the claimed impurities.  The plain language of the claim indicates that "pharmaceutical batch" *includes* the claimed impurities.  *See* '901 Patent, claim 1 ("A pharmaceutical batch *consisting of* treprostinil or a salt thereof *and impurities* . . . .") (emphases added).  However, the specification and prosecution history indicate that the "pharmaceutical batch" *excludes* the claimed impurities.  For instance, the specification states that the "impurities carried over from intermediate steps (i.e.

alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step." *Id.* at 17:1-4.  Additionally, during prosecution of the '901 Patent, UTC argued that the claimed invention was nonobvious because it *excluded* impurities found in batches made by the prior art Moriarty 2004 process. *See, e.g.*, Response to Non-Final Rejection (U.S. Application No. 14/754,932) (Aug. 11, 2016) at 5-6.  Without even "reasonable certainty" as to whether the claimed "pharmaceutical product" includes or excludes the claimed impurities, a POSA would not be afforded "clear notice of what is claimed, thereby apprising the public of what is still open to them." *Nautilus*, 572 U.S. at 909 (alterations omitted).

Additionally, neither the specification, claims, nor prosecution history of the '901 Patent apprise a POSA with "reasonable certainty" as to what constitutes an "impurit[y]" within the meaning of claim 1.  Claim 1 of the '901 Patent states only that the "impurities" must "result[] from (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) containing the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil."  The specification provides no further guidance.  During prosecution of the '901 Patent, UTC submitted two expert declarations that were submitted by UTC during the '393 Patent IPR.  Those expert declarations identify eight impurities contained in the Moriarty 2004 (Former Process) batches: ███████████████████████████

███████████████████████  *See, e.g.*, Declaration of Dr. Robert M. Williams, *SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Exhibit 2020 at ¶ 94 (P.T.A.B. July 6, 2016) ("Williams Declaration").  Neither declaration, however, identifies the chemical compounds that are labeled ███████████████████████████  Further, neither declaration ███████████████████████████████████████  As the Patent

Trial & Appeal Board noted in its Final Written Decision invalidating the '393 Patent, the "claims contain no limitations relating to the impurity profile of the recited product, 'and it is the claims ultimately that define the invention.'"  *SteadyMed Ltd.*, IPR2016-00006, Paper No. 82 at 18 (P.T.A.B. Mar. 31, 2017) (quoting *Purdue*, 438 F.3d at 1136).  Without further guidance as to what constitutes an "impurit[y]" within the meaning of claim 1, a skilled artisan would not be apprised with "reasonable certainty" as to what impurities are needed to meet the claim limitation.

Similarly, neither the specification, claims, nor prosecution history of the '901 Patent apprise a POSA with "reasonable certainty" as to what level of "impurities" is needed to meet the claim limitation.  Moriarty 2004 specifies that the treprostinil made according to Moriarty 2004 was 99.7% pure.  *See* Moriarty 2004 at 1902.  While UTC contends in the specification of the '901 Patent that the "Former Process" (i.e., Moriarty 2004) has a purity of approximately ███ as compared to a purity of ███ for the process of the claimed invention (*see* '901 Patent col. 16, step 53), the calculations of UTC's own expert submitted during prosecution acknowledge that the "Former Process" yields a purity of ███.  *See SteadyMed*, IPR2016-00006, Paper 82 at 35. UTC's expert Dr. Williams reviewed ██ commercial batches of treprostinil in accordance with Moriarty 2004 and found that the average purity of the batches was ███, which the PTAB acknowledged was an accurate value and the same as reported in Moriarty 2004.  *Id*.  Further, as acknowledged by the PTAB in the '393 IPR, Dr. Williams also reviewed ██ commercial batches of treprostinil made according to the process disclosed in the '393 (and thus the '901) Patent, and several Moriarty 2004 commercial batches were more pure than the batches made according to the disclosed process.  *Id*. at 38-39.  Thus, a POSA would not have any reasonable certainty what level of impurity should be "included" in the product.  As such, a person of ordinary skill in the art would not know, with reasonable certainty, what level of purity will be required to meet the

**HIGHLY CONFIDENTIAL**

limitations of claim 1. *Butamax*, 117 F. Supp. 3d at 642. Thus, claim 1 of the '901 Patent and, therefore, all other Asserted Claims of the '901 Patent are invalid as indefinite.

### b.  Claim Reciting "Storage" and "Storing" Is Indefinite

Asserted Claim 6 of the '901 Patent is directed to a method of preparing the pharmaceutical product from a pharmaceutical batch of claim 1 comprising "storing" a pharmaceutical batch at ambient temperature and preparing a pharmaceutical product from the pharmaceutical batch after "storage." A patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. "[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id*. at 909 (alterations omitted). Accordingly, claim 6 of the '901 Patent, read in light of the specification and prosecution history, must apprise a POSA with "reasonable certainty" as to what constitutes "storage" or "storing" a pharmaceutical batch of treprostinil salt.

As mentioned above, UTC noted in its Preliminary Response to Liquidia's IPR Petition with respect to the '901 Patent that "[p]rostaglandin derivatives," like treprostinil, "in particular were known to be unstable upon storage due to inherent instability of the crystalline lattice of these compounds owning to their long, flexible sidearms, as well as the presence of multiple polymorphic crystals." *Liquidia Techs.*, IPR2020-00770, Paper 6 at 53. Further, UTC noted in its Preliminary Response that "[e]nvironmental factors are a significant factor (*e.g.*, temperature, oxygen, atmosphere, humidity). This is especially true for compounds stored as salts." *Id*. at 54. Without guidance as to "significant" environmental factors needed to "store" the pharmaceutical batch of treprostinil salt, a person of ordinary skill in the art "would not be apprised with reasonable certainty about the scope of the invention." *Butamax*, 117 F. Supp. 3d at 642.

Thus, Asserted Claim 6 of the '901 Patent is invalid as indefinite.

**HIGHLY CONFIDENTIAL**

### c. Claims Reciting "Therapeutically Effective Amount" Are Indefinite

Asserted Claims 3 and 4 of the '901 Patent are directed to pharmaceutical products comprising a "therapeutically effective amount" of treprostinil or "salt treprostinil." "[T]he language of the claims must make it clear what subject matter they encompass." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1562 (Fed. Cir. 1996). "The requirement that the claims 'particularly point[] out and distinctly claim[]' the invention is met when a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification." *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001) (quoting *Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993)). To meet the definiteness requirement, claims 3 and 4 of the '901 Patent, read in light of the specification and prosecution history, must inform with "reasonable certainty" those skilled in the art about the scope of the invention. *See Nautilus*, 572 U.S. at 901.

Here, however, neither the specification nor prosecution history define or use the term "therapeutically effective amount," which was contained in the original claims of the application. More specifically, neither the claims, specification, nor prosecution history indicate which condition the "therapeutically effective amount" of treprostinil is intended to treat, which route the amount is to be administered, or the level of treatment (e.g., amelioration of symptoms) the amount is intended to achieve. Without even guidance as to which indication or route of administration the "therapeutically effective amount" is intended, claims 3 and 4 of the '901 Patent, read in light of the specification and prosecution history, would not apprise a POSA with "reasonable certainty" as to the scope of the invention. *Nautilus*, 572 U.S. at 901.

Thus, Asserted Claims 3 and 4 of the '901 Patent are invalid as indefinite.

### IV. THE '066 AND '901 PATENTS ARE INVALID FOR CLAIMING AN OLD

161

**PRODUCT**

The Asserted Claims of the '066 and '901 Patents are invalid as they are not directed to a

novel and nonobvious product.  More specifically, claim 1, and dependent claims 2-7 and 9 of the

'066 patent, and claim 1 and dependent claims 2-5 of the '901 patent are ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ The '393 Patent is the grandparent

application of both the '066 and '901 Patents.[26] █████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ *Id.*  The claims of both are substantially

similar if not nearly identical to those of the '393 Patent as shown below.

| USP 8,497,393 Claim 1 | USP 9,593,066 Claim 1 | USP 9,604,901 Claim 1 |
|---|---|---|
| A product comprising a compound of formula I <br><br> or a pharmaceutically acceptable salt thereof, | A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, | A pharmaceutical batch consisting of treprostinil or a salt thereof |

---

[26] The '393 Patent resulted from U.S. Application No. 13/548,446 ("the '446 Application").  The '066 Patent resulted from a divisional application of U.S. Application No. 13/933,623, which is a continuation application of the '446 Application.  The '901 Patent resulted from a continuation application of U.S. Application No. 13/933,623, which is a continuation application of the '446 Application.

**HIGHLY CONFIDENTIAL**

| wherein said product is prepared by a process comprising | said composition prepared by a process comprising providing a starting batch of treprostinil having one or more impurities resulting from | and impurities resulting from |
|---|---|---|
| (a) alkylating a compound of [a genus including benzindene triol] with an alkylating agent to produce a compound [from a genus comprising treprostinil], | prior alkylation and | (a) alkylating a benzindene triol, |
| (b) hydrolyzing the product [] of step (a) with a base | hydrolysis steps, | (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, |
| (c) contacting the product of step (h) with a base B to form a salt of formula I$_s$.<br><br> | forming a salt of treprostinil by combining the starting batch and a base, | (c) containing the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, |
| | isolating the treprostinil salt, | (d) isolating the salt of treprostinil, and |
| | and preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, | |
| (d) optionally reacting the salt formed in step (c) with an acid to form the compound of formula I. | | (e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and |
| | whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and wherein | |

163

**HIGHLY CONFIDENTIAL**

| | said alkylation is alkylation of benzindene triol. | |
|---|---|---|
| | | wherein the pharmaceutical batch contains at least 2.9 g of treprostinil or its salt. |

Although the '393 Patent claims a "product," the '066 Patent claims a "pharmaceutical composition," and the '901 Patent claims a "pharmaceutical batch," all three patents confirm that the "product," "pharmaceutical composition," and "pharmaceutical batch" can comprise only treprostinil or a salt of treprostinil. That is, the claims of the '066 and '901 Patents can comprise the same "product" as claimed in the '393 patent. The prosecution histories of all three patents confirm that they claim the same treprostinil product made by UTC's "new" process. During prosecution of the '393 Patent, UTC overcame the Examiner's anticipation rejection by submitting a declaration of its Executive Vice President of Chemical Research and Development purportedly establishing that "[t]he product of Moriarty 2004 is *physically different* from the product of claims 1 and 10, in which a base addition salt is formed *in situ* with treprostinil that has not been previously isolated." Response to Non-Final Office Action (U.S. Application No. 13/548,446) (Feb. 8, 2013) at 9 (first emphasis added); *see also* Declaration of Dr. David Walsh (U.S. Application No. 13/548,446) (June 5, 2013). In its Patent Owner Preliminary Response during the '393 Patent IPR, UTC submitted two expert declarations that also purportedly established that the product of the pending claims differed from the product of Moriarty 2004. *See* Declaration of Dr. Robert M. Williams, *SteadyMed Ltd.*, IPR2016-00006, Exhibit 2020; Declaration of Dr. Robert R. Ruffolo, *SteadyMed Ltd.*, IPR2016-00006, Exhibit 2022.

**HIGHLY CONFIDENTIAL**

███████████████████████████████████████████

███████████████████████████████

Before the PTAB issued its Final Written Decision invalidating the '393 Patent, UTC relied on those same expert declarations during prosecution of the '066 and '901 Patents to similarly argue that the claimed products differed from those of Moriarty 2004. *See* Response to Non-Final Office Action (U.S. Application No. 14/849,981) (Aug. 24, 2016); Response to Non-Final Office Action (U.S. Application No. 14/754,932) (Aug. 11, 2016). The Examiner of the '066 and '901 Patents only withdrew the obviousness and anticipation rejections after receiving the expert declarations submitted by UTC during the '393 Patent IPR proceeding. *See* Final Rejection (U.S. Application No. 14/849,981) (Nov. 30, 2016) (withdrawing obviousness and anticipation rejections but maintaining obviousness-type double patenting rejection); Final Rejection (U.S. Application No. 14/754,932) (Oct. 19, 2016) (same). In withdrawing the obviousness rejection of the '066 Patent, moreover, the Examiner expressly relied on the expert declarations as evidence that the claimed product differed from Moriarty 2004. *See* Final Rejection (U.S. Application No. 14/849,981) (Nov. 30, 2016) at 2 ("[T]he declarations [submitted by UTC during the '393 Patent IPR proceeding] describe the product of Moriarty to have a different impurity profile from the product [of] the instant claims where [the] salt formation step is present.").

By relying on evidence submitted during the '393 Patent IPR proceeding to purportedly establish that the claimed inventions of the '066 and '901 Patents differed from the product described in Moriarty 2004, UTC confirmed that the '066 and '901 Patents claim the same treprostinil product claimed in the '393 Patent. The PTAB invalidated the claims of the '393 patent, and the Federal Circuit affirmed. *See SteadyMed Ltd.*, IPR2016-00006, Paper No. 82 at 84; *United Therapeutics Corp. v. SteadyMed Ltd.*, 702 Fed. App'x. 990 (Fed. Cir. 2017) (affirming

invalidation of '393 Patent).   Because the product of the '393 Patent is not valid, the "pharmaceutical composition" and "pharmaceutical batch" of the '066 and '901 Patents, respectively, are not directed to novel and nonobvious products and thus are invalid product by process claims.   "If the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process."  *Thorpe*, 777 F.2d at 697; *see also Amgen.*, 580 F.3d at 1366 ("It has long been the case that an old product is not patentable even if it is made by a new process.").  Because the '066 and '901 Patents claim the same treprostinil product claimed by the '393 Patent, which was invalidated by the PTAB in its Final Written Decision and affirmed by the Federal Circuit, the claims of the '066 and '901 Patents are invalid as being directed to the same product as the '393 Patent.

Further, documentary evidence demonstrates that the



More specifically, UTC disclosed specifications of

.  *See*  UTC_OREN_0084429-309 at UTC_OREN_00844304.   In comparison, and within the same document, UTC

.  *See id.* at UTC_OREN_00844302-303.  The

**HIGHLY CONFIDENTIAL**

███████████████████████████████████████████. Moreover, ████████

████████████████████████████████████████████████████████████

███████████. *Id.* ██████████████████████████████████████████

██ █████████████████████████████████████████████████████████

██████████████████████████████████████████████████ █

█████████████████████████████ ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████ █████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

167
**HIGHLY CONFIDENTIAL**



As such, the product-by-process claims of the '066 and '901 patents are invalid as they claim an old product.

## V.    U.S. PATENT NO. 10,716,793

The '793 Patent issued July 21, 2020 from application No. 16/778,662, filed January 31, 2020.  *See* '793 Patent at 1.  Application No. 16/778,662 is a continuation of 16/536,954, filed on August 9, 2019, which is a continuation of Application No. 15/011,999, filed on February 1, 2016, now Patent No. 10,376,525, which is a division of Application No. 13/469,854, filed on May 11, 2012, now Patent No. 9,339,507, which is a division of Application No. 12/591,200, filed on November 12, 2009, now Patent No. 9,358,240, which is a continuation of Application No. 11/748,205, filed on May 14, 2007, now abandoned.  *Id.*

The '793 Patent is directed to methods of treating pulmonary hypertension where treprostinil is delivered by inhalation.  '793 Patent, Abstract, claims 1-8.  UT's Preliminary Infringement Contentions served on October 16, 2020 assert claims 1, 4, and 6-8 (collectively, "the Asserted Claims") of the '793 Patent.

Asserted Claim 1, the only independent claim, recites the following:

   1[a] A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof

   1[b] with an inhalation device,

1[c] wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof

1[d] delivered in 1 to 3 breaths.

*Id.* at claim 1.

The seven dependent claims are directed to various inhalation devices and formulation properties. *Id.* at claims 2-8. Asserted dependent claims 4 and 6-8 are directed to methods where the inhalation device is a dry powder inhaler (DPI) (claim 4), the formulation is a powder (claim 6), the powder comprises particles less than 5 micrometers in diameter (claim 7), and the formulation contains no metacresol (claim 8). *Id.* at claims 4, 6-8.

Notably, the specification of the '793 Patent contains only a single mention of a dry powder inhaler and dry powder formulations. *Id.* at 7:22-26 ("The inhalation device can be also a dry powder inhaler. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.").

These Supplemental Invalidity Contentions establish that claims 1, 4, and 6-8 of the '793 Patent are unpatentable as either anticipated under 35 U.S.C. § 102 or obvious under 35 U.S.C. § 103 based on:

- the '212 Patent[27] alone;

---

[27] U.S. Patent No. 6,521,212.

**HIGHLY CONFIDENTIAL**

- the '212 Patent in combination with Voswinckel JAHA[28];

- the '212 Patent in combination with Voswinckel 2006[29];

- Voswinckel 2006 alone;

- Voswinckel 2006 in combination with the '212 Patent;

- Voswinckel JAHA alone; and/or

- Voswinckel JAHA in combination with the '212 Patent.

Moreover, these Supplemental Invalidity Contentions show that the Asserted Claims of the '793 Patent are also invalid under 35 U.S.C. § 112.

### A.    Claims 1, 4, and 6-8 Are Invalid Under 35 U.S.C. §§ 102 and 103

#### 1.    Scope and Content of the Prior Art

##### a.    '212 Patent

The '212 Patent issued on February 18, 2003, and therefore is prior art to the '793 Patent under at least 35 U.S.C. §§ 102(a), (b), and (e).

The '212 Patent discloses methods of delivering a therapeutically effective amount of benzindene[30] prostaglandin (including treprostinil, referred to as "UT-15") by inhalation to treat pulmonary hypertension.  '212 Patent, Abstract, 2:16-18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24.  A POSA in May 2006 would have known that "UT-15" is synonymous with treprostinil sodium, and

---

[28] Robert Voswinckel, Beate Enke, Andre Kreckel, Frank Reichenberger, Stefanie Krick, Henning Gall, Tobias Gessier, Thomas Schmehl, Markus G. Kohstall, Friedrich Grimminger, Hossein A. Ghofrani, Werner Seeger, and Horst Olschewski, Abstract 1414: "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension," *Journal of the American Heart Association* 110:17 (October 26, 2004).

[29] Robert Voswinckel, Hossein A. Ghofrani, Friedrich Grimminger, and Werner Seeger, "Clinical Observations" on "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," "Letters" Section of the *Annals of Internal Medicine* 144:2 (January 2006).

[30] This appears to be a typographical error in the '212 patent, as well as the '901 and '066 Patents; "benzindene" should be "benzidine."

**HIGHLY CONFIDENTIAL**

that treprostinil is an analog of benzindene prostaglandin.[31]  The '212 Patent further discloses that an inhaler may be used to deliver the benzindene prostaglandin, and that powder formulations may be used.  *Id.* at 5:30-32, 5:37-41 ("Alternatively, solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention.  In such case, the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter.").

The '212 Patent states that "[i]n the case of treating peripheral vascular disease by inhalation of a benzindene prostaglandin of the present invention, the dosage for inhalation, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg; typically from 0.5 µg to 2.5 mg, preferably from 7 µg to 285 µg, per day per kilogram bodyweight."  '212 Patent, 5:54-62; *see also id.* at Figs. 16, 18.  The '212 Patent further states that aerosolized (i.e., inhaled) UT-15 "has a greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly."  *Id.* at 8:9-18.  The '212 Patent

---

[31] *See, e.g.,* https://www.medchemexpress.com/Treprostinil-sodium.html#:~:text=Treprostinil%20sodium%20(Synonyms%3A%20UT%2D15)&text=Treprostinil%20sodium%20is%20a%20potent,6.2%C2%B11.2%20nM%2C%20respectively.&text=*%20Please%20select%20Quantity%20before%20adding%20items ("Treprostinil sodium (Synonyms: UT-15 sodium)"); Chattaraj, S.C., "Treprostinil sodium Pharmacia," CURR. OPIN. INVESTIG. DRUGS, 3(4):582-6 (Apr. 2002), *available at* https://pubmed.ncbi.nlm.nih.gov/12090728/ ("United Therapeutics Corp (UTC) is developing treprostinil sodium (Remodulin, UT-15), a stable structural analog of prostacyclin [prostaglandin I2 or PGI2], for the potential treatment of primary pulmonary (arterial) hypertension (PAH), peripheral vascular disease (PVD) and other cardiovascular conditions. . ."); *see also* U.S. Patent No. 9,358,240 ("the '240 Patent") at 5:41-44 ("U.S. Pat Nos. 6,521,212 and 6,756,033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions.").

also discloses delivering dosages of 262.5 micrograms of nebulized UT-15 (*id.* at 9:4-9) and dosages of 250, 500, and 1000 micrograms per kg of body weight per minute of aerosolized UT-15 (*id.* at 11:7-13).

Additionally, the '212 Patent explains that "[t]he precise amount that is considered effective for a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor." *Id.* at 6:56-7:3; *see also id.* at 7:25-33.  The '212 Patent further teaches that the disclosed benzindene prostaglandin, UT-15, can be "given in high doses without significant non-lung effects." *Id.* at 10:51-57 ("These data are important in that this would indicate that, unlike intravenously infused UT-15, aerosolized UT-15 can be given in high doses without significant non-lung effects, i.e., heart rate, cardiac output. The aerosol delivery of UT-15 for these experiments is approximately 15-27 times that of the effective minimal tested dose of 250 ng per kg per min shown in FIG. 16.").

### b.      '033 Patent

U.S. Patent No. 6,756,033 ("the '033 Patent") issued on June 29, 2004, and therefore is prior art to the '793 Patent under 35 U.S.C. §§ 102(a), (b), and (e).  The '033 Patent is a continuation of and shares its specification with the '212 Patent.  Accordingly, the '033 Patent contains the same disclosures as the '212 Patent, described above.

### c.      Voswinckel JAHA

Abstract 1414 entitled "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension" authored by Robert Voswinckel, Beate Enke, Andre Kreckel, Frank Reichenberger, Stefanie Krick, Henning Gall, Tobias Gessier, Thomas Schmehl, Markus G. Kohstall, Friedrich Grimminger, Hossein A. Ghofrani, Werner Seeger, and Horst Olschewski was published in the Journal of the American Heart Association on October 26, 2004 ("**Voswinckel**

JAHA"), and is therefore prior art to the '793 Patent under at least 35 U.S.C. §§ 102(a) and 102(b). Voswinckel JAHA describes a study in which 17 patients with "severe pulmonary hypertension" received a treprostinil inhalation by use of the "pulsed OptiNeb® ultrasound nebulizer" at a dosage of "3 single breaths" of "600 µg/ml)" of treprostinil solution. The study found that treprostinil "inhalation resulted in a sustained, highly pulmonary selective vasodilation over 120 minutes," showing "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." Voswinckel JAHA at 1414. Voswinckel JAHA also teaches that "[t]olerability [of treprostinil] is excellent even at high concentrations and short inhalation times (3 breaths)." *Id.*

### d.    Voswinckel JESC

Abstract 218 entitled "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension" authored by Robert Voswinckel, Marcus G. Kohstall, Beate Enke, Tobias Gessler, Frank Reichenberger, Hossein A. Ghofrani, Werner Seeger, and Horst Olschewski was published in the Journal of the European Society of Cardiology on October 15, 2004 ("**Voswinckel JESC**"), and is therefore prior art to the '793 Patent under 35 U.S.C. §§ 102(a) and 102(b). Voswinckel JESC describes a study investigating "the acute hemodynamic response to inhaled treprostinil." Voswinckel JESC at Background. The study enrolled 29 patients: 8 received placebo and 21 were administered 16, 32, 48, and 64 µg/mL treprostinil solutions for 6 minutes via the OptiNeb ultrasound nebulizer, then produced by the company Nebu-tec in Germany. *Id.* at Methods. Of the 29 patients, 10 had "idiopathic PAH". *Id.* at Results. The results showed that "[t]reprostinil inhalation results in a significant long-lasting pulmonary vasodilatation" and that, at 16 µg/mL, "near maximal pulmonary vasodilatation is achieved without adverse effects." *Id.* at Conclusion.

### e.    Voswinckel 2006

In the January 2006 edition of the "Letters" section of the Annals of Internal Medicine, Drs. Robert Voswinckel, Hossein A. Ghofrani, Friedrich Grimminger, and Werner Seeger published an article under "Clinical Observations" on "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension" ("**Voswinckel 2006**").  The article is prior art under at least 35 U.S.C. § 102(a).  The article discloses a patient trial run to "characterize the effects of inhaled treprostinil with special regard to safety, tolerability, and efficacy in patients with severe pulmonary arterial hypertension."  Voswinckel 2006 at 149-50.  Three patients with "severe pulmonary hypertension" were given a "single 15-µg dose of treprostinil, inhaled in 3 breaths through a modified OptiNeb ultrasonic inhalation device."  *Id.* at 150.  One patient had a "favorable vasodilator response" and the other two patients were given "long-term inhaled treprostinil therapy . . . consisting of 4 daily 15-µg doses" over 3 months, resulting in "dramatic[]" functional improvement without side effect.  *Id.*  The authors concluded that treprostinil was "clinically effective, safe, and well tolerated when 15 µg was inhaled in 3 breaths 4 times daily."  *Id.*

### f.    Chaudry 2004

U.S. Patent Appl. Pub. No. 2004/0265238 to Imtiaz Chaudry ("Chaudry 2004") issued on December 30, 2004, and therefore is prior art to the '793 Patent under 35 U.S.C. §§ 102(a), (b), and (e).  Chaudry 2004 is directed to "inhalable formulation[s] for the treatment of pulmonary hypertension" where the formulation comprises a "hypertension-reducing agent" including a "vasodilator," such as "the prostacyclin analog treprostinil sodium."  Chaudry 2004, Abstract, [0010], [0012], [0017], [0026], [0097], Claim 44.  Chaudry 2004 further discloses that "[c]ontinuous intravenous prostacyclin is far from ideal as a treatment for pulmonary hypertension, however, because the agent is available only in limited supply, it is very costly, and optimal management requires that the intravenous therapy with prostacyclin be started in specialized centers familiar with the technique, equipment, and dose ranging. . . .  Further, because the agent

174

HIGHLY CONFIDENTIAL

is delivered systemically with only a small percentage of the agent actually absorbed by the pulmonary system, it must be administered in high dosages." *Id.* at [0011]. Chaudry 2004 discloses that "therapeutically effective amount[s] of a hypertension-reducing agent" may include various ranges, such as from "about 0.001 mg/ml to about 20 mg/ml[,]" "about 0.008 mg/ml to about 15.0 mg/ml[,]" "about 0.001 mg/ml to about 0.50 mg/ml[,]" "about 0.001 mg/ml to about 1.0 mg/ml[,]" "about 0.005 mg/ml to about 1.0 mg/ml[,]" and "about 0.01 mg/ml to about 1.0 mg/ml." *Id.* at [0037]-[0038]. Chaudry provides extensive disclosure regarding the use of nebulizing devices for inhalation. *Id.* at [0061-0066]. Chaudry 2004 also discloses that inhalation of the formulation "may take about . . . 3 minutes." *Id.* at [0067].

### g.      Ghofrani 2005

"New therapies in the treatment of pulmonary hypertension" by Ghofrani, et al., URBAN & VOGEL, No. 4, pp. 296-302 (2005) ("Ghofrani 2005") is prior art to the '793 Patent at least under 35 U.S.C. § 102(a). Ghofrani 2005 describes the use of inhaled treprostinil to treat pulmonary hypertension. Ghofrani 2005 at pp. 297-98. Ghofrani states the following:

> Initial trials in Giessen have shown proof of efficacy of *inhaled* treprostinil for the effective reduction of the pulmonary vascular resistance (PVR) [6]. In this first study, 17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil (***15 mcg/inhalation***). This led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min. In direct comparison with inhaled iloprost, inhaled treprostinil showed a stronger pulmonary selectivity, so that ***it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring*** [6]. Due to these unique properties (pronounced pulmonary selectivity and long duration of action after an individual inhalation), it is possible to reduce the number inhalations necessary to up to four per day; the inhalation period can be reduced to < 1 min. by selecting a suitable device. Additionally, the initial data shows that ***it is technically feasible for there to be only one to two breaths in an application***.

*Id.* at 298 (emphases added).

### h.        Bender 1997

"Nonadherence in asthmatic patient: is there a solution to the problem?" by Bender, et al., ANN. ALLERGY ASTHMA IMMUNOL., 79:177-86 (1997) ("Bender 1997") was published in September 1997 and therefore is prior art to the '793 Patent under at least 35 U.S.C. §§ 102(a) and (b).   Bender 1997 discusses the challenge of patient compliance or adherence to inhaled medications.  Bender 1997, Abstract.  Bender 1997 found that "[t]here is no evidence of recent improvement in the rates of nonadherence, and patients continue on average to take about 50% of prescribed medication."  *Id.*  Bender 1997 also reported that adherence to inhaled medications is linked to treatment outcome.  *See id.* at 179-80 ("[P]atients with high adherence rates in both groups had a dramatically lower mortality rate than poor adherers.").

### i.        Clark 1995

"Medical Aerosol Inhalers: Past, Present, and Future" by A.R. Clark, AEROSOL SCIENCE AND TECHNOLOGY, 22(4):374-391 (1995) ("Clark 1995") was published in 1995 and therefore is prior art to the '793 Patent under at least 35 U.S.C. §§ 102(a) and (b).  Clark 1995 provides an overview of "three major types of medical aerosol inhalers" – the nebulizer, the pressurized metered dose inhaler, and the dry powder inhaler.  Clark 1995, Abstract.  Clark 1995 further states that the dry powder inhaler was first commercialized in the early 1960s.  *Id.*

### j.        Olschewski 2002

"Inhaled Iloprost for Severe Pulmonary Hypertension" by Olschewski, et al., New Engl. J. Med., 347(5):322-29 (Aug. 1, 2002) ("Olschewski 2002") was published on August 1, 2002 and therefore is prior art to the '793 Patent under at least 35 U.S.C. §§ 102(a) and (b).  Olschewski 2002 reports that inhaled iloprost, an analog of prostacyclin, is an effective therapy for patients with severe pulmonary hypertension.  Olschewski 2002, Abstract.  The study used an inhalation

device where "inhalation commonly required 10 minutes," but Olschewski 2002 noted that "[d]ifferent techniques of administering aerosolized iloprost result in similar acute hemodynamic effects as long as identical doses are delivered to the respiratory tract in a particle size suitable for alveolar deposition.[]   With other techniques, the duration of inhalation may be shortened considerably." *Id.* at 328.

### k.     Ventavis® Label 2004

The December 2004 label for Ventavis® (iloprost) inhalation solution ("Ventavis® Label 2004") is prior art to the '793 Patent under at least 35 U.S.C. §§ 102(a) and (b).  "Iloprost is a synthetic analogue of prostacyclin PGI$_2$."  Ventavis® Label 2004 at 4.  "Ventavis is breathed (inhaled) into your lungs" and "[o]ne treatment session will usually last about 4 to 10 minutes." *Id.* at 16.  Ventavis® is indicated for treatment of pulmonary arterial hypertension (*id.* at 8) and has a maximum daily dose of 45 micrograms (*id.* at 11).

### l.     OptiNeb® User Manual 2005

Opti-Neb-ir® Operating Instructions, Model ON-100/2 (2005) ("OptiNeb® User Manual 2005") is prior art to the '793 Patent under at least 35 U.S.C. § 102(b).  OptiNeb® User Manual 2005 discloses that the OptiNeb® device could nebulize (*i.e.*, produce aerosol) at a rate of 0.6 ml/min.  OptiNeb® User Manual 2005 (LIQ02804126 – LIQ02804176) at 28.

### m.     Additional Background Prior Art

In general, there has been extensive interest in inhaled prostacyclins prior to May 15, 2006. For example, an article by Walmrath, et al. titled "Direct Comparison of Inhaled Nitric Oxide and Aerosolized Prostacyclin in Acute Respiratory Distress Syndrome" published in the American Journal of Respiratory Critical Care Medicine, Volume 153, pages 991-996 in 1996 ("**Walmrath**") reported the use of prostacyclin aerosol compared to the standard of therapy with nitric oxide (NO). An article by Olschewski, et al. titled "Inhaled Prostacyclin and Iloprost in Severe Pulmonary

**HIGHLY CONFIDENTIAL**

Hypertension Secondary to Lung Fibrosis" published in the American Journal of Respiratory Critical Care Medicine, Volume 160,  pages 600 to 607 in 1999 ("**Olschewski 1999**") studied in pulmonary arterial hypertension patients inhaled prostacyclin, inhaled iloprost, and inhaled treprostinil.  Olschewski 1999 concluded that "in pulmonary hypertension secondary to lung fibrosis, aerosolization of $PGI_2$ or iloprost causes marked pulmonary vasodilatation with maintenance of gas exchange and systemic arterial pressure.  Olschewski 1999 at Abstract.  Two articles by **Hache**, et al. (2003) ("Inhaled epoprostenol (prostacyclin) and pulmonary hypertension before cardiac surgery" in the Journal of Thoracic and Cardiovascular Surgery) and  **De Wet**, et al. (2004) ("Inhaled prostacyclin is safe, effective, and affordable in patients with pulmonary hypertension, right heart dysfunction, and refractory hypoxemia after cardiothoracic surgery") published on the benefits of inhaled prostacyclin in surgical patients with pulmonary hypertension and compared this approach over the use of the then standard of therapy NO.

Patents on inhaled prostacyclins, other than those discussed above, also pre-date May 15, 2006.  For example, U.S. Patent No. 5,187,286 to **Skuballa**, et al. discloses the synthesis and delivery by inhalation of "prostacyclin agonists" which includes the class of prostacyclin drugs delivered by inhalation such as epoprostenol, iloprost and treprostinil.  U.S. Patent No. 6,242,482 to **Shorr**, et al. discloses administration of inhalation of derivatives of prostaglandins that also cover prostacyclin-like molecules.

Additionally, there was extensive literature prior to May 15, 2006 on the pros and cons of various inhalation devices, as well as plentiful motivation to reduce the number of breaths required for adequate dosing with these devices.  A 2006 chapter on "Aerosols" in the Encyclopedia of Respiratory Medicine by S.P. Newman ("**Newman**") and a 2005 article by David E. Geller entitled "Comparing Clinical Features of the Nebulizer, MDI, and DPI" published in *Respiratory Care*,

Volume 50, Issue 10 ("**Geller 2005**") describe nebulizers and dry powder inhalers. Newman also discloses that it was generally known in the art that "inhaler devices should deliver particles smaller than approximately 5 μm in diameter in order to enter the lungs." Newman, at 58. A 2003 article by David Geller and several co-authors, titled "Bolus Inhalation of rhDNase with the AERx System in Subjects with Cystic Fibrosis" and published in the Journal of Aerosol Medicine's Volume 16, Issue 2 ("**Geller 2003**") emphasizes the benefits of reducing the duration of therapy from multiple breaths from a nebulizer lasting several minutes to much shorter inhalation time using just 3 breaths from a "soft mist inhaler" AERx. Geller 2003 at Abstract.

Efforts to reduce the duration of the dose administration specifically in the case of prostacyclin medication have been presented prior to 2006 in several publications. As noted above, Olschewski, et al. observed a preference for shorter delivery time of iloprost. Olschewski 2002 at 328. Gessler, et al. in a 2001 publication titled "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension" in the European Respiratory Journal, Volume 17, pages 14 to 19 ("**Gessler**") compared the traditional jet nebulizer versus a fast ultrasonic nebulizer to significantly reduce the number of breaths required for this inhaled therapy by pulmonary arterial hypertension patients and therefore the overall duration of a dose delivery from 12 to 2 min. Similar improvements were reported for treprostinil in Voswinckel JAHA and 2006, described above.

### 2. Technical Background

#### a. History of Inhalation Therapy

Inhalation therapy has been used since ancient times, and the inhalation of therapeutic aerosols for the treatment of asthma is described as early as 600 BC. Stein, S.W., et al., "The History of Therapeutic Aerosols: A Chronological Review," *Journal of Aerosol Medicine and Pulmonary Drug Delivery*, 30(1):20-41 (2017) ("Stein") at 20-21. Mass production of

**HIGHLY CONFIDENTIAL**

standardized inhalation devices arrived with the industrial revolution in the late 18th century to 19th century.  *Id.* at 23-25.

Devices that reduced a medicated liquid to fine droplets for inhalation, such as atomizers and nebulizers, were developed in the late 1800s.  *Id.* at 25.  And dry powder inhalers ("DPI") were first developed in 1852, as a powdered medicine in a glass inhaler.  *Id.* at 26.  Other DPIs for various uses were developed before 1900.  *Id.* at 26-27.

After the passage of the Food and Drug Act of 1906, multiple clinical studies were conducted to evaluate the effectiveness of various therapeutic aerosols.  *Id.* at 27.  By the mid-1950s, the "aerosol delivery of beta agonists, corticosteroids, and anticholinergic . . . drugs had all been demonstrated to be effective for the treatment of respiratory diseases," and "[c]onvenient delivery by a DPI or squeeze bulb glass nebulizers had been demonstrated."  *Id.*  DPIs and nebulizer technologies advanced from 1956 to 1986.  *See id.* at 29.

The first propellant meter dosed inhaler ("MDI" or, more specifically, "pMDI" to distinguish from other inhalers that use metered doses) was introduced in 1956 as the "first inhaler device that achieved effective lung delivery in a truly convenient and portable device and rapidly became the dominant delivery system for treatment of asthma."  *Id.* at 27.  These inhalers passed FDA approval and were marketed as the Medihaler Epi and Medihaler Iso in 1956.  *Id.* at 28.  But these inhalers had an issue:  the patient had to synchronize the release of the drug dose with their inhalation.  The first-breath actuated MDI, the Autohaler, addressed this concern and was launched in 1970.  *Id.*

The period from 1987 to the 21st century was "a period of unprecedented innovation and growth in the delivery of therapeutic aerosols."  *Id.* at 30.  The "signing of the Montreal Protocol in September of 1987 dramatically changed the pharmaceutical aerosol industry and led to a surge

**HIGHLY CONFIDENTIAL**

of development and innovation of inhaler products that eventually resulted in hydrofluoroalkane (HFA) MDIs and a large increase in the number and types of DPIs available, as well as the development of advanced nebulizer systems and other inhalation devices." *Id.*; *see also id.* at 30-32. By 1995, "three major types of medical aerosol inhalers" – the nebulizer, the pressurized metered dose inhaler, and the dry powder inhaler were on the market. Clark 1995 at Abstract. By 2006, multiple DPIs and nebulizers had been approved by the FDA and were available, as well as the soft mist inhaler Respimat. Stein at Table 3, Table 4, 33-36, Figure 15. Dozens of MDI inhalers were also approved by the FDA by 2006. *See, e.g.*, *id.* at Tables 1-3.

### b.      Inhaled Treprostinil and Its Analogues

Treprostinil is a prostacyclin receptor agonist, meaning that it stimulates the prostacyclin receptor on cells. Such stimulators have long been used to treat pulmonary vascular disease by countering vasoconstriction, i.e. the narrowing of blood vessels. As such, the therapeutic utility of injected and inhaled prostacyclins for pulmonary arterial hypertension was well-known and widely publicized in prominent journals before 2006. *See* Farber, H.W. and Loscalzo, J., "Pulmonary Arterial Hypertension," *N Engl J Med*, 351:1655-65 (2004) ("Farber and Loscalzo"); Rubin, L.J. and Badesch, D.B., "Evaluation and Management of the Patient with Pulmonary Arterial Hypertension," *Ann Intern Med.*, 143:282-92 (2005) ("Rubin and Badesch").

Other prostacyclin receptor agonists known by 2006 include iloprost and epoprostenol (the name for the naturally occurring prostacyclin, but which could also be produced synthetically). Flolan® Label at 1, Description ("Epoprostenol (PGI$_2$, PGX, prostacyclin), a metabolite of arachidonic acid, is a naturally occurring prostaglandin with potent vasodilatory activity and inhibitory activity of platelet aggregation.").

Treprostinil and iloprost are analogues of epoprostenol. Ruan, C.-H., et al., "Prostacyclin Therapy for Pulmonary Arterial Hypertension," *Texas Heart Institute Journal*, 37(4):391-99

(2010) ("Ruan") at 392 ("Epoprostenol, a synthetic prostacyclin, and iloprost and treprostinil, synthetic prostacyclin analogues, are currently used to treat patients with PAH.").

Between the 1990s and 2006, there was already extensive literature on inhaled prostacyclins. For example, a 1996 article reported the use of prostacyclin aerosol compared to the standard of therapy with nitric oxide (NO) for patients with Adult Respiratory Distress Syndrome (ARDS). *See generally* Walmrath.

Even more specifically, prostacyclins and iloprost have been proven to treat pulmonary arterial hypertension. A 1999 article published in the American Journal of Respiratory Critical Care Medicine studied inhaled prostacyclin and inhaled iloprost in pulmonary arterial hypertension patients. Olschewski 1999. Olschewski 1999 concluded that "in pulmonary hypertension secondary to lung fibrosis, aerosolization of $PGI_2$ or iloprost causes marked pulmonary vasodilatation with maintenance of gas exchange and systemic arterial pressure." Olschewski 1999 at Abstract. Other researchers described the benefits of inhaled prostacyclin in surgical patients with pulmonary hypertension and compared this approach over the use of nitrous oxide. Hache 2003 at 642 ("Inhaled epoprostenol (prostacyclin) and pulmonary hypertension before cardiac surgery"); De Wet 2004 at 1058 ("Inhaled prostacyclin is safe, effective, and affordable in patients with pulmonary hypertension, right heart dysfunction, and refractory hypoxemia after cardiothoracic surgery.").

Numerous patents and patent publications on inhaled epoprostenol, iloprost, and treprostinil, existed by 2006. U.S. Patent No. 6,242,482 to Shorr, et al. disclosed the administration of treprostinil and prostaglandin derivatives via intravenous injection and inhalation. Shorr at 1:54-56, 4:37-61, Figure 1-5, and claims 1, 35, and 49. U.S. Patent Publication No. 2004/0265238 to Chaudry was directed to "inhalable formulation[s] for the treatment of pulmonary hypertension"

**HIGHLY CONFIDENTIAL**

where the formulation comprises a "hypertension-reducing agent" including a "vasodilator," such as "the prostacyclin analog **treprostinil sodium**." *See* Chaudry at Abstract, [0010], [0012] (emphasis added), [0017], [0026], [0097], Claim 44. The '212 Patent, detailed in the "Overview of the Prior Art" section below, similarly discloses use of inhaled treprostinil for the treatment of pulmonary hypertension. '212 Patent at Abstract, 3:1-5, 2:16-18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24.

The benefits of inhalation over other forms of administration, such as intravenous delivery, were also well-known by 2006. For example, Chaudry disclosed that "[c]ontinuous intravenous prostacyclin is far from ideal as a treatment for pulmonary hypertension, . . . because the agent is available only in limited supply, it is very costly, and optimal management requires that the intravenous therapy with prostacyclin be started in specialized centers familiar with the technique, equipment, and dose ranging. . . . Further, because the agent is delivered systemically with only a small percentage of the agent actually absorbed by the pulmonary system, it must be administered in high dosages." Chaudry at [0011]. Chaudry 2004 disclosed that "therapeutically effective amount[s] of a hypertension-reducing agent" may include various ranges, such as from "about 0.001 mg/ml to about 20 mg/ml" and provided extensive disclosure regarding the use of nebulizing devices for inhalation. *Id.* at [0037]-[0038], [0061]-[0066]. The '212 Patent, detailed below, similarly disclosed that inhaled delivery was known to be more "potent" than intravenous delivery. '212 Patent at 8:9-17.

In fact, iloprost had already been approved for inhaled use to treat pulmonary arterial hypertension in 2004, under the brand name Ventavis®. "Ventavis is breathed (inhaled) into your lungs" and "[o]ne treatment session will usually last about 4 to 10 minutes." Ventavis® Label

2004 at 4, 15-16.  Ventavis® was approved for treatment of pulmonary arterial hypertension (*id.* at 8) with a maximum daily dose of 45 micrograms (*id.* at 11).

### c.  Well Known Considerations for Inhalation Therapies

As early as 1981, the deposition of pharmaceutical aerosols in the human respiratory tract as a function of their size distribution was well understood.  Gonda, I., "A semi-empirical model of aerosol deposition in the human respiratory tract for mouth inhalation," *J. Pharm. Pharmacol.*, 33:692-96 (1981) ("Gonda 1981"); Gonda, I., "Study of the effects of polydispersity of aerosols on regional deposition in the respiratory tract," *J. Pharm. Pharmacol.*, 33 (Suppl.) 52P (1981) ("Gonda 1981b").  By 2006, it was certainly well-known that inhalation drug particles needed to be a certain size.  For example, from modern use of inhalation therapy for asthma in the 1990s, it was well known that "to avoid inertial impaction in the oropharyngeal cavity and reach the lung," aerosol particles needed to be 7 micrometers or less.  Clark 1995 at 374.  If those particles needed to reach the peripheral lung, the particles needed to be closer to 2 to 3 micrometers.  *Id.*  A 2006 chapter on "Aerosols" in the Encyclopedia of Respiratory Medicine by S.P. Newman ("Newman") confirms that it was generally known that "inhaler devices should deliver particles smaller than approximately 5 μm in diameter in order to enter the lungs."  Newman at Abstract.  The '212 Patent, discussed more below, also discloses particles "preferably, less than 5 micrometers in diameter."  '212 Patent at 5:40-41.

Further, it was well known by May 2006 that titrating doses of inhaled prostacyclins achieved optimal levels of efficacy and safety for individual patients.  *See, e.g.*, Walmrath, D., et al., "Aerosolised prostacyclin in adult respiratory distress syndrome," *Lancet*, 342:961-62 (1993) ("Walmrath 1993") at 962 ("Titration of aerosolized [prostacyclin] in individual patients might be necessary to produce selective vasodilation in well-ventilated lung areas.").  In 1997, Hoeper, et al. delivered iloprost by inhalation to 24 patients suffering from pulmonary hypertension and

184

**HIGHLY CONFIDENTIAL**

increased the doses of iloprost for patients whose symptoms did not improve after three months of treatment.  Hoeper, M.M., et al., "Long-Term Treatment of Primary Pulmonary Hypertension with Aerosolized Iloprost, a Prostacyclin Analogue," *N Engl J Med*, 342(25):1866-70 (2000) ("Hoeper") at 1867.  The study revealed that "[c]oughing during inhalation was common during the first days of treatment but invariably disappeared spontaneously within the first four weeks." *Id*. at 1868.  Accordingly, well before May 2006, it was known that titration of inhaled prostacyclins achieved therapeutic efficacy and that patients gained a tolerance to initial side effects (e.g., coughing).

Similarly, by 2006, various inhalation devices were commonly used, and there was extensive literature on the pros and cons of those devices.  Geller 2005 at 1313 (titled "Comparing clinical features of the Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler").  Specifically, nebulizers can be used by patients of any age, do not use propellants, and can deliver high drug doses; however, nebulizers were known to be more time-consuming, less portable, and less predictable with respect to the amount of drug available for lung deposition.  *Id*. at 1315.  To contrast, Geller explains that pressurized metered dose inhalers are portable, less expensive, and offer very high lung deposition; however, pressurized metered dose inhalers were known to be the most difficult device to use, causing them to be often used incorrectly.  *Id*. at 1315-16.  Lastly, Geller explains that dry powder inhalers are breath-actuated (and, therefore, easier to use), portable, and quick to use; however, dry powder inhalers require higher inspiratory flow and lung volume, making them unsuitable for some patients (e.g., young children).  *Id*. at 1316.

Dozens of pressurized MDIs were FDA approved by 1997.  *See e.g.*, Stein at 29, Table 1 (listing over 20 pressurized metered dose inhalers (pMDIs) approved in U.S. by 1997).  In

particular, at least 6 pMDIs using hydrofluoroalkanes as propellants were approved. *Id.* at Table 2.

Dry powder inhalers (DPIs) were also well-known as of 2006. *See* Atkins, P.J., "Dry Powder Inhalers: An Overview," *Respiratory Care*, 50(10):1304-12 (2005) ("Atkins") at 1305-06 (describing the choice of single and multiple dose DPIs, including the means of "metering" doses). At least 10 dry powder inhalers had been approved by the FDA by 2006, including the blockbuster product Advair, used for asthma and chronic obstructive pulmonary disease (COPD) treatment. Stein at 33, Table 3. Methods of creating dry powder formulations to use in DPIs were also known, such as by grinding (or "milling" or "micronization") of powders, spray drying, and using supercritical fluid preparations of powders for inhalation. *See* Telko, M.J. and Hickey, A.J., "Dry Powder Inhaler Formulation," *Respiratory Care*, 50(9):1209-27 (2005) ("Telko and Hickey") at 1212-23 (summarizing the variety of formulation composition and manufacturing methods for preparation of dry powders for inhalations).

The first soft mist inhaler approved was Respimat (first in Germany in 2004, then in U.S.), while several other soft mist inhalers were in development at the time, including Aradigm's AERx which was the inhaler used in the treprostinil collaboration with UTC announced in 2005. *See* October 24, 2005 Press Release, "Aradigm Corporation And United Therapeutics Corporation Sign Development and Commercialization Agreement Targeting Pulmonary Hypertension," *available at* https://www.biospace.com/article/releases/aradigm-corporation-and-united-therapeutics-corporation-sign-development-and-commercialization-agreement-targeting-pulmonary-hypertension-/. Respimat capabilities were well characterized—using a range of drug concentrations from 0.049-0.833%, the majority of the drug mass was in droplets of < 5 microns (as evidenced by the mass median diameter < 5 microns) and the dose delivered per puff was about

5 micrograms. Ziegler, J. and Wachtel, H., "Comparison of Cascade Impaction and Laser Diffraction for Particle Size Distribution Measurements," *Journal of Aerosol Medicine*, 18(3):311-24 (2005) ("Ziegler and Wachtel") at 313; Pitcairn, G., et al., "Deposition of Corticosteroid Aerosol in the Human Lung by Respimat® Soft Mist™ Inhaler Compared to Deposition by Metered Dose Inhaler or by Turbuhaler® Dry Powder Inhaler," *Journal of Aerosol Medicine*, 18(3):264-72 (2005) ("Pitcairn") at Abstract (describing *in vitro* and *in vivo* studies delivering an asthma drug in a single breath using 200 micrograms in 15 microliters of solution, delivered via Respimat and showing successful delivery to the lung); *see generally* Dalby, R., et al., "A review of the development of Respimat® Soft Mist™ Inhaler," *International Journal of Pharmaceutics*, 283:1-9 (2004) ("Dalby") (describing Respimat's operation in great detail, including results *in vitro* and in humans with multiple drugs and a variety of drug concentrations and doses). Based on these understood characteristics of Respimat, an inhaled formulation POSA would understand that Respimat would be suitable for inhaled delivery of treprostinil from such a small convenient device at similar dosages in one or a small number of breaths.

For all of these inhaled therapies, there were widespread patient adherence concerns. *See* Bender 1997 at Abstract, 179-80 (patients on inhaled therapies "on average [only] take about 50% of prescribed medication"); Rau, J.L., "Determinants of Patient Adherence to an Aerosol Regimen," *Respiratory Care* 50(10):1346-56 (2005) ("Rau 2005") at Abstract (noting that a factor "related to patient adherence" was the "complexity of the inhalation regimen[s] (dosing frequency, number of drugs)").

By May 2006, it was well-known that inhalation therapies could achieve therapeutic efficacy in three or fewer breaths. *See, e.g.*, Geller 2003 at 181 (concluding that "inhalation . . . in only three breaths is feasible").

Thus, reducing the duration of the inhaled dose administration of treprostinil was a common goal by 2006, and one that had been met with success.  Chaudry disclosed that inhalation of its treprostinil formulation "may take about . . . 3 minutes" (Chaudry at [0067]), while Voswinckel JAHA and Voswinckel 2006, detailed below, disclosed reductions in treprostinil administration duration to 3 breaths.  The desire to reduce the administration duration of aerosolized prostacyclins goes back well before 2006 (*see* Gessler at 19; Olschewski 2002 at 328), which is consistent with the general sentiments that nebulizers are "cumbersome and time-consuming to use."  Dolovich, M.B., et al., "Device Selection and Outcomes of Aerosol Therapy: Evidence-Based Guidelines," *CHEST*, 127:335-71 (2005) ("Dolovich") at 337.

### 3.   Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious over the '212 Patent Alone

The Asserted Claims of the '793 Patent would have been obvious to a POSA by May 15, 2006 over the '212 Patent[32] alone.

For the same reasons explained herein, claims 1, 4, and 6-8 of the '793 Patent are invalid for obviousness-type double patenting over the '212 Patent, which is assigned to UTC.  This deficiency cannot be cured by filing a terminal disclaimer, because the '212 Patent has expired.

#### a.   Claims 1 Would Have Been Would Have Been Obvious

##### (1)   Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|------|---|

---

[32] The '033 Patent shares a specification with the '212 patent.  Thus, all references to the '212 patent in this section are equally applicable to the '033 Patent.

**HIGHLY CONFIDENTIAL**

Claim element 1[a] of the '793 Patent is disclosed in the '212 Patent.  The '212 Patent describes methods of delivering a therapeutically effective amount of benzindene prostaglandin (also known as "UT-15") by inhalation to treat pulmonary hypertension in a single dose event. '212 Patent at Abstract, 2:16-18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24.  A POSA as of May 2006 would have readily understood that "UT-15" is synonymous with treprostinil sodium, and that treprostinil is an analog of benzindene prostaglandin.[33]

Specifically, the '212 Patent discloses "a method of treating pulmonary hypertension by inhalation of a benzindene prostaglandin" (*id.* at 7:18-20) or a "pharmaceutically acceptable salt" thereof (*id.* at 4:11-12).  The '212 Patent further states that the "benzindene prostaglandin is delivered by inhalation to a patient in need thereof in a 'therapeutically effective amount.'"  *Id.* at 6:56-58.  "A 'therapeutically effective amount' refers to that amount that has therapeutic effects on the condition intended to be treated or prevented."  *Id.* at 6:58-61.  The '212 Patent explains that "[t]he precise amount that is considered effective for a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor."  *Id.* at 6:66-7:2.  Accordingly, the '212 patent teaches "[a] method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof," as recited claim element 1[a] of the '793 Patent.

### (2)    Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|------|------------------------------|

---

[33] *See infra* note 14.

Claim element 1[b] of the '793 Patent is disclosed in the '212 Patent, which expressly discloses that an inhaler may be used to deliver the benzindene prostaglandin.  '212 Patent, 5:30-32 ("Preferably, a nebulizer, **inhaler**, atomizer or aerosolizer is used[,] which forms droplets from a solution or liquid containing the active ingredient(s).") (emphasis added).  A POSA as of May 2006 would have readily understood that an inhaler is an inhalation device.

### (3)    Claim Element 1[c]

| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
|------|-----|

Claim element 1[c] of the '793 Patent is disclosed in the '212 Patent, which teaches delivering "from 15 micrograms to 90 micrograms" of inhaled treprostinil.

The '212 Patent expressly discloses the claimed dosage amount of "from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof."  The '212 Patent states that "[i]n the case of treating peripheral vascular disease by inhalation of a benzindene prostaglandin of the present invention, **the dosage for inhalation**, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, **should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 μg to 250 mg**; typically from 0.5 μg to 2.5 mg, **preferably from 7 μg to 285 μg**, per day per kilogram bodyweight."  '212 Patent, 5:54-62 (emphasis added); *see also id.* at Figs. 16, 18.  The '212 Patent further explains that inhaled UT-15 "has a greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly."  *Id.* at 8:9-18.  A POSA would have been further informed by additional disclosures in the '212 Patent that likewise teach the claimed dosage amount of "from 15 micrograms to 90 micrograms."  *See, e.g.,* '793 Patent at 9:4-

9 (disclosing delivery of 262.5 micrograms of nebulized UT-15); *see also id.* at 11:7-13 (disclosing delivery of 250, 500, and 1000 micrograms per kg of body weight per minute of aerosolized UT-15).

Moreover, the '212 Patent states that "[t]he precise amount that is considered effective for a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor."  '212 Patent, 6:56-7:3; *see also id.* at 7:25-33; *see also generally id.* at 1:10-2:64.  The '212 Patent also states that the disclosed benzindene prostaglandin, UT-15, can be "given in high doses without significant non-lung effects." *Id.* at 10:51-57 ("These data are important in that this would indicate that, unlike intravenously infused UT-15, aerosolized UT-15 can be given in high doses without significant non-lung effects, i.e., heart rate, cardiac output. The aerosol delivery of UT-15 for these experiments is approximately 15-27 times that of the effective minimal tested dose of 250 ng per kg per min shown in FIG. 16.").  These disclosures would have further motivated a POSA reading the '212 Patent to administer inhaled treprostinil at a dosage amount of 15-90 micrograms, as claimed.

#### (4)    Claim Element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |
| --- | --- |

Claim element 1[d] of the '793 Patent would have been obvious over the '212 Patent in view of a POSA's general knowledge in the field and/or by applying routine optimization.

A POSA reading the '212 Patent would have been motivated to minimize the number of breaths required for administration of treprostinil by inhalation, to increase patient compliance and convenience.  *See* '212 Patent, 11:7-13 (disclosing a per-minute delivery rate); *see also id.* at 13:6-8 (describing aerosolized UT-15 delivered for "4-5 minutes").  By May 2006, the general state of

the art had established the safety and efficacy of inhaled therapeutics, including prostaglandin analogs such as treprostinil, delivered over short periods of time. *See, e.g.,* Chaudry 2004 at [0037]-[0038], [0067] (disclosing that delivery by inhalation "may take about . . . 3 minutes"); *see also* Ghofrani 2005 at p. 298 ("[I]t is technically feasible for there to be only one to two breaths in an application."); *see also* Clark 1995, Abstract; *see also* Olschewski 2002 at Abstract, 328; *see also* Ventavis® Label 2004 at 4, 16; *see also* OptiNeb® User Manual 2005 at 28; Geller 2003 at Abstract; *see also generally, supra*, "Additional Background Prior Art" Section.  A POSA would have been further aware of the problem of patient noncompliance to inhaled medications, and thus would have been encouraged to reduce the number of breaths required for drug delivery to increase patient compliance and treatment outcome. *See, e.g.,* Bender 1997 at Abstract, 179-80; *see also* Olschewski 2002 at 328; Newman at 63; Geller 2003 at Abstract; Geller 2005 at 1314, 1318. Accordingly, claim element 1[d] requiring "delivery in 1 to 3 breaths" would have been obvious over the '212 Patent in view of a POSA's general knowledge in the field.

Relying on the '212 Patent to deliver inhaled treprostinil in 1 to 3 breaths would have amounted to mere routine optimization that cannot save the '793 Patent from obviousness. *See, e.g., Genzyme Therapeutic Prods. L.P. v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1365, 1373 (Fed. Cir. 2016) (affirming decision finding dosing claims obvious when "the claimed dosing schedule would have been arrived at by routine optimization"); *see also Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1329-31 (Fed. Cir. 2014) (affirming decision finding dosing claims obvious because "[a] relatively infrequent dosing schedule has long been viewed as a potential solution to the problem of patient compliance"); *see also Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.,* 395 F.3d 1364, 1373 (Fed. Cir. 2005) (reversing decision to find claims obvious that covered slightly different dosages from those of the prior art).  In fact, the '212 Patent itself contemplates

**HIGHLY CONFIDENTIAL**

dose optimization as a matter of routine.  '212 Patent, 6:56-7:3, 7:25-33; *see also generally id.* at 1:10-2:64.  A POSA therefore would have understood that the benzindene prostaglandin (*i.e.*, treprostinil) disclosed in the '212 Patent could be "delivered in 1 to 3 breaths," as claimed.

### b.  Dependent Claims 4 and 6-8 Would Have Been Obvious

#### (1)  Claim 4

| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
|---|---|

Claim 4 is disclosed in the '212 Patent, which discloses an "inhaler" may be used to deliver the benzindene prostaglandin.  '212 Patent at 5:30-32.  The '212 Patent further states "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention."  *Id.* at 5:37-39.  And finally, claim 9 of the '212 Patent is specifically directed to an inhaled powder formulation of treprostinil.  Accordingly, a POSA would have readily understood the "inhaler" disclosed in the '212 Patent could be used as a "dry powder inhaler," as claimed, to deliver powder formulations.  Such dry powder inhalers were well known and "widely accepted" as of 2006.  *See* Atkins at 1311.

#### (2)  Claim 6

| 6 | The method of claim 1, wherein the formulation is a powder. |
|---|---|

Claim 6 of the '793 Patent is disclosed in the '212 Patent, which discloses that powder formulations may be used.  '212 Patent at 5:37-39 ("Alternatively, solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention.").[34]

---

[34] To the extent UTC contends that the '212 Patent fails to describe a powder formulation of treprostinil administered in 1-3 breaths, the claims of the '793 Patent are invalid under § 112, as described below.

### (3)    Claim 7

| 7 | The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter. |
|---|---|

Claim 7 of the '793 Patent is disclosed in the '212 Patent, which expressly discloses that "the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter."  '212 Patent, 5:39-41.

### (4)    Claim 8

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

The '212 Patent discloses administration of treprostinil containing no metacresol because it contains no disclosure requiring the presence of metacresol in the described formulation.  *See generally* '212 Patent; *see also, e.g., id.* at 4:47-54 (stating that the active ingredients include "liquid formulations comprising a benzindene prostaglandin, such as UT-15, **alone** or in combination with other active ingredients") (emphasis added).  Indeed, the use of preservatives in inhalation products was strongly discouraged by 2006.  Beasley, R., et al., "Preservatives in Nebulizer Solutions: Risks without Benefit," *Pharmacotherapy*, 18(1):130-39 (1998) ("Beasley") at 137-38 ("On the basis of current knowledge, it can be recommended that nebulizer solutions be formulated preservative free and made available in sterile unit-dose vials . . . .").  Additionally, the FDA-approval of preservative-free tobramycin (Tobi®) for inhalation in 1998 was well publicized and replaced the off-label inhalation of preservative-containing tobramycin intended for injection.  *See generally* Prober, C.G., et al., "Technical Report: Precautions Regarding the Use of Aerosolized Antibiotics," *Pediatrics*, 106(6):1-6 (2000) ("Prober") at 1, 3.  And significantly, the label of then-approved iloprost (Ventavis®), an inhaled prostacyclin, specifically stated that the product contained "no preservatives."  Ventavis® Label 2004 at Description.

Moreover, the '212 Patent describes a "more preferred" formulation that contains no metacresol. *See* '212 Patent at 5:25-29. Specifically, the patent states, "[a] more preferred solution is prepared by mixing 0.125 grams of UT-15, 1.25 grams hydrous sodium citrate, 0.125 grams of anhydrous citric acid, 0.05 grams of sodium hydroxide, and approximately 250 ml of water for injection." *Id*. Additionally, the '212 Patent discloses steps of preparing a treprostinil inhalation solution that does not include metacresol. *Id*. at 8:39-44 ("Inhalation solutions were prepared by combining 1.25 grams of Sodium Citrate (Hydrous), 0.125 Citric Acid (Anhydrous), 0.05 grams of Sodium Hydroxide (NF/BP), 0.125 grams of UT-15, and approximately 250 ml of Water for Injection according to the following steps."). Accordingly, a POSA would know from the '212 Patent that treprostinil formulations containing no metacresol could be administered by inhalation, and were actually "more preferred," in May 2006.

### c. Motivation to Modify the '212 Patent to Arrive at "Delivered in 1 to 3 Breaths"

As explained above in connection with claim element 1[d], a POSA would have been motivated to modify the '212 Patent to arrive at the limitation reciting "delivered in 1 to 3 breaths." *See supra* Section V.A.3.a.4. The relevant scientific literature was replete with teachings regarding the safe and effective administration of inhaled therapeutics, including prostaglandin analogs such as treprostinil. *See, e.g.,* Chaudry 2004 at [0037]-[0038], [0067] (disclosing that "a therapeutically effective amount of a hypertension-reducing agent may include from about 0.001 mg/ml to about 20 mg/ml" and that delivery by inhalation "may take about . . . 3 minutes"); *see also* Ghofrani 2005 at p. 298 (disclosing administration of inhaled treprostinil at a dose of "15 mcg/inhalation" and that "it is possible to increase the dosage to up to 90 mcg") ("[I]t is technically feasible for there to be only one to two breaths in an application."); *see also* Clark 1995, Abstract; *see also*

Olschewski 2002 at Abstract, 328; *see also* Ventavis® Label 2004 at 4, 16; *see also* OptiNeb® User Manual 2005 at 28; *see also generally, supra*, "Additional Background Prior Art" Section.

Additionally, the problem of patient nonadherence to inhaled medications was well-understood, and a POSA in May 2006 would have readily appreciated that reducing the number of breaths for drug delivery would increase patient compliance and, in turn, treatment outcome. *See, e.g.,* Bender 1997 at Abstract, 179-80 (emphasizing the challenge of patient compliance to inhaled medications and its relationship to treatment outcome); *see also* Olschewski 2002 at 328 (noting that "the duration of inhalation may be shortened considerably"); Newman at 63; Geller 2003, Abstract; Geller 2005 at 1314, 1318. Therefore, a POSA would have been encouraged to modify the teachings of the '212 Patent to deliver inhaled treprostinil in 1 to 3 breaths. This modification would have represented mere routine optimization, which is not enough to save a claim from obviousness. *See, e.g., Genzyme Therapeutic*, 825 F.3d at 1365, 1373; *see also Hoffmann-La Roche*, 748 F.3d at 1329-31; *see also Merck,* 395 F.3d at 1373.

### d. Reasonable Expectation of Success in Modifying the '212 Patent to Arrive at "Delivered in 1 to 3 Breaths"

Similarly, a POSA also would have had a reasonable expectation of success in modifying the '212 Patent to arrive at the limitation reciting "delivered in 1 to 3 breaths." For the same reasons set forth above, a POSA would have expected to succeed in reducing the number of breaths during administration of inhaled treprostinil, due to the general state of the art regarding the safety and efficacy of inhaled therapeutics and the known problem of patient noncompliance. *See supra* Section V.A.3.c; *see also supra* Section V.A.3.a.4. Further, the '212 patent discloses that "aerosolized UT-15 has both greater potency and efficacy relative to attenuating chemically induced pulmonary hypertension," and "greater potency as compared to intravascularly administered UT-15." '212 Patent, 8:5-12. As such, a POSA would readily conclude that a

"therapeutically effective" amount of treprostinil could be delivered via inhalation in 1-3 breaths. Additionally, relying on the '212 Patent to deliver treprostinil in 1 to 3 breaths would have required only routine optimization, which would have further bolstered a POSA's expectation of success. *See id.*

### 4. Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious over the '212 Patent in Combination with Voswinckel JAHA

The Asserted Claims of the '793 Patent would have been obvious over the '212 Patent[35] in combination with **Voswinckel JAHA** by May 15, 2006.

#### a. Claims 1 Would Have Been Would Have Been Obvious

##### (1) Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|------|---|

Claim element 1[a] the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.4.a.1.  Claim element 1[a] is also disclosed in Voswinckel JAHA, as described above in Section V.A.9.a.1.

##### (2) Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|------|---|

Claim element 1[b] of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.4.a.2.  Claim element 1[b] is also disclosed in Voswinckel JAHA, as described

---

[35] The '033 Patent shares a specification with the '212 Patent.  Thus, all references to the '212 Patent in this section are equally applicable to the '033 Patent.

**HIGHLY CONFIDENTIAL**

above in Section V.A.9.a.2.

### (3)    Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 microgramsto 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|---|---|

Claim element 1[c] of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.4.a.3.

To the extent that UT contends that the single event dose is not disclosed in the '212 patent, this limitation is disclosed in **Voswinckel JAHA**.  As discussed below, claim 1 is therefore obvious over the '212 Patent in combination with Voswinckel JAHA.  Voswinckel JAHA conducted a study of inhaled treprostinil in patients with severe pulmonary hypertension and states that "[p]atients received a TRE [inhaled treprostinil sodium] by use of the pulsed OptiNeb® ultrasound nebulizer (3 single breaths, TRE solution 600 μg/ml)."  *See* Voswinckel JAHA.  A POSA reading Voswinckel JAHA would have known that the OptiNeb® ultrasound nebulizer could deliver 15-90 micrograms of inhaled treprostinil, due to the variability in dosing provided by this device.  *See also, e.g.,* OptiNeb® User Manual 2005.  More specifically, as demonstrated by the Tyvaso prescribing information, the administration described in the Voswinckel JAHA paper delivers 18 micrograms in 3 breaths.  *See* Tyvaso Label (2009) at 1 ("Initial dosage: 3 breaths (18 mcg) per treatment session.  If 3 breaths are not tolerated, reduce to 1 or 2 breaths."); *see also id.* at 1 (disclosing a treprostinil solution of "0.6 mg per mL," *i.e.,* 600 micrograms per mL); *see also id.* at 2 ("Tyvaso is intended for oral inhalation using the Tyvaso Inhalation System, which consists of the Optineb-ir Model ON-100/07 (an ultrasonic, pulsed-delivery device) and its accessories.").  Therefore, the claimed dosage amount would have been obvious over the '212 Patent in combination with Voswinckel JAHA.  A POSA would have been motivated to combine the '212

Patent with Voswinckel JAHA for the reasons set forth below in Sections V.A.5.a.4, V.A.5.c, and V.A.5.d.

### (4)    Claim Element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|--------------------------------|

Claim element 1[d] of the '793 Patent would have been obvious over the '212 Patent in combination with **Voswinckel JAHA**.

Voswinckel JAHA states that "[p]atients received a TRE [inhaled treprostinil sodium] by use of the pulsed OptiNeb® ultrasound nebulizer (3 single breaths, TRE solution 600 µg/ml)" and further observes that "[t]olerability is excellent even at high drug concentrations and short inhalation times (3 breaths)."   *See* Voswinckel JAHA.   A POSA also would have known, as explained above, that it would be desirable to reduce the number of breaths required for delivery of treprostinil by inhalation, to increase patient compliance and convenience.   *See, e.g.,* Bender 1997 at Abstract, 179-80; *see also* Olschewski 2002 at 328; Newman at 63; Geller 2003 at Abstract; Geller 2005 at 1314, 1318.   Therefore, a POSA therefore would have been encouraged to apply the 3-breath delivery disclosure of Voswinckel JAHA to the teachings of the '212 Patent. A POSA would have been further motivated to combine the '212 Patent with Voswinckel JAHA, and would have had a reasonable expectation of success in doing so, because both references are directed to the use of inhaled treprostinil (also known as benzindene prostaglandin UT-15), for the treatment of pulmonary hypertension.   *See, e.g.,* '212 Patent, Abstract (disclosing "[a] method of delivering benzindene prostaglandins to a patient by inhalation" for the treatment of "pulmonary hypertension"); *see also* Voswinckel JAHA (titled "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension").   Moreover, Voswinckel JAHA discloses that delivery of

inhaled treprostinil in 3 single breaths was successful, further confirming that a POSA would have had a reasonable expectation of successfully achieving the claimed invention.  *Id*.

Accordingly, claim element 1[d] would have been obvious over the combination of the '212 Patent with Voswinckel JAHA.

### b.    Dependent Claims 4 and 6-8 Would Have Been Obvious

#### (1)    Claim 4

| 4 | *The method of claim 1, wherein the inhalation device is a dry powder inhaler.* |
|---|---|

The additional limitation of claim 4 of the '793 Patent is disclosed in the '212 Patent, as described above.

#### (2)    Claim 6

| 6 | *The method of claim 1, wherein the formulation is a powder.* |
|---|---|

The additional limitation of claim 6 of the '793 Patent is disclosed in the '212 Patent, as described above.

#### (3)    Claim 7

| 7 | *The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter.* |
|---|---|

The additional limitation of claim 7 of the '793 Patent is disclosed in the '212 Patent, as described above.

#### (4)    Claim 8

| 8 | *The method of claim 1, wherein the formulation contains no metacresol .* |
|---|---|

The additional limitation of claim 8 of the '793 Patent is disclosed in the '212 Patent, as described above.  Additionally, treprostinil was delivered without metacresol as disclosed in Voswinckel JAHA.  Voswinckel JAHA also specifically states that a "preservative free solution

of inhaled TRE" was used (Voswinckel JAHA at Methods), which a POSA would understand to mean that the solution contained no metacresol, because metacresol was known in 2006 to be a preservative. '793 Patent, 15:40-41 (referring to a "metacresol preservative" in "treprostinil solution").

### c.    Motivation to Combine the '212 Patent with Voswinckel JAHA

A POSA would have been motivated to combine the '212 Patent with Voswinckel JAHA to arrive at the Asserted Claims of the '793 Patent.  Both the '212 Patent and Voswinckel JAHA are directed to the use of inhaled treprostinil (also known as benzindene prostaglandin UT-15), for the treatment of pulmonary hypertension. *See, e.g.,* '212 Patent, Abstract (disclosing "[a] method of delivering benzindene prostaglandins to a patient by inhalation" for the treatment of "pulmonary hypertension"); *see also* Voswinckel JAHA (titled "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension").  Indeed, Voswinckel JAHA puts into clinical practice the express teachings of the '212 patent, with success.  Voswinckel JAHA's results confirm the conclusions reached in the '212 Patent that "aerosolized UT-15 can be given in high doses without significant non-lung effects, i.e., heart rate, cardiac output."  '212 Patent, 10:51-57.  As such, a POSA would have been motivated to combine the teachings of the '212 Patent to deliver treprostinil in 1 to 3 breaths due to the disclosure in Voswinckel JAHA that "[t]olerability is excellent even at high drug concentrations and short inhalation times (3 breaths)." *See* Voswinckel JAHA at Conclusion.

Additionally, and as noted, the relevant scientific literature was replete with teachings regarding the safe and effective administration of inhaled therapeutics, including prostaglandin analogs. *See, e.g.,* Chaudry 2004 at [0037]-[0038], [0067] (disclosing that "a therapeutically effective amount of a hypertension-reducing agent may include from about 0.001 mg/ml to about 20 mg/ml" and that delivery by inhalation "may take about . . . 3 minutes"); *see also* Ghofrani

**HIGHLY CONFIDENTIAL**

2005 at p. 298 (disclosing administration of inhaled treprostinil at a dose of "15 mcg/inhalation" and that "it is possible to increase the dosage to up to 90 mcg") ("[I]t is technically feasible for there to be only one to two breaths in an application."); *see also* Clark 1995, Abstract; *see also* Olschewski 2002 at Abstract, 328; *see also* Ventavis® Label 2004 at 4, 16; *see also* OptiNeb® User Manual 2005 at 28; *see generally, supra*, "Additional Background Prior Art" Section.

Further, the problem of patient nonadherence to inhaled medications was well-understood, and a POSA in May 2006 would have readily appreciated that reducing the number of breaths for drug delivery would increase patient compliance and, in turn, treatment outcome. *See, e.g.,* Bender 1997 at Abstract, 179-80 (emphasizing the challenge of patient compliance to inhaled medications and its relationship to treatment outcome); *see also* Olschewski 2002 at 328 (noting that "the duration of inhalation may be shortened considerably"); Newman at 63; Geller 2003 at Abstract; Geller 2005 at 1318, 1318. Therefore, a POSA would have been encouraged to apply the 3-breath delivery disclosure of Voswinckel JAHA to the teachings of the '212 Patent to arrive at the limitation reciting "delivery in 1 to 3 breaths" claimed by the '793 Patent.

### d. Reasonable Expectation of Success in Combining the '212 Patent with Voswinckel JAHA

Similarly, a POSA also would have had a reasonable expectation of success in combining the '212 Patent with Voswinckel JAHA to arrive at the claimed treatment including delivery of 15-90 micrograms "in 1 to 3 breaths." As noted, the '212 Patent and Voswinckel JAHA are directed to solving the same problem, treatment of pulmonary hypertension, via the same means, inhaled treprostinil. For the same reasons set forth above, a POSA would have expected to succeed in reducing the number of breaths when delivering inhaled treprostinil, due to the general state of the art regarding the safety and efficacy of inhaled therapeutics, the known problem of patient noncompliance, and Voswinckel JAHA's explicit disclosure that administration of treprostinil was

**HIGHLY CONFIDENTIAL**

successful. *See supra* Section V.A.4.c. Therefore, a POSA would have had a reasonable expectation of success in applying the 3-breath delivery disclosure of Voswinckel JAHA to the teachings of the '212 Patent.

### 5. Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious over the '212 Patent in Combination with Voswinckel 2006

The Asserted Claims of the '793 Patent would have been obvious over the '212 Patent[36] in combination with **Voswinckel 2006** by May 15, 2006.

#### a. Claims 1 Would Have Been Would Have Been Obvious

##### (1) Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|------|---|

Claim element 1[a] the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.4.a.1.

Claim element 1[a] is also disclosed in Voswinckel 2006, which teaches the recited method of treating pulmonary hypertension. Voswinckel 2006 describes treating three patients with "severe pulmonary hypertension" with "inhaled treprostinil." Voswinckel 2006 at 150. Voswinckel 2006 also describes "a single 15-μg dose of treprostinil, inhaled in 3 breaths" inducing "highly pulmonary selective and sustained vasodilatation" proving that "[t]he drug was clinically effective" at the dosage and number of breaths. *Id.*

##### (2) Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|------|---|

---

[36] The '033 Patent shares a specification with the '212 Patent. Thus, all references to the '212 Patent in this section are equally applicable to the '033 Patent.

**HIGHLY CONFIDENTIAL**

Claim element 1[b] of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.4.a.2.

Claim element 1[b] is also disclosed in Voswinckel 2006, which expressly discloses "inhaled treprostinil" administered "through a modified OptiNeb ultrasonic inhalation device." Voswinckel 2006 at 150.

### (3)   Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|------|--------------------------------------------------------------------|

Claim element 1[c] of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.4.a.3.  To the extent that UT contends that the '212 Patent alone does not disclose the claimed dosage amount, this limitation would have been obvious over the '212 Patent in combination with **Voswinckel 2006**.  Claim 1 is therefore obvious over the '212 Patent in combination with Voswinckel 2006.

Voswinckel 2006 expressly discloses that treprostinil was "clinically effective, safe, and well tolerated when 15 µg was inhaled in 3 breaths 4 times daily."  Voswinckel 2006 at 150. Voswinckel 2006 also teaches that "a single 15-µg dose of treprostinil" was inhaled by patients "through a modified OptiNeb ultrasonic inhalation device."  *Id.*  Therefore, the claimed dosage amount would have been obvious over the '212 Patent in combination with Voswinckel 2006.  A POSA would have been motivated to combine this teaching from Voswinckel 2006 with the '212 Patent for the reasons set forth below in Sections V.A.6.a.4, V.A.6.c, and V.A.6.d.

### (4)   Claim Element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|--------------------------------|

**HIGHLY CONFIDENTIAL**

Claim element 1[d] of the '793 Patent would have been obvious over the '212 Patent in combination with **Voswinckel 2006**.

Voswinckel 2006 expressly discloses delivery of inhaled treprostinil "in 3 breaths."  *See* Voswinckel 2006 at 150.  A POSA also would have known, as explained above, that it would be desirable to reduce the number of breaths required for delivery of treprostinil by inhalation, to increase patient compliance and convenience.  *See, e.g.,* Bender 1997 at Abstract, 179-80; *see also* Olschewski 2002 at 328; Newman at 63; Geller 2003 at Abstract; Geller 2005 at 1314, 1318.  Therefore, a POSA therefore would have been encouraged to apply the 3-breath delivery disclosure of Voswinckel 2006 to the teachings of the '212 Patent.  A POSA would have been further motivated to combine the '212 Patent with Voswinckel 2006, and would have had a reasonable expectation of success in doing so, because both references are directed to the use of inhaled treprostinil (also known as benzindene prostaglandin UT-15), for the treatment of pulmonary hypertension.  *See, e.g.,* '212 Patent, Abstract (disclosing "[a] method of delivering benzindene prostaglandins to a patient by inhalation" for the treatment of "pulmonary hypertension"); *see also* Voswinckel 2006 at 149 (titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension").  Moreover, Voswinckel 2006 discloses that delivery of inhaled treprostinil in 3 single breaths was successful, further confirming that a POSA would have had a reasonable expectation of successfully achieving the claimed invention.  *Id.*

Accordingly, claim element 1[d] would have been obvious over the combination of the '212 Patent with Voswinckel 2006.

### b.  Dependent Claims 4 and 6-8 Would Have Been Obvious

#### (1)  Claim 4

| 4 | *The method of claim 1, wherein the inhalation device is a dry powder inhaler.* |
|---|---|

The additional limitation of claim 4 of the '793 Patent is disclosed in the '212 Patent, as described above.

A POSA would have readily understood that "inhaled treprostinil" dosage and breath disclosure of Voswinckel 2006 could be utilized as a powder delivered in a "dry powder inhaler" as disclosed and claimed by the '212 Patent.   A POSA would have been motivated to do so because dry powder inhalers were well-known to be very portable and quick to use, breath-actuated, could be designed as single-dose or multi-dose devices, provided the "lowest cost dose," and were easier for patients (especially children) to use than the pulsed ultrasonic nebulizer disclosed in Voswinckel 2006.   Newman 2006 at 58, 61-62, 63; Geller 2005 at 1316-17; *see also* Frijlink and De Boer, "Dry powder inhalers for pulmonary drug delivery," Expert Opinion on Drug Delivery, 1:1, pp. 67-86 (2004) at 81 ("Advantages such as the potential ability to generate high FPFs and a relatively high lung deposition, fast and easy administration, the ability to prepare stable formulations (compared with solutions), and the fact that DPIs are breath-actuated and easily portable, justify their existence."). A POSA would thus have had a reasonable expectation of success that the "inhaled treprostinil" described in Voswinckel 2006 could be delivered using a dry powder inhaler.

### (2)    Claim 6

| 6 | *The method of claim 1, wherein the formulation is a powder.* |
|---|---|

The additional limitation of claim 6 of the '793 Patent is disclosed in the '212 Patent, as described above.

A POSA would have been motivated to convert Voswinckel 2006's treprostinil solution to a powder because powders were known to be more stable formulations than solutions by May 2006, and the '212 Patent specifically claims such powder formulations for the same indication as

Voswinckel 2006.  *See*  Frijlink and De Boer at 81; '212 Patent, claim 9.  A POSA would have had a reasonable expectation of success in doing so because converting a solution to dry powder was well known by 2006, and the '212 Patent discloses and claims that treprostinil can be formulated as a powder for delivery by inhalation.  *See, e.g.*, Chew and Chan, "Pharmaceutical Dry Powder Aerosol Delivery," KONA No. 19, pp. 46-56 (2001) at 51-53 ("Preparation of Powders" section), available at https://www.jstage.jst.go.jp/article/kona/19/0/19_2001010/_pdf.

### (3)    Claim 7

| 7 | The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter. |
|---|---|

The additional limitation of claim 7 of the '793 Patent is disclosed in the '212 Patent, as described above.

### (4)    Claim 8

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

The additional limitation of claim 8 of the '793 Patent is disclosed in the '212 Patent, as described above.  Additionally, treprostinil was delivered without metacresol in Voswinckel 2006.

### c.    Motivation to Combine the '212 Patent with Voswinckel 2006

A POSA would have been motivated to combine the '212 Patent with Voswinckel 2006 to arrive at the Asserted Claims of the '793 Patent.  Both the '212 Patent and Voswinckel 2006 are directed to the use of inhaled treprostinil (also known as benzindene prostaglandin UT-15), for the treatment of pulmonary hypertension.  *See, e.g.,* '212 Patent, Abstract (disclosing "[a] method of delivering benzindene prostaglandins to a patient by inhalation" for the treatment of "pulmonary hypertension"); *see also* Voswinckel 2006 at 149 (titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension").  Indeed, Voswinckel 2006 puts into clinical practice the express teachings of the '212 patent, with success.  But Voswinckel 2006 is limited to one form

HIGHLY CONFIDENTIAL

of inhalation delivery, and other forms were well-known by 2006. Each form had various advantages and disadvantages that made it useful for different patients and scenarios. *See, e.g.*, Geller 2005 ("Comparing Clinical Features of the Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler"). A POSA would have been motivated to apply the '212 Patent's teachings as to various forms of inhalers and dry powder formulations, while maintaining the dosage and breath limitations of Voswinckel 2006, with a reasonable expectation of success because Voswinckel 2006 had shown that treprostinil was "clinically effective, safe, and well tolerated" at the dosage and breath of "15 μg … inhaled in 3 breaths." Voswinckel 2006 at 150. As such, a POSA would have been motivated to combine the teachings of the '212 Patent to deliver treprostinil in 1 to 3 breaths due to the disclosure in Voswinckel 2006 that treprostinil was "clinically effective, safe, and well tolerated when 15 μg was inhaled in 3 breaths 4 times daily." *See id.*

Additionally, as noted, the relevant scientific literature was replete with teachings regarding the safe and effective administration of inhaled therapeutics, including prostaglandin analogs. *See, e.g.,* Chaudry 2004 at [0037]-[0038], [0067] (disclosing that "a therapeutically effective amount of a hypertension-reducing agent may include from about 0.001 mg/ml to about 20 mg/ml" and that delivery by inhalation "may take about . . . 3 minutes"); *see also* Ghofrani 2005 at p. 298 (disclosing administration of inhaled treprostinil at a dose of "15 mcg/inhalation" and that "it is possible to increase the dosage to up to 90 mcg") ("[I]t is technically feasible for there to be only one to two breaths in an application."); *see also* Clark 1995, Abstract; *see also* Olschewski 2002 at Abstract, 328; *see also* Ventavis® Label 2004 at 4, 16; *see also* OptiNeb® User Manual 2005 at 28; *see generally, supra*, "Additional Background Prior Art" Section.

Further, the problem of patient nonadherence to inhaled medications was well-understood, and a POSA in May 2006 would have readily appreciated that reducing the number of breaths for

drug delivery would increase patient compliance and, in turn, treatment outcome.  *See, e.g.,* Bender 1997 at Abstract, 179-80 (emphasizing the challenge of patient compliance to inhaled medications and its relationship to treatment outcome); *see also* Olschewski 2002 at 328 (noting that "the duration of inhalation may be shortened considerably"); Newman at 63; Geller 2003, Abstract; Geller 2005 at 1314, 1318.  Therefore, a POSA would have been encouraged to apply the disclosures of Voswinckel 2006 to the teachings of the '212 Patent to arrive at the claimed dosage amount and "delivery in 1 to 3 breaths" limitation.

### d.      Reasonable Expectation of Success in Combining the '212 Patent with Voswinckel 2006

Similarly, a POSA also would have had a reasonable expectation of success in combining the '212 Patent with Voswinckel 2006 to arrive at the limitation reciting "delivered in 1 to 3 breaths."  As noted, the '212 Patent and Voswinckel 2006 are directed to solving the same problem treatment of pulmonary hypertension, via the same means, inhaled treprostinil.  For the same reasons set forth above, a POSA would have expected to succeed in reducing the number of breaths when delivering inhaled treprostinil, due to the general state of the art regarding the safety and efficacy of inhaled therapeutics, the known problem of patient noncompliance, and Voswinckel 2006's explicit disclosure that administration of treprostinil was successful.  *See supra* Section V.A.5.c.  Therefore, a POSA would have had a reasonable expectation of success in applying the disclosures of Voswinckel 2006 regarding dosage amount and number of breaths to the teachings of the '212 Patent.

### 6.      Claim 1 of the '793 Patent is Anticipated by Voswinckel 2006

Claim 1 of the '793 Patent is anticipated by Voswinckel 2006.

### a.      Claim 1 is Anticipated

### (1)      Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |

Claim element 1[a] of the '793 Patent is disclosed in Voswinckel 2006, which teaches the recited method of treating pulmonary hypertension.  Voswinckel 2006 describes treating "three patients with severe pulmonary hypertension" with "inhaled treprostinil."  Voswinckel 2006 at 150.  Voswinckel 2006 also describes "**a single** 15-µg **dose** of treprostinil, inhaled 3 breaths" inducing "highly pulmonary selective and sustained vasodilation" proving that "the drug was clinically effective" at the dosage and number of breaths.  *Id*. (emphasis added).

### (2)     Claim Element 1[b]

| 1[b] | *with an inhalation device,* |

Claim element 1[b] of the '793 Patent is disclosed in Voswinckel 2006, which expressly discloses "inhaled treprostinil" administered "through a modified OptiNeb ultrasonic **inhalation device**."  *Id.* (emphasis added).

### (3)     Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |

Claim element 1[c] of the '793 Patent is disclosed in Voswinckel 2006, which specifically teaches that "a single 15-µg dose of treprostinil" was inhaled by patients "through a modified OptiNeb ultrasonic inhalation device."  *Id.*

### (4)     Claim Element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |

HIGHLY CONFIDENTIAL

Claim element 1[d] of the '793 Patent is disclosed in Voswinckel 2006 which specifically teaches that "15-µg dose of treprostinil" was inhaled by patients "in **3 breaths** through a modified OptiNeb ultrasonic inhalation device." *Id.* (emphasis added).

### 7. Claims 4 and 6-8 of the '793 Patent Would Have Been Obvious over Voswinckel 2006 in Combination with the '212 Patent

Claims 4 and 6-8 of the '793 Patent would have been obvious over Voswinckel 2006 in combination with the '212 Patent by May 15, 2006. All of the limitations of Claim 1 are disclosed by Voswinckel 2006, as described above. The additional limitations of the dependent claims 4 and 6-8 are obvious over Voswinckel 2006 in combination with the '212 Patent. A POSA would have motivated to modify Voswinckel 2006 with the '212 Patent with a reasonable expectation of success as described below.

#### a. Dependent Claims 4 and 6-8 Would Have Been Obvious

##### (1) Claim 4

| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
|---|---|

The '212 Patent discloses this element, as detailed above at Section V.A.4.b.1. A POSA would have readily understood that the "inhaled treprostinil" dosage and breath disclosure of Voswinckel 2006 could be utilized as a powder delivered in a "dry powder inhaler" as disclosed and claimed by the '212 Patent. A POSA would have been motivated to do so because dry powder inhalers were well-known to be very portable and quick to use, breath-actuated, could be designed as single-dose or multi-dose devices, provided the "lowest cost dose," and were easier for patients (especially children) to use than the pulsed ultrasonic nebulizer disclosed in Voswinckel 2006. *Id.*; Newman at 58, 61-62, 63; Geller 2005 at 1316-17; *see also* Frijlink and De Boer at 81 ("Advantages such as the potential ability to generate high FPFs and a relatively high lung deposition, fast and easy administration, the ability to prepare stable formulations (compared with

solutions), and the fact that DPIs are breath-actuated and easily portable, justify their existence."). A POSA would thus have had a reasonable expectation of success that the "inhaled treprostinil" described in Voswinckel 2006 could be delivered using a dry powder inhaler.

Claim 4 of the '793 Patent would have been obvious over Voswinckel 2006 in combination with the '212 Patent, which discloses that an "inhaler" may be used to deliver its disclosed benzindene prostaglandin: UT-15 (i.e. treprostinil salt). '212 Patent, 5:30-32. The '212 Patent further states that "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention." *Id.* at 5:37-39. The "present invention" of the '212 Patent includes the 15 µg disclosed dosage of Voswinckel 2006: "[i]n the case of treating peripheral vascular disease by inhalation of a benzindene prostaglandin of the present invention, **the dosage for inhalation**, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, **should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg**; typically from 0.5 µg to 2.5 mg, **preferably from 7 µg to 285 µg**, per day per kilogram bodyweight." '212 Patent, 5:54-62 (emphasis added); *see also id.* at Figs. 16, 18. Voswinckel 2006 teaches that those dosages can be administered in 3 breaths.

To the extent a POSA would not have a reasonable expectation of success in converting Voswinckel 2006's dosing regimen from a pulsed ultrasonic nebulizer to a dry powder inhaler, claim 4 of the '793 Patent is invalid for lack of enablement and written description, because, as discussed in Sections V.B.1.a and V.B.2.a below, the '793 Patent does not disclose or enable converting treprostinil delivery between the two inhalation devices.

### (2)   Claim 6

| 6 | *The method of claim 1, wherein the formulation is a powder.* |
|---|---|

**HIGHLY CONFIDENTIAL**

Claim 6 would have been obvious over Voswinckel 2006 in combination with the '212 Patent, which discloses and claims that powder formulations may be used to treat pulmonary hypertension. '212 Patent at 5:37-39 ("Alternatively, solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention."), claims 6 and 9. A POSA would have been motivated to convert Voswinckel 2006's treprostinil solution to a powder because powders were known to be more stable formulations than solutions by May 2006, and the '212 Patent specifically claims such powder formulations for the same indication as Voswinckel 2006. *See* Frijlink and De Boer at 81; '212 Patent at claim 9. A POSA would have had a reasonable expectation of success in doing so because converting a solution to dry powder was well known by 2006, and the '212 Patent discloses and claims that treprostinil can be formulated as a powder for delivery by inhalation. *See, e.g.*, Chew and Chan, "Pharmaceutical Dry Powder Aerosol Delivery," KONA No. 19, pp. 46-56 (2001) at 51-53 ("Preparation of Powders" section), available at https://www.jstage.jst.go.jp/article/kona/19/0/19_2001010/_pdf.

To the extent a POSA would not have a reasonable expectation of success in converting Voswinckel 2006's treprostinil formulation to a powder, claim 6 of the '793 Patent is invalid for lack of enablement and written description, because, as discussed in Sections V.B.1.a and V.B.2.a below, the '793 Patent does not disclose or enable converting treprostinil delivery between the two inhalation devices.

### (3)    Claim 7

| 7 | *The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter.* |
|---|---|

Claim 7 would have been obvious over Voswinckel 2006 in combination with the '212 Patent, which expressly discloses that "the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter." '212 Patent, 5:39-41.

**HIGHLY CONFIDENTIAL**

Further, it was generally known in the art that "inhaler devices should deliver particles smaller than approximately 5 μm in diameter in order to enter the lungs."  Newman at 58.

### (4)    Claim 8

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

Claim 8 is disclosed in Voswinckel 2006 and the '212 Patent.  Voswinckel 2006 does not disclose the presence of metacresol in the described formulation of "inhaled treprostinil," and the '212 Patent discloses formulations without metacresol.  *See generally* Voswinckel 2006; '212 Patent at 5:25-29 (disclosing formulation of a "more preferred solution" that does not include metacresol), 8:39-44 (disclosing steps of formulating treprostinil inhalation solution that do not include metacresol).

Moreover, claim 8 would have been obvious over Voswinckel 2006 in combination with the '212 Patent, as Voswinckel 2006 does not disclose the presence of metacresol in the described formulation of "inhaled treprostinil," and the '212 Patent discloses that the active ingredients include "liquid formulations comprising a benzindene prostaglandin, such as UT-15, **alone** or in combination with other active ingredients."  *See generally* Voswinckel 2006; *see also, e.g.,* '212 Patent at 4:47-54 (emphasis added).  Voswinckel 2006 in combination with the '212 Patent therefore discloses a formulation of treprostinil that contains no metacresol.

### 8.    Claim 1 of the '793 Patent Would Have Been Obvious over Voswinckel JAHA Alone

Claim 1 of the '793 Patent would have been obvious over Voswinckel JAHA by May 15, 2006.

#### a.    Claims 1 Would Have Been Would Have Been Obvious

##### (1)    Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|------|------|

Claim element 1[a] the '793 Patent would have been obvious over Voswinckel JAHA, which teaches the recited method of treating pulmonary hypertension.  Voswinckel JAHA describes treating "17 patients with severe pulmonary hypertension" with "Inhaled Treprostinil Sodium (TRE)."  Voswinckel JAHA at Title, Methods.  Voswinckel JAHA also describes a single event dose of "3 breaths" of "TRE solution 600 µg/ml" having "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing."  *Id.* at Methods, Conclusion.

### (2) Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|------|------|

Claim element 1[b] of the '793 Patent would have been obvious over the Voswinckel JAHA, which expressly discloses "inhaled TRE" through "the use of the pulsed OptiNeb[®] ultrasound nebulizer."  *Id.* at Methods.  A POSA as of May 2006 would have readily understood that this nebulizer is an inhalation device.

### (3) Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|------|------|

Claim element 1[c] of the '793 Patent would have been obvious over Voswinckel JAHA, which teaches the claimed dosage amount for inhaled treprostinil.  Voswinckel JAHA discloses treating patients with a single event dose of "TRE solution 600 µg/ml" through the use of the pulsed OptiNeb[®] ultrasound nebulizer.  A POSA would understand that a patient taking 1 to 3

breaths of such a solution through a pulsed OptiNeb® ultrasound nebulizer would inhale between 15 and 90 micrograms of treprostinil.

### (4)    Claim Element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|--------------------------------|

Claim element 1[d] of the '793 Patent would have been obvious over Voswinckel JAHA, which discloses treating patients with a single event dose of "3 breaths." Voswinckel JAHA at Methods.

### 9.    Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious Over Voswinckel JAHA in Combination with the '212 Patent

The Asserted Claims of the '793 Patent would have been obvious over Voswinckel JAHA in combination with the '212 Patent by May 15, 2006. A POSA would have motivated to modify Voswinckel JAHA with the '212 Patent with a reasonable expectation of success as described for the relevant limitations below.

### a.    Claims 1 Would Have Been Would Have Been Obvious

### (1)    Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|------|----------------------------------------------------------------------------------------|

As explained above, claim element 1[a] of the '793 Patent is disclosed in both Voswinckel JAHA and the '212 Patent.

### (2)    Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|------|------------------------------|

As explained above, claim element 1[b] of the '793 Patent is disclosed in both Voswinckel JAHA and the '212 Patent.

### (3)    Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 microgram to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|------|---|

Claim element 1[c] of the '793 Patent would have been obvious over Voswinckel JAHA in combination with the '212 Patent.

Voswinckel JAHA discloses treating patients with a single event dose of  "TRE solution 600 µg/ml" in "3 breaths" and teaches that this dose was effective in showing "strong pulmonary selective vasodilatory efficacy . . . following single acute dosing.'  Voswinckel JAHA at Methods, Conclusion.  A POSA would understand Voswinckel JAHA's disclosure of a single event dose of "3 breaths" of inhaled treprostinil having "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing" to mean that 3 breaths delivered an amount of the drug to be effective in treating pulmonary hypertension.

The '212 Patent expressly discloses that an effective amount of inhaled treprostinil is "from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof." Specifically, the '212 Patent states that "[i]n the case of treating peripheral vascular disease by inhalation of a benzindene prostaglandin of the present invention, **the dosage for inhalation**, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream **should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg**; typically from 0.5 µg to 2.5 mg, **preferably from 7 µg to 285 µg**, per day per kilogram bodyweight." '212 Patent, 5:54-62 (emphasis added); *see also id.* at Figs. 16, 18.  The '212 Patent further explains that inhaled UT-15 "has a greater potency compared

to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.* at 8:9-18.  A POSA would have been further informed by additional disclosures in the '212 Patent that likewise teach the claimed dosage amount of "from 15 micrograms to 90 micrograms."  *See, e.g., id.* at 9:4-9 (disclosing delivery of 262.5 micrograms of nebulized UT-15); *see also id.* at 11:7-13 (disclosing delivery of 250, 500, and 1000 micrograms per kg of body weight per minute of aerosolized UT-15).  Accordingly, a POSA reading Voswinckel JAHA's disclosure of 3 breaths with the effects described in Voswinckel JAHA's conclusion would understand that the treprostinil was delivered within the claimed dosage range.

A POSA would have been motivated to combine the Voswinckel JAHA's breath disclosure with the dosage disclosure in the '212 Patent, because both references are directed to the use of inhaled treprostinil sodium (also known as benzindene prostaglandin UT-15), for the successful treatment of pulmonary hypertension.  *See, e.g.,* '212 Patent, Abstract (disclosing "[a] method of delivering benzindene prostaglandins to a patient by inhalation" for the treatment of "pulmonary hypertension"); *see also* Voswinckel JAHA (titled "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension").

Further, the general state of the art would have further motivated a POSA to combine the teachings of Voswinckel JAHA with those of the '212 Patent.  The relevant scientific literature was replete with teachings regarding the safe and effective administration of inhaled therapeutics, including prostaglandin analogs.  *See, e.g.,* Chaudry 2004 at [0037]-[0038], [0067] (disclosing that "a therapeutically effective amount of a hypertension-reducing agent may include from about 0.001 mg/ml to about 20 mg/ml" and that delivery by inhalation "may take about . . . 3 minutes"); *see also* Ghofrani 2005 at p. 298 (disclosing administration of inhaled treprostinil at a dose of "15

HIGHLY CONFIDENTIAL

mcg/inhalation" and that "it is possible to increase the dosage to up to 90 mcg") ("[I]t is technically feasible for there to be only one to two breaths in an application."); *see also* Clark 1995, Abstract; *see also* Olschewski 2002 at Abstract, 328; *see also* Ventavis® Label 2004 at 4, 16; *see also* OptiNeb® User Manual 2005 at 28; *see generally, supra*, "Additional Background Prior Art" section.

A POSA also would have had a reasonable expectation of success in combining Voswinckel JAHA with the '212 Patent to arrive at the Asserted Claims of the '793 Patent.  As noted, the two references pertain to the effective and improved use of inhaled treprostinil to treat pulmonary hypertension.  *See, e.g.,* '212 Patent, Abstract; *see also* Voswinckel JAHA at Title.  In fact, Voswinckel JAHA expressly states that "[t]olerability is excellent even at high drug concentrations and short inhalation times (3 breaths)."  *See* Voswinckel JAHA at Conclusion.  A POSA therefore would have expected success when modifying the Voswinckel JAHA to deliver treprostinil in 3 breaths at the effective dosage amounts disclosed in the '212 Patent.

### (4)      Claim Element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|--------------------------------|

Claim element 1[d] of the '793 Patent is disclosed in Voswinckel JAHA, which discloses treating patients with a single event dose of "3 breaths."  Voswinckel JAHA at Methods.

### b.      Dependent Claims 4 and 6-8 Would Have Been Obvious

### (1)      Claim 4

| 4 | *The method of claim 1, wherein the inhalation device is a dry powder inhaler.* |
|---|---------------------------------------------------------------------------------|

Claim 4 of the '793 Patent would have been obvious over Voswinckel JAHA in combination with the '212 Patent, which discloses that an "inhaler" may be used to deliver the benzindene prostaglandin.  '212 Patent, 5:30-32.  The '212 Patent further states that "solid

formulations, usually in the form of a powder, may be inhaled in accordance with the present invention." *Id.* at 5:37-39. The '212 Patent specifically teaches the claimed dosages to be effective in treating inhaled treprostinil, and Voswinckel JAHA teaches that those dosages can be administered in 3 breaths. Accordingly, a POSA would have readily understood that "inhaled treprostinil" dosage and breath disclosure of Voswinckel JAHA could be expanded to use in "dry powder inhaler" as disclosed by the '212 Patent. A POSA would have been motivated to do so because dry powder inhalers were well-known to be very portable and quick to use, breath-actuated, could be designed as single-dose or multi-dose devices, provided the "lowest cost dose," and were easier for patients (especially children) to use than the pulsed ultrasonic nebulizer disclosed in Voswinckel 2006. Newman at 58, 61-62, 63; Geller 2005 at 1316-17; *see also* Frijlink and De Boer, "Dry powder inhalers for pulmonary drug delivery," Expert Opinion on Drug Delivery, 1:1, pp. 67-86 (2004) at 81 ("Advantages such as the potential ability to generate high FPFs and a relatively high lung deposition, fast and easy administration, the ability to prepare stable formulations (compared with solutions), and the fact that DPIs are breath-actuated and easily portable, justify their existence.").

To the extent a POSA would not have a reasonable expectation of success in converting Voswinckel JAHA's dosing regimen from a pulsed ultrasonic nebulizer to a dry powder inhaler, claim 4 of the '793 Patent is invalid for lack of enablement and written description, because, as discussed in Sections V.B.1.a and V.B.2.a below, the '793 Patent does not disclose or enable converting treprostinil delivery between the two inhalation devices.

### (2)     Claim 6

| 6 | *The method of claim 1, wherein the formulation is a powder.* |
|---|---|

**HIGHLY CONFIDENTIAL**

Claim 6 of the '793 Patent would have been obvious over Voswinckel JAHA in combination with the '212 Patent, which discloses that powder formulations may be used. '212 Patent, 5:37-39 ("Alternatively, solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention."). A POSA would have been motivated to convert Voswinckel JAHA's treprostinil solution to a powder because powders were known to be more stable formulations than solutions by May 2006. *See* Frijlink and De Boer, "Dry powder inhalers for pulmonary drug delivery," Expert Opinion on Drug Delivery, 1:1, pp. 67-86 (2004) at 81. A POSA would have had a reasonable expectation of success in doing so converting a solution to dry powder was well known by 2006. *See, e.g.*, Chew and Chan, "Pharmaceutical Dry Powder Aerosol Delivery," KONA No. 19, pp. 46-56 (2001) at 51-53 ("Preparation of Powders" section), available at https://www.jstage.jst.go.jp/article/kona/19/0/19_2001010/_pdf.

To the extent a POSA would not have a reasonable expectation of success in converting Voswinckel JAHA's treprostinil formulation to a powder, claim 6 of the '793 Patent is invalid for lack of enablement and written description, because, as discussed in Sections V.B.1.b and V.B.2.b below, the '793 Patent does not disclose or enable making a treprostinil powder formulation.

### (3) Claim 7

| 7 | *The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter.* |
|---|---|

Claim 7 of the '793 Patent would have been obvious over Voswinckel JAHA in combination the '212 Patent, which expressly discloses that "the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter." '212 Patent, 5:39-41. Further, it was generally known in the art that "inhaler devices should deliver particles smaller than approximately 5 μm in diameter in order to enter the lungs." Newman at 58.

HIGHLY CONFIDENTIAL

### (4)   Claim 8

| 8 | *The method of claim 1, wherein the formulation contains no metacresol.* |
|---|---|

Claim 8 of the '793 Patent is disclosed in Voswinckel JAHA and in the '212 Patent as discussed above.  Moreover, claim 8 would have been obvious over Voswinckel JAHA in combination with the '212 Patent, as Voswinckel JAHA does not disclose the presence of metacresol in the described formulation of "inhaled treprostinil," and the '212 Patent discloses that the active ingredients include "liquid formulations comprising a benzindene prostaglandin, such as UT-15, **alone** or in combination with other active ingredients."  *See generally* Voswinckel JAHA; '212 Patent; *see also, e.g.,* '212 Patent at 4:47-54 (emphasis added).  Voswinckel JAHA in combination with the '212 Patent therefore discloses a formulation of treprostinil that contains no metacresol.

### 10.   Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious Over the '212 Patent in Combination with Voswinckel JESC and Voswinckel JAHA

The Asserted Claims of the '793 Patent would have been obvious over the '212 Patent in combination with Voswinckel JESC and Voswinckel JAHA by May 15, 2006.  A POSA would have motivated to modify the '212 Patent with Voswinckel JESC and Voswinckel JAHA with a reasonable expectation of success as described for the relevant limitations below.

#### a.   Claim 1 Would Have Been Obvious

##### (1)   Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|---|---|

Claim element 1[a] the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.3.a.1.

### (2)   Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|------|------------------------------|

Claim element 1[b] of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.3.a.2.

### (3)   Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|------|------------------------------|

The '212 Patent discloses that "[i]t has been discovered that aerosolized UT-15 has both greater potency and efficacy" for "attenuating chemically induced pulmonary hypertension" as compared to intravascular delivery.  '212 Patent at 8:5-8.  The '212 Patent quantifies this potency, teaching that "aerosolized UT-15 has a greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly."  *Id.* at 8:8-12.

Given these teachings, the successful sheep data, and the claims of the '212 Patent, a POSA would have been motivated to look for data administering inhaled treprostinil in humans with PH and the doses used therein.  A POSA would have been readily led to Voswinckel JESC, which discloses the effective administration of inhaled treprostinil for human patients with pulmonary arterial hypertension for 6 minutes on the OptiNeb® nebulizer of treprostinil solution at a concentrations of 16 to 64 µg/mL.  Voswinckel JESC at Methods.

As explained above at Section V.A.2.d., a skilled artisan would have understood at least 16, 32, 48, or 64 µg of treprostinil were delivered to patients with PAH in this study, and that understanding would have been confirmed by the volume of solution a POSA would have expected to be nebulized by the OptiNeb® device used in the study, as well as the nebulizers known in the

art.  Specifically, a POSA would have expected at least 1 mL of the treprostinil solution was used over 6 minutes of inhalation, and thus would understand, therefore, at least **16, 32, 48, or 64 μg** of treprostinil were delivered to different dosing groups in this study.  Such dosages would make sense to a POSA for patients being administered treprostinil for the first time.  Numerous nebulizers used at the time were known and expected to deliver more than 1 mL of solution.[37]  In fact, a POSA would have expected the OptiNeb® device used at the time (before 2006) to nebulize (i.e., turned liquid to aerosol) at a rate of 0.6 mL of solution per minute.  OptiNeb® User Manual 2005 at 28.  Assuming continuous administration over 6 minutes, the administered volume would have been as much as 0.6 x 6, or 3.6mL.  Thus, at 16 μg/mL, which is what Voswinckel JESC recommends as the concentration at which "near maximal pulmonary vasodilatation is achieved without adverse [side] effects" (Voswinckel JESC at Conclusion), the administered single event dose could be as high as 0.6 mL/min x 16 μg/mL x 6 min = **57.6** μg.

This understanding is confirmed by the intravascular dosing of UT-15 to treat pulmonary hypertension approved by the FDA in 2004 for intravascular treatment of pulmonary hypertension at a dosage of 1.25 ng/kg/min.  Remodulin® Label at Dosage and Administration.  The label provides calculations based on a 60 kg and 65 kg patient.  *Id.* at 10.  Accordingly, a POSA administering Remodulin® would have known he was giving his patients a daily treprostinil dose of 1.25 ng x 60 kg x (24x60) min to 1.25 ng x 65 kg x (24x60) min, which is to *108 to 117 micrograms*.  A POSA would apply the '212 Patent's 10-50% adjustment between intravascular and inhaled dosing ('212 Patent at 8:5-12) and understand the '212 Patent to be teaching that an

---

[37] *See, e.g.*, AccuNeb® Label at Dosage and Administration (3 mL dose); Ventavis® Label 2004 at Dosage and Administration (2.5-5 mL dose); Pulmozyme® Label at Dosage and Administration (2.5 mL dose).

**HIGHLY CONFIDENTIAL**

FDA-approvable effective dosage of aerosolized treprostinil for the treatment of pulmonary hypertension would be **10.8 to 58.5 micrograms**. *Id.* This range covers over half of the claimed 15 to 90 µg dosage.[38]

Accordingly, a POSA would understand the '212 Patent in combination with Voswinckel JESC to disclose an inhaled single event dosage range of 15 to 90 µg of treprostinil as claimed.

### (4)    Claim Element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|-------------------------------|

A POSA would have known to increase patient compliance and convenience, it would be desirable to reduce the number of breaths required for delivery of treprostinil by inhalation. A POSA who understood the necessary amount of dosing for aerosolized delivery of treprostinil would then look to the art for the fewest number of breaths in which that delivery could occur.

Voswinckel JAHA discloses a low number of breaths for the aerosolized delivery of treprostinil *specifically for treatment of pulmonary hypertension*. Thus, a POSA would understand the '212 Patent and Voswinckel JESC's dosage teachings would be readily applicable to the breath disclosure of Voswinckel JAHA. In particular, Voswinckel JAHA states "[p]atients received a TRE [inhaled treprostinil sodium] by use of the pulsed OptiNeb® ultrasound nebulizer (**3 single breaths**, TRE solution 600 µg/ml)" and further observes that "[t]olerability is excellent even at

---

[38] In addition, the '212 Patent discloses that "[i]n the case of treating peripheral vascular disease . . . [,] the dosage for inhalation . . . should be sufficient to deliver an amount that is equivalent to a daily [intravascular] infusion dose in the range of 25µg to 250mg." '212 Patent at 5:54-62; *see also id.*, Figs. 16, 18. By teaching that only 10-50% is needed for inhalation (*id.*, 8:5-12), the '212 Patent discloses that the effective dosage of inhaled treprostinil for treating peripheral vascular disease would be 2.5µg (micrograms) to 125mg (milligrams). This encompasses the full 15 to 90 micrograms claimed by the '793 Patent. Accordingly, given the fact that the '212 Patent is directed to methods of treating both pulmonary hypertension and peripheral vascular disease (*see id.*, 13:26-14:29, claims 6 and 9), a POSA would understand that an inhaled dosage of 15 to 90 micrograms of treprostinil for treatment of pulmonary hypertension would be equally possible.

**HIGHLY CONFIDENTIAL**

high drug concentrations and short inhalation times (**3 breaths**)" with "strong pulmonary selective vasodilatory efficacy with a long duration of affect following single acute dosing." *See* Voswinckel JAHA at Methods, Conclusion (emphases added). A POSA therefore would have applied the 3-breath delivery disclosure of Voswinckel JAHA to the teachings of the '212 Patent to improve patient adherence to treatment.

Accordingly, a POSA reading the '212 Patent and Voswinckel JESC and applying Voswinckel JAHA's teachings to increase patient compliance and ease of use would have thought it obvious to administer treprostinil via inhalation in 3 breaths, thereby rendering 1[d] obvious.

### b. Dependent Claims 4 and 6-8 Would Have Been Obvious

#### (1) Claim 4

| 4 | *The method of claim 1, wherein the inhalation device is a dry powder inhaler.* |
|---|---|

Claim 4 of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.4.b.(1).

#### (2) Claim 6

| 6 | *The method of claim 4, wherein the formulation is a powder.* |
|---|---|

Claim 6 of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.4.b.(2).

#### (3) Claim 7

| 7 | *The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter.* |
|---|---|

Claim 7 of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.4.b.(3).

#### (4) Claim 8

**HIGHLY CONFIDENTIAL**

| 8 | *The method of claim 1, wherein the formulation contains no metacresol.* |

Claim 8 of the '793 Patent is disclosed in the '212 Patent, as described above in Section V.A.4.b.(4).

Claim 8 is also disclosed in Voswinckel JAHA.  Voswinckel JAHA also specifically states that a "preservative free solution of inhaled TRE" was used (Voswinckel JAHA at Methods), which a POSA would understand to mean that the solution contained no metacresol, because metacresol was known in 2006 to be a preservative. '793 Patent, 15:40-41 (referring to a "metacresol preservative" in "treprostinil solution").

### c.   Motivation to Combine '212 Patent with Voswinckel JESC and Voswinckel JAHA With a Reasonable Expectation of Success

A POSA would have been motivated to combine the '212 Patent with Voswinckel JESC and Voswinckel JAHA to arrive at the claims of the '793 Patent.  All three publications are directed to solving the same problem (treatment of pulmonary hypertension) via the same means (inhaled treprostinil).  *See, e.g.,* '212 Patent at Abstract (disclosing "[a] method of delivering benzindene prostaglandins to a patient by inhalation" for the treatment of "pulmonary hypertension"); Voswinckel JESC at Background, Results (investigating "inhaled treprostinil" on patients with "idiopathic PAH"); Voswinckel JAHA (titled "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension").

A POSA starting with the '212 Patent would understand that it discloses use of inhaled treprostinil sodium (UT-15) for the treatment of pulmonary hypertension, discloses a dosage range for intravascular administration of treprostinil for the treatment of pulmonary vascular disease, and discloses that only 10-50% of the dosage delivered intravascularly would be needed via inhalation to have the same therapeutic effect.  '212 Patent at Abstract, 6:1-2 (disclosing "[a] method of delivering benzindene prostaglandins" "including UT-15" "to a patient by inhalation" for the

treatment of "pulmonary hypertension"); 5:54-62 ("daily infusion dose in the range of 25 μg to 250 mg; typically from 0.5 tg [sic] to 2.5 mg, preferably from 7 μg to 285 μg, per day per kilogram bodyweight"), 8:9-17 (the "actual amount of UT-15 delivered via aerosolization delivery" need only be "a fraction (10-50%) of the dosage delivered intravascularly").

A POSA would also understand the '212 Patent discloses experiments in sheep and explains sheep are a model of pulmonary arterial hypertension in humans. *Id*. at 9:14-27; Examples I-V and accompanying Figs. A POSA would further understand these sheep experiments were relied upon to support claims directed to treating pulmonary hypertension in mammals, which include humans, via inhaled solutions and powder formulations of treprostinil. *Id*. at claims 6, 9. Given these teachings, a POSA would have been motivated to further investigate inhaled treprostinil as a treatment for PH in humans and would have looked to the results of Voswinckel JESC and Voswinckel JAHA, which report on this very issue.

Voswinckel JESC, published after issuance of the '212 Patent, confirms the results of the '212 Patent that inhaled treprostinil is a safe and effective means for treating PH in humans. Voswinckel JESC discloses the effective administration of inhaled treprostinil for human patients with PAH via a nebulizer for 6 minutes. Voswinckel JESC at Methods. As detailed above at Section V.A.1.d, a POSA would understand Voswinckel JESC to disclose delivery of at least 16 to 64 μg of inhaled treprostinil in a single event dose to achieve this effectiveness. A POSA would have a reasonable expectation of success in combining the '212 Patent's disclosure with the dosage of Voswinckel JESC, because Voswinckel JESC's results showed that "[t]reprostinil inhalation results in significant long-lasting pulmonary vasodilatation" and that "near maximal pulmonary vasodilatation is achieved without adverse effects." *Id.* at Conclusion.

**HIGHLY CONFIDENTIAL**

Having established via the '212 Patent and Voswinckel JESC that inhaled treprostinil can be used to safely and effectively treat PH, a POSA would have been further motivated to reduce the duration of treatment to increase patient convenience and adherence—from the 6 minutes disclosed in Voswinckel JESC to 3 breaths, as disclosed in Voswinckel JAHA. As explained above, the problem of patient nonadherence to inhaled medications was well-understood, and a POSA in May 2006 would have readily appreciated reducing the number of breaths for drug delivery would increase patient adherence and, in turn, treatment outcome. *See supra*, Section V.A.2.c. A POSA would also have understood that reducing the duration of treatment would require increasing the concentration of the administered treprostinil solution, which is confirmed by Voswinckel JAHA's use of a 600 mcg/mL solution. Voswinckel JAHA at Methods.

A POSA would have a reasonable expectation of success with this combination, because Voswinckel JAHA teaches that "[t]olerability is excellent even at high drug concentrations[39] and short inhalation times (3 breaths)" with "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." *Id*. at Conclusion. Additionally, the relevant scientific literature taught safe and effective administration of high dosages of inhaled therapeutics in short durations. *See, e.g.,* Ghofrani at 298 (disclosing administration of inhaled treprostinil at a dose of "15 mcg/inhalation" and that "it is possible to increase the dosage to up to 90 mcg" and that "it is technically feasible for there to be only one to two breaths in an application."); Geller 2003 at 177 (delivery 0.45mg of drug in 3 breaths). In sum, a POSA would have expected to succeed in reducing the number of breaths when delivering 15-90 μg of inhaled

---

[39] Voswinckel JAHA's results confirm the conclusions reached in the '212 Patent that "aerosolized UT-15 can be given in high doses without significant non-lung effects, i.e., heart rate, cardiac output." '212 Patent at 10:51-57.

**HIGHLY CONFIDENTIAL**

treprostinil, due to the general state of the art regarding the safety and efficacy of such dosages of inhaled therapeutics, the known problem of patient noncompliance, and Voswinckel JAHA's explicit disclosure that administration of treprostinil was successful.

A POSA would expect Voswinckel JESC's dosage and Voswinckel JAHA's breaths to be a therapeutically effective dosing regimen for PH, and would be motivated by the '212 Patent's disclosure that "solid formulations, usually in the form of a powder" could also "be inhaled in accordance with the ['212 Patent's] invention" to create a dry powder that provided the same single event dosage as Voswinckel JESC and breath limitations of Voswinckel JAHA with a reasonable expectation of success. '212 Patent at 5:30-32, 5:37-41, claims 6, 9.

Therefore, a POSA would have been motived to and had a reasonable expectation of success in combining the teachings of the '212 Patent with the dosage of Voswinckel JESC and the breaths of Voswinckel JAHA, the combination of which renders all claims invalid, as explained below.

### 11. Claims 1, 4, and 6-8 of the '793 Patent Would Have Been Obvious Over the '212 Patent and Voswinckel JESC

The Asserted Claims of the '793 Patent would have been obvious over the '212 Patent in combination with Voswinckel JESC by May 15, 2006. A POSA would have motivated to modify the '212 Patent with Voswinckel JESC with a reasonable expectation of success as described for the relevant limitations below.

### a. Claim 1 Would Have Been Obvious

### (1) Claim Element 1[a]-[c]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|------|------|
| 1[b] | *with an inhalation device,* |

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|------|----|

Claim elements 1[a]-[b] are disclosed in the '212 Patent, as described above in Section V.A.4.a.(1)-(2).   Claim element 1[c]  is disclosed by the '212 Patent in combination with Voswinckel JESC, as described above in Section V.A.11.a.(3).

### (2)  Claim Element 1[d] is obvious via routine optimization

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|----|

Element 1[d] would have been obvious over the '212 Patent and Voswinckel JESC in view of a POSA's general knowledge in the field and/or by applying routine optimization.

A POSA reading the '212 Patent and Voswinckel JESC would have been motivated to minimize the number of breaths required for administration of treprostinil by inhalation, to increase patient compliance and convenience. *See* Chaudry 2004 at [0063] ("Reducing the amount of time to complete the treatment means individuals will be more likely to comply with the prescribed dosing regimen and achieve optimal benefit from the medication prescribed.").   In addition, by May 2006, the general state of the art had established the safety and efficacy of high dosages of inhaled therapeutics delivered over a small number of breaths.  *See, e.g.*, Geller 2005 at 177 (delivery of 0.45mg of drug in 3 breaths); Ghofrani at 298 ("[I]t is technically feasible for there to be only one to two breaths in an application."); Voswinckel JAHA at Methods (administration of 600 µg/mL treprostinil in 3 breaths); Voswinckel 2006 at 150 (administration of 15µg treprostinil in 3 breaths).  Further, claim 9 of the '212 Patent is specifically directed to an inhaled powder formulation of treprostinil, which is commonly delivered by dry powder inhalers. '212 Patent, claim 9.  Dry powder inhalers are breath-actuated as opposed to delivering doses over a set period of time.  Frijlink & De Boer at 81 ("Advantages such as the potential ability to generate

high FPFs and a relatively high lung deposition, fast and easy administration, the ability to prepare stable formulations (compared with solutions), and the fact that DPIs are breath-actuated and easily portable, justify their existence."). Therefore, a POSA would have been encouraged to and found it obvious to modify the teachings of the '212 Patent and Voswinckel JESC to deliver inhaled treprostinil in 1 to 3 breaths.

Relying on the '212 Patent and Voswinckel JESC to deliver inhaled treprostinil in 1 to 3 breaths would have amounted to mere routine optimization. *See, e.g., Genzyme Therapeutic Prods. L.P. v. Biomarin Pharm., Inc.*, 825 F.3d 1360, 1365, 1373 (Fed. Cir. 2016) (affirming decision finding dosing claims obvious when "the claimed dosing schedule would have been arrived at by routine optimization"); *see also Hoffmann-La Roche*, 748 F.3d at 1329-31 (affirming decision finding dosing claims obvious because "[a] relatively infrequent dosing schedule has long been viewed as a potential solution to the problem of patient compliance"); *see also Merck,* 395 F.3d at 1373 (reversing decision to find claims obvious that covered slightly different dosages from those of the prior art). In fact, the '212 Patent itself contemplates dose optimization as a matter of routine. '212 Patent at 6:56-7:3 ("Titration to effect may be used to determine proper dosage."), 7:25-33; *see also generally id.* at 1:10-2:64. Such titration to effect was well known in similar aerosolized prostacyclin therapy. Walmrath 1993 at 962 ("Titration of aerosolized [prostacyclin] in individual patients might be necessary to produce selective vasodilation in well-ventilated lung areas."); Hoeper at 1867-868. A POSA therefore would have understood the benzindene prostaglandin (*i.e.*, treprostinil) disclosed in the '212 Patent and Voswinckel JESC could be "delivered in 1 to 3 breaths."

### b. Dependent Claims 4 and 6-8 Would Have Been Obvious

The additional limitations of dependent claims 4 and 6-8 are disclosed in the '212 Patent, as explained above in Section V.A.4.a.(1)-(4).

### c.  Motivation to Combine the '212 Patent with Voswinckel JESC

A POSA would have been motivated to combine the '212 Patent with Voswinckel JESC, because both disclose use of the same drug (treprostinil/UT-15) for the same disease (pulmonary arterial hypertension) through the same route of administration (inhalation of solution of treprostinil).  The first four paragraphs of Section V.A.11.c. explain why a POSA would have been motivated to combine these references with a reasonable expectation of success.

### 12.  Claim 1 of the '793 Patent is Anticipated by Ghofrani

Asserted Claim 1 of the '793 Patent was anticipated by Ghofrani by May 15, 2006 as described for the relevant limitations below.

### a.  Claim 1 is Anticipated by Ghofrani

#### (1)  Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|---|---|

Element 1[a] is disclosed by Ghofrani, which teaches the recited method of treating pulmonary hypertension.  Ghofrani, in relevant part, discloses the efficacy of "inhaled treprostinil" for 17 patients with "pulmonary hypertension" at a dosage of "15mcg/inhalation" for total dosage of "up to 90mcg . . . without adverse effects occurring."  Ghofrani at 298.  Ghofrani further discloses that "initial data shows that it is technically feasible for there to be only one to two breaths in an application."  *Id.*

#### (2)  Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|---|---|

Element 1[b] is disclosed by Ghofrani, which states patients were administered "inhaled treprostinil," which would require an inhalation device.  Ghofrani at 298.  Ghofrani further

discloses that "it is possible to reduce the number [of] inhalations necessary to up to four per day; the inhalation period can be reduced to <1min. by selecting **a suitable device**." *Id*.  A POSA as of May 2006 would have readily understood such a "suitable device" to be an inhalation device.

### (3)   Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 microgram to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|------|------|

Ghofrani discloses a study in which patients "were administered [a single event dose of] inhaled treprostinil (15 mcg[40]/inhalation)."  Ghofrani at 298.  That dose "led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of >180 min." *Id*.  Ghofrani further discloses "it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring." *Id.*  Ghofrani thus discloses a per inhalation exercise (i.e., single event dose) that covers the claimed dosage range.

### (4)   Claim Element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|------|

Ghofrani discloses that "it is technically feasible for there to be only one to two breaths in an application" of the claimed dosage, disclosing element 1[d] to a POSA.  Ghofrani at 298.

### 13.   Claims 1 and 8 of the '793 Patent Would Have Been Obvious Over Voswinckel JAHA and Ghofrani

Asserted Claims 1 and 8 of the '793 Patent would have been obvious over the '212 Patent in combination with Voswinckel JAHA and Ghofrani by May 15, 2006.  A POSA would have been motivated to modify Voswinckel JAHA with Ghofrani with a reasonable expectation of success as described for the relevant limitations below.

---

[40] A POSA would have understood that "mcg" and "μg" refer to micrograms.

**HIGHLY CONFIDENTIAL**

### a.     Claim 1 Would Have Been Obvious

#### (1)     Claim Element 1[a]

| 1[a] | *A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof* |
|------|---|

Element 1[a] is disclosed by Voswinckel JAHA, which teaches the recited method of treating pulmonary hypertension.  Voswinckel JAHA describes treating "17 patients with severe pulmonary hypertension" with "Inhaled Treprostinil Sodium (TRE)."  Voswinckel JAHA at Title, Methods.  Voswinckel JAHA also describes a single event dose of "3 single breaths" of "TRE solution 600 µg/ml" having "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing."  *Id.* at Methods, Conclusion.

Ghofrani also discloses element 1[a], as described above in Section V.A.13.a.(1).

#### (2)     Claim Element 1[b]

| 1[b] | *with an inhalation device,* |
|------|---|

Element 1[b] is disclosed by Voswinckel JAHA, which expressly discloses "inhaled TRE" through the "use of the pulsed OptiNeb® ultrasound nebulizer."  Voswinckel JAHA at Methods. A POSA as of May 2006 would have readily understood that this nebulizer is an inhalation device.

Ghofrani also discloses element 1[b], as described above in Section V.A.13.a.(2).

#### (3)     Claim Element 1[c]

| 1[c] | *wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof* |
|------|---|

Element 1[c] would have been obvious over Voswinckel JAHA in combination with Ghofrani.  Because Voswinckel does not expressly provide the total dose administered in its single

event dose, a POSA would have looked to Ghofrani to fill in the optimal single event dosing range, since "both references disclose that inhaled administration of treprostinil at these doses in 1-3 breaths was an effective treatment for pulmonary hypertension."  In Ghofrani, patients "were administered inhaled treprostinil (15 mcg/inhalation)."  Ghofrani at 298.  Ghofrani further discloses that "it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring."  *Id.*  Ghofrani further discloses that "it is technically feasible for there to be only one to two breaths in an application."  *Id.*  Thus, a POSA would have understood that Ghofrani was disclosing a 15 to 90 µg single event dose—the entire claimed range—in the same 1-3 breath range as Voswinckel JAHA.  A POSA administering treprostinil in accordance with the teachings of Voswinckel JAHA would have been motivated to use the range of doses disclosed by Ghofrani because such doses "led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min . . . without adverse effects occurring," i.e., a POSA would understand that this dose was therapeutically effective and safe.  Ghofrani at 298.

### (4)     Claim Element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |
|------|-------------------------------|

Element 1[d] is disclosed by Voswinckel JAHA, which discloses treating patients with a single event dose of "3 single breaths."  Voswinckel JAHA at Methods.  Ghofrani further discloses that "it is technically feasible for there to be only one to two breaths in an application" of the claimed dosage.  Ghofrani at 298.  Thus, both Voswinckel JAHA and Ghofrani disclose element 1[d].

### b.     Dependent Claim 8 Would Have Been Obvious

### (1)     Claim 8

**HIGHLY CONFIDENTIAL**

| 8 | *The method of claim 1, wherein the formulation contains no metacresol.* |
|---|---|

The limitation of claim 8 is disclosed by Voswinckel JAHA, which states that a "preservative free solution of inhaled TRE" was used (Voswinckel JAHA at Methods), which a POSA would understand to mean that the solution contained no metacresol, because metacresol was known in 2006 to be a preservative. *See* '793 Patent at 15:40-41 (referring to a "metacresol preservative" in "treprostinil solution").

### c. Motivation to Combine Voswinckel JAHA and Ghofrani with a Reasonable Expectation of Success

The Patent Trial and Appeal Board has found that "Voswinckel [2004] references a 17 patient study that appears to be the same as the 17 patent study discussed in the relevant portions of Ghofrani." *Watson Labs., Inc. v. United Therapeutics Corp.*, IPR2017-01621, Paper 10 at 14 (P.T.A.B. Jan. 11, 2018). A POSA would have expected the disclosures of Ghofrani to apply to Voswinckel JAHA.

Even if not the same study, every author of Ghofrani is also an author of Voswinckel JAHA, motivating a POSA to look at Ghofrani for additional details after reviewing the Voswinckel JAHA Abstract. *Compare* Ghofrani, *with* Voswinckel JAHA. Since Voswinckel JAHA does not expressly provide the total dose administered in its single event dose of 1 to 3 breaths, a POSA would have been motivated to look to Ghofrani for the optimal dosing range in Voswinckel JAHA's breath range. Ghofrani discloses a study in which patients "were administered inhaled treprostinil (15 mcg/inhalation)," teaches that "it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring," and discloses that "it is technically feasible for there to be only one to two breaths in an application" with these dose ranges. Ghofrani at 298. Thus, a POSA would have been motivated to combine Voswinckel JAHA with the 15-90 mcg dosage disclosure of Ghofrani.

A POSA would have had a reasonable expectation of success in combining the two, because both references teach successful safety and efficacy of inhaled treprostinil at their respective breath and dosage levels. Voswinckel JAHA teaches that its "inhalation resulted in a sustained, highly pulmonary selective vasodilatation over 120 minutes," showing "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing" with "[n]o side effects." Voswinckel JAHA at Results, Conclusion. Ghofrani teaches that its dosing "led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of >180 min . . . without adverse effects occurring." Ghofrani at 298.

### B.     Claims 1, 4, and 6-8 Are Invalid Under 35 U.S.C. § 112

Claims 1, 4, and 6-8 of the '793 Patent are invalid under 35 U.S.C. § 112 for lack of written description support and lack of enablement. To the extent UTC contends that claims 1, 4, and 6-8 of the '793 Patent are not obvious, the asserted claims of the '793 patent are invalid under 35 U.S.C. § 112 for the reasons stated below. The legal standards for written description and enablement under § 112 are set forth above in Section II.C.

#### 1.     Claims 1, 4, and 6-8 Lack Written Description Support

##### a.     The Limitation Reciting "15 micrograms to 90 micrograms . . . delivered in 1 to 3 breaths" in Claims 1, 4, and 6-8 Lacks Written Description Support

Independent claim 1 of the '793 Patent requires administering "from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths." '793 Patent, claim 1. Claims 4 and 6-7 depend from claim 1 and further recite, respectively, "wherein the inhalation device is a dry powder inhaler," "wherein the formulation is a powder," and "wherein the powder comprises particles less than 5 micrometers in diameter." *Id.* at claims 4, 6-7. As such, claim 1 and claim 8, which depends from claim 1, must be construed broadly enough to include the use of a dry powder formulation and DPI delivering 15 to 90

**HIGHLY CONFIDENTIAL**

micrograms.  However, the specification of the '793 Patent contains only a single statement regarding dry powder formulations and dry powder inhalers.  *Id.* at 7:22-26 ("The inhalation device can also be a dry powder inhaler.  In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.").

During prosecution of a related patent, U.S. Patent No. 9,358,240 ("the '240 Patent"), UTC filed a declaration of Dr. Edmund J. Elder, Jr., to overcome the Examiner's prior art rejections. '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr.  In his declaration, Dr. Elder noted that delivery of the drug through a "single event," as claimed here by the '793 Patent, depends upon a number of factors associated with the nebulizer, including "fill volume" and "dead volume," which are in turn used to calculate the "delivered volume."  *Id.* at ¶¶ 8, 11-12.  However, all of the doses and examples disclosed in the '793 Patent are directed to aerosolized solutions—not dry powder formulations.  *See* '793 Patent, 8:56-18:11.  Moreover, the discussion of the doses needed and concentrations of treprostinil are in the context of metered dose inhalers, which utilize solutions rather than dry powder formulations.  *See, e.g.,* '793 Patent, 7:45-53.  The '793 Patent does not disclose the dosage amount of powder formulation needed for administration via a dry powder inhaler—much less any experimental data to support the claim language reciting "dry powder inhaler" and "powder" formulations.  In fact, the specification is lacking any details or guidance as to the dosage amount or number of breaths required to treat pulmonary hypertension using a powder formulation administered with a dry powder inhaler, as claimed.

Accordingly, a POSA reading the specification of the '793 Patent would conclude that the inventors were not in possession of a method of treatment using a dry powder inhaler to deliver a

**HIGHLY CONFIDENTIAL**

powder formulation at the claimed dosage amount of 15-90 micrograms delivered in 1 to 3 breaths. The specification's sole generic disclosure regarding dry powder formulations and dry powder inhalers is not sufficient to allow a POSA to recognize that the inventor actually invented what is claimed, particularly in light of Dr. Elder's testimony during prosecution of a related patent.  The '793 Patent fails to describe what the dry powder formulation is, much less how to formulate treprostinil into a dry powder.  The specification is completely lacking in working examples of delivering 15-90 micrograms of powder treprostinil in 1 to 3 breaths using a dry powder inhaler. In fact, to our knowledge, Liquidia's LIQ861 product "will be the first-to-market inhaled dry powder treprostinil that can be delivered using a convenient, palm-sized, disposable DPI."  *See* D.I. 31-1 (Exhibits to UTC's Motion to Dismiss Counterclaims) at 32.  Thus, claims 1, 4, and 6-8 are invalid for lack of written description.

### b. The Limitations Reciting "Powder" in Claims 1, 4, and 6-8 Lack Written Description Support

As noted, claims 4 and 6-7 of the '793 Patent recite, respectively, "wherein the inhalation device is a dry powder inhaler," "wherein the formulation is a powder," and "wherein the powder comprises particles less than 5 micrometers in diameter."  '793 Patent, claims 4, 6-7.  Claims 4 and 6-8 ultimately depend from claim 1.  Accordingly, claims 1 and 8 must be construed to include the use of a powder formulation and DPI.  However, the specification of the '793 Patent contains only a single statement regarding dry powder formulations and dry powder inhalers.  *Id.* at 7:22-26 ("The inhalation device can also be a dry powder inhaler.  In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.").  This bare disclosure is not sufficient to convey to a POSA that the inventors were in possession of a method of treatment using a dry powder inhaler to deliver a powder formulation, particularly in light of Dr. Elder's

testimony described above.  Indeed, the '793 Patent fails to describe what the dry powder formulation is, much less how to formulate treprostinil into a dry powder.  The specification is completely lacking in working examples of delivering powder treprostinil using a dry powder inhaler.  In fact, to our knowledge, Liquidia's LIQ861 product "will be the first-to-market inhaled dry powder treprostinil that can be delivered using a convenient, palm-sized, disposable DPI."  *See* D.I. 31-1 (Exhibits to UTC's Motion to Dismiss Counterclaims) at 32.  Thus, claims 1, 4, and 6-8 are invalid for lack of written description.

### c.    The Limitation Reciting "Method of Treating Pulmonary Hypertension" Lacks Written Description Support

Claim 1 recites a "method of treating pulmonary hypertension."  '793 Patent, claim 1. Claims 4 and 6-8 ultimately depend from claim 1.  Accordingly, claims 4 and 6-8 must be construed to include a method of treating pulmonary hypertension.  It was well-known by May 15, 2006 that the broad genus of "pulmonary hypertension" includes multiple different disorders, including but not limited to idiopathic pulmonary arterial hypertension, familial pulmonary arterial hypertension, pulmonary capillary hemangiomatosis, pulmonary venous hypertension, and pulmonary veno-occlusive disease.  G. Simonneau, et al., *Clinical Classification of Pulmonary Hypertension*, 43 J.AM. COLL. CARDIOL 5S (2004) ("Simonneau"); *see also* 9-15-2021 Deposition Transcript of Lewis Rubin.  The specification of the '793 Patent provides no evidence that the claimed method of treatment would treat the *full scope* of the broad genus of pulmonary hypertension.  Rough Deposition Transcript of Lewis Rubin (Sept. 15, 2021) ("Rough Rubin Dep. Tr.") at 36:14-37:3 (drugs do not work for both PAH and PVH).  This bare disclosure is insufficient to demonstrate to a POSA in May 15, 2006 that the inventors possessed a method of treating the entire scope of pulmonary hypertension.  Thus, claims 1, 4, and 6-8 are invalid for lack of written description.

2.      **Claims 1, 4, and 6-8 Are Not Enabled**

a.      **The Limitation Reciting "15 micrograms to 90 micrograms . . . delivered in 1 to 3 breaths" Is Not Enabled as to Claims 1, 4, and 6-8**

Independent claim 1 of the '793 Patent requires administering "from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths." '793 Patent, claim 1.  Claims 4 and 6-8 depend from claim 1 and further recite, respectively, "wherein the inhalation device is a dry powder inhaler," "wherein the formulation is a powder," "wherein the powder comprises particles less than 5 micrometers in diameter," and "wherein the formulation contains no metacresol."  *Id.* at claims 4, 6-8.  As such, claim 1 must be construed broadly enough to include the use of a dry powder formulation and DPI delivering 15 to 90 micrograms.  However, as noted above, the specification of the '793 Patent contains only a single statement regarding dry powder formulations and dry powder inhalers.  *Id.* at 7:22-26 ("The inhalation device can also be a dry powder inhaler.  In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.").  Further, the '793 Patent fails to describe what the dry powder formulation is, much less how to formulate treprostinil into a dry powder.  The specification is completely lacking in working examples of delivering 15-90 micrograms of powder treprostinil in 1 to 3 breaths using a dry powder inhaler.  In fact, to our knowledge, Liquidia's LIQ861 product "will be the first-to-market inhaled dry powder treprostinil that can be delivered using a convenient, palm-sized, disposable DPI."  *See* D.I. 31-1 (Exhibits to UTC's Motion to Dismiss Counterclaims) at 32.

During prosecution of a related patent, U.S. Patent No. 9,358,240 ("the '240 Patent"), UTC filed a declaration of Dr. Edmund J. Elder, Jr., to overcome the Examiner's prior art rejections. '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr.  In

**HIGHLY CONFIDENTIAL**

his declaration, Dr. Elder noted that delivery of the drug through a "single event," as claimed here by the '793 Patent, depends upon a number of factors associated with the nebulizer, including "fill volume" and "dead volume," which are in turn used to calculate the "delivered volume." *Id.* at ¶¶ 8, 11-12.  However, all of the doses and examples disclosed in the '793 Patent are directed to aerosolized solutions—not dry powder formulations. *See* '793 Patent, 8:56-18:11.  Moreover, the discussion of the doses needed and concentrations of treprostinil are in the context of metered dose inhalers, which utilize solutions rather than dry powder formulations. *See, e.g.,* '793 Patent, 7:45-53.  The '793 Patent does not disclose the dosage amount of powder formulation needed for administration via a dry powder inhaler.  The '793 Patent does not disclose the dosage amount of powder formulation needed for administration via a dry powder inhaler—much less any experimental data to support the claim language reciting "dry powder inhaler" and "powder" formulations.  In fact, the specification is lacking any details or guidance as to the dosage amount or number of breaths required to treat pulmonary hypertension using a powder formulation administered with a dry powder inhaler, as claimed.

Accordingly, claims 1, 4, and 6-8 of the '793 Patent are not enabled because the specification does not provide sufficient guidance as to the concentration and amount of treprostinil powder formulation that would be needed to obtain a dose of 15-90 micrograms in 1-3 breaths, as claimed.  Instead, a POSA would be required to undergo undue experimentation to practice the invention recited in claims 1, 4, and 6-8 of the '793 Patent.

Applying the eight *Wands* factors in sequential order, and taking into account UTC's prior representations to the Patent Office through the testimony of Dr. Elder, the specification of the '793 Patent would not enable a POSA to treat patients with pulmonary hypertension by

administering 15-90 micrograms of powder formulation of treprostinil in 1 to 3 breaths using a dry powder inhaler.

| *Wands* Factor | Application to Claims 1, 4, and 6-8 of the '793 Patent |
|---|---|
| Quantity of Experimentation Necessary | Guided by just one generic disclosure relating to dry powder inhalers and powder formulations (and no disclosure regarding the corresponding dosage amount and number of breaths), a POSA would have to engage in significant amounts of experimentation to discern the dosage amount and number of breaths required to administer a powder formulation of treprostinil with a dry powder inhaler for the treatment of pulmonary hypertension.  For example, a POSA would have to conduct extensive experimentation to determine the "fill volume," "dead volume," and "delivered volume" required to deliver an effective amount of powder treprostinil by inhalation.  *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶¶ 8, 11-12. |
| Amount of Guidance or Direction Presented | As discussed above, the specification provides only one vague disclosure relating to dry powder inhalers and powder formulations. The specification is completely silent as to the dosage amount or number of breaths required to treat pulmonary hypertension using these claimed powder formulations administered by dry powder inhalers.  The amount of guidance is therefore non-existent. |
| Presence or Absence of Working Examples | Besides the brief disclosure that "[t]he inhalation device can also be a dry powder inhaler" where treprostinil is "usually in the form of a powder" ('793 Patent, 7:22-26), the specification is completely lacking in working examples of delivering 15-90 micrograms of powder treprostinil in 1 to 3 breaths using a dry powder inhaler. |
| Nature of the Invention | During prosecution of a related patent, UTC noted that drug delivery through a "single event," as claimed here by the '793 Patent, depends upon a number of factors associated with the nebulizer, including "fill volume" and "dead volume," which are in turn used to calculate the "delivered volume."  *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶¶ 8, 11-12.  Accordingly, to the extent UTC argues that claims 4 and 6-8 would have been nonobvious, the nature of the invention was one of great uncertainty. |
| State of the Prior Art | According to UTC, the prior art reference Chaudry 2004 "does little to provide guidance to one of skill in the art if attempting to determine a 'single event dose' for the treprostinil formulation," as |

| | |
|---|---|
| | claimed by the '793 Patent.  *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶ 10. "Instead, Chaudry provides a variety of possible permutations and combinations of variables, leaving one of ordinary skill in the art with no starting point from which to determine who to achieve a specific outcome."  *Id.* at ¶ 26.  To the extent UTC argues that claims 1, 4, and 6-8 would have been nonobvious, without guidance as to the multiple "[i]mportant factors influencing the total dose delivered to a patient's airways" (in UTC's own words), the state of the prior art was very limited.  *See id.* at ¶ 11. |
| Relative Skill of Those in the Art | Given the medical subject matter of the Asserted Claims, the level of skill of those in the art would be relatively high. |
| Predictability or Unpredictability of the Art | During prosecution of a related patent, UTC highlighted the unpredictable nature of determining dosage amounts for drugs delivered by inhalation.  *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶¶ 8, 11-12 (identifying multiple factors affecting drug delivery via nebulizer, including "fill volume" and "dead volume," which are in turn used to calculate "delivered volume").  Accordingly, to the extent UTC argues that claims 1, 4, and 6- would have been nonobvious, the art was highly unpredictable. |
| Breadth of the Claims | Claims 1, 4, and 6-8 are extremely broad, as the claimed dosage range of 15 to 90 micrograms is very wide, and the claims provide no details regarding how much treprostinil in the form of a powder is required to treat pulmonary hypertension. |

Applying all eight *Wands* factors, the '793 Patent fails to enable a person of ordinary skill in the art to practice claims 1, 4, and 6-8.  Thus, claims 1, 4, and 6-8 are invalid for lack of enablement.

### b.    Claims 1, 4, and 6-8 Are Not Enabled With Respect to Powder Formulations of Treprostinil for Use In Treating Pulmonary Hypertension

As noted, claims 4 and 6-8 of the '793 Patent recite, respectively, "wherein the inhalation device is a dry powder inhaler," "wherein the formulation is a powder," and "wherein the powder comprises particles less than 5 micrometers in diameter."  '793 Patent, claims 4, 6-8.  Claims 4

and 6-8 ultimately depend from claim 1.  Accordingly, claims 1 and 8 must be construed to include the use of a powder formulation and DPI.  The '793 patent provides no example or guidance regarding the formulation of any dry powder formulation of treprostinil, let alone a dry powder formulation of treprostinil that would treat pulmonary hypertension.  The specification of the '793 Patent contains only a single statement regarding dry powder formulations and dry powder inhalers.  *Id.* at 7:22-26 ("The inhalation device can also be a dry powder inhaler.  In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.").  This bare disclosure is not sufficient to enable a POSA to practice claims 1, 4, and 6-8, which require a "powder" formulation of treprostinil, particularly in light of Dr. Elder's testimony described above.  Further, the '793 Patent fails to describe what the dry powder formulation is, much less how to formulate treprostinil into a dry powder.  The specification is completely lacking in working examples of delivering powder treprostinil using a dry powder inhaler.  In fact, to our knowledge, Liquidia's LIQ861 product "will be the first-to-market inhaled dry powder treprostinil that can be delivered using a convenient, palm-sized, disposable DPI."  *See* D.I. 31-1 (Exhibits to UTC's Motion to Dismiss Counterclaims) at 32.  Dr. Rubin testified that administration of nebulized solutions is "completely different" than administration of powder formulations via DPI.  Rough Rubin Dep. Tr. at 96:2-97:2.  Success with a nebulized solution of treprostinil does not provide sufficient information that a POSA would be able to develop and administer a dry powder formulation with a DPI without undue experimentation.  Dr. Rubin also testified that as of the priority date, POSAs understood that treprostinil was a very potent drug, and precise dosing of treprostinil through the inhalation route was required.  *Id*. at 98:13-100:6.  However, as of the

priority date, Dr. Rubin testified that DPIs could not administer doses in the precise amounts that would result in safe and therapeutically effective treatment of pulmonary hypertension.  *Id*.

Accordingly, claims 1, 4, and 6-8 of the '793 Patent are not enabled because the specification does not provide sufficient guidance regarding how to treat pulmonary hypertension with the claimed powder formulation and/or using a dry powder inhaler.  Instead, a POSA would be required to undergo undue experimentation to practice the invention recited in claims 1, 4, and 6-8 of the '793 Patent.

Applying the eight *Wands* factors in sequential order, and taking into account UTC's prior representations to the Patent Office through the testimony of Dr. Elder, the specification of the '793 Patent would not enable a POSA to treat patients with pulmonary hypertension by administering a powder formulation of treprostinil using a dry powder inhaler.

| *Wands* Factor | Application to Claims 1, 4, and 6-8 of the '793 Patent |
|---|---|
| Quantity of Experimentation Necessary | Guided by just one generic disclosure, a POSA would have to engage in significant amounts of experimentation to formulate the claimed powder formulation for the treatment of pulmonary hypertension using a dry powder inhaler.  For example, a POSA would have to conduct extensive experimentation to determine the "fill volume," "dead volume," and "delivered volume" required to deliver an effective amount of powder treprostinil by inhalation.  *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶¶ 8, 11-12. |
| Amount of Guidance or Direction Presented | As discussed above, the specification provides only one vague disclosure relating to dry powder inhalers and powder formulations.  The amount of guidance is therefore minimal at best. |
| Presence or Absence of Working Examples | Besides the brief disclosure that "[t]he inhalation device can also be a dry powder inhaler" where treprostinil is "usually in the form of a powder" ('793 Patent, 7:22-26), the specification is completely lacking in working examples of delivering powder treprostinil using a dry powder inhaler. |
| Nature of the Invention | During prosecution of a related patent, UTC noted that drug delivery through a "single event," as claimed here by the '793 |

|  | Patent, depends upon a number of factors associated with the nebulizer, including "fill volume" and "dead volume," which are in turn used to calculate the "delivered volume." *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶¶ 8, 11-12. Accordingly, to the extent UTC argues that claims 4 and 6-8 would have been nonobvious, the nature of the invention was one of great uncertainty. |
|---|---|
| State of the Prior Art | According to UTC, the prior art reference Chaudry 2004 "does little to provide guidance to one of skill in the art if attempting to determine a 'single event dose' for the treprostinil formulation," as claimed by the '793 Patent. *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶ 10. "Instead, Chaudry provides a variety of possible permutations and combinations of variables, leaving one of ordinary skill in the art with no starting point from which to determine who to achieve a specific outcome." *Id.* at ¶ 26. To the extent UTC argues that claims 1, 4, and 6-8 would have been nonobvious, without guidance as to the multiple "[i]mportant factors influencing the total dose delivered to a patient's airways" (in UTC's own words), the state of the prior art was very limited. *See id.* at ¶ 11. |
| Relative Skill of Those in the Art | Given the medical subject matter of the Asserted Claims, the level of skill of those in the art would be relatively high. |
| Predictability or Unpredictability of the Art | During prosecution of a related patent, UTC highlighted the unpredictable nature of determining dosage amounts for drugs delivered by inhalation. *See* '240 File History, 02/02/2016 Declaration under 37 C.F.R. § 1.132 of Dr. Edmund J. Elder, Jr., at ¶¶ 8, 11-12 (identifying multiple factors affecting drug delivery via nebulizer, including "fill volume" and "dead volume," which are in turn used to calculate "delivered volume"). Accordingly, to the extent UTC argues that claims 1, 4, and 6-8 would have been nonobvious, the art was highly unpredictable. |
| Breadth of the Claims | Claims 1, 4, and 6-8 are extremely broad, as they provide no details regarding how much treprostinil in the form of a powder is required to treat pulmonary hypertension. |

Applying all eight *Wands* factors, the '793 Patent fails to enable a person of ordinary skill in the art to practice claims 1, 4, and 6-8. Thus, claims 4 and 6-8 are invalid for lack of enablement.

     **c.**     **The Limitation Reciting "Method of Treating Pulmonary Hypertension" in Claims 1, 4, and 6-8 Is Not Enabled**

**HIGHLY CONFIDENTIAL**

Claim 1 recites a "method of treating pulmonary hypertension." '793 Patent, claim 1. Claims 4 and 6-8 ultimately depend from claim 1. Accordingly, claims 4 and 6-8 must be construed to include a method of treating pulmonary hypertension.

It was well-known by May 15, 2006 that the broad genus of "pulmonary hypertension" includes multiple different disorders, including but not limited to pulmonary arterial hypertension, pulmonary hypertension due to left heart disease, pulmonary venous hypertension, pulmonary hypertension caused by chronic lung diseases, chronic thromboembolic pulmonary hypertension, and pulmonary hypertension causes by other disorders (e.g., sickle cell disease). Gerald Simonneau et al., *Clinical Classification of Pulmonary Hypertension*, 43 J.AM. COLL. CARDIOL 5S (2004) ("Simonneau"); *see also* Rough Rubin Tr at 33:9-39:5. The specification of the '793 Patent provides no guidance for using the claimed method to treat the *full scope* of the broad genus of pulmonary hypertension. Rough Rubin Dep. Tr. at 36:14-37:3 (drugs do not work for both PAH and PVH). The specification of the '793 Patent provides no disclosure how to treat all conditions encompassed by pulmonary hypertension using the claimed method of treatment. Without more, a POSA would not be capable of treating all conditions encompassed by pulmonary hypertension without undue experimentation. Thus, claims 1, 4, and 6-8 are invalid for lack of enablement.

Applying the eight *Wands* factors in sequential order, the specification of the '793 Patent would not enable a POSA to treat the broad genus of pulmonary hypertension with inhaled treprostinil.

| *Wands* Factor | Application to Claims 1, 4, and 6-8 of the '793 Patent |
|---|---|
| Quantity of Experimentation Necessary | To the extent UTC argues a method of treating pulmonary hypertension using inhaled treprostinil is non-obvious, achieving a method of treating the numerous disorders encompassed by pulmonary hypertension using inhaled treprostinil, would require an exorbitant amount of effort, entailing significant amounts of |

| | time-consuming and expensive preclinical and clinical studies evaluating different formulations and doses. |
|---|---|
| Amount of Guidance or Direction Presented | The '793 patent provides no guidance, or even a list of, the numerous disorders encompassed by pulmonary hypertension. There is no guidance or direction as to treating the numerous disorders with inhaled treprostinil. |
| Presence or Absence of Working Examples | The '793 patent only provides an examples of "patients with moderate to severe precapillary pulmonary hypertension," and otherwise only generally references "pulmonary hypertension." Working examples of other types of pulmonary hypertension are absent. |
| Nature of the Invention | Inventor and UTC 30(b)(6) witness Dr. Rubin testified that the same drugs do not work for two forms of pulmonary hypertension: PAH and PVH. Rough Rubin Dep. Tr. at 36:14-37:3. Given that different forms of pulmonary hypertension require different drugs (and dosages to be therapeutically effective), the nature of the invention was one of great uncertainty. |
| State of the Prior Art | To the extent UTC argues that claims 1, 4, and 6-8 would have been nonobvious, the prior art does not provide guidance on use of inhaled treprostinil to treat the numerous disorders encompassed by pulmonary hypertension. The prior art identifies multiple disorders encompassed by the terms "pulmonary hypertension" and POSAs knew that drug treatments varied between the disorder. Thus the prior art establishes the level of uncertainty and quantity of experimentation needed to enable treatment of a particular type of pulmonary hypertension. |
| Relative Skill of Those in the Art | Given the medical subject matter of the Asserted Claims, the level of skill of those in the art would be relatively high. |
| Predictability or Unpredictability of the Art | Inventor and UTC 30(b)(6) witness Dr. Rubin testified that the same drugs do not work for two forms of pulmonary hypertension: PAH and PVH. Rough Rubin Dep. Tr. at 36:14-37:3. There are large enough differences between the numerous disorders encompassed by pulmonary hypertension, that the same drugs (much less dosage of a drug) do not work on all of them. Accordingly, to the extent UTC argues that claims 1, 4, and 6-8 would have been nonobvious, the art was highly unpredictable. |
| Breadth of the Claims | Claims 1, 4, and 6-8 are extremely broad, as they provide no details regarding whether and how much inhaled treprostinil is needed to treat the genus of disorders encompassed by "pulmonary hypertension." |

Applying all eight *Wands* factors, the '793 Patent fails to enable a person of ordinary skill in the art to practice claims 1, 4, and 6-8 without undue experimentation.  Thus, claims 4 and 6-8 are invalid for lack of enablement.

## VI.   UTC'S ALLEGED EVIDENCE OF SECONDARY CONSIDERATIONS IS UNAVAILING

### A.   The '066 and '901 Patents Do Not Claim Unexpected Results

UTC argues vaguely that the claimed inventions of the '066 and '901 Patents exhibit unexpected results without identifying any evidence in support of its claim.  *See* UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 24-25.  To be considered evidence of non-obviousness, "unexpected results must be established by factual evidence."  *In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997).  "Mere argument or conclusory statements" by the patentee "does not suffice."  *Id.* (quoting *In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1994)).  In other words, "naked attorney argument is insufficient to establish unexpected results."  *Id.* at 1471 (internal quotation marks, citations omitted).  UTC's allegations of unexpected results are just that, and, thus, UTC's presentation "does not suffice."  *Id.* at 1470.

First, UTC contends that "the claimed inventions of the '066 and '901 Patents unexpectedly result in a highly pure final material" and "allow the 'crude treprostinil salts [to] be stored as raw material at ambient temperature.'"  UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 24-25.  Besides quoting the shared specification of the '066 and '901 Patents generally, however, UTC provides no factual evidence supporting its claim that treprostinil products made according to the claimed inventions possess any "unexpectedly superior" characteristics.  For instance, with respect to storage, UTC only points to a single unsupported

sentence from the shared specification.  *Id.* at 24-25 (quoting '066 Patent at 17:29-40) ("[T]he claimed inventions of the '066 and '901 Patent allow the 'crude treprostinil salts [to] be stored as raw material at ambient temperature,' which thereafter may be converted to a final treprostinil API through acidification with dilute hydrochloric acid.").   There is no data, however, supporting this allegation, let alone evidence suggesting that a salt form of treprostinil would not be stable at ambient temperature.

With respect to purity, UTC disregards the fact that neither the claims of the '066 or '901 Patents specify a percentage purity, and, moreover, the asserted claims of the '901 Patent specifically include impurities resulting from the recited process steps. Pinal Dep. Tr. at 54:11-14 ("Q. And claim 1 requires impurities in that pharmaceutical batch, correct?  A. Among the other things, impurities, correct.").  Further, there is no data to support UTC's allegation that the claimed inventions of the '066 and '901 Patents exhibit unexpectedly superior purity compared to prior art processes.  UTC has made no showing that, in Example 6, there is any material difference between the "approximately 99.0%" "Purity" of the "Former Process" and the "99.9%" "Purity" of the "Process According to the Present Invention."  Indeed, UTC made the same arguments during the '393 IPR, and the PTAB specifically rejected them.  *SteadyMed*, IPR2016-00006, Paper 32 at 49 ("[A] person of skill in the art would not have expected the results of the '393 patent to be so successful at reducing the levels of so many impurities."); *SteadyMed*, IPR2016-00006, Paper 82 at 64 ("[W]e note that UTC's contentions regarding unexpected results are predicated on UTC's claim that treprostinil made according to the process described in the '393 patent has fewer impurities than treprostinil produced by other methods.  However, as explained in Parts II.C.2.b, II.D.2.e, and II.E.3.d., the present record does not support that contention.").   Further, ████

████████████████████████████████████████████████████████████████



Because UTC has failed to provide any factual evidence supporting its claim that treprostinil products according to the claimed inventions produce an "unexpectedly superior product," this allegation of unexpected results fails. *See Geisler*, 116 F.3d at 1470.

Second, UTC contends that the claimed processes provide unexpected "production efficiencies" such as synthesizing "treprostinil salts . . . from the solution of treprostinil without isolation" and without "cumbersome and time-consuming purification processes." UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 25. To begin with, and although Liquidia disagrees with UTC's constructions, UTC contends in its claim construction briefing that the Asserted Claims permit isolation and purification steps after alkylation and before salt formation. Plaintiff United Therapeutics Corporation's Opening Claim Construction Brief with Respect to U.S. Patent Nos. 9,593,066 and 9,604,901, *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-cv-755, at 4-8, 13-17 (D. Del. Feb. 5, 2021) ("UTC's Opening Claim Construction Brief"). Thus, if UTC is correct, these alleged "production efficiencies" are not "commensurate in scope" with the Asserted Claims and do not support allegations of objective

**HIGHLY CONFIDENTIAL**

indicia.[41]  *Therasense, Inc. v. Becton, Dickinson, and Co.*, 593 F.3d 1325, 1336 (Fed. Cir. 2010) (citation omitted).  Further, for the reasons stated above in Section III.C.2.c, a POSA would have been motivated to eliminate the intermediate isolation step with a reasonable expectation of success.  Because a POSA would have a reasonable expectation of success in eliminating the isolation step, any alleged efficiencies gained by the claimed processes are far from unexpected.  During the '393 IPR, the PTAB similarly rejected alleged evidence of "Process Advantages" in the context of unexpected results.  *SteadyMed*, IPR2016-00006, Paper 82 at 66-67.  Thus, this allegation of unexpected results similarly fails.

Lastly, UTC contends that the claimed processes provide the unexpected result of "commercial-scale production of treprostinil for use as an active ingredient in a pharmaceutical composition or pharmaceutical product."  UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 25.  However, as explained in further detail in Liquidia's Answering Claim Construction Brief and during the '901 IPR, neither the '066 nor '901 Patents are directed towards "large-scale" or "commercial-scale" production.  *See* Liquidia's Answering Claim Construction Brief at 1-3; *Liquidia*, IPR2020-007700, Paper 15 at 8-9.  The '901 Patent covers as low as 2.9-gram quantities.  The PTAB similarly confirmed during the '393 IPR that "the challenged claims are not directed to an efficient, cost-effective, or commercial scale synthesis."  *SteadyMed*, IPR2016-00006, Paper 82 at 63.  Further, the Court did not adopt UTC's proposed constructions that read in commercial or large-scale production limitations into the asserted claims.  Accordingly, this unexpected result alleged by UTC also fails.

---

[41] UTC's allegations of secondary considerations are in direct conflict with positions UTC has taken before the Court with respect to its proposed construction of the Asserted Claims.  Indeed, UTC has alleged that the claims of the '901 Patent do include "isolation" before salt formation and also do include "purification."  *See* UTC's Opening Claim Construction Brief at 4-8, 13-17.

**HIGHLY CONFIDENTIAL**

For at least these reasons, the claimed inventions of the '066 and '901 Patents do not exhibit unexpected results.

### B.    The '066 and '901 Patents Do Not Satisfy a Long-Felt but Unmet Need

Similarly, relying on bare attorney argument, UTC argues that the '066 and '901 Patents satisfy a long-felt but unmet need.  UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 26.  Like unexpected results, however, Federal Circuit precedent "requires that the applicant submit actual evidence of long-felt need, as opposed to attorney argument."  *See In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006).  To demonstrate long-felt need, the patentee must point to an "*articulated identifiable problem* and evidence of efforts to solve that problem."  *Texas Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993) (emphasis added).  And when assessing long-felt but unmet need, Courts "are constrained . . . to consider whether the *claimed invention* satisfied a long felt need . . . ."  *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988) (emphasis in original).  As such, advantages to claimed inventions that are unclaimed are "irrelevant in terms of the obviousness analysis."  *Id.* (citing *In re Vamco Machine & Tool, Inc.*, 752 F.2d 1564, 1577 (Fed. Cir. 1985)).

Quoting the shared specification of the '066 and '901 Patents, UTC argues broadly that "[b]ecause Treprostinil, and other prostacyclin derivatives are of great importance from a medicinal point of view, a need exists for an efficient process to synthesize these compounds on a large scale suitable for commercial production."  UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 26 (quoting '066 Patent at 1:66-23).  However, UTC fails to provide any evidence supporting its contention that such a long-felt need exists or that the claimed inventions of the '066 and '901 Patents satisfy that need.  *Kahn*, 441 F.3d at 990.  Indeed, UTC previously used the Moriarty process for its commercial production of treprostinil, and as found by the PTAB and affirmed by the Federal Circuit, that process led to treprostinil that was as

**HIGHLY CONFIDENTIAL**

pure, if not more pure, than the process resulting in the product claimed in the '066 and '901 Patents.  *SteadyMed*, IPR2016-00006, Paper 82 at 38 ("[I]ndividual commercial batches of Moriarty treprostinil exhibit impurity profiles nearly identical, if not superior, to those seen in the individual commercial batches of '393 patent treprostinil.").  Moreover, even assuming such a need existed and was met by the '066 and '901 Patents, neither "efficient," "large scale," or "commercial" synthesis are claimed and, thus, the advantages described by UTC are "irrelevant in terms of the obviousness analysis."  *Sjolund*, 847 F.2d at 1582; *see also* Pinal Dep. Tr. at 105:21-106:21 (UTC's expert acknowledging the terms "commercial," "high-scale," "plant," "large-scale manufacture," and "industrial scale" do not appear in the '901 Patent claims).  Just as the PTAB found during the '393 IPR, "the challenged claims are not directed to an efficient, cost-effective, or commercial scale synthesis, and thus, cannot be said to satisfy such a need."  *SteadyMed*, IPR2016-00006, Paper 82 at 63.  Accordingly, this allegation of a long-felt but unmet need satisfied by the '066 and '901 Patents is without merit.

Without alleging another long-felt but unmet need expressly, UTC discusses several other "advantages" of the claimed inventions.  UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 26 ("Additional advantages include storage at ambient temperature with simple subsequent conversion, synthesis without isolation, and better-quality final product with significant savings in material and labor.").  To the extent UTC implies that these alleged "advantages" satisfy a long-felt but unmet need, UTC has failed to provide an "articulated identified problem and evidence of efforts to solve that problem."  *Texas Instruments*, 988 F.2d at 1178.  Moreover, by relying solely on unsupported statements from the shared specification, UTC has failed to provide "actual evidence" that the claimed inventions satisfy any implied long-felt but unmet need.  *Kahn*, 441 F.3d at 990. UTC's allegation that the process requires "synthesis

without isolation" cannot be a long-felt need as UTC asserts that the claims of the '066 and '901 patents permit isolation prior to salt formation.  As such, there is no nexus between the claimed invention and the alleged long-felt need.  And at least with respect to UTC's allegation that the claimed inventions offer a "better-quality final product with significant savings in material and labor," such an advantage is not claimed (or supported) by the '066 and '901 Patents and is belied by UTC's claim construction positions, making it irrelevant to the obviousness analysis.  *Sjolund*, 847 F.2d at 1582.

For the reasons stated above, neither the '066 nor '901 Patents satisfy a long-felt but unmet need.

### C.   Yonsung Does Not Perform and Therefore Has Not "Copied" the Claimed Processes of the '066 and '901 Patents[42]

UTC alleges broadly that Yonsung "copies the process[es] claimed in the ['066 and '901] patent[s]."   UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 26-27.  However, as explained further in Liquidia's Answering Claim Construction Brief and Response to UTC's Interrogatory No. 1, Yonsung does not perform the claimed processes of the '066 and '901 Patents.   Liquidia's Answering Claim Construction Brief at 16-24; Defendant Liquidia Technologies, Inc.'s Objections and Responses to Plaintiff's Interrogatory No. 1 (Nov. 23, 2020) at 10-15, 32-35, 42-46.  Yonsung performs an ███████████████████ ████████████████, which is expressly excluded from the Asserted Claims of the '901 Patent.  Defendant Liquidia Technologies, Inc.'s Objections and Responses to Plaintiff's Interrogatory No. 1 (Nov. 23, 2020) at 28-31.   Additionally, ███████████████

---

[42] Pending the Court's construction of "contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil," Liquidia reserves the right to supplement and/or withdraw Section VI.C.

**HIGHLY CONFIDENTIAL**

██████████████████████████████████████████████████████████████████

as required by the Court's construction of "ambient temperature."   D.I. 119 at 1; Defendant

Liquidia Technologies, Inc.'s Objections and Responses to Plaintiff's Interrogatory No. 1 (Nov.

23, 2020) at 24-26.  Because the process of preparing the treprostinil salt API used in LIQ861 does

not infringe the '066 or '901 Patents, Yonsung did not "copy" the claimed processes of the '066

and '901 Patents.

Additionally, UTC contends that "Yonsung's use of salt formation even after using ██████

███████████████████████████████████████████████  cannot achieve a purity of

treprostinil sufficient for commercial scale."  UTC's Objections and Responses to Interrogatory

No. 2 (Dec. 17, 2020) at 27.  Yonsung's implementation of a ████████████████████████████

████████████████████  is in no way an admission as to the sufficiency of any step.  Indeed,

UTC itself employed a ████████████████████  in its prior commercial scale treprostinil

process, proving that ████████████████  is sufficient.  Regardless, UTC's improper inference

is legally irrelevant to any issue in this case because neither the '066 nor '901 Patents claim a

"commercial scale" process.  *See, e.g.*, Liquidia's Answering Claim Construction Brief at 1-3;

*Liquidia*, IPR2020-007700, Paper 15 at 8-9.

For the reasons stated above, UTC's contention that Yonsung "copies" the claimed

processes of the '066 and '901 Patents is incorrect.

### D.    Yonsung's Implementation of a Salt Formation Step Does Not Evidence Failure of Others as to the '066 and '901 Patents

UTC presents the confusing argument that "the fact that Yonsung still includes the salt

formation step, and thereby infringes the claims of the '066 and '901 Patents, is evidence that

Yonsung could not perform the process without the salt formation step to achieve sufficient purity

for a commercial-scale product."  UTC's Objections and Responses to Interrogatory No. 2

**HIGHLY CONFIDENTIAL**

(Dec. 17, 2020) at 27.  UTC's argument lacks any factual support for its implied assertion that Yonsung did not originally use a salt formation step; thus, there is no evidence of "failure" to contrast with or provide a basis for "success."  Further, to establish failure of others, the evidence must demonstrate that "prior attempts failed because the [processes] lacked the claimed features." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1313 (Fed. Cir. 2006).  Yonsung's implementation of a salt formation step during manufacture of treprostinil salt, therefore, does not evidence a "failure" of others, let alone a failure attributable to the absence of any claimed aspect of the '066 or '901 Patents.  *Id.*  Salt formation is one of the most commonly used processes in large- and small-scale pharmaceutical processes.  *See, e.g.*, G. S. Paulekuhn, et al., "Trends in Active Pharmaceutical Ingredient Salt Selection based on Analysis of the Orange Book Database," 50 J. MED. CHEM.  6665, 6665-666 (2007) ('901 IPR Ex. 1024).  Further, the claims of the '066 and '901 Patents do not include any limitation concerning the level of purity, and the PTAB already factually found that the Moriarty commercial process results in a treprostinil product that is as pure, if not more pure than the treprostinil formed by the claimed inventions.  UTC's contention also ignores the fact that the claims of the '901 Patent require the presence of impurities, which UTC's expert Dr. Pinal confirmed.  Pinal Dep. Tr. at 54:11-14.  Finally, UTC's contention is legally irrelevant, moreover, because neither the '066 nor '901 Patents claim a "commercial scale" product.  *See, e.g.*, Liquidia's Answering Claim Construction Brief at 1-3; *Liquidia*, IPR2020-007700, Paper 15 at 8-9.

### E.  UTC Has Failed to Prove the Claimed Aspects of the '066 and '901 Patents Resulted in Any Alleged Commercial Success of Tyvaso®

Regarding commercial success, UTC contends that "the commercial success of Tyvaso® is shown by the substantial sales and market share of Tyvaso®, despite marketplace challenges, as well as the acceptance of Tyvaso® by doctors and patients."  UTC's Objections and Responses to

Interrogatory No. 2 (Dec. 17, 2020) at 27.  However, to establish commercial success, at least some factual evidence must be provided beyond mere attorney argument.  *Cf. In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991) ("[I]nformation solely on number of units sold is insufficient to establish commercial success.").  UTC's one-sentence contention that Tyvaso® has experienced commercial success, without actual evidence provided, or establishing a nexus between the claimed inventions and the alleged commercial success, is therefore legally insufficient to establish commercial success.  *Id.*

Moreover, "the asserted commercial success of the product must be due to the merits of the *claimed invention* beyond what was readily available in the prior art."  *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997) (emphasis added).  UTC has, therefore, failed to establish that any alleged commercial success of Tyvaso® was due to the merits of the '066 and '901 Patents' claimed inventions beyond what was readily available in the prior art.  *Id.*  UTC cannot establish that any alleged commercial success is due to any claimed aspect of the '066 and '901 Patents because, as the Board found during the '393 IPR, treprostinil products produced according to that process are functionally and structurally indistinguishable from treprostinil products made according to processes known in the prior art (e.g., Moriarty and Phares 2005).  *See, e.g.*, *SteadyMed*, IPR2016-00006, Paper 82 at 29 ("[W]e find that the evidence of record supports a finding that treprostinil produced according to Phares [2005] has the same, or better, overall purity and purity profile than treprostinil produced according to the process recited in the '393 patent.").  Further, by asserting that the claimed processes of the '066 and '901 Patents result in the Tyvaso®'s commercial success, UTC ███████████████████████████████████

███████████████████████████████████████████████████████.  *See* ██████

███████████████████████████████████████████████████████

███ ) (UTC_LIQ00206482-UTC_LIQ00206549) at 60-61 ████████████████

████████████████████████████████████ ███████████████

████████████████████████████████ (UTC_LIQ00204305-

UTC_LIQ00204559) at 26 ████████████████████████████

██████████████ ██████████████████ As such, the products of the '066

and '901 Patents are not novel and thus invalid for the same reasons set forth by the PTAB and

affirmed by the Federal Circuit.

Finally, UTC cannot establish that Tyvaso®'s commercial success is due to the inventions

claimed in the '066 and '901 patents, because UTC has blocked all competition for treprostinil

products for the treatment of PAH.  Initially, UTC obtained orphan drug exclusivity for Tyvaso®

that prevented additional inhaled treprostinil products from being approved by the FDA and

commercialized.  Additionally, several companies have sought to make generic treprostinil

products, but in each instance, UTC has settled litigation that prevented those companies from

marketing their products.  Further, UTC has systematically used its patents covering treprostinil,

and continues to attempt to obtain new patents, including the '793 patent, to block others from

developing and commercializing treprostinil products. *Acorda Therapeutics, Inc. v. Roxane Labs.,*

*Inc.*, 903 F.3d 1310, 1338-339 (Fed. Cir. 2018).  UTC has gone so far in its efforts to assert before

the PTAB that the claims of the '066 and '901 patents do not encompass a process that includes

column chromatography or isolation before salt formation, only to walk-back from those

arguments in district court proceedings ████████████████████████████

█████████████████████████████████████ UTC's use of

its patents, and the willingness to change positions mid-litigation to expand the scope of the claims

of the '066 and '901 patents to prevent competition negates any commercial success, unexpected results, or long-felt need allegedly met by the claims of the '066 and '901 patents.

### F.   The Claimed Invention of the '793 Patent Does Not Exhibit Unexpected Results

UTC argues vaguely that the claimed invention of the '793 Patent exhibits unexpected results without identifying any evidence in support of its claim.  *See* UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 28-29.  Specifically, UTC contends that "[t]he '793 Patent discloses that treprostinil by inhalation is unexpectedly and surprisingly safe and effective, even at high doses."  UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 28.  For the reasons stated above in Section V.A, *supra*, it was neither surprising nor unexpected that treprostinil by inhalation was safe and effective, even at high doses, considering the prior art disclosures in the '212 Patent, Voswinckel JAHA, and Voswinckel 2006.  Further, UTC has not specifically stated whether it contends inhalation of both a solution and a powder formulation of treprostinil is unexpectedly safe and effective.  Additionally, UTC's sole reliance on statements made in the '793 Patent amounts to "[m]ere argument or conclusory statements" and therefore "does not suffice."  *Geisler*, 116 F.3d at 1470 (citation omitted).

### G.   The '793 Patent Does Not Satisfy a Long-Felt But Unmet Need

UTC alleges that Tyvaso® (treprostinil) inhalation solution for oral inhalation is covered by the '793 Patent and satisfies a long-felt need but unmet need for a "treatment for pulmonary hypertension that can be administered using a compact inhalation device."  *See* UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 29.  UTC is incorrect.  The product label for Tyvaso® specifically requires breaths should be increased "by an additional 3 breaths per session at approximately 1-2 week intervals" to a "target maintenance dosage of 9 breaths or 54 mcg per treatment session as tolerated."  Tyvaso® Label (2009) at Dosage and Administration.

Thus, the Tyvaso® product label, and the recommended use of the product does not fall within the 1-3 breaths limitation of the '793 Patent claims.  Moreover, Tyvaso® requires 4 sessions per day to achieve therapeutic effectiveness, whereas the claims of the '793 Patent require therapeutic efficacy in a "single event dose."  *Compare* '793 Patent at claim 1, *with* Tyvaso® Label at Dosage and Administration.  Finally, by relying solely on an unsupported statement in the specification, UTC has failed to provide "actual evidence of long-felt need" but rather provides only bare attorney argument.  *Kahn*, 441 F.3d at 990.  Additionally, based on the disclosures of the '212 Patent, Voswinckel JAHA, Voswinckel JESC, and Voswinckel 2006, any of such long-felt need was already met.  *See, e.g.*, Section V.A, *supra*.  Thus, UTC's allegation of a long-felt but unmet need satisfied by the '793 Patent is meritless.

### H.    UTC Has Failed to Prove the Claimed Aspects of the '793 Patent Resulted in Any Alleged Commercial Success of Tyvaso®

Lastly, UTC argues that commercial success of the '793 Patent is evidenced by "commercial success of Tyvaso® . . . shown by the substantial sales and market share of Tyvaso®, despite marketplace challenges, as well as the acceptance of Tyvaso® by doctors and patients." *See* UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 29.  As discussed in the previous section, Tyvaso® does not fall within the scope of the '793 Patent claims.  Further, despite alleging that Tyvaso® has experienced "substantial sales and market share . . . despite marketplace challenges," UTC provides no actual data or facts to support its contention.  *See Baxter*, 952 F.2d at 392 (requiring actual data to support allegation of commercial success).  Indeed, UTC made no attempt to identify those marketplace challenges, nor have they established that the sales of Tyvaso® are due to the product attributes, as opposed to UTC's blocking patents.  *Acorda*, 903 F.3d at 1338-339.  Moreover, UTC has failed to explain why any alleged commercial success of Tyvaso® was "due to the merits of the *claimed invention* beyond what was readily

**HIGHLY CONFIDENTIAL**

available in the prior art." *J.T. Eaton*, 106 F.3d at 1571 (emphasis added).  As explained above in Section V.A.2, treprostinil inhalation solutions were known in the art before May 15, 2006, and, therefore, any alleged commercial success of Tyvaso® could not have been due to the "merits of the claimed invention." *Id*.  Thus, UTC's unsupported allegation of commercial success is unavailing.

Finally, UTC cannot establish that Tyvaso's® commercial success is due to the inventions claimed in the '793 patent due to the fact that UTC has blocked all competition for treprostinil products for the treatment of PAH.  Initially, UTC obtained orphan drug exclusivity for Tyvaso® that prevented additional inhaled treprostinil products from being approved by the FDA and commercialized.  Additionally, several companies have sought to make generic treprostinil products, but in each instance, UTC has settled litigation that prevented those companies from marketing their products.  Further, UTC has systematically used its patents covering treprostinil, and continues to attempt to obtain new patents, including the '793 patent, to block others from developing and commercializing treprostinil products.  *See Acorda*, 903 F.3d at 1337-41 (finding commercial success weak indicia of nonobviousness in such cases).  UTC has gone so far in its efforts to assert before the PTAB that the claims of the '066 and '901 patents do not encompass a process that includes column chromatography or isolation before salt formation, only to walk-back from those arguments in district court proceedings ███████████████████████████████████ ████████████████████████████████████████████████████████████.  UTC's use of its patents, and the willingness to change positions mid-litigation to expand the scope of the claims of the '066 and '901 patents to prevent competition negates any commercial success, unexpected results, or long-felt need allegedly met by the claims of the '066 and '901 patents.

**HIGHLY CONFIDENTIAL**

## I.      Liquidia Has Not "Copied" the '793 Patent

UTC contends that Liquidia "copied" the '793 Patent by developing its own treprostinil inhalation product and "utiliz[ing] the knowledge and knowhow of one of the inventors of the '793 Patent, Dr. Roscigno, to head Liquidia's program to develop an infringing product."  *See* UTC's Objections and Responses to Interrogatory No. 2 (Dec. 17, 2020) at 29.  For the reasons stated in Defendant Liquidia Technologies, Inc.'s Objections and Responses to Plaintiff's Interrogatory No. 1, dated November 23, 2020, Liquidia's treprostinil inhalation product is not covered by the '793 Patent.  Defendant Liquidia Technologies, Inc.'s Objections and Responses to Plaintiff's Interrogatory No. 1 (Nov. 23, 2020) at 47-52.  Additionally, as further explained in Defendant's Answering Brief in Opposition to Plaintiff's Motion to Dismiss Defendants' Counterclaim, Liquidia did not "utilize the knowledge and knowhow" of Dr. Roscigno to "develop an infringing product."  *See generally* D.I. 37; *see also* D.I. 45 (Court denying UTC's Motion to Dismiss).  Thus, UTC's allegations of "copying" the '793 Patent are unsupported and incorrect.

## VII.   CONCLUSION

Based upon the information presently available to Liquidia, and based upon Liquidia's initial understanding of the scope and construction of the Asserted Claims of the Asserted Patents, and of UTC's apparent positions concerning the scope and construction of the Asserted Claims of the Asserted Patents, the Asserted Claims of the Asserted Patents are invalid at least for the reasons set forth above and based on the production that will accompany these Supplemental Invalidity Contentions.  Discovery and Liquidia's investigation are ongoing, and Liquidia reserves the right to modify and/or supplement its Supplemental Invalidity Contentions.

HIGHLY CONFIDENTIAL

OF COUNSEL:
Sanya Sukduang
Jonathan R. Davies
Douglas W. Cheek
COOLEY LLP
1299 Pennsylvania Avenue, NW Suite 700
Washington, DC 20004-2400
(202) 776-2982
(202) 776-2049

Erik Milch
COOLEY LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190-5656
(703) 456-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6840

Lauren Krickl
Deepa Kannappan
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5065
(650) 843-5673

Dated: September 28, 2021

/s/ Douglas W. Cheek
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 298-0702
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*
*Liquidia Technologies, Inc.*

**HIGHLY CONFIDENTIAL**

## CERTIFICATE OF SERVICE

I, Nathan R. Hoeschen, hereby certify that on September 28, 2021, this document was

served on the persons listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Michael J. Flynn
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

Amy Mahan
MCDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
(617) 535-4000
amahan@mwe.com

William C. Jackson
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4216
wjackson@goodwinlaw.com

Bill Ward
BOIES SCHILLER FLEXNER LLP
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
(213) 995-5745
bward@bsfllp.com

Huiya Wu
Joel Broussard
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 459-7270
hwu@goodwinlaw.com
jbroussard@goodwinlaw.com

Adam W. Burrowbridge
Joshua Revilla
Timothy M. Dunker
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street
Washington, DC 20001-1531
(202) 756-8000
aburrowbridge@mwe.com
jrevilla@mwe.com
tdunker@mwe.com

Douglas H. Carsten
Art Dykhuis
Jiaxiao Zhang
Katherine Pappas
MCDEMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633
dcarsten@mwe.com
adykhuis@mwe.com
jiazhang@mwe.com
kpappas@mwe.com

Harrison Gunn
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1064
hgunn@goodwinlaw.com

/s/ Nathan R. Hoeschen
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*
*Liquidia Technologies, Inc.*

# EXHIBIT 44

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE TRUSTEES OF THE | : | |
| UNIVERSITY OF PENNSYLVANIA, | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | Civ. No. 15-6133 |
| | : | |
| ELI LILLY AND COMPANY, et al., | : | |
| **Defendants.** | : | |
| | : | |

## O R D E R

Plaintiff, The Trustees of the University of Pennsylvania, allege that Defendants Eli Lilly, ImClone, and Bristol Myers Squibb induced infringement of its U.S. Patent No. 7,625,558 (the '558 Patent). (Doc. Nos. 1, 63-15); 35 U.S.C. § 271(b) (2018). The Parties have submitted numerous Motions *in limine*, asking me to exclude testimony and strike portions of Replies and reports. (Doc. Nos. 174, 292, 293, 294, 269, 2918, 299, 317.) Because I am being asked to make evidentiary trial rulings when trial has not yet begun, my decisions are necessarily tentative. I am prepared to revisit them during trial should any Party ask me to do so. I am also prepared to give the jury appropriate limiting instructions should any Party so request.

## I.    BACKGROUND

Penn owns Patent Number 7,625,558 which claims methods of treating cancerous tumors by "administering a cytostatic antibody that inhibits tumor cell growth," and then exposing that cell to radiation. (Doc. No. 1 at ¶ 17; '558 Patent.) Erbitux, which is manufactured and sold by Defendants, is an FDA approved treatment for Squamous Cell Carcinoma of the Head and Neck (SCCHN). (Doc. No. 1-2). The active ingredient in Erbitux is Cetuximab, an antibody that binds to epidermal growth factor receptor (EGFR), an erbB-family protein. (Id.; Doc. No 206 at ¶ 21.)

1

The Erbitux label states that it is "indicated in combination with radiation therapy."  (Doc. No. 183 at ¶ 68.)

On November 13, 2015, Penn brought this action alleging Defendants infringed "at least" 35 of the '558 Patent's 41 Claims by marketing and selling Erbitux.  (Doc. No. 1 at ¶ 45, 46.)  The matter was assigned to Judge Robert Kelly.  Penn did not explicitly allege infringement of Claims 8, 13, 15, 18, 31, or 41.  (Id.)  Judge Kelly granted Defendants' Motion to Dismiss as to the infringement of Claims 32-40 of the '558 Patent because they are invalid.  (Doc. Nos. 52, 53.)

Defendants filed a Petition for an *inter partes* review (IPR) at the USPTO of Claims 1-7, 9-12, 14, 16, 17, and 19-31 of the '558 Patent.  This case was stayed during the IPR proceedings and following appeals before the USPTO and Federal Circuit.  (Doc. Nos. 23, 60, 62.)  The Patent Trial and Appeal Board invalidated each of the challenged claims in the IPR.  (Doc. No. 61-1 at 59); Eli Lilly & Co v. Trustees of the Univ. of Pa., No. IPR2016-00458, 2017 WL 2992425, at *6 (P.T.A.B. July 13, 2017).  The PTAB ruled that each of the challenged claims was unpatentable as being obvious over a combination of prior art references.  Id. at *3, *22.  Each of Penn's originally asserted claims were thus either invalidated or dismissed.

On November 8, 2018, Penn filed a Motion for Leave to Amend Infringement Contentions, seeking to include Claim 13.  (Doc. No. 63.)  To explain why it had not previously asserted infringement of Claim 13, Penn offered an article by Fournier et al. (Fournier), first published on April 20, 2018 on bioRxiv, an online database of articles that have not yet been published in a peer-reviewed journal.  (Doc. No. 63-2 at ¶¶ 20-24.)  Penn stated that before publication of Fournier it "had no reason to expect . . . that treatment with the Erbitux antibody would affect kinase activity mediated by a p185 homodimer."  (Id. at ¶ 24.)  Based on the known mechanisms of Erbitux, however, and the new findings in Fournier regarding EGFR heterodimer formation, "it

2

follows that Erbitux treatment would be expected to inhibit kinase activity mediated by a p185 homodimer." (Id.) Judge Kelly granted Penn's Motion for Leave to Amend Infringement Contentions. (Doc. No. 74.) Accordingly, Claim 13, which depends from Claim 11, is the sole remaining asserted Claim. Claims 11 and 13 recite:

> **11.** A method for inhibiting proliferation of a tumor cell, said tumor cell being from an erbB mediated tumor, which method comprises of:
>
> (a) contacting the cell with an antibody that disrupts erbB kinase activity said disruption having a cytostatic effect on the tumor cell; and
>
> (b) thereafter exposing the tumor cell to an effective amount of anti-cancer radiation.
>
> **13.** The method according to claim **11** wherein the antibody inhibits kinase activity mediated by a p185 homodimer.

Before me are several motions relating to the strongly contested issues of validity, infringement, and damages. Each Party expects to present evidence and expert testimony at trial regarding these issues. With respect to the validity of Claim 13, Defendants filed Motions seeking to exclude any testimony that the order of administration of antibodies and radiation is an indicium of non-obviousness and to exclude the testimony of Penn's damages expert, Ms. Krista Holt, regarding evidence of commercial success as an indicium of non-obviousness. (Doc. Nos. 270, 273.) As to infringement, Penn filed Motions seeking to exclude the testimony of Defendants' infringement experts, Drs. Jennifer Grandis and Steven Block. (Doc. Nos. 278, 279.) Defendants similarly filed Motions seeking to exclude portions of the expert report and testimony of Penn's infringement expert, Dr. Antony Burgess. (Doc. Nos. 173, 271.) As to damages, Penn has moved to exclude the testimony of Defendants' damages expert, Dr. Christopher Vellturo, and Defendants filed a Motion seeking to exclude the testimony of Penn's damages expert, Ms. Krista Holt.

## II.     LEGAL STANDARDS

In a patent case, the law of the regional circuit applies for issues not unique to patent law while Federal Circuit precedent applies for substantive issues of patent law. Info-Hold, Inc. v. Muzak LLC, 783 F.3d 1365, 1371 (Fed. Cir. 2015). Accordingly, I apply Third Circuit law for procedural and non-substantive issues and apply Federal Circuit law where the question turns on an issue of patent law. See id.

### A.  Motions to Strike

Rule 12(f) governs motions to strike. Fed. R. Civ. P. 12(b). I may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Id. Motions to strike under Rule 12(f) are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." Canters Deli Las Vegas, LLC v. Freedom Pay, Inc., 460 F. Supp. 3d 560, 568 (E.D. Pa. 2020).

Rule 26 requires parties to make initial disclosures without a discovery request. Fed. R. Civ. P. 26(a). If a party fails to comply with the disclosure provisions of Rule 26(a), I may exclude the untimely disclosed evidence or testimony under Rule 37(c)(1). Fed. R. Civ. P. 37(c)(1); Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir. 1995). I may not, however, exclude that evidence or testimony "if substantial justification exists for the failure to disclose, or if the failure to disclose was harmless." Newman, 60 F.3d at 156. In determining whether exclusion is appropriate, I must apply the Third Circuit's Pennypack factors: (1) "the prejudice or surprise" to the party the evidence is offered against; (2) the possibility of curing the prejudice; (3) the likelihood of disruption of the trial; (4) "any bad faith or willfulness"; and (5) the "importance of

the excluded evidence." <u>ZF Meritor, LLC v. Eaton Corp.</u>, 696 F.3d 254, 298 (3d Cir. 2012) (citing

<u>Meyers v. Pennypack Woods Home Ownership Ass'n</u>, 559 F.2d 894, 904-05 (3d Cir. 1977)).

B. <u>Expert Testimony</u>

A witness may qualify as an expert if her "scientific, technical, or other specialized

knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."

Fed. R. Evid. 702. In evaluating the admissibility of expert testimony, I must consider: (1) the

expert's qualifications; (2) the reliability of her methodology; and (3) whether the testimony is

relevant and helpful for the trier of fact. <u>Schneider ex rel. Estate of Schneider v. Fried</u>, 320 F.3d

396, 404 (3d Cir. 2003); <u>Breidor v. Sears, Roebuck & Co.</u>, 722 F.2d 1134, 1139 (3d Cir. 1983)

("Helpfulness is the touchstone of Rule 702.").

An expert witness is qualified if she has "'specialized knowledge' regarding the area of

testimony." <u>Waldorf v. Shuta</u>, 142 F.3d 601, 625 (3d Cir. 1998). The qualification requirement

is interpreted liberally. <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 741 (3d Cir. 1994). "The

basis of this specialized knowledge 'can be practical experience as well as academic training and

credentials.'" <u>Waldorf</u>, 142 F.3d at 625 (quoting <u>American Tech. Res. v. U.S.</u>, 893 F.3d 651, 656

(3d Cir. 1990)). An expert is qualified even if she is not "the best qualified or . . . does not have

the specialization that the court considers most appropriate." <u>Pineda v. Ford Motor Co.</u>, 520 F.3d

237, 244 (3d Cir. 2008). "The focus, instead, is on whether the qualifications that an expert does

have provide a foundation for the witness to testify meaningfully on a given matter." <u>Shire

Viropharma Inc., v. CSL Behring LLC</u>, Civ. No. 17-414, 2021 WL 1227097, at *3 (D. Del. Mar.

31, 2021).

"[T]he inquiry as to whether a particular scientific technique or method is reliable is a flexible one." In re Paoli, 35 F.3d at 742. The Third Circuit has set forth a non-exhaustive list of factors to determine reliability:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Id. at 742 n.8. Reliability does not, however, require the proffering party to demonstrate correctness of an opinion. Id. at 744. ("The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.").

To "fit the issue in the case . . . the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Schneider, 320 F.3d at 404. Testimony is helpful to the trier of fact when it presents "a valid scientific connection to the pertinent inquiry." See id. "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." In re Paoli, 35 F.3d at 743 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 591 (1993)).

## III. DISCUSSION

### A. Penn's Motion to Strike Defendants' Replies

Penn argues that Defendants' failed to seek leave of the Court to file Replies in support of Defendants' evidentiary motions (Doc. Nos. 306, 307, 308) and so move to strike Defendants' Replies. (Doc. No. 314-1.) Penn alternatively requests leave to file sur-replies. (Id.)

6

My October 22, 2019 Standing Order states that "[u]nless otherwise ordered, I will accept reply or supplemental briefs." (Doc. No. 112 at 5.) All reply briefs are due within fourteen days of a response brief and all sur-reply briefs are due within seven days of the reply brief. (Id.) Defendants filed their reply briefs within fourteen days of Penn's response briefs. (Doc. Nos. 306, 307, 308). Penn has filed two sur-reply briefs within seven days of Defendants' reply briefs. (Doc. Nos. 312, 313.) Because the Parties have complied with my Standing Order, I will deny Penn's Motion to Strike Defendants' Reply Briefs and will consider all briefs filed by the Parties.

B. <u>Defendants' Motion to Exclude Testimony Regarding the Order of Administration</u>

In July 2019, Defendants served their invalidity contentions which asserts that Claim 13 is invalid as obvious. (<u>See</u> Doc. No. 122-1 at 1-2.) Penn seeks to argue at trial that the requirement that the antibodies be administered before the radiation is a critical feature of the invention making Claim 13 non-obvious. (Doc. No. 270-1 at 1.) Defendants urge that this argument is barred by collateral estoppel because it was litigated in the IPR proceedings which cancelled each challenged Claim—including Claim 11 from which Claim 13 depends—because they were unpatentable as being obvious. (<u>Id.</u> at 3.)

Collateral estoppel is an affirmative defense which must generally be asserted in a responsive pleading. Fed. R. Civ. P. 8(c). I may, however, allow Defendant to raise collateral estoppel "by way of a post-answer motion so long as it is raised 'at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.'" <u>Courteau v. United States</u>, 287 F. App'x 159, 161-62 (3d Cir. 2008) (quoting <u>Charpentier v. Godsil</u>, 937 F.3d 859, 864 (3d Cir. 1991)) (alteration in original).

Penn urges that Defendants' Motion should be denied as untimely and prejudicial because it has "no opportunity for additional fact or expert discovery to develop a record to specifically counter Defendants' bald and new assertions of collateral estoppel based on the PTAB decision, or to develop alternative theories for validity and secondary considerations that do not rely at all on the language of [C]laim 11." (Doc. No. 312 at 5.) Raising collateral estoppel in a post-answer motion, however, "introduce[s] only a new question of law which [does] not [] require[] [Plaintiff] to conduct any further discovery." Rutter v. Rivera, 74 F. App'x 182, 186-87 (3d Cir. 2003) (plaintiff not prejudiced when Defendant raised collateral estoppel ten days before trial). Penn cannot say that it was "unaware of or unfairly surprised by the [PTAB] judgment." See id. Although Penn makes a vague assertion that it has "no opportunity for additional fact or expert discovery" to counter Defendants' assertion of collateral estoppel, it does not suggest it "has any evidence which might have been offered to overcome the collateral estoppel effect" of the PTAB's decision. See Prinz v. Greate Bay Casino Corp., 705 F.2d 692, 695 (3d Cir. 1983). Estoppel does not preclude Penn from presenting other evidence that Claim 13 is non-obvious or from presenting evidence regarding order of administration for purposes other than showing non-obviousness.

Moreover, the purpose of requiring collateral estoppel to be pled as an affirmative defense "is to give the opposing party notice of the plea of estoppel and a chance to argue, if he can, why the imposition of an estoppel would be inappropriate." Blonder–Tongue Labs. v. Univ. of Ill. Found., 402 U.S. 313, 350 (1971). Penn has filed both a Response and Sur-Reply to Defendants' Motion in which it opposed the application of collateral estoppel. (Doc. Nos. 292, 312.) Penn has thus had ample opportunity to contest collateral estoppel. See Sanders v. Sec'y Pa. Dept. of Corr., 602 F. App'x 54, 56 n.1 (3d Cir. 2015); Curry v. City of Syracuse, 316 F.3d 324, 331 (2d. Cir. 2003) (permitting Defendant to raise collateral estoppel in a Reply to a Response in opposition of

Motion for Summary Judgment because Plaintiff was granted leave to file a Sur-Reply). Accordingly, because Penn is not prejudiced and has been given the opportunity to oppose application of collateral estoppel, I will not deny Defendants' Motion as untimely.

Collateral estoppel, or issue preclusion, "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (quoting New Hampshire v. Maine, 532 U.S. 742, 748-49 (2001)). "[A] collateral estoppel determination is generally guided by regional circuit precedent, but [Federal Circuit] precedent [applies] to those aspects of such a determination that involve substantive issues of patent law." Ohio Willow Wood Co. v. Alps S., LLC., 735 F.3d 1333, 1342 (Fed. Cir. 2013). The Third Circuit imposes four requirements for collateral estoppel to apply: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 249 (3d Cir. 2006).

The Parties dispute only if the issue of whether the order of administration makes Claim 13 non-obvious is "the identical issue" to that adjudicated in the IPR proceedings. (See Doc. No. 292 at 6-13.) Penn argues that the issues are not identical because the PTAB applies a different legal standard than district courts. (Id. at 6.) A final judgment from the PTAB, however, "has an immediate issue-preclusive effect on any pending or co-pending actions involving the patent." XY, LLC v. Trans Ova Genetics, 890 F.3d 1282, 1294 (Fed. Cir. 2018). That different burdens of proof and standards of validity apply does not preclude collateral estoppel. See id. at 1300 (Newman, J. concurring in part and dissenting in part); see also M2M Sols. LLC v. Sierra Wireless

<u>Am., Inc.</u>, Civ. No. 14-1102 Doc. Nos. 213, 214 (D. Del. Mar. 31, 2021) ("[D]istrict courts have interpreted <u>XY v. Trans Ova</u> to stand for the position that differing burdens of proof will not prevent the application of collateral estoppel to PTAB decisions that meet all other requirements.").

Penn also urges that identity of issues does not exist because the PTAB and my <u>Markman</u> Order construed "cytostatic effect" differently. (Doc. No. 292 at 10-13.) Unadjudicated claims are subject to collateral estoppel only if "the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity." <u>Ohio Willow Wood</u>, 735 F.3d at 1342. The "use [of] slightly different language to describe substantially the same invention . . . does not create a new issue of invalidity." <u>Id.</u> at 1342-43. To preclude application of collateral estoppel the party must "explain[] how any [] alleged differences in claim scope alter the invalidity determination." <u>Id.</u> at 1343 (patentee failed to explain how limiting the scope of "polymeric gel" to a 'block copolymer' gel'" altered the invalidity determination).

In its Final Written Decision, the PTAB, applying the broadest reasonable interpretation standard, explicitly declined to adopt Penn's proposed meaning of "cytostatic effect" in Claim 11 of "an inhibition of tumor cell growth by accumulation of tumor cells in the $G_1$ (also known as $G_0/G_1$) phase of the cell cycle." <u>Eli Lilly & Co.</u>, 2017 WL 2992425, at *6. Rather, the PTAB interpreted the term to mean that any "antibody that disrupts tyrosine kinase activity . . . is sufficient to satisfy the claimed inhibition having a 'cytostatic effect.'" <u>Id.</u> In contrast, I construed "cytostatic effect," as recited in Claim 13, to mean "inhibition or suppression of cell growth." (Doc. No. 158 at 13-14.) Although Defendants originally argued that "cytostatic effect" be given its "plain and ordinary meaning," they were unable to articulate the "plain and ordinary meaning"

of the term.  (Id.)  After arguing that antibodies can have different effects—which Penn did not dispute—Defendants agreed to Penn's construction.  (Id.)

Penn urges that the difference in construction of the term "cytostatic" materially alters the question of invalidity.  (Doc. No. 292 at 13.)  It argues that the "cytostatic effect limitation is a key basis for the non-obviousness of the order of administration" because the prior art taught the administration of an anti-EGFR antibody—which under its interpretation was inherently cytostatic—prior to radiation to increase the therapeutic response.  (Id.)  Defendants respond that "the PTAB considered Penn's proposed construction and found that the claims would have been obvious even under Penn's proposed construction."  (Doc. No. 306 at 6.)  Indeed, the PTAB found that "even under [Penn's] construction of the term "cytostatic" . . . [Defendants have] shown sufficiently that" the anti-EGFR antibody administered in prior art had a "cytostatic" effect.  Eli Lilly & Co., 2017 WL 2992425, at *14.  My construction of the term "cytostatic" thus does not "materially alter[] the question of invalidity."  See Ohio Willow Wood, 735 F.3d at 1342. Accordingly, I will Grant Defendants' Motion and Penn will be collaterally estopped from presenting testimony that administering the antibody first followed by radiation makes Claim 13 non-obvious.

C.  Motions to Exclude Expert Testimony Regarding Infringement

The Parties' dispute whether Defendants' have infringed Claim 13 of the '558 Patent. Both Parties' expect to offer expert testimony to support or refute infringement.  Penn's infringement expert, Dr. Antony Burgess, has opined that Erbitux infringes Claim 13.  (Doc. No. 173-3.) Defendants move to strike portions of Burgess' report because it "advances a new theory of infringement" and move to exclude his testimony insofar as it relies on Fournier because it is unreliable and irrelevant.  (Doc. Nos. 173-1, 271.)

11

Defendants expect to present two expert witnesses to rebut Penn's assertions they infringed Claim 13: Dr. Jennifer R. Grandis and Dr. Steven M. Block. Grandis has opined that administration of Erbitux followed by radiation does not directly infringe Claim 13. (Doc. No. 281-10.) Penn moves to exclude Grandis' testimony as unreliable. (Doc. No. 279.) Block has opined that Burgess' opinion that Erbitux inhibits kinase activity mediated by a p185 homodimer is based on a flawed interpretation of Fournier. (Doc. No. 285-1 at ¶ 49.) Penn moves to exclude Block's testimony because he is unqualified, and because his opinion is unreliable. (Doc. No. 278.)

1. Defendants' Motion to Strike Portions of the Infringement Report of Dr. Antony Burgess

Defendants urge that the "infringement theory in Dr. Burgess's expert report bears no relation to the theory Penn disclosed in its infringement contentions" and thus paragraphs 47-69, 71-76 and 84-92 of the report should be excluded under Rule 12(f), or in the alternative under Rule 37(c)(1). (Doc. No. 173-1 at 23.) Because I find that the report is not a pleading, I will not strike it under Rule 12(f). Similarly, because the report does not advance a new theory of infringement, I will not strike it under Rule 37(c)(1).

**Striking the Report Under Rule 12(f)**

Defendants first urge that I strike paragraphs 47-69, 71-76 and 84-92 of the report pursuant to Rule 12(f). (Doc. No. 173-1 at 14-15.) Rule 12(f) allows me to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(b). An expert report is not a pleading. See Fed. R. Civ. P. 7(a). Rather, as I have discussed,

if the report is an untimely disclosure, I may exclude it under Rule 37(c)(1).  I will not thus strike the report under Rule 12(f).

### Striking the Report under Rule 37(c)(1)

Infringement contentions are analogous to "initial disclosures" under Rule 26(a).  <u>Midwest Athletics & Sports All. LLC v. Ricoh USA, Inc.</u>, No. 19-cv-514, 2021 WL 1907475, at *4 (E.D. Pa. May 12, 2021) (citing <u>ViaTech Techs., Inc. v. Microsoft Corp.</u>, No. 17-cv-570, 2021 WL 663057, at *1 (D. Del. Feb. 19, 2021)).  Untimely infringement contentions are thus subject to exclusion under Rule 37(c)(1).  <u>ViaTech</u>, 2021 WL 663057, at *1; Fed. R. Civ. P. 37(c)(1).  "The threshold question in deciding whether to strike an expert report is whether the expert has permissibly specified the application of a disclosed theory or impermissibly substituted a new theory altogether."  <u>Digit. Reg of Tex., LLC v. Adobe Sys. Inc.</u>, Civ. No. 12-1971, 2014 WL 1653131, at *2 (N.D. Cal. Aug. 24, 2014).  If so, I must determine whether exclusion is appropriate by applying the Third Circuit's <u>Pennypack</u> factors.  <u>ZF Meritor</u>, 696 F.3d at 298.

Defendants argue that Dr. Burgess' report offers new theories of infringement that conflict with those set forth in the amended infringement contentions and relies on literature not cited in the amended infringement contentions.  (Doc. No. 173-1 at 14.)  Penn responds that the expert report is consistent with its amended infringement contentions and that any additional literature merely provides additional evidentiary support for the arguments in its amended infringement contentions.  (Doc. No. 174 at 1.)

The Amended Infringement Contentions provide that Defendants induce infringement of Claim 13 of the '558 Patent: (1) Claim 13 is directly infringed when "a healthcare professional first administers Erbitux followed by anticancer radiation;" and (2) Defendants "induce

infringement . . . by actively and intentionally encouraging, aiding, instructing, and inducing others to practice the methods of the asserted [C]laim[]." (Doc. No. 63-15 at 2.) The Amended Infringement Contentions includes a chart identifying where each limitation of Claim 13 of the '558 Patent is found. (Id. at 3, 26-30, 31-32.)

Infringement contentions "require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed." O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 467 F.3d 1355, 1366 n.12 (Fed. Cir. 2006) (quoting Nova Measuring Instruments Ltd. v. Nanometrics, Inc., 417 F. Supp. 2d 1121, 1123 (N.D. Cal. 2006)). A patentee thus may not introduce a theory of infringement in an expert report that was not disclosed in its infringement contentions. See Phigenix, Inc. v. Genentech, Inc., 783 F. App'x 1014, 1017-18 (Fed. Cir. 2019). The scope of the expert report and infringement contentions "are not coextensive," however. Realtime Data LLC v. NetApp, Inc., Civ. No. 16-cv-961, 2017 WL 4844254, at *1 (E.D. Tex. Oct. 26, 2016). Infringement contentions are thus not required to "disclos[e] [] specific evidence [or] . . . prove [] infringement." KlausTech, Inc. v. Google LLC, 2018 WL 5109383 , at *2 (N.D. Cal. Sept. 14, 2018); see also Linex Techs. v. Belkin Int'l, Inc., 628 F. Supp. 2d 703, 713 (E.D. Tex. 2008) ("Infringement contentions are not meant to provide a forum for litigation of the substantive issues; they are merely designed to streamline the discovery process.").

I may strike portions of an expert report if it clearly sets forth a new theory of infringement. See, e.g., ViaTech, 2021 WL 663057, at *2 (striking portions of an expert report that introduced new doctrine of equivalents); see also ASUS Comput. Int'l v. Round Rock Rsch., LLC, Civ. No. 12-cv-2099, 2014 WL 1463609, at *2-3 (N.D. Cal. Apr. 11, 2014) (striking portions of an expert report regarding indirect infringement when patentee's infringement contentions included only

"boilerplate" indirect infringement assertions). I may not, however, strike portions of an export report that are simply explaining or supporting the infringement theories set forth in the infringement contentions. See, e.g., Realtime Data, 2017 WL 4844254, at *1.

Defendants argue that the report "relies on literature not cited in the amended infringement contentions" because it sets forth "extensive scientific articles beyond the Fournier manuscript allegedly supporting Penn's claim that the use of Erbitux infringes [C]laim 13." (Doc. No. 173-1 at 14-15.) Yet, Penn may present additional evidence of infringement that was not disclosed in its infringement contentions. See, e.g., KlausTech, 2018 WL 5109383, at *2. "It is illogical to force a plaintiff to only be able to use evidence in its expert reports that was originally in its infringement contentions." Sol IP, LLC, v. AT&T Mobility LLC, Civ. No. 18-cv-526, 2020 WL 10045985, at *2 (E.D. Tex. Apr. 23, 2020). Accordingly, I will not strike portions of the report because it includes additional literature not cited in the Amended Infringement Contentions.

Defendants also argue that the report advances a new theory of infringement because it contradicts Penn's previous position as to (1) whether Erbitux inhibits formation of p185 homodimers; (2) whether it was previously known that heteroclusters are active; and (3) the prevalence of p185 in SCCHN. (Doc. No. 173-1 at 18.) Penn responds that this is a mischaracterization of both the amended invalidity contentions and the report. (Doc. No. 174 at 3.)

### Formation of p185 Homodimers

Penn's Amended Infringement contentions allege that "Erbitux binding to EGFR inhibits formation of EGFR dimers." (Doc. No 63-15 at 31.) It cites Fournier as evidence that when EGF binds EGFR, it results in "the formation of EGFR dimers . . . [and] the subsequent assembly of EGFR dimers and [p185] dimers into an activated herocluster." (Id.) In his supplemental

declaration supporting Penn's Motion for Leave to Amend Infringement Contentions, Dr. Rolf Craven explained that based on the findings of Fournier "Erbitux must [] inhibit formation of activated heteroclusters containing p185 homodimers." (Doc. No. 68-5 at ¶ 4.) The report states that Erbitux "prevents the formation of the ligand stimulated conformation of the EGFR needed to induce the formation of the activated p185 homodimer." (Doc No. 173-3 at ¶ 69.) Defendants characterize the report's statement of how Erbitux effects p185 as a "new theory of infringement" because it "directly contradicts" the Amended Infringement Contentions and Dr. Craven's declaration. (Doc. No. 173-1 at 18-19.) Penn responds that Defendants have selectively quoted and mischaracterized the report and Amended Infringement Contentions. (Doc. No. 174 at 4-6.) I agree with Penn.

It is clear from the Amended Infringement Contentions that Cetuximab inhibits the formation of EGFR dimers and therefore, p185 dimers are unable to form a heterocluster with EGFR dimers, which then is "active." (See Doc. No. 63-15 at 31-32.) This does not contradict the report's description that when Cetuximab binds EGFR, it is not able to induce the formation of an "activated p185 dimer," which the report explains is a dimer that contained within a higher-order assembly. (Doc No. 173-3 at ¶¶ 46-47, 69.) Penn has thus not changed its theory of how Erbitux inhibits kinase activity mediated by a p185 dimer.

### Active Heteroclusters

In its Motion for Leave to Amend Infringement Contentions, Penn stated that its "sole basis for [its] request for leave to assert [C]laim 13 is the Fournier article," and that it "could not have found reason to assert [C]laim 13 against Defendants before the Fournier article." (Doc. No. 63-14 at 8-9.) The report, however, provides a lengthy discussion of heterocluster formation of erbB receptors, including articles published before Fournier. (Doc No. 173-3 at ¶¶ 47-62.) Defendants

16

argue that this constitutes a new theory of induced infringement.  (Doc. No. 173-1 at 20-21); 35 U.S.C. § 271(b).

Induced infringement requires a showing that "the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." Microsoft Corp. v. DataTern, Inc., 755 F.3d 899, 904 (Fed. Cir. 2014).  Defendants urge that the report sets forth a new theory of induced infringement because, although Penn first argued that they had "secret knowledge" of Erbitux's properties such that they knew they were inducing infringement, the report now suggests that the "requisite knowledge was 'clear' and known to 'many' people in the art." (Id.)  I disagree.

The Amended Infringement Contentions state that "Defendants' knowingly induce health care providers to directly practice the method" and cite the Erbitux label and their knowledge of the '558 Patent as evidence of their specific intent to induce infringement.  (Doc. No. 63-15 at 27.) This is a far cry from "placeholder" statements that merely recite the requirements for induced infringement under § 271(b).  See, e.g., ASUS, 2014 WL 1463609, at *3 (striking expert report statements that ASUS indirectly infringes by selling products without a specific component and then directing customers to incorporate that component because the infringement contentions included a bare recitation of elements to satisfy the claim).  The report thus does not advance a new theory of induced infringement.

### p185 expression in SCCHN

Dr. Craven stated in his Declaration supporting Penn's Motion for Leave to Amend Infringement Contentions that p185 "can be detected on at least 40% of head and neck cancer samples." (Doc. No. 63-2 at ¶ 31.)  Defendants characterize this statement as showing that Penn's theory of infringement was that less than 50% of head and neck tumors express p185.  (Doc. No.

173-1.)  The report states, however, that "almost all head and neck tumors" express p185.  (Doc No. 173-3 at ¶ 71.)  Defendants argue that the report thus offers a new theory of infringement as to "which head and neck tumors express p185."

The Amended Infringement Contentions do not explicitly state that less than 50% of head and neck express p185.  Rather, it states that that "[e]xpression of EGFR is [] detected in many human cancers including those of the head and neck." (Doc. No. 63-15 at 26.)  Moreover, in his declaration Dr. Craven stated that p185 is expressed on "**at least** 40%."  (Doc. No. 63-2 at ¶ 31 (emphasis added).)  The additional evidence uncovered by Penn is not inconsistent with either its Amended Infringement Contentions or its previous statement that "almost all head and neck tumors express p185."  Any additional evidence is merely "proof showing that the accused element did in fact practice the limitation."  Sol IP, 2020 WL 10045985, at *2.  Accordingly, the report does not advance a new theory of infringement as to which head and neck tumors express p185.

Because the report does not advance any new theories of infringement beyond those in the Amended Infringement Contentions, I need not determine whether exclusion is warranted under the Pennypack factors.  I will deny Defendants' Motion to Strike Portions of the Infringement report of Dr. Antony Burgess.

2. Penn's Motion to Motion to Exclude Non-Infringement Testimony of Dr. Jennifer R. Grandis

Defendants' Expert, Dr. Jennifer Grandis, has opined that administration of Erbitux followed by radiation does not directly infringe Claim 13 of the '558 Patent.  Grandis is the Robert K. Werbe Distinguished Professor in Head and Neck Cancer at the University of California, San Francisco.  (Doc. No. 281-10 at ¶ 2.)  She earned her M.D. in 1987 from the University of Pittsburgh and completed a surgery and otolaryngology fellowship and research fellowship at the

University of Pittsburgh.  (<u>Id.</u> at ¶¶ 3-5.)  While at the University of Pittsburgh Medical Center (UPMC), Grandis led the Head and Neck Cancer Program and was the principal investigator for two National Institute of Health grants.  (<u>Id.</u> at ¶¶ 6-7.)  Grandis' research focuses on signal transduction in head and neck squamous cell carcinoma.  (<u>Id.</u> at ¶ 9.)

Penn argues that Grandis "lacks specialized expertise in the pertinent art—erbB receptor biology."  (Doc. No. 279 at 8-14.)  Penn characterizes Grandis as a physician who studies the "expression of erbB receptors" but has no expertise on the "interactions between erbB receptors." (<u>Id.</u> at 8.)  Penn cites Grandis' testimony that before this case she was "unfamiliar with the term 'clustering' with respect to erbB receptors" and that she did not know whether a p185 homodimer can "phosphorylate other proteins that lead to downstream signal transduction" without further review of the scientific literature.  (Doc. No. 281-9 at 61:4-15; 130:11-17.)  Penn further criticizes the publications on which Grandis has relied to support her opinion.  (Doc. No. 279 at 11-14.) Penn ignores, however, Grandis' own extensive publication history and research experience— much of which relates to EGFR signaling in head and neck cancer.  (<u>See</u> Doc. No. 285-1 at ¶¶ 2- 14.)  Moreover, Defendants' argue that Grandis' purported errors are actually disputes of scientific fact.  (Doc. No. 296 at 8.)   Even if Grandis made errors in her testimony, those mistakes do not "render her unqualified as an expert for purposes for purposes of Rule 702."  <u>In re Paoli</u>, 35 F.3d at 754.

Penn also argues that Grandis' opinions are unreliable because they "arise from a cherry-picked literature review," and are "directly contradicted by her own publications."  (Doc. No. 279 at 15.)  It further argues that Grandis "focused her non-infringement positions on the Fournier and Patel publications while completely overlooking or providing only cursory responses to other publications directly undermining her assertions."  (<u>Id.</u> at 16.)  A disagreement between experts

about the importance of specific literature, however, does not make one of the experts unreliable. See Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 81 (3d Cir. 2017) ("'The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research. . . . Instead, the court looks to whether the expert's testimony is supported by 'good grounds.'") (quoting In re Paoli, 35 F.3d at 745). Defendants urge that any contradiction between Grandis' opinion and publications are mischaracterizations. (Doc. No. 296 at 11 n.5 (Grandis' "statements are not mutually exclusive and are entirely consistent with one another").) Any argument that Grandis' conclusions are scientifically inaccurate can be explored through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." United States v. Phung, 127 F. App'x 594, 598 (3d Cir. 2005) (quoting Daubert, 509 U.S. at 596).

Because Grandis is qualified and because her proposed testimony is reliable, I will deny Penn's Motion to Exclude Grandis' Testimony

3. Defendants' Motion to Exclude Expert Testimony Based on the Fournier Manuscript

Penn's Infringement Expert, Dr. Antony Wilks Burgess, has opined that Fournier provides evidence that administration of Erbitux inhibits kinase activity mediated by a p185 homodimer and thus infringes Claim 13. (Doc. No. 173-3 at ¶ 46, 64.) Defendants do not move to exclude Dr. Burgess' testimony in its entirety. Rather, they move to exclude only testimony and evidence regarding Fournier because it is unreliable and irrelevant. (Doc. No. 271); See Fed. R. Evid. 702; Daubert, 509 U.S. at 579. Yet, "it is not the district court's role under Daubert to evaluate the correctness of facts underlying an expert's testimony." i4i Ltd. P'ship v. Microsoft Corp., 598

F.3d 831, 856 (Fed. Cir. 2010). Because Dr. Burgess is qualified, and his testimony is reliable and relevant, I will deny Defendants' Motion.

To admit expert testimony, the expert must be qualified, and the testimony must be reliable and "fit the issues in the case." Schneider, 320 F.3d at 404. Defendants do not challenge Burgess' qualifications but argue that any testimony related to Fournier is unreliable and irrelevant. Defendants focus their argument on the Fournier's peer review comments: they urge that four peer-reviewed journals rejected Fournier "due to its seriously flawed methodology, analysis and conclusions." (Doc. No. 271 at 7.) Burgess does not base his opinion on Fournier alone, however, but rather on a body of scientific literature—including Defendants' own publications. (See Doc No. 173-3.) Moreover, although the reviewers found flaws in Fournier, Burgess himself was one of those reviewers. (See Doc. No. 186-19 at 167:54-168:2.) Burgess acknowledges that "certain parts of [Fournier] need to be improved," but maintains that "there is some solid data there on the size of the erbB clusters." (Doc. No. 295-5 at 167:18-23.) Any argument that Burgess' conclusions based on Fournier are scientifically inaccurate can be explored through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Phung, 127 F. App'x at 598 (quoting Daubert, 509 U.S. at 596); see also Whitserve, LLC v. Comput. Packages, Inc., 694 F.3d 10, 29 (Fed. Cir. 2012).

Defendants also urge that Fournier "does not fit the facts of this case" because any assertion that Fournier establishes that Erbitux "inhibits kinase activity mediated by a p185 homodimer" relies on "undisputedly" false assumptions. (Doc. No. 271 at 13.) Defendants argue that Fournier "used the wrong kind of cells," that it is unclear whether those cells had p185 homodimers, and that Fournier "did not measure kinase activity mediated by p185 homodimers." (Id. at 14-20.) Expert testimony may however "fit the issue of the case" when there are "good grounds to

21

extrapolate" results of a study such that it "connects the work of the expert to the particular case." See In re Paoli, 35 F.3d at 743.

Burgess bases his opinions on more than just Fournier. His report includes a lengthy discussion, based on several scientific publications (none of which Defendants argue are unreliable or irrelevant), supporting his opinion that head and neck cancers express EGFR and p185 and how Erbitux inhibits kinase activity mediated by a p185 homodimer. (Doc. No. 173-3 at ¶¶ 46-73.) Moreover, Burgess has explained how the findings in Fournier can be extrapolated to show that Erbitux inhibits p185 homodimer-mediated kinase activity in head and neck cancer. (See, e.g., Doc. No. 186-19 at 122:3-5 ("The biology of the receptor, with direct activation receptor or its inhibition will be very similar on different cells.").) Accordingly, Burgess' proposed testimony 'fits the issues in the case." See In re Paoli, 35 F.3d at 743.

As I have discussed, Burgess' proposed testimony is reliable and will assist the fact trier in determining whether administration of Erbitux infringes Claim 13. Although Fournier may have flaws, "it is not the district court's role under Daubert to evaluate the correctness of facts underlying an expert's testimony." i4i Ltd., 598 F.3d at 856. Defendants may cross-examine Burgess regarding the facts he relies on, and may present contrary evidence. Phung, 127 F. App'x at 598. Accordingly, I will deny Defendants' Motion to Exclude Testimony and Evidence Regarding Fournier.

4. Penn's Motion to Exclude Testimony of Dr. Steven M. Block

Defendants' Expert, Dr. Steven Block, has opined that "Burgess' opinion that Erbitux inhibits kinase activity mediated by a p185 homodimer" is incorrect. (Doc. No. 285-1 at ¶ 49.) Block's analysis focuses on Burgess' interpretation of Fournier. He describes the peer-review

process in the scientific community and the comments from peer-reviewers on Fournier. (Id. at ¶¶ 37-44.) He then critiques Burgess' interpretation of Fournier by describing the problems with Fournier's methodology and suggests that the authors should have used the "Saffman-Delbrück" model of diffusion rather than the "Stokes-Einstein equation" model of diffusion. (Id. at ¶ 55.)

Penn urges that Block "lacks the expertise necessary to opine about erbB receptors." (Doc. No. 278 at 7.) An expert witness may not testify "on the issues of noninfringement or invalidity unless that witness is qualified as an expert in the pertinent art." Sundance, Inc. v. DeMonte Fabricating Ltd., 550 F.3d 1356, 1363 (Fed. Cir. 2008). Block is a professor at Stanford with a joint appointment in the Departments of Applied Physics and Biology. (Id. at ¶ 2.) He earned bachelors and masters degrees in physics, a Ph.D. in biology. (Id. at ¶ 3.)

Block's scientific research focuses on single molecule biophysics and he is undisputedly an expert in this field. (Id. at ¶ 7.) The TIRF microscopy method used in Fournier is within the field of single molecule biophysics. (See Doc. No. 63-4 at 5.) Although Block has no background or expertise in erbB receptors, Defendants argue that Blocks' opinions are "limited to discussing the flaws and limitations of Fournier's single-molecule bioimaging work." (Doc. No. 297 at 7.) Block is thus qualified to opine on the Fournier methodology and results and the conclusions drawn from those results in Fournier.

Penn also argues that Block's testimony is unreliable because it is "premised on the faulty application of a physical model," the Saffman-Delbrück model. (Doc. No. 278 at 10.) Penn urges that the Saffman-Delbrück is in accurate when measuring larger proteins, such as erbB proteins. Defendants counter that Block has explained that this model is more appropriate when measuring proteins through biological membranes, such as erbB proteins. (Doc. No. 285-1 at ¶¶ 54, 60-67.) Moreover, Block cites several articles explaining the applicability of the Saffman-Delbrück model.

(Id. at ¶¶ 66-67.)  "The grounds for the expert's opinion merely have to be good, they do not have to be perfect."  In re Paoli, 35 F.3d at 744.  Block has cited several studies supporting his application of the Saffman-Delbrück model.  Once again, any argument that Block's conclusions are scientifically inaccurate can be explored through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  Phung, 127 F. App'x at 598 (quoting Daubert, 509 U.S. at 596); see also Whitserve, 694 F.3d at 29.

Penn argues that Block's criticisms of Fournier will not assist the finder of fact because he does not dispute the conclusion of the Fournier publication that higher order erbB clusters form. (Doc. No. 279 at 12-13.)  Block's report clearly describes why, in his opinion, "the claim that activated EGFR dimers associate with [p185] partners that cluster together as upon EGF binding is unjustified."  (Doc. No. 281-3 at ¶ 74.)

Because Block is qualified to discuss the single-molecule biophysics results of Fournier and conclusions drawn therefrom and because his proposed testimony is reliable and will assist the finder of fact, I will deny Penn's motion to exclude Block's testimony.

## D.  Motions to Exclude Damages Expert Testimony

Both Parties' expect to offer expert testimony as evidence of the amount of damages. Although the Parties' agree that the correct measurement of damages is measured by a reasonable royalty, the experts reports unsurprisingly offer significantly different opinions on the amount of damages.  (Doc. Nos. 273-1, 286-6.)  Each side has moved to exclude the testimony of other other's damages expert under Daubert.  (Doc. Nos. 273, 280.)

A reasonable royalty is the amount "that would have been agreed to in a hypothetical negotiation between a willing licensee and willing licensors at the time infringement began."

Fujifilm Corp. v. Benun, 605 F.3d 1366, 1372 (Fed. Cir. 2010). "[E]stimating a reasonable royalty is not an exact science" and there may be "a range of reasonable royalties, rather than a single value." Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1296 (Fed. Cir. 2015). Moreover, "there may be more than one reliable method for estimating a reasonable royalty." Id. Regardless of which method is used to be reliable "the data utilized in the methodology is sufficiently tied to the facts of the case." Id.

Here, both experts began by determining the base upon which a royalty rate would be applied. (Doc. Nos. 273-1 at 19-25; 281-6 at ¶¶ 38-42.) Then both experts applied the Georgia-Pacific factors to determine the reasonable royalty. (Doc. Nos. 273-1, 286-6); see AstraZeneca AB v. Apotex Corp., 782 F.3d 1324, 1332 (Fed. Cir. 2015) ("[T]he so-called Georgia–Pacific factors[] [are a] set of 15 factors drawn from the frequently cited opinion in Georgia–Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y.1970).).

1. Defendants' Motion to Exclude the Testimony of Krista Holt

Penn's damages expert, Krista Holt, opined that the reasonable royalty damages would be approximately $43 million. (Doc. No. 273-1 at 78.) She also opines on the commercial success of Erbitux as an indicium of non-obviousness. (Id. at 80-81.) Defendants move to exclude the entirety of Holts' testimony. (Doc. No. 273.) I will Deny Defendants' Motion.

**Holt's Reasonable Royalty Rate Opinion**

Defendants move to exclude Holt's reasonable royalty opinion on the basis that it is unreliable because: (1) she relies on a licensing agreement that is not comparable to the hypothetical negotiation; (2) her opinion does not capture the incremental benefit that Claim 13 adds to Erbitux; and (3) her opinion that the reasonably royalty damages should include a fixed

lump sum payment should is inconsistent with the Patent Act.  (Id.)  Because these arguments go to the weight and credibility—but not the admissibility—of Holt's opinion, I will deny Defendants' Motion to Exclude Holt's Reasonable Royalty Testimony.

*Licensing Agreements Comparable to the Hypothetical Negotiation*

Defendants argue that Holt's opinion regarding reasonable royalty damages is unreliable because she relies on a licensing agreement that is not comparable to the hypothetical negotiation. (Doc. No. 273 at 10-15.)  An expert may rely on past licenses in calculating damages; those licenses, however, must be "sufficiently comparable to the hypothetical license at issue in suit." Lucent Techs., Inc. v. Gateway Inc., 580 F.3d 1301, 1325 (Fed. Cir. 2009).  Accordingly, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case."  Id. at 1317.  The expert's analysis must "account for the technological and economic differences between" the prior license and the hypothetical license in this case.  Wordtech Sys., Inc. v. Integrated Networks Sols., Inc., 609 F.3d 1308, 1320 (Fed. Cir. 2010) (internal quotation marks omitted).

Holt's report includes an analysis of eight licensing agreements: three between Penn and its licensing partners, and five between Defendants and their licensing partners.  (Doc. No. 273-1 at 31-44.)  Holt does not find any of these licensing agreements to be comparable to the hypothetical license agreement in this case.  (Id.)  She nevertheless relies on four of these licensing agreements in forming her opinion because they are "potentially informative of the royalty that would be agreed to between Penn and Defendants" or are "informative for the starting point of a hypothetical negotiation."  (Id. at 35, 37, 39-40.)  For each of these four licensing agreements, Holt describes the similarities and differences between the surrounding technologies and economic circumstances in those agreements and the hypothetical agreement in this case.  (Id.)

26

Defendants argue that although Holt primarily relies on a 2004 Penn-Genentech Agreement, she states that it is not comparable to the hypothetical license agreement in this case and her opinion is thus unreliable. (Doc. No. 273 at 11-12.) Defendants can hardly claim that the reliance on the 2004 Penn-Genentech Agreement makes Holt's testimony unreliable, however, when its own expert heavily relies on the same agreement in forming his opinion. (See Doc. No. 281-6 at ¶¶ 79, 111); Versata Software, Inc. v. SAP Am., Inc., 717 F.3d 1255, 1268 (Fed. Cir. 2013) (Defendant "cannot legitimately challenge the comparability of its own comparable.").

Defendants further argue that Holt failed to analyze the technical and economic differences between the 2004 Penn-Genentech Agreement and the hypothetical agreement here. (Id. at 12-13.) Holt's report, however, includes a discussion of the technical and economic differences between the 2004 Penn-Genentech Agreement and the current hypothetical agreement. (Doc. No. 273-1 at 11-12.) Any argument that her assumptions are incorrect go to the weight of Holt's testimony and may be explored through cross-examination and presentation of contrary evidence. See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012) (Defendants "disagreements are with the conclusions reached by [Plaintiff's] expert and the factual assumptions and considerations underlying those conclusions, not his methodology. These disagreements go to the weight to be afforded the testimony and not its admissibility.").

Defendants also urge that Holt's use of industry licenses to adjust the royalty rate range of the 2004 Penn-Genentech Agreement renders her opinion unreliable. (Doc. No. 273 at 13.) They argue that Holt did not "ensure that the industry agreements were comparable to this case in any way." (Id.) Holt adjusts the 2004 Penn-Genentech Agreement (which was a license of non-FDA approved treatment) royalty rate range by a 2.8 multiplier based on her analysis of licenses in the pharmaceutical and biotechnology industry which showed higher royalty rates for drugs that were

27

FDA approved at the time of the negotiation compared to preclinical drugs. (Doc. No. 273-1 at 71-72.) Defendants argue that Holt failed to consider alternative reasons for the observed increase in royalty rate. (Doc. No. 273 at 14.) Again, Defendants' arguments amount to disagreements with Holt's conclusions regarding the applicability of the industry agreements and thus do not render Holt's opinion unreliable. See ActiveVideo Networks, 694 F.3d at 1333.

### *Apportionment to the Incremental Value of Claim 13*

Defendants also argue that Holt's opinion is unreliable because it does not capture the incremental benefit that Claim 13 adds to Erbitux. (Doc. No. 273 at 16-20.) To be reliable, the expert's opinion on "reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1226 (Fed. Cir. 2014). The expert must thus "separate the damages between the patented improvement and the conventional components" of the infringing product. Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., 879 F.3d 1332, 1348 (Fed. Cir. 2018).

Penn argues that incremental value of Claim 13 to Erbitux is "the use of Erbitux the treatment of [Locally-advanced SCCHN] in connection with radiotherapy wherein Erbitux inhibits the kinase activity mediated by a p185 homodimer." (Doc. No. 294 at 12-13.) In her report, Holt states that "[r]eseaerch has determined that 96.4% of SCCHN patients expressed p185" and that she "apportioned the royalty based by assuming 96.4% of the [] U.S. sales are tied to alleged infringement of Claim 13." (Doc. No. 273-1 at 22.) Defendants urge that this is not proper apportionment because Holt failed to account for any benefit of inhibiting p185 homodimer-mediated kinase activity over erbB kinase activity generally, how much of Erbitux sales was driven by its ability to inhibit p185 homodimer-mediated kinase activity, and if physicians prefer Erbitux over other drugs because of its ability to inhibit p185 homodimer-mediated kinase activity. (Doc.

No. 273 at 18.)  Yet, these arguments are "not the proper subject of a <u>Daubert</u> motion, as [they] turns on the resolution of a factual dispute—specifically, whether the features identified by Defendants are non-patented components that drive demand for" Erbitux.  <u>See</u> <u>Shire Viropharma</u>, 2021 WL 1227097, at *28.  Defendants are free to cross-examine Holt on her factual assumptions underlying her apportionment analysis.

### Lump Sum Payments

Defendants urge that Holt's reasonable royalty opinion is unreliable because it includes a fixed $6.5 million lump sum, which is inconsistent with the Patent Act.  (Doc. No. 273 at 21.) They argue that the lump sum payment "cannot be tied to the infringement in any case, because it is fixed regardless of the amount of infringing sales or the time period of the alleged infringement." (<u>Id.</u> at 22.)

There is no *per se* rule against an award of both a running royalty award and a lump sum award.  <u>See, e.g.</u>, <u>Fujifilm Corp</u>, 605 F.3d at 1373 (affirming an award of a $2.5 million sump sum and $2.00 per infringing use running royalty based on the hypothetical negotiation).  An expert opinion in favor lump sum award in addition to a running royalty award must nevertheless be based on the hypothetical negotiation.  <u>See</u> <u>LaserDynamics, Inc. v. Quanta Comput., Inc.</u>, 694 F.3d 51, 80 (Fed. Cir. 2012).

In her report, Holt explains that "both [P]arties' most similar agreements to the hypothetical negotiation include lump sum payments" and that "it is reasonable to expect that both [P]arties would anticipate a lump sum payment to be part of the royalty arrangement."  (Doc. No. 273-1 at 70.)  In her deposition, Holt characterizes this as an "up-front access fee" that would have been paid at the time of hypothetical negotiation.  (Doc. No. 295-6 at 161:4-7.)  She explains that Penn always includes these lump sum payments as "an insurance" in the event there were no royalties.

(See id. at 163:15-23.)   All of the licenses Holt deemed relevant to the reasonable royalty calculation include a lump sum component and thus including a lump sum in her opinion is not inconsistent with the Patent Act.   See LaserDynamics, 694 F.3d at 79-80 (Comparable licenses are "probative not only of the proper amount of a reasonable royalty, but also of the proper form of the royalty structure.").   To the extent that Defendants disagree with Holt's conclusions, they are free to explore her factual basis of her opinion on cross-examination.

Defendants also argue that Holt impermissibly relies on Penn's litigation costs as a reason for including the lump-sum component.  (Doc. No. 173 at 23); Mahukar v. C.R. Bard, Inc., 79 F.3d 1572, 1581 (Fed. Cir. 1996) (litigation expenses do not factor into reasonable royalty awards).  In her deposition Holt testified: "[The access fee] secures an upfront fee no mater what happens afterwards . . . they still get their upfront fee. . . . I think Penn said they have spent somewhere up to $2 million on just the prosecution and IPR for the patents."  (Doc. No. 295-6 at 161:4-21.)  Holt again references Penn's costs in response to Defendants question regarding whether a lump sum payment would be appropriate if the damages occurred on a single day:

> The access fee would be paid, and then if the product killed everyone the next day and people just somehow started dropping over dead, then the access fee would have been paid, but the royalties would only be one day's worth, right? So what an access fee does is it protects Penn so that they get the access fee for the technology, right? They have a lot of cost that they put in the patents, right? They put almost $2 million just fighting in the US and worldwide on the prosecution against Lilly. And then there's another half a million for the IPR. So is Penn going to do all of that work and fight for that many years and then receive one day of royalties? No. That's not what -- if we look at what Penn does, 100 percent of the time, Penn has an upfront payment on their licenses.

(Id. at 163:15 – 164:15.)  Defendants characterize Holt's statement as showing that the lump sum component is to compensate Penn for its litigation expenses.  (Doc. No. 173 at 23.)  Penn responds that this statement is merely explaining "Penn's policies *generally* and explaining why an up-front

fee is always included in Penn's licenses." (Doc. No. 294 at 18.)  Any dispute over the meaning of Holt's statements goes to credibility and cannot be resolved in a <u>Daubert</u> motion.

Because Holt's opinion is reliable, I will deny Defendants' Motion to Exclude Holt's Reasonable Royalty Testimony.

### Holt's Commercial Success Opinion

Defendants argue that Holt's commercial success opinion should be excluded because it does not provide a nexus between the success of Erbitux and Claim 13.  (Doc. No. 273 at 23.) Penn responds that it is entitled to a presumption of nexus because the sales are coextensive with the invention, and that Holt has nevertheless established a nexus.  (Doc. No. 294 at 21-22.) Because Holt has provided a nexus between the claimed invention and the commercial success of Erbitux, I will deny Defendants' Motion to Exclude Holt's testimony of commercial success.

Evidence of commercial success is relevant only if a nexus "exist[s] between the commercial success and the claimed invention." <u>Tokai Corp. v. Easton Enters., Inc.</u>, 632 F.3d 1358, 1369 (Fed. Cir. 2011).  The strength of the nexus between the commercial success and the claimed invention "goes primarily to the weight secondary considerations should be given, and the Daubert inquiry is one of admissibility rather than weight." <u>Genband US LLC v. Metaswitch Networks Corp.</u>, Civ. No. 14-33, 2016 WL 98745, at *2 (E.D. Tex. Jan. 8, 2016); <u>see also</u> <u>Alarm.com, Inc v. SecureNet Techs. LLC</u>, Civ. No. 15-807, 2019 WL 133228, at *3 (D. Del. Jan. 8, 2019) (Defendants' argument that the expert's nexus was legally insufficient was "a more appropriate inquiry for summary judgment, not for a Daubert motion.").  A plaintiff may also provide additional evidence of a nexus between commercial success and the invention.  <u>See</u> <u>St. Jude Med. v. Volcano Corp.</u>, Civ. No. 10-631, 2012 WL 4773752, at *1 (D. Del. 2012) (denying

motion *in limine* to exclude expert testimony of commercial success of models that may not have been covered by the patent but requiring the patentee to establish a nexus through another expert).

In her report, Holt states that "Lilly earned over $770,000,000 in additional revenue and $566,000,000 in additional profit directly tied to the invention of Claim 13." (Doc. No. 273-1 at 81.) This figure excludes the sales not attributable to other uses of Erbitux. (Id. ("These sales which were only attainable through practice of the inventions of the asserted claim . . . equal 11.0% of Erbitux sales over the period.")) Although Holt does not use the word "nexus," her analysis that the "commercial success is tied to" Claim 13 is sufficient. (See id.) Moreover, Penn states that another expert, Dr. Susan Knox, provides additional evidence of the nexus between Claim 13 and the commercial success of Erbitux. (Doc. No. 294 at 21.)

Defendants' argument that this nexus is insufficient goes to weight, not admissibility. See ActiveVideo, 694 F.3d at 1333. I will thus deny Defendants' Motion to Exclude Holt's testimony on commercial success.

### 2. Penn's Motion to Exclude Reasonable Royalty Rate Opinion of Dr. Christopher A. Vellturo

Defendants' damages expert, Dr. Christopher A. Vellturo, has opined that if Defendants are liable for inducing infringement of Claim 13, the reasonable royalty damages would be approximately $569,800. (Doc. No. 286-6 at 71.) Penn moves to exclude Vellturo's testimony as unreliable because: (1) Vellturo disregards the relationship between independent and dependent claims; (2) he discounts the full scope of Claim 13 by improperly opening "the book of wisdom"; and (3) he ignores the Parties' licensing practices. (Doc. No. 280.) I will deny Penn's Motion.

**Apportionment to the Incremental Value of Claim 13**

In his report, Vellturo assess the "'footprint' of the patented invention in the market place" by evaluating the incremental contribution of Claim 13 relative to Claim 11. (Doc. Nos. 286-6 at ¶¶ 131- 134.) In his deposition, Vellturo explained that the footprint of Claim 13 is the subject matter that "is unique to [Claim] 13 [and] that would not be captured by [Claim] 11." (Doc. No. 286-7 at 106:17-107-2.) Penn argues that Vellturo thus does not consider all the limitations of Claim 13 but rather "discounts every limitation except one." (Doc. No. 280 at 4.)

Damages experts must "value the *entire scope* of the asserted claims." Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1317-18 (Fed. Cir. 2014) (emphasis in original). As I have explained, however, the damages expert must "separate the damages between the patented improvement and the conventional components" of the infringing product. Exmark, 879 F.3d at 1348. When the "accused product consists of both a patented feature and unpatented features" the "market value rule" applies and the patentee must thus "give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." AstraZeneca, 782 F.3d at 1338 (quoting LaserDynamics, 694 F.3d at 67).

Vellturo calculated the reasonable royalty damages by first "computing the relevant royalty base on which a royalty should be assessed." (Doc. No. 286-6 at ¶ 8.) He calculated the royalty base by identifying the "total Erbitux net sales in the U.S and implement adjustments for each of [the] limitations" of Claim 13. (Id. at ¶ 9.) Vellturo agrees with the opinion of Penn's damages expert in that the Erbitux total sales should first be limited to its use for treating head and neck cancer, and then further limited those sales for use of Erbitux in combination with radiation therapy. (Id. at ¶¶ 39-41.)

Vellturo and Penn's Expert then disagree on the reduction in royalty base to account for the last limitation of Claim 13: that the antibody inhibits kinase activity mediated by a p185 homodimer. (Compare id. at ¶ 41 with Doc. No. 286-1 at 22.) Penn's damages expert relies on Penn's infringement expert and reduces the royalty base only by an additional 4.6%. (Doc. No. 286-1 at 22 ("96.4% of SCCHN patients express[] p185. . . . Although [p185] may be present in every case, I have apportioned the royalty base by assuming 96.4% of the [] U.S. sales are tied to alleged infringement of Claim 13.).) Vellturo, relying on Defendants' infringement expert reduces the royalty base by 94%. (Doc. No. 286-6 at ¶¶ 41-42 ("[O]verexpression of p185 is necessary for homodimerization of p185, and [] a conservative estimate for the proportion of head and neck tumors that overexpress p185—and thus could have the p185 homodimers specified in the Asserted Claim—is 6%.").)

Vellturo thus considers each limitation of Claim 13. Like Penn's expert, he reduces the entire market value of Erbitux using tangible evidence such that the royalty base profits are those that represent only use of Erbitux that infringes Claim 13. Any disagreements of "factual assumptions and considerations underlying [an expert's] conclusions go to the weight to be afforded the testimony and not its admissibility." ActiveVideo, 694 F.3d at 1333. I will thus not exclude Vellturo's testimony on the basis that he does not consider all of the limitations of Claim 13.

Penn also argues that Vellturo's opinion is unreliable because he applies a "two-step apportionment." (Doc. No. 280 at 7-8.) After adjusting the royalty base to account for sales that represent only infringing uses of Erbitux, Vellturo also adjusts the royalty rate that would be applied to account for the "invention's incremental contribution to the licensed product." (Doc. No. 281-6 at ¶ 131.) In considering Georgia-Pacific factors 9 and 10, Vellturo explained that the

incremental value of inhibiting p185 homodimer mediated kinase activity was limited and thus the Parties would have lowered the royalty rate. (Id. at ¶¶ 132-134.) Penn's damages expert also considered Georgia-Pacific factors 9 and 10 but found that they had an "upward" impact on the royalty rate. (Doc. No. 273-1 at 58-59.) As I have discussed, Penn's argument that Vellturo's reduction in the royalty rate because invention's incremental contribution to the licensed product is minimal is "not the proper subject of a Daubert motion, as it turns on the resolution of a factual dispute—specifically, whether the features identified by Defendants are non-patented components that drive demand for" Erbitux. See Shire Viropharma, 2021 WL 1227097, at *28. Penn is free to cross-examine Vellturo on the factual assumptions underlying his apportionment analysis.

### Discounting the Full Scope of Claim 13

In his analysis, Vellturo "assume[s] the parties at the hypothetical negotiation would have considered the Asserted Claim to be valid and infringed." (Doc. No. 281-6 at ¶ 47.) He does not consider, however, the entire '558 Patent to be valid and infringed because "many of the other claims of the Patent-in-Suit have been adjudicated and found invalid by the PTAB, including independent Claim 11, on which the Asserted Claim relies." (Id.at ¶ 48.) Penn urges that allowing this knowledge to factor into the hypothetical negotiation renders his opinion unreliable because it "disregard[s] the central premise of the hypothetical negotiation exercise: that the parties sit down on the eve of infringement, assume that that patent at issue is valid and infringed, and try to work out a deal based on what is then known." (Doc. No. 280 at 5-6.)

"The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." Lucent, 580 F.3d at 1325. The relevant question is thus what would the "royalty payment scheme" be if the parties had negotiated a licensing scheme. Id. "The hypothetical negotiation assumes that the *asserted* patent claims are

valid and infringed." Id. (emphasis added). Penn urges that Lucent requires an assumption that the *entire patent* be valid and infringed during the hypothetical negotiation, yet this is not what Lucent requires. See id. Although Penn originally asserted Claim 11, the PTAB cancelled that claim as invalid and thus Penn can no longer maintain a cause of action based on the infringement of that claim. See Trustees of Univ. of Pa. v. Eli Lilly & Co., 737 F. App'x 1006 (Fed. Cir. 2017); Fresenius USA, Inc. v. Baxter Int'l, Inc., 721 F.3d 1330, 1336-37 (Fed. Cir. 2013). Claim 13 is thus the sole remaining asserted claim. (See Doc. No. 63-15.) Vellturo has properly assumed that Claim 13 is valid and infringed. (Doc. No. 281-6 at ¶ 47.)

Moreover, the hypothetical negotiation analysis "permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." Fromson v. W. Litho Plate & Supply Co., 853 F.2d 1568, 1575 (Fed. Cir. 1988) overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337 (Fed. Cir. 2004). For example, "evidence of usage [of the infringing product] after infringement started can, under appropriate circumstances, be helpful to the jury and the court in assessing whether a royalty is reasonable" because it may "provide information that the parties would frequently have estimated during the negotiation." Lucent, 580 F.3d at 1333-34. Similarly, the factfinder may (but is not required to) consider evidence that the infringing product did not receive FDA approval before the expiration of the patent—which occurred after the date of the hypothetical negotiation—because the parties would have recognized that possibility. Amgen Inc. v. Hospira, Inc., 336 F. Supp. 3d 333, 351-52 (D. Del. 2018), aff'd, 944 F.3d 1327 (Fed. Cir. 2019). Here the Parties would have recognized the possibility that all or some of the '558 Patent Claims might be found invalid. Penn's arguments thus go to the weight of Vellturo's opinion, not admissibility.

Parties' Licensing Practices

Penn argues that although Vellturo opined that "that the [P]arties would not have negotiated a license to the entire '558 Patent," he did not consider any license agreements to a single patent claim. (Doc. No. 280 at 9.) An expert may rely only on a license that is "sufficiently comparable to the hypothetical license at issue in suit." Lucent, 580 F.3d at 1325. A patentee may, however, "seek only those damages attributable to the infringing features." Virnetx, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1328 (Fed. Cir. 2014). Here, Vellturo has reviewed the same licenses as Penn's expert. As I have discussed both Penn's expert and Vellturo relied heavily on the same 2004 Penn-Genentech Agreement. Penn's arguments amount to no more than disagreements with Vellturo's conclusions of final royalty rate—not his methodology—which is not a ground for excluding her testimony. ActiveVideo, 694 F.3d at 1333.

Because Vellturo's opinion is reliable, I will deny Penn's Motion to Exclude Vellturo's Reasonable Royalty Testimony.

IV.    CONCLUSION

AND NOW, this 14th day of January, 2022, upon consideration of Defendants Motions (Doc. Nos. 173, 270, 271, 273), Penn's Responses (Doc. Nos. 174, 292, 293, 294), Defendants Replies (Doc Nos. 175, 306, 307, 308) and Penn's Sur-Reply (Doc. No. 312, 313) and consideration of Penn's Motions (Doc. Nos. 278, 279, 280, 314) and Defendants' Responses (Doc. Nos. 269, 297, 299, 317), and the entirety of the record, it is hereby ORDERED that:

1.    Defendants' Motion to Strike Portions of the Infringement Report of Dr. Antony Burgess (Doc. No. 173) DENIED;

2.      Defendants' Motion to Exclude Testimony Regarding the Order of Administration (Doc. No. 270) is **GRANTED**. Penn is **ESTOPPED** from presenting testimony of order of administering the antibody first followed by radiation as an indicium of the non-obviousness of Claim 13;

3.      Defendants' Motion to Exclude Expert Testimony Based on the Fournier Manuscript (Doc. No. 271) is **DENIED**;

4.      Defendants' Motion to Exclude Testimony of Ms. Krista Holt (Doc. No. 273) is **DENIED**;

5.      Penn's Motion to Exclude the Testimony of Dr. Steven M. Block (Doc. No. 278) is **DENIED**;

6.      Penn's Motion to Exclude the Non-Infringement Testimony of Dr. Jennifer R. Grandis (Doc. No. 279) is **DENIED**;

7.      Penn's Motion to Exclude the Reasonable Royalty Rate Opinion of Christopher A. Vellturo, Ph.D. (Doc. No. 280) is **DENIED**; and

8.      Penn's Motion to Strike Defendants Replies (Doc. No. 314) is **DENIED**.


                                        **AND IT IS SO ORDERED.**

                                        _/s/ Paul S. Diamond_
                                        Paul S. Diamond, J.