IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | **Redacted - Public Version** |
| v. | ) ) ) | C.A. No. 20-755-RGA-JLH |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) ) | ███████████████ |
| Defendant. | ) | |

## LETTER TO THE HONORABLE JENNIFER L. HALL
## FROM NATHAN R. HOESCHEN

Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia
Technologies, Inc.*

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Douglas W. Cheek
Adam Pivovar
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Deepa Kannappan
Lauren Krickl
Brittany Cazakoff
Kyung Taeck Minn
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: February 14, 2022



Nathan R. Hoeschen
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
(302) 298-0709 – Direct
nhoeschen@shawkeller.com

February 14, 2022

**BY CM/ECF & HAND DELIVERY**
The Honorable Jennifer L. Hall
United States District Court for the District of Delaware
844 N. King Street
Wilmington, DE 19801

**Redacted - Public Version**



Re:    *United Therapeutics Corporation v. Liquidia Technologies, Inc.,*
       C.A. No. 20-755-RGA-JLH

Dear Judge Hall:

        Liquidia respectfully requests the Court order UTC to produce Form FDA 3542 ("Form 3542") for Tyvaso®, listing U.S. Patent No. 10,716,793 (the "'793 patent") in the Orange Book as a patent covering Tyvaso®'s recently approved indication—pulmonary hypertension with interstitial lung disease ("PH-ILD"). This form is directly relevant to Liquidia's document requests and UTC's novel construction of "pulmonary hypertension" as used in the claims of the '793 patent (Ex. A), advanced for the first time during expert discovery.

        Expert discovery in this matter began on October 15, 2021 with expert depositions taking place from mid-December through mid-January. (D.I. 20 at ¶ 10.) As part of this discovery, UTC submitted the report of pulmonary specialist Dr. Aaron Waxman, who opined on the non-obviousness of the '793 patent claims. Dr. Waxman and UTC initially asserted that the "claimed invention of the '793 patent satisfies a long-felt unmet need in the treatment of pulmonary hypertension" for treating "a ***broader range of pulmonary hypertension patients*** than the therapeutics available at the time of the invention" and that, before the '793 patent, "there were no other therapies approved for the treatment of pulmonary hypertension in patients with interstitial lung disease." (*See* Ex. B at ¶¶ 121, 123-124 (listing pulmonary arterial hypertension ("PAH"), CTEPH, pulmonary fibrosis, and PH-ILD as pulmonary hypertension conditions treated with the inhaled treprostinil claimed in the '793 patent) (emphasis added); *see also id.* at ¶¶ 120-121 (opining that "several objective factors" including "long-felt unmet need" establish the non-obviousness of claims 1-8 of the '793 patent).) Liquidia and its pulmonary specialist agreed that the term "pulmonary hypertension," as used in the specification and claims of the '793 patent, covers this "broad" range.

        During Dr. Waxman's deposition, however, and in an apparent attempt to preserve the validity of the '793 patent under 35 U.S.C. § 112, he and UTC reversed course. Dr. Waxman testified that the plain and ordinary meaning of "pulmonary hypertension" was narrower and ***excludes*** all Groups of pulmonary hypertension except Group 1 PAH. (*See* Ex. C at 116:9-120:10.) Dr. Waxman and UTC specifically represented that the plain and ordinary meaning of "pulmonary hypertension" excludes Group 3 pulmonary hypertension, the group in which PH-ILD is categorized. (*Id.* at 117:1-6; *see also id.* at 106:7-15.) Up until this point, UTC had never advanced

SHAW KELLER LLP

Page 2

this narrower meaning of pulmonary hypertension and never asked the Court to construe the term. (*See generally* D.I. 75.)

Tyvaso®—which UTC represents is a commercial embodiment of the '793 patent (*see* Ex. B at ¶ 67)—was approved for PAH (WHO Group 1) in 2009 and for PH-ILD (WHO Group 3) in 2021. (*See* Ex. D at 1.) Under 21 C.F.R §§ 315.53(a)-(c), UTC was required to submit patent information for listing in the Orange Book using Form 3542 for each patent that claims the method of use for inhaled treprostinil under the NDA, or its supplement for Tyvaso®, including upon approval of UTC's new PH-ILD indication. If, in its Form 3542, UTC represented that the '793 patent covers PH-ILD, that representation to the FDA would squarely contradict positions UTC now intends to take before this Court. Thus, following the deposition, Liquidia promptly requested UTC provide any Form 3542 for Tyvaso® as approved for PH-ILD. (Ex. E at 5 (01/17/22 Email from B. Cazakoff).) Since then, Liquidia has repeatedly requested via email and a meet and confer that UTC produce the form, but UTC has stalled and refused. (*See generally* Ex. E.)

UTC's stonewalling impermissibly prevents Liquidia from receiving documents which UTC has a duty to provide. Indeed, these forms became relevant and material when UTC narrowed its construction of the term "pulmonary hypertension" during Dr. Waxman's deposition. *See Integra LifeSciences Corp. v. Hyperbranch Med. Tech., Inc.*, No. CV 15-819-LPS-CJB, 2017 WL 11558096, at *9 (D. Del. Dec. 11, 2017) (finding when plaintiffs changed their theory relating to the appropriate market for damages and failed to supplement their response, they violated Rule 26(e)); *see id.* (explaining Rule 26(e) requires that "as theories mature and the relevance of various items of evidence changes[,]" a party has a duty to supplement) (citing *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1280 (Fed. Cir. 2012)). The Form 3542 is also responsive to Liquidia's Request for Production ("RFP") No. 30 which seeks "[a]ll documents and things concerning the listing of the Patents-in-Suit in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (the Orange Book)" and RFP No. 40 which seeks "[a]ll documents and things related to Plaintiff's communications with the FDA relating to NDA No. 022387 for TYVASO® and supplemental applications and/or amendments thereto . . . ." (Ex. F, 40, 50.) For both requests, UTC responded it would "produce responsive non-privileged documents, to the extent that such documents exist. . . ." (*Id.* at 41, 51.)

UTC has not indicated that the requested Form 3542 does not exist, has not disputed that the requested Form 3542 identifies Tyvaso®'s new PH-ILD indication, and has not objected on the grounds that production of this single form and accompanying correspondence with the FDA would be unduly burdensome. UTC's only apparent objection to producing Form 3542 is that it is after the close of fact discovery and only "relate[s]" to Dr. Waxman's deposition testimony. (*See* Ex. E at 2 (02/03/22 Email from A. Dykhuis).) On the contrary, the document became highly relevant when UTC, at the eleventh hour, narrowed its position on the plain and ordinary meaning of "pulmonary hypertension."

Good cause exists for UTC to produce Form 3542. *See* Fed. R. Civ. P. 16(b)(4). Liquidia diligently sought Form 3542 from UTC immediately upon learning UTC changed its understanding of the plain and ordinary meaning of pulmonary hypertension. *In re ChanBond, LLC Patent Litig.*, No. 15-cv-842-RGA, 2019 WL 2098316, at *2 (D. Del. May 14, 2019) (finding good cause existed when defendant engaged in additional discovery upon learning of plaintiff's new validity theory in expert's opposition report). Without the form, Liquidia is prejudiced from

SHAW KELLER LLP

Page 3

using the document during cross-examination at the March 28, 2022 trial should UTC continue to advance its new construction of "pulmonary hypertension" in contradiction to Dr. Waxman's original report and representations made to the FDA.  UTC, by comparison, suffers no prejudice: The form is already in UTC's possession, and UTC need only produce as little as one form for PH-ILD to no more than a handful of documents relevant to Liquidia's request.

For the foregoing reasons, Liquidia respectfully requests the Court order UTC to produce Form FDA 3542 for Tyvaso® regarding the '793 patent.

Respectfully submitted,

*/s/ Nathan R. Hoeschen*

Nathan R. Hoeschen (No. 6232)

cc:    Clerk of the Court (by CM/ECF & hand delivery)
       All counsel of record (by CM/ECF &  e-mail)

# EXHIBIT A

US010716793B2

## (12) United States Patent
### Olschewski et al.

(10) Patent No.: **US 10,716,793 B2**

(45) Date of Patent: **\*Jul. 21, 2020**

(54) **TREPROSTINIL ADMINISTRATION BY INHALATION**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Horst Olschewski**, Graz (AT); **Robert Roscigno**, Chapel Hill, NC (US); **Lewis J. Rubin**, LaJolla, CA (US); **Thomas Schmehl**, Giessen (DE); **Werner Seeger**, Giessen (DE); **Carl Sterritt**, Weybridge (GB); **Robert Voswinckel**, Giessen (DE)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/778,662**

(22) Filed: **Jan. 31, 2020**

(65) **Prior Publication Data**

US 2020/0171044 A1 Jun. 4, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/536,954, filed on Aug. 9, 2019, which is a continuation of application No. 15/011,999, filed on Feb. 1, 2016, now Pat. No. 10,376,525, which is a division of application No. 13/469,854, filed on May 11, 2012, now Pat. No. 9,339,507, which is a division of application No. 12/591,200, filed on Nov. 12, 2009, now Pat. No. 9,358,240, which is a continuation of application No. 11/748,205, filed on May 14, 2007, now abandoned.

(60) Provisional application No. 60/800,016, filed on May 15, 2006.

(51) **Int. Cl.**
  *A61K 31/557* (2006.01)
  *A61K 9/00* (2006.01)
  *A61K 31/192* (2006.01)

(52) **U.S. Cl.**
  CPC ............ *A61K 31/557* (2013.01); *A61K 9/008* (2013.01); *A61K 9/0078* (2013.01); *A61K 31/192* (2013.01)

(58) **Field of Classification Search**
  None
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,664,337 A | 5/1972 | Lindsey et al. |
| 4,001,650 A | 1/1977 | Romain |
| 4,007,238 A | 2/1977 | Glenn |
| 4,281,113 A | 7/1981 | Axen et al. |
| 4,306,075 A | 12/1981 | Aristoff |
| 4,306,076 A | 12/1981 | Nelson |
| 4,349,689 A | 9/1982 | Aristoff |
| 4,473,296 A | 9/1984 | Shofner et al. |
| 4,486,598 A | 12/1984 | Aristoff |
| 4,495,944 A | 1/1985 | Brisson et al. |
| 4,635,647 A | 1/1987 | Choksi |
| 4,668,814 A | 5/1987 | Aristoff |
| 4,677,975 A | 7/1987 | Edgar et al. |
| 4,683,330 A | 7/1987 | Aristoff |
| 4,692,464 A | 9/1987 | Skuballa et al. |
| 4,708,963 A | 11/1987 | Skuballa et al. |
| 4,976,259 A | 12/1990 | Higson et al. |
| 4,984,158 A | 1/1991 | Hillsman |
| 5,063,922 A | 11/1991 | Hakkinen |
| 5,080,093 A | 1/1992 | Raabe et al. |
| 5,153,222 A | 10/1992 | Tadepalli et al. |
| 5,234,953 A | 8/1993 | Crow et al. |
| 5,322,057 A | 6/1994 | Raabe et al. |
| 5,361,989 A | 11/1994 | Merchat et al. |
| 5,363,842 A | 11/1994 | Mishelevich et al. |
| 5,497,763 A | 3/1996 | Lloyd et al. |
| 5,551,416 A | 9/1996 | Stimpson et al. |
| 5,727,542 A | 3/1998 | King |
| 5,865,171 A | 2/1999 | Cinquin |
| 5,881,715 A | 3/1999 | Shibasaki |
| 5,908,158 A | 6/1999 | Cheiman |
| 6,054,486 A | 4/2000 | Crow et al. |
| 6,123,068 A | 9/2000 | Lloyd et al. |
| 6,357,671 B1 | 3/2002 | Cewers |
| 6,521,212 B1 | 2/2003 | Gilles et al. |
| 6,626,843 B2 | 9/2003 | Hillsman |
| 6,756,033 B2 | 6/2004 | Cloutier et al. |
| 6,765,117 B2 | 7/2004 | Moriarty et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 1999959533 B2 | 2/2000 |
| DE | 19838711 C1 | 6/2000 |

(Continued)

OTHER PUBLICATIONS

Abe et al., "Effects of inhaled prostacyclin analogue on chronic hypoxic pulmonary hypertension," J. Cardiovascular Pharmacology, 2001, 37, 239 251.

Agnew JE, Bateman RM, Pavia D, Clarke SW. (1984) Radionuclide demonstration of ventilatory abnormalities in mild asthma. Clinical Science; 66: 525-531.

(Continued)

*Primary Examiner* — Jeffrey S Lundgren

*Assistant Examiner* — Michael J Schmitt

(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

Treprostinil can be administered using a metered dose inhaler. Such administration provides a greater degree of autonomy to patients. Also disclosed are kits that include a metered dose inhaler containing a pharmaceutical formulation containing treprostinil.

**8 Claims, 12 Drawing Sheets**

Liquidia's Exhibit 1001
Page 1
LIQ02799887

## US 10,716,793 B2
Page 2

(56)                **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,803,386 | B2 | 10/2004 | Shorr et al. |
| 6,809,223 | B2 | 10/2004 | Moriarty et al. |
| 7,172,557 | B1 | 2/2007 | Parker |
| 7,199,157 | B2 | 4/2007 | Wade et al. |
| 7,261,102 | B2 | 8/2007 | Barney et al. |
| 7,384,978 | B2 | 6/2008 | Phares et al. |
| 7,417,070 | B2 | 8/2008 | Phares et al. |
| 7,544,713 | B2 | 6/2009 | Phares et al. |
| 7,726,303 | B2 | 7/2010 | Tyvoll et al. |
| 9,339,507 | B2 * | 5/2016 | Olschewski ............... A61P 9/12 |
| 9,358,240 | B2 * | 6/2016 | Olschewski .......... A61P 43/00 |
| 10,376,525 | B2 * | 8/2019 | Olschewski ........... A61P 11/00 |
| 2003/0192532 | A1 | 10/2003 | Hopkins |
| 2004/0063912 | A1 | 4/2004 | Blumberg et al. |
| 2004/0105819 | A1 | 6/2004 | Hale et al. |
| 2004/0149282 | A1 | 8/2004 | Hickle |
| 2004/0265238 | A1 | 12/2004 | Chaudry |
| 2005/0165111 | A1 | 7/2005 | Wade et al. |
| 2005/0166913 | A1 | 8/2005 | Sexton et al. |
| 2005/0183719 | A1 | 8/2005 | Wuttke et al. |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2006/0147520 | A1 | 7/2006 | Ruegg |
| 2006/0201500 | A1 | 9/2006 | Von Hollen et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2010/0076083 | A1 | 3/2010 | Olschewski et al. |
| 2010/0236545 | A1 | 9/2010 | Kern |
| 2010/0282622 | A1 | 11/2010 | Phares |
| 2012/0177693 | A1 | 7/2012 | Cipolla et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19934582 A1 | 1/2001 |
| FR | 2783431 A1 | 3/2000 |
| JP | 2003-522003 A | 7/2003 |
| JP | 2004-512101 A | 4/2004 |
| JP | 2005-034341 A | 2/2005 |
| WO | WO 93/00951 A1 | 1/1993 |
| WO | WO 01/58514 A1 | 8/2001 |
| WO | WO 01/85241 A1 | 11/2001 |
| WO | WO 02/34318 A2 | 5/2002 |

### OTHER PUBLICATIONS

Annals of the International Commission on Radiological Protection (ICRP) vol. 28, No. 3, 1998, Publication 80, Radiation Dose to Patients from Radiopharmaceuticals.

Aradigm Corporation news release Oct. 24, 2005, "Aradigm and United Therapeutics Sign Development and Commercialization Agreement Targeting Pulmonary Hypertension," Red Orbit News, http://www.redorbit.com/modules/news/tools.php?tool=print&id=281787, 2 pages.

Aristoff et al., "Synthesis of benzopyran prostaglandins, potent stable prostacyclin analogs, via an intermolecular mitsunobu reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.

Badesch et al., "Prostanoid Therapy for Pulmonary Arterial Hypertension," Journal of the American College of Cardiology, 2004, 43(12:Suppl.S):56S-61S.

Bein et al., "Cardiovascular and pulmonary effects of aerosolized prostacyclin administration in severe respiratory failure using a ventilator nebulization system," J. Cardiovascular Pharmacology, 1996, 27, 583-586.

Benedict et al., "Evidence-based pharmacologic management of pulmonary arterial hypertension," Clinical Therapeutics, 2007, 29, 2134-2153.

Bindl et al., "Aerosolised prostacyclin for pulmonary hypertension in neonates," Archives of disease in childhood, Fetal and neonatal edition, 1994, 71(3), F214-6.

Blanchard, J.D., Cipolla, D., Liu, K., Morishige, R., Mudumba, S., Thipphawong, J., Taylor, G., Warren, S., Radhakrishnan, R., Van Vlasselaer, R., Visor , G. and Starko, K. (2003) Lung Deposition of Interferon Gamma-1b following Inhalation via AERx® System vs. Respirgard II™ Nebulizer Proc. ATS Annual Meeting (Abstract A373), Seattle.

Booke et al., "Prostaglandins in Patients with Pulmonary Hypertension: The Route of Administration," Anesth. Analg., 1998, 86:917, Letter to the Editor.

Boyd, B., Noymer, P., Liu, K., Okikawa, J., Hasegawa, D., Warren, S., Taylor, G., Ferguson, E., Schuster, J., Farr, S., and Gonda, I. (2004) Effect of Gender and Device Mouthpiece Shape on Bolus Insulin Aerosol Delivery Using the AERx Pulmonary Delivery System. Pharmaceutical Research. 21 (10) 1776-1782.

Byron, Peter R., "Drug Delivery Devices, Issues in Drug Development," Proc. Am. Thorac. Soc., 2004, 1:321-328.

Channick et al., "Safety and efficacy of inhaled treprostinil as add-on therapy to bosentan in pulmonary arterial hypertension," J. American College of Cardiology, 2006, 48, 1433-1437.

Colthorpe P, Taylor G, Farr SJ. (1997) A comparison of two non-invasive methods for quantifying aerosol deposition in the lungs of rabbits. J. Aerosol Med.; 10:255.

Defendant Watson Laboratories, Inc.'s Invalidity Contentions for U.S. Pat. No. 9,339,507 and 9,358,240, in The United States District Court for the District of New Jersey, Civil Action No. 3.15:cv-05723-PGS-LHG, Aug. 5, 2016, 56 pages.

Doyle et al., "Inhaled prostacyclin as a selective pulmonary vasodilator," Anaesthesia and Intensive Care, Aug. 1996, 24(4):514-515.

Dumas et al,. "Hypoxic pulmonary vasoconstriction," General Pharmacology, 1999, 33, 289-297.

Dworetz et al., "Survival of infants with persistent pulmonary hypertension without extracorporeal membrane oxygenation," Pediatrics, 1989, 84, 1-6.

EPA Integrated Risk Information System (IRIS): data sheet for 3-methylphenol (m-cresol). Accessed at http://www.epa.gov/iris/subst/0301/htm on Mar. 9, 2014.

EU Community Register, Annexes to Commission Decision C(2005)3436, Sep. 5, 2005, http://ec.europa.eu/health/documents/communityregister/2005/2005090510259/anx_10259_en.pdf(Annex III—Ventavis® Labelling and Package Leaflet), 30 pages.

Ewert et al., "Aerosolized iloprost for primary pulmonary hypertension," New England Journal of Medicine, 2000, 343, 1421-1422.

Ewert et al., "Iloprost als inhalative bzw. Intravenose langzeitbehandlung von patienten mit primarer pulmonaler hypertonie," Z. Kardiol., 2000, 89, 987-999.

Farr et al., "Comparison of in vitro and in vivo efficiencies of a novel unit-dose liquid aerosol generator and a pressurized metered dose inhaler," International Journal of Pharmaceutics, 2000, 198:63-70.

Final Office Action dated Oct. 16 2014 in U.S. Appl. No. 12/591,200.
Final Office Action dated Oct. 17, 2012 in U.S. Appl. No. 12/591,200.
Final Office Action dated Nov. 4, 2013 in U.S. Appl. No. 12/303,877.
Final Office Action dated Dec. 22, 2011 in U.S. Appl. No. 12/591,200.
Final Office Action dated Jul. 2, 2013 in U.S. Appl. No. 13/120,015.
Final Office Action dated Jul. 20, 2015 in U.S. Appl. No. 13/120,015.
Final Office Action dated Aug. 1, 2012 in U.S. Appl. No. 12/303,877.

Findlay et al., "Radioimmunoassay for the Chemical Stable Prostacyclin Analog, 15AU81: a Preliminary Pharmacokinetics Study in the Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):167-174.

Fink et al., "Use of Prostacyclin and its Analogues in the Treatment of Cardiovascular Disease," Heart Disease, 1999, 1:29-40.

Gessler et al., "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension," Eur. Respir. J., 2001, 17, 14-19.

Ghofrani et al., "Hypoxia- and non-hypoxia-related pulmonary hypertension—Established and new therapies," Cardiovascular Research, 2006, 72:30-40.

Ghofrani et al., "New therapies in the treatment of pulmonary hypertension," Herz (Heart), 2005, 4:296-302, with English translation.

Hallioglu et al., "Comparison of Acute Hemodynamic Effects of Aerosolized and Intravenous Iloprost in Secondary Pulmonary Hypertension in Children With Congenital Heart Disease," Am. J. Cardiol., 2003, 92:1007-1009.

Liquidia's Exhibit 1001
Page 2

LIQ02799888

**US 10,716,793 B2**

Page 3

(56)         **References Cited**

OTHER PUBLICATIONS

Haraldsson et al., "Comparison of inhaled nitric oxide and inhaled aerosolized prostacyclin in the evaluation of heart transplant candidates with elevated pulmonary vascular resistance," Chest, 1998, 114, 780-786.

Hoeper et al., "A comparison of the acute hemodynamic effects of inhaled nitric oxide and aerosolized iloprost in primary hypertension," J. American College of Cardiology, 2000, 35, 176-182.

Hoeper et al., "Effects of inhaled nitric oxide and aerosolized iloprost in pulmonary veno-occlusive disease," Respiratory Medicine, 1999, 93, 62-70.

Hoeper et al., "Long term treatment of primary pulmonary hypertension with aerosolized iloprost, a prostacyclin analogue," New England Journal of Medicine, 2000, 342, 1866-1870.

Horn et al., "Treprostinil therapy for pulmonary artery hypertension," Expert Opinion on Investigational Drugs, 2002, 11(11):1615-1622.

Howarth, P.H., "Why particle size should affect clinical response to inhaled therapy," Journal of Aerosol Medicine, 2001, 14 Supp. 1, S-27-S-34.

Ichida et al., "Additive effects of beraprost on pulmonary vasodilation by inhaled nitric oxide in children with pulmonary hypertension," American Journal of Cardiology, 1997, 80, 662-664.

Konorza et al., "Klinisch-pharmakologische Austestung bei pulmonaler Hypertonie zur Therapiefuehrung," Herz, 2005, 30:286-295, English abstract on first page.

Krause et al., "Pharmacokinetics and pharmacodynamics of the prostacyclin analogue iloprost in man," Eur. J. Clin. Pharmacol., 1986, 30, 61-68.

Labiris et al., "Pulmonary drug delivery. Part II: The role of inhalant delivery devices and drug formulations in therapeutic effectiveness of aerosolized medications," Br. J. Clin. Pharmacol., 2003, 56(6):600-612.

Lee et al., "Current strategies for pulmonary arterial hypertension," J. Internal Medicine, 2005, 258, 199-215.

Martin, John C., "Inhaled Form of Remodulin in the Pipeline," http://www.phneighborhood.com/content/in_the_news/archive_2320,aspx, ph Neighborhood, Oct. 28, 2005, 2 pages.

Max et al., "Inhaled prostacyclin in the treatment of pulmonary hypertension," Eur. J. Pediatr., 1999, 158 Suppl 1, S23-S26.

McNulty et al., "The Pharmacokinetics and Pharmacodynamics of the Prostacyclin Analog 15AU81 in the Anesthetized Beagle Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):159-166.

Miller et al., "Standardisation of spirometry. Series ATS/ERS Task Force: Standardisation of Lung Function Testing" Eur Respir J 2005; 26: 319-338.

Mueller et al., "Inhaled iloprost in the management of pulmonary hypertension in infants undergoing congenital heart surgery," European Journal of Anaesthesiology, Jun. 2004, 21(Suppl.33):3, Abstract No. 084.

National Radiological Protection Board. Doses to Patients from Medical Radiological Examinations in Great Britain. (1986) Radiological Protection Bulletin No. 77.

Nebu-Tec med. Produkte Eike Kern GmbH, VENTA-NEB®-ir A-I-C-I® Operating Instructions, Sep. 2005.

Non-Final Office Action dated Jan. 29, 2015 in U.S. Appl. No. 13/120,015.

Non-Final Office Action dated Oct. 11, 2011 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Oct. 31, 2012 in U.S. Appl. No. 13/120,015.

Non-Final Office Action dated Dec. 30, 2014 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Mar. 15, 2013 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Mar. 9, 2014 in U.S. Appl. No. 12/591,200.

Notes for Guidance on the Clinical Administration of Radiopharmaceuticals and Use of Sealed Radioactive Sources.

Administration of Radioactive Substances Advisory Committee (ARSAC) (Mar. 2006). ARSAC Secretariat, Chilton, Didcot, Oxon. OX11 0RQ.

Notice of Allowance dated Jun. 11, 2015 in U.S. Appl. No. 12/303,877.

Olschewski et al. For the German PPH Study Group, "Inhaled iloprost to treat severe pulmonary hypertension—An uncontrolled trial," Annals of Internal Medicine, 2000, 132, 435-443.

Olschewski et al., Aerosolized prostacyclin and iloprost in severe pulmonary hypertension,: Annals of Internal Medicine, 1996, 124, 820 824.

Olschewski et al., "Inhaled Iloprost for Severe Pulmonary Hypertension," N. Eng. J. Med., Aug. 1, 2002, 347(5):322-329.

Olschewski et al., "Inhaled prostacyclin and iloprost in severe pulmonary hypertension secondary to lung fibrosis," Am. Respir. Crit. Care Med., 1999, 160, 600-607.

Olschewski et al., "Pharmacodynamics and pharmacokinetics of inhaled iloprost, aerosolized by three different devices, in severe pulmonary hypertension," Chest, 2003, 124, 1294-1304.

Olschewski et al., "Prostacyclin and its analogues in the treatment of pulmonary hypertension," Pharmacology and Therapeutics, 2004, 102, 139-153.

Olschewski et al., "Recovery from circulatory shock in severe primary pulmonary hypertension (PPH) with aerosolization of iloprost," Intensive Care Med., 1998, 24, 631-634.

Olschewski, Horst, "Therapie der pulmonalen Hypertonie," Pneumologe, 2004, 1:95-101.

OPTINEB®-ir Operating Instructions, Unit Type ON-100/2-2.4 MHz, 2005, 33 pages, verified English translation.

Pappert et al., "Aerosolized Prostacyclin Versus Inhaled Nitric Oxide in Children with Severe Acute Respiratory Distress Syndrome," Anesthesiology, Jun. 1995, 82(6):1507-1511.

Publications of the International Commission on Radiological Protection (ICRP) (1977) Recommendations of the International Commission on Radiological Protection 26.

Pulmonary Delivery, ONdrugDelivery, 2006, 5 pages.

Rigby, Jonathan, Aradigm Corporation, "Technological advances for success: Product pipeline in targeted pulmonary delivery," Pulmonary Delivery Innovative Technologies Breathing New Life into Inhalable Therapeutics, ONdrugDelivery, http://www.ondrugdelivery.com/publications/Pulmonary.pdf, 2006, 17-19.

Rubin et al., "Pulmonary Arterial Hypertension: A Look to the Future," Journal of the American College of Cardiology, Jun. 18, 2004, 43(12,Suppl.S):89S-90S.

Saini et al., "Effect of Electrostatic Charge and Size Distributions on Respirable Aerosol Deposition in Lung Model," Industry Applications Conference, 2004, 39th IAS Annual Meeting, Conference Record of the 2004 IEEE Seattle, WA, Oct. 3-7, 2004, 2:948-952.

Sandifer et al., "Effects of Aerosol vs IV UT-15 on Prostaglandin $H_2$ Analog-Induced Pulmonary Hypertension in Sheep," Chest, 2005, 128:616S.

Sandifer et al., "Potent effects of aerosol compared with intravenous treprostinil on the pulmonary circulation," J. Appl. Physiol., 2005, 99:2363-2368.

Santak et al., "Prostacyclin aerosol in an infant with pulmonary hypertension," Eur. J. Pediatr., 1995, 154, 233-235.

Scientific discussion for the approval of Ventavis, European Medicines Agency (EMEA), Oct. 20, 2004, 30 pages.

Soditt et al., "Improvement of oxygenation induced by aerosolized prostacyclin in a preterm infant with persistent pulmonary hypertension of the newborn," Intensive Care Med., 1997, 23, 1275-1278.

Steffen et al., "The Effects of 15AU81, a Chemically Stable Prostacyclin Analog, on the Cardiovascular and Renin-Angiotensis Systems of Anesthetized Dogs," Prostaglandins, Leukotrienes and Essential Fatty Acids, 1991, 43:277-286.

Stricker et al., "Sustained improvement of performance and haemodynamics with long-term aerosolized prostacyclin therapy in severe pulmonary hypertension," Schweiz Med. Wochenschr., 1999, 129, 923-927.

Van Heerden et al., "Inhaled aerosolized prostacyclin as a selective pulmonary vasodilator for the treatment of severe hypertension," Anaesthesia and Intensive Care, 1996, 24, 87-90.

Liquidia's Exhibit 1001
Page 3

LIQ02799889

**US 10,716,793 B2**

Page 4

(56)         **References Cited**

OTHER PUBLICATIONS

Van Heerden et al., "Re: Delivery of inhaled aerosolized prostacyclin (IAP)," Anaesthesia and Intensive Care, 1996, 24, 624-625.
Voswinckel et al., "Acute effects of the combination of sildenafil and inhaled treprostinil on haemodynamics and gas exchange in pulmonary hypertension," Pulmonary Pharmacology & Therapeutics, 2008, 21, 824-832.
Voswinckel et al., "Favorable Effects of Inhaled Treprostinil in Severe Pulmonary Hypertension," Journal of the American College of Cardiology, 2006, 48(8):1672-1681.
Voswinckel et al., "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," Annals of Internal Medicine, Jan. 17, 2006, 144(2):149-150.
Voswinckel et al., "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal, Journal of the European Society of Cardiology, ESC Congress, Aug. 28-Sep. 1, 2004, Munich, Germany, p. 22, abstract 218.
Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 2004, Abstract 1414, 110, 17 Supplement.
Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 26, 2004, Supplement, 110(17):295, abstract 1414.
Walmrath et al., "Effects of inhaled versus intravenous vasodilators in experimental pulmonary hypertension," Eur. Respir. J., 1997, 10, 1084-1092.
Wasserman et al., "Bronchodilator effects of prostacyclin (PGI2) in dogs and guinea pigs," European Journal of Pharmacology, 1980, 66, 53-63.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01621, U.S. Pat. No. 9,358,240, Jan. 11, 2018.
*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01622, U.S. Pat. No. 9,339,507, Jan. 11, 2018.
*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner), Petition for Inter Partes Review, IRP2017-01622, U.S. Pat. No. 9,339,507, with all Exhibits on exhibit list.
*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner), Petition for Inter Partes Review, IRP2017-01621, U.S. Pat. No. 9,358,240, with only Exhibits 1002, 1059, 1161 and 1164 and not including exhibits already provide with C2.
Webb et al., "The use of inhaled aerosolized prostacyclin (IAP) in the treatment of pulmonary hypertension secondary to pulmonary embolism," Intensive Care Med., 1996, 22, 353-355.
Wensel et al., "Effects of iloprost inhalation on exercise capacity and ventilator efficiency in patients with primary pulmonary hypertension," Circulation, 2000, 101, 2388-2392.
Wetzel, R.C., "Aerosolized prostacyclin: in search of the ideal pulmonary vasodilator," Anesthesiology, 1995, 82, 1315-1317.
Wittwer et al., "Inhalative Pre-Treatment of Donor Lungs Using the Aerosolized Prostacyclin Analog Iliprost Ameliorates Reperfusion Injury," J. Heart Lung Transplant, 2005, 24:1673-1679.
Zanen et al., "Optimal particle size for beta 2 agonist and anticholinergic aerosols in patients with severe airflow obstruction," Thorax, 1996, 51, 977-980.
Zanen et al., "The optimal particle size for β-adrenergic aerosols in mild asthmatics," International Journal of Pharmaceutics, 1994, 107, 211-217.

* cited by examiner

Liquidia's Exhibit 1001
Page 4

LIQ02799890

FIGURE 1



Liquidia's Exhibit 1001
Page 5
LIQ02799891

U.S. Patent

Jul. 21, 2020

Sheet 2 of 12

US 10,716,793 B2

FIGURE 2



Liquidia's Exhibit 1001
Page 6
LIQ02799892

FIGURE 3



Liquidia's Exhibit 1001
Page 7
LIQ02799893

FIGURE 4



FIGURE 5





Liquidia's Exhibit 1001
Page 9
LIQ02799895

FIGURE 6



Liquidia's Exhibit 1001
Page 10

LIQ02799896

FIGURE 7



Liquidia's Exhibit 1001
Page 11
LIQ02799897

FIGURE 8



Liquidia's Exhibit 1001
Page 12
LIQ02799898

FIGURE 9



Liquidia's Exhibit 1001
Page 13
LIQ02799899

FIGURE 10



Liquidia's Exhibit 1001
Page 14
LIQ02799900

FIGURE 11



Liquidia's Exhibit 1001
Page 15
LIQ02799901

FIGURE 12



LIQ02799902

US 10,716,793 B2

1

# TREPROSTINIL ADMINISTRATION BY INHALATION

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation of U.S. application Ser. No. 16/536,954, filed Aug. 9, 2019, which is a Continuation of U.S. application Ser. No. 15/011,999, filed Feb. 1, 2016, which is a Divisional of U.S. application Ser. No. 13/469,854, filed May 11, 2012, Divisional of U.S. application Ser. No. 12/591,200, filed Nov. 12, 2009, which is a Continuation of U.S. application Ser. No. 11/748,205, filed May 14, 2007, which claims priority to U.S. provisional application 60/800,016 filed May 15, 2006, which are incorporated herein by reference in their entirety.

## FIELD OF THE INVENTION

The present application relates to methods and kits for therapeutic treatment and, more particularly, to therapeutic methods involving administering treprostinil using a metered dose inhaler and related kits.

## BACKGROUND OF THE INVENTION

All blood is driven through the lungs via the pulmonary circulation in order, among other things, to replenish the oxygen which it dispenses in its passage around the rest of the body via the systemic circulation. The flow through both circulations is in normal circumstances equal, but the resistance offered to it in the pulmonary circulation is generally much less than that of the systemic circulation. When the resistance to pulmonary blood flow increases, the pressure in the circulation is greater for any particular flow. The above described condition is referred to as pulmonary hypertension (PH). Generally, pulmonary hypertension is defined through observations of pressures above the normal range pertaining in the majority of people residing at the same altitude and engaged in similar activities.

Pulmonary hypertension may occur due to various reasons and the different entities of pulmonary hypertension were classified based on clinical and pathological grounds in 5 categories according to the latest WHO convention, see e.g. Simonneau G., et al. J. Am. Coll. Cardiol. 2004; 43(12 Suppl S):5S-12S. Pulmonary hypertension can be a manifestation of an obvious or explicable increase in resistance, such as obstruction to blood flow by pulmonary emboli, malfunction of the heart's valves or muscle in handling blood after its passage through the lungs, diminution in pulmonary vessel caliber as a reflex response to alveolar hypoxia due to lung diseases or high altitude, or a mismatch of vascular capacity and essential blood flow, such as shunting of blood in congenital abnormalities or surgical removal of lung tissue. In addition, certain infectious diseases, such as HIV and liver diseases with portal hypertension may cause pulmonary hypertension. Autoimmune disorders, such as collagen vascular diseases, also often lead to pulmonary vascular narrowing and contribute to a significant number of pulmonary hypertension patients. The cases of pulmonary hypertension remain where the cause of the increased resistance is as yet inexplicable are defined as idiopathic (primary) pulmonary hypertension (iPAH) and are diagnosed by and after exclusion of the causes of secondary pulmonary hypertension and are in the majority of cases related to a genetic mutation in the bone morphogenetic protein receptor-2 gene. The cases of idiopathic

2

pulmonary arterial hypertension tend to comprise a recognizable entity of about 40% of patients cared for in large specialized pulmonary hypertension centers. Approximately 65% of the most commonly afflicted are female and young adults, though it has occurred in children and patients over 50. Life expectancy from the time of diagnosis is short without specific treatment, about 3 to 5 years, though occasional reports of spontaneous remission and longer survival are to be expected given the nature of the diagnostic process. Generally, however, disease progress is inexorable via syncope and right heart failure and death is quite often sudden.

Pulmonary hypertension refers to a condition associated with an elevation of pulmonary arterial pressure (PAP) over normal levels. In humans, a typical mean PAP is approximately 12-15 mm Hg. Pulmonary hypertension, on the other hand, can be defined as mean PAP above 25 mmHg, assessed by right heart catheter measurement. Pulmonary arterial pressure may reach systemic pressure levels or even exceed these in severe forms of pulmonary hypertension. When the PAP markedly increases due to pulmonary venous congestion, i.e. in left heart failure or valve dysfunction, plasma can escape from the capillaries into the lung interstitium and alveoli. Fluid buildup in the lung (pulmonary edema) can result, with an associated decrease in lung function that can in some cases be fatal. Pulmonary edema, however, is not a feature of even severe pulmonary hypertension due to pulmonary vascular changes in all other entities of this disease.

Pulmonary hypertension may either be acute or chronic. Acute pulmonary hypertension is often a potentially reversible phenomenon generally attributable to constriction of the smooth muscle of the pulmonary blood vessels, which may be triggered by such conditions as hypoxia (as in high-altitude sickness), acidosis, inflammation, or pulmonary embolism. Chronic pulmonary hypertension is characterized by major structural changes in the pulmonary vasculature, which result in a decreased cross-sectional area of the pulmonary blood vessels. This may be caused by, for example, chronic hypoxia, thromboembolism, collagen vascular diseases, pulmonary hypercirculation due to left-to-right shunt, HIV infection, portal hypertension or a combination of genetic mutation and unknown causes as in idiopathic pulmonary arterial hypertension.

Pulmonary hypertension has been implicated in several life-threatening clinical conditions, such as adult respiratory distress syndrome ("ARDS") and persistent pulmonary hypertension of the newborn ("PPHN"). Zapol et al., Acute Respiratory Failure, p. 241-273, Marcel Dekker, New York (1985); Peckham, J. Ped. 93:1005 (1978). PPHN, a disorder that primarily affects full-term infants, is characterized by elevated pulmonary vascular resistance, pulmonary arterial hypertension, and right-to-left shunting of blood through the patent ductus arteriosus and foramen ovale of the newborn's heart. Mortality rates range from 12-50%. Fox, Pediatrics 59:205 (1977); Dworetz, Pediatrics 84:1 (1989). Pulmonary hypertension may also ultimately result in a potentially fatal heart condition known as "cor pulmonale," or pulmonary heart disease. Fishman, "Pulmonary Diseases and Disorders" 2nd Ed., McGraw-Hill, New York (1988).

Currently, there is no treatment for pulmonary hypertension that can be administered using a compact inhalation device, such as a metered dose inhaler.

## SUMMARY OF THE INVENTION

One embodiment is a method of delivering to a subject in need thereof a therapeutically effective amount of trepros-

Liquidia's Exhibit 1001
Page 17

LIQ02799903

US 10,716,793 B2

3

tinil, or treprostinil derivative or a pharmaceutically acceptable salt thereof comprising administering to the subject a therapeutically effective amount of the treprostinil or treprostinil derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Another embodiment is a method for treating pulmonary hypertension comprising administering to a subject in need thereof treprostinil or its derivative, or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Yet another embodiment is a kit comprising a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or treprostinil derivative, or a pharmaceutically acceptable salt thereof.

And yet another embodiment is a kit for treating pulmonary hypertension in a subject, comprising (i) an effective amount of treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; (ii) a metered dose inhaler; (iii) instructions for use in treating pulmonary hypertension.

Administration of treprostinil using a metered dose inhaler can provide patients, such as pulmonary hypertension patients, with a high degree of autonomy.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 pulmonary and systemic changes in hemodynamics following the inhalation of placebo (open circles), 30 µg treprostinil (triangles), 45 µg treprostinil (squares) or 60 µg TREprostinil (black circles) applied by a Metered Dose Inhaler (MDI-TRE). A single short inhalation of treprostinil induced sustained reduction of PAP and PVR that outlasted the observation period of 120 minutes at doses of 45 and 60 µg MDI-TRE. Systemic arterial pressure and resistance were not significantly affected. PAP=mean pulmonary artery pressure; PVR=pulmonary vascular resistance; SAP=mean systemic arterial pressure; SVR=systemic vascular resistance. Data are given as mean value±standard error of the mean (SEM).

FIG. 2 presents hemodynamic changes induced by the inhalation of placebo (open circles), 30 µg treprostinil (triangles), 45 µg treprostinil (squares) or 60 µg treprostinil (black circles) applied by a metered dose inhaler. Treprostinil induced sustained elevation of cardiac output. Heart rate was rather unchanged as a sign for low spillover of MDI-TRE to the systemic circulation. Gas exchange was not negatively affected. CO=cardiac output; HR=heart rate; SaO2=arterial oxygen saturation; SvO2=central venous oxygen saturation. Data are given as mean value±SEM.

FIG. 3 shows areas under the curve for changes in pulmonary vascular resistance (PVR) calculated for an observation period of 120 minutes after inhalation treprostinil using a metered dose inhaler. PVR was markedly lowered by treprostinil inhalation. The increased pulmonary vasodilation over time with the two highest doses mainly relies on the more sustained effect over time. Data are shown as mean value±95% confidence intervals.

FIG. 4 demonstrates Ventilation-perfusion matching measured with the multiple inert gas elimination technique. Five patients (30 µg TRE, n=2; 45 µg TRE, n=1; 60 µg TRE, n=2) with pre-existing gas exchange problems were investigated for changes in ventilation-perfusion ratios. All patients had significant shunt flow at baseline. Shunt-flow and low V/Q areas were not significantly changed by nitric oxide (NO) inhalation or treprostinil inhalation using a metered dose inhaler (MDI-TRE). MDI-TRE applied at high treprostinil concentrations did not negatively affect ventilation-perfusion matching and gas-exchange. Data are given as mean value±95% confidence intervals.

4

FIG. 5 presents response of pulmonary vascular resistance (PVR) to inhaled treprostinil vs. iloprost—period effects. a) First inhalation with treprostinil (n=22) vs. first inhalation with iloprost (n=22); b) second inhalation with treprostinil (n=22) vs. second inhalation with iloprost (n=22). The PVR decrease with treprostinil was delayed and prolonged, compared to iloprost. Due to carryover effects from the first period, in the second period, the effects of both drugs appeared shortened. Data are shown as percent of baseline values (mean value±95% confidence interval).

FIG. 6 presents response of PVR and systemic arterial pressure (SAP) to inhalation of treprostinil vs. iloprost—dose effects. a) Inhalation of 7.5 µg iloprost (in 6 min) vs. 7.5 µg treprostinil (6 min) (n=14, in a randomized order). b) Inhalation of 7.5 µg iloprost (6 min) vs. 15 µg treprostinil (6 min) (n=14, in randomized order). c) Inhalation of 7.5 µg iloprost (6 min) vs. 15 µg treprostinil (3 min) (n=16, in randomized order). Data are shown as percent of baseline values (mean±95% confidence interval). Iloprost, filled circles; Treprostinil, open triangles.

FIG. 7 presents hemodynamic response to inhalation of treprostinil vs. iloprost. Data from n=44 patients, who inhaled both drugs in randomized order, shown as percent of baseline values (mean value±95% confidence interval). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. 8 presents pharmacodynamics after treprostinil inhalation vs. placebo. Placebo or treprostinil in doses of 30 µg, 60 µg or 90 µg were inhaled (means±95% confidence intervals). Maximal decrease of PVR was comparable for all doses. The duration of pulmonary vasodilation (PVR-decrease) appeared to be dose dependent. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output; SaO2, arterial oxygen saturation; SvO2, mixed venous oxygen saturation.

FIG. 9 presents Areas Between the placebo and the treprostinil Curves (ABC). ABCs were calculated for a 3-hour period after inhalation of TRE or placebo from the relative changes of hemodynamic parameters (means±95% confidence intervals). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; SVR, systemic vascular resistance.

FIG. 10 presents hemodynamic responses to the inhalation of 15 µg treprostinil. The inhalation time by increasing treprostinil concentration. A pulse of aerosol was generated every 6 seconds. TRE aerosol was inhaled in concentrations of 100 µg/ml (18 pulses; n=6), 200 µg/ml (9 pulses; n=6), 600 µg/ml (3 pulses; n=21), 1000 µg/ml (2 pulses; n=7) and 2000 µg/ml (1 pulse; n=8). Placebo data correspond to FIG. 8. Data are shown as means±95% confidence intervals. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. 11 presents areas between the placebo curve and the responses to 15 µg treprostinil applied at increasing concentrations to minimize inhalation time. Mean±SEM of relative changes of hemodynamic parameters (observation time 120 min). PAP, pulmonary arterial pressure, SAP, systemic arterial pressure, PVR, pulmonary vascular resistance, CO, cardiac output, SaO2, systemic arterial oxygen saturation, SvO2, pulmonary arterial oxygen saturation.

FIG. 12 presents pharmacokinetics of treprostinil after a single inhalation. Treprostinil plasma levels after inhalation of 30 µg, 60 µg, 90 µg or 120 µg treprostinil (6 min

Liquidia's Exhibit 1001
Page 18

LIQ02799904

5

inhalation period; experiments correspond to those shown in FIGS. **8** and **9**). Data with error bars represent mean values±SEM.

### DETAILED DESCRIPTION OF THE INVENTION

Unless otherwise specified, the term "a" or "an" used herein shall mean "one or more."

The present application incorporates herein by reference in its entirety Voswinckel R, et al. J. Am. Coll. Cardiol. 2006; 48:1672-1681.

The inventors discovered that a therapeutically effective dose of treprostinil can be administered in a few single inhalations using a compact inhalation device, such as a metered dose inhaler. Furthermore, the inventors discovered that such administering does not cause significant side effects, especially no significant side effects related to systemic blood pressure and circulation as well as no gas exchange deteriorations or disruptions.

Accordingly, one embodiment of the invention is a method of delivering to a subject in need thereof, such as a human being, a therapeutically effective amount of treprostinil comprising administering to the subject a formulation comprising a therapeutically effective amount of treprostinil, its derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler. Treprostinil can be administered via a metered dose inhaler to a subject affected with a condition or disease, which can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

Another embodiment of the invention is a method for treating pulmonary hypertension, comprising administering to a subject in need thereof, such as a human being, treprostinil or its derivative, or a pharmaceutically acceptable salt using a metered dose inhaler.

Treprostinil, or 9-deoxy-2',9-alpha-methano-3-oxa-4,5,6-trinor-3,7-(1'3'-interphenylene)-13,14-dihydro-prostaglandin F1, is a prostacyclin analogue, first described in U.S. Pat. No. 4,306,075. U.S. Pat. No. 5,153,222 describes use of treprostinil for treatment of pulmonary hypertension. Treprostinil is approved for the intravenous as well as subcutaneous route, the latter avoiding septic events associated with continuous intravenous catheters. U.S. Pat. Nos. 6,521,212 and 6,756,033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions. U.S. Pat. No. 6,803,386 discloses administration of treprostinil for treating cancer such as lung, liver, brain, pancreatic, kidney, prostate, breast, colon and head-neck cancer. US patent application publication No. 2005/0165111 discloses treprostinil treatment of ischemic lesions. U.S. Pat. No. 7,199,157 discloses that treprostinil treatment improves kidney functions. US patent application publication No. 2005/0282903 discloses treprostinil treatment of neuropathic foot ulcers. U.S. provisional application No. 60/900, 320 filed Feb. 9, 2007, discloses treprostinil treatment of pulmonary fibrosis.

The term "acid derivative" is used herein to describe C1-4 alkyl esters and amides, including amides wherein the nitrogen is optionally substituted by one or two C1-4 alkyl groups.

The present invention also encompasses methods of using Treprostinil or its derivatives, or pharmaceutically acceptable salts thereof. In one embodiment, a method uses Treprostinil sodium, currently marketed under the trade name of REMODULIN®. The FDA has approved Trepro-

6

stinil sodium for the treatment of pulmonary arterial hypertension by injection of dose concentrations of 1.0 mg/mL, 2.5 mg/mL, 5.0 mg/mL and 10.0 mg/mL. The chemical structure formula for Treprostinil sodium is:



Treprostinil sodium is sometimes designated by the chemical names: (a) [(1R,2R,3aS,9aS)-2,3,3a,4,9,9a-hexahydro-2-hydroxy-1-[(3S)-3-hydroxyoctyl]-1H-benz[f]inden-5-yl]oxy]acetic acid; or (b) 9-deoxy-2',9-α-methano-3-oxa-4,5,6-trinor-3,7-(1',3'-interphenylene)-13,14-dihydroprostaglandin F$_1$. Treprostinil sodium is also known as: UT-15; LRX-15; 15AU81; UNIPROST™; BWA15AU; and U-62,840. The molecular weight of Treprostinil sodium is 390.52, and its empirical formula is C$_{23}$H$_{34}$O$_5$.

In certain embodiments, treprostinil can be administered in combination with one or more additional active agents. In some embodiments, such one or more additional active agents can be also administered together with treprostinil using a metered dose inhaler. Yet in some embodiments, one or more additional active agents can be administered separately from treprostinil. Particular additional active agents that can be administered in combination with treprostinil may depend on a particular disease or condition for treatment or prevention of which treprostinil is administered. In some cases, the additional active agent can be a cardiovascular agent such as a calcium channel blocker, a phosphodiesterase inhibitor, an endothelial antagonist, or an antiplatelet agent.

The present invention extends to methods of using physiologically acceptable salts of Treprostinil, as well as non-physiologically acceptable salts of Treprostinil that may be used in the preparation of the pharmacologically active compounds of the invention.

The term "pharmaceutically acceptable salt" refers to a salt of Treprostinil with an inorganic base, organic base, inorganic acid, organic acid, or basic or acidic amino acid. Salts of inorganic bases can be, for example, salts of alkali metals such as sodium or potassium; alkaline earth metals such as calcium and magnesium or aluminum; and ammonia. Salts of organic bases can be, for example, salts triethylamine, triethylamine, pyridine, picoline, ethanolamine, diethanolamine, and triethanolamine. Salts of inorganic acids can be, for example, salts of hydrochloric acid, hydroboric acid, nitric acid, sulfuric acid, and phosphoric acid. Salts of organic acids can be, for example, salts of formic acid, acetic acid, trifluoroacetic acid, fumaric acid, oxalic acid, lactic acid, tartaric acid, maleic acid, citric acid, succinic acid, malic acid, methanesulfonic acid, benzenesulfonic acid, and p-toluenesulfonic acid. Salts of basic amino acids can be, for example, salts of arginine, lysine and ornithine. Salts of acidic amino acids can include, for example, salts of aspartic acid and glutamic acid. Quaternary ammonium salts can be formed, for example, by reaction with lower alkyl halides, such as methyl, ethyl, propyl, and butyl chlorides, bromides, and iodides, with dialkyl sul-

Liquidia's Exhibit 1001
Page 19

LIQ02799905

US 10,716,793 B2

7                                                                8

phates, with long chain halides, such as decyl, lauryl, myristyl, and stearyl chlorides, bromides, and iodides, and with aralkyl halides, such as benzyl and phenethyl bromides.

Preferred pharmaceutically acceptable salts are disclosed, for example, in US patent application publication No. 20050085540.

Treprostinil can be administered by inhalation, which in the present context refers to the delivery of the active ingredient or a combination of active ingredients through a respiratory passage, wherein the subject in need of the active ingredient(s) through the subject's airways, such as the subject's nose or mouth.

A metered dose inhaler in the present context means a device capable of delivering a metered or bolus dose of respiratory drug, such as treprostinil, to the lungs. One example of the inhalation device can be a pressurized metered dose inhaler, a device which produces the aerosol clouds for inhalation from solutions and/or suspensions of respiratory drugs in chlorofluorocarbon (CFC) and/or hydrofluoroalkane (HFA) solutions.

The inhalation device can be also a dry powder inhaler. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.

The metered dose inhaler can be a soft mist inhaler (SMI), in which the aerosol cloud containing a respiratory drug can be generated by passing a solution containing the respiratory drug through a nozzle or series of nozzles. The aerosol generation can be achieved in SMI, for example, by mechanical, electromechanical or thermomechanical process. Examples of soft mist inhalers include the Respimat® Inhaler (Boeringer Ingelheim GmbH), the AERx® Inhaler (Aradigm Corp.), the Mystic™ Inhaler (Ventaira Pharmaceuticals, Inc) and the Aira™ Inhaler (Chrysalis Technologies Incorporated). For a review of soft mist inhaler technology, see e.g. M. Hindle, The Drug Delivery Companies Report, Autumn/Winter 2004, pp. 31-34. The aerosol for SMI can be generated from a solution of the respiratory drug further containing pharmaceutically acceptable excipients. In the present case, the respiratory drug is treprostinil, its derivative or a pharmaceutically acceptable salt thereof, which can be formulated in SMI as a solution. The solution can be, for example, a solution of treprostinil in water, ethanol or a mixture thereof. Preferably, the diameter of the treprostinil-containing aerosol particles is less than about 10 microns, or less than about 5 microns, or less than about 4 microns.

Treprostinil concentration in an aerosolable formulation, such as a solution, used in a metered dose inhaler can range from about 500 μg/ml to about 2500 μg/ml, or from about 800 μg/ml to about 2200 μg/ml, or from about 1000 μg/ml to about 2000 μg/ml.

The dose of treprostinil that can be administered using a metered dose inhaler in a single event can be from about 15 μg to about 100 μg or from about 15 μg to about 90 μg or from about 30 μg to about 90 μg or from about 30 μg to about 60 μg.

Administering of treprostinil in a single event can be carried out in a limited number of breaths by a patient. For example, treprostinil can be administered in 20 breaths or less, or in 10 breaths or less, or than 5 breaths or less. Preferably, treprostinil is administered in 3, 2 or 1 breaths.

The total time of a single administering event can be less than 5 minutes, or less than 1 minute, or less than 30 seconds.

Treprostinil can be administered a single time per day or several times per day.

In some embodiments, the method of treatment of pulmonary hypertension can further comprise administering at least one supplementary agent selected from the group consisting of sildenafil, tadalafil, calcium channel blockers (diltiazem, amlodipine, nifedipine), bosentan, sitaxsentan, ambrisentan, and pharmaceutically acceptable salts thereof. In some embodiments, the supplementary agents can be included in the treprostinil formulation and, thus, can be administered simultaneously with treprostinil using a metered dose inhaler. In some embodiments, the supplementary agents can be administered separately from treprostinil. In some embodiments, the application of intravenous prostacyclin (flolan), intravenous iloprost or intravenous or subcutaneous treprostinil can be administered in addition to treprostinil administered via inhalation using a metered dose inhaler.

The present invention also provides a kit that includes a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof. Such a kit can further include instructions on how to use the metered dose inhaler for inhaling treprostinil. Such instructions can include, for example, information on how to coordinate patient's breathing, and actuation of the inhaler. The kit can be used by a subject, such as human being, affected with a disease or condition that can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

In some cases, the kit is a kit for treating pulmonary hypertension, that includes (i) a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; and (ii) instructions for use of the metered dose inhaler containing treprostinil in treating pulmonary hypertension.

As used herein, the phrase "instructions for use" shall mean any FDA-mandated labeling, instructions, or package inserts that relate to the administration of Treprostinil or its derivatives, or pharmaceutically acceptable salts thereof, for treatment of pulmonary hypertension by inhalation. For example, instructions for use may include, but are not limited to, indications for pulmonary hypertension, identification of specific symptoms associated with pulmonary hypertension, that can be ameliorated by Treprostinil, recommended dosage amounts for subjects suffering from pulmonary hypertension and instructions on coordination of individual's breathing and actuation of the metered dose inhaler.

The present invention can be illustrated in more detail by the following example, however, it should be understood that the present invention is not limited thereto.

Example 1

Open Label Study Upon Acute Safety, Tolerability and Hemodynamic Effects of Inhaled Treprostinil Delivered in Seconds

A study was conducted of acute vasodilator challenge during right heart catheter investigation to determine the safety, tolerability and pulmonary vasodilatory potency of inhaled treprostinil applied in seconds by a soft mist inhaler (SMI-TRE). The study produced evidence for a long lasting

Liquidia's Exhibit 1001
Page 20

LIQ02799906

US 10,716,793 B2

9

favourable effect of SMI-TRE on pulmonary hemodynamics in absence of systemic side effects and gas exchange disruptions.

Summary:

Inhaled nitric oxide (20 ppm; n=45) and inhaled treprostinil sodium (TRE; n=41) or placebo (n=4) were applied once during right heart catheter investigation. TRE was delivered in 2 breaths (1000 μg/ml aerosol concentration; 30 μg dose; n=12), 3 breaths (1000 μg/ml; 45 μg; n=9) or 2 breaths (2000 μg/ml; 60 μg; n=20) from a Respimat® SMI. Pulmonary hemodynamics and blood gases were measured at defined time points, observation time following TRE application was 120 minutes. TRE doses of 30 μg, 45 μg and 60 μg reduced pulmonary vascular resistance (PVR) to 84.4±8.7%, 71.4±17.5% and 77.5±7.2% of baseline values, respectively (mean±95% confidence interval). The 120 minute area under the curve for PVR for placebo, 30 μg, 45 μg and 60 μg TRE was 1230±1310, −870±940, −2450±2070 and −2000±900 min %, respectively. Reduction of PVR by a single inhalation of the two higher doses outlasted the observation period of 120 minutes. Reduction of systemic vascular resistance and pressure was negligible, showing a high pulmonary selectivity for SMI-TRE. Intrapulmonary selectivity was also provided by SMI-TRE as ventilation/perfusion matching, assessed by the multiple inert gas elimination technique in 5 patients with gas exchange problems, was not significantly different after SMI-TRE compared to inhaled nitric oxide or no treatment. No significant side effects were observed.

Conclusions: The acute application of inhaled treprostinil with a metered dose inhaler in 2-3 breaths was safe, well tolerated and induced a strong and sustained pulmonary selective vasodilation.

Methods and Patients

A total number of 45 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics were: female to male ratio (f/m)=29/16, age 59±2.3 years, pulmonary artery pressure (PAP) 45±1.8 mmHg, pulmonary vascular resistance (PVR) 743±52 dynes·s·cm$^{-5}$, pulmonary artery wedge pressure (PAWP) 8.6±0.5 mmHg, central venous pressure (CVP) 6.4±0.7 mmHg, cardiac output (CO) 4.5±0.2 l/min, central venous oxygen saturation (SvO2) 62.3±1.2 mmHg (mean±Standard Error of the Mean). Disease etiologies were idiopathic PAH (iPAH) (n=13), PAH other (n=11), chronic thromboembolic pulmonary hypertension (CTEPH) (n=17) and pulmonary fibrosis (n=4). Table 1 presents the patient characteristics of the different groups.

TABLE 1

Patient characteristics of the different treatment groups.
Data are given as mean ± Standard Error of the Mean (SEM).

|  | Placebo (n = 4) | 30 μg TRE (n = 12) | 45 μg TRE (n = 9) | 60 μg TRE (n = 20) |
|---|---|---|---|---|
| Age [years] | 61 ± 8 | 53.9 ± 3.9 | 54.2 ± 5.7 | 65.5 ± 3.1 |
| PAP [mmHg] | 49.5 ± 10.1 | 45 ± 3.1 | 54.3 ± 2.8 | 39.7 ± 2.0 |
| PVR [Dynes] | 896 ± 163 | 597 ± 53.9 | 1049 ± 107 | 663 ± 81 |
| CO [l/min] | 4.46 ± 0.9 | 5.2 ± 0.4 | 3.9 ± 0.4 | 4.4 ± 0.3 |
| SAP [mmHg] | 98 ± 8.1 | 90.1 ± 3.2 | 82.8 ± 3.9 | 86.1 ± 2.0 |
| SaO2 [%] | 85.3 ± 4.5 | 90.0 ± 1.1 | 89.6 ± 1.1 | 90.6 ± 0.5 |
| SvO2 [%] | 57.5 ± 3.9 | 66.0 ± 1.6 | 59.1 ± 3.4 | 62.5 ± 1.6 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

Baseline values were determined 20-30 minutes after placement of the catheter. Heart rate, pulmonary and sys-

10

temic blood pressure and cardiac output were measured and blood gases were taken during each pharmacological intervention at defined time points. Pharmacological interventions included the inhalation of 20 ppm nitric oxide (NO) after evaluation of baseline parameters (n=45) and the consecutive inhalation of placebo (n=4), 30 μg SMI-TRE (n=12), 45 μg SMI-TRE (n=9) or 60 μg (n=20) SMI-TRE. Placebo and treprostinil was applied with the Respimat® SMI. For filling of this device with treprostinil solution, the placebo solution was withdrawn from the device with a syringe and treprostinil solution was injected into the device under sterile conditions. Aerosol quality was controlled before and after refilling of the SMI devices by laser diffractometry, see e.g. Gessler T., Schmehl T., Hoeper M. M., Rose F., Ghofrani H. A., Olschewski H. et al. Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension. Eur. Respir. J. 2001; 17:14-19 incorporated herein in its entirety. The aerosol sizes before (placebo) and after filling (treprostinil) were unchanged. The aerosol particles mass median aerodynamic diameter of treprostinil-aerosol was 4-5 μm, which can be at the upper limit for alveolar deposition. The aerosol volume delivered by one cycle from the SMI was 15 μl. The solution used for aerosol generation was prepared from treprostinil sodium salt using a standard protocol. The SMI was either filled with a concentration of 1000 μg/ml treprostinil sodium (one aerosol puff=15 μg TRE) or with 2000 μg/ml (one puff=30 μg TRE). The different doses were applied as 2 puffs 1000 μg/ml (30 μg), 3 puffs 1000 μg/ml (45 μg) and 2 puffs 2000 μg/ml (60 μg). The placebo was inhaled as 2 puffs from a placebo-SMI. Hemodynamics and gas-exchange parameters were recorded for 120 minutes after TRE inhalation. This study used the Respimat® device, because the implemented "soft mist" technology was well suited for the deposition of such highly active drugs like prostanoids.

The impact of SMI-TRE on ventilation-perfusion matching was assessed in five patients (30 μg TRE, n=2; 45 μg TRE, n=1; 60 μg TRE, n=2) with pre-existing gas exchange problems by use of the multiple inert gas elimination technique (MIGET), see e.g. Wagner P D, Saltzman H A, West J B. Measurement of continuous distributions of ventilation-perfusion ratios: theory. J Appl Physiol. 1974; 36:588-99; Ghofrani H A, Wiedemann R, Rose F, Schermuly R T, Olschewski H, Weissmann N et al. Sildenafil for treatment of lung fibrosis and pulmonary hypertension: a randomised controlled trial. Lancet. 2002; 360:895-900, both incorporated herein in their entirety.

Statistics:

Mean values, standard deviation, standard error of the mean and 95% confidence intervals were calculated. Statistical analysis was done by use of a paired t-test.

Results:

The inhalation of treprostinil sodium from the metered dose inhaler (SMI-TRE) was well tolerated, only mild and transient cough for a maximum of one minute was reported. No systemic side effects like headache, flush, nausea or dizziness were observed.

Two to three breaths of SMI-TRE induced a strong pulmonary vasodilation that outlasted the observation time of 120 minutes (45 and 60 μg). The lower dose of 30 μg TRE induced a somewhat shorter effect on pulmonary vascular resistance; however, the maximal pulmonary vasodilation was comparable. In contrast, placebo inhalation did not induce pulmonary vasodilation. In fact a slight increase in PVR over the time of the right heart catheter investigation could be recorded following placebo inhalation (FIG. 1). The effect of SMI-TRE on systemic vascular resistance and

Liquidia's Exhibit 1001
Page 21

LIQ02799907

US 10,716,793 B2

| 11 | 12 |

pressure was very small and not clinically significant. Cardiac output was significantly increased over the whole observation period, whereas heart rate was rather unchanged. Gas exchange was not influenced by SMI-TRE (FIG. **2**). The maximal changes in hemodynamic and gas-exchange parameters compared to baseline values are depicted in Table 2.

TABLE 2

Extremes of the relative changes of hemodynamic and gas exchange parameters compared to baseline after inhalation of Placebo (n = 4), 30 µg treprostinil (n = 12), 45 µg treprostinil (n = 9) and 60 µg treprostinil (n = 20). Highest (max) and lowest (min) values during the observation period are shown. Data are given as percent of baseline values (mean ± SEM).

|  | Placebo | 30 µg TRE | 45 µg TRE | 60 µg TRE |
|---|---|---|---|---|
| PAP (min) | 99.4 ± 3.0 | 83.4 ± 3.2 | 77.6 ± 6.8 | 79.5 ± 2.4 |
| PVR (min) | 101.4 ± 1.9 | 84.4 ± 4.4 | 71.4 ± 8.9 | 77.5 ± 3.7 |
| CO (max) | 99.7 ± 1.1 | 108.8 ± 3.8 | 108.6 ± 5.6 | 103.8 ± 2.0 |
| SVR (min) | 104.3 ± 4.3 | 97.7 ± 4.2 | 92 ± 3.9 | 91.3 ± 2.1 |
| SAP (min) | 102.7 ± 1.7 | 97.3 ± 1.9 | 96.1 ± 1.5 | 93.6 ± 2.9 |
| HR (max) | 105 ± 2.1 | 106.1 ± 2.9 | 99.1 ± 2.4 | 101.1 ± 0.9 |
| SaO2 (min) | 98.2 ± 0.4 | 101 ± 0.3 | 94.4 ± 1.8 | 95.8 ± 0.9 |
| SvO2 (max) | 104.5 ± 1.4 | 102.4 ± 1.3 | 104.5 ± 4.4 | 102 ± 1.0 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; SVR = systemic vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; HR = heart rate; SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

The areas under the curve for PVR were calculated for placebo and the different SMI-TRE doses over the 120 minute observation period (FIG. **3**). A dose effect of SMI-TRE with a trend to a more sustained effect with the two highest doses could be observed.

The inhalation of a highly concentrated aerosol can be in theory prone to disturbances of gas exchange because the deposition of even small amounts of aerosol may deliver high doses locally and thereby antagonize the hypoxic pulmonary vasoconstriction in poorly ventilated areas. This would then lead to increased shunt flow or increase of low ventilation/perfusion (V/Q) areas. This question was addressed in five patients with the multiple inert gas elimination technique (MIGET), the gold-standard for intrapulmonary V/Q ratio determination. The MIGET patients were selected for pre-existing gas exchange limitations. Characteristics of these patients were: PAP 54.6±3.2 mmHg, PVR 892±88 dynes, SaO2 91.7±0.5%, SvO2 65.2±1.8%. Etiologies were iPAH (n=1), CTEPH (n=3), pulmonary fibrosis (n=1). The maximal relative reduction of SaO2 after inhalation of SMI-TRE in these patients was −3.8±1.5% compared to baseline values. Shunt flow at baseline, NO-inhalation and 60 minutes after SMI-TRE was 6.4±4.3%, 5.4±3.0% and 8.3±3.4%, respectively (mean±95% confidence interval; FIG. **4**).

No significant increase in low V/Q areas or shunt fraction after inhalation of SMI-TRE was observed, in fact the distribution of perfusion was not different to that at baseline and during nitric oxide inhalation. This proves an excellent intrapulmonary selectivity of SMI-TRE, which is also reflected by unchanged arterial oxygen saturation.

Conclusion:

Treprostinil is tolerated at high doses with no systemic side effects. The application of an effective amount of treprostinil in only few or even one single breath was achieved with a highly concentrated treprostinil sodium solution. Treprostinil can be applied by a metered dose inhaler, such as Respimat® soft mist inhaler.

Example 2

Investigation of the Effects of Inhaled Treprostinil on Pulmonary Hemodynamics and Gas Exchange in Severe Pulmonary Hypertension

This study investigated the effects of inhaled treprostinil on pulmonary vascular resistance in severe pulmonary hypertension and addressed systemic effects and gas exchange as well as tolerability and efficacy of high doses of treprostinil given in short time. A total of 123 patients with a mean pulmonary artery pressure of about 50 mmHg were investigated in three separate randomized studies. Inhaled treprostinil exerted potent sustained pulmonary vasodilation with excellent tolerability and could be safely applied in a few breaths or even in one breath.

Summary:

Three different studies were conducted on a total of 123 patients by means of right heart catheterization: i) a randomized crossover-design study (44 patients), ii) a dose escalation study (31 patients) and iii) a study of reduction of inhalation time while keeping the dose fixed (48 patients). The primary endpoint was the change in pulmonary vascular resistance (PVR).

The mean pulmonary artery pressure of the enrolled patients was about 50 mmHg. Hemodynamics and patient characteristics were similar in all studies. In study i) TRE and Iloprost (ILO), at an inhaled dose of 7.5 µg, displayed comparable PVR decrease, with a significantly different time course (p<0.001), TRE exhibiting a more sustained effect on PVR (p<0.0001) and less systemic side effects. In study ii) placebo, 30 µg, 60 µg, 90 µg or 120 µg TRE were applied with drug effects being observed for 3 hours after inhalation. A near-maximal acute PVR decrease was observed at 30 µg TRE. In study iii) TRE was inhaled with a pulsed ultrasonic nebulizer, mimicking a metered dose inhaler. 15 µg TRE was inhaled with 18 pulses (TRE concentration 100 µg/ml), 9 pulses (200 µg/ml), 3 pulses (600 µg/ml), 2 pulses (1000 µg/ml) or 1 pulse (2000 µg/ml), each mode achieving comparable, sustained pulmonary vasodilation.

Inhaled treprostinil exerts sustained pulmonary vasodilation with excellent tolerability at doses, which may be inhaled in a few or even one breath. Inhaled treprostinil is advantageous to inhaled iloprost in terms of duration of effect and systemic side effects. Inhaled treprostinil is well tolerated in concentrations up to 2000 mg/ml (bringing down inhalation time to a single breath) and in high doses (up to 90 µg).

Methods:

All inhalations were performed with the OPTINEB® ultrasonic nebulizer (Nebutec, Elsenfeld, Germany).

Study i) was a randomized, open-label, single-blind crossover study. The primary objective was to compare the acute hemodynamic effects and the systemic side effects of inhaled treprostinil with inhaled iloprost at comparable doses. A total number of 44 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics and hemodynamic as well as gas exchange parameters are outlined in Table 3.

Liquidia's Exhibit 1001
Page 22

LIQ02799908

US 10,716,793 B2

13      14

TABLE 3

Patient characteristics, hemodynamic parameters and gas exchange values at baseline, before challenge with inhalative prostanoids.

| | N | Age | Gender f/m | Etiology i/o/t/f | PAP [mmHg] | PVR [dyn * s * cm⁻⁵] | SAP [mmHg] | CVP [mmHg] | PAWP [mmHg] | CO [l/min] | SaO2 [%] | SvO2 [%] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1a | 14 | 55.1 ± 4.8 | 11/3 | 4/4/2/4 | 53.8 ± 3.1 | 911 ± 102 | 95.4 ± 3.6 | 7.4 ± 1 | 8.0 ± 0.8 | 4.3 ± 0.4 | 93.8 ± 2 | 63.9 ± 2.4 |
| 1b | 14 | 54.1 ± 3.3 | 10/4 | 1/6/5/2 | 47.4 ± 3.8 | 716 ± 80 | 90.6 ± 3.3 | 5.9 ± 1.4 | 6.4 ± 0.7 | 4.7 ± 0.4 | 92 ± 1 | 64.4 ± 2.3 |
| 1c | 16 | 56 ± 2.9 | 7/9 | 6/3/6/1 | 47.5 ± 4.5 | 777 ± 102 | 92 ± 4.5 | 8.3 ± 1.4 | 8.6 ± 1.4 | 4.4 ± 0.5 | 91.4 ± 0.9 | 59.8 ± 2.6 |
| 2a | 8 | 60.8 ± 4 | 4/4 | 2/2/3/1 | 51.9 ± 4.9 | 849 ± 152 | 95.9 ± 4.8 | 7.6 ± 1.4 | 11.1 ± 1.7 | 4.4 ± 0.6 | 89.6 ± 2.8 | 60.1 ± 2.8 |
| 2b | 8 | 52.8 ± 6.6 | 6/2 | 1/3/3/1 | 49 ± 4 | 902 ± 189 | 92.4 ± 2.4 | 4.8 ± 1.1 | 7.2 ± 1.3 | 4.0 ± 0.4 | 92.4 ± 2.4 | 62.5 ± 1.7 |
| 2c | 6 | 56.8 ± 5.9 | 4/2 | 0/2/2/2 | 44.2 ± 3.5 | 856 ± 123 | 96.3 ± 3.9 | 5 ± 1.1 | 6 ± 1 | 3.8 ± 0.3 | 92.8 ± 1.5 | 63.6 ± 1.8 |
| 2d | 6 | 51.2 ± 3.8 | 4/2 | 2/2/2/0 | 55.5 ± 4.9 | 940 ± 110 | 91.2 ± 8.1 | 11.2 ± 1.2 | 10 ± 0.7 | 3.9 ± 0.4 | 92 ± 1.9 | 62 ± 5.8 |
| 2e | 3 | 57.3 ± 9.1 | 1/2 | 0/1/0/2 | 45.3 ± 5.2 | 769 ± 267 | 99 ± 3.2 | 5 ± 2.1 | 9 ± 0.6 | 4.5 ± 0.6 | 94.2 ± 1.3 | 66.3 ± 1.5 |
| 3a | 6 | 52.7 ± 6.6 | 4/2 | 2/4/0/0 | 53.8 ± 6.7 | 928 ± 145 | 92.7 ± 7.9 | 8.7 ± 2.7 | 8.8 ± 1.3 | 4.2 ± 0.6 | 90.4 ± 2.8 | 64.8 ± 4.3 |
| 3b | 6 | 58.3 ± 3.5 | 4/2 | 3/1/1/1 | 54.2 ± 6.1 | 808 ± 156 | 94.3 ± 2.8 | 7 ± 1.4 | 10 ± 1.3 | 5 ± 0.7 | 91.9 ± 0.7 | 63.5 ± 2.9 |
| 3c | 21 | 57.4 ± 5.6 | 8/3 | 7/7/6/1 | 46.1 ± 2.5 | 900 ± 99 | 88 ± 2.8 | 9 ± 1.4 | 9.2 ± 0.5 | 3.7 ± 0.3 | 91.7 ± 0.5 | 59.7 ± 2 |
| 3d | 7 | 55.6 ± 5.8 | 3/4 | 0/4/3/0 | 53.1 ± 7.1 | 732 ± 123 | 91.4 ± 5.6 | 7.9 ± 3.1 | 8.6 ± 1.3 | 5 ± 0.4 | 90.7 ± 1.4 | 61.3 ± 3.7 |
| 3e | 8 | 59 ± 5.2 | 7/1 | 0/4/4/0 | 45.1 ± 3.9 | 733 ± 114 | 92.8 ± 6.8 | 4.6 ± 0.8 | 8.1 ± 1.1 | 4.3 ± 0.2 | 90.7 ± 0.8 | 66.3 ± 2.8 |

Group 1 corresponds to study i); randomized crossover study comparing inhaled iloprost (ILO) and inhaled treprostinil (TRE).

a = 7.5 g ILO vs. 7.5 µg TRE,

b = 7.5 g ILO vs. 15 µg TRE (6 min inhalation time),

c = 7.5 g ILO vs. 15 µg TRE (3 min inhalation time).

Group 2 corresponds to study ii); evaluation of maximal tolerated dose of TRE.

a = placebo inhalation,

b = 30 µg TRE,

c = 60 µg TRE,

d = 90 µg TRE,

e = 120 µg TRE.

Group 3 corresponds to study iii); reduction of inhalation time by increase of TRE concentration, aiming at a total inhaled dose of 15 µg.

a = 18 pulses of 100 µg/ml TRE,

b = 9 pulses of 200 µg/ml TRE,

c = 3 pulses of 600 µg/ml TRE,

d = 2 pulses of 1000 µg/ml TRE,

e = 1 pulse 2000 µg/ml TRE.

Etiology of pulmonary hypertension was classified as idiopathic PAH (i), PAH of other causes (o), chronic thromboembolic PH (t), and pulmonary fibrosis (f).

Each patient inhaled both iloprost and treprostinil on the same day during right heart catheter investigation; the drugs were administered consecutively with a one hour interval between the drug applications. One half of the study patients initially inhaled treprostinil and then inhaled iloprost (n=22), while the other half initially inhaled iloprost and then inhaled treprostinil (n=22). Patients were randomized to one of the two groups and blinded as to the study drugs. Drug effects were monitored for 60 minutes after each inhalation. Iloprost was inhaled at a 4 µg/ml (6 min inhalation time; n=44) and treprostinil was inhaled at a concentration of 4 µg/ml (6 min inhalation; n=14), 8 µg/ml (6 min inhalation; n=14) or 16 µg/ml (3 min inhalation; n=16). Based on previous biophysical characterization of the ultrasonic device with iloprost- and treprostinil-solution, this corresponds to a total inhaled dose of 7.5 µg iloprost and treprostinil (4 µg/ml) and 15 µg treprostinil (8 µg/ml and 16 µg/ml), respectively.

Study ii) was a randomized, open-label, single blind, placebo controlled study. The primary objectives were to describe the pharmacodynamic and pharmacokinetic effects of inhaled treprostinil at a well tolerated dose (30 µg) and to explore the highest tolerated single dose. A total number of 31 patients inhaled either placebo or treprostinil; each patient received one inhalation. The first 16 patients were randomized to 30 µg TRE (16 µg/ml, n=8) or placebo (stock solution in a concentration corresponding to TRE 16 µg/ml). Subsequent patients received 60 µg TRE (32 µg/ml; n=6), 90 µg TRE (48 µg/ml; n=6) and 120 µg TRE (64 µg/ml; n=3). Inhalation time was 6 minutes in all groups. Hemodynamics and gas-exchange as well as arterial treprostinil concentrations were recorded for 180 minutes.

Study iii) was a randomized, open-label, single blind study. The primary objective was to explore the shortest possible inhalation time for a 15 µg dose of inhaled trepro-

stinil. A total of 48 patients inhaled one dose of TRE during right heart catheter investigation. The drug was applied in 18, 9, 3, 2 or 1 breaths. The aerosol was generated by a pulsed ultrasonic nebulizer (OPTINEB®, Nebutec, Eisenfeld, Germany) in cycles consisting of 2 seconds aerosol production (pulse) and 4 seconds pause. The device included an opto-acoustical trigger for the patient to synchronize the inspiration to the end of the aerosol pulse, thereby providing exact dosage. The TRE dose of 15 µg was either generated during 18 cycles (OPTINEB® filled with 100 µg/ml TRE, n=6), 9 cycles (200 µg/ml TRE, n=6), 3 cycles (600 µg/ml TRE, n=21), 2 cycles (1000 µg/ml TRE, n=7) or 1 cycle (2000 µg/ml TRE, n=8). Hemodynamics and gas exchange were recorded for 120-180 minutes.

Treprostinil plasma concentrations were assessed in study ii) at 10, 15, 30, 60 and 120 minutes after inhalation. Treprostinil quantification was done by Alta Analytical Laboratory (El Dorado Hills, Calif., USA) with a validated liquid chromatography atmospheric-pressure ionization tandem mass spectrometry as previously described Wade M., et al. J. Clin. Pharmacol. 2004; 44:503-9. Mixed venous blood was drawn at the depicted time points (FIG. 11) after inhalation, centrifuged and the plasma frozen at –80° C. until temperature controlled shipping on dry ice.

Statistics:

For statistical analysis of study i) the repeated PVR measurements after inhaled iloprost and treprostinil were subjected to a three-factorial analysis of variance (ANOVA; factors: time (A), drug (B), treprostinil concentration (C)) to avoid multiple testing. The time to maximum PVR decrease after inhalation of iloprost versus treprostinil was compared by paired t-test. Area under the curve (AUC) was calculated from start of inhalation until 60 min after inhalation. Means, standard error of the mean (SEM) and 95% confidence

Liquidia's Exhibit 1001
Page 23
LIQ02799909

US 10,716,793 B2

15

intervals were calculated. For study ii) and iii) areas between curves (ABC) were calculated between placebo inhalation (study ii) and the respective treprostinil inhalation until 180 min (study ii) and 120 min (study iii)) after end of inhalation.

Results:

The inhalation of iloprost as well as treprostinil in study i) resulted in a rapid decrease in PVR and PAP (FIG. 5-7). No significant differences were observed for the areas under the curve (AUC) of PVR decrease after inhalation of 7.5 μg TRE in 6 minutes (AUC −12.6±7.0%), 15 μg TRE in 6 minutes (AUC −13.3±3.2%) and 15 μg TRE in 3 minutes (AUC −13.6±4.3%). The AUC for PVR after the inhalation of 7.5 μg iloprost in 6 minutes was −7.7±3.7% (mean±95% confidence interval). An overview of the pooled data of treprostinil inhalation as compared to iloprost inhalation is given in FIG. 7. The maximum effect of iloprost and treprostinil on PVR was comparable but this effect was reached significantly later after treprostinil inhalation (18±2 min) compared to iloprost (8±1 min; mean±SEM, p<0.0001) and lasted considerably longer (after 60 min, PVR values in the treprostinil group had not yet returned to baseline). The increase in cardiac output was less acute but prolonged after treprostinil inhalation. Systemic arterial pressure (SAP) was unaffected by treprostinil inhalation, whereas a transient decrease was observed after iloprost inhalation. Iloprost and treprostinil did not affect gas exchange. Three-factorial ANOVA for PVR demonstrated a significant difference between repeated measurements after inhalation ($p_{(A)}$<0.0001), no significant difference between drugs ($p_{B}$=0.1), no difference between treprostinil concentrations ($p_{(C)}$=0.74) and a significant drug×time interaction ($p_{(A×B)}$<0.0001). This translates into a significant effect of both drugs on PVR with comparable drug potency but a prolonged drug effect of treprostinil compared to iloprost.

In this study the occasionally observed mild side effects of iloprost inhalation at the given dose (transient flush, headache) were not observed with inhaled treprostinil. Bad taste was reported by most of the patients after inhalation of TRE. This was later found to be attributable to the metacresol preservative contained in the treprostinil solution.

In study ii) pharmacodynamics of inhaled placebo or treprostinil were observed for 180 minutes. Placebo inhalation was followed by a gradual increase in PVR over the entire observation time. Due to reduced patient number in the 120 μg TRE group (because of side effects, see below), the hemodynamic values for this group were not included in the graphs of this study (FIG. 8-9). All TRE doses lead to comparable maximal decreases of PVR to 76.5±4.7% (30 μg), 73.7±5.8% (60 μg), 73.3±4.3% (90 μg) and 65.4±4.1% (120 μg) of baseline values. An extended duration of pulmonary vasodilation was noted, surpassing the 3 hour observation period for the 60 μg and 90 μg (and 120 μg) TRE doses, whereas in the 30 μg dose group the hemodynamic changes had just returned to baseline within this period. Even at the highest doses, TRE had only minor effects on systemic arterial pressure (FIG. 8). Cardiac output was increased to a maximum of 106.8±3.2% (30 μg), 122.9±4.3% (60 μg), 114.3±4.8% (90 μg) and 111.3±3.9% (120 μg TRE). The areas between the response curves after placebo versus TRE inhalation were calculated for PVR, PAP, SVR and SAP (FIG. 9). Areas between the curves for PVR were not significantly different for 30 μg, 60 μg and 90 μg TRE, a nearly maximal effect on PVR was already observed with 30 μg TRE. Effects on PAP and SAP were small and did not show a dose-response relationship. Gas exchange was not affected at doses up to 90 μg TRE, but

16

arterial oxygen saturation was significantly decreased at a dose of 120 μg TRE in all 3 patients. Further dose increments were omitted due to this side effect and severe headache in one patient.

Again, bad taste of the TRE aerosol was reported by most patients. Other side effects were flushing (n=1; 30 μg TRE), mild transient cough (n=3; 60 μg TRE), mild transient bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 30 μg TRE), moderate bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 120 μg TRE), and severe headache (n=1; 120 μg TRE). The bad taste, the bronchoconstriction and the drop in SaO2 was attributed to metacresol in the original TRE solution. With the use of a metacresol-free solution of TRE (University Hospital Giessen, Germany; produced according to the manufacturer's protocol) in the following study, these side effects did no longer occur.

Study iii) was performed with metacresol-free TRE solution, having no specific taste and smell. A total of 48 patients were enrolled. This study aimed at the reduction of inhalation time and aerosol volume needed for pulmonary drug delivery. A modified OPTINEB® inhalation device was programmed to produce a constant amount of aerosol during repeatable pulses of aerosol generation. With this device, treprostinil could be safely utilized up to a concentration of 2000 μg/ml without considerable side effects. No relationship of number or type of side effects to TRE concentration was observed. Reported side effects were mild transient cough (n=6), mild headache (n=2) and mild jaw pain (n=1).

The reduction of PVR and PAP was comparable between all groups (FIG. 10). TRE inhalation reduced PVR to 76.3±5.6% (18 pulses, 100 μg/ml), 72.9±4.9% (9 pulses, 200 μg/ml), 71.2±6.0% (3 pulses, 600 μg/ml), 77.4±4.5% (2 pulses, 1000 μg/ml) and 80.3±5.2% (1 pulse, 2000 μg/ml). PAP was reduced to 84.2±4.5% (18 pulses, 100 μg/ml), 84.2±4.1% (9 pulses, 200 μg/ml), 81.1±4.1% (3 pulses, 600 μg/ml), 86±4% (2 pulses, 1000 μg/ml) and 88±5.4% (1 pulse, 2000 μg/ml). Cardiac output was moderately increased in all groups, whereas systemic arterial pressure was not significantly affected.

The areas between the curves (ABC) for changes in hemodynamic and gas-exchange parameters after inhalation of 15 μg TRE versus placebo were calculated for an observation time of 120 minutes (FIG. 11). The ABC for both PVR and PAP was comparable between all groups.

Pharmacokinetic results from study ii): Peak plasma concentrations of treprostinil were found 10-15 minutes after inhalation. Maximal treprostinil plasma concentrations ($C_{max}$) for the 30 μg, 60 μg, 90 μg and 120 μg doses were 0.65±0.28 ng/ml (n=4), 1.59±0.17 ng/ml (n=4), 1.74 ng/ml (n=1) and 3.51±1.04 ng/ml (n=2), respectively (mean±SEM; FIG. 12).

Discussion:

These studies investigated whether i) the acute effects of inhaled treprostinil would be comparable to or possibly advantageous over inhaled iloprost in pulmonary hypertensive patients, ii) the inhaled prostanoid dose might be increased without substantial local or systemic side effects, and iii) if the time of inhalation, which is 6-12 minutes for iloprost, could be reduced significantly by increasing the concentration of treprostinil aerosol.

The patient population in these studies included different forms of precapillary pulmonary hypertension. All these patients had a need for therapy of pulmonary hypertension and reflected the typical population of a pulmonary hyper-

Liquidia's Exhibit 1001
Page 24

LIQ02799910

US 10,716,793 B2

17

tension center. No major differences in patient characteristics or hemodynamic baseline values existed between the different groups (table 3).

In study i) it was shown that the inhalation of treprostinil and iloprost in similar doses resulted in a comparable maximum pulmonary vasodilatory effect. However, marked differences in the response profile were noted. The onset of the pulmonary vasodilatory effect of inhaled treprostinil was delayed compared to iloprost, but lasted considerably longer, with the PVR decrease continuing beyond the one-hour observation period. Although the average dose of treprostinil was higher than the iloprost dose, no systemic effects were noted after treprostinil inhalation, whereas flush and transient SAP decrease, accompanied by more prominent cardiac output increase, occurred after iloprost inhalation. Such side effects were more prominent than in previous studies with inhaled iloprost. This may have been caused by the fact that the iloprost dose used in this study was 50% higher than the recommended single inhalation dose (5 µg) and that the preceding treprostinil inhalation may have added to the systemic side effects caused by the iloprost inhalation. Surprisingly, with TRE there was no such systemic side effect, although the average effect on PVR was as potent as with iloprost.

This study used a cross-over design in order to minimize the effects of inter-individual differences in response to prostanoids. The short observation period of 1 hour was used to avoid an uncomfortably long catheter investigation. As a study limitation, the short observation interval may have caused carryover effects of the first to the second period as suggested by FIG. **5**. However, this still allowed for the interpretation of the study, that both drugs are potent pulmonary vasodilators and that treprostinil effects are significantly sustained compared to the iloprost effects.

The longer duration of action and the virtual absence of side effects (except the bitter taste of treprostinil aerosol, later attributed to metacresol) encouraged increasing the applied treprostinil dose in study ii). Observation time was extended to 3 hours to obtain precise pharmacodynamic data. Inhaled treprostinil resulted in a strong pulmonary vasodilation that outlasted the observation time of 3 hours when compared to placebo inhalation. Surprisingly, inhaled treprostinil was tolerated in doses up to 90 µg.

Study iii) successfully demonstrated that the inhalation time could be reduced to literally one single breath of 2000 µg/ml treprostinil solution, thereby applying a dose of 15 µg.

18

This drug administration with a single breath induced pulmonary vasodilation for longer than 3 hours compared to placebo inhalation. Side effects were minor, of low frequency and not related to drug concentration. It was a surprising finding that such high concentrations of treprostinil were so well tolerated.

Conclusion:

Inhaled treprostinil can be applied in high doses (up to 90 µg) with a minimal inhalation time. Inhaled treprostinil exerts high pulmonary selectivity and leads to a long-lasting pulmonary vasodilation.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

**1**. A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

**2**. The method of claim **1**, wherein the inhalation device is a soft mist inhaler.

**3**. The method of claim **1**, wherein the inhalation device is a pulsed ultrasonic nebulizer.

**4**. The method of claim **1**, wherein the inhalation device is a dry powder inhaler.

**5**. The method of claim **1**, wherein the inhalation device is a pressurized metered dose inhaler.

**6**. The method of claim **4**, wherein the formulation is a powder.

**7**. The method of claim **6**, wherein the powder comprises particles less than 5 micrometers in diameter.

**8**. The method of claim **1**, wherein the formulation contains no metacresol.

* * * * *

Liquidia's Exhibit 1001
Page 25

LIQ02799911

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>LIQUIDIA TECHNOLOGIES, INC.,<br><br>Defendant. | C.A. No. 20-755 (RGA) (JLH)<br><br><br>**HIGHLY CONFIDENTIAL** |

## REBUTTAL EXPERT REPORT OF AARON WAXMAN, M.D., PH.D

patent surprisingly demonstrated that a therapeutically effective dose of 15 micrograms[4] to 90 micrograms could be safely delivered to a patient in just a few breaths.  Hill Report, Ex 1 at 16:61-63; *see also id.* at 17:44-46 (study "successfully demonstrated that the inhalation time could be reduced to literally one single breath of 2000 µg/ml treprostinil solution, thereby applying a dose of 15 µg").  Surprisingly, high concentrations of treprostinil were shown to be well tolerated by patients with even a single breath administration of the drug, which induced pulmonary vasodilation for longer than 3 hours with minimal side effects.  *Id.* at 18:1-6.  This result was surprising because treprostinil was known to be a potent drug and another prostacyclin analog, iloprost, was approved in delivered doses of only 2.5 to 5.0 µg because of side effects.  Hill Report, Ex 34 at 9.

67.    I have regularly prescribed Tyvaso® (inhaled treprostinil), which I understand to be the commercial embodiment of the '793 patent, because Tyvaso® has shown distinct advantages over Ventavis®, the only other available inhalation treatment for pulmonary hypertension.  For example, Tyvaso® (inhaled treprostinil) does not need to be administered as frequently as Ventavis®, leading to higher patient compliance and less risk of rebound pulmonary hypertension.  Tyvaso® (inhaled treprostinil) has a much longer half-life than Ventavis® when inhaled by

---

[4] A microgram is a unit of mass equal to one millionth of a gram.  A microgram is commonly abbreviated as mcg or µg.  As such, I may use microgram, mcg and/or µg interchangeably throughout my declaration.

human subjects suffering from pulmonary hypertension. This allows Tyvaso® to be administered markedly less frequently – about 4 times a day. I have observed that patients are more likely to comply with a regimen that requires less frequent administrations. Furthermore, because Tyvaso® has a longer half-life than Ventavis®, there is less risk when the patient is asleep or otherwise unable to take the medication.

68.    A study reported that "the transition from inhaled iloprost to inhaled treprostinil resulted in a time savings of approximately 1.4 h per day." Bourge *et al., Cardiovascular Therapeutics*, 31:38-44 (2013) (Bourge 2013) at 42. Patients transferring from inhaled iloprost to inhaled treprostinil also had improved six-minute walk distances (a common metric to assess pulmonary hypertension), improved patient satisfaction, and improved quality of life. *Id.* at 5-6.

## V.    THE ASSERTED CLAIMS OF THE '793 PATENT ARE NOT RENDERED OBVIOUS BY THE IDENTIFIED COMBINATIONS OF REFERENCES

### A.    Overview of the Cited References

69.    Dr. Hill opines that the Asserted Claims of the '793 patent "were either directly disclosed/anticipated in the prior art or would have been obvious to a skilled artisan by May 15, 2006" as summarized below:

| '793 Patent Claims | Alleged Basis of Invalidity |
| --- | --- |
| 1, 4, 6-8 | Obviousness: '212 patent, Voswinckel JAHA, Voswinckel JESC |

1, 4, and 6-8 of the '793 patent.  Further, a POSA would not be motivated to combine these references or have a reasonable expectation of success in doing so.

### D.    OBJECTIVE INDICIA OF NON-OBVIOUSNESS

120.   In my opinion, several objective factors also establish the non-obviousness of claims 1-8 of the '793 patent.

121.   The claimed invention of the '793 patent satisfies a long-felt unmet need in the treatment of pulmonary hypertension.

122.   As of the priority date, many patients found existing therapies for the treatment of pulmonary arterial hypertension to be intolerable or ineffective.  As a practicing clinician, when Tyvaso® (which I understand is a commercial embodiment of the '793 patent) was approved, and as of and before the priority date, Tyvaso® was a significant advance over other available treatments for pulmonary hypertension because it did not and does not need to be administered as frequently, leading to better patient compliance.  Intravenous administration involves the use of needles, chronic indwelling central venous catheters (Hickman Catheter), and complicated drug administration procedures, which patients do not prefer, and subcutaneous administration also can involve pain and includes the risk of infection. An inhaled solution only four times per day was much safer and easier for the patient, avoiding the risks and complexities of a central venous catheter and chronic infusion pump.

123.   Inhaled treprostinil is also approved to treat a broader range of pulmonary hypertension patients than the therapeutics available at the time of the invention.  *See, e.g.,* Hill Report, Ex. 1 at 9:44-50 (explaining that the study described in example 1 included patients with idiopathic PAH, PAH other, chronic thromboembolic pulmonary hypertension (CTEPH) and pulmonary fibrosis); see also Hill Report, Ex. 16 (Tyvaso® label) as compared to Hill Opening Ex. 37 (Remodulin® label) (inhaled treprostinil is currently approved for pulmonary arterial hypertension and pulmonary hypertension associated with interstitial lung disease).

124.   At the time of the claimed invention, there were no other therapies approved for the treatment of pulmonary hypertension in patients with interstitial lung disease.  Waxman *et al.,* 2021, *Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease*, N. Eng. J. Med. 384:325-334 ("Waxman 2021"). I note that Defendant's expert, Dr. Gonda, agrees with me that there is "a completely unmet medical need" where "[t]here [is] nothing that these patients were getting as a therapy for their problems."  Gonda Dep. Tr. at 105:6-8.

125.   Defendant has also acknowledged that an inhaled dosing regimen for the treatment of pulmonary arterial hypertension as described in the claims of the '793 patent satisfies a long-felt unmet need.  McLaughlin *et al.*, *Efficacy and safety of treprostinil: an epoprostenol analog for primary pulmonary hypertension*, J.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date:  November 12, 2021

_____
Aaron B. Waxman, M.D., Ph.D.

# EXHIBIT C



Deposition of:
## Aaron B. Waxman , M.D., Ph.D.

*January 15, 2022*

In the Matter of:

## United Therapeutics Corporation vs Liquidia Technologies Inc

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

HIGHLY CONFIDENTIAL

Page 1

1

                    UNITED STATES DISTRICT COURT
2                   FOR THE DISTRICT OF DELAWARE
        ——————————————————————————————
3                                       )Case No.
        UNITED THERAPEUTICS             )1:20-cv-00755
4       CORPORATION                     )
                                        )
5          Plaintiff                    )
                                        )
6       vs.                             )
                                        )
7       LIQUIDIA TECHNOLOGIES, INC.,    )
                                        )
8          Defendant                    )
        ——————————————————————————————
9
10
11              - HIGHLY CONFIDENTIAL -
12
13
              Remote Videotaped Deposition of
14
               AARON B. WAXMAN, M.D., Ph.D.
15
                    January 15, 2022
16
                      10:32 a.m.
17
18
19
20
21
        Reported by:  Bonnie L. Russo
22
        Job No. 5009257

HIGHLY CONFIDENTIAL

Page 2

1     Remote Videotaped Deposition of Aaron B.

2     Waxman, M.D., Ph.D. held through:

3

4

5

6

7                         Veritext Legal Solutions

8                         1250 I Street, N.W.

9                         Washington, D.C.

10

11

12

13

14

15

16

      Pursuant to Notice, when were present on behalf

17

      of the respective parties:

18

19

20

21

22

HIGHLY CONFIDENTIAL

```
 1        APPEARANCES:
 2        On behalf of the Plaintiff:
 3            MANDY KIM, ESQUIRE
             McDERMOTT WILL & EMERY
 4            18565 Jamboree Road, Suite 250
             Irvine, California 92612
 5            mhkim@mwe.com
 6                 -and-
 7            JOSH REVILLA, ESQUIRE
             McDERMOTT WILL & EMERY
 8            500 N. Capitol Street, N.W.
             Washington, D.C. 20001
 9            jrevilla@mwe.com
10        On behalf of the Defendant:
11            JONATHAN DAVIES, ESQUIRE
             COOLEY LLP
12            1299 Pennsylvania Avenue, N.W.
             Suite 700
13            Washington, D.C. 20004
             jdavies@cooley.com
14
                  -and-
15
             BRITTANY CAZAKOFF, ESQUIRE
16           COOLEY LLP
             11951 Freedom Drive
17           1 Freedom Square
             Reston Town Center
18           Reston, Virginia 20190
             bcazakoff@cooley.com
19
20
          Also Present:
21        Orson Braithwaite, Videographer
22
```

HIGHLY CONFIDENTIAL

Page 7

1              P R O C E E D I N G S

2                   (10:32 a.m.)

3

4              THE VIDEOGRAPHER:  Good morning.  We

5      are going on the record at 10:32 a.m. on

6      January 15, 2022.

7              This is Media Unit 1 of the

8      remote-recorded deposition of Dr. Aaron Waxman

9      in the matter of United Therapeutics

10     Corporation versus Liquidia Technologies, Inc.

11     filed in the United States District Court for

12     the District of Delaware, Case Number 20-755.

13             My name is Orson Braithwaite from

14     the firm Veritext Legal Solutions.  I am the

15     videographer.  The court reporter is Bonnie

16     Russo from the firm Veritext Legal Solutions.

17             Counsel will now state their

18     appearances and affiliations for the record.

19             MR. DAVIES:  Jonathan Davies from

20     Cooley LLP for defendant, Liquidia and with me

21     today is my colleague, Brittany Cazakoff.

22             MS. KIM:  Mandy Kim with McDermott

HIGHLY CONFIDENTIAL

Page 8

1     Will & Emery on behalf of plaintiff, United

2     Therapeutics Corporation and with me is my

3     colleague, Joshua Revilla, also with McDermott

4     Will & Emery.

5               THE VIDEOGRAPHER:  Thank you.  Will

6     the court reporter please swear in the witness.

7               THE COURT REPORTER:  Yes.  First, I

8     have a stipulation to put on the record.

9               The attorneys participating in this

10    deposition acknowledge that I am not physically

11    present in the deposition room, and that I will

12    be reporting this deposition remotely.

13               They further acknowledge that, in

14    lieu of an oath administered in person, I will

15    administer the oath remotely.

16               The parties further agree that if

17    the witness is testifying from a state where I

18    am not a notary, that the witness may be sworn

19    in by an out-of-state notary.

20               If any party has an objection to

21    this manner of reporting, please state it now.

22               (Pause.)

HIGHLY CONFIDENTIAL

Page 9

1          THE COURT REPORTER:  Hearing, none

2     we can proceed and I will swear in the witness.

3

4          AARON B. WAXMAN, M.D., Ph.D.,

5     being first duly sworn, to tell the truth, the

6     whole truth, and nothing but the truth,

7     testified as follows:

8          EXAMINATION BY COUNSEL FOR DEFENDANT

9          BY MR. DAVIES:

10     Q.    Good morning, Dr. Waxman.

11     A.    Good morning.

12     Q.    Could you state your full name for

13     the record.

14     A.    Aaron B. Waxman.

15     Q.    Can you provide your address,

16     please.

17     A.    My home address ███████████,

18     ██████████████████████████████

19     Q.    And you have been deposed before,

20     correct?

21     A.    Yes.

22     Q.    And about how many times?

Page 105

1          Q.    Can you tell me what the five

2      categories were as of May 2006 with respect to

3      pulmonary hypertension?

4          A.    Well, they are groupings.  There was

5      group 1, 2, 3, 4, 5.  Group 1 was what was

6      termed pulmonary arterial hypertension and

7      included idiopathic, it included familial, it

8      included that associated with connective tissue

9      disease associated with advanced portal

10     hypertension or liver disease, HIV disease.  It

11     also included pulmonary hypertension of the

12     newborn as well as -- which shows some of the

13     flaws in the groupings pulmonary venous

14     venoocclusive disease and pulmonary capillary

15     hemangiomatosis.  Those were the predominant

16     things in Group 1.

17              In Group 2 included patients with

18     left heart disease including diastolic

19     dysfunction which is no longer called diastolic

20     dysfunction.  It is now called heart failure of

21     preserved ejection fraction.  It also included

22     patients with systolic dysfunction or

Page 106

1      congestive heart failure as well as those

2      patients who might have valvular disease,

3      including mitral valve and aortic valve disease

4      as well as patients who might have things like

5      hypotrophic cardiomyopathy and other diseases

6      of the left side of the heart.

7                  Group 3 disease includes those with

8      advanced or hypoxemic lung disease, including

9      chronic obstructive pulmonary disease,

10     interstitial lung disease.  At that time it

11     included sarcoid, I believe, which has bounced

12     back and forth between Group 3 and Group 5.  It

13     also included obstructive sleep apnea and sleep

14     disorder, breathing, as well as some other less

15     frequent lung diseases.

16                 Group 4 included those patients who

17     have chronic thromboembolic pulmonary

18     hypertension.

19                 And then Group 5 was kind of a catch

20     basin for everything that didn't fit into the

21     other four groups and that would include

22     patients who presented with liquid

HIGHLY CONFIDENTIAL

Page 116

1          A.    Correct.

2          Q.    Okay.  And all I am trying to find

3     out is what is the scope of the claim that you

4     applied.  Okay?

5               So with Claim 1, looking at Claim 1,

6     you see the term "pulmonary hypertension,"

7     correct?

8          A.    Correct.

9          Q.    Okay.  Did the plain and ordinary

10    meaning of pulmonary hypertension that you

11    applied in your analysis provided in your

12    expert declaration include any forms of

13    pulmonary hypertension other than pulmonary

14    arterial hypertension?

15              MS. KIM:  Same objection.

16              THE WITNESS:  I think again it

17    describes the treatment of pulmonary arterial

18    hypertension.

19              BY MR. DAVIES:

20         Q.    In your opinion does it describe the

21    treatment of left heart disease?

22         A.    No.

Page 117

1          Q.    In your opinion does it describe the

2     treatment of Group 3 pulmonary hypertension?

3          A.    In this application it does not.

4          Q.    And in this application you are

5     referring to the '793 patent?

6          A.    Yes.

7          Q.    Okay.  In your opinion does Claim 1

8     describe the treatment of Group 4 pulmonary

9     hypertension?

10          A.    Well, that would be a form of

11     pulmonary arterial hypertension.

12          Q.    Okay.  Are all patients within Group

13     4 suffering from pulmonary arterial

14     hypertension?

15          A.    Yes.

16          Q.    Okay.  Why is that a separate class

17     as of 2006 then?

18          A.    Because it is amenable to surgical

19     intervention.

20          Q.    Okay.  So in offering your opinions

21     you included Group 4 within the plain and

22     ordinary meaning of pulmonary hypertension,

HIGHLY CONFIDENTIAL

Page 118

1     correct?

2          A.     No.

3          Q.     You did not?

4          A.     No.  I was answering your question

5     about Group 4 as to whether it was pulmonary

6     arterial hypertension or not, but as to this

7     patent the only application is to pulmonary

8     arterial hypertension as it described in the

9     groupings at the time.

10         Q.     Understood.  So in your opinion does

11    Claim 1 describe treatment of Group 4 pulmonary

12    hypertension?

13         A.     No.

14         Q.     In your opinion does Claim 1

15    describe treatment of Group 5 pulmonary

16    hypertension?

17         A.     No.

18         Q.     So in offering your opinions in your

19    expert declaration -- expert declarations

20    offered in this case, the only group that you

21    included within Claim 1's reference to

22    pulmonary hypertension is Group 1 pulmonary

Page 119

1          arterial hypertension, correct?

2                    MS. KIM:   Objection.

3          Mischaracterizes witness testimony.

4                    THE WITNESS:   The only group that I

5          included is pulmonary arterial hypertension.

6                    BY MR. DAVIES:

7          Q.    Understood.   And that's Group 1,

8          correct?

9          A.    That includes Group 1.

10         Q.    As of 2006 -- as of May 2006 would

11         that have included any other groups?

12         A.    No.

13         Q.    You would agree, and I can point you

14         back to the passage that was back in Column 1;

15         Line 41, you would agree that at least in the

16         -- at Column 1 of the patent it does disclose

17         five groups for pulmonary hypertension as of

18         May 2006, correct?

19         A.    In -- as what is described in Column

20         1?

21         Q.    Yes.

22         A.    Yes.   I think we went over those

HIGHLY CONFIDENTIAL

Page 120

1      five groups.

2              Q.    So you would agree that while the

3      patent discloses five groups of pulmonary

4      hypertension, in your opinion Claim 1 is

5      limited to methods of treating Group 1

6      pulmonary arterial hypertension, correct?

7                   MS. KIM:  Objection.

8      Mischaracterizes witness testimony.

9                   THE WITNESS:  Again applying

10     pulmonary arterial hypertension.

11                  BY MR. DAVIES:

12              Q.    Can you look at the -- let's look at

13     the examples in the '793 patent.  And the first

14     one, just for expediency, is Example 1 on Page

15     20, bottom of Column 8 of the '793 patent.

16     Just let me know once you are there.

17              A.    I'm there.

18              Q.    Okay.  Actually, in coming up with

19     your plain and ordinary meaning of the term

20     "pulmonary hypertension," what did you consider

21     in arriving at your definition?

22              A.    I'm not sure what you mean.

HIGHLY CONFIDENTIAL

Page 252

1          CERTIFICATE OF NOTARY PUBLIC

2              I, Bonnie L. Russo, the officer before

3      whom the foregoing deposition was taken, do

4      hereby certify that the witness whose testimony

5      appears in the foregoing deposition was duly

6      sworn by me; that the testimony of said witness

7      was taken by me in shorthand and thereafter

8      reduced to computerized transcription under my

9      direction; that said deposition is a true

10     record of the testimony given by said witness;

11     that I am neither counsel for, related to, nor

12     employed by any of the parties to the action in

13     which this deposition was taken; and further,

14     that I am not a relative or employee of any

15     attorney or counsel employed by the parties

16     hereto, nor financially or otherwise interested

17     in the outcome of the action.

18                    _Bonnie L Russo_

19

20              Notary Public in and for

21                the District of Columbia

22     My Commission expires:  August 14, 2025

HIGHLY CONFIDENTIAL

Page 253

1    United Therapeutics Corporation v. Liquidia Technologies Inc

2          Aaron B. Waxman , M.D., Ph.D.

3       INSTRUCTIONS TO THE WITNESS

4          Please read your deposition over

5    carefully and make any necessary corrections.

6    You should state the reason in the

7    appropriate space on the errata sheet for any

8    corrections that are made.

9          After doing so, please sign the errata

10   sheet and date it.

11         You are signing same subject to the

12   changes you have noted on the errata sheet,

13   which will be attached to your deposition.

14         It is imperative that you return the

15   original errata sheet to the deposing

16   attorney within thirty (30) days of receipt

17   of the deposition transcript by you.  If you

18   fail to do so, the deposition transcript may

19   be deemed to be accurate and may be used in

20   court.

21

22   5009257

```
                                                    Page 254
 1    United Therapeutics Corporation v. Liquidia Technologies Inc

 2                        Aaron B. Waxman , M.D., Ph.D.

 3               E R R A T A

 4                 - - - - -

 5     PAGE    LINE    CHANGE

 6    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 7    Reason:_____

 8    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 9    Reason:_____

10    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11    Reason:_____

12    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13    Reason:_____

14    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

15    Reason:_____

16    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

17    Reason:_____

18    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19    Reason:_____

20    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

21

22     5009257
```

HIGHLY CONFIDENTIAL

Page 255

1    United Therapeutics Corporation v. Liquidia Technologies Inc

2                    Aaron B. Waxman , M.D., Ph.D.

3           ACKNOWLEDGMENT OF DEPONENT

4              I, _____, do

5    hereby certify that I have read the foregoing

6    pages and that the same is a correct

7    transcription of the answers given by

8    me to the questions therein propounded,

9    except for the corrections or changes in form

10   or substance, if any, noted in the attached

11   Errata Sheet.

12

13   _____        _____

14   DATE              SIGNATURE

15

16

17

18

19

20

21

22   5009257

# EXHIBIT D

For Immediate Release

**UNITED THERAPEUTICS ANNOUNCES FDA APPROVAL AND LAUNCH OF TYVASO® FOR THE TREATMENT OF PULMONARY HYPERTENSION ASSOCIATED WITH INTERSTITIAL LUNG DISEASE**

*First and only approved therapy in the United States for patients with PH-ILD, a serious, life-threatening disease with potentially more than 30,000 patients in need*

*FDA approval based on data from the INCREASE clinical trial*

*PH-ILD is the second FDA-approved indication for Tyvaso, which was initially approved for the treatment of pulmonary arterial hypertension*

SILVER SPRING, Md., and RESEARCH TRIANGLE PARK, N.C., April 1, 2021 – United Therapeutics Corporation (Nasdaq: UTHR) today announced that the U.S. Food and Drug Administration (FDA) has approved Tyvaso® (treprostinil) Inhalation Solution for the treatment of patients with pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability. This is the second FDA-approved indication for Tyvaso, which was first approved in July 2009 for the treatment of pulmonary arterial hypertension (PAH; WHO Group 1) to improve exercise ability.

"Adults living with both interstitial lung disease and pulmonary hypertension typically have a poor quality of life because of increased shortness of breath, poor exercise tolerance, and increased mortality. Until now, clinicians treating these patients did not have any approved treatment options," said Aaron Waxman, M.D., Ph.D., Director of the Pulmonary Vascular Disease Program at Brigham and Women's Hospital and the chair of the *INCREASE* Study Steering Committee. "The regulatory approval of Tyvaso, an inhaled treatment, is exciting news both for patients with PH-ILD and the physicians who treat adults living with this serious, life-threatening disease. This will change the way we manage these patients."

Interstitial lung disease (ILD) is a group of lung diseases in which marked scarring occurs within the lungs. It is often complicated by pulmonary hypertension (PH; high blood pressure in the lungs), which further symptoms and decreases survival. PH is estimated to affect at least 15% of patients with early-stage ILD (approximately 30,000 PH-ILD patients in the United States) and may affect up to 86% of patients with more severe ILD.

"The FDA approval of Tyvaso for patients with PH-ILD is a landmark treatment advancement for this vulnerable patient population," said Martine Rothblatt, Ph.D., Chairperson and Chief Executive Officer of United Therapeutics. "It also underscores our commitment to driving innovation in the field of pulmonary hypertension and expanding the number of patients who can achieve a clinical benefit from Tyvaso. We plan to tap into our experience and expanded infrastructure to bring this safe and effective inhaled therapy to the many patients living with PH-ILD in the United States."

"With this approval representing such a breakthrough for PH-ILD patients, we're treating this indication launch with a sense of urgency," said Michael Benkowitz, President and Chief Operating Officer of United Therapeutics. "We've already expanded our field-based teams by 40% to educate the ILD community on the benefits of Tyvaso and how to properly diagnose PH-ILD. We expect rapid uptake of Tyvaso in this indication and expect to double the number of patients on Tyvaso therapy by the end of 2022, barring any COVID-related delays."

The FDA approval of the supplemental New Drug Application (sNDA) for Tyvaso for PH-ILD is supported by data from *INCREASE*, the largest and most comprehensive completed study of adult patients with PH-ILD. The multicenter, randomized, double-blind, placebo-controlled, 16-week, parallel-group study of 326 patients met its primary endpoint, demonstrating a significant improvement in six-minute walk distance (6MWD). Results,

published in the *New England Journal of Medicine,* and discussed at a recent United Therapeutics investor meeting, also showed benefits across several key subgroups, including etiology of PH-ILD, disease severity, age, gender, baseline hemodynamics, and dose. Significant improvements were also observed in each of the secondary endpoints, including reduction in the cardiac biomarker NT-proBNP, time to first clinical worsening event, change in peak 6MWD at week 12, and change in trough 6MWD at week 15. Additional observations included placebo-corrected improvements in forced vital capacity (FVC) and significantly fewer exacerbations of underlying lung disease in patients receiving Tyvaso. Treatment with Tyvaso of up to 12 breaths per session, four times daily, in the *INCREASE* study was well tolerated and the safety profile was consistent with previous Tyvaso studies and known prostacyclin-related adverse events (see the Important Safety Information below under "About TYVASO® (treprostinil) Inhalation Solution").

**About PH-ILD**
Interstitial lung disease (ILD) is a group of lung diseases that are characterized by marked scarring or fibrosis of the bronchioles and alveolar sacs within the lungs. Increased fibrotic tissue in ILD prevents oxygenation and free gas exchange between the pulmonary capillaries and alveolar sacs, and the condition can present with a wide range of symptoms, including shortness of breath with activity, labored breathing, and fatigue.

WHO Group 3 Pulmonary hypertension (PH) frequently complicates the course of patients with interstitial lung disease and is associated with worse functional status measured by exercise capacity, greater supplemental oxygen needs, decreased quality of life, and worse outcomes.  PH is estimated to affect at least 15% of patients with early-stage ILD (approximately 30,000 PH-ILD patients in the United States) and may affect up to 86% of patients with more severe ILD.

**About TYVASO® (treprostinil) Inhalation Solution**

INDICATION

TYVASO (treprostinil) is a prostacyclin mimetic indicated for the treatment of:

- Pulmonary arterial hypertension (PAH; WHO Group 1) to improve exercise ability. Studies establishing effectiveness predominately included patients with NYHA Functional Class III symptoms and etiologies of idiopathic or heritable PAH (56%) or PAH associated with connective tissue diseases (33%).

  The effects diminish over the minimum recommended dosing interval of 4 hours; treatment timing can be adjusted for planned activities.

  While there are long-term data on use of treprostinil by other routes of administration, nearly all controlled clinical experience with inhaled treprostinil has been on a background of bosentan (an endothelin receptor antagonist) or sildenafil (a phosphodiesterase type 5 inhibitor). The controlled clinical experience was limited to 12 weeks in duration.

- Pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability. The study establishing effectiveness predominately included patients with etiologies of idiopathic interstitial pneumonia (IIP) (45%) inclusive of idiopathic pulmonary fibrosis (IPF), combined pulmonary fibrosis and emphysema (CPFE) (25%), and WHO Group 3 connective tissue disease (22%).

**IMPORTANT SAFETY INFORMATION**

WARNINGS AND PRECAUTIONS
- TYVASO is a pulmonary and systemic vasodilator. In patients with low systemic arterial pressure, TYVASO may produce symptomatic hypotension.
- TYVASO inhibits platelet aggregation and increases the risk of bleeding.
- Co-administration of a cytochrome P450 (CYP) 2C8 enzyme inhibitor (e.g., gemfibrozil) may increase exposure (both $C_{max}$ and AUC) to treprostinil. Co-administration of a CYP2C8 enzyme inducer (e.g., rifampin) may decrease exposure to treprostinil. Increased exposure is likely to increase adverse events associated with treprostinil administration, whereas decreased exposure is likely to reduce clinical effectiveness.

DRUG INTERACTIONS/SPECIFIC POPULATIONS
- The concomitant use of TYVASO with diuretics, antihypertensives, or other vasodilators may increase the risk of symptomatic hypotension.
- Human pharmacokinetic studies with an oral formulation of treprostinil (treprostinil diolamine) indicated that co-administration of the cytochrome P450 (CYP) 2C8 enzyme inhibitor, gemfibrozil, increases exposure (both $C_{max}$ and AUC) to treprostinil. Co-administration of the CYP2C8 enzyme inducer, rifampin, decreases exposure to treprostinil. It is unclear if the safety and efficacy of treprostinil by the inhalation route are altered by inhibitors or inducers of CYP2C8.
- Limited case reports of treprostinil use in pregnant women are insufficient to inform a drug-associated risk of adverse developmental outcomes. However, pulmonary arterial hypertension is associated with an increased risk of maternal and fetal mortality. There are no data on the presence of treprostinil in human milk, the effects on the breastfed infant, or the effects on milk production.
- Safety and effectiveness in pediatric patients have not been established.
- Across clinical studies used to establish the effectiveness of TYVASO in patients with PAH and PH-ILD, 268 (47.8%) patients aged 65 years and over were enrolled. The treatment effects and safety profile observed in geriatric patients were similar to younger patients. In general, dose selection for an elderly patient should be cautious, reflecting the greater frequency of hepatic, renal, or cardiac dysfunction, and of concomitant diseases or other drug therapy.

ADVERSE REACTIONS
- <u>Pulmonary Arterial Hypertension (WHO Group 1)</u>
  In a 12-week, placebo-controlled study (TRIUMPH I) of 235 patients with PAH (WHO Group 1 and nearly all NYHA Functional Class III), the most common adverse reactions seen with TYVASO in ≥4% of PAH patients and more than 3% greater than placebo in the placebo-controlled study were cough (54% vs 29%), headache (41% vs 23%), throat irritation/pharyngolaryngeal pain (25% vs 14%), nausea (19% vs 11%), flushing (15% vs <1%), and syncope (6% vs <1%). In addition, adverse reactions occurring in ≥4% of patients were dizziness and diarrhea.

- <u>Pulmonary Hypertension Associated with ILD (WHO Group 3)</u>
  In a 16-week, placebo-controlled study (INCREASE) of 326 patients with PH-ILD (WHO Group 3), adverse reactions were similar to the experience in studies of PAH.

Please see Full Prescribing Information, the <u>TD-100</u> and <u>TD-300</u> TYVASO® Inhalation System Instructions for Use manuals, and other additional information at <u>www.tyvaso.com</u> or call 1-877-UNITHER (1-877-864-8437).

**United Therapeutics: Enabling Inspiration**

United Therapeutics Corporation focuses on the strength of a balanced, value-creating biotechnology model. We are confident in our future thanks to our fundamental attributes, namely our obsession with quality and innovation, the power of our brands, our entrepreneurial culture, and our bioinformatics leadership. We also believe that our determination to be responsible citizens – having a positive impact on patients, the environment, and society – will sustain our success in the long term.

Through our wholly owned subsidiary, Lung Biotechnology PBC, we are focused on addressing the acute national shortage of transplantable lungs and other organs with a variety of technologies that either delay the need for such organs or expand the supply. Lung Biotechnology is the first public benefit corporation subsidiary of a public biotechnology or pharmaceutical company.

Please visit unither.com to learn more.

**Forward-looking Statements**

Statements included in this press release that are not historical in nature are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements include, among others, statements relating to the potential for the approval of Tyvaso in PH-ILD to change the way PH-ILD patients are treated, our expectation of a rapid uptake of Tyvaso in PH-ILD patients, and our expectation that we will double the number of patients on Tyvaso therapy by the end of 2022, our ability to create value and sustain our success in the long-term, as well as our efforts to develop technologies that either delay the need for transplantable organs or expand the supply of transplantable organs. These forward-looking statements are subject to certain risks and uncertainties, such as those described in our periodic reports filed with the Securities and Exchange Commission, that could cause actual results to differ materially from anticipated results. Consequently, such forward-looking statements are qualified by the cautionary statements, cautionary language and risk factors set forth in our periodic reports and documents filed with the Securities and Exchange Commission, including our most recent Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K. We claim the protection of the safe harbor contained in the Private Securities Litigation Reform Act of 1995 for forward-looking statements. We are providing this information as of April 1, 2021, and assume no obligation to update or revise the information contained in this press release whether as a result of new information, future events or any other reason.

TYVASO is a registered trademark of United Therapeutics Corporation.

For Further Information Contact:
Dewey Steadman at (202) 919-4097
Email: ir@unither.com

# # #

# EXHIBIT E

| | |
|---|---|
| **From:** | Dykhuis, Art <Adykhuis@mwe.com> |
| **Sent:** | Monday, February 14, 2022 9:47 AM |
| **To:** | Cazakoff, Brittany N; Carsten, Douglas; Burrowbridge, Adam; Jiaxiao Zhang; Revilla, Joshua; Pappas, Katherine; Kim, Mandy; Dunker, Tim; WJackson@goodwinlaw.com; Hwu@goodwinlaw.com; HGunn@goodwinlaw.com; jblumenfeld@morrisnichols.com; 'bchard@morrisnichols.com'; Flynn, Michael J.; UTCvLiquidia-Del; Teter, Elizabeth; Kim, Mandy |
| **Cc:** | z/Liquidia v UTC 308970-201; 'kkeller@shawkeller.com'; nhoeschen@shawkeller.com |
| **Subject:** | RE: United Therapeutics v. Liquidia (20-755):  Waxman Deposition (1/15) Follow-up |

**[External]**

Brittany,

UTC does not intend to produce in response to Liquidia's request.

Thanks,

Art

ART DYKHUIS
Associate
**McDermott Will & Emery LLP**  18565 Jamboree Road, Suite 250, Irvine, CA 92612-2565
**Tel** +1 949 989 8292    **Email** adykhuis@mwe.com
Website | vCard | Twitter | LinkedIn

**From:** Cazakoff, Brittany N <bcazakoff@cooley.com>
**Sent:** Thursday, February 10, 2022 3:44 PM
**To:** Dykhuis, Art <Adykhuis@mwe.com>; Carsten, Douglas <Dcarsten@mwe.com>; Burrowbridge, Adam <Aburrowbridge@mwe.com>; Zhang, Jiaxiao <Jiazhang@mwe.com>; Revilla, Joshua <Jrevilla@mwe.com>; Pappas, Katherine <Kpappas@mwe.com>; Kim, Mandy <Mhkim@mwe.com>; Dunker, Tim <Tdunker@mwe.com>; WJackson@goodwinlaw.com; Hwu@goodwinlaw.com; HGunn@goodwinlaw.com; jblumenfeld@morrisnichols.com; 'bchard@morrisnichols.com' <bchard@morrisnichols.com>; Flynn, Michael J. <michael.flynn@MNAT.com>; UTCvLiquidia-Del <UTCvLiquidia-Del@mwe.com>; Teter, Elizabeth <Eteter@mwe.com>; Kim, Mandy <Mhkim@mwe.com>
**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>; 'kkeller@shawkeller.com' <kkeller@shawkeller.com>; nhoeschen@shawkeller.com
**Subject:** RE: United Therapeutics v. Liquidia (20-755): Waxman Deposition (1/15) Follow-up

**[ External Email ]**
Art,

Please let us know if UTC intends to produce the Forms 3542.

Thanks,
Brittany

**From:** Cazakoff, Brittany N
**Sent:** Friday, February 4, 2022 6:29 AM

**To:** Dykhuis, Art <Adykhuis@mwe.com>; Carsten, Douglas <Dcarsten@mwe.com>; Burrowbridge, Adam <Aburrowbridge@mwe.com>; Jiaxiao Zhang <jiazhang@mwe.com>; Revilla, Joshua <Jrevilla@mwe.com>; Pappas, Katherine <Kpappas@mwe.com>; Kim, Mandy <Mhkim@mwe.com>; Dunker, Tim <Tdunker@mwe.com>; WJackson@goodwinlaw.com; Hwu@goodwinlaw.com; HGunn@goodwinlaw.com; JBroussard@goodwinlaw.com; jblumenfeld@morrisnichols.com; 'bchard@morrisnichols.com' <bchard@morrisnichols.com>; Flynn, Michael J. <michael.flynn@MNAT.com>; UTCvLiquidia-Del <UTCvLiquidia-Del@mwe.com>; Teter, Elizabeth <Eteter@mwe.com>; Kim, Mandy <Mhkim@mwe.com>
**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>; 'kkeller@shawkeller.com' <kkeller@shawkeller.com>; nhoeschen@shawkeller.com
**Subject:** RE: United Therapeutics v. Liquidia (20-755): Waxman Deposition (1/15) Follow-up

Art,

We are available on Monday at 2pm ET to meet and confer.  I will circulate an invite.

Thanks,
Brittany

---

**From:** Dykhuis, Art <Adykhuis@mwe.com>
**Sent:** Thursday, February 3, 2022 12:31 PM
**To:** Cazakoff, Brittany N <bcazakoff@cooley.com>; Carsten, Douglas <Dcarsten@mwe.com>; Burrowbridge, Adam <Aburrowbridge@mwe.com>; Jiaxiao Zhang <jiazhang@mwe.com>; Revilla, Joshua <Jrevilla@mwe.com>; Pappas, Katherine <Kpappas@mwe.com>; Kim, Mandy <Mhkim@mwe.com>; Dunker, Tim <Tdunker@mwe.com>; WJackson@goodwinlaw.com; Hwu@goodwinlaw.com; HGunn@goodwinlaw.com; JBroussard@goodwinlaw.com; jblumenfeld@morrisnichols.com; 'bchard@morrisnichols.com' <bchard@morrisnichols.com>; Flynn, Michael J. <michael.flynn@MNAT.com>; UTCvLiquidia-Del <UTCvLiquidia-Del@mwe.com>; Teter, Elizabeth <Eteter@mwe.com>; Kim, Mandy <Mhkim@mwe.com>
**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>; 'kkeller@shawkeller.com' <kkeller@shawkeller.com>; nhoeschen@shawkeller.com
**Subject:** RE: United Therapeutics v. Liquidia (20-755): Waxman Deposition (1/15) Follow-up

**[External]**

---

Brittany,

You state that the requested Forms "directly relate" to Dr. Waxman's deposition testimony. Please provide any authority you may have for the proposition that a party should produce documents that "relate" to expert deposition testimony after the close of fact discovery.

We propose to meet and confer, if needed, on Monday at 2pm ET.

Thanks,

Art

ART DYKHUIS
Associate
**McDermott Will & Emery LLP**  18565 Jamboree Road, Suite 250, Irvine, CA 92612-2565
**Tel** +1 949 989 8292   **Email** adykhuis@mwe.com
**Website | vCard | Twitter | LinkedIn**

**From:** Cazakoff, Brittany N <bcazakoff@cooley.com>
**Sent:** Wednesday, February 2, 2022 9:38 AM
**To:** Dykhuis, Art <Adykhuis@mwe.com>; Carsten, Douglas <Dcarsten@mwe.com>; Burrowbridge, Adam <Aburrowbridge@mwe.com>; Zhang, Jiaxiao <Jiazhang@mwe.com>; Revilla, Joshua <Jrevilla@mwe.com>; Pappas, Katherine <Kpappas@mwe.com>; Kim, Mandy <Mhkim@mwe.com>; Dunker, Tim <Tdunker@mwe.com>; WJackson@goodwinlaw.com; Hwu@goodwinlaw.com; HGunn@goodwinlaw.com; JBroussard@goodwinlaw.com; jblumenfeld@morrisnichols.com; 'bchard@morrisnichols.com' <bchard@morrisnichols.com>; Flynn, Michael J. <michael.flynn@MNAT.com>; UTCvLiquidia-Del <UTCvLiquidia-Del@mwe.com>; Teter, Elizabeth <Eteter@mwe.com>; Kim, Mandy <Mhkim@mwe.com>
**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>; 'kkeller@shawkeller.com' <kkeller@shawkeller.com>; nhoeschen@shawkeller.com
**Subject:** RE: United Therapeutics v. Liquidia (20-755): Waxman Deposition (1/15) Follow-up

==[ External Email ]==
Art,

Please produce the Forms FDA 3542 today or provide UTC's availability for a meet and confer either today or tomorrow.  If UTC refuses Liquidia's request, Liquidia intends to bring this issue to the attention of the court.

Thanks,
Brittany

**From:** Cazakoff, Brittany N <bcazakoff@cooley.com>
**Sent:** Monday, January 31, 2022 9:58 AM
**To:** Dykhuis, Art <Adykhuis@mwe.com>; Carsten, Douglas <Dcarsten@mwe.com>; Burrowbridge, Adam <Aburrowbridge@mwe.com>; Jiaxiao Zhang <jiazhang@mwe.com>; Revilla, Joshua <Jrevilla@mwe.com>; Pappas, Katherine <Kpappas@mwe.com>; Kim, Mandy <Mhkim@mwe.com>; Dunker, Tim <Tdunker@mwe.com>; WJackson@goodwinlaw.com; Hwu@goodwinlaw.com; HGunn@goodwinlaw.com; JBroussard@goodwinlaw.com; jblumenfeld@morrisnichols.com; 'bchard@morrisnichols.com' <bchard@morrisnichols.com>; Flynn, Michael J. <michael.flynn@MNAT.com>; UTCvLiquidia-Del <UTCvLiquidia-Del@mwe.com>; Teter, Elizabeth <Eteter@mwe.com>; Kim, Mandy <Mhkim@mwe.com>
**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>; 'kkeller@shawkeller.com' <kkeller@shawkeller.com>; nhoeschen@shawkeller.com
**Subject:** RE: United Therapeutics v. Liquidia (20-755): Waxman Deposition (1/15) Follow-up

Art,

Please confirm you will send the forms today, or provide UTC's availability today for a meet and confer.

Thanks,
Brittany

**From:** Cazakoff, Brittany N <bcazakoff@cooley.com>
**Sent:** Friday, January 28, 2022 8:15 AM
**To:** Dykhuis, Art <Adykhuis@mwe.com>; Carsten, Douglas <Dcarsten@mwe.com>; Burrowbridge, Adam <Aburrowbridge@mwe.com>; Jiaxiao Zhang <jiazhang@mwe.com>; Revilla, Joshua <Jrevilla@mwe.com>; Pappas, Katherine <Kpappas@mwe.com>; Kim, Mandy <Mhkim@mwe.com>; Dunker, Tim <Tdunker@mwe.com>; WJackson@goodwinlaw.com; Hwu@goodwinlaw.com; HGunn@goodwinlaw.com; JBroussard@goodwinlaw.com; jblumenfeld@morrisnichols.com; 'bchard@morrisnichols.com' <bchard@morrisnichols.com>; Flynn, Michael J.

3

<michael.flynn@MNAT.com>; UTCvLiquidia-Del <UTCvLiquidia-Del@mwe.com>; Teter, Elizabeth <Eteter@mwe.com>;
Kim, Mandy <Mhkim@mwe.com>
**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>; 'kkeller@shawkeller.com'
<kkeller@shawkeller.com>; nhoeschen@shawkeller.com
**Subject:** RE: United Therapeutics v. Liquidia (20-755): Waxman Deposition (1/15) Follow-up

Art,

Thank you for sending Dr. Waxman's CV.

The Forms FDA 3542 directly relate to Dr. Waxman's testimony and UTC's apparent position that the claims of the '793
Patent only cover Group 1 PAH but not other Groups of pulmonary hypertension.  (*See* 1/15/22 Waxman Depo Tr.,
116:9-120:10 (excluding all Groups of pulmonary hypertension except Group 1 PAH from the meaning of claim 1's
reference to pulmonary hypertension).)  Notably, Dr. Waxman testified that claim 1's reference to pulmonary
hypertension excludes Group 3 pulmonary hypertension, in which PH-ILD falls.  (*See id.* at 117:1-6.)

Please provide any forms by Monday, Jan 31.  Alternatively, please provide your availability for a meet and confer on
Monday.

Thanks,
Brittany

---

**From:** Dykhuis, Art <Adykhuis@mwe.com>
**Sent:** Thursday, January 27, 2022 10:06 PM
**To:** Cazakoff, Brittany N <bcazakoff@cooley.com>; Carsten, Douglas <Dcarsten@mwe.com>; Burrowbridge, Adam
<Aburrowbridge@mwe.com>; Jiaxiao Zhang <jiazhang@mwe.com>; Revilla, Joshua <Jrevilla@mwe.com>; Pappas,
Katherine <Kpappas@mwe.com>; Kim, Mandy <Mhkim@mwe.com>; Dunker, Tim <Tdunker@mwe.com>;
WJackson@goodwinlaw.com; Hwu@goodwinlaw.com; HGunn@goodwinlaw.com; JBroussard@goodwinlaw.com;
jblumenfeld@morrisnichols.com; 'bchard@morrisnichols.com' <bchard@morrisnichols.com>; Flynn, Michael J.
<michael.flynn@MNAT.com>; UTCvLiquidia-Del <UTCvLiquidia-Del@mwe.com>; Teter, Elizabeth <Eteter@mwe.com>;
Kim, Mandy <Mhkim@mwe.com>
**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>; 'kkeller@shawkeller.com'
<kkeller@shawkeller.com>; nhoeschen@shawkeller.com
**Subject:** RE: United Therapeutics v. Liquidia (20-755): Waxman Deposition (1/15) Follow-up

**[External]**

---

Brittany, attached is a copy of Dr. Waxman's CV. Regarding your request for Form(s) 3542, please further explain the
alleged basis for relevance at this stage, such as by citing the portion(s) of his transcript you contend they are relevant
to.

Thanks,

Art

ART DYKHUIS
Associate
**McDermott Will & Emery LLP**  18565 Jamboree Road, Suite 250, Irvine, CA 92612-2565
**Tel** +1 949 989 8292    **Email** adykhuis@mwe.com
Website | vCard | Twitter | LinkedIn

**From:** Cazakoff, Brittany N <bcazakoff@cooley.com>
**Sent:** Wednesday, January 26, 2022 4:11 PM
**To:** Dykhuis, Art <Adykhuis@mwe.com>; Carsten, Douglas <Dcarsten@mwe.com>; Burrowbridge, Adam
<Aburrowbridge@mwe.com>; Zhang, Jiaxiao <Jiazhang@mwe.com>; Revilla, Joshua <Jrevilla@mwe.com>; Pappas,
Katherine <Kpappas@mwe.com>; Kim, Mandy <Mhkim@mwe.com>; Dunker, Tim <Tdunker@mwe.com>;
WJackson@goodwinlaw.com; Hwu@goodwinlaw.com; HGunn@goodwinlaw.com; JBroussard@goodwinlaw.com;
jblumenfeld@morrisnichols.com; 'bchard@morrisnichols.com' <bchard@morrisnichols.com>; Flynn, Michael J.
<michael.flynn@MNAT.com>; UTCvLiquidia-Del <UTCvLiquidia-Del@mwe.com>; Teter, Elizabeth <Eteter@mwe.com>;
Kim, Mandy <Mhkim@mwe.com>
**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>; 'kkeller@shawkeller.com'
<kkeller@shawkeller.com>; nhoeschen@shawkeller.com
**Subject:** RE: United Therapeutics v. Liquidia (20-755): Waxman Deposition (1/15) Follow-up

**[ External Email ]**
Counsel,

Per the below request, please provide any Form(s) FDA 3542 that UTC submitted for Tyvaso® as indicated for PH-ILD.  As
well, please provide the most recent copy of Dr. Waxman's CV.

Thanks,
Brittany

---

**From:** Cazakoff, Brittany N
**Sent:** Monday, January 17, 2022 10:34 AM
**To:** Dykhuis, Art <Adykhuis@mwe.com>; Carsten, Douglas <Dcarsten@mwe.com>; Burrowbridge, Adam
<Aburrowbridge@mwe.com>; Jiaxiao Zhang <jiazhang@mwe.com>; Revilla, Joshua <Jrevilla@mwe.com>; Pappas,
Katherine <Kpappas@mwe.com>; Kim, Mandy <Mhkim@mwe.com>; Dunker, Tim <Tdunker@mwe.com>;
WJackson@goodwinlaw.com; Hwu@goodwinlaw.com; HGunn@goodwinlaw.com; JBroussard@goodwinlaw.com;
jblumenfeld@morrisnichols.com; bchard@morrisnichols.com; Flynn, Michael J. <michael.flynn@MNAT.com>;
UTCvLiquidia-Del <UTCvLiquidia-Del@mwe.com>; Teter, Elizabeth <Eteter@mwe.com>; Kim, Mandy
<Mhkim@mwe.com>
**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>; kkeller@shawkeller.com;
nhoeschen@shawkeller.com
**Subject:** United Therapeutics v. Liquidia (20-755): Waxman Deposition (1/15) Follow-up

Counsel,

Please provide any Form(s) FDA 3542 that UTC submitted for Tyvaso® as indicated for interstitial lung disease (PH-ILD,
WHO Group 3).  These forms are directly relevant to testimony Dr. Waxman provided in his district court deposition on
January 15, 2022.

Additionally, please provide the most recent copy of Dr. Waxman's CV.

Thanks,
Brittany

Brittany Cazakoff
Cooley LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
+1 650 843 5522 office
+1 650 849 7400 fax
bcazakoff@cooley.com

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distr bution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

*******************************************************************************************************************

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information or data and any personal information or data provided or made available to us. Thank you.
*******************************************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distr bution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distr bution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. 20-755 (RGA) ) |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) |
| Defendant. | ) |

**UNITED THERAPEUTICS CORPORATION'S RESPONSES AND
OBJECTIONS TO LIQUIDIA'S FIRST SET OF REQUESTS FOR THE
PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFF (NOS. 1-80)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the applicable

Local Rules of the United States District Court for the District of Delaware, Plaintiff United

Therapeutics Corporation ("UTC"), by and through its undersigned counsel, hereby responds to

Defendant Liquidia Technologies, Inc.'s ("Liquidia" or "Defendant") First Set of Requests for

Production of Documents and Things (Nos. 1-80).

**PRELIMINARY STATEMENT**

The following responses are made solely for the purpose of, and in relation to, this action.

Each response is provided subject to all appropriate objections (including, without limitation,

objections relating to competency, relevancy, propriety, proportionality, and admissibility) that

would require the exclusion of any statement provided herein if that statement were made by a

witness testifying in court.  All such objections are reserved and may be interposed at the time of

trial.

The following responses are made based on the facts and information presently known to

UTC.  The responses refer only to the contentions that have been asserted to date, based on facts

seeks the production of documents that contain proprietary business information, trade secrets, or other confidential information that are not relevant to the claim or defense of any party in this case, including information which is subject to a confidentiality agreement or protective order. UTC objects to this Request to the extent that it is duplicative of other Requests.

Subject to and without waiving the foregoing general and specific objections, UTC will produce responsive non-privileged documents, to the extent that such documents exist and are found in its possession, custody, or control after a reasonably diligent search of its files. UTC will not produce documents protected against disclosure by the attorney-client privilege, the work-product doctrine, the common interest privilege, or any other applicable privilege or immunity.

**REQUEST FOR PRODUCTION NO. 30**

All documents and things concerning the listing of the Patents-in-Suit in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (the Orange Book).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30**

UTC incorporates by reference the General Statements and Objections set forth above as if fully stated herein. UTC objects to this Request as overly broad, unduly burdensome, seeks information that is not related to any claim or defense in this action, and is not proportional to the needs of the litigation, particularly to the extent it refers to "all" documents and things, and "concerning." UTC objects to this Request as vague, ambiguous, indefinite, and unclear as to the information sought. For example, the term "concerning the listing of" is vague and ambiguous. UTC objects to this Request to the extent it seeks documents or information protected by attorney-client privilege, attorney work product, and/or any other applicable privilege or doctrine. UTC objects to this Request on the grounds that it seeks the production of documents that contain proprietary business information, trade secrets, or other confidential information that are not

relevant to the claim or defense of any party in this case, including information which is subject to a confidentiality agreement or protective order.  UTC objects to this Request to the extent that it calls for a legal conclusion.  UTC objects to this Request to the extent it seeks production of documents outside of UTC's possession, custody, or control.

Subject to and without waiving the foregoing general and specific objections, UTC will produce responsive non-privileged documents, to the extent that such documents exist and are found in its possession, custody, or control after a reasonably diligent search of its files.  UTC will not produce documents protected against disclosure by the attorney-client privilege, the work-product doctrine, the common interest privilege, or any other applicable privilege or immunity.

**REQUEST FOR PRODUCTION NO. 31**

All documents and things concerning the development program that led to treprostinil, the properties of treprostinil, or the use of treprostinil, including but not limited to TYVASO® and REMODULIN®.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31**

UTC incorporates by reference the General Statements and Objections set forth above as if fully stated herein.  UTC objects to this Request as overly broad, unduly burdensome, seeks information that is not related to any claim or defense in this action, and is not proportional to the needs of the litigation, particularly to the extent it refers to "all" documents and things, "concerning," "the development program the led to," "the properties of," and "the use of."  UTC objects to this Request as vague, ambiguous, indefinite, and unclear as to the information sought. For example, the terms "concerning the development program," "the properties of," and "the use of" are vague and ambiguous.  UTC objects to this Request to the extent it seeks documents or information protected by attorney-client privilege, attorney work product, and/or any other applicable privilege or doctrine.  UTC objects to this Request on the grounds that it seeks the

product."  Plaintiffs object to this Request as vague, ambiguous, indefinite, unintelligible, and unclear as to the information sought, particularly to the extent it refers to "relating to."  Plaintiffs object to this Request to the extent it seeks production of documents protected from disclosure by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or doctrine.  Plaintiffs object to this Request on the grounds that it seeks the production of documents which contain proprietary business information, trade secrets, or other confidential information, including information which is subject to a confidentiality agreement or protective order.  UTC further objects to this Request to the extent it is duplicative of other Requests.

Subject to and without waiving the foregoing general and specific objections, UTC will produce responsive non-privileged documents, to the extent that such documents exist and are found in its possession, custody, or control after a reasonably diligent search of its files.

## REQUEST FOR PRODUCTION NO. 40

All documents and things related to Plaintiff's communications with the FDA relating to NDA No. 022387 for TYVASO® and supplemental applications and/or amendments thereto, including, but not limited to, the NDA itself and all related DMFs and IND applications, regardless of whether the DMFs or IND applications were filed with the FDA.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 40

UTC incorporates by reference the General Statements and Objections set forth above as if fully stated herein.  UTC objects to this Request as overly broad, unduly burdensome, seeks information that is not related to any claim or defense in this action, and is not proportional to the needs of the litigation, particularly to the extent it refers to "all" documents and things, "related to Plaintiff's communications," "relating to NDA No. 022387" "supplemental applications and/or amendments thereto," "all related DMFs and IND applications" and "regardless of whether … filed with the FDA."  UTC objects to this Request as vague, ambiguous, indefinite, unintelligible, and unclear as to the information sought.  For example, the terms "related to Plaintiff's

communications," "relating to NDA No. 022387" "supplemental applications and/or amendments thereto," and "all related DMFs and IND applications" are vague and ambiguous.  UTC objects to this Request to the extent it seeks production of documents protected from disclosure by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or doctrine.  UTC objects to this Request on the grounds that it seeks the production of documents which contain proprietary business information, trade secrets, or other confidential information, including information which is subject to a confidentiality agreement or protective order.  UTC objects to this Request to the extent it seeks publicly available documents that are as readily available to UTC as they are Defendant.  UTC further objects to this Request to the extent it is duplicative of other Requests.

Subject to and without waiving the foregoing general and specific objections, UTC will produce responsive non-privileged documents, to the extent that such documents exist and are found in its possession, custody, or control after a reasonably diligent search of its files.

## REQUEST FOR PRODUCTION NO. 41

Documents concerning representative batch records for TYVASO®.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 41

UTC incorporates by reference the General Statements and Objections set forth above as if fully stated herein.  UTC objects to this Request as overly broad, unduly burdensome, seeks information that is not related to any claim or defense in this action, and is not proportional to the needs of the litigation.  UTC objects to this Request as vague, ambiguous, indefinite, and unclear as to the information sought, particularly to the extent it refers to documents "concerning representative batch records."  UTC objects to this Request to the extent it seeks documents or information protected by attorney-client privilege, attorney work product, and/or any other

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

OF COUNSEL:

Douglas H. Carsten
Joshua Mack
WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real
San Diego, CA  92130
(858) 305-2300

Adam W. Burrowbridge
WILSON SONSINI GOODRICH & ROSATI
1700 K Street NW, Fifth Floor
Washington, DC  20006
(202) 973-8800

William C. Jackson
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC  20005
(202) 237-2727

*Attorneys for Plaintiff United Therapeutics
Corporation*

September 3, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 3, 2020, copies of the foregoing were caused to be served

upon the following in the manner indicated:

Karen E. Keller, Esquire                       *VIA ELECTRONIC MAIL*
Jeff Castellano, Esquire
David M. Fry, Esquire
Nathan R. Hoeschen, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Sanya Sukduang, Esquire                    *VIA ELECTRONIC MAIL*
Jonathan Davies, Esquire
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC  20004-2400
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Erik Milch, Esquire                          *VIA ELECTRONIC MAIL*
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA  20190-5640
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Ivor Elrifi, Esquire                          *VIA ELECTRONIC MAIL*
COOLEY LLP
55 Hudson Yards
New York, NY  10001-2157
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Lauren Krickl, Esquire                                    *VIA ELECTRONIC MAIL*
Deepa Kannappan, Esquire
COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*


*/s/ Jack B. Blumenfeld*

_____
Jack B. Blumenfeld (#1014)