IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 20-755-RGA-JLH |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S POST-TRIAL OPENING BRIEF REGARDING INVALIDITY OF U.S. PATENT NOS. 9,593,066 AND 10,716,793**

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Douglas W. Cheek
Adam Pivovar
Brittany Cazakoff
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia Technologies, Inc.*

Lauren Krickl
Deepa Kannappan
Kyung Taeck Minn
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: May 4, 2022

<u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................... 2

III.  THE ASSERTED CLAIMS OF THE '066 PATENT ARE INVALID ............................ 2

    A.  Product-by-Process Claims Are Anticipated by Moriarty Publication Product .................................................................................................. 3

        1.  Claims 1-3, 6, and 9 Claim the Same Product Made by Moriarty ............ 3

        2.  UTC Identifies No Structural or Functional Difference Between Treprostinil Produced by the '066 Patent and Moriarty .......................... 5

    B.  Claim 1's "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition" Limitation Lacks Written Description Support ............................................................... 8

        1.  The '066 Patent Provides No Impurity Information to Make the Comparison between the Starting Batch and the Final Composition ....... 9

        2.  UTC's Expert Testimony Does Not Cure the Lack of Disclosure........... 11

IV.  THE ASSERTED CLAIMS OF THE '793 PATENT ARE INVALID UNDER § 112 ...................................................................................................... 13

    A.  The Asserted Claims of the '793 Patent Are Not Enabled for the Full Scope of Treating PH ....................................................................... 14

        1.  "A Method for Treating Pulmonary Hypertension" Includes Group 2 ........................................................................................... 14

        2.  A POSA Could Not Practice the Full Scope of Treating PH without Undue Experimentation ..................................................... 15

    B.  The '793 Patent Inventors Did Not Possess the Full Scope of Treating Pulmonary Hypertension ............................................................. 19

    C.  The '793 Patent Fails to Demonstrate That the Inventors Possessed a Dry Powder Formulation of Treprostinil or DPI for Treatment of PH ...................... 20

    D.  Making and Using a Dry Powder Formulation of Treprostinil for the Treatment of PH Would Require Undue Experimentation .............................. 23

V.  CONCLUSION ................................................................................................ 28

i

## TABLE OF AUTHORITIES

Page

**Cases**

*Alcon Res., Ltd. v. Apotex Inc.*,
  687 F.3d 1362 (2012)............................................................................ 18

*ALZA Corp. v. Andrx Pharms., LLC*,
  603 F.3d 935 (Fed. Cir. 2010) ............................................................ 25

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
  580 F.3d 1340 (Fed. Cir. 2009) ............................................................ 3

*Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 ........................................................................................ 9

*Auto. Techs. Int'l, Inc. v. BMW of North America, Inc.*,
  501 F.3d 1274 (Fed. Cir. 2007) .......................................................... 26

*Biogen Int'l. GMBH v. Mylan Pharms. Inc.*,
  18 F.4th 1333 (Fed. Cir. 2021) .......................................... 9, 19, 20, 22

*Bos. Sci. Corp. v. Johnson & Johnson Inc.*,
  679 F. Supp. 2d 539 (D. Del. 2010)........................................ 9, 10, 13, 22

*Bos. Sci. Corp. v. Johnson & Johnson*,
  647 F.3d 1353 (Fed. Cir. 2011) ...................................................... 9, 22

*C R Bard Inc. v. AngioDynamics, Inc.*,
  979 F.3d 1372 (Fed. Cir. 2020) ............................................................ 8

*Enzo Biochem, Inc. v. Calgene, Inc.*,
  188 F.3d 1362 ...................................................................................... 25

*Genentech, Inc. v. Novo Nordisk, A/S*,
  108 F.3d 1361 (Fed. Cir. 1997) .................................................... 14, 26

*Greenliant Sys., Inc. v. Xicor LLC*,
  692 F.3d 1261 (Fed. Cir. 2012) ............................................................ 3

*Impax Lab'ys, Inc. v. Aventis Pharms. Inc.*,
  545 F.3d 1312 (Fed. Cir. 2008) .................................................... 17, 24

*In re Copaxone Consolid. Cases*,
  No. 14-1171, 2017 WL 401943 (D. Del. Jan. 30, 2017) ........................ 8

*In re Corkill*,
   771 F.2d 1496 (Fed. Cir. 1985) ............................................................. 16

*In re Marosi*,
   710 F.2d 798 (Fed. Cir. 1983) ................................................................. 3

*In re Thorpe*,
   777 F.2d 695 (Fed. Cir. 1985) ............................................................. 3, 5

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988) ............................................................... 16

*MagSil Corp. v. Hitachi Global Storage Techs., Inc.*,
   687 F.3d 1377 (Fed. Cir. 2012) ............................................................. 15

*Network-1 Techs. v. Hewlett-Packard Co.*,
   981 F.3d 1015 (Fed. Cir. 2020) ....................................................... 15, 18

*Noven Pharms. v. Amneal Pharms. LLC*,
   No. 18-699-LPS 2020 WL 11191445 (D. Del. Sept. 4, 2020) ................. 23

*Nuvo Pharms. (Ireland) Designation Activity Co. v. Dr. Reddy's Labs., Inc.*,
   923 F.3d 1368 (Fed. Cir. 2019) ..................................................... passim

*Old Town Canoe Co. v. Confluence Holdings Corp.*,
   448 F.3d 1309 (Fed. Cir. 2006) ............................................................. 25

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
   438 F.3d 1123 (Fed. Cir. 2006) ....................................................... 15, 18

*SmithKline Beecham Corp. v. Apotex Corp.*,
   439 F.3d 1312 (Fed. Cir. 2006) ............................................................... 5

*SteadyMed Ltd. v. United Therapeutics Corp.*,
   IPR2016-00006, Paper No. 82 (P.T.A.B. Mar. 31, 2017) .......................... 7

*Trs. of Bos. Univ. v. Everlight Elecs. Co., Ltd.*,
   896 F.3d 1357 (Fed. Cir. 2016) ..................................... 16, 18, 19, 26

*Wyeth & Cordis Corp. v. Abbott Lab'ys*,
   720 F.3d 1380 (Fed. Cir. 2013) ............................................................. 14

**Statutes**

35 U.S.C. § 112 ................................................................................... 8, 14

TABLE OF ABBREVIATIONS

**Asserted Patents & Parties**

| | |
|---|---|
| '066 patent | U.S. Patent No. 9,593,066 |
| '793 patent | U.S. Patent No. 10,716,793 |
| Asserted claims of the '066 patent | Claims 1, 2, 3, 6, 8, 9 |
| Asserted claims of the '793 patent | Claims 1, 4, 6, 7, 8 |
| UTC/Plaintiff | United Therapeutics Corporation |
| Liquidia/Defendant | Liquidia Technologies, Inc. |

**Commonly Used Terms & Abbreviations**

| | |
|---|---|
| BTO | Benzindene triol |
| CMC | Chemistry, Manufacturing, and Controls |
| DMF | Drug master file |
| DPI | Dry powder inhaler |
| FDA | Food and Drug Administration |
| LHD | Left heart disease |
| MannKind | MannKind Corporation |
| NDA | New Drug Application |
| PAH | Pulmonary arterial hypertension (Group 1 PH) |
| PAWP | Pulmonary artery wedge pressure |
| PH | Pulmonary hypertension |
| POSA | Person of ordinary skill in the art |
| PTAB | Patent Trial and Appeal Board |
| TRE | Treprostinil |
| TRS | Total related substances |
| WHO | World Health Organization |
| Yonsung | Yonsung Fine Chemicals |
| LGM | LGM Pharma |

## I.     INTRODUCTION

UTC filed this Hatch-Waxman case in response to Liquidia's filing of its NDA No. 213005 in January 2020, seeking FDA approval to market its dry powder formulation of treprostinil, known as LIQ861 (Yutrepia™), for the treatment of PAH.  FOF1, 66.  LIQ861 *is not* a generic version of any currently marketed drug but is instead an entirely new product developed by Liquidia utilizing its proprietary PRINT technology.  FOF1, 97, 101.  Liquidia is the first company to receive tentative FDA approval for a dry powder formulation of treprostinil.  FOF1, 97.  Liquidia uses treprostinil sodium salt, made by Korean company Yonsung, and processes that API into a dry powder.  FOF4-5, 97.

At trial, UTC asserted that Liquidia infringes claims 1-3, 6, and 8-9 of the '066 patent and claims 1, 4, and 6-8 of the '793 patent.  FOF6-7.  In this opening brief, Liquidia asserts that all of these claims (except '066 claim 8)[1] are invalid.  FOF8.

Claims 1-3, 6, and 9 of the '066 patent are invalid product-by-process claims because they cover a "pharmaceutical composition[/product] comprising treprostinil" anticipated by the treprostinil disclosed in a 2004 Moriarty publication.  UTC cannot show any structural or functional difference between the Moriarty treprostinil and the product of the '066 claims. Additionally, claims 1-3 and 6 are invalid for lack of written description, because the patent specification fails to disclose any data or information as to the level of impurities present in the starting batch of treprostinil, thus providing no comparison point to adequately describe the "level

---

[1] Liquidia presented evidence at trial that claim 8's storage limitation was invalid for indefiniteness, because the PTAB, the Court, and three different experts had rendered at least three different interpretations of the term in the context of the '066 patent, and thus a POSA would not have reasonable certainty as to the metes and bounds of the claim.  Tr. 497:19-499:14 (Winkler). The Court however granted UTC's 52(c) motion on this argument.  Tr. 780:20-22.  Liquidia preserves the right to appeal the Court's decision on the issue.

of one or more impurities found in the starting batch of treprostinil [being] lower in the pharmaceutical composition," as recited by claim 1 (carried over to dependent claims 2, 3, and 6).

Claims 1, 4, and 6-8 of the '793 patent, directed to a method of treating PH, including by dry powder inhalers and powder formulations, are not enabled and lack written description. The claims encompass the full scope of PH—all five Groups—but provide no guidance to a POSA for treating or addressing the significant safety concerns of administering inhaled treprostinil in any Group 2 PH patient. Undue experimentation would be required to treat the majority of PH patients using the claimed invention. Given the lack of disclosure of treating any Group 2 PH patient, the '793 patent is invalid for lack of written description. Moreover, the patent lacks any disclosure of particular dry powder formulations of treprostinil and DPIs suitable for use with PH patients. A POSA, therefore would not believe the inventors possessed a dry powder formulation of treprostinil or DPI for treatment of PH, and it would have required undue experimentation to develop the claimed invention.

## II.    FACTUAL BACKGROUND

The relevant facts are provided in Defendant's Findings of Fact Related to Invalidity of U.S. Patent Nos. 9,593,066 and 10,716,793.

## III.    THE ASSERTED CLAIMS OF THE '066 PATENT ARE INVALID

The '066 patent expires on December 15, 2028, with a priority date of December 17, 2007. A POSA as of 2007 would have had a master's degree or a Ph.D. in medicinal or organic chemistry, or a closely related field; or have a bachelor's degree and at least five years of practical experience in medicinal or organic chemistry. FOF9, 12. Three of the four inventors testified at trial. FOF10.

UTC asserts claims 1-3, 6, and 8-9 of the '066 patent. FOF7. Claims 1 and 8 are independent claims; claims 2-3 and 6 depend from claim 1; claim 9 depends from claim 8. FOF11. Relevant to this brief, claims 1-3, 6 and 9 are product-by-process claims, claiming a

2

"pharmaceutical composition[/product] comprising treprostinil or a pharmaceutically acceptable salt thereof." FOF11, 13. The claims involve a process of alkylating benzindene triol, hydrolyzing the resulting product to form a starting batch of treprostinil, and then forming a salt that is either itself the claimed final pharmaceutical composition/product or is used to regenerate treprostinil free acid as the final pharmaceutical composition/product. FOF43.

### A.   Product-by-Process Claims Are Anticipated by Moriarty Publication Product

In a "product-by-process" claim, the claimed "product is defined in part by the process by which it is made." *See Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1264-65 (Fed. Cir. 2012). "In determining validity of a product-by-process claim, the focus is on the product and not on the process of making it." *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1369 (Fed. Cir. 2009). This is because of the "long-standing rule that an old product is not patentable even if it is made by a new process." *Id.* at 1370. Accordingly, "[i]f the product in a product-by-process claim is the same as [i.e., anticipated by] or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process." *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985). Once a patent challenger provides evidence that the claimed product appears to be the same or similar to that of the prior art, the burden shifts to the patentee to prove that "the process by which a product is made imparts 'structural and functional differences' distinguishing the claimed product from the prior art[.]" *Greenliant*, 692 F.3d at 1268 (citation omitted*); In re Marosi*, 710 F.2d 798, 802 (Fed. Cir. 1983); FOF26. Here, claims 1-3, 6, and 9 are invalid because the product claimed is the same product previously disclosed in the prior art by a 2004 publication by Moriarty et al.

### 1.   Claims 1-3, 6, and 9 Claim the Same Product Made by Moriarty

Product-by-process claims 1-3, 6 and 9 require a "pharmaceutical composition[/product] comprising treprostinil or a pharmaceutically acceptable salt thereof." FOF13, 11 (detailing how

3

the claims are to the final product, and that claims 2, 3, and 6 add limitations to the process steps of claim 1 but not the final claimed product).  Thus, the "product" of these claims can be treprostinil, also known as UT-15 or treprostinil free acid.  FOF13.  These claims do not claim any purity percentage, impurity profile, or identify a specific impurity in the treprostinil product.  FOF14.  And as UTC admitted, the claims do not cover any stability or storage of the final treprostinil product—those limitations in claims 6 and 9 relate only to the intermediate salt generated during the process steps.  FOF15.  Although the claims do not require any level of purity, the specification discloses that the treprostinil generated by the claimed process can have a purity ranging from 99.7% to 99.9%, and could be as low as 90%.  FOF16.

A 2004 publication in the *Journal of Organic Chemistry* by Robert M. Moriarty et. al., in relevant part entitled "Synthesis of UT-15 (Treprostinil)" ("Moriarty"), teaches synthesis of treprostinil free acid with a purity of 99.7%, by alkylation and hydrolysis if BTO.  DTX258; FOF17.  The UT-15 treprostinil taught by Moriarty has the same chemical structure as the treprostinil of claims 1-3, 6, and 9, and its 99.7% purity falls within the disclosure of the patent specification.  FOF17-19.

Liquidia expert, Dr. Winkler, testified that the Moriarty UT-15 treprostinil and the '066 claimed treprostinil product were structurally and functionally the same.  FOF20.  Specifically, he testified that a POSA would know the two products have the same chemical structure and that Example 6 of the '066 patent compares the two processes, demonstrating that both processes resulted in the same UT-15 treprostinil compound.  FOF21.  Dr. Winkler also testified that UTC manufactured UT-15 treprostinil according to both processes, that the UT-15 treprostinil made by both processes had the same chemical structure, and that UTC told the FDA that the products made by both processes were the "same" and "equivalent."  FOF22.  Simply stated, the treprostinil of

the '066 patent's product-by-process claims is identical to the treprostinil disclosed in Moriarty.

No UTC expert or fact witness provided testimony that there was difference between the Moriarty UT-15 treprostinil and the treprostinil of claims 1-3, 6, and 9.  FOF25.  In fact, no UTC witness testified about the Moriarty publication or the UT-15 treprostinil it discloses, much less compared it to the '066 patent claims.  FOF27.  Dr. Winkler's testimony concerning the invalidity of the '066 patent's product-by-process claims is therefore unrebutted, and claims 1-3, 6 and 9 are invalid because they do not claim a novel product.  *Thorpe*, 777 F.2d at 697; *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1318-19 (Fed. Cir. 2006).

### 2.     UTC Identifies No Structural or Functional Difference Between Treprostinil Produced by the '066 Patent and Moriarty

Rather than squarely address the UT-15 treprostinil disclosed in the Moriarty publication, or Dr. Winkler's testimony, UTC offered the testimony of two fact witnesses: Mr. Dean Bunce and inventor Dr. Walsh.  FOF28-33.  Importantly, neither Mr. Bunce nor Dr. Walsh provided testimony there was any structural or functional difference between the treprostinil free acid claimed in the '066 patent, and that same compound disclosed in the Moriarty publication.  FOF27, 30, 31.  As such, despite having to come forward with evidence of a structural or functional difference, UTC has offered no testimony that a POSA would consider the claimed product of the '066 patent to be different, in any way, from the prior art.

Mr. Bunce testified on the specification limits between two UTC processes used to make treprostinil for UTC's Remodulin® product: a Chicago process that made the Moriarty UT-15 treprostinil, and a Silver Spring process that made the same treprostinil, but by the process of the '066 patent.  FOF28, 34-35.  But his testimony identified no *actual differences* between the products.  For example, Mr. Bunce pointed to an increase in purity assay range from 97-101% (Chicago) to 98-102% (Silver Spring) between the two processes' product specifications.  FOF29.

This testimony is irrelevant, because the claims are not directed to any numerical range of overall treprostinil purity.  Nonetheless, Dr. Winkler testified, and UTC did not refute, that the purity of all 96 batches of UT-15 treprostinil made in Chicago fell within the higher 98-102% range, and that the average purity of those Chicago batches was 99.7%.  FOF29.  As such, the purported difference between the purity assay range of Chicago and Silver Spring is theoretical as opposed to an actual structural or functional difference.  Mr. Bunce then testified that the FDA asked UTC to tighten its "total related substances specification" circa 2009, but that UTC "disagreed that it could"; thus, Mr. Bunce confirmed that the total related substances specification stayed the same between the products of the two processes.  FOF30.  Finally, even considering Mr. Bunce's testimony, the claims of the '066 patent are not limited to purity assay range of 98%-102% or a specific "total related substances specification."  FOF14, 16.  Accordingly, Dr. Bunce provided no testimony pertinent to any structural or functional difference between the Moriarty UT-15 treprostinil and the treprostinil product/composition in claims 1-3, 6 and 9.  FOF30.

Dr. Walsh also failed to identify any structural or functional difference between the products.  Dr. Walsh did not compare the Moriarty UT-15 treprostinil and the *treprostinil* product of claims 1-3, 6, and 9.  FOF31.  Rather, Dr. Walsh compared the Moriarty UT-15 treprostinil made in UTC's Chicago facility to the diethanolamine *salt of treprostinil*.  *Id.*  Dr. Walsh confirmed that treprostinil diethanolamine salt is a different compound from the claimed treprostinil free acid (*id.*), and thus his testimony is not relevant.

Even if Dr. Walsh's comparison of two completely different compounds is considered, his discussion of the 3AU90 impurity and Total Related Substances impurities do not render the product of the '066 patent structurally or functionally different from the Moriarty UT-15 treprostinil; ***neither is claimed***, nor identified in the patent specification.  FOF32.  Moreover, both

the PTAB and Federal Circuit considered similar testimony from Dr. Walsh, including reference to the 3AU90 impurity, and concluded "the comparisons of purity data for Moriarty and '393 patent[2] treprostinil set forth in the Walsh Declaration and in the specification of the '393 patent itself similarly indicate that batch-to-batch variation, rather than any structural or functional difference between treprostinil products, accounts for the reported differences in overall purity and impurity profile."  *SteadyMed Ltd. v. United Therapeutics Corp.*, IPR2016-00006, Paper No. 82, at *39 (P.T.A.B. Mar. 31, 2017); FOF33.

Finally, UTC's own documents establish that there is no structural or functional difference between the treprostinil made by Moriarty and the '066 patent.  FOF34-42.  Unlike the Moriarty process used in Chicago, the'066 patent's process used in Silver Spring involved the removal of a column chromatography purification step and the introduction of an intermediate step of diethanolamine salt (UT-15C) formation.  FOF36.  Both processes were used to make treprostinil free acid with the same chemical structure, for the same FDA approved product: Remodulin®.  FOF37, 39.  UTC repeated in multiple documents to the FDA that the products from both processes were the same:

> "the simplified chemical synthesis of treprostinil will provide API that **meets the same acceptance criteria** as API obtained from the 20-step chemical synthesis, with a **very similar impurity profile and similar acceptance criteria**."

> "[t]he release data for the drug substance batch prepared by the revised route of synthesis indicate that **it is of equivalent quality** to the batches produced by the current synthetic route, **particularly with respect to the assay and purity profile**."

> [T]he lots of treprostinil API produced by the new process in Silver Spring are of the **same** **high quality and purity** as the commercial lots of API produced by the existing process at the Chicago facility.

---

[2] The '066 and '393 patents share the same specification.  *Compare* JTX2, *with* DTX138.

FOF38, 40-41.  At no time did UTC inform the FDA that treprostinil made according to the '066 patent in Silver Spring was more safe, less toxic or more efficacious than the treprostinil previously made according to the Moriarty publication in Chicago.  FOF42.  These representations made to the FDA, years prior to any litigation, cannot be disregarded.  *See C R Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1379 (Fed. Cir. 2020) (district court erred in granting JMOL of non-infringement where defendant represented to FDA that product met claim limitations); *In re Copaxone Consolid. Cases*, No. 14-1171, 2017 WL 401943 at *20 (D. Del. Jan. 30, 2017) (finding asserted claims invalid as obvious, noting "[t]he court finds that Plaintiff's statement to the FDA accurately reflects the motivations of those in the art").

And Dr. Winkler presented unrebutted testimony based on UTC's own documents that (1) the average purity of the treprostinil free acid made from both the Chicago and Silver Spring processes was the same: 99.7%; (2) all 96 treprostinil batches made in Chicago fell within the both the Chicago and Silver Spring processes' overall purity specification ranges; and (3) the two specifications are exactly the same with respect to impurity profiles, particularly with respect to unidentified impurities, identified impurities, and total related substances.  FOF23-24, 29, 42. Accordingly, UTC has failed to meet its burden of showing any structural or functional difference between the Moriarty UT-15 treprostinil and the treprostinil of claims 1-3, 6, and 9.

In view of Liquidia's unrebutted evidence and UTC's own FDA statements and batch records, the Court should find product-by-process claims 1-3, 6, and 9 of the '066 patent invalid as anticipated by the treprostinil disclosed in the 2004 Moriarty publication.

**B.    Claim 1's "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition" Limitation Lacks Written Description Support**

A patent claim is invalid if the patent does not contain an adequate written description of the claimed invention.  35 U.S.C. § 112, ¶1.  The written description requirement "is satisfied only

if the inventor convey[s] with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention, and demonstrate[s] that by disclosure in the specification of the patent." *Nuvo Pharms. (Ireland) Designation Activity Co. v. Dr. Reddy's Labs., Inc.*, 923 F.3d 1368, 1376 (Fed. Cir. 2019) (internal quotations and citation omitted). In determining whether a specification contains an adequate written description, "one must make an 'objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.'" *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011) (quoting *Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010)). Whether a patent claim satisfies the written description requirement is a question of fact. *Ariad*, 598 F.3d at 1351.

Inventor testimony cannot establish written description support where none exists, but inventor testimony can "illuminate[] the ***absence*** of critical description." *Nuvo*, 923 F.3d at 1381 (emphasis added); *see, e.g.*, *Biogen Int'l. GMBH v. Mylan Pharms. Inc.*, 18 F.4th 1333, 1343-44 (Fed. Cir. 2021) (relying on inventor testimony to find claims invalid for lack of written description); *Bos. Sci. Corp. v. Johnson & Johnson Inc.*, 679 F. Supp. 2d 539, 555 (D. Del. 2010) ("Logically, the inventors could not have described a knowledge that they did not possess[.]").

### 1. The '066 Patent Provides No Impurity Information to Make the Comparison between the Starting Batch and the Final Composition

Claim 1 requires that "a level of one or more impurities found in the starting batch of treprostinil is lower in the [final claimed] pharmaceutical composition" of treprostinil or its salt, where the "starting batch of treprostinil [has] one or more impurities resulting from prior alkylation and hydrolysis steps," "wherein said alkylation is alkylation of benzindene triol." FOF43. As part of claim 1's process, an actual comparison of impurities between the starting batch and the final treprostinil product must be made.

The '066 patent Examples 1 and 2 describe the alkylation and hydrolysis steps, respectively. FOF44-45. In relevant part, the specification does not report the purity of the products resulting from the alkylation and hydrolysis steps, nor does it identify any specific impurity, much less the level of a specific impurity generated after alkylation or hydrolysis steps. FOF44-45. This makes sense, since the inventors never assayed to determine purity or impurities after these process steps, and thus could not describe what they did not possess. FOF44-46, 55; *Nuvo*, 923 F.3d at 1381; *Bos. Sci. Corp.*, 679 F. Supp. 2d at 555. Accordingly, the patent specification does not provide adequate written description of the "level of one or more impurities found in the starting batch of treprostinil" produced after the hydrolysis step.

Example 3 describes the formation of treprostinil diethanolamine salt by contacting a starting batch of treprostinil with diethanolamine base, but the specification again does not identify any particular impurity present after salt formation. FOF47-48. The patent only provides *purity* of the final treprostinil free acid regenerated from the salt. FOF48.

Accordingly, a POSA would understand that the '066 patent does not provide any comparison of impurities between a starting batch of treprostinil and the final pharmaceutical composition. FOF49. Importantly, there is insufficient data and information in the specification of the '066 patent for a POSA to make such a comparison as claimed. *Id.* And despite calling two current UTC employees (Mr. Poisson and Mr. Bunce), and inventor (Dr. Walsh) at trial, UTC did not present testimony or data demonstrating the inventors actually compared the impurities in the "starting batch" resulting from alkylation and hydrolysis of BTO to determine if those impurities were lower in the "pharmaceutical composition."

The level of data necessary for a POSA to make the claimed comparison is clear from UTC's infringement case. For infringement, UTC compared numerical levels of impurities

resulting from alkylation and hydrolysis in the starting batch ("TN02" in the accused process) versus pharmaceutical composition ("TN").  FOF51.  UTC expert Dr. Nuckolls agreed that claim 1 requires "an actual reduction in impurities," measured by a "number reduction"; UTC expert Dr. Toste testified that "in order to perform this analysis, of course, you have to identify impurities" and compare the "starting batch of treprostinil" with the "pharmaceutical composition" to see if there are "fewer . . . process impurities," and agreed that "in order to conduct [his] infringement analysis, [he] had to rely on actual data comparing impurities from the starting batch . . . to the pharmaceutical composition . . . ."  FOF51.  In contrast, the '066 patent does not provide this data or information for a POSA to make the same comparison.  *Id.*

### 2.    UTC's Expert Testimony Does Not Cure the Lack of Disclosure

To overcome this clear lack of disclosure, UTC presented the testimony of Dr. Karl Scheidt.[3]  But Dr. Scheidt's analysis is flawed.  First, Dr. Scheidt pointed to "color differences" between the *pale-yellow* starting batch of treprostinil at the end of Example 2 and the *off-white* crude treprostinil generated after salt formation in Example 5.  But this does not show a reduction in the level of one or more impurities resulting from the alkylation and hydrolysis of BTO.  Color differences do not identify any impurity or the amount of any impurity removed.  FOF53.  A POSA would not be able to determine the ***origin*** or ***relative numerical level*** of any specific impurity be reduced, let alone a reduction of impurities resulting from the alkylation of BTO, as in claim 1.  For example, the color at each step could be coming from alkylating/hydrolyzing reagents, solvents, or anywhere other than the BTO.  *Id.*  Moreover, both parties' experts testified that many compounds, including BTO and treprostinil sodium, are both pale-yellow and off-white/white;

---

[3] '066 patent inventor Dr. Walsh did not offer testimony at trial in support of Dr. Scheidt's opinions concerning the use of color changes or TLC disclosed in the '066 patent to measure impurities.

thus a color change from pale-yellow to off-white is not indicative of impurity reduction.  *Id.*

Second, Dr. Scheidt pointed to Examples 1 and 2's disclosure of TLC (thin layer chromatography) to monitor the progress of the alkylation and hydrolysis reactions.  FOF54. Though TLC *may* be used to qualitatively see the presence of impurities generated as the reaction proceeds, the '066 patent does not disclose using TLC to identify or measure impurities.  *Id.*  And the '066 inventors confirmed that UTC never used TLC in this manner.  *Id.*  Instead, the '066 specification describes using TLC to monitor reaction completion, not to measure levels of impurities, and thus does not provide written description support for claim 1.  FOF60.

Third, claim 1 clearly covers a "pharmaceutical composition comprising treprostinil *or a pharmaceutically acceptable salt thereof*."  JTX2, 17:51-52.  But Dr. Scheidt provided no evidence of any impurities (qualitative or quantitative) in the final *salt* pharmaceutical composition covered by claim 1, or that impurities were reduced in the salt when compared to the starting batch. Examples 3 and 4 are the only examples relating to the salt, and Dr. Scheidt skipped those examples entirely in his testimony.  FOF52.  Instead, Dr. Scheidt compared the pale-yellow hydrolysis product at the end of Example 2 with the off-white final treprostinil free acid at the end of Example 5, without pointing to any disclosures regarding impurities in treprostinil salt.  FOF52. Dr. Scheidt's testimony does not cover the full scope of claim 1.

Finally, Dr. Scheidt pointed to the '066 patent's one sentence disclosure that "[t]he impurities carried over from intermediate steps (i.e., alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step."  FOF55. But such language cannot support written description here, given the complete lack of information within the specification to inform a POSA that the inventors actually possessed this aspect of the invention.  FOF50.  Moreover, this sentence does not disclose to a POSA that impurities generated

12

from alkylation and hydrolysis of BTO, as opposed to other impurities, are reduced.  FOF55.  And again, the inventors confirmed that they never measured this supposed impurity removal (FOF55), which is relevant because "[l]ogically, the inventors could not have described a knowledge that they did not possess." *Bos. Sci. Corp.*, 679 F. Supp. 2d at 555; *Nuvo*, 923 F.3d at 1381.

The '066 patent clearly does not contain any written description of a "level of one or more impurities found in the starting batch of treprostinil" to compare against the final claimed pharmaceutical composition.  Accordingly, the Court should find that claim 1 (and its dependent claims 2-3 and 6 (FOF56)) lack written description.

## IV. THE ASSERTED CLAIMS OF THE '793 PATENT ARE INVALID UNDER § 112

Liquidia publicly announced on January 27, 2020, that it had filed its NDA for LIQ861. FOF66.  The '793 patent was filed a few days later, on January 31, 2020, issued on July 21, 2020, and expires on May 14, 2027.  *Id.*  The '793 patent claims priority to a provisional application filed on May 15, 2006 and lists seven inventors, among whom Dr. Werner Seeger and Dr. Lewis Rubin testified via deposition.  JTX3, Cover; FOF66.

UTC is asserting claims 1, 4, and 6-8 of the '793 patent, with claims 4 and 6-8 depending from independent claim 1.  FOF7, 68.  Claim 1 is directed to a method for treating PH by administering a therapeutically effective single event dose of treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, where the therapeutically effective single event dose comprises between 15-90 micrograms ("mcg" or "μg") of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.  FOF67.  Claims 4 and 6-8 recite a dry powder inhaler and specific formulation characteristics, including a powder formulation (claim 6), and powder particle sizes of less than 5 micrometers (claim 7).  FOF68.

With respect to treating PH, a POSA would have a medical degree with a specialty in pulmonology or cardiology, plus at least two years of experience treating patients with pulmonary

hypertension as an attending, including with inhaled therapies, or equivalent degree or experience. With respect to inhaled formulations used in treating PH, a POSA would have a Ph.D. in pharmaceutical science or a related discipline like chemistry or medicinal chemistry, plus two years of experience in pharmaceutical formulations, including inhaled products, or equivalents (*e.g.*, an M.S. in the same fields, plus five years of experience).  FOF76.

### A.    The Asserted Claims of the '793 Patent Are Not Enabled for the Full Scope of Treating PH

The asserted claims of the '793 patent are not enabled for the full scope of treating all five PH Groups defined by the WHO.  A patent claim is invalid if the patent does not enable a person of ordinary skill in the art to make or use the alleged invention. 35 U.S.C. § 112, ¶1.  "Enablement is a question of law based on underlying facts."  *Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1384 (Fed. Cir. 2013).  "Claims are not enabled when, at the effective filing date of the patent, one of ordinary skill in the art could not practice their full scope without undue experimentation."  *Id.* at 1384; *see also Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997).

### 1.    "A Method for Treating Pulmonary Hypertension" Includes Group 2

A POSA would understand "treating pulmonary hypertension" as recited in the specification and asserted claims to encompass treating all five WHO Groups of PH, including both isolated Group 2 (also referred to as isolated post-capillary Group 2) and pre- and post-capillary combined Group 2.  JTX3, claim 1; FOF60, 64, 77-79.  The specification expressly includes all five Groups when describing "pulmonary hypertension" and does not otherwise limit "pulmonary hypertension" to any particular subset of PH patients.  *See* JTX3, 1:41-45; FOF77-79. The parties' experts agreed that the ordinary meaning of "pulmonary hypertension" in the patent includes all five Groups.  FOF78.  While the underlying pathophysiology amongst the five Groups

differs, the parties' experts and the '793 specification agree that the shared defining characteristic across all PH Groups is an increase in lung pressure.  *Id; see Network-1 Techs. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1024 (Fed. Cir. 2020) (where there is no dispute as to the ordinary meaning of a term and neither the claims nor the specification require a departure from the ordinary meaning, the district court erred in excluding embodiments encompassed by the ordinary meaning).  In fact, UTC's expert Dr. Waxman agreed that PH as used in the '793 patent covers all five Groups, and that he did not exclude isolated Group 2 PH from claim's scope.  Tr. 630:23-631:5, 659:15-660:2; FOF78.  His medical opinion that he would not treat an isolated Group 2 PH patient with a vasodilator does not change the scope of PH as claimed.  Tr. 659:21-661:20.

Any attempts by UTC to now exclude isolated Group 2 PH patients—a Group that makes up approximately fifty percent of all PH patients (*see* FOF64)—and argue that the asserted claims should instead be understood as directed only at treating patients who have precapillary PH, fail in view of the patent specification and expert testimony.  Indeed, the specification refers to "precapillary hypertension" (JTX3, 9:35-36; 12:64-65; 16:64-65), but the inventors chose to broadly claim "pulmonary hypertension" instead.  *Id.*, claims.  Moreover, nowhere in the patent, the prosecution history, or anywhere else in the record does UTC clearly and unmistakably disavow a portion of PH.  *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).  Thus, any attempt by UTC to renounce its broad claim scope to preserve validity should not be permitted.  *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012) ("[A] patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage.").

## 2.   A POSA Could Not Practice the Full Scope of Treating PH without Undue Experimentation

The Federal Circuit has set forth eight "[f]actors to be considered in determining whether

a disclosure would require undue experimentation": (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). "Claims which include a substantial measure of inoperatives . . . are fairly rejected" for lack of enablement. *In re Corkill*, 771 F.2d 1496, 1501 (Fed. Cir. 1985). A court may "safely conclude" that a specification does not enable what experts agree is physically impossible. *Trs. of Bos. Univ. v. Everlight Elecs. Co., Ltd.* ("*Everlight*"), 896 F.3d 1357, 1362 (Fed. Cir. 2016).

Applying the *Wands* factors, it would require undue experimentation to practice the full scope of the claimed "treating pulmonary hypertension." The state of the art as of May 2006, demonstrates a POSA would have known that administering prostacyclins (FOF69) to Group 2 PH patients presented significant safety concerns. FOF81. A POSA would know that the FIRST study using the prostacyclin epoprostenol increased the risk of mortality in Group 2 PH patients and that inhaled iloprost (Ventavis®) also carried a significant risk of exacerbating Group 2 PH patients' symptoms. FOF83-84. Further, a POSA would have known that there was no meaningful guidance in the art on how to overcome these safety concerns. FOF85. Indeed, in 2006, and still today, no prostacyclin therapy is approved for treating any Group 2 PH patient (FOF65, 87), and UTC has not pointed to any reference demonstrating a POSA would understand that prostacyclins like treprostinil could be safely and effectively used in any Group 2 PH patient. FOF85.

Given these significant safety concerns as well as differences in underlying pathophysiology between Group 2 and non-Group 2 PH patients (*see* FOF86), a POSA would have found successfully administering inhaled treprostinil to treat a Group 2 PH patient highly

16

unpredictable and requiring extensive experimentation.  FOF87-88.  As Dr. Hill explained, since nothing in the prior art or the '793 patent establishes the feasibility or safety of using inhaled treprostinil to treat either isolated Group 2 or pre- and post-capillary combined Group 2 PH patients, a POSA would have needed to "start at square one": very carefully selecting patients and then working out a protocol to establish safety and feasibility of inhaled treprostinil for Group 2 PH patients, before even getting to therapeutic effectiveness.  FOF88.

Knowing that there were safety concerns with treating Groups 2 PH patients, the asserted claims of the '793 patent are nonetheless broad, encompassing WHO Groups 1-5 of PH and not a smaller subset of the disease.  *See supra*, §IV.A.1.  Despite this breadth, the specification provides no guidance, working examples, or other information sufficient for a POSA to safely treat ***any*** Group 2 PH patient with inhaled treprostinil.  FOF81, 85-86.  None of the Examples describe administering inhaled treprostinil to either isolated Group 2 or pre- and post-capillary combined Group 2 PH patients.  FOF74, 82.  This lack of disclosure is striking given that a POSA would have been concerned that prostacyclins could exacerbate symptoms and increase mortality in Group 2 PH patients.  FOF83-85.  The '793 specification is silent as to these safety concerns and provides no guidance demonstrating that these safety concerns were mitigated in the claimed invention.  *See Impax Lab'ys, Inc. v. Aventis Pharms. Inc.*, 545 F.3d 1312, 1315-16 (Fed. Cir. 2008) (explaining the absence of working examples can weigh against a finding of enablement).

UTC's and Dr. Waxman's arguments that the '793 patent claims are enabled are unavailing.  Tr. 638:4-23, 639:7-11 (Waxman); Tr. 906:5-24 (UTC).  UTC's position appears to be premised on restricting the claims to "precapillary forms of pulmonary hypertension" and excluding isolated Group 2 PH patients from the claim term "pulmonary hypertension."  Tr. 906:5-24.  But UTC does not offer any evidence from the specification or prosecution history supporting

the position that the '793 patent disclaims, or that a POSA would exclude, isolated Group 2 PH patients from the definition of PH. *Purdue*, 438 F.3d at 1136. In fact, UTC's own expert, Dr. Waxman, testified that he did not exclude isolated Group 2 PH patients from his definition of PH in the '793 patent. FOF78. There thus can be no dispute that the '793 patent defines "pulmonary hypertension" to include ***all*** five WHO PH Groups, including sub-groups. *See supra*, § IV.A.1.

Alternatively, UTC submits that POSAs would never treat isolated Group 2 PH patients with the claimed invention thereby excluding, by implication, isolated Group 2 which comprises approximately fifty percent of all PH patients. Tr. 906:5-24 (UTC). UTC's position is based on Dr. Waxman's medical opinion that a POSA would not use the claimed invention to treat Group 2 PH patients because it would not work. Tr. 637:5-7, 659:8-662:3. Dr. Waxman's medical opinion, however, cannot substitute for the scope of the claims, which he admitted include Group 2 PH. FOF78; *see Network-1*, 981 F.3d at 1024 (where there is no dispute that the ordinary meaning of a term includes an embodiment, the district court erred in excluding an inoperative embodiment); *Alcon Res., Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1368 (2012) ("This is not how patent law works. . . . you can't simply disavow the invalid portion and keep the valid portion of the claim.").

The facts here are highly analogous to those in *Everlight*. In *Everlight*, the parties and experts all agreed that the full scope of the claimed invention included six embodiments, one of which was epitaxially growing a monocrystalline film directly on an amorphous structure. 896 F.3d at 1362, 1365. The parties also agreed that this one embodiment was inoperative. *Id*. The patentee argued that its claim was nonetheless enabled because "there is no dispute as to enablement of five out of the six referenced permutations and argue[d] '[t]hat is sufficient.'" *Id.* at 1364. The Federal Circuit rejected this argument stating "[o]ur precedents make clear that the specification must enable the full scope of the claimed invention." *Id*. The same holds true here—

18

UTC cannot save the claims by arguing that the claimed invention can be used to treat four of the five WHO PH Groups.  Group 2 PH patients comprise approximately seventy-five percent of all PH patients, and even if restricted to only isolated, post-capillary Group 2 PH patients, *that population comprises approximately **fifty percent of all PH patients***.  FOF63-64.  UTC, through its expert, having agreed that the term "pulmonary hypertension" encompasses all WHO Groups, must successfully defend against an enablement challenge as to the claim's full scope.  *Everlight*, 896 F.3d at 1365.  And here, there can be no legitimate dispute that the full scope of the claimed treating PH is not enabled, and thus the asserted claims of the '793 patent are invalid.

## B.    The '793 Patent Inventors Did Not Possess the Full Scope of Treating Pulmonary Hypertension

The '793 patent does not convey with reasonable certainty that, as of May 15, 2006, the inventors possessed the full scope of treating PH.  *Nuvo*, 923 F.3d at 1376.  As explained in Section IV.A.1 above, the full scope of the asserted claims includes a method for treating all five WHO Groups, including all of Group 2 PH.  Plaintiff and Defendant's experts agree that '793 patent specification does not provide any Example or any other description of treating any Group 2 PH patient.  FOF82.  And while significant safety concerns with using prostacyclins in Group 2 PH patients existed as of May 15, 2006, the '793 patent provides no indication that the '793 patent inventors addressed these safety concerns.  FOF81, 83-85, 90.  Given the asserted claims are method of treatment claims, these safety concerns cannot be ignored.  *Biogen*, 18 F.4th at 1343 ("An inventor need not 'prove that a claimed pharmaceutical compound actually achieves a certain result.  But when the inventor expressly claims that result, our case law provides that [such] result must be supported by adequate disclosure in the specification.'") (quoting *Nuvo*, 923 F.3d at 1384).  Thus, the information in the four corners of the '793 specification fails to adequately demonstrate that the '793 patent inventors were in possession of the full scope of treating PH as claimed.

UTC contends that a POSA would know to exclude isolated Group 2 PH from treatment but would have the rationale to treat pre- and post-capillary combined Group 2 PH patients from the claimed invention. As already explained above, given the disclosures in the '793 patent, UTC has no basis to exclude isolated Group 2 PH from the asserted claims or limit the claims to "pre-capillary" PH. *See supra*, § IV.A.1. Even if the Court believes UTC's argument, a mere "wish or plan" for treating pre- and post-capillary combined Group 2 PH patients is not enough. *Nuvo*, 923 F.3d at 1381; *see also Biogen*, 18 F.4th at 1344 ("[T]he law is clear that a patent cannot be awarded for mere theoretical research without more"). The Federal Circuit in *Nuvo* found that general disclosures of dosages of an uncoated proton-pump inhibitor ("PPI") failed to adequately describe the effectiveness of the PPI, especially given the record evidence demonstrated that a POSA "would not have known or understood that uncoated PPI is effective." *Nuvo*, 923 F.3d at 1380-81. In overturning the district court's decision, the Court explained,

> "In light of the fact that the specification provides nothing more than the mere claim that uncoated PPI might work, even though persons of ordinary skill in the art would not have thought it would work, the specification is fatally flawed."

*Id.* at 1381. The '793 patent disclosure is equally flawed. UTC's argument is nothing more than the mere assertion that inhaled treprostinil *might* be used to treat a pre- and post-capillary combined Group 2 PH patient. But the '793 patent specification is even more deficient than the specification at issue in *Nuvo*: the '793 patent specification never describes administering inhaled treprostinil to *any* Group 2 PH patient, and no disclosures evidence that the treatment could be used to treat a pre- and post-capillary combined Group 2 PH patient. FOF90. The '793 patent is thus invalid as lacking written description for the full scope of treating PH. *See* FOF89-90.

### C.   The '793 Patent Fails to Demonstrate That the Inventors Possessed a Dry Powder Formulation of Treprostinil or DPI for Treatment of PH

Claim 1 of the '793 patent broadly claims using an inhaled "formulation comprising

treprostinil or pharmaceutically acceptable salt thereof" and an "inhalation device."  FOF91-92.
Claim 1, therefore, includes inhaled liquid solutions delivered via nebulizers, soft mist inhalers, and metered dose inhalers, as well as dry powders delivered via a dry powder inhaler ("DPI").  The asserted dependent claims also encompass inhaled powders.  Importantly, the '793 inhaled formulations of treprostinil must also be used to treat PH.  FOF100, 108.  Here, a POSA in May 2006 reviewing the '793 patent would not believe that the named inventors possessed a dry powder formulation of treprostinil with a compatible DPI for treatment of PH.

The complete disclosure of powder formulations within the '793 patent consists of two sentences: "The inhalation device can be also a dry powder inhaler.  In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter."  JTX3, 7:22-26; FOF71, 94.  The specification has no examples of dry powder formulations, excipients that can be used in dry powder formulations, methods of manufacturing dry powder formulations, or DPI devices that can be used by PH patients for delivery of such formulations.  FOF95.  The specification's two Examples disclose only liquid formulations for inhalation via nebulizers and soft mist inhalers.  FOF72-73, 94.  Because inhaled powder formulations are very different from inhaled liquid formulations, a POSA would understand that development of a treprostinil solution does not inform the development of a treprostinil powder formulation.  FOF93.  '793 patent inventors Drs. Rubin and Seeger confirmed that solutions and dry powder formulations are "completely different," and "may not be simply identical."  FOF99; DTX268, 10.  DPIs, which rely on a patient's own inhalation ability, are very different from nebulizers, soft mist inhalers, and metered dose inhalers, all of which use external energy to aerosolize drugs into inhalable particles.  FOF93. As such a POSA would not believe from the bare disclosure of the '793 patent that the inventors

possessed a dry powder formulation of treprostinil and compatible DPI for treatment of PH.

Testimony from the '793 patent inventors confirm the specification's inadequate disclosure. Drs. Rubin and Seeger both testified unambiguously that that inventors did not work on a dry powder formulation of treprostinil or DPI as of May 2006. FOF96. Dr. Seeger went so far as to state that he and his co-inventor colleagues did not even possess the technical knowledge to make a dry powder formulation of treprostinil. *Id.*; *Bos. Sci. Corp.*, 679 F. Supp. 2d at 555 ("Logically, the inventors could not have described a knowledge that they did not possess[.]"); *see also Nuvo*, 923 F.3d at 1381; *see, e.g.*, *Biogen*, 18 F.4th at 1343-44.

UTC's response—that the words "powder" and "dry powder inhaler" are recited in the specification and thus the invention is adequately described—has been roundly rejected by the Federal Circuit.[4] Tr. 903:21-905:2. First, simply stating the term "powder" is nothing more than a "mere wish or plan" for a powder formulation, which is not enough. *Nuvo*, 923 F.3d at 1381; *see also Biogen*, 18 F.4th at 1344. Second, *ipsis verbis* description of subject matter is not sufficient to establish that the inventors were in possession of the claimed invention. *Nuvo*, 923 F.3d at 1380. Here, other than reciting the words "powder" and "dry powder inhaler," there is simply no other disclosure in the '793 patent relevant to developing a dry powder formulation of treprostinil that is not only compatible with a DPI, but that can be used for the claimed method of treating PH. FOF94-95; *Bos. Sci. Corp.*, 647 F.3d at 1364 (affirming summary judgment finding of lack of written description where specification provided only *ipsis verbis* disclosure of claimed

---

[4] The inventors lack of possession of powder formulations for treatment of PH is further confirmed by UTC's agreement to pay $95M and double-digit royalties to MannKind for an exclusive license to MannKind's dry powder formulation of treprostinil in late 2018. FOF97-98. That is, if the '793 patent adequately described inhaled powder formulations for the treatment of PH, granting UTC a monopoly in this area, it would make little sense to pay a third-party nearly $100M plus a significant percentage of future sales to access a technology UTC allegedly possessed since 2006.

subject matter); *Noven Pharms. v. Amneal Pharms. LLC,* No. 18-699-LPS 2020 WL 11191445, at *36-37 (D. Del. Sept. 4, 2020) (finding lack of written description from *ipsis verbis* disclosure, noting "[t]hat essentially the same language appears in the claims and specification does not alter the outcome.").

The testimony of UTC's expert Dr. Andrew Clark that he "ha[s] no doubt" that a POSA would have believed the inventors were in possession of a dry powder formulation of treprostinil is also insufficient. FOF99. Dr. Clark's opinion relies solely on the dose and number of breaths disclosed in the patent to "deliver a bolus of Treprostinil." *Id.*; Tr. 832:13-833:6. But these examples and "bolus" were determined using ***solutions*** of treprostinil inhaled via nebulizers and soft mist inhalers, not powder formulations delivered using a DPI. FOF99. Dr. Clark's testimony contradicts his own publications, which state that "[i]t is important to realize that in contrast to nebulizer formulations, . . . the formulation of dry powders for use in DPIs is ***critically important*** for their effective performance." DTX268, 10 (emphasis added). There is no dispute that solutions and powder formulations are completely different, and as explained by Dr. Gonda, information related to solutions of treprostinil provide no indication that a powder formulation could also be used to treat PH. FOF93, 99; Tr. 297:10-298:1. Dr. Clark offered no testimony that information concerning delivery of inhaled treprostinil *solution* is applicable to delivery of inhaled treprostinil *powder*. For these reasons, the '793 patent does not provide sufficient written description support for the full scope of the asserted claims and is thus invalid.

### D.   Making and Using a Dry Powder Formulation of Treprostinil for the Treatment of PH Would Require Undue Experimentation

The '793 patent claims are not enabled for treating PH patients with dry powder formulations of treprostinil. Applying the *Wands* factors, it would have required undue experimentation for a POSA to practice the full scope of the claimed "formulation comprising

treprostinil or pharmaceutically acceptable salt thereof" and "inhalation device" for treatment of PH. First, the asserted claims are broad, reciting any inhaled "formulation comprising treprostinil or pharmaceutically acceptable salt thereof" and any "inhalation device." FOF67, 91-92. The claims, therefore, include inhaled liquid solutions delivered via nebulizers, soft mist inhalers, and metered dose inhalers, as well as dry powders delivered via a DPI. FOF92.

Second, the '793 patent provides no guidance or working examples of treprostinil dry powder formulations or DPIs suitable for treating PH patients. FOF95. None of the patent's examples describe administering dry powder formulations of treprostinil. FOF94. Thus, the patent fails to provide the necessary guidance for developing a dry powder formulation of treprostinil or DPI for treatment of PH. *See Impax*, 545 F.3d at 1315. While the state of the art in 2006 included dry powder formulations of other drugs used to treat diseases other than PH, there were simply no dry powder formulations of treprostinil, or any drug for that matter, used with a DPI to treat PH. FOF96-98. Thus, the relevant art provides no meaningful guidance or examples on how to make a dry powder formulation of treprostinil suitable for the treatment of PH. FOF100-109.

Given the lack of guidance in both the prior art and the patent, a POSA would have found development of a treprostinil dry powder formulation highly unpredictable and requiring extensive experimentation to practice the full scope of the claimed "formulation comprising treprostinil or pharmaceutically acceptable salt thereof" and "inhalation device." FOF100; PTX905, 1210 ("Development of pharmaceuticals for inhalation is a particular challenge, as it involves the preparation of a formulation and the selection of a device for aerosol dispersion."). As Dr. Gonda explained, a POSA would have needed to (i) identify a suitable form of treprostinil that is stable during manufacture, storage, and administration, (ii) identify a suitable carrier that is safe and compatible with the API, and (iii) identify a suitable DPI that can be used with PH patients.

FOF100-109.  This is not merely routine work, but instead complex experimentation involving multiple factors that are interdependent on one another.  PTX905, 1211-212 ("The character of particulate systems is central to the performance of DPIs.  Powders present unique design challenges. . . . Powder properties can vary widely.  Powder features, such as physicochemical properties and morphology of its constituent particles and the distribution of particle sizes, contribute to variability.").

Indeed, the failed experimentation of UTC's expert, Dr. Smyth, is proof of not only the fact that the '793 patent does not enable dry powder formulations of treprostinil, but that routine experimentation is insufficient to make and use the full scope of the claimed invention.  FOF110-115.  In particular, Dr. Smyth was unable to make a dry powder formulation of treprostinil sodium conducting routine experimentation of milling treprostinil sodium and combining it with lactose, because treprostinil sodium was too hygroscopic.  FOF104, 111; PTX905, 1213-14 ("Moisture Content and Hygroscopicity").  Dr. Smyth even attempted to address the hygroscopicity issue with treprostinil sodium by using a glove box to control humidity—this also failed.  FOF104, 111.  It cannot be said that the claims of the '793 patent are enabled when work conducted by UTC's own expert, to establish enablement, failed.  *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1372-73 (affirming finding of non-enablement based on inventor's failed attempts to practice claimed invention); *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 942 (Fed. Cir. 2010) (". . . ALZA's difficulties in creating a non-osmotic dosage form as claimed, . . . was relevant to ALZA's arguments that the quantity of experimentation required was not undue."); *Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1320 (Fed. Cir. 2006) (vacating JMOL of enablement where "expert was not able to carry out the entire process" claimed).

Dr. Clark's testimony that development of dry powders was routine as of 2006 was

conclusory in nature and not linked to the subject matter of the claimed invention.[5]  FOF100-109.

To begin with, general knowledge as to dry powder formulations is insufficient to demonstrate the subject matter of the '793 patent is enabled when the patent provides no other pertinent information concerning making or using dry powder formulations of treprostinil to treat PH.  *See Auto. Techs. Int'l, Inc. v. BMW of North America, Inc.*, 501 F.3d 1274, 1284 (Fed. Cir. 2007) (explaining a specification, which provides only "a starting point, a direction for further research" is not enabling); FOF100-109.  As the Federal Circuit has noted, "[i]t is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement." *Auto. Techs. Int'l, Inc.,* 501 F.3d at 1283 (citing *Genentech*, 108 F.3d at 1366).  Indeed, while the specification need not disclose what was well known in the art and a POSA's knowledge can fill gaps, the Federal Circuit has made clear that "gap-filling is merely supplemental; it cannot substitute for a basic enabling disclosure."  *Everlight*, 896 F.3d at 1364.  Here, UTC is attempting to use a POSA's knowledge as an entire substitute for a deficient specification—this is expressly prohibited.

Additionally, the '793 patent claims are not simply directed to a dry powder formulation of treprostinil.  That formulation must also be used with a DPI ***to treat PH***.  FOF100, 108.  In fact, Dr. Clark's publication in *Aerosol Science and Technology* demonstrates that "successful DPI design relies as much on the powder formulation as it does on the device engineer" because, in part, "delivery and dispersion performance, and hence the dose which they deliver to the lung, is affected by a patient's ability to inhale at a suitably high flow rate."  DTX268, 12; FOF108.  And

---

[5] Had development of a dry powder formulation of treprostinil been as easy and routine as Dr. Clark claims, UTC would not have agreed to pay nearly $100M plus a significant percentage of future sales to obtain exclusive rights to the dry powder formulation of treprostinil developed by MannKind using its proprietary technology.  FOF98.

as of 2006, there was no disclosure in the art that patients with PH could use DPIs successfully. That knowledge was not public until 2021, when UTC's expert, Dr. Waxman, published the first study evaluating DPIs in patients with PH. DTX468, 1 ("Inhalation profiles to support use of dry powder inhalers for drug delivery in patients with pulmonary arterial hypertension have not been reported."); FOF109. Thus, even considering the general knowledge concerning DPIs and the development of powder formulations, that general knowledge does not establish that developing the claimed invention would have involved only routine experimentation.

Dr. Smyth's experiments, conducted over a three-week period, are also insufficient to demonstrate that claims of the '793 patent are fully enabled. FOF110, 115. Although the claims instruct a POSA to use some form of treprostinil, the experiments Dr. Smyth conducted were based entirely on information **outside** the specification of the '793 patent—again, impermissible gap-filling. FOF110-115. The '793 patent does not disclose lactose, does not disclose the DPI Dr. Smyth selected (Plastiape RS01 low resistance device), and does not disclose the in vitro testing using a Next Generation Impactor device nor the parameters Dr. Smyth selected to conduct that testing. *See generally* JTX3. Further, the '793 patent specifically identifies treprostinil sodium as a suitable salt for development, but as discussed above, Dr. Smyth's attempts to formulate treprostinil sodium failed. FOF104, 111. And Dr. Smyth's experiments with treprostinil free acid and treprostinil diethanolamine salt are similarly insufficient. FOF112-113. Despite the known propensity for treprostinil free acid to form unwanted dimers at ambient temperature, Dr. Smyth conducted no work and made no effort to determine whether the treprostinil free acid dry powder formulation he made was suitably stable at ambient conditions and did not form dimers. FOF112. Dr. Smyth further mixed treprostinil diethanolamine with lactose without conducting any compatibility experiments, which a POSA at the very least would have conducted

27

due to the well-known Maillard reaction between secondary amines (like treprostinil diethanolamine) and lactose.[6]  FOF113.

Lastly, Dr. Smyth's laboratory experiments with both treprostinil free acid and treprostinil diethanolamine assumed large inhaled volumes and flow rates, which are directly contradicted by Dr. Waxman's 2021 findings regarding the ability of PH patients to use DPIs.  FOF114.  These larger inhaled volumes and flow rates do not demonstrate that a PH patient can inhale a dry powder formulation of treprostinil.  FOF114.  In fact, Dr. Smyth testified that further additional testing would be needed before the formulation he developed could be administered to a PH patient.  *Id.* Had this additional testing been conducted—and Dr. Smyth discovered treprostinil free acid formed dimers, a Maillard reaction occurred between lactose and treprostinil diethanolamine, or that the powders were otherwise unsuitable due to hygroscopicity—, he and a POSA would have needed to start over and conduct further experimentation in accordance with Dr. Gonda's testimony.  *See* FOF111-113.  UTC cannot demonstrate the claims are enabled by choosing to conduct a bare minimum number of experiments over a short period of time that purposely prevent a determination as to whether Dr. Smyth's powder formulations are suitable for treating PH.

In sum, applying the *Wands* factors, a POSA would have had to engage in undue experimentation to practice the full scope of the claimed "formulation comprising treprostinil or pharmaceutically acceptable salt thereof" and "inhalation device."  As such, the asserted claims of the '793 patent are not enabled and invalid.

## V.   CONCLUSION

For the reasons above, Liquidia asks this Court to find claims 1-3, 6, and 9 of the '066 patent, and all asserted claims of the '793 patent invalid.

---

[6] Notably, Liquidia's LIQ861 product does not use lactose as a carrier.  FOF113.

/s/ Nathan R. Hoeschen
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Douglas W. Cheek
Adam Pivovar
Brittany Cazakoff
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Lauren Krickl
Deepa Kannappan
Kyung Taeck Minn
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: May 4, 2022