IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 20-755-RGA-JLH |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S FINDINGS OF FACT RELATED TO INVALIDITY OF
U.S. PATENT NOS. 9,593,066 AND 10,716,793**

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Douglas W. Cheek
Adam Pivovar
Brittany Cazakoff
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia
Technologies, Inc.*

Lauren Krickl
Deepa Kannappan
Kyung Taeck Minn
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: May 4, 2022

TABLE OF CONTENTS

Page

I.    LIQUIDIA'S NDA NO. 213005 ........................................................................ 1

II.   THE ASSERTED CLAIMS ............................................................................... 1

III.  THE ASSERTED CLAIMS OF THE '066 PATENT ARE INVALID .......................... 2

      A.    '066 Patent Overview and POSA Definition ......................................... 2

      B.    Product-by-Process Claims 1-3, 6, and 9 are Invalid as Anticipated by the
            Product of the Moriarty Publication ...................................................... 3

            1.    The Moriarty Publication Discloses the Same Treprostinil as
                  Claimed in Product-By-Process Claims 1-3, 6 and 9 ............................ 3

            2.    UTC Has Not Established Any Structural or Functional Difference
                  between the Moriarty Treprostinil and the Claimed Treprostinil ............. 6

            a.    UTC Did Not Establish a Structural or Functional Difference ................. 6

            b.    UTC's Documents Show There Is No Structural or Functional
                  Difference between the Moriarty and Claimed Treprostinil ..................... 8

      C.    "[A] level of one or more impurities found in the starting batch of
            treprostinil is lower in the pharmaceutical composition" Lacks Written
            Description ........................................................................................... 10

IV.   THE ASSERTED CLAIMS OF THE '793 PATENT ARE INVALID UNDER
      § 112 .................................................................................................... 14

      A.    Background Relevant to the '793 Patent ............................................. 14

            1.    State of the Art regarding Pulmonary Hypertension............................. 14

      B.    '793 Patent Overview and POSA Definition ....................................... 17

      C.    The Asserted Claims of the '793 Patent Are Invalid for Lack of Written
            Description and Enablement ............................................................... 20

            1.    A POSA Would Understand "Pulmonary Hypertension" as
                  Claimed Encompasses All Five Groups of PH ...................................... 20

            2.    A POSA Could Not Have Practiced the Full Scope of "Treating
                  Pulmonary Hypertension" without Undue Experimentation .................. 22

            3.    The Inventors Were Not in Possession of the Claimed "Treating
                  Pulmonary Hypertension"................................................................. 26

      D.    The '793 Patent Does Not Have Adequate Written Description or Enable a
            Powder Formulation of Treprostinil and DPI for Treatment of PH.................... 27

            1.    No Evidence that the Inventors Were in Possession of a
                  Treprostinil Powder Formulation and a DPI for Treatment of PH .......... 27

<u>TABLE OF CONTENTS</u>

2.   The '793 Patent Does Not Enable a POSA to Make a Dry Powder
      Formulation of Treprostinil without Undue Experimentation ................ 30

TABLE OF ABBREVIATIONS

**Asserted Patents & Parties**

| | |
|---|---|
| '066 patent | U.S. Patent No. 9,593,066 |
| '793 patent | U.S. Patent No. 10,716,793 |
| Asserted claims of the '066 patent | Claims 1, 2, 3, 6, 8, 9 |
| Asserted claims of the '793 patent | Claims 1, 4, 6, 7, 8 |
| UTC/Plaintiff | United Therapeutics Corporation |
| Liquidia/Defendant | Liquidia Technologies, Inc. |

**Commonly Used Terms & Abbreviations**

| | |
|---|---|
| BTO | Benzindene triol |
| CMC | Chemistry, Manufacturing, and Controls |
| DMF | Drug master file |
| DPI | Dry powder inhaler |
| FDA | Food and Drug Administration |
| LHD | Left heart disease |
| MannKind | MannKind Corporation |
| NDA | New Drug Application |
| PAH | Pulmonary arterial hypertension (Group 1 PH) |
| PAWP | Pulmonary artery wedge pressure |
| PH | Pulmonary hypertension |
| POSA | Person of ordinary skill in the art |
| PTAB | Patent Trial and Appeal Board |
| TRE | Treprostinil |
| TRS | Total related substances |
| WHO | World Health Organization |
| Yonsung | Yonsung Fine Chemicals |
| LGM | LGM Pharma |

## I.     LIQUIDIA'S NDA NO. 213005

1.     On January 24, 2020, Liquidia filed its NDA seeking FDA approval to market LIQ861 (Yutrepia™), its dry powder formulation of treprostinil, for the treatment of PAH. DTX369; DTX408, 1; Tr. 722:20-723:9 (Gonda).  On November 4, 2021, FDA granted "tentative approval" of Liquidia's NDA, becoming the first FDA-approved dry powder formulation for the treatment of PAH.  Tr. 724:22-725:1 (Gonda); DTX408, 35.

2.     On September 4, 2018, UTC announced its collaboration with MannKind in which UTC obtained a worldwide exclusive license for the development and commercialization of MannKind's dry powder formulation of treprostinil.  DTX389; Tr. 723:18-724:10 (Gonda).

3.     UTC/MannKind's dry powder formulation of treprostinil has not yet been approved.  Tr. 724:19-21 (Gonda).

4.     Yonsung, based in South Korea, manufactures the treprostinil sodium API used to make Liquidia's LIQ861 product.  Tr. 74:21-75:5, 93:16-25 (Nuckolls); PTX20, LIQ00029588. Yonsung has a Drug Master File ("DMF") for the treprostinil sodium used in LIQ861.  DTX106 (Open DMF); DTX167 (Restricted DMF).

5.     LGM is a U.S. based administrative intermediary between Yonsung and Liquidia. Tr. 346:7-10 (Kindig); Tr. 364:4-10 (introducing LGM's 30(b)(6) witness Lenox); Tr. 439:2-5 (Winkler).  Yonsung's shipments of treprostinil sodium sometimes go through LGM to Liquidia; however, LGM does not manufacture treprostinil sodium, nor is it involved in the development or administration of Liquidia's LIQ861 product.  Tr. 331:14-21, 346:7-10 (Kindig); Tr. 364:7-8, 366:5-16 (Lenox); Tr. 439:2-5 (Winkler).

## II.    THE ASSERTED CLAIMS

6.     This is a patent infringement suit against Liquidia arising out of Liquidia's NDA submission under § 505(b)(2) of the Federal Food, Drug and Cosmetic Act.  D.I. 16.

7.      UTC asserted at trial that Liquidia infringes claims 1-3, 6, and 8-9 of the '066 patent and claims 1, 4, and 6-8 of the '793 patent.  D.I. 322, Ex. 13, ¶7.  Prior to trial, UTC filed a Stipulation of Partial Judgment of Non-Infringement of U.S. Patent No. 9,604,901.  D.I. 276.

8.      Liquidia asserts both that it does not infringe the asserted claims of the '066 and '793 patents, and that claims 1-3, 6, and 9 of the '066 patent and claims 1, 4, and 6-8 of the '793 patent are invalid under 35 U.S.C. §§ 102 and/or 112.

## III.    THE ASSERTED CLAIMS OF THE '066 PATENT ARE INVALID

### A.      '066 Patent Overview and POSA Definition

9.      The '066 patent, titled "Process to Prepare Treprostinil, the Active Ingredient in Remodulin®," issued on March 14, 2017.  JTX2, cover.  The '066 patent expires on December 15, 2028 and claims priority to U.S. Provisional Application No. 61/014,232, filed on December 17, 2007.  *Id.*  The application that issued as the '066 patent was filed on September 10, 2015 (*id.*), years after the 2013 filing date of Yonsung's DMF for the treprostinil sodium that is used to make LIQ861 and is accused of infringing the '066 patent.  *See* DTX106, 1; DTX167, 1.

10.     The inventors are Hitesh Batra, Sudersan M. Tuladhar, Raju Penmasta, and David A. Walsh.  JTX2, cover.  Dr. Batra was designated as UTC's 30(b)(6) witness and testified at trial via deposition.  Tr. 542:11-551:5 (Batra).  Dr. Tuladhar also testified at trial via deposition.  Tr. 551:14-556:5 (Tuladhar).  Dr. Walsh testified in person.  Tr. 792:19-804:19 (Walsh).

11.     Claims 1 and 8 are independent claims.  JTX2, 17:51-63, 18:38-61.  Claims 2-3 and 6 depend from claim 1; claim 9 depends from claim 8.  JTX2, 17:64-18:63.  Claims 2-3, 6, and 9 add limitations to the process steps of claim 1 but not the final claimed product.  *See* JTX2, 17:64-65 (claim 2 adding that the intermediate salt from which the final pharmaceutical composition is formed is "isolated in crystalline form"), 17:66-18:28 (claim 3 listing a group of bases with which the starting treprostinil batch can be combined to form the intermediate salt); 18:34-35 (claim 6

2

specifying storage of the intermediate salt before formation of the final pharmaceutical composition); 18:62-63 (claim 9 adding nothing but a "pharmaceutical product prepared by the process of claim 8"). Thus, claims 1-3, 6 and 9 are product-by-process claims. JTX2, 17:51-18:66; Tr. 459:19-22 (Winkler); Tr. 957:20-23 (UTC Closing).

12. A POSA at the time of the alleged invention of the '066 patent (December 17, 2007) would have a master's degree or a Ph.D. in medicinal or organic chemistry, or a closely related field. Alternatively, a POSA would include an individual with a bachelor's degree and at least five years of practical experience in medicinal or organic chemistry. Tr. 402:17-403:12 (Winkler).

**B. Product-by-Process Claims 1-3, 6, and 9 are Invalid as Anticipated by the Product of the Moriarty Publication**

**1. The Moriarty Publication Discloses the Same Treprostinil as Claimed in Product-By-Process Claims 1-3, 6 and 9**

13. The '066 product-by-process claims require a "pharmaceutical composition [/product] comprising treprostinil or a pharmaceutically acceptable salt thereof[.]" JTX2, 17:51-52 (claim 1); 17:64, 17:66, 18:34 (claims 2, 3, 6 reciting the "pharmaceutical composition of claim 1"); 18:38-40, 18:62-63 (claim 9 reciting a "pharmaceutical product" depending from claim 8). Thus, the "products" of claims 1-3, 6 and 9 of the '066 patents can be treprostinil. JTX2, 17:51-52; Tr. 459:19-460:7, 462:15-24 (Winkler); Tr. 104:14-105:18 (Nuckolls). Treprostinil is also known as UT-15 or treprostinil free acid. DTX258, 1; DTX674, 4; Tr. 408:16-17, 459:5-6, 461:5-6 (Winkler); Tr. 742:5-9 (Gonda).

14. Claims 1-3, 6, and 9 do not claim any purity percentage, impurity profile, or commercial scale production. Tr. 460:8-16 (Winkler); *see also* Tr. 105:19-106:6 (Nuckolls).

15. Claims 1-3, 6, and 9 do not claim the stability or storage of the claimed final product—those limitations in claims 6 and 9 relate only to the intermediate salt generated during the process steps, not treprostinil free acid or the final pharmaceutical composition. JTX2, 17:51-

3

18:28, 17:34-35, 17:62-63.  UTC admitted that there is no evidence that the treprostinil free acid covered by claims 1-3, 6, and 9 has any stability or storage advantage.  Tr. 964:19-965:6 (UTC Closing).

16.    The '066 claims do not require any level of purity, but the '066 specification discloses that treprostinil free acid can have a purity ranging from 99.7% to 99.9%.  JTX2, 14:55-65; Tr. 803:13-804:16 (Walsh).  The patent further advises that "[i]n one embodiment, the purity of [treprostinil free acid] is at least 90.0%, 95.0%, 99.0%, 99.5%."  JTX2, 9:22-23.  Thus, the purity of the claimed treprostinil can be as low as 90%.

17.    A 2004 Journal of Organic Chemistry article by Moriarty et. al., in relevant part titled "Synthesis of UT-15 (Treprostinil)," teaches synthesis of 99.7% pure treprostinil free acid, via alkylation and hydrolysis.  DTX258, 1, 8, 13; Tr. 460:25-462:14 (Winkler).

18.    The UT-15 treprostinil taught by Moriarty is the same chemical structure as the treprostinil product of claims 1-3, 6, and 9 of the '066 patent.  Tr. 462:25-463:2, 467:3-5 (Winkler); *compare* DTX258, 3 (depicting the chemical structure of UT-15 treprostinil as compound 7), *with* JTX2, 10:55-65 (depicting the chemical structure of UT-15 treprostinil).

19.    The UT-15 treprostinil taught by Moriarty has a purity falling within the disclosure of the '066 patent's specification.  *Compare* DTX258, 13 ("purity 99.7%"), *with* JTX2, 14:55-65 (purities ranging between 99.7 and 99.9%); Tr. 803:16-804:16 (Walsh).

20.    Liquidia expert Dr. Winkler testified the Moriarty treprostinil and the '066 treprostinil were structurally and functionally the same.  Tr. 457:6-480:2 (Winkler).

21.    Dr. Winkler testified that both products have the same chemical structure. Tr. 462:25-463:2, 467:21-468:3 (Winkler).  He also pointed to the '066 patent's Example 6, which compares a "former" process and the "invention" process, corresponding to the Moriarty process

and the '066 process, respectively.  Tr. 463:3-19 (Winkler).  Example 6 shows both processes resulting in the same compound: UT-15 treprostinil.  *See* JTX2, col. 17 (step 51).

22.   Dr. Winkler also testified that UTC manufactured UT-15 treprostinil according to both processes (Tr. 463:20-22), that the UT-15 treprostinil made by both processes was the same chemical structure (Tr. 466:1-467:5), and that UTC told the FDA that the products made by both processes were the "same" and "equivalent."  Tr. 468:11-469:14; *see also infra* Section III.B.2.b; DTX619, 10; DTX070, 3.  UTC never told the FDA that the UT-15 treprostinil made according to the '066 patent was safer, less toxic, or purer than the UT-15 treprostinil made according to Moriarty.  Tr. 469:7-14, 478:23-479:21 (Winkler).  In fact, UTC used both products to prepare its drug Remodulin®.  Tr. 467:21-468:3 (Winkler).  And the '066 patent does not state that the product made therein was safer, less toxic, or more efficacious than the UT-15 treprostinil made according to Moriarty.  *See generally* JTX2.  Thus, a POSA would not understand there to be any "efficacy, toxicity," or "biological activity" differences between the two.  Tr. 479:12-21 (Winkler).

23.   Dr. Winkler testified that UTC had identical specification limits (with respect to unidentified impurities, identified impurities, and total related substances) on allowable impurities between the two processes' products.  Tr. 469:15-471:23 (Winkler); *compare* DTX151, 1 ('066 Product Certificate of Analysis from 2020) *and* DTX627A, 5-6 ('066 Process Optimization Batches Release Testing Data), *with* DTX627A, 7 (Moriarty Release Testing Data).

24.   Dr. Winkler testified that he and a prior UTC expert concluded that the average purity of UTC's batches of UT-15 treprostinil made by Moriarty and the '066 process were the same: 99.7%.  Tr. 473:16-477:18 (Winkler); DDX2.13; DTX664, ¶98 ("The treprostinil product of the ['066] patent has an average purity of 99.71%"); DTX660, 93:11-24 (UTC expert testimony, on which Dr. Winkler relied, agreeing that the ['066] product averaged 99.7% purity).

25.     At trial, no UTC expert or fact witness rebutted Dr. Winkler's opinion or provided testimony that there was any structural or functional difference between the Moriarty UT-15 treprostinil free acid and the treprostinil free acid product/composition of claims 1-3, 6, and 9.

### 2.     UTC Has Not Established Any Structural or Functional Difference between the Moriarty Treprostinil and the Claimed Treprostinil

26.     UTC agrees that it bears the burden to show that the Moriarty treprostinil is structurally or functionally different from the claimed treprostinil.  Tr. 963:6-11 (UTC Closing).

### a.     UTC Did Not Establish a Structural or Functional Difference

27.     No UTC witness provided any testimony concerning the Moriarty publication or UT-15 treprostinil.  And no UTC witness compared the Moriarty UT-15 treprostinil to the claimed treprostinil product/composition of claims 1-3, 6 and 9 of the '066 patent.

28.     UTC fact witness and employee Mr. Dean Bunce testified on the specification limits between two UTC processes: a Chicago process that made treprostinil following Moriarty, and a Silver Spring process that made the same treprostinil, but by the '066 patent process.  Tr. 783:15-784:10 (Bunce); *see generally* Tr. 784:23-789:25 (Bunce).

29.     Mr. Bunce testified that UTC increased its purity assay specification range from 97-101% to 98-102%.  Tr. 784:23-786:9 (Bunce).  But Dr. Winkler testified that the purity of the 96 batches of treprostinil UTC made by the Moriarty process was 98.9%-100.3%, within both the 97-101% and 98-102% ranges (Tr. 470:21-473:5; DTX627A, 7; DTX151, 1), and had an average purity of 99.7%, a number that UTC's own expert (Dr. Williams) agreed with.  Tr. 473:16-477:4 (Winkler); DDX2.13 (lodged in D.I. 391).  No UTC witness disputed this evidence and testimony.

30.     Mr. Bunce then testified that the FDA asked UTC to tighten its "total related substances specification" for treprostinil circa 2009, but that UTC "disagreed that it could"; thus, the total related substances specification stayed the same between the products of the two

processes.  Tr. 788:16-789:25 (Bunce); Tr. 469:18-471:23 (Winkler); *compare* DTX151, 1 (2020 Silver Spring Certificate of Analysis with Total Related Substances specification of "Not more than 3.00%"), *with* DTX627A, 7 (Chicago Release Testing Data with the same Total Related Substances specification of "Not more than 3.00%").  Dr. Bunce provided no testimony pertinent to any structural or functional difference between the Moriarty UT-15 treprostinil and the claimed '066 treprostinil product/composition.

31.     UTC fact witness, inventor, and former employee, Dr. Walsh, did not compare the Moriarty UT-15 treprostinil and the claimed *treprostinil free acid* product/composition.  He also did not provide any testimony distinguishing, structurally or functionally, the Moriarty UT-15 treprostinil free acid and the claimed treprostinil free acid.  Instead, Dr. Walsh compared the diethanolamine *salt* of treprostinil to the Moriarty UT-15 treprostinil free acid made in UTC's Chicago facility.  Tr. 799:1-804:16 (discussing PDX5.2-5.6 (D.I. 389)).  Dr. Walsh confirmed that treprostinil diethanolamine is a different compound from treprostinil free acid.  Tr. 804:17-19.

32.     Dr. Walsh's discussion of 3AU90 and Total Related Substances are impurities that are not claimed or mentioned in the specification of the '066 patent.  JTX2, cols. 17-18; Tr. 958:8-960:1719; *see generally* JTX2.  In fact, no specific impurity is identified within the specification of the '066 patent.  *Id.*

33.     Dr. Walsh previously testified during prosecution of U.S. Patent No. 8,497,393 regarding 3AU90.  In the '393 IPR proceeding, the PTAB noted that "the comparisons of purity data for Moriarty and '393 patent treprostinil set forth in the Walsh Declaration and in the specification of the '393 patent itself similarly indicate that batch-to-batch variation, rather than any structural or functional difference between treprostinil products, accounts for the reported differences in overall purity and impurity profile."  *SteadyMed Ltd. v. United Therapeutics Corp.*,

IPR2016-00006, Paper No. 82, at *39 (P.T.A.B. Mar. 31, 2017). The '066 patent is a continuation of the '393 patent, and shares the same specification. JTX2, cover. The PTAB invalidated the '393 patent and found that "individual commercial batches of Moriarty treprostinil exhibit impurity profiles nearly identical, if not superior, to those seen in individual commercial batches of '393 patent treprostinil." *SteadyMed*, Paper No. 82 at *38.

> **b.      UTC's Documents Show There Is No Structural or Functional Difference between the Moriarty and Claimed Treprostinil**

34.      UTC made treprostinil according to the Moriarty process in a Chicago facility from ~1997 to 2007. DTX627A, 1; Tr. 545:15-546:10 (Batra); Tr. 463:3-463:19, 464:15-465:2 (Winkler); *see also* Tr. 784:2-7 (Bunce); Tr. 796:6-14 (Walsh); JTX2, 1:28-31 ("Treprostinil, and other prostacyclin derivatives have been prepared as described in Moriarty . . . .").

35.      UTC made treprostinil free acid according to the '066 patent's process in a Silver Spring facility from 2007 to present. DTX627A, 1; Tr. 543:1-9, 546:1-4 (Batra); Tr. 464:15-465:2 (Winkler); *see also* Tr. 784:2-7 (Bunce); Tr. 796:6-797:10 (Walsh).

36.      Unlike the Chicago Moriarty process, the '066 patent's process used in Silver Spring removed the column chromatography purification step and introduced an intermediate diethanolamine salt (UT-15C) formation step. Tr. 410:17-411:5, 466:21-467:16 (Winkler); DTX619, 8 ("The main change is the formation of the stable diethanolamine salt as part of the purification process of the crude treprostinil. Treprostinil diethanolamine is then converted back to the free acid to yield pure treprostinil . . . ."); DTX627A, 3 ("In Silver Spring the diethanolamine salt was introduced as a purification step . . . ."); DTX070, 2 ("Historically at our Chicago facility, [treprostinil diethanolamine] UT-15C intermediate is not a compound that was used during the conversion of benzindene triol to treprostinil."); JTX2, 17:28-29 ("The purification of benzindene nitrile by column chromatography is eliminated."); Tr. 550:3-10 (inventor Dr. Batra testifying that

"trying to introduce a column [chromatography step] after . . . looking at this ['066 patent] process . . . is nothing but a sheer stupidity").

37.     Both processes were used to make treprostinil free acid for the same UTC drug, Remodulin®.  Tr. 460:17-21, 467:17-468:3, 496:17-497:4 (Winkler); Tr. 545:7-19 (Batra); JTX2, 1 (titled "Process to Prepare Treprostinil, The Active Ingredient in Remodulin®").

38.     In an October 3, 2006 letter to the FDA, UTC provided the following CMC "question[] . . . for the discussion" at a November 1, 2006 FDA guidance meeting (DTX646, 2):

> 1.  In order to increase its manufacturing capacity, United Therapeutics, Inc., the owner of Lung Rx, Inc., is outsourcing the current 20-step chemical synthesis of treprostinil, API, described in NDA-21-272. . . . [B]y the first quarter of 2007, the manufacturing of treprostinil will be transferred from Chicago, IL to Silver Spring, Maryland.  Based on the CMC data in the Lung Rx's briefing package and those to be submitted in the forthcoming United Therapeutics's Prior Approval Supplement for NDA 21-272, **the simplified chemical synthesis of treprostinil will provide API that meets the same acceptance criteria as API obtained from the 20-step chemical synthesis, with a very similar impurity profile and similar acceptance criteria**.  Does the Division agree that there is no need for any additional preclinical studies for this API?

DTX646, 4-5 (emphasis added).

39.     In the "[b]ackground information" of the FDA Briefing Document for this question (DTX619, 1), UTC provided "Diagrams 1 and 2 [to] show the current (former) route of synthesis with the proposed process and Table 4 [to] summari[ze] these processes."  DTX619, 5.  Diagram 1 shows the "Former" process used in Chicago, and Diagram 2 shows the "New" manufacturing process used in Silver Spring.  DTX619, 6.  Both processes arrive at the same molecule: treprostinil free acid (UT-15).  *Id.*  Table 4 is identical to Example 6 of the '066 patent, and confirmed the same.  *Compare* DTX619, 7-8, *with* JTX2, 15:1-17:25 (Example 6).

40.     In the same document, UTC informed the FDA that "[t]he release data for the drug substance batch prepared by the revised route of synthesis indicate that **it is of equivalent quality**

9

to the batches produced by the current synthetic route, **particularly with respect to the assay and purity profile**." DTX619, 10 (emphasis added); Tr. 468:14-469:1 (Winkler).

41.     In a January 2, 2009 letter to the FDA, UTC stated:

[T]he lots of treprostinil API produced by the new process in Silver Spring are of the **same** high quality and purity as the commercial lots of API produced by the existing process at the Chicago facility.

DTX070, 3 (emphasis added); *see also* Tr. 786:10-17 (Bunce).

42.     UTC never told the FDA that the treprostinil free acid made at both facilities had any structural or functional differences, including any differences in safety, toxicity, efficacy, biological activity, or any other consideration.  *See supra* ¶22.  Instead, UTC's documents show that the average purity and impurity profiles between the two products were the same (*see supra* ¶¶24), and that the HPLC assay, or overall purity, of *every single* Chicago batch fell within both process' specification ranges.  *See supra* ¶29.

### C.     "[A] level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition" Lacks Written Description

43.     Claim 1 recites a process of alkylating BTO, hydrolyzing the resulting product to form a starting batch of treprostinil, and then forming a salt that is either itself the claimed final pharmaceutical composition or is used to regenerate treprostinil free acid as the final pharmaceutical composition.  JTX2, 17:51-63.  Claim 1 requires that "a level of one or more impurities found in the starting batch of treprostinil is lower in the [final claimed] pharmaceutical composition" of treprostinil or its salt.  *Id.*  Claim 1 also requires "a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps[,]" "wherein said alkylation is alkylation of benzindene triol."  *Id.*

44.     Example 1 of the '066 patent describes the formation of benzindene nitrile by alkylating BTO.  JTX2, 9:46-10:37; Tr. 482:19-25 (Winkler).  Example 1 does not provide the

purity or impurity profile of the resulting benzindene nitrile.  Tr. 483:1-4 (Winkler).  Nor did the inventors assay to determine purity or impurities at this step.  Tr. 546:11-21, 547:22-548:1 (Batra); Tr. 553:6-12, 553:17-554:1 (Tuladhar).

45.     Example 2 of the '066 patent describes the formation of treprostinil free acid by hydrolyzing the benzindene nitrile of Example 1.  JTX 2, 10:40-11:48; Tr. 485:13-20 (Winkler).  The treprostinil of Example 2 is the "starting batch" recited in claim 1.  Tr. 485:21-23 (Winkler); Tr. 189:14-17 (Toste).  Example 2 does not provide the purity or impurity profile of the resulting treprostinil "starting batch."  Tr. 485:24-486:1 (Winkler); Tr. 188:18-189:17 (Toste).  Nor did the inventors assay to determine purity or impurities at this step.   Tr. 546:22-548:15 (Batra); Tr. 552:23-553:16, 553:23-554:1 (Tuladhar).

46.     The patent does not, nor did the inventors ever, identify any particular impurit(ies) generated after alkylation or hydrolysis.  Tr. 480:25-481:5 (Winkler); Tr. 553:6-554:1 (Tuladhar).

47.     Example 3 describes the formation of treprostinil diethanolamine salt by contacting the treprostinil prepared in Example 2 with diethanolamine.  JTX2, 11:50-13:14; Tr. 489:4-9 (Winkler).  Example 3 does not provide the purity or impurity profile of the resulting treprostinil diethanolamine salt.  Tr. 489:10-15 (Winkler).

48.     The '066 patent does not identify any particular *im*purity or *im*purities present after salt formation.  Tr. 481:17-19 (Winkler).  The patent only provides *purity* of the final treprostinil free acid regenerated from the salt.  JTX2, 14:55-65.

49.     A POSA would understand that the '066 patent does not provide any comparison of impurities between a starting batch of treprostinil and the final pharmaceutical composition.  Tr. 481:20-482:7 (Winkler).  And there is insufficient data and information in the specification of the '066 patent for a POSA to make such a comparison.  Tr. 480:3-496:16 (Winkler).

11

50.     The '066 inventors never measured impurities after the alkylation and hydrolysis steps because the alleged benefit of their invented process was to not need to look at impurities until after salt formation.  Tr. 481:6-16 (Winkler); Tr. 546:15-548:15 (Batra); Tr. 552:3-554:1 (Tuladhar).

51.     For infringement, UTC compared numerical levels of impurities resulting from alkylation and hydrolysis in the starting batch TN02 versus pharmaceutical composition TN. Tr. 480:9-21 (Winkler).  UTC expert Dr. Nuckolls agreed that claim 1 requires "an actual reduction in impurities," measured by a "number reduction."  Tr. 108:4-110:1 (Nuckolls).  UTC expert Dr. Toste testified that "in order to perform this analysis, of course, you have to identify impurities" and compare the "starting batch of treprostinil" with the "pharmaceutical composition" to see if there are "fewer . . . process impurities . . . ."  Tr. 175:8-25 (Toste); Tr. 181:4-182:1, 199:10-202:19 (Dr. Toste using data to compare the levels of the epi-treprostinil impurity); Tr. 188:2-8 (Dr. Toste agreeing that "in order to conduct [his] infringement analysis, [he] had to rely on actual data comparing impurities from the starting batch -- and in Yonsung nomenclature that's TN02 --  to the pharmaceutical composition -- and in Yonsung's nomenclature, that's TN . . . .").  The '066 patent does not provide sufficient information to make that comparison.  Tr. 480:22-24 (Winkler).

52.     UTC expert Dr. Scheidt provided no evidence of any impurities in the final *salt* pharmaceutical composition of claim 1.  Examples 3 and 4 relate to the salt, and Dr. Scheidt's testimony ignores these Examples.  Dr. Scheidt compared the pale-yellow hydrolysis product at the end of Example 2 with the off-white final treprostinil free acid at the end of Example 5, without pointing to any disclosures regarding impurities in treprostinil salt.  Tr. 810:11-811:1, 816:10-817:25 (Dr. Scheidt skipping from Example 2 to Example 5).

53.     Color differences between the pale-yellow alkylation product/starting batch of treprostinil and the off-white crude treprostinil generated after salt formation do not show a reduction in the level of one or more impurities resulting from the alkylation and hydrolysis of BTO, because (1) color differences do not identify any impurity (Tr. 820:5-8 (Scheidt)) or the amount of any *specific* impurity removed (Tr. 820:9-12 (Scheidt); Tr. 491:24-492:7 (Winkler)), (2) the color at each step could be coming from alkylating/hydrolyzing reagents, solvents, or anywhere else other than the BTO (Tr. 483:16-484:8, 487:19-488:15 (Winkler)), and (3) multiple compounds, including BTO and treprostinil sodium salt are both pale-yellow and off-white/white in their pure forms, thus a color change from pale-yellow to off-white is not indicative of impurity reduction (Tr. 491:17-23 (Winkler); Tr. 820:13-25 (Scheidt); PTX201, LIQ00573781).

54.     Dr. Scheidt points to Examples 1 and 2, which disclose using TLC (thin layer chromatography) to monitor the progress of the alkylation and hydrolysis reactions—the '066 patent does not disclose using TLC to identify or measure impurities.  Tr. 484:9-485:4, 487:3-18 (Winkler); JTX2, 10:30, 11:14-16.  Though TLC may be used to qualitatively see the presence of impurities generated as the reaction proceeds, the '066 inventors confirmed that UTC never used TLC in this manner.  Tr. 547:9-547:21 (Batra); Tr. 485:5-12 (Winkler).

55.     The '066 patent's one sentence disclosure that "the impurities carried over from intermediate steps [i.e., alkylation of triol and hydrolysis of benzindene nitrile] are removed during the carbon treatment and salt formation step" does not disclose to a POSA that impurities generated from alkylation and hydrolysis of benzindene triol, as opposed to impurities in the starting materials, reagents, or solvents, are carried over and reduced.  Tr. 495:3-496:6 (Winkler).  The inventors confirmed that they never measured this supposed impurity removal.  Tr. 546:15-548:15 (Batra); Tr. 552:3-554:1 (Tuladhar); Tr. 496:7-10 (Winkler).

56.     Claims 2-3 and 6 depend from claim 1, and the '066 patent lacks written description of these claims for the same reasons.  Tr. 430:8-12, 457:15-22 (Winkler).

## IV.     THE ASSERTED CLAIMS OF THE '793 PATENT ARE INVALID UNDER § 112

57.     The '793 patent specification is directed to "methods and kits for therapeutic treatment, and more particularly, to therapeutic methods involving administering treprostinil using a metered dose inhaler and related kits."  JTX3, 1:20-23.  Claim 1 of the '793 patent recites a method for treating PH using inhaled treprostinil, and the dependent claims recite a dry powder inhaler and certain formulation characteristics of a dry powder.  JTX3, claims.

### A.     Background Relevant to the '793 Patent

58.     By May 15, 2006, a POSA would have known the following facts:

#### 1.     State of the Art regarding Pulmonary Hypertension

59.     Pulmonary hypertension refers to abnormally high blood pressure in the lungs.  Tr. 562:13-14, 562:18-21 (Hill); Tr. 629:9-630:1, 677:21-678:7 (Waxman); JTX3, 1:37-40.  Patients with PH suffer from exertional shortness of breath, fatigue, and dizziness.  Tr. 562:18-22 (Hill).

60.     At the time of and as described in the '793 patent and still today, a POSA would have known that PH includes a range of conditions classified in five different WHO groups: Group 1, PAH; Group 2, pulmonary venous hypertension, *i.e.*, PH related to left heart disease ("LHD"); Group 3, PH associated with disorders damaging the lungs; Group 4, PH caused by chronic thrombotic or embolic disease, including chronic blood clots in the lungs; and Group 5, a miscellaneous category for conditions that do not fit well into the other four groups.  JTX3, 1:41-46; Tr. 564:19-566:7, 575:22-576:4 (Hill); Tr. 609:18-610:11 (Rubin); DTX385, 2.  The groups were first characterized in 1998 at the World Symposium on Pulmonary Hypertension in Evian.  Tr. 566:8-17 (Hill); DTX385, 1.

61.     The pulmonary circulation is characterized by arteries that bring deoxygenated blood from the right heart to the lung; capillaries that exchange oxygen and carbon dioxide between the lungs and the blood; and the veins which carry oxygenated blood back to the left heart. DDX3.1, *see also* D.I. 391, Ex. 3; Tr. 564:5-17 (Hill).  PH Groups 1, 3, and 4 are classified as "precapillary" PH as they are characterized by conditions affecting the pulmonary arteries or precapillary vessels.  Tr. 564:18-566:4, 591:24-592:1 (Hill).   In contrast, the high blood pressure in the lungs of Group 2 PH patients has a different underlying cause.  Defects in the left side of the heart cause elevated pressure which reflect back as high pressure in the pulmonary arteries. Tr. 565:4-16 (Hill).  Because the left heart is downstream (in terms of blood flow) of the pulmonary capillaries, Group 2 PH is sometimes referred to as "postcapillary" PH.  Tr. 564:5-17, 565:4-16 (Hill); Tr. 630:10-17 (Waxman).

62.     Group 1 PH can be differentiated from Group 2 PH based on a diagnostic hemodynamic parameter called pulmonary artery wedge pressure ("PAWP").  Tr. 580:4-15 (Hill). Group 2 PH patients have a PAWP of greater than 15 mmHg, while Group 1 PH patients have a PAWP of less than 15 mmHg.  *Id.*

63.     Group 2 PH patients comprise the vast majority of patients with PH.  Tr. 568:20-23 (Hill); DTX398, 14 (Gabbay et al. abstract reporting 78.7 percent of PH patients diagnosed on echocardiograms had left heart disease).  By comparison, in May 2006, Group 1 PH comprised approximately 4 percent of all PH patients:



DDX3.2, *see also* D.I. 391, Ex. 3; Tr. 569:14-17 (Hill); DTX398, 14.

64.    In addition to left heart defects, a small subset of Group 2 PH patients also exhibit defects in the pulmonary arteries, which have undergone constriction and thickening, further increasing the pulmonary arterial pressure.  Tr. 571:15-572:8 (Hill); Tr. 629:14-630:17 (Waxman). These patients are referred to as pre- and post-capillary combined Group 2 PH patients.  Tr. 571:10-14 (Hill).  The majority of Group 2 PH patients, however, suffer solely from left heart defects and are termed "isolated Group 2" or "isolated postcapillary" PH patients.[1]  Tr. 571:6-9, 572:17-573:1 (Hill); Tr. 630:10-13 (Waxman); DTX2000, 5 (reporting 13% of PH patients had pre- and post-capillary combined Group 2 PH while 52% had isolated Group 2 PH).  As Defendant's expert Dr. Hill explained, two-thirds to 75 percent of Group 2 PH patients are isolated Group 2 PH patients, and thus roughly 50 percent[2] of all PH patients are isolated Group 2 PH patients.  Tr. 572:17-573:1 (Hill).  While Dr. Waxman testified that in his program "about 35 to 40 percent of [PH] patients will have Group 2 disease[,]" and "of those, probably about two-thirds of them will have combined pre- and postcapillary [PH]" (Tr. 631:15-18 (Waxman)), he provided no supporting

---

[1] This subset of Group 2 PH patients is referred to herein as "isolated Group 2" PH patients.  The general term Group 2 PH is used when referring to all Group 2 PH patients, including both isolated and pre- and post-capillary combined Group 2 PH patients.
[2] 2/3*78.7 percent = 52 percent.

16

documentation for his testimony.  In contrast, an article by Assad et al., titled "Clinical and Biological Insights into Combined Post- and Pre-Capillary Pulmonary Hypertension," published in 2016 in the Journal of the American College of Cardiology, reported thirteen (13) percent of PH patients were pre- and post-capillary combined Group 2 PH patients while fifty-two (52) percent were isolated Group 2 PH patients, which is consistent with Dr. Hill's testimony that a smaller subset of Group 2 PH patients have pre- and post-capillary combined Group 2 PH.  DTX2000, 5; Tr. 572:17-573:1 (Hill); Tr. 672:16-23 (Waxman).

65.     By May 15, 2006, several prostacyclins were approved to treat Group 1 PH including subcutaneous and intravenous treprostinil (Remodulin®), intravenous epoprostenol, and inhaled iloprost (Ventavis®).  Tr. 573:6-574:9 (Hill).  By 2006 and even today, no prostacyclins were approved for treating any Group 2 PH patient, and no randomized controlled trials supported the benefit of Group 1 PAH-specific therapies in Group 2 PH patients.  DTX383, 5; Tr. 586:5-589:10, 581:16-22, 595:7-12 (Hill).  Administration of treprostinil to Group 2 PH patients has not been successful.  Tr. 581:13-582:5, 599:9-14 (Hill).  And even today, prostacyclins are not approved to treat any Group 2 PH patient.  Tr. 595:7-12 (Hill).

### B.     '793 Patent Overview and POSA Definition

66.     The '793 patent expires on May 14, 2027 and claims priority to U.S. Provisional Patent Application No. 60/800,016, filed on May 15, 2006.  JTX3, front cover; D.I. 350, Ex.1, ¶¶37-38.  The application that issued as the '793 patent was filed on January 31, 2020—just four days after Liquidia announced that it had filed NDA No. 213005 for LIQ861.  JTX3, front cover; DTX369, 1; Tr. 722:25-723:9 (Gonda); D.I. 23, ¶2.

67.     Claim 1 is directed to a method for treating PH by administering a therapeutically effective single event dose of treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, where the therapeutically effective single event dose comprises between 15-90

micrograms ("mcg" or "µg") of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.  *See* JTX3, claim 1; Tr. 562:5-9 (Hill); 726:13-22 (Gonda).

68.     Claims 4 and 6-8 depend from claim 1.  JTX3, cls. 4, 6-8.  The dependent claims recite a dry powder inhaler and specific formulation characteristics, including a powder formulation (claim 6), powder particle sizes of less than 5 micrometers (claim 7) and a formulation containing no metacresol (claim 8).  JTX3, cls. 4, 6-8; Tr. 733:4-6 (Gonda).

69.     Treprostinil is a member of the family of compounds referred to as prostacyclins or prostacyclin analogs.  JTX3, 5:37-39; Tr. 573:21-22 (Hill).  Prostacyclins dilate, or widen, the blood vessels of the lungs.  Tr. 574:10-15 (Hill).

70.     The '793 patent specification describes administering treprostinil to PH patients.  *See* JTX3, 5:32-36, Example 1, Example 2.  The specification describes PH broadly, specifically stating that "[g]enerally, pulmonary hypertension is defined through observations of [pulmonary circulation] pressures above the normal range" (*id.*, 1:37-38) and that PH "may occur due to various reasons and the different entities of pulmonary hypertension were classified based on clinical and pathological grounds in 5 categories according to the latest WHO convention, see e.g. Simonneau G., et al. J. Am. Coll. Cardiol. 2004; 43(12 Suppl S):5S-12S."  *Id.*, 1:41-46.

71.     The specification has only two sentences that refer to dry powder inhalers and powders:  "The inhalation device can be also a dry powder inhaler.  In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter."  JTX3, 7:22-26.

72.     The '793 patent specification has two Examples.  Example 1 describes an acute study to examine the safety, tolerability, and potency of inhaled treprostinil applied in seconds using a soft-mist inhaler.  JTX3, 8:63-67.  All 54 patients in the study had "moderate to severe

precapillary pulmonary hypertension" (*id.*, 9:35-36) and inhaled treprostinil, in the form of a solution, using a soft-mist inhaler. *Id.*, 8:63-67, 9:7-10. The Example expressly identifies patients with Groups 1, 3, and 4 PH. *Id.*, 9:44-47 (describing "[d]isease etiologies were idiopathic PAH (iPAH) (n=13), PAH other (n=11), chronic thromboembolic pulmonary hypertension (CTEPH) (n=17) and pulmonary fibrosis (n=4)"); Tr. 578:9-20 (Hill). The study reports hemodynamic changes in the patients following a single dose of inhaled treprostinil. JTX3, 9:11-16.

73.     Example 2 also describes measuring hemodynamic changes in patients with precapillary PH who were administered inhaled treprostinil. JTX3, 12:8-27. Patients inhaled treprostinil, again in the form of a solution, using the OPTINEB® ultrasonic nebulizer. *Id.*, 12:56-59. The Example contains three studies, all of which describe acute administration of an inhaled solution of treprostinil. *Id.*, 12:60-14:47. Like Example 1, Example 2 identifies patients in Groups 1, 3, and 4. JTX3, Table 3 (explaining "[e]tiology of pulmonary hypertension was classified as idiopathic PAH (i), PAH of other causes (o), chronic thromboembolic PH (t), and pulmonary fibrosis (f)"); Tr. 579:14-24 (Hill). The patients all had PAWP less than 15 mmHg, meaning none had Group 2 PH. JTX3, Table 3; Tr. 579:25-580:15 (Hill).[3]

74.     Neither the Examples, nor anywhere else in the specification, describe using a dry powder formulation in a patient, excipients useful for dry powder formulations, appropriate dry

---

[3] While Plaintiff's expert, Dr. Waxman testified that Table 1 in the '793 patent does not list wedge pressures or the nature of pressures, (Tr. 638:16-23, 658:2-8 (Waxman)), but Table 3 of the '793 patent and as confirmed by Dr. Hill plainly lists PAWP for patients. None of the patients in Table 3, had PAWP above 15 mmHg. JTX3, Table 3. Moreover, as Drs. Waxman and Hill testified, Examples 1 and 2 describe Group 1, 3, and 4 PH patients, not Group 2 PH patients. Tr. 577:8-578:17, 579:14-24 (Hill); 634:24-635:13 (Waxman). And the patent only uses the term precapillary to describe Group 1, 3, and 4 patients treated with inhaled treprostinil, but never uses any terms that might describe Group 2 PH patients such as "postcapillary," or "pre- and post-capillary combined patients." *See generally* JTX3.

powder inhalers for patients with PH, administering inhaled treprostinil to a Group 2 PH patient, or the effects of delivering more than one dose of inhaled treprostinil to a patient. *See generally* JTX3.

75.    As noted above, claim 1 and the dependent claims are directed to treating PH broadly rather than treating precapillary PH or any particular subgroup of PH. *See* JTX3, claims.

76.    With respect to treating PH, a POSA would have a medical degree with a specialty in pulmonology or cardiology, plus at least two years of experience treating patients with PH as an attending, including with inhaled therapies, or equivalent degree or experience. Tr. 574:24-575:3 (Hill); DDX3.3, *see also* D.I. 391, Ex. 3. With respect to inhaled formulations used in treating PH, a POSA would have a Ph.D. in pharmaceutical science or a related discipline like chemistry or medicinal chemistry, plus two years of experience in pharmaceutical formulations, including inhaled products, or equivalents (*e.g.*, an M.S. in the same fields, plus five years of experience). Tr. 725:15-23 (Gonda).

**C.    The Asserted Claims of the '793 Patent Are Invalid for Lack of Written Description and Enablement**

**1.    A POSA Would Understand "Pulmonary Hypertension" as Claimed Encompasses All Five Groups of PH**

77.    Given the disclosures in the patent and the state of the art, a POSA would understand that "pulmonary hypertension" as used in the '793 patent claims comprises all five groups of PH, including subgroups. Tr. 575:22-576:25, 580:24-581:2 (Hill). The '793 patent specifically describes the five WHO groups in reference to PH. Tr. 576:8-25 (Hill); Tr. 661:5-7 (Waxman); JTX3, 1:41-46 (citing DTX385 in explaining "the different entities of pulmonary hypertension were classified, based on clinical and pathological grounds in 5 categories"). A POSA would thus understand that the asserted claims of the '793 patent reciting treating PH

encompass WHO Groups 1-5, and not just a subset of the five Groups.  Tr. 575:22-576:4, 576:8-25 (Hill).

78.    A POSA would further understand that PH as claimed does not exclude any subgroup of Group 2 PH patients.  Tr. 571:6-24 (Hill) (explaining Group 2 has patients termed isolated Group 2 PH and pre- and post-capillary combined Group 2 PH); JTX3, 1:37-38 ("Generally, pulmonary hypertension is defined through observations of pressures above the normal range"); Tr. 630:10-631:5 (Waxman) (explaining the unifying theme for PH, including isolated Group 2 PH, is increased pressure in the pulmonary arteries); Tr. 659:21-660:2 (Waxman).  A POSA would understand that the claims do not exclude isolated Group 2 PH patients.  Indeed, UTC's own expert Dr. Waxman did not carve out isolated Group 2 PH from the meaning of PH.  Tr. 659:21-660:2 ("Q.  And in fact, you've carved them out of your definition of pulmonary hypertension that you applied to Claim 1; correct?  A.  Well, I have not carved them out of the definition of pulmonary hypertension.  I've simply carved them out of a patient who has pulmonary arterial involvement and who you would consider treating with a pulmonary vasodilator.").  Finally, UTC pointed to nothing in the specification or file history demonstrating that the inventors disclaimed any PH subgroup from the definition of PH.

79.    While Dr. Waxman argued, without support, that a POSA would know, based on the state of the art by May 15, 2006, to exclude isolated Group 2 PH from the claimed "treating pulmonary hypertension" (Tr. 658:12-16 (Waxman)), the patent never excludes isolated Group 2 PH from the scope of the claims and never distinguishes isolated Group 2 PH from pre- and post-capillary combined Group 2 PH.  *See generally* JTX3.  Nothing in the patent informs a POSA to exclude isolated Group 2 PH from the scope of the claims.  *Id.*  Dr. Waxman further argued that a POSA would know from the patent disclosures that inhaled treprostinil could be used to treat PH

21

patients with a precapillary or pulmonary arterial component.  Tr. 634:17-635:10, 635:16-20, 636:6-10 (Waxman).  But the claims are not limited to treating "precapillary" PH and instead recite the more general treating "pulmonary hypertension."  Tr. 578:24-579:6 (Hill).

### 2. A POSA Could Not Have Practiced the Full Scope of "Treating Pulmonary Hypertension" without Undue Experimentation

80.      The full scope of "treating pulmonary hypertension" as claimed is not enabled. Tr. 581:6-12, 595:13-20 (Hill).  Based on the disclosures in the '793 patent, including the '793 patent's express disclosure of the five WHO Groups of PH, a POSA would have understood that the asserted claims are directed to the full scope of PH, including the five WHO Groups and both isolated Group 2 and pre- and post-capillary combined Group 2 PH.  *See supra*, §IV.C.1.

81.      Considering the state of the art of treating PH by May 15, 2006 and lack of description in the '793 patent for actually treating Group 2 PH patients, a POSA would have had significant safety concerns about administering inhaled treprostinil to treat *any* Group 2 PH patient. Tr. 592:3-16, 592:17-593:18, 681:12-682:1 (Hill).  The '793 patent fails to address these safety concerns, even for pre- and post-capillary combined Group 2 PH patients in which a particular rationale existed for using treprostinil.  *Id.*  Thus, a POSA would have had to engage in undue experimentation to practice the full scope of treating Group 2 PH patients with inhaled treprostinil. Tr. 581:6-12, 595:13-20 (Hill).

82.      The experts agreed the '793 patent provides no description of treating Group 2 PH patients.  Tr. 579:25-580:23, 590:25-591:10, 591:16-592:2 (Hill); 634:22-635:13 (Waxman).

83.      By May 15, 2006, several studies indicated Group 1 PH therapies like prostacyclins could exacerbate symptoms in Group 2 PH patients.  In the FIRST trial, patients with Group 2 PH were treated intravenously with the prostacyclin epoprostenol.  Tr. 582:12:-583:23 (Hill).  Because more people died in the epoprostenol treatment group than in the control group, the study was

prematurely stopped.  Tr. 583:4-13, 585:10-14, 585:21-586:2 (Hill); DTX358, Abstract, 8-9 ("[C]hronic epoprostenol infusion in severe left ventricular failure resulted in increased mortality rates and no evidence of improved quality of life").  The authors of the FIRST trial publication noted that "[d]espite the **theoretical rationale** . . ., this trial demonstrated that a chronic infusion of epoprostenol in patients with severe left ventricular dysfunction was associated with increased mortality rates and no improvement in quality of life."  DTX358, 7 (emphasis added).  DTX385, which the '793 patent expressly relies on when explaining PH encompasses five WHO groups, cites to the FIRST study (DTX358) in noting "epoprostenol therapy in patients with pulmonary venous hypertension [Group 2 PH] can be harmful."  DTX385, 2; *see also id.* at 7 (listing reference number 8 as Califf, et al)  Given the lack of description in the '793 patent and state of the art by May 15, 2006, a POSA would have been wary of using inhaled treprostinil in either isolated Group 2 or pre- and post-capillary combined Group 2 PH patients.  Tr. 586:3-5, 587:23-588:5, 592:3-12, 681:12-682:1 (Hill).  Knowing this, the '793 patent inventors still chose to claim treating "pulmonary hypertension" broadly, without providing any guidance for ameliorating the safety concerns a POSA would have using treprostinil in a Group 2 PH patient.

84.     The label for Ventavis® (iloprost), which was the only inhaled prostacyclin approved for treatment of Group 1 PH by May 15, 2006, similarly warned that treatment should be stopped if signs of pulmonary edema occur, as this may be a sign of pulmonary venous hypertension.[4]  DTX345, 6; Tr. 586:6-587:22 (Hill).  Based on this warning, a POSA would have been extremely cautious about using not only intravenous prostacyclins like Flolan as used in the FIRST trial, but also inhaled prostacyclins in Group 2 PH patients as increasing the pulmonary

---

[4] Group 2 PH is characterized by pulmonary venous hypertension.  *See supra*, ¶60.

venous pressure could create a potentially life-threatening situation in these patients.  Tr. 587:5-588:5 (Hill).  Dr. Waxman does not provide any evidence that the PH field, by May 15, 2006, had determined how to address these significant safety concerns.

85.     The '793 patent never addresses these significant safety concerns that a POSA would have had in using inhaled treprostinil in isolated or pre- and post-capillary combined Group 2 PH patients.  Tr. 592:3-12 (Hill); 681:12-682:1 (Hill) ("I'm a little more concerned about the safety concerns that I raised yesterday, particularly the danger of inducing pulmonary hypertension.  And so, I think we don't have enough evidence in that [pre- and post-capillary combined] group to justify saying, well, we should just go ahead and treat with these pulmonary hypertension-specific drugs that are available.").  Thus, while the '793 patent broadly claims a method for treating PH, it provides no guidance to a POSA for treating Group 2 PH patients, which make up the majority of patients with PH.  Tr. 591:16-19 (Hill).  Neither Dr. Waxman nor UTC provided any explanation concerning how the '793 patent or the state of the art by May 15, 2006 addressed these significant safety concerns in any Group 2 PH patient.  In fact, Dr. Waxman acknowledged that, by May 15, 2006, there was no published evidence that using prostacyclins could treat any Group 2 PH patient.  Tr. 638:24-639:4 (Waxman).

86.     Moreover, both isolated Group 2 and pre- and post-capillary combined Group 2 PH patients have a different pathophysiology (*i.e.*, LHD) that Group 1, 3, and 4 patients lack.  *See supra*, ¶61, 64; DTX2000, 2 (explaining 15% of PH patients with left heart disease may develop combined pre- and post-capillary Group 2 PH).  In addition to the safety concerns then, a POSA could not rely on the Examples in the '793 patent specification, which provide no description of any Group 2 PH patient, to deduce how to treat a Group 2 PH patient or whether the treatment would work.  Tr. 591:16-592:2 (Hill); *see supra*, ¶82.  A POSA with the information in the '793

patent disclosure would not have believed the inventors had shown treprostinil could be used in isolated Group 2 PH patients.  Tr. 589:14-22 (Hill).  For pre- and post-capillary combined Group 2 PH patients, a POSA would have a rationale to use inhaled treprostinil on an expectation that the patients may benefit from vasodilation provided by a prostacyclin.  Tr. 590:11-24, 592:6-9, 599:15-18, 681:14-682:1 (Hill).  Yet, the '793 patent, as explained above, provides no description of inhaled treprostinil actually being used to treat these patients and never addresses the safety concerns that would extend to all Group 2 PH patients.  Indeed, even several years after 2006, Dr. Hill explained he cautiously administered a Group 1 therapy (sildenafil) to a Group 2 PH patient without success.  Tr. 599:9-14, 605:13-20 (Hill).

87.     A POSA in May 15, 2006 would have found treating Group 2 PH patients with inhaled treprostinil unpredictable.  Tr. 592:13-16 (Hill).  As noted, by May 15, 2006, no prostacyclin therapy was approved to treat Group 2 PH patients (see supra, ¶65), and no evidence supported that any prostacyclin, let alone treprostinil, would treat any Group 2 PH patient.  Tr. 581:6-582:5 (Hill).  While Dr. Hill had used a Group 1 therapy in a Group 2 PH patient, he did so after May 15, 2006, and his attempt was unsuccessful.  Tr. 599:9-14, 605:8-23 (Hill).

88.     A POSA additionally would have required an undue amount of experimentation to practice the full scope of the claimed "treating pulmonary hypertension."  Tr. 592:17-24 (Hill).  Nothing in the literature established the feasibility or safety of treating *any* Group 2 PH patients with inhaled treprostinil.  Tr. 592:25-593:18 (Hill).  The patent does not describe treatment of any Group 2 PH patient and does not provide any evidence that inhaled treprostinil—a drug which was believed to act primarily by relaxing and enlarging the pulmonary arteries—has any therapeutic effect on PH associated with LHD.  *See supra*, ¶¶69, 74, 82-86.  A POSA would have needed to

start at "square one," conducting additional preclinical and clinical trials to determine whether the treprostinil formulation was safe and effective in treating Group 2 PH patients.  Tr. 593:2-18 (Hill).

### 3. The Inventors Were Not in Possession of the Claimed "Treating Pulmonary Hypertension"

89.    The '793 patent lacks adequate written description for the full scope of "treating pulmonary hypertension" in claims 1, 4 and 6-8 of the '793 patent.  Tr. 595:21-596:5 (Hill).

90.    A POSA reading claim 1 of the '793 patent would understand the claim encompasses treatment of all five WHO PH groups.  *See supra*, ¶¶60, 77-79.  Yet the '793 patent omits any description of treating *any* Group 2 PH patient with inhaled treprostinil.  *See supra*, ¶82; Tr. 596:13-15 (Hill).  None of the Examples in the specification describe treating any Group 2 PH patients or that the '793 patent inventors tried inhaled treprostinil in a Group 2 PH patient.  *See supra*, ¶¶74, 82, 85.  And the '793 patent never addresses the safety concerns a POSA would have had in using inhaled treprostinil in isolated Group 2 or pre- and post-capillary combined Group 2 PH patients.  *See supra*, ¶¶81, 83-85.  Given the underlying cause of Group 2 PH, lack of disclosures for treating Group 2 PH in the specification, and the known lack of therapeutic effectiveness in using Group 1 therapies, including inhaled prostacyclin therapies, to treat Group 2 PH (*see* § IV.C.2), a POSA would not have understood that the '793 patent inventors were in possession of the full scope of the treating PH as claimed.  Tr. 596:3-5, 596:16-19 (Hill).  Indeed, for isolated Group 2 PH patients, who make up approximately fifty percent of all PH patients (*see supra*, ¶64), Dr. Waxman agreed that a POSA would not have understood that the inventors were in possession of treating PH as claimed.  Tr. 635:21-636:5 (Waxman).  Thus, a POSA would not have understood that the inventors were in possession of claim 1.  Similarly, a POSA would not have believed that the inventors possessed dependent claims 4 and 6-8.

D.     **The '793 Patent Does Not Have Adequate Written Description or Enable a Powder Formulation of Treprostinil and DPI for Treatment of PH**

91.    Claim 1 of the '793 patent recites, in part, a "method of treating pulmonary hypertension comprising administering by inhalation . . . a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device . . . ." JTX3, 18:23-31.

92.    Claim 1 does not specify the type of "formulation" and thus a POSA would understand the "formulation" to include both solutions and powder formulations of treprostinil or a pharmaceutically acceptable salt thereof.  Tr. 727:10-22 (Gonda).  Similarly, claim 1 does not specify the type of "inhalation device" and thus a POSA would understand the "inhalation device" to include at least pulsed ultrasonic nebulizers, metered dose inhalers, soft mist inhalers, and dry powder inhalers ("DPIs").  Tr. 727:23-728:10 (Gonda).  Claims 4, 6, and 7, which depend from claim 1, specifically claim treprostinil powder formulations or the use of DPIs.  JTX3, 18:36-37, 40-43.  Claim 8, which depends from claim 1, would also encompass solution and powder formulations of treprostinil.  JTX3, 18:44-45; Tr. 733:1-13 (Gonda).  Thus, all asserted claims could include a treprostinil dry powder formulation suitable for administration via a DPI.

1.     **No Evidence that the Inventors Were in Possession of a Treprostinil Powder Formulation and a DPI for Treatment of PH**

93.    Based on the bare disclosure of the '793 patent, a POSA in May 2006 would not have believed that the inventors possessed a powder formulation of treprostinil or corresponding dry powder inhaler ("DPI") suitable for treatment of PH patients.  Inhaled powder formulations are very different from inhaled liquid formulations such that a POSA would have understood that development of a solution of treprostinil or its salt for inhalation does not inform the development of a powder formulation of treprostinil for inhalation.  Tr. 612:4-20 (Rubin); Tr. 718:15-20 (Gonda); Tr. 297:10-298:1 (Seeger); PTX905, 1211-212 ("The character of particulate systems is

27

central to the performance of DPIs. Powders present unique design challenges."); DTX268, 10-11 ("It is important to realize that in contrast to nebulizer formulations, . . . the formulation of dry powders for use in DPIs is critically important for effective performance[.]") . DPIs are very different from devices used for delivery of liquid solutions, including nebulizers, soft mist inhalers, and metered dose inhalers, which use external energy (e.g., compressor, propellants, springs) to generate the energy required for aerosolization. Tr. 716:1-718:25 (Gonda); DDX5.1; DTX268, 3. DPIs rely instead on patients' ability to inhale to disperse the powder particles and generate therapeutic aerosols. Tr. 717:25-721:1 (Gonda); DTX268, 12.

94.     The '793 patent includes only two sentences referencing powder formulations and DPIs: "The inhalation device can be also a dry powder inhaler. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter." JTX3, 7:22-26; Tr. 729:1-21 (Gonda). The two Examples provided in the '793 patent describe clinical studies involving the administration of treprostinil aqueous **solutions**. JTX3, 8:57-16:54; Tr. 730:3-731:14 (Gonda); Tr. 849:1-13 (Clark). Example 1 describes a clinical study in which treprostinil solutions were administered to humans via a soft mist inhaler. JTX3, 10:23-25; Tr. 730:6-18 (Gonda). Similarly, Example 2 describes three clinical studies in which treprostinil solutions were administered to humans via pulsed ultrasonic nebulizers. JTX3, 12:58-59; Tr. 730:19-731:5 (Gonda). None of this information conveys to a POSA that the inventors had possession of a powder formulation of treprostinil. Tr. 728:11-731:14 (Gonda).

95.     The '793 patent provides no disclosure that a dry powder formulation of treprostinil or DPI for treatment of PH was developed prior to May 15, 2006. Tr. 732:7-16 (Gonda); Tr. 849:10-13 (Clark). The specification of the '793 patent provides no examples of dry powder

formulations, excipients that can be used in such powder formulations, methods of manufacture of such powders, or DPI devices for the delivery of such formulations.  Tr. 729:22-731:14 (Gonda); Tr. 847:22-25 (Clark) ("Q.  [D]o you agree that the '793 patent does not disclose any method for making a powder formulation of Treprostinil?  A.  Yes."); *see generally* JTX3.

96.     Named inventors Drs. Lewis J. Rubin and Werner Seeger confirmed what the '793 patent discloses to a POSA: that the '793 patent inventors had not formulated or otherwise pursued a treprostinil powder formulation suitable for administration via a DPI by May 15, 2006.  Dr. Rubin testified that he never worked on an inhaled powder formulation of treprostinil while collaborating with UTC.  Tr. 612:21-24 (Rubin).  Similarly, Dr. Seeger testified that while working with UTC on inhaled treprostinil, he never used a dry powder formulation of treprostinil or DPI.  Tr. 296:15-298:1 (Seeger).  Dr. Seeger testified that the named inventors never tried to make a dry powder formulation of treprostinil likely because their experience was primarily in inhaled solutions.  *Id*.  UTC presented no testimony at trial that the named inventors performed work on powder formulation or were otherwise in possession of a dry powder formulation or DPI for treatment of PH patients.

97.     The first companies known to develop dry powder formulations of treprostinil were Liquidia and MannKind Corporation ("MannKind").  Tr. 721:20-25 (Gonda).  MannKind utilized its proprietary Technosphere™ technology to develop a dry powder formulation of treprostinil.  Tr. 722:1-9 (Gonda).  Liquidia similarly utilized its proprietary PRINT® technology to develop a dry powder formulation of treprostinil.  Tr. 722:10-19 (Gonda).  Neither MannKind's nor Liquidia's proprietary technologies were available to a POSA as of May 2006.  Tr. 741:17-19 (Gonda).  And only Liquidia's dry powder formulation of treprostinil has received (tentative) approval from the FDA to treat PH patients.  Tr. 724:19-725:1 (Gonda).

98.     UTC's current pursuit of a treprostinil powder formulation and device for treatment of PH patients is not based on any work disclosed in the '793 patent, but instead by obtaining an exclusive license from third-party MannKind in late 2018 to use its proprietary dry powder treprostinil formulation.  DTX389; Tr. 720:21-721:10 (Gonda).  UTC agreed to pay $95 million in upfront and milestone payments and double-digit royalties on net sales to MannKind, stating that "[w]e believe this collaboration will have the potential to significantly improve the lives of people living with pulmonary arterial hypertension."  DTX389; Tr. 724:3-10 (Gonda).

99.     UTC expert Dr. Clark stated that he "ha[d] no doubt" that a POSA would have believed the inventors were in possession of a dry powder formulation of treprostinil in May 2006 based on the specification's disclosure of a dose and the "time . . . over which you would deliver it."  Tr. 833:10-20, 835:7-13 (Clark).  Dr. Clark conceded, however, that the two Examples deal only with liquid formulations (Tr. 833:7-9, 849:7-9 (Clark)), and the very brief discussion of dry powder formulations and DPIs in the specification (JTX3, 7:22-26) provides no evidence that the inventors had actually made a dry powder formulation of treprostinil (Tr. 834:21-24, 849:10-13 (Clark)).  '793 patent inventors Dr. Rubin and Dr. Seeger confirmed that solutions and dry powder inhalers are "completely different" (Tr. 612:4-20 (Rubin)) and "may not be simply identical" (Tr. 297:10-298:1 (Seeger).  *See also* Tr. 717:25-718:25 (Gonda).  In fact, inventors of the '793 patent confirmed that they were not in possession of a dry powder formulation of treprostinil in May 2006.  *See supra*, ¶ 96.

## 2.     The '793 Patent Does Not Enable a POSA to Make a Dry Powder Formulation of Treprostinil without Undue Experimentation

100.    A POSA reading the '793 patent would have had to engage in undue experimentation to develop a dry powder formulation of treprostinil and corresponding DPI for treatment of PH patients.  DDX5.3; Tr. 733:14-735:10 (Gonda); PTX905, 1210 ("Development of

pharmaceuticals for inhalation is a particular challenge, as it involves the preparation of a formulation and the selection of a device for aerosol dispersion.").  First, a POSA would need to identify a chemically and physically stable form of treprostinil to ensure that the chemical and physical properties of the formulation do not change during manufacture, storage, and administration.  DDX5.3; Tr. 734:13-735:16, 742:17-744:4 (Gonda).  Second, a POSA would need to identify a suitable carrier that is safe for administration to humans, stable during manufacture and storage, and compatible with the particular API.  DDX5.3; Tr. 735:17-736:9 (Gonda); *see also* Tr. 851:3-19 (Clark).  Lastly, a POSA would need to identify a DPI that can be effectively used with the formulation to treat PH patients.  DDX5.3; DTX268, 12; Tr. 719:4-721:1, 736:10-25 (Gonda).

101.    Exemplary of the amount of experimentation necessary to develop a dry powder formulation of treprostinil is the work Liquidia and MannKind conducted independently to prepare such formulations.   Both Liquidia and MannKind utilized their own, proprietary powder formulation technologies, the PRINT technology and the Technosphere® technology, respectively. Tr. 721:17-722:19, 723:18-724:10 (Gonda).  That is, neither company attempted to use routine or conventional technologies to develop their treprostinil powder formulations or technologies that were known in the art in May 2006.  In September 2018, MannKind announced that it had granted UTC an exclusive license to its Treprostinil Technosphere® dry-powder formulation and technology.   DTX389.   UTC offered no evidence that it attempted to make a dry powder formulation of treprostinil before announcing its collaboration with MannKind in late 2018.

> **a.      The '793 Patent Does Not Identify a Suitable Form of Treprostinil for Use in a Dry Powder Formulation**

102.    A POSA would need to identify a chemically and physically stable form of treprostinil to ensure that the chemical and physical properties of the formulation do not change

during manufacture, storage, and administration.  Tr. 734:15-735:10, 738:25-744:4 (Gonda).  The claims of the '793 patent identify treprostinil or a pharmaceutically acceptable salt of treprostinil as the API of interest.  JTX3, claim 1.  Although the '793 patent tells a POSA to select some form of treprostinil, a POSA would still have needed to identify a form suitable for development into a powder formulation.  Tr. 734:15-735:16 (Gonda).  The existence of multiple solid forms of the same chemical compound adds complexity to the development of a powder formulation, as these different forms often have distinct physical properties that affect their physical behavior as powders.  Tr. 734:15-735:16 (Gonda).  The claims of the '793 patent are not limited to a particular form of treprostinil, or a particular pharmaceutically acceptable salt of treprostinil.  JTX3, 18:22-44.  A POSA therefore would not have known which, if any, forms of treprostinil or its salts would have been suitable for dry powder formulation, and would have needed to engage in extensive experimentation to identify a suitable form of treprostinil.   Tr. 734:12-735:16, 738:25-744:4 (Gonda).

103.     Crystallinity and polymorphism as well as the possibility of formation of different solvates pose unique challenges to powder formulations because changes in structure can result in changes to the size, shape, density and dispersibility of the drug powders.  Tr. 734:7-735:16 (Gonda).  By 2005, it was known that "[n]early one third of all drugs are known to display polymorphism, which is the ability of a solid to exist in more than one crystal f[orm]."  PTX905, 1212.  A POSA in May 2006 would need to determine and analyze the different polymorphic forms of the treprostinil or treprostinil salt used before developing a dry powder because "[d]ifferent polymorphs are at different energy states and thus have different properties, including stability, solubility, and even bioavailability."  *Id*.; *see also id*., 1213; Tr. 734:7-735:16 (Gonda).  Because the size, shape, and density of the solid drug forms is important for reproducibility, a

POSA would need to select the most stable polymorph to "reduce the risk of transformation during processing or storage." PTX905, 1213.

104.    The '793 patent identifies treprostinil sodium by name and structure as a potential API. JTX3, 6:5-17; Tr. 740:14-19 (Gonda). Thus, a POSA would consider treprostinil sodium a likely candidate for development of a powder formulation. Treprostinil sodium is extremely hygroscopic, meaning it is prone to taking on moisture from surroundings, and presents a greater risk of physical and chemical instability. PTX905, 1213; Tr. 738:25-740:13 (Gonda). Treprostinil sodium under ordinary conditions is so hygroscopic that it will pick up enough moisture from surroundings to dissolve into a liquid. Tr. 738:25-740:13 (Gonda). Thus, despite the '793 patent's specific identification of treprostinil sodium, a POSA seeking to make a dry powder formulation using treprostinil sodium would have recognized treprostinil sodium's extreme hygroscopicity would present additional challenges that would need to be resolved with no guidance from the '793 patent's specification as to possible solutions. Id. In fact, UTC's expert Dr. Hugh Smyth was unable to make dry powder formulation of treprostinil sodium due to the material's extreme hygroscopicity. Id.; Tr. 880:19-881:8 (Smyth). Dr. Smyth even tried to control for humidity, thereby reducing the uptake of moisture by the treprostinil sodium, by employing a glove box to store treprostinil sodium. Tr. 882:18-885:7 (Smyth); DTX618. Even controlling for humidity, keeping it as low as "<20%" RH, (DTX600, 7, 14, 17, 20, 24, 25) Dr. Smyth was unable to make a dry powder formulation of treprostinil sodium.[5]

---

[5] Liquidia was able to use treprostinil sodium to make its LIQ861 product because it used its proprietary technology, which dissolves treprostinil sodium with excipients before drying and forming inhalable particles. DTX204, 2; Tr. 741:1-19 (Gonda); Tr. 448:6-23 (Winkler).

105.     Regarding treprostinil free acid, a POSA in May 2006 would have had to first test the chemical and physical stability of treprostinil free acid, and in doing so, would conclude that treprostinil free acid is unstable at room temperature and has the tendency to form dimers. Tr. 741:20-744:4 (Gonda).  In fact, UTC discovered very early on that treprostinil free acid is unstable at room temperature and has a propensity to form dimers.  DTX674, 4 ("In 2001 UT began a project to determine a suitable oral form of treprostinil.  Because of the instability and propensity of UT-15 free acid to form dimers at ambient temperature, it was thought that a salt form of UT-15 might be more stable."); Tr. 741:20-744:4 (Gonda).  Treprostinil free acid dimers are different molecules than treprostinil free acid, which could cause efficacy and safety problems when given to a patient.  Tr. 741:20-744:4 (Gonda).  After conducting those tests, a POSA would have recognized that additional undue experimentation would be required to attempt to make a dry powder formulation of treprostinil free acid, developing a method to prevent the formation of dimers at ambient temperature, suitable for treatment of a PH patient.  *Id.*  The specification of the '793 patent does not provide any information or guidance to a POSA for developing such a method to prevent or reduce dimer formation.

> **b.     The '793 Patent Fails to Identify a Suitable Carrier to Use in a Dry Powder Formulation of Treprostinil or Treprostinil Salt**

106.     Because treprostinil is a highly potent drug, a POSA would need to identify a suitable carrier material to mix with the API so that the drug can be precisely metered for safe and effective administration to a patient.  Tr. 735:17-736:9 (Gonda); *see also* Tr. 795:3-11 (Walsh); PTX905, 1221.  A POSA would need to ensure that the carrier is safe for administration to humans and stable during manufacture and storage.  Tr. 735:17-736:9 (Gonda).  And even after a non-toxic and stable carrier is identified, a POSA must ensure that the carrier does not react chemically with the chosen treprostinil or treprostinil salt.  Tr. *Id.*; Tr. 851:3-19 (Clark).  The '793 patent does not

disclose any carriers suitable for use with treprostinil in the development of a dry powder formulation.  Tr. 737:12-16 (Gonda).

107.    For dry powders as of May 2006, there were very few carriers available with proven tolerability and safety by inhalation, and none that had been demonstrated to be compatible with any form of treprostinil.  PTX905, 1221.  As of May 2006, lactose was the only FDA-approved carrier used in dry powder formulations in the U.S.  *Id*.  Nonetheless, a POSA would have recognized that identification and selection of a suitable carrier for treprostinil is critically important to effective administration via DPI.  *Id*. ("Despite the apparent lack of choices, the [carrier] must be carefully selected; physicochemical properties such as size and morphology profoundly affect the performance of the formulation.").  Although lactose was the only FDA approved carrier for dry powder formulations at the time, that does not alleviate a POSA's need to assess compatibility of lactose with the various forms of treprostinil.

### c.      The '793 Patent Does Not Identify a DPI for Treatment of PH

108.    Lastly, after identifying a suitable API and carrier particle for the dry powder formulation, a POSA would need to identify a DPI that could be used effectively by PH patients.  DTX268, 10-12 ("In general successful DPI design relies as much on the powder formulation as it does on the device engineer."); Tr. 717:25-721:1, 736:10-737:16 (Gonda).  In the absence of information on the patient population's ability to inhale through DPIs, a POSA would need to test the specific device in the specific patient population.  Tr. 717:25-721:1, 736:10-737:16 (Gonda).  UTC's expert Dr. Clark was one of the first scientists in the inhalation field to recognize the need to test DPIs in the patient population of interest.  DTX268, 12 ("Paradoxically, the main problem with DPIs is the very attribute which is their main advantage.  All currently available DPIs utilize the energy in the patient's inspiration as the powder source for aerosol generation.  Therefore, their delivery and dispersion performance, and hence the dose which they deliver to the lung, is affected

by a patient's ability to inhale at a suitably high flow rate."); Tr. 717:25-721:1 (Gonda).  The '793 patent provides no guidance as to DPIs that would be suitable for patients with PH.  Tr. 736:10-737:16 (Gonda).

109.    Until 2021, when UTC's expert Dr. Waxman published a peer-reviewed paper in *Pulmonary Circulation*, "[i]nhalation profiles to support use of dry powder inhalers for drug delivery in patients with pulmonary arterial hypertension ha[d] not been reported."  DTX468, 1; Tr. 749:4-753:2 (Gonda); *see also* Tr. 855:21-856:9 (Clark).  Because the PH patient population's ability to inhale through DPIs had not been studied as of May 2006, a POSA would have had to test DPIs in PH patients to determine whether a dry powder formulation of treprostinil, even if made, could actually be used with a DPI in PH patients.  Tr. 717:25-721:1, 736:10-737:16 (Gonda).  Had a POSA conducted those studies, as Dr. Waxman did in 2021, the POSA would have determined that PH patients have much lower inspiratory (inhalation) effort and total inhaled volume than healthy patients.  DTX468, 4 (Table 2); Tr. 749:4-753:2 (Gonda).  The '793 patent provides no information as to which DPI, if any, would even be feasible for use with PH patients.

### d.    Dr. Smyth's Experiments Do Not Demonstrate Enablement of Treprostinil Powder Formulation or Suitable DPIs

110.    Dr. Hugh Smyth's experiments failed to demonstrate that the '793 patent would enable a POSA to develop a dry powder formulation of treprostinil as of May 2006 without undue experimentation.  Tr. 738:20-24 (Gonda); DDX5.3.  From a high level, Dr. Smyth's experiments involved jet milling of the API several times, blending the formulations with lactose, adding the formulations to capsules, and testing the capsules using a DPI device and machine called a Next Generation Impactor, intended to mimic patient inhalation.  Tr. 864:23-865:3 (Smyth).

111.    Dr. Smyth failed to identify a form of treprostinil suitable for a DPI formulation.[6] DDX5.3.  Dr. Smyth was unable to make dry powder formulation of treprostinil sodium because it was too hygroscopic.   Tr. 737:24-740:13 (Gonda); Tr. 880:19-881:8 (Smyth).   Dr. Smyth attributed the failure to a lack of sufficient "humidity control" in his laboratory in Austin, Texas." Tr. 882:9-17 (Smyth).   But Dr. Smyth confirmed that he used a "glove box" with treprostinil sodium in his laboratory, a well-known method of controlling humidity (Tr. 882:18-883:3 (Smyth)).   Utilizing this glove box, Dr. Smyth was able to keep the humidity to about <20% relative humidity.  DTX600, 7, 14, 17, 20, 24.  Dr. Smyth also claimed that he was unable to make a dry powder formulation of treprostinil sodium because his laboratory was too humid.  Tr. 882:9-17 (Smyth).  Dr. Smyth, however, conceded on cross-examination that his experimental notebook, which recorded the humidity at the start of each experiment, does not indicate a relative humidity above 43%.  Tr. 883:24-885:7 (Smyth); DTX600, 6-8, 14, 17, 20-22, 24-27, 29, 31.  Using the form of treprostinil depicted in the '793 patent—treprostinil sodium—and various routine techniques to control humidity, Dr. Smyth failed to make a dry powder formulation for inhalation.

112.    With respect to treprostinil free acid, Dr. Smyth did not conduct any experimentation to assess the physical and chemical stability of a powdered formulation using treprostinil free acid.   As discussed above, (*supra*, ¶105), treprostinil free acid is unstable at ambient temperature and has a propensity to form dimers.  Indeed, UTC shipped treprostinil free acid and treprostinil sodium to Dr. Smyth under cold pack conditions.  DTX618, 18; Tr. 879:15-880:3 (Smyth).  Dr. Smyth did not test the stability of his treprostinil free acid powder formulation

---

[6] As an initial matter, Dr. Smyth failed to demonstrate that a POSA would have access to any of the API forms he used in his experiments because they were provided to him by UTC's counsel. Tr. 879:15-18 (Smyth).

and thus did not establish his dry powder formulation of treprostinil free acid was stable and suitable for use in patients.  Tr. 741:20-744:10 (Gonda).

113.    With respect to at least treprostinil diethanolamine, Dr. Smyth's experiments failed to demonstrate that he identified a suitable carrier to blend with the API.  A POSA would not have been satisfied that Dr. Smyth's short-term work was sufficient to demonstrate that the '793 patent enables the production of a treprostinil powder formulation.  As Dr. Gonda explained, lactose was known to react with secondary, aliphatic amines like treprostinil diethanolamine through a reaction known as the Maillard reaction.  Tr. 744:21-747:14 (Gonda); DTX481, 1; *see also* PTX905, 1221; Tr. 844:16-23 (Clark) (acknowledging that the Maillard reaction is a "legitimate concern" with using lactose with an amine).  While FDA-approved drugs containing amines and lactose were known as of May 2006, a POSA would have nonetheless been wary of mixing lactose with treprostinil diethanolamine and would have *at the very least* conducted a compatibility study to determine whether the reaction was occurring between treprostinil diethanolamine and lactose. Tr. 744:21-747:14 (Gonda); *see also* Tr. 844:24-845:2 (Clark).  Despite this knowledge in the field as of May 2006, Dr. Smyth decided to use lactose as the carrier in his treprostinil diethanolamine formulations and never assessed whether the Maillard reaction occurred.  Tr. 747:15-748:9 (Gonda).  Dr. Smyth in fact never assessed compatibility of lactose with any of the treprostinil API forms that he used.  Tr. 748:3-9 (Gonda).  Tellingly, although lactose was the only FDA-approved carrier for dry powder formulations (Tr. 763:14-21 (Gonda); PTX905, 1221), Liquidia's LIQ861 product does not use lactose as an excipient.  DTX408, 10 (listing inactive ingredients).  No evidence was offered at trial that dry powder formulations of treprostinil using lactose were ever developed by Liquidia, MannKind, or any other company.

114.    Lastly, Dr. Smyth failed to demonstrate that PH patients could effectively inhale

his formulations using a DPI.  DDX5.4; Tr. 748:10-754:21 (Gonda).  Dr. Smyth assumed a 4 kPa flow rate and 4.0 L total inhaled volume in his laboratory experiments, but Dr. Waxman's 2021 study demonstrated that PAH patients exert a pressure drop of only $2.6 \pm 1.2$ kPa and inhale a total volume of $1.4 \pm 0.03$ L on the same low resistance RS01 devices used by Dr. Smyth.  DDX5.4; DTX468, 4 (Table 2); 751:14-754:13 (Gonda).  These differences in flow rate and inhaled volume meaningfully affect delivered dose, particle size, and dispersion of particles.   Tr. 754:4-13 (Gonda).  If Dr. Smyth used the correct parameters Dr. Waxman identified in 2021, delivered dose likely would have been lower, particle size likely would have been higher, and particle dispersion likely would have been poor.  *Id*.  In fact, Dr. Smyth testified that more experimentation would be needed before his powder formulations could be administered to PH patients.  Tr. 885:16-886:4 (Smyth).

115.    In sum, Dr. Smyth skipped many steps that a POSA in May 2006 would have conducted even doing the bare minimum of formulation work to develop a treprostinil dry powder formulation and corresponding DPI.  Tr. 737:20-738:24, 743:21-744:10, 746:8-748:9, 753:3-754:21 (Gonda).  Dr. Smyth conducted his experiments only over a three-week time frame, which was insufficient to determine whether dimers would have formed with treprostinil free acid, a Mallaird reaction occurred between lactose and treprostinil diethanolamine, or another issue impacting the stability of the powder formulations Dr. Smyth made occurred.  For the reasons stated above, a POSA would have had to engage in excessive experimentation to formulate a powder formulation of treprostinil or its pharmaceutically acceptable salt and DPI suitable to deliver the treprostinil powder formulation as required by the asserted claims of the '793 patent.

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Douglas W. Cheek
Adam Pivovar
Brittany Cazakoff
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Lauren Krickl
Deepa Kannappan
Kyung Taeck Minn
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: May 4, 2022

/s/ Nathan R. Hoeschen
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*