IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) ) | C.A. No. 20-755 (RGA) (JLH) |
| v. | ) ) | |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) ) | |
| Defendant. | ) | |

### PLAINTIFF'S OPENING POST-TRIAL BRIEF

OF COUNSEL:

Huiya Wu
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

William C. Jackson
Eric Levi
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036
(202) 346-4216

Douglas H. Carsten
Mandy H. Kim
Arthur Dykhuis
Jiaxiao Zhang
Katherine Pappas
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92612
(949) 851-0633

Ian B. Brooks
Adam W. Burrowbridge
Joshua Revilla
Timothy M. Dunker
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000

May 4, 2022

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
Sarah E. Simonetti (#6698)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com
ssimonetti@morrisnichols.com

*Attorneys for Plaintiff*
*United Therapeutics Corporation*

Harrison Gunn
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    STATEMENT OF FACTS ......................................................................................... 3

III.   LEGAL STANDARDS ............................................................................................. 3

IV.    LIQ861 INFRINGES ALL ASSERTED CLAIMS OF THE '066 PATENT ................. 4

       A.     Liquidia's NDA Product .............................................................................. 4

       B.     Liquidia Infringes the '066 Patent Claims 1, 2, 3, and 6 ...................................... 6

              1.     Liquidia's Proposed Product Infringes Independent Claim 1 ................... 6

              2.     Liquidia's Proposed Product Infringes Dependent Claims 2 and 3 ........... 9

              3.     Liquidia's Proposed Product Infringes Dependent Claim 6 ................... 10

       C.     Liquidia Infringes '066 Patent Claims 8 and 9 ......................................... 15

V.     LIQ861 INFRINGES ALL ASSERTED CLAIMS OF THE '793 PATENT ................. 18

       A.     LIQ861 Is Administered in a "Single Event Dose" ............................................. 19

       B.     LIQ861 Is "Therapeutically Effective" ................................................................. 20

       C.     Liquidia Will Induce Infringement of All Asserted Claims ................................ 21

VI.    CONCLUSION ........................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Baxter Pharm. Prods.*,
  334 F.3d 1274 (Fed. Cir. 2003)..............................................................................20

*Abbott Labs. v. TorPharm, Inc.*,
  300 F.3d 1367 (Fed. Cir. 2002)............................................................................3, 4

*ACCO Brands, Inc. v. ABA Locks Mfrs.*,
  501 F.3d 1307 (Fed. Cir. 2007)..............................................................................21

*Align Tech., Inc. v. 3Shape*,
  2021 WL 2320139 (D. Del. June 7, 2021).............................................................21

*Allergan, Inc. v. Alcon Labs*,
  324 F.3d 1322 (Fed. Cir. 2003)................................................................................5

*Amgen Inc. v. Amneal Pharms. LLC*,
  945 F.3d 1368 (Fed. Cir. 2020)..............................................................................19

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
  580 F.3d 1340 (Fed. Cir. 2009)................................................................................3

*AstraZeneca LP v. Apotex, Inc.*,
  633 F.3d 1042 (Fed. Cir. 2010)..........................................................................4, 22

*EPOS Techs. Ltd v. Pegasus Techs. Ltd.*,
  766 F.3d 1338 (Fed. Cir. 2014)..............................................................................21

*ESCO Grp. LLC v. Deere & Co.*,
  No. 20-1679-RGA-JLH, 2022 WL 1025967 (D. Del. Apr. 6, 2022)......................20

*Exela Pharma Scis., LLC v. Eton Pharms., Inc.*,
  No. 20-CV-365 (MN), 2022 WL 806524 (D. Del. Feb. 8, 2022)...................3, 4, 10

*Ferring B.V. v. Watson, Inc.-Fla.*,
  764 F.3d 1382 (Fed. Cir. 2014)..........................................................................3, 12

*Forest Labs. v. Abbott Labs.*,
  239 F.3d 1305 (Fed. Cir. 2001)................................................................................3

*Forest Labs. v. Ivax Pharms.*,
  501 F.3d 1263 (Fed. Cir. 2007)................................................................................5

*Glaxo, Inc. v. Novopharm, Ltd.*,
    110 F.3d 1562 (Fed. Cir. 1997)..................................................................................3

*Global-Tech Appliances v. SEB S.A.*,
    563 U.S. 754 (2011)................................................................................................22

*Hospira, Inc. v. Amneal Pharma., LLC*,
    285 F. Supp. 3d 776 (D. Del. 2018)..................................................................10, 12, 15

*KCJ Corp. v. Kinetic Concepts*,
    223 F.3d 1351 (Fed. Cir. 2000)................................................................................20

*Manville Sales Corp. v. Paramount Sys., Inc.*,
    917 F.2d 544 (Fed. Cir. 1990).................................................................................22

*Martek BioSciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009)................................................................................3

*Novartis Corp. v. Ben Venue Labs.*,
    271 F.3d 1043 (Fed. Cir. 2001)................................................................................3

*Par Pharma., Inc. v. Hospira, Inc.*,
    835 F. App'x. 578 (Fed. Cir. 2020) ................................................................. *passim*

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
    731 F.3d 1271 (Fed. Cir. 2013)....................................................................... *passim*

*Syngenta Crop Prot., LLC v. Willowood, LLC*,
    944 F.3d 1344 (Fed. Cir. 2019)................................................................................5

*TC Tech. LLC v. Sprint Corp.*,
    2019 WL 6037877 (D. Del. Nov. 14, 2019) ...............................................................20

*Tyco Healthcare Grp L.P. v. Mut. Pharm.*,
    762 F.3d 1338 (Fed. Cir. 2014).........................................................................12, 13, 15

*Vanda Pharm. Inc. v. West-Ward Pharm. Int'l Ltd.*,
    887 F.3d 1117 (Fed. Cir. 2018)................................................................................4

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996).................................................................................21

*Warner-Lambert Co. v. Apotex Corp.*,
    316 F.3d 1348 (Fed. Cir. 2003)................................................................................3

**Statutes**

35 U.S.C. § 271.......................................................................................................5

**Other Authorities**

21 C.F.R. § 314.50 (2022) ........................................................................................................12

21 C.F.R. §§ 314.50(d)-(e)......................................................................................................12

Guidance for Industry: Investigating Out-of-Specification (OOS) Test Results for
    Pharmaceutical Production (Oct. 2006)...................................................................................13

**ASSERTED CLAIMS: '066 PATENT**

| Claim | Claim Limitation |
|---|---|
| 1[a] | A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising |
| 1[b] | providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps, |
| 1[c] | forming a salt of treprostinil by combining the starting batch and a base, |
| 1[d] | isolating the treprostinil salt, and |
| 1[e] | preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, |
| 1[f] | whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and |
| 1[g] | wherein said alkylation is alkylation of benzindene triol. |
| 2 | The pharmaceutical composition of claim 1, wherein the salt is isolated in crystalline form. |
| 3 | The pharmaceutical composition of claim 1, wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline. |
| 6 | The pharmaceutical composition of claim 1, wherein the isolated salt is stored at ambient temperature. |
| 8[a] | A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising |
| 8[b] | alkylating a triol intermediate of the formula:<br><br>hydrolyzing the resulting compound to form treprostinil, |
| 8[c] | forming a salt of treprostinil stable at ambient temperature, |
| 8[d] | storing the treprostinil salt at ambient temperature, |
| 8[e] | and preparing a pharmaceutical product from the treprostinil salt after storage, wherein |
| 8[f] | the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof. |
| 9 | A pharmaceutical product prepared by the process of claim 8. |

## ASSERTED CLAIMS: '793 PATENT

| Claim | Claim Limitation |
|---|---|
| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension |
| 1[b] | a therapeutically effective single event dose |
| 1[c] | of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, |
| 1[d] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
| 1[e] | delivered in 1 to 3 breaths. |
| 4 [f] | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
| 6 [g] | The method of claim 4, wherein the formulation is a powder. |
| 7 [h] | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 [i] | The method of claim 1, wherein the formulation contains no metacresol. |

## I.     <u>INTRODUCTION</u>

Plaintiff United Therapeutics Corporation ("UTC") has proven by a preponderance of the evidence that Defendant Liquidia Technologies, Inc. ("Liquidia") infringes the two UTC patents asserted in this action, namely U.S. Patent 9,593,066 ("the '066 patent") and 10,716,793 ("the '793 patent"), which relate to how treprostinil is made and how it is administered to patients.

**<u>The '066 Patent.</u>** The '066 patent is directed to pharmaceutical compositions and products containing treprostinil made from an improved process. That improved process produces fewer impurities from the recited alkylation and hydrolysis steps and results in a treprostinil active pharmaceutical ingredient ("API") that is both stable and storable at ambient temperature. There is no dispute that Liquidia's proposed product, known as "LIQ861" (and to be marketed under the brand name "Yutrepia"), contains treprostinil sodium ("TN") made by its manufacturing partner, Yonsung Fine Chemicals Co., Ltd. ("Yonsung"), according to the patented process steps including alkylation, hydrolysis, and salt formation. By performing the claimed process steps, Liquidia's drug substance has fewer impurities and is stable and storable at ambient temperature.

Liquidia makes two primary non-infringement arguments regarding the '066 patent: (i) that the lowered impurities in its TN are not generated from a single "benzindene triol" or "BTO" molecule; and (ii) that storage during shipment or in between manufacturing steps is not storage. Neither of these arguments hold water. First, Liquidia's impurity argument ignores the fact that the claims of the '066 patent require starting with a real-world batch of benzindene triol, which undisputedly contains impurities. Tr. 423:15-16. When evaluating the existence of impurities resulting from certain process steps, a person of skill in the art ("POSA") would look at the batch as a whole and not merely a single BTO molecule. Second, Liquidia's storage argument is likewise flawed. Liquidia stores TN at ambient temperature at various times during production. Liquidia recommends—but specifically does not require—a storage temperature range of 2-8ºC. That

1

recommendation does not alter the evidence showing that Liquidia's TN is stable at ambient temperature and is, in fact, stored at ambient temperature at Yonsung, during shipment, and in between steps of the PRINT process. Liquidia itself specifically verified that shipments of TN stored at ambient temperature met storage temperature conditions (*e.g.*, PTX-19, PTX-104). Liquidia's NDA likewise instructs ambient temperature storage during and in-between steps of the PRINT process. PFF ¶¶ 52-55. Liquidia has and will continue to use batches of TN stored at ambient temperature to make LIQ861, has used such LIQ861 in human clinical trials, and will sell that LIQ861 for administration to humans upon final approval. Simply put, Liquidia's importation use, and proposed sale of Yonsung's TN in LIQ861 infringes and will infringe the '066 patent.

**The '793 Patent.** The '793 patent is directed to a method of administering treprostinil by inhalation. The inventors discovered that patients could inhale treprostinil in higher doses in fewer breaths with a longer duration of action in the body, allowing for fewer administrations per day. The '793 patent claims doses of 15-90 µg of treprostinil delivered in 1-3 breaths to treat pulmonary hypertension. Liquidia instructs the use of LIQ861 within UTC's claimed dose and in the claimed number of breaths. Liquidia disputes only two elements of the asserted claims: that LIQ861 is administered in a "single event dose" and that the dose is "therapeutically effective." Both defenses strain credibility. LIQ861 is administered 3-5 times per day. Each administration delivers a claimed "single event dose" that is therapeutically effective by reducing pulmonary arterial pressure ("PAP") and pulmonary vascular resistance ("PVR"). While patients will practice the asserted claims, Liquidia has knowledge of the '793 patent, will encourage, recommend, and promote the administration of therapeutically effective single event doses of treprostinil through its label and instructions for use, and is well aware that its instructions will cause infringement of the asserted claims. Liquidia is therefore liable for inducing infringement of the '793 patent.

## II.   <u>STATEMENT OF FACTS</u>

A statement of facts is provided in Plaintiff's Proposed Findings of Fact ("PFF").

## III.   <u>LEGAL STANDARDS</u>

In a Hatch-Waxman case, infringement is hypothetical: "the ANDA must be judged on its face for what an accused infringer seeks FDA's approval to do" and the infringement inquiry is "limited to an analysis of whether what the generic drug maker is requesting authorization for in the ANDA would be an act of infringement if performed." *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1364 (Fed. Cir. 2003). Infringement can be proven by "any method of analysis that is probative of the fact of infringement," including through the use of "circumstantial evidence." *Martek BioSciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) (citing *Forest Labs. v. Abbott Labs.*, 239 F.3d 1305, 1312 (Fed. Cir. 2001)).

Under § 271(e)(2), the "infringement inquiry … is focused on the product that is likely to be sold following FDA approval … [b]ecause drug manufacturers are bound by strict statutory provisions to sell only those products that comport with the [NDA]'s description of the drug[.]" *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002); *cf. Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1045, 1047 (Fed. Cir. 2001).  For product-by-process patents, an NDA applicant infringes when the NDA "is 'for' a patent-claimed drug," (*Par Pharma., Inc. v. Hospira, Inc.*, 835 F. App'x. 578, 583 (Fed. Cir. 2020)), or when the applicant is likely to market and sell drug product by performing "process terms" that are within the scope of the asserted claims. *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1370, 1378 (Fed. Cir. 2009); *see Ferring B.V. v. Watson , Inc.-Fla.*, 764 F.3d 1382, 1386-88 (Fed. Cir. 2014); *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1278-80 (Fed. Cir. 2013); *Abbott*, 300 F.3d at 1373; *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1570 (Fed. Cir. 1997); *Exela Pharma Scis., LLC v. Eton Pharms., Inc.*, No. 20-CV-365 (MN), 2022 WL 806524, at *3 (D. Del. Feb. 8, 2022).

Where the NDA applicant "asks for and receives approval to market" a drug product that is within the scope of a patent, the NDA "is not silent" and the applicant has infringed as a matter of law.  *Par*, 835 F. App'x. at 585-86; *see Sunovion*, 731 F.3d at 1279; *Exela*, 2022 WL 806524 at *3. A "certification pledging not to infringe" or "[s]imply saying 'But I won't do it,'" is unavailing "as a matter of law." *Sunovion*, 731 F.3d at 1280; *see also Par*, 835 F. App'x at 586. Put differently, if the applicant seeks approval of an NDA that encompasses infringing activity, the applicant infringes the patent, even if the applicant represents that it implemented procedures to avoid the infringing activity. *See Sunovion*, 731 F.3d at 1278-79. When the NDA and DMF describe the product that is "likely to be" and "will be sold," they "define the compound in a manner that directly addresses the question of infringement." *Abbott*, 300 F.3d at 1373-75 (analyzing infringement "based on the entire contents of [the] ANDA").

For method-of-treatment patents, an NDA applicant has "the requisite specific intent to induce infringement [where it] include[s] instructions in its proposed label that will cause at least some users to infringe the asserted method claims." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010); *see also Vanda Pharm. Inc. v. West-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1129 (Fed. Cir. 2018).

## IV.   LIQ861 INFRINGES ALL ASSERTED CLAIMS OF THE '066 PATENT
### A.   Liquidia's NDA Product

Liquidia seeks to market "LIQ861" treprostinil products, which are dry powder formulations of treprostinil sodium contained in capsules in four strengths: 26.5 mcg, 53 mcg, 79.5 mcg, and 106 mcg. PFF ¶¶ 18, 59. Liquidia's Korean supplier, Yonsung, makes treprostinil sodium ("TN"), the active ingredient or drug substance for Liquidia's products, pursuant to DMF 27680. PFF ¶¶ 4-6, 12, 15. The TN is stored in Korea and ultimately shipped to Liquidia. PFF ¶¶ 9, 11, 44, 50-51. LGM serves as an intermediary between Liquidia and Yonsung, and sometimes receives

shipments from Yonsung before forwarding them on to Liquidia. PFF ¶¶ 7, 9-10, 13. Liquidia uses its PRINT process, in particular steps 1-4, to mix treprostinil sodium with excipients and process that composition into LIQ861 bulk powder. PFF ¶ 17. Liquidia then ships that bulk powder to Xcelience in Florida; Xcelience carries out the final steps 5 and 6 of the PRINT process, which involves encapsulating the bulk powder into the final pharmaceutical product, LIQ861. PFF ¶ 18. Pursuant to Liquidia's NDA and the parties' API Supply and Quality Agreements, Liquidia collaborates with Yonsung, LGM, and Xcelience to manufacture, import, market, and distribute LIQ861 and is therefore liable for infringement. PFF ¶¶ 7-14; *see, e.g.,* 35 U.S.C. § 271, *Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344, 1363-64 (Fed. Cir. 2019); *Forest Labs. v. Ivax Pharms.*, 501 F.3d 1263, 1265-66, 72 (Fed. Cir. 2007).

As shown at trial, UTC has proven that LIQ861 literally meets every element of the '066 patent's asserted claims. The asserted claims all require a pharmaceutical composition or pharmaceutical product containing treprostinil or a salt thereof. Claim 1 and its dependent claims (2, 3, and 6) further require that particular impurities—namely one or more impurities from the alkylation and hydrolysis steps—are lowered after the claimed salt formation and isolation steps. Claim 6, in addition, requires that the *isolated* treprostinil salt is stored at ambient temperature before it is used to prepare a "pharmaceutical composition." Claim 8 and its dependent claim 9, in contrast, do not contain the impurity limitations of claim 1.[1] Those claims, however, do require that the treprostinil salt (whether isolated or not) be stored at ambient temperature prior to preparation of the claimed "pharmaceutical product." The following schematic aligns the claim elements of "storage at ambient temperature," "isolated treprostinil salt," "pharmaceutical composition," and "pharmaceutical product" with Liquidia's process:

---

[1] Notably, Liquidia has no pending invalidity challenge to claim 8. Tr. 939:19-22.



**B.**   **Liquidia Infringes the '066 Patent Claims 1, 2, 3, and 6**

1.   Liquidia's Proposed Product Infringes Independent Claim 1

Claim 1 of the '066 patent (JTX-2) recites the following annotated elements:

> **[a]** A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising **[b]** providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps, **[c]** forming a salt of treprostinil by combining the starting batch and a base, **[d]** isolating the treprostinil salt, and **[e]** preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, **[f]** whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and **[g]** wherein said alkylation is alkylation of benzindene triol.

UTC's expert, Dr. Nuckolls, demonstrated that each of elements [**a**] through [**g**] are met:

- **Element [a]**:  Liquidia's LIQ861 bulk powder (consisting of aqueous stock solution from Liquidia's PRINT Step 1, processed in Steps 2-4), is a pharmaceutical composition containing the treprostinil sodium or "TN" obtained from Yonsung.[2] PFF ¶ 17.

- **Elements [b]** and **[g]**: Yonsung's treprostinil or "TN02" has one or more impurities resulting from prior alkylation and hydrolysis steps. PFF ¶¶ 21-27, 29, 33. The alkylation step performed by Yonsung is alkylation of benzindene triol or "BTO." PFF ¶ 15, 22.

- **Element [c]**: Yonsung forms treprostinil sodium (TN) by combining the starting batch of treprostinil (TN02) with a base (sodium). PFF ¶ 15.

- **Element [d]**: Yonsung isolates the treprostinil sodium (TN). PFF ¶ 16.

---

[2] Liquidia's expert testified that Yonsung's TN is the "pharmaceutical composition" of claim 1. Tr. 408:19-21. UTC's expert testified that Liquidia's LIQ861 bulk powder is the "pharmaceutical composition" of claim 1 because it distinguishes between the claim terms "isolated treprostinil salt" and "pharmaceutical composition," and gives meaning to the step of "preparing" a pharmaceutical composition from the isolated treprostinil salt as described in element [**e**].

- **Element [e]**: Liquidia prepares the aqueous stock solution and ensuing LIQ861 bulk powder from Yonsung's isolated treprostinil sodium (TN). PFF ¶ 17.
- **Element [f]**: The level of one or more impurities in the starting batch of treprostinil (TN02) is lower in the pharmaceutical composition (aqueous stock solution processed into LIQ861 bulk powder). PFF ¶¶ 22-33. Yonsung performed reproducibly validated HPLC tests on the treprostinil sodium (TN) quantifying the levels of impurities resulting from the alkylation and hydrolysis steps, which are not affected by Liquidia's subsequent mixing of the TN with excipients and PRINT processing. PFF ¶¶ 24-25.

Liquidia does not dispute that most of these elements are satisfied and rests its non-infringement argument on element [**g**]. Liquidia contends that there are no impurities that result from element [**g**], "wherein said alkylation is alkylation of benzindene triol."[3] According to Liquidia, only impurities generated from the alkylation of the single molecule BTO count. But that is not how real-world chemistry works. Real-world chemistry considers all the contents and materials involved. As an initial matter, "said alkylation" in element [**g**] refers to the prior alkylation ***step*** in element [**b**]. A POSA would understand that such an alkylation step encompasses applying the alkylation conditions to all the materials in the flask, not merely to one molecule, *i.e.*, BTO, as Dr. Winkler posits. PFF ¶ 22. In fact, without the other materials, such as the reagent, the alkylation step cannot take place. *Id*. Dr. Winkler's impurity opinion is also not credible because, under his theoretical view, no impurities would ever be generated; theoretical alkylation of BTO only results in alkylated BTO. A POSA would understand that impurities generated during the alkylation and hydrolysis steps (e.g., from side reactions) would be within the claim. *Id*. Dr. Winkler's testimony requiring "starting with the alkylation of benzindene triol and benzidine triol only" is even less

---

[3] Liquidia's other contention, raised belatedly at trial and which UTC moved to strike (Tr. 419:2-421:3, 424:16-425:13) should not be considered. Liquidia contends the differences in levels of impurities between TN02 and TN is too small for a POSA to consider. This argument, however, is not credible in view of Dr. Winkler's opinion that "[UTC's expert's] discussion of HPLC sensitivities" is "not relevant to the claim limitation requiring impurities resulting from alkylation of BTO and hydrolysis of the resulting compounds." Tr. 511:5-21. Moreover, the impurity measurements that Dr. Nuckolls and Dr. Toste rely upon were provided by Yonsung in its DMF, in many instances years before this action began. Thus, notwithstanding Dr. Winkler's complaints, these impurity measurements should be considered reliable. *See* PFF ¶¶ 24-25.

credible in view of his admission that "a real batch of – a bottle of benzidine triol could contain impurities [including] 15-epi BTO." Tr. 423:15-20. Dr. Winkler's hyper-technical view of what is alkylated in element [**g**] should be rejected. Yonsung performs alkylation and hydrolysis steps starting with BTO (and associated impurities), and the impurities resulting from those steps are subsequently lowered, as demonstrated by Dr. Nuckolls's and Dr. Toste's analyses.

Whether assessed by (i) amount of impurities, (ii) number of impurities, or (iii) amount of epi-treprostinil, Yonsung's process results in infringing treprostinil salt. Dr. Nuckolls's first analysis shows that—based on Yonsung's own impurity testing data reported to the FDA[4]—one or more impurities in the TN02 necessarily results from the alkylation and hydrolysis steps and is lowered after the salt formation step. PFF ¶ 26; PDX2.11; PTX-201 at LIQ00573781-83. These results are in accord with Yonsung's DMF, which tightens the allowed amounts of impurities in the TN compared to TN02. *See* PTX-201 at LIQ00573782-83 (2.0% in TN02; 0.5% in TN).

In Dr. Nuckolls's second analysis based on the *number* of impurities detected in Yonsung's DMF validation batches, he demonstrates that one or more impurities in the TN02 necessarily results from the alkylation and hydrolysis steps and is lowered after the salt formation stepexplained, there are a number of different related substance impurities detected by Yonsung in the HPLC chromatograms for the DMF validation batches[5] in each of the corresponding BTO, TN01, TN02, and TN. The various components of the mixtu batchesre, *i.e.*, the desired component (*e.g.*, TN02) and impurities (*e.g.*, 15-epi-treprostinil), elute at different retention times and show up as peaks on the chromatogram. PFF ¶ 24; Tr. 81:5-23; *see also* Tr. 176:1-23. In short, because there are more impurities in the TN01 (after alkylation of the BTO) and in the TN02 (after

---

[4] Using the % "Total Related Substances" impurities reported by Yonsung. PFF ¶ 26.
[5] Dr. Nuckolls was unable to perform this analysis on validation batch TN117K020 because Liquidia never produced the underlying HPLC chromatograms. Tr. at 84:14-19.

hydrolysis of the TN01) than there are in the BTO, there is necessarily at least one impurity in the TN02 resulting from the prior alkylation and hydrolysis steps; one or more of those impurities is then lowered to below a detectable level in the TN, demonstrating infringement.

With respect to pinpointing one particular impurity, Drs. Toste and Nuckolls both considered the impurity 15-epi-treprostinil,[6] which is an isomer of treprostinil that differs from the treprostinil molecule by orientation at one carbon atom. PFF ¶ 28; *id.* at ¶ 33 (Nuckolls identifying epi-treprostinil as an infringing impurity); Tr. 177:4-9, *see also* PTX-532, PDX3.8. The molecules are so similar that epi-treprostinil is difficult to separate from treprostinil using HPLC. Tr. 176:1-180:1. The epi-treprostinil impurity results from the prior alkylation and hydrolysis steps, first appearing in Yonsung's starting batch (TN02). PFF ¶ 29; Tr. 217:12-218:1. The epi-treprostinil in the starting batch of treprostinil is then lowered by the claimed salt formation and isolation steps, during which the treprostinil molecules come together in forming the salt and reject the epi-treprostinil into the "mother liquor" that is washed away in the isolation step. PFF ¶ 30. Dr. Toste testified to the "strong trend where the amount of epi-[t]reprostinil goes down," demonstrating infringement. PFF ¶¶ 30-32; *see also* PTX-548, PDX3.10.

### 2.   Liquidia's Proposed Product Infringes Dependent Claims 2 and 3

Dependent claim 2 recites "[t]he pharmaceutical composition of claim 1, wherein the salt is isolated in crystalline form." JTX-2. There is no dispute that, as set forth in Yonsung's DMF, when the salt is isolated (*see* element [**d**] of claim 1), it is in crystalline form. PFF ¶ 16. Liquidia thus infringes dependent claim 2. Liquidia also infringes dependent claim 3, which recites "[t]he pharmaceutical composition of claim 1, wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline." JTX-2. It is undisputed that under the DMF and NDA (PFF ¶¶ 4-6), the isolated salt and

---

[6] 15-epi-treprostinil is also referred to as "epi-treprostinil", "epi-TN02", and/or "3AU90."

pharmaceutical composition use the claimed base sodium. PFF ¶ 15.

3.    Liquidia's Proposed Product Infringes Dependent Claim 6

Claim 6 depends on claim 1 and further requires that "the isolated salt is stored at ambient temperature" before it is used to prepare a pharmaceutical composition (*see* element [**e**] of claim 1). Liquidia's NDA meets the "stored" and "ambient temperature" limitations of claim 6.

Isolated salt TN used to make LIQ861 is stored at ambient temperature at three points. PFF ¶¶ 9, 13, 14, 40-44, 50-52. The first is ambient storage between when the isolated treprostinil sodium (TN) is manufactured by Yonsung (*i.e.*, DMF Step 12) and when it is received at Yonsung's warehouse. PFF ¶ 50. The second is when the TN is stored and shipped from Yonsung to Liquidia at ambient temperature. PFF ¶¶ 40-45, 51. The third is at the start of PRINT Step 1, when the NDA instructs that TN is stored at ambient temperature in the dry box before it is combined with excipients. PFF ¶ 52. Such storage of isolated salt at ambient temperature and then using that isolated salt to prepare the pharmaceutical composition infringes claim 6.

Liquidia's representations to FDA in its NDA submissions establish that Liquidia infringes claim 6 both as a matter of law and fact.[7] *Par*, 835 F. App'x. at 586; *Sunovion*, 731 F.3d at 1279; *Exela*, 2022 WL 806524 at *3; *see also Hospira, Inc. v. Amneal Pharma., LLC,* , 285 F. Supp. 3d 776, 807-09 (D. Del. 2018). "What a generic asks for and receives approval to market, if within the scope of a valid claim, is an infringement." *Sunovion*, 731 F.3d at 1279. Any subsequent "certification pledging not to infringe" or "[s]imply saying 'But I won't do it,'" is unavailing "as a matter of law." *Id.* at 1280. The evidence shows Liquidia has "ask[ed] for and receiv[ed]" (*id.*) tentative approval to market LIQ861 wherein the drug substance is "stored at ambient temperature." PFF ¶¶ 4-6, 34-36, 39-43, 45, 50-52; *Sunovion*, 731 F.3d at 1278 ("[I]f a product

---

[7] Claims 8 and 9 involve storage of treprostinil salt (whether isolated or not). Liquidia infringes those claims for the same reasons it infringes the claim 6 limitation, requiring the isolated salt be stored at ambient temperature. *See* JTX-2 18:57 (cl. 8); 18:62-63 (cl. 9).

that an ANDA applicant is asking the FDA to approve for sale falls within the scope of an issued patent, a judgment of infringement must necessarily ensue").

First, Liquidia's NDA is "not silent" with respect to the storage claim limitations. *See Par*, 835 F. App'x. at 586 ("*Sunovion* governs" when the "ANDA is not silent on the point"). As discussed above, Liquidia's NDA specifically instructs storing the isolated TN at ambient temperature in a dry box during PRINT Step 1. PFF ¶¶ 9, 52. Further, Liquidia's NDA incorporates Yonsung's DMF (PFF ¶¶ 5, 34), which includes a "representative [treprostinil sodium] product label"[8] permitting storage of TN within the "ambient" claim limitations. *Accord* PFF ¶¶ 19-20, 36, 39-46, 50-51. Liquidia's regulatory expert witness, Mr. Fuson, admitted the NDA/DMF is not silent on "STORAGE" conditions and does not *require* that the TN be stored at any particular temperature. Tr. 392:1-7; Tr. 395:18-24; *see* Tr. 385:3-5 ("I know that the [DMF] speaks to the temperature range."); *see also* PFF ¶¶ 19, 20, 34, 35, 37-39, 45. Accordingly, Liquidia has received approval to market LIQ861 that "falls within the scope of [the '066] patent." *Sunovion*, 731 F.3d at 1278; *see* Tr. 369:14-25 ("LGM determined that the material [stored at ambient] met specifications for sale to Liquidia").

Second, approval of Liquidia's NDA is based on clinical trials, which used LIQ861 prepared from TN stored at ambient temperature. PFF ¶¶ 40-43, 45 50-52. Liquidia's NDA admits that "*representative* treprostinil sodium drug substance batches used in clinical studies". PFF ¶¶ 40-42; *see also* 21 C.F.R. §§ 314.50(d)-(e). "These disclosures to the FDA are sufficient" to find Liquidia "can", has, and is likely to continue to store its API within the scope of the claims. *Par*,

---

[8] PTX-112 at LIQ00000517.  Yonsung's DMF controls labeling of the TN drug substance. Yonsung's Certificate of Analysis ("COA") further specifies that the 2-8ºC recommended storage condition is for "Long-term storage" of Yonsung's TN. *See e.g.,* PTX-991 at 2 ("Storage condition: *Should* be kept in a tight container, protected from moisture and light and stored at 2ºC to 8ºC (*Long-term storage*)") (emphasis added); PTX-104 at LIQ02798166-167 (same).

835 F. Appx. at 586. Importantly, FDA's reliance on "representative" batches confirms these batches are within Liquidia's specification. *See* PFF ¶¶ 4-6, 19-20, 34, 36-40, 45-46, 51; 21 C.F.R. §§ 314.50(d)-(e); *see* Tr. 238:8-24 ("ICHQ 1A"); ICH Q1A(R2) (Nov. 2003) (§2.1.3) at 3 ("using a method of manufacture and procedure that simulates the final process to be used" and "representative of the quality of the material to be made on a production scale"). An applicant's "submi[ssions] to the FDA," such as "biobatch data and actual samples" are "relevant evidence". *Ferring*, 764 F.3d at 1409; *see also Tyco Healthcare Grp L.P. v. Mut. Pharm.*, 762 F.3d 1338, 1344-45 (Fed. Cir. 2014) (data and samples demonstrate the scope of the "as-marketed commercial . . . product"). And there is nothing wrong with Liquidia's reliance on TN stored at ambient temperature: Yonsung's studies establish that TN stored at ambient temperature is identical to TN stored at 2-8º C. PFF ¶¶ 19-20, 34, 39, 45.[9]

Third, after storage at ambient temperature, the TN used to manufacture LIQ861 remains fit-for-use, *i.e.*, is within the NDA's drug substance Specification, within Yonsung's Specification, and meets LGM's specification for sale to Liquidia. PFF ¶¶ 19-20, 39, 45. Nevertheless, Liquidia argues that its own "Raw Material Specification" ("RMS") dictates the scope of approved TN storage temperatures. *See* PFF ¶ 36. Not so for several reasons. First, Liquidia's RMS does not govern handling of the TN at Yonsung throughout the process. *See* PFF ¶¶ 6, 10-12, 34. The Quality Agreement between Yonsung, LGM, and Liquidia specifies that, before Liquidia receives the TN, Yonsung/LGM are responsible for "storage and shipping", and under the API Supply Agreement it is *Yonsung's* Specification—not Liquidia's RMS—that governs. *Id.* Yonsung's

---

[9] Section 3.2.S.7.1 of Yonsung's DMF, (PTX-112, -519-561), includes studies demonstrating stability of TN at ambient temperature. PFF ¶¶ 19-20. Because the TN stored at ambient temperature tested within Yonsung's specification, approval of storage at ambient temperature is "necessarily present in Defendant's" NDA. *Hospira*, 285 F. Supp. 3d at 808; *see* PFF ¶¶ 34, 38, 40, 42-45, 50-51.

Specification does not mention storage temperature. PFF ¶ 35; Tr. 391:4-392:7 (agreeing "there's not a temperature specification" in Yonsung's controlling TN Specification). Second, even if Liquidia's RMS governed, the regulatory purpose of specification criteria is that the criteria are "testable" and "retestable" so that "[y]ou can evaluate the product . . . to determine where it's sufficiently stable or is going to negatively impact the finished drug product." Tr. 384:10-14; *see* PFF ¶¶ 37-38. This means that, for specification criteria to have any teeth, Liquidia needs to be able to test and retest the API to make sure those criteria have been met. *Id*. Because "you can't retest temperature[,]" (*id.*), and because there is no difference between TN stored at 2-8°C and ambient temperature (PFF ¶¶ 19-20), Liquidia's artificial temperature construct is merely an attempt to circumvent infringement.[10]

This evidence all points to the inescapable conclusion that Liquidia seeks approval to sell LIQ861 wherein the isolated salt can be stored at ambient temperature, infringing claim 6. This is clear from (1) TN shipped and stored at ambient temperature historically, (2) the TN is stable at ambient temperature and can meet the NDA/DMF specifications, (3) FDA will permit use of TN stored at ambient temperature pursuant to "representative" stability data and historical data, including ambient-stored batches used in prior clinical trials and primary stability batches as set forth in Liquidia's NDA, and (4) Liquidia's practice of using TN stored at ambient temperature in manufacture of LIQ861 has all occurred while Liquidia has had its purported temperature conditions in place. There is no credible reason to believe that Liquidia will suddenly act

---

[10] Even if considered out-of-specification, under FDA GMP principles and according to both sides' experts, Liquidia can still use/sell batches stored at ambient temperatures. PFF ¶¶ 19-20, 34, 39, 45-49; *see Tyco*, 762 F.3d at 1344 (reasonably "alleg[ing] infringement . . . [where] the as-marketed commercial . . . product will infringe, even though the hypothetical product," using API stored at a recommended storage condition, "could not infringe"); *see generally* Guidance for Industry: Investigating Out-of-Specification (OOS) Test Results for Pharmaceutical Production (Oct. 2006) (an "adequate investigation[] of any OOS result" permits release and GMP use).

differently upon commercial launch.

It is undisputed that Liquidia has purchased, imported, received, developed and used TN exposed to ambient temperature as "representative" batches in Liquidia's NDA. PFF ¶¶ 40-43, 50-52. Tellingly, despite receiving from Yonsung millions of dollars of TN that was not temperature controlled or was demonstrably stored outside 2-8°C, there is no evidence that Liquidia ever returned that TN and requested a refund. PFF ¶¶ 42, 44, 46, 49, 51; PTX-2020. Indeed, when accepting batches of TN stored for 9 days at 16°C, Liquidia checked the box on its receiving form that temperature criteria were met. PFF ¶¶ 44, 46, 48. It cannot point to "quarantined batches"[11] and temperature monitoring as evidence of noninfringement, while relying on TN stored at ambient temperature to seek FDA approval and maintain flexibility to infringe. PFF ¶¶ 40-45; Tr. 68:7-15, 69:9-70:1 (Liquidia's head of quality assurance stating "I will be the final arbiter of the disposition" of TN stored at ambient temperature because "it's my decision, ultimately, to make").

Such "[b]ut I won't do it" made-for-litigation promises of future noninfringement are legally irrelevant. *Sunovion*, 731 F.3d at 1280; *Par*, 835 F. App'x at 586; *see Sunovion*, 731 F.3d at 1280 ("hold[ing] that any so-called certification pledging not to infringe cannot override the conclusion that when a drug manufacturer seeks FDA approval to market a [] compound within the scope of a valid patent, it is an infringement as a matter of law."). Even if taken at its word, Liquidia states only "*these batches*"[12] are "not going to be used for GMP," not that it will *never* use infringing TN in the future. Tr. 348:15-351:9 (emphasis added). Indeed, the evidence showed

---

[11] Quarantine does not signify non-use. All TN intended for GMP use is similarly quarantined upon receipt. Tr. 248:21-250:4; Tr. 225:11-15.

[12] Liquidia fails to justify why "*these batches*" warrant different treatment from clinical trial and primary stability study batches, which were similarly stored at ambient temperature and/or not temperature monitored. *Compare* PFF ¶¶ 42, 50, 51 *with* PFF ¶ 44. Based on Liquidia's NDA (and DMF), the FDA will permit Liquidia to use identical TN (stored at ambient temperature) in commercial LIQ861. PFF ¶¶ 34, 40-41, 45, 48.

it would be near impossible for Liquidia to use only TN stored and shipped at 2-8ºC. No batch shipped from Korea to the U.S. has *ever* met Liquidia's recommended 2-8ºC storage temperature. PFF ¶¶ 42, 44, 48; *cf. Hospira*, 285 F. Supp. 3d at 808. Further, nothing in the law and nothing in evidence *requires* rejecting TN stored outside 2-8ºC.[13] *Tyco*, 762 F.3d at 1344. Liquidia's knowing acceptance and prior use of infringing TN is probative of its future conduct. *Sunovion*, 731 F.3d at 1278-79. If it had "no intent to infringe, [Liquidia] should not have requested, or should not accept, approval to market a product within the scope of the claims." *Id.* at 1279.

### C.   Liquidia Infringes '066 Patent Claims 8 and 9

Claim 8 of the '066 patent (JTX-2) recites the following elements:

> [**a**] A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising [**b**] alkylating a triol intermediate of the formula:



> hydrolyzing the resulting compound to form treprostinil, [**c**] forming a salt of treprostinil stable at ambient temperature, [**d**] storing the treprostinil salt at ambient temperature, [**e**] and preparing a pharmaceutical product from the treprostinil salt after storage, wherein [**f**] the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.

As discussed above, it is undisputed that Liquidia' seeks to sell [**a** and **f**] a pharmaceutical product that comprises treprostinil sodium, which is a pharmaceutically acceptable salt of treprostinil. PFF ¶ 18. It is also undisputed that Yonsung's process involves [**b**] alkylating a batch of BTO (DMF Step 10), hydrolyzing the resulting compound to form treprostinil (DMF Step 11), and [**c**]

---

[13] Noticeably absent from Liquidia's receiving forms is any requirement that Liquidia reject TN exposed to ambient temperature. *See* PFF ¶ 46. All GMP API received by Liquidia is labeled with a lot number, placed in GMP quarantine, sampled, and tested for conformance with the Yonsung Specification criteria (*i.e.*, without temperature requirement). *See* PTX-19; PTX-104; DTX-208.

performing a salt formation step on the treprostinil to yield treprostinil sodium (DMF Step 12). PFF ¶ 15. Finally, it is undisputed that [**c**] Yonsung's treprostinil sodium is stable at ambient temperature. PFF ¶ 19. Liquidia's NDA, which incorporates Yonsung's DMF, identifies these steps and thus satisfies elements [**a**], [**b**], [**c**], [**f**] of claim 8. PFF ¶¶ 4-6, 15, 18-19. Liquidia disputes infringement of only elements [**d**] and [**e**] of claim 8.

With respect to element [**d**], Dr. Nuckolls described 6 different examples of storage of the treprostinil salt that demonstrate this claim is infringed by the manufacture and sale of Liquidia's Proposed Product. PFF ¶¶ 50-55, *see also id.* ¶ 44. The first three instances are discussed above with respect to claim 6 (§ IV.B.3, *supra*), before the isolated treprostinil salt has been mixed with other materials. These three instances, and the discussion therein, equally apply to claim 8. Claim 6, however, is limited to storage of "the isolated salt" whereas claim 8 is directed to storage of "the treprostinil salt" whether isolated or not. In addition to the instances of storage identified above, Liquidia also stores at ambient temperature the LIQ861 bulk powder, which contains the treprostinil salt after it is mixed with excipients and no longer isolated. PFF ¶¶ 53-55. This is visually represented in the schematic on page 6, where the pharmaceutical composition is prepared during PRINT Steps 1-4, and then the pharmaceutical product prepared in PRINT Steps 5-6. As shown in that schematic, the fourth instance of storage at ambient temperature (element [**d**]) is between PRINT Steps 1 and 2, when the material is stored in a capped Nalgene bottle (PTX-70 at LIQ00032049 (identifying "Nalgene Receiver Bottle 8L"), -058 (recording step of filling and massing 8L Nalgene receiver bottle)). PFF ¶ 53. The fifth is between PRINT Steps 2 and 3, when the material is "stored in a bag with desiccant" (PTX-71 at LIQ02791559). PFF ¶ 54. The sixth is between PRINT Steps 3 and 4, when the material is "packaged in a bag with desiccant and transferred to a desiccator for storage" (PTX-71 at LIQ02791559). PFF ¶ 55. Individually and

16

collectively, these six instances of storing the treprostinil salt at ambient temperature before preparing the pharmaceutical product in Steps 5-6 of the PRINT process establish infringement of element [**d**]. Element [**e**], "preparing a pharmaceutical product from the treprostinil salt after storage" is satisfied by contractor Xcelience preparing the pharmaceutical product by encapsulating the powder and packaging the Proposed Product in its final dosage form. PFF ¶ 18.

Rather than directly addressing these instances of ambient storage relevant to element [**d**], Liquidia argues that the "preparing a pharmaceutical product from the treprostinil salt after storage" described in element [**e**] necessarily begins back at PRINT Step 1. Not so. Liquidia's own NDA describes the preparation of the "product" as starting at PRINT step 5. *See* PFF ¶ 18. Liquidia's reading of claim 8 is also inconsistent with a POSA's. Claim 8 requires a "pharmaceutical product" as distinct from the "pharmaceutical composition" of claims 1-6. A POSA would understand the "pharmaceutical product" to capture the actual pharmaceutical product to be sold, *i.e.*, encapsulated in final dosage form. *See* PFF ¶ 18. Liquidia's other argument, that once the PRINT process starts, there can be no storage, is also wrong and directly contradicted by the NDA. Dr. Nuckolls testified about the manufacturing flow charts in Liquidia's NDA, which show many hours of storage at ambient temperature in between PRINT Steps 1 and 2, Steps 2 and 3, and Steps 3 and 4. His reading of these documents was confirmed by Liquidia's corporate representative, Mr. Kindig. PFF ¶¶ 53-55. Dr. Nuckolls's and Mr. Kindig's testimony should be credited, and Dr. Winkler's inconsistent view that there can be no storage *during* the PRINT process is not credible and should be rejected. Because treprostinil salt is stored at ambient temperature (at Yonsung, in transit to Liquidia, and by Liquidia through PRINT Step 4), and then used to prepare the Proposed Product in PRINT Steps 5-6 after storage (P),  show it is more likely than not that LIQ861 will infringe claim 8, including elements [**d**] and [**e**]. *See* § IV.B.3, *supra*

(analyzing infringement by first three instances of storage). Claim 9 recites: "A pharmaceutical product prepared by the process of claim 8." JTX-2. As discussed above, Liquidia's Proposed Product (LIQ861) will be a pharmaceutical product prepared by the process of claim 8, further infringing dependent claim 9. *See also* PFF ¶ 18.

## V.   LIQ861 INFRINGES ALL ASSERTED CLAIMS OF THE '793 PATENT

Claim 1 of the '793 patent (JTX-3) recites:

> [**a**] A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension [**b**] a therapeutically effective single event dose [**c**] of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, [**d**] wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof [**e**] delivered in 1 to 3 breaths.

The asserted dependent claims require that [**f**] the inhalation device is a dry powder inhaler (claim 4) and that the formulation [**g**] is a powder (claim 6), [**h**] comprising particles less than 5 micrometers in diameter (claim 7), and [**i**] containing no metacresol (claim 8). The evidence shows—and Liquidia does not dispute—administration of LIQ861 meets elements [**a**] and [**c**]-[**i**]:

- **Element [a]**: LIQ861 is for the treatment of humans with pulmonary hypertension via inhalation. PFF ¶ 57.
- **Element [c]**: LIQ861's formulation includes treprostinil, and patients inhale LIQ861 from an inhalation device. PFF ¶ 58.
- **Element [d]**: LIQ861 is administered in delivered doses of treprostinil between 15-90 micrograms. Liquidia's NDA describes capsule doses providing 26.5, 53, 79.5, and 106 micrograms of treprostinil, which corresponds to delivered doses[14] of 15.1, 36, 56.6, and 75.7 micrograms, and those delivered doses are all between 15-90 micrograms. PFF ¶ 59.
- **Element [e]**: LIQ861 is delivered in 1-3 breaths. The proposed label and instructions for use state that the patient should use two breaths per administration. PFF ¶ 60.
- **Element [f]**: LIQ861's proposed inhalation device is the Plastiape S.p.A. RS00 Model 8 Monodose DPI (dry powder inhaler). PFF ¶ 61.
- **Elements[g]-[h]**: LIQ861's formulation is a powder, and that powder comprises particles

---

[14] The "capsule dose" is the amount of drug in the capsule provided to the patient. The "delivered dose" refers to the dose actually delivered to the patient's mouth. PTX-573 at 20; PTX-134 at 9; PDX8.18; PTX-1213 at 1; PDX8.22; Tr. 840:1-841:3.

of less than 5 µm in diameter. PFF ¶ 62.

- **Element [i]**: LIQ861's formulation lacks metacresol. Its ingredients are only treprostinil, trehalose, polysorbate 80, L-leucine, sodium citrate, and sodium chloride. PFF ¶ 63.

Liquidia disputes only whether its product is delivered in a "single event dose" and whether that dose is "therapeutically effective" (element [**b**]). The Court should reject both arguments.

## A.  LIQ861 Is Administered in a "Single Event Dose"

There can be no legitimate dispute that LIQ861 is administered in a single event dose. The parties' experts agree that the "single event dose" required by claim 1 refers to a single treatment session, even if that session involves multiple breaths. PFF ¶ 64. The experts also agree that LIQ861 is administered 3-5 times per day, which the experts agree is 3-5 single event doses. *Id.* Thus, each of LIQ861's 3-5 administrations meet the single event dose limitation. PFF ¶¶ 64, 66. Dr. Hill opines, however, that Liquidia's LIQ861 will not infringe because the single event dose limitation allegedly limits claim 1 to one single event dose *per day*. Tr. 684:3-8. This position strains credibility, ignores the language of claim 1, and finds no support in the specification.

Claim 1 recites a method of administration "comprising administering … a therapeutically effective single event dose" and does not limit the number of single event doses per day. JTX-3 at 18:23-31. By using the transitional term "comprising," claim 1 plainly allows for the administration of one or more single event doses per day. *Amgen Inc. v. Amneal Pharms. LLC*, 945 F.3d 1368, 1378-79 (Fed. Cir. 2020) (explaining that it is well established that "'comprising' is the standard transition term used to make clear that the claim does not preclude the presence of components or steps that are in addition to, though not inconsistent with, those recited in the limitations that follow."). Claim 1 plainly recites the administration of "a" single event dose, and both the Federal Circuit and this Court "ha[ve] repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open ended claims containing the transitional phrase 'comprising.'" *TC Tech. LLC v. Sprint Corp.*, 2019 WL 6037877 at *3 (D.

Del. Nov. 14, 2019) (citing *KCJ Corp. v. Kinetic Concepts*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)).

There is nothing in the specification that limits the claim to one single event dose per day. *See generally* JTX-3; *Abbott Labs. v. Baxter Pharm. Prods.*, 334 F.3d 1274, 1278-1279 (Fed. Cir. 2003) (requiring "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope" before departing from plain and ordinary meaning); *ESCO Grp. LLC v. Deere & Co.*, No. 20-1679-RGA-JLH, 2022 WL 1025967, at *1 (D. Del. Apr. 6, 2022) (requiring "a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction"). The patent does not claim "single *daily* dose" or "single dose *per day*." Rather, the '793 patent claims a "single event dose" and expressly states that treprostinil can be administered "a single time per day or several times per day." JTX-3 at 8:1-2. Dr. Hill admitted that the POSA in 2006 would understand treprostinil to have a three- to four-hour half-life, necessitating three or four doses per day. PFF ¶ 65. The fact that Liquidia's LIQ861 is to be administered three to five times per day demonstrates multiple single event doses that infringe claim 1. PFF ¶ 64-66.

## B.     LIQ861 Is "Therapeutically Effective"

It is also clear that a single event dose of LIQ861 meets the "therapeutically effective" limitation of claim 1. First, Liquidia could not obtain FDA approval if LIQ861 was not shown to be therapeutically effective. PFF ¶ 67. Indeed, Liquidia's counsel admitted during closing arguments that LIQ861 is therapeutically effective. Tr. 934:23-935:3 (responding to the Court's question, "Yes. … [Y]ou could not sell the drug if it wasn't therapeutically effective.").

Second, it is undisputed that treprostinil is a vasodilator that acts to reduce pulmonary vasoconstriction, causing vasodilation and reduction of pulmonary arterial pressure and pulmonary vascular resistance. PFF ¶ 68. Both sides' experts agree that treprostinil will improve patients' hemodynamics (*id.*), which the '793 patent makes clear constitutes therapeutic effectiveness. PFF ¶ 69. The specification describes examples showing treprostinil's hemodynamic effects and

describes those effects as therapeutically effective after one single event dose. *Id.* In fact, even Dr. Hill admits that administration of LIQ861 will provide a "transient improvement in hemodynamics," which is a "therapeutic effect." Tr. 694:20-695:2 (after an LIQ861 single event dose, "you would expect no therapeutic effect *beyond those first few hours*") (emphasis added).

There is no basis in the patent for "therapeutically effective" to exclude effects on hemodynamics. Tr. 685:13-18. Indeed, the '793 patent contradicts Liquidia's stance. PFF ¶ 69. Dr. Hill's contrary interpretation of "therapeutically effective" to exclude improved hemodynamics would improperly exclude the examples described in the patent. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *EPOS Techs. Ltd v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014); *Align Tech., Inc. v. 3Shape*, 2021 WL 2320139, at *3 (D. Del. June 7, 2021).

Third, even if the Court were to require therapeutic effectiveness to be based on patients' symptoms, survival, or ability to perform tasks (*i.e.*, function), use of LIQ861 still infringes the '793 patent. Liquidia's §505(b)(2) NDA and proposed label rely on efficacy data of UTC's Tyvaso® product and cite the Tyvaso® TRIUMPH I clinical trial, which tested inhaled treprostinil and found, *inter alia*, improvements in 6-minute walk distance ("6MWD"). PFF ¶ 70. Liquidia's own INSPIRE (LTI-301) study also shows therapeutic effectiveness, and Liquidia has touted the therapeutic effectiveness of treprostinil. PFF ¶ 71.

### C.   Liquidia Will Induce Infringement of All Asserted Claims

"[T]o prevail on an inducement claim, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *ACCO Brands, Inc. v. ABA Locks Mfrs.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007). The defendant must also know of the patent and that "his actions would induce actual infringement." *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990); *Global-Tech Appliances v. SEB S.A.*, 563 U.S. 754, 765 (2011).

The evidence presented at trial establishes all requirements. Liquidia only disputes whether it induces infringement of the "therapeutically effective" and "single event dose" limitations, for the same reasons argued on direct infringement. Tr. 699:1-11. Those arguments fail as described above and it is otherwise undisputed that Liquidia will induce infringement. First, administration of LIQ861 infringes the '793 patent. *See* §§V.A-V.B, *supra*. Second, Liquidia has knowledge of the '793 patent from this litigation and Tyvaso®'s listing in FDA's Orange Book. PFF ¶ 72. Third, Liquidia's instructions induce patients to undertake infringing acts. Liquidia's proposed label and instructions for use instruct patients to administer the claimed doses in the claimed number of breaths. *See* PTX-469; PFF ¶¶ 73, 74; *see also* §§V.A-V.B, *supra*. Fourth, in Hatch-Waxman cases, "[t]he pertinent question is whether the proposed label instructs users to perform the patented method." *AstraZeneca*, 633 F.3d at 1060. The package must "inevitably lead some consumers to practice the claimed method." *See id.* at 1060. Liquidia's instructions meet this standard. *See* §§V.A-V.B, *supra*; *see also* PTX-469 at 16. Liquidia will induce patients to infringe.

## VI.   <u>CONCLUSION</u>

For the reasons above, Liquidia infringes the asserted claims of the '066 and '793 patents. Plaintiff respectfully requests the Court enter judgment granting UTC its requested relief pursuant to 35 U.S.C. § 271(e)(4)(A)-(B), and any additional relief the Court deems just and proper.

OF COUNSEL:

William C. Jackson
Eric Levi
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036
(202) 346-4216

Douglas H. Carsten
Mandy H. Kim
Arthur Dykhuis
Jiaxiao Zhang
Katherine Pappas
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92612
(949) 851-0633

Huiya Wu
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Ian B. Brooks
Adam W. Burrowbridge
Joshua Revilla
Timothy M. Dunker
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000

Harrison Gunn
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000


May 4, 2022

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
Sarah E. Simonetti (#6698)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com
ssimonetti@morrisnichols.com

*Attorneys for Plaintiff*
*United Therapeutics Corporation*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 4, 2022, I caused the foregoing to be electronically filed with

the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered

participants.

I further certify that I caused copies of the foregoing document to be served on May 4,

2022, upon the following in the manner indicated:

Karen E. Keller, Esquire                                        *VIA ELECTRONIC MAIL*
Nathan R. Hoeschen, Esquire
Emily S. DiBenedetto, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Sanya Sukduang, Esquire                                   *VIA ELECTRONIC MAIL*
Jonathan Davies, Esquire
Douglas W. Cheek, Esquire
Adam Pivovar, Esquire
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC  20004-2400
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Erik Milch, Esquire                                             *VIA ELECTRONIC MAIL*
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA  20190-5640
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Ivor Elrifi, Esquire                                             *VIA ELECTRONIC MAIL*
COOLEY LLP
55 Hudson Yards
New York, NY  10001-2157
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Lauren Krickl, Esquire                                        *VIA ELECTRONIC MAIL*
Deepa Kannappan, Esquire
Brittany Cazakoff, Esquire
Kyung Taeck Minn, Esquire
COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

/s/ *Michael J. Flynn*
_____
Michael J. Flynn (#5333)