IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 20-755-RGA-JLH |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL ANSWERING BRIEF REGARDING
NONINFRINGEMENT OF U.S. PATENT NOS. 9,593,066 AND 10,716,793**

Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia
Technologies, Inc*

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Douglas W. Cheek
Adam Pivovar
Brittany Cazakoff
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Deepa Kannappan
Lauren Krickl
Kyung Taeck Minn
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: June 1, 2022

<u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  LIQUIDIA DOES NOT INFRINGE THE '066 PATENT ................................................. 1

    A.  UTC Cannot Establish Liquidia Infringes the Claimed Impurities
        Limitations ................................................................................................. 1

        1.  UTC Fails to Compare the Impurities in Liquidia's
            "Pharmaceutical Composition" to the "Starting Batch of
            Treprostinil" ....................................................................................... 1

        2.  Claimed "Impurities" Must Result From "Prior Alkylation and
            Hydrolysis . . . of Benzindene Triol" ............................................... 3

        3.  UTC's Comparison of "Total Impurities" and 15-*epi*-Treprostinil
            Fails to Demonstrate the Claimed Reduction of Impurities ................... 4

    B.  UTC Fails to Establish Infringement of Claims 6, 8, or 9 .................................... 5

        1.  TN for LIQ861 is *Never* Stored at Ambient Temperature ........................ 6

        2.  Yonsung Stores Isolated TN at Refrigerated Temperatures at *All*
            Times .................................................................................................. 6

        3.  TN is Shipped at Refrigerated Temperatures ............................................. 8

        4.  Isolated TN Is Not Stored at Ambient Temperature in PRINT Step
            1 ........................................................................................................ 9

        5.  Liquidia's "Pharmaceutical Product" is Not Prepared After Storing
            LIQ861 Bulk Inhalation Powder at Ambient Temperature ................... 10

        6.  "Preparing a Pharmaceutical Product" Begins at PRINT Step 1 ............. 10

        7.  UTC Has Not Established the "Stability" Limitation of Claims 8-9 ....... 12

II.  LIQUIDIA DOES NOT INFRINGE THE '793 PATENT ............................................. 12

    A.  The '793 Claims Require "a Therapeutically Effective Single Event Dose" ...... 12

    B.  Liquidia Does Not Induce Infringement of the Asserted Claims ........................ 14

        1.  There Will Not Be Any Act of Direct Infringement ................................. 15

        2.  Liquidia Lacks Specific Intent to Induce Infringement ........................... 16

III.  CONCLUSION ........................................................................................................... 17

i

<u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Abbott Lab'ys v. TorPharm*,
  300 F.3d 1367 (Fed. Cir. 2002)............................................................................. 6

*Amgen v. F. Hoffman-La Roche*,
  580 F.3d 1340 (Fed. Cir. 2009)............................................................................ 1, 2

*Amgen v. Hospira*,
  No. 15-839-RGA, 2016 WL 7013483 (D. Del. Nov. 30, 2016) ............................... 13

*Amgen v. Vidal*,
  No. 2019-2171, 2022 WL 1112817 (Fed. Cir. Apr. 14, 2022) ................................ 14

*Baldwin Graphic Sys. v. Siebert*,
  512 F.3d 1338 (Fed. Cir. 2008)............................................................................. 13

*Bayer AG v. Elan Pharm. Rsch.*,
  212 F.3d 1241 (Fed. Cir. 2000)............................................................................. 1

*Bd. of Regents of Univ. Tex. Sys. v. BENQ Am.*,
  533 F.3d 1362 (Fed. Cir. 2008)............................................................................. 14

*Bicon v. Straumann*,
  441 F.3d 945 (Fed. Cir. 2006)............................................................................ 4, 13

*Brigham & Women's Hosp. v. Perrigo*,
  761 F. App'x 995 (Fed. Cir. 2019) ...................................................................... 1, 2, 5

*Commil USA, LLC v. Cisco Sys, Inc.*,
  575 U.S. 632 (2015)................................................................................................ 17

*DeMarini Sports v. Worth*,
  239 F.3d 1314 (Fed. Cir. 2001)............................................................................ 2, 3

*E-Pass Techs. v. 3Com*,
  473 F.3d 1213 (Fed. Cir. 2007)............................................................................. 10

*Ferring B.V. v. Watson Lab'ys, Inc.-Fla.*,
  764 F.3d 1401 (Fed. Cir. 2014)............................................................................. 1

*Fujitsu v. Netgear*,
  620 F.3d 1321 (Fed. Cir. 2010)............................................................................. 7

*Glaxo v. Novopharm*,
   110 F.3d 1562 (Fed. Cir. 1997)................................................................. 1, 7

*HZNP Meds. v. Actavis Labs. UT*,
   940 F.3d 680 (Fed. Cir. 2019)................................................................. 15

*In re Power Integrations*,
   884 F.3d 1370 (Fed. Cir. 2018)................................................................. 13

*Johnson & Johnston Assocs. v. R.E. Serv.*,
   285 F.3d 1046 (Fed. Cir. 2002)................................................................. 16

*Johnston v. IVAC*,
   885 F.2d 1574 (Fed. Cir. 1989)................................................................. 2

*Joy Techs. v. Flakt*,
   6 F.3d 770 (Fed. Cir. 1993)................................................................. 15

*Kyocera Wireless v. Int'l Trade Comm'n*,
   545 F.3d 1340 (Fed. Cir. 2008)................................................................. 14

*Lucent Techs. v. Gateway*,
   543 F.3d 710 (Fed. Cir. 2008)................................................................. 10

*McKesson Info. Sols. v. Trizetto Grp.*,
   426 F. Supp. 2d 197 (D. Del. 2006)................................................................. 2

*Orexo AB v. Actavis Elizabeth*,
   424 F. Supp. 3d 371 (D. Del. 2019)................................................................. 16

*Par Pharm. v. Hospira*,
   835 F. App'x 578 (Fed. Cir. 2020)................................................................. 1

*Pfizer v. Teva Pharms. U.S.A.*,
   882 F. Supp. 2d 643 (D. Del. 2012)................................................................. 5

*Sanofi v. Lupin Atl. Holdings S.A.*,
   282 F. Supp. 3d 818 (D. Del. 2017)................................................................. 17

*Takeda Pharm. v. Teva Pharms. USA*,
   668 F. Supp. 2d 614 (D. Del. 2009)................................................................. 1

*Takeda Pharms. U.S.A. v. West-Ward Pharm.*,
   785 F.3d 625 (Fed. Cir. 2015)................................................................. 15

*Warner-Lambert v. Apotex*,
   316 F.3d 1348 (Fed. Cir. 2003)................................................................. 8

<u>TABLE OF ABBREVIATIONS</u>

**Asserted Patents & Parties**

| | |
|---|---|
| '066 patent | U.S. Patent No. 9,593,066 |
| '793 patent | U.S. Patent No. 10,716,793 |
| Asserted claims of the '066 patent | Claims 1, 2, 3, 6, 8, 9 |
| Asserted claims of the '793 patent | Claims 1, 4, 6, 7, 8 |
| UTC/Plaintiff | United Therapeutics Corporation |
| Liquidia/Defendant | Liquidia Technologies, Inc. |
| POBr | Plaintiff's Opening Post-Trial Brief (D.I. 408) |
| PFF | Plaintiff's Infringement Findings of Fact (D.I. 409) |
| DFF | Defendant's Invalidity Findings of Fact (D.I. 407) |
| FF | Defendant's Non-Infringement Findings of Fact |

**Commonly Used Terms & Abbreviations**

| | |
|---|---|
| 6MWD | Six minute walk distance |
| BTO | Benzindene triol |
| CMC | Chemistry, Manufacturing, and Controls |
| DMF | Drug master file |
| DPI | Dry powder inhaler |
| FDA | Food and Drug Administration |
| LHD | Left heart disease |
| LIQ861 | Liquidia's LIQ861 Product / Yutrepia™ |
| MannKind | MannKind Corporation |
| μg (mcg) | microgram |
| NDA | New Drug Application |
| PAH | Pulmonary arterial hypertension (Group 1 PH) |
| PAWP | Pulmonary artery wedge pressure |
| PH | Pulmonary hypertension |
| POSA | Person of ordinary skill in the art |
| PTAB | Patent Trial and Appeal Board |
| RMS | Raw Material Specification |
| TN | Treprostinil sodium |
| TRE | Treprostinil |
| TRS | Total related substances |
| WHO | World Health Organization |
| Yonsung | Yonsung Fine Chemicals |
| LGM | LGM Pharma |

# I.      LIQUIDIA DOES NOT INFRINGE THE '066 PATENT

"The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence." *Takeda Pharm. v. Teva Pharms. USA*, 668 F. Supp. 2d 614, 619 (D. Del. 2009).[1]  Additionally, "speculative data . . . cannot sustain [patentee's] burden of proof." *Brigham & Women's Hosp. v. Perrigo*, 761 F. App'x 995, 1003-04 (Fed. Cir. 2019).   "In determining infringement of a product-by-process claim . . . , the focus is on the process of making the product as much as it is on the product itself." *Amgen v. F. Hoffman-La Roche*, 580 F.3d 1340, 1370 (Fed. Cir. 2009) (en banc). "[A] product-by-process claim is not infringed by a product made by a process other than the one recited in the claim." *Id.*

In Hatch-Waxman cases, "[t]he relevant inquiry is whether the patentee has proven by a preponderance of the evidence that the alleged infringer will likely market an infringing product." *See Glaxo v. Novopharm*, 110 F.3d 1562, 1570 (Fed. Cir. 1997). Where the NDA "defines a proposed [505(b)(2)] product in a manner that either meets the limitations of an asserted patent claim or is outside the scope of such a claim[,]" the NDA "specification directly resolves the infringement question[.]" *Ferring B.V. v. Watson Lab'ys, Inc.-Fla.*, 764 F.3d 1401, 1408-09 (Fed. Cir. 2014); *see also Bayer AG v. Elan Pharm. Rsch.*, 212 F.3d 1241, 1248-50 (Fed. Cir. 2000); *Par Pharm. v. Hospira*, 835 F. App'x 578, 586 (Fed. Cir. 2020).

## A.      UTC Cannot Establish Liquidia Infringes the Claimed Impurities Limitations

### 1.      UTC Fails to Compare the Impurities in Liquidia's "Pharmaceutical Composition" to the "Starting Batch of Treprostinil"

Claims 1-3 and 6 are product-by-process claims that require "a level of one or more

---

[1] UTC attempted to shift its burden in its § 295 motion, which was denied. D.I. 311, 374, 375. UTC's expert Dr. Toste declared that "UTC has not been able to determine the actual process by which Yonsung makes the treprostinil sodium API with respect to the tracking of such particular impurities and their origins[.]"  D.I. 314, ¶13. Yet, at trial, Dr. Toste testified that he was now "highly confident" that Liquidia's infringement of the '066 patent is "absolute." Tr. 216:19-217:2.

impurities found in the starting batch of treprostinil *is lower* in the pharmaceutical composition[.]" JTX2, claim 1 (emphasis added); Tr. 957:16-23. UTC's expert Dr. Nuckolls agreed that this limitation requires an "actual reduction in impurities." Tr. 109:22-110:1 (Nuckolls); FF116. UTC identified Liquidia's LIQ861 "bulk powder" as the "pharmaceutical composition" of claim 1, and Yonsung's TN02 as the "starting batch of treprostinil." POBr, 6-7; Tr. 955:8-10.

UTC cannot prove infringement of claims 1-3 and 6 because neither UTC, nor its experts, compared **any** impurities in TN02 to the impurities in LIQ861 bulk powder, let alone determined whether there was an "actual reduction" of those impurities. FF118-20. Dr. Nuckolls testified he never made such a comparison. Tr. 122:24-123:1 (Nuckolls). Dr. Toste never addressed the bulk powder. Instead, Drs. Nuckolls and Toste focused entirely on impurity differences between TN02 and TN, which is not the "pharmaceutical composition." FF120; POBr, 7-9. Without making the required claimed comparison, UTC cannot meet its burden of establishing infringement of claims 1-3 and 6. *Amgen*, 580 F.3d at 1370; *DeMarini Sports v. Worth*, 239 F.3d 1314, 1331 (Fed. Cir. 2001); c*f. McKesson Info. Sols. v. Trizetto Grp.*, 426 F. Supp. 2d 197, 201–02 (D. Del. 2006); *see also Johnston v. IVAC*, 885 F.2d 1574, 1578 (Fed. Cir. 1989).

UTC attempts to overcome this fatal error by arguing that the impurity levels "are not affected by Liquidia's subsequent mixing of TN with excipients and PRINT processing." POBr, 7 (citing PFF24-25). This argument relies wholly on Dr. Nuckolls' speculation that he "wouldn't expect" the PRINT process to have an impact—not actual evidence. PFF25 (citing Tr. 157:7-17); *Brigham,* 761 F. App'x at 1003-04. UTC's position is belied by Dr. Nuckolls' testimony that when Liquidia "make[s] the pharmaceutical composition," "they mixed it with a number of excipients and other ingredients. So—and without samples, it would be very hard to even do that analysis." Tr. 133:22-134:3. UTC was provided samples of LIQ861 bulk powder but chose not to have its

experts conduct the analysis required to show infringement of the claims. D.I. 345, Exs. 8, 10; FF119. UTC's attempt to use the isolated TN as a proxy for the "pharmaceutical composition" (LIQ861 bulk powder) does not meet the claim limitation. *DeMarini,* 239 F.3d at 1331.

### 2. Claimed "Impurities" Must Result From "Prior Alkylation and Hydrolysis . . . of Benzindene Triol"

To the extent the Court considers a comparison of TN02 to TN (which is not the "pharmaceutical composition"), relevant to infringement, that comparison also fails. A POSA reading claim 1 would understand that the claimed impurities must result from alkylation and hydrolysis of "BTO"—not alkylation and hydrolysis of *any* compound or impurity in the reaction vessel. FF122, FF125; JTX2, claim 1 ("one or more impurities resulting from prior alkylation and hydrolysis steps . . . *wherein said alkylation is alkylation of benzindene triol*") (emphasis added). UTC attempts to read out "wherein said alkylation is alkylation of benzindene triol" by asserting that "[r]eal-world chemistry" dictates that any "impurities generated during the alkylation and hydrolysis steps (e.g., from side reactions) would be within the claim." POBr, 7. However, a POSA considering "real-world" chemistry in light of the express claim language and specification understands the claims' focus on impurities derived specifically from BTO. Dr. Nuckolls confirmed that within a "batch" of BTO, both BTO and other impurities would undergo alkylation. Tr. 113:24-115:7 (Nuckolls). Dr. Winkler agreed, testifying that the claim requires alkylation of BTO, not just a single molecule as UTC misleadingly contends, and the impurities of interest are those generated by BTO, not the other compounds within the batch. FF125; Tr. 422:6-423:20 (Winkler). Drs. Nuckolls and Toste, however, focus on the other compounds within the batch of BTO, not BTO itself. Adopting UTC's interpretation of "impurities" would impermissibly read out and render meaningless the limitation "wherein said alkylation is alkylation of benzindene triol" in identifying the impurities to which the claims relate. *See Bicon v. Straumann*, 441 F.3d

945, 950-51 (Fed. Cir. 2006). Finally, UTC's contention that "no impurities would ever be generated" from alkylation of BTO (POBr, 7) is incorrect because, as Dr. Winkler explained, impurities from BTO would be a "relatively small subset of th[e] universe of possible total impurities," none of which UTC attempted to identify. FF122.

### 3. UTC's Comparison of "Total Impurities" and 15-*epi*-Treprostinil Fails to Demonstrate the Claimed Reduction of Impurities

First, UTC's comparison of the (i) number and (ii) amount of "total impurities" in TN and TN02 (POBr, 8-9) fails to demonstrate a reduction in "one or more impurities resulting from prior alkylation and hydrolysis steps . . . *wherein said alkylation is alkylation of benzindene triol*." JTX2, claim 1 (emphasis added). This is because "total impurities" includes, among other things, residual solvents and any impurity contained in the reagents or starting materials, not just impurities resulting from the claimed process steps. FF122. Thus, total impurities could be reduced, while specific impurities, like 15-*epi*, increased. *Id.* UTC's method of simply counting the number of peaks in HPLC chromatograms suffers from the same flaw: none of the peaks have been identified by chemical structure or origin other than 15-*epi*-BTO, 15-*epi*-treprostinil, and 15-*epi*-TN (FF123), which as explained below do not "result from . . . alkylation of benzindene triol." Lastly, UTC fails to (1) reconcile that the percent of 15-*epi*-treprostinil *increased* between TN02 and TN in the validation batches or (2) account for impurities removed by Yonsung's column chromatography step (making TN02 pure enough that very little, if any, is reduced), further establishing the insufficiency of UTC's "total impurities" analyses. FF121-24.

Second, UTC's reliance on 15-*epi*-treprostinil similarly fails to establish infringement. POBr, 9. All experts agree that 15-*epi*-treprostinil results from alkylation and hydrolysis of 15-*epi*-BTO—a different compound than BTO. FF125; Tr. 193:2-11 (Toste). As such, 15-*epi*-treprostinil is not an "impurit[y] resulting from . . . *alkylation of benzindene triol*." JTX2, claim 1

(emphasis added); FF125. And even if 15-*epi*-treprostinil were an impurity meeting the claim limitation, UTC fails to reconcile why the amount of 15-*epi*-treprostinil *increased* between TN02 and TN for the three "validation" batches relied upon by Dr. Nuckolls (TN117I010, TN117J010, and TN117K010). FF126. For many other batch records, the levels of 15-*epi*-treprostinil were higher in TN than TN02 or were undetected in each.[2] FF126, 127. This evidence cannot establish infringement of a claim which requires ***a reduction*** in impurities.

Lastly, UTC has not demonstrated an "actual reduction" in the claimed impurities as required by claim 1, because they failed to account for the limit of detection, limit of quantitation, and standard experimental error present in HPLC measurements. FF127. A POSA would expect variations (not actual differences) in HPLC measurements with the miniscule concentrations of impurities in TN02 and TN, as demonstrated by the fact that Yonsung and Liquidia obtained different HPLC values for the 15-epi impurity despite testing the same batch. FF127; DDX12.1. Thus, UTC's "speculative data" fails to establish an actual reduction of 15-*epi*-treprostinil in TN versus TN02. FF127; *see Brigham*, 761 F. App'x at 1003-04; *Pfizer v. Teva Pharms. U.S.A.*, 882 F. Supp. 2d 643, 715 (D. Del. 2012) (finding no literal infringement, noting "HPLC data detections at the [limit of detection] are less reliable"), *aff'd,* 555 F. App'x 961 (Fed. Cir. 2014).

### B.   UTC Fails to Establish Infringement of Claims 6, 8, or 9

UTC fails to establish infringement of claims 6, 8, and 9 because neither Liquidia, LGM, nor Yonsung store TN at ambient temperature before preparation of LIQ861 bulk powder or LIQ861 capsules. Claim 6 requires the "isolated salt" is stored at "ambient temperature" before "preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt[.]" JTX2, claim 6; FF145. Claim 8 and claim 9,

---

[2] To the extent UTC contends that 15-*epi*-treprostinil results from "epimerization" of TN02, the evidence is clear that epimerization does not occur in Yonsung's process. FF125 n.1, FF126.

require a "salt of treprostinil stable at ambient temperature," and "storing the treprostinil salt at ambient temperature" and "preparing a ***pharmaceutical product*** from the treprostinil salt ***after*** storage[.]" JTX2, claim 8 (emphasis added), claim 9. This Court construed "ambient temperature" as "room temperature (equal to or less than the range of 15°C to 30°C)." FF128; D.I. 119.

### 1.    TN for LIQ861 is *Never* Stored at Ambient Temperature

Liquidia's NDA, including the Quality Overall Summary for Drug Substance, incorporates Yonsung's DMF, which specifies the storage conditions for TN: "STORAGE: Should be kept in a tight container, protected from moisture and light and stored at 2°C to 8°C." FF130-31, DTX106, 517; PTX105, -707. Yonsung's label, certificates of analysis, batch production records and List of Finished and Intermediate Products dating back to 2017, require TN be stored at "refrigerate[d]" temperatures after production is complete, and during shipment to Liquidia which is, and will be, monitored with temperature loggers. FF132-34; DTX413, 1, 12. LGM follows the storage conditions set by Yonsung. FF133. And Liquidia's RMS requires: "Storage Conditions: 2°-8°C, protected from light and moisture," which is followed by the company and confirmed by the FDA during its site inspection. FF134; DTX9, 1; DTX236; DTX237; Tr. 310:20-312:1 (Kindig); DTX407, 3. The FDA expects Liquidia to adhere to the required storage conditions. FF134-36; Tr. 396:7-10 (Fuson). Because Liquidia is "bound by strict statutory provisions to sell only those products that comport with the [NDA's] description of the drug," Liquidia's NDA "control[s] the infringement inquiry." *Abbott Lab'ys v. TorPharm*, 300 F.3d 1367, 1373 (Fed. Cir. 2002). The Court need look no further to conclude Liquidia does not infringe claims 6, 8 and 9.[3]

### 2.    Yonsung Stores Isolated TN at Refrigerated Temperatures at *All* Times

---

[3] Even UTC ships TN at non-ambient temperatures, and POSAs stored UTC's TN in refrigerated conditions. FF136; Tr. 879:15-880:18 (Smyth). If TN could be shipped and stored at ambient temperature, then surely UTC needn't have expended the extra money/resources for cold shipping.

Yonsung does not store isolated TN at ambient temperature "between when the isolated treprostinil sodium (TN) is manufactured by Yonsung (*i.e.*, DMF Step 12) and when it is received at Yonsung's warehouse." POBr, 10; PFF50. UTC relies solely on the *absence* of a temperature notation in a single, 2017, batch record for TN117I010. *Id.* Dr. Nuckolls confirmed, however, that Yonsung's List of Finished/Intermediate Products from 2017 requires storage of TN at refrigerated temperatures. FF132; DTX43, 1, 6. Additionally, TN batch records from 2019 unequivocally state TN is "refrigerate[d]" after production is complete. FF132; DTX413, 1, 12; *see Glaxo*, 110 F.3d at 1570. Pre-litigation TN Certificates of Analysis from as early as 2015 specify: "Storage condition: Should be kept in a tight container, protected from moisture and light and stored at 2°C to 8°C (Long-term storage)." DTX154, 1. The overwhelming evidence shows Yonsung stores isolated TN at refrigerated temperatures and thus does not infringe claim 6.

UTC also contends that stability testing by Yonsung at 25°C proves infringement because TN "***can be*** stored," "***can*** meet," or "***permit[s]*** storage" at ambient temperature before making LIQ861. POBr, 11-13; *see also id.*, 12 n.9, 13 n.10, 14 n.12 (emphases added). Even if UTC were correct in asserting TN is *capable* of storage at ambient temperature, "it is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement." *Fujitsu v. Netgear*, 620 F.3d 1321, 1329 (Fed. Cir. 2010). Dr. Nuckolls confirmed the claims require "actual" storage, not simply being "capable" of storage. Tr. 136:23-137:5 (Nuckolls). Thus, this stability testing does not meet the "actual" storage limitations of claims 6, 8, and 9. Further, the FDA will not permit use of TN stored at ambient temperature (POBr, 13). The FDA inspected Liquidia's facilities and confirmed storage of TN at 2-8°C (FF134; DTX407, 3), and Mrs. Matto and Fuson agreed that stability data is insufficient to permit use of TN that falls above the 2-8°C specification—a full investigation by Liquidia is still

necessary. FF131, 141.

### 3.     TN is Shipped at Refrigerated Temperatures

Yonsung shipped TN at non-ambient temperatures before this litigation and will continue to do so, using temperature data loggers, so Liquidia can ensure TN is maintained below 8°C at all times during shipment. FF130-44. UTC lacks evidence of any batch of TN that experienced ambient temperatures during shipment being used by Liquidia to make a pharmaceutical composition/product. *Id*. UTC identifies three batches of TN (TN120C010, TN120G010, and TN120I010) that experienced temperatures above 15°C during shipment. POBr, 14; PFF42, 44, 46, 49, 51. None of these batches, however, were used to prepare a pharmaceutical composition/product as required by claims 6, 8, and 9, but instead were immediately placed into quarantine and subsequently rejected and used for non-human R&D purposes. FF137-42; Tr. 312:2-313:25 (Kindig); Tr. 68:12-70:2 (Battistoni); Tr. 446:1-23 (Winkler). Liquidia's rejection of these out-of-specification batches establishes Liquidia has not, and will not infringe claims 6, 8 and 9. *Warner-Lambert v. Apotex*, 316 F.3d 1348, 1365-66 (Fed. Cir. 2003). That Liquidia did not return for a refund these out-of-specification batches to Yonsung is of no moment, because Liquidia had a non-human R&D use for these materials. POBr, 14.[4]

The other batches identified by UTC were never exposed to ambient temperatures. PFF40-43, 50-52. UTC claims that one shipment containing three batches of TN experienced a temperature excursion above 15°C. POBr, 10; PFF50-52 (citing TN116J010, TN117K010, and TN117I010). UTC ignores that the temperature increase on the data logger corresponds with Liquidia's receipt of that shipment and reflects when the box was opened and the data logger

---

[4] This is not a pledge to avoid future infringement as UTC asserts. POBr, 14. As discussed in § I.B.1-I.B.2 above, the as-filed DMF and NDA establish storage at non-ambient temperatures well-before any litigation ensued. That requirement was and will continue to be met.

8

removed from the box. FF143; PTX116, -951 (received Dec. 11, 2017), -962-963 (showing increase on Dec. 11, 2017); PTX117, -850, -862-863 (same); Tr. 310:1-19, 321:18-323:7 (Kindig) (explaining that data logger set aside while material is removed from box and moved to refrigerators). The remaining batches either (i) lacked temperature logger data and included Yonsung's certificate of analysis requiring storage at 2-8°C (TN115I010, TN115E010, TN118H010) or (ii) included temperature logger data showing maximum temperatures of 6.1°C (TN118F010). FF144; PTX123, -566; PTX124, -604; PTX126, -774; PTX127, -889; PTX823, -844. There is no evidence *any* TN used to make a pharmaceutical composition/product that experienced ambient temperatures during shipment.

### 4.      Isolated TN Is Not Stored at Ambient Temperature in PRINT Step 1

UTC incorrectly asserts that at the start of PRINT Step 1, Liquidia's NDA "instructs that TN is stored at ambient temperature in the dry box before it is combined with excipients." POBr, 10-11 (citing PFF9, 52); FF145-49. TN is placed in a dry box (at low humidity because it is not stable) so it can be *used* in Step 1—weighing enough sample to make the stock aqueous solution. FF145-50. Pointing to Step 2-2, Dr. Nuckolls incorrectly stated that TN is put into the dry box and then was kept in the dry box for 3 hours until Step 2-17, constituting "storage." FF147-48. Dr. Nuckolls is wrong. TN was not placed in the dry box at Step 2-2, but instead at Step 2-3, where no "time" stamp is identified. FF147-48. Dr. Nuckolls' reliance on Step 2-17 is arbitrary and likely identified simply because of a time stamp. PTX070, -057. Thus, the evidence only establishes that TN was placed in the dry box so it can be used in Step 1, not stored. Steps 2-1 through 2-17 do not recite storing TN in the dry box during this entire period, Dr. Nuckolls only assumed so. FF146-48; DTX9, 1; Tr. 311:24-312:1, 314:1-25 (Kindig); Tr. 68:12-69:2 (Battistoni). But to accept Dr. Nuckolls' assumption requires ignoring Liquidia's RMS, which requires storage of TN at 2-8°C. DTX9, 1; FF134. Dr. Nuckolls also assumed, without evidence, that the dry box was at ambient

temperature. PFF52; FF148. "[A]mbient temperature" is only mentioned in Step 2-17 *after* the stock solution is made (FF148), and UTC's alleged circumstantial evidence provides "uncertainty and speculation" at best to prove that isolated TN is "stored" in a dry box at ambient temperature. *Lucent Techs. v. Gateway*, 543 F.3d 710, 723 (Fed. Cir. 2008); *E-Pass Techs. v. 3Com*, 473 F.3d 1213, 1222-23 (Fed. Cir. 2007).

### 5. Liquidia's "Pharmaceutical Product" is Not Prepared After Storing LIQ861 Bulk Inhalation Powder at Ambient Temperature

UTC asserts that the "pharmaceutical composition" of claims 1 and 6, which UTC states is LIQ861 bulk powder prepared by PRINT Steps 1-4, is "distinct from" the "pharmaceutical product" of claim 8-9, which UTC asserts is the encapsulated and packed finished product prepared by PRINT Steps 5-6. POBr, 16-17; Tr. 136:12-22, 147:6-13 (Nuckolls). UTC, however, relies entirely on PRINT Steps 1-3 to argue infringement of claim 8. POBr, 16 (citing PFF53-55). According to Step 5, preparing the "pharmaceutical product" starts with Bulk LIQ861 Inhalation Powder, not TN. DTX204, 7, 12. UTC's brief ignores that Bulk LIQ861 Inhalation Powder is packaged, sealed, and maintained *at 2-8°C* before use in Step 5, consistent with Yonsung, Liquidia, and LGM's other storage specifications, discussed above. FF145, 150; DTX204, 6, 12 ("Bulk LIQ861 inhalation powder is stored in the pouch for NMT 6 months at 2°C to 8°C[.]"); Tr. 149:9-150:16 (Nuckolls). Because UTC asserts that preparation of the "pharmaceutical product" starts with Bulk LIQ861 Inhalation Powder and processing it through PRINT steps 5-6, PRINT Steps 1-3 (which come before powder formation) are not relevant to infringement of claims 8-9. POBr, 17. Accordingly, the evidence establishes Liquidia does not infringe these claims.

### 6. "Preparing a Pharmaceutical Product" Begins at PRINT Step 1

As discussed above, UTC's contention that "preparing a pharmaceutical product" begins at PRINT Step 5 establishes non-infringement and UTC cannot now withdraw that position.

However, preparing the final LIQ861 product begins with PRINT Step 1 and continues for a total of 6 steps. FF145; DTX204, 2-8. Dr. Nuckolls agrees that as soon as TN is added to the stock bottle with other excipients in Step 1, Liquidia is "in the process . . . of making the pharmaceutical product" of claim 8. FF145; Tr. 147:3-18 (Nuckolls). Thus, "use" of TN starts with PRINT Step 1, and the PRINT process cannot be considered "storage" of TN under the plain and ordinary meaning of that term. FF128, 146. Whether the Court considers "preparing a pharmaceutical product from the treprostinil salt after storage [at ambient temperature]" in accordance with claim 8 begins at PRINT Step 1 or PRINT Step 5, the evidence establishes that Liquidia does not infringe the "storage" limitation of this claim.

Further, once TN is dissolved in water in Step 1, it is dissociated treprostinil and sodium ions in solution and not "TN," mixed with other materials (i.e., excipients) to prepare the pharmaceutical product (i.e., LIQ861). FF149; Tr. 450:1-15 (Winkler); Tr. 741:7-13 (Gonda). Despite having samples of bulk powder to test, UTC has no evidence that "TN" is present at any step of manufacturing following the complete dissolution of TN at Step 1, as required by claim 8. Thus, UTC's assertions that aqueous solutions and particles "comprising treprostinil sodium" during PRINT Steps 1-4 are incorrect and unsupported. PFF53-55.

Finally, UTC and Dr. Nuckolls rely on the *absence* of temperature notation during "hold times" between PRINT Steps 1 to 3 as evidence of storage at ambient temperature. POBr, 16-17 (citing PFF53-55). As discussed above, UTC admits that Steps 1 to 3 are not directed to making the "pharmaceutical product" of claims 8-9 and thus are irrelevant to infringement of those claims. POBr, 17. Moreover, the material generated in Steps 1 to 3 is changed throughout the process; in particular, it is not until Step 4 that the material is finished drying. DTX204, 12. FF150. Contrary to Dr. Nuckoll's opinion, drying cannot be considered "storage."  FF129; FF150. As such, even

PRINT Steps 1 to 3 do not establish infringement of claims 8-9.

### 7.     UTC Has Not Established the "Stability" Limitation of Claims 8-9

Claims 8 and 9 require "a salt of treprostinil *stable* at ambient temperature."  Whether "isolated" or combined with excipients, TN is not stable at ambient temperature, as confirmed by UTC's shipment of TN to Dr. Smyth at non-ambient conditions (FF136, FF141; Tr. 879:15-880:18 (Smyth)). Dr. Smyth, UTC's expert, confirmed that isolated TN is not stable at ambient temperature because its hygroscopicity impacts its physical stability. FF141; Tr. 880:22-881:2 (Smyth) ("we could see it, . . . it was starting to take on moisture. It was very hygroscopic."); Tr. 738:25-740:10 (Gonda). And LIQ861 bulk powder (TN in solution, combined with excipients and dried) is stored at 2-8°C. DTX204, 6, 12. Thus, UTC has failed to prove that Liquidia uses "a salt of treprostinil stable at ambient temperature."

A POSA looking at the totality of the evidence would conclude that UTC's evidence of "storage" at ambient temperature is speculative, at best, and disregards the DMF and NDA requirements of "storage" of TN and Bulk LIQ861 Inhalation Powder at 2-8°C. UTC has not met its burden of establishing infringement of claims 6, 8 and 9.

## II.     LIQUIDIA DOES NOT INFRINGE THE '793 PATENT

### A.     The '793 Claims Require "a Therapeutically Effective Single Event Dose"

Every '793 claim requires administration of "a therapeutically effective single event dose." The patent does not define this term, nor does it define "therapeutically effective" or "single event dose." JTX3; FF152, FF154. Both parties' experts agree, however, that "a therapeutically effective single event dose" requires every single event dose must be therapeutically effective. FF152.

A POSA would understand the plain and ordinary meaning of "therapeutically effective" is an improvement in symptoms, functions, and/or survival because this definition accords with

what doctors and patients look for in a PH treatment. FF154.[5]  Thus, a POSA would understand that hemodynamic improvements alone are not sufficient for a "therapeutically effective" treatment. Transient changes in hemodynamics do not necessarily correlate with what a patient looks for in a PH therapy. FF155. Dr. Hill explained that PH patients administered epoprostenol in the FIRST study exhibited hemodynamic changes, but did not exhibit a therapeutic effect as the drug resulted in higher mortality rates. *Id.* Dr. Hill did not testify that a transient improvement in hemodynamics is therapeutically effective, (POBr, 21) but repeatedly testified that hemodynamics are not enough to show therapeutic effectiveness (FF155). The testimony UTC points to is entirely consistent with Dr. Hill's opinion that, to the extent a hemodynamic effect is observed from a single dose of LIQ861, the effect is not synonymous with therapeutic effectiveness.

The claims also require administration of "**a … single** event dose" in a day rather than multiple doses per day. JTX3, claims. While the indefinite article "a" in combination with "comprising" is ordinarily open ended, an exception to the general rule arises where "the language of the claims themselves, the specification, or prosecution history necessitate a departure from the rule." *Amgen v. Hospira*, No. 15-839-RGA, 2016 WL 7013483, at *2 (D. Del. Nov. 30, 2016) (citing *Baldwin Graphic Sys. v. Siebert*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008)). Claim 1 recites "a … **single** event dose," and not simply "a … dose."  And following UTC's position would read "single event" out of the claims. *In re Power Integrations*, 884 F.3d 1370, 1376 (Fed. Cir. 2018) (rejecting claim construction that rendered claim terms meaningless); *Hospira*, 2016 WL 7013483, at *2 (finding "a" or "an" in the claimed "an isolated . . . isoform" cannot mean "one or more" as this reading would render "isolated" superfluous). Further, while UTC is correct that the claims do

---

[5] "Therapeutically effective" must mean more than "effective," which is used differently in the specification for treprostinil administration. *Bicon*, 441 F.3d at 950 ("Claims are interpreted with an eye toward giving effect to all terms in the claim"); FF154; JTX3, 3:15-16, 11:63-66.

not say "single daily dose" or "single dose per day" (POBr, 20), the claims also do not say "several times per day" or "*multiple* single event dose*s*."  FF153.

UTC is also incorrect that "nothing in the specification [] limits the claim to one single event dose per day."  POBr, 20. The Examples and Figures 1-12 describe administering only a single dose of treprostinil to patients.[6] FF152. While the specification has a single statement that "[t]reprostinil can be administered a *single time per day* or several times per day[,]"  (JTX3, 8:1-2 (emphasis added)), this shows that the inventors and UTC knew how to recite a dosing regimen that permitted dosing several times per day, but chose to claim a "single event dose."  FF153; *Amgen v. Vidal*, No. 2019-2171, 2022 WL 1112817, at *2-3 (Fed. Cir. Apr. 14, 2022) (finding the specification distinguishes between "final thiol-pair ratio" and "buffer thiol-pair ratio," and the claim could have been written to recite the "buffer thiol-pair ratio," but recited only "final thiol-pair ratio"); *Bd. of Regents of Univ. Tex. Sys. v. BENQ Am.*, 533 F.3d 1362, 1369-70 (Fed. Cir. 2008). UTC cannot rely on a single sentence, to the exclusion of the rest of the specification and claim language, to expand the scope of claim 1. Contrary to UTC's argument, disavowal is not required. POBr, 20. The plain and ordinary meaning of "single event dose," read in light of the claim and specification establishes the scope of claim 1. Accordingly, the proper scope of "a . . . single event dose," is a single dose, not several doses, per day.

## B.  Liquidia Does Not Induce Infringement of the Asserted Claims

UTC must show that there has been direct infringement, and then that the alleged infringer knowingly induced infringement and had specific intent to encourage infringement. *Kyocera Wireless v. Int'l Trade Comm'n*, 545 F.3d 1340, 1353-54 (Fed. Cir. 2008). Without proof of direct infringement, there can be no induced infringement. *Joy Techs. v. Flakt,* 6 F.3d 770, 774 (Fed. Cir.

---

[6] Dr. Hill's testimony concerning the half-life of treprostinil is irrelevant (POBr, 20) where the claims and specification make clear that the '793 invention targets a single event dose.

1993). To induce infringement of a method in the Hatch-Waxman context, a drug "label must encourage, recommend, or promote infringement." *Takeda Pharms. U.S.A. v. West-Ward Pharm.*, 785 F.3d 625, 631 (Fed. Cir. 2015). "The focus is not on whether the instructions describe the mode of infringement, but rather on whether the instructions teach an infringing use of the device such that we are willing to infer from those instructions an affirmative intent to infringe the patent." *HZNP Meds. v. Actavis Labs. UT*, 940 F.3d 680, 701-02 (Fed. Cir. 2019). Merely describing the infringing use, or possibility of infringement, will not suffice; UTC must show specific intent and action to induce infringement. *Id.*

### 1.   There Will Not Be Any Act of Direct Infringement

UTC argues "single event dose" and "therapeutically effective" separately because the evidence conclusively establishes that LIQ861 is not administered as "a therapeutically effective singe event dose."[7]  POBr, 19-21. UTC presented no evidence that LIQ861 is therapeutically effective, under any definition, after a single event dose as required by the claims. UTC relies on improved hemodynamics as evidence of infringement but presented no evidence of any hemodynamic changes brought upon by LIQ861, after either a single event dose or multiple doses. FF160. Further, nothing in the LIQ861 label teaches that LIQ861 produces hemodynamic changes after a single event dose. *Id.*; Tr. 695:23-696:1 (Hill). In fact, there is no hemodynamic data in the LIQ861 label at all. DTX408. Recognizing its failure of proof as to LIQ861, UTC contends that treprostinil "will improve patients' hemodynamics," pointing to the '793 patent and ancillary expert testimony. POBr, 20. LIQ861 is not disclosed in the '793 patent and is administered in a completely different form from any previously approved treprostinil treatment. FF159. The trial record lacks any evidence for UTC to meet its burden under its construction.

---

[7] The label teaches 26.5, 53, 79.5, 106, 132.5, 159, 185.5, and 212 mcg doses of LIQ861. The 106-212 mcg doses fall outside the claimed 15-90 mcg, and are irrelevant to infringement. FF157.

Applying Dr. Hill's construction of "therapeutically effective," UTC also fails to meet its burden. POBr, 20-21. LIQ861 is not Tyvaso®. FF159; *Orexo AB v. Actavis Elizabeth*, 424 F. Supp. 3d 371, 383 (D. Del. 2019) ("Infringement . . . does not arise by comparing the accused product with a preferred embodiment described in the specification, or with a commercialized embodiment of the patent") (quoting *Johnson & Johnston Assocs. v. R.E. Serv.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002)). Both the INSPIRE study for LIQ861 and the Tyvaso® TRIUMPH I study (utilizing the 6MWD test) measured therapeutic effectiveness after weeks of dosing, not after a single event dose. FF158-59. In the TRIUMPH I trial, patients treated with Tyvaso® showed no evidence of therapeutic effectiveness in the 6MWD after a day (four doses/day) of therapy. FF159. Dr. Waxman's opinion that reductions in PAP and PVR would be expected to translate into a patient "feeling better, doing more, and probably living longer" (PFF70) is thus incorrect as to hemodynamics, unsupported by the trial evidence, and divorced from the claim language. FDA approval of LIQ861 (POBr, 20) does not mean, as UTC contends, that LIQ861 infringes. LIQ861's approval is based on the cumulative effect of multiple administrations over an extended period of time and not "a therapeutically effective single event dose." Under any construction of "therapeutically effective," UTC failed to provide any evidence that LIQ861 meets "a therapeutically effective single event dose."

Further, the LIQ861 label never encourages, recommends, or promotes administering LIQ861 as a single event dose. In fact, the label makes clear, and the experts agree, that LIQ861 must be administered multiple times per day. FF156. For this additional reason, neither doctors nor patients will directly infringe the "single event dose."

## 2.    Liquidia Lacks Specific Intent to Induce Infringement

Liquidia has no intent to induce infringement of the claimed "therapeutically effective single event dose." UTC has not and cannot point to anything in the LIQ861 label or elsewhere

proving Liquidia has the required intent. As evidenced by the LIQ861 label, Liquidia has never taken active steps to encourage administration of a single event dose of LIQ861 or instruct that LIQ861 is therapeutically effective as a single event dose. *Supra*, §II.B.1. If anything, the LIQ861 label, which teaches therapeutic benefits from long-term dosing multiple times per day (FF158-59), demonstrates that Liquidia encourages away from the claims. *See Sanofi v. Lupin Atl. Holdings S.A.*, 282 F. Supp. 3d 818, 825-26 (D. Del. 2017) (finding no induced infringement where label taught away from the claimed administration). That the LIQ861 label discusses doses and number of breaths (POBr, 22) does nothing to encourage or instruct patients to use LIQ861 as "a single event dose."  FF156; Tr. 691:7-8 (Hill). Moreover, the label describes the TRIUMPH I 6MWD and the INSPIRE trial, which used multiple times per day dosing over an extended time period, not single event dosing. FF158-59; POBr, 21. Thus, the label does not encourage "a therapeutically effective single event dose."

UTC also fails to prove that Liquidia instructs that LIQ861 produces hemodynamic changes after a single event dose. That is because UTC cannot—neither the LIQ861 label nor any other literature teach that LIQ861 produces hemodynamic changes after a single event dose or that physicians should measure hemodynamic changes after a single event dose of LIQ861. FF160. Without this information, UTC cannot meet its burden that Liquidia induces infringement of "a therapeutically effective single event dose."[8]

## III.   CONCLUSION

For the reasons above, Liquidia asks this Court to find Liquidia does not infringe the asserted claims of the '066 patent and the asserted claims of the '793 patent.

---

[8] In a parallel IPR proceeding, the PTAB instituted Liquidia's petition to find claims 1-8 obvious, and the final decision is expected August 11, 2022. IPR2021-00406, Paper No. 18, 1, 3-4. Should the PTAB find the claims invalid, Liquidia cannot be liable for inducing infringement of a patent that is actually invalid. *Commil USA, LLC v. Cisco Sys., Inc.,* 575 U.S. 632, 644 (2015).

/s/ Nathan R. Hoeschen
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia*
*Technologies, Inc*

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Douglas W. Cheek
Adam Pivovar
Brittany Cazakoff
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Deepa Kannappan
Lauren Krickl
Kyung Taeck Minn
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: June 1, 2022