**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No.: 1:20-cv-00755-RGA |
| v. | ) ) ) | |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) ) | |

**PLAINTIFF'S ANSWERING POST-TRIAL BRIEF**

<table>
<tr><td>OF COUNSEL:</td><td>Morris, Nichols, Arsht & Tunnell LLP</td></tr>
<tr><td>

William C. Jackson
Eric Levi
Goodwin Procter LLP
1900 N Street NW
Washington, DC 20036
(202) 346-4216

Douglas H. Carsten
Mandy H. Kim
Arthur Dykhuis
Jiaxiao Zhang
Katherine Pappas
McDermott Will & Emery LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92612
(949) 851-0633

Ian B. Brooks
Adam W. Burrowbridge
Joshua Revilla
Timothy M. Dunker
McDermott Will & Emery LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000

June 1, 2022

</td><td>

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
Sarah E. Simonetti (#6698)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com
ssimonetti@morrisnichols.com

*Attorneys for Plaintiff United Therapeutics Corporation*

</td></tr>
</table>

# TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................... 1

II.  COUNTERSTATEMENT OF FACTS .................................................................. 3

III.  LEGAL STANDARDS ........................................................................................ 3

IV.  THE '066 PATENT IS NOT INVALID................................................................ 6

  A.  The Asserted Claims Have Impurity and Stability/Storage Limitations ............... 6

  B.  Liquidia's Anticipation Challenge Is Fundamentally Flawed ............................... 8

    1.  Liquidia's Treprostinil Molecule Misdirection.......................................... 8

    2.  Liquidia's Overall Purity Misdirection ..................................................... 9

    3.  Liquidia's FDA Standards Misdirection.................................................. 12

  C.  No Evidence Supports Anticipation by the Asserted MPP................................. 14

    1.  The MPP, even with Moriarty 2004, Does Not Explicitly Anticipate ....................................................................................... 15

    2.  The MPP Does Not Inherently Anticipate the Asserted Claims.............. 17

    3.  UTC's "Former Process" Does Not Invalidate the '066 Patent............... 17

    4.  Liquidia Waived Its On-Sale Bar Theory ................................................ 20

  D.  Liquidia Failed to Prove Structural and Functional Identicality......................... 20

    1.  Liquidia Improperly Seeks to Shift the Burden of Proof to UTC............ 20

    2.  The Claimed Product is Structurally and Functionally Different ............ 22

  E.  The "Impurities" Limitation, Explicitly Described in the Specification, Satisfies the Written Description Requirement..................................................... 24

    1.  A POSA Would Have Understood the Relevant Impurities.................... 26

    2.  Liquidia Improperly Relies on Extrinsic Evidence to Support Its Written Description Argument ................................................................ 26

    3.  The Specification Describes the "Impurities" Limitation......................... 28

V.  THE '793 PATENT IS NOT INVALID FOR CLAIMING TREATMENT OF PULMONARY HYPERTENSION ...................................................................... 29

A.    The POSA Would Consider Each Claim as a Whole and Know the Types of PH Treatable with a Vasodilator like Treprostinil............................................ 29

B.    The '793 Patent Enables Treatment with a Therapeutically Effective Dose of Treprostinil Without Undue Experimentation..................................................... 31

C.    A POSA Would Understand the Inventors Possessed Methods for "Treating Pulmonary Hypertension" ................................................................... 34

VI.   THE '793 PATENT IS NOT INVALID FOR CLAIMS INVOLVING POWDER FORMULATIONS OR A DRY POWDER INHALER ..................................................... 35

A.    A POSA Would Understand the Inventors Possessed Treating PH with a Dry Powder Formulation Administered with a DPI ............................................ 35

B.    The '793 Patent Enables Administration of a Dry Powder Formulation of Treprostinil Using a DPI Without Undue Experimentation ................................. 37

VII.   CONCLUSION.................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Mohan*,
   482 F. App'x 574 (Fed. Cir. 2012) ........................................................21

*Abbott Labs. v. Sandoz, Inc.*,
   566 F.3d 1282 (Fed. Cir. 2009)..............................................................5

*Alcon Rsch Ltd. v. Barr Labs., Inc.*,
   745 F.3d 1180 (Fed. Cir. 2014).............................................................35

*Allergan, Inc. v. Apotex Inc.*,
   754 F.3d 952 (Fed. Cir. 2014)..............................................................17

*Amgen Inc. v. F. Hoffman-La Roche*,
   580 F.3d 1340 (Fed. Cir. 2009)..................................................... *passim*

*Amgen Inc. v. Sanofi*,
   No. CV 14-1317-RGA, 2019 WL 4058927 (D. Del. Aug. 28, 2019)....................25

*In re Anderson*,
   471 F.2d 1237 (CCPA 1973) ...............................................................32

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010)..................................................... *passim*

*In re Arkley*,
   455 F.2d 586 (CCPA 1972) ..................................................................6

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
   750 F.2d 1569 (Fed. Cir. 1984)........................................................32, 33

*Baxalta Inc. v. Bayer Healthcare LLC*,
   513 F. Supp. 3d 426 (D. Del. 2021).......................................................29

*Belcher Pharms., LLC v. Hospira, Inc.*,
   450 F. Supp. 3d 512 (D. Del. 2020)................................................. *passim*

*Biogen Int'l GmbH v. Mylan Pharms. Inc.*,
   2020 WL 3317105 (N.D.W. Va. June 18, 2020)...........................................27

*Biogen Int'l GmbH v. Mylan Pharms. Inc.*,
   28 F.4th 1194 (Fed. Cir. 2022) ...........................................................26

*Bioverativ Inc. v. CSL Behring LLC*,
   No. CV 17-914-RGA, 2020 WL 1066019 (D. Del. Mar. 5, 2020)........................................26

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
   489 U.S. 141 (1989).........................................................................................................5

*Bos. Sci. Corp. v. Johnson & Johnson*,
   647 F.3d 1353 (Fed. Cir. 2011).......................................................................................37

*Bos. Sci. Corp. v. Johnson & Johnson Inc.*,
   679 F. Supp. 2d 539 (D. Del. 2010).................................................................................27

*Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*,
   477 F. Supp. 3d 306 (D. Del. 2020).................................................................................38

*Centrak, Inc. v. Sonitor Techs. Inc.*,
   915 F.3d 1360 (Fed. Cir. 2019).................................................................................35, 37

*Cephalon, Inc. v. Watson Pharms., Inc.*,
   707 F.3d 1330 (Fed. Cir. 2013).................................................................................33, 40

*Commil USA, LLC v. Cisco Sys., Inc.*,
   575 U.S. 632 (2015).......................................................................................................22

*In re Cook*,
   439 F.2d 730 (CCPA 1971) ............................................................................................32

*In re Corkill*,
   771 F.2d 1496 (Fed. Cir. 1985).......................................................................................33

*Crown Operations Int'l., Ltd. v. Solutia Inc.*,
   289 F.3d 1367 (Fed. Cir. 2002).........................................................................................6

*Cubist Pharms., Inc. v. Hospira, Inc.*,
   75 F. Supp. 3d 641 (D. Del. 2014)................................................................................4, 22

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
   758 F.3d 1344 (Fed. Cir. 2014).........................................................................................7

*In re Dinh-Nguyen*,
   492 F.2d 856 (CCPA 1974) ............................................................................................32

*Elan Pharms., Inc. v. Mayo Found.*,
   346 F.3d 1051 (Fed. Cir. 2003).......................................................................................15

*Eli Lily and Co. v. Zenith Goldline Pharms., Inc.*,
   471 F.3d 1369 (Fed. Cir. 2006).......................................................................................15

*Endo Pharms. Inc. v. Actavis Inc.*,
  C.A. No. 14-cv-1381-RGA, 2017 WL 3731001 (D. Del. Aug. 30, 2017) .............................16

*Enzo Biochem, Inc. v. Calgene, Inc.*,
  188 F.3d 1362 (Fed. Cir. 1999).......................................................................................6, 11

*Enzo Life Scis., Inc. v. Digene Corp.*,
  305 F. Supp. 2d 400 (D. Del. Feb. 19, 2004) ..........................................................................37

*Falkner v. Inglis*,
  448 F.3d 1357 (Fed. Cir. 2006).........................................................................34, 36, 38

*First Quality Tissue, LLC v. Irving Consumer Prod.*,
  CA No. 19-428-RGA, 2022 WL 958089 (D. Del. Mar. 30, 2022)........................................29

*In re Geerdes*,
  491 F.2d 1260 (CCPA 1974) .............................................................................................30, 32

*Gevo, Inc. v. Butamax Advanced Biofuels LLC*,
  2013 WL 3914467 (D. Del. July 26, 2013) ................................................................................32

*Glaxo Grp. Ltd. v. Apotex, Inc.*,
  376 F.3d 1339 (Fed. Cir. 2004)......................................................................................21

*Glaxo Grp. Ltd. v. Kali Labs., Inc.*,
  No. 03-CV-399, 2005 WL 1793728 (D.N.J. July 27, 2005).............................................30, 31

*Greenliant Sys., Inc. v. Xicor LLC*,
  692 F.3d 1261 (Fed. Cir. 2012).....................................................................................20, 21

*Helifix Ltd. v. Blok-Lok, Ltd.*,
  208 F.3d 1339 (Fed. Cir. 2000).......................................................................................15

*Kao Corp. v. Unilever U.S., Inc.*,
  334 F. Supp. 2d 527 (D. Del. 2004), *aff'd*, 441 F.3d 963 (Fed. Cir. 2006) .............................30

*In re Luck*,
  476 F.2d 650 (CCPA 1973) ...................................................................................................5

*In re Marosi*,
  710 F.2d 799 (Fed. Cir. 1983).......................................................................................21

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005).....................................................................................30

*Mettler-Toledo, Inc. v. B-Tek Scales, LLC*,
  671 F.3d 1291 (Fed. Cir. 2012).......................................................................................5

*Microsoft Corp. v. I4I Ltd. P'ship*,
    564 U.S. 91 (2011) ................................................................................4, 21

*In re Myers*,
    410 F.2d 420 (CCPA 1969) ....................................................................32

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008) ................................................................6

*In re Nordt Dev. Co.*,
    881 F.3d 1371 (Fed. Cir. 2018) .............................................................5, 8

*Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*,
    923 F.3d 1368 (Fed. Cir. 2019) ..................................................25, 27, 35

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
    806 F.2d 1565 (Fed. Cir. 1986) ..............................................................21

*PAR Pharm., Inc. v. TWI Pharm.*,
    773 F.3d 1186 (Fed. Cir. 2014) ................................................................6

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007) .........................................................21, 22

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006) ..............................................................21

*Schumer v. Lab. Comput. Sys., Inc.*,
    308 F.3d 1304 (Fed. Cir. 2002) ................................................................6

*Sysmex Corp. v. Beckman Coulter, Inc.*,
    C.A. No. 19-cv-01642, D.I. 507 (D. Del. May 20, 2022) ................10, 16

*Tech. Licensing Corp. v. Videotek, Inc.*,
    545 F.3d 1316 (Fed. Cir. 2008) ..............................................................21

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*,
    295 F.3d 1292 (Fed. Cir. 2002) ..............................................................10

*Trs. of Bos. Univ. v. Everlight Elecs. Co., Ltd.*,
    896 F.3d 1357 (Fed. Cir. 2016) ..............................................................33

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*,
    782 F.3d 671 (Fed. Cir. 2015) ................................................................24

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
    721 F.2d 1540 (Fed. Cir. 1983) ....................................................6, 16, 17

*Wesley Jessen Corp. v. Bausch & Lomb, Inc.*,
   209 F. Supp. 2d 348 (D. Del. 2002)........................................................................................18

**Statutes**

35 U.S.C. § 282......................................................................................................................4, 6, 21

**Other Authorities**

D. Del. R. 7.1.3(c)(2) ...................................................................................................................16

## ASSERTED CLAIMS: '066 PATENT

| Claim | Claim Limitation |
| --- | --- |
| 1[a] | A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising |
| 1[b] | providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps, |
| 1[c] | forming a salt of treprostinil by combining the starting batch and a base, |
| 1[d] | isolating the treprostinil salt, and |
| 1[e] | preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, |
| 1[f] | whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and |
| 1[g] | wherein said alkylation is alkylation of benzindene triol. |
| 2 | The pharmaceutical composition of claim 1, wherein the salt is isolated in crystalline form. |
| 3 | The pharmaceutical composition of claim 1, wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline. |
| 6 | The pharmaceutical composition of claim 1, wherein the isolated salt is stored at ambient temperature. |
| 8[a] | A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising |
| 8[b] | alkylating a triol intermediate of the formula:<br><br>hydrolyzing the resulting compound to form treprostinil, |
| 8[c] | forming a salt of treprostinil stable at ambient temperature, |
| 8[d] | storing the treprostinil salt at ambient temperature, |
| 8[e] | and preparing a pharmaceutical product from the treprostinil salt after storage, wherein |
| 8[f] | the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof. |
| 9 | A pharmaceutical product prepared by the process of claim 8. |

## ASSERTED CLAIMS: '793 PATENT

| Claim | Claim Limitation |
|-------|------------------|
| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension |
| 1[b] | a therapeutically effective single event dose |
| 1[c] | of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, |
| 1[d] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
| 1[e] | delivered in 1 to 3 breaths. |
| 4 [f] | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
| 6 [g] | The method of claim 4, wherein the formulation is a powder. |
| 7 [h] | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 [i] | The method of claim 1, wherein the formulation contains no metacresol. |

## <u>ABBREVIATIONS</u>

- '066 patent – U.S. Patent No. 9,593,066
- '793 patent – U.S. Patent No. 10,716,793
- API – active pharmaceutical ingredient
- Br. – Defendant Liquidia's Post-Trial Opening Brief Regarding Invalidity of U.S. Patent Nos. 9,593,066 and 10,716,793 (D.I. 406)
- DPI – dry powder inhaler
- FWD – Final Written Decision
- LFF – Defendant Liquidia's Findings of Fact Related to Invalidity of U.S. Patent Nos. 9,593,066 and 10,716,793 (D.I. 407)
- LPIC – Liquidia Preliminary Invalidity Contentions
- LSIC – Liq. Supp. Invalidity. Contentions
- MPP – Moriarty 2004 Publication Product
- PCH – March 4, 2022 Pretrial Conference Hearing
- PH – pulmonary hypertension
- PK – pharmacokinetics
- POBr. – Plaintiff's Opening Post-Trial Brief (D.I. 408)
- POSA – person of ordinary skill in the art
- PTC Tr.– March 4, 2022 Pretrial Conference Hearing Transcript
- PVR – pulmonary vascular resistance
- PAP – pulmonary arterial pressure
- PFF – Plaintiff's Proposed Findings of Fact (D.I. 409, or filed concurrently)
- SIC – Supplemental Invalidity Contentions
- UTC – United Therapeutics Corporation

## I.     INTRODUCTION

The '066 and '793 patents are presumed valid and Liquidia bears the burden of showing invalidity by clear and convincing evidence. Liquidia has failed to do so. Liquidia's two arguments for the '066 patent—namely that claims 1, 2, 3, 6, and 9 are anticipated by a product disclosed in the Moriarty 2004 publication and that the impurity limitation of claims 1, 2, 3, and 6 of the '066 patent does not provide sufficient written description—should be rejected. UTC also asserts claim 8 of the '066 patent, but Liquidia has no validity challenge to that claim. For the '793 patent, Liquidia asserts § 112 defenses relating to treatment of one sub-type of pulmonary hypertension ("PH")—isolated postcapillary Group 2 PH—and powder formulations of treprostinil. For both, Liquidia exaggerates alleged difficulties and ignores basic teachings in the '793 patent and the knowledge of the person of ordinary skill in the art ("POSA").

**'066 Patent Anticipation Challenge**: Throughout the litigation, Liquidia has failed to present or maintain a cogent theory for overcoming the presumed validity of the '066 patent's product-by-process claims. The reason is simple: there is no invalidating prior art publication or product. Attempting to avoid this conclusion, Liquidia applies the wrong legal standard and argues merely that the claimed product "appears to be the same" as the prior art. D.I. 406 (Liquidia Invalidity Br.) ("Br.") p. 3. That is not the law. Liquidia further argues that it is UTC's burden to prove differences between the prior art and the claimed product, rather than Liquidia's burden to prove anticipation. *Id.* Liquidia's argument is contrary to black letter patent law.

In essence, Liquidia's theory comes down to arguing that treprostinil is treprostinil so long as it has a sufficiently high purity level. But that is not what the '066 patent claims. Instead, it claims a product in which certain specific impurities—namely those resulting from alkylation and hydrolysis steps—are lowered in the pharmaceutical composition. Lacking evidence to support its

1

theory, Liquidia ignores the claim language about "impurities resulting from prior alkylation and hydrolysis steps" and directs the Court's attention to a single, unclaimed, unproven, and irrelevant attribute: overall purity. Liquidia's theory is inconsistent with the law and the facts. Liquidia has not and cannot meet its burden of proving anticipation by clear and convincing evidence.

**'066 Patent Written Description Challenge**: Nor has Liquidia met its burden to prove by clear and convincing evidence that the "impurities" limitation fails to satisfy the written description requirement. The specification plainly states that "[t]he impurities carried over from intermediate steps (*i.e.*, alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step." JTX-2, '066 Patent at 17:27-40. Those statements are supported by the inventors' teachings about monitoring the reactions by chromatography and the inventors' description of color changes from the reaction steps. Those disclosures in the specification demonstrate that the inventors possessed the "impurities" limitation. Liquidia's arguments to the contrary are misguided and fanciful. Liquidia's approach should be rejected.

**'793 Patent Enablement Challenges**: Liquidia's first enablement challenge to the '793 patent asserts that the POSA could not use inhaled treprostinil to treat patients with isolated postcapillary Group 2 PH (i.e., Group 2 patients with only postcapillary issues, no precapillary disease). Liquidia's argument fails, however, because it considers the term "pulmonary hypertension" in isolation, overlooking the claim as a whole. Knowing that treprostinil vasodilates and that the claim requires an effective dose to treat PH, the POSA would understand the claims as limited to precapillary PH, which includes patients in all five Groups. And even if isolated postcapillary patients are included, alleged "safety concerns" do not establish lack of enablement for claiming an "inoperative" embodiment. PH is elevated pulmonary blood pressure, and regardless of which type of PH a patient has, treprostinil will vasodilate the pulmonary vasculature,

reducing blood pressure—*i.e.*, treating PH.

Liquidia's second enablement challenge asserts that a POSA could not prepare and administer a powder formulation of inhaled treprostinil using a dry powder inhaler ("DPI"). This argument also fails. As Dr. Clark explained, the POSA knew how to perform the routine steps required to prepare a dry powder formulation of treprostinil. Beginning with the teachings in the '793 patent regarding drug, route of administration, dose, and number of breaths, the POSA would prepare a formulation using lactose, the most common powder formulation excipient, and would use routine techniques such as jet milling and blending to prepare the formulation. There were also numerous active and passive DPIs available by 2006. Dr. Smyth's testing, performed over three weeks, demonstrates that the POSA could follow those routine steps and administer treprostinil by inhalation in the claimed doses and number of breaths.

**'793 Patent Written Description Challenge**: Likewise, a POSA would understand, based on the specification and background knowledge, the inventors were in possession of the claimed method. The specification expressly discloses that the surprisingly high doses of treprostinil could be administered in only 1-3 breaths with limited or no side effects and long duration of action. The POSA would understand the inventors possessed the claimed methods because treprostinil lowers pulmonary blood pressure, and could be done with a powder formulation and DPI. The inventors were in possession of the claimed invention and Liquidia has not and cannot prove otherwise.

## II.    COUNTERSTATEMENT OF FACTS

A statement of facts is provided in Plaintiff's Proposed Findings of Fact ("PFF").[1]

## III.    LEGAL STANDARDS

"A patent is presumed to be valid, and this presumption only can be overcome by clear and

---

[1] PFF Nos. 1-74 are set forth in D.I. 409. UTC's findings of fact responsive to Liquidia's Opening Brief (D.I. 406) are filed concurrently with this brief.

convincing evidence to the contrary." *Amgen Inc. v. F. Hoffman-La Roche*, 580 F.3d 1340, 1366 (Fed. Cir. 2009); *see* 35 U.S.C. § 282. It is Liquidia's burden to prove anticipation by clear and convincing evidence. *See*, *e.g.*, *Amgen*, 580 F.3d at 1367, 1370. "For a patent claim to be invalid due to anticipation, each and every limitation must be found, either expressly or inherently, in a single prior art reference." *Belcher Pharms., LLC v. Hospira, Inc.*, 450 F. Supp. 3d 512, 537 (D. Del. 2020). Moreover, "[t]he test for anticipation … is not whether two substantially similar (but not necessarily identical) structures can be used for the same purpose and in compliance with some standard (such as the USP). Rather, the Court looks only at whether the prior art references anticipate the structure that would result from the claimed process." *Id.* at 543.

Because Liquidia cannot meet that standard, Liquidia resorts to misdescribing the relevant inquiry. First, Liquidia argues that "the claimed product *appears* to be the same or *similar* to that of the prior art." Br. 3 (emphasis added). Liquidia cites no law for this standard, and UTC is aware of none. Second, Liquidia inaccurately asserts that "the burden shifts to the patentee to *prove …* differences[] distinguishing the claimed product from the prior art." Br. 3 (emphasis added). Neither Liquidia's cases nor any other case supports such a burden shifting in the context of an issued patent. Br. 3. The burden to prove anticipation by clear and convincing evidence always remains with Liquidia.[2] *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 100 (2011). For product-by-process claims, Liquidia's burden includes proving the claimed inventions have no structural or functional differences from the prior art reference. *See Amgen*, 580 F.3d at 1367, 1370 (concluding that defendant "did not meet its burden" to show that the claimed invention was the same as the prior art "because [the two] were structurally and functionally different."); *Cubist*

---

[2] The patentee can come forward and identify structural or functional differences, but at all times Liquidia bears the burden of proving by clear and convincing evidence that a prior art reference anticipates the claimed inventions. *See* Br. 3 ("is the same as [i.e., anticipated by]").

*Pharms., Inc. v. Hospira, Inc.*, 75 F. Supp. 3d 641, 668 (D. Del. 2014) ("The party asserting anticipation bears the burden of proving that the process limitations do not result in an invention distinguishable from the prior art.").

A product-by-process claim "is one in which the product is defined at least in part in terms of the method or process by which it is made." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 158 n. * (1989); *see also In re Luck*, 476 F.2d 650, 653 (CCPA 1973) ("[I]t is well established that product claims may include process steps to wholly or partially define the claimed product."). Courts have held in "numerous instances" that "such limitations [] convey structure even when they also describe a process of manufacture." *In re Nordt Dev. Co.*, 881 F.3d 1371, 1376 (Fed. Cir. 2018) (collecting cases); *see also Amgen*, 580 F.3d at 1367 (affirming claim construction where "by its plain terms," the patent "claim[ed] a product with a source limitation"). Process limitations provide an additional means to define claimed inventions. *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1294 (Fed. Cir. 2009) ("[T]his court clarifies that the inventor is absolutely free to use process steps to define this product."). Any structural or functional difference conferred by the process is sufficient to show that the claimed product is not anticipated. *Belcher*, 450 F. Supp. 3d at 544 ("This structural difference precludes a finding of anticipation."). Thus, Liquidia must show by clear and convincing evidence that the products do not have any "structural/functional difference attributable to the process." *Id.* at n.11.

When assessing anticipation of a product-by-process claim, the inquiry compares the prior art to the claimed product. *Belcher* at 543 ("Court[s] look[] only at whether the prior art references anticipate the structure that would result from the claimed process."). What a prior art reference discloses is a question of fact. *Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291, 1297 (Fed. Cir. 2012). In proving anticipation, Liquidia "must identify each claim element … and

explain in detail how each claim element is disclosed in the prior art reference. The testimony is insufficient if it is merely conclusory." *Schumer v. Lab. Comput. Sys., Inc.*, 308 F.3d 1304, 1315-16 (Fed. Cir. 2002). Anticipation requires more than similarity—it requires that the prior art and the claimed product be identical. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) ("[D]ifferences between the prior art reference and a claimed invention, however slight, invoke the question of obviousness, not anticipation."); *In re Arkley*, 455 F.2d 586, 587 (CCPA 1972) (finding that the prior art must "disclose the claimed [invention] or direct those skilled in the art to the [invention] without *any* need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference.").

While certain limitations could be inherent in a prior art reference, inherency is a question of fact that must be proven with clear and convincing evidence. *Crown Operations Int'l., Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002). Inherency requires inevitably and "may not be established by probabilities or possibilities." *PAR Pharm., Inc. v. TWI Pharm.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014). Unproven assumptions do not satisfy the clear and convincing evidence standard. *Crown*, 289 F.3d at 1377 (declining "to accept the proposition that if a prior art reference discloses the same structure … the resulting property … should be assumed."). Inherency "cannot be predicated on mere conjecture" that the limitations "might result from" practicing the prior art. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1554 (Fed. Cir. 1983) (requiring that prior art "inherently" or "always … produce[s] products meeting all of the claim limitations").

## IV.    THE '066 PATENT IS NOT INVALID

### A.    The Asserted Claims Have Impurity and Stability/Storage Limitations

Liquidia misreads the claims and fails to address any differences in the asserted claims. Yet, the claims have different scope and "are independently presumed valid." *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1379 (Fed. Cir. 1999) (citing 35 U.S.C. § 282). The asserted

claims are directed to "pharmaceutical compositions" (claims 1-3, 6) and a "process/product" (claims 8/9) comprising treprostinil. They do not claim the treprostinil molecule/compound alone.[3] Rather, claims 1-3 and 6 have impurity limitations requiring that the claimed composition has fewer specific impurities than the prior art. *See Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1349 (Fed. Cir. 2014) ("a composition of matter requires the combination of two or more substances and includes all composite articles"). This fundamental distinction is fatal to Liquidia's anticipation theory.[4] Similarly, claims 8 and 9 require forming a salt of treprostinil stable and stored at ambient temperature, a feature the prior art was incapable of achieving. Liquidia no longer pursues invalidity of claim 8 (Br. 1, n.1) and advances no invalidity argument specific to claim 9. Claim 9 is presumed valid and presumed to be different than claim 1. Liquidia's offers no clear and convincing evidence to the contrary.

The first step of any validity analysis is to properly interpret the claims—a step Liquidia never undertakes. Claims 1-3 and 6 claim a "pharmaceutical composition" that has "one or more impurities found in the starting batch of treprostinil [that] is lower in the pharmaceutical composition." JTX-2, 17:51-18:28, 18:34-35, PFF ¶¶ 75-79. This impurity limitation means that the patent does not merely claim the treprostinil molecule/compound itself or any composition comprising treprostinil. Rather, it claims only pharmaceutical compositions of treprostinil comprising the reduction of specific impurities "resulting from prior alkylation and hydrolysis steps." JTX-2, 17:54-55, 62-62, PFF ¶ 75. It is unrebutted that this limitation describes the "product" and not merely the "process." When asked, "Would a POSA consider these highlighted

---

[3] The Patent Office appreciated this distinction when it allowed the asserted claims over the specification's explicit disclosure of prior patents and publications involving treprostinil, including Moriarty 2004. JTX-2, 1:27-35 ("Treprostinil . . . ha[s] been prepared as described in Moriarty" and its "teachings are incorporated by reference to show how to practice the embodiments").

[4] Liquidia filed an IPR petition on the '066 patent arguing, *inter alia*, obviousness over Moriarty. That petition was not even instituted. D.I. 293, Ex. 6.

limitations as process limitations or as describing a product?" Dr. Winkler stated "No, they're simply describing the *product*." *Id.* (emphasis added). The *process* includes "forming a salt of treprostinil by combining the starting batch and a base, isolating the treprostinil salt, and preparing a pharmaceutical composition" whereas the claimed *product* is defined as the "pharmaceutical composition" with lower levels of the impurities "resulting from prior alkylation and hydrolysis steps." JTX-2, 17:51-63; *see In re Nordt*, 881 F.3d at 1376 (collecting cases where "such limitations [] convey structure even when they also describe a process of manufacture.").

## B.    Liquidia's Anticipation Challenge Is Fundamentally Flawed

Liquidia's anticipation invalidity theories rely on three central tenets, none of which actually establishes that the product from Moriarty 2004 is the same as the composition claimed by the '066 patent. First, Liquidia argues that the treprostinil molecule itself anticipates the claims, but the asserted claims are to pharmaceutical compositions, not to that molecule alone. Second, Liquidia argues that the prior art product anticipates the claims based on overall purity calculations, but—as Liquidia must admit—the claims are agnostic to overall purity. Third, Liquidia argues that certain statements made to the FDA relevant to minimum regulatory standards show that a different UTC product, *i.e.*, not the asserted Moriarty 2004 product, is "equivalent" to the asserted claims. This too fails for several reasons.

### 1.    Liquidia's Treprostinil Molecule Misdirection

Claims 1-3 and 6 are directed to a "pharmaceutical composition" with specific impurity characteristics "resulting from prior alkylation and hydrolysis steps." JTX-2, 17:51, 54-55; PFF ¶ 75. Liquidia is wrong to reduce the claims to the "treprostinil" molecule "also known as UT-15." Br. 4; PFF ¶ 76. Anticipation does not turn on whether the claims involve treprostinil. Rather, "the Court looks only at whether the prior art references anticipate the structure that would result from the claimed process." *Belcher*, 450 F. Supp. 3d at 543. Here the patent claims a "pharmaceutical

composition" not just the single treprostinil molecule Liquidia focuses on throughout its brief. *See, e.g.,* Br. 4 ("both processes resulted in the same UT-15 *compound*."); *see also* Tr. 948:10-14 ("It's just a compound."), PFF ¶ 76. Even Liquidia's expert, Dr. Winkler, admits the claims involve reduction of specific claimed impurities from the alkylation and hydrolysis steps. Tr. 405:9-406:5; PPF ¶ 75 ("one or more of those impurities…must be lower in the pharmaceutical composition."). Liquidia's misdirection, from a "pharmaceutical composition *comprising* treprostinil" to *only* the "treprostinil" molecule/compound, misconstrues the claims and the law. PFF ¶ 76. Establishing that Moriarty 2004 and the '066 patent both involve treprostinil does nothing to show that Moriarty 2004 anticipates the '066 patent's claimed pharmaceutical composition.

### 2.      Liquidia's Overall Purity Misdirection

Liquidia also erroneously focuses on the overall purity percentage, which is claimed in the '393 patent, to conclude that same purity percentage is relevant to the '066 patent. There are multiple problems with this reasoning. First, the '066 patent does not claim any overall impurity level. It claims a pharmaceutical composition with a reduction of impurities resulting from prior alkylation and hydrolysis steps. Second, at the Final Pretrial Conference, Liquidia represented that it was not relying on overall purity to show anticipation. *See* PFF ¶ 81.

It is undisputed that the asserted claims of the '066 patent do not include any overall purity limitations. PFF ¶¶ 75-79. Liquidia repeatedly admits "[t]hese claims do not claim any purity percentage" and "the claims do not require any level of purity." Br. 4. Liquidia further admits that "the claims are not directed to any numerical range of overall treprostinil purity." Br. 6; *see also* LFF ¶ 16. Thus, Liquidia's overall purity argument is a red herring. Nevertheless, Liquidia argues this single unclaimed attribute is sufficient to prove that Moriarty 2004 anticipates the '066 patent because Moriarty 2004's "99.7% purity falls within the disclosure of the ['066] patent *specification*." Br. 4 (emphasis added); PFF ¶ 91. Liquidia confuses the specification of the '066

patent with its claims. The claims and only the claims dictate anticipation. *See Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1294 (Fed. Cir. 2002) ("novelty's identity requirement applies to claims, not specifications"). Overall purity is irrelevant to anticipation here. *Sysmex Corp. v. Beckman Coulter, Inc.*, C.A. No. 19-1642, D.I. 507 (D. Del. May 20, 2022) (finding insufficient record for identicality where "expert…never opined as to how the [prior art] reads on the asserted claims"). Liquidia's fundamental legal misunderstanding of patent law is fatal to its stance.

In addition, Liquidia's argument assumes: (i) that Moriarty 2004 is the same as the "Former Process" referenced in the '066 specification; (ii) that that "Former Process" is the same as the process claimed in the '393 patent; and (iii) the '393 patent is the same as the '066 patent.[5] Liquidia's evidence by transitive property is unprecedented in patent law. The only relevant comparison is between the asserted Moriarty 2004 prior art and the '066 patent.

Liquidia's argument requires the Court to conclude that the product of the '393 patent is the same as the product of the '066 patent and that both have 99.71% purity. Liquidia's arguments have been waived, precluded, and are severely flawed. During the pre-trial conference, Liquidia confirmed that its "sole purpose" of wanting to rely on evidence involving the '393 patent/product "has to do with proving disputed facts relating to collateral estoppel." PTC at 37:4-22; PFF ¶ 81. The Court granted UTC's MIL#1 (D.I. 323), explaining "I'm going to grant the Plaintiff's motions … to exclude[] the argument that the same product is a relevant fact, because the Defendant has made it clear the only way that they would consider it a relevant fact is in support of their collateral estoppel argument." *Id.* at 39:6-14; D.I. 335 (same); PFF ¶ 81. The Order granting UTC's MIL#1 ruled "[w]hether the same product—treprostin[il]—is the product of the claims of the '393, '901,

---

[5] The Court has already rejected this same argument in the context of Liquidia's MSJ where Liquidia argued that the '066 patent was "the same as the product and process claimed by … the '393 patent." D.I. 282 (MSJ Opening Br.) at 1. Liquidia's reliance on the '393 FWD in this litigation suffers from the same problems. Br. 7; PFF ¶ 81.

and '066 patents is also irrelevant to obviousness." D.I. 335 at 1; PFF ¶ 81.

Undeterred by its waiver, Liquidia continues to treat embodiments of the '393 patent as the same as claims of the '066 patent. A cornerstone of Liquidia's product-by-process theory is that "the average purity of UTC's batches of UT-15 treprostinil made by Moriarty 2004 and the '066 process were the same: 99.7%." *See* LFF ¶ 24. For this proposition, Liquidia relies on statements in the '393 IPR concerning the '393 patent, *not* statements in this litigation concerning the '066 patent.[6] In fact, Liquidia affirmatively misquotes an expert in the '393 IPR, concerning the '393 patent, not the '066 patent at issue here. *See* LFF ¶ 24. UTC's expert in the '393 IPR, Dr. Williams, testified that "[t]he treprostinil product of the **'393** patent has an average purity of 99.71% while the Moriarty product[7] has an average purity of 99.05%." DTX-664, ¶ 98 (emphasis added); *see also* PFF ¶ 80. Liquidia, however, uses brackets to alter Dr. Williams' testimony about the '393 patent to read as if he were discussing the '066 patent. *See* LFF ¶ 24 (DTX-664, ¶ 98 ("The treprostinil product of the **['066]** patent has an average purity of 99.71%")) (bracketed alteration by Liquidia, bold emphasis by UTC); *see also* DDX-2.14 (concluding "Average Purity of '066 Silver Spring Treprostinil Batches Is 99.7%" based on statements concerning *the* '393 patent, not the '066 patent); Tr. 473:16-477:18 (relying on '393 IPR batch data); PFF ¶¶ 80-81. Plainly, "a party may not avoid its burden of proof by making a blanket statement that its proofs with respect to one patent apply to another." *Calgene*, 188 F.3d at 1379. No evidence supports Liquidia's alteration of evidence, resulting conclusions, or anticipation stance. Without its purity cornerstone Liquidia's product-by-process anticipation theory crumbles.

---

[6] The Board was charged with discerning whether a different prior art reference (not asserted in this litigation) anticipated the '393 patent. The '393 patent, unlike the '066 patent had claims concerning overall purity of the product *without* limitations to specific impurities. PFF ¶ 80.

[7] The "Moriarty product" referred to by Dr. Williams is not the product of Moriarty 2004. Rather it is the result of different and scaled-up work Dr. Moriarty pioneered for UTC. PFF ¶¶97-101; *infra* IV.C.2.

### 3. Liquidia's FDA Standards Misdirection[8]

Liquidia also seeks to rely on UTC communications with the FDA, thereby implying that FDA regulatory standards are relevant to anticipation. Liq. Br. 6-8. They are not.

"The test for anticipation … is not whether two substantially similar (but not necessarily identical) structures can be used for the same purpose and in compliance with some standard (such as the USP)." *Belcher*, 450 F. Supp. 3d at 543. Rather than prove actual identicality between the claimed "pharmaceutical composition" and the prior art, Liquidia argues that UTC told the FDA that UTC's new synthesis was the "same" and "equivalent" for purpose of FDA standards. Br. 4. FDA minimum standards, and UTC's statements concerning those standards are inconsequential to "whether the prior art references anticipate the structure that would result from the claimed process," *i.e.*, the claimed pharmaceutical composition. *Belcher*, 450 F. Supp. 3d at 543.

Liquidia's FDA-correspondence argument relies on testimony from Dr. Winkler. First, Dr. Winkler admits that he is not an expert in reading FDA documents and "not an expert in FDA requirements." PFF ¶ 108. Dr. Winkler's testimony concerning UTC's statements and his speculation concerning what UTC's statements to the FDA mean should not be credited. Furthermore, the cited FDA correspondence related to the overall "purity" numbers for UTC's products. As discussed, those overall purity numbers do not address whether the product meets the claim limitations of reducing impurities that had resulted from the alkylation and hydrolysis steps.

Even if the overall purity numbers were relevant, which they are not, Liquidia improperly relies on a subset of batches selected without explanation. Liquidia asserts that "all 96 batches" from the Chicago facility fell within the FDA manufacturing specification for both Silver Spring

---

[8] Liquidia's FDA-related arguments do not compare the MPP to the claimed product. Instead, Liquidia erroneously compares a different UTC product from a similar but different UTC process. Accordingly, for this separate reason, the Court should reject Liquidia's FDA-related arguments.

and Chicago (Br. 6; PFF ¶ 103); but, at trial, Dr. Winkler stated he analyzed only 46 batches produced by UTC at its Chicago facility for his purity analysis. Tr. 475:3-4 (referring to 46). Moreover, the document upon which Liquidia relies shows an average purity of 99.5% for the 96 batches. DTX-627 at 7; *see also* PFF ¶ 103. Liquidia's argument provides no explanation as to why regarding FDA minimum purity it relies on 96 batches, and only 46 cherry-picked batches to prove the purity of the product made in Chicago. To fill the gap between Dr. Winkler's analysis and Liquidia's desired conclusion, Liquidia relies upon testimony from Dr. Williams's deposition in the '393 IPR, during which Liquidia examined Dr. Williams (using documents not in evidence in this litigation) to assert an average purity of 99.7% based on a subset of batches—contrary to Dr. Williams' sworn declaration reporting 99.05% on all batches. DTX-664 at 33. At trial, Liquidia did not show any of Dr. Williams' calculations or data, nor any calculations from Dr. Winkler. PFF ¶ 103, *cf* LFF ¶ 24; *see also* PFF ¶¶ 80-81. Furthermore, even if the Court considers Dr. Williams' testimony about the '393 patent, he stated he was "not talking about [the] impurity profile" of the batches, whereas the '066 claims have limitations directed to the impurity profile— i.e. a reduction of impurities from the alkylation and hydrolysis steps. DTX-600, 93:24-25; PFF ¶¶ 80-81. Liquidia's cherry-picked and inexplicably shifting data set is not clear and convincing.

Second, FDA's request that UTC tighten its release specification is not "theoretical." Br. 6. It is a response to real-world data. PFF ¶¶ 113-115. Mr. Bunce testified the change in purity assay range more accurately reflected the improved purity data from API synthesized according to the patented process. PFF ¶¶ 113-14. The claimed process resulted in a pharmaceutical composition that fell outside the FDA's specification because it was *too pure*. PFF ¶ 114. Consequently, in response to FDA correspondence (PTX-1553, Comment 2) UTC confirmed "based on the process and the data, that we could *tighten* our specifications." Tr. 789:10-25; PTX-

1553 at 2 ("*We propose* to … *lower the total impurity limit to NMT 1.0%* (0.3% + 0.3% +2*0.2%) based on a worst-case scenario.") (emphasis added); PFF ¶¶ 113-114. "The FDA would like those to be as low as possible again so there's less chance of unintended side effects from those impurities." Tr. 791:9-14; PFF ¶ 109. Liquidia ignores these documents and testimony—indeed, Liquidia did not cross examine Mr. Bunce. Tr. 791:16.[9]

### C.      No Evidence Supports Anticipation by the Asserted MPP

Liquidia's argument that the 2004 MPP anticipates the claims of the '066 patent is mere lawyer *ipse dixit*. There is no record evidence supporting a finding that the MPP is the same as the composition claimed by the '066 patent. Here, the MPP (even as supported by Moriarty 2004) fails to teach "each and every limitation … either expressly or inherently, in a single prior art reference." *Belcher*, 450 F. Supp. 3d at 537. First, the MPP alone cannot anticipate the claims because no more is known about the MPP than what was disclosed in Moriarty 2004 itself—and Liquidia concedes that the publication is not § 102(a) invalidating prior art.[10] Second, neither the Moriarty 2004 process nor the MPP itself inherently anticipates the claims of the '066 patent. PFF 90-93. Because there is no evidence that the MPP anticipates the claimed "pharmaceutical composition" Liquidia's anticipation theory must be rejected.

---

[9] Liquidia ignores the plain language of the regulatory correspondence in favor of a transcription error at trial, or minor misstatement from Mr. Bunce, that UTC "disagreed" that it could tighten its total related substances specification. Br. 6. The totality of Mr. Bunce's testimony as well as the documentary evidence clearly show UTC *agreed* that it could tighten its total related substances specification, proposed that exact change, and in fact revised the relevant specification (Section 3.2.P.5.1). PFF ¶ 113; Tr. 789:10-25, PTX-1553 at 2.

[10] While Liquidia asserted in its Supplemental Invalidity Contentions that Moriarty 2004 is prior art under §§ 102(a) and (b), it never advanced a § 102(a) anticipation theory. *Compare* D.I. 303, Ex 42 at 8-10 ("Moriarty is prior art to the '066 [] under §§ 102(a) and (b)") *with* D.I. 303 Ex. 42 at 14 (§ 103), D.I 303 Ex. 43 at 24 (§ 102(b)) Rather Liquidia identified Moriarty 2004 as prior art only in support of its abandoned obviousness theory. *Compare* D.I 303 Ex. 43 at 27, 31 (stating product made according to Moriarty and sold Remodulin invalidate under § 102(b)) *with* D.I 303 Ex. 43 at 49 (obviousness Moriarty challenge). Similarly, Liquidia's brief does not argue that the Moriarty 2004 publication itself anticipates—nor could it.

1.      **The MPP, even with Moriarty 2004, Does Not Explicitly Anticipate**

Liquidia asserts that "claims 1-3, 6, and 9 are invalid because the product claimed is the same product previously disclosed in the prior art by a 2004 publication by Moriarty et al." Br. 3.[11] In other words, Liquidia asserts that the product of Moriarty 2004, *i.e.*, the MPP, anticipates the product of the '066. Liquidia must prove that the public would possess each and every element of the claimed product simply by practicing the process in Moriarty 2004. *See Amgen*, 580 F.3d at 1368-69; *Eli Lily and Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006) (holding that anticipation requires the inventive composition be in the possession of the public).

Because the only description of the MPP is the Moriarty 2004 publication itself, the MPP cannot anticipate the '066 patent unless Moriarty 2004 was enabled, such that the product of the claimed process was in possession of the public, and that product anticipates each and every limitation of the asserted claims. *Eli Lilly*, 471 F.3d at 1375; *Elan Pharms., Inc. v. Mayo Found.*, 346 F.3d 1051, 1054-55 (Fed. Cir. 2003) (anticipation requires enablement; the reference "must teach one of ordinary skill in the art to make or carry out the claimed invention without undue experimentation"); *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000). Moriarty 2004 does not provide sufficient information to create a pharmaceutical composition. Liquidia presented no evidence at trial or argument in its brief that the Moriarty 2004 process was capable of creating a pharmaceutical composition, let alone one that even Dr. Winkler admits would need to meet the "very explicit[] impurities limitations" of the claims. Tr. 405:9-406:5; PFF ¶¶ 75, 85. *See W.L. Gore*, 721 F.2d at 1554 (patent challenger failed to prove anticipation where "[t]he teachings…are so unacceptably vague concerning characteristics of the products produced by their respective processes" because "[n]o…tests…[of the] processes were conducted," "[n]o products

---

[11] Accordingly, Liquidia's evidence relating to *other* products/processes is misplaced.

of those processes were placed in evidence, and...no analysis of any such evidentiary products" are of record); *Sysmex*, 19-cv-01642 at D.I. 507 ("The few snippets from the record cited by Defendant, are far too vague as to whether the devices were similar in all material respects."). Furthermore, there is no evidence that a POSA could practice the process disclosed in Moriarty 2004. For example, there is no evidence that a POSA could obtain the materials disclosed in Moriarty 2004 such as benzindene triol and other necessary materials for practicing the steps Moriarty 2004 discloses. PFF ¶ 96. Instead, Dr. Winkler opined only on two pages of Moriarty 2004 and offered conclusory testimony that the final page described a "detailed recipe" even though that "recipe" has a different yield on page 8. PFF ¶ 94.

By not presenting evidence that as of the priority date a POSA could practice the claimed inventions based on Moriarty 2004—and further failing to make that argument in its opening brief—Liquidia has waived the argument. *See*, *e.g.*, *Endo Pharms. Inc. v. Actavis Inc.*, C.A. No. 14-cv-1381-RGA, 2017 WL 3731001, at *13 (D. Del. Aug. 30, 2017) ("Defendants failed to present this … argument in post-trial briefing" and therefore it "is deemed waived"); D. Del. R. 7.1.3(c)(2) ("The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief"). Liquidia has failed to show that the MPP, even with Moriarty 2004, enabled a POSA to practice the '066 inventions, including the impurities limitations. PFF ¶¶ 84-86, 94.

Even if Moriarty were enabled, which it is not, it does not disclose purification by salt formation as required by the claims. *See* DTX-258; PFF ¶ 91. Nowhere in Moriarty 2004 is there a single sentence on the topic. *Id.* Nor does it disclose a "composition" with the impurity limitation required by claims 1-3 and 6. PFF ¶¶ 75, 93 *See Amgen,* 580 F.3d at 1367. Nor does Moriarty 2004 disclose *any* information concerning impurities, much less the reduction of specific impurities as

described by the asserted claims. *Id.* The silence of Moriarty 2004 is compounded because Dr. Winkler did not perform the process disclosed in Moriarty 2004 and did not test or analyze the MPP disclosed therein. Tr. 527:17-21, 529:24-530:8, 531:7-16; PFF ¶¶ 89, 102. Instead, Dr. Winkler attempts to rely on the inventor's disclosures in the '066 patent specification and other post-issuance statements with over a decade of hindsight to conclude that the process of Moriarty 2004 was "essentially" the same as UTC's former process (Tr. 517:13-520:21)—a far cry from establishing that Moriarty 2004 and the claimed composition are the same. PFF ¶¶ 95, 101.

## 2. The MPP Does Not Inherently Anticipate the Asserted Claims

The Moriarty 2004 process did not disclose a product meeting the '066 claims. Nor does the MPP inherently anticipate those claims. Despite inherency being a "question of fact" that must be proved by clear and convincing evidence, Liquidia did not put forward any evidence or argument that practicing the process steps recited in Moriarty 2004 would inherently anticipate the asserted claims including the reduction of certain impurities. *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958 (Fed. Cir. 2014). Therefore, any such inherency argument is also waived.

Even if it had not waived inherency, Liquidia could not meet its burden. Inherent anticipation requires that the limitations not identified in the prior art are *necessarily* present because they are "a natural result of the prior art process." *Allergan*, 754 F.3d at 961; *see W.L. Gore*, 721 F.2d at 1554 (inherency "cannot be predicated on mere conjecture respecting the characteristics of the products that might result from the practice of the processes disclosed in references"). Inherency requires inevitability, and "may not be established by probabilities or possibilities." *Allergan*, 754 F.3d at 960. Liquidia presented no evidence whatsoever that practicing Moriarty 2004 would necessarily result in practicing the claims. PFF ¶¶ 87, 92-94.

## 3. UTC's "Former Process" Does Not Invalidate the '066 Patent

Liquidia also cannot rely on data from UTC's former process to argue inherent properties

of the MPP because Liquidia never established that UTC's former process was actually *the same* as the process disclosed in Moriarty 2004. PFF ¶¶ 97-103; *see also Wesley Jessen Corp. v. Bausch & Lomb, Inc.*, 209 F. Supp. 2d 348, 393 (D. Del. 2002) (holding Defendant failed to demonstrate anticipation by inherency where "the four physical properties" claimed were not present in prior art embodiments and a POSA would not recognize the prior art, "with the benefit of hindsight," "teach[es] or suggest[s] substitutions … to produce those samples" that "meet the four properties" claimed). Having done no element-by-element analysis of the claims and having failed to make obviousness or inherency arguments to fill the gaps, Liquidia fails to show the requisite identicality between the MPP (or Moriarty 2004's disclosure) and the asserted claims.

Liquidia's unprecedented theory of anticipation by transitive property is factually and legally wrong. Just as Liquidia's anticipation theory relies on the assumption that the '393 patent is the same as the '066 patent (*supra* IV.B.2), it also relies on finding that the MPP is identical to the product of the "Former" or "Chicago" process. Liquidia's theory is again inconsistent with the evidence at trial. The evidence shows that the processes and products are *not* identical such that Liquidia cannot use the product of the Former Process as a proxy for the MPP. PFF ¶¶ 97-103. Experts from both sides testified that chromatographic methods are based on the separation of compounds for qualitative analysis (TLC), quantitative analysis (HPLC), and purification (column chromatography) using solvents. PFF ¶ 99. Liquidia failed to address the difference in the solvents detailed in the Former Process and Moriarty 2004. In Moriarty 2004, a column is run using a "solvent gradient of 20-50% ethyl acetate in hexanes," while the Former Process has a higher solvent gradient ratio (45L ethyl acetate in 60L Hexanes) and an additional solvent (dichloromethane). PFF ¶ 100. Liquidia cannot assert identicality of the composition, *including impurities*, produced by each process, by ignoring differences in, *inter alia*, the purification step.

Further evidence of improvements to the Former Process are detailed in Example 6 including reported yield and batch size. Moriarty 2004 reported a yield of 83%, while the Former Process reports a yield of ~91%. *Id*. Dr. Winkler also pointed to a summary of release testing data for UTC's Chicago facility as evidence. However, the same document notes that the batch size varies from 350g-1kg, while Moriarty 2004 only reported 441g. *Id.* Liquidia cites one of the inventors, Dr. Batra, who merely confirmed that he had heard "all kinds of terms" used to describe the Chicago process and that "Moriarty's process" "might be one of the terms." PFF ¶ 101. But Dr. Moriarty had multiple patents and did substantial work on synthesizing treprostinil. *See* JTX-2 1:30-33. The fact that a synthesis process "might be" referred to as a "Moriarty's process" does not mean that it was the process from Moriarty 2004, let alone that it was the same as any particular UTC process. Indeed, as Dr. Batra testified, UTC was "always improving the process." PFF ¶ 97. No evidence establishes that the process disclosed in Moriarty 2004 (a non-commercial scale reaction process), was identical to the Chicago process.

Dr. Winkler offered no testimony addressing differences between the "former process" and the process disclosed to synthesize the MPP. PFF ¶ 100. While Dr. Winkler generally asserted that the "Moriarty *process* was used in Chicago, he never asserted that they are the same, only that they "relate[]". PFF ¶¶ 95, 97, 101. Instead, Dr. Winkler relied on UTC naming conventions to equate Moriarty 2004 and the "Former Process," while actively ignoring differences between the two, such as the different solvents in the purification step. PFF ¶ 101.

Rather than directly address the question, Liquidia cites a hodgepodge of disconnected statements—none of which actually compare Moriarty 2004 or the MPP to the '066 pharmaceutical composition. For example, Liquidia asserts that "UTC made treprostinil according to the Moriarty process in a Chicago facility." LFF ¶ 34. The general statement that historically,

treprostinil batches "have been prepared as described in Moriarty" and *four* other patents (two which name Dr. Moriarty as an inventor) is insufficient to establish identicality to the MPP. JTX-2 1:28-30, p. 2-3 ("References Cited"); *cf.* LFF ¶ 34. Because the MPP is not the same as the process/product of the Former Process, there is no evidence that data from the Chicago facility applies to the asserted MPP prior art.

### 4.      Liquidia Waived Its On-Sale Bar Theory

Liquidia has expressly disclaimed any on-sale bar theory and has offered no evidence that the MPP was publicly available. PCH Tr. at 47:9-11; PFF 82. In light of its express disclaimer of any on-sale bar theory, Liquidia cannot now argue that UTC's sale of Remodulin® (which is not the MPP) constitutes a § 102(b) bar. Even if Liquidia had not waived such an argument (which it has), Liquidia never presented evidence of the physical characteristics of the MPP or of Remodulin® in the public domain prior to the '066 patent's priority date. PFF ¶ 86.

### D.      Liquidia Failed to Prove Structural and Functional Identicality

Liquidia cannot establish by clear and convincing evidence that there are no structural or functional differences between the MPP and the '066 patent.

### 1.      Liquidia Improperly Seeks to Shift the Burden of Proof to UTC

Liquidia seeks to sidestep its obligation by shifting the burden to UTC. Br. 3 ("Once a patent challenger provides evidence that the claimed product appears to be the same or similar to that of the prior art, the burden shifts to the patentee to prove that the process by which a product is made imparts 'structural and functional differences' distinguishing the claimed product from the prior art.") (emphasis added) (citing *Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1268 (Fed. Cir. 2012) and *In re Marosi*, 710 F.2d 799, 802 (Fed. Cir. 1983)).[12] That is improper. Once a patent

---

[12] Liquidia's reliance on *In re Marosi* and *Greenliant* is misplaced. *In re Marosi* focused on the
(continued...)

is granted, the burden of proving invalidity *always* remains with the challenger. *See* 35 U.S.C. § 282 ("The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."); *Microsoft*, 564 U.S. at 100; *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007) ("[T]he patent challenger bears the burden of proving the factual elements of invalidity by clear and convincing evidence. That burden of proof never shifts to the patentee to prove validity."); *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed. Cir. 1986) ("a jury or a court may reach a conclusion that a patent remains valid *solely* on the failure of the patent challenger's evidence to convincingly establish the contrary.").

Liquidia's "conclusory assertions" do not amount to "clear and convincing evidence of invalidity to overcome th[e] presumption" of validity. *3M Co. v. Mohan*, 482 F. App'x 574, 577 (Fed. Cir. 2012). Liquidia's "burden is especially difficult when, as is the present case, [Liquidia] attempts to rely on prior art that was before the patent examiner during prosecution." *Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004) (quotations omitted). Moriarty 2004 was explicitly discussed in the specification. JTX-2, p. 2, 1:30-31; *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1375 (Fed. Cir. 2006) (rejecting anticipation challenge where Examiner considered prior art reference disclosed approximately fifty different salts without singling out a preference for the claimed salt form); *see also Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1330 (Fed. Cir. 2008)(applying an "added burden of overcoming the deference due to the PTO").

Liquidia's stance that it need only to show that "the claimed product *appears to be the same* or *similar* to that of the prior art" and then "the burden shifts to the patentee *to prove*" structural and functional differences is wrong for two reasons. First, Liquidia has to prove more

---

applicant's burden during prosecution where no presumption of validity applies, 710 F.2d at 803, and *Greenliant* addressed the rule against recapture where the patentee sought to enlarge the scope of the original claims post-issuance, 692 F.3d at 1271. Neither addresses the issue here: an alleged infringer's burden to prove anticipation during a district court litigation of an issued patent.

than the fact that the claimed product "appears to be the same" as or "similar" to the prior art. Liquidia must show by clear and convincing evidence that the two products *are* the same. *See Amgen*, 580 F.3d at 1367; *Cubist Pharms.,* 75 F. Supp. 3d at 668 ("The party asserting anticipation bears the burden of proving that the process limitations do not result in an invention distinguishable from the prior art."). That includes establishing the absence of structural and functional differences. Second, the patentee *never* has "to prove" validity. *See Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 643 (2015) ("[§ 282's] presumption takes away any need for a plaintiff to prove his patent is valid"). Ultimately, Liquidia must prove invalidity "by clear and convincing evidence by considering the totality of the evidence, including any rebuttal evidence presented by the patentee." *Pfizer*, 480 F.3d at 1360.

### 2. The Claimed Product is Structurally and Functionally Different

Liquidia has failed to demonstrate by clear and convincing evidence that the '066 claims cover products that are not structurally and functionally different from the Moriarty 2004 product. *Amgen*, 580 F.3d at 1367, 1370. Nonetheless, UTC identifies structural and functional differences that Liquidia failed to address. The steps identified in the '066 patent including forming and isolating a salt of treprostinil—not disclosed by Moriarty 2004—confer at least two structural and functional improvements to the claimed pharmaceutical composition.

First, the alkylation and hydrolysis steps generate impurities including isomers (*e.g.*, 3AU90). PFF ¶¶ 29, 106. The claimed '066 pharmaceutical composition has lower levels of these impurities resulting from the alkylation and hydrolysis steps.[13] Those isomers are so structurally similar to the active molecule that they can: (i) be very difficult to separate out (PFF ¶¶ 28, 106); and (ii) interact with the body in unintended ways (PFF ¶ 109). The salt formation and isolation

---

[13] Liquidia's assertion that a reduction of these specific impurities (*e.g.*, 3AU90) is not claimed (Br. 6) ignores the actual language of the claims including the impurity limitations. *Supra* IV.A.

steps then lower such impurities, leading to a novel treprostinil pharmaceutical composition never described in Moriarty 2004. PFF ¶¶ 84-87, 93.[14] *Supra* IV.C.

This structural difference is also clear from the evidence presented by inventor Dr. Walsh, who testified about analytic data on impurity testing from embodiments of the '066 patent as compared to batches prepared by UTC using its former process.[15] PFF ¶¶ 110-111; PDX-5.5– PDX-5.6, Tr. 792:23-794:5, 795:12-796:12, 797:11-802:19. As shown by the data, batches of treprostinil API manufactured by UTC using its former process (*i.e.*, without the claimed salt formation and isolation purification steps) showed higher amounts of impurities. PFF ¶¶ 110-111, 113-114. Liquidia's focus on the "free acid" is misplaced. Br. 5-6. Because those impurities from the alkylation and hydrolysis steps (*e.g.*, 3AU90) are separated from the treprostinil during the salt formation step then washed away in the isolation step, those impurities would not be re-introduced during *any* subsequent steps. PFF ¶ 107. Consequently, the structural differences in the claimed composition remain. *Id.*[16] There is no evidence to the contrary. As Dr. Walsh testified, batches manufactured using the '066 patent's process had "much fewer impurities in them than the old process" and further that "some batches we made we couldn't see any impurities at all"— something Dr. Walsh had not seen in his experience (Tr. 802:7-19), including in all prior UTC treprostinil synthesis processes. Tr. 792:23-793:13, 795:21-796:5, 802:7-19; PFF ¶ 104.

---

[14] Notably, in denying instituting IPR on the '066 patent, the PTAB rejected Liquidia's argument that the PTAB ignore the impurities limitation. *See* D.I. 293, Ex. 6 at 12-15 (finding Liquidia had not sufficiently demonstrated obviousness over Moriarty 2004 because the combination did not suggest the impurities-lowering limitation of claim 1).

[15] Liquidia argues that a "salt of treprostinil" is not a "treprostinil product" of the '066 patent. Br. 6. Curious and incorrect. *See e.g.*, Claim 1 ("pharmaceutically acceptable salt thereof"); PFF ¶ 84.

[16] Liquidia presented no MPP batch data. Liquidia attempts to escape its lack of evidence comparing the MPP directly to the claimed inventions by faulting Dr. Walsh for not making such a comparison. Br. 6. Moreover, Dr. Walsh's unrebutted testimony established that the former process and the '066 process were different. PFF 110-111. Because, unlike Moriarty 2004, the claims of the '066 patent require salt formation/isolation (reducing 3AU90), this structural difference presented by Dr. Walsh applies equally to the salt and free acid forms of treprostinil.

Second, the '066 patent provides for an isolated salt that is stable at ambient temperature. The MPP is free acid treprostinil that is not stable at ambient temperature. There was no prior art treprostinil API that could be stored at ambient temperature because it would degrade (increasing impurities) unless kept under cold conditions. *See* Tr. 801:25-802:2; PFF ¶ 92, 79. By contrast, the '066 patent claims involve a treprostinil salt (claim 1), which "is stored at ambient temperature" (claim 6) and used in the pharmaceutical composition. The capability for making a pharmaceutical composition from treprostinil salt that had been stored at ambient temperature is novel over the prior art, as is the isolated treprostinil salt of claims 1 and 6. As shown at trial, treprostinil API from the '066 patent stored at *ambient* temperature for 6 months had fewer impurities than treprostinil API from UTC's former process stored at *refrigerated* temperatures for 6 months. PDX-5.6; PFF ¶¶ 105, 110. Thus, the '066 patent's claims result in a treprostinil pharmaceutical composition with the functional benefit that it can be stored at ambient temperature.

**E.**     **The "Impurities" Limitation, Explicitly Described in the Specification, Satisfies the Written Description Requirement**

Liquidia has not met its burden of proving by clear and convincing evidence that the "impurities" limitation does not satisfy the written description requirement. *See Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015) ("A party must prove invalidity for lack of written description by clear and convincing evidence."). To meet their written description obligation, the inventors need to demonstrate merely that they were in possession of the invention as described in the patent specification. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) ("[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."). The specification clearly satisfies this standard. A POSA would have understood that the inventors were in possession of the

"impurities" limitation as a result of the specification language: "The impurities carried over from intermediate steps (i.e. alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step." PFF ¶ 119. That should end the analysis.

Beyond this explicit disclosure, a POSA would have understood the inventors possessed the invention, including the impurities limitation, as a result of other statements in the specification. *See Ariad Pharms.,* 598 F.3d at 1351 (written description "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art."). For example, the specification discloses color changes and chromatographic techniques that would have alerted a POSA to impurities. Tr. 819:7-18, 812:6-816:17; PFF ¶ 116. Both sides' experts agree that all reactions generate impurities and no material is 100% pure. PFF ¶¶ 117, 124-125. A POSA would have understood visual evidence of the impurities generated from the alkylation and hydrolysis steps from the disclosure that TLC was used to monitor the progress of the reactions. PFF ¶ 123; *see Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1382-83 (Fed. Cir. 2019); *see also Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, 2019 WL 4058927, at *17 (D. Del. Aug. 28, 2019). A POSA would also have understood that, after beginning with a BTO batch that was colorless, one or more impurities resulted from the alkylation and hydrolysis steps because the product of those reactions, *i.e.*, the "starting batch of treprostinil," was pale-yellow. PFF ¶¶ 120-122. The same POSA would have understood that these impurities were lowered during salt formation because the result was no longer pale-yellow, but off-white. PFF ¶¶ 120-122; *see Bioverativ Inc. v. CSL Behring LLC*, No. CV 17-914-RGA, 2020 WL 1066019, at *3 (D. Del. Mar. 5, 2020) ("[i]nformation that is well known in the art need not be described in detail in the specification."). Liquidia ignores these various disclosures in the specification.

### 1.      A POSA Would Have Understood the Relevant Impurities

Much like its hyper-technical non-infringement analysis centered around the BTO molecule, Liquidia bases its lack-of-written-description argument on an erroneous interpretation of the relevant impurities. POBr. 7-8. Liquidia does not dispute that the specification describes that impurities are generated during the alkylation and hydrolysis steps and removed during the salt formation step, as claimed. Instead Liquidia argues that the specification does not differentiate between impurities "resulting from the alkylation and hydrolysis of the BTO molecule" and other impurities, for example those from reagents and solvents. Tr. at 533:14-535:17; Br. 11. But a POSA would have understood that the alkylation and hydrolysis steps could not occur without reagents. PFF ¶ 118. A POSA would have understood the relevant impurities include any impurity resulting from alkylating and hydrolyzing the entire contents of the batch including the reagents and solvents, and not just alkylating and hydrolyzing the BTO molecule alone. PFF ¶ 118.

### 2.      Liquidia Improperly Relies on Extrinsic Evidence to Support Its Written Description Argument

Written description involves what a POSA would understand based only on the four corners of the patent. *See Biogen Int'l GmbH v. Mylan Pharms. Inc.*, 28 F.4th 1194, 1202 (Fed. Cir. 2022) ("Where the disclosure in a patent's specification plainly corresponds to what is claimed, extrinsic evidence should not be used to cast doubt on the meaning of what is disclosed."). Contravening this principle, Liquidia impermissibly seeks to rely on evidence outside the patent specification, including: (1) inventor testimony; (2) Yonsung's DMF; and (3) UTC's infringement analysis. None of these sources hold water, let alone satisfy Liquidia's burden.

Liquidia's reliance on inventor testimony is improper. Br. 9. In every case involving inventor testimony on which Liquidia relies, that inventor testimony is used only to *confirm* the fact that the patent specification contained no words at all regarding the given topic. *Id.*; *Nuvo*

*Pharms.*, 923 F.3d at 1381 ("That conclusion [that there is no written description] is *confirmed* by the inventors … own testimony") (emphasis added); *Biogen Int'l GmbH v. Mylan Pharms. Inc.*, 2020 WL 3317105, at *13 (N.D.W. Va. June 18, 2020) ("Extrinsic Evidence *Confirms* the Lack of Written Description") (emphasis added); *Bos. Sci. Corp. v. Johnson & Johnson Inc.*, 679 F. Supp. 2d 539, 555 (D. Del. 2010) ("Logically, the inventors could not have described a knowledge that they did not possess; moreover, as mentioned previously, there was no attempt in the specification to do so.") (emphasis added). Here, by contrast, the specification describes the "impurities" limitation and includes language evidencing that the inventors possessed it.[17] As such, each of these cases is inapposite here, where there is an explicit disclosure of the challenged "impurities" limitation in the specification. JTX-2, 17:27-40.

Liquidia also improperly relies on Yonsung's DMF and mischaracterizes Dr. Scheidt's testimony to assert that "both parties' experts testified that many compounds, including BTO and treprostinil sodium, are both pale-yellow and off-white/white; thus a color change from pale-yellow to off-white is not indicative of impurity reduction." Br. 11-12; LFF ¶ 53. Dr. Scheidt agreed that Yonsung's DMF has a BTO *appearance acceptance criterion* of white to pale yellowish powder. Tr. 820:13-25; PTX-201 at LIQ00573781. That does not mean a white powder composition and a pale-yellow powder composition would have the same level of impurities. Rather, as Dr. Scheidt explained, the inventors explicitly described that impurities were lowered after salt formation by referring to the treprostinil composition before salt formation as being pale-yellow and the treprostinil composition after salt formation as being off-white. PFF ¶¶ 121-122. Extrinsic evidence from Yonsung's 2013 DMF, unavailable to a POSA as of the priority date, does

---

[17] Moreover, to the extent inventor testimony is relevant, the record shows that the inventors were in possession of the impurities limitation. Tr. at 555:10-12, 481:12-16 (Dr. Tuladhar testifying that "[i]n the new process, we carry on [the impurities] until the salt formation"); Tr. at 547:12-13 (Dr. Batra testifying that "if you may see some impurity, they will show up on TLC, also.").

not impact Dr. Scheidt's analysis of the '066 specification.

Finally, Liquidia improperly relies on UTC's infringement analysis and claims that written description is lacking because the specification does not provide the same type of numerical comparison of impurities that UTC presented to prove that Liquidia infringes. Br. 10-11. Liquidia does not cite any caselaw to support such a requirement because there is none. Patent owners are not required to use the same steps described in a patent's specification to prove infringement. The question at the heart of the written description requirement is whether a POSA would have known that the inventors possessed the limitation. *See Ariad Pharms.*, 598 F.3d at 1351. That is entirely separate from whether and how the patent owner proves infringement.

### 3.     The Specification Describes the "Impurities" Limitation

Finally, Liquidia argues that the full scope of the "impurities" limitation is not covered by the specification's disclosures. This stance is also flawed.[18] Br. 12. The pale-yellow starting batch of treprostinil was combined with a base to form a treprostinil salt. JTX-2 at 12:37-59. That treprostinil salt was then combined with an acid to convert the salt back to treprostinil, which was characterized as off-white in the specification. *Id.* at 14:34-56. A POSA would have understood that the process of converting the salt back to treprostinil would not impact the impurities from the alkylation and hydrolysis steps. PFF ¶ 107. As such, the conclusions regarding the comparison of the pale-yellow starting batch of treprostinil to the off-white treprostinil would equally apply to a comparison of the pale-yellow starting batch of treprostinil to the treprostinil salt. *See First Quality Tissue, LLC v. Irving Consumer Prod.*, CA No. CV 19-428-RGA, 2022 WL 958089, at *7 (D. Del. Mar. 30, 2022) ("The Federal Circuit has made clear that a claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples

---

[18] Liquidia did not present its "full scope" argument at trial—it should be stricken as untimely.

explicitly covering the full scope of the claim language."); *see also Baxalta Inc. v. Bayer Healthcare LLC*, 513 F. Supp. 3d 426, 453 (D. Del. 2021).

## V.     THE '793 PATENT IS NOT INVALID FOR CLAIMING TREATMENT OF PULMONARY HYPERTENSION

### A.     The POSA Would Consider Each Claim as a Whole and Know the Types of PH Treatable with a Vasodilator like Treprostinil

When each claim is considered as a whole—not just one term in isolation—and understood in view of the specification, the POSA would understand that the claims are limited to the effective treatment of precapillary PH with treprostinil.

The asserted claims require (i) treating pulmonary hypertension using (ii) treprostinil in a (iii) therapeutically effective single event dose. JTX-3, claim 1. It is undisputed that PH is elevated pulmonary blood pressure that can be caused by problems in either the precapillary (before the lung capillaries) or postcapillary (after the lungs) vasculature. PFF ¶¶ 127-129. With precapillary disease, narrowed pulmonary arteries or other causes increase resistance to blood flow and thus increase blood pressure. *Id.* The POSA also knew that treprostinil is a vasodilator, which means it "widen[s] the [blood] vessel[s] due to relaxation of the muscle in the vessel wall." Tr. 574:10-15 (Hill); LFF ¶ 69; PFF ¶ 132. Thus, treatment with treprostinil reduces resistance to blood flow and decreases the elevated pulmonary blood pressure that defines PH. PFF ¶ 132.

By contrast, Dr. Hill testified that stiffening in the left ventricle causes postcapillary PH. PFF ¶¶ 128, 129, 136. Elevated pressure in the postcapillary veins can work its way back through the lungs into the precapillary pulmonary arteries. *Id.* But because the cause is the left heart, not precapillary resistance, the POSA in practice would use a different drug. *Id.*; Tr. 636:1-5 (Waxman) ("in purely isolated postcapillary disease … we would not consider any pulmonary vasodilator … because the mainstay of treatment is a diuretic."). Dr. Hill testified that treating postcapillary PH with a vasodilator "could induce pulmonary edema" and would be "stupid." PFF

¶ 128. The '793 specification describes treatment of precapillary PH. PFF ¶¶ 134-135.

The POSA would consider the meaning of the claims as a whole with this background in mind. *In re Geerdes*, 491 F.2d 1260, 1262-63 (CCPA 1974) ("[E]very limitation in the claim must be given effect rather than considering one in isolation"). Although "pulmonary hypertension" *in isolation* includes five groups, by reciting "treating pulmonary hypertension comprising administering … treprostinil," a vasodilator, the POSA would understand the claim to require treating PH through vasodilation. Thus, the POSA would understand claim 1 as a whole to be limited to treating varieties of PH where using a vasodilator addresses the cause of the disease— i.e., precapillary PH. *See, e.g.*, *Glaxo Grp. Ltd. v. Kali Labs., Inc.*, No. 03-CV-399, 2005 WL 1793728, at *3 (D.N.J. July 27, 2005) (construing claims to "reach … only those manifestations of nausea against which [the claimed API] is effective"); *Kao Corp. v. Unilever U.S., Inc.*, 334 F. Supp. 2d 527, 546 (D. Del. 2004), *aff'd*, 441 F.3d 963 (Fed. Cir. 2006).

Liquidia focuses on the meaning of "pulmonary hypertension" in isolation, citing "the patent specification and expert testimony." Br. 15. But Liquidia did not identify this alleged expert testimony, unless it was alluding to testimony that PH in isolation includes five groups, which fails for the reasons described above. Liquidia's lone argument based on the specification also fails because reciting "precapillary pulmonary hypertension" in claim 1 would have been unnecessary and redundant. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (preferring claim constructions that give meaning to all terms). One of Liquidia's citations actually contradicts its position by equating precapillary PH with PH, stating that "The patient population … included different forms of *precapillary* pulmonary hypertension. All these patients had a need for therapy *of pulmonary hypertension*[.]" JTX-3, 16:64-65.[19]

---

[19] Disavowal is not at issue. UTC relies on the POSA's understanding of the claim as a whole.
(continued...)

**B.    The '793 Patent Enables Treatment with a Therapeutically Effective Dose of Treprostinil Without Undue Experimentation**

The '793 patent is enabled. Liquidia's PH enablement argument fails for at least three reasons. First, there is no dispute that the '793 patent enables treating precapillary PH, which includes patients in all five PH Groups. The Examples disclose treating PH patients in Groups 1, 3, and 4, which are all precapillary. PFF ¶ 135. Liquidia has not disputed that treprostinil can also treat patients in Group 5, and Drs. Waxman and Hill agree the POSA would know that inhaled treprostinil can also be used for some pre- and postcapillary combined Group 2 PH patients, which have a precapillary condition. PFF ¶¶ 135-136. The '793 patent fully enables the asserted claims when properly construed. *Supra* § V.A.

Second, even if the claims include isolated postcapillary Group 2 PH, Liquidia has failed to show undue experimentation by clear and convincing evidence. The POSA's alleged "safety concerns" might affect how often a physician would prescribe a drug or how closely to monitor a patient for certain complications (*e.g.*, edema), but they do not show a lack of enablement. The claims do not require FDA approval or that no patient ever experience complications, and Liquidia has not presented evidence that assessing the pulmonary edema risk for any given patient would require undue experimentation. *E.g.*, JTX-3, claim 1; Br. 15-19. Further, treprostinil vasodilates the pulmonary vasculature and reduces pulmonary blood pressure even in isolated postcapillary PH patients, as confirmed by Dr. Hill. PFF ¶¶ 129, 132, 135-136. Describing the FIRST study, Dr. Hill testified that administration of epoprostenol (Flolan®) to isolated postcapillary Group 2 patients reduced PAP, PVR, and wedge pressure, which were "significant changes" and "improvements." Tr. 585:9-10; DTX-358 at 1, 5-7 (improvements in hemodynamics, exercise

---

*Glaxo*, 2005 WL 1793728, at *3 (declining to construe claims as "a cure-all for all … forms of nausea, as no skilled artisan would interpret [them] as such").

duration, and dyspnea score); PFF ¶ 136.

Third, Liquidia's argument fails even if the claims are interpreted to include treating isolated postcapillary Group 2 PH, and even if doing so is "inoperative" as alleged. Claims are not required to carve out all possible inoperative embodiments. *In re Dinh-Nguyen*, 492 F.2d 856, 858-59 (CCPA 1974) ("It is not a function of the claims to specifically exclude either possible inoperative substance or ineffective reactant proportions[.]"); *In re Geerdes*, 491 F.2d at 1265; *In re Myers*, 410 F.2d 420, 426 (CCPA 1969) (claims excluding every inoperative element would be "so detailed as to obscure, rather than particularly point out and distinctly claim, the invention"); *In re Anderson*, 471 F.2d 1237, 1242 (CCPA 1973) ("It is not the function of claims to *exclude* all [inoperative combinations] but to point out what the combination is.").

Allegedly inoperative embodiments only support a lack of enablement "if the *number* of inoperative combinations becomes significant, and in effect forces [a POSA] to experiment *unduly* in order to practice the invention[.]" *Atlas Powder Co. v. E.I. du Pont De Nemours & Co*., 750 F.2d 1569, 1576 (Fed. Cir. 1984) (emphasis added); *In re Cook*, 439 F.2d 730, 735 (CCPA 1971). The claim must "read[] on *significant numbers* of inoperative embodiments," and "[a]s long as one of ordinary skill possesses the 'necessary information to limit the claims to operative embodiments,' there is no failure to satisfy the enablement requirement for claiming substantial inoperable embodiments[.]" *Gevo, Inc. v. Butamax Advanced Biofuels LLC*, 2013 WL 3914467, at *17 (D. Del. July 26, 2013) (citation omitted) (emphasis added).

Here, assuming both that the claims encompass isolated postcapillary Group 2 patients and that Liquidia's "safety concerns" render treatment of those patients "inoperative," the POSA would either already know that the treatment would be inoperative based on pathophysiology (*i.e.*, the presumed basis for Dr. Hill calling it "stupid" to give such patients treprostinil) or could readily

test a small number of patients using routine methods (*e.g.*, a repeat of the Flolan® epoprostenol study, but using treprostinil) to confirm. Each option involves one embodiment—not a "substantial number"—and neither option involves undue experimentation. *Atlas Powder*, 750 F.2d at 1576. Merely asserting that the POSA would have to select patients and "work[] out a protocol" does not qualify as clear and convincing evidence of undue experimentation. *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1339 (Fed. Cir. 2013) ("Unsubstantiated statements indicating that experimentation would be 'difficult' and 'complicated' are not sufficient" to establish lack of enablement by clear and convincing evidence); *cf.* Br. 17. The quantity of experimentation would be almost nonexistent, and no other *Wands* factors establish undue experimentation.

Liquidia's citations to *In re Corkill*, 771 F.2d 1496 (Fed. Cir. 1985) and *Trs. of Bos. Univ. v. Everlight Elecs. Co., Ltd.*, 896 F.3d 1357 (Fed. Cir. 2016)) are unavailing. The claims in *Corkill* were found not enabling because a significant *number* of embodiments (i.e., 90% of the claimed particle sizes) were inoperative, whereas isolated postcapillary PH is just *one* embodiment.[20] In *Everlight*, the patent owner obtained a construction covering certain embodiments, and the experts agreed one of them was *impossible* as of the priority date. No expert here believes treatment of any PH patient with treprostinil is *impossible*; indeed, Liquidia merely asserts "safety concerns." In fact, the FIRST study and Dr. Hill's testimony show that it would be possible to treat isolated postcapillary PH patients with a prostacyclin and achieve therapeutic effectiveness. PFF ¶ 136.

Lastly, Liquidia's own inhaled treprostinil patent claims also recite treating "pulmonary hypertension," which the patent describes as including all five groups. PFF ¶ 137. Liquidia's patent shows that Liquidia acknowledges there is no problem with claims encompassing Group 2 PH.

---

[20] This is why the percentage of isolated postcapillary Group 2 patients is irrelevant. But even if relevant, Liquidia has not met its burden. DTX-398 is an abstract with data from a limited population of one town in Australia. DTX-2000 postdates the priority date by a decade. PFF ¶ 133. About 8-10% of Dr. Waxman's patients have isolated postcapillary Group 2 PH. PFF ¶ 130.

### C.  A POSA Would Understand the Inventors Possessed Methods for "Treating Pulmonary Hypertension"

The '793 patent fully satisfies the written description requirement, which requires the specification show "possession" of the claimed invention. *Ariad*, 598 F.3d at 1351. "Possession" means assessing whether "the inventor[s] actually invented the invention claimed" and is evaluated based on the four corners of the specification. *Id.*; *Falkner v. Inglis*, 448 F.3d 1357, 1366 (Fed. Cir. 2006) (knowledge of a POSA combined with the specification is sufficient). The level of detail required depends on the nature and scope of the claims. *Ariad*, 598 F.3d at 1351.

Here, the invention is a method of treatment. The inventors discovered that treprostinil could be administered at higher doses with longer-lasting benefits and reduced side effects. PFF ¶¶ 131-132, 134-135, 138-139.The '793 patent describes how administering treprostinil by inhalation targets the lungs, dilates the blood vessels, and reduces blood pressure—*i.e.*, treats PH. *Id.* The POSA would therefore recognize from the specification that the inventors "invented what is claimed"—inhaled treprostinil at specific doses delivered in specific breaths to reduce pulmonary blood pressure to effectively treat PH. *Id.* Despite these disclosures, Liquidia again argues a lack of written description premised upon "safety concerns" for a subset of patients with postcapillary Group 2 PH. Like its similar enablement stance, Liquidia's arguments fail.

First, the claims are limited to precapillary PH as explained in § V.A, above.

Second, assuming the claims also include isolated postcapillary Group 2 patients, the claims still have adequate written description. Even if there were "safety concerns" over a risk of pulmonary edema, the POSA would understand that treprostinil still would be effective to vasodilate the pulmonary vasculature, affect hemodynamics, and treat a patient's elevated pulmonary blood pressure, *i.e.*, treat PH. PFF ¶ 136. The fact that '793 patent Examples 1 and 2 include patients from PH Groups 1, 3, and 4 is inapposite, as the data presented already shows

hemodynamic therapeutic benefit for the claimed doses and written description does not even require testing data demonstrating effectiveness. *Nuvo*, 923 F.3d at 1380. Moreover, written description requires only "possession" as shown by the specification, not "[proof] to the skilled reader that the invention works, or how to make it work[,] which is an enablement issue." *Alcon Rsch Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1191 (Fed. Cir. 2014).

## VI.   THE '793 PATENT IS NOT INVALID FOR CLAIMS INVOLVING POWDER FORMULATIONS OR A DRY POWDER INHALER

### A.   A POSA Would Understand the Inventors Possessed Treating PH with a Dry Powder Formulation Administered with a DPI

The '793 patent also satisfies the written description requirement regarding dry powder. "[T]he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Centrak, Inc. v. Sonitor Techs. Inc.*, 915 F.3d 1360, 1367 (Fed. Cir. 2019). Here, the claims are directed to methods of treating PH using treprostinil. *E.g.*, JTX-3, claim 1. The '793 patent discloses and claims the condition to be treated (PH), the drug (treprostinil or a salt thereof), the route of administration (inhalation), the dosage (15-90 μg), and the number of breaths (1-3). *Id.*; PFF ¶ 135. The specification demonstrates efficacy of the claimed bolus dose by presenting data from testing using a soft mist inhaler and a nebulizer and states that the same effect could be accomplished using a pressurized metered dose inhaler or a DPI. PFF ¶¶ 136, 139-140. Dr. Clark explained that a POSA would have understood the inventors to have discovered that a bolus dose of treprostinil delivered by inhalation in a few breaths provides therapeutic efficacy without the expected negative side effects. Tr. 832:19-833:6. The fact that the inventors stated, in the original specification, that "[t]he inhalation device can be also a dry powder inhaler," and "[i]n such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder," demonstrates the inventors were in constructive possession of treating PH with a bolus dose of treprostinil

delivered as an inhaled dry powder. JTX-3, 7:22-26; PFF ¶¶ 138-139.

The '793 patent shows possession of the claimed methods using a powder formulation even though the example data is from inhaled solutions. Dr. Clark testified that the POSA would understand the inventors possessed a dry powder formulation based on the specification's teachings and data from inhaled solution testing and express statements regarding powders and DPIs. PFF ¶ 138-139. For powder formulations delivered by a DPI over few breaths, the POSA would need to know the dose and whether it was effective and tolerable to deliver as a bolus, which the '793 patent teaches by describing dosing in 1-3 breaths without side effects. PFF ¶¶ 138-140. Numerous DPIs were available by 2006 and the process for developing dry powder formulations involved routine techniques. PFF ¶¶ 142-151. Given the state of the art and the information provided by the '793 patent, a POSA would have understood the inventors to be in possession of methods of treatment using a dry powder formulation of treprostinil with a DPI. PFF ¶¶ 138-146.

Liquidia asserts the inventors lacked an actual reduction to practice, but written description requires only constructive possession and is an analysis into the "four corners" of the specification from the POSA's perspective.[21] *Ariad*, 598 F.3d at 1351; *id.* The information Liquidia complains is missing from the '793 patent, such as "examples of dry powder formulations," excipients, manufacturing methods, and DPIs, was known and within the skill of the POSA. PFF ¶¶ 126, 142-151; *Falkner*, 448 F.3d at 1365 ("a patent need not teach … what is well known in the art").

The statements in the '793 patent are more than sufficient under the Federal Circuit's *ipsis verbis* caselaw. Liquidia's citation to *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1364 (Fed. Cir. 2011) is unavailing. That case involved claims to a "vast genus" of "tens of thousands" of potential analog molecules, about which the specification "contain[ed] virtually no

---

[21] UTC's work with MannKind, which postdates the priority date by over a decade and is directed to FDA approval—a much higher bar than reduction to practice—is legally irrelevant. Br. 22, n.4.

information." *Id.* at 1363-64. The Federal Circuit distinguishes between patents encompassing broad genus claims from those involving relatively few possible embodiments. *E.g.*, *Centrak*, 915 F.3d at 1368. Here, the claims of the '793 patent are not directed to a "vast" genus of molecules, but instead to a method of treating PH with inhaled treprostinil.

Liquidia's claims that information regarding inhaled solutions cannot inform a POSA regarding dry powder formulations also fall flat. Br. 22-23. Liquidia's NDA for its dry powder product relies on Tyvaso® (inhaled solution) data. PFF ¶ 141. This fact alone fatally undermines Liquidia's claims. Br. 21. Moreover, Liquidia cited Dr. Rubin's testimony, but he stated merely that a solution could not be used in a DPI, not that nothing a POSA learns from a solution can be applied to development of a powder formulation. Tr. 612:4-5. Dr. Seeger provided only a vague statement that "bringing something down" as a powder may or may not be "simply identical" to using a solution. Tr. 297:10-22. Neither establishes by clear and convincing evidence that the '793 patent failed to provide sufficient information to a POSA. Further, it is not UTC's burden to disprove Liquidia's conclusory stance. *See Enzo Life Scis., Inc. v. Digene Corp.*, 305 F. Supp. 2d 400, 403 (D. Del. Feb. 19, 2004). Regardless, Dr. Clark explained that a POSA would recognize the inventors possessed the claimed method using a dry powder formulation based on the patent's disclosure in view of a POSA's knowledge and skill. PFF ¶¶ 138-140; *see also infra* § VI.B.

### B. The '793 Patent Enables Administration of a Dry Powder Formulation of Treprostinil Using a DPI Without Undue Experimentation

The '793 patent is fully enabled when viewed from the perspective of a POSA. *See Falkner*, 448 F.3d at 1365. The basic steps a POSA would take in developing a dry powder in 2006 are not contested. PFF ¶ 146. Dr. Smyth performed these steps using methods and materials known and available in 2006. PFF ¶¶ 146, 153-154. In only 3 weeks of testing, Dr. Smyth prepared treprostinil free acid and treprostinil diethanolamine dry powder formulations that aerosolized well and

delivered doses within the claimed 15-90 µg range.[22] PFF ¶ 153. When an expert can successfully practice the claims, as Dr. Smyth did, this court has concluded that the defendant failed to prove lack of enablement. *Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.* ("*BMS*"), 477 F. Supp. 3d 306, 352-53 (D. Del. 2020).[23]

As in *BMS*, Liquidia—the party bearing the burden of proof—did not perform any testing itself. *Id.* at 352. Instead, it identified additional experiments Dr. Smyth allegedly should have performed and asserts his testing "failed." None of the additional tests are necessary, however, and his testing was far from a failure. The claims do not require an optimized and FDA-approved product. PFF ¶ 147; *see*, *e.g.*, JTX-3, claim 1. Nor should Dr. Smyth have been expected to actually administer to a human being for purposes of patent litigation. *Id.* His testing shows that the POSA could make and use the claimed invention with only a few weeks' effort. PFF ¶ 153.

The POSA would not need to perform undue experimentation to "(i) identify a suitable form of treprostinil … (ii) identify a suitable carrier … and (iii) identify a suitable DPI." Br. 24. First, the patent identifies the API to be used in the invention in claim 1. JTX-3; PFF ¶ 149. API salt screening was routine by 2006 and every major pharmaceutical company has performed these screens for decades. PFF ¶ 149. Dr. Gonda also admitted that the "stability" testing was routine. *Id.* Liquidia similarly admitted they did not perform extensive stability testing in selecting the API for LIQ861. Tr. 275:22-24 ("[Liquidia] didn't search the world for stability data, you just made a formulation and tried it? A. Basically, yes."). Thus, it would be routine for a POSA to identify a

---

[22] Dr. Smyth's testing also shows that preparation of a dry powder formulation was predictable. Jet milling worked, lactose worked, and the resulting blend and particle size delivered doses in the claimed range with particle sizes appropriate to reach the lung. PFF ¶¶ 153-154.

[23] In discussing his work with treprostinil sodium, Dr. Smyth testified that his lab does not have humidity control. Tr. 882:9-17. Dr. Gonda testified that a POSA in 2006 would have a laboratory with temperature and humidity control readily available. Tr. 762:4-14. A POSA could have handled any humidity issues like hygroscopicity at the time.

suitably stable form of treprostinil.

Second, identifying a suitable carrier was also routine. All three experts agree that lactose was the only FDA-approved carrier in 2006. PFF ¶ 150. Although a Maillard reaction could potentially occur when lactose is formulated with an amine drug, treprostinil free acid does not have an amine group, so the concern does not apply to the acid form. PFF ¶ 151. For treprostinil diethanolamine, Dr. Gonda, Dr. Clark, Dr. Smyth, and the evidence all confirmed that this concern is minor at worst, and easily testable. *Id.* The Physician's Desk Reference contains 72 entries of amine drugs formulated with lactose. PFF ¶ 151; PTX-47 at 2569. Dr. Gonda has prepared amine drugs using lactose. PFF ¶ 150. Dr. Clark testified that while the Maillard reaction "is a concern in terms of paying attention," it would not stop a POSA from using lactose unless she noticed an adverse reaction. PFF ¶ 151. Dr. Smyth did not notice any adverse reaction when using lactose with treprostinil diethanolamine. PFF ¶ 151.

Third, identifying a DPI for PH patients would not require undue experimentation. Dr. Clark testified that Meyer 2005 (PTX-1980)—available as of the priority date—confirmed PH patients' ability to inhale from a DPI. PFF ¶ 152. As Dr. Clark explained, based on Meyer a POSA would expect PH patients to achieve max inspiratory pressures of 5.2 kPa for females and 6.8 kPa for males. PFF ¶ 152; PTX-1980 at 1. Dr. Smyth's testing was performed using 4.0 kPa through a low resistance dry powder inhaler available to POSAs in 2006.[24] PFF ¶ 154.

Dr. Smyth's statement that further studies would be needed on the formulations he developed before delivering them to a PH patient are likewise irrelevant. Enablement does not require actual FDA approval of the product that Dr. Smyth developed; it merely requires that "the specification … enable a person of ordinary skill in the art to make and use the invention … without

---

[24] In fact, Dr. Smyth's testing used the same inhaler Liquidia relies on for its product. PFF ¶ 144.

undue experimentation." *Cephalon*, 707 F.3d at 1336. Dr. Smyth's three-week testing results demonstrated that the claims are enabled to a POSA.

## VII.    CONCLUSION

For the reasons above, Liquidia has failed to establish invalidity. Plaintiff respectfully requests that the Court enter judgment finding the '066 and '793 patents not invalid, and any additional relief the Court deems just and proper.

OF COUNSEL:

William C. Jackson
Eric Levi
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036
(202) 346-4216

Douglas H. Carsten
Mandy H. Kim
Arthur Dykhuis
Jiaxiao Zhang
Katherine Pappas
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92612
(949) 851-0633

Huiya Wu
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Ian B. Brooks
Adam W. Burrowbridge
Joshua Revilla
Timothy M. Dunker
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000

Harrison Gunn
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000


June 1, 2022

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*
_____
Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
 Sarah E. Simonetti (#6698)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com
ssimonetti@morrisnichols.com

*Attorneys for Plaintiff*
*United Therapeutics Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 1, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 1, 2022, upon the following in the manner indicated:

Karen E. Keller, Esquire                                          *VIA ELECTRONIC MAIL*
Nathan R. Hoeschen, Esquire
Emily S. DiBenedetto, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Sanya Sukduang, Esquire                                          *VIA ELECTRONIC MAIL*
Jonathan Davies, Esquire
Douglas W. Cheek, Esquire
Adam Pivovar, Esquire
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC  20004-2400
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Erik Milch, Esquire                                              *VIA ELECTRONIC MAIL*
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA  20190-5640
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Ivor Elrifi, Esquire                                             *VIA ELECTRONIC MAIL*
COOLEY LLP
55 Hudson Yards
New York, NY  10001-2157
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Lauren Krickl, Esquire                                    *VIA ELECTRONIC MAIL*
Deepa Kannappan, Esquire
Brittany Cazakoff, Esquire
Kyung Taeck Minn, Esquire
COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*


                                    */s/ Michael J. Flynn*

                                    _____

                                    Michael J. Flynn (#5333)