IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | )     C.A. No. 20-755-RGA-JLH ) |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) |
| Defendant. | ) |

**DEFENDANT'S POST-TRIAL REPLY BRIEF REGARDING INVALIDITY OF
<u>U.S. PATENT NOS. 9,593,066 AND 10,716,793</u>**

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Douglas W. Cheek
Adam Pivovar
Brittany Cazakoff
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 842-7800

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Liquidia
Technologies, Inc*

Deepa Kannappan
Lauren Krickl
Kyung Taeck Minn
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: June 15, 2022

TABLE OF CONTENTS

Page

I.  THE '066 PATENT IS INVALID ................................................................................. 1
    A.  Moriarty Anticipates Claims 1-3, 6, and 9 Under Product-By-Process Law ......... 1
        1.  Moriarty Discloses the Same Product as the '066 Patent .......................... 1
        2.  UTC Has Failed to Show Any Structural or Functional Difference .......... 4
        3.  UTC Refutes Legal Arguments Liquidia Never Made .............................. 5
    B.  Claims Lack Written Description of the Reduction in Impurities
        Limitation ................................................................................................................ 6
II. THE '793 PATENT IS INVALID ................................................................................ 7
    A.  The '793 Claims Are Not Limited to Treating Precapillary PH ............................ 7
    B.  The '793 Claims Are Not Enabled for Treating the Full Scope of PH .................. 8
    C.  The '793 Claims Lack Written Description for Treating Group 2 PH .................. 9
    D.  Dry Powder Formulations of Treprostinil Lack Written Description .................... 9
    E.  Dry Powder Formulations of Treprostinil Are Not Enabled ................................ 10

## TABLE OF AUTHORITIES

Page

**Cases**

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
   580 F.3d 1340 (Fed. Cir. 2009) .................................................................................................. 5

*Biogen Int'l GmbH v. Mylan Pharms. Inc.*,
   No. 1:17CV116, 2020 WL 3317105 (N.D. WV Jun. 18, 2020) ................................................. 7

*Biogen Int'l GmbH v. Mylan Pharms. Inc.*,
   18 F.4th 1333 (Fed. Cir. 2021) .................................................................................................. 7

*Bos. Sci. Corp. v. Johnson & Johnson, Inc.*,
   647 F.3d 1353 (Fed. Cir. 2011) ................................................................................................ 10

*Genentech, Inc. v. Chiron Corp.*,
   112 F.3d 495 (Fed. Cir. 1997)..................................................................................................... 1

*Glaxo Grp. Ltd. v. Kali Labs., Inc.*,
   No. 03-CV-399, 2005 WL 1793728 (D.N.J. July 27, 2005) ...................................................... 8

*In re Antor Media*,
   689 F.3d 1282 (Fed. Cir. 2012)................................................................................................... 5

*In re Nordt Dev. Co.*,
   881 F.3d 1371 (Fed. Cir. 2018) .................................................................................................. 2

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 801 (Fed. Cir. 2021) ..................................................................................................... 6

*Kao Corp. v. Unilever U.S. Inc.*,
   334 F. Supp. 2d 527 (D. Del. 2004), *aff'd*, 441 F.3d 963 (Fed. Cir. 2006) ........................... 7-8

*Noven Pharms. Inc. v. Amneal Pharms. LLC*,
   No. 18-CV-699-LPS, 2020 WL 11191445 (D. Del. Sept. 4, 2020).........................................10

*Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*,
   923 F.3d 1368 (Fed. Cir. 2019).............................................................................................. 7, 9

*Trs. of Bos. Univ. v. Everlight Elecs. Co., Ltd.*,
   896 F.3d 1357 (Fed. Cir. 2018).................................................................................................. 9

TABLE OF ABBREVIATIONS

**Asserted Patents & Parties**

| '066 patent | U.S. Patent No. 9,593,066 |
|---|---|
| '793 patent | U.S. Patent No. 10,716,793 |
| Asserted claims of the '066 patent | Claims 1, 2, 3, 6, 8, 9 |
| Asserted claims of the '793 patent | Claims 1, 4, 6, 7, 8 |
| UTC/Plaintiff | United Therapeutics Corporation |
| Liquidia/Defendant | Liquidia Technologies, Inc. |
| POBr | Plaintiff's Opening Post-Trial Brief (D.I. 408) |
| PABr | Plaintiff's Answering Post-Trial Brief (D.I. 413) |
| PFF | Plaintiff's Infringement Findings of Fact (D.I. 409) |
| | Plaintiff's Validity Findings of Fact (D.I. 414) |
| DOBr | Defendant's Opening Post-Trial Brief (D.I. 406) |
| DABr | Defendant's Answering Post-Trial Brief (D.I. 411) |
| DFF | Defendant's Invalidity Findings of Fact (D.I. 407) |
| | Defendant's Non-Infringement Findings of Fact (D.I. 412) |

**Commonly Used Terms & Abbreviations**

| 6MWD | Six minute walk distance |
|---|---|
| API | Active pharmaceutical ingredient |
| BTO | Benzindene triol |
| CMC | Chemistry, Manufacturing, and Controls |
| COA | Certificate(s) of Analysis |
| DMF | Drug master file |
| DPI | Dry powder inhaler |
| FDA | Food and Drug Administration |
| LHD | Left heart disease |
| LIQ861 | Liquidia's LIQ861 Product / Yutrepia™ |
| MannKind | MannKind Corporation |
| µg (mcg) | microgram |
| NDA | New Drug Application |
| PAH | Pulmonary arterial hypertension (Group 1 PH) |
| PAWP | Pulmonary artery wedge pressure |
| PH | Pulmonary hypertension |
| POSA | Person of ordinary skill in the art |
| PTAB | Patent Trial and Appeal Board |
| RMS | Raw Material Specification |
| TN | Treprostinil sodium |
| TRE | Treprostinil |
| TRS | Total related substances |
| WHO | World Health Organization |
| Yonsung | Yonsung Fine Chemicals |
| LGM | LGM Pharma |

## I.     THE '066 PATENT IS INVALID

### A.     Moriarty Anticipates Claims 1-3, 6, and 9 Under Product-By-Process Law

Claims 1-3, 6, and 9[1] are product-by-process claims to a "pharmaceutical composition [/product] comprising treprostinil[.]" DOBr2-3. Moriarty (DTX258) discloses a process for making the same composition/product, treprostinil, at 99.7% purity. DFF17. Critically, no UTC witness addressed Moriarty or Dr. Winkler's testimony regarding that reference. DFF25, 27.

#### 1.     Moriarty Discloses the Same Product as the '066 Patent

Based solely on attorney argument, UTC contends Moriarty does not invalidate the product-by-process claims because it only discloses the compound treprostinil, as opposed to a "composition" or "product" "comprising treprostinil." PABr8-9. This argument is unsupported by the law, facts, and contradicted by UTC's own brief. First, "comprising" permits other components but does not require them; thus, Moriarty's treprostinil is a composition/product "comprising" treprostinil. *See Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). Second, no UTC witness provided testimony concerning Moriarty (DFF25), and Dr. Winkler offered no opinion that there was a difference between Moriarty and '066 products—indeed, he testified they are the same. DFF20-24; DOBr3-5.[2] Third, the Moriarty treprostinil was 99.7% pure, and is thus not exclusively treprostinil—it is a composition or product *comprising* treprostinil. DTX258, 13. Fourth, in arguing structural or functional difference, UTC relied solely on data from "treprostinil API," not a "composition" or "product," exposing the fallacy of its proposed distinction. PABr23.

---

[1] Claim 9 claims the product made by claim 8's process. JTX2, 18:62-63. It is invalid for the same reasons as claim 1. *Cf.* PABr7. Both here and in the DOBr, Liquidia applied its product-by-process analysis to claims 1-3, 6, *and* 9. In contrast, UTC's arguments related to the impurities limitation of claim 1 are not applicable to claim 9, since claim 8 has no such limitations.
[2] Citing to Dr. Winkler's non-infringement testimony, UTC conflates proof necessary to establish infringement of a product-by-process claim, where process steps are relevant, and proof necessary to invalidate a product-by-process claim, where the process steps are not relevant. PFF75.

1

As for the claim limitation that the "level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition," the Court correctly noted that it "sounds like a process limitation." Tr. 958:10-19. The limitation, as Drs. Nuckolls and Toste testified to, requires the step of *comparing* a process intermediate (the starting batch of treprostinil) and the final claimed product (the pharmaceutical composition). DFF51; PFF26-33. This case is, therefore, different than the cases cited in *In re Nordt*, and unlike *Nordt,* the '066 specification never imparts a structural meaning to this limitation. PABr8 (citing 881 F.3d at 1376).

UTC condemns Liquidia's reliance on Moriarty's overall purity of 99.7% on the basis that claim 1 "does not claim any overall impurity level." PABr 9-11. UTC is correct that claim 1 does not require any purity of the claimed product, proving Liquidia's point that comparing the impurity level of the starting batch and final composition/product is not a limitation relevant to the claimed '066 product. UTC also overlooks that the patent only provides overall purity data. DFF16.

UTC's contention that Liquidia relies on some "transitive" property between Moriarty, the '393 patent, and the '066 patent is incorrect. PABr10-11. The invalidated '393 patent was never entered into evidence. Instead, Dr. Winkler relied on treprostinil purity data submitted in the '393 IPR. DFF24, 29; DOBr8; Tr. 307:11-19, 473:16-474:17. That data was not used as a "proxy" for Moriarty, but instead to head off UTC's structural/functional difference argument, comparing its "former process" Chicago treprostinil batches to batches made according to the '066 patent in Silver Spring. PABr23-24; DOBr5-8; DFF34-42. Dr. Winkler's unrebutted testimony shows that UTC's Chicago and Silver Spring processes resulted in products with the same average purity of 99.7%,[3] establishing no structural/functional difference. DFF24, 29; DOBr8.

---

[3] UTC faults Liquidia for not forcing the Court to look at spreadsheets to accept, as evidence, calculations that both Dr. Winkler and Dr. Williams testified to, and what no trial witness disagreed

UTC's attempt to distinguish its Chicago process from Moriarty and its '066 process from Silver Spring is unavailing. PABr17-20. UTC told the PTO that "[t]he 'former process' in example 6 [of the '066 patent] is essentially the same as Liquidia's Moriarty references," and its expert opined that "Moriarty teaches only the Former Process," referring to the same Moriarty art. D.I. 77-1, Ex. D4, 66; D.I. 79-2, Ex. D31,¶134. Dr. Winkler testified that the Moriarty process was used in Chicago (DFF34), and no UTC witness disputed that fact. And while UTC's attorneys point out some differences in solvents between Moriarty and the "Former Process" of '066 Example 6 (PFF100; PABr18), this is irrelevant because the claims are not directed to solvents, but to the product treprostinil. As for whether the Silver Spring documents from the '393 IPR practice the '066 claims (PABr12-13), UTC's witnesses confirmed that the same process was disclosed in the '066 and '393 patents (Tr. 544:16-545:4) and relied on documents comparing the Chicago and Silver Spring products to attempt to demonstrate a structural difference (PABr23-24).

Finally, Liquidia pointed to UTC's FDA statements to demonstrate that UTC knows there are no structural or functional differences between the Moriarty treprostinil and the '066 patent treprostinil. DOBr4-8; DFF38-42. It is only now, in the context of litigation, that UTC argues otherwise, spending 3 pages on why *its own* statements should not be credited, despite making them to a government agency. PABr12-14. UTC also argues that it "could" have tightened its specifications with the new process (PABr13-14), but ignores that it never actually did (DFF30[4]),

---

with. PABr13. UTC's new attorney rebuttal (PABr12-13) should be rejected. UTC argues the Silver Spring product was less pure, despite Dr. Walsh saying the opposite, and did not produce the underlying data for DTX627's 96 batches. The produced data averaged 99.7% purity. Tr. 474:25-475:16; DDX2.13; DTX660, 84:15-86:9, 92:8-92:35 (Dr. Williams correcting 99.05% to 99.7%). Within DTX627, the Chicago and Silver Spring impurity specifications were identical, and the purity of all 96 Chicago batches fell within the Silver Spring specification. DFF24, 29, 42.
[4] UTC attempts to rewrite testimony (PABr14, n.9), despite two rounds of transcript errata. UTC relies on a 2009 document (PTX1553) to show a specification change, but a 2020 COA still had the original specification (DFF30), supporting the correctly transcribed version of Dr. Bunce's testimony that UTC did not tighten its specification, because it disagreed that it needed to.

and that the Chicago batches met every release specification requirement for the Silver Spring batches. DFF24, 29, 42.

### 2. UTC Has Failed to Show Any Structural or Functional Difference

Liquidia bears the ultimate burden of proof, but UTC admitted that it bears the burden of production on demonstrating a structural or functional difference. DOBr3; DFF26. Dr. Winkler repeatedly testified that the products of Moriarty and the '066 patent were the "same." Tr. 457:11-13; 458:2-8; 458:19-459:6; 462:25-463:2; 466:19-20; 467:3-5; 467:21-468:13; 470:17-20; 471:20-23; 473:3-5 ("no difference at all"); 477:1-14; 479:2-6; 479:22-480:2 ("they're structurally and functionally the same"); *cf.* PABr21-22. His testimony stands unrebutted. DOBr5-6.

As expected (DOBr5-8), UTC argues a structural and functional difference relying on Dr. Walsh's comparison of an impurity (3AU90) in the treprostinil diethanolamine of the '066 process to the same impurity in the treprostinil of the former process. PABr23. This comparison is irrelevant to the extent UTC contends Moriarty is *different* from the "former process" (PABr18), i.e., Dr. Walsh's comparison shows no difference between the '066 patent and Moriarty. Dr. Walsh also compared two different compounds (diethanolamine salt and treprostinil free acid), which does not establish any difference between the Moriarty free acid and '066 patent free acid. DOB6-7; DFF31-33. Further, there is no testimony that the 3AU90 impurity was generated from alkylation and hydrolysis, and, in fact 3AU90 increased over time with treprostinil free acid, indicating that it is a degradation product generated *after* treprostinil is formed. PDX5.5 (blue line going up); Tr. 799:12-800:21, 803:1-6. UTC asserts that "impurities would not be re-introduced during *any* subsequent steps" after salt formation (PABr23 (citing PFF107 (citing 466:16-20, 803:19-804:12)), but its cites do not address whether impurities are reintroduced or can otherwise arise after salt formation. Nonetheless, UTC's certificates of analysis show that impurities were higher in the regenerated treprostinil. DTX618, 3 (salt at 0.04% total impurities), 16 (treprostinil

4

at 0.28% total impurities). UTC asserts that impurities "can" "interact with the body in unintended ways" (PABr22), but that is a general proposition, untied to treprostinil or any of the impurities UTC cites, and nonetheless debunked by UTC's FDA statements. DFF38-42.

Finally, UTC points to stability and storability of the salt, but that is not a characteristic of the final claimed product. All storability and stability limitations are tied to the process's intermediate salt, which is then used to make the final composition/product. *See* JTX2 (claim 6, claim 8). The evidence adduced at trial proves that treprostinil free acid made according to the '066 patent ***is not*** stable and storable at ambient temperature, as UTC shipped treprostinil free acid (UT15) to Dr. Smyth under cold conditions. DFF112. And UTC admitted that treprostinil free acid does not possess those storage and stability properties. Tr. 964:19-965:7; PABr24 (treprostinil would "degrade (increasing impurities) unless kept under cold conditions"). Thus, the "*capability* for making a pharmaceutical composition from treprostinil salt that had been stored at ambient temperature" is not a structural or functional difference of the final claimed product and does not convert the '066 product-by-process claims into novel subject matter. PABr24 (emphasis added).

### 3. UTC Refutes Legal Arguments Liquidia Never Made

Curiously, UTC rebuts arguments Liquidia never raised. First, UTC conflates Liquidia not asserting Moriarty as § 102(a) invalidating art for the process steps, with Moriarty anticipating under product-by-process law. PABr14; *cf.* DOBr3 (citing *Amgen* (process steps not relevant)).

Second, UTC newly argues that Moriarty is not enabled, despite the reference containing a detailed description of the process to synthesize UT-15 treprostinil. PABr15-17. Prior art publications are presumed enabled, and it is UTC's burden to prove otherwise, which they have failed to do. *See In re Antor Media*, 689 F.3d 1282, 1287-1289 (Fed. Cir. 2012) (extending the presumption to prior art publications). UTC cites no legal reason for the Court to require an expert to practice the prior art steps for the art to be presumed enabled. *Cf.* PABr17. UTC then argues

5

that a POSA could not practice the Moriarty process because it could not obtain "benzindene triol and other necessary materials for practicing the steps Moriarty 2004 discloses," but Moriarty discloses how to make BTO (compound 34). DTX258, 12-13; PABr15-16 (citing PFF94 and PFF96).[5] UTC also argues that the salt formation steps are not disclosed in Moriarty (PABr16), but those are *process* steps and therefore irrelevant to the product-by-process inquiry.

Third, UTC argues that Moriarty does not "inherently anticipate" the '066 claims (PABr17), and that Liquidia "waived" its on-sale bar argument (PABr20), but Liquidia never made an inherency or on-sale bar argument.

### B.  Claims Lack Written Description of the Reduction in Impurities Limitation

Claim 1 requires an actual reduction in impurities resulting from alkylation and hydrolysis of BTO (DFF51), but UTC points to no such actual reduction in the '066 specification, instead relying on qualitative observations of overall impurities, which are flawed. *See* PABr8; DOBr11-13. Further, UTC's contention that claim 1 simply requires a comparison of the level of total impurities present in the starting batch of treprostinil versus the level of total impurities present in the final product (PABr26) renders "superfluous" the limitation specifying that the "impurities" are "resulting from prior alkylation and hydrolysis steps." JTX2, 17:54-55. This is "highly disfavored." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021) (collecting cases).

Dr. Scheidt's qualitative analysis of color changes (PABr25) does not satisfy written description, because the '066 patent does not state BTO is colorless as Dr. Scheidt asserted. PFF121. It is instead white to pale yellow, preventing a POSA from using this observation as a proxy for the quantitative determination the claims require. DFF53. Further, TLC "monitor[ing]" was for reaction completeness, not an assessment of impurity generation and removal. DFF54.

---

[5] PFF94 refers to Moriarty's description of overall yield from the starting material, which has no relevance to the structure or function of the final treprostinil product. PFF96 cites no evidence.

Additionally, UTC asks the Court to ignore inventor testimony regarding the lack of disclosure. PABr26-27. The precedent Liquidia cited is not limited to when the "patent specification contained no words at all regarding the given topic." *Id.* For example, in *Nuvo*, the specification "describe[d] using uncoated PPI" but that was not sufficient to show the "inventor possessed an effective uncoated PPI." 923 F.3d at 1375. In *Biogen*, the specification identified a 480mg/day dose and the specified disease, but the inventor explained that a reader would not link the two, i.e. that the dose would be effective for that disease. 2020 WL 3317105 at *10-11, *13; 18 F.4th 1333, 1342-44. The inventor testimony here similarly confirms lack of "possession." DOBr10; DFF44-46, 55.

Finally, UTC argues that reduction in impurities from the starting batch to a salt is described, because conversion from salt back to treprostinil "would not impact the impurities," and thus, the color disclosure for treprostinil "would equally apply" to the salt. PABr28-29. This is new attorney argument (Dr. Scheidt did not testify about the salt) and incorrect. The impurity profiles of the salt and reconverted treprostinil are not the same. *Supra* pp.4-5 (citing DTX618).

## II. THE '793 PATENT IS INVALID

### A. The '793 Claims Are Not Limited to Treating Precapillary PH

UTC asks this Court to take the untenable position that "pulmonary hypertension" "in isolation" includes all five PH groups, but "*treating* pulmonary hypertension" is limited to treating "*precapillary* PH." PABr29-30 (emphasis added). There is no dispute that POSAs would interpret the term PH in claim 1 as including all 5 groups. DFF60; Tr. 631:6-23. UTC's position is premised on construing "treating PH" as synonymous with "treating precapillary PH." That the '793 specification uses "precapillary hypertension" *and* "treating pulmonary hypertension" demonstrates that "precapillary" is a subpart of the broader condition of pulmonary hypertension— they are not synonyms. In fact, *Kao* (PABr30) reiterates that without a "clear manifestation" that

7

the inventors intended the term PH to be limited to precapillary PH, the Court should "not read limitations found in the specification into the claim[.]" 334 F. Supp. 2d 527, 546-47 (D. Del. 2004), *aff'd,* 441 F.3d 963 (Fed. Cir. 2006). *Glaxo* (PABr30-31) is inapposite: "nausea and vomiting" there were generic symptoms with a range of causes that no POSA expected one drug to address; here, all POSAs understood PH to be finite in scope, the patent lists Group 2 in its PH description, and UTC argues Group 2 is enabled/described. DFF60; PABr31-35. Finally, UTC's assertion that using the phrase "precapillary pulmonary hypertension" in claim 1 would have been "unnecessary and redundant" (PABr30) contradicts the specification's use of both these terms and rests on a presumption no expert expressed. DOBr15 (citing JTX3, 9:35-36, 12:64-65, 16:64-65).[6]

### B. The '793 Claims Are Not Enabled for Treating the Full Scope of PH

Relying on its new construction, UTC's argues first that the '793 claims are enabled for "pre-capillary" PH patients. PABr31. UTC's construction disregards the full scope of PH, including isolated Group 2 patients, who only have post-capillary PH. UTC next argues that for isolated Group 2 patients, avoiding patient death (characterized as minimizing "alleged 'safety concerns'") would not require undue experimentation. PABr31. Speculation that treprostinil may vasodilate and reduce blood pressure in these patients is not enablement, as UTC asserts (*id.*), because those same studies had to be stopped, despite hemodynamic changes, due to increased mortality. DFF83-85. A failed study is not evidence of enablement, and instead further demonstrates the unpredictability in the art that is not addressed in the '793 patent. DFF86. There is no evidence that simply "test[ing] a small number of patients using routine methods" would overcome these issues. PABr32-33. Instead, a POSA would have to start from "square one." DFF88.

Finally, no case UTC cites says inoperative embodiments support a lack of enablement

---

[6] Liquidia's patent is irrelevant to how UTC uses these terms in the '793 patent. *Cf.* PABr33 n.20.

"only" if the number becomes significant. PABr32, 33. Even one inoperative embodiment out of six total embodiments is sufficient for invalidation. *See Trs. of Bos. Univ. v. Everlight Elecs. Co.* ("*Everlight*"), 896 F.3d 1357, 1364 (Fed. Cir. 2018). Here, the inoperative embodiments (isolated Group 2 PH patients), are ~50% of all PH patients[7] (*see* DFF64), and under UTC's view of PH as three groups (pre-capillary, post-capillary, and combined), UTC offered no evidence that treprostinil would work in the latter two groups, who are ~78% of all PH patients (*see* DFF63).

### C. The '793 Claims Lack Written Description for Treating Group 2 PH

UTC does not point to a single disclosure of treatment of any Group 2 PH patients in the patent. If the Court finds those patients are included within "treatment of pulmonary hypertension," the '793 claims lack written description support. UTC argues there is adequate written description for Group 2 PH patients, because a POSA would have known of the hemodynamic effects in the FIRST study. PABr34 (citing PFF¶136). As explained, no POSA would think that the FIRST study demonstrated successful treatment of Group 2 PH when the study was stopped because too many patients died. DFF83. UTC is also incorrect in arguing that written description does not require demonstration of effectiveness (PABr34-35): the *Nuvo* case holds that where a claim covers effectiveness, like here, that effectiveness must be described. DOBr20.

### D. Dry Powder Formulations of Treprostinil Lack Written Description

Conceding that the '793 patent provides only an *ipsis verbis* disclosure of a dry powder formulation, UTC claims that "constructive possession" exists. PABr35-37. UTC cites no law for their "constructive possession" argument, because whether "essentially the same language appears in the claims and specification does not alter the outcome" in finding lack of written description.

---

[7] That Dr. Waxman's practice has 8-10% isolated Group 2 patients does not disprove multiple population studies (*e.g.*, DTX398, DTX2000) reporting that ~50% of PH patients have isolated Group 2 PH. *Cf.* PABr33 n.20. UTC points to no literature contesting this number.

9

*Noven*, 2020 WL 11191445, at *36. Dr. Clark's testimony that DPIs and formulation methods were available does not establish written description support for treprostinil powder formulations and ignores Drs. Gonda and Rubin's testimony that powder and solution formulations are completely different. DFF93-99. *Boston Scientific* is applicable to the '793 patent's exceedingly broad claims, which encompass *all* "inhalation device[s]" and "formulation[s]" of treprostinil (*cf.* PABr36-37 (UTC's characterizing these claims as narrow)), and minimal disclosure of only two devices that use liquid formulations. DOBr21-22; DFF91-92.

E.  **Dry Powder Formulations of Treprostinil Are Not Enabled**

UTC contends Dr. Smyth's experiments demonstrate enablement of powder formulations of treprostinil. PABr37-40. Dr. Smyth actually ***failed*** to make a powder formulation of treprostinil sodium, the API salt expressly disclosed in the '793 patent. DFF104.[8] UTC asserts that Dr. Smyth's lab did not have humidity controls, but that a POSA in May 2006 would. PABr38 n.23. This confirms Dr. Smyth did not even attempt to conduct the experimentation a POSA, as Dr. Gonda testified, would deem necessary. DFF100-15. Further, UTC concedes that treprostinil free acid is not stable at ambient temperature (PABr24), and Dr. Smyth's quick experiments do not establish that making a powder formulation was predictable. DFF112; DOBr27-28. Finally, that Dr. Smyth did not notice the Maillard reaction is only due to the short timeframe of his experiments and his failure to do basic analysis of API stability and excipient compatibility. DFF113. Dr. Smyth's three weeks of testing, conducted in a manner to avoid observing incompatibilities, does not establish that the '793 patent enabled a treprostinil powder formulation that, as the claims require, is ***therapeutically effective*** in ***treating*** PH. DFF108-09, DFF114-15.

---

[8] Liquidia developed its own dry powder formulation of treprostinil over several years using its proprietary PRINT technology, ***years after*** the 793 patent's priority date, demonstrating the significant level of experimentation necessary to develop a dry powder formulation of treprostinil. DFF101; *cf.* PABr38.

|  |  |
|---|---|
| | /s/ Nathan R. Hoeschen |
| | Karen E. Keller (No. 4489) |
| | Nathan R. Hoeschen (No. 6232) |
| | SHAW KELLER LLP |
| | I.M. Pei Building |
| | 1105 North Market Street, 12th Floor |
| | Wilmington, DE 19801 |
| OF COUNSEL: | (302) 298-0700 |
| Sanya Sukduang | kkeller@shawkeller.com |
| Jonathan Davies | nhoeschen@shawkeller.com |
| Douglas W. Cheek | *Attorneys for Defendant Liquidia* |
| Adam Pivovar | *Technologies, Inc* |
| Brittany Cazakoff | |
| COOLEY LLP | |
| 1299 Pennsylvania Avenue, NW, Suite 700 | |
| Washington, DC 20004-2400 | |
| (202) 842-7800 | |

Erik Milch
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
(703) 546-8000

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Deepa Kannappan
Lauren Krickl
Kyung Taeck Minn
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000


Dated: June 15, 2022

11