IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 20-755 (RGA) (JLH) |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY POST-TRIAL BRIEF**

OF COUNSEL:

William C. Jackson
Eric Levi
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036
(202) 346-4216

Douglas H. Carsten
Mandy H. Kim
Arthur Dykhuis
Jiaxiao Zhang
Katherine Pappas
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92612
(949) 851-0633

Ian B. Brooks
Adam W. Burrowbridge
Joshua Revilla
Timothy M. Dunker
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000

June 15, 2022

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
Sarah E. Simonetti (#6698)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com
ssimonetti@morrisnichols.com

*Attorneys for Plaintiff*
*United Therapeutics Corporation*

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | LIQ861 INFRINGES THE '066 PATENT | | 2 |
| | A. | Liquidia Will Infringe the Impurities Limitations | 2 |
| | | 1. UTC Demonstrated Infringement by a Preponderance of the Evidence | 2 |
| | | 2. "Alkylation and Hydrolysis *Steps*," Not Alkylation of the BTO Molecule | 2 |
| | | 3. UTC's Evaluation of Yonsung's Treprostinil Salt Is Scientifically Sound | 4 |
| | B. | Liquidia Will Infringe The Stability/Storage Limitations | 5 |
| | | 1. Treprostinil Salt is Stable and Stored at Ambient Temperature | 5 |
| | | 2. Liquidia Cannot Avoid Infringement by Promising Not to Infringe | 7 |
| III. | LIQ861 INFRINGES THE '793 PATENT | | 8 |
| | A. | Liquidia Misinterprets "Therapeutically Effective Single Event Dose" | 8 |
| | B. | Administration of LIQ861 Will Directly Infringe the Claims | 9 |
| | C. | Liquidia Will Induce Infringement | 10 |
| IV. | CONCLUSION | | 10 |

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Labs. v. TorPharm*,
   300 F.3d 1367 (Fed. Cir. 2002)...........................................................................................6

*Amgen Inc. v. Hospira, Inc.*,
   2016 WL 7013483 (D. Del. Nov. 30, 2016) ........................................................................8

*Fujitsu v. Netgear*,
   620 F.3d 1321 (Fed. Cir. 2010)...........................................................................................1

*Merck Sharp & Dohme Corp. v. Amneal Pharms. LLC*,
   881 F.3d 1376 (Fed. Cir. 2018)...........................................................................................2

*Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*,
   2018 WL 2225113 (D. Del. May 15, 2018).......................................................................10

*Sanofi v. Glenmark Pharms. Inc., USA*,
   204 F. Supp. 3d 665 (D. Del. 2016)...................................................................................10

*Semcon Tech, LLC v. Micron Technology, Inc.*,
   C.A. No. 12-532-RGA, 2017 WL 2591945 (D. Del. June 15, 2017) ..................................7

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
   731 F.3d 1271 (Fed. Cir. 2013).................................................................................2, 6, 8

*Takeda Pharms. U.S.A. v. West-Ward Pharm.*,
   785 F.3d 625 (Fed. Cir. 2015)...........................................................................................10

*Vectura Limited v. GlaxoSmithKline*,
   397 F. Supp. 3d 579 (D. Del. 2019).....................................................................................4

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996).............................................................................................9

*Warner-Lambert Co. v. Apotex Corp.*,
   316 F.3d 1348 (Fed. Cir. 2003).........................................................................................10

## ASSERTED CLAIMS: '066 PATENT

| Claim | Claim Limitation |
|---|---|
| 1[a] | A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising |
| 1[b] | providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps, |
| 1[c] | forming a salt of treprostinil by combining the starting batch and a base, |
| 1[d] | isolating the treprostinil salt, and |
| 1[e] | preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, |
| 1[f] | whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and |
| 1[g] | wherein said alkylation is alkylation of benzindene triol. |
| 2 | The pharmaceutical composition of claim 1, wherein the salt is isolated in crystalline form. |
| 3 | The pharmaceutical composition of claim 1, wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline. |
| 6 | The pharmaceutical composition of claim 1, wherein the isolated salt is stored at ambient temperature. |
| 8[a] | A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising |
| 8[b] | alkylating a triol intermediate of the formula:<br><br>[chemical structure]<br><br>hydrolyzing the resulting compound to form treprostinil, |
| 8[c] | forming a salt of treprostinil stable at ambient temperature, |
| 8[d] | storing the treprostinil salt at ambient temperature, |
| 8[e] | and preparing a pharmaceutical product from the treprostinil salt after storage, wherein |
| 8[f] | the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof. |
| 9 | A pharmaceutical product prepared by the process of claim 8. |

## ASSERTED CLAIMS: '793 PATENT

| Claim | Claim Limitation |
|---|---|
| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension |
| 1[b] | a therapeutically effective single event dose |
| 1[c] | of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, |
| 1[d] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
| 1[e] | delivered in 1 to 3 breaths. |
| 4 [f] | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
| 6 [g] | The method of claim 4, wherein the formulation is a powder. |
| 7 [h] | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 [i] | The method of claim 1, wherein the formulation contains no metacresol. |

## TABLE OF ABBREVIATIONS

| Abbreviation | Full Name |
|---|---|
| '066 patent | U.S. Patent No. 9,593,066 (JTX-2) |
| '793 patent | U.S. Patent No. 10,716,793 (JTX-3) |
| LAB | Liquidia Answering Brief (D.I. 411) |
| TN | Treprostinil Sodium |
| TN02 | Treprostinil |
| BTO | Benzindene Triol |
| RS | Related Substances |
| PFF | Plaintiff UTC's Proposed Findings of Fact: D.I. 409 (PFF ¶¶ 1-75); D.I. 414 (PFF ¶¶ 76-154) |
| LFF | Liquidia's Proposed Findings of Fact: D.I. 407 (LFF ¶¶ 1-115); D.I. 412 (LFF ¶¶ 116-160) |

## I.  INTRODUCTION

UTC has proven that Liquidia's LIQ861 product infringes the '066 and '793 patents.

**'066 patent.** Liquidia infringes claims 1-3 and 6. Liquidia misreads claim 1 to assert the claimed "impurities" must result from "Prior Alkylation and Hydrolysis … of Benzindene Triol" ((D.I. 411) ("LAB") at 3), but the ellipsis in Liquidia's quote alters its meaning. The impurities must result from "prior alkylation and hydrolysis *steps*" (JTX 2 at 17:55 (emphasis added)) including the material used to carry out those steps. Further, Liquidia concedes that the claimed impurities result from "alkylation and hydrolysis" but contends UTC should have compared impurities from TN02 to the bulk powder. Liquidia is wrong. It is undisputed that the accused impurities result from "alkylation and hydrolysis steps" when Yonsung makes treprostinil, which occurs only once—prior to "preparing a pharmaceutical composition." Liquidia infringes claims 6, 8, and 9 by "storing" stable isolated and non-isolated treprostinil salt at ambient temperature. "[S]pecific instances of direct infringement" include storage of treprostinil salt at Yonsung, during storage/shipping, and at PRINT process Step 1. LAB 7 (citing *Fujitsu v. Netgear*). Liquidia infringes these claims.

**'793 patent.** UTC's Opening Brief (D.I. 408) describes LIQ861's infringement of limitations **[a]-[i]** of asserted claims 1, 4, and 6-8. Liquidia disputes only element **[b]**'s requirement of a "therapeutically effective single event dose." But it is undisputed that administration of a single event dose of treprostinil causes pulmonary vasodilation and improved hemodynamics, which constitute therapeutic effects benefitting the patient. PFF ¶¶ 68-70. As shown by the LIQ861 label (PTX-469) and trial testimony, Liquidia intends patients to administer LIQ861 according to the label, which infringes the claimed methods. PFF ¶ 74. Liquidia's arguments regarding direct and induced infringement rely on an erroneous interpretation that misreads the claim language, ignores intrinsic evidence, and excludes the embodiments in the specification.

1

## II. LIQ861 INFRINGES THE '066 PATENT

### A. Liquidia Will Infringe the Impurities Limitations

#### 1. UTC Demonstrated Infringement by a Preponderance of the Evidence

UTC's experts Drs. Nuckolls and Toste demonstrated infringement of the claim 1 impurities limitations (i.e., limitations [**b**] and [**f**]) using three different methodologies, analyzing: (1) Related Substance ("RS") impurities by percentage, (2) RS impurities by number, and (3) epi-treprostinil, a particular RS impurity. D.I. 408 at 6-9, PFF ¶¶ 26-33. These analyses use the same impurity data that Liquidia relies on in its NDA seeking approval of LIQ861. D.I. 408 at 8, PFF ¶¶ 5-6, 15, 24-25, 31-33; *see also Merck Sharp & Dohme Corp. v. Amneal Pharms. LLC*, 881 F.3d 1376, 1385 (Fed. Cir. 2018) (finding that "the critical inquiry [for infringement] is whether [the sample] is representative of what is likely to be approved and marketed"). Further, Liquidia seeks approval to infringe based on the acceptance criteria for RS impurities in the DMF/NDA. D.I. 408 at 8; PTX-201 at LIQ00573782-83 (2.0% in TN02; 0.5% in TN); *see also Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1279-80 (Fed. Cir. 2013). Liquidia's new-found challenges on the reliability of Yonsung's data—the same data underlying Liquidia's NDA—should not be credited. D.I. 408 at 7, n. 3, Tr. 419:2-421:3, 424:16-425:13, 511:5-21; *cf.* LAB 5, LFF ¶ 127 (repeatedly citing Dr. Winkler over UTC's motion to strike).[1]

#### 2. "Alkylation and Hydrolysis *Steps*," Not Alkylation of the BTO Molecule

Liquidia argues that none of its impurities are relevant to the claim. LAB 3-4. But Liquidia

---

[1] UTC renews its motion to strike. UTC raised the prejudice of this argument in its § 295 briefing. D.I. 352 at 5-6 ("Liquidia has dictated the universe of analytical testing documentation … only to criticize [UTC's] reliance on it and argue its insufficiency[.]"); *see also* D.I. 314 ¶¶ 28-30. Liquidia also misconstrues Dr. Toste's § 295 declaration (LAB 1, n.1); Dr. Toste consistently opined that epi-treprostinil infringes (D.I. 314 at ¶ 23), but without further discovery he was unable to analyze infringement by other impurities or whether they originate from alkylation of the BTO molecule in particular, as Liquidia asserts they must (*id*. ¶¶ 27, 31-38).

2

misconstrues claim 1, reading out the word "steps" (1[**b**]) and asserting that limitations to the "starting batch" (1[**b**]) and "pharmaceutical composition" (1[**f**]) include only alkylation of perfectly pure BTO (*see* 1[**g**]). Indeed, Liquidia's ellipsis in subheading §I.A.2 is an attempt to rewrite the claim. *Compare* LAB at 3 ("Claimed 'Impurities' Must Result From 'Prior Alkylation and Hydrolysis … of Benzindene Triol'") *with* JTX-2, Claim 1[**b**], 1[**g**]. The impurities must result from "prior alkylation and hydrolysis steps," not alkylation and hydrolysis of just BTO. Even Liquidia's expert agrees that in the real world the alkylation and hydrolysis steps are performed on a batch of BTO, which includes impurities. Tr. 505:11-506:3, 507:21-508:13; PFF ¶ 22.

Liquidia erroneously argues that "total [HPLC Related Substance] impurities" analyzed by Dr. Nuckolls "includes, among other things, residual solvents and any impurity contained in the reagents or starting materials[.]" LAB 4; LFF ¶ 122. First, residual solvents are not included in Dr. Nuckolls' "total impurities" analysis, as Yonsung uses gas chromatography (not HPLC) to report residual solvents. *See* PFF ¶¶ 24, 26; *compare* PTX-112 at LIQ00000038-39 (identifying RS impurities) *with id*. at -0195 (residual solvents, "examined by gas chromatography"). Second, a POSA would understand that impurities originating in necessary starting materials or reagents are impurities resulting from those steps. PFF ¶ 22; *see also* Tr. 193:25-195:3. Liquidia's reading is inconsistent with the patent language, inventor testimony, and even Yonsung's data. PFF ¶ 22.

Importantly, the reduction of epi-treprostinil alone demonstrates infringement even under Liquidia's view. Dr. Winkler agrees that epimerization of BTO to epi-treprostinil is possible[2] and is expected to occur at a low rate.[3] Tr. 508:23-509:12. Epi-treprostinil found in Yonsung's starting

---

[2] Dr. Winkler also concedes that epi-BTO is, in fact, "a benzindene triol" (Tr. 503:22-504:1), further supporting that epi-treprostinil in Yonsung's TN02 infringes 1[**b**] and 1[**g**].

[3] The epimerization rate is about 0.1% relative to the desired pathway (BTO to TN02). Tr. 509:7-12. That 0.1% is substantial because the FDA regulates RS impurities, even at low levels. *See* PTX-1552 (FDA asked UTC to "tighten [its] acceptance criterion for total related substances");
(continued...)

3

batch results from prior alkylation and hydrolysis steps, and its subsequent lowering through the claimed salt formation and isolation steps demonstrate infringement. PFF ¶¶ 29-33.

### 3. UTC's Evaluation of Yonsung's Treprostinil Salt Is Scientifically Sound

UTC's experts properly analyzed Yonsung's analytical data to show infringement. Liquidia argues that they considered the wrong substance by comparing the TN02 and TN batches. LAB 1-3. Liquidia is wrong. Impurities from the alkylation and hydrolysis steps are fixed by Yonsung's synthesis of treprostinil, not Liquidia's later handling of it—as shown in Liquidia's own documents and representations to the FDA, as well as Dr. Nuckolls' unrebutted testimony.[4]

Yonsung performs the alkylation and hydrolysis steps of claim 1 when it alkylates and hydrolyzes a batch of BTO to obtain a batch of treprostinil. PFF ¶ 15. Yonsung then performs the claimed salt formation and isolation steps to obtain treprostinil sodium (TN) as recited in claim 1. *Id*. Yonsung then ships that isolated treprostinil salt to Liquidia, and Liquidia uses the salt as the API for LIQ861 by putting the TN in solution, combining it with inactive excipients, then drying it into the LIQ861 bulk powder. LAB 12; PTX-20 at 12; PFF ¶ 17. Liquidia's handling of the TN does not involve any alkylation or hydrolysis steps, and do not affect the impurities from those steps. PFF ¶ 25; Tr. 157:7-17. A POSA would understand the importance of testing the impurity levels before dilution or the adding the excipients to the composition. *Id*; Tr. 133:25-135:14. *Vectura Limited v. GlaxoSmithKline*, 397 F. Supp. 3d 579, 587 (D. Del. 2019).

Liquidia's own documents support UTC's experts' reliance on Yonsung's data for

---

*see also* PFF ¶ 109. Indeed, Liquidia's NDA reports to the FDA levels of epi-treprostinil measured as low as 0.01% (Tr. 204:2-4; PTX-105 at LIQ00029715), and Yonsung's analytical testing of TN01 and TN02 indicate epi-treprostinil originating from the hydrolysis step. PFF ¶ 33.

[4] That UTC did not test LIQ861 bulk powder is irrelevant. LAB 2-3. The claims require the pharmaceutical composition to have lowered impurities compared to the preceding "starting batch of treprostinil." But Liquidia never produced a sample for *any* starting batch. See D.I. 314 at ¶¶ 24-31. Thus, analysis of Liquidia's bulk powder would have been meaningless.

4

identifying and quantifying impurities. Liquidia's NDA relies on Yonsung data for information on drug substance process impurities. PTX-66 at LIQ00029677; *see also* PTX-105 at LIQ00029711-13 ("representative treprostinil sodium drug substance batches"). Yonsung's testing data for TN02 batch TN02118F010 reports 0.076% RS impurities (PTX-1170 at LIQ00576770), which were lowered to an undetectable level in the TN or bulk powder.[5] Thus, Yonsung and Liquidia reported that the levels of *every* RS impurity found in that starting batch of treprostinil were lowered below detectable limits after the claimed salt formation and isolation steps, which remained true in the bulk powder. As such Liquidia's LIQ861 infringes claim 1.

Liquidia's expert contends Yonsung's TN is the claimed pharmaceutical composition. Tr. 408:3-21. Regardless of whether the TN or the bulk powder is considered the "pharmaceutical composition," LIQ861 will infringe. *See also* Tr. 134:18-135:1; Tr. 172:12-173:20. Claim 1 is a product-by-process claim with a "comprising" preamble (1[**a**]). It claims synthesis and isolation of treprostinil salt from a starting batch of treprostinil, which lowers the level of one or more impurities in the pharmaceutical composition from that found in the starting batch. JTX-2. Those steps are performed by Yonsung in Korea. Limitation 1[**e**] is then fulfilled by, *e.g.*, Yonsung drying down and packaging the TN at the end of DMF Step 12 for the LIQ861 drug substance. Thus, even if the "pharmaceutical composition" is the TN rather than the bulk powder, Liquidia infringes.

### B.  Liquidia Will Infringe The Stability/Storage Limitations

#### 1.  Treprostinil Salt is Stable and Stored at Ambient Temperature

Liquidia argues that TN is "*Never* Stored at Ambient Temperature" (LAB 6), but the evidence shows TN is *often* stored at ambient temperature before reaching Liquidia and is *always*

---

[5] PTX-326 at 4 (correlating TN02 with TN), PTX-105 at LIQ00029713 (no detected RS impurities); PTX-66 at LIQ00029673-674 (correlating TN with bulk powder), PTX-160 at LIQ00943328 (no reportable RS impurities); PTX-126 at LIQ0279769-770 (no detected RS impurities), PTX-1169 at LIQ00576819 (no detected RS impurities).

5

stored at ambient temperature during Liquidia's PRINT process. UTC Op. Br. 10, 14-17.

Liquidia's "NDA … incorporates Yonsung's DMF" (LAB 6). PFF ¶¶ 5, 6; LFF ¶ 130. While Liquidia now argues "TN is not stable at ambient temperature" (LAB 12), its expert disagrees (Tr. 393:17-19). The stability studies confirm that its process results in an infringing "salt of treprostinil [that is] stable at ambient temperature[.]" JTX-2 at claims 8, 9; PFF ¶¶ 19, 34, 39. Those studies also prove that Yonsung, LGM, and Liquidia can store TN at ambient temperature consistent "with the [NDA's] description of the drug." *Abbott Labs. v. TorPharm*, 300 F.3d 1367, 1373 (Fed. Cir. 2002). PFF ¶¶ 19-20, 34-52. Further, the NDA provides that the isolated treprostinil salt will be stored at ambient temperature in a dry box during PRINT Step 1 (*see* D.I. 408 at 10-15), and that the treprostinil salt (no longer isolated) will be stored at ambient temperature between Steps 1, 2, and 3 (*id.* at 15-18). PFF ¶¶ 52-55. The TN in LIQ861 will be stored at ambient temperature, demonstrating infringement. *See Sunovion*, 731 F.3d at 1278-80.

Liquidia argues that Dr. Nuckolls's testimony on these instances of ambient temperature storage is speculative. LAB 9-10, 11. Again Liquidia is wrong. Dr. Nuckolls's testimony is based on the NDA itself and aligns with testimony from Liquidia's corporate representative, Mr. Kindig. PFF ¶¶ 52-55; Tr. 61:4-64:4. The NDA expressly says that LIQ861 "manufacturing activities are conducted in … 18°C-24°C … unless otherwise specified." PTX-74 at LIQ02791550; PFF ¶ 52; *cf.* LFF ¶ 150. Consequently, when the TN is stored between PRINT steps and in a dry box during PRINT Step 1, it is stored at 18°C-24°C, which is "ambient temperature." PFF ¶¶ 52-55; D.I. 119.

Liquidia's stances are inconsistent with the NDA and how a POSA would understand the claims. For example, Liquidia argues that it begins preparing claim 8's "pharmaceutical product" during PRINT Step 1 (LAB 10-11), but this argument is inconsistent with the NDA that shows the "product" being prepared starting at PRINT Step 5. PTX-74 at LIQ02791550. Liquidia's argument

6

seeks to avoid evidence of ambient temperature storage during and between PRINT steps. *See* D.I. 408 at 17. Similarly, Liquidia argues that "once TN is dissolved in water in Step 1, it is dissociated treprostinil and sodium ions in solution and not 'TN,'" so there can be no infringing storage of treprostinil salt after that point. LAB 11; LFF ¶ 149. But this attorney argument[6] is contrary to Liquidia's own approved labeling, which states that the proposed product "contains treprostinil sodium" and identifies the chemical structure. PTX-469 at LIQ02818829-830; PFF ¶ 18.

Liquidia asserts that "storage" must exclude "transportation" (*e.g.*, during shipment) and "use" (*e.g.*, during or in between PRINT steps). *See* LFF ¶ 128.[7] But a POSA would not so mechanistically apply that definition given the context of the '066 patent. When the substance sits undisturbed at ambient temperature—whether during transportation to a manufacturing site, on a chemist's benchtop between manufacturing steps, or in a dry box—*the substance* is being stored at ambient temperature regardless of whether the chemist has additional future intentions or considerations. Liquidia's stances ignore these facts and misconstrues the claims.

### 2. Liquidia Cannot Avoid Infringement by Promising Not to Infringe

Liquidia argues that it does not infringe because (a) the NDA provides that the treprostinil sodium will be maintained at 2-8°C, and (b) the temperature data logger excursions from that zone occur when the shipping packaging is opened and the data logger is separated from the drug substance. LAB 8-9. First, the NDA does not state that the treprostinil *must* be maintained at those temperatures, but instead that it "[*s*]*hould* be … stored at 2°C to 8°C." PTX-112 at -517 (emphasis

---

[6] Liquidia cites two experts, but neither actually addresses Liquidia's argument raised for the first time that there is "no evidence that [treprostinil sodium] is present at any step of manufacturing following the complete dissolution of TN at Step 1, as required by claim 8." LAB 11.

[7] LFF ¶ 128 is unsupported. There is no evidence Dr. Scheidt agreed with this narrow "storage" definition. Moreover, this Court properly rejected that construction (D.I. 75 at 39), construing the term "storage" to have its plain and ordinary meaning (D.I. 119), and should "reject [Liquidia's] attempt to re-litigate a position [the Court] already rejected." *Semcon Tech, LLC v. Micron Technology, Inc.*, C.A. No. 12-532-RGA, 2017 WL 2591945, at *6 (D. Del. June 15, 2017).

added); Tr. 396:18-24. By using the word "should" rather than "must," Liquidia's NDA recognizes that its treprostinil sodium can be used even when it has not been maintained at 2-8°C. Second, if the FDA actually required Liquidia to maintain the treprostinil sodium at 2-8°C, the FDA would not have accepted Liquidia's NDA batches that lacked temperature loggers. PFF ¶¶ 40, 42, 43; LFF ¶ 144; LAB 8-9; *see also* PFF ¶¶ 34-39, 41, 44-49.[8] Third, Liquidia's promise not to use batches shipped at ambient temperature (LAB 8)[9] is irrelevant because the FDA permits Liquidia to use drug substance stored at ambient temperature based on Yonsung six-month ambient temperature stability data. PFF ¶¶ 19-20, 34-51. *See Sunovion*, 731 F.3d at 1280 ("Simply saying 'But I won't do it' is not enough to avoid infringement."). Liquidia infringes the '066 patent.

### III. LIQ861 INFRINGES THE '793 PATENT

#### A. Liquidia Misinterprets "Therapeutically Effective Single Event Dose"

Claim 1 recites a method "comprising … a therapeutically effective single event dose." JTX-3, claim 1. By using the open-ended transition "comprising" and requiring "a" dose, the claim is satisfied by one or more doses. "That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention. The exceptions to this rule are extremely limited[.]" *Amgen Inc. v. Hospira, Inc.*, 2016 WL 7013483, at *2 (D. Del. Nov. 30, 2016). No exception applies here—especially when the specification expressly describes administration multiple times per day. JTX-3, 8:1-2.

Liquidia's new argument regarding the word "single" misreads the claim and the intrinsic

---

[8] Absent documentation showing otherwise, the FDA interprets the entire data logger record to represent the complete duration and extent of temperature exposure. PFF ¶ 43.

[9] Liquidia's alleged rejection of 3 batches stored at ambient temperature does not "establish[]" noninfringement. LAB 8. Despite ambient storage for 9 days, Liquidia accepted the batches, noting "Requirements Met" for "Transport Conditions (Temperature-if applicable)." PFF ¶¶ 20, 44-46, 48-49; LFF 137-38; *see also* LFF ¶ 140 ("*Eventually*, the batches were relegated to R&D") (emphasis added). Under its NDA, Liquidia could use those or similar batches of TN stored at ambient temperature—indeed, Liquidia's head of quality makes the decision. PFF ¶¶ 44-49.

8

evidence. *Amgen*, 2016 WL 7013483 at *2; LAB 13. Claim 1 recites a "single event dose," not a "single dose." "Single" describes "event," so the claimed dose is one administered in a "single event"—one treatment session—as opposed to multiple sessions over an extended period. Indeed, the experts agreed that "single event dose" means the dose delivered in a single treatment session. PFF ¶ 64; Tr. 704:25-705:3. According to the specification, inhaled treprostinil has beneficial effects in the three hours after administration (JTX-3, 15:51-54), but there is nothing in the specification stating that treprostinil must be used only one time per day. *See id.* at 13:33-37 (describing patients that received iloprost and treprostinil on the same day, one hour apart), Fig. 5.

Nor is there any basis to exclude hemodynamics from the meaning of "therapeutically effective." The specification provides examples detailing the hemodynamic results of inhaled treprostinil at claimed doses and Liquidia's proposed interpretation would exclude those embodiments. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (excluding preferred embodiments is "rarely, if ever, correct"). The POSA would understand the plain meaning of "therapeutically effective single event dose" as a dose given in one treatment session that provides therapeutic benefit to the PH patient, such as improved hemodynamics (*e.g.*, reduced PAP or PVR). PFF ¶¶ 64, 68-69, 127, 134-136.

### B.   Administration of LIQ861 Will Directly Infringe the Claims

Liquidia's lone non-infringement argument is premised upon a flawed interpretation of "therapeutically effective single event dose" and therefore fails. *Supra* § III.A.

The evidence establishes that LIQ861 is administered as a therapeutically effective single event dose. Treprostinil vasodilates the pulmonary vasculature when administered to patients, thus reducing PAP and PVR. PFF ¶¶ 1-2, 68, 70. The '793 patent describes those treprostinil properties, as does the UTC Tyvaso® clinical data that Liquidia cites in its NDA and LIQ861 label. PFF ¶¶ 2, 69-70, 136; PTX-573, 7 ("The NDA for LIQ861 inhalation powder … rel[ies] on the FDA's

9

previous finding of safety and effectiveness for Tyvaso, the selected reference listed drug (RLD) for demonstration of *the effectiveness of treprostinil* in the treatment of PAH.") (emphasis added). Liquidia's expert, Dr. Hill, testified that after administration of LIQ861, "you would expect no therapeutic effect beyond those first few hours." Tr. 694:20-695:2. As such, Dr. Hill admitted that LIQ861 provides a therapeutic effect for those first few hours. *Id.*; PFF ¶ 68. That only makes sense—the FDA would not approve LIQ861 unless it showed therapeutic effectiveness. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1362 (Fed. Cir. 2003) (the FDA grants "approval to market a drug for a specific use for which the drug has been demonstrated to be safe and effective"); *see also*, *e.g.*, PTX-469, 12; PTX-573, 5, 7-10, 30-31; PTX-1213, 2, 5; PFF ¶ 67.

### C. Liquidia Will Induce Infringement

By instructing administration of therapeutically effective single event doses, Liquidia's label "encourage[s], recommend[s], or promote[s] infringement." *Takeda Pharms. U.S.A. v. West-Ward Pharm.*, 785 F.3d 625, 631 (Fed. Cir. 2015); PFF ¶¶ 57-64, 66-68, 70-71. And Liquidia intends to induce doctors and patients to infringe. *Sanofi v. Glenmark Pharms. Inc., USA*, 204 F. Supp. 3d 665, 673-74 (D. Del. 2016); PFF ¶¶ 73-74.

Contrary to Liquidia's argument, the label merely has to instruct the infringing act, not explain how the act is infringing. *See* LAB 17. The claims require administering a therapeutically effective single event dose, not that the doctor or patient measure LIQ861's hemodynamic effects. JTX-3, claim 1; *Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 2018 WL 2225113, at *9 (D. Del. May 15, 2018) ("The Federal Circuit has made clear that all that is required is that 'the product labeling … would inevitably lead some physicians to infringe.'") (citation omitted). Liquidia's label will induce infringement of the '793 patent.

### IV. CONCLUSION

Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor.

10

OF COUNSEL:

William C. Jackson
Eric Levi
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036
(202) 346-4216

Douglas H. Carsten
Mandy H. Kim
Arthur Dykhuis
Jiaxiao Zhang
Katherine Pappas
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92612
(949) 851-0633

Huiya Wu
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Ian B. Brooks
Adam W. Burrowbridge
Joshua Revilla
Timothy M. Dunker
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000

Harrison Gunn
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

June 15, 2022

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
Sarah E. Simonetti (#6698)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com
ssimonetti@morrisnichols.com

*Attorneys for Plaintiff
United Therapeutics Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 15, 2022, upon the following in the manner indicated:

| | |
|---|---|
| Karen E. Keller, Esquire<br>Nathan R. Hoeschen, Esquire<br>Emily S. DiBenedetto, Esquire<br>SHAW KELLER LLP<br>I.M. Pei Building<br>1105 North Market Street, 12th Floor<br>Wilmington, DE  19801<br>*Attorneys for Defendant Liquidia Technologies, Inc.* | *VIA ELECTRONIC MAIL* |
| Sanya Sukduang, Esquire<br>Jonathan Davies, Esquire<br>Douglas W. Cheek, Esquire<br>Adam Pivovar, Esquire<br>COOLEY LLP<br>1299 Pennsylvania Avenue, NW, Suite 700<br>Washington, DC  20004-2400<br>*Attorneys for Defendant Liquidia Technologies, Inc.* | *VIA ELECTRONIC MAIL* |
| Erik Milch, Esquire<br>COOLEY LLP<br>11951 Freedom Drive, 14th Floor<br>Reston, VA  20190-5640<br>*Attorneys for Defendant Liquidia Technologies, Inc.* | *VIA ELECTRONIC MAIL* |
| Ivor Elrifi, Esquire<br>COOLEY LLP<br>55 Hudson Yards<br>New York, NY  10001-2157<br>*Attorneys for Defendant Liquidia Technologies, Inc.* | *VIA ELECTRONIC MAIL* |

Lauren Krickl, Esquire                                    *VIA ELECTRONIC MAIL*
Deepa Kannappan, Esquire
Brittany Cazakoff, Esquire
Kyung Taeck Minn, Esquire
COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

                                    */s/ Michael J. Flynn*
                                    _____
                                    Michael J. Flynn (#5333)