# EXHIBIT A

S&P Global
Market Intelligence

# Liquidia Corporation NasdaqCM:LQDA

# Special Call

## Thursday, September 01, 2022 1:00 PM GMT

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Table of Contents

Call Participants .......................................................................... 3

Presentation .......................................................................... 4

Question and Answer .......................................................................... 7

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Call Participants

**EXECUTIVES**

**Jason Adair**
*Senior Vice President of Corporate Development & Strategy*

**Michael Kaseta**
*Chief Financial Officer*

**Roger A. Jeffs**
*CEO & Director*

**Rusty Schundler**

**ANALYSTS**

**Gregory Allen Harrison**
*BofA Securities, Research Division*

**Julian Reed Harrison**
*BTIG, LLC, Research Division*

**Matthew Lee Kaplan**
*Ladenburg Thalmann & Co. Inc., Research Division*

**Serge D. Belanger**
*Needham & Company, LLC, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Good morning, and welcome, everyone, to the Liquidia Corporation Corporate Update Conference Call. My name is Julie, and I will be your conference operator today. [Operator Instructions] I would like to remind everyone that this conference call is being recorded.

Before the company begins, please note that today's conference call will contain forward-looking statements, including those statements regarding future results, unedited and forward-looking financial information, as well as the company's future performance and our achievements. These statements are subject to known and unknown risks and uncertainties, which may cause our actual results or performance to be materially different from any future results or performance expressed or implied on this call. For additional information, including a detailed discussion of risk factors, please refer to the company's documents filed with the Securities and Exchange Commission, which can be accessed on the website at www.liquidia.com.

Joining the call today are Chief Executive Officer, Roger Jeffs; General Counsel, Rusty Schundler and other members of the Liquidia management team.

I will now turn the call over to Mr. Roger Jeffs.

**Roger A. Jeffs**
*CEO & Director*

Thank you, Julie, and thank you, everyone, for joining today's corporate update on the webcast. We've organized this brief call today to emphasize that Liquidia's path to changing the lives of PAH patients is clear, even if it will be slightly longer than we had hoped. The very good news, which should not be missed is that between yesterday's decision from Judge Andrews in the District Court of Delaware and the previous favorable decisions from the Patent Trial and Appeal Board or PTAB, all of the patent claims asserted by United Therapeutics have been found by at least 1 tribunal to be either invalid or not infringed. I will speak to each patent in more detail to make this point clearer. I wanted to reiterate the conclusion of our productive efforts to date.

If the decisions we've received to date from the court and the PTAB are affirmed on appeal, then we will be able to seek final approval for YUTREPIA and bring this important therapeutic option to PAH patients and their health care practitioners.

For today's call, I will refer to each of the disputed 3 patents by their abbreviated names which are '066 and '901 for the 2 trepostinil API manufacturing patents and '793 for the method of use patent. Liquidia has now been found to not infringe any valid claim in the '066 and '901 patents, the 2 patents that originally triggered the 30-month regulatory stay.

These patents were listed in the Orange Book for nebulized TYVASO, the reference listed drug in the YUTREPIA NDA. When we submitted under the 505(b)(2) regulatory path in 2020. Between yesterday's court decision on '066 and the inter partes review or IPR of the '901 patent, Liquidia has demonstrated that nearly all of the claims in these 2 patents are invalid. The remaining valid claims describe ambient temperature storage that are not infringed during the manufacturing of YUTREPIA. As you will note, the ruling issued by Judge Andrews only addresses the '066 patent because United Therapeutics had already stipulated Liquidia's non-infringement of the '901 in an earlier court proceeding.

Moving to the '793 patent, Judge Andrews did not rule on Liquidia's favor based on the arguments presented at trial. This ruling of patent infringement may seem confusing in light of the PTAB's prior decision that all of the claims of '793 are unpatentable. However, it is important to understand that due to IPR at staple, Liquidia was precluded from uncertainty before Judge Andrews any grounds for invalidity that it had raised in the inter partes review proceeding at the PTAB. Thus, Liquidia was only able to

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

present the judge with arguments of invalidity based on lack of enablement and lack of written description of the claims, which were not arguments that Liquidia is successfully presented to the PTAB.

Based on these specific arguments, the judge ruled that Liquidia did not show by clear and convincing evidence that the asserted claims of the '793 patent were invalid.

Despite the conflicting decisions, we are confident in the future path to YUTREPIA's approval. You may ask why. The answer is that Judge Andrews' ruling does not overrule the PTAB decision. Instead, the PTAB's decision, which is currently a subject to a request for rehearing by United Therapeutics. We'll go through its own appeals process and it ultimately affirms the '793 patent would be canceled, effectively nullifying Judge Andrews' decision on the '793 patent.

This brings us to next steps. Based on this ruling, we expect Judge Andrews will order the FDA should not approve YUTREPIA at this time. This order will remain in place until the earliest of either, a, the PTAB's decision regarding the '793 patent is affirmed; or b, Judge Andrews' decision regarding the '793 patent is reversed; or c, the expiration of the '793 patent. As I've previously noted, United Therapeutics has filed a request for rehearing with respect to the '793 patent. They have also stated in court panels that if the rehearing request is denied, they will file an appeal of the PTAB's decision.

We remain confident that the merits of our arguments that we've successfully made before the PTAB against the '793 patent and look forward to the completion of the appeals process.

I'd like to turn the call over to Rusty now so that he can speak briefly on the timeline related to the gating '793 PTAB appeal and affirmation. Rusty?

**Rusty Schundler**

Thanks, Roger. As Roger noted, given yesterday's decision, we anticipate the Judge Andrews' order soon in which he orders that the effective date of the approval of YUTREPIA cannot be earlier than the expiration of the '793 patent in 2027.

As Roger also noted, however, this order would be dissolved upon either a successful appeal by liquidity of Judge Andrews' decision with respect to the '793 patent, or an affirmation on appeal of the PTAB's earlier decision in validating all claims of the '793 patent. We anticipate that a typical appeal can be expected to take approximately 12 months from the date of the notice of appeal. However, we will seek to expedite the briefing process and try to shorten this time period, if possible.

With respect to the Hatch-Waxman decision, we anticipate that we will follow a notice of appeal in short order after the judge's order is entered. This means that the 12-month clock will begin to run within a few weeks.

With respect to the '793 patent PTAB decision, United Therapeutics has filed a request for rehearing. Assuming that rehearing request is denied, then United Therapeutics would have 63 days from the date of the denial in which to file their notice of appeal. The variable we do not yet know is how long it will take for the PTAB to decide with respect to the rehearing request. PTAB's internal goal for responding to rehearing request is 1 month. However, this is not a requirement by statute and PTAB often misses this 1-month goal.

Again, we will seek to expect this process so we can have the appeals heard and decided as soon as possible. And we will provide updates as the appeal timeline becomes clear.

Roger?

**Roger A. Jeffs**
*CEO & Director*

Thank you, Rusty, for that very good clarification. We are here on this call to get years of dedication from a team of scientists, clinicians, manufacturers, financial backers and yes, lawyers, all bound by a single purpose to ensure this transformative new product can get into the hands of patients and physicians. The drive and result to surmount any obstacle along this path to this purpose is the foundation for what our

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

company represents. We will continue to bring the same fight and commitment to help better the complex lives of PAH patients with a simple powder, a simple device and a simple promise to offer choice when they have had very few to date.
At this time, I'd like to now open the conference for questions. Operator, first question.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Your first question comes from Greg Harrison from Bank of America.

**Gregory Allen Harrison**
*BofA Securities, Research Division*

How are you thinking about the possibility of a launch at risk prior to an IPR appeal? Is this an option you're considering? And what are the most important factors in that decision?

**Roger A. Jeffs**
*CEO & Director*

Yes. Good to hear from you, Greg. I'd like to turn that question over to Rusty, please.

**Rusty Schundler**

Thanks, Roger, and thanks for the question. So the launch at risk, in this case, is not -- would not really be an option for 2 reasons. One, the court's order will likely prohibit approval of YUTREPIA before the expiration of the '793 patent. Again, unless [indiscernible] process into -- concludes earlier. Secondly, because then the gating factor is the interest of the appeals process. There really wouldn't be a launch at risk at that point because at that point, you would have had both your decisions and the appeals process play out. So again, a launch at risk really is not something we're focused on at this point.

**Operator**

Next question comes from Serge Belanger from Needham & Company.

**Serge D. Belanger**
*Needham & Company, LLC, Research Division*

Just a couple of questions for us. Is there a potential that the judge does not enforce an injunction in its final ruling, given that the '793 patent was not part of the original Hatch-Waxman litigation initiated in 2019? And then secondly, maybe for Rusty, can you just walk us through some of the timelines expected around rehearing an appeals process at the PTAB?

**Roger A. Jeffs**
*CEO & Director*

Serge, I think both of those questions really reflect legal answer. So to Rusty, if you would?

**Rusty Schundler**

Thanks, Roger, thanks, Serge. So on 2 questions, taking the first one first. We think the statute here requires to Judge Andrews include -- issue an injunction based on the '793. The fact that it wasn't part of the original Orange Book listing or the original 30-month stay isn't relevant at this stage in the proceedings. So we don't anticipate that as a likely scenario. With respect to the timing, and again, this is specific to the timing of the appeal and the '793 PTAB decision, so right now, again, they filed the rehearing request. We're waiting for the PTAB's response on that. The PTAB's internal goals for responding to rehearing requests are 30 days. They oftentimes don't hit that goal. And there's no statutory requirements to when they have to respond and address the rehearing request. We do anticipate it will be some number of months again as soon as 1 month. Once they make a decision, assuming they deny the rehearing request, United Therapeutics would then have 63 days in which to file their notice of appeal. And then once they file the notice of appeal, then that 12-month ballpark time period that I talked about would start to run. And again, we'll seek ways to expedite a briefing and other ways to try to cut down on that 12 months timeline once the notice of appeal has been filed.

**Serge D. Belanger**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*Needham & Company, LLC, Research Division*

okay so the -- I think in the press release that went out yesterday was talk of a mid-2024 potential target. So that just assumes all these -- the accumulation of all this time and the 12-month appeals process?

**Rusty Schundler**

Correct. And again, I think we said by mid-2024, the 1 variable, as I noted, we don't know is how long it will take the PTAB to rule on the rehearing request. Obviously, once we know that, we'll be able to dial in a little bit more tightly the expected timeline, but that's the one variable we don't know from a timing perspective yet.

**Roger A. Jeffs**
*CEO & Director*

Yes, thanks, Serge. And I think, again, we were just trying to bracket the time frame. And as Rusty said, we'll update as soon as the recurring request is hopefully denied.

**Operator**

Your next question comes from Julian Harrison from BTIG.

**Julian Reed Harrison**
*BTIG, LLC, Research Division*

Congrats on the update. Wondering if you're able to provide any color on your updated cash runway during and through the appeals here. And also along similar lines, how do you expect OpEx to trend over the next few quarters? Also wondering if there's still near-term plans for Group III PH study or does the FDA recently telling you that you don't need to run one maybe make it less group priority.

**Roger A. Jeffs**
*CEO & Director*

I'll take the last question first, and then Mike, if you could answer the financial questions, that would be great. So in terms of things that we're going to do in the interim, I think there's -- it's an important period of time for the company to still progress on many fronts. So I think we'll continue to gather longer-term data from our open-label extension study, where we want to continue to further elucidate and amplify the therapeutic profile as we see dose increase and patients endure the therapy for longer periods of time, which is all good data to express to the community.

I do think we will look to do company-sponsored studies and investigator-initiated studies that explore additional benefits and uses of YUTREPIA either within Group III or other groups, frankly, and that's something we're actively pursuing at this point. We will continue to develop our medical education efforts to drive awareness. So before launch, I think there's some net-add things we can do to keep the community informed about the value proposition that YUTREPIA uniquely will provide. And then finally, I think we'll solidify our commercial plan, especially in Group III patients. As the important thing to note also is that upon affirmation and launch into WHO Group 1 patients with successful resolution of this litigation the PH-ILD market as you suggest, Julian, will be available to us almost at the same point in time, which, frankly, could be -- which would be at the end of March '24, at the latest. So this means we'll be able to launch into a cumulative opportunity that should be by that time, well in excess of $1 billion market opportunity. And we think with our preferred product profile, we can quickly become a preferred therapeutic option for patients new to inhaled treprostinil.

So with that, Mike, if you could speak to the cash from the OpEx questions that Julian asked.

**Michael Kaseta**
*Chief Financial Officer*

Yes, thanks, Roger, and thanks for the question, Julian. As you know, we ended Q2 with about $103 million in cash. We've previously stated that we -- that should enable us to get into 2024. As we've always done, we will evaluate all options to do what's best for shareholders. We feel confident in the cash position

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

that we have right now, and like I said, we'll evaluate all those options. And with much more certainty on launch, we feel that many other options will be available for us to consider. And like Roger said, we'll be launching into a full label for that is obviously very helpful as well. So as it relates to the OpEx over the coming quarters, as we have stated on our Q2 call, we were playing to win, and we're preparing for a launch. So we're manufacturing commercial supply, building out the commercial teams. But one thing that we've done is we've been very judicious with our decision-making around building out the sales force. So we will be able to put things like that on hold. As Roger said, we will continue to look for future development opportunities for YUTREPIA, prepare for a launch that is just around the corner here. So I would expect that OpEx would stay flat to where we are right now to reducing a bit, especially in Q4 '22 and the early part of '23. But then we will be immediately back up. Ramping up to get ready for launch, hopefully at the latter part of '23 or first half of 2024.

**Operator**

Your next question comes from Matt Kaplan from Ladenburg.

**Matthew Lee Kaplan**
*Ladenburg Thalmann & Co. Inc., Research Division*

Just a point of clarity. In terms of -- although you were precluded from using the arguments in the '793 patent that you -- that we're successful with the PTAB, could you use those arguments going forward in your appeal process of Judge Andrews' decision?

**Jason Adair**
*Senior Vice President of Corporate Development & Strategy*

This is Jason Adair. Robert just had to drop for a second. So Rusty, could you take that question, please?

**Rusty Schundler**

Sure, and thanks, Matt, for the question. So the way the appeals work is that the appeal is from the underlying decision, and so what the appeals court will look at is the judge's decision based on the issues presented to the judge. So there's not -- we wouldn't be able to look at the PTAB decision and say Judge Andrews should be overturned on whether he found the '793 patent valid because the PTAB found it invalid. However, consistent with some of the filings we made after the PTAB decision was entered with Judge Andrews, there would be some grounds for appeal potentially around some of those issues. But again, it wouldn't be quite the way you asked it. We wouldn't be able to point to the PTAB's decision on invalidity and then have Judge Andrews overturned on the grounds that he should have found the '793 to be invalid as well for the same reasons if that makes sense.

**Operator**

There are no further questions at this time. I will turn the call back over to the presenters.

**Jason Adair**
*Senior Vice President of Corporate Development & Strategy*

Thanks, Julie. Mike, can you wrap up the call for us today?

**Michael Kaseta**
*Chief Financial Officer*

Yes, thanks, Jason. So we really appreciate everyone joining on short notice. As Roger has said, we're very excited about the decisions that we are victorious on all 3 claims. We would like to launch these products earlier, but we will go through the appropriate channel to seek resolution as soon as possible and get this important medicine into patients' hands in the near term.

So thanks, everyone, for your time, and have a great day.

**Operator**
This concludes today's conference call. You may now disconnect.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

# EXHIBIT B

Liquidia

# Liquidia Provides Update on Hatch-Waxman Litigation and to Host Call on September 1, 2022, at 8:00am E.T.

August 31, 2022

- District Court ruling was favorable on '066 patent and unfavorable on '793 patent
- All patent claims asserted have been found to be either invalid or not infringed by District Court or U.S. Patent Trial and Appeal Board (PTAB)
- PTAB decision to invalidate all claims of '793 patent is not affected
- Ability to seek final FDA approval of YUTREPIA™ (treprostinil) inhalation powder is contingent on affirmation of the PTAB decision or reversal of District Court decision regarding the '793 patent

MORRISVILLE, N.C., Aug. 31, 2022 (GLOBE NEWSWIRE) -- Liquidia Corporation (NASDAQ: LQDA) announced today that a ruling was issued by Judge Andrews, who is presiding over the litigation filed by United Therapeutics Corporation (UTC) in the United States District Court for the District of Delaware under the Drug Price Competition and Patent Term Restoration Act (Hatch-Waxman Act) that alleges Liquidia infringes U.S. Patent No. 9,593,066 ('066 Patent), U.S. Patent No. 10,716,793 ('793 Patent) and U.S. Patent No. 9,604,901 ('901 patent).

The company will host a conference call and webcast on Thursday, September 1 at 8:00 a.m. Eastern Time. The call can be accessed by dialing 1-800-715-9871 (domestic) or 1-646-307-1963 (international) and entering the conference code: 4265646. A webcast of the call will be available on Liquidia's website at https://liquidia.com/index.php/investors/events-and-presentations.

Taking today's ruling together with prior PTAB decisions, Liquidia has now demonstrated in at least one forum that all claims asserted against it are invalid or not infringed. Based on the arguments presented at trial, the Court ruled that 5 of 6 asserted claims of the '066 patent are invalid and that the only valid claim is not infringed by Liquidia. Judge Andrews also found Liquidia would induce infringement of the 5 asserted claims in the '793 patent. The Court's decision does not affect the PTAB's prior decision that all claims in the '793 patent are unpatentable. The '901 patent was not addressed in the ruling because UTC previously stipulated that Liquidia does not infringe any of the asserted claims based on the Court's construction of certain terms in the patent.

Roger Jeffs, Chief Executive Officer of Liquidia, said: "We are pleased that all three patents asserted against us have been found to be either invalid or not infringed among the different legal proceedings. While we are disappointed with the Court's decision on the '793 patent, we are optimistic that the PTAB's favorable decision will be affirmed on appeal, thereby unlocking the path to potential approval of YUTREPIA by mid-2024, if not earlier. We will aggressively pursue the appeals process, including an appeal of Judge Andrews' decision, in hope of bringing the final resolution sooner. While this is not the perfect outcome we had hoped for, it is incrementally positive as it does provide us with a definitive path to resolving the patent dispute and making YUTREPIA available as a treatment option for patients, which is our singular focus."

UTC has stated in district court filings that it will appeal the PTAB's decision regarding the '793 patent to the Court of Appeals for the Federal Circuit if the PTAB denies UTC's request for rehearing the IPR. Accordingly, Liquidia's ability to seek final approval for YUTREPIA (treprostinil) inhalation powder will be contingent upon either the affirmation of the PTAB's earlier decision in the *inter partes* review (IPR) regarding the '793 patent or the reversal of Judge Andrews' decision regarding the '793 patent.

**About YUTREPIA™ (treprostinil) inhalation powder**
YUTREPIA is an investigational, inhaled dry powder formulation of treprostinil delivered through a proven, convenient, palm-sized device. On November 5, 2021, the FDA issued a tentative approval for YUTREPIA, which is indicated for the treatment of pulmonary arterial hypertension (PAH) to improve exercise ability in adult patients with New York Heart Association (NYHA) Functional Class II-III symptoms. YUTREPIA was designed using Liquidia's PRINT ® technology, which enables the development of drug particles that are precise and uniform in size, shape, and composition, and that are engineered for optimal deposition in the lung following oral inhalation. Liquidia has completed INSPIRE, or Investigation of the Safety and Pharmacology of Dry Powder Inhalation of Treprostinil, an open-label, multi-center phase 3 clinical study of YUTREPIA in patients diagnosed with PAH who are naïve to inhaled treprostinil or who are transitioning from Tyvaso® (nebulized treprostinil). YUTREPIA was previously referred to as LIQ861 in investigational studies.

Tyvaso® is a registered trademark of United Therapeutics Corporation.

**About Liquidia Corporation**
Liquidia Corporation is a biopharmaceutical company focused on the development and commercialization of products in pulmonary hypertension and other applications of its PRINT® Technology. The company operates through its two wholly owned subsidiaries, Liquidia Technologies, Inc. and Liquidia PAH, LLC. Liquidia Technologies has developed YUTREPIA™ (treprostinil) inhalation powder for the treatment of pulmonary arterial hypertension (PAH). Liquidia PAH provides the commercialization for pharmaceutical products to treat pulmonary disease, such as generic Treprostinil Injection. For more information, please visit www.liquidia.com.

**Cautionary Statements Regarding Forward-Looking Statements**
This press release may include forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements contained in this press release other than statements of historical facts, including statements regarding our future results of operations and financial position, our strategic and financial initiatives, our business strategy and plans and our objectives for future operations, are forward-looking statements. Such forward-looking statements, including statements regarding clinical trials, clinical studies and other clinical work (including the funding therefor, anticipated patient enrollment, safety data, study data, trial outcomes, timing or associated costs), regulatory applications and related submission contents and timelines, including the potential for final FDA approval of the NDA for YUTREPIA, the timeline or outcome related to appeals

or rehearing requests arising from our patent litigation in the U.S. District Court for the District of Delaware or *inter partes* review proceedings conducted at the PTAB, the issuance of patents by the USPTO and our ability to execute on our strategic or financial initiatives, involve significant risks and uncertainties and actual results could differ materially from those expressed or implied herein. The favorable decisions of the PTAB in the IPRs for the '793 and '901 patents and of the Court in the Hatch-Waxman litigation are not determinative of the outcome of any appeal of those decisions. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should," "target," "would," and similar expressions are intended to identify forward-looking statements. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy, short-term and long-term business operations and objectives and financial needs. These forward-looking statements are subject to a number of risks discussed in our filings with the SEC, including the impact of the coronavirus (COVID-19) outbreak on our Company and our financial condition and results of operations, as well as a number of uncertainties and assumptions. Moreover, we operate in a very competitive and rapidly changing environment and our industry has inherent risks. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties and assumptions, the future events discussed in this press release may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. Nothing in this press release should be regarded as a representation by any person that these goals will be achieved, and we undertake no duty to update our goals or to update or alter any forward-looking statements, whether as a result of new information, future events or otherwise.

**Contact Information**

**Media & Investors:**
Jason Adair
Senior Vice President, Corporate Development and Strategy
919.328.4400
jason.adair@liquidia.com

Source: Liquidia Corporation

# EXHIBIT C

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 13, 2022 Decided September 20, 2022

No. 21-5040

KATRINA L. WEBSTER,
APPELLANT

v.

CARLOS DEL TORO, SECRETARY OF NAVY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-00610)

*Keith Klovers*, appointed by the court, argued the cause as *amicus curiae* in support of appellant. With him on the briefs were *Steffen N. Johnson* and *Kelsey J. Curtis*, appointed by the court.

*Christopher C. Hair*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *R. Craig Lawrence* and *Jane M. Lyons*, Assistant U.S. Attorneys. *Kenneth A. Adebonojo* and *Heather Graham-Oliver*, Assistant U.S. Attorneys, entered appearances.

Before: ROGERS, KATSAS, and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: An employee charged the Navy with discrimination and retaliation in violation of Title VII. The Navy investigated the charge and dismissed it as unproven. The Equal Employment Opportunity Commission agreed that the charge was unproven, but it identified in the administrative record a distinct retaliation claim that the employee herself had not charged. The question on appeal is whether the employee may pursue that claim in court without first exhausting it before the Navy. We hold that she may not.

I

A

Section 717 of the Civil Rights Act of 1964 prohibits federal employers from discriminating based on race and from retaliating against employees who have complained of discrimination. 42 U.S.C. § 2000e-16; *see Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006). An aggrieved employee may file suit, but only after exhausting her claim administratively. Section 717(c) sets forth the exhaustion process: First, the employee must file with the employing agency an initial charge or complaint that describes the alleged violation. Once the agency takes final action on the complaint or 180 days pass, the employee may file suit in federal district court. Alternatively, she may appeal the agency's decision to the EEOC. If unsatisfied by the EEOC's final decision or 180 days pass, the employee has another opportunity to file suit.

B

Katrina Webster worked as a secretary for the Navy. In 2017, Webster filed a charge alleging that Richard Garland, a Navy contractor, had subjected her to a hostile work

environment. According to Webster, Garland made comments describing her as trouble and telling co-workers to watch out or turn away when she approached. Webster also alleged that Garland, who provided IT support, once tried to remove a printer from her desk. The charge alleged that Webster's direct supervisor, Captain Patrick Croley, who headed the branch where Webster worked, permitted the harassment because of her race and her past EEO activity.

The Navy investigated Webster's charge. During the investigation, Webster provided a sworn statement naming Garland as the individual responsible for her harassment and backing away from the allegation that Croley had permitted it. Webster further stated her view that Garland knew of her prior EEO activity, and she suggested that Croley may have told him. Lieutenant Tarik Yameen, the deputy branch head under Croley, testified that he was unaware of Webster's EEO activity when she filed the complaint against Garland. Yameen further testified that he learned of that complaint from Webster's EEO counselor shortly after she filed it, and that he learned from Croley, around the same time, that Webster had filed other complaints.

In 2018, the Navy issued a final decision concluding that Webster failed to prove that Garland harassed her.

On appeal, the EEOC agreed with the Navy's conclusion, but it raised two distinct claims that Webster had not charged. First, the Commission concluded that Croley retaliated against Webster by disclosing her past EEO activity to Yameen. Second, the EEOC noted certain perceived deficiencies with the Navy's anti-harassment policy. The Commission thus remanded the case with instructions for the Navy to consider damages for Webster and to amend its policy.

Despite the remand, the EEOC deemed its own decision to be final. Its order contained a section titled "Complainant's Right To File A Civil Action," which stated in relevant part:

> This is a decision requiring the Agency to continue its administrative processing of your complaint. However, if you wish to file a civil action, you have the right to file such action in an appropriate United States District Court within ninety (90) calendar days from the date that you receive this decision. … Filing a civil action will terminate the administrative processing of your complaint.

J.A. 33 (cleaned up).

Webster, acting *pro se*, chose to sue. Charitably read, her complaint alleged that (1) Garland created a hostile work environment, (2) the Navy's anti-harassment policy was inadequate, (3) the Navy retaliated against Webster by failing to promote her before the Garland incident, and (4) Croley retaliated against Webster by disclosing her past EEO activity to Yameen. The district court dismissed the complaint for failure to state a claim. *Webster v. Braithwaite*, No. 1:20-cv-0610, 2020 WL 7340058 (D.D.C. Dec. 14, 2020).

Webster appealed, and both parties moved for summary disposition. A motions panel denied Webster's motion in full and granted the Navy's motion as to the first three claims. *Webster v. Del Toro*, No. 21-5040, 2021 WL 6102269 (D.C. Cir. Dec. 15, 2021). But we declined to summarily affirm the retaliation-by-disclosure claim. Instead, we appointed Keith Klovers as an amicus in support of Webster on that claim. He has ably discharged his responsibilities.

II

We review dismissal for failure to state a claim *de novo*. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017). We may affirm on any ground supported by the record. *Smith v. Lanier*, 726 F.3d 166, 169 (D.C. Cir. 2013).

III

The only open question in this appeal involves the claim that Croley retaliated against Webster by disclosing her past EEO activity to Yameen. The district court dismissed that claim on the merits. We affirm on the alternative ground that Webster failed to exhaust it before the Navy.

Section 717(c) of the Civil Rights Act permits federal employees to sue for employment discrimination, subject to various exhaustion requirements and time limits for filing. As relevant here, section 717(c) provides:

> Within 90 days of receipt of notice of final action taken by a department, agency, or unit [of the federal government], or by the Equal Employment Opportunity Commission upon an appeal from a decision of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section …, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the Equal Employment Opportunity Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take

> final action on his complaint, may file a civil action as provided in section 2000e-5 of this title ….

42 U.S.C. § 2000e-16(c).

Section 717(c) consists of one long, convoluted sentence, but this much is clear: It requires a federal employee to present a "charge" or "complaint" of discrimination or retaliation to the employing agency before pressing it in court. When Congress extended Title VII to the federal workforce, it gave agencies the "primary responsibility" for resolving discrimination complaints and eliminating employment discrimination. *Brown v. GSA*, 425 U.S. 820, 832 (1976) (cleaned up). Section 717(c) imposes "rigorous exhaustion requirements and time limitations" to preserve for the employing agency a "crucial administrative role" in addressing alleged violations. *Id.* at 833. Consistent with *Brown*, we have long held that section 717(c) "renders filing an 'initial charge' with the employing agency a prerequisite to court action." *Loe v. Heckler*, 768 F.2d 409, 417 (D.C. Cir. 1985) ("Congress ordered first resort to agency processes before Title VII complainants repair to court."); *see Kizas v. Webster*, 707 F.2d 524, 543 (D.C. Cir. 1983) ("'sine qua non' for Title VII civil action regarding federal employment is a complaint formally filed with the agency charged with discrimination" (quoting *Porter v. Adams*, 639 F.2d 273, 276 (5th Cir. 1981))).

In this case, it is undisputed that Webster's administrative complaint failed to present a charge of retaliation based on Croley's disclosure to Yameen. The amicus offers two apparently independent arguments for why Webster nonetheless satisfied the statutory exhaustion requirement: First, she either received a final decision from the EEOC or failed to receive such a decision within 180 days of the filing of her administrative appeal. Second, the retaliation-by-

disclosure claim, although not raised in her charge, became apparent during the Navy's investigation. We consider these arguments in turn.[1]

A

The amicus first contends that Webster exhausted by receiving, or waiting long enough for, a final EEOC decision. He makes alternative arguments depending on whether the EEOC decision was "final action" within the meaning of section 717(c). If it was, then Webster exhausted by receiving the final action, and she permissibly filed suit within 90 days. If not, then Webster exhausted by waiting for the administrative appeal to remain undecided for 180 days, and she then permissibly filed suit. Either way, the amicus concludes, Webster satisfied the "statutory preconditions" for litigating in court. Amicus Br. at 30 (cleaned up). None of these points turns on the substance of the claims that Webster presented to the Navy. The amicus thus appears to suggest that,

---

[1] The amicus also asserts that the Navy waived exhaustion by not pressing it in its motion for summary affirmance. We disagree. To obtain summary affirmance, an appellee must satisfy a "heavy burden" of showing that the merits "are so clear that expedited action is justified." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987). We do not grant summary affirmance lightly; many arguments warrant affirmance but not summary affirmance. So there is no basis for holding that a party, if it seeks summary affirmance on one ground, must simultaneously raise all of its arguments for affirmance. Nor is there any basis for holding that a party, if it affirmatively waives an argument as a basis for summary affirmance, also waives it as a basis for affirmance after full briefing. In this case, the Navy raised an exhaustion defense in the district court and reasserted the defense in its merits brief on appeal. That was enough to preserve the issue.

because Webster exhausted one claim, she was free to litigate another.

That suggestion is mistaken. As explained above, section 717(c) requires a federal employee to file an "initial charge" with her employer before pursuing a Title VII claim in court. It borrowed that requirement from section 706(b) of the Civil Rights Act, which requires a private-sector employee to file a "charge" with the EEOC before pursuing a Title VII claim in court. 42 U.S.C. § 2000e-5(b); *see also id.* § 2000e-16(c) (authorizing civil actions for federal employees "as provided in section 2000e-5"). Such a "charge" must include the "date, place and circumstances of the alleged unlawful employment practice." *Id.* § 2000e-5(b) ("contents of charges"). And outside the context of hostile work environment claims, an "unlawful employment practice" under Title VII is a "discrete retaliatory or discriminatory act" that must be individually charged and filed within the appropriate deadline. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–10 (2002); *see* 42 U.S.C. § 2000e-2(a) (making discriminatory acts an "unlawful employment practice"); *id.* § 2000e-3(a) (same for retaliatory acts). These provisions together make clear that a "charge" alleging one "unlawful employment practice" does not permit the employee to challenge others.

Both the EEOC and this Court have recognized as much. EEOC regulations confirm that the "complaint" filed with the employing agency must "describe generally the action(s) or practice(s) that form the basis of the complaint." 29 C.F.R. § 1614.106(c). Likewise, we routinely apply section 717(c)'s exhaustion requirement on a claim-by-claim basis, to hold that federal employees have exhausted challenges to some employment practices but not others. For example, in *Crawford v. Duke*, 867 F.3d 103 (D.C. Cir. 2017), we held that the plaintiff "adequately exhausted his claims of racial

discrimination, retaliation, and a hostile work environment" arising out of an October 2011 performance evaluation and a December 2011 suspension, but "did not … properly exhaust his claimed denial of a promotion" in November 2011. *Id.* at 109. In *Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012), we held that the plaintiff exhausted a challenge to the selection of another employee for a manager position in 2003, but not to the selection of that same employee for a temporary detail in 2002. *See id.* at 1350. And in *Payne v. Salazar*, 619 F.3d 56 (D.C. Cir. 2010), we held that the plaintiff exhausted a challenge to retaliation that she suffered in 2004, but not to retaliation that she suffered four years later. *See id.* at 65.

In this case, Webster exhausted her claim that Garland created a hostile work environment by speaking ill of her to co-workers and by attempting to remove her printer. But as the EEOC acknowledged in its decision, Webster's complaint to the Navy "did not allege" that Croley retaliated against her by disclosing her prior EEO activity to Yameen. J.A. 23. Without more, Webster's exhaustion of the former claim does not permit her to litigate the latter one.

The fact that the EEOC told Webster she had a right to sue does not change this analysis. As noted above, the EEOC itself recognizes that an employee must describe in her charge "the action(s) or practice(s) that form the basis of the complaint." 29 C.F.R. § 1614.106(c). The EEOC thus stated that Webster could "file a civil action *on the underlying complaint*" originally filed with the Navy. J.A. 32 (emphasis added). Nothing in its right-to-sue determination is inconsistent with our analysis.

B

Alternatively, the amicus contends that Webster exhausted her retaliation-by-disclosure claim because it became apparent

from facts that the Navy uncovered while investigating her complaint. The amicus reasons that when Yameen testified that Croley had disclosed Webster's prior EEO activity to him, the Navy was put on notice of that claim, as if Webster had alleged it in her complaint. And because the Navy had notice of that claim, the amicus concludes, the purpose of the exhaustion requirement was satisfied.

Before addressing this contention, we briefly note two points that the amicus does not press. First, we construe administrative complaints charitably in favor of the employee. *President v. Vance*, 627 F.2d 353, 362 (D.C. Cir. 1980). But here, Webster's complaint asserted only that Croley permitted Garland to subject her to a hostile work environment on or about March 3, 2017.[2] No amount of liberal construction can transform that claim into one that Croley unlawfully disclosed Webster's past EEO activity to Yameen out of retaliatory animus sometime after mid-March.

Second, we have flexibly construed section 717(c) to permit litigation not only of the precise claims raised in a charge, but also of claims "like or reasonably related to" the ones so raised. *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (cleaned up). We have twice reserved the question whether *Park* survives *Morgan*. *See Payne*, 619 F.3d at 65; *Weber v. Battista*, 494 F.3d 179, 183–84 (D.C. Cir. 2007). We do the same here, as the amicus affirmatively disavows any reliance on this doctrine. *See* Amicus Reply Br. at 31–32.

---

[2] Webster's administrative complaint does not appear in the record, but the charge was restated in the Navy's formal acknowledgment of the complaint. J.A. 71; *see also* 29 C.F.R. § 1614.106(e). Webster does not dispute that the charged violation centered on alleged harassment by Garland.

Instead, we focus on the amicus's contention that Webster satisfied the exhaustion requirement because the facts underlying her claim became apparent during the Navy's investigation. This theory of exhaustion does not square with the statute. As explained above, section 717(c) requires an employee to file a charge that identifies an alleged unlawful employment practice. The cases cited by the amicus are not to the contrary. They hold only that attachments to an administrative complaint count as part of the complaint, *Crawford*, 867 F.3d at 107, and that an employee may clarify ambiguities in the charge during the ensuing investigation, *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985); *President*, 627 F.2d at 360–63. The amicus cites no authority, and we find none, for the proposition that a plaintiff has exhausted any possible Title VII claim lurking in the administrative record that neither was raised as, nor is "like or reasonably related to," the charged violations. Accepting this theory of exhaustion would invert the basic rule that the employee must identify for the agency the claims that she wishes to pursue.

Finally, even if we were to look past the charge to what happened during the Navy's investigation, Webster never indicated that she wished to pursue a retaliation claim based on Croley's disclosure of her EEO activity. To the contrary, while the charge at least had some link to Croley as the alleged enabler of Garland's harassment, Webster affirmatively disavowed even that much during the investigation. When asked to elaborate on her claim, Webster said that it was *not* about Croley's conduct. J.A. 77 ("Q: You allege that Mr. Croley permitted a [hostile] work environment … correct? A: No, I am not …. I filed [an] EEO complaint against Mr. Rich Garland." (cleaned up)). Although Webster mentioned in passing the possibility that Croley may have disclosed her EEO history to Garland, that statement was purely speculative. J.A. 88 ("[F]or all I know, [Croley] could have been the person who

discussed my prior EEO activity with Mr. Garland that led him to call me 'trouble.''"). That conjecture fell far short of suggesting even a claim that Croley retaliated by needlessly disclosing her prior EEO activity to an IT contractor, much less one that Croley retaliated by disclosing the activity to his own second-in-command.

## IV

Because Webster failed to present her retaliation-by-disclosure claim to the Navy before filing this lawsuit, we affirm the order dismissing it.[3]

*So ordered.*

[3] Because we decide this appeal on exhaustion grounds, we modify the order of dismissal to be without prejudice as to Webster's retaliation-by-disclosure claim. *See Lee v. USAID*, 859 F.3d 74, 79 (D.C. Cir. 2017). We express no opinion on whether Webster may still pursue that claim administratively.

# EXHIBIT D



# TYVASO DPI FITS IN THE PALM OF YOUR HAND

Ask your healthcare provider about the **D**ry **P**owder **I**nhaler (**DPI**) option now approved for TYVASO.

**CONVENIENTLY PORTABLE**

**SINGLE-DOSE CARTRIDGES PREFILLED WITH MEDICINE**

**JUST 1 BREATH PER CARTRIDGE, 4X DAILY**

How to use TYVASO DPI

**Taking a dose is as simple as:**
JUST ONE BREATH—
OPEN, LOAD, INHALE

**Watch this video** to see how simple it is to use TYVASO DPI.

## 98% Patient Satisfaction with TYVASO DPI

**TYVASO DPI received high satisfaction marks** from 45 of 46 people in a clinical study who switched from the TYVASO nebulizer.*

# DOSING WITH TYVASO DPI

### The simple-to-use TYVASO DPI fits in the palm of your hand.

**DOSES ARE TAKEN IN 1 BREATH PER CARTRIDGE, 4X DAILY. MOST PATIENTS USE JUST 1 CARTRIDGE.**

- Available in a **variety of cartridge strengths,** which are color-coded to help you know which ones to take
- Each dose is inhaled in **less than 2 seconds**



**IMPORTANT SAFETY INFORMATION** EXPAND +

**Before you take TYVASO or TYVASO DPI, tell your healthcare provider about all of your medical conditions, including if you:**

- Have low blood pressure
- Have or have had bleeding problems

Each kit is conveniently packed with a **4-week supply** of disposable inhalers and cartridges.

*In the clinical study, 51 people with PAH who had been using the TYVASO nebulizer for at least 3 months switched to TYVASO DPI. Researchers recorded side effects, and after 3 weeks, 46 patients rated their satisfaction with TYVASO DPI in a questionnaire.

## Learn more about TYVASO for

**PAH** (WHO Group 1)
Pulmonary arterial hypertension

**PH-ILD** (WHO Group 3)
Pulmonary hypertension associated with interstitial lung disease

## IMPORTANT SAFETY INFORMATION

COLLAPSE —

**Before you take TYVASO or TYVASO DPI, tell your healthcare provider about all of your medical conditions, including if you:**

- Have low blood pressure
- Have or have had bleeding problems
- Have asthma or chronic obstructive pulmonary disease (COPD)
- Are pregnant or plan to become pregnant. It is not known if either product will harm your unborn baby.
- Are breastfeeding or plan to breastfeed. It is not known if either product passes into your breast milk. Talk to your healthcare provider about the best way to feed your baby during treatment.

**Tell your healthcare provider about all of the medicines you take,** including prescription and over-the-counter medicines, vitamins, and herbal supplements. Either product and other medicines may affect each other.

**Especially tell your healthcare provider if you take:**

- Medicines used to treat high blood pressure or heart disease
- Medicines that decrease blood clotting (anticoagulants)
- Water pills (diuretics)
- Gemfibrozil (Lopid®) or rifampin (Rimactane®, Rifadin®, Rifamate®, Rifater®)

**What are the possible side effects of TYVASO or TYVASO DPI?**

Both products can cause **serious side effects,** including:

- **Low blood pressure** (symptomatic hypotension). If you have low blood pressure, either product may lower your blood pressure more.
- **Bleeding problems.** Either product may increase the risk of bleeding, especially in people who take blood thinners (anticoagulants).

**The most common side effects** of both products are cough, headache, throat irritation and pain, nausea, reddening of the face and neck (flushing), fainting or loss of consciousness, dizziness, diarrhea, and shortness of breath. Like other inhaled prostaglandins, you may have trouble breathing after taking TYVASO or TYVASO DPI because it may cause the muscles around your airway to tighten (bronchospasm). These are not all the possible side effects. Call your doctor for medical advice about side effects or if you have trouble breathing.

**You may report side effects to the FDA at www.fda.gov/MedWatch or call 1-800-FDA-1088.**

### What are TYVASO and TYVASO DPI?

TYVASO (treprostinil) Inhalation Solution and TYVASO DPI (treprostinil) Inhalation Powder are prescription medicines used in adults to treat:

- Pulmonary arterial hypertension (PAH; WHO Group 1), which is high blood pressure in the arteries of your lungs. TYVASO or TYVASO DPI can improve the ability to exercise. Your ability to exercise decreases 4 hours after taking TYVASO or TYVASO DPI. It is not known if TYVASO or TYVASO DPI is safe and effective in children under 18 years of age.
- Pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3), which is high blood pressure in the lungs due to inflammation and sometimes scarring in the lungs. TYVASO or TYVASO DPI can improve the ability to exercise.

**The risk information provided here is not comprehensive. To learn more about TYVASO or TYVASO DPI, talk with your healthcare provider. Please see Full Prescribing Information for TYVASO or TYVASO DPI, Instructions for Use manuals for TD-100 and TD-300 TYVASO® Inhalation System and TYVASO DPI™ Inhalation Powder, and additional information at www.TYVASO.com or call 1-877-UNITHER (1-877-864-8437).**

TYVISIconMAY2022

WHO=World Health Organization.

Privacy Policy
Terms of Use

United Therapeutics CORPORATION

TYVASO is a registered trademark and TYVASO DPI is a trademark of United Therapeutics Corporation.

© 2022 United Therapeutics Corporation. All rights reserved. US/TYV/0576

IMPORTANT SAFETY INFORMATION

EXPAND +

**Before you take TYVASO or TYVASO DPI, tell your healthcare provider about all of your medical conditions, including if you:**

- Have low blood pressure
- Have or have had bleeding problems